**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and and ST. PAUL MERCURY INSURANCE COMPANY, | : : : : | C. A. NO. 1:06-CV-00412 SLR |
| Plaintiffs, | : |
| v. | : : : TRIAL BY JURY OF |
| FISHER CONTROLS INTERNATIONAL, LLC, | : : TWELVE DEMANDED |
| Defendant. | : |

## DEFENDANT FISHER CONTROLS INTERNATIONAL
## LLC'S ANSWER AND COUNTERCLAIM
## TO PLAINTIFFS' COMPLAINT

Defendant Fisher Controls International, LLC ("Fisher"), by and through its attorneys of

record, answers plaintiffs' Complaint and asserts affirmative defenses as set forth below. Each

allegation not specifically admitted shall be deemed denied:

### INTRODUCTION

1.    Responding to paragraph 1 of the Complaint, Fisher admits that this is a

contractual indemnification action; admits that the actions identified were filed; and admits that

the action filed by Great American Assurance Company was consolidated with actions filed by

Motiva Enterprises, LLC and Praxair, Inc. Responding further, Fisher denies that it was

obligated to defend and/or indemnify Northeast Controls for its own negligence in any of those

actions.

## PARTIES

2.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 2 of the Complaint and therefore denies the same.

3.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 3 of the Complaint and therefore denies the same.

4.     Admitted.

5.     Admitted.

6.     Admitted.

7.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 7 of the Complaint and therefore denies the same.

## JURISDICTION AND VENUE

8.     Admitted.

9.     Admitted.

## BACKGROUND RELEVANT TO THE CLAIM

10.    Answering paragraph 10 of the Complaint, Fisher admits that Northeast Controls, Inc. ("Northeast Controls") and Fisher entered into a Representative Agreement on or about January 1, 1998, but denies that the document attached as Exhibit "A" to the Complaint is the entire Representative Agreement. Responding further, Fisher states that the Representative Agreement speaks for itself.

11.    Fisher admits that the Representative Agreement contains the passage set forth in paragraph 11 of the Complaint, but does not contain the emphasis added by plaintiffs. Responding further, Fisher states that the Representative Agreement speaks for itself.

12.     Admitted.

13.     Admitted.

14.     Admitted.

15.     Admitted. Responding further, Fisher states that Northeast Controls failed to place the purchase order for the valve tagged as "83HV0629" in accordance with specifications provided by Praxair to plaintiff. Northeast Controls' failure to do so breached its contract with Fisher and breached the duty of care owed by Northeast Controls to persons, including itself, who could foreseeably be injured by Northeast Controls' failure to place the order in accordance with the specifications provided by Praxair. Further, Northeast Controls' negligent performance of its obligations under the Representative Agreement caused the losses suffered by Northeast Controls in the underlying actions.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Responding to paragraph 21 of the Complaint, Fisher admits that a fire occurred at the Delaware City Power Plant Repowering Project on or about May 20, 2000, but denies that the fire occurred "during re-powering of the ASU."

22.     Admitted.

23.     Responding to paragraph 23 of the Complaint, Fisher admits that, in the underlying actions, allegations were made that Praxair, Parsons Corporation ("Parsons"), and

Motiva sustained property damage as a result of the May 20, 2000, fire. Responding further,
Fisher states that, on information and belief, neither Praxair nor Parsons suffered property
damage as a result of the fire that occurred on May 20, 2000, at the Delaware City Power Plant
Repowering Project.

24.    Fisher lacks knowledge or information sufficient to form a belief as to the
allegations set forth in paragraph 24 of the Complaint and therefore denies the same.

25.    Admitted.

26.    Fisher admits that the Great American Complaint contains the passage set forth in
paragraph 26 of the Complaint, but denies that the quoted passage is the entirety of the
Complaint. Responding further, Fisher states that Northeast Controls' characterization of the
Great American Complaint is partial and misleading and that the Great American Complaint
speaks for itself.

27.    Denied. Responding further, Fisher states that Northeast Controls'
characterization of the Great American Complaint is partial and misleading and that the Great
American Complaint speaks for itself.

28.    Fisher admits that the Great American Complaint "alleged that the defects, among
other things, caused the fire and resulting damage," but states that Northeast Controls'
characterization of the Great American Complaint is partial and misleading and that the Great
American Complaint speaks for itself.

29.    Admitted.

30.    Fisher admits that paragraph 43 of the Olsons' Complaint alleges defects in the
Fisher valve and further alleges that those defects caused injuries to Ronald and Carol Olson, but

states that Northeast Controls' characterization of the Olsons' Complaint is partial and misleading and that the Olsons' Complaint speaks for itself.

31.    Denied.

32.    Admitted.

33.    Admitted.

34.    Denied. Responding further, Fisher states that the letter attached as Exhibit "F" speaks for itself.

35.    Denied. Responding further, Fisher states that it fully defended the valve in the underlying actions; that it was not obligated to defend Northeast Controls for its negligence; and that all of Northeast Controls' losses in the underlying actions were caused by Northeast Controls' breach of its contract and its negligent conduct in failing to provide Fisher with the specifications for the valve that Praxair had provided to Northeast Controls.

36.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 36 and therefore denies the same.

37.    Denied. Responding further, Fisher states that the Representative Agreement speaks for itself.

38.    Fisher admits that Great American and the Olsons both alleged the presence of defects in the Fisher valve, but states that Northeast Controls' characterization of those Complaints is partial and misleading and that those Complaints speak for themselves. Responding further, Fisher states that Great American voluntarily dismissed Fisher, but not Northeast Controls, from the Great American action. Fisher also states that the Olsons later

agreed that there were no defects in the Fisher valve and therefore agreed to entry of judgment on behalf of Fisher, but did not agree to the dismissal of Northeast Controls from the Olson action.

39.     Fisher admits that Praxair and Motiva both filed suits alleging that the Fisher valve was defective and that separate counsel appeared for Northeast Controls in the lawsuits filed by those entities. Responding further, Fisher states that Northeast Controls' characterization of the Praxair and Motiva complaints is partial and misleading and that those Complaints speak for themselves. Fisher also states that the plaintiffs in the Praxair and Motiva actions alleged that Northeast Controls was negligent and that the evidence confirmed that negligence.

40.     Admitted.

41.     Denied. Fisher admits that opinions of Dr. Robert. A. Mostello (Fisher's retained expert) are attached as Exhibit G to plaintiff's complaint. Those documents speak for themselves. Fisher denies each and every other allegation set forth in paragraph 41 in plaintiff's complaint.

42.     Denied. Fisher admits that opinions of Dr. Robert. A. Mostello (Fisher's retained expert) are attached as Exhibit G to plaintiff's complaint. Those documents speak for themselves. Fisher denies each and every other allegation set forth in paragraph 42 in plaintiff's complaint.

43.     Denied.

44.     Denied.

45.     Denied.

{99999.00936 / W0066626}291/530386.02
41155.00412

6

46.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 46 of the Complaint and therefore denies the same.

47.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 47 of the Complaint and therefore denies the same.

48.     Denied.

49.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 49 of the Complaint and therefore denies the same.

50.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 50 of the Complaint and therefore denies the same.

51.     Denied.

52.     Denied.

53.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 53 of the Complaint and therefore denies the same.

54.     Denied.

## AFFIRMATIVE DEFENSES

1.     Plaintiffs' damages, if any, should be barred or reduced proportionally under the doctrines of contributory negligence and/or comparative fault.

2.     The various causes of action alleged in the Complaint are barred in whole or in part by the statute of limitations.

3.     The various causes of action alleged in the Complaint are barred in whole or in party by the principles of issue and/or claim preclusion.

4.     Northeast Controls failed to mitigate its damages, if any.

{99999.00936 / W0066626}291/530386.02
41155.00412                                         7

5.    Fisher is entitled to recoupment in the form of a reduction in the amount of Plaintiff's recovery in this lawsuit, if any, in the amount of attorneys fees and costs Fisher incurred in defending the underlying actions, which fees and costs were incurred by Fisher as a direct result of Northeast Controls' breach of contract and negligence in transmitting Praxair's specifications to Fisher.

6.    Fisher reserves the right to assert additional affirmative defenses disclosed through discovery or otherwise.

## COUNTERCLAIM

By way of counterclaim against plaintiff Northeast Controls, Inc., defendant Fisher Controls International, LLC ("Fisher"), by and through its counsel of record, alleges as follows:

## JURISDICTION

1.    This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1332(a).

2.    This Court has jurisdiction over Fisher's counterclaim against plaintiff Northeast Controls under 28 U.S.C. § 1367(a) and Fed. R. Civ. P. 13(a).

## PARTIES

3.    Based on allegations in plaintiffs' Complaint, plaintiff Northeast Controls is a New York corporation with its principal place of business in Clifton Park, New York.

4.    Fisher is a Delaware limited liability company with a principal place of business in Marshalltown, Iowa.

## FACTUAL ALLEGATIONS

5.    At all times material to Fisher's counterclaims, Northeast Controls and Fisher were parties to a Representative Agreement. A true and correct copy of the Representative Agreement is attached as Exhibit 1 to this Answer and Counterclaim.

6.    At all times material to Fisher's counterclaims, Fisher and Praxair, Inc. ("Praxair") were parties to a Worldwide Procurement Agreement. A true and correct copy of the Worldwide Procurement Agreement is attached as Exhibit 2 to this Answer and Counterclaim. The president of Northeast Controls signed the Worldwide Procurement Agreement on behalf of Northeast Controls.

7.    The Worldwide Procurement Agreement called for Fisher to manufacture its products supplied to Praxair in accordance with Praxair's specifications for those products.

8.    Under the terms of the Representative Agreement, and in accordance with the Worldwide Procurement Agreement, Northeast Controls placed orders with Fisher for control valves ordered by Praxair through Northeast Controls.

9.    Under the terms of the Representative Agreement, Northeast Controls was required to maintain documentation relating to the services that it provided in placing orders with Fisher for control valves ordered by Praxair through Northeast Controls.

10.    In 1996, Northeast Controls placed orders with Fisher for control valves for an air separation unit ("the ASU") that was being constructed by Praxair as part of the Delaware City Power Plant Repowering Project.

11.     The ordering and purchase of the control valves identified in paragraph 6 of this Counterclaim were governed by the Worldwide Purchasing Agreement between Fisher and Praxair.

12.     Northeast Controls' work in ordering the control valves identified in paragraph 10 of this Counterclaim was governed by the Representative Agreement between Fisher and Northeast Controls.

13.     On or about June 3, 1996, Praxair provided Northeast Controls with specifications for a 12" Type A11 valve that was to be identified or "tagged" as valve 83HV0629. Valve 83HV0629 is referred to hereafter as "the Valve."

14.     As part of the order process for the Valve, Praxair provided specifications to Northeast Controls for the Valve. A true and correct copy of Praxair's specifications for the Valve is attached as Exhibit 3 to this Answer and Counterclaim.

15.     Bert Cappellini was Northeast Controls' designated representative for purposes of Praxair's ordering of the Valve. In his capacity as representative of Northeast Controls, Bert Cappellini initialed Praxair's specifications for the Valve as set forth in Exhibit 3.

16.     The document attached as Exhibit 3 to this Answer and Counterclaim was the only document relating to the purchase and sale of the Valve exchanged between Praxair and Northeast Controls that contained the initials of Bert Cappellini, as representative for Northeast Controls, and any representative for Praxair.

17.     The specifications provided by Praxair, and initialed by Bert Cappellini, called for the Valve to have, among others, the following specifications: a disk manufactured of Monel; a shaft made of Monel; Monel bearings; and a seal manufactured of Monel/PTFE.

{99999.00936 / W0066626}291/530386.02
41155.00412                                             10

18.     Acting as Northeast Controls' representative, Bert Cappellini transmitted specifications to Fisher for the Valve.

19.     The specifications transmitted by Northeast Controls to Fisher for the Valve did not match the specifications provided to Northeast Controls in the only document signed by representatives for both Praxair and Northeast Controls. Specifically, the specifications that Northeast Controls transmitted to Fisher called for a disk manufactured of Hastelloy C; a shaft manufactured of Inconel 718; bearings manufactured of TFE composite; and a seal manufactured of Tefzel.

20.     Northeast Controls did not inform Praxair that Northeast Controls had provided Fisher with specifications for the Valve that differed from the specifications Praxair provided to Northeast Controls and Bert Cappellini accepted on behalf of Northeast Controls.

21.     Before the fire at issue in this matter, Northeast Controls never informed Fisher that Praxair had never agreed to purchase a Valve manufactured in accordance with the specifications provided by Northeast Controls to Fisher in relation to the Valve at issue.

22.     After Fisher received Northeast Controls' specifications for the Valve, a Fisher representative telephoned Bert Cappellini and recommended that the specification for the Valve seat be changed from Tefzel to Kel-F.

23.     Northeast Controls agreed that Fisher should change the material for the Valve seat from Tefzel to Kel-F.

24.     Northeast Controls did not obtain Praxair's approval for the change in the material for the Valve seat from Tefzel to Kel-F. Nor did Bert Cappellini ever obtain Praxair's approval to use Kel-F in the Valve seat.

25.     Northeast Controls never informed Fisher that Praxair had requested that the

Valve be manufactured using a Monel disk; a Monel shaft; Monel bearings; and a Monel/PTFE

seat.

26.     Northeast Controls never informed Praxair that Fisher had manufactured the

Valve using materials different from those specified by Praxair to Northeast Controls.

27.     Fisher manufactured the Valve in accordance with the specifications set forth in

the communications between Northeast Controls and Fisher.

28.     On May 20, 2000, an incident ("the Incident") occurred at the Delaware City

Power Plant Repowering Project.

29.     The Incident involved the Fisher Type A11 valve tagged "83HV0629."

30.     Following the Incident, four lawsuits ("the Underlying Actions") were filed

against Fisher Controls International, Inc.

31.     In each of the Underlying Actions, the allegations against Fisher rested on the

alleged failure of the Fisher Valve to comply with the specifications provided by Praxair to

Northeast Controls.

32.     In the Underlying Actions, none of the parties ever adduced any evidence showing

or tending to show that the Fisher Valve was defective in design or manufacture.

33.     In response to Northeast Controls' demand that Fisher defend and indemnify

Northeast Controls in regard to the Underlying Actions, Fisher informed Northeast Controls that

Fisher would defend Northeast Controls against any claim that the Valve was defective in design

or manufacture.

34.     Fisher further informed Northeast Controls that it (Fisher) would not defend Northeast Controls against Northeast Controls' own negligence.

35.     In the Underlying Actions, Fisher defended the design and manufacturing of the Valve.

36.     Fisher filed motions for summary judgment in all four of the Underlying Actions.

37.     In the four Underlying Actions, Fisher's counsel drafted the motions for summary judgment identified in paragraph 36 of this Counterclaim.

38.     In the Underlying Actions, Fisher's counsel provided drafts of Fisher's motions for summary judgment to counsel for Northeast Controls before filing those motions.

39.     Northeast Controls did not file any motions for summary judgment in any of the Underlying Actions.

40.     After Fisher filed its motion for summary judgment as to all claims asserted by Motiva, Motiva voluntarily dismissed all of its claims.

41.     After Fisher filed its motion for summary judgment as to all claims asserted by Great American, Great American voluntarily dismissed all of its claims against Fisher.

42.     Great American did not voluntarily dismiss its claims against Northeast Controls.

43.     The state court granted Fisher's motion for summary judgment as to all claims asserted by Praxair against Fisher.

44.     After Fisher filed its motions for summary judgment in the Olson action, all of the parties to that action, including Northeast Controls, agreed to Fisher's dismissal from the Olson action.

## **COUNTERCLAIM**

## **BREACH OF CONTRACT**

45.     Fisher hereby incorporates the allegations set forth in paragraphs 1-44 of its Counterclaim as if fully set forth herein.

46.     The claims against both Northeast Controls an Fisher in the Underlying Actions were the direct result of Northeast Controls' failure to convey to Fisher the specifications provided for the Valve by Praxair to Northeast Controls.

47.     In failing to convey to Fisher the specifications provided for the Valve by Praxair, Northeast Controls breached the Representative Agreement.

48.     Northeast Controls' breach of the Representative Agreement caused Fisher damages, including but not limited to the costs incurred in defending the Olson, Praxair, Motiva, and Great American actions.

49.     In defending the Underlying Actions, Fisher incurred attorneys fees and costs in an amount to be proven at trial.

50.     In defending the Underlying Actions, Fisher incurred expert fees in an amount to be proven at trial.

51.     The attorneys fees and expert fees incurred by Fisher were reasonable.

52.     Fisher is entitled to recoupment in the form of a reduction in the amount of Plaintiff's recovery in this lawsuit, if any, in the amount of the attorney fees, costs and expert fees incurred in defending the underlying action.

WHEREFORE, Fisher demands judgment in its favor, reducing the amount of Northeast Controls' recovery, if any, in the amount of the attorney fees, costs and expert fees incurred in

{99999.00936 / W0066626}291/530386.02
41155.00412                                14

defending the underlying action, together with all costs and expenses for defending this action

and any other such relief as the Court may deem equitable and just.

MARON & MARVEL, P.A.

By:  /s/ Paul A. Bradley
     Paul A. Bradley (DE Bar Id No. 2156)
     Maron & Marvel, P.A.
     1201 N. Market St, Ste. 900
     Wilmington, DE 19801
     (302) 425-5177 (Tel.)
     (302) 425-0180 (Fax)
     pab@maronmarvel.com

Date: August 18, 2006

Of Counsel:

Patrick D. McVey, Esquire
Daniel J. Gunter, Esquire
Riddell Williams P.S.
1001 Fourth Avenue Plaza
Suite 4500
Seattle, WA  98454
(206) 624-3600
(206) 389-1708 facsimile

# EXHIBIT A

7/15/98 ·MON 13:01 FAX 716 879 235⁻    PRAXAIR PURCHASING

| ect:    STAR Delaware City P-8064 | SPECIFICATION FORM FOR PROCESS MEASUREMENT |
|---|---|
| : | Data Sheet    46 of    6/3/98 |
| : | Spec: |
|    46 | Tag:    83HV0629 |
| | DWG:    A-2272740 |
| _al: | Service:BLOC discharge isolation |

---

Fluid:   OXYGEN                                    Crit. Pres. PC:737.620 psia

| SERVICE CONDITIONS | Units | MAX | NRM | MIN | Shut-Off | OTH |
|---|---|---|---|---|---|---|
| Q | scfh | 2572200.0 | 2184800.0 | | | |
| P1 | psia | 1167.000 | 1167.000 | | 1300 psid | |
| P2 | psia | 1165.000 | 1165.000 | | | |
| T | deg F | 250.000 | 250.000 | | | |
| SG | | 1.105 | 1.105 | | | |
| Fk | | 1.000 | 1.000 | | | |
| CV | | 1095.733 | 930.654 | | | |
| Vlv LpA | dB(A) | <50.0 | <50.0 | | | |

---

PIPE LINE
   Size, Schedule In:12 in SCH STD
   Size,Schedule Out:12 in SCH STD
   Insulation:
VALVE BODY/BONNET    Type:BUTTERFLY
   Size:12"              ANSI 600
   Max Press:  1300 psig   Temp:300·F
   Mfg/Model:           FISHER/A11
   Body/Bonnet Matl: Hastelloy C
      iner Matl/ID:   NONE
      .d Connection In:WAFER
   End Connection Out:WAFER
   Flg Face Finish:  ANSI B16.5-81
   End Ext/Matl:
   Flow Direction:    Shaft UP Stream
BONNET    Type:       EXTENDED
   Lub-Iso Valve:          Lube:
   Packing Material: SINGLE TFE
   Packing Type:   V-RING, JAM TYPE

TRIM Type:          STANDARD
   Size:FULL       Travel: 90 Deg
   Characteristic:  MOD EQUAL PERCENT

   Rated Cv:2831    Fl:.520   Xt:.350
   Disk Material:   Monel
   Seat Material:   Monel/PTFE
   Guide Material:  Monel
   Stem Material:   Monel
   2 Asco sol. Model: 8316G2 24vdc
   piped per P&ID 3051
SPECIAL ACCESSORIES
   NEC:      Group:      Div:
   STANDARD NOTES SUPPLIED PER DWG
   A-2234221 ALT D
   1,2,4,11,13,15,16,17(2),18,23,24,
   25,26,28,29,30,31,32,35,43

   Torque Req.= 1264.9 FT-lbs
   Torque Gen.= 1350.0 Ft-lbs
   FF Dim.= 5.50"

| 53 | ACTUATOR Type:       PISTON,SPRING RTN |
|---|---|
| 54 | Mfg/Model:           FISHER/1031 |
| 55 | Size: 33102-SR        Eff Area: N/A |
| 56 | On/Off:                Modulating: YES |
| 57 | Spring Action:       CLOSE |
| 58 | Max Allow Press: 120 psig |
| 59 | Min Req'd Press: 80 psig |
| 60 | Available Air Supply Pressure |
| 61 | Max:120 psig    Min:90 psig |
| 62 | Bench Range:     N/A |
| 63 | Act Orientation: HORIZ. |
| 64 | Handwheel Type: NONE |
| 65 | Air Fails Valve: CLOSE  Set at: |
| 66 | Stroke time < 1 sec to close |
| 67 | Input Signal:       4-20 mA dc |
| 68 | POSITIONER Type:    SINGLE ACTING |
| 69 | Mfg/Model:          FISHER/3720 |
| 70 | Incr Signal Output: INCREASES |
| 71 | Gauges: SUPP & OUT   By-Pass: NONE |
| 72 | Cam Characteristic: LINEAR |
| 73 | |
| | SWITCHES |
| 74 | Type: POSITION TRANSMITTER   Qty: 1 |
| 75 | Mfg/Model:       Stonel/PQ70E1C |
| 76 | Contacts/Rating: |
| 77 | Actuation Points:4-20 MA |
| 78 | |
| | AIRSET |
| 79 | Mfg/Model:       FISHER/67AFD FILTER |
| 80 | Set Pressure:    n/a |
| 81 | Filter:YES        Gauges: No |
| 82 | |
| 83 | TESTS Hydro Press: |
| 84 | ANSI/FCI Leak Class: VI |
| 85 | Instrument overpressure protection |
| 86 | required Yes( ) No (x) |

| Rev | Date | Revision | Orig | App |
|---|---|---|---|---|
| | 6/3/98 | | BC | BSB |
| | | | CHK'D | REV'D |
| | | 1.42 HV0629-1 | BSB | BSB |

REPRESENTATIVE AGREEMENT

THIS AGREEMENT, made this 1st day of January, 1998, by and between FISHER CONTROLS INTERNATIONAL, INC. having its principal offices at 8000 Maryland Avenue, Clayton, Missouri 63105 (hereinafter called "Fisher"), and NORTHEAST CONTROLS, INC., ~~Sitterly Road~~, Clifton Park, NY 12065 (hereinafter called "Representative"). 3 Bodentschen Drive 

WHEREAS, Fisher desires to appoint on its own behalf and has been duly authorized by the other companies identified in Appendix A hereto (each such company, including Fisher, is hereinafter referred to individually as a "Fisher Company" and collectively as the "Fisher Companies") to appoint Representative as a sales, engineering and service representative for Products of the Fisher Companies upon the following terms and conditions; and

WHEREAS, Representative represents that it is qualified to act as such a representative for the Fisher Companies in the Territory defined in Section I below pursuant to such terms and conditions;

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

I.    APPOINTMENT AND TERRITORY

Fisher hereby appoints Representative during the term of this Agreement, and Representative hereby accepts such appointment, as a sales, engineering and service representative for the Fisher Companies and for their designated products and related services as further described herein (said products and related services hereinafter referred to as "Products") in the territorial area specified in Appendix C hereto (hereinafter referred to as the "Territory").

It is understood that the Products included in this Agreement are those manufactured or supplied by the Fisher Companies specified in Appendix A unless otherwise excluded by such Appendix. The Fisher Companies shall also have the right, at any time, to amend or modify any Appendix to this Agreement upon written notice to Representative. This Agreement does not include representation for other subsidiaries or affiliated companies of the Fisher Companies or their products or services unless specifically listed in Appendix A.

FCI 500032

1

## II.    OBLIGATIONS OF REPRESENTATIVE

Representative shall:

A.    Use its best efforts to fully promote, and pursue all reasonable opportunities in the solicitation of orders for, the Products in the Territory at such prices, license fees, and upon such terms and conditions as may be from time to time specified by the Fisher Company for whom orders are solicited. All such orders shall be promptly transmitted to the Fisher Company on whose behalf the orders were solicited and shall be subject to the written approval and acceptance of such Fisher Company. In no event shall Representative accept any order or otherwise attempt to bind any Fisher Company in any transaction unless specifically authorized by the appropriate Fisher Company. All remittances by the customer to whom Products are sold or licensed shall be made directly by the customer to the relevant Fisher Company.

B.    Except to the extent limited by, and subject to the terms of, Section VII and Appendix D hereof, furnish engineering services, consistent with Fisher's standards and practices, to customers and potential customers, including without limitation, reviewing and evaluating the requirements for the Products and participating in the selection and designation of the proper Products and specifications therefor.

C.    Except to the extent limited by, and subject to the terms of, Section VII and Appendix D hereof, furnish proper technical services to all users of the Products located or installed in the Territory, including without limitation, assistance in connection with the start-up, check-out and calibration of Products, the diagnosis of user inquiries concerning Products and the servicing of deficiencies in, and the performance of warranty obligations on, the Products in the manner specified from time to time by the Fisher Companies.

D.    Maintain in the Territory suitable premises, equipment and current technical and promotional literature for the Products, and employ sufficient and suitably qualified and trained technical, engineering and other competent personnel necessary to carry out the duties of Representative under this Agreement to the satisfaction of the Fisher Companies. Representative and its personnel shall maintain a working knowledge and familiarity with the Products, including associated services, and attend training sessions as appropriate to maintain such knowledge and familiarity.

E.    Keep the appropriate Fisher Companies fully informed of commercial and market conditions within the Territory and of the activities of customers and competitors, and regularly cover the trade and industry for the purposes of furthering sales of the Products.

F.    Provide the Fisher Companies periodically, as requested, with sales forecasts for the Products and customer evaluations.

G.    Assist, when requested, the Fisher Companies in obtaining relevant information relating to the financial standing and reputation of customers in order to evaluate credit risks.

H.    Maintain records in such form and in such detail as the Fisher Companies may reasonably request from time to time with respect to customers; outstanding quotations and orders; engineering and technical services and related activities, including plans,

2                                              FCI 500033

drawings and other documents; and any other business matters relating to the Products; and promptly transmit such records to the relevant Fisher Company upon request.

I.  Not incur any liability on behalf of the Fisher Companies, or in any way pledge or purport to pledge the Fisher Companies' credit, or describe or hold itself out as an agent or employee of the Fisher Companies, or describe itself other than as a sales representative of the Fisher Companies for the performance of functions specified in, and pursuant to, this Agreement; or make any warranties or representations of any kind with respect to the Fisher Companies, the Products, or any other products of the Fisher Companies, other than to present to the prospective customer the specifications and description of the Products in the identical terms as supplied by the Fisher Company to Representative.

J.  Not, without Fisher's prior written consent, which shall not be unreasonably withheld, sell or distribute any products which are competitive with the Products.

K.  Not advertise or distribute any printed matter referring to the Products or to the Fisher Companies without the specific prior approval in writing of the relevant Fisher Company with regard to the form, manner, and content of such advertising and printed matter. All advertising by Representative shall be without recourse to any Fisher Company for any expense incurred unless such expense shall have been specifically authorized in writing by the relevant Fisher Company.

L.  Confer with, and establish to the satisfaction of, the appropriate Fisher Companies, goals and strategies for representation during the year covering such matters as orders by Product line and Representative's management structure, staffing and territorial coverage. Appropriate adjustments may be made during the term of this Agreement in the goals and strategies to take into account material events and circumstances affecting the representation, such as positive or negative changes in external business and economic conditions or the introduction by the Fisher Companies of additional products and programs.

M.  Abide by all laws and governmental rules and regulations applicable to Representative's and the Fisher Companies' activities hereunder. The Representative shall not make any bribes, kickbacks, or payments to governmental officials to obtain business, or other illegal payments.

N.  In its capacity as a commission representative, follow sales strategy developed by the Fisher-Rosemount Industry Solutions Group on those projects which have been identified as appropriate for a total Fisher-Rosemount integrated approach through the Fisher-Rosemount Industry Solutions Group. In such situations, Representative will not independently pursue a strategy for sale of the Products which is inconsistent with such Group strategy.

FCI 500034

## III.   FISHER ASSISTANCE

The Fisher Companies shall support the activities of Representative with regard to its promotion of the Products, its solicitation of orders, and engineering and technical services. The Fisher Companies shall make available training and instruction for Representative and the Fisher Companies' customers with respect to the Products and shall make available to Representative technical data and literature covering the Products. Such training, instruction, technical data and literature will be provided at prices to be established from time to time by the Fisher Companies. The Fisher Companies shall advise Representative of their current price lists and discounts for their Products for purposes of soliciting orders hereunder.

The Fisher Companies reserve the right, in their absolute discretion, to decline to accept any order transmitted to them for acceptance by Representative or to decline to submit any tender on any inquiry transmitted to them by Representative.

## IV.   PURCHASE OF PRODUCTS FOR RESALE

In order to further its representative obligations hereunder, Representative agrees to purchase adequate quantities of Products, including spare parts, from the Fisher Companies for inventory purposes to meet the market demands and requirements of the Territory. Such Products will be sold to Representative at discounts from the then current published selling prices as established from time to time by the applicable Fisher Companies and under their standard terms and conditions of sale. Representative may extend the applicable Fisher Companies' warranties for such Products to its customer, provided such Products are not modified or are modified pursuant to and in accordance with the Fisher Companies' established procedures, but all other terms and conditions of resale, including price, are solely within the control and at the risk of Representative.

## V.   CONFIDENTIALITY PROVISIONS

As Representative may have heretofore received, and will in the future receive from time to time, confidential and proprietary information and data concerning the Products, research and engineering, developmental products and projects, business plans and operations of, or belonging to, the Fisher Companies and/or other companies with whom a Fisher Company has a business relationship (herein collectively referred to as "Fisher Information"), Representative agrees to treat, and to cause its officers and employees to treat, all such Fisher Information as the Fisher Companies' confidential property and not to divulge it to others at any time, or to use it for Representative's private purposes, or otherwise, except with the prior written authorization of the Fisher Company from which such Fisher Information originated and then only in the manner and to the extent authorized, unless or until such Fisher Information (a) becomes a part of the public domain, or (b) is known to Representative prior to any disclosure by a Fisher

4                                                    FCI 500035

Company. Representative's obligation hereunder further applies to Fisher Information received by Representative in the course of Representative's prior, if any, representative capacity with any Fisher Company and shall continue beyond and after the termination or expiration of this Agreement, and at the termination or expiration of this Agreement, or at any time a Fisher Company so requests, Representative shall deliver to the Fisher Company all notes, memoranda, records, drawings or other documents and other information or materials pertaining to the Fisher Information, including all copies and reproductions thereof. Representative further agrees to obtain similar written undertakings from each of its employees having access to the Fisher Information.

VI.    COMMISSIONS

A.    Subject to the provisions of Appendix E, the exceptions stated below in this Section VI, and to fulfillment of the undertakings by Representative to the Fisher Companies, the Fisher Company whose Products are sold in the Territory shall pay to the participating representative(s) and/or offices maintained by Fisher or its subsidiaries (hereinafter referred to as "sales office(s)", in consideration for its services hereunder, a purchasing, a territorial service, and/or an engineering commission with respect to the sale of Products by such Fisher Company in the Territory. The total available commission shall be computed on the basis of the F.O.B. Factory net price to the customer following discounts and allowances, if any, at the rates set forth in Appendix B hereto for the applicable Fisher Company. Payments will be made promptly following receipt of payment from the customer by the relevant Fisher Company. Commissions paid to Representative on any uncollectible account will be used as an offset against future commissions earned by, or invoiced to, Representative in accordance with its participation in the original commission payments. Representative agrees that the Fisher Companies may debit Representative's commission account any overdue amount owed by Representative to the Fisher Companies.

B.    The commission on sales of Products involving the active participation of more than one representative or sales office will be assigned to or proportioned between or among the participating representatives and sales offices by the Fisher Companies on the following basis:

1.    All Sales (excluding sales of replacement parts or repairs having invoice value of under U.S. **REDACTED**

a.    A *Purchasing Credit* of             of the total available commission shall normally be given by the applicable Fisher Company to the representative or sales office in whose territory the order originates and shall be based upon the representative's or sales office's efforts in soliciting the order and assisting the customer and its purchasing function in connection therewith; in preparing the quotation; in participating in the negotiation of the purchase order; and in

obtaining the order and the manner of processing the order through the relevant Fisher Company. *The Fisher Companies shall have the discretion to make exceptions to the foregoing in unusual situations.*

b. A ***Territorial Service Credit*** of REDACTED of the total available commission shall be given to the representative or sales office in whose territory the Product(s) is installed to cover the *representative's service obligations.*

c. An ***Engineering Credit*** of REDACTED of the total available commission will be given to the representative or sales office, or be retained, in whole or in part, by the applicable Fisher Company, based upon the engineering service provided to the customer. In determining the division of this credit, the Fisher Company will take into consideration the following aspects: (a) development of specifications to include Fisher Products; (b) detail engineering work with contractor or user, including quotations; (c) degree of insistence by ultimate user upon Fisher Products; (d) having contractor or user add the Fisher Companies to the list of acceptable bidders; and (e) the ratio of the engineering work carried out by Representative to the total engineering work required.

2. Replacement Parts or Repair Orders: REDACTED

   a. Where the invoice is under U.S. REDACTED, all available commissions will be paid to the representative or sales office in whose territory the purchase order originates.

   b. Where the invoice value is U.S. REDACTED or more, but less than U.S. REDACTED, the available commission will be REDACTED, and will be paid, respectively, to the representative or sales office in whose territory the purchase order originates and to the representative or sales office in whose territory the parts are installed.

   c. Where the invoice value is U.S. REDACTED or more, the available commission will be divided in accordance with the provisions of Section VI-B-1, above; i.e., Purchasing Credit, Territorial Service Credit, and Engineering Credit.

3. The final allocation of the available commission credits shall be determined at the discretion of the Fisher Companies in unusual circumstances. Consideration will be given to the work done by the representatives, sales offices, and the Fisher Companies.

4. Commissions paid under this Agreement on Products subsequently returned to Fisher shall be refunded in full by Representative, or at the Fisher Companies' discretion, may be charged back to Representative's commission account.

6

C.  Unless specifically indicated in Appendix A hereto, it is agreed that Representative shall not be entitled to the applicable commission(s) on the following sales of Products, which sales are excluded from this Agreement:

   1.  Sales to subsidiaries of Fisher (companies in which Fisher has a direct or indirect majority ownership interest) or sales to licensees of Fisher or to the licensees of its subsidiary companies.

   2.  Sales in respect of which Representative has failed to perform in accordance with the provisions of this Agreement.

   3.  Sales by Fisher Companies in the Territory resulting from orders not obtained by Representative if this Agreement provides in Section I that Representative is a non-exclusive representative for the sale of such Products.

D.  If a Fisher Company shall refuse to accept or execute any order as provided in this Agreement, the Representative shall not be entitled to any commission or other remuneration in respect thereof.

## VII.  CERTIFICATION AND SUPPORT FEES PAYABLE BY REPRESENTATIVE

Representative agrees to pay support fees and certification fees to the Fisher Company specified in Appendix D hereto in accordance with the terms of Appendix D. Certification fees, if any, shall be paid by the Representative no later than March 1. Support fees, if any, shall be paid within 30 days of the end of each calendar quarter during the term of this Agreement with respect to receipts by Representative of qualifying payments from the customer in such quarter. Representative agrees that the Fisher Companies may debit the Representative's account any overdue amount owed by the Representative to the Fisher Companies pursuant to this Section VII and to Appendix D.

## VIII.  TERM

A.  This Agreement shall be effective for a period of one (1) year from the date set forth in the opening paragraph of this Agreement and will automatically terminate at the end of such period unless specifically renewed upon the further written agreement of Fisher and Representative, but subject to cancellation at any time as provided in paragraph C below.

B.  In the event of termination of this Agreement, the Representative shall be entitled to receive commissions, pursuant to Section VI above, as follows:

   1.  Commissions accruing to Representative on all shipments made before the date of termination shall be paid subject to the provisions of this Agreement.

7                                    FCI 500038

2.   No Territorial Service Commission shall be paid to Representative on shipments of Products made after the date of termination. A Purchasing Commission will be paid only on shipments made within 90 days after termination. The Engineering Commission shall be paid only on shipments made within one (1) year after termination.

3.   Fifty percent (50%) of commissions becoming due and payable after date of termination will be held for one year after termination to protect the Fisher Companies from loss on returned or rejected Products unless Representative provides the Fisher Companies with a bond or guarantee in form and substance acceptable to Fisher.

4.   Representative will deliver to the Fisher Companies or otherwise dispose of per the Fisher Companies' instructions, all sales and pricing data, literature, engineering prints and reports, copies of requisitions and orders, customer correspondence and the like that pertain to the Products. Any literature, catalogs, or other sales data that has been purchased from the Fisher Companies by Representative, and is still current, may be returned to the Fisher Companies, and the full invoice price less any transportation costs borne by the Fisher Companies will be refunded.

C.   Fisher shall also have the right without prejudice to any other rights it may have in law or by contract, to terminate this Agreement on behalf of the Fisher Companies, effective immediately upon notice to Representative, as a result of any of the following:

1.   The insolvency of Representative or any of its owners/operators, or the filing of a voluntary or involuntary petition in bankruptcy or for a reorganization arrangement under applicable laws by or against any of them or their property; or the making of an assignment for the benefit of any of their creditors; or the voluntary or involuntary dissolution of Representative.

2.   The untrue statement of a material fact, or omission to state a material fact necessary to make the statements contained therein not misleading, in any information or statement furnished by Representative to a Fisher Company in connection with Representative's appointment as a Fisher Representative or Representative's performance pursuant to this Agreement.

3.   Any breach by Representative of any of the provisions of this Agreement or any other contractual or legal obligations of Representative to a Fisher Company.

4.   The non-attainment by Representative of the goals or strategies established pursuant to Section II.L.

8

FCI 500039

5. The death or incapacity, or removal or withdrawal from the management of Representative, of any owner or key manager; or the voluntary or involuntary transfer of any ownership interest in Representative.

6. Any act or omission of Representative or of any owner/operator which, in the sole opinion of Fisher, may damage or adversely affect or reflect upon Representative, a Fisher Company, the Products, or any performance pursuant to this Agreement.

D. Nothing contained herein shall be deemed to create any express or implied obligation on either party to renew or extend this Agreement or, if Representative is continued or renewed as a Fisher representative after the term hereof, to create any right to continue such relationship on the same terms and conditions contained herein. Each party, in its sole discretion, shall have the right to determine, for any reason whatsoever, not to renew, continue or extend this Agreement. In addition to the foregoing, it is recognized and accepted by Representative that it is Fisher's policy not to extend representative agreements to persons who are, or will be, or entities whose principal owner is or will be, during the term thereof, sixty (60) years of age, except in those instances where Fisher, in its sole discretion, deems it to be in the best interests of its business.

E. Neither party, by reason of the termination or non-renewal of this Agreement, shall be liable to the other for compensation, reimbursement or damages arising from any loss of anticipated sales or prospective profits or from any expenditures, investments, leases, property improvements or other matters related to the business or goodwill of the parties. Except as provided in Section VIII, there shall be no other payments of any kind or nature due to or made to Representative upon the cancellation or termination of this Agreement, notwithstanding any investment or expenditures incurred by Representative in order to facilitate the sale of Products hereunder.

## IX.  NON-ASSIGNMENT

Representative may not assign, transfer or delegate this Agreement or any of its rights or obligations under this Agreement without the prior written consent of Fisher, and any attempted assignment, transfer or delegation without such consent shall be deemed null and void and of no effect.

## X.  TRADEMARKS AND TRADE NAMES

A. Representative acknowledges the validity of the trademarks and trade names which designate and identify the Products and further acknowledges that Fisher or its subsidiaries or affiliates are the exclusive owners of such marks and names.

9

FCI 500040

B.   Representative agrees that it may only use those Product trademarks which identify the Products it is authorized to sell and then only to further the promotion and sale of the Products such trademarks identify. Representative may only use such trademarks in their standard form and style as they appear upon the Products or as instructed in writing by Fisher. No other letter(s), word(s), design(s), symbol(s), or other matter of any kind shall be superimposed upon, associated with or shown in such proximity to the trademarks so as to tend to alter or dilute them and Representative further agrees not to combine or associate any of such trademarks with any other trademark or trade name. The generic or common name of the Product must always follow the trademark except in those instances when Representative uses the name "FISHER" when referring to a Fisher Company, in which event no generic or common name is required.

C.   In all advertisements, sales and promotional literature or other printed matter in which any of such trademarks appear, Representative must identify itself by its full name and address and state its relationship to the Fisher Company. Every such trademark used or displayed by Representative must be identified as a trademark owned by the relevant Fisher Company in the manner prescribed by Fisher.

D.   On its letterheads, business cards, invoices, statements, etc., Representative or sales office may identify itself as the sales representative of the relevant Fisher Company or Companies.

E.   Representative agrees that it will never use any trademark or trade name of Fisher or its subsidiaries or affiliates or any simulation of such marks or names as a part of Representative's corporate or other trading name or designation of any kind.

F.   Upon expiration or termination of this Agreement, Representative shall promptly discontinue every use of such trademarks, trade names, corporate logos and identities, and any similar styles and any language stating or suggesting that Representative is a sales representative of any Fisher Company, as well as any word or term resembling such names, marks, logos, identities or styles which would be likely to cause confusion or deception.

## XI.   INDEMNITY

Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Representative from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. The obligations set forth in the immediately preceding sentence shall not apply unless

10                                      FCI 500041

Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses arising from the following:

A.    Any express warranty unauthorized by Fisher;

B.    Any distribution or sale of a Product for a purpose unauthorized by Fisher;

C.    Use of any instructions, labels, warnings or other product literature which have not been previously approved in writing by Fisher;

D.    Any failure by Representative to maintain any Product in merchantable condition;

E.    Demonstration, installation, servicing, modification or repair of any Product by Representative or any third party not in accordance with written warnings or instructions of Fisher, or

F.    Negligent acts or omissions by Representative.

## XII.    EXPENSES

All expenses incurred by Representative in carrying out this Agreement will be borne by Representative unless otherwise expressly provided herein.

## XIII.    GOVERNING LAW, ENTIRE AGREEMENT

The validity, interpretation and performance of this Agreement and any dispute connected herewith shall be governed and construed in accordance with the laws of the State of Missouri, U.S.A. This Agreement constitutes the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement. This Agreement cancels and supersedes all existing contracts and arrangements by and between Fisher, The Fisher Companies and the Representative for the representation of the Fisher Companies. Except as specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms and conditions of this Agreement shall be binding unless hereafter made in writing and signed by the party to be bound, and no modification shall be effected by the acknowledgment or acceptance of purchase order or shipping instruction forms containing terms and conditions at variance with or in addition to

11                          FCI 500042

those set forth herein.  No waiver by either Fisher, a Fisher Company or Representative with respect to any breach or default or of any right or remedy and no course of dealing, shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver be expressed in writing signed by the party to be bound.  If any term or condition of this Agreement or the application thereof is judicially or otherwise determined to be invalid or unenforceable, the remainder of this Agreement and the application thereof shall not be affected and shall remain in full force and effect.


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written by their respective authorized officials.


NORTHEAST CONTROLS, INC.               FISHER CONTROLS INTERNATIONAL, INC.
(Representative)

By _____         By _____
Title _____President_____          Title ___Area Vice President, Northeast___

FCI 500043

## APPENDIX A

## FISHER COMPANIES

Representative shall solicit orders for Products in the Territory only on behalf of the following specified Fisher Companies during the term of the Agreement.

Fisher Controls International, Inc.
205 South Center Street
Marshalltown, Iowa 50158
U.S.A.

Fisher Service Company
205 South Center Street
Marshalltown, Iowa 50158
U.S.A.

Fisher-Rosemount Limited
Medway House
Knight Road
Strood
Rochester, Kent
England ME2 2EZ

Fisher Controls Pty. Ltd.
102 Hassall Street
Wetherill Park
New South Wales, 2164
Australia

Fisher-Rosemount Systems, Inc.
8301 Cameron Road
Austin, Texas 78754

Fisher Rosemount S.A.
1 Rue Traversiere
Silic 125
94523 Rungis
France

Nippon Fisher Company, Ltd.
New Pier Takeshiba
South Tower 6F
1-161-1 Kaigan
Minato-Ku, Toyota
Japan

Fisher-Rosemount Singapore Pte. Ltd.
1 Pandan Crescent
Singapore 0512
Republic of Singapore

Fisher-Rosemount B.V.
P.O. Box 212
2280-AE Rijswijk
Netherlands

H. D. Baumann Inc.
35 Mirona Road
Portsmouth, NH 03801

Con-Tek Valves, Inc.
2177-G Flintstone Drive
Tucker, Georgia 30084

### EXCLUDED PRODUCTS
It is understood that this Agreement does not include representation for the following products of the above listed Fisher Companies:

* Liquified Petroleum Gas Regulators, fittings and associated parts or equipment.
* Farris safety/relief valves.

13                                          FCI 500044

## APPENDIX B-1
### Commissions Payable Under Representative Agreement for Products of
### FISHER CONTROLS INTERNATIONAL, INC.

The following commissions shall be applicable to the Representative Agreement between Fisher Controls International, Inc. and the Representative with respect to the Products of Fisher Controls International, Inc. The commission schedule may be changed at any time at the discretion of Fisher. The discount column refers to the percentage discount below Fisher Controls International, Inc.'s current selling price (commonly referred to as "consumer net price") at the time of the sale. Such discounts can only be granted or extended by Fisher Controls International, Inc..

FISHER CONTROLS INTERNATIONAL, INC.

MARSHALLTOWN, IOWA; SHERMAN, & McKINNEY, TEXAS; NORTH STONINGTON, CONNECTICUT; ATLANTA, GEORGIA

TABLE A – Control Valves, Accessories, other FCS Instrumentation and Regulators

| Discount | Commission | Discount | Commission |
|----------|------------|----------|------------|







TABLE A -- Control Valves, Accessories, other FCS Instrumentation and Regulators

| Discount | Commission | Discount | Commission |
|---|---|---|---|



**Commission remains        for discounts in excess of amount shown.

TABLE B -- Replacement Parts for Table A Products
Applies to all products identified by a part number.

| Discount | Commission | Discount | Commission |
|---|---|---|---|

Rev. 12/97
Apx. B1

15

FCI 500046

TABLE B -- Replacement Parts for Table A Products (cont.)

Discount ...................... Commission     Discount............................Commission
. . .

REDACTED

\*Commission applies to net selling price to customer.

\*\*Commission remains        ⌐ for discounts in excess of amount shown.

TABLE C -- Training, Buyouts and other Special Items

Commission

Education - Regional Training Schools ..............................................

Educational Video Training Packages ...............................................

FAS software, services and service contracts ....................................

Buyout Items (which complement standard products)........................

Buyout Items from competitors .....................................At discretion of Fisher

Cost Items (export boxing, special tooling, etc.) .....................................None

Special Priced Items .............. Determined at factory discretion when quoted

NOTE:   The commissions stated in Table A and B apply to the referenced
        discount amount and any discount between that amount and
        the next greater discount level.  For example, in Table A, a discount
        of          will cause commission to be calculated at the          rate.

APPENDIX B-2

Commissions Payable Under
Representative Agreement for Products of
FISHER SERVICE COMPANY

The following commissions shall be applicable to the Representative Agreement between
Fisher Controls International, Inc. (Fisher) and the Representative with respect to the
Products of Fisher Service Company. This commission schedule may be changed at any
time at the discretion of Fisher or Fisher Service Company. The discount column refers to
the percentage discount below Fisher Service Company's current selling price (commonly
referred to as "consumer net price") at the time of the sale. Such discounts can only be
granted or extended by Fisher Service Company.

FISHER SERVICE COMPANY

U.S. Locations                    Canadian Locations

Los Angeles, California          Burlington, Ontario
San Francisco, California        Edmonton, Alberta
Beaumont, Texas                  Montreal, Quebec
Houston, Texas                   Sarnia, Ontario
Longview, Texas
Mansfield, Ohio
Chicago, Illinois
Gonzales, Louisiana
Mobile, Alabama
Burlington, New Jersey
Columbia, South Carolina
Worcester, Massachusetts
Seattle, Washington
Appleton, Wisconsin
Detroit, Michigan
St. Louis, Missouri
Jacksonville, FL
Memphis, TN
Decatur, AL
Bangor, Maine
Cincinnati, Ohio

FCI 500048

Rev. 12/97                              17

Table A — New Assemblies

Refer to Appendix B, Table A (Control Valves, Accessories and Regulators) for Fisher Controls International, Inc..

Table B — Repair or Rebuild Valves, Instruments or Trim

|  | Commission |
|---|---|
| Repair Labor........................................................................................... | REDACTED |
| Buyout Items (which complement standard products).............................. | REDACTED |
| Competitor's Purchased Parts or Non-Fisher Buyout Items............................ None |

Table C — Parts

| Discount | Commission |
|---|---|
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | REDACTED |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |
| .................................................................................................... | |

FCI 500049

Table C -- Parts (continued)

Discount                                                              Commission

.............................................................................................

.............................................................................................

.............................................................................................

... .  .............................................................................................

*Commission applies to net selling price to customer.
**Commission remains      for discounts in excess of amount shown.

Table D -- Flow Scanner Diagnostics

Labor ......................................................................................

System Sales...........................................................................    REDACTED

Software ..................................................................................

Table E -- Encore Products:        Discount                     Commission*

          Standard Delivery              REDACTED    .....................................

          Expedited Delivery                         .....................................
          (Under two weeks)

* Commission indicated is a percent of standard delivery price.

Commissions shall be given to the Representative or Sales Office in whose
territory the repaired or rebuilt equipment is installed.

FCI 500050

APPENDIX B-3
Commissions Payable Under
Representative Agreement for Products of
H. D. BAUMANN INC.

The following commissions shall be applicable to the Representative Agreement between
Fisher Controls International, Inc. (Fisher) and the Representative with respect to the Products
of H. D. Baumann Inc. The commission schedule may be changed at any time at the
discretion of Fisher or H. D. Baumann Inc. The discount column refers to the percentage
discount below H. D. Baumann Inc.'s current selling price (commonly referred to as "consumer
net price") at the time of the sale. Such discounts can only be granted or extended by H. D.
Baumann Inc.

TABLE A - Control Valves, Accessories and Spare Parts

| Discount | Commission | Discount | Commission |
|----------|------------|----------|------------|
| ........................................ | | ................................ | |
| ........................................ | | ................................ | REDACTED |
| ........................................ | REDACTED | ................................ | |
| ........................................ | | ................................ | |
| ........................................ | | ................................ | |
| ........................................ | | ................................ | |
| ........................................ | | ................................ | |
| ........................................ | | ................................ | |
| ........................................ | | ................................ | |
| ........................................ | | ................................ | |
| ........................................ | REDACTED | ................................ | |
| ........................................ | | ................................ | REDACTED |
| ........................................ | | ................................ | |
| ........................................ | | ................................ | |
| ........................................ | | ................................ | |

*Commission remains      for discounts in excess of amount shown.

NOTE 1.  The commissions stated in Table A apply to the referenced discount amount and any
discount between that amount and the next greater discount level. For example, a
discount of      will cause commission to be calculated at the      rate.

TABLE B - Stocking Discounts

All Products.............................Consumer Net price less REDACTED

## APPENDIX B-4
### Commissions Payable Under Representative Agreement for Products of
### FISHER-ROSEMOUNT SYSTEMS, INC. and
### FISHER CONTROLS INC. (Cambridge, Ontario, Canada)

The following commissions shall be applicable to the Representative Agreement between Fisher Controls International, Inc. and the Representative with respect to the Products of Fisher-Rosemount Systems, Inc. and Fisher Controls Inc. (Cambridge). The commission schedule may be changed at any time at the discretion of Fisher, Fisher Controls Inc. (Cambridge) or Fisher-Rosemount Systems, Inc. The discount column refers to the percentage discount below Fisher Controls Inc.'s (Cambridge) or Fisher-Rosemount Systems, Inc.'s current selling price (commonly referred to as "consumer net price") at the time of the sale. Such discounts can only be granted or extended by Fisher-Rosemount Systems, Inc. or Fisher Controls Inc. (Cambridge), as applicable.

SECTION I: FISHER-ROSEMOUNT SYSTEMS DIVISION

TABLE A--PROVOX®, RS3, RMV, AMS Instrumentation
Applies to all products and options identified with a model number or FS number, except those identified as non-discountable.

| Discount | Commission | Discount | Commission |
|---|---|---|---|
| | REDACTED | | REDACTED |

FCI 500053

TABLE A -- PROVOX®, RS3, RMV, AMS Instrumentation (cont.)

| Discount | Commission | Discount | Commission |
|---|---|---|---|
| ..................................... | | ............................ | |
| .............................. | | ................................ | |
| ............................. | | .............................. | |
| ............................. | | .............................. | |
| ............................. | | .............................. | |
| ............................. | | .............................. | |
| ............................. | | .............................. | |
| ............................. | | ............................... | |
| ............................. | | ............................... | |
| ............................. | | ............................... | |

### Notes to Table A
1. The commissions stated in Table A apply to the referenced discount amount and any discount between that amount and the next greater discount level. For example, in Table A, a discount of [REDACTED] will cause commission to be calculated at the ___ rate.
2. Commission remains ___ for discounts in excess of amount shown unless specifically negotiated to a different amount.
3. Manager ___ products are excluded from this agreement.
4. All AMS products are currently non-discountable

### TABLE B -- DELTA V
DeltaV products and services will primarily be sold with the Representative functioning as a commissioned representative, according to the terms of this Agreement. With respect to this business, the Representative will be compensated according to the terms of Tables B AND D of this Appendix. However, if the DeltaV products being sold result in a single DeltaV system installation of less than ___ Device Signal Tags (DSTs), the mechanism for sale will be via resale, as described in Appendix F.

Since all currently released DeltaV products are covered by the resale agreement in Appendix F, the commission table for DeltaV will be determined at a later date.

### TABLE C -- REPLACEMENT PARTS FOR TABLE A PRODUCTS
Applies to all products identified by a part number.

| Discount | Commission | Discount | Commission |
|---|---|---|---|
| ............................. | | ............................ | |
| ............................. | | ............................ | |
| ............................. | | ............................ | |
| ............................. | | ............................ | |

TABLE C — REPLACEMENT PARTS FOR TABLE A PRODUCTS (cont..)

| Discount | Commission | Discount | Commission |
|---|---|---|---|
| ..................................... | | ..................................... | |
| ..................................... | REDACTED | ..................................... | |
| ..................................... | | ..................................... | |
| ..................................... | | ..................................... | |
| ..................................... | | ..................................... | |
| ..................................... | | ..................................... | REDACTED |
| ..................................... | | ..................................... | |
| ..................................... | | ..................................... | |
| ..................................... | | ..................................... | |

### Notes to Table C

1. Commission applies to net selling price to customer.
2. Commission remains      for discounts in excess of amount shown unless specifically negotiated to a different amount.
3. The commissions stated in Table C apply to the referenced discount amount and any discount between that amount and the next greater discount level. For example, in Table C, a discount of   REDACTED   will cause commission to be calculated at the  , rate.

TABLE D — Buyouts, Services and other Special Items

| Buyout Items | Commission |
|---|---|
| • Standard markup (Buyout cost x | |
| • Premium value (Greater than | REDACTED |
| • Pass through (Less than | |

    Determination of commission for Premium value or Pass through buyouts will be by FRSI factory based on actual markup and overall order content.

Standard Engineering Services ................................................. REDACTED

Premium Value/Consulting Services .........................................

    Premium Value Services is typically over USD 100 per man hour. Determination of commission by FRSI factory based on actual price ,type of service and overall order content.

Cost Items (export boxing, special tooling, etc.) ................................None

Special Priced Items .......... Determined at factory discretion when quoted

Non-Discountable Products ...........................................................

  
## SECTION II: FISHER-ROSEMOUNT INDUSTRY SOLUTIONS GROUP(ISG)

### REPRESENTATIVE SERVICES ON SOLUTIONS PROPOSALS/ORDERS

Although Fisher-Rosemount Industry Solutions is located in Austin, Texas and Burnsville, Minnesota, the Representative located in the territory where the Industry Solution proposal will be made shall provide necessary product specification and support for the proposal and resulting order.   For opportunities where a local Representative may not be available or, in the estimation of ISG, capable of the work required,  ISG may employ the services of the Representative where the Industry Solutions proposal is generated.

### COMMISSIONS

Commissions on orders placed with ISG are divided into two primary segments:

- Commissions for the sale of non-ISG products and services included in the order
- Commissions for the Solutions Other Value Added portion of the order

### A.    Fisher-Rosemount Products, Integrated Buyouts and Standard Services

Equal to the net customer price of all products, Integrated Buyouts (see definition below), and standard services of Fisher-Rosemount divisions served by the Representative.  Commission value will be determined by the applicable Appendix B commission schedule for those products and services.   Discount level and pricing applicable to each product type for purposes of commission calculation shall be determined by ISG.

### B.    Solutions Other Value Added

The Solutions Other Value Added amount is the difference between the net customer purchase price for an order and the total value of the Products, Integrated Buyouts and Services of all Fisher-Rosemount divisions which are included in the order.

Commissions based on the Solutions Other Value Added portion will be split between eligible Representatives and other Fisher-Rosemount sales channels based on product mix included in the order and efforts expended in winning the order.

Commission

The Solutions Other Value Added ... ... ... ... ... ... ... ... ... ... ...    REDACTED

*Commission allocated as follows:

    a.) Sales Leadership:
        The Sales Leadership portion of the Solutions Other Value Added
        commission will be allocated as determined at the sole discretion of the VP,
        North American Sales.

        Commission value =    ‹ Solutions Other Value Added

Rev. 6/97
Apx. B4                          REDACTED          25

b.)    Product Content:

Commission = .03 x Solutions Other Value Added  x  <u>Divisional Content</u>
                                                      Total F-R Content

Divisional Content  =              The value of products and services as
                                   determined in Section II.A

Total F-R Content  =               Sum of all Products, Integrated Buyouts
                                   and Services of all F-R Divisions
                                   included in the order.

NOTE.  Configuration Services subcontracted back to the Representatives
will not be included in the calculation of  Solutions Other Value Added
commissions.

## BUYOUT DEFINITION
For purposes of determining commissions related to ISG sales, buyouts are generally
defined as indicated below.  However, buyouts may be specifically  designated by ISG
as Integrated or Non-Integrated for any order.

Integrated Buyouts:
Products and Services obtained from entities other than a Fisher-Rosemount
controlled entity that are integrated, connected or become an essential part of a
Fisher-Rosemount  supplied product.  Commissions on Integrated Buyouts are
indicated in the specific division's commission schedule.   Examples of typical
Integrated Buyouts include:

|            |                                    |
|------------|------------------------------------|
| Valves:    | Flanges                            |
| FRSI:      | Terminal Blocks, Networks, PC's,   |
|            | Emergency Shutdown System, etc.    |

Non-Integrated Buyouts:
Products and Services obtained from entities other than a Fisher-Rosemount
controlled entity that stand alone and do not become a part of or connected to
Fisher-Rosemount products.  Commissions on Non-Integrated Buyouts are as
indicated for the Solutions Other Value Added portion of an order.  Examples of
typical Non-Integrated Buyouts include:

Hand Tools
Services not in the normal Fisher-Rosemount Scope, e.g.
     Installation
Skid Design/Manufacture

APPENDIX B-5
Commissions Payable Under
Representative Agreement for Products of
FISHER-ROSEMOUNT LIMITED
(U.K.)

The following commissions shall be applicable to the Representative Agreement
between Fisher Controls International, Inc. (Fisher) and the Representative with
respect to the Products of Fisher-Rosemount Limited. This commission schedule may
be changed at any time at the discretion of Fisher or Fisher-Rosemount Limited. The
discount column refers to the percentage discount below Fisher-Rosemount Limited's
current selling price (commonly referred to as "consumer net price") at the time of the
sale. Such discounts can only be granted or extended by Fisher-Rosemount Limited.

Control Valves, Accessories, other FCS Instrumentation and Regulators

| Discount | Commission | Discount | Commission |
|----------|-----------|----------|-----------|

REDACTED

- Special Items -- at the discretion of Fisher, based on cost and selling price.
- Replacement Parts sold at consumer net........    ....................................
- Replacement Parts sold at consumer net less    ....................................
- Repair and rebuild charges............................................................................
- Cost Items (export boxing, special purchased items, tooling, etc.)................
- Buyout Items...........................................................................At discretion of Fisher



APPENDIX B-6
Commissions Payable Under
Representative Agreement for Products of
FISHER CONTROLS S.A.
(France)

The following commissions shall be applicable to the Representative Agreement between Fisher Controls International, Inc. (Fisher) and the Representative with respect to the Products of Fisher Controls S.A. This commission schedule may be changed at any time at the discretion of Fisher or Fisher Controls S.A. The discount column refers to the percentage discount below Fisher Controls S.A.'s current selling price (commonly referred to as "consumer net price") at the time of the sale. Such discounts can only be granted or extended by Fisher Controls S.A.

CONTROL VALVES, ACCESSORIES, OTHER FCS INSTRUMENTATION & REGULATORS

| Discount | Commission | Discount | Commission |
|---|---|---|---|




- The above are inclusive of butterfly valve products manufactured by Fisher Controls S.A. However, major accessories (i.e., actuators, etc.) purchased other than from Fisher for use on butterfly assemblies ..........
- Special Items -- at the discretion of Fisher, based on cost and selling price.
- Replacement Parts sold at consumer net ..........   ........................
- Replacement Parts sold at consumer net less   ........................
- Repair and rebuild charges.................................................................
- Cost Items (export boxing, special purchased items, tooling, etc.)........
- Buyout Items ................................................................. At discretion of Fisher

APPENDIX B-7
Commissions Payable Under
Representative Agreement for Products of
FISHER-ROSEMOUNT B.V.
(Netherlands)

The following commissions shall be applicable to the Representative Agreement between Fisher Controls International, Inc. (Fisher) and the Representative with respect to the Products of Fisher-Rosemount B.V. This commission schedule may be changed at any time at the discretion of Fisher or Fisher-Rosemount B.V. The discount column refers to the percentage discount below Fisher-Rosemount B.V.'s current selling price (commonly referred to as "consumer net price") at the time of the sale. Such discounts can only be granted or extended by Fisher-Rosemount B.V.

PROVOX®, RS3 INSTRUMENTATION

| Discount | Commission | Discount | Commission |
|---|---|---|---|
| | | | ........................ REDACTED |
| | | Replacement Parts................. | |
| REDACTED | | Repair or Rebuild Charges .... | |
| | | Buyout Items ... At discretion of Fisher | |
| | | Cost Items (export boxing, etc.) .None | |

FCI 500060

APPENDIX B-8
Commissions Payable Under
Representative Agreement for Products of
FISHER-ROSEMOUNT SINGAPORE PRIVATE LIMITED
(Singapore)

The following commissions shall be applicable to the Representative Agreement between
Fisher Controls International, Inc. (Fisher) and the Representative with respect to the
Products of Fisher-Rosemount Singapore Private Limited. This commission schedule may
be changed at any time at the discretion of Fisher or Fisher-Rosemount Singapore Private
Limited. The discount column refers to the percentage discount below Fisher-Rosemount
Singapore Private Limited's current selling price (commonly referred to as "consumer net
price") at the time of the sale. Such discounts can only be granted or extended by Fisher-
Rosemount Singapore Private Limited.

TABLE A -- Control Valves, Accessories, Regulators, PRoVOX® Instrumentation (except as
noted below), and other Field Mounted Instruments

| Discount | Commission | Discount | Commission |
|---|---|---|---|

 

TABLE B -- PRoVOX® Instrumentation Spare Assemblies & Specified Stock Buyout
Products

| Discount | Commission |
|---|---|



TABLE C -- Parts, Buyouts, and other Special Items

Commission
* Replacement Parts sold at consumer net price.........................................
* Repair and Rebuild charges ..................................................................
* Buyout Items (which complement standard products).......................................
* Buyout Items from competitors.............................................. At discretion of Fisher
* Cost Items (export boxing, special tooling, etc.) ..............................................None
* Special Priced Items ......................... Determined at factory discretion when quoted

APPENDIX B-9
Commissions Payable Under
Representative Agreement for Products of
NIPPON FISHER COMPANY, LTD.
(Japan)

The following commissions shall be applicable to the Representative Agreement between Fisher Controls International, Inc. (Fisher) and the Representative with respect to the Products of Nippon Fisher Company, Ltd. The discount column refers to the percentage discount below Nippon Fisher Company, Ltd.'s current selling price (commonly referred to as "consumer net price") at the time of the sale. Such discounts can only be granted or extended by Nippon Fisher Company, Ltd.

CONTROL VALVES, ACCESSORIES, REGULATORS & OTHER FIELD MEASUREMENT INSTRUMENTS

| Discount | Commission | Discount | Commission |
|---|---|---|---|
| REDACTED | | REDACTED | |

- House Service Gas Regulators -- at the discretion of Nippon Fisher, based on cost and selling price.
- Special Items (such as buyout) -- at the discretion of Nippon Fisher, based on cost and selling price.
- Replacement Parts sold at consumer net........ ................................ REDACTED
- Replacement Parts sold at consumer net less ............................
- Repair and rebuild charges..................................................................
- Cost Items (export boxing, special purchased items, tooling, etc.) ........................ None



APPENDIX B-10
Commissions Payable Under
Representative Agreement for Products of
FISHER CONTROLS PTY. LIMITED
(Australia)

The following commissions shall be applicable to the Representative Agreement between Fisher Controls International, Inc. (Fisher) and the Representative with respect to the Products of Fisher Controls Pty. Limited. This commission schedule may be changed at any time at the discretion of Fisher or Fisher Controls Pty. Limited. The discount column refers to the percentage discount below Fisher Controls Pty. Limited's current selling price (commonly referred to as "consumer net price") at the time of the sale. Such discounts can only be granted or extended by Fisher Controls Pty. Limited.

TABLE A
Control Valves, Accessories, Regulators
Other Field Measurement Equipment
PRoVOX® Instrumentation

| DISCOUNT | COMMISSION | DISCOUNT | COMMISSION |
|----------|------------|----------|------------|
| REDACTED | REDACTED | REDACTED | REDACTED |

TABLE B
Minimum Engineered Products
(such as Posi-Seal Butterfly Valves)

| DISCOUNT | COMMISSION | DISCOUNT | COMMISSION |
|----------|------------|----------|------------|
| | | | REDACTED |
| REDACTED | REDACTED | REDACTED | |

—

TABLE C
Products Marketed by Fisher but Manufactured by Others
PRoVOX® Instrumentation Spare Assemblies

DISCOUNT                    COMMISSION

                    

TABLE D
Parts, Buyouts and Other Special Items

| | COMMISSION |
|---|---|
| Replacement parts sold at consumer net price ....... | ......... |
| Replacement parts sold at consumer net price less | ......... |
| Buyout items (which complement standard products) ............................... | |
| Buyout items from competitors ............................................... At discretion of Fisher | |
| Cost items (export boxing, special tooling, etc.).................................................... Nil | |
| Special priced items ...........................Determined at factory discretion when quoted | |

FISHER CONTROLS INTERNATIONAL, INC.
REPRESENTATIVE AGREEMENT

APPENDIX C
Territory Description

NORTHEAST CONTROLS, INC.
Clifton Park, New York

THE NORTHERN PORTION OF THE STATE OF NEW YORK, bordered on the
south by the counties of Dutchess, Ulster and Sullivan (these counties being in
the territory of Northeast Controls, Inc.).

THE FOLLOWING COUNTIES IN THE STATE OF MASSACHUSETTS:
Berkshire, Franklin, Hampshire and Hampden.

THE FOLLOWING COUNTIES IN THE STATE OF VERMONT:
Bennington and Windham.

FCI 500065

APPENDIX D

## CERTIFICATION AND SUPPORT FEES

<u>Section 1</u> - Representative shall make an election as to which of the following certifications it desires for purposes of the sale and servicing of the Products of Fisher-Rosemount Systems, Inc. ("FRSI").

Certification Level
A. Sales Office
B. Service Center
C. System Center
D. Engineering Center

In addition to electing certification in one of the above levels, Representative shall also maintain certification as a DeltaV Systems Integrator, which applies to DeltaV Products which result in a single DeltaV system installation of less than 751 Device Signal Tags (DSTs).

In addition to Representative's obligations in Section II of the Agreement, Representative will perform the services and comply with the requirements associated with the certifications it receives from FRSI, and such further requirements as FRSI may reasonably promulgate from time to time.

Any changes to the obligations associated with any certification level, or to the requirements of Representative with respect to its certification, shall be communicated in writing to Representative prior to the time Representative is required to make its election for certification. The certification status of the Representative during the previous Agreement shall apply during the term of this Agreement unless FRSI is notified by the Representative of its desire to change or if FRSI notifies the Representative that it no longer qualifies for the certification status in effect. Such notification by either party must occur by 1 March of each year of this Agreement.

<u>Section 2</u> - In the event FRSI fails or refuses to grant Representative the certification which Representative has elected, FRSI shall notify Representative thereof and shall thereupon grant Representative the certification for which, in the judgment of FRSI, Representative is qualified. Representative shall not hold itself out to any third party as being authorized by FRSI to perform any services relating to FRSI products for which Representative has not been certified by FRSI hereunder.

<u>Section 3</u> - In consideration of future certification of Representative as provided herein, Representative agrees to pay FRSI: (a) a certification fee, if any, for the certification

35

Rev. 12/97
Apx. D

Representative receives from FRSI, in accordance with the schedule below; and (b) a support fee equal to ¡ REDACTED , for each REDACTED of Installed Base. For purposes of this Appendix D, Installed Base shall be equal to the sum of all FRSI shipments of FRSI hardware, software and services into the Territory, excluding buyouts, during the most recent seven year period ending September 30, as determined by FRSI. Such Support Fee will be computed by FRSI and invoiced quarterly in equal parts, beginning in the January following the end of the seven year period.

Schedule of Certification Fees

| Office Certification Level | Certification Fee |
|---|---|
| Sales Office | |
| Service Center | |
| Systems Center | REDACTED |
| Engineering Center | |
| Delta V Systems Integrator | |

* Waived if Representative is certified as a Systems Center or as an Engineering Center.

Section 4 – The certification and support program shall be administered by FRSI, and it shall have authority to issue rules and regulations in implementing and administering such program. This Appendix D may be modified at any time at the discretion of FRSI.

Rev. 12/97
Apx. D

FCI 500067

APPENDIX E
POLICY ON COMMISSIONS
FOR
ORDERS PLACED OUTSIDE NORTH AMERICA

The following describes the policy and method of allocating commission payments for Representative for any order placed outside of North America.

1.0    Definitions:  The following definitions apply only to this Appendix E:
    1.1    Customer Net Price - The final selling price  after application of all discounts. No commissions will be paid on products, value-added work, engineering services, data, documentation and legalization fees, charges for export packing, all freight and delivery charges or other items not covered in Appendix B.
    1.2    Discount - The percentage reduction from Fisher Company's current Consumer Net Price.  Representative must always receive discounting approval from Fisher Company prior to extending a discount to the customer.
    1.3    Total Available Commission - Is computed according to the following formula: Customer Net Price X (applicable commission percentage from Appendix B / 100)
    1.4    Commission Distribution - The distribution of commission between eligible selling organizations for and within the four major functions of sales pursuit: sales credit, purchasing, territory, and engineering as outlined in Section 2.0 below.

2.0    Commission Distribution:
    2.1    The following is a summary of actions required to qualify for, and the recommended distribution of, commission payments within the four major categories of sales credit, purchasing, territory and engineering.
        2.2    Sales Credit          of Total Available Commission)
        2.2.1    End User Sales Influence -        REDACTED        of Total Available Commission will be allocated to the Fisher Company sales offices or representatives who, through the development and execution of both commercial and technical strategies, successfully influence the end user site, including its purchasing, engineering, and other functions, in the purchase of Products.
        2.2.2    Engineering Contractor Sales Influence -      REDACTED        of the Total Available Commission will be allocated to the Fisher Company sales offices or representatives who through the development and execution of both commercial and technical strategies successfully influence the engineering contractor involved in the sale; including its purchasing, engineering, and other functions, in the purchase of Products.

37

2.2.3  Process Licensor Sales Influence [REDACTED] ] of the Total
Available Commission will be allocated to the Fisher Company sales
offices or representatives who through the development and execution
of both commercial and technical strategies successfully influence the
process licensor, including its purchasing, engineering, and other
functions, in the purchasing of Products.

2.2.4  Corporate Headquarters Sales Influence - [REDACTED] , of the
Total Available Commission will be allocated to the Fisher Company
sales offices or  representatives who through the development and
execution of both commercial and technical strategies successfully
influence the end user corporate headquarters, including its
management, technical, purchasing, and other functions, in the
purchase of Products.

2.2.5  In those situations where one or more of the sales influence functions
listed above is not involved in the purchase of Products, the Total
Available Commission from those areas will be proportionately
allocated to the participating functions.

2.3  Purchasing Credit        of Total Available Commission)

2.3.1  Order Entry and Expediting - [REDACTED]  of the Total
Available Commission will be allocated to the Fisher Company
sales offices or  representatives who administer the order,
together with all the attendant change orders and expediting
services that may need to be done.  Also, included in this sub-
category are assistance to the customer in obtaining letters of
credit; assistance in securing collection of payment to the Fisher
Company and providing ongoing status to the customer on
Product deliveries.  If order entry and expediting processes are
divided, each will carry equal percentage weight.

2.3.2  Quotation - [REDACTED]  . of the Total Available Commission
will be allocated to the Fisher Company sales office or
representative who develop the proposal/quotation on paper,
submits it to the customer, and ensure its proper internal
distribution to facilitate effective cooperation.  If more than one
office submits a quotation, the commission percentage from this
sub-category will be allocated to the Fisher Company sales
office or  representative who made the winning proposal.  An
exception to this guideline can be made in the situation where it
can be demonstrated that the non-winning alternate or
budgetary quotation was specifically helpful in obtaining the
order.  In such cases the percentage allocation in this category
would be shared among the Fisher Company sales offices or
representatives who participated.

2.4    Territory Credit ____ of Total Available Commission)

    2.4.1    Start-Up Support of the Total Available Commission will be allocated to the Fisher Company sales office or representative who furnishes the after sales on-site services required to handle customer complaints and/or mistakes that may occur in the sales, engineering, and manufacturing cycles. Included are technical maintenance, and account development/relationship services required to ensure that the project is a success at the process location.

    2.4.2    Post Start-Up Services of the Total Available Commission will be allocated to the Fisher Company sales office or representative who furnishes the required set of post start-up services. Included in this category are resolving any problems which arise during the warranty period and arranging for field service as needed, advising the customer in the proper use of Products by providing field training as required, and determining that adequate spare parts are on hand to meet the customer's needs.

2.5    Engineering Credit of Total Available Commission)

    2.5.1    Engineering the Specification of the Total Available Commission will be allocated to the Fisher Company sales offices or representatives who translate the customer's needs/process requirements into Product specifications. Included in this sub-category are engineering services which both enable the customer to specify the proper Product for his application which favorably influences the customer's specification toward Fisher Company's areas of competitive advantage.

    2.5.2    Pricing of the Total Available Commission will be allocated to the Fisher Company sales office or representative which completes the conversion of Product specifications into priced items suitable for entry into Fisher Company's order entry system, conducts necessary bid review meetings, and arranges necessary discount approvals from Fisher Company.

3.0    Commission Payment Parameters:

    3.1    Notification – if Representative wants Fisher Company to consider a request for allocation of a portion of a Payable Commission based on Representative's activities in promoting or engineering Products leading to their eventual purchase outside of the Representatives Territory, it must report all activity in pursuit of such purchase orders and request allocation prior to Fisher Company's acceptance of the purchase order to which the requested allocation pertains.

Unless otherwise agreed to in writing by Fisher Company, any Payable Commission paid to Representative pursuant to Fisher Company's decision regarding allocation for work done in promoting or engineering Products leading to eventual purchase outside of Territory shall be paid only with respect to such orders accepted by Fisher Company within one (1) year after such allocation was agreed upon.

3.2   Payable Commission Parameters - For purposes of computing Payable Commission, the following rules shall apply:

(1) a purchase order shall be considered a single order even though delivery may take place over a period of time;

(2) purchase orders received by Fisher Company from one customer within sixty (60) days as determined by date of receipt of order at Fisher Company, that follow or result from one negotiation or quotation or a series of negotiations or quotations, will be considered as if it were a single order.

(3) when a purchaser adds on to a purchase order or contract or exercises an option to increase quantities covered by a sales contract or makes a purchase that was initially contingent, the original order and the add-on quantities shall be considered as if it were a single order.

(4) No commission will be paid on repair charges or billings except as specifically noted in Appendix B; however, a replacement at customer's expense will be considered a new sale for which a Payable Commission will be paid.

(5) Payable Commission will be paid by Fisher Company to Representative only on those orders placed by purchasers other than Representative.

3.3   Commission Payment - Representative is entitled to payment of Payable Commission only when Fisher Company has received full payment for the corresponding Products and/or services. Except as otherwise provided in this Agreement, Fisher Company will within a reasonable time remit Payable Commissions to Representative on all purchases made by irrevocable letter of credit, and on all purchases where Fisher Company has waived the irrevocable letter of credit without request to do so by Representative. However, if Representative has requested that the irrevocable letter of credit requirements be waived and Fisher Company agrees to do so, Representative shall not be considered to have earned the Payable Commission until Fisher Company has received full payment for the corresponding Products and/or services. Under these circumstances, if a customer has not paid for the Products and/or services within six (6) months after shipment of the Products or performance of the services, and the Payable Commission has already been paid to Representative, Fisher Company shall have the right to reclaim the commission either by deducting the amount from future commission payments or by demanding repayment from Representative. Should such an account be paid by the customer at any subsequent time, the amount of Payable Commission shall be repaid to Representative by Fisher Company.

Further, if Representative has requested waiver of the irrevocable letter of credit requirement, Representative will be responsible, whenever requested by Fisher Company, to assist Fisher Company fully in its efforts to make collection.

3.4    Invoices of Sales - Fisher Company shall furnish Representative with copies of all invoices and pertinent correspondence relating to sales in Territory.

FCI 500072

APPENDIX F

REPRESENTATIVE RESALE OF DELTAV™ PRODUCTS

DeltaV is a new product offering which FRSI believes can reach maximum market penetration through a combination of sales by FRSI with commissions paid to Representative and resale by Representative in a restricted territory and under the terms and conditions of this Appendix. This Appendix F sets forth the terms under which (a) FRSI shall provide FRSI Products to Representative on a discount basis for resale to customers within its Territory, (b) Representative shall perform services in connection with FRSI Products, only within its Territory, and (c) Representative shall only distribute the FRSI Products along with services to Representative's customers within its Territory, regardless of the final destination for such FRSI Products.

This Appendix F consists of Sections 1 through 9, with Exhibits A through F. All terms which have their first letter capitalized, and which are not defined in Section 1 below, shall retain the same definition as given in the Representative Agreement.

1.    Definitions
      As used in this Appendix,

            (a)    "FRSI Products" means DeltaV hardware items, such as computers, controllers, power supplies, input/output modules (hereinafter "FRSI Hardware Products") and DeltaV object code software products and firmware products (hereinafter "FRSI Software Products"), all as listed on that FRSI standard price list which is prevailing at the time FRSI accepts a purchase order from the Representative.

            (b)    "FRSI Products with Added Service" means FRSI Products in connection with which services, such as integration work, have been provided by Representative to its End-Use Customers.

            (c)    "End-Use Customers" means customers who shall use FRSI Products with Added Service to enhance manufacturing processes or production operations in the regular course of their businesses.

            (d)    "FRSI License" means any FRSI license agreement for the license of an FRSI Software Product, including any warranty provisions and limitations of warranty and liability included in such license, and including the FRSI License in Exhibit C hereto. Where in this Appendix the term "price" is used in relation to an FRSI Software Product, this shall be deemed to mean the license fee applicable to that product.

FCI 500073

2.    Discount, Prices, and Payments

(a)    The price for each FRSI Product is either FRSI's standard list price in effect at the time of receipt of the Representative's purchase order, less the discount then applicable to Representative, or the price contained in a valid, authorized quotation made by FRSI to Representative. FRSI shall allow Representative the applicable discounts from FRSI's standard price list set out in Exhibit A to this Appendix, and shall honor the prices contained in a valid, authorized FRSI quotation, with respect to FRSI Products that are the subject of purchase orders from Representative, provided that Representative is in compliance with all terms of this Appendix (and, if applicable, the terms of the relevant FRSI quotation) and meets the following additional requirements: Representative's purchase order must (1) issue from a purchase ordering location listed on Exhibit B, (2) cover at least ___ (list price) of FRSI Products (3) be received by FRSI during the term of this Appendix and request delivery within six months after the issue date of the purchase order, (4) be based on and refer to this Agreement (and, if applicable, the terms of the relevant FRSI quotation), (5) order FRSI Products subject to Representative discounts on FRSI's standard price list or on any authorized quotation by FRSI in effect at the time of acceptance, (6) be accepted by FRSI, in its sole discretion, and (7) be for use by Representative in accordance with Paragraph 6 below.

(b)    All prices are Ex-works, Austin, Texas, and payment is due upon shipment, or net thirty (30) days with approved credit. A cancellation charge of twenty percent (20%) may be charged by FRSI for any order canceled within five (5) days before the quoted or scheduled shipment date.

(c)    Representative agrees that FRSI's prices are net prices, not subject to any deductions or set-offs other than the Representative discount. In particular, no deductions or set-offs shall be made for any present or future taxes (including without limitation sales or use taxes, value added taxes, customs duties and import or export fees), imposts, levies, duties, withholdings or deductions, or any other similar payment in connection with Representative activities under this Appendix (collectively "Taxes"). All Taxes shall be paid by Representative.

3.    Purchase Orders and Shipment

(a)    FRSI Products shall be ordered by Representative by written purchase order to FRSI or by an approved electronic data interface. In the case of orders for FRSI Software Products, for licensing, export compliance and product safety notification purposes, End-Use Customer information must be stated either with the order or as soon thereafter as such information becomes known to Representative, but in any event, prior to shipment of the FRSI Products by Representative to the End-Use Customer.

12/97
Apx. F

43

Such information shall include name and address of End-Use Customer, its contact persons, its products, and its phone number.

(b)    FRSI may, in its sole discretion, accept such purchase order or reject it, in whole or in part, and without recourse. All purchase orders shall be deemed accepted as of the date of acceptance at FRSI's offices in Austin, Texas. Acceptance shall occur as of the date which FRSI enters the purchase order on its order entry system. FRSI reserves the right to deny any request by Representative to change the quantity, delivery schedule, or any other matter in a Representative purchase order. If any change is authorized, additional charges may be applied to the order.

(c)    Packaging and shipment of FRSI Products (including selection of carrier) shall be in accordance with FRSI's customary business procedures, unless otherwise agreed in writing. All Products are shipped Ex-works Austin, Texas, and Representative shall pay all transit insurance, shipping costs and carriers, who shall be Representative's agents. Representative shall notify carriers and take all actions necessary to assert claims against carriers if Products are lost or delivered in damaged condition, and shall notify FRSI of any such event. Risk of loss shall pass to Representative on delivery by FRSI to the carrier.

(d)    Absent FRSI's express written acceptance, any terms and conditions contained in any Representative purchase order, other than the number and classification of Products ordered, are not binding upon FRSI. FRSI's License (Exhibit C) and standard Terms and Conditions of Sale (Exhibit D) for hardware shall govern each purchase and sale and/or license of FRSI Products hereunder.

4.    Return Policy

(a)    Non-FRSI Products may not be returned. Should Representative desire to return any FRSI Hardware Product, Representative may request a return or modification of a prior order in writing and, if applicable, on any return authorization forms designated by FRSI from time to time. All returns and order modifications must be approved in writing by FRSI. Such requests are subject to the procedures and restocking charges described below. NO REQUEST FOR RETURNS SHALL BE CONSIDERED AFTER ONE HUNDRED EIGHTY DAYS HAVE ELAPSED AFTER FRSI'S SHIPMENT DATE. Payment of restocking charges applied by FRSI shall be made within thirty (30) days of invoices for such charges.

(b)    Representative shall not return any FRSI Products for any reason without the prior authorization of FRSI and issuance by FRSI of a Merchandise Return Authorization (MRA) number. The MRA shall specify the terms and conditions upon which the return may be made. Returns made

without obtaining prior authorization shall be returned to Representative at Representative's expense.

(c)    FRSI, at its option, may accept or reject any request by Representative to return an FRSI Product for credit. FRSI shall reasonably consider any request by Representative to return an FRSI Product. The following criteria shall typically apply:

Representative may return an FRSI Product to FRSI for eighty percent (80%) credit provided that, (i) Representative has first obtained a MRA number, (ii) FRSI receives the returned material within one hundred eighty (180) days from the time such material was originally shipped by FRSI, (iii) the returned material has not been used and is received by FRSI in an undamaged condition, and (iv) the returned material and any attendant documentation thereof are received by FRSI in their original packaging.

(d)    No credit shall be granted for any software license key once issued by FRSI to Representative.

5.    Projected Purchase Schedule
At FRSI's request, Representative shall provide FRSI with a projected purchase schedule for each one-year period during which this Appendix is in effect. Representative shall act in good faith and use its best efforts to meet the projected purchase schedules.

6.    Representative and FRSI Representations and Obligations
(a)    Representative agrees that, in consideration of the discounts allowed and the other benefits provided in this Appendix, it shall market, sell and/or license FRSI Products combined with additional services to create FRSI Products with Added Service.

(b)    As part of each transaction with an End-Use Customer hereunder, Representative shall include the FRSI License set forth in Exhibit C in all quotations and shall deliver to each of its customers, in the original packaging and in unaltered form, all FRSI Software Products and associated material, including diskettes, documentation, and security and software keys, and shall deliver to each of its customers in unaltered form the applicable FRSI License. Representative shall fully cooperate with FRSI in FRSI's efforts to secure from End-Use Customer the DeltaV Product Registration Form. FRSI and Representative agree that the DeltaV Product Registration Form provides information which is essential in order to activate the applicable FRSI Product warranties and activate other FRSI support services for the benefit of the End-Use Customer, and also provides information needed to facilitate FRSI's efforts to maintain detailed serial number records

FCI 500076

for traceability purposes. FRSI plans to maintain such records in a database accessible to Representative.

(c)    Representative shall provide technical support for all applications where the Representative has either provided FRSI Products with Added Service or provided FRSI Products with Added Service combined with non-FRSI products.    FRSI shall provide technical product support for FRSI Products, but reserves the right to charge End-Use Customers for such services, except as covered by an applicable warranty, including any extended warranty purchased under an agreement with FRSI to provide extended support, all in accordance with FRSI Licenses, terms and conditions and policies in effect from time to time.    Representative shall provide application support for FRSI Products in all cases except those in which FRSI, in its sole discretion and/or where such problems cannot be resolved by Representative's best efforts, may provide application support for problems related to FRSI Products.

(d)    Representative certifies that, prior to placing any purchase order with FRSI, it has or shall obtain a valid sales tax exemption certificate for each jurisdiction where it is doing business and where such a certificate is required to avoid payment of sales or use taxes on orders under this Appendix. Representative shall provide such certificates to FRSI, which FRSI may accept or reject in its sole discretion, and shall notify FRSI immediately of any change in the status of such certificates. Representative agrees to indemnify and hold harmless FRSI from and against any liability for sales or use taxes, duties or tariffs incurred by FRSI on account of licenses and purchases under this Appendix, including those levied where Representative has not obtained a certificate, or where the relevant taxing authorities dispute the validity or coverage of a certificate.

(e)    Representative shall maintain the capability to provide its End-Use Customers with around-the-clock, 365 day per year, access to technical support for FRSI Products.    Nothing herein shall be deemed to restrict Representative from setting its own prices to its End-Use Customers for providing such technical support. Representative shall provide FRSI with accurate instructions and information so that FRSI may contact Representative, both during and outside of Representative's normal business hours, concerning matters which relate to End-Use Customer service assistance. Representative shall provide to FRSI updates to the foregoing information as necessary to ensure its continued accuracy.

(f)    Representative represents that it has and agrees to maintain the marketing facilities, the financial and managerial capability, and the skilled personnel to vigorously and effectively promote the distribution and use of the FRSI Products with Added Service.    Representative agrees that during the term of this Appendix it shall, at its sole expense, maintain a staff of

46

FCI 500077

engineers capable of configuring, integrating and using the FRSI Products. In this regard, Representative agrees to obtain certification from FRSI in accordance with the requirements of Exhibit F prior to providing FRSI Products with Added Service to its End-Use Customers.

(g)      Representative shall promptly inform FRSI of any known or suspected defects in the code, media, documentation, or hardware constituting the FRSI Products of which Representative becomes aware.    In addition, Representative shall fully cooperate with FRSI to collect information needed to identify, and provide problem resolution assistance to help resolve, those problems relating to FRSI Products which are experienced in the field.

(h)      Upon the successful completion by Representative of the certification process set forth in Section 6 (f) above, FRSI shall issue to Representative one Systems Integrator System I.D. Key for each DeltaV development system owned by the Representative at each Representative site. The Systems Integrator System I.D. Key is a special key that gives Representative the ability to load its End-Use Customer's software license keys into the Representative's DeltaV development system. With the End-Use Customer's software license keys installed, the Representative can test the system configuration it has developed for the End-Use Customer, and ensure that the limits of the End-Use Customer's software licenses are maintained. Systems Integrator System I.D. Keys must remain in the possession of Representative for its exclusive use in its development systems. Representative agrees to return all Systems Integrator System I.D. Keys in its possession or control to FRSI immediately upon the expiration or termination of this Agreement for any reason.

(i)      Representative agrees that it shall not, under any circumstances, sell, assign or otherwise transfer to an End-Use Customer, or other party, any system or product identifier, software key(s) or other security device which, under this Appendix, is intended for Representative's use only.

(j)      Representative shall fully cooperate with FRSI to implement and support service standards and information sharing systems developed by FRSI for service call tracking and technical information retrieval.

(k)      Representative shall fully cooperate with FRSI to appropriately notify affected End-Use Customers of any product recall or other information affecting the safe use of FRSI Products or components thereof. Representative acknowledges that FRSI may, from time to time by written notification to the Representative, request Representative to maintain certain serial number or other records relating to FRSI Products or components thereof which enable FRSI to identify what was shipped to End-Use Customers. In the event that FRSI makes such a request, Representative agrees to work out the details of such record keeping in good faith with FRSI.

FCI 500078

(i)     If Representative engages any third party to assist Representative in the performance of work in connection with FRSI Products, or resells any FRSI Products to a sub-systems integrator, then Representative shall ensure that all obligations of Representative under this Appendix are fully communicated to, agreed to and performed by such third party or sub-systems integrator. To this end, Representative agrees that any agreement entered into between it and any third party or sub-systems integrator relating to FRSI Products shall be substantially in the form set forth in Exhibit F.

7.     License Grant

Provided that Representative remains in compliance with all terms of this Appendix, FRSI grants to Representative a non-transferable right, only within the Territory, to distribute and market FRSI Products as part of FRSI Products with Added Service to End-Use Customers. This right is only effective if Representative includes the FRSI License set forth in Exhibit C in all quotations and delivers with each FRSI Product the applicable FRSI License as set forth in Exhibit C to its End-Use Customers. Failure by Representative to so quote and deliver the applicable FRSI License with each FRSI Product shall constitute a material breach of this Agreement. No right or license to use, alter, modify, copy, or prepare derivative works of FRSI Products is granted by this Appendix. FRSI retains the right to market and distribute, directly to customers FRSI Products (and products based on FRSI Products) without limit, whether within or outside of Territory.

8.     Warranty and Limitation of Liability

(a)     (i)     With respect to FRSI Software Products, FRSI's exclusive warranty to End-Use Customers of Representative is as set forth in the FRSI License in Exhibit C, and FRSI confirms such warranties to Representative to the extent that Representative is a licensee and user of any FRSI Product.

(ii)     Representative acknowledges and agrees that, for breach of warranty by FRSI, the sole and exclusive remedy of the Representative and End-Use Customer of any FRSI Software Product is as set forth in the FRSI License in Exhibit C, which is also provided with the FRSI Software Product, and Representative is not authorized to, and shall not, offer any other remedies on FRSI's behalf.

(iii)     Representative shall be entitled to transfer in full to its customers the benefits of FRSI's warranties given in Exhibit D (Fisher-Rosemount Standard Terms and Conditions of Sale) in respect of FRSI Hardware Products; the applicable warranty period shall be calculated from the date of delivery of the FRSI Hardware Products to Representative. Representative shall be solely liable for any promises, representations, warranties, guarantees or remedies which are inconsistent with, or additional to, FRSI's Standard Terms and Conditions of Sale.

12/97
Apx. F

48

FCI 500079

(b)    FRSI's warranties with respect to any FRSI Product shall be voided if Representative sells for use in conjunction with such FRSI Product any personal computer not certified by FRSI.    Also, FRSI's warranties shall be voided by changes or defects caused or made by Representative to the functional or technical performance of FRSI Products, or any defects that result from software or hardware changes or additions made by Representative, and Representative agrees to indemnify and hold harmless FRSI from and against damages, loss, and liability arising from claims, including breach of warranty claims, brought by any End-Use Customers arising out of such changes, additions or defects.

Representative shall pay for correction of such changes, defects and additions, and all support performed by FRSI outside the warranty, at the FRSI time and materials rates then in effect.

(c)    In cases of non-warranty work, travel and living expenses for FRSI personnel who must travel to make corrections shall be billed to and paid by Representative at cost. FRSI shall not travel to make corrections unless travel is requested in writing, by Representative to FRSI.

(d)    Representative bears sole responsibility for determining the fitness of FRSI Products for inclusion in FRSI Products with Added Service.

(e)    Other than as expressly set forth above, Representative bears sole responsibility for providing and fulfilling any warranties on FRSI Products with Added Service. Representative shall provide all reasonable assistance to FRSI in the distribution of any corrections made by FRSI to End-Use Customers. Except as expressly provided above, FRSI delivers the FRSI Products AS IS and MAKES NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, WHETHER OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.

(f)    Neither Representative nor any other person is permitted to expand, supplement, modify or waive any provision of any limited warranty set forth in any FRSI License. Representative agrees that it shall not make any claims concerning functionality or other claims for FRSI Products.

(g)    FRSI AND REPRESENTATIVE EXPRESSLY AGREE THAT FRSI SHALL NOT BE LIABLE TO REPRESENTATIVE FOR ANY LOSS OF PROFITS; ANY INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES; OR , EXCEPT AS PROVIDED IN SECTION 9, ANY CLAIMS OR DEMANDS BROUGHT AGAINST REPRESENTATIVE BY ANY END-USE CUSTOMER OR OTHER PARTY, WHETHER OR NOT FRSI HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH CLAIMS OR DEMANDS.

FCI 500080

9.    Indemnification
(a)    Except as otherwise provided in this Section 9 (a), Representative may
agree to any terms and conditions of sale it desires in transactions with End-Use
Customers. Representative expressly agrees to conduct its sales to End-Use
Customers such that the liability of FRSI under such Representative sales to End-
Use Customers is limited as set forth in the clauses entitled "LIMITED WARRANTY"
and "LIMITATION OF REMEDY AND LIABILITY" of Exhibit D; and Representative
agrees that such liability of FRSI is absolutely limited as set forth in the Exhibit D.
To the extent that Representative has not procured the express written agreement of
the End-Use Customer to limit the liability of FRSI as required by this Section 9 (a) in
any sale of FRSI Products by Representative wherein its customer's order covers
FRSI Products which, notwithstanding any discounts offered by Representative,
would have an aggregate list price based upon the then current FRSI list price
totaling $100,000.00 or more, then Representative agrees that, except as provided
in the succeeding paragraph, the indemnification pursuant to Section XI of this
Agreement above shall be null and void as to such FRSI Products, and
Representative further agrees, at its own expense, to protect, defend, indemnify and
hold harmless FRSI from and against any and all Losses, and all incidental and
consequential damages, which may arise out of or be made in connection with such
FRSI Products. For all sales by Representative wherein its customer's order covers
FRSI Products which, notwithstanding any discounts offered by Representative,
would have an aggregate list price, based upon the then current FRSI list price,
totaling less than $100,000.00, the result described in the immediately preceding
sentence shall apply only if Representative fails to carry out such exchanges of
standard purchase order and acknowledgment forms, or the like (battles of the
forms) in connection with the sale, as would ordinarily be required in order to secure
the proper limitations of liability referred to in this Section 9 (a).

Notwithstanding the foregoing provisions of this Section 9(a) and any other
provisions in this Agreement, in the event that Representative secures in its contract
with an End-Use Customer the proper limitations as required by this Section 9 (a),
but it is determined by a court of competent jurisdiction that (i) any limitations of
FRSI's Limited Warranty, as incorporated into that contract by Representative
pursuant to this Agreement, are unenforceable, or (ii) FRSI's warranty obligations
extend beyond the limitations set forth in the Limited Warranty, then FRSI's
indemnification obligations set forth in Section XI of this Agreement shall continue.
Furthermore, FRSI's indemnification obligations set forth in Section XI of this
Agreement shall continue to the extent of FRSI's standard Limited Warranty
provision and shall also continue up to an amount equal to the price of the goods
giving rise to the cause of action, as stated in FRSI's Limitation of Remedy and
Liability provision, even in view of Representative's failure to secure the required
Limitation of Remedy and Liability provision in its contract with an End-User
Customer.

12/97
Apx. F

FCI 500081

(b)     FRSI shall protect, defend, indemnify and hold harmless Representative from and against all Losses arising from breach of this Agreement by FRSI, and against all claims, damages, costs and expenses arising from the actual or alleged infringement by the FRSI Products of any patent or copyright, or the trademark, trade secret, or intellectual property rights of any third party, except to the extent that the claim or suit is based upon the Representative service component of FRSI Products with Added Service.

(c)     Representative shall protect, defend, indemnify and hold harmless FRSI from and against all Losses arising from breach of this Agreement by Representative, and against all claims, damages, costs and expenses arising from the actual or alleged infringement by any of the services provided by Representative of any patent or copyright, or the trademark, trade secret, or intellectual property rights of any third party, except to the extent that the claim or suit is based upon FRSI Products.

---

## EXHIBITS

| | |
|---|---|
| Exhibit A | Applicable FRSI Product Discounts |
| Exhibit B | Purchase Ordering Location |
| Exhibit C | End-Use Customer License Appendix |
| Exhibit D | Fisher-Rosemount Standard Terms and Conditions of Sale |
| Exhibit E | DeltaV Representative Certification |
| Exhibit F | Sub-Systems Integrator Appendix for DeltaV Products |

FCI 500082

APPENDIX F

EXHIBIT A

Applicable FRSI Product Discounts

The following FRSI Products and discounts are included in this Appendix.

| Model Number | Price List | Discount | Description |
|---|---|---|---|
| VE21XX Series | Current | | Visual User Station Software |
| VE22XX Series | Current | | Integration Station Software |
| VE31XX Series | Current | | Visual Control Software |
| VE41XX Series | Current | | Serial I/O Software |
| VE30XX Series | Current | | Controller, Power/Controller Carrier |
| VE40XX Series | Current | | I/O, I/O Interface Carrier |
| VE5001, VE5002 | Current | | System Power Supply and Passthrough Power Supply |
| VE6101 | Current | | Carrier Blank Cap |
| KJXXXX Series | Current | | Replacement/Spare Parts |
| VE20XX Series | Current | | PCs, monitors, accessories |
| VE5003, VE5004, VE5005, VE5006 | Current | | Bulk Power Supplies, UPS |
| VE6XXX Series | Current | | Hubs, Network Cable, Cable Connector Kit |
| VE99XX Series | Current | | Documentation |
| VE9001 Series | Current | | Foundation Services |
| VE9002 Series | Current | | Extended Warranty |
| VE9010 Series | Current | | Integration Station Telephone Support (8hrs) |

12/97
Apx. F

52

FCI 500083

APPENDIX F

EXHIBIT B

Purchase Order Location

NORTHEAST CONTROLS, INC.
SITTERLY ROAD
CLIFTON PARK, NY 12065

APPENDIX F

EXHIBIT C

Software License Agreement

BY OPENING THIS PACKAGE YOU AGREE TO ACCEPT THESE TERMS AND
CONDITIONS. IF YOU DO NOT AGREE WITH THESE TERMS, YOU SHOULD PROMPTLY
RETURN THE PACKAGE UNOPENED AND YOUR MONEY WILL BE REFUNDED. Fisher-
Rosemount Systems, Inc. (FRSI) provides this computer program and related materials for
your use. You assume responsibility for the acquisition of a machine and associated
equipment compatible with the program, and for installation, use, and results obtained from
the program.

LICENSE: FRSI grants to you a non-transferable, non-exclusive license to: (a) use all fully
paid up licensed programs provided to you to run on a single machine; (b) copy the program
for backup or modification purposes in support of the program on the single machine. You
must reproduce and include the copyright notice on any copy or modification. YOU MAY NOT
REVERSE ENGINEER, USE, COPY, OR MODIFY ANY PROGRAM OR RELATED
MATERIALS OR ANY COPY, MODIFICATION, IN WHOLE OR IN PART, EXCEPT AS
EXPRESSLY PROVIDED FOR IN THIS LICENSE. IF YOU TRANSFER POSSESSION OF
ANY COPY OR MODIFICATION OF THE PROGRAM OR RELATED MATERIALS TO
ANOTHER PARTY, YOUR LICENSE IS AUTOMATICALLY TERMINATED.

TITLE: Title to and ownership of the program and related materials shall at all times remain
with FRSI or its licensors. Your right to use the same is at all times subject to the terms and
condition of this Agreement. FRSI may, from time to time, revise or update the program
and/or related materials and, in so doing, incurs no obligation to furnish such revisions or
updates to you.

TERM: This license is effective upon opening this package. You may terminate it at any time
by destroying the program and the related materials together with all copies and modifications
in any form. It will also terminate upon conditions set forth elsewhere in this Agreement or if
you fail to comply with any term or condition of this Agreement. You agree upon such
termination to destroy the program and the related materials together with all copies and
modification in any form.

LIMITED WARRANTY: FRSI warrants the media on which the program is furnished to be free
from defects in materials and workmanship under normal use for a period of ninety (90) days
from the date of delivery to you as evidenced by a copy of your invoice. However, FRSI does
not warrant that the functions contained in the program will meet your requirements or that the
operation of the program will be uninterrupted or error free. THE PROGRAM AND RELATED
MATERIALS ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER
EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES

12/97                                              54
Apx. F

FCI 500085

OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ENTIRE
RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM IS WITH YOU.
SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL
NECESSARY SERVICING, REPAIR, OR CORRECTION.

LIMITATIONS OF REMEDIES: FRSI's entire liability and your exclusive remedy shall be: (1)
the replacement of any media not meeting FRSI's "Limited Warranty" and which is returned
with a copy of your invoice to Fisher-Rosemount Systems, Inc., 8301 Cameron Road, Austin,
Texas 78754, or (2) if FRSI is unable to deliver a replacement media which is free of defects
in materials or workmanship, you may terminate this Agreement by returning the program and
your money will be refunded. IN NO EVENT WILL FRSI BE LIABLE TO YOU FOR ANY
DAMAGES ARISING OUT OF ANY CAUSES WHATSOEVER (WHETHER SUCH CAUSES
BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT, PATENT
INFRINGEMENT, OR OTHERWISE), INCLUDING ANY LOST PROFITS, LOST SAVINGS,
OR OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE
OR INABILITY TO USE SUCH PROGRAM EVEN IF FRSI HAS BEEN ADVISED OF THE
POSSIBILITY OF SUCH DAMAGES, OR OF ANY CLAIM BY ANY OTHER PARTY.

GOVERNING LAW: This Agreement, and all matters concerning its construction,
interpretation, performance or validity, shall be governed by the laws of the State of Texas.

EXPORT RESTRICTIONS: Licensee shall comply fully with all laws, regulations, decrees and
orders of the United States of America that restrict or prohibit the exportation (or re-
exportation) of technical data and/or the direct product of it to other countries, including,
without limitation, the U.S. Export Administration Regulations.

U.S. GOVERNMENT RIGHTS: The programs and related materials are provided with
"RESTRICTED RIGHTS." Use, duplication or disclosure by the U.S. Government is subject to
restrictions set forth in the Federal Acquisition Regulations and its Supplements.

GENERAL: You may not sublicense, assign, or transfer the license or the program and
related materials without the prior written consent of FRSI. Any attempt otherwise to
sublicense, assign or transfer any of the rights, duties, or obligations hereunder without such
consent is void.

Should you have any question concerning this Agreement, please contact your FRSI
representative or sales office.

YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, UNDERSTAND IT,
AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS. YOU FURTHER AGREE
THAT IT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT
BETWEEN US WHICH SUPERSEDES ANY PROPOSAL OR PRIOR AGREEMENT, EXCEPT
THE MASTER LICENSE AGREEMENT, ORAL OR WRITTEN, AND ANY OTHER
COMMUNICATIONS BETWEEN US RELATING TO THE SUBJECT MATTER OF THIS
AGREEMENT. YOU AGREE THAT FRSI MAY AUDIT YOUR FACILITY TO CONFIRM
COMPLIANCE WITH THE FOREGOING PROVISIONS.

12/97                                    55
Apx. F

FCI 500086

## APPENDIX F

### EXHIBIT D

#### Fisher-Rosemount Standard Terms and Conditions of Sale

These terms and conditions, the attendant quotation or acknowledgment, and all documents incorporated by reference therein, bind the company(s) which issues the quotation or acknowledgment for the provision of services (Services) and/or the sale of goods, including (except as provided in Section 11) firmware incorporated therein (Goods), to be provided hereunder by seller (i.e., Fisher Controls International, Inc., Rosemount Inc., Fisher-Rosemount Systems, Inc. or other Fisher-Rosemount Group Company), hereinafter Seller, and the buyer, hereinafter Buyer, and constitute the entire agreement (Agreement) between Buyer and Seller regarding such sale and/or provision.

1. PRICES: Unless otherwise specified by Seller, Seller's price for the Goods and/or Services shall remain in effect for thirty (30) days after the date of Seller's quotation or acceptance of the order for the Goods/Services, whichever is delivered first, provided an unconditional, complete authorization for the immediate manufacture and shipment of the Goods and/or provision of Services pursuant to Seller's standard order processing procedures is received and accepted by Seller within such time period. If such authorization is not received by Seller within such thirty (30) day period, Seller shall have the right to change the price for the Goods/Services to Seller's price in effect for the Goods/Services at the time the order is released to final manufacture. Notwithstanding any of the foregoing to the contrary, the price for Goods/Services sold by Seller, but manufactured by others, shall be Seller's price in effect at the time of shipment to Buyer.

2. DELIVERY AND DOCUMENTATION: All shipping dates are approximate and are based upon Seller's prompt receipt of all necessary information from Buyer to properly process the order. Seller shall provide Buyer with that data/documentation which is specifically identified in the quotation. If additional copies of data/documentation or non-standard data/documentation are to be provided by Seller, they shall be provided to Buyer at Seller's price then in effect.

3. EXCUSE OF PERFORMANCE: Seller shall not be liable for delays in performance or for non-performance due to acts of God, war, riot, fire, labor trouble, unavailability of materials or components, explosion, accident, compliance with governmental requests, laws, regulations, orders or actions, or unforeseen circumstances or causes beyond Seller's reasonable control.

4. TERMINATION AND SUSPENSION BY BUYER: Buyer may terminate or suspend its order for any or all of the Goods/Services covered by the Agreement, provided that Buyer gives Seller reasonable advance written notice of such termination or suspension and reimburses Seller for all losses, damages, costs and expenses arising from such termination or suspension.

12/97
Apx. F

56

FCI 500087

5. LIMITED WARRANTY: Subject to the limitations contained in Section 6 and except as otherwise expressly provided herein, Seller warrants that the firmware will execute the programming instructions provided by Seller, and that the Goods manufactured or Services provided by Seller will be free from defects in materials or workmanship under normal use and care until the expiration of the applicable warranty period. Goods are warranted for twelve (12) months from the date of initial installation or eighteen (18) months from the date of shipment by Seller, whichever period expires first. Consumables and Services are warranted for a period of 90 days from the date of shipment or provision. Products purchased by Seller from a third party for resale to Buyer ("Resale Products") shall carry only the warranty extended by the original manufacturer. Buyer agrees that Seller has no liability for Resale Products beyond making a reasonable commercial effort to arrange for procurement and shipping of the Resale Products. If Buyer discovers any warranty defects and notifies Seller thereof in writing during the applicable warranty period, Seller shall, at its option, promptly correct any errors that are found by Seller in the firmware or Services, or repair or replace F.O.B. point of manufacture that portion of the Goods or firmware found by Seller to be defective, or refund the purchase price of the defective portion of the Goods/Services. All replacements or repairs necessitated by inadequate maintenance, normal wear and usage, unsuitable power sources, unsuitable environmental conditions, accident, misuse, improper installation, modification, repair, storage or handling, or any other cause not the fault of Seller are not covered by this limited warranty, and shall be at Buyer's expense. Seller shall not be obligated to pay any costs or charges incurred by Buyer or any other party except as may be agreed upon in writing in advance by an authorized Seller representative. All costs of dismantling, reinstallation and freight and the time and expenses of Seller's personnel for site travel and diagnosis under this warranty clause shall be borne by Buyer unless accepted in writing by Seller. Goods repaired and parts replaced during the warranty period shall be in warranty for the remainder of the original warranty period or ninety (90) days, whichever is longer. This limited warranty is the only warranty made by Seller and can be amended only in a writing signed by an authorized representative of Seller. Except as otherwise expressly provided-in the Agreement, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, OR ANY OTHER MATTER WITH RESPECT TO ANY OF THE GOODS OR SERVICES.

6. LIMITATION OF REMEDY AND LIABILITY: SELLER SHALL NOT BE LIABLE FOR DAMAGES CAUSED BY DELAY IN PERFORMANCE. THE SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY HEREUNDER SHALL BE LIMITED TO REPAIR, CORRECTION, REPLACEMENT OR REFUND OF PURCHASE PRICE UNDER THE LIMITED WARRANTY CLAUSE IN SECTION 5. IN NO EVENT, REGARDLESS OF THE FORM OF THE CLAIM OR CAUSE OF ACTION (WHETHER BASED IN CONTRACT, INFRINGEMENT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE), SHALL SELLER'S LIABILITY TO BUYER AND/OR ITS CUSTOMERS EXCEED THE PRICE TO BUYER OF THE SPECIFIC GOODS MANUFACTURED OR SERVICES PROVIDED BY SELLER GIVING RISE TO THE CLAIM OR CAUSE OF ACTION. BUYER AGREES THAT IN NO EVENT SHALL SELLER'S LIABILITY TO BUYER AND/OR ITS CUSTOMERS EXTEND TO INCLUDE INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES. THE TERM "CONSEQUENTIAL DAMAGES" SHALL INCLUDE, BUT NOT BE LIMITED TO, LOSS OF ANTICIPATED PROFITS, LOSS OF USE, LOSS OF REVENUE AND COST OF CAPITAL.

12/97
Apx. F

FCI 500088

7. **PATENTS:** Subject to the limitations contained in Section 6, Seller shall defend any suits brought against Buyer based on a claim that use of the Goods manufactured by Seller constitutes an infringement of a valid patent of the United States, and shall pay any damages awarded therein against Buyer, provided that Buyer: promptly notifies Seller in writing of the filing of such suit or the threat thereof; permits Seller to control completely the defense or compromise of such claim of infringement; and provides all reasonable assistance and cooperation requested by Seller for the defense of such suit. In the event that only the Goods manufactured by Seller are held to be infringing in such suit and their use is enjoined, Seller shall, at Seller's option and expense provide a commercially reasonable alternative, including, but not limited to, procuring for Buyer the right to continue using the Goods, replacing them with a non-infringing product or modifying them so they become non-infringing. Buyer agrees that Seller shall not be liable for infringement, and that Buyer shall fully indemnify Seller therefor, if infringement is based upon the use of Goods in connection with goods not manufactured by Seller or in a manner for which the Goods were not designed by the Seller or if the Goods were not designed by the Seller or if the Goods were designed by the Buyer or were modified by or for the Buyer in a manner to cause them to become infringing.

8. **INSTALLATION:** Buyer shall be responsible for receiving, storing, installing, starting up and maintaining all Goods. Seller shall provide a quotation for services to assist Buyer in these functions if requested.

9. **TAXES:** Any tax or governmental charge payable by the Seller because of the manufacture, sale or delivery of the Goods, or provision of Services, may at Seller's option be added to the price herein specified. The foregoing shall not apply to taxes based upon Seller's net income.

10. **TERMS OF PAYMENT:** Subject to the approval of Seller's Credit Department, terms are F.O.B. shipping point, net 30 days from date of Seller's invoice in U.S. currency, except for applicable milestone payments covered below or export shipments for which Seller may require other arrangements. If any payment owed to Seller hereunder is not paid when due, it shall bear interest, at a rate to be determined by Seller which shall not exceed the maximum rate permitted by law, from the date on which it is due until it is paid. Seller shall have the right, among other remedies, either to terminate the Agreement or to suspend further deliveries under this and/or other agreements with Buyer in the event Buyer fails to make any payment hereunder when due. Buyer shall be liable for all expenses attendant to collection of past due amounts, including attorneys' fees.

Unless otherwise provided in Seller's written quotation, periodic milestone payments shall be made by Buyer when the purchase price of this Agreement exceeds $100,000. In such cases, invoices shall be issued by Seller and paid by Buyer based on the following milestones: Milestone 1: 30% of price upon acceptance of order by Seller. Milestone 2: 30% of price upon release by Seller of approved bills of material to manufacturing for assembly. Milestone 3: 40% of price upon shipment of the Goods by Seller. Seller reserves the right to designate additional Milestones where the Agreement provides for Services in excess of $50,000.

12/97
Apx. F

58

FCI 500089

11.  SOFTWARE AND FIRMWARE:  Notwithstanding any other provision herein to the contrary, Seller or applicable third party owner shall retain exclusive title to its respective firmware and software.  Except as otherwise provided herein, Buyer is hereby granted a nonexclusive, royalty free license to use firmware incorporated into the Goods.  Buyer's use of certain firmware (as specified by Seller) and all other software shall be governed exclusively by Seller's and/or third party owner's applicable license terms.

12.  BUYER SUPPLIED DATA:  To the extent that Seller has relied upon any specifications, information, representation of operating conditions or other data supplied in writing by Buyer to Seller in the selection or design of the Goods and/or provision of the Services and the preparation of Seller's quotation, and in the event that actual operating conditions or other conditions differ from those represented by Buyer and relied upon by Seller, any warranties or other provisions contained herein which are affected by such conditions shall be null and void, unless otherwise mutually agreed upon in writing.

13.  GENERAL PROVISIONS: (a) Buyer shall not assign its rights or obligations under the Agreement without Seller's prior written consent. (b) There are no understandings, agreements or representations, express or implied, not specified in the Agreement. (c) No action, regardless of form, arising out of transactions under the Agreement, may be brought by either party more than two (2) years after the cause of action has accrued.  (d) Any modification of these terms and conditions must be set forth in a written instrument signed by a duly authorized representative of Seller. (e) The Agreement is formed and shall be construed, performed and enforced under the laws of the State of Missouri. However, Buyer and Seller agree that the proper venue for all actions arising under the Agreement shall be only in the State where the Goods involved in such actions were manufactured. (f) If Goods/Services supplied hereunder are to be used in nuclear applications, including, without limitation, any power generation facility, Buyer fully indemnifies Seller pursuant to Seller's "Special Nuclear Terms of Sale" a copy of which is available upon request.  (g) The 1980 United Nations Convention on Contracts for the International Sale of Goods does not apply to this Agreement.

12/97
Apx. F

59

FCI 500090

APPENDIX F

## EXHIBIT E

### DeltaV Representative Certification

Certification is a formal process to establish and recognize that organizations and individuals offering systems integration services for Fisher-Rosemount Systems (FRS) DeltaV products, do so in line with approved standards, and have the skills and resources essential for the delivery of value, quality and customer satisfaction.

Certification applies at two levels:

- Individual systems engineers
- System Integrator Organization

Individual certification is based on satisfactory completion of appropriate training courses.

Representative certification is based on the provision of defined equipment, tools and facilities, the use of certified engineering staff, the operation of an effective quality management system and proven project experience.

Details of the certification requirements and process are contained in FRSI Customer Services Network Administration Manual, Section 4.

FCI 500091

APPENDIX F

<u>EXHIBIT F</u>

Sub-Systems Integrator Agreement Format for DeltaV Products

(For purposes of document clarity, this exhibit is included as Appendix G of the
Representative Agreement)

FCI 500092

## APPENDIX G

(This appendix is integral to Appendix F but has been separated for purposes of document clarity.)

### EXHIBIT F

#### Independent Systems Integrator Agreement for DeltaV™ Products

Between [Company Name of FRSI Representative] ("Company"), having a principal place of business at
_____, and the party identified as Independent Systems Integrator on the signature page of this
Agreement ("ISI").

This Agreement sets forth the terms under which (a) Company shall provide DeltaV Products to ISI on a discount
basis for redistribution to End-Use Customers, (b) ISI shall perform services in connection with DeltaV Products, and
(c) ISI shall distribute the DeltaV Products along with services to ISI's End-Use Customers. Company and ISI,
intending to be legally bound, agree as follows:

1.    Definitions

      As used in this Agreement,

            (a)    "DeltaV Products" means DeltaV hardware items, such as computers, controllers, power supplies
            input/output modules (hereinafter "DeltaV Hardware Products") and DeltaV object code software product
            and firmware products (hereinafter "DeltaV Software Products"), all as listed on that Company price lis
            which is prevailing at the time Company accepts a purchase order from the ISI.

            (b)    "DeltaV Products with Added Service" means DeltaV Products in connection with which services
            such as integration work, have been provided by ISI to its End-Use Customers.

            (c)    "End-Use Customers" means customers who shall use DeltaV Products with Added Service t
            enhance manufacturing processes or production operations in the regular course of their businesses.

            (d)    "FRSI License" means any agreement generated by Fisher-Rosemount Systems, Inc., for th
            license of a DeltaV Software Product, including all warranty provisions and limitations of warranty an
            liability set forth in such license, and including the FRSI License in Exhibit C hereto. Where in thi
            Agreement the term "price" is used in relation to a DeltaV Software Product, this shall be deemed to mea
            the license fee applicable to that product.

2.    Discount, Prices, and Payments

            (a)    The price for each Company Product is either Company's list price in effect at the time of receipt c
            the ISI's purchase order, less the discount then applicable to ISI, or the price contained in a vali
            authorized quotation made by Company to ISI.

            (b) All Taxes shall be paid by ISI.

3.    Purchase Orders and Shipment

            (a)    DeltaV Products shall be ordered by ISI by written purchase order to Company which purchas
            order may be an approved electronic interface. When ordering DeltaV Software Products, for licensin
            export compliance and product safety notification purposes, End-Use Customer information must l
            communicated at the time of order placement with Company, or as soon thereafter as such informatic
            becomes known to ISI, but in any event, prior to shipment of the DeltaV Software Products by ISI to tl
            End-Use Customer. Such information shall include name and address of End-Use Customer, its conta
            persons, its products, and its phone number.

Rev.12/97
Apx. G

FCI 500093

(b)    Absent Company's express written acceptance, any terms and conditions contained in any ISI purchase order, other than the number and classification of Products ordered, are not binding upon Company. Fisher-Rosemount Systems, Inc.'s (FRSI) License for DeltaV Software (Exhibit C) and the Terms and Conditions of Sale for DeltaV Hardware (Exhibit D) shall govern each purchase and sale and/or license of DeltaV Products hereunder.

4.    ISI and Company Representations and Obligations

(a)    ISI agrees that, in consideration of the discounts allowed and the other benefits provided in this Agreement, it shall market, sell and/or license DeltaV Products only when combined with additional services to create DeltaV Products with Added Service.

(b)    As part of each transaction with an End-Use Customer hereunder, ISI shall include the FRSI License set forth in Exhibit C in all quotations and deliver to each of its customers, in the original packaging and in unaltered form, all DeltaV Software Products and associated material, including diskettes, documentation, and security and software keys, and shall deliver to each of its customers in unaltered form the applicable FRSI License. ISI shall fully cooperate with Company in Company's efforts to secure from End-Use Customer the DeltaV Product Registration Form. Company and ISI agree that the DeltaV Product Registration Form provides information which is essential in order to activate the applicable DeltaV Product warranties and activate other FRSI and Company support services for the benefit of the End-Use Customer.

(c)    ISI agrees that during the term of this Agreement it shall, at its sole expense, maintain a staff of engineers capable of configuring, integrating and using the DeltaV Products. In this regard, ISI agrees to obtain certification from Fisher-Rosemount Systems, Inc. in accordance with the "Independent Systems Integrator Certification and Service Support Agreement for DeltaV Products" (Exhibit E). An annual support fee as set forth in Exhibit E shall be paid by ISI to Fisher-Rosemount Systems, Inc. to cover the cost of certification, DeltaV Product training and DeltaV Product or application support availability.

(d)    ISI shall promptly inform Company of any known or suspected defects in the code, media, documentation or hardware constituting the DeltaV Products of which ISI becomes aware. In addition, ISI shall fully cooperate with Company to collect information needed to identify, and provide problem resolution assistance to help resolve, those problems relating to DeltaV Products which are experienced in the field.

(e)    Upon the successful completion by ISI of the certification process set forth in Section 4 (c) above Company shall issue to ISI one ISI System I.D. Key for each DeltaV development system owned by the ISI at each ISI site. The ISI System I.D. Key is a special key that gives ISI the ability to load its End-Use Customer's software license keys into the ISI's DeltaV development system. With the End-Use Customer's software license key installed, the ISI can test the system configuration it has developed for the End-Use Customer, and ensure that the limits of the End-Use Customer's software licenses are maintained. ISI System I.D. Keys must remain in the possession of ISI for its exclusive use in its development systems. ISI agrees to return all ISI System I.D. Keys in its possession or control to Company immediately upon the expiration or termination of this Agreement for any reason.

(f)    ISI agrees that it shall not, under any circumstances, sell, assign or otherwise transfer to an End-Use Customer, or other party, any ISI System I.D. Key, other software key or other security device which, under this Agreement, is intended for ISI's use only.

(g)    ISI shall fully cooperate with Company to appropriately notify affected End-Use Customers of any product recall or other information affecting the safe use of DeltaV Products or components thereof. ISI acknowledges that Company may, from time to time by written notification to the ISI, request ISI to maintain certain serial number or other records relating to DeltaV Products or components thereof which will enable the identification of what was shipped to End-Use Customers. In the event that Company makes such a request, ISI agrees to work out the details of such record keeping in good faith with Company.

FCI 500094

5.    License Grant

To the extent that Company has been granted the requisite right to sub-license by Fisher-Rosemount Systems, Inc., and provided that ISI remains in compliance with all terms of this Agreement, Company grants ISI a non-exclusive, non-transferable right to distribute and market DeltaV Products as part of DeltaV Products with Added Service to End-Use Customers. This right is only effective if ISI includes the FRSI License set forth in Exhibit C in all quotations and delivers with each Company Product the applicable FRSI License as set forth in Exhibit C to its End-Use Customers. Failure by ISI to so quote and deliver the applicable FRSI License with each Company Product shall constitute a material breach of this Agreement. No right or license to use, alter, modify, copy, or prepare derivative works of DeltaV Products is granted by this Agreement. Company retains the right, for itself and others, to market and distribute, directly to End-Use Customers and indirectly through intermediaries, such as other ISIs, DeltaV Products (and products based on DeltaV Products) without limit.

6.    Trademarks and Tradenames

(a)    ISI acknowledges the validity of the trademarks and trade names which designate and identify DeltaV Products and further acknowledges that Fisher-Rosemount Systems, Inc. (FRSI), or its subsidiaries or affiliates, are the exclusive owners of such marks and names.

(b)    ISI agrees that it may only use those trademarks which identify DeltaV Products and then only to further the promotion and sale of the DeltaV Products such trademarks identify. ISI may only use such trademarks in their standard form and style as they appear upon the DeltaV Products or as instructed in writing by Company. Use of trademarks and logos in any other material item of merchandise is strictly prohibited without the express written consent of FRSI. No other letter(s), word(s), design(s), symbol(s), or other matter of any kind shall be superimposed upon, associated with or shown in such proximity to the trademarks so as to tend to alter or dilute them and ISI further agrees not to combine or associate any of such trademarks with any other trademark or trade name. The generic or common name of the DeltaV Product must always follow the trademark except in those instances when ISI uses the name "FISHER-ROSEMOUNT" when referring to Fisher-Rosemount Systems, Inc., in which event no generic or common name is required.

(c)    In all advertisements, sales and promotional literature or other printed matter in which any of such trademarks appear, ISI must identify itself by its full name and address and state its relationship to Fisher-Rosemount Systems, Inc. Every such trademark used or displayed by ISI in connection with DeltaV Products must be identified as a trademark owned by Fisher-Rosemount Systems, Inc.

(d)    On its letterheads, business cards, invoices, statements, etc., ISI may identify itself as an authorized DeltaV Systems Integrator.

(e)    ISI agrees that it will never use any trademark or trade name relating to DeltaV Products, or any simulation of such marks or names, as a part of ISI's corporate or other trading name or designation of any kind.

(f)    Upon expiration or termination of this Agreement, ISI shall promptly discontinue every use of such trademarks, trade names, corporate logos and identities, and any similar styles and any language stating or suggesting that ISI is an authorized DeltaV Systems Integrator, as well as any word or term resembling such names, marks, logos, identities or styles which would be likely to cause confusion or deception.

7.    Confidential Information

As ISI may have heretofore received, and will in the future receive from time to time, confidential and proprietary information and data concerning DeltaV Products, research and engineering, developmental products and projects, business plans and operations of, or belonging to Company, or Fisher-Rosemount Systems, Inc., or other companies with whom Company has a business relationship (herein collectively referred to as "Confidential Information"), ISI agrees to treat, and to cause its officers and employees to treat, all such Confidential Information appropriately and not to divulge it to others at any time, or to use it for ISI's private purposes, or otherwise, except with the prior written authorization of Company, or the entity from

Rev.12/97
Apx. G                                    64

FCI 500095

which such Confidential Information originated, and then only in the manner and to the extent authorized, unless or until such Confidential Information (a) becomes a part of the public domain, or (b) is known to ISI prior to any disclosure by Company or other discloser with whom Company has a business relationship. ISI's obligation hereunder shall continue beyond and after the termination or expiration of this Agreement, and at the termination or expiration of this Agreement, or at any time Company so requests, ISI shall deliver to Company all notes, memoranda, records, drawings or other documents and other information or materials pertaining to the Confidential Information, including all copies and reproductions thereof. ISI further agrees to obtain similar written undertakings from each of its employees, representatives and agents having access to Confidential Information.

8.    Term of Agreement

(a)  This Agreement shall become effective as of _____, shall continue for one year from the effective date, and shall thereafter be renewable for an additional term(s) pursuant to the execution of a written renewal by and between ISI and Company.

(b)  Upon termination of this Agreement:

(i)    ISI shall cease reference to itself as an authorized DeltaV Systems Integrator and shall discontinue the use of all trademarks and tradenames as provided in Section 6 (f);

(ii)    Sections 1, 7, 9, and 10 shall survive the termination of this Agreement.

9.    Warranty and Limitation of Liability

(a)

(i)    With respect to DeltaV Software Products, the exclusive warranty to End-Use Customers of ISI i as set forth in the FRSI License in Exhibit C, and Company confirms such warranties to ISI to th extent that ISI is a licensee and user of any DeltaV Product.

(ii)    ISI acknowledges and agrees that the sole and exclusive remedy of ISI and the End-Use Custome of any DeltaV Software Product is as set forth in the FRSI License in Exhibit C, which is als provided with the DeltaV Software Product, and ISI is not authorised to, and shall not, offer an other remedies.

(iii)    ISI shall be entitled to transfer in full to its customers the benefits of warranties given in Exhibit D i respect of DeltaV Hardware Products; the applicable warranty period shall be calculated from th date of delivery of the DeltaV Hardware Products to ISI or registration of the DeltaV Product by th End-Use Customer as applicable. ISI shall be liable for any promises, representations, warrantie guarantees or remedies which are inconsistent with, or additional to, the Terms and Conditions Sale.

(b)    FRSI's warranties with respect to any FRSI Product shall be voided if ISI sells for use in conjunction wi such FRSI Product any personal computer not certified by FRSI. Also, all warranties shall be voided by changes defects made or caused by ISI in the functional or technical performance of DeltaV Products, or any defects th result from software or hardware changes or additions made by ISI, and ISI agrees to indemnify and hold harmle Company from and against damages, loss, and liability arising from claims, including breach of warranty claim brought by any of End-Use Customers arising out of such changes, additions or defects.

(d)    ISI bears sole responsibility for determining the fitness of DeltaV Products for inclusion in DeltaV Produc with Added Service.

(e)    Other than as expressly set forth above, ISI bears sole responsibility for providing and fulfilling a warranties on DeltaV Products with Added Service. ISI shall provide all reasonable assistance to Company a FRSI in the distribution of any corrections made by Company and FRSI to End-Use Customers. Except expressly provided above, Company delivers the DeltaV Products AS IS and DISCLAIMS ALL OTHER WA

Rev.12/97
Apx. G                                         65

FCI 500096

RANTIES, EXPRESSED OR IMPLIED, WHETHER OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.

(f)    Neither ISI nor any other person is permitted to expand, supplement, modify or waive any provision of any limited warranty set forth in any FRSI License. ISI agrees that it shall not make any claims concerning functionality or other claims for DeltaV Products.

(g)    COMPANY AND ISI EXPRESSLY AGREE THAT COMPANY SHALL NOT BE LIABLE TO ISI FOR ANY LOSS OF PROFITS; ANY INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES; OR ANY CLAIMS OR DEMANDS BROUGHT AGAINST ISI BY ANY END-USE CUSTOMER OR OTHER PARTY, WHETHER OR NOT COMPANY HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH CLAIMS OR DEMANDS.

10.    Indemnification

ISI shall indemnify and hold harmless Company from and against all damages, losses, and liabilities arising from breach of this Agreement by ISI, including reasonable attorneys' fees, and against all damages, losses, liabilities and costs, including reasonable attorneys' fees, for defence of any claim or suit arising from alleged infringement by any of the services provided by ISI of any patent or copyright, or the trademark, trade secret, or intellectual property rights of any third party, except to the extent that the claim or suit is based solely on DeltaV Products included in the DeltaV Products with Added Service.

11.    Compliance with Law

(a)    In connection with its distribution of DeltaV Products outside the United States, ISI agrees to obtain from the United States Federal government and any other government with jurisdiction, and including any agency, bureau, commission, authority or body thereof (collectively, "Government"), all licenses, authorisations, approvals and consents required by applicable law and regulation, including the regulations of the United States Export Administration, which are necessary for such distribution of DeltaV Products, the export of technical data relating to DeltaV Products, the export of the direct product of such technical data, and necessary to ensure the validity of FRSI Licenses.

(b)    ISI understands that the Government, including the United States Government, prohibit export of DeltaV Products to certain countries and certain organisations and individuals, and ISI agrees that it shall not directly o indirectly license, sell, make available or export DeltaV Products, technical data relating to such products, or the direct product of such technical data in violation of such prohibitions.  ISI shall obtain from all of its foreign customers written assurances and statements of end-use necessary to ensure compliance with the foregoing obligations, and Company shall have the right to review and audit ISI's records and export activities to ensure compliance with these requirements and other requirements of this Agreement.

(c)    ISI shall take all actions required by any Government in connection with distribution of DeltaV Products under this Agreement, including any required filings or registrations of FRSI Licenses or other documents with the Government and any foreign exchange approvals.  ISI shall provide Company with prior written notice of and the right to consent to any foreign destination of any Company Product before exporting any Company Product so that Company may make any trademark, copyright or other foreign filings it may deem desirable in connection with such export.

FCI 500097

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed, effective as of the day and year set forth in Section 8(a), by their respective authorised officials.

[Insert Company Name]                    [Insert ISI Name]
Address                                  Address
Address                                  Address

By: _____             By: _____

Title: _____            Title: _____

Date: _____             Date: _____

Rev.12/97
Apx. G                          67

FCI 500098

INDEPENDENT SYSTEMS INTEGRATOR AGREEMENT FOR DeltaV PRODUCTS

<u>EXHIBITS</u>

Exhibit A                    Applicable DeltaV Product Discounts

Exhibit B                    Purchase Ordering Location

Exhibit C                    FRSI End-Use Customer License Agreement

Exhibit D                    Terms and Conditions of Sale

Exhibit E                    Independent Systems Integrator Certification and
                             Service Support Agreement for DeltaV™ Products

Rev.12/97
Apx. G                                  68

FCI 500099

INDEPENDENT SYSTEMS INTEGRATOR AGREEMENT FOR DeltaV PRODUCTS

EXHIBIT A

Applicable DeltaV Product Discounts

The following DeltaV Products and discounts are included in this Agreement.

| Model Number | Price List | Discount | Description |
|---|---|---|---|
| VE21XX Series | Current | | Visual User Station Software |
| VE22XX Series | Current | | Integration Station Software |
| VE31XX Series | Current | | Visual Control Software |
| VE41XX Series | Current | | Serial I/O Software |
| VE30XX Series | Current | | Controller, Power/Controller Carrier |
| VE40XX Series | Current | | I/O, I/O Interface Carrier |
| VE5001, VE5002 | Current | | System Power Supply and Passthrough Power Supply |
| VE6101 | Current | | Carrier Blank Cap |
| KJXXXX Series | Current | | Replacement/Spare Parts |
| VE20XX Series | Current | | PCs, monitors, accessories |
| VE5003, VE5004, VE5005, VE5006 | Current | | Bulk Power Supplies, UPS |
| VE6XXX Series | Current | | Hubs, Network Cable, Cable Connector Kit |
| VE99XX Series | Current | | Documentation |
| VE9001 Series | Current | | Foundation Services |
| VE9002 Series | Current | | Extended Warranty |
| VE9010 Series | Current | | Integration Station Telephone Support (8hrs) |

Rev.12/97
Apx. G

69

FCI 500100

INDEPENDENT SYSTEMS INTEGRATOR AGREEMENT FOR DeltaV PRODUCTS

EXHIBIT B

Purchase Order Location

(insert ISI's address)

FCI 500101

INDEPENDENT SYSTEMS INTEGRATOR AGREEMENT FOR DeltaV PRODUCTS

## EXHIBIT C

### Software License Agreement

BY OPENING THIS PACKAGE YOU AGREE TO ACCEPT THESE TERMS AND CONDITIONS. IF YOU DO NOT AGREE WITH THESE TERMS, YOU SHOULD PROMPTLY RETURN THE PACKAGE UNOPENED AND YOUR MONEY WILL BE REFUNDED. Fisher-Rosemount Systems, Inc. (FRSI) provides this computer program and related materials for your use. You assume responsibility for the acquisition of a machine and associated equipment compatible with the program, and for installation, use, and results obtained from the program.

LICENSE: FRSI grants to you a non-transferable, non-exclusive license to: (a) use all fully paid up licensed programs provided to you to run on a single machine; (b) copy the program for backup or modification purposes in support of the program on the single machine. You must reproduce and include the copyright notice on any copy or modification. YOU MAY NOT REVERSE ENGINEER, USE, COPY, OR MODIFY ANY PROGRAM OR RELATED MATERIALS OR ANY COPY, MODIFICATION, IN WHOLE OR IN PART, EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS LICENSE. IF YOU TRANSFER POSSESSION OF ANY COPY OR MODIFICATION OF THE PROGRAM OR RELATED MATERIALS TO ANOTHER PARTY, YOUR LICENSE IS AUTOMATICALLY TERMINATED.

TITLE: Title to and ownership of the program and related materials shall at all times remain with FRSI or its licensors. Your right to use the same is at all times subject to the terms and condition of this Agreement. FRSI may, from time to time, revise or update the program and/or related materials and, in so doing, incurs no obligation to furnish such revisions or updates to you.

TERM: This license is effective upon opening this package. You may terminate it at any time by destroying the program and the related materials together with all copies and modifications in any form. It will also terminate upon conditions set forth elsewhere in this Agreement or if you fail to comply with any term or condition of this Agreement. You agree upon such termination to destroy the program and the related materials together with all copies and modification in any form.

LIMITED WARRANTY: FRSI warrants the media on which the program is furnished to be free from defects in materials and workmanship under normal use for a period of ninety (90) days from the date of delivery to you as evidenced by a copy of your invoice. However, FRSI does not warrant that the functions contained in the program wi meet your requirements or that the operation of the program will be uninterrupted or error free. THE PROGRAM AND RELATED MATERIALS ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM IS WITH YOU. SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR, OR CORRECTION.

LIMITATIONS OF REMEDIES: FRSI's entire liability and your exclusive remedy shall be: (1) the replacement of any media not meeting FRSI's "Limited Warranty" and which is returned with a copy of your invoice to Fisher-Rosemount Systems, Inc., 8301 Cameron Road, Austin, Texas 78754, or (2) if FRSI is unable to deliver a replacement media which is free of defects in materials or workmanship, you may terminate this Agreement by returning the program and your money will be refunded. IN NO EVENT WILL FRSI BE LIABLE TO YOU FOR ANY DAMAGES ARISING OUT OF ANY CAUSES WHATSOEVER (WHETHER SUCH CAUSES BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT, PATENT INFRINGEMENT, OR OTHERWISE), INCLUDING ANY LOST PROFITS, LOST SAVINGS, OR OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE SUCH PROGRAM EVEN IF FRSI HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, OR OF ANY CLAIM BY ANY OTHER PARTY.

GOVERNING LAW: This Agreement, and all matters concerning its construction, interpretation, performance or validity, shall be governed by the laws of the State of Texas.

Rev.12/97
Apx. G                                              71

EXPORT RESTRICTIONS: Licensee shall comply fully with all laws, regulations, decrees and orders of the United States of America that restrict or prohibit the exportation (or re-exportation) of technical data and/or the direct product of it to other countries, including, without limitation, the U.S. Export Administration Regulations.

U.S. GOVERNMENT RIGHTS: The programs and related materials are provided with "RESTRICTED RIGHTS." Use, duplication or disclosure by the U.S. Government is subject to restrictions set forth in the Federal Acquisition Regulations and its Supplements.

GENERAL: You may not sublicense, assign, or transfer the license or the program and related materials without the prior written consent of FRSI. Any attempt otherwise to sublicense, assign or transfer any of the rights, duties, or obligations hereunder without such consent is void. Should you have any question concerning this Agreement, please contact your FRSI representative or sales office.

YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, UNDERSTAND IT, AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS. YOU FURTHER AGREE THAT IT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US WHICH SUPERSEDES ANY PROPOSAL OR PRIOR AGREEMENT, EXCEPT THE MASTER LICENSE AGREEMENT, ORAL OR WRITTEN, AND ANY OTHER COMMUNICATIONS BETWEEN US RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT. YOU AGREE THAT FRSI MAY AUDIT YOUR FACILITY TO CONFIRM COMPLIANCE WITH THE FOREGOING PROVISIONS.

Rev.12/97
Apx. G                        72

FCI 500103

INDEPENDENT SYSTEMS INTEGRATOR AGREEMENT FOR DeltaV PRODUCTS

EXHIBIT D

Fisher-Rosemount Standard Terms and Conditions of Sale

These terms and conditions, the attendant quotation or acknowledgment, and all documents incorporated by reference therein, bind the company(s) which issues the quotation or acknowledgment for the provision of services (Services) and/or the sale of goods, including (except as provided in Section 11) firmware incorporated therein (Goods), to be provided hereunder by seller (i.e., Fisher Controls International, Inc., Rosemount Inc., Fisher-Rosemount Systems, Inc. or other Fisher-Rosemount Group Company), hereinafter Seller, and the buyer, hereinafter Buyer, and constitute the entire agreement (Agreement) between Buyer and Seller regarding such sale and/or provision.

1. **PRICES:** Unless otherwise specified by Seller, Seller's price for the Goods and/or Services shall remain in effect for thirty (30) days after the date of Seller's quotation or acceptance of the order for the Goods/Services, whichever is delivered first, provided an unconditional, complete authorization for the immediate manufacture and shipment of the Goods and/or provision of Services pursuant to Seller's standard order processing procedures is received and accepted by Seller within such time period. If such authorization is not received by Seller within such thirty (30) day period, Seller shall have the right to change the price for the Goods/Services to Seller's price in effect for the Goods/Services at the time the order is released to final manufacture. Notwithstanding any of the foregoing to the contrary, the price for Goods/Services sold by Seller, but manufactured by others, shall be Seller's price in effect at the time of shipment to Buyer.

2. **DELIVERY AND DOCUMENTATION:** All shipping dates are approximate and are based upon Seller's prompt receipt of all necessary information from Buyer to properly process the order. Seller shall provide Buyer with that data/documentation which is specifically identified in the quotation. If additional copies of data/documentation or non-standard data/documentation are to be provided by Seller, they shall be provided to Buyer at Seller's price then in effect.

3. **EXCUSE OF PERFORMANCE:** Seller shall not be liable for delays in performance or for non-performance due to acts of God, war, riot, fire, labor trouble, unavailability of materials or components, explosion, accident, compliance with governmental requests, laws, regulations, orders or actions, or unforeseen circumstances or causes beyond Seller's reasonable control.

4. **TERMINATION AND SUSPENSION BY BUYER:** Buyer may terminate or suspend its order for any or all of the Goods/Services covered by the Agreement, provided that Buyer gives Seller reasonable advance written notice of such termination or suspension and reimburses Seller for all losses, damages, costs and expenses arising from such termination or suspension.

5. **LIMITED WARRANTY:** Subject to the limitations contained in Section 6 and except as otherwise expressly provided herein, Seller warrants that the firmware will execute the programming instructions provided by Seller, and that the Goods manufactured or Services provided by Seller will be free from defects in materials or workmanship under normal use and care until the expiration of the applicable warranty period. Goods are warranted for twelve (12) months from the date of initial installation or eighteen (18) months from the date of shipment by Seller, whichever period expires first. Consumables and Services are warranted for a period of 90 days from the date of shipment or provision. Products purchased by Seller from a third party for resale to Buyer ("Resale Products") shall carry only the warranty extended by the original manufacturer. Buyer agrees that Seller has no liability for Resale Products beyond making a reasonable commercial effort to arrange for procurement and shipping of the Resale Products. If Buyer discovers any warranty defects and notifies Seller thereof in writing during the applicable warranty period, Seller shall, at its option, promptly correct any errors that are found by Seller in the firmware or Services, or repair or replace F.O.B. point of manufacture that portion of the Goods or firmware found by Seller to be defective, or refund the purchase price of the defective portion of the Goods/Services. All replacements or repairs necessitated by inadequate maintenance, normal wear and usage, unsuitable power sources, unsuitable environmental conditions, accident, misuse, improper installation, modification, repair, storage or handling, or any other cause not the fault of Seller are not covered by this limited warranty, and shall be at Buyer's expense. Seller shall not be obligated to pay any costs or charges incurred by Buyer or any other party except as may be agreed upon in writing in advance by an authorized Seller representative. All costs of dismantling, reinstallation and freight and the time and expenses of Seller's personnel for site travel and diagnosis under this warranty clause shall be borne by Buyer unless accepted in

Rev.12/97

Apx. G                                    73

FCI 500104

writing by Seller. Goods repaired and parts replaced during the warranty period shall be in warranty for the remainder of the original warranty period or ninety (90) days, whichever is longer. This limited warranty is the only warranty made by Seller and can be amended only in a writing signed by an authorized representative of Seller. Except as otherwise expressly provided in the Agreement, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, OR ANY OTHER MATTER WITH RESPECT TO ANY OF THE GOODS OR SERVICES.

6. LIMITATION OF REMEDY AND LIABILITY: SELLER SHALL NOT BE LIABLE FOR DAMAGES CAUSED BY DELAY IN PERFORMANCE. THE SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY HEREUNDER SHALL BE LIMITED TO REPAIR, CORRECTION, REPLACEMENT OR REFUND OF PURCHASE PRICE UNDER THE LIMITED WARRANTY CLAUSE IN SECTION 5. IN NO EVENT, REGARDLESS OF THE FORM OF THE CLAIM OR CAUSE OF ACTION (WHETHER BASED IN CONTRACT, INFRINGEMENT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE), SHALL SELLER'S LIABILITY TO BUYER AND/OR ITS CUSTOMERS EXCEED THE PRICE TO BUYER OF THE SPECIFIC GOODS MANUFACTURED OR SERVICES PROVIDED BY SELLER GIVING RISE TO THE CLAIM OR CAUSE OF ACTION. BUYER AGREES THAT IN NO EVENT SHALL SELLER'S LIABILITY TO BUYER AND/OR ITS CUSTOMERS EXTEND TO INCLUDE INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES. THE TERM "CONSEQUENTIAL DAMAGES" SHALL INCLUDE, BUT NOT BE LIMITED TO, LOSS OF ANTICIPATED PROFITS, LOSS OF USE, LOSS OF REVENUE AND COST OF CAPITAL.

7. PATENTS: Subject to the limitations contained in Section 6, Seller shall defend any suits brought against Buyer based on a claim that use of the Goods manufactured by Seller constitutes an infringement of a valid patent of the United States, and shall pay any damages awarded therein against Buyer, provided that Buyer: promptly notifies Seller in writing of the filing of such suit or the threat thereof; permits Seller to control completely the defense or compromise of such claim of infringement; and provides all reasonable assistance and cooperation requested by Seller for the defense of such suit. In the event that only the Goods manufactured by Seller are held to be infringing in such suit and their use is enjoined, Seller shall, at Seller's option and expense provide a commercially reasonable alternative, including, but not limited to, procuring for Buyer the right to continue using the Goods, replacing them with a non-infringing product or modifying them so they become non-infringing. Buyer agrees that Seller shall not be liable for infringement, and that Buyer shall fully indemnify Seller therefor, if infringement is based upon the use of Goods in connection with goods not manufactured by Seller or in a manner for which the Goods were not designed by the Seller or if the Goods were not designed by the Seller or if the Goods were designed by the Buyer or were modified by or for the Buyer in a manner to cause them to become infringing.

8. INSTALLATION: Buyer shall be responsible for receiving, storing, installing, starting up and maintaining all Goods. Seller shall provide a quotation for services to assist Buyer in these functions if requested.

9. TAXES: Any tax or governmental charge payable by the Seller because of the manufacture, sale or delivery of the Goods, or provision of Services, may at Seller's option be added to the price herein specified. The foregoing shall not apply to taxes based upon Seller's net income.

10. TERMS OF PAYMENT: Subject to the approval of Seller's Credit Department, terms are F.O.B. shipping point, net 30 days from date of Seller's invoice in U.S. currency, except for applicable milestone payments covered below or export shipments for which Seller may require other arrangements. If any payment owed to Seller hereunder is not paid when due it shall bear interest, at a rate to be determined by Seller which shall not exceed the maximum rate permitted by law, from the date on which it is due until it is paid. Seller shall have the right, among other remedies, either to terminate the Agreement or to suspend further deliveries under this and/or other agreements with Buyer in the event Buyer fails to make any payment hereunder when due. Buyer shall be liable for all expenses attendant to collection of past due amounts including attorneys' fees.

Unless otherwise provided in Seller's written quotation, periodic milestone payments shall be made by Buyer when the purchase price of this Agreement exceeds $100,000. In such cases, invoices shall be issued by Seller and paid by Buyer based on the following milestones: Milestone 1: 30% of price upon acceptance of order by Seller. Milestone 2: 30% of price upon release of approved bills of material to manufacturing for assembly. Milestone 3: 40% of price upon shipment of the Goods by Seller. Seller reserves the right to designate additional Milestones where the Agreement provide for Services in excess of $50,000.

Rev.12/97
Apx. G                                    74

FCI 500105

11. SOFTWARE AND FIRMWARE: Notwithstanding any other provision herein to the contrary, Seller or applicable thir party owner shall retain exclusive title to its respective firmware and software. Except as otherwise provided herein, Buyer i hereby granted a nonexclusive, royalty free license to use firmware incorporated into the Goods. Buyer's use of certai firmware (as specified by Seller) and all other software shall be governed exclusively by Seller's and/or third party owner' applicable license terms.

12. BUYER SUPPLIED DATA: To the extent that Seller has relied upon any specifications, information, representation o operating conditions or other data supplied in writing by Buyer to Seller in the selection or design of the Goods and/o provision of the Services and the preparation of Seller's quotation, and in the event that actual operating conditions or othe conditions differ from those represented by Buyer and relied upon by Seller, any warranties or other provisions containe herein which are affected by such conditions shall be null and void, unless otherwise mutually agreed upon in writing.

13. GENERAL PROVISIONS: (a) Buyer shall not assign its rights or obligations under the Agreement without Seller's prior written consent. (b) There are no understandings, agreements or representations, express or implied, not specified in the Agreement. (c) No action, regardless of form, arising out of transactions under the Agreement, may be brought by either party more than two (2) years after the cause of action has accrued. (d) Any modification of these terms and conditions must be set forth in a written instrument signed by a duly authorized representative of Seller. (e) The Agreement is formed and shall be construed, performed and enforced under the laws of the State of Missouri. However, Buyer and Seller agree that the proper venue for all actions arising under the Agreement shall be only in the State where the Goods involved in such actions were manufactured. (f) If Goods/Services supplied hereunder are to be used in nuclear applications, including, without limitation, any power generation facility, Buyer fully indemnifies Seller pursuant to Seller's "Special Nuclear Terms of Sale" a copy of which is available upon request. (g) The 1980 United Nations Convention on Contracts for the International Sale of Goods does not apply to this Agreement.

FCI 500106

INDEPENDENT SYSTEMS INTEGRATOR AGREEMENT FOR DeltaV PRODUCTS

EXHIBIT E

FISHER-ROSEMOUNT SYSTEMS, INC.

Independent Systems Integrator Certification and Service Support Agreement for DeltaV™ Products

Between Fisher-Rosemount Systems, Inc. ("FRSI"), having a principal place of business at 8301 Cameron Road, Austin, Texas 78726 , and the party identified as Independent Systems Integrator on the signature line of this Agreement ("ISI").

This Agreement sets forth the terms under which (a) FRSI shall provide Certification and Service Support for DeltaV Products to ISI, and (b) ISI shall perform certification requirements for DeltaV Products.

FRSI and ISI, intending to be legally bound, agree as follows:

"Certification and Service Support Subscription" means the initial ·                                    fee to be paid by check to FRSI for the benefits of Systems Integrator Program including, but not limited to:

- One (1) seat in a Fisher-Rosemount Systems conducted DeltaV integration training class.
- A       discount on additional DeltaV integration training classes.
- A "Gold" System Identification Key (expiration to match certification period), for use in checking out end user system configurations using the customer's license keys.
- Access to factory technical support data bases, including call tracking systems and installed systems profiles.
- Purchase discount for DeltaV Development Systems.
- No charge Foundation Support and warranty parts replacement service for customer systems while being staged by the SI prior to delivery to the end user.

For each subsequent year in which the ISI remains a DeltaV Systems Integrator the ISI will pay a                                    renewal fee for the benefits listed above. All costs for travel and living expenses for the training classes are the responsibility of the ISI. Unless otherwise noted, all training classes will be held at Fisher-Rosemount System's corporate office in Austin, TX. The Certification and Service Support fee must be attached to the signed copies of the Certification and Support Services Agreement when returned to FRSI. DeltaV Systems Integrator status will not be considered active until the service subscription fee is received by FRSI. Please indicate that payment is the Certification and Service Support Subscription for the DeltaV Systems Integrator Program.

For the benefits listed above, the ISI agrees to meet the certification requirements outlined in Exhibit A of the DeltaV Independent Systems Integrator Certification Manual.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective authorized officials.

FISHER-ROSEMOUNT SYSTEMS, INC.          SYSTEMS INTEGRATOR:
8301 Cameron Road                       Address:
Austin, Texas 78754


By:_____      By:_____

Title:_____      Title:_____

Date:_____      Date:_____

Rev.12/97
Apx. G                                  76

ADDENDUM
TO
AGREEMENT
BETWEEN
FISHER CONTROLS INTERNATIONAL, INC.
AND
NORTHEAST CONTROLS, INC.

January 1, 1998

The subject agreement is hereby modified to include the following paragraph in
Appendix G, Exhibit F, Section 4:

    (h)    While ISI may provide any terms and conditions it desires to End-Use
Customers, ISI expressly agrees to conduct its sales to End-Use Customers such
that the liability of Company and Fisher-Rosemount Systems, Inc. under ISI's
sales to End-Use Customers is limited as set forth in Exhibit D; and ISI agrees
that the liability of Company and Fisher-Rosemount Systems, Inc. is absolutely
limited as set forth in Exhibit D.  To the extent that ISI has not limited the liability
of Company and Fisher-Rosemount Systems, Inc. as required by this Section 4
(h), ISI agrees that it shall, at its own expense, protect, defend, indemnify and
hold harmless Company and Fisher-Rosemount Systems, Inc. from and against
all claims, actions, losses, damages, liabilities, costs and expenses which may
arise out of or be made in connection therewith.

Acknowledged and agreed:

NORTHEAST CONTROLS, INC.

By _____
Title:  President

FCI 500108

# EXHIBIT B



# Worldwide Procurement Agreement

## 1 January 1995

## Agreement # 80171750T



FISHER-ROSEMOUNT™

## *Praxair, Inc. and Fisher-Rosemount*
### *Worldwide Agreement: #80171750T*

*This Agreement numbered; 80171750T, dated 1 January 1995, between PRAXAIR, INC., a Delaware corporation, having an office at 39 Old Ridgebury Road, Danbury, Connecticut 06810-5113 (hereinafter called "Buyer"), and Fisher-Rosemount, having a place of business at 12001 Technology Drive, Eden Prairie, Minnesota 55344-3695 (hereinafter called "Seller"). As used herein, the term "Fisher-Rosemount" shall mean, collectively and individually, the entities listed in Section I below, labeled Scope. In consideration of the mutual promises herein, Seller and Buyer agree as follows:*

*I. Scope*

*Seller hereby agrees to sell and Buyer hereby agrees to purchase, on the terms and conditions hereinafter set forth, process instrumentation and services (hereinafter called "Goods and Services") as Buyer may order from Seller by means of "Releases." Unless specifically modified herein, all terms and pricing in any and all existing agreements from all said group companies shall be superseded by this new agreement. Process instruments and terms as defined in Exhibits A through E, with Fisher-Rosemount group companies include:*

*-Exhibit A:   Rosemount, Inc. Measurement Division [6 Pgs. Total]*
*-Exhibit A:   Micro Motion Inc.*
*-Exhibit A:   Rosemount Analytical Inc.*
   *◆ RAI-Irvine, California*
   *◆ RAI-LaHabra, California*
   *◆ RAI-Orrville, Ohio*

*-Exhibit B:   Fisher Controls, Inc.  [2 Pgs.]*
*-Exhibit C:   Rosemount Service and Support Division [2 Pgs.]*
*-Exhibit D:   Praxair's Transportation Routing Conditions [5 Pgs.]*
*-Exhibit E:   Commercial Terms & Conditions [6 Pgs.]*

*This Agreement applies to all Buyer's worldwide locations as well as subsidiaries, affiliates, and joint ventures where Buyer has greater THAN 50% ownership or where PRAXAIR DIRECTLY MANAGES the facility. JOINT VENTURES WHERE PRAXAIR HAS 50% OWNERSHIP ARE ELIGIBLE FOR THE PRICING AND TERMS CONTAINED HEREIN PROVIDED THAT THEY ALSO ACCEPT THE COMMITMENTS CALLED FOR HEREIN. This agreement will additionally include SIAD and SIAD Macchine Impianti in Italy, and PT. Praxair Indonesia in Jakarta.*

*ENGINEERING CONTRACTORS WORKING ON BEHALF OF BUYER ARE ELIGIBLE FOR THE PRICING CONTAINED HEREIN, PROVIDED THAT THEY ALSO ACCEPT THE TERMS OF THIS AGREEMENT.*

*The pricing and terms contained herein will be honored by all Seller's subsidiary locations as well as by Seller's authorized representatives and/or agents. This Agreement may be expanded to include other Seller's Group companies as desired by Buyer.*

## II. *Duration/Termination*

*This agreement shall remain "Evergreen" with regularly scheduled meetings every (3) three months or as deemed necessary by both parties. The intent of "Evergreen" status is to assure that both respective companies maintain focus and jointly implement a strategic plan to pursue Buyer's opportunities worldwide while assuring continued commitment for success. Either party will retain the right to terminate the provisions of this Agreement, in its entirety, with or without cause, by giving the other party 60 (sixty)days written notice.*

## III. *Primary Source Commitment*

*In return for these prices, terms, and alliance status, Seller shall be considered Buyer's primary supplier of electronic process instrumentation and control valves. Primary is defined as, where Seller's products meet or reasonable meet Buyer's technical requirements. Seller shall be given first opportunity to supply all of Buyer's related requirements, per the pricing and terms of this Agreement. THIS COMMITMENT APPLIES TO RELEASES PLACED BY BUYER DIRECTLY OR PLACED BY CONTRACTORS OR AGENTS OPERATING ON BUYER'S BEHALF.*

## IVa. *United States Pricing*

*The Seller's standard, published U.S. List Price sheets dated January 1994 and appropriate multipliers set forth in Exhibit A through D for the divisions listed, shall be the basis for worldwide pricing for said products. The product of Seller's U.S. List Price in effect at time of order placement and the appropriate multiplier from referenced Exhibits shall be referred to as Buyer's Net Price in U.S. dollars. Discounts reflect the product price of single purchase orders. Spare parts and buy-outs are not discounted unless indicated on the price tables. The discounts agreed to are based on an estimated annual business level of $8.5 million for all Fisher-Rosemount Group products [$4.5 million/Measurement & $4 million/Valves].*

## IVb. *Worldwide Pricing & Special Projects*

*Pricing for all orders covered under this Agreement shall be in accordance with current U.S. Price Lists and Exhibits A through D per the definitions contained herein. All selling prices are in U.S. dollars. For special projects that exceed expected yearly volumes beyond estimates stated above, preferential product pricing shall be considered for said projects. It is desired that said projects shall be identified during the annual capital expenditure review meetings to qualify for preferential pricing.*

## V. Price Protection

*Prices to Buyer and associates mentioned on previous pages, shall be implemented using Seller's U.S. List Price sheets dated January 1994. Thereafter, Seller may increase or decrease said prices upon a 45 day written notification and then only in the event of a general price increase by Seller to all customers. In no event shall product pricing increase by more than 5% per annum. During a 45 day price protection period, releases shall be placed using pre-notification prices, providing delivery is accepted within 6 (six) months. In the event of a general pricing repositioning of Seller's products covered herein, both parties shall mutually agree to adjust the multipliers to maintain approximately the same Net Price to Buyer.*

## VI. Currency Conversions

*For prices quoted in currencies other than U.S. dollars, all conversions will be done at Emerson Electric Company's published exchange rates, which are updated every 6 (six) months. Updates will be forwarded to Buyer's Procurement Department for further distribution within Buyer's company as appropriate. If the actual exchange rate at time of order entry varies by more than 5% in either direction from the published Emerson rate then in effect, a new rate shall be agreed upon locally by both parties prior to actual order entry.*

## VII. Shipping Terms

*Any special packaging (such as export packaging), freight, insurance, and applicable taxes and/or duties between the specified FCA or EX-Works point from Exhibits A through D and the destination shall be at Buyer's account. For orders from Fisher Controls, Buyer will take liability for damages during shipping. However, Fisher Controls will accept freight charges on standard deliveries as noted in Exhibit B, pages 1 and 2.*

## VIII. Payment Terms

*Payment terms shall be 2% 10, EFT 30 Days from date of invoice. If regions outside the U.S. or Canada are unable to administer an Electronic Funds Transfer, payment terms shall be Net 30 days from date of invoice. Letters of Credit may be required in Latin America and Mexico. This requirement will be reviewed and defined during the quotation stage prior to order entry.*

## IX. Commercial Terms and Conditions

*Unless specifically modified herein, the Terms and Conditions presently agreed to between our respective companies shall apply to all releases received hereunder in North and South America, Europe, and Asia. The aforementioned document shall form the basis for any local terms which may be required outside of these regions or which may be required by Buyer's local purchasing locations in order to release actual Releases. Such regional or local terms shall not conflict substantially with the terms of this document without the prior written consent of Seller's Account Director and Buyer's Procurement Agent. In the event of any such conflict which does not have the aforementioned required approvals, the terms of this Agreement shall prevail.*

X. *Services*

At Buyer's request, Seller shall provide Services and Buyer shall pay for Services, in accordance with Exhibit C, dated January 1, 1995. Seller may increase said rate only upon a forty-five (45) days written notification, and only in the event of a general price increase by Seller to all its customers.

Seller warrants that Services performed hereunder shall be rendered in a workmanlike fashion. In the event Buyer notifies Seller within forty-five (45) days from the date any Services are performed that such Services fail to conform to this warranty, Seller shall, at its option, conform such Services to this warranty, at no cost to Buyer. With respect to parts and materials provided to Buyer in connection with Services, Seller shall assist Buyer in obtaining from the manufacturer, in accordance with the manufacturer's warranty (copies of which shall be furnished upon request) or customary practice, the repair or replacement of parts and materials that may prove defective in the material or workmanship.

The Seller agrees to first, review and then comply to Buyer's Form: L-11-454-E, entitled, "Safety, Health & Environmental Rules for Contractors" providing policies of this document do not conflict with the safety policies as established for Seller's Service personnel. A copy of document L-11-454-E, dated September 1992, is on file with Rosemount's Service and Support Division.

Seller shall provide a current copy of their Workmen's Compensation and Liability Insurance certificate(s). It must be in Buyer's possession prior to the commencement of any work. Certificate(s) shall be mailed to the following address: Praxair, Inc., P.O. Box 44, Tonawanda, NY 14151-0044, Attn: Procurement Department.

Seller shall submit invoices to Buyer in a timely manner but not later than four (4) weeks after the completion of the work. Invoices must be supported with appropriate backup information which shall include, but not be limited to, a report of the work completed, detailed time sheets for labor, and invoices for additional cost for material and supplies. Each invoice shall reference Agreement Number: 80171750T. Payment shall be 2% 10, EFT 30 days.

XI. *Engineering Assistance*

Seller agrees to continue to place a high priority on Buyer's product and project development initiatives. Such programs will be reviewed and prioritized periodically via joint meetings. Seller further agrees to assist Buyer during the engineering phase of capital projects. Such assistance may include, but is not limited to, review of application requirements, review of specification sheets, and translation of Buyer's specifications into Seller's product numbers. Details of such engineering assistance, including capabilities, scope and timing, shall be negotiated and arranged locally between Buyer and Seller's representatives and direct sales personnel.

## XII. *Purchases & Order Tracking*

*Seller will provide periodic Release reports summarizing the level of Buyer's purchasing activity by each division. The frequency of these reports will be agreed upon between Buyer and Seller's local Group Representatives. Releases administered by Buyer shall reference Agreement Number: 80171750T. Buyer is responsible for communicating the terms of this Agreement to its locations and beneficiaries. In the event of a situation where the pricing specified in this Agreement is not properly applied to any given Release, Buyer must notify Seller verbally and in writing within six (6) months of the date that the goods were shipped in order to request a monetary adjustment.*

## XIII. *Routine Audits*

*As this relates to separate Releases, Seller agrees to keep proper records on account, establishing each of the transition costs applicable to Releases hereunder, and such records shall be available to audit and inspection by Buyer at all reasonable times during, and for a period of two (2) years after expiration or termination of this Release.*

## XIV. *Strategic Alliances*

*To gain a better understanding of the Fisher-Rosemount position regarding alliances and joint cooperation, please refer to the Memorandum of Understanding affixed as Attachment A.*

*THIS AGREEMENT SUPERSEDES AND REPLACES*
*ANY PRIOR AGREEMENT OR AGREEMENTS BETWEEN BUYER AND SELLER.*

By: _____ Date: 1/4/95
    Ed Hotard/President Praxair
    and President Gases USA

By: _____ Date: 4 Jan 95
    Rob Bateman/Chief Executive Officer
    Rosemount, Inc.

By: _____ Date: 1/4/95
    Mike Peters/President
    Northeast Controls, Inc.

*In witness where of, Praxair, Inc., Northeast Controls, Inc., and Fisher-Rosemount above have caused this Agreement to be signed and executed by their duly authorized representatives.*

*Attachment A*

## MEMORANDUM OF UNDERSTANDING

*Between Praxair, Inc. and Fisher-Rosemount*

### 1.    PARTIES

*The Parties to this Memorandum of Understanding are:*

*The Purchaser, being Praxair, Inc.*

*and*

*The Supplier, being Fisher-Rosemount*

### 2.    SCOPE

*This Memorandum does not represent a formal contract between the Parties, nor is it intended to do so, but only set out the basis upon which Praxair, Inc., and Fisher-Rosemount will cooperate in the area of application of Fisher-Rosemount Group products, in use or planned to be used by Praxair, Inc.. This Memorandum describes the required organizational structure and the approach to establishing the intended level of cooperation.*

### 3.    OBJECTIVES

*The Parties intend to develop to a more open business relationship with the aim to increase mutual competitive advantages. Generally, the objective of the relationship include:*

*(a)    To identify and explore all business opportunities in an atmosphere of close communication and defined risk.*

*(b)    To establish effective communications pertaining to technological advances and business conditions.*

*(c)    To achieve a major increase in resource efficiencies through a commitment for multiple implementations of technology standards.*

*(d)    To achieve continuous improvement in the areas of quality, reliability, time to market, service, technology, delivery, training and costs.*

4.     *VISION STATEMENT*

*Praxair and Fisher-Rosemount agree to develop a mutually beneficial relationship. This will be a long-term commitment between the two organizations, for the purpose of achieving each party's business objectives.*

*The parties will strive toward trust, common goals and an understanding of each other's individual expectation and values.*

*Expected benefits include shorter project lead times, stable and competitive product pricing, reduction of costs for Praxair, Inc., projects by improved engineering productivity, improved efficiency and cost effectiveness, increased opportunity for innovation and continuous improvement in product applications.*

*Achievement of these benefits will lead to the progressive increase of business between the parties.*

5.     *FORWARD DIRECTION*

*To achieve the agreed objectives, the parties will identity and employ areas of mutual benefit. For this purpose Praxair, Inc., and Fisher-Rosemount will:*

-     *Provide a focal point for communication participation of all interested parties*

-     *Promote improvements in the areas of Process Control & Automation Technology and Technology implementation*

-     *Identify, justify, and communicate the benefits of Process Control & Automation*

-     *Develop, maintain and support standards, transportable expertise and guidelines, and ensure consistent concepts*

-     *Identify and list training needs and product standards*

-     *Develop systems for monitoring and sharing project and operating experience*

-     *Develop and implement Life Cycle support Planning regimes*

-     *Define, develop and promote the interface into Integrated Manufacturing Systems*

-     *Share information on future needs, technology developments and resources.*

*Praxair, Inc., and Fisher-Rosemount agree to share views on Technology developments in their related fields, and to jointly support those International Councils that are forwarding new Technology development and application in Process Control and instrumentation.*

6.    *CORPORATE SUPPORT & COORDINATION*

*In order to obtain the intended benefits, Praxair, Inc., processing plants should be offered corporate support from both parties in matters related to Fisher-Rosemount Group products.*

*The required support & coordination structure will be organized as indicated below:*

-    *Praxair, Inc., will assign a North and South American contact coordinator. This coordinator is the Praxair, Inc., central day to day contact point for Fisher-Rosemount. The contact coordinator will maintain communication on technology issues and on matters relating with project execution. This functionality will extend to other regions of the world as deemed necessary by the Parties.*

-    *Praxair, Inc., will assign a North and South American buying coordinator. This coordinator will be responsible for the development and tracking of the commercial aspects of the relation between Praxair, Inc., and Fisher-Rosemount. This functionality will extend to other regions of the world as deemed necessary by the Parties.*

-    *Fisher-Rosemount will maintain a critical mass of resources with knowledge of Praxair's processes and specific applications.*

-    *The operation of the various Praxair, Inc., and Fisher-Rosemount support centers will be coordinated by the contact coordinator and the local sales representatives.*

*In addition to the above organizational aspects, the parties agree to:*

-    *Organize regular regional user group forums.*

-    *Provide support services from the Praxair, Inc., and Fisher-Rosemount support centers such as coordination and advise activities for Praxair production facilities.*

7.    *REGIONAL & WORLDWIDE SUPPORT TO PRAXAIR, INC., PRODUCTION SITES*

*Although the initial centers of support will be based in North America, other regional support centers for Praxair, Inc. projects may be established.*

*The most optimum combination of the above mentioned support functions and local Praxair, Inc. site resources and local Fisher-Rosemount engineering services and representatives, will be used in regional areas.*

*It is the intention that Fisher-Rosemount will strengthen their designated local support organization in those countries where Praxair, Inc., tends to place business with Fisher-Rosemount to effectively support the Praxair, Inc., production sites.*

*The scope of project services at Praxair, Inc., sites, such as plant automation and up grades, functional design specification, scope definitions, commissioning and start-up support will be negotiated for each individual project.*

## 8.    TRANSFER OF EXPERTISE

*A main responsibility of Fisher-Rosemount is to maximize the efficiency of Praxair's based plant automation and upgrades. This will be achieved through coordinating the efforts of the resource groups involved in order to define standards, to reduce duplication of effort and to promote transfer of expertise. A number of activities related to these objectives are listed below:*

*Praxair, Inc., and Fisher-Rosemount engineers will develop, document and issue a coordinated set of Engineering Standards for Praxair process applications. These standards will include:*

- *Generic Specifications*
- *Common system engineering structures and tools conforming to international standards*
- *Common project management and administration procedures*
- *Praxair, Inc., & Fisher-Rosemount quality procedures*
- *Project documentation*
- *Develop EDI specifications for order entry as required*

*Praxair, Inc., will actively encourage the application of these standards in all projects and specifications.*

## 9.    ORDER PATH

*To eliminate repeat tendering, multiple vendor assessment, overall project lead times and project costs, and to increase the efficiency of project handling, the following order path will be followed:*

- *Fisher-Rosemount may be invited by Praxair, Inc. to the pre-Capital Expenditure Proposal stage to provide budgetary project estimates.*

*After approval of the Capital Expenditure Proposal stage by Praxair, Inc., commitment can be made for Fisher-Rosemount Group products through an order from the agreed Praxair, Inc., contact or the specific production facility. A contract will be drawn up on the basis of the attached Terms and Conditions. During execution of the project, strict variation/change order procedures will be applied.*

## 10.    COMMERCIAL ISSUES

*Commercial issues related to the purchasing of Fisher-Rosemount Group products by Praxair, Inc., are covered in the attached Terms & Conditions. Establishment of current product discount schedules may commence at the earliest convenience of Praxair, Inc., and Fisher-Rosemount coordinators as recognized in part 6, Corporate Support & Coordination.*

FISHROSE.LBL
Worldwide Contract

GARY BLANCHAT
PRAXAIR, INC. (Plt. #661)
P. O. BOX 217
DEER PARK, TX 77536-0217

GEORGE EDDINGTON
PRAXAIR, INC. (Plt. #742)
P. O. BOX 250
DEER PARK, TX 77536-0250

T. E. PARTIN
PRAXAIR, INC. (Plt. #749)
P. O. BOX 35
HAMILTON, MS 39746-0035

J. D. DOCKINS
PRAXAIR, INC. (Plt. #849)
P. O. BOX 3777
TEXAS CITY, TX 77592-3777

N. G. RAUCH
PRAXAIR, INC. (Plt. #878)
P. O. BOX 1099
THEODORE, AL 36590-1099

CLYDE HOWARD
PRAXAIR, INC. (Plt. #885)
6710 HOGABOOM RD
GROVES, TX 77619

INEZ SCHUBERT
PRAXAIR, INC. (Plt. #906)
363 LINDE RD.
HUNTSVILLE, AL 35815-4268

DAN NOAH
PRAXAIR, INC. (Plt. #909)
1601 INDUSTRIAL DR.
NEOSHO, MO 64850-9058

SARAH DEDMON
PRAXAIR, INC. (Plt. #952)
P. O. BOX 1649
LA PORTE, TX 77572-1649

PARIS BURNLEY
PRAXAIR, INC. (Plt. #533)
P. O. BOX 930188
NORCROSS, GA 30093

L. C. MESSER
PRAXAIR, INC. (Plt. #704)
412 VAN DEL BLVD.
GADSDEN, AL 35904-2445

JOHN KIESPERT
PRAXAIR, INC. (Plt. #747)
P. O. BOX 424
NEW JOHNSONVILLE, TN 37134

C. F. BROOKS
PRAXAIR, INC. (Plt. #842)
2225 LONNECKER DR.
GARLAND, TX 75041-1204

MIKE NOWAK
PRAXAIR, INC. (Plt. #849)
P. O. BOX 3777
TEXAS CITY, TX 77592-3777

DONALD SMITH
PRAXAIR, INC. (Plt. #878)
P. O. BOX 1099
THEODORE, AL 36590-1099

R. H. BARBEE
PRAXAIR, INC. (Plt. #906)
363 LINDE RD.
HUNTSVILLE, AL 35815-4268

DAVE BOWERS
PRAXAIR, INC. (Plt. #909)
1601 INDUSTRIAL DR.
NEOSHO, MO 64850-9058

BOB HOECKER
PRAXAIR, INC. (Plt. #952)
P. O. BOX 1649
LA PORTE, TX 77572-1649

R. G. KLADZAN
PRAXAIR, INC. (Plt. #964)
2801 HAMMOCK RD.
MIMS, FL 32754-5681

K. E. PUBLICOVER
PRAXAIR, INC. (Plt. #661)
P. O. BOX 217
DEER PARK, TX 77536-0217

P. R. PEMBROKE
PRAXAIR, INC. (Plt. #742)
P. O. BOX 250
DEER PARK, TX 77536-0250

BILL RUNYAN
PRAXAIR, INC. (Plt. #747)
P. O. BOX 424
NEW JOHNSONVILLE, TN 37134

DWAYNE BLACK
PRAXAIR, INC. (Plt. #842)
2225 LONNECKER DR.
GARLAND, TX 75041-1204

W. L. RUNYAN
PRAXAIR, INC. (Plt. #869)
5055 OLD MILLINGTON RD.
MEMPHIS, TN 38127

R. A. VAUGHN
PRAXAIR, INC. (Plt. #885)
6710 HOGABOOM RD
GROVES, TX 77619

HAROLD RICE
PRAXAIR, INC. (Plt. #906)
363 LINDE RD.
HUNTSVILLE, AL 35815-4268

CINDY PAPP
PRAXAIR, INC. (Plt. #909)
1601 INDUSTRIAL DR.
NEOSHO, MO 64850-9058

JOHN SHEEHAN
PRAXAIR, INC. (Plt. #952)
P. O. BOX 1649
LA PORTE, TX 77572-1649

B. C. BEAN
PRAXAIR, INC. (Plt. #975)
P. O. BOX 250
DEER PARK, TX 77536-0250

G. K. HYLA
PRAXAIR, INC. (Plt. #975)
P. O. BOX 250
DEER PARK, TX  77536-0250

R. FERNANDEZ
PRAXAIR, INC. (Plt. #983)
BOX 1927
LA PORTE, TX  77571-1927

ALTON GADDIS
PRAXAIR, INC. (Plt. #983)
BOX 1927
LA PORTE, TX  77571-1927

D. P. KELLEHER
PRAXAIR, INC.
12000 NETWORK BLVD., BLDG. C
SAN ANTONIO, TX  78249

F. P. SCHRECHENGOST
PRAXAIR, INC.
RT. 1, BOX 5
HWY. 3142, GATE 866
HAHNVILLE, LA  70057

CARL CANTRELL
PRAXAIR, INC.
RT. 1, BOX 5
HWY. 3142, GATE 866
HAHNVILLE, LA  70057

TONY MOORE
PRAXAIR, INC. (Plt. #737)
P. O. BOX 1211
LORAIN, OH  44055

A. RAK
PRAXAIR, INC. (Plt. #737)
P. O. BOX 1211
LORAIN, OH  44055

J. RODRIQUEZ
PRAXAIR, INC. (Plt. #737)
P. O. BOX 1211
LORAIN, OH  44055

E. MOORE
PRAXAIR, INC. (Plt. #737)
P. O. BOX 1211
LORAIN, OH  44055

D. J. PUNTEL
PRAXAIR, INC. (Plt. #737)
P. O. BOX 1211
LORAIN, OH  44055

R. LEE
PRAXAIR, INC. (Plt. #719)
P. O. BOX 29008
ECORSE, MI  48229-0008

MIKE TWARDESKY
PRAXAIR, INC. (Plt. #719)
P. O. BOX 29008
ECORSE, MI  48229-0008

E. BRINKER
PRAXAIR, INC. (Plt. #753)
1224 NORTH BOO RD.
CHESTERTON, IN  46304

M. MIKOVICH
PRAXAIR, INC. (Plt. #753)
1224 NORTH BOO RD.
CHESTERTON, IN  46304

AL JOSIVOFF
PRAXAIR, INC. (Plt. #753)
1224 NORTH BOO RD.
CHESTERTON, IN  46304

R. KENDALL
PRAXAIR, INC. (Plt. #913)
P. O. BOX 712
WHITING, IN  46394

REID MARTIN
PRAXAIR, INC. (Plt. #913)
P. O. BOX 712
WHITING, IN  46394

F. LEARMAN
PRAXAIR, INC. (Plt. #914)
4400 KENNEDY AVE.
EAST CHICAGO, IN  46312-9998

R. NEWMAN
PRAXAIR, INC. (Plt. #914)
4400 KENNEDY AVE.
EAST CHICAGO, IN  46312-9998

M. SHANNON
PRAXAIR, INC. (Plt. #914)
4400 KENNEDY AVE.
EAST CHICAGO, IN  46312-9998

G. DOXTATER
PRAXAIR, INC. (Plt. #929)
4330 KENNEDY AVE.
EAST CHICAGO, IN  46312-9998

P. FUSCOE
PRAXAIR, INC. (Plt. #929)
4330 KENNEDY AVE.
EAST CHICAGO, IN  46312-9998

G. MARTIN
PRAXAIR, INC. (Plt. #959)
4450 KENNEDY AVE.
EAST CHICAGO, IN  46312

V. RIOLI
PRAXAIR, INC. (Plt. #959)
4450 KENNEDY AVE.
EAST CHICAGO, IN  46312

P. A. JOHNSON
PRAXAIR, INC. (Plt. #959)
4450 KENNEDY AVE.
EAST CHICAGO, IN  46312

N. ZACOK
PRAXAIR, INC. (Plt. #959)
4450 KENNEDY AVE.
EAST CHICAGO, IN  46312

D. WILCOX
PRAXAIR, INC. (Plt. #959)
4450 KENNEDY AVE.
EAST CHICAGO, IN  46312

D. ISHMON
PRAXAIR, INC. (Plt. #959)
4450 KENNEDY AVE.
EAST CHICAGO, IN  46312

E. MEJEAN
PRAXAIR, INC. (Plt. #959)
4450 KENNEDY AVE.
EAST CHICAGO, IN  46312

I. ISHMAL.
PRAXAIR, INC. (Plt. #959)
4450 KENNEDY AVE.
EAST CHICAGO, IN 46312

G. FRIDELL
PRAXAIR, INC. (Plt. #850)
6701 ST. JOHN AVE.
KANSAS CITY, MO 64125

S. FOG
PRAXAIR, INC. (Plt. #998)
11499 COURTHOUSE BLVD.
INVER GROVE HEIGHTS, MN 55077

L. GREEN
PRAXAIR, INC. (Plt. #998)
11499 COURTHOUSE BLVD.
INVER GROVE HEIGHTS, MN 55077

C. BRYLSKI
PRAXAIR, INC. (Plt. #998)
11499 COURTHOUSE BLVD.
INVER GROVE HEIGHTS, MN 55077

L. MYERS
PRAXAIR, INC. (Plt. #998)
11499 COURTHOUSE BLVD.
INVER GROVE HEIGHTS, MN 55077

R. SEARLE
PRAXAIR, INC. (Plt. #693)
ROUTE #1, BOX 14DD
SATANTA, KS 67870

R. SEARLE
PRAXAIR, INC. (Plt. #904)
ROUTE #1, BOX 4
LORRAINE, KS 67459

JOE SYROMI (Plt. #725)
c/o GE
260 HUDSON RIVER RD
WATERFORD, NY 12188

BOB STEWART
PRAXAIR, INC. (Plt. #738)
ROUTE 25
INSTITUTE, WV 25112

ROBERT SALTER
PRAXAIR, INC. (Plt. #738)
ROUTE 25
INSTITUTE, WV 25112

JIM MEYER
PRAXAIR, INC. (Plt. #722)
NORTHEAST STD. PLANTS
1721 SOUTH ALLEN ST.
STATE COLLEGE, PA 16801

LANNY WILLIAMS
PRAXAIR, INC. (Plt. #727)
SOUTHEAST STD. PLANTS
P. O. BOX 310
LUGOFF, SC 29078

L. J. MAZGAJEWSKI
PRAXAIR, INC. (Plt. #536)
554 SHELL RD.
CARNEYS POINT, NJ 08069

DALLAS SHELTON
PRAXAIR, INC. (Plt. #818)
55 PROGRESS PLACE
JACKSON, NJ 08527

R. V. STEPHENS
PRAXAIR, INC. (Plt. #872)
P. O. BOX 310
LUGOFF, SC 29078

TOM FALKOWSKI
PRAXAIR, INC. (Plt. #873)
UCAR STREET
SUFFIELD, CT 06078

D. R. HAUS
PRAXAIR, INC. (Plt. #881)
2929 TOWNSHIP LINE RD.
SOUDERTON, PA 18964

C. W. SHANNON
PRAXAIR, INC. (Plt. #889)
P. O. BOX 749
MARIETTA, OH 45750

J. H. MOORE
PRAXAIR, INC. (Plt. #894)
4832 HIGHWAY 421 NORTH
WILMINGTON, NC 28401-2244

R. J. LEROUX
PRAXAIR, INC. (Plt. #907)
P. O. BOX 877
WOODBRIDGE, NJ 07095-0877

M. L. BLACKBURN
PRAXAIR, INC. (Plt. #918)
7350 CARBIDE RD.
CURTIS BAY, MD 21226

G. K. PRIMBAS
PRAXAIR, INC. (Plt. #934)
P. O. BOX 39
ASHTABULA, OH 44004-0039

E. A. CASCIANI
PRAXAIR, INC. (Plt. #939)
4501 ROYAL AVE.
NIAGARA FALLS, NY 14303-2121

R. A. MOHAR
PRAXAIR, INC. (Plt. #941)
3201 NO. ARMISTEAD AVE.
HAMPTON, VA 23666

G. V. FINNEGAN
PRAXAIR, INC. (Plt. #942)
P. O. BOX 296
STRUTHERS, OH 44471-0296

MARK COOK
PRAXAIR, INC. (Plt. #953)
P. O. BOX 1496
NIAGARA FALLS, NY 14302

S. A. ARNEKLEV
PRAXAIR, INC. (Plt. #635)
1785 OLD OAKLAND RD.
SAN JOSE, CA 95131

J. M. TURNBULL
PRAXAIR, INC. (Plt. #726)
P. O. DRAWER U
HURLEY, NM 88043

LYNN HUSEBY
PRAXAIR, INC. (Plt. #765)
P. O. BOX 306
MAGNA, UT 84044

DAVE YOUNG
PRAXAIR, INC. (Plt. #840)
6 MILES NORTH OF CARLIN, NV
CARLIN, NV 89822

MIKE COOK
PRAXAIR, INC. (Plt. #843)
5735 EAST AIRPORT DR.
ONTARIO, CA 91761-8611

KEITH CASEY
PRAXAIR, INC. (Plt. #861)
2300 E. PACIFIC COAST HWY
WILMINGTON, CA 90744-2919

GREG MC CLUSKEY
PRAXAIR, INC. (Plt. #886)
2902 - 20TH ST. EAST
TACOMA, WA 98424

RAY LOGSDON
PRAXAIR, INC. (Plt. #935)
2000 LOVERIDGE RD.
PITTSBURG, CA 94565

DOUG CARR
PRAXAIR, INC. (Plt. #955)
950 DES MOINES AVE.
LOVELAND, CO 80537

M. M. STENBERG
PRAXAIR, INC. (Plt. #986)
10829 ETIWANDA AVE.
FONTANA, CA 92337-6984

FRED HERNER
PRAXAIR, INC. (Plt. #711)
c/o DOW CHEMICAL CO.
BLDG. 1366
MIDLAND, MI 48667

MATT RUSH
PRAXAIR, INC. (Plt. #745)
WALLACE ST AND AVENUE K
P. O. BOX 480
STERLING, IL 61081

T. PAYTON
PRAXAIR, INC. (Plt. #755)
CLARK & DEAN MITCHELL ROADS
GARY, IN 46406

D. DUFFICY
PRAXAIR, INC. (Plt. #709)
4450 KENNEDY AVE.
EAST CHICAGO, IN 46312

BARRY DARE
PRAXAIR, INC. (Plt. #605)
P. O. BOX 200395
CARTERSVILLE, GA 30120

Subsidiaries/
Affiliates

AMKO SERVICE COMPANY
J. G. CRAYNE
P. O. BOX 160
HOPE, AR 71801

AMKO SERVICE COMPANY
J. E. REICOSKY
P. O. BOX 426
HOPE, AR 44622

AMKO SERVICE COMPANY
R. K. WATSON
2296 LARSON RD., SE
P. O. BOX 220
GNADENHUTTEN, OH 44629

INNOVATIVE MEMBRANE SYS. INC.
W. C. PINCHES
189 DEAN ST.
NORWOOD, MA 02062

J. FLYNN
PRAXAIR, INC.
P. O. BOX 4010
HARRISBURG, PA 17111-0010

SPECIALTY GASES -
HELIUM

R. BURGESS
PRAXAIR, INC.
223 REAR HARTFORD PIKE
SHREWSBURY, MA 01545

A. DUVA
PRAXAIR, INC.
P. O. BOX 237
INDUSTRIAL HIGHWAY
KEASBEY, NJ 08832

G. KRIEPS
PRAXAIR, INC.
P. O. BOX 501
4550 KENNEDY AVE.
EAST CHICAGO, IN 46312

T. TABLER
SEMATECH
SITE GAS MANAGEMENT
2706 MONTOPOLIS DR.
P. O. BOX 17906
AUSTIN, TX 78760

BEVERLY STEPHENS
PRAXAIR SURFACE TECHNOLOGY
1500 POLCO ST.
INDIANAPOLIS, IN 46224-0184

R. M. RASTELLI
PRAXAIR, INC.
777 OLD SAW MILL RIVER RD.
ROUTE 100C
TARRYTOWN, NY 10591

A. M. RADDI
PRAXAIR, INC.
308 HARPER DR.
MOORESTOWN, NJ 08057

J. DONAHUE (UCISCO)
U.C. INDUSTRIAL SERVICE CORP.
222 PENBRIGHT DR.
SUITE 300
HOUSTON, TX 77090-5999

J. MASCARI
PRAXAIR, INC.
P. O. BOX 6157 (86402)
I-40 GRIFFITH RD.
KINGMAN, AZ 86401

R. MONTONYE
PRAXAIR, INC.
1025 COMSTOCK ST.
SANTA CLARA, CA 95054

J. GIBBONS
PRAXAIR, INC.
13505 VARGON ST.
DALLAS, TX 75243

G. SICKELS
PRAXAIR, INC.
2520 SECOND SW
ALBUQUERQUE, NM  87103

MRS. H. PORTIER
PRAXAIR PRODUCTION N.V.
HAVEN 1013
SCHELDEDIJK 58
B-2070 ZWIJNDRECHT, BELGIUM

K. KORPAN, PRAXAIR, INC. (Plt. #742)
(FLETCHER CHALLENGE PROPTY)
ELK FALLS PULP & PAPER MILL
P. O. BOX 200
CAMPBELL RIVER, BC
CANADA  V9W 5C9
K. HAWBOLDT
PRAXAIR, INC. (Plt. #754)
P. O. BOX 214
SELKIRK, MANITOBA
CANADA  R1A 2B2

A. D'ARNE
PRAXAIR, INC. (Plt. #769)
BOX 2252
915 SOUTH VIDAL ST.
SARNIA, ONTARIO
CANADA  N7T 7L7
M. STANBRIDGE
PRAXAIR, INC. (Plt. #788)
BOX 66
SOREL, QUEBEC
CANADA  J3P 5N6

MR. P. DANIEL
PRAXAIR, S.A.
USINE DE CREIL
QUAI D'AVAL
F-60100 CRAIL, FRANCE

MR. A. NORIS
SIAD
VIA S. BERNARDINO, 92
I-24126 BERGAMO, ITALY

K. H. LEE
UNION GAS COMPANY, LTD.
4-5TH FL., DAEWON BLDG.
946-18, DAECHI-DONG
DANGNAM-KU, SEOUL
135-280 KOREA
MR. J. CASSARRUBIOS
ARGON S.A.
CALLE CRANSE N° 11-5°
E-28020 MADRID 20, SPAIN

PRAXAIR -
INTERNATIONAL
REGIONS

TITO LARA
S.A.W.M. - WHITE MARTINS
RUA MAYRINK VEIGA 9
P. O. BOX 455
RIO DE JANEIRO, BRAZIL

L. J. HOLMAN
PRAXAIR, INC. (Plt. #747)
P. O. BOX 3119
119TH ST & HWY 15
FORT SASKATCHEWAN, ALBERTA
CANADA  T8L 2T1
G. BRIDGEWATER
PRAXAIR, INC. (Plt. #765)
BOX 937
1 PATRICK ST.
SAULT STE MARIE, ONTARIO
CANADA  P6A 5N5
D. BUCHAN
PRAXAIR, INC. (Plt. #780)
P. O. BOX 282
VICKERS HEIGHT, ONTARIO
CANADA  P0T 2Z0

MS. WENDY MC CAULEY
PRAXAIR, INC.
ONE CITY CENTRE DR.
SUITE 1200
MISSISSAUGA, ONTARIO
CANADA L5B 1M2
MR. P. KAISER
PRAXAIR GMBH
JUSTUS-VON-LIEBIG-STRASSE 2
D-64584 BIEBESHEIM AM RHEIN
GERMANY

MR. D. SILVESTRO
SIAD MACCHINE IMPIANTI
VIA CANOVINE, 2/4
I-24126 BERGAMO, ITALY

JORGE GUERRA
LINDE DE MEXICO, S.A. DE C.V.
CARLOS SALAZAR 2333 OTE
COL. OBRERA 64010
MONTERREY, N.L., MEXICO

MR. E. ABASCAL
PRAXAIR IBERICA S.A.
APARTADO 109
E-GIJON ASTURIAS SPAIN

F. JESPERS
PRAXAIR, N.V.
LAMMERDRIES 29
B-2250 OLEN, BELGIUM

T. LUYCKX, PRAXAIR, INC.
(FLETCHER CHALLENGE PROPTY)
CROFTON PULP & PAPER MILL
P. O. BOX 400
CROFTON, BC
CANADA  V0R 1R0
K. SLOMAN
PRAXAIR, INC. (Plt. #748)
P. O. BOX 6014
RED DEER, ALBERTA
CANADA  T4N 6A1

N. ALLATT
PRAXAIR, INC. (Plt. #770)
BOX 585
2393 SPEERS RD.
OAKVILLE, ONTARIO
CANADA L6J 5B4
J. G. FORTIER
PRAXAIR, INC. (Plt. #785)
BOX 216, STATION "K"
MONTREAL, QUEBEC
CANADA  H1N 3L1

DEE STORM
PEOPLE'S REPUBLIC OF CHINA
BEIJING PRAXAIR, INC.
DAJIAOTING, CHAOYANG DISTRICT
POST CODE 100022, BEIJING, CHINA

J. L. TRAVASSOS
PRAXAIR, ASIA, INC.
RM 701-4, NEW MANDARIN PLAZA TOWER A
14 SCIENCE MUSEUM RD.
TSIM SHA TSUI EAST
KOWLOON, HONG KONG
MR. L. ROCCA
RIVOIRA SPA
C.SO BELGIO, 107
I-10153 TORINO, ITALY

LUIZ TROCHE
PRAXAIR LINDE PUERTO RICO, INC.
ROUTE 189, INT. 931
P. O. BOX 307
GURABO, PUERTO RICO  00658

UNION CARBIDE THAILAND
6TH FLOOR, YADA BLDG.
G.P.O. BOX 1254
56 SILOM ROAD
BANGKOK 10500, THAILAND

C. M. KRICHBAUM
SHANGHAI PRAXAIR BAOSTEEL. INC.
153# PAN GU ROAD
BAOCHAN DISTRICT
SHANGHAI, CHINA 201900

JAMES E. MEYER
1721 SOUTH ALLEN ST.
STATE COLLEGE, PA 16801

C. B. POLLOCK
P.T. PRAXAIR INDONESIA
12TH FLOOR
BANK SURYA BLDG, SUITE 1202
J.I.M.H. THAMRIN KAV. 9
JAKARTA 10350, INDONESIA
JOE MC KILLOP
3 WESTLAND AVE.
CHELMSFORD, MS 01824

Standard Plants

JOE SYROMI
P. O. BOX 420
WATERFORD, NY 12188

STEVE VEZINA
30 SPAK RD.
WILLINGTON, CT 06279

MAC TRESSLER
2767 MARIAN RD.
DORSET, OH 44032

HOWARD SHORE
200 CHERRY LANE
SOUDERTON, PA 18964

AL HAMPTON
158 N. OAKLAND AVE.
SHARON, PA 16146

LANNY WILLIAMS
345 CLAY RD.
CAMDEN, SC 29020

JOHN GARDNER
364 WILDWOOD LANE
LUGOFF, SC 29078

JODY E. WILSON
824 POLSON RD.
CAMDEN, SC 29020

JOE L. MADRY
312 DEERFIELD DR.
LUGOFF, SC 29078

JEFF S. STEWART
1280 ELLISON LANDING RD.
JOHNSONVILLE, SC 29555

MIKE CLIFTON
130 SHILOH DR.
LUGOFF, SC 29078

DAVID ALLEN
506 SOUTHERN WAY
SPANISH FORT, AL 36527

WINFORD B. MACK
3340 CENTANNE ST.
WHISTLER, AL 36612

BOB BURFORD
616 PEMBRIDGE DR. W.
JACKSONVILLE, FL 32221

ROCKY DROHAN
3705 WOOD DUCK DR.
MIMS, FL 32754

BILLIE A. GRAY
2303 SINGLETON AVE.
MIMS, FL 32754

JOHN FOWLER
332 SHIVERS GREEN RD.
RIDGEWAY, SC 29130

TIM CASEY
980 WHITEHEAD ST.
BAKER, LA 70714

DAN DUFFICY
1802 N. HALSTEAD
CHICAGO, IL 60614

FRED HERNER
5428 HERNER RD.
RHODES, MI 48652

KEN EVANS
201 MORNINGSIDE AVE.
GARY, IN 46408

RON GREENLEE
1420 BAYSWATER LANE
CICERO, IN 46034-9404

JIM MURPHY
10726 N. STATE RD 267
BROWNSBURG, IN 46112

TODD A JOHNSON
17792 NORTH 740 E. RD.
OAKWOOD, IL 61858

VINCENT A. DE LAURENTIS
3117 - 192ND ST.
LANSING, IL 60438

BILL DONAGHE
W6377 BOB WHITE RD.
GREENWOOD, WI 54437

GARY M. POLK
225 E. PEAR ST.
GRANTSVILLE, UT 84209

RAY CORNELL
84250 HEIGHTS RD
ALBUQUERQUE, NM 87111

MIKE BOUMAN
9049 ROOT RD.
N. RIDGEVILLE, OH 44039

ERNIE BENASH
2240 WEST 3800 SOUTH
APT. E106
WEST VALLEY, UT 84119

CLIFF JOHNSON
2820 RIO BRAVO BLVD. SW
ALBUQUERQUE, NM 87105

BARRY PETERSON
458 N. MONROE ST.
MONROE, MI 48161

REGGIE KORNAS
6924 SEDGE NW
ALBUQUERQUE, NM 87111

MIKE OWENS
11666 ANDANZA WAY
SAN DIEGO, CA 92127

*Agreement No. 80171750T*
*Exhibit "A"*
*1 January 1995*
*Page 1 of 6*

### ROSEMOUNT, INC.
### PRAXAIR WORLDWIDE REQUIREMENTS
### (U.S. LIST PRICING)

*For both domestic and international Process Instrumentation requirements, requests for technical information, pricing, delivery, international shipping costs, or execution of a Release in accordance with this Agreement, Buyer shall forward request directly to Seller as follows:*

I.    DOMESTIC

*Pricing represents applying the appropriate multiplier to Seller's current list price at time of order.*

A.

*Rosemount, Inc.*
*Measurement Division*
*870 Cross Keys Office Park*
*Fairport, NY  14450-3513*
*Contact: Keven Dunphy*
*(Phone: 716-223-0400 / Fax: 716-223-8318)*

| Model | | Multiplier |
|---|---|---|
| 3051c | -Differential, Gage and Absolute Pressure Transmitter | .66 |
| 1151 | -Alphaline Pressure Transmitter | .66 |
| 1151 | -Smart Electronics Package/(Smart Kit) | .70 |
| 2088 | -Absolute and Gage Pressure Transmitter | .64 |
| 2024 | -Differential Pressure Transmitter | .85 |
| 3095 | -Flow Transmitter | .90 |
| 3311 | -Current-to-Pressure Transducer | .85 |
| 3044c | -Smart Temperature Transmitter | .85 |
| 8800 | -Smart Vortex Flowmeter | .90 |
| 444R | -Alphaline Field Mounted Temperature Transmitter | .66 |
| 244P | - Two-Wire Temperature Transmitter | .90 |
| Sensors | -RTD and Thermocouples | .95 |
| 4002 | -Process Monitor | .90 |

*Remote Seals discounts not included*
*New products added at Standard OEM Discount*
*SHIPPING TERMS:  FCA Chanhassen, MN*

*Agreement No. 80171750T*
*Exhibit "A"*
*1 January 1995*
*Page 2 of 6*
*DELIVERIES*

- *Standard Factory:* Releases calling for lead times that correspond with Seller's standard Factory lead time, at time of order placement. "Factory" shall be defined as the "Ship point" listed. Standard Buyer discounts shall apply.

- *Quick Delivery:* Releases calling for lead times that are shorter than Seller's standard Factory lead time at time of order placement. The shipping point for such orders may be different than for Factory Releases listed and is typically closer to Buyer's plant site. In the U. S., these are typically Service Center orders. For all Expedited Releases, terms of shipment will be that of the "shipping point". Standard U. S. list prices will apply.

- *Guaranteed Delivery:* Less than 24 hours. Pricing will be current U. S. list plus 25%. In addition, when shipping product under 24 hours Seller shall guarantee delivery, and pay for shipping costs to Buyer's plant site.

*Agreement No. 80171750T*
*Exhibit "A"*
*1 January 1995*
*Page 3 of 6*

B.

**Rosemount Analytical Inc.**
**870 Cross Keys Office Park**
**Fairport, NY  14450-3513**
**Contact: John Bosic**
**(Phone: 716-223-0400 / Fax: 716-223-8318)**

| Description | Multiplier | Shipping Terms |
|---|---|---|
| 1. *Gas Analysis/Instrumentation* | | FCA LaHabra, California |
| A. *Capital Projects* | .90 | |
| B. *MRO Purchases* | | |
| 1) *Rosemount Products* | .95 | |
| 2) *Buyout Products* | .85 | |
| | | |
| C. *Panels and Systems* | 1.00 | |
| D. *Spare Parts* | .95 | |
| | | |
| 2. *Liquid Analyzers/Sensors* | | FCA Irvine, California |
| A. *Capital Projects* | .90 | |
| B. *MRO Purchases* | .90 | |
| C. *Spare Parts* | .95 | |
| D. *Series 54 PH,ORP* | .80 | |
| *-Conductivity Analyzers* | | |
| *-Series 385 PH & ORP* | | |
| *-Sensors* | | |
| *-Series 150 Conductivity* | | |
| | | |
| 3. *Combustion Analyzer* | .95 | FCA Orrville, Ohio |
| *Products* | | |

*DELIVERY*

*Standard Factory:*   *Releases calling for lead times that correspond with Analytical's standard*
*Factory lead time, at time of order placement.  "Factory" shall be defined*
*as the "Ship point" listed.  Standard Buyer discounts shall apply.*

C.

*Micro Motion, Inc.*
*870 Cross Keys Office Park*
*Fairport, NY  14450-3513*
*Contact: Keven Dunphy*
*(Phone: 716-223-0400 / Fax: 716-223-8318)*

| All Models By U.S. Dollars | Discount Factor |
|---|---|
| 0-$24,999 | 0 |
| $25,000 -$49,999 | .975 |
| $50,000 -$74,999 | .95 |
| $75,000 -$99,999 | .925 |
| $100,000 and Up | .90 |

SHIPPING TERMS:  FCA Boulder, CO


DELIVERY

    *Standard Factory:*   *Releases calling for lead times that correspond with Micro Motion's standard Factory lead time, at time of order placement. "Factory" shall be defined as the "Ship point" listed.  Standard Buyer discounts shall apply.*

Invoices shall be forwarded to:

    *Praxair, Inc.*
    *P.O. Box 808*
    *Tonawanda, NY 14151-0808*
    *Attention: Financial Services*

*Mode of Transportation:  Reference Exhibit "D" (5 sheets), dated 1 January 1995, for Corporate Transportation Guidelines.*

*Agreement No. 80171750T*
*Exhibit "A"*
*1 January 1995*
*Page 5 of 6*

## II.    INTERNATIONAL

*In support of Buyer's international process instrumentation requirements, one of the following options shall be followed when executing Releases in accordance with this Agreement.*

*Option 1:    Instrumentation Procured Directly Through The United States*

*All requests for quotation and/or Releases shall be forwarded directly to appropriate representative (address/contact name listed above)*

*Pricing represents U.S. price in accordance with Agreement. Export documentation and international transportation shall be coordinated through Seller's Corporate Headquarters.*

*Seller shall forward invoice to address specified on Release at time of order.*

*Option 2:    Instrumentation Procured In Specific Country*

*To execute a Release in your country, reference, "1994 Fisher-Rosemount Worldwide Directory" for specific representatives to contact directly. Pricing represents "Domestic" pricing plus specific country "Factor" at time of Release. "Country" multipliers and shipping terms are defined below as follows:*

### Adjustment Factors for Intra-Country
### Rosemount Inc. Product Purchases

| Point of Order Entry | Factor | Shipping Terms |
|---|---|---|
| Canada | 1.015 | FCA Destination in Canada |
| Germany | 1.17 | EXW Wessling, Germany |
| England | 1.17 | EXW European Plant Named Place |
| Belgium | 1.17 | EXW European Plant Named Place |
| Italy | 1.17 | EXW European Plant Named Place |
| Spain | 1.17 | EXW European Plant Named Place |
| France | 1.17 | EXW European Plant Named Place |
| Asia-Pacific | 1.19 | EXW Singapore |
| L. America/Mexico | 1.10 | FCA Chanhassen, MN |

*Agreement No. 80171750T*
*Exhibit "A"*
*1 January 1995*
*Page 6 of 6*

*Invoice shall be forwarded to address specified on Release at time of order.*

*Note:*          *Most Micro Motion meters ordered in Europe will be shipped EXW Veenendaal, The Netherlands.*

*Recommendation:*   *For Releases procuring more than ten (10) pieces (project requirements), purchase through the United States.*

*Any Release procuring less than ten (10) pieces (i.e. MRO), place locally.*

*Agreement No. 80171750T*
*Exhibit "B"*
*1 January 1995*
*Page 1 of 2*

### FISHER VALVE PRODUCTS
### PRAXAIR WORLDWIDE REQUIREMENTS
### (U.S. LIST PRICING)

*For both domestic and international Fisher Valve requirements, requests for technical information, pricing, delivery, international shipping costs, or execution of a Release in accordance with this Agreement, shall be forwarded directly to Fisher Controls as follows:*

*Fisher Controls International*
*c/o Northeast Controls Inc.*
*60 John Glenn Drive, Suite 104*
*Amherst, NY  14228*
*Contact: Burt Cappellini*
*(Phone: 716-691-0081 / Fax: 716-691-0087)*

<u>*Pricing*</u>

| <u>Model</u> | <u>Multiplier</u> |
|---|---|
| Price Book 100 Products (includes control valves and accessories; regulators; relief valves; and POSI-SEAL valves) | 0.5621    .5775 |

*All Releases, domestic and international, will be procured directly through the United States. All requests for quotation and/or Releases shall be forwarded directly to Fisher Controls (address/contact name listed above).*

*Pricing represents U.S. price in accordance with Agreement.   Export documentation and international transportation shall be coordinated through Fisher Control's Corporate Headquarters located in Marshalltown, Iowa.*

*Fisher Controls shall forward invoice to address specified on Release at time of order.*

*Agreement No. 80171750T*
*Exhibit "B"*
*1 January 1995*
*Page 2 of 2*

### Shipping Terms

| Point of Destination | Shipping Terms | |
|---|---|---|
| | *If Air Freight* | *If Ocean Freight* |
| United States | CPT Named Location | N/A |
| Canada | CPT Named Location | C&F Named Port |
| Europe | CPT Named Location | C&F Named Port |
| Asia-Pacific | CPT Named Location | C&F Named Port |
| L. America/Mexico | CPT Named Location | C&F Named Port |

### Deliveries

*Standard Factory:*    Releases calling for lead times that correspond with Sellers's standard Factory lead time, at time of order placement.

*FAST or Express:*    Releases calling for lead times that are shorter than standard factory lead times at the time of order entry.

The multiplier will be .6160, CPT Named Location for Motor Freight.
The multiplier will be .6622, CPT Named Location when Air Freight is required.

*Mode of Transportation:*    Reference Exhibit "D" (5 sheets), dated 1 January, 1995, for Corporate Transportation Guidelines.

### Service

To obtain Service internationally, reference the "1994 Fisher-Rosemount Worldwide Directory" for specific representatives to contact directly.

*Agreement No. 80171750T*
*Exhibit "C"*
*1 January 1995*
*Page 1 of 5*

### *Demand Service Rates*

*The following On-Site Service rates are for 24 hours, 7 days a week, demand service. Fisher-Rosemount's minimum billing is four [4] hours. For all demand services, Praxair is requested to call our National Response Center at: 1-800-654-7768, identify yourself as Praxair, Inc., and provide the administrator with Agreement: #80171750T. This will entitle Praxair to a 10% discount from the current Demand Services Price List. Travel related charges are not subject to discounts.*

| *Maintenance Hours* | *Field Representative [U.S. List Price/Hr.]* | *Application/Factory Representative [U.S. List Price/Hr.]* |
|---|---|---|
| *M-F [7:00A-6:00P] [8 hours Maximum]* | *$110.00* | *$130.00* |
| *Saturday [after 8<12 Hrs./day]* | *$165.00* | *$195.00* |
| *Sundays & Holidays and after 12 Hrs./day* | *$220.00* | *$260.00* |

*A 10% discount may be taken from the above list prices per this agreement. Discount does not apply to travel costs.*

*This pricing applies to service performed in the continental United States only. Time and material service performed outside the continental U.S. will be charged at 150% of the hourly labor rate shown above if this service requires a U.S. representative to travel internationally. Service performed within foreign countries by foreign service centers will be billed in local rates in local currency.*

*Fisher-Rosemount additionally provides product repair and bench calibration services at our Depot Repair facilities at our Service Centers. These services include the analysis, repair or replacement of faulty boards or sensors, and calibration of these instruments. Our minimum billing for this demand service is one [1] hour. Depot Repair Service is $75/hour plus parts.*

*In concurrence with this agreement, Fisher-Rosemount will be discussing the second option of entering into a Value Added Service contract for Praxair sites throughout the U.S. and International locations. Results of these discussions will become part of this worldwide agreement.*

*Agreement No. 80171750T*
*Exhibit "C"*
*1 January 1995*
*Page 2 of 5*

## Praxair's Customer Service Monitar Panel (RTU) Installation (Domestic)

### Rosemount Service and Support

*This Agreement does not include the installation of Praxair's monitar panels for hydrogen or medical (hospitals) customers.*

*The following process shall be followed when requesting such service:*

1. *Praxair Technician identifies the need to outsource an RTU installation and reviews with customer.*

2. *To request service, Praxair Technician calls the Rosemount Project Leader at (800) 654-7768 providing a ten (10) day lead time. Praxair Technician shall provide the following information to the Rosemount Project Leader:*

   *(1) Your name*
   *(2) Customer's name and location*
   *(3) Contact and phone number*
   *(4) Praxair Number and RTU telephone number*
   *(5) Praxair work order/charge number*

3. *Rosemount identifies appropriate service representative and provides "ship to" address for RTU.*

4. *Praxair ships RTU to Rosemount Service Representative with return address for Barton liquid level gauge.*

5. *Rosemount Service Representative contacts customer to schedule RTU installation and to confirm security clearance.*

6. *Rosemount Service Representative informs Praxair's RTU Program Manager of installation schedule with 24 hours lead time.*

7. *Rosemount Service Representative travels to Praxair's customer site and reviews the scope of work with the customer contact.*

*Agreement No. 80171750T*
*Exhibit "C"*
*1 January 1995*
*Page 3 of 5*

8. *Service representative shall provide the following service:*

    a. *Remove Barton Gauge from C Bracket;*
    b. *Install new Monitor Panel - physically;*
    c. *Wire AC pigtail for RTU and hard wire the phone line;*
    d. *Contact Praxair contact to verify phone line, telephone number;*
    e. *Review install with Praxair customer;*
    f. *Fill out our Field Service Report and attach to invoice;*
    g. *Service Rep will ship back the old Barton Panel to the Praxair Contact.*

9. *Rosemount Service Representative shall inform Praxair Service Center of installation completion and provide an RTU serial number.*

10. *Installation complete.*

11. *Field Service Report shall reference this Agreement Number (80171750T), Praxair Technician requesting service and Praxair work order/charge number. The Field Service Report shall be attached to the invoice and forwarded to Praxair, Inc., P. O. Box 808, Tonawanda, New York 14151-0808 for payment.*

· *Price:  $500.00/per panel per installation.*

· *Base Price includes any Praxair customer site within 100 (one way) miles of the following Rosemount offices:*

| Praxair Center City/State | Radius | Number of RTUs | Rosemount Service Office | Rosemount Service Region |
|---|---|---|---|---|
| Detroit, MI | 100 | 30 | Ann Arbor, MI | Central |
| Cleveland, OH | 100 | 15 | Cleveland, OH | Central |
| Suffield, CT | 100 | 15 | Poughkeepsie, NY | NE |
| Hatfield, PA | 100 | 40 | Philadelphia, PA | Northeast |
| Marietta, OH | 150 | 30 | Cleveland, OH | Central |
| Baltimore, MD | 150 | 30 | Philadelphia, PA | Northeast |
| Ashtabula, OH | 175 | 30 | Cleveland, OH | Central |

*Agreement No. 80171750T*
*Exhibit "C"*
*1 January 1995*
*Page 4 of 5*

| Praxair Center City/State | Radius | Number of RTUs | Rosemount Service Office | Rosemount Service Region |
|---|---|---|---|---|
| Buffalo, NY | 150 | 30 | Cleveland, OH | Central |
| Gadsden, AL | 150 | 20 | Atlanta, GA | Southeast |
| Deer Park, TX | 200 | 50 | Houston, TX | Gulf |
| Taft, LA | 150 | 20 | Baton Rouge, LA | Gulf |
| Garland, TX | 200 | 40 | Houston, TX | Gulf |
| Memphis, TN | 150 | 30 | St. Louis, MO | Central |
| Camden, SC | 150 | 20 | Charlotte, NC | Southeast |
| Theodore, AL | 175 | 40 | Atlanta, GA | Southeast |
| Neosho, MO | 150 | 20 | St. Louis, MO | Central |
| Cape Kennedy, FL | 150 | 20 | Atlanta, GA | Southeast |
| Chicago, IL | 150 | 100 | Chicago, IL | Central |
| Garfield, UT | 100 | 15 | San Francisco, CA | West |
| Kansas City, MO | 150 | 20 | St. Louis, MO | Central |
| Wilmington, CA | 200 | 60 | Los Angeles, CA | West |
| Fife, WA | 200 | 30 | Seattle, WA | West |
| Pittsburg, CA | 100 | 30 | Los Angeles, CA | West |
| Loveland, CO | 200 | 25 | Denver, CO | West |
| Minneapolis, MN | 200 | 50 | Chanhassen, MN | Central |

*Travel outside of 100 miles (one way) will be charged at $55.00 per hour plus actual expenses - airfare, motel, rental car (if airfare is charged) plus a per diem meal allowance of $32.00 per day. Normally, we would expect our people to travel during our normal work week - Monday through Friday. ANY overtime for TRAVEL will be billed at $80.00*

*Agreement No. 80171750T*
*Exhibit "C"*
*1 January 1995*
*Page 5 of 5*

- *INSTALLATION overtime will be billed at $100.00 per hour after 8 hours or on Saturdays. Holidays and Sundays will be billed at $125.00 per hour.*

- *If we encounter wait times at any site of over 1 hour, we will add $55 per hour of wait time, any call which is aborted when we are on site or in transit, will trigger a $100 + $55 per hour (time from leaving office to return to office). The Call Abort charge will be set at a maximum of $700 per site visit plus expenses. The maximum Wait Charge will be $440.00.*

- *Rosemount and Praxair will work together on the work process flow and try it at 1 or 2 sites and make the necessary revisions. Praxair will train the lead Rosemount Service Reps on the Monitar, an overview of the logistics operation, key contacts for Rosemount Reps within Praxair, and the necessary training films on site/product safety.*

- *After the first twenty installations, Rosemount and Praxair will meet to review the quality of the installation work (based on Praxair's survey), the work flow process, and discuss if any pricing adjustments (up or down) are needed for this work.*

- *Rosemount Service also recommends that our Service Reps carry a kit containing extra pieces needed in the installation of these panels. We will list the things which we need and supply Praxair with the 'Bill of Materials'. The actual cost of these parts will be our cost + 15% administration fee for the first twenty sites. We will then mutually establish the average parts usage and the piece part list price for the remaining installations.*

met\exhibitc.fr

*Agreement No. 80171750T*
*Exhibit "D"*
*1 January 1995*
*Page 1 of 5*

## *PRAXAIR'S TRANSPORTATION ROUTING GUIDE*

## *PRAXAIR'S PROCUREMENT TRANSPORTATION TEAM*

| *NAME* | *PHONE & FAX* | *ROLE* |
|---|---|---|
| *LARRY ABATE* | *(716) 879-2380 (Ph)*<br><br>*(716) 879-2344 (Fax)* | *• MANAGER*<br><br>*• IMPORT/EXPORT*<br><br>*• FREIGHT FORWARDER MANAGEMENT* |
| *NORBERT HINZE* | *(716) 879-2210 (Ph)*<br><br>*(716) 879-2344 (Fax)* | *• DOMESTIC TRUCKING RATE NEGOTIATIONS*<br><br>*• RAIL RATE NEGOTIATIONS*<br><br>*• AIR FREIGHT RATE NEGOTIATIONS* |
| *GEORGE KRUG* | *(716) 879-2201 (Ph)*<br><br>*(716) 878-7581 (Fax)* | *• DOMESTIC TRAFFIC OPERATIONAL SUPPORT* |
| *JOAN BUCKLEY* | *(716) 879-2715 (Ph)*<br><br>*(716) 879-2344 (Fax)* | *• INTERNATIONAL REGION COMPANY ORDER SUPPORT*<br>*• CLERICAL/SECRETARIAL SUPPORT* |
| *KRIS OVIATT* | *(716) 879-7233 (Ph)*<br><br>*(716) 879- 2344 (Fax)* | *• INTERNATIONAL REGION COMPANY ORDERS*<br>*• IMPORTS*<br>*• VPSA, MEMBRANE PROJECTS* |

*Agreement No. 80171750T*
*Exhibit "D"*
*1 January 1995*
*Page 2 of 5*

## PRAXAIR'S AUTHORIZED CARRIERS

*Small packages (Ground Transportation under 150 lbs)*

→ *Roadway Package Service (RPS)* ←

*When Fisher-Rosemount Group manufacturing facilities ship instrumentation to Praxair locations, a RPS bar-coded label shall be applied to each package prior to shipping. Billing instructions shall be , "third party billing".*

*If a package is being forwarded to destination point where RPS does not service, UPS should be used at that time. Billing instructions shall be "prepay and add".*

*Agreement No. 80171750T*
*Exhibit "D"*
*1 January 1995*
*Page 3 of 5*

# *PRAXAIR'S AUTHORIZED AIR FREIGHT GUIDELINES*

## *(OVERNIGHT OR SECOND DAY SERVICE)*

*DOMESTIC*

*Envelopes through 70 lbs:*

- *DHL (Account #: 754410038)*

- *Airborne (Account #: 1152297)*

*Over 70 lbs:*

- *Seko Air Freight (Account #: 419304).*
  *Must call 800-344-7356 to make arrangements*

- *Burlington Air (Account #: 556195813)*

- *Emery Worldwide (Account #: 002123792)*

*For Dispatch call Carrier's Local Office/Terminal*

- *Ship third party billing. Invoice to:*
  *Praxair, Inc.*
  *P. O. Box 808*
  *Tonawanda NY  14150-0808*

- *Give Praxair account number and Purchase order numbers*

- *Praxair is "self-insured", DO NOT declare value on air bill.*

*Should you encounter problems with any of the above carriers, please contact Praxair's Transportation Representative, Norbert Hinze (716-879-2210).*

*Agreement No. 80171750T*
*Exhibit "D"*
*1 January 1995*
*Page 4 of 5*

INTERNATIONAL

*Fisher-Rosemount shall be responsible for furnishing the following information for all Praxair International releases placed directly with Fisher-Rosemount and in accordance with agreement:*

- *Terms on a C.I.F. basis*

- *Notify party (list import broker's name/phone/fax where appropriate)*

- *Praxair's invoicing instruction*

NOTE:    *For Brazilian orders, a Pro Forma Invoice should be generated at time of quotation to allow WMIG to apply for import licenses.*

*Agreement No. 80171750T*
*Exhibit "D"*
*1 January 1995*
*Page 5 of 5*

# PRAXAIR'S AUTHORIZED

## LESS-THAN-TRUCKLOAD (LTL) CARRIERS

### (generally under 24,000 pounds)

| CARRIER | | LENGTH OF HAUL* |
|---|---|---|
| Consolidated Freightways | Nationwide | Long |
| Yellow Freight System | Nationwide | Long |
| Overnight Transportation | Regional/Nationwide | Long/Short |

#### FOR DISPATCH - CALL CARRIER'S LOCAL TERMINAL

\*    LONG HAUL - GENERAL OVER 400 MILES

\*    REGIONAL - SHORT AND LONGER HAUL WITHIN OR BETWEEN REGIONS

*The following instructions must be included on the Bill of Lading provided to carrier:*

*(1)    Praxair's purchase order number*

*(2)    Billing instructions "Third Party Billing". Invoice to:*

> *Praxair, Inc.*
> *P. O. Box 808*
> *Tonawanda NY 14151-0808*

NOTE:        *Any additional freight costs resulting from Fisher-Rosemount's failure to comply with these instructions shall be deducted from the final invoice for the goods.*

Agreement No. 80171750T
Exhibit "E"
1 January 1995
Page 1 of 7

PRAXAIR, INC. AND FISHER-ROSEMOUNT TERMS & CONDITIONS
AGAINST AGREEMENT: #80171750T

1.    DEFINITIONS: Any and all items ordered hereunder are referred to herein as "Equipment".

2.    INSPECTION: At such reasonable times as are requested by Buyer, Buyer and/or its representa-
tives shall have the right to enter upon the premises where the Equipment is being manufactured
or where the Equipment is located at any time prior to delivery to Buyer, for the purpose of
inspecting the Equipment and expediting the performance of this Order. Inspections shall be limited
to Seller's finished goods area.

3.    ACCEPTANCE: Except as otherwise expressly provided in this Order, acceptance of any of the
Equipment shall not occur until Buyer has been given a reasonable opportunity to inspect and test
such Equipment after arrival at destination or after completion of installation, if Seller is obligated
to install said Equipment. Buyer may reject any non-conformance or defective Equipment F.O.B.
the location at which Buyer discovers said non-conformance or defect, if Seller fails to promptly
correct said non-conformance or defect after being given the opportunity to do so.

4.    EXCESS QUANTITY: Quantities of the Equipment shipped in excess of the quantity designated
in this Order may be returned at Seller's expense.

5.    TRANSPORTATION CHARGES: Except as otherwise mutually agreed to in writing, (a) where
transportation charges are separately charged to Buyer by Seller, such charges shall in no event
exceed the lowest legal freight charges via the carrier or routing specified herein, in effect on the
date of shipment, and (b) where transportation charges are allowed to Buyer by Seller, such
allowance shall not be less than the actual freight charges paid by Buyer or, where Buyer performs
the transportation, such allowance shall be in an amount equal to the freight charges which would
have been assessed for a like movement via common carrier.

6.    DELIVERY: The Equipment shall be properly packaged for shipment. Each package shall be
numbered and labeled with Buyer's order number, stock number, contents and weight, shall contain
an itemized packing slip. No charges will be allowed for packing, crating, freight, express or
cartage unless specified on the face hereof. Time is of the essence hereof. If any Equipment is
not delivered within the time specified in this Order, or within a reasonable time if no time is
specified, Buyer may either (i) refuse to accept such Equipment and terminate this Order, or (ii)
cause Seller to ship the Equipment by the most expeditious means of transportation whereupon
any additional transportation charges in excess of those which would apply for the usual means of
transportation shall be for the account of Seller.

7.    INVOICES: Unless otherwise requested by Buyer, invoices shall (a) be rendered separately for
each delivery; (b) cover only this Order; (c) be rendered with order number noted thereon.

8.    WARRANTY: Seller hereby warrants that the Equipment and the operation thereof shall conform
to the mutually agreed to descriptions and specifications contained or referred to in this Order,
except to the extent any such non-conformance in operation is due to the design specified by
Buyer; and Seller further warrants that the Equipment and all parts thereof shall be free from (i)
defects in material and workmanship; and (ii) defects due to design (other than any design specified
by Buyer). If the Equipment, or any part hereof fails to meet any or all of the foregoing warranties
at any time prior to the Expiration Date hereinafter described, then, upon Buyer's request for
remedial work, Seller shall, at its sole expense, promptly either replace or repair free of charge,
F.O.B. Buyer's factory provided that the goods or part(s) are returned to Seller's designated factory,
transportation charges to Seller's account (except for Fisher Control valves three inches (3") in size
or greater, in which case transportation charges shall be split equally by Seller and Buyer), within
the period of this warranty. If Seller fails to comply with the provisions above, promptly after any
such request, Buyer shall have the right, after notifying Seller of its intent to do so, to perform or
cause to be performed, the work provided for above, and, after such work has been performed,
Seller shall pay Buyer the reasonable cost thereof within thirty (30) days after receipt of invoice
therefore. As used herein "Expiration Date" shall mean twelve (12) months after the date of the
Equipment is either used or placed in operation, provided, however, that such Expiration Date shall
in no event exceed a period of eighteen (18) months from the date of shipment by Seller.

If the aforementioned specifications include a performance test, Seller warrants that the Equipment
shall operate in accordance with said specifications continuously during said performance test,
except to the extent any failure to so operate is due to a design specified by Buyer. The aforesaid
performance test shall commence on or before the date specified in said specifications for
commencement of said test, or if no such date is specified, within eighteen (18) months after the
date on which delivery of the Equipment to the place of delivery specified in this Order has been
completed. If the Equipment fails to meet said warranty, then, upon Buyer's request, Seller shall,
at its sole expense, promptly proceed with the remedies set forth in item (a) or (b) above, and, if
within a reasonable time, the Equipment fails to meet said warranty, Buyer shall have the right to
rescind this Order and return the Equipment to Seller, F.O.B. the place of installation, whereupon
Seller shall promptly refund to Buyer all payments theretofore made by Buyer for the Equipment.

In the event this Order covers more than one (1) unit of Equipment, then all of the aforesaid
warranties shall be separately applicable to each such unit of Equipment.

IN CONSIDERATION OF THE HEREIN STATED PURCHASE PRICE OF THE GOODS, SELLER
GRANTS ONLY THE ABOVE STATED EXPRESS WARRANTY. NO OTHER WARRANTIES ARE
GRANTED INCLUDING, BUT NOT LIMITED TO EXPRESS AND IMPLIED WARRANTIES OF
MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

The foregoing warranty provision shall apply to consumables, which include glass electrodes,
membranes, liquid junctions, electrolytes, and O-rings, except that the warranty period shall be for
a period of ninety (90) days from date of shipment by Seller.

Agreement No. 80171750T
Exhibit "E"
1 January 1995
Page 3 of 7

9.    **PATENTS:** Except as hereinafter limited, Seller shall defend, indemnify and save harmless Buyer from and against claims, damages, judgement, expenses and loss arising from infringement or alleged infringement of any patent of the United States by any of the Equipment (or part thereof), and Seller shall defend or settle at its own expense any suit or proceedings brought against Buyer for such infringement, provided that Seller is notified promptly in writing of the commencement of such suit or proceeding and is given authority, information and assistance by Buyer for the defense or settlement thereof, and provided further that Buyer shall not settle or compromise any such suit or proceeding without the prior written consent of Seller.  Furthermore, in the event that Buyer should be enjoined in such suit or proceeding from using any of the Equipment (or part thereof), Seller, at its option, shall promptly either (i) secure termination of the injunction and procure for Buyer the right to use such Equipment (or part) without any obligation or liability, (ii) replace said Equipment (or part) with non-infringing Equipment or modify same to become non-infringing, all at Seller's expense to Buyer's satisfaction, or (iii) remove said Equipment at Seller's expense and refund to Buyer the amount paid to Seller therefore.  The provisions of this paragraph, however, shall not apply to (i) infringement caused by specifications furnished by  Buyer or to (ii) the use of the Equipment delivered hereunder in combination with other materials or in the practice of any process, or to (iii) infringement by reason of such use.

10.    **INSTALLATION AND WORK:** In the event that any of the Equipment requires, in connection with the installation thereof or work thereon, the services of a supervisor, expert or other  person connected with or employed by Seller, and Seller agrees to furnish the same, either with or without charge, such supervisor, expert or other person in performing such services shall not be deemed to be the agent or employee of Buyer, and Seller assumes full responsibility for his acts and omissions and exclusive liability for any payroll taxes or contributions imposed by any Federal or State law dealing with any of the subjects covered by the Federal Social Security Act approved August 14, 1935, as amended.

11.    **INSURANCE:** Prior to Seller's commencing any work under the WARRANTY or other terms of this Order on property owned or controlled by Buyer or by any other party on whose property the Equipment is installed, Seller shall, at its expense, procure and maintain Workmen's Compensation to the extent required by law and Contractor's Bodily Injury Liability and Property Damage Liability insurance (including Contractual Liability covering the indemnity set forth in the next Paragraph) in such amounts as are approved by Buyer. Prior to commencing any such work, Seller shall furnish to Buyer written certificates establishing that above insurance has been procured and is being maintained, which certificates shall provide that written notice of cancellation shall be given to Buyer at least fifteen (15) days prior to the effective date of such cancellation.

12.    **INDEMNITY; PHYSICAL DAMAGE RESPONSIBILITY:** Seller shall defend, protect and indemnify Buyer, its officers, agents, employees, and assigns for and against any and all losses, expenses, liens, claims, demands and causes of action of Buyer and all third parties for death, personal injury, property damage or any other liability damages, fines or penalties (except where reimbursement of same is prohibited by applicable law) arising out of any act performed by Seller or its employees in the course of work under this Contract, except to the extent such loss, expense, claim, damage, etc. is contributed to by (a) the negligence in any form of Buyer, its agents, employees, and/or independent sellers or any other third party directly responsible to it, or (b) defects in, or condition of the premises on which the work is to be performed or equipment thereon or materials furnished by Buyer.  The foregoing shall apply provided that Buyer has provided to Seller adequate notice,

Agreement No. 80171750T
Exhibit "E"
1 January 1995
Page 4 of 7

information and assistance (at Seller's expense) to enable Seller to adequately defend itself. In no case shall Seller's liability herein exceed the amount set forth in Article 26 entitled Limitations of Remedy.

13.    SECURITY INTEREST: Buyer hereby reserves, and Seller hereby grants to Buyer, a security interest in the Equipment, to the extent, and in the amount, of the payments made by Buyer to Seller under this order in advance of delivery of such Equipment to Buyer.  As used in this paragraph, "Equipment" shall include Equipment in its fully completed or partially completed form, and any and all subassemblies, component parts and/or materials which are acquired by  Seller for use in the manufacture of the Equipment. Seller hereby authorizes Buyer, and will assist Buyer, in filing a financial statement or any other document necessary to enable Buyer to perfect and continue a security interest in the Equipment in which Buyer has a security interest.  Seller shall segregate from its other property the Equipment in which Buyer has a security interest and shall attach or affix thereto an identification specifying that said Equipment is the property of Praxair, Inc. Seller shall not permit any liens or encumbrances to be placed upon any such Equipment and shall cause any such liens or encumbrances to be promptly discharged.

14.    FORCE MAJEURE: Neither party hereto shall be liable to the other for default or delay in performing its obligations hereunder if caused by fire, strike, riot, war, act of God, delay of carriers, governmental order or regulation, complete or partial shut down of plant by reason of inability to obtain sufficient raw materials or power, and/or any other similar or different occurrence beyond the reasonable control of the party so defaulting or delaying.  The party whose performance is prevented by any such occurrence shall notify the other party thereof in writing as soon as it is reasonably possible after the commencement of such occurrence, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the other party of the cessation of such occurrence.  No payment shall be made by Buyer to Seller for any expenses incurred by Seller by reason of such default or delay.

15.    DRAWINGS AND OTHER ITEMS: [Deleted]

16.    SECRECY: As used in this Order, "Confidential Information" shall mean and include all of the following:

> information, know-how and data, whether technical or non-technical, which is in any way, heretofore or hereafter, disclosed to Seller by or on behalf of Buyer in the course of, or in connection with this Order or in connection with proposals or negotiations for the Order.

Except as provided below and except as otherwise agreed to in writing by Buyer, Seller shall use its best efforts to keep confidential and to prevent the disclosure of Confidential Information except on a confidential basis, to such of its employees and subcontractors who need such Confidential Information in order to enable Seller to properly perform under this Order and who sign secrecy agreements obligating them at least to the same extent as Seller is obligated under this provision, and Seller shall not use or permit to be used Confidential Information for anyone other than Buyer.

Seller's obligation under this SECRECY provision shall not apply, however, to Confidential Information when, after and to the extent that the Confidential Information either:

a)    is known to the public; or

b)    was known to Seller prior to the first disclosure to Seller by or on behalf of Buyer
      or any affiliate of Buyer and Seller can establish such fact by reasonably
      convincing evidence; or

c)    is received by Seller in good faith from a third party other than an affiliate of Buyer
      and Seller does not violate any obligation which it may have to a third party with
      respect to such Confidential Information.

As used in this SECRECY provision, "affiliate of Buyer" shall mean: (i) any corporation 50% or more
of the voting capital stock of which is owned or controlled by Buyer; or (ii) any corporation owning
or controlling 50% or more of the voting capital stock of Buyer; or (iii) any corporation 50% or more
of the capital stock of which is owned or controlled by a corporation owning or controlling 50% or
more of the voting capital stock of Buyer.

Notwithstanding the foregoing, Seller's obligations herein shall be limited to: (1) a period of five (5)
years from the date of this Agreement; (2) written information, or, verbal disclosures if reduced to
writing and provided to Seller within sixty (60) days; and (3) disclosures which are clearly marked,
or in the case of verbal disclosures, clearly noted, as "CONFIDENTIAL" or "PROPRIETARY".

17.   **FAIR LABOR STANDARDS ACT:** Seller hereby agrees that the Equipment will be produced in
      compliance with the Fair Labor Standards Act, as amended, and agrees to certify on its invoices.

18.   **COMPLIANCE WITH LAWS:** Seller shall comply with and shall indemnify and hold harmless Buyer
      from and against all damages or penalties arising out of Seller's failure to comply with all laws,
      ordinances, and government rules, regulations and orders applicable to this order, including but not
      limited to, applicable Federal Acquisition Regulation Clauses related to SELLER'S CERTIFICATION
      OF NON-SEGREGATED FACILITIES FAR 52.222-21, EQUAL OPPORTUNITY FAR 52.222-26,
      AFFIRMATIVE ACTION FOR SPECIAL DISABLE AND VIETNAM ERA VETERANS FAR 52.222-
      35, AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS FAR 52.222-36, UTILIZATION OF
      SMALL BUSINESS CONCERNS AND SMALL DISADVANTAGED BUSINESS CONCERNS FAR
      52.219-8,-9, THE IMMIGRATION AND CONTROL ACT OF 1986 and UTILIZATION OF LABOR
      SURPLUS AREA CONCERNS FAR 52.220-3,-4, which is to the extent applicable are hereby
      incorporated into this order. The provisions of Executive Order 11246, as amended by Executive
      Order 11375 (Equal Employment Opportunity), 38 USC 4212 (Vietnam Era Veterans Adjustment
      Assistance Act), Section 503 of the Rehabilitation Act of 1973 (Handicapped Regulations), and the
      implementing regulations found at 41 CFR 60-1 & 2, 41 CFR 60-250, and 41 CFR 60-741,
      respectively, are hereby incorporated by reference.

19.   **TERMINATION FOR CONVENIENCE:** Provided that Seller receives at least fifteen (15) days
      written notice from Buyer, Buyer may terminate or suspend performance at Buyer's convenience
      subject to the following charges for standard inventoried parts and products:

|                               |                                                      |
|-------------------------------|------------------------------------------------------|
| Not assigned to production:   | No charge                                            |
| In Production:                | 15% of equipment price                               |
| In Shipping:                  | 20% of equipment price                               |
| Shipped:                      | 30% of equipment price if returned within 6 months,  |
|                               | unused, undamaged and in original container.         |

Agreement No. 80171750T
Exhibit "E"
1 January 1995
Page 6 of 7

For non-inventoried parts and products, Buyer shall reimburse Seller for all of Seller's costs and expenses arising from such termination.

20. **TERMINATION FOR DEFAULT:** If Seller should be or become financially insolvent, should make a general assignment for the benefit of creditor, should have any proceeding brought by or against it seeking any reorganization, rearrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future Federal bankruptcy act or under any other applicable Federal, State or other statute, law or regulation, or should have any proceeding brought seeking the appointment of a receiver or similar officer of the court with respect to Seller's business, or if Seller shall fail to perform or fulfill, at the time and/or in the manner herein provided, any obligation or condition required to be performed or fulfilled by Seller hereunder and such failure is not excused under the FORCE MAJEURE provision or is not remedied within fifteen (15) days after Seller's receipt of written notice from Buyer specifying such failure, then, Buyer shall have the right to terminate this Order by written notice to Seller given at any time thereafter. Any termination of this Order pursuant to this provision shall be in addition to and shall not be exclusive of or prejudicial to, and other rights or remedies at law or in equity which Buyer may have on account of default of Seller.

21. **ASSIGNMENT:** Any assignment of this Order without prior written consent of Buyer shall be void.

22. **NON-WAIVER:** No waiver by either party of any breach of any of the terms of this Order to be performed by the other party shall be construed as a waiver of any subsequent breach, whether of the same or of any other term of this Order.

23. **REMEDIES:** The rights and remedies of Buyer set forth in this order are not exclusive and are in addition to all other rights and remedies of Buyer.

24. **GOVERNING LAW:** For orders shipped from Seller's United States factories, the validity, interpretation, and performance of this Order shall be governed by the law of the State of Missouri. For orders shipped from Seller's non-U.S. factories, the validity, interpretation, and performance of this Order shall be in accordance with the laws of the country (including specific province, etc. where applicable) in which Seller's factory is located.

25. **MISCELLANEOUS:** If this Order constitutes an offer, Seller's acceptance of this Order is hereby expressly limited to the terms of this Order and shipment of any part of the Equipment shall be deemed to constitute such acceptance. If this Order constitutes an acceptance of an offer such acceptance is expressly made conditional on Seller's assent to the terms of this Order, and shipment of any part of the Equipment covered hereunder shall be deemed to constitute such assent. This Order constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, and there are no oral understandings, representations or warranties affecting it. Neither course of performance nor course of dealing nor usage of trade shall be used to interpret, construe, qualify, explain or supplement any of the terms of this Order. This Order shall not be amended except in writing signed by the parties hereto.

26. **LIMITATIONS OF REMEDY:** In no case shall Seller's liability to Buyer or its customers for breach of contract exceed an aggregate amount equal to the total purchase order value covering the goods and/or services provided by Seller giving rise to the cause of action. Buyer agrees that in no event shall Seller's liability extend to include incidental or consequential damages.

Agreement No. 80171750T
Exhibit "E"
1 January 1995
Page 7 of 7

Consequential damages shall include, but not be limited to, loss of anticipated profits, loss of use, loss of revenue, cost of capital and damage or loss of other property or equipment.  NOTWITHSTANDING THE FOREGOING, IN NO CASE, REGARDLESS OF THE FORM OF THE CAUSE OF ACTION (WHETHER IN CONTRACT, INFRINGEMENT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT, OR OTHERWISE), SHALL SELLER'S LIABILITY TO BUYER OR ITS CUSTOMERS EXCEED AN AGGREGATE AMOUNT EQUAL TO TWO MILLION DOLLARS ($2,000,000) FOR ANY AND ALL CLAIMS ARISING IN ANY GIVEN CALENDAR YEAR.

# EXHIBIT C

```
/15/98 ·MON 13:01 FAX 716 879 234¯    PRAXAIR PURCHASING
```

ect:    STAR Delaware City P-8064

46

al:

SPECIFICATION FORM FOR PROCESS MEASUREMENT
Data Sheet    46 of     6/3/98
Spec:
Tag:    83HV0629
DWG:    A-2272740
Service:BLOC discharge isolation

---

Fluid:  OXYGEN                          Crit. Pres. PC:737.620 psia

| SERVICE CONDITIONS | Units | MAX | NRM | MIN | Shut-Off | OTH |
|---|---|---|---|---|---|---|
| Q | scfh | 2572200.0 | 2184800.0 | | | |
| P1 | psia | 1167.000 | 1167.000 | | 1300 psid | |
| P2 | psia | 1165.000 | 1165.000 | | | |
| T | deg F | 250.000 | 250.000 | | | |
| SG | | 1.105 | 1.105 | | | |
| Fk | | 1.000 | 1.000 | | | |
| CV | | 1095.733 | 930.654 | | | |
| Vlv LpA | dB(A) | <50.0 | <50.0 | | | |

---

```
PIPE LINE                              53 ACTUATOR Type:      PISTON,SPRING RTN
  Size, Schedule In:12 in SCH STD      54  Mfg/Model:         FISHER/1031
  Size,Schedule Out:12 in SCH STD      55  Size: 33102-SR        Eff Area: N/A
  Insulation:                          56  On/Off:               Modulating: YES
VALVE BODY/BONNET    Type:BUTTERFLY    57  Spring Action:     CLOSE
  Size:12"          ANSI 600           58  Max Allow Press: 120 psig
  Max Press: 1300 psig  Temp:300 · F   59  Min Req'd Press: 80 psig
  Mfg/Model:       FISHER/A11          60  Available Air Supply Pressure
  Body/Bonnet Matl: Hastelloy C        61  Max:120 psig   Min:90 psig
  iner Matl/ID:    NONE                62  Bench Range:    N/A
  d Connection In:WAFER                63  Act Orientation: HORIZ.
  End Connection Out:WAFER             64  Handwheel Type:  NONE
  Flg Face Finish: ANSI B16.5-81       65  Air Fails Valve: CLOSE  Set at:
  End Ext/Matl:                        66  Stroke time < 1 sec to close
  Flow Direction:  Shaft UP Stream     67  Input Signal:     4-20 mA dc
BONNET  Type:     EXTENDED             68 POSITIONER Type:   SINGLE ACTING
  Lub-Iso Valve:        Lube:          69  Mfg/Model:         FISHER/3720
  Packing Material: SINGLE TFE         70  Incr Signal Output: INCREASES
  Packing Type:    V-RING, JAM TYPE    71  Gauges: SUPP & OUT  By-Pass: NONE
                                       72  Cam Characteristic: LINEAR
TRIM Type:        STANDARD             73
  Size:FULL        Travel: 90 Deg         SWITCHES
  Characteristic:  MOD EQUAL PERCENT   74  Type: POSITION TRANSMITTER  Qty: 1
                                       75  Mfg/Model:      Stonel/PQ70E1C
  Rated Cv:2831    Fl:.520  Xt:.350    76  Contacts/Rating:
  Disk Material:   Monel               77  Actuation Points:4-20 MA
  Seat Material:   Monel/PTFE          78
  Guide Material:  Monel                   AIRSET
  Stem Material:   Monel               79  Mfg/Model:       FISHER/67AFD FILTER
  2 Asco sol. Model: 8316G2 24vdc      80  Set Pressure:    n/a
  piped per P&ID 3051                  81  Filter:YES       Gauges: No
SPECIAL ACCESSORIES                    82
  NEC:       Group:      Div:          83 TESTS Hydro Press:
  STANDARD NOTES SUPPLIED PER DWG      84  ANSI/FCI Leak Class: VI
  A-2234221 ALT D                      85  Instrument overpressure protection
  1,2,4,11,13,15,16,17(2),18,23,24,    86  required  Yes( )  No (x)
  25,26,28,29,30,31,32,35,43
```

| Rev | Date | Revision | Orig | App |
|---|---|---|---|---|
| | 6/3/98 | | BC | BSB |
| | | | CHK'D | REV'D |
| | | 1.42 HV0629-1 | BSB | BSB |

```
  Torque Req.= 1264.9 FT-lbs
  Torque Gen.= 1350.0 Ft-lbs
  FF Dim.= 5.50"
```

## CERTIFICATE OF SERVICE

I, Paul A. Bradley, Esquire, hereby certify that, on August 18, 2006, I caused a true and correct copy of the Defendant Fisher Controls International, LLC's Answer and Counterclaim to Plaintiffs' Complaint to be served upon counsel of record via electronic filing.


/s/ Paul A. Bradley
Paul A. Bradley (DE Bar Id No. 2156)