# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, INC.   :  CIVIL ACTION – LAW
   and        :
ST. PAUL MERCURY INSURANCE COMPANY :
              :
              :
    v.        :
              :
              :
FISHER CONTROLS INTERNATIONAL, LLC :  NO. 1:06-CV-00412 (SLR)

## MOTION FOR LEAVE TO AMEND COMPLAINT

Northeast Controls, Inc., and St. Paul Mercury Insurance Company, by and through their attorneys, Marshall, Dennehey, Warner, Coleman & Goggin, hereby move this Court for leave to amend their Complaint in Civil Action against defendant, Fisher Controls International, LLC, and, in support thereof, allege the following:

1.  This action arises from the refusal of defendant, Fisher Controls International, LLC ("Fisher"), to assume the defense of plaintiff Northeast Controls, Inc. ("Northeast") in two underlying suits.

2.  Fisher manufactures and sells valves for use in New Castle County and the state of Delaware.

3.  Northeast is a sales representative for Fisher

4.  Two underlying suits have been filed against Northeast alleging that a valve manufactured by Fisher was defective and caused the underlying plaintiffs economic and/or personal injury.

5.  As outlined in both the original Complaint filed by Plaintiffs in this matter and the proposed Amended Complaint, Fisher is obligated to assume the defense of Northeast under a

contract whereby Fisher agreed to protect, defend, indemnify and hold harmless Northeast from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses arising from or in connection with any actual or alleged defect of the valves. The Complaint and the proposed First Amended Complaint are hereby incorporated by reference. The proposed First Amended Complaint is attached hereto at Exhibit "A".

6.    Fisher has provided more than one response to the tender demand. Fisher through its agent Matthew W. Geekie, also wrote a letter before the underlying suits were filed. The gist of this letter was that Fisher promised to defend, indemnify and hold harmless Northeast if there were subsequent assertions of actual or alleged defect in the valve.

7.    Plaintiffs seek to clarify the record in this case by adding averments relating to Mr. Geekie's letter to the Complaint, as the promise expressed in that letter relates directly to Plaintiffs' claims for indemnification from Fisher.

8.    Amendment of the Complaint is within the deadline established by this Court in its October 18, 2006 Order. D.I. 16.

9.    Amendment of the Complaint is also within the applicable statute of limitations.

10.    In support of this Motion to Amend, Plaintiffs offer the Memorandum of Law filed simultaneously herewith.

<u>Statement Pursuant to Local Rule 7.1.1</u>

Plantiffs' counsel attempted to consult with defendats' counsel regarding this Motion, but the parties were unable to reach an agreement prior to the filing of this Motion.

WHEREFORE, Plaintiffs, St. Paul Mercury Insurance Company and Northeast Controls, Inc., respectfully request that this Honorable Court enter the proposed Order attached hereto.


**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**

_/s/ Thomas P. Wagner_____

BY:   **THOMAS P. WAGNER, ESQUIRE**
**1845 Walnut Street**
**Philadelphia, PA  19103**
**Telephone No. (215) 575-4562**
**Attorneys for Plaintiffs**

**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**


BY:   _/s/ Lorenza A. Wolhar_____
**LORENZA A. WOLHAR, ESQ.**
**DE ID #3971**
**1220 N. Market Street, 5th Floor**
**P.O. Box 8888**
**Wilmington, DE 19899-8888**
**Attorneys for Plaintiffs**


Date: March 12, 2007

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, INC.           :     CIVIL ACTION – LAW
     and                     :
ST. PAUL MERCURY INSURANCE COMPANY :
                               :
         v.                 :
                               :
FISHER CONTROLS INTERNATIONAL, LLC   :    NO. 1:06-CV-00412 (SLR)

## CERTIFICATE OF SERVICE

       I hereby certify that on March 12, 2007, I electronically filed the Motion to Amend of Plaintiffs, Northeast Controls, Inc., and St. Paul Mercury Insurance Company, with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

       **Paul A. Bradley, Esquire**
       **Maron, Marvel, Bradley & Anderson, P.A.**
       **1201 North Market Street, Suite 900**
       **P.O. Box 288**
       **Wilmington, DE  19899-0288**

       I hereby certify that on March 12, 2007, we have mailed by United States Postal Service, the Motion to Amend of Plaintiffs, Northeast Controls, Inc., and St. Paul Mercury Insurance Company, to the following non-registered participant:

       **Daniel J. Gunter**
       **Patrick D. McVey**
       **Riddell Williams P.S.**
       **1001 Fourth Avenue Plaza, Ste. 4500**
       **Seattle, Washington 98454**

                   **MARSHALL, DENNEHEY, WARNER,**
                       **COLEMAN & GOGGIN**

             **BY:**   */s/ Lorenza A. Wolhar*
                   **LORENZA A. WOLHAR, ESQ.**
                   **DE ID #3971**
                   **1220 N. Market Street, 5th Floor**
                   **P.O. Box 8888**
                   **Wilmington, DE 19899-8888**
                   **Attorney for Plaintiffs**

EXHIBIT "C"

2.     Defendant Motiva Enterprises, L.L.C. ("Motiva") is a Delaware Limited Liability Company and owns and/or operates a power plant located on River Road, Route 9, Delaware City, Delaware 19706 (the "Plant").

3.     Defendant Battaglia Mechanical, Inc ("Battaglia") is a Delaware corporation with its principal headquarters at 11 Industrial Boulevard, New Castle, Delaware 19720.

4.     Defendant Fisher Controls International, Inc. ("Fisher") is a Delaware corporation, and, upon information and belief, its principal headquarters is located at 205 South Center Street, Marshalltown, Iowa 50158. Among other things, Fisher engages in the business of manufacturing and distributing control valves used in oxygen systems.

5.     Upon information and belief, Defendant Hydrochem Industrial Services Inc. ("Hydro") is a Delaware corporation with offices located at 450 Preston Street, Houston, Texas 77002.

6.     Upon information and belief, Defendant JJ White, Inc. ("JJ White") is a Delaware corporation with its principal headquarters located at 5500 Bingham Street, Philadelphia, Pennsylvania 19120. JJ White is engaged in the business of, among other things, general construction, construction management and mechanical construction.

7.     Defendant Northeast Controls, Inc. ("Northeast") is a distributor of valves manufactured by Fisher. Northeast has offices located at 6000 N. Bailey Avenue, Suite 2B, Amherst, NY 14226. Upon information and belief, Northeast maintains its executive offices at 3 Enterprise Avenue, Clifton Park, New York.

8.     Defendant Parsons Energy and Chemicals Group, Inc. ("Parsons") is a Delaware Corporation, and, upon information and belief, its principal headquarters is located at 2675

2

Morgantown Road, Reading, PA 19611. Parsons is engaged in the business of designing, engineering, and managing the construction of institutional facilities.

9.    Defendant Praxair, Inc. ("Praxair") is a publicly traded company engaged in the business of supplying atmospheric, process and specialty gases, high-performance coatings, and related technologies. Upon information and belief, Praxair's principal headquarters is located at 39 Old Ridgebury Road, Danbury, Connecticut 06810-5113. Praxair also maintains lab facilities in Tonawanda, New York.

10.    Defendant Texaco Aviation Products L.L.C. ("Texaco") is a Delaware Limited Liability Company.

11.    Texaco Global Gas & Power ("GG&P") was created by Texaco, Inc. in 1997 to manage the company's worldwide natural gas, natural gas liquids, electric power and synthesis gas marketing and project development activities. GG&P is a combination of three Texaco, Inc. business entities: Texaco Natural Gas North America, Texaco Natural Gas International and Texaco's Alternate Energy Department.

12.    Defendant Daikin Industries, Ltd ("Daikin") is an international company with its principal place of business in Osaka, Japan. Daikin is engaged in the business of, among other things, the production, manufacturing, and/or distribution of various chemicals, including polymers. At all relevant times hereto, Daikin conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

13.    Saint-Gobain Performance Plastics ("SGPP") is a worldwide supplier of polymer products. SGPP is headquartered in Wayne, New Jersey. At all relevant times hereto, SGPP conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

14.    Rix Industries, Inc. ("Rix") is headquarted out of Benecia, California and is engaged in the business of, among other things, manufacturing oil-free compressors for industrial use.

15.    Texaco Development Corp. ("Texaco Development") is a Delaware corporation that maintains offices at 2000 West Chester Avenue, White Plains, New York.  The corporation's registered agent is Prentice Hall, 2711 Centerville Road, Suite 400 Wilmington, Delaware.

16.    `Gary Delgrego is an adult individual who resides at 13027 Fox Brush Lane, Houston, Texas and a post office box at P.O. Box 279, Delaware City, Delaware.  At all times relevant hereto Mr. Delgrego conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

### Background

17.    In May 2000, certain of the Defendants were engaged in the construction and operation of a "re-powering project" at the Plant (the "Project").  The Project included, among other things, the calibration of an oxygen-flow transmitter, which is utilized in the process of transferring 99.99% pure oxygen gas from a base load oxygen compressor ("BLOC") in a air separation unit ("ASU") through a series of control valves and pipes to a gassifier (The ASU and BLOC, together with all interconnected, vents, pipes, valves and gassifier are hereafter referred to collectively as the "Oxygen System" or "System").

18.    Upon information and belief, Parsons was retained to perform work for the Project and entered into an agreement with Praxair to supply, erect, and test the ASU.  The work included, amont other things, the installation of a valve intended to block and/or control the flow of oxygen to gassifiers.

4

19.    Upon information and belief, Praxair, Inc. purchased from Fisher and/or Northeast a BLOC control valve, tag number 83HVO629 (the "Valve"). The purpose of the Valve was to block and/or control the flow of oxygen the gassifier.

20.    Upon information and belief, valve specifications indicated that the Valve would be utilized for oxygen service. The specifications required, among other things, Fisher and/or Northeast to utilize certain disc material, seat material, guide material, and stem material.

21.    Fisher and/or Northeast knew or reasonably should have known, regardless of the purchase order's terms, that Praixair would utilize the Valve for high pressure oxygen service.

22.    Upon information and belief, Fisher and/or Northeast designed, manufactured, and sold the Valve to Praxair. The Valve was then shipped to the Plant for use in the Project. The Valve was installed in conjunction with the ASU.

23.    Upon information and belief, Texaco Development representatives, including Mr. Delgrego, assisted in plant operations and began and oversaw the initial opening of the Valve on May 20, 2000.

24.    A control room operator attempted to open the Valve, which did not respond. Mr. Olson responded to a call from the control room operator to check the Valve While checking the Valve, an explosion occurred and Mr. Olson was engulfed in flames. As a result of the explosion, Mr. Olson sustained severe and permanent injuries, including but not limited to, severe burns, scarring, disfigurement, and pain and suffering. Mr. Olson has undergone several operations, has incurred and will continue to incur medical expenses, and has lost significant time from work resulting in a loss of wages and may continue to incur lost wages in the future.

25.    Upon information and belief, and at all times relevant hereto, Defendant Texaco participated in the development of operating procedures and design of the Oxygen System and

Plant. At all relevant times hereto, Texaco had a duty to ensure that the operating procedures and design of the System and Plant were properly designed and developed. Texaco also had a duty of reasonable care to ensure that the Oxygen System was properly maintained and cleaned and that the operating procedures were safe.

26.     Upon information and belief, and at all times relevant hereto, Defendant GG&P participated in the development of operating procedures and design of the Oxygen System and Plant. At all relevant times hereto, GG&P had a duty to ensure that the operating procedures and design of the System and Plant were properly designed and developed. GG&P also had a duty of reasonable care to ensure that the Oxygen System was properly maintained and cleaned and that the operating procedures were safe.

27.     Upon information and belief, and at all times relevant hereto, Defendant Motiva owned the Plant and also supplied specifications and requirements in connection with the Plant and/or System. At all times relevant hereto, Motiva had a duty to ensure that the System was safe and properly operated, maintained and cleaned.

28.     Upon information and belief, and at all times relevant hereto, Defendant Parsons was engaged to, among other things, engineer, design, build and/or procure some or all of the System. At all times relevant hereto, Parsons had a duty to ensure that the System was properly designed and built and also that the System was safe and properly operated, maintained and cleaned.

29.     Upon information and belief, and at all times relevant hereto, Defendant Praxair was engaged to, among other things, engineer, design, build and/or procure some or all of the System, including the Valve. At all times relevant hereto, Praxair was engaged to support operations regarding the System. At all times relevant hereto, Praxair had a duty to ensure that

the System was safe and properly operated, maintained and cleaned.30.    Upon information and belief, and at all times relevant hereto, Defendant Battaglia was engaged to perform services on the System so that the System could be properly maintained and cleaned.

30.    Upon information and belief, and at all times relevant hereto, Defendant JJ White was engaged to perform services on the System.

31.    Upon information and belief, and at all times relevant hereto, Defendant Hydro was engaged to perform cleaning and maintenance services on the System.

32.    Upon information and belief, and at all times relevant hereto, Defendant Daikin manufactured and distributed polymer to SGPP, which, in turn, SGPP implemented into a valve seat or a part thereof (the "Valve Seat"). The Valve Seat was then implemented into the System.

33.    Upon information and belief, and at all times relevant hereto, Defendant SGPP manufactured and distributed the Valve Seat.

34.    Upon information and belief, and at all times relevant hereto, Defendant Rix distributed the Valve.

## Count I
### Negligence – Texaco

35.    At all times relevant hereto, Defendant Texaco owed a duty of reasonable care to Mr. Olson, which duty Defendant Texaco, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently developing and designing the operating procedures, the Oxygen System and/or the Plant, and negligently maintaining and/or cleaning the System. As a direct and proximate result of Defendant Texaco's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count II
### Negligence – Motiva

36.    At all times relevant hereto, Defendant Motiva owed a duty of reasonable care to Mr. Olson, which duty Defendant Motiva, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently supplying specifications and requirements in connection with the Plant and/or System and negligently maintaining and/or cleaning the System. As a direct and proximate result of Defendant Motiva's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count III
### Negligence – Parsons

37.    At all times relevant hereto, Defendant Parsons owed a duty of reasonable care to Mr. Olson, which duty Defendant Parsons, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently engineering, designing, building and/or procuring some or all of the System and negligently maintaining and/or cleaning the System. As a direct and proximate result of Defendant Parsons' negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count IV
### Negligence – Praxair

38.    At all times relevant hereto, Defendant Praxair owed a duty of reasonable care to Mr. Olson, which duty Defendant Praxair, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently engineering, designing, building and/or procuring some or all of the System, including the Valve, and negligently maintaining operating

and/or cleaning the System,  As a direct and proximate result of Defendant Praxair's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count V
### Negligence – Fisher and Northeast

39.    At all times relevant hereto, Defendant Fisher and Northeast owed a duty of reasonable care to Mr. Olson, which duty defendants Fisher and Northeast, themselves, and through their agents, servants, and/or employees, breached by, among other things, negligently designing, manufacturing, and/or distributing the Valve.  Upon information and belief, Fisher and Northeast were also negligent in failing to design, manufacture, assemble and distribute a BLOC control valve compatible with and  appropriate for high pressure oxygen service; failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment; failing to investigate, for safety, the materials utilized during the design, assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment; failing to provide a valve that complied with the specifications that required use of certain material; and failing to advise of any deficiencies in the Valve that would make the product unsafe or unfit for use in a high pressure oxygen environment.  As a direct and proximate result of defendants Fisher and Northeast's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

### Count VI
### Negligence – Battaglia

40.    At all times relevant hereto, Defendant Battaglia owed a duty of reasonable care to Mr. Olson, which duty Defendant Northeast, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently maintaining and cleaning the System. As a direct and proximate result of Defendant Battaglia's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

### Count VII
### Negligence – JJ White

41.    At all times relevant hereto, Defendant JJ White owed a duty of reasonable care to Mr. Olson, which duty Defendant Northeast, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently maintaining and cleaning the System. As a direct and proximate result of Defendant JJ White's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

### Count VIII
### Negligence – Hydro

42.    At all times relevant hereto, Defendant Hydro owed a duty of reasonable care to Mr. Olson, which duty Defendant Hyrdo, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently maintaining and cleaning the System. As a direct and proximate result of Defendant Hydro's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count IX
### Breach of Warranty – 6 Del. C. § 2-314 – Fisher and Northeast

43.     At all times relevant hereto, defendants Fisher and Northeast were merchants within the meaning of 6 Del. C. § 2-104. Defendants Fisher and Northeast sold the Valve, which Valve at the time of the sale, was defective. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher and Northeast's breach of the warranty of merchantability and the defective condition of the Valve. Defendant Northeast has notice of Mr. Olson's injuries and the damage caused by the defective Valve.

## Count X
### Breach of Warranty – 6 Del. C. § 2-315 – Fisher and Northeast

44.     Upon information and belief, at all times relevant hereto, defendants Fisher and Northeast had reason to know the purpose for which the Valve was required and that the buyer of the Valve was relying on Fisher and Northeast's skill or judgment to select or furnish a suitable valve. The Valve was not fit for the purpose for which it was intended. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher Northeast's breach of the implied warranty of fitness.

## Count XI
### Breach of Warranty – 6 Del. C. § 2-313 – Fisher and Northeast

45.     Upon information and belief, at all times relevant hereto, defendants Fisher and Northeast expressly warranted that the Valve that they designed, manufactured, assembled and/or distributed contained materials suitable for and safe in a high pressure oxygen environment, and utilized certain material as required in the valve specifications. Mr. Olson relied on the parties' skill, knowledge, and expertise in providing a BLOC control valve suitable for use in a high pressure oxygen environment. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher and Northeast's breach of the express warranty.

11

### Count XII
### Negligence – GG&P

46.    At all times relevant hereto, Defendant GG&P owed a duty of reasonable care to Mr. Olson, which duty Defendant GG&P, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently developing and designing the operating procedures, the Oxygen System and/or the Plant, and negligently maintaining and/or cleaning the System. As a direct and proximate result of Defendant GG&P's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

### Count XIII
### Negligence – Daikin

47.    At all times relevant hereto, Defendant Daikin owed a duty of reasonable care to Mr. Olson, which duty Defendant Daikin, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently designing, manufacturing, and/or distributing the polymer that was used in the Valve Seat. As a direct and proximate result of Defendant Daikin's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

### Count XIV
### Breach of Warranty – 6 Del. C. § 2-314 – Daikin

48.    At all times relevant hereto, Defendant Daikin was a merchant within the meaning of 6 Del. C. § 2-104. Defendant Daikin manufactured and distributed the polymer used in the Valve Seat. The polymer was defective when it was distributed. Mr. Olson sustained significant injuries, which injuries were caused by Defendant Daikin's breach of the warranty of

merchantability and the defective condition of the polymer. Defendant Daikin has notice of Mr. Olson's injuries and the damage caused by the defective polymer.

## Count XV
### Breach of Warranty – 6 Del. C. § 2-315 – Daikin

49. Upon information and belief, at all times relevant hereto, Defendant Daikin had reason to know the purpose for which the polymer was required and that the buyer of the polymer was relying on Daikin's skill or judgment to select or furnish suitable polymer. The polymer was not fit for the purpose for which it was intended. Mr. Olson sustained significant injuries, which injuries were caused by Defendant Daikin's breach of the implied warranty of fitness.

## Count XVI
### Negligence – SGPP

50. At all times relevant hereto, Defendant SGPP owed a duty of reasonable care to Mr. Olson, which duty Defendant SGPP, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently designing, manufacturing, and/or distributing the Valve Seat. As a direct and proximate result of Defendant SGPP's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count XVII
### Breach of Warranty – 6 Del. C. § 2-314 – SGPP

51. At all times relevant hereto, Defendant SGPP was a merchant within the meaning of 6 Del. C. § 2-104. Defendant SGPP manufactured and distributed the Valve Seat. The Valve Seat was defective when it was distributed. Mr. Olson sustained significant injuries, which injuries were caused by Defendant SGPP's breach of the warranty of merchantability and the

defective condition of the Valve Seat. Defendant SGPP has notice of Mr. Olson's injuries and the damage caused by the defective Valve Seat.

## Count XVIII
### Breach of Warranty – 6 Del. C. § 2-315 – SGPP

52.     Upon information and belief, at all times relevant hereto, Defendant SGPP had reason to know the purpose for which the Valve Seat was required and that the buyer of the Valve Seat was relying on SGPP's skill or judgment to select or furnish a suitable Valve Seat. The Valve Seat was not fit for the purpose for which it was intended. Mr. Olson sustained significant injuries, which injuries were caused by Defendant SGPP's breach of the implied warranty of fitness.

## Count XIX
### Negligence – Rix

53.     At all times relevant hereto, Defendant Rix owed a duty of reasonable care to Mr. Olson, which duty Defendant Rix, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently distributing the Valve. As a direct and proximate result of Defendant Rix's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count XX
### Breach of Warranty – 6 Del. C. § 2-314 – Rix

54.     At all times relevant hereto, Defendant Rix was a merchant within the meaning of 6 Del. C. § 2-104. Defendant Rix distributed the Valve. The Valve was defective when it was distributed. Mr. Olson sustained significant injuries, which injuries were caused by Defendant Rix's breach of the warranty of merchantability and the defective condition of the Valve. Defendant Rix has notice of Mr. Olson's injuries and the damage caused by the defective Valve.

## Count XXI
### Breach of Warranty – 6 Del. C. § 2-315 – Rix

55.     Upon information and belief, at all times relevant hereto, Defendant Rix had reason to know the purpose for which the Valve was required and that the buyer of the Valve was relying on Rix's skill or judgment to select or furnish a suitable valve.  The Valve was not fit for the purpose for which it was intended.  Mr. Olson sustained significant injuries, which injuries were caused by Defendant Rix's breach of the implied warranty of fitness.

## Count XXII
### Negligence – Texaco Development

56.     At all times relevant hereto, Defendant Texaco Development owed a duty of reasonable care to Mr. Olson, which duty Defendant Texaco Development, itself, and through its agents, servants, and/or employees, breached by, among other things, failing to properly train operators on proper start-up and operation procedures; failing to make sure that proper and adequate start-up procedures were in place prior to opening the BLOC control valve; failing to immediately stop the start-up activity at the initial suggestion of a potential problem; and failing to terminate valve opening procedures prior to sending Mr. Olsen to the site to investigate.  As a direct and proximate result of Defendant Texaco Development's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count XXIII
### Loss of Consortium

57.     As a direct and proximate result of the aforementioned injuries sustained by her husband, Ms. Olson was and may in the future continue to be deprived of the consortium, care, comfort and society of her husband in various degrees as a result of Mr. Olson's injuries.

## CONCLUSION

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally,

for all damages permitted by law, together with reasonable attorneys' fees, interest, and costs.


ASHBY & GEDDES


Randall E. Robbins
Joseph C. Handlon
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Ronald and Carol Olson*


Dated: May 20, 2002
110354.1

# EXHIBIT "D"



# RAWLE & HENDERSON, LLP



THOMAS P. WAGNER
215-575-4307
twagner@rawle.com

THE NATION'S OLDEST LAW OFFICES
ESTABLISHED 1783

www.rawle.com

The Widener Building
One South Penn Square
Philadelphia, PA 19107

Telephone: (215) 575-4200
Facsimile: (215) 563-2583

July 3, 2002

Warren Voter, Esquire
Sweeney & Sheehan, P.C.
1515 Market Street
19th Floor
Philadelphia, PA 19102

Re:    **Incident at Praxair Installation**
       **Our File No. 300,004**

Dear Warren:

I understand that you represent Fisher Controls International, Inc. in the above-captioned case. As you probably know, suit has now been filed by Great American Assurance Company as subrogee of Praxair, Inc., Parsons Corporation and Motiva Enterprises, LLC, Ron Olson and Praxair, Inc. The defendants include your client Fisher Controls International, Inc., and our client Northeast Controls, Inc., in addition to several others. Enclosed please find copies of the complaints.

On behalf of our client, we have made two written demands on Fisher Controls International, Inc. for defense and indemnification, as well as for reimbursement of all costs incurred so far in this matter. We first tendered the defense and indemnification of our client to Fisher on October 4, 2000. Having received no response, we did a follow-up letter on March 30, 2001. We then received a response signed by Matthew Geekie, Esquire and dated October 29, 2001. Mr. Geekie's letter declined to accept our client's defense and indemnification at that time, saying that he felt the tender was premature. Mr. Geekie pointed out that no conclusions had been reached in the investigation of this matter, and that no allegations of defect in the Fisher valve had yet been made.

The letter stated, however, that the defense and indemnification of Northeast would be accepted by Fisher in the event of a future allegation that a defect in the valve gave rise to the losses sued upon. Mr. Geekie's letter was very specific on this point. He stated as follows:

0669901.01

PHILADELPHIA, PA          MEDIA, PA          PITTSBURGH, PA          MARLTON, NJ          NEW YORK, NY

RAWLE & HENDERSON LLP

Warren Voter, Esquire
July 3, 2002
Page 2

If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement.

Mr. Geekie's letter limited this commitment to indemnify Northeast only with respect to our client's own negligent acts or omissions, if any. He went on to say that the extent of Fisher's ultimate indemnification would depend upon the conclusions and allegations that may be made.

Now suit has been filed, and we are in a position to know the allegations that have been made. The complaints make specific allegations of negligence against Fisher and Northeast simultaneously. All the allegations of negligent conduct arise specifically from the design and manufacture of the butterfly valve. The complaint alleges that Fisher and Northeast simultaneously were negligent in failing to design and manufacture a valve that was safe for use in a high pressure oxygen environment, failing to provide a valve that complied with specifications, and failing to warn of defects in the valve. There are no allegations of separate or independent acts of negligence by Northeast. Instead, all the allegations of negligence are simultaneous and coincidental.

Under the circumstances of this case, the conduct of our client Northeast would be completely secondary to that of your client Fisher. All the design and manufacturing was done by Fisher. The only separate allegations at all against our client Northeast are based in contact, and any liability here would also pass through directly to Fisher.

With this matter now in suit, our client will begin incurring substantially greater costs than it has already incurred. We request that you and your client agree immediately to take over the complete defense and indemnification of Northeast Controls, Inc., as well as reimburse our client and its insurer for all defense costs incurred to date.

0669901.01

RAWLE & HENDERSON LLP

Warren Voter, Esquire
July 3, 2002
Page 3


     I request that you get back to me within one week so that we can avoid the need for any more duplicative costs of suit.  In addition, please confirm whether there is vendor coverage available.  I look forward to hearing from you.

                  Very truly yours,

                  RAWLE & HENDERSON LLP

                  By:

                     Thomas P. Wagner

TPW/sdk

0669901.01

# EXHIBIT "E"

# R A W L E & H E N D E R S O N LLP



THOMAS P. WAGNER
215-575-4307
rwagner@rawle.com

LAW OFFICES
THE WIDENER BUILDING
ONE SOUTH PENN SQUARE
PHILADELPHIA, PA 19107
215-575-4200

CABLE RAWLE PHILADELPHIA
FACSIMILE 215-563-2583

NEW JERSEY OFFICE
TEN LAKE CENTER EXECUTIVE PARK
MARLTON, NEW JERSEY

NEW YORK OFFICE
140 BROADWAY
NEW YORK, NY

September 25, 2000

**VIA CERTIFIED MAIL**

Mr. Robert Walker, Area Vice President
Fisher Controls International, Inc.
205 South Center Street
Marshalltown, IA 50158

> Re:    **Incident at Praxair Installation**
> Date of Loss: 05/20/00
> Our File No. 435,197

Dear Mr. Walker:

It is our understanding that you represent Fisher Controls International, Inc. in connection with the above-captioned matter. Please accept this correspondence as the demand of Northeast Controls, Inc. that Fisher Controls International, Inc. take over the defense of Northeast Controls, Inc. in connection with the above-captioned matter pursuant to the terms of the Representative Agreement between Fisher Controls International, Inc. and Northeast Controls, Inc.

As you are aware, the above matter concerns an alleged incident which took place during the final stages of ASU startup at the Connectiv facility in Delaware City, Delaware. According to the information supplied by Wendell Hull Associates, the incident at issue appears to involve a BLOC Isolation Valve which failed while Connectiv was preparing to deliver high pressure oxygen to the gasifiers. The valve at issue was designed, manufactured and/or supplied by Fisher Controls International, Inc. pursuant to specifications provided by Praxair. In accordance with the terms of the Representative Agreement, Fisher Controls, Inc. designated Northeast Controls, Inc. as its sales, engineering and service representative for its designated products and related services.

Article XI of the Representative Agreement states the following:

XI. INDEMNITY
    Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at is own expense, protect, defend, indemnify and hold harmless

RAWLE & HENDERSON LLP

Robert Walker
September 25, 2000
Page 2

Representative [Northeast Controls, Inc.] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whosoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. The obligations set forth in the immediately preceding sentence shall not apply unless Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provision of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any losses arising from the following:
A.  Any express warranty unauthorized by Fisher;
B.  Any distribution or sale of a Product for a purpose unauthorized by Fisher;
C.  Use of any instruction labels, warnings or other product literature which have not been previously approved in writing by Fisher;
D.  Any failure by Representative to maintain any Product in merchantable condition;
E.  Demonstration, installation, servicing, modification or repair of any Product by Representative or any third party not in accordance with written warnings or instructions of Fisher, or
F.  Negligent acts or omissions by Representative.

In light of the provisions of the Representative Agreement, Northeast Controls, Inc. requests that Fisher Controls International, Inc. take over the defense of Northeast Controls, Inc. in this case, and agree to reimburse Northeast Controls, Inc. for all its costs of defense in this matter.

    If you have any questions or comments regarding the foregoing, please contact this office. Thank you.

R A W L E & H E N D E R S O N LLP

Robert Walker
September 25, 2000
Page 3

Very truly yours,

RAWLE & HENDERSON LLP

By:

Thomas P. Wagner
Jason Banonis

TPW/jb

cc:   Matthew Geekie
      Warren Voter

# RAWLE & HENDERSON LLP



THOMAS P. WAGNER
215-575-4307
twagner@rawle.com

LAW OFFICES
THE WIDENER BUILDING
ONE SOUTH PENN SQUARE
PHILADELPHIA, PA 19107
215-575-4200

CABLE RAWLE PHILADELPHIA
FACSIMILE 215-563-2583

NEW JERSEY OFFICE
TEN LAKE CENTER EXECUTIVE PARK
MARLTON, NEW JERSEY

NEW YORK OFFICE
140 BROADWAY
NEW YORK, NY

October 4, 2000

**VIA CERTIFIED MAIL**

Mr. Robert Walker, Area Vice President
Fisher Controls International, Inc.
205 South Center Street
Marshalltown, IA 50158

      Re:   **Incident at Praxair Installation**
      **Date of Loss: 05/20/00**
      **Our File No. 435,197**

Dear Mr. Walker:

       It is our understanding that you represent Fisher Controls International, Inc. in connection with the above-captioned matter. Please accept this correspondence as the demand of Northeast Controls, Inc. that Fisher Controls International, Inc. take over the defense of Northeast Controls, Inc. in connection with the above-captioned matter pursuant to the terms of the Representative Agreement between Fisher Controls International, Inc. and Northeast Controls, Inc.

       As you are aware, the above matter concerns an alleged incident which took place during the final stages of ASU startup at the Connectiv facility in Delaware City, Delaware. According to the information supplied by Wendell Hull Associates, the incident at issue appears to involve a BLOC Isolation Valve which failed while Connectiv was preparing to deliver high pressure oxygen to the gasifiers. The valve at issue was designed, manufactured and/or supplied by Fisher Controls International, Inc. pursuant to specifications provided by Praxair. In accordance with the terms of the Representative Agreement, Fisher Controls, Inc. designated Northeast Controls, Inc. as its sales, engineering and service representative for its designated products and related services.

       Article XI of the Representative Agreement states the following:

XI.  INDEMNITY
      Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at is own expense, protect, defend, indemnify and hold harmless

RAWLE & HENDERSON LLP

Robert Walker
October 4, 2000
Page 2

Representative [Northeast Controls, Inc.] from and against any and
all claims, demands, actions, losses, damages, liabilities, costs and
expenses (collectively, "Losses") which may arise out of or be
made in connection with the death or injury of any person, or
damage to property, by whosoever suffered, resulting or claimed to
result from any actual or alleged defect in any Product.  The
obligations set forth in the immediately preceding sentence shall
not apply unless Representative, upon receiving notice thereof,
promptly notifies Fisher in writing thereof of such claim, demand
or action, and thereafter reasonably cooperates with Fisher in the
resolution thereof.

Notwithstanding the provision of the immediately preceding
paragraph of this Section XI or any other provision of this
Agreement, Fisher shall not be obligated to protect, defend,
indemnify or hold harmless Representative from and against any
losses arising from the following:
A.  Any express warranty unauthorized by Fisher;
B.  Any distribution or sale of a Product for a purpose unauthorized
by Fisher;
C.  Use of any instruction labels, warnings or other product
literature which have not been previously approved in writing by
Fisher;
D.  Any failure by Representative to maintain any Product in
merchantable condition;
E.  Demonstration, installation, servicing, modification or repair of
any Product by Representative or any third party not in accordance
with written warnings or instructions of Fisher, or
F.  Negligent acts or omissions by Representative.

In light of the provisions of the Representative Agreement, Northeast Controls, Inc. requests that
Fisher Controls International, Inc. take over the defense of Northeast Controls, Inc. in this case,
and agree to reimburse Northeast Controls, Inc. for all its costs of defense in this matter.

If you have any questions or comments regarding the foregoing, please contact this office.
Thank you.

RAWLE & HENDERSON LLP

Robert Walker
October 4, 2000
Page 3

Very truly yours,

RAWLE & HENDERSON LLP

By:

Thomas P. Wagner
Jason Banonis

TPW/jb

cc:    Matthew Geekie
       Warren Voter

EXHIBIT "F"



**EMERSON.**
Process Management

Fisher Controls International, Inc.
205 South Center Street
P.O. Box 190
Marshalltown, Iowa 50158-0190
USA

T (641) 754-3011
F (641) 754-2830

September 13, 2002

Mr. Michael J. Peters
President
Northeast Controls, Inc.
3 Enterprise Avenue
Clifton Park, NY 12065

Re:   Motiva Enterpirses v. Fisher Controls, et al.

Dear Mr. Peters:

Fisher agrees that, with respect to the accident which occurred at the Delaware City
Power Plant, which is the subject of litigation including but not limited to: Olsen v. Motiva
Enterprises, L.L.C. et al. C.A. No. 02C-04-263, Praxair, Inc. v. Fisher Controls
International, et al., C.A. No. 02C-05-190; Great American Assurance Company V.
Fisher Controls International, Inc. et al., C.A. No. 02C-05-168; and Motiva Enterprises,
L.L.C. v. Fisher Controls International, Inc. et. al., C.A. No. 02-05-169; it shall, at its own
expense, protect, defend, indemnify and hold harmless Northeast Controls, Inc. from
and against all claims, demands, actions, losses, damages, liabilities, costs and
expenses (collectively "Losses") which may arise out of or be made in connection with
the death or injury of any person, or the damage of property, by whomsoever suffered,
resulting or claimed to result from any actual or alleged defect in any Product.
Notwithstanding the provisions of the immediately preceding sentence, Fisher shall not
be obligated to protect, defend, indemnify or hold harmless Northeast Controls, Inc.
from and against any Losses arising from any negligent acts or omissions of Northeast
Controls, Inc. or any other independent basis for liability as set forth in Paragraphs XI A-
E of the Representative Agreement entered into between the parties effective January
1, 1998.

Sincerely,

FISHER CONTROLS INTERNATIONAL, INC.

*Michael J. Mason*

Michael J. Mason
Executive Vice President

**FISHER**



EXHIBIT

F

EXHIBIT "G"

# REPORT ON THE DELAWARE CITY EXPLOSION AT THE DELAWARE CITY, DELAWARE FACILITY OF MOTIVA ENTERPRISES ON MAY 20, 2000

Prepared by:   Robert A. Mostello, PE, PhD
AMCS Corp.
981 Rt. 22 West, Suite 101
Bridgewater, NJ 08807

Tel: (908) 429-2100
Fax: (908) 429-3004



# REPORT ON THE DELAWARE CITY EXPLOSION AT THE DELAWARE CITY, DELAWARE FACILITY OF MOTIVA ENTERPRISES ON MAY 20, 2000

## TABLE OF CONTENTS                                    Page

INTRODUCTION.................................................................................3

PERSONAL BACKGROUND ..................... ......................................... 3

ACCESS TO INFORMATION..............................................................4

PROJECT BACKGROUND.............................................................. 6

SITE CONDITIONS........................................................... 7

DESIGN IMPLICATIONS...................................................... 8

CONDITIONS AT STARTUP............................................... 9

OCCURRENCE OF THE ACCIDENT.................................. 14

DAMAGE SCENARIO......................................................... 16

CONCLUSIONS................................................................ 17

APPENDIX..................................................................19



Report on Delaware City Explosion                Report issued:  January 3, 2005
Of May 20, 2000

## INTRODUCTION

A convergence of circumstances led to an unexpected and undesired event on
May 20, 2000 at the Delaware City plant of Motiva Enterprises. Admission of
high-pressure oxygen from the Air Separation Unit (ASU) to the Motiva pipeline
occurred when:

- Adequate particulate removal had not been accomplished upstream of
  83HV0629 isolation valve
- The procedure for opening the valve under high differential pressure was
  not in keeping with recognized standards
- The mechanism for actuation of the valve under startup conditions was not
  understood
- Poor training of personnel and inadequate precautions in place led to the
  presence of and injuries sustained by Mr. Ronald W. Olson.


## PERSONAL BACKGROUND

I am a chemical engineer with 40 years of experience in industry. My principal
specialty is process design, development, troubleshooting and safety of air
separation plants, in which I have been engaged for more than half that time. My
background includes environmental control and safety issues of petrochemical
plants, and process and process equipment design for chemical processing
plants. I have authored or co-authored several publications on the operation and
design of cryogenic systems, including a section on air separation in the
"Encyclopedia of Chemical Processing and Design" (ed. McKetta). I am the
author of about 15 US patents.

I have been a project engineer, a process engineer, and a startup engineer.
Recently, I specified a replacement piping system for supplying vaporized liquid
oxygen to supply a wastewater treatment plant, including conducting the HAZOP.
More recently, I was the proposal engineer and the process engineer for
supplying a nitrous oxide purification plant, including design of the process
equipment, setting the control strategy, conducting the HAZOP, commissioning,
and incorporating safety features necessary for processing nitrous oxide, which
is a strong oxidizer and which also can undergo explosive decomposition.

I was in a position of responsible charge for investigating multiple accidents in an
air separation plant, and keeping that dangerous plant safe while designing
remediation equipment and establishing means for interim operation. I have
reported on in-house accidents in air separation plants.

I investigated an oxygen valve fire (coincidentally in year 2000), with a findings
presentation to the Compressed Gas Association in 2001. Acknowledgment of



Report on Delaware City Explosion                Report issued:  January 3, 2005
Of May 20, 2000

the significance of my findings was made in Document 13/02E of the European
Industrial Gases Association (EIGA) "Oxygen Pipeline Systems" 2002.

I planned and executed an operation for blowdown of particulate contaminants at
an air separation plant to correct for poor plant performance.

My resume is appended to this report, as is that of my colleague, Mr. Ammar
Kasabchy, with whom I have collaborated on several aspects of this
investigation.


## ACCESS TO INFORMATION

I have had access to Deposition Transcripts and Deposition Exhibits for the
Delaware City Explosion of May 20, 2000 in which an employee of Conectiv, Mr.
Ronald W. Olson, was injured.  Much of the especially relevant material has been
in my office for immediate access over several months.  I have had unlimited
access to the complete collection of discovery documents (Olson v. Motiva, et
al.) made available  during two visits of 3-day and 2-day duration to the offices of
Riddell Williams P.S. in Seattle, WA. I have also received documents on request
by mail from Riddell Williams.  I have utilized these references by prioritizing
what appeared to me to be the most significant issues and circumstances
surrounding the accident, including the construction and operation of the pipeline
delivery system from the air separation plant, which principally was installed for
supplying oxygen for gasification of petroleum coke at Motiva in Delaware City,
DE.

I have also requested and received information from other engineers in AMCS
Corporation, who have specific knowledge and/or experience in  air separation
plants.  These sources were:
- Mr. Ammar Kasabchy, as the principal resource and consultant to me in
  AMCS. Mr. Kasabchy reviewed the control system around the valve
  83HV0629, including the valve itself, and the solenoid valves and
  positioner supplying instrument air to the actuator.  Mr. Kasabchy was the
  lead participant in testing an exemplar valve system at the Colorado
  Engineering Experiment Station (CEESI).  His digital photos from the
  CEESI testing show especially revealing information. Mr. Kasabchy has
  also formulated the sequence of fire progression in the valve and piping.
  He was also responsible for examining, assembling and displaying
  electronic information in hard copy.  His resume is attached.

- Mr. Saad Ali, for typical operating and startup concerns and procedures in
  a large air separation plant suppying high-pressure oxygen, where he has
  had many years of experience.
- Mr. Lee Miller, for reviewing instrumentation and control installation
  procedures as described in the depositions for Mr. Liechty and Mr.



Page 4 of 31        by:  Robert A. Mostello, PE, PhD

Report on Delaware City Explosion            Report issued:  January 3, 2005
Of May 20, 2000

Weldon.  Mr. Miller has many years in instrumentation installation for air
separation plants.

I have reviewed other references,  relevant to my investigation. These include:
- operating data from the incident
- piping and instrumentation diagrams
- piping isometrics
- data log (Trend Export –Second Results)
- Operator Action Journal
- Complete set of photographs taken by Mr. Dave Toler at the accident site.
  I have met with Mr. Toler and have questioned him about details of the
  photos and any other relevant information he derived from his visit to the
  Delaware City site.
- Photos taken by Fisher Controls at the Praxair Tonawanda labs
- Phase I and II laboratory reports from Praxair
- CGA document G-4.4 "Industrial Practices for Gaseous Oxygen
  Transmission and Distribution Piping Systems"
- Praxair Standards in-place on May 20, 2000: EN-4, "DESIGN
  REQUIREMENTS FOR OXYGEN COMPRESSION AND DELIVERY
  SYSTEMS", and EN-6, "MAXIMUM ALLOWABLE VELOCITIES OF
  GASEOUS OXYGEN IN PIPING AND PIPING COMPONENTS
  (INCLUDING PRESSURE AND NONPRESURE VESSELS)"
- ASTM Guide:  G 88-90, "Standard Guide for Designing Systems for
  Oxygen Service"
- ASTM Guide:  G 145-96, "Standard Guide for Studying Fire Incidents in
  Oxygen Systems"
- Photos taken by AMCS Corp. during exemplar valve testing at CEESI
- Trend charts displaying step and response data taken during exemplar
  valve testing at CEESI

I have reviewed the construction and dimensional details of the Fisher valve
83HV0629, which was severely damaged in the Delaware City Explosion,
including observing and operating an exemplar valve, positioner, actuator, and
air supply configured as per the Delaware City installation, including the blow-
through of a partially-opened valve at full pressure difference from an initially
closed valve, at Colorado Engineering Experiment Station, Inc. in Nunn,
Colorado.  I, personally, have taken dimensional and weight measurements of
selected and available valve and gasket components.

I also have read the "Expert Report, Engineering Design & Testing Corp., Tim A.
Jur, PhD"; and the "Wendell Hull Phase 1 Report and Exhibits". I have read Dr.
Jur's depositions.  I also have read the related publication by the Wendell Hull
authors, Newton and Forsyth, "Cause and Origin Analyses of Two Large
Industrial Oxygen Valve Fires", appearing in the 10th volume of Flammability and
Sensitivity of Materials in Oxygen-Enriched Atmospheres, ASTM International
STP 1454, pp. 279-289 (2003).



Report on Delaware City Explosion
Of May 20, 2000                              Report issued:  January 3, 2005

I have read all of the depositions of deponents up to the date of my report.

## PROJECT BACKGROUND

The project for gasification of petroleum coke at the Motiva (later Premcor) facility in Delaware City, Delaware involved several large organizations, including Motiva (the owner), Conectiv (the contracted operating organization), Texaco (the gasification technology provider), Parsons (the general contractor), and Praxair (the supplier of the air separation unit, the principal product of which is high-presure oxygen which is supplied to the gasifier).  Several other organizations supported the project as equipment and service suppliers, including Fisher Controls International, the manufacturer of valve 83HV0629 (629 valve) and Northeast Controls, Inc., a sales representative for Fisher.

The contractual relationship between Parsons and Praxair required Praxair to be responsible for issues related to oxygen supply. In the contract for "Subcontractor", section 3.3 reads "The ASU vendor shall be responsible for inspecting the item(s) and checking the applicable records, prior to shipment, to verify that all specification requirements have been complied with."

It is common knowledge in industry that problems frequently develop  where there is a division of responsibility among organizations or even persons within the same organization.  Admitting oxygen from the  ASU to the gasifier is the process link between Praxair and Motiva.  What seems to be lacking in the project is what could be called "contiguity", i.e. the organizational support for preventing important issues from getting lost in the cracks.  Admitting oxygen is one of the most important safety issues in the program.

- The admission of oxygen to the gasifier was not addressed in the HAZOP.  The logic for operation of valve 83HV0629 was already embedded in the software, but the Operating Instructions for admitting oxygen to the pipeline had not been provided for use during startup. On May 4, 2000, Mr. Delgrego's Overview Procedure (Exhibit 95, no. 13, says, "Pressurize the oxygen pipeline up to the gasifier train split valves. Follow Praxair's procedures for startup of the BLOC and opening of the automatic oxygen block valve at the ASU battery limits." There was no written procedure for opening the oxygen block valve.  That was left blank for the May 20, 2000 startup.
- Not all the operating personnel were  advised of the serious nature of this part of the startup. Personnel on the top gasifier deck were warned of impending admission of oxygen and to clear the deck (Exhibit 95, no. 17, May 4, 2000).  That warning was not extended to  personnel literally on the ground, although these personnel could be in close proximity to hazardous areas, as was Mr. Olson at the time of the accident.



Report on Delaware City Explosion                    Report issued:  January 3, 2005
Of May 20, 2000

## SITE CONDITIONS

The atmosphere around the plant was known to be potentially high in
combustible particulates.  (Exh. 19, March 9, 2000 memo from Dave Good:  "The
potential unusual presence of coke dust was not considered or investigated
outside the scope to normal particle loading and filter efficiency." )  The concern
about particulates is detailed in a series of communications, some of which are
listed below:

| DATE | EXHIBIT NO. | DESCRIPTION |
|---|---|---|
| 09-04-99 | 268 | ASU Safety, Star, Delaware |
| 09-07-99 | 269 | ASU Safety, Star, Delaware |
| 09-15-99 | 270 | Delaware City Repowering Project Coke Dust Meeting |
| 09-20-99 | 216 | O2 Cleaning/Contamination Concerns, STAR/Delaware Project |
| 09-29-99 | 174 | Warm End Oxygen Piping Cleanliness Audit |
| 10-05 to 10-21-99 | 174 | Oxygen System Audit & Findings-Warm End |
| 10-28-99 | 67 | Warm End Oxygen Cleanliness Audit |
| 10-28-99 | 274 | Star Enterprise-Delaware City Oxygen Cleaning Audit 10/21/99 |
| 11-03-99 | 271 | STAR-Delaware City Coke Dust Reactivity Testing |
| 11-04-99 | 272 | "What does this mean about the Star startup?" |
| 11-08-99 | 273 | ". . . THIS STUFF HAS TO BE REMOVED FROM THE OXYGEN SYSTEM.  NO IFS OR BUTS ALLOWED." |
| 11-23-99 | 215 | Oxygen System Piping Blow Down Procedure |
| 11-30-99 | 37 | BLOC discharge piping blowdown |
| 12-03-99 | 217 | Delaware City-Coke Dust on ASFH Filters |
| ~March 2000 | | D. Good deposition v. 2, pp. 382 et seq. citing Exh. 179 (PRA 3162 and 3171) inspection downstream of 629 valve and decision not to inspect the line upstream of the 629 valve |
| 4-03-00 | 72 | Emails on Praxair Meeting Coke Dust Concerns |
| 4-15-00 | 158 | Notes on coke dust concerns, mitigation and needs |

Exhibit 273 describes Praxair's test on petroleum coke dust, in which self-heating
begins at 170°C (274°F) at 1500 psi, the standard pressure for the calorimeter
test. After further heating, the coke dust ignited and destroyed the apparatus.
The inlet conditions at the 629 valve were 1150 psig and 270°F.  In addition, it is
likely that rust and metallic elements were present (Mr. Zawierucha, Exhibit 273),



Report on Delaware City Explosion
Of May 20, 2000                                    Report issued:  January 3, 2005

increasing the risk of fire by their catalytic effects coupled with a mechanical
disturbance like opening the 629 valve.

Mr. Saccoccia was concerned and asked, "What does this mean about the Star
startup?", but follow-through was inadequate.  In particular, when deposits were
discovered immediately downstream of valve 83HV0629 and cleaned out, it was
imperative to open and  inspect the upstream side of that valve, which was not
done.


## DESIGN IMPLICATIONS

The piping design upstream of valve 83HV0629 predisposes collection of
particulates in the piping section immediately upstream of the valve, when the
valve is closed.  Thus it was a poor design for the application.  The dead leg
between the recycle tee and the 629 valve constitutes a ledge for particulate
collection.  The crevices, formed at the gasket junction between the welding-neck
inlet flange and the 629 valve body, present locations for particle accumulation;
as does the recessed area in the valve body just before the seal.

There was a disconnect in the intention of the valve 83HV0629.  On one hand,
Mr. Bhakoo says that he knew the valve would be in throttling service some of
the time (Bhim S. Bhakoo, Vol. 2, April 1, 2004).  Yet, the only conditions
specified for the valve were for a very low pressure drop in the specifications
given to Northeast Controls (Exhibit 118).  A large pressure drop across that
valve would cause the oxygen velocity downstream  to exceed the allowable
velocity for oxygen service.  Valve 83HV0629 was not intended for control of
oxygen flow to the gasifier.  On signal from the gasifier, excess oxygen would be
vented from the Air Separation Unit (ASU), or the ASU production rate would be
reduced or increased to meet gasifier demand.  Numerous documents refer to
83HV0629 as a "discharge isolation valve".

The industry guideline Compressed Gas Association document CGA G-4.4—
1993, Industrial Practices for Gaseous Oxygen Transmission and Distribution
Piping Systems[1], states (5.3.1 Isolation valves): "Isolation valves are valves
operated either fully open or fully closed. . .They are never operated in any
intermediate throttling or regulating mode."  Mr. Paolino's testimony states that
the intended way to admit oxygen to the pipeline was to partially open the 629
valve even with a 1150 psi pressure difference across the valve.  As stated
above, this  contradicts industry practice.  An internal review by Praxair of the
implications of this plant operating procedure was in order, as it would be
unusual for Mr. Paolino to be unilaterally responsible for this policy.  Control
software was configured to prevent the valve from opening more than 10%, while
the pressure drop across it was more than 10 psi.  With a high pressure

---

[1] CGA G –4.4—1993 is included in the Appendix.



Page 8 of 31       by:  Robert A. Mostello, PE, PhD

Report on Delaware City Explosion
Of May 20, 2000

Report issued:  January 3, 2005

difference, the 629 valve opened to 10% would lead to downstream piping velocities[2] higher than what the oxygen industry considers safe, as the downstream piping pressurized.  Praxair Standard EN-4[3], 4.2.1.1 (Exhibit 178) states:  "These valves act to isolate the system, and normally are either completely open or closed, performing no process control.  Normally these valves are sized equal to line size, and have relatively low velocities through them."[4]

## CONDITIONS AT STARTUP

On May 20, 2000, the Operating Manual for Section 3.14 "Establishing Gaseous Oxygen Flow to the Battery Limits" has the notation:  "Procedure to be written in conjunction with the gasifier startup."

Praxair Technical Proposal Job 93346 Check-Out/Commissioning/Startup Plan Delaware City includes in the commissioning plan for Delaware City by Brian McKie (Praxair) a statement that " . . . commissioning members will be fully trained in required Praxair safety procedures, especially SA 32 . . . commissioning team will provide or arrange for personnel . . . to checkout, commission and startup:  Baseload oxygen compressor for the warm end GO2 make system through the BLOC to the pipeline delivery point at the customer".

The contract between Star (Motiva) and Parsons has among the Engineering Deliverables: "6. Process Hazard Analysis (PHA) Contractor shall be responsible for conducting a PHA review . . . based on P&ID's to be issued by ASU supplier . . ."  This message is repeated again in Praxair's Operating instructions for T-2700 NA, the ASU in Section 3.1.11 Establishing Gaseous Oxygen Flow to the Battery Limits: "This procedure is to be written in conjunction with the gasifier startup procedure."  The original HAZOP document (from Praxair) (Exh. 29), "HAZOP Action Items", covered in a meeting facilitated by Quest, and attended by STAR, Praxair, and Parsons personnel, makes no reference to initiating flow through the 629 valve.

Messrs. Good and Paolino of Praxair should have been present at the startup, when oxygen gas was to be admitted to the gasifier for the first time.  Mr. Patel was at the plant that day, and instructed  Mr. Freuler that oxygen enrichment was to proceed; but Mr. Patel was in his office at the time a signal was sent to the

---

[2]  Reference is made to CGA G-4.4—1993 and Praxair EN-6, which are included in the Appendix.
[3] EN-4 is included in the Appendix.
[4] The adopted startup procedure, post-accident, operates the BLOC on air and raises the discharge pressure to  fill the downstream piping with air until full pipeline pressure is reached.  Then, the oxygen is to be admitted to the BLOC suction, displacing the air in the system.  But the 629 valve is then wide open.



Page 9 of 31      by:  Robert A. Mostello, PE, PhD

Report on Delaware City Explosion
Of May 20, 2000

Report issued:  January 3, 2005

83HV0629 calling for it to open.  It was an important event for the project; and the technical implications could not be regarded as routine by any party with a high level of responsibility for the project.

It is clear that Mr. Olson was not fully trained in the practice of oxygen safety. Had he been, and had the typical cautionary warnings been issued and precautionary devices been used in the vicinity of the 629 valve on pipeline startup, his injury would not have occurred.

May 20, 2000 was a Saturday and admission of oxygen would occur during the swing shift (4PM to 12 PM).  There are pressures of time and money in projects. But this part of the project should have assumed high enough importance to postpone the startup to  the day shift on the following Monday.  It is well-known that support services of every kind are not at their maximums on the weekend. This would include sure access to executives of all companies, access to specialists of all companies, access to persons off-site with prior site and project experience, a full complement of operating and support personnel on the site, and police, fire, and emergency services.

Praxair correspondence shows justifiable concern (in fact, alarm) about combustible  particulates in the plant atmosphere and potential ingress of these particulates into the air separation plant.[5]

The warm-end oxygen piping included a "dead leg", i.e. a section of 12" diameter pipe, about  22 inches long, through which there would be no flow at times at startup, and possibly at times when the gasifier was up and running.  Pre-commissioning activities involving operation of the base load oxygen compressor (BLOC) circulated gas past this dead leg (but not through it).  This dead leg constituted a trap for any particulates, whether these originated from the air intake of the plant, whether they were resulted from piping and plant construction

---

[5] This is a concern in air separation plants because particulates can enter internal plant sections during construction and can also be drawn into the air separation unit with the intake air. Combustible particulates drawn into the plant with intake air and not subsequently removed by control devices; or particulates pre-existing in the plant piping and equipment can contaminate the liquid oxygen reboiler pool creating a potential for explosion there. Contaminants pre-existing downstream of the liquid oxygen reboiler pool, or in the liquid oxygen pool, travel to the liquid oxygen storage tank and travel with the "liquid-pumped" oxygen (the principal product of the air separation plant), which is vaporized in the main heat exchanger and is fed to the base load oxygen compressor (BLOC). These particulates can be de-entrained by collection in low- or no-velocity locations in equipment or piping. This fate may be also shared by particles pre-existing in the piping and equipment downstream of the BLOC. THE PRINCIPAL REASON FOR THE INDUSTRY PRACTICE OF LIMITING VELOCITIES IN OXYGEN PIPING IS THE RECOGNITION THAT TOTAL REMOVAL OF PARTICULATES IS NOT POSSIBLE. (ASTM G 88-90, para. 5.2.5) ASTM G 88-90 is appended.



by:  Robert A. Mostello, PE, PhD

Report on Delaware City Explosion
Of May 20, 2000

Report issued:  January 3, 2005

activities, or whether they formed from known particle-generation tendencies of equipment (ASTM G 88-90, 5.2.4).

These circumstances should have raised a red flag to experienced process and project personnel in the air separation industry to the point of justifiable paranoia, and in fact, the red flag was raised, but remediation was not thorough.[6]

Regardless of how far the 629 valve was allowed to open on startup, there would be a pressure drop as high as 1150 psi in across it.  The rush of oxygen gas from the upstream side would increase the oxygen velocity from zero to its sonic velocity of about 1200 ft/sec at the valve disc aperture.  This occurs with acceleration of the likely combustible particle presence immediately upstream of the valve.  Exhibit 271 shows how potentially reactive this combustible particle presence could be.[7]

The piping system was chiefly carbon steel.  Generally, this is the economic choice for long oxygen pipelines. Carbon steel is among the least resistant materials to ignition in oxygen and subsequent burning.   So guidelines and standards require lower allowable velocities as the operating pressure increases.

For short pipelines, materials such as copper, nickel, and their alloys in smaller pipe diameters (thus higher velocities) can offer some advantages, including high resistance to ignition and consumption in an oxygen fire.

---

[6] In any event, there is no indication that the  629 valve was ever "pulled", i.e. completely removed from the pipeline and inspected and cleaned (Exh. 174, Oxygen System Audit & Findings – Warm End, Item 4. Piping Actions to be Taken, "Also with respect to PD-0227B, upstream from the above noted joint, pull and inspect valves 12"83Y0629Q and 12"83HV0629 and the spool between them as indicated on the attached copy of the iso. RESULTS OF INSPECTION:  Re inspected FLG at B/L; Blacklight and white cloth  OK; did not pull YO629Q.  Jack Hancock 10/27/99").

[7] Impingement of inert particles like rust, sand, and clinker is known to ignite carbon steel pipe in oxygen atmospheres.  Impact of combustible materials is even more likely to cause ignition.  Ignition probability is increased as oxygen pressure increases and as the velocity of impact increases.  This relationship  has been  demonstrated for carbonaceous materials (pulverized and granular coke and hard coal) by von Wegener in "Investigations on the Safe Velocity of Flow to be Admitted for Oxygen in Steel Pipe Lines", Stahl u. Eisen, 84, 8, 469-475 (9 April 1964).
At a relatively cool temperature of 8-10°C (46-50°F) von Wegener reported particle ignitions of carbonaceous materials at velocities as low as 40 ft/sec and pressures as low as 375 psig; and resulting steel pipe ignitions therefrom at a velocity of  42.6 ft/sec and a pressure of 412 psig in many locations in the pipe section of elbows; ignition after an elbow at an velocity of 279 ft/sec a pressure of 250 psig; and after an elbow at an average velocity of 118 ft/sec and a pressure of 368 psig.



by:  Robert A. Mostello, PE, PhD

Report on Delaware City Explosion                    Report issued: January 3, 2005
Of May 20, 2000

Preparation for admission of oxygen to the pipeline should have included:

- A hard blowdown of the piping through the 629 valve with successive blasts of high-pressure air.[8] This air was readily available from the BLOC.
- The blowdown would have necessarily included stroking and proving the 629 valve operation.
- The area around the valve and around the BLOC system would be cordoned off and signed forbidding entry.

In the light of some of this neglect, the control system in-place exacerbated the situation. In fact, Mr. Olson's observations that the 629 valve was not responding to the command from the control room (and the control room confirming that the valve did not appear to open) can be shown to be correct.[9] The electronic signal from the control room to open the valve is eventually converted to a pneumatic signal fed to the valve positioner; effectively telling the positioner how far to open the valve. A spool valve, part of the positioner system, which admits instrument air (which may be supplied in the 80-120 psig range) proportions its opening aperture to the error signal between the actual valve position and the commanded position. This routes the instrument air to each of two internally-piloted, 3-way solenoid valves which are configured to back up each other in case of failure of either of them. Instrument air then passes through one of the solenoid valves to the piston-type valve actuator to rotate the 629 valve stem and disc.

**Essential to note** is that these 3-way internally-piloted solenoid valves require a difference in pressure of 15 psi between the pressure port and the exhaust port in order to achieve full activation. Until that pressure difference builds up and sets the solenoid valve to deliver full air to the actuator, the actuator does not receive any or enough air to move the 629 stem. With an instrument air system initially at atmospheric pressure, and a command to change valve position from zero to 1% (or 2 or 3%), the instrument air supplied from the barely open spool valve cannot build up required pressure to overcome pre-activation venting from the solenoid valves exhaust and pilot exhaust ports.

I have had the opportunity to test an exemplar system, which was set up at Colorado Engineering Experiment Station, Inc. in Nunn, CO.[10] This was a test with air at 1150 psig pressure, upstream of an exemplar 12" Fisher 629 valve equipped with a positioner, actuator, solenoid valves system, and instrument air supply essentially identical to the installation at the Motiva Delaware City plant on May 20, 2000.

---

[8] Admittedly, provision for the blowdown gas exiting the pipeline would be necessary.
[9] There seems to be some dispute in the record about whether the instrument air was valved in. It may be that the instrument air was already valved in before the first attempt.
[10] This testing took place on November 4, 2004. Others in attendance were: Mr. Ammar Kasabchy of AMCS, Mr. Nile Dielschneider and Mr. Tim McMahon of Fisher Controls, and Mr. Pat McVey of Riddell Williams.



Page 12 of 31        by:  Robert A. Mostello, PE, PhD

Report on Delaware City Explosion                    Report issued:  January 3, 2005
Of May 20, 2000

During testing, the control room signal scenario was repeated, **stepwise and timewise**, with the exemplar system, using 100 psig instrument air (Fig. 1).  (See also Fig. 4 for a repeat test.)  The first attempt failed  to open the valve after a 9% signal to open had been reached.  On the second attempt to open the 629 valve, the control room signal had to reach 10% open before the solenoid valves sealed permanently (in our case it was 11% in Fig. 1 and 10% in Fig. 4).  Venting of the instrument air supply ceased; and the 629 valve then moved to the 9% position in Fig. 1 and the 8.5% position in Fig. 4.  Before this point is approached, there is a considerable racket made by high-frequency chattering and venting from the system, as the solenoid valves cycle (compete) between their energized and de-energized positions as instrument air is introduced to and then partially exhausted from the actuator system through the newly de-energized solenoid valves.

That the solenoid valves become stable in their energized positions is due both to the rate of air supply finally providing makeup air to overcome air loss in the startup cycle, and the required pressurization of the actuator to an operating pressure.  **After this condition is established, there is no further anomalous behavior.**  (De-energizing the solenoid valves vents instrument air from the actuator, which is the action which the safety system employs to close the 629 valve rapidly.)

The first attempt on May 20, 2000 by the control room to open the valve with up to a 9% signal, and failing to get any reaction, clearly could have happened exactly as described, as was shown by the exemplar system. With a 9% signal, the rate of air supply was not high enough to energize the solenoid valves permanently.  Actual demarcation points will change with each solenoid valve, with instrument air supply pressure, and with the configuration of the instrument air supply system.  Indeed, with the same setup and an 81 psig instrument air supply, it required a command of 17% to achieve activation (Fig. 2).  This also was preceded by a period of chattering as the command signal was raised to 17%.  At 105 psig instrument air, solenoid valve sealing was achieved with a 7% command signal (Fig. 3).

When the 629 valve opened in the exemplar case, the valve moved to the commanded position which existed at that time—i.e. directly to its final position from full-closed.[11]

---

[11] In his notes on Exhibit 242, Mr. Paolino observed that an 11% signal was required before the 629 valve moved.  Whether this occurred before or after May 20, 2000 is uncertain. It still is a corroboration of the operation of the system.  Mr. Paolino attributed this observed behavior to hysteresis; but, in fact, it was demonstrating its typical response under a startup condition.



by:  Robert A. Mostello, PE, PhD

Report on Delaware City Explosion          Report issued: January 3, 2005
Of May 20, 2000

Figure 5 is presented to demonstrate that after the actuator system is pressurized, and the 629 valve is commanded to close, it will close, and the solenoid valves remain sealed against instrument air loss. Residual pressure in the actuator cylinder is then available for direct and expected response for any command to open from the control room.

Once the actuator is pressurized, the command signal-actuator-629 valve system behaves normally. **Failure to understand[12] this startup issue and to be forewarned of apparent valve failure in the first attempt to open the valve was particularly <u>contributory to the presence of Mr. Olson</u> at that location at the time of the accident.**

Other information from the test work at CEESI is appended. This includes:
- Selected photographs from the CEESI test facility
  - The overall assembly
  - The components of the installation
  - Rust tracks in the 7 o'clock to 9 o'clock positions on the retaining ring of the exemplar 629 valve as a result of a high-pressure (1150 psig air) blowdown through the valve as it opened from full closed to 10%, showing the path of gas and random rust particulates sourced from well upstream in the test facilty

- Graphical presentations of system variables vs. time during step commands to open the exemplar 629 valve, which duplicate fairly well the startup observations and accident scenario at the Delaware City site on May 20, 2000.


## OCCURRENCE OF THE ACCIDENT


Since there was no other known event which occurred simultaneously with the initiation of combustion, the effort to open the 629 valve and the commencement of oxygen flow is clearly the most suspect. High-purity oxygen gas at about 270°F and 1150 psig was circulating in the BLOC system for about two hours before the accident and venting through the 613 valve or the 670 valve.

The 629 valve was installed with the disc shaft on the downstream side. At even 10% open, the two thrust bearings would present only their left sides to a small oxygen flow, because the disc opening is not symmetric and almost exclusively favors flow through the left side of the disc (looking from upstream to downstream). The flow undergoes an isentropic expansion to sonic velocity

---

[12] Parsons initiated the required configuration of the solenoid system and specified the solenoid valve model numbers. Praxair passed these requirements to Fisher for assembly. Motiva and Conectiv, as the owners and operators, as well as the other parties, apparently did not appreciate the operating implications.



Report on Delaware City Explosion                    Report issued: January 3, 2005
Of May 20, 2000

through the crescent-shaped opening at the 9 o'clock position and a pressure of about 723 psig (the pressure at which sonic velocity is reached). The oxygen immediately downstream would be cooler than 270°F (about 181°F). Further downstream, the sonic velocity collapses in a shock wave, and the expansion becomes isenthalpic with a final temperature of about 250°F. It is a reasonable assumption that the thrust bearings saw an oxygen stream no warmer than 250°F after the 629 valve opened.

The thrust bearing is a fiberglass/epoxy composite with a covering of PTFE and organic fibers impregnated with epoxy. One of the possible explanations for initiation of ignition (i.e. the start of a kindling chain) given in the report by Wendell Hull Associates links published data for an autoignition temperature of 311°F for a phenolic resin/fiberglass composite as predictive for the behavior of this thrust bearing. But this trivializes not only the actual temperature difference in the two instances, but the significant difference in compositions between the two. The bearing was tested at 1160 psig for autoignition temperature (AIT) in oxygen[13]. The base material had an AIT of 417°F, and the covering had an AIT of 414°F. These values are substantially higher than the approximately 250°F or lower which existed at the 629 valve.

Aerodynamics of flow over the partially-shrouded Kel-F seal ring, and the Viton backup ring behind it, seem to reduce or even eliminate particle impact potential there. The seal ring and backup ring together weigh 3.95 oz (112 gms); and their combustion heat would have to sustain combustion of the Hastelloy C retaining ring and valve body. Hastelloy C is not likely to support combustion in 1150 psig oxygen. In the 12" valve, the seal ring center line is 2.75 inches downstream from the carbon steel inlet flange and gasket and is separated from the carbon steel flange and gasket by the Hastelloy C retaining ring and valve body. The fire would have to migrate upstream to ignite the carbon steel flange. The intact section of the upstream carbon steel flange supports the expected difficulty of fire spreading upstream from its ignition location against oxygen flow[14]. This is also discussed in the Wendell Hull Phase 1 Report and Exhibits (ibid. p. 29),

---

[13] The test work was conducted by Bundesanstalt fuer Materialforschung und –pruefung (BAM). BAM testing for AIT gives results similar to ASTM G 72. Both BAM and ASTM G 72 were shown to give conservative (lower AIT) results in round-robin testing conducted by seven laboratories: "An Analysis of Autoignition Temperature Round Robin Test Data", Hirsch, et al, Flammability and Sensitivity of Materials in Oxygen-Enriched Atmospheres, Ninth Volume, ASTM STP 1395, 510-520 (August 2000).

[14] Based on these observations, the discrepancies between valve materials discussed between representatives of Praxair and Northeast Controls and those supplied by Fisher Controls, (but accepted by Praxair on receipt of the valve and its packing list, and as reflected on an order confirmation document generated by Fisher Controls and sent to Praxair) were not implicated in the initiation of the fire. Rather, the valve was a victim of the fire, which was initiated by particle impingement and was strongly fueled by the carbon steel flange upstream, as evidenced by the burn patterns.



Page 15 of 31        by: Robert A. Mostello, PE, PhD

Report on Delaware City Explosion          Report issued:  January 3, 2005
Of May 20, 2000

"Experience indicates that fires in oxygen systems tend to propagate downstream, not upstream, unless the flow rate is very low."

In a subsequent publication, the Wendell Hull authors allow for another possibility, i.e. the <u>direct</u> ignition of the carbon steel flange by particle impact. [Newton and Forsyth, "Cause and Origin Analyses of Two Large Industrial Oxygen Valve Fires",appearing in the 10th volume of <u>Flammability and Sensitivity of Materials in Oxygen-Enriched Atmospheres</u>, ASTM International STP 1454, pp. 279-289 (2003).]

Photographs of the piping immediately upstream of the 629 valve taken four days after the accident depict red rust.  This kind of oxidation is a result of moisture. Lines in oxygen service should be installed rust-free and kept dry to prevent rusting.  The rust may have existed before the accident; or it developed after the pipeline rupture.

The valve had to open because  the most severe combustion took place on the 9 o'clock side of the valve.  In my opinion, when the 629 valve opened, the high velocity and high turbulence raised particulates which had formerly deposited in the dead leg, in the flange crevices and at the valve disc. The particulates either self-ignited or ignited on contact with the carbon steel flange between the 6 to 8 o'clock positions.  (There is little or no aperture at the 12 to 6 o'clock position for 10% open.)


## DAMAGE SCENARIO

Refer to Fig. 6.  The numbers on the drawing are referenced in the following text.
1) Under the operating conditions  of oxygen circulating through the recycle loop at 270°F and 1150 psig, the signal from the control room which finally moves valve 629 is 10%, and the valve sweeps open from full-closed to nominally 10% open.
2) Due to the pressure difference across the valve, which was about 1150 psi, turbulence between the 6 and 8 o'clock positions generated and accelerated a cloud of particles, which were present in the dead leg. There was either particle self-ignition or ignition by impingement of the particle cloud on the carbon steel flange.
3) The gasket groove between the valve and the upstream flange also constituted a collection area for particles; and the edge of the carbon steel flange would be most susceptible to ignition.
4) Damage to the Monel pipe indicates that a directed jet-like flow of burning gas, hot metal, and slag was propelled through the valve and impacted that area.
5) The combustion zone grew rapidly and loosened the flange bolts in the combustion area.



Report on Delaware City Explosion          Report issued:  January 3, 2005
Of May 20, 2000

6) The layout indicates that the downstream piping is not as well anchored as the upstream piping. The downstream flange loosened, and burning gas, hot metal, and slag began to escape from that area, as combustion proceeded.

As hot oxygen escaped from the carbon steel flange area, it melted and burned back the steel, much the same as a steel cutter's torch.

Combustion consumed areas 3, 4, and 5 simultaneously. This incident occurred less than two seconds after the initiation of flow; and transmission of data to the control room was terminated due to failed components.

Apparently, Mr. Olson was in line with the jet blast of hot gas passing through the Monel cavity.

## CONCLUSIONS

1. Several overriding disconnects led to the accident on May 20, 2000:
   a. A faulty procedure for admitting oxygen to the pipeline was part of the startup.
   b. The petroleum coke dust problem highlighted with alarm by Messrs. Million, Zawierucha, and Saccoccia was not addressed adequately.
   c. Early evidence of contamination downstream of 83HV0629, e.g. Exh. 205, was missed as a signal that the upstream side of that valve was suspect, given the known gravity of particulate contamination.

2. In my opinion the cause of the accident at the Delaware City plant on May 20, 2000 was particle impact on and ignition of the carbon steel flange upstream of the pipeline block valve, 83HV0629, caused by opening 83HV0629 in high-pressure oxygen, with a high pressure difference across the valve, and with the presence of particulates in the dead leg piping upstream of the valve, the upstream flange gasket crevices and the recessed valve body upstream of the butterfly valve disc, leading to further conflagration of materials close by, and to the burn injuries to Mr. Ronald W. Olson.

3. The Motiva site at Delaware City was a suspect site from the standpoint of particulate air pollution, which could affect an air separation plant. Particulates were suspiciously ubiquitous and cleaning was not thorough.

4. There were multiple parties involved in the effort to commission the pipeline supply of oxygen to the gasifier; and the relationships among them were loose and without an overall responsible party or person, which lowered the security of the joint operation.



by:  Robert A. Mostello, PE, PhD

Report on Delaware City Explosion
Of May 20, 2000

Report issued:  January 3, 2005

5.  Full training of Conectiv operating personnel; full familiarization of Praxair
    operating personnel; *a priori* understanding of 629 valve activation and
    operation; and full involvement of project personnel were lacking.  When it
    was suggested that someone go over to the 629 valve and determine
    whether it was responding, no one on-site said, "Don't go near the valve!"





January 28, 2005

Mr. Patrick D. McVey
Riddell Williams P.S.
1001 Fourth Avenue Plaza
Suite 4500
Seattle, WA 98154-1065

Dear Mr. McVey:

This rebuttal report addresses certain elements in the "Preliminary Report of Findings" released on December 21, 2004 by Messrs. Whitman and Wiseman of the Rimkus Consulting Group, Inc. In their development of the physical situation, Whitman and Wiseman arrive at a very low velocity upstream of the 629 valve, and ascribe ignition to sonic gas flow over the valve seal ring.

Sonic flow develops when a flowing gas stream is confronted by a constriction in flow cross-sectional area, when the ratio of the upstream to downstream pressure is about 2 or greater. At the constriction and slightly downstream of it, the pressure ratio is about 2, regardless of what the pressure is further downstream. The Rimkus report assumes the pressure at the constriction (valve aperture) to be 0 psig. By my calculation, the conditions at the constriction were 590 psig and 144.5°F. (This result is a further refinement of the 723 psig and 181°F which appear in my report.) This is because once sonic flow is reached at the ultimate constriction, well-recognized thermodynamic theory and practice have shown that the pressure will not decrease further until the constriction is passed, and then in an abrupt shock wave leading to less than sonic velocities.

Because a higher gas density will exist at a higher pressure, the mass flow would be at least (590 + 14.7)/ 14.7 = 41 times the value in the Rimkus report. (The actual valve calculation for upstream conditions of 1150 psig and 270°F and 10% open, yields a flow of about 63 lbs per second, or almost 100 times that in the Rimkus report.)

This is also the mass flow upstream af the valve and the Rimkus report takes the calculated mass flow at the upstream pressure and divides it by the full cross-sectional area of the pipe. My correction of the Rimkus analysis gives a velocity of about 18 feet per second in the approach to the valve. The upstream gas is accelerating from 18 feet per second as it approaches the aperture.

AMCS Corp.
981 Rt. 22 West
Bridgewater, NJ 08807
Tel: (908) 429-2100
Fax: (908) 429-3004
Email:
bob.mostello@amcscorp.com

When the 629 valve opens to 10%, the oxygen flow contacts the leading edge of the valve disc, when it is opposite the carbon steel inlet flange. Upstream of that location, acceleration is underway as the cross section for gas flow decreases from full pipe area to a minimum flow area where the gas reaches its ultimate sonic velocity of 1157 feet per second. At the disc leading edge (opposite the carbon steel flange), the velocity has risen to above 200 feet per second because of the flow area constriction at that point, exposing the carbon steel pipe and flange to high particle impingement velocities. Under these conditions, the

allowable velocity for oxygen in straight carbon steel piping, according to Praxair standard EN-6 (rev. 12/15/97), is about 22 feet per second. The flow continues to accelerate as it approaches the disc trailing edge, which determines the limiting cross-sectional area for flow where sonic velocity occurs.

Most of the flow then passes over the seal ring without contact, because the seal ring is recessed relative to the retaining ring diameter upstream of it. At sonic velocity, contact with the seal ring in the form of friction theoretically could raise the seal ring to a maximum temperature of 270°F (the same temperature upstream of the valve). Because of turbulence and heat transfer between the seal ring and the rest of the gas at 144.5°F (which is most of it), the seal ring temperature would not be expected to be much over 144.5°F. [Brown et al, "Unit Operations", Wiley, p. 204 (1950)]. This is consistent with chemical engineering design practice and observations. A simple example is letting air out of an automobile or bicycle tire. When gas pressure is let down through the tire valve, the valve gets colder (well before the air in the tire gets colder); and the velocity in the valve restriction is sonic as long as the tire pressure is more than twice atmospheric pressure. (Automobile tire pressures are usually 45 psia and atmospheric pressure is 14.7 psia at sea level. Bicycle tire pressures can be 75 psia or higher.)

Significant heating of non-metal surfaces due to friction effects of high-velocity gas (Mach 1 and below) is not established as a physical reality. The American Society for Testing and Materials (ASTM) Committee G04 on Compatibility and Sensitivity of Materials in Oxygen Enriched Atmospheres does not include a test for this phenomenon, although ASTM has a multitude of other specific tests for oxygen safety. At best, friction heating due to gas flow is speculated by investigators as a last resort when no other cause of an oxygen fire can be identified. In the case of the Delaware City plant explosion, abundant evidence exists from identifiable causes of the fire. That evidence includes the nature of the damaged components, the overall site contamination, and the inadequate preparations for operation. In light of this evidence, there is no need to reach out to a theory of ignition which is not supported by the literature.

This concludes my analysis of key elements in the Rimkus report.

Respectfully submitted,

Robert A. Mostello, PE, PhD

# EXHIBIT "H"

## RELEASE AND SETTLEMENT AGREEMENT

KNOW ALL MEN BY THESE PRESENTS, that GREAT AMERICAN ASSURANCE COMPANY, formerly known as Agricultural Insurance Company, hereinafter "the Undersigned," in sole consideration of the sum of Five Hundred and One Thousand dollars ($501,000), by check made payable to its attorneys, WHITE AND WILLIAMS, LLP, the receipt of which is hereby acknowledged, does for itself and its successors, assigns, subsidiaries and inter-related companies, officers, employees, agents and representatives, and any other person, corporation, association or partnership hereby remise, release, and forever discharge all actions, claims and demands whatsoever, including, but not limited to, claims for property damage subrogation and any other damages, that now exist, ever existed, or may hereafter accrue, against NORTHEAST CONTROLS, INC. its successors, assigns, subsidiaries and inter-related companies, officers, employees, agents and representatives, and any other person, corporation, association or partnership or entity arising out of or in any way resulting from a fire/explosion incident at the Delaware City Power Plant more particularly in the Air Separation Unit at or around HV0629 which occurred on or about May 20, 2000 in Delaware City, New Castle County, Delaware (hereinafter, "the Fire") and which is the subject of a suit originally instituted by GREAT AMERICAN ASSURANCE COMPANY as subrogee for Praxair, Inc., Parsons Corporation, and Motiva Enterprises, LLC. against FISHER CONTROLS INTERNATIONAL, INC., NORTHEAST CONTROLS, INC. et al in the Superior Court of Delaware in and for New Castle County, 02C-05-168(JSS). The Undersigned acknowledges that it is compromising disputed claims for damages for which the parties herein released have denied any and all liability. The Undersigned also acknowledges that no promise or inducement has been offered except as set forth in this document; that this Release is executed without reliance upon any

statement or representation by the person or parties released herein, or their representatives, concerning the nature and extent of the injuries, damages or legal liability therefore; that the Undersigned representative is of legal age, legally competent and authorized to execute this Release and accepts full responsibility therefore.

In further consideration of payment of the aforementioned sum, it is agreed that the Undersigned will instruct Becht Engineering, Inc. and its team members to close their files and return any documentation received or generated during the course of the investigation to counsel for the Undersigned, Christopher Konzelmann, of White and Williams, LLP.  Further, the Becht team members will be instructed not to discuss the litigation or investigation with others, or to participate through testimony or otherwise, in any litigation arising out of the fire.  Additionally, a Becht authorized representative will execute an affidavit which states that the file has been closed and all documentation concerning Becht's involvement has been returned to counsel for the Undersigned.  The affidavit will be incorporated into the terms of this agreement.  Lastly, in the event that any party to the companion case entitled OLSON v. MOTIVA ENTERPRISES, et al 02CV-04-263 (JSS), seeks to obtain the Becht documents, opinions and investigation files, the Undersigned counsel, Christopher Konzelmann, will agree to file, argue, and pursue Motions to Quash or for a Protective Order which will drafted and prepared by counsel for Northeast Controls, Inc.

The Undersigned acknowledges that the damages to its insureds may be more severe or serious than now experienced or anticipated, and that a portion of the consideration paid by those released herein to the Undersigned shall operate as a final release and discharge of all such presently unknown and unanticipated injuries and damages resulting from the aforementioned events, as well as those now known.

In further consideration of payment of the aforementioned sum, the Undersigned agrees that it will not, and will not permit its agents, attorneys, representatives or anyone else to disclose or cause to be disclosed the fact of or the terms of this settlement for any reason or purpose whatsoever to any person at any time other than his attorneys. The Undersigned understands and agrees that it must advise all such individuals of the confidentiality of this agreement and obtain consent thereto prior to discussing it with them. The Undersigned also agrees that any letters or other documentation exchanged in connection with this litigation or the settlement of this matter shall also remain confidential.

The Undersigned hereby agrees to direct his attorneys to dismiss with prejudice all claims in the action instituted by GREAT AMERICAN ASSURANCE COMPANY V. FISHER CONTROLS INTERNATIONAL, INC., NORTHEAST CONTROLS, INC. et al in the Superior Court of Delaware in and for New Castle County, Civil Action No. 02C-05-168 (JSS), upon execution of this Release.

The Undersigned certifies that he has made this compromise settlement after consultation with and advice from his attorney, CHRISTOPHER KONZELMANN, ESQUIRE, who has explained the nature and extent of the Undersigned's' legal rights and the effect of this Release.

IN WITNESS WHEREOF, we have hereunto set our hand and seal this *24th* day of *May* , 2004.

_____
(Authorized Representative's Name)

*Vice - President Claims*
(Title)

EXHIBIT "I"

# RELEASE

THIS RELEASE is entered into this _28th_ day of _July_, 2005

by **RONALD W. OLSON and CAROL OLSON** (hereinafter "Olson").

For the sole consideration of the total sum of **FOUR MILLION SEVEN HUNDRED FIFTEEN THOUSAND DOLLARS ($4,715,000.00)** and for other good and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged.  Said amount shall be paid as follows:

(a)    **THREE MILLION THREE HUNDRED SIXTY-FIVE THOUSAND DOLLARS ($3,365,000.00)** to be paid by Defendant, Praxair, Inc.;

(b)    **SEVEN HUNDRED FIFTY THOUSAND ($750,000.00)** to be paid by Defendant, Motiva Enterprises LLC;

(c)    **FIVE HUNDRED THOUSAND DOLLARS ($500,000.00)** to be paid by Defendants, Texaco, Inc. and Texaco Development Corporation;

(d)    **ONE HUNDRED THOUSAND DOLLARS ($100,000.00)** to be paid by Defendant, Northeast Controls, Inc.

Olson, intending to be bound hereby, agrees as follows:

1.    Olson hereby remises, releases, acquits and forever discharges **PRAXAIR, INC. MOTIVA ENTERPRISES LLC, TEXACO, INC., TEXACO DEVELOPMENT CORPORATION and NORTHEAST CONTROLS, INC** and their respective past and present officers, directors, agents, employees, insurers, shareholders, attorneys, consultants, successors, assigns and related, affiliated companies, subsidiary companies, and its, his, her and their respective personal



EXHIBIT
I

representatives, successors and assigns, and all other persons or entities in the world (all hereinafter collectively referred to as "Defendants"), excepting worker's compensation carriers and health care providers, of and from any and all claims, liens, demands, causes of action, obligations, damages and liabilities of any kind or nature whatsoever, known or unknown, foreseen or unforeseen, on account of or with respect to any injury or damage, known or unknown, foreseen or unforeseen, from acts of negligence, egregious conduct, breach of contract, or otherwise, which has occurred, is occurring, or may hereinafter occur, directly or indirectly to Olson resulting, directly or indirectly, from that certain release of high-pressure oxygen resulting in a fire which occurred at the Motiva's Delaware City refinery on May 20, 2000, and all claims, liens, demands, causes of action, obligations, damages and liabilities, known or unknown, foreseen or unforeseen, that Olson has had in the past, or now has or may hereafter have in the future against the Defendants, or any other persons or entities, arising directly or indirectly out of, or related in any way to the subject matter involved in that certain civil action filed in the Superior Court, in and for New Castle County, Delaware, captioned as follows: <u>Ronald W. Olson and Carol Olson v. Motiva Enterprises LLC</u>, C. A. No. 02C-04-263 (JRS), consolidated with C. A. No. 02C-05-168 (JRS), C. A. No. 02C-05-169 (JRS) and C. A. No. 02C-05-170 (JRS).

    2.    It is expressly understood and agreed that this Release by Olson is

intended to cover and does cover not only all known losses and damages to Olson, but any further and future losses and damages, including death, not now known or anticipated, but which may later develop or be discovered, including, without limitation, all of the effects and consequences thereof.

3.    Olson acknowledges that the payment of the consideration referred to hereinabove is made solely for the purpose of purchasing peace and eliminating further involvement in protracted litigation based upon disputed claims, and does not constitute an admission or concession of liability by any of the Defendants on account of any of the said claims or matters, liability for which is expressly denied.

4.    Olson covenants that they will not directly or indirectly abet, encourage, suggest, promote, commence, aid, prosecute or cause or permit to be commenced or prosecuted against the Defendants, any action or other proceeding based upon any claims, liens, demands, causes of action, obligations, damages or liabilities which are the subject of this Release.

5.    Olson hereby agrees to indemnify and hold the Defendants harmless from and against any and all claims, liens, demands, causes of action, obligations, damages, liabilities, judgments and costs, including attorneys' fees, asserted against the Defendants as a result of, or in connection with: (a) any action or other proceeding brought by or prosecuted for the benefit of Olson or by any heirs, legal representatives, successors or assigns of Olson, or (b) any action or other proceeding

in which Olson, their heirs, legal representatives, successors or assigns, or any of them, may have direct or indirect interest, contrary to the provisions of this Release.

6.     Olson understands that this Release includes all claims for costs, expenses and attorneys' fees, taxable or otherwise, incurred by Olson, in or arising out of the aforesaid civil actions.

7.     It is further understood and agreed that this settlement is upon specific warranty, guarantee and representation that any and all outstanding liens against this settlement, including liens for hospital or medical care, or time loss, as well as workers' compensation benefits, will be paid by Olson and Olson specifically promises and agrees to defend and hold the Defendants harmless from any such claim or lien by any person, hospital, private or governmental agency, which may assert or attempt to assert the same, whether it be valid or not, and whether the same be known or unknown at the time of this settlement.

8.     Olson understands and expressly agrees that this Release shall bind all of their heirs, legal representatives, successors and assigns, and shall inure to the benefit of the Defendants, their legal representatives, successors and assigns.

9.     Olson agrees that this Release shall not be filed of record.  Further, Olson warrants that, except pursuant to an order of a court, or federal or state administrative taxing agency,the execution of this Release and the contents of this Release will not be disclosed or publicized to persons or entities other than the parties

to the above-mentioned lawsuit and Olson, their heirs, legal representatives, successors and assigns hereby agree to maintain secrecy as to the terms and contents of this settlement, and the execution of this Release, and to make no public disclosure of any kind with regard to its execution or its terms and conditions. Nothing contained in this Release shall alter or modify the obligation of Olson to adhere to the Stipulated Protective Order entered in the actions identified in paragraph 1 above.

10.    It is further agreed that Olson will forthwith cause the above-referenced lawsuit to be dismissed as against all of the Defendants, with prejudice.

11.    Olson warrants that no promise, inducement or agreement not expressed in this Release has been made to them in connection with this Release, and that the Release constitutes the entire agreement between Olson and the Defendants. This Release is entered into by the undersigned freely and voluntarily and with and upon the advice of counsel. All executed copies are duplicate originals.

_____
RONALD W. OLSON

_____
CAROL OLSON

STATE OF DELAWARE          :
                                          :    SS.
NEW CASTLE COUNTY          :

Personally appeared before me the above-named, RONALD W. OLSON and

CAROL OLSON, and acknowledged the foregoing instrument to be their voluntary

act and deed.

_____
                                        Notary Public

My Commission Expires: _March 10, 2009_

EXHIBIT "J"



**EMERSON.**
Process Management

Matthew W. Geekie
Assistant General Counsel

Emerson Process Management
8100 West Florissant Avenue
P. O. Box 36911
St. Louis, MO 63136
USA

T  (314) 553 1814
F  (314) 553 1816
Matt.Geekie@EmersonProcess.com

October 29, 2001

Thomas P. Wagner, Esq.
Rawle & Henderson LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107

Re:  Incident at Praxair Installation

Dear Mr. Wagner:

I am in receipt of your letter dated March 30, 2001 to Mr. Robert Walker, Area Vice President for Fisher Controls International, Inc.  Please consider this letter responsive to yours.

Pursuant to the Representative Agreement between Northeast Controls, Inc. ("**Northeast**") and Fisher Controls International, Inc.  ("**Fisher**"), made the first day of January, 2000 (the "**Agreement**"), Northeast acted as one of Fisher's sales representatives in May 2000. In accordance with the Agreement, Northeast provided certain services in support of the sale of Products (as defined in the Agreement) to Praxair, Inc., ("**Praxair**").  As you are aware, on or about May 20, 2000 an explosion and fire occurred at the Motiva facility in Delaware City, Delaware (the "**Praxair Incident**").  The Praxair Incident entailed damage to property as well as injury to an individual, (the "**Losses**").

Subsequent to the Praxair Incident several parties, including, but not limited to, Fisher, Northeast, Praxair, and Motiva, Inc., have, to varying degrees, participated in an investigation of the Praxair Incident (the "**Third Party Investigation**").  Fisher understands that this Third Party Investigation is focusing on the area of a Fisher butterfly valve as well as upstream and downstream of its location.  The Third Party Investigation has yet to arrive at any conclusions, let alone allegations, as to the cause of the Praxair Incident.  More particularly, this investigation has not resulted in any allegations or claims that the Losses arose out of any actual or alleged defect in the butterfly valve or for that matter, any Product.

OCT 31 2001 14:08 FR EMERSON PROCESS MGMNT314 553 1816 TO 912155632583    P.03/03

Thomas P. Wagner, Esq.
October 29, 2001
Page 2

In light of the fact that no conclusions have been reached and no allegations of Product defect have been made, we believe that your request that Fisher agree to defend, indemnify and hold harmless Northeast is premature. Accordingly, at this time Fisher declines to accept the tender of Northeast's defense. If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement. Pursuant to the Agreement, however, Fisher will not protect, indemnify, defend and hold harmless Northeast from its own negligent acts or omissions. The conclusions and the allegations that may be made will ultimately determine the extent, if at all, to which Fisher agrees to protect, defend, indemnify and hold harmless Northeast and the extent to which Fisher will need to reserve its rights while doing so should evidence develop suggesting that the Losses resulted from negligent acts or omissions of Northeast.

If you have any questions about any of the issues set forth above, please do not hesitate to contact me.

Sincerely,

Matthew W. Geekie

MWG/slh
cc:  Terry Buzbee
     Walter Stark
     Michael Keating
     Steve Frauen
     Meredith Miller
     Warren Voter
     Patrick McVey

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHEAST CONTROLS, INC. | : | CIVIL ACTION – LAW |
| and | : | |
| ST. PAUL MERCURY INSURANCE COMPANY | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FISHER CONTROLS INTERNATIONAL, LLC | : | NO. 1:06-CV-00412 (SLR) |

## **ORDER**

**AND NOW,** this _____ day of _____, 2007, upon consideration

of the Motion of Plaintiffs, Northeast Controls, Inc., and St. Paul Mercury Insurance Company,

For Leave To Amend Complaint, and any Response thereto, it is hereby ORDERED that:

A.    Plaintiffs' Motion is GRANTED; and

B.    The First Amended Complaint attached as Exhibit "A" to the Motion shall be

entered on the docket forthwith.

_____

J.

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, INC.　　　　：　　CIVIL ACTION
3 Enterprise Avenue　　　　　　　　：
Clifton Park　　　　　　　　　　　：
New York, NY 12065　　　　　　　　：　　NO. 06-412
　　　　　　　　　　　　　　　　：
ST. PAUL MERCURY　　　　　　　　：
INSURANCE COMPANY　　　　　　　：
385 Washington Street　　　　　　　：
St. Paul, MN 55102　　　　　　　　：
　　　　　　　　　Plaintiffs,　　　：
　　　　　　v.　　　　　　　　　：
FISHER CONTROLS　　　　　　　　：
INTERNATIONAL, LLC,　　　　　　　：
205 S. Center Street　　　　　　　　：
Marshalltown, Iowa 50158　　　　　　：
　　　　　　　　　Defendant.　　　：

## FIRST AMENDED COMPLAINT

Northeast Controls, Inc., and St. Paul Mercury Insurance Company, by and through their

attorneys, Marshall, Dennehey, Warner, Coleman & Goggin, hereby make this Complaint in

Civil Action against defendant, Fisher Controls International, LLC, and in support thereof allege

the following:

## INTRODUCTION

1.　　This action is a contractual indemnification claim for defense and indemnity

arising from the defense and settlement of the following actions: one brought by Great American

Assurance Company as subrogee of Praxair, Inc. ("Praxair"), Parsons Corporation and Motiva

Enterprises, LLC ("Motiva") at Civil Action No. 02C-05-168 ("Great American Complaint") and

the other brought by Ronald W. Olson and Carol Olson, Civil Action No. 02C-04-263 ("Olson

Complaint") in the Superior Court of the State of Delaware in and for New Castle County against

Northeast Controls, Inc. and others. The Great American Complaint was consolidated with two

other property damage suits filed separately by Motiva and Praxair.

## PARTIES

2.      Plaintiff, Northeast Controls, Inc. ("Northeast"), is a New York corporation with a principal place of business at 3 Enterprise Avenue, Clifton Park, New York 12065.

3.      Plaintiff, St. Paul Mercury Insurance Company ("St. Paul"), is a Minnesota corporation with a principal place of business at 385 Washington Street, St. Paul, MN 55102.

4.      Defendant, Fisher Controls International, LLC ("Fisher") is a Delaware limited liability company with a principal place of business at 205 S. Center Street, Marshalltown, Iowa 50158 and a Registered Agent for service of process at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

5.      Fisher manufactures and sells valves for use in New Castle County and the state of Delaware.

6.      Northeast is a sales representative for Fisher.

7.      Northeast had a valid insurance policy with St. Paul at the time of the accident involved in the Great American and Olson litigations and, St. Paul, on behalf of its insured, expended attorneys' fees in defending these case and made contributions toward their resolutions.

## JURISDICTION AND VENUE

8.      This court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.      Venue is proper in this district in accordance with 28 U.S.C. §1391 (a)(1) and (2) since the defendant is incorporated in and a citizen of Delaware, the defendant resides in this district pursuant to 28 U.S.C. §1391 (c), the defendant may be served in this district and

1250288 v.1

substantial parts of the transaction or occurrence for which the cause of action asserted herein took place in this district.

## BACKGROUND RELEVANT TO THE CLAIM

10.    On or about January 1, 1998, Northeast and Fisher renewed and entered into a Representative Agreement which outlined the sales representative relationship between Northeast and Fisher. A true and correct copy of the Representative Agreement is attached hereto as Exhibit "A" and incorporated herein as if set forth in full.

11.    The Representative Agreement contained an Indemnity Clause in Section XI, which provides the following:

Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at its own expense, **protect, defend, indemnify and hold harmless** Representative (Northeast) from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses ... which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, **resulting or claimed to result from any actual or alleged defect in any Product**. The obligations set forth in the immediately preceding sentence shall not apply unless Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any losses **arising from** the following:

A.    Any express warranty unauthorized by Fisher;
B.    Any distribution or sale of a Product for a purpose unauthorized by Fisher;
C.    Use of any instructions, labels, warnings or other product literature which have not been previously approved in writing by Fisher;
D.    Any failure of Representative to maintain any Product in merchantable condition;
E.    Demonstration, installation, servicing, modification or repair of any Product by Representative or any third party not in accordance with written warnings or instructions of Fisher, or
F.    Negligent acts or omissions by Representative.

(emphasis added). *See* Exhibit "A."

12.    The January 1, 1998 Representative Agreement was in effect for a period of one (1) year and was renewed thereafter.

3

1250288 v.1

13.     Pursuant to a Worldwide Procurement Agreement dated January 1, 1995 between Praxair and Fisher, Northeast was identified as the sales representative for Praxair's purchases of control valves from Fisher.

14.     In accordance with the Worldwide Procurement Agreement, Praxair contacted Northeast regarding the purchase of control valves for a re-powering project at the Delaware City Power Plant in 1997.

15.     As part of the purchases for the project, on or about June 24, 1998, Northeast placed a purchase order for a control valve (hereinafter "valve") with Fisher on behalf of Praxair.

16.     Fisher sent an order acknowledgement form for the valve to Praxair on or about July 21, 1998, and thereafter, manufactured the valve (tag no. 83HVO629).

17.     Fisher invoiced Praxair for the valve on or about October 23, 1998 and the valve was shipped to and accepted by Praxair on or about December 3, 1998.

18.     Thus, the January 1, 1998 Representative Agreement was validly in place on the dates that the valve in question was ordered, manufactured, sold and shipped to Praxair.

19.     Thereafter, the valve was installed at the power plant located at River Road, Route 9, Delaware City, Delaware 19076 (hereinafter the "Plant") as part of a re-powering project.

20.     The valve was installed to control the flow of oxygen from a base load oxygen compressor ("BLOC") in an air separation unit ("ASU") to a gassifier.

21.     On or about May 20, 2000, there was a fire at the Plant during re-powering of the ASU.

22.     As a result of the fire, Ronald W. Olson allegedly sustained personal injuries.

23.     As a result of the fire, Praxair, Parsons Corporation ("Parsons") and Motiva allegedly sustained property damage.

4

24.     Great American Assurance Company ("Great American"), which insured Parsons

and others, paid claims made by Praxair, Parsons and Motiva as a result of the fire.

25.     Thereafter, on or about May 2002, Great American filed suit as subrogee of

Praxair, Parsons and Motiva against Northeast and others in the Superior Court of the State of

Delaware in and for New Castle County. A true and correct copy of the Great American

Complaint is attached hereto as Exhibit "B."

26.     The Great American Complaint alleged in part that Fisher and Northeast were

negligent and that their negligence included:

> **(a)     failing to design, manufacture, assemble and distribute a BLOC control
> valve compatible with and appropriate for high pressure oxygen service;**
> **(b)     failing to utilize materials in the design and assembly process that were safe
> for use in a high pressure oxygen environment;**
> ...
> **(e)     failing to advise of any deficiencies in the valve that would make the product
> unsafe or unfit for use in a high pressure oxygen environment;**
> ...

*See* ¶23 of Exhibit B. (Emphasis added).

27.     Great American's allegations in ¶ 23 of its Complaint were that Fisher's BLOC

control valve was defective in its design, manufacture and assembly.

28.     Great American alleged that the defects, among other things, caused the fire and

resulting damage. *See* ¶24 of Exhibit B.

29.     On or about April 2002, Ronald W. Olson and Carol Olson filed suit against

Northeast and others in the Superior Court of the State of Delaware in and for New Castle

County. A true and correct copy of the Olsons' First Amended Complaint dated May 20, 2002 is

attached hereto as Exhibit "C."

30.    The Olsons' First Amended Complaint alleged that the valve at issue was defective at the time of sale and that the injuries sustained by the plaintiff were caused by the defective valve. *See* Count IX, ¶43 in Exhibit C.

31.    Fisher had the duty under the Representative Agreement to both defend and indemnify Northeast on the Great American and Olson Complaints, both of which claimed damages due to alleged defects in the Fisher valve.

32.    By letter dated July 3, 2002, Northeast made a demand for defense and indemnification to Fisher based upon the Representative Agreement. A true and correct copy of the demand letter is attached hereto as Exhibit "D."

33.    Northeast made similar requests on two previous occasions. *See* attached letters dated September 25, 2000 and October 4, 2000 made a part hereof cumulatively as Exhibit "E."

34.    Northeast also demanded defense and indemnification from Fisher prior to the filing of the Great American and Olson Complaints.

35.    Fisher, through Matthew W. Geekie, responded to Northeast in a letter dated October 29, 2001. A true and correct copy of Mr. Geekie's letter is attached hereto as Exhibit J.

36.    Mr. Geekie was authorized to speak for Fisher.

37.    Fisher's response as set forth in Mr. Geekie's letter was as follows:

> I am in receipt of your letter dated March 30, 2001 to Mr. Robert Walker, Area Vice President for Fisher Controls International, Inc. Please consider this letter responsive to yours.
>
> Pursuant to the Representative Agreement between Northeast Controls, Inc. ("Northeast") and Fisher Controls International, Inc. ("Fisher"), made the first day of January, 2000 (the "Agreement"), Northeast acted as one of Fisher's sales representatives in May 2000. In accordance with the Agreement, Northeast provided certain services in support of the sale of Products (as defined in the Agreement) to Praxair, Inc., ("Praxair"). As you are aware, on or about May 20, 2000 an explosion and fire occurred at the Motiva facility in Delaware City, Delaware (the "Praxair Incident"). The

6

Praxair Incident entailed damage to property as well as injury to an individual, (the "Losses").

Subsequent to the Praxair Incident several parties, including, but not limited to, Fisher, Northeast, Praxair, and Motiva, Inc., have, to varying degrees, participated in an investigation of the Praxair Incident (the "Third Party Investigation"). Fisher understands that this Third Party Investigation is focusing on the area of a Fisher butterfly valve as well as upstream and downstream of its location. The Third Party Investigation has yet to arrive at any conclusions, let alone allegations, as to the cause of the Praxair Incident. More particularly, this investigation has not resulted in any allegations or claims that the Losses arose out of any actual or alleged defect in the butterfly valve or for that matter, any Product.

In light of the fact that no conclusions have been reached and no allegations of Product defect have been made, we believe that your request that Fisher agree to defend, indemnify and hold harmless Northeast is premature. Accordingly, at this time Fisher declines to accept the tender of Northeast's defense. *If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement.* Pursuant to the Agreement, however, Fisher will not protect, indemnify, defend and hold harmless Northeast from its own negligent acts or omissions. The conclusions and the allegations that may be made will ultimately determine the extent, if at all, to which Fisher agrees to protect, defend, indemnify and hold harmless Northeast and the extent to which Fisher will need to reserve its rights while doing so should evidence develop suggesting that the losses resulted from negligent acts or omissions of Northeast.

If you have any questions about any of the issues set forth above, please do not hesitate to contact me.

Exhibit J (emphasis added).

7

38.    By letter dated September 13, 2002, Fisher also admitted its responsibility for defending and indemnifying Northeast on claims of a product defect.  See Fisher's letter of September 13, 2002, a true and correct copy of which is attached hereto as Exhibit "F".

39.    Despite this acknowledgment of the obligation to Northeast, Fisher has failed to accept Northeast's demand for defense and indemnification of the Great American and Olson Complaints.

40.    The law firm of Rawle & Henderson LLP was initially retained to defend Northeast in any lawsuit filed related to this fire.  Presently, the undersigned counsel represents Northeast in these matters.

41.    According to the plain language of the Representative Agreement, Fisher's duty to defend and indemnify Northeast is immediately triggered upon **an allegation of a product defect**. *See* Exhibit A.

42.    Both Great American and the Olsons alleged in their respective Complaints that the Fisher valve was defective.

43.    Separate suits filed by Praxair and Motiva against Northeast and others similarly alleged that the Fisher valve was defective, and Northeast defended these suits as well.

44.    No Court has ever determined that the fire at the plant or the resulting alleged injuries and damages were caused by Northeast's negligence.

45.    Fisher did not claim nor adduce any evidence during any of the underlying cases that the fire at the plant or resulting alleged injuries or damages were caused by Northeast's negligence.

46.    On the contrary, Fisher produced evidence, including an expert opinion, which absolved Northeast from liability as the valve construction was not the cause of the fire.  *See* the

opinion of Dr. Robert A. Mostello in reports dated January 3, 2005 and January 28, 2005, attached hereto cumulatively as Exhibit "G."

47.    Despite repeated requests by Northeast for defense and indemnification, however, Fisher wrongfully refused to defend or indemnify Northeast during the time that all cases were pending and up until the present time.

48.    Accordingly, Fisher is in breach of its obligations under the Representative Agreement.

49.    As a result of Fisher's breach of the Representative Agreement, Northeast has incurred various damages, expenses and costs.

50.    On or about April 2004, Northeast entered into a Release and Settlement Agreement with Great American in order to limit its exposure in the Great American suit.

51.    According to the settlement, St. Paul, on behalf of its insured, Northeast, paid Great American $501,000.00 (Five Hundred One Thousand Dollars) in order to secure a general release. A true and correct copy of the Release signed by Great American is attached hereto as Exhibit "H."

52.    This settlement was fair and reasonably required to limit St. Paul's and Northeast's liability exposure to Great American caused by Fisher's wrongful denial of Northeast's request for defense and for indemnification.

53.    On or about July 28, 2005, St. Paul, on behalf of its insured, Northeast, contributed an amount of $100,000.00 to the Olson plaintiffs as part of a global settlement. A true and correct copy of the Release signed by the Olsons is attached hereto as Exhibit "I."

54.    This settlement contribution was fair and reasonably required to end St. Paul's and Northeast's litigation expenses.

1250288 v.1

55.    As a result of Fisher's wrongful denial of its contractual obligation, St Paul, while defending Northeast, was forced to incur $466,621.80 in attorney's fees in defending the Great American, Olson, Praxair and Motiva Complaints.

56.    As a result of Fisher's wrongful denial of its contractual obligation, St Paul, while defending Northeast, was forced to incur $70,934.18 in costs in defending the Great American, Olson, Praxair and Motiva Complaints.

57.    Finally, St. Paul and Northeast will incur costs and expenses, including attorney's fees associated with the prosecution of this suit.

58.    The total costs and expenses incurred by Plaintiffs as a result of Fisher's refusal to defend and indemnify Northeast pursuant to the requirements of the Representative Agreement is in excess of $1,138,555.90.

**WHEREFORE**, Plaintiffs, St. Paul Mercury Insurance Company and Northeast Controls, Inc., demand judgment in their favor and against Defendant Fisher Controls International, LLC in the amount of $1,138,555.90 together with all costs and expenses for bringing this action and interest and any other such relief as the Court may deem equitable and just.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

___/s/ Lorenza A. Wolhar_____
BY:    LORENZA A. WOLHAR, ESQUIRE
       DE ID #3971
       1220 N. Market Street, 5th Floor
       P.O. Box 8888
       Wilmington, DE  19899-8888
       Attorneys for Plaintiffs

Date: _____

10

1250288 v.1

# EXHIBIT "A"

ADDENDUM
TO
AGREEMENT
BETWEEN
FISHER CONTROLS INTERNATIONAL, INC.
AND
NORTHEAST CONTROLS, INC.

January 1, 1998

The subject agreement is hereby modified to include the following paragraph in Appendix G, Exhibit F, Section 4:

(h)    While ISI may provide any terms and conditions it desires to End-Use Customers, ISI expressly agrees to conduct its sales to End-Use Customers such that the liability of Company and Fisher-Rosemount Systems, Inc. under ISI's sales to End-Use Customers is limited as set forth in Exhibit D; and ISI agrees that the liability of Company and Fisher-Rosemount Systems, Inc. is absolutely limited as set forth in Exhibit D. To the extent that ISI has not limited the liability of Company and Fisher-Rosemount Systems, Inc. as required by this Section 4 (h), ISI agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Company and Fisher-Rosemount Systems, Inc. from and against all claims, actions, losses, damages, liabilities, costs and expenses which may arise out of or be made in connection therewith.

Acknowledged and agreed:

NORTHEAST CONTROLS, INC.

By _Michael Peters_____

Title:  President

CONFIDENTIAL

## REPRESENTATIVE AGREEMENT

THIS AGREEMENT, made this 1st day of January, 1998, by and between FISHER CONTROLS INTERNATIONAL, INC. having its principal offices at 8000 Maryland Avenue, Clayton, Missouri 63105 (hereinafter called "Fisher"), and NORTHEAST CONTROLS, INC., ~~Sitterly Road~~, Clifton Park, NY 12065 (hereinafter called "Representative"). 3 Bodewtschew Drive

WHEREAS, Fisher desires to appoint on its own behalf and has been duly authorized by the other companies identified in Appendix A hereto (each such company, including Fisher, is hereinafter referred to individually as a "Fisher Company" and collectively as the "Fisher Companies") to appoint Representative as a sales, engineering and service representative for Products of the Fisher Companies upon the following terms and conditions; and

WHEREAS, Representative represents that it is qualified to act as such a representative for the Fisher Companies in the Territory defined in Section I below pursuant to such terms and conditions;

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

## I.    APPOINTMENT AND TERRITORY

Fisher hereby appoints Representative during the term of this Agreement, and Representative hereby accepts such appointment, as a sales, engineering and service representative for the Fisher Companies and for their designated products and related services as further described herein (said products and related services hereinafter referred to as "Products") in the territorial area specified in Appendix C hereto (hereinafter referred to as the "Territory").

It is understood that the Products included in this Agreement are those manufactured or supplied by the Fisher Companies specified in Appendix A unless otherwise excluded by such Appendix. The Fisher Companies shall also have the right, at any time, to amend or modify any Appendix to this Agreement upon written notice to Representative. This Agreement does not include representation for other subsidiaries or affiliated companies of the Fisher Companies or their products or services unless specifically listed in Appendix A.

CONFIDENTIAL

## II.  OBLIGATIONS OF REPRESENTATIVE                    CONFIDENTIAL

Representative shall:

A.   Use its best efforts to fully promote, and pursue all reasonable opportunities in the solicitation of orders for, the Products in the Territory at such prices, license fees, and upon such terms and conditions as may be from time to time specified by the Fisher Company for whom orders are solicited.  All such orders shall be promptly transmitted to the Fisher Company on whose behalf the orders were solicited and shall be subject to the written approval and acceptance of such Fisher Company.  In no event shall Representative accept any order or otherwise attempt to bind any Fisher Company in any transaction unless specifically authorized by the appropriate Fisher Company.  All remittances by the customer to whom Products are sold or licensed shall be made directly by the customer to the relevant Fisher Company.

B.   Except to the extent limited by, and subject to the terms of, Section VII and Appendix D hereof, furnish engineering services, consistent with Fisher's standards and practices, to customers and potential customers, including without limitation, reviewing and evaluating the requirements for the Products and participating in the selection and designation of the proper Products and specifications therefor.

C.   Except to the extent limited by, and subject to the terms of, Section VII and Appendix D hereof, furnish proper technical services to all users of the Products located or installed in the Territory, including without limitation, assistance in connection with the start-up, check out and calibration of Products, the diagnosis of user inquiries concerning Products and the servicing of deficiencies in, and the performance of warranty obligations on, the Products in the manner specified from time to time by the Fisher Companies.

D.   Maintain in the Territory suitable premises, equipment and current technical and promotional literature for the Products, and employ sufficient and suitably qualified and trained technical, engineering and other competent personnel necessary to carry out the duties of Representative under this Agreement to the satisfaction of the Fisher Companies.  Representative and its personnel shall maintain a working knowledge and familiarity with the Products, including associated services, and attend training sessions as appropriate to maintain such knowledge and familiarity.

E.   Keep the appropriate Fisher Companies fully informed of commercial and market conditions within the Territory and of the activities of customers and competitors, and regularly cover the trade and industry for the purposes of furthering sales of the Products.

F.   Provide the Fisher Companies periodically, as requested, with sales forecasts for the Products and customer evaluations.

G.   Assist, when requested, the Fisher Companies in obtaining relevant information relating to the financial standing and reputation of customers in order to evaluate credit risks.

H.   Maintain records in such form and in such detail as the Fisher Companies may reasonably request from time to time with respect to customers; outstanding quotations and orders; engineering and technical services and related activities, including plans

CONFIDENTIAL

drawings and other documents; and any other business matters relating to the Products; and promptly transmit such records to the relevant Fisher Company upon request.

I.  Not incur any liability on behalf of the Fisher Companies, or in any way pledge or purport to pledge the Fisher Companies' credit, or describe or hold itself out as an agent or employee of the Fisher Companies, or describe itself other than as a sales representative of the Fisher Companies for the performance of functions specified in, and pursuant to, this Agreement; or make any warranties or representations of any kind with respect to the Fisher Companies, the Products, or any other products of the Fisher Companies, other than to present to the prospective customer the specifications and description of the Products in the identical terms as supplied by the Fisher Company to Representative.

J.  Not, without Fisher's prior written consent, which shall not be unreasonably withheld, sell or distribute any products which are competitive with the Products.

K.  Not advertise or distribute any printed matter referring to the Products or to the Fisher Companies without the specific prior approval in writing of the relevant Fisher Company with regard to the form, manner, and content of such advertising and printed matter. All advertising by Representative shall be without recourse to any Fisher Company for any expense incurred unless such expense shall have been specifically authorized in writing by the relevant Fisher Company.

L.  Confer with, and establish to the satisfaction of, the appropriate Fisher Companies, goals and strategies for representation during the year covering such matters as orders by Product line and Representative's management structure, staffing and territorial coverage. Appropriate adjustments may be made during the term of this Agreement in the goals and strategies to take into account material events and circumstances affecting the representation, such as positive or negative changes in external business and economic conditions or the introduction by the Fisher Companies of additional products and programs.

M.  Abide by all laws and governmental rules and regulations applicable to Representative's and the Fisher Companies' activities hereunder. The Representative shall not make any bribes, kickbacks, or payments to governmental officials to obtain business, or other illegal payments.

N.  In its capacity as a commission representative, follow sales strategy developed by the Fisher-Rosemount Industry Solutions Group on those projects which have been identified as appropriate for a total Fisher-Rosemount integrated approach through the Fisher-Rosemount Industry Solutions Group. In such situations, Representative will not independently pursue a strategy for sale of the Products which is inconsistent with such Group strategy.



## III.    FISHER ASSISTANCE

The Fisher Companies shall support the activities of Representative with regard to its promotion of the Products, its solicitation of orders, and engineering and technical services. The Fisher Companies shall make available training and instruction for Representative and the Fisher Companies' customers with respect to the Products and shall make available to Representative technical data and literature covering the Products. Such training, instruction, technical data and literature will be provided at prices to be established from time to time by the Fisher Companies. The Fisher Companies shall advise Representative of their current price lists and discounts for their Products for purposes of soliciting orders hereunder.

The Fisher Companies reserve the right, in their absolute discretion, to decline to accept any order transmitted to them for acceptance by Representative or to decline to submit any tender on any inquiry transmitted to them by Representative.

## IV.    PURCHASE OF PRODUCTS FOR RESALE

In order to further its representative obligations hereunder, Representative agrees to purchase adequate quantities of Products, including spare parts, from the Fisher Companies for inventory purposes to meet the market demands and requirements of the Territory. Such Products will be sold to Representative at discounts from the then current published selling prices as established from time to time by the applicable Fisher Companies and under their standard terms and conditions of sale. Representative may extend the applicable Fisher Companies' warranties for such Products to its customer, provided such Products are not modified or are modified pursuant to and in accordance with the Fisher Companies' established procedures, but all other terms and conditions of resale, including price, are solely within the control and at the risk of Representative.

## V.    CONFIDENTIALITY PROVISIONS

As Representative may have heretofore received, and will in the future receive from time to time, confidential and proprietary information and data concerning the Products, research and engineering, developmental products and projects, business plans and operations of, or belonging to, the Fisher Companies and/or other companies with whom a Fisher Company has a business relationship (herein collectively referred to as "Fisher Information"), Representative agrees to treat, and to cause its officers and employees to treat, all such Fisher Information as the Fisher Companies' confidential property and not to divulge it to others at any time, or to use it for Representative's private purposes, or otherwise, except with the prior written authorization of the Fisher Company from which such Fisher Information originated and then only in the manner and to the extent authorized, unless or until such Fisher Information (a) becomes a part

Company. Representative's obligation hereunder further applies to Fisher Information received by Representative in the course of Representative's prior, if any, representative capacity with any Fisher Company and shall continue beyond and after the termination or expiration of this Agreement, and at the termination or expiration of this Agreement, or at any time a Fisher Company so requests, Representative shall deliver to the Fisher Company all notes, memoranda, records, drawings or other documents and other information or materials pertaining to the Fisher Information, including all copies and reproductions thereof. Representative further agrees to obtain similar written undertakings from each of its employees having access to the Fisher Information.

## VI.  COMMISSIONS

A.  Subject to the provisions of Appendix E, the exceptions stated below in this Section VI, and to fulfillment of the undertakings by Representative to the Fisher Companies, the Fisher Company whose Products are sold in the Territory shall pay to the participating representative(s) and/or offices maintained by Fisher or its subsidiaries (hereinafter referred to as "sales office(s)", in consideration for its services hereunder, a purchasing, a territorial service, and/or an engineering commission with respect to the sale of Products by such Fisher Company in the Territory. The total available commission shall be computed on the basis of the F.O.B. Factory net price to the customer following discounts and allowances, if any, at the rates set forth in Appendix B hereto for the applicable Fisher Company. Payments will be made promptly following receipt of payment from the customer by the relevant Fisher Company. Commissions paid to Representative on any uncollectible account will be used as an offset against future commissions earned by, or invoiced to, Representative in accordance with its participation in the original commission payments. Representative agrees that the Fisher Companies may debit Representative's commission account any overdue amount owed by Representative to the Fisher Companies.

B.  The commission on sales of Products involving the active participation of more than one representative or sales office will be assigned to or proportioned between or among the participating representatives and sales offices by the Fisher Companies on the following basis:

1.  All Sales (excluding sales of replacement parts or repairs having invoice value of under U.S.          ):

a.  A *Purchasing Credit* of one-fourth (1/4) of the total available commission shall normally be given by the applicable Fisher Company to the representative or sales office in whose territory the order originates and shall be based upon the representative's or sales office's efforts in soliciting the order and assisting the customer and its purchasing function in connection therewith; in preparing the

CONFIDENTIAL

obtaining the order and the manner of processing the order through the relevant Fisher Company. The Fisher Companies shall have the discretion to make exceptions to the foregoing in unusual situations.

b. A *Territorial Service Credit* of one-fourth (1/4) of the total available commission shall be given to the representative or sales office in whose territory the Product(s) is installed to cover the representative's service obligations.

c. An *Engineering Credit* of one-half (1/2) of the total available commission will be given to the representative or sales office, or be retained, in whole or in part, by the applicable Fisher Company, based upon the engineering service provided to the customer. In determining the division of this credit, the Fisher Company will take into consideration the following aspects: (a) development of specifications to include Fisher Products; (b) detail engineering work with contractor or user, including quotations; (c) degree of insistence by ultimate user upon Fisher Products; (d) having contractor or user add the Fisher Companies to the list of acceptable bidders; and (e) the ratio of the engineering work carried out by Representative to the total engineering work required.

2. Replacement Parts or Repair Orders:

a. Where the invoice is under U.S. $.    ), all available commissions will be paid to the representative or sales office in whose territory the purchase order originates.

b. Where the invoice value is U.S. $1.      or more, but less than U.S. $     , the available commission will be divided equally, and will be paid, respectively, to the representative or sales office in whose territory the purchase order originates and to the representative or sales office in whose territory the parts are installed.

c. Where the invoice value is U.S. $      or more, the available commission will be divided in accordance with the provisions of Section VI-B-1, above; i.e., 1/4 Purchasing Credit, 1/4 Territorial Service Credit, and 1/2 Engineering Credit.

3. The final allocation of the available commission credits shall be determined at the discretion of the Fisher Companies in unusual circumstances. Consideration will be given to the work done by the representatives, sales offices, and the Fisher Companies.

4. Commissions paid under this Agreement on Products subsequently returned to Fisher shall be refunded in full by Representative, or at the Fisher Companies' discretion, may be charged back to Representative's commission account.

CONFIDENTIAL

C.  Unless specifically indicated in Appendix A hereto, it is agreed that Representative shall not be entitled to the applicable commission(s) on the following sales of Products, which sales are excluded from this Agreement:

   1.  Sales to subsidiaries of Fisher (companies in which Fisher has a direct or indirect majority ownership interest) or sales to licensees of Fisher or to the licensees of its subsidiary companies.

   2.  Sales in respect of which Representative has failed to perform in accordance with the provisions of this Agreement.

   3.  Sales by Fisher Companies in the Territory resulting from orders not obtained by Representative if this Agreement provides in Section I that Representative is a non-exclusive representative for the sale of such Products.

D.  If a Fisher Company shall refuse to accept or execute any order as provided in this Agreement, the Representative shall not be entitled to any commission or other remuneration in respect thereof.

## VII.  CERTIFICATION AND SUPPORT FEES PAYABLE BY REPRESENTATIVE

Representative agrees to pay support fees and certification fees to the Fisher Company specified in Appendix D hereto in accordance with the terms of Appendix D. Certification fees, if any, shall be paid by the Representative no later than March 1. Support fees, if any, shall be paid within 30 days of the end of each calendar quarter during the term of this Agreement with respect to receipts by Representative of qualifying payments from the customer in such quarter. Representative agrees that the Fisher Companies may debit the Representative's account any overdue amount owed by the Representative to the Fisher Companies pursuant to this Section VII and to Appendix D.

## VIII.  TERM

A.  This Agreement shall be effective for a period of one (1) year from the date set forth in the opening paragraph of this Agreement and will automatically terminate at the end of such period unless specifically renewed upon the further written agreement of Fisher and Representative, but subject to cancellation at any time as provided in paragraph C below.

B.  In the event of termination of this Agreement, the Representative shall be entitled to receive commissions, pursuant to Section VI above, as follows:

   1.  Commissions accruing to Representative on all shipments made before the date of termination shall be paid subject to the provisions of this Agreement.

2.  No Territorial Service Commission shall be paid to Representative on shipments of Products made after the date of termination.  A Purchasing Commission will be paid only on shipments made within 90 days after termination.  The Engineering Commission shall be paid only on shipments made within one (1) year after termination.

3.  of commissions becoming due and payable after date of termination will be held for one year after termination to protect the Fisher Companies from loss on returned or rejected Products unless Representative provides the Fisher Companies with a bond or guarantee in form and substance acceptable to Fisher.

4.  Representative will deliver to the Fisher Companies or otherwise dispose of per the Fisher Companies' instructions, all sales and pricing data, literature, engineering prints and reports, copies of requisitions and orders, customer correspondence and the like that pertain to the Products.  Any literature, catalogs, or other sales data that has been purchased from the Fisher Companies by Representative, and is still current, may be returned to the Fisher Companies, and the full invoice price less any transportation costs borne by the Fisher Companies will be refunded.

C.  Fisher shall also have the right without prejudice to any other rights it may have in law or by contract, to terminate this Agreement on behalf of the Fisher Companies, effective immediately upon notice to Representative, as a result of any of the following:

1.  The insolvency of Representative or any of its owners/operators, or the filing of a voluntary or involuntary petition in bankruptcy or for a reorganization arrangement under applicable laws by or against any of them or their property; or the making of an assignment for the benefit of any of their creditors; or the voluntary or involuntary dissolution of Representative.

2.  The untrue statement of a material fact, or omission to state a material fact necessary to make the statements contained therein not misleading, in any information or statement furnished by Representative to a Fisher Company in connection with Representative's appointment as a Fisher Representative or Representative's performance pursuant to this Agreement.

3.  Any breach by Representative of any of the provisions of this Agreement or any other contractual or legal obligations of Representative to a Fisher Company.

4.  The non-attainment by Representative of the goals or strategies established pursuant to Section II.L.

5. The death or incapacity, or removal or withdrawal from the management of Representative, of any owner or key manager, or the voluntary or involuntary transfer of any ownership interest in Representative.

6. Any act or omission of Representative or of any owner/operator which, in the sole opinion of Fisher, may damage or adversely affect or reflect upon Representative, a Fisher Company, the Products, or any performance pursuant to this Agreement.

D. Nothing contained herein shall be deemed to create any express or implied obligation on either party to renew or extend this Agreement or, if Representative is continued or renewed as a Fisher representative after the term hereof, to create any right to continue such relationship on the same terms and conditions contained herein. Each party, in its sole discretion, shall have the right to determine, for any reason whatsoever, not to renew, continue or extend this Agreement. In addition to the foregoing, it is recognized and accepted by Representative that it is Fisher's policy not to extend representative agreements to persons who are, or will be, or entities whose principal owner is or will be, during the term thereof, sixty (60) years of age, except in those instances where Fisher, in its sole discretion, deems it to be in the best interests of its business.

E. Neither party, by reason of the termination or non-renewal of this Agreement, shall be liable to the other for compensation, reimbursement or damages arising from any loss of anticipated sales or prospective profits or from any expenditures, investments, leases, property improvements or other matters related to the business or goodwill of the parties. Except as provided in Section VIII, there shall be no other payments of any kind or nature due to or made to Representative upon the cancellation or termination of this Agreement, notwithstanding any investment or expenditures incurred by Representative in order to facilitate the sale of Products hereunder.

## IX.    NON-ASSIGNMENT

Representative may not assign, transfer or delegate this Agreement or any of its rights or obligations under this Agreement without the prior written consent of Fisher, and any attempted assignment, transfer or delegation without such consent shall be deemed null and void and of no effect.

## X.    TRADEMARKS AND TRADE NAMES

A. Representative acknowledges the validity of the trademarks and trade names which designate and identify the Products and further acknowledges that Fisher or its subsidiaries or affiliates are the exclusive owners of such marks and names.

CONFIDENTIAL

B.   Representative agrees that it may only use those Product trademarks which identify the Products it is authorized to sell and then only to further the promotion and sale of the Products such trademarks identify.  Representative may only use such trademarks in their standard form and style as they appear upon the Products or as instructed in writing by Fisher.  No other letter(s), word(s), design(s), symbol(s), or other matter of any kind shall be superimposed upon, associated with or shown in such proximity to the trademarks so as to tend to alter or dilute them and Representative further agrees not to combine or associate any of such trademarks with any other trademark or trade name.  The generic or common name of the Product must always follow the trademark except in those instances when Representative uses the name "FISHER" when referring to a Fisher Company, in which event no generic or common name is required.

C.   In all advertisements, sales and promotional literature or other printed matter in which any of such trademarks appear, Representative must identify itself by its full name and address and state its relationship to the Fisher Company.  Every such trademark used or displayed by Representative must be identified as a trademark owned by the relevant Fisher Company in the manner prescribed by Fisher.

D.   On its letterheads, business cards, invoices, statements, etc., Representative or sales office may identify itself as the sales representative of the relevant Fisher Company or Companies.

E.   Representative agrees that it will never use any trademark or trade name of Fisher or its subsidiaries or affiliates or any simulation of such marks or names as a part of Representative's corporate or other trading name or designation of any kind.

F.   Upon expiration or termination of this Agreement, Representative shall promptly discontinue every use of such trademarks, trade names, corporate logos and identities, and any similar styles and any language stating or suggesting that Representative is a sales representative of any Fisher Company, as well as any word or term resembling such names, marks, logos, identities or styles which would be likely to cause confusion or deception.

## XI.   INDEMNITY

Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Representative from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product.  The

CONFIDENTIAL

Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses arising from the following:

A.    Any express warranty unauthorized by Fisher;

B.    Any distribution or sale of a Product for a purpose unauthorized by Fisher;

C.    Use of any instructions, labels, warnings or other product literature which have not been previously approved in writing by Fisher;

D.    Any failure by Representative to maintain any Product in merchantable condition;

E.    Demonstration, installation, servicing, modification or repair of any Product by Representative or any third party not in accordance with written warnings or instructions of Fisher, or

F.    Negligent acts or omissions by Representative.

## XII.    EXPENSES

All expenses incurred by Representative in carrying out this Agreement will be borne by Representative unless otherwise expressly provided herein.

## XIII.    GOVERNING LAW, ENTIRE AGREEMENT

The validity, interpretation and performance of this Agreement and any dispute connected herewith shall be governed and construed in accordance with the laws of the State of Missouri, U.S.A. This Agreement constitutes the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement. This Agreement cancels and supersedes all existing contracts and arrangements by and between Fisher, The Fisher Companies and the Representative for the representation of the Fisher Companies. Except as specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms and conditions of this Agreement shall be binding unless hereafter made in writing and signed by the party to be bound, and no modification shall be effected by the acknowledgment or acceptance of purchase order or

those set forth herein. No waiver by either Fisher, a Fisher Company or Representative with respect to any breach or default or of any right or remedy and no course of dealing, shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver be expressed in writing signed by the party to be bound. If any term or condition of this Agreement or the application thereof is judicially or otherwise determined to be invalid or unenforceable, the remainder of this Agreement and the application thereof shall not be affected and shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written by their respective authorized officials.

NORTHEAST CONTROLS, INC.
(Representative)

By _____

Title _____President_____

FISHER CONTROLS INTERNATIONAL, INC.

By _____

Title _____Area Vice President, Northeast_____

# EXHIBIT "B"

FROM WHITE AND WILLIAMS LLP

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| GREAT AMERICAN ASSURANCE COMPANY (formerly known as AGRICULTURAL INSURANCE COMPANY)as subrogee of PRAXAIR, INC., PARSONS CORPORATION and MOTIVA ENTERPRISES, LLC | : : : : : : | C.A. NO.<br><br>NON-ARBITRATION |
| Plaintiff, | : | |
| v. | : | |
| FISHER CONTROLS INTERNATIONAL, INC., NORTHEAST CONTROLS, INC., CONECTIV OPERATING SERVICES COMPANY, INC., TEXACO DEVELOPMENT CORP., and GARY DELGREGO | : : : : : | JURY TRIAL DEMANDED |
| Defendants. | : | |

## CIVIL ACTION COMPLAINT

1.    Great American Assurance Company ("Great American"), a stock insurance company, is authorized to transact business in Delaware and maintains offices at 580 Walnut Street, Cincinnati, Ohio.  Great American Assurance Company was formally known as Agricultural Insurance Company.

2.    Defendant Fisher Controls International, Inc. ("Fisher") is a Delaware Corporation that maintains its principal offices at 205 South Center Street, Marshalltown, Iowa 50158.  Fisher manufactures control valves utilized in oxygen systems which it distributes internationally.

DMS# 1296094 v2

**EXHIBIT**

B

FCI/SJ 001

FROM WHITE AND WILLIAMS LLP          (FRI) 5. 17' 02 15:36/    ⁄5:30⁄NO. 4260550115 P  4

3.    Defendant  Northeast  Controls  ("Northeast")  is  a distributor of Fisher Valves.   Northeast maintains its executive offices at 3 Enterprise Avenue, Clifton Park, New York and a branch office at 8000 North Bailey Avenue, Suite 2B, Amherst, New York. At all times relevant hereto, Northeast conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

4.    Defendant  Conectiv  Operating  Service  Company, Inc.("Conectiv") is a Delaware corporation with its principal offices located at 800 King Street, Wilmington, Delaware.   The corporation's registered agent is Conectiv Resource Partners, Inc., 800 King Street, Wilmington, Delaware.

5.    Defendant  Texaco  Development  Corp.  is  a  Delaware corporation that maintains offices at 2000 West Chester Avenue, White Plains, New York.   The corporation's registered agent is Prentice Hall, 2711 Centerville Road, Suite 400, Wilmington, Delaware.

6.    Defendant Gary Delgrego is an adult individual who currently maintains a residence at 13027 Fox Brush Lane, Houston, Texas and a post office box at P.O. Box 279, Delaware City, Delaware. At all times relevant hereto, Gary Delgrego conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

Doc# 1296094 v2

FROM WHITE AND WILLIAMS  LLP          (FRI) 5. 17' 02 15:36/  5:30/NO. 4260650115 P  5

7.   Plaintiff  Great  American  issued  a  builder's  risk
insurance  policy  to  Parsons  Corporation  and  related  companies
("Parsons").  The policy provided certain protection to Parsons,
and others, for defined losses during the Delaware City, Delaware
repowering project.

8.   The  Great  American  policy  provided  for  subrogation
rights.  If the company paid a covered loss to an insured party
that was caused by the actions of a third-party, the company would
become subrogated to the insured's claims against that third-party
to the extent of the claim payments.

9.   Parsons was retained to perform work for the repowering
project at the Delaware City, Delaware refinery.

10.  Parsons entered into an agreement with Praxair, Inc. to
supply, erect, and test a 2500 STPD air separation unit for the
repowering project.  The work included, among other things, the
installation of a valve intended to block and/or control the flow
of oxygen to gasifiers.

11.  Praxair, Inc. purchased from Fisher and/or Northeast a
BLOC control valve, tag number 83HV0629.  The purpose of the valve
was to block and/or control the flow of oxygen to the gasifier.

12.  Valve specifications indicated that the 83HV0629 valve
would be utilized for oxygen service.  The specifications required,
among other things, Fisher and/or Northeast to utilize Monel for
the  disc  material,  seat  material,  guide  material,  and  stem

Doc# 1296084 v2

FROM WHITE AND WILLIAMS LLP             (FRI) 5. 17'02 15:36/St  5:30/NO. 4260650115 P  6

material.

13.  Fisher and/or Northeast knew or reasonably should have known, regardless of the purchase order's terms, that Praxair, Inc. would utilize the valve for high pressure oxygen service.

14.  Fisher and/or Northeast designed, manufactured, and sold to Praxair the 83HV029 BLOC control valve.  The company shipped the valve to the Delaware City project.

15.  The Fisher valve was installed in conjunction with the air separation unit equipment.

16.  Conectiv operated, maintained, and managed the Delaware City plant.

17.  Texaco Development Corp representatives, including Gary Delgreco, assisted in plant operations.

18.  Conective and Texaco Development Corp. representatives, including Gary Delgrego, began and oversaw the initial opening of the BLOC control valve on or about May 20, 2000.

19.  A control room operator attempted to open the BLOC control valve which did not respond.

20.  Conectiv employee Ron Olson was sent to the valve to assist with the opening process. While at the valve, an explosion and fire occurred causing significant losses.

21.  Praxair, Inc., Parsons, and MOTIVA Enterprises LLP submitted claims to Great American. Great American made certain loss payments in response to those claims.  The company may make

Doc# 1296004 v3

FROM WHITE AND WILLIAMS LLP        (FRI) 5. 17' 02 15:37/ST  J:30/NO. 4260650115 P  7

additional payments in the future.  Great American is subrogated to Praxair, Inc.'s, Parsons', and MOTIVA Enterprises LLP's rights and claims against the defendants to the extent of its payments.

COUNT I

PLAINTIFF V. FISHER AND NORTHEAST (Negligence)

22.  Plaintiff incorporates the allegations contained in paragraphs one through twenty-one as if set forth at length.

23.  Fisher and Northeast were negligent.  The negligent acts include, but are not necessarily limited to, the following:

    a.  Failing to design, manufacture, assemble, and distribute a BLOC control valve compatible with and appropriate for high pressure oxygen service;

    b.  Failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment;

    c.  Failing to investigate, for safety, the materials utilized during the design, assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment;

    d.  Failing to provide a valve that complied with the specifications that required use of Monel;

    e.  Failing to advise of any deficiencies in the valve that would make the product unsafe or unfit for use in a high pressure oxygen environment;

    f.  Failing to use due care under the circumstances.

24.  Fisher's and Northeast's breach of duty was a direct and

Doc# 1296094 v2

FROM WHITE AND WILLIAMS LLP    (FRI) 5.17'02 15:37/ST. 15:30/NO. 4260650115 P  8

proximate cause of the failure, fire, and resulting damage.

WHEREFORE, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

### COUNT II

### PLAINTIFF V. FISHER AND NORTHEAST (Warranty)

25. Plaintiff incorporates the allegations contained in paragraphs one through twenty-four as if set forth at length.

26. Fisher and Northeast expressly and/or impliedly warranted that the BLOC control valve that they designed, manufactured, assembled, and distributed contained materials suitable for and safe in a high pressure oxygen environment.

27. Fisher and Northeast expressly and/or impliedly warranted that the BLOC control valve utilized Monel as required in the valve specifications.

28. The parties relied on Fisher's and Northeast's skill, knowledge, and expertise in providing a BLOC control valve suitable for use in a high pressure oxygen environment.

29. Fisher and Northeast breached the expressed and implied warranties issued in conjunction with the sale of the BLOC control valve.

30. Fisher's and Northeast's breach of the expressed and/or implied warranties was a direct and proximate cause of the May 20, 2000 failure, fire, and resulting damage.

Docr 1296094 v2

WHEREFORE, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

### COUNT III

### PLAINTIFF v. NORTHEAST (Contract)

31. Plaintiff incorporates the allegations contained in paragraphs one through thirty as if set forth at length.

32. Praxair entered into a contract with Northeast to purchase a valve made in accordance with certain written specifications and that would be suitable for use in a high pressure oxygen environment.

33. Northeast breached the contract entered into with Praxair by supplying a valve that did not conform to the specifications and was not suitable for use in a high pressure oxygen environment.

34. Northeast's breach of the Praxair contract was a direct and proximate cause of the failure, fire, and resulting damage.

WHEREFORE, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

### COUNT IV

### PLAINTIFF v. CONECTIV, TEXACO DEVELOPMENT CORP., and GARY DELGREGO (Negligence)

35. Plaintiff incorporates the allegations contained in paragraphs one through thirty-four as if set forth at length.

Doc# 1296094 v2

FROM WHITE AND WILLIAMS LLP                    (FRI) 5. 17'02 15:37/ST. 5:30/NO. 4260650115 P 10

36. Conectiv, Texaco Development Corp., and Gary Delgrego were negligent. The negligent acts committed by the corporate defendants' agents, servants, and/or employees, along with Gary Delgrego individually, include, but are not necessarily limited to, the following:

a.  Failing to properly train operators on proper start-up and operation procedures;

b.  Failing to make sure that proper and adequate start-up procedures were in place prior to opening the BLOC control valve;

c.  Failing to immediately stop the start-up activity at the initial suggestion of a potential problem;

d.  Failing to terminate valve opening procedures prior to sending Ron Olsen to the site to investigate;

e.  Failing to use due care under the circumstances.

37. Conectiv's, Texaco Development Corps.' and Gary Delgrego's negligence were a direct and proximate cause of the May 20, 2000 failure, fire, and resulting damage.

WHEREFORE, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

Doc# 1296094 v2

Respectfully submitted,

WHITE AND WILLIAMS LLP


BY:    _____
       JOHN BALAGUER, ESQUIRE
       824 North Market Street
       Suite 902
       P.O. Box 902
       Wilmington, DE 19899-C709
       Attorney for Plaintiffs


       Of Counsel:

       Christopher Konzelmann, Esquire
       White and Williams LLP
       1800 One Liberty Place
       Philadelphia, PA 19103-7395

Doc# 1296094 v2