## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, INC.   :  CIVIL ACTION – LAW
   and         :
ST. PAUL MERCURY INSURANCE COMPANY :
             :
             :
    v.        :
             :
             :
FISHER CONTROLS INTERNATIONAL, LLC :  NO. 1:06-CV-00412 (SLR)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND COMPLAINT

   Northeast Controls, Inc., and St. Paul Mercury Insurance Company, by and through their

attorneys, Marshall, Dennehey, Warner, Coleman & Goggin, hereby submit the instant

Memorandum of Law in support of their Motion to Amend the Complaint in Civil Action against

defendant, Fisher Controls International, LLC, and in support thereof allege the following:

## I. NATURE AND STAGE OF PROCEEDINGS

   This action is a contractual indemnification claim for defense and indemnity arising from

the defense and settlement of the following actions: one brought by Great American Assurance

Company as subrogee of Praxair, Inc. ("Praxair"), Parsons Corporation and Motiva Enterprises,

LLC ("Motiva") at Civil Action No. 02C-05-168 ("Great American Complaint") and the other

brought by Ronald W. Olson and Carol Olson, Civil Action No. 02C-04-263 ("Olson

Complaint") in the Superior Court of the State of Delaware in and for New Castle County against

Northeast Controls, Inc. and others. The Great American Complaint was consolidated with two

other property damage suits filed separately by Motiva and Praxair.  These two underlying

actions set forth claims that a valve manufactured by Fisher Controls International, LLC

("Fisher") was defective.

The instant Motion is being filed in accordance with the deadline set by this Court in its October 18, 2006 Order.

## II.   <u>SUMMARY OF ARGUMENT</u>

There is evidence, in the form of a letter from an agent of defendant Fisher, which is directly relevant to Plaintiffs' claims for defense and indemnity.  Specifically, this letter sets forth a promise that Fisher will defend, indemnify and hold harmless Northeast in the event that any claim arising from actual or alleged defects in the valve.  Accordingly, in order to clarify the record in this action, Plaintiffs seek to amend the Complaint to include averments relating to this letter.  This Motion to Amend is timely, and no prejudice will be created as a result of the proposed amendment.

## III.   <u>STATEMENT OF FACTS</u>

On or about January 1, 1998, Northeast and Fisher renewed and entered into a Representative Agreement which outlined the sales representative relationship between Northeast and Fisher. A true and correct copy of the Representative Agreement is attached hereto as Exhibit "A" and incorporated herein as if set forth in full.

The Representative Agreement contained an Indemnity Clause in Section XI, which provides the following:

> Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at its own expense, **protect, defend, indemnify and hold harmless** Representative (Northeast) from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses … which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, **resulting or claimed to result from any actual or alleged defect in any Product**. The obligations set forth in the immediately preceding sentence shall not apply unless Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and

thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any losses **arising from** the following:

      A.    Any express warranty unauthorized by Fisher;

      B.    Any distribution or sale of a Product for a purpose unauthorized by Fisher;

      C.    Use of any instructions, labels, warnings or other product literature which have not been previously approved in writing by Fisher;

      D.    Any failure of Representative to maintain any Product in merchantable condition;

      E.    Demonstration, installation, servicing, modification or repair of any Product by    Representative or any third party not in accordance with written warnings or instructions  of Fisher, or

      F.    Negligent acts or omissions by Representative.

(emphasis added). *See* Exhibit "A."

The January 1, 1998 Representative Agreement was in effect for a period of one (1) year and was renewed thereafter.

Pursuant to a Worldwide Procurement Agreement dated January 1, 1995 between Praxair and Fisher, Northeast was identified as the sales representative for Praxair's purchases of control valves from Fisher.  In accordance with the Worldwide Procurement Agreement, Praxair contacted Northeast regarding the purchase of control valves for a re-powering project at the Delaware City Power Plant in 1997.  As part of the purchases for the project, on or about June 24, 1998, Northeast placed a purchase order for a control valve (hereinafter "valve") with Fisher on behalf of Praxair.  Fisher sent an order acknowledgement form for the valve to Praxair on or about July 21, 1998, and thereafter, manufactured the valve (tag no. 83HVO629).  Fisher

invoiced Praxair for the valve on or about October 23, 1998 and the valve was shipped to and accepted by Praxair on or about December 3, 1998.  Thus, the January 1, 1998 Representative Agreement was validly in place on the dates that the valve in question was ordered, manufactured, sold and shipped to Praxair.  Thereafter, the valve was installed at the power plant located at River Road, Route 9, Delaware City, Delaware 19076 (hereinafter the "Plant") as part of a re-powering project.  The valve was installed to control the flow of oxygen from a base load oxygen compressor ("BLOC") in an air separation unit ("ASU") to a gassifier.

On or about May 20, 2000, there was a fire at the Plant during re-powering of the ASU. As a result of the fire, Ronald W. Olson allegedly sustained personal injuries.  As a result of the fire, Praxair, Parsons Corporation ("Parsons") and Motiva allegedly sustained property damage.

Great American Assurance Company ("Great American"), which insured Parsons and others, paid claims made by Praxair, Parsons and Motiva as a result of the fire.  Thereafter, on or about May 2002, Great American filed suit as subrogee of Praxair, Parsons and Motiva against Northeast and others in the Superior Court of the State of Delaware in and for New Castle County. A true and correct copy of the Great American Complaint is attached hereto as Exhibit "B."

The Great American Complaint alleged in part that Fisher and Northeast were negligent and that their negligence included:

> **(a)    failing to design, manufacture, assemble and distribute a BLOC control      valve compatible with and appropriate for high pressure oxygen service;**
>
> **(b)    failing to utilize materials in the design and assembly process that were safe      for use in a high pressure oxygen environment;**
>
> **...**

      **(e)     failing to advise of any deficiencies in the valve that would make the product    unsafe or unfit for use in a high pressure oxygen environment;**

      **...**

*See* ¶23 of Exhibit B. (Emphasis added).

      Great American's allegations in ¶ 23 of its Complaint were that Fisher's BLOC control valve was defective in its design, manufacture and assembly.  Great American alleged that the defects, among other things, caused the fire and resulting damage. *See* ¶24 of Exhibit B.

      On or about April 2002, Ronald W. Olson and Carol Olson filed suit against Northeast and others in the Superior Court of the State of Delaware in and for New Castle County. A true and correct copy of the Olsons' First Amended Complaint dated May 20, 2002 is attached hereto as Exhibit "C."  The Olsons' First Amended Complaint alleged that the valve at issue was defective at the time of sale and that the injuries sustained by the plaintiff were caused by the defective valve. *See* Count IX, ¶43 in Exhibit C.

      Fisher had the duty under the Representative Agreement to both defend and indemnify Northeast on the Great American and Olson Complaints, both of which claimed damages due to alleged defects in the Fisher valve.  By letter dated July 3, 2002, Northeast made a demand for defense and indemnification to Fisher based upon the Representative Agreement. A true and correct copy of the demand letter is attached hereto as Exhibit "D."  Northeast made similar requests on two previous occasions. *See* attached letters dated September 25, 2000 and October 4, 2000 made a part hereof cumulatively as Exhibit "E." Fisher admitted its responsibility for defending and indemnifying Northeast on claims of a product defect.  See Fisher's letter of September 13, 2002, a true and correct copy of which is attached hereto as Exhibit "F"  The original Complaint in the instant matter contained averments relating to these demands for defense and indemnification and Fisher's September 13, 2002 response.

In addition, Northeast also demanded defense and indemnification from Fisher prior to the filing of the Great American and Olson Complaints. Fisher, through Matthew W. Geekie, responded to Northeast in a letter dated October 29, 2001. Mr. Geekie was authorized to speak for Fisher. A true and correct copy of Mr. Geekie's letter is attached hereto as Exhibit "G". Fisher's response as set forth in Mr. Geekie's letter was as follows:

> I am in receipt of your letter dated March 30, 2001 to Mr. Robert Walker, Area Vice President for Fisher Controls International, Inc. Please consider this letter responsive to yours.

> Pursuant to the Representative Agreement between Northeast Controls, Inc. ("Northeast") and Fisher Controls International, Inc. ("Fisher"), made the first day of January, 2000 (the "Agreement"), Northeast acted as one of Fisher's sales representatives in May 2000. In accordance with the Agreement, Northeast provided certain services in support of the sale of Products (as defined in the Agreement) to Praxair, Inc., ("Praxair"). As you are aware, on or about May 20, 2000 an explosion and fire occurred at the Motiva facility in Delaware City, Delaware (the "Praxair Incident"). The Praxair Incident entailed damage to property as well as injury to an individual, (the "Losses").

> Subsequent to the Praxair Incident several parties, including, but not limited to, Fisher, Northeast, Praxair, and Motiva, Inc., have, to varying degrees, participated in an investigation of the Praxair Incident (the "Third Party Investigation"). Fisher understands that this Third Party Investigation is focusing on the area of a Fisher butterfly valve as well as upstream and downstream of its location. The Third Party Investigation has yet to arrive at any conclusions, let alone allegations, as to the cause of the Praxair Incident. More particularly, this investigation has not resulted in any allegations or claims that the Losses arose out of any actual or alleged defect in the butterfly valve or for that matter, any Product.

> In light of the fact that no conclusions have been reached and no allegations of Product defect have been made, we believe that your request that Fisher agree to defend, indemnify and hold harmless Northeast is premature. Accordingly, at this time Fisher declines to accept the tender of Northeast's defense. *If, at some point in the future there is an assertion that there was an actual or alleged*

> *defect in the butterfly valve that gave rise to the Losses, then*
> *Fisher will honor its obligations under the Agreement and will*
> *protect, defend, indemnify and hold harmless Northeast in*
> *accordance with the Agreement.* Pursuant to the Agreement,
> however, Fisher will not protect, indemnify, defend and hold
> harmless Northeast from its own negligent acts or omissions. The
> conclusions and the allegations that may be made will ultimately
> determine the extent, if at all, to which Fisher agrees to protect,
> defend, indemnify and hold harmless Northeast and the extent to
> which Fisher will need to reserve its rights while doing so should
> evidence develop suggesting that the losses resulted from negligent
> acts or omissions of Northeast.

> If you have any questions about any of the issues set forth above,
> please do not hesitate to contact me.

Exhibit G (emphasis added).

Mr. Geekie's letter was not included in the original Complaint in this matter. Fisher has

provided more than one response to the tender demand. As argued below, Plaintiffs submit that

amendment of the Complaint should be allowed in order to clarify the record.

## IV. ARGUMENT

### A. Standard of Review.

In relevant part, under Rule 15(a) of the Federal Rules of Civil Procedure, a party may

amend a pleading by leave of court, "and leave shall be freely given when justice so requires." F.

R. Civ. P. 15(a). Furthermore, although the grant or denial of leave to amend is generally within

the sound discretion of the court, "'outright refusal to grant the leave without any justifying

reason appearing for the denial is not an exercise of that discretion; it is merely an abuse of that

discretion and inconsistent with the spirit of the Federal Rules.'" In re Burlington Coat Factory

Securities Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (*quoting* Foman v. Davis, 371 U.S. 178,

182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)). *See also* CCPI Inc. v. American Premier, Inc., 967

F. Supp. 813, 815 (D. Del. 1997) ("The Supreme Court of the United States has cautioned the

lower federal courts to heed the liberal policy of amendment embodied in Rule 15(a).") (*citing* <u>Foman</u>, 371 U.S. at 181-82). "[L]eave to amend should be granted absent 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" <u>CCPI</u>, 967 F. Supp. at 815 (*quoting* <u>Foman</u>, 371 U.S. at 182).

        The proposed Amended Complaint merely clarifies the record in this case by averring additional facts which arise from the same transaction at issue in the original Complaint, *i.e.,* defendant Fisher's refusal to assume the defense of Northeast in the underlying actions. Further, no prejudice would be experienced by Fisher as a result of the amendment. Accordingly, the Court should allow the proposed amendment to the Complaint.

        **B.**    **Amendment of the Complaint Should Be Allowed, as This Motion Is Timely, and No Prejudice Will Be Created By the Amendment.**

        As an initial matter, it is clear that this Motion to Amend is being filed within the statute of limitations and the deadline set by the Court in its October 18, 2006 Order. Thus, no undue delay, bad faith, or dilatory motive can be imputed to Plaintiffs from their moving to amend the Complaint.

        Furthermore, it is clear that Fisher will experience no prejudice as a result of the proposed amendment of the Complaint. Discovery is not scheduled to end until October 19, 2007. *See* October 18, 2006 Order, at ¶ 2(b). Fisher thus has ample time in which it could take discovery, if justified, relating to the issues raised by Mr. Geekie's letter. *See* <u>Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.</u>, 295 F. Supp. 2d 430, 433 (D. Del. 2003) (because party opposing amendment of counterclaim had "more than two months of discovery remaining" when

motion to amend was filed, the opposing party was not unduly prejudiced, even " regardless of the possible need to call an additional expert witness.").

## V.    CONCLUSION

Mr. Geekie's letter relates directly to the transaction giving rise to Plaintiffs' claims for defense and indemnity from Fisher.  Furthermore, the instant Motion to Amend is timely and will create no prejudice, as Fisher would have ample opportunity to conduct relevant discovery where permissible.  In sum, the proposed addition of averments relating to Mr. Geekie's letter merely clarifies, without prejudice, the pertinent factual record in this litigation.  In light of the liberal standard allowing amendment of pleadings, as set forth in Rule 15 and the above-cited cases, the proposed amendment of the Complaint should be allowed.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN


_/s/ Thomas P. Wagner_____

BY:    THOMAS P. WAGNER, ESQUIRE
(Admitted Pro Hac Vice)
1845 Walnut Street
Philadelphia, PA  19103
Telephone No. (215) 575-4562
Attorneys for Plaintiffs


MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN


BY:    _/s/ Lorenza A. Wolhar_____
LORENZA A. WOLHAR, ESQ.
DE ID #3971
1220 N. Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899-8888
Attorneys for Plaintiffs


Date: March 12, 2007

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NORTHEAST CONTROLS, INC. | : | CIVIL ACTION – LAW |
| and | : | |
| ST. PAUL MERCURY INSURANCE COMPANY | : | |
| | : | |
| v. | : | |
| | : | |
| FISHER CONTROLS INTERNATIONAL, LLC | : | NO. 1:06-CV-00412 (SLR) |

**CERTIFICATE OF SERVICE**

       I hereby certify that on March 12, 2007, I electronically filed the Memorandum of Law in Support of Motion to Amend Complaint of Plaintiffs, Northeast Controls, Inc., and St. Paul Mercury Insurance Company, with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

       **Paul A. Bradley, Esquire**
       **Maron, Marvel, Bradley & Anderson, P.A.**
       **1201 North Market Street, Suite 900**
       **P.O. Box 288**
       **Wilmington, DE  19899-0288**

       I hereby certify that on March 12, 2007, we have mailed by United States Postal Service, the Memorandum of Law in Support of Motion to Amend Complaint of Plaintiffs, Northeast Controls, Inc., and St. Paul Mercury Insurance Company, to the following non-registered participant:

       **Daniel J. Gunter**
       **Patrick D. McVey**
       **Riddell Williams P.S.**
       **1001 Fourth Avenue Plaza**
       **Ste. 4500**
       **Seattle, Washington 98454**

                                    **MARSHALL, DENNEHEY, WARNER,**
                                       **COLEMAN & GOGGIN**

                    **BY:**  _/s/ Lorenza A. Wolhar_
                            **LORENZA A. WOLHAR, ESQ.**
                            **DE ID #3971**
                            **1220 N. Market Street, 5th Floor**
                            **P.O. Box 8888**
                            **Wilmington, DE 19899-8888**
                            **Attorney for Plaintiffs**

EXHIBIT "A"

ADDENDUM
TO
AGREEMENT
BETWEEN
FISHER CONTROLS INTERNATIONAL, INC.
AND
NORTHEAST CONTROLS, INC.

January 1, 1998

The subject agreement is hereby modified to include the following paragraph in
Appendix G, Exhibit F, Section 4:

(h)    While ISI may provide any terms and conditions it desires to End-Use
Customers, ISI expressly agrees to conduct its sales to End-Use Customers such
that the liability of Company and Fisher-Rosemount Systems, Inc. under ISI's
sales to End-Use Customers is limited as set forth in Exhibit D; and ISI agrees
that the liability of Company and Fisher-Rosemount Systems, Inc. is absolutely
limited as set forth in Exhibit D.  To the extent that ISI has not limited the liability
of Company and Fisher-Rosemount Systems, Inc. as required by this Section 4
(h), ISI agrees that it shall, at its own expense, protect, defend, indemnify and
hold harmless Company and Fisher-Rosemount Systems, Inc. from and against
all claims, actions, losses, damages, liabilities, costs and expenses which may
arise out of or be made in connection therewith.


Acknowledged and agreed:

NORTHEAST CONTROLS, INC.


By _____
Title:  President


CONFIDENTIAL

## REPRESENTATIVE AGREEMENT

THIS AGREEMENT, made this 1st day of January, 1998, by and between FISHER CONTROLS INTERNATIONAL, INC. having its principal offices at 8000 Maryland Avenue, Clayton, Missouri 63105 (hereinafter called "Fisher"), and NORTHEAST CONTROLS, INC., ~~Sitterly Road~~ Clifton Park, NY 12065 (hereinafter called "Representative").    *3 Bodentschen Drive* MW 2/11/1

WHEREAS, Fisher desires to appoint on its own behalf and has been duly authorized by the other companies identified in Appendix A hereto (each such company, including Fisher, is hereinafter referred to individually as a "Fisher Company" and collectively as the "Fisher Companies") to appoint Representative as a sales, engineering and service representative for Products of the Fisher Companies upon the following terms and conditions; and

WHEREAS, Representative represents that it is qualified to act as such a representative for the Fisher Companies in the Territory defined in Section I below pursuant to such terms and conditions;

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

I.     APPOINTMENT AND TERRITORY

Fisher hereby appoints Representative during the term of this Agreement, and Representative hereby accepts such appointment, as a sales, engineering and service representative for the Fisher Companies and for their designated products and related services as further described herein (said products and related services hereinafter referred to as "Products") in the territorial area specified in Appendix C hereto (hereinafter referred to as the "Territory").

It is understood that the Products included in this Agreement are those manufactured or supplied by the Fisher Companies specified in Appendix A unless otherwise excluded by such Appendix. The Fisher Companies shall also have the right, at any time, to amend or modify any Appendix to this Agreement upon written notice to Representative. This Agreement does not include representation for other subsidiaries or affiliated companies of the Fisher Companies or their products or services unless specifically listed in Appendix A.

CONFIDENTIAL

## II.    OBLIGATIONS OF REPRESENTATIVE

**CONFIDENTIAL**

Representative shall:

A.  Use its best efforts to fully promote, and pursue all reasonable opportunities in the solicitation of orders for, the Products in the Territory at such prices, license fees, and upon such terms and conditions as may be from time to time specified by the Fisher Company for whom orders are solicited.  All such orders shall be promptly transmitted to the Fisher Company on whose behalf the orders were solicited and shall be subject to the written approval and acceptance of such Fisher Company.  In no event shall Representative accept any order or otherwise attempt to bind any Fisher Company in any transaction unless specifically authorized by the appropriate Fisher Company.  All remittances by the customer to whom Products are sold or licensed shall be made directly by the customer to the relevant Fisher Company.

B.  Except to the extent limited by, and subject to the terms of, Section VII and Appendix D hereof, furnish engineering services, consistent with Fisher's standards and practices, to customers and potential customers, including without limitation, reviewing and evaluating the requirements for the Products and participating in the selection and designation of the proper Products and specifications therefor.

C.  Except to the extent limited by, and subject to the terms of, Section VII and Appendix D hereof, furnish proper technical services to all users of the Products located or installed in the Territory, including without limitation, assistance in connection with the start-up, check out and calibration of Products, the diagnosis of user inquiries concerning Products and the servicing of deficiencies in, and the performance of warranty obligations on, the Products in the manner specified from time to time by the Fisher Companies.

D.  Maintain in the Territory suitable premises, equipment and current technical and promotional literature for the Products, and employ sufficient and suitably qualified and trained technical, engineering and other competent personnel necessary to carry out the duties of Representative under this Agreement to the satisfaction of the Fisher Companies.  Representative and its personnel shall maintain a working knowledge and familiarity with the Products, including associated services, and attend training sessions as appropriate to maintain such knowledge and familiarity.

E.  Keep the appropriate Fisher Companies fully informed of commercial and market conditions within the Territory and of the activities of customers and competitors, and regularly cover the trade and industry for the purposes of furthering sales of the Products.

F.  Provide the Fisher Companies periodically, as requested, with sales forecasts for the Products and customer evaluations.

G.  Assist, when requested, the Fisher Companies in obtaining relevant information relating to the financial standing and reputation of customers in order to evaluate credit risks.

H.  Maintain records in such form and in such detail as the Fisher Companies may reasonably request from time to time with respect to customers; outstanding quotations and orders; engineering and technical services and related activities, including plans

CONFIDENTIAL

drawings and other documents; and any other business matters relating to the Products; and promptly transmit such records to the relevant Fisher Company upon request.

I.    Not incur any liability on behalf of the Fisher Companies, or in any way pledge or purport to pledge the Fisher Companies' credit, or describe or hold itself out as an agent or employee of the Fisher Companies, or describe itself other than as a sales representative of the Fisher Companies for the performance of functions specified in, and pursuant to, this Agreement; or make any warranties or representations of any kind with respect to the Fisher Companies, the Products, or any other products of the Fisher Companies, other than to present to the prospective customer the specifications and description of the Products in the identical terms as supplied by the Fisher Company to Representative.

J.    Not, without Fisher's prior written consent, which shall not be unreasonably withheld, sell or distribute any products which are competitive with the Products.

K.    Not advertise or distribute any printed matter referring to the Products or to the Fisher Companies without the specific prior approval in writing of the relevant Fisher Company with regard to the form, manner, and content of such advertising and printed matter.  All advertising by Representative shall be without recourse to any Fisher Company for any expense incurred unless such expense shall have been specifically authorized in writing by the relevant Fisher Company.

L.    Confer with, and establish to the satisfaction of, the appropriate Fisher Companies, goals and strategies for representation during the year covering such matters as orders by Product line and Representative's management structure, staffing and territorial coverage.  Appropriate adjustments may be made during the term of this Agreement in the goals and strategies to take into account material events and circumstances affecting the representation, such as positive or negative changes in external business and economic conditions or the introduction by the Fisher Companies of additional products and programs.

M.    Abide by all laws and governmental rules and regulations applicable to Representative's and the Fisher Companies' activities hereunder.  The Representative shall not make any bribes, kickbacks, or payments to governmental officials to obtain business, or other illegal payments.

N.    In its capacity as a commission representative, follow sales strategy developed by the Fisher-Rosemount Industry Solutions Group on those projects which have been identified as appropriate for a total Fisher-Rosemount integrated approach through the Fisher-Rosemount Industry Solutions Group.  In such situations, Representative will not independently pursue a strategy for sale of the Products which is inconsistent with such Group strategy.

## III.  FISHER ASSISTANCE

The Fisher Companies shall support the activities of Representative with regard to its promotion of the Products, its solicitation of orders, and engineering and technical services. The Fisher Companies shall make available training and instruction for Representative and the Fisher Companies' customers with respect to the Products and shall make available to Representative technical data and literature covering the Products. Such training, instruction, technical data and literature will be provided at prices to be established from time to time by the Fisher Companies. The Fisher Companies shall advise Representative of their current price lists and discounts for their Products for purposes of soliciting orders hereunder.

The Fisher Companies reserve the right, in their absolute discretion, to decline to accept any order transmitted to them for acceptance by Representative or to decline to submit any tender on any inquiry transmitted to them by Representative.

## IV.  PURCHASE OF PRODUCTS FOR RESALE

In order to further its representative obligations hereunder, Representative agrees to purchase adequate quantities of Products, including spare parts, from the Fisher Companies for inventory purposes to meet the market demands and requirements of the Territory. Such Products will be sold to Representative at discounts from the then current published selling prices as established from time to time by the applicable Fisher Companies and under their standard terms and conditions of sale. Representative may extend the applicable Fisher Companies' warranties for such Products to its customer, provided such Products are not modified or are modified pursuant to and in accordance with the Fisher Companies' established procedures, but all other terms and conditions of resale, including price, are solely within the control and at the risk of Representative.

## V.  CONFIDENTIALITY PROVISIONS

As Representative may have heretofore received, and will in the future receive from time to time, confidential and proprietary information and data concerning the Products, research and engineering, developmental products and projects, business plans and operations of, or belonging to, the Fisher Companies and/or other companies with whom a Fisher Company has a business relationship (herein collectively referred to as "Fisher Information"), Representative agrees to treat, and to cause its officers and employees to treat, all such Fisher Information as the Fisher Companies' confidential property and not to divulge it to others at any time, or to use it for Representative's private purposes, or otherwise, except with the prior written authorization of the Fisher Company from which such Fisher Information originated and then only in the manner and to the extent authorized, unless or until such Fisher Information (a) becomes a part



Company. Representative's obligation hereunder further applies to Fisher Information received by Representative in the course of Representative's prior, if any, representative capacity with any Fisher Company and shall continue beyond and after the termination or expiration of this Agreement, and at the termination or expiration of this Agreement, or at any time a Fisher Company so requests, Representative shall deliver to the Fisher Company all notes, memoranda, records, drawings or other documents and other information or materials pertaining to the Fisher Information, including all copies and reproductions thereof. Representative further agrees to obtain similar written undertakings from each of its employees having access to the Fisher Information.

## VI.  COMMISSIONS

A.  Subject to the provisions of Appendix E, the exceptions stated below in this Section VI, and to fulfillment of the undertakings by Representative to the Fisher Companies, the Fisher Company whose Products are sold in the Territory shall pay to the participating representative(s) and/or offices maintained by Fisher or its subsidiaries (hereinafter referred to as "sales office(s)", in consideration for its services hereunder, a purchasing, a territorial service, and/or an engineering commission with respect to the sale of Products by such Fisher Company in the Territory.  The total available commission shall be computed on the basis of the F.O.B. Factory net price to the customer following discounts and allowances, if any, at the rates set forth in Appendix B hereto for the applicable Fisher Company.  Payments will be made promptly following receipt of payment from the customer by the relevant Fisher Company.  Commissions paid to Representative on any uncollectible account will be used as an offset against future commissions earned by, or invoiced to, Representative in accordance with its participation in the original commission payments.  Representative agrees that the Fisher Companies may debit Representative's commission account any overdue amount owed by Representative to the Fisher Companies.

B.  The commission on sales of Products involving the active participation of more than one representative or sales office will be assigned to or proportioned between or among the participating representatives and sales offices by the Fisher Companies on the following basis:

1.  All Sales (excluding sales of replacement parts or repairs having invoice value of under U.S.          ):

    a.  A *Purchasing Credit* of one-fourth (1/4) of the total available commission shall normally be given by the applicable Fisher Company to the representative or sales office in whose territory the order originates and shall be based upon the representative's or sales office's efforts in soliciting the order and assisting the customer and its purchasing function in connection therewith; in preparing the

NFC528

CONFIDENTIAL

obtaining the order and the manner of processing the order through the relevant. Fisher Company. The Fisher Companies shall have the discretion to make exceptions to the foregoing in unusual situations.

b.  A *Territorial Service Credit* of one-fourth (1/4) of the total available commission shall be given to the representative or sales office in whose territory the Product(s) is installed to cover the representative's service obligations.

c.  An *Engineering Credit* of one-half (1/2) of the total available commission will be given to the representative or sales office, or be retained, in whole or in part, by the applicable Fisher Company, based upon the engineering service provided to the customer. In determining the division of this credit, the Fisher Company will take into consideration the following aspects: (a) development of specifications to include Fisher Products; (b) detail engineering work with contractor or user, including quotations; (c) degree of insistence by ultimate user upon Fisher Products; (d) having contractor or user add the Fisher Companies to the list of acceptable bidders; and (e) the ratio of the engineering work carried out by Representative to the total engineering work required.

2.  Replacement Parts or Repair Orders:

a.  Where the invoice is under U.S. $ .   ), all available commissions will be paid to the representative or sales office in whose territory the purchase order originates.

b.  Where the invoice value is U.S. $1    or more, but less than U.S. $    , the available commission will be divided equally, and will be paid, respectively, to the representative or sales office in whose territory the purchase order originates and to the representative or sales office in whose territory the parts are installed.

c.  Where the invoice value is U.S. $    or more, the available commission will be divided in accordance with the provisions of Section VI-B-1, above; i.e., 1/4 Purchasing Credit, 1/4 Territorial Service Credit, and 1/2 Engineering Credit.

3.  The final allocation of the available commission credits shall be determined at the discretion of the Fisher Companies in unusual circumstances. Consideration will be given to the work done by the representatives, sales offices, and the Fisher Companies.

4.  Commissions paid under this Agreement on Products subsequently returned to Fisher shall be refunded in full by Representative, or at the Fisher Companies' discretion, may be charged back to Representative's commission account.

CONFIDENTIAL

C.  Unless specifically indicated in Appendix A hereto, it is agreed that Representative shall not be entitled to the applicable commission(s) on the following sales of Products, which sales are excluded from this Agreement:

1.  Sales to subsidiaries of Fisher (companies in which Fisher has a direct or indirect majority ownership interest) or sales to licensees of Fisher or to the licensees of its subsidiary companies.

2.  Sales in respect of which Representative has failed to perform in accordance with the provisions of this Agreement.

3.  Sales by Fisher Companies in the Territory resulting from orders not obtained by Representative if this Agreement provides in Section I that Representative is a non-exclusive representative for the sale of such Products.

D.  If a Fisher Company shall refuse to accept or execute any order as provided in this Agreement, the Representative shall not be entitled to any commission or other remuneration in respect thereof.

## VII.  CERTIFICATION AND SUPPORT FEES PAYABLE BY REPRESENTATIVE

Representative agrees to pay support fees and certification fees to the Fisher Company specified in Appendix D hereto in accordance with the terms of Appendix D. Certification fees, if any, shall be paid by the Representative no later than March 1. Support fees, if any, shall be paid within 30 days of the end of each calendar quarter during the term of this Agreement with respect to receipts by Representative of qualifying payments from the customer in such quarter. Representative agrees that the Fisher Companies may debit the Representative's account any overdue amount owed by the Representative to the Fisher Companies pursuant to this Section VII and to Appendix D.

## VIII.  TERM

A.  This Agreement shall be effective for a period of one (1) year from the date set forth in the opening paragraph of this Agreement and will automatically terminate at the end of such period unless specifically renewed upon the further written agreement of Fisher and Representative, but subject to cancellation at any time as provided in paragraph C below.

B.  In the event of termination of this Agreement, the Representative shall be entitled to receive commissions, pursuant to Section VI above, as follows:

1.  Commissions accruing to Representative on all shipments made before the date of termination shall be paid subject to the provisions of this Agreement.

2.  No Territorial Service Commission shall be paid to Representative on shipments of Products made after the date of termination. A Purchasing Commission will be paid only on shipments made within 90 days after termination. The Engineering Commission shall be paid only on shipments made within one (1) year after termination.

3.  ⁣ of commissions becoming due and payable after date of termination will be held for one year after termination to protect the Fisher Companies from loss on returned or rejected Products unless Representative provides the Fisher Companies with a bond or guarantee in form and substance acceptable to Fisher.

4.  Representative will deliver to the Fisher Companies or otherwise dispose of per the Fisher Companies' instructions, all sales and pricing data, literature, engineering prints and reports, copies of requisitions and orders, customer correspondence and the like that pertain to the Products. Any literature, catalogs, or other sales data that has been purchased from the Fisher Companies by Representative, and is still current, may be returned to the Fisher Companies, and the full invoice price less any transportation costs borne by the Fisher Companies will be refunded.

C.  Fisher shall also have the right without prejudice to any other rights it may have in law or by contract, to terminate this Agreement on behalf of the Fisher Companies, effective immediately upon notice to Representative, as a result of any of the following:

1.  The insolvency of Representative or any of its owners/operators, or the filing of a voluntary or involuntary petition in bankruptcy or for a reorganization arrangement under applicable laws by or against any of them or their property; or the making of an assignment for the benefit of any of their creditors; or the voluntary or involuntary dissolution of Representative.

2.  The untrue statement of a material fact, or omission to state a material fact necessary to make the statements contained therein not misleading, in any information or statement furnished by Representative to a Fisher Company in connection with Representative's appointment as a Fisher Representative or Representative's performance pursuant to this Agreement.

3.  Any breach by Representative of any of the provisions of this Agreement or any other contractual or legal obligations of Representative to a Fisher Company.

4.  The non-attainment by Representative of the goals or strategies established pursuant to Section II.L.

5. The death or incapacity, or removal or withdrawal from the management of Representative, of any owner or key manager, or the voluntary or involuntary transfer of any ownership interest in Representative.

6. Any act or omission of Representative or of any owner/operator which, in the sole opinion of Fisher, may damage or adversely affect or reflect upon Representative, a Fisher Company, the Products, or any performance pursuant to this Agreement.

D. Nothing contained herein shall be deemed to create any express or implied obligation on either party to renew or extend this Agreement or, if Representative is continued or renewed as a Fisher representative after the term hereof, to create any right to continue such relationship on the same terms and conditions contained herein. Each party, in its sole discretion, shall have the right to determine, for any reason whatsoever, not to renew, continue or extend this Agreement. In addition to the foregoing, it is recognized and accepted by Representative that it is Fisher's policy not to extend representative agreements to persons who are, or will be, or entities whose principal owner is or will be, during the term thereof, sixty (60) years of age, except in those instances where Fisher, in its sole discretion, deems it to be in the best interests of its business.

E. Neither party, by reason of the termination or non-renewal of this Agreement, shall be liable to the other for compensation, reimbursement or damages arising from any loss of anticipated sales or prospective profits or from any expenditures, investments, leases, property improvements or other matters related to the business or goodwill of the parties. Except as provided in Section VIII, there shall be no other payments of any kind or nature due to or made to Representative upon the cancellation or termination of this Agreement, notwithstanding any investment or expenditures incurred by Representative in order to facilitate the sale of Products hereunder.

## IX.  NON-ASSIGNMENT

Representative may not assign, transfer or delegate this Agreement or any of its rights or obligations under this Agreement without the prior written consent of Fisher, and any attempted assignment, transfer or delegation without such consent shall be deemed null and void and of no effect.

## X.  TRADEMARKS AND TRADE NAMES

A. Representative acknowledges the validity of the trademarks and trade names which designate and identify the Products and further acknowledges that Fisher or its subsidiaries or affiliates are the exclusive owners of such marks and names.

CONFIDENTIAL

B.    Representative agrees that it may only use those Product trademarks which identify the Products it is authorized to sell and then only to further the promotion and sale of the Products such trademarks identify.  Representative may only use such trademarks in their standard form and style as they appear upon the Products or as instructed in writing by Fisher.  No other letter(s), word(s), design(s), symbol(s), or other matter of any kind shall be superimposed upon, associated with or shown in such proximity to the trademarks so as to tend to alter or dilute them and Representative further agrees not to combine or associate any of such trademarks with any other trademark or trade name.  The generic or common name of the Product must always follow the trademark except in those instances when Representative uses the name "FISHER" when referring to a Fisher Company, in which event no generic or common name is required.

C.    In all advertisements, sales and promotional literature or other printed matter in which any of such trademarks appear, Representative must identify itself by its full name and address and state its relationship to the Fisher Company.  Every such trademark used or displayed by Representative must be identified as a trademark owned by the relevant Fisher Company in the manner prescribed by Fisher.

D.    On its letterheads, business cards, invoices, statements, etc., Representative or sales office may identify itself as the sales representative of the relevant Fisher Company or Companies.

E.    Representative agrees that it will never use any trademark or trade name of Fisher or its subsidiaries or affiliates or any simulation of such marks or names as a part of Representative's corporate or other trading name or designation of any kind.

F.    Upon expiration or termination of this Agreement, Representative shall promptly discontinue every use of such trademarks, trade names, corporate logos and identities, and any similar styles and any language stating or suggesting that Representative is a sales representative of any Fisher Company, as well as any word or term resembling such names, marks, logos, identities or styles which would be likely to cause confusion or deception.

## XI.  INDEMNITY

Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Representative from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product.  The

CONFIDENTIAL

Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses arising from the following:

A.    Any express warranty unauthorized by Fisher;

B.    Any distribution or sale of a Product for a purpose unauthorized by Fisher;

C.    Use of any instructions, labels, warnings or other product literature which have not been previously approved in writing by Fisher;

D.    Any failure by Representative to maintain any Product in merchantable condition;

E.    Demonstration, installation, servicing, modification or repair of any Product by Representative or any third party not in accordance with written warnings or instructions of Fisher, or

F.    Negligent acts or omissions by Representative.

## XII.  EXPENSES

All expenses incurred by Representative in carrying out this Agreement will be borne by Representative unless otherwise expressly provided herein.

## XIII.  GOVERNING LAW, ENTIRE AGREEMENT

The validity, interpretation and performance of this Agreement and any dispute connected herewith shall be governed and construed in accordance with the laws of the State of Missouri, U.S.A. This Agreement constitutes the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement.  This Agreement cancels and supersedes all existing contracts and arrangements by and between Fisher, The Fisher Companies and the Representative for the representation of the Fisher Companies.  Except as specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms and conditions of this Agreement shall be binding unless hereafter made in writing and signed by the party to be bound, and no modification shall be effected by the acknowledgment or acceptance of purchase order or shipping instruction forms containing terms and conditions at variance with or in addition to

those set forth herein.  No waiver by either Fisher, a Fisher Company or Representative with respect to any breach or default or of any right or remedy and no course of dealing, shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver be expressed in writing signed by the party to be bound.  If any term or condition of this Agreement or the application thereof is judicially or otherwise determined to be invalid or unenforceable, the remainder of this Agreement and the application thereof shall not be affected and shall remain in full force and effect.


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written by their respective authorized officials.


NORTHEAST CONTROLS, INC.            FISHER CONTROLS INTERNATIONAL, INC.
(Representative)

By _____     By _____
Title _____President_____     Title ___Area Vice President, Northeast____

# EXHIBIT "B"

FROM WHITE AND WILLIAMS LLP          (FRI) 5.17'02 15:56. S⁷   /:30.'NO. 4260650115 P   B

P

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

435 '

| | | |
|---|---|---|
| GREAT AMERICAN ASSURANCE COMPANY | : | C.A. NO. |
| (formerly known as AGRICULTURAL | : | |
| INSURANCE COMPANY) as subrogee of | : | |
| PRAXAIR, INC., PARSONS CORPORATION | : | |
| and MOTIVA ENTERPRISES, LLC | : | NON-ARBITRATION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FISHER CONTROLS INTERNATIONAL, INC., | : | JURY TRIAL DEMANDED |
| NORTHEAST CONTROLS, INC., CONECTIV | : | |
| OPERATING SERVICES COMPANY, INC., | : | |
| TEXACO DEVELOPMENT CORP., and | : | |
| GARY DELGREGO | : | |
| | : | |
| Defendants. | : | |

## CIVIL ACTION COMPLAINT

1.    Great American Assurance Company ("Great American"), a stock insurance company, is authorized to transact business in Delaware and maintains offices at 580 Walnut Street, Cincinnati, Ohio.    Great American Assurance Company was formally known as Agricultural Insurance Company.

2.    Defendant Fisher Controls International, Inc. ("Fisher") is a Delaware Corporation that maintains its principal offices at 205 South Center Street, Marshalltown, Iowa 50158.    Fisher manufactures control valves utilized in oxygen systems which it distributes internationally.

IACP 1296094 v2

EXHIBIT
B

FROM WHITE AND WILLIAMS LLP          (FRI) 5. 17' 02 15:36/    /5:30/NO. 4260550115 P  4

3.    Defendant    Northeast    Controls    ("Northeast")    is    a distributor of Fisher Valves.    Northeast maintains its executive offices at 3 Enterprise Avenue, Clifton Park, New York and a branch office at 6000 North Bailey Avenue, Suite 2B, Amherst, New York. At all times relevant hereto, Northeast conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

4.    Defendant    Conectiv    Operating    Service    Company, Inc.("Conectiv") is a Delaware corporation with its principal offices located at 800 King Street, Wilmington, Delaware.    The corporation's registered agent is Conectiv Resource Partners, Inc., 600 King Street, Wilmington, Delaware.

5.    Defendant Texaco Development Corp. is a Delaware corporation that maintains offices at 2000 West Chester Avenue, White Plains, New York.    The corporation's registered agent is Prentice Hall, 2711 Centerville Road, Suite 400, Wilmington, Delaware.

6.    Defendant Gary Delgrego is an adult individual who currently maintains a residence at 13027 Fox Brush Lane, Houston, Texas and a post office box at P.O. Box 279, Delaware City, Delaware.    At all times relevant hereto, Gary Delgrego conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

FROM WHITE AND WILLIAMS LLP          (FRI) 5.17'02 15:36/ST. 5:30/NO. 4260650115 P  5

7.    Plaintiff   Great   American   issued   a   builder's   risk insurance  policy  to  Parsons  Corporation  and  related  companies ("Parsons").   The policy provided certain protection to Parsons, and others, for defined losses during the Delaware City, Delaware repowering project.

8.    The   Great   American   policy   provided   for   subrogation rights.   If the company paid a covered loss to an insured party that was caused by the actions of a third-party, the company would become subrogated to the insured's claims against that third-party to the extent of the claim payments.

9.    Parsons was retained to perform work for the repowering project at the Delaware City, Delaware refinery.

10.   Parsons entered into an agreement with Praxair, Inc. to supply, erect, and test a 2500 STPD air separation unit for the repowering project.   The work included, among other things, the installation of a valve intended to block and/or control the flow of oxygen to gasifiers.

11.   Praxair, Inc. purchased from Fisher and/or Northeast a BLOC control valve, tag number 83HV0629.  The purpose of the valve was to block and/or control the flow of oxygen to the gasifier.

12.   Valve specifications indicated that the 83HV0629 valve would be utilized for oxygen service.  The specifications required, among other things, Fisher and/or Northeast to utilize Monel for the  disc  material,  seat  material,  guide  material,  and  stem

Doc# 1296094 v2

material.

13.  Fisher and/or Northeast knew or reasonably should have known, regardless of the purchase order's terms, that Praxair, Inc. would utilize the valve for high pressure oxygen service.

14.  Fisher and/or Northeast designed, manufactured, and sold to Praxair the 83HV029 BLOC control valve.  The company shipped the valve to the Delaware City project.

15.  The Fisher valve was installed in conjunction with the air separation unit equipment.

16.  Conectiv operated, maintained, and managed the Delaware City plant.

17.  Texaco Development Corp representatives, including Gary Delgreco, assisted in plant operations.

18.  Conective and Texaco Development Corp. representatives, including Gary Delgrego, began and oversaw the initial opening of the BLOC control valve on or about May 20, 2000.

19.  A control room operator attempted to open the BLOC control valve which did not respond.

20.  Conectiv employee Ron Olson was sent to the valve to assist with the opening process. While at the valve, an explosion and fire occurred causing significant losses.

21.  Praxair, Inc., Parsons, and MOTIVA Enterprises LLP submitted claims to Great American. Great American made certain loss payments in response to those claims.  The company may make

Doc# 1296694 v2

FROM WHITE AND WILLIAMS LLP    (FRI) 5. 17' 02 15:57/ST J:30/NO. 4260650115 P  7

additional payments in the future.  Great American is subrogated to

Praxair, Inc.'s, Parsons', and MOTIVA Enterprises LLP's rights and

claims against the defendants to the extent of its payments.

COUNT I

PLAINTIFF V. FISHER AND NORTHEAST (Negligence)

22.  Plaintiff incorporates the allegations contained in paragraphs one through twenty-one as if set forth at length.

23.  Fisher and Northeast were negligent.  The negligent acts include, but are not necessarily limited to, the following:

a.  Failing to design, manufacture, assemble, and distribute a BLOC control valve compatible with and appropriate for high pressure oxygen service;

b.  Failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment;

c.  Failing to investigate, for safety, the materials utilized during the design, assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment;

d.  Failing to provide a valve that complied with the specifications that required use of Monel;

e.  Failing to advise of any deficiencies in the valve that would make the product unsafe or unfit for use in a high pressure oxygen environment;

f.  Failing to use due care under the circumstances.

24.  Fisher's and Northeast's breach of duty was a direct and

Doc# 1296094 v2

FROM WHITE AND WILLIAMS LLP                    (FRI) 5. 17'02 15:37/ST. 5:30/NO. 4260650115 P  8

proximate cause of the failure, fire, and resulting damage.

WHEREFORE, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

## COUNT II

## PLAINTIFF V. FISHER AND NORTHEAST (Warranty)

25.  Plaintiff incorporates the allegations contained in paragraphs one through twenty-four as if set forth at length.

26.  Fisher and Northeast expressly and/or impliedly warranted that the BLOC control valve that they designed, manufactured, assembled, and distributed contained materials suitable for and safe in a high pressure oxygen environment.

27.  Fisher and Northeast expressly and/or impliedly warranted that the BLOC control valve utilized Monel as required in the valve specifications.

28.  The parties relied on Fisher's and Northeast's skill, knowledge, and expertise in providing a BLOC control valve suitable for use in a high pressure oxygen environment.

29.  Fisher and Northeast breached the expressed and implied warranties issued in conjunction with the sale of the BLOC control valve.

30.  Fisher's and Northeast's breach of the expressed and/or implied warranties was a direct and proximate cause of the May 20, 2000 failure, fire, and resulting damage.

Doc# 1296094 v?

FROM WHITE AND WILLIAMS LLP    (FRI) 5. 17' 02 15:37/ST 130/NO. 4260650115 P  9

WHEREFORE, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

### COUNT III

#### PLAINTIFF v. NORTHEAST (Contract)

31. Plaintiff incorporates the allegations contained in paragraphs one through thirty as if set forth at length.

32. Praxair entered into a contract with Northeast to purchase a valve made in accordance with certain written specifications and that would be suitable for use in a high pressure oxygen environment.

33. Northeast breached the contract entered into with Praxair by supplying a valve that did not conform to the specifications and was not suitable for use in a high pressure oxygen environment.

34. Northeast's breach of the Praxair contract was a direct and proximate cause of the failure, fire, and resulting damage.

WHEREFORE, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

### COUNT IV

#### PLAINTIFF v. CONECTIV, TEXACO DEVELOPMENT CORP., and GARY DELGREGO (Negligence)

35. Plaintiff incorporates the allegations contained in paragraphs one through thirty-four as if set forth at length.

Doc# 1296064 v2

FROM WHITE AND WILLIAMS LLP                (FRI) 5. 17'02 15:37/S'. 5:30/NO. 4260650115 P 10

36.  Conectiv, Texaco Development Corp., and Gary Delgrego
were negligent.  The negligent acts committed by the corporate
defendants' agents, servants, and/or employees, along with Gary
Delgrego individually, include, but are not necessarily limited to,
the following:

    a.    Failing to properly train operators on
          proper start-up and operation procedures;

    b.    Failing to make sure that proper and
          adequate start-up procedures were in
          place prior to opening the BLOC control
          valve;

    c.    Failing to immediately stop the start-up
          activity at the initial suggestion of a
          potential problem;

    d.    Failing to terminate valve opening
          procedures prior to sending Ron Olsen to
          the site to investigate;

    e.    Failing to use due care under the
          circumstances.

37.  Conectiv's, Texaco Development Corps.' and Gary
Delgrego's negligence were a direct and proximate cause of the May
20, 2000 failure, fire, and resulting damage.

    WHEREFORE, plaintiff demands judgment against defendants
for damages together with interest, attorney's fees, and costs of
suit.

Doc# 1296094 v2

FROM WHITE AND WILLIAMS LLP          (FRI) 5. 17' 02  15:38/ST          30/NO. 4260650115 P 11

Respectfully submitted,

WHITE AND WILLIAMS LLP


BY: _____
    JOHN BALAGUER, ESQUIRE
    824 North Market Street
    Suite 902
    P.O. Box 902
    Wilmington, DE 19899-0709
    Attorney for Plaintiffs


Of Counsel:

Christopher Konzelmann, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

Doc# 1296094 v2

EXHIBIT "C"

2.    Defendant Motiva Enterprises, L.L.C. ("Motiva") is a Delaware Limited Liability Company and owns and/or operates a power plant located on River Road, Route 9, Delaware City, Delaware 19706 (the "Plant").

3.    Defendant Battaglia Mechanical, Inc ("Battaglia") is a Delaware corporation with its principal headquarters at 11 Industrial Boulevard, New Castle, Delaware 19720.

4.    Defendant Fisher Controls International, Inc. ("Fisher") is a Delaware corporation, and, upon information and belief, its principal headquarters is located at 205 South Center Street, Marshalltown, Iowa 50158. Among other things, Fisher engages in the business of manufacturing and distributing control valves used in oxygen systems.

5.    Upon information and belief, Defendant Hydrochem Industrial Services Inc. ("Hydro") is a Delaware corporation with offices located at 450 Preston Street, Houston, Texas 77002.

6.    Upon information and belief, Defendant JJ White, Inc. ("JJ White") is a Delaware corporation with its principal headquarters located at 5500 Bingham Street, Philadelphia, Pennsylvania 19120. JJ White is engaged in the business of, among other things, general construction, construction management and mechanical construction.

7.    Defendant Northeast Controls, Inc. ("Northeast") is a distributor of valves manufactured by Fisher. Northeast has offices located at 6000 N. Bailey Avenue, Suite 2B, Amherst, NY 14226. Upon information and belief, Northeast maintains its executive offices at 3 Enterprise Avenue, Clifton Park, New York.

8.    Defendant Parsons Energy and Chemicals Group, Inc. ("Parsons") is a Delaware Corporation, and, upon information and belief, its principal headquarters is located at 2675

2

Morgantown Road, Reading, PA 19611. Parsons is engaged in the business of designing, engineering, and managing the construction of institutional facilities.

9. Defendant Praxair, Inc. ("Praxair") is a publicly traded company engaged in the business of supplying atmospheric, process and specialty gases, high-performance coatings, and related technologies. Upon information and belief, Praxair's principal headquarters is located at 39 Old Ridgebury Road, Danbury, Connecticut 06810-5113. Praxair also maintains lab facilities in Tonawanda, New York.

10. Defendant Texaco Aviation Products L.L.C. ("Texaco") is a Delaware Limited Liability Company.

11. Texaco Global Gas & Power ("GG&P") was created by Texaco, Inc. in 1997 to manage the company's worldwide natural gas, natural gas liquids, electric power and synthesis gas marketing and project development activities. GG&P is a combination of three Texaco, Inc. business entities: Texaco Natural Gas North America, Texaco Natural Gas International and Texaco's Alternate Energy Department.

12. Defendant Daikin Industries, Ltd ("Daikin") is an international company with its principal place of business in Osaka, Japan. Daikin is engaged in the business of, among other things, the production, manufacturing, and/or distribution of various chemicals, including polymers. At all relevant times hereto, Daikin conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

13. Saint-Gobain Performance Plastics ("SGPP") is a worldwide supplier of polymer products. SGPP is headquartered in Wayne, New Jersey. At all relevant times hereto, SGPP conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

14.    Rix Industries, Inc. ("Rix") is headquarted out of Benecia, California and is engaged in the business of, among other things, manufacturing oil-free compressors for industrial use.

15.    Texaco Development Corp. ("Texaco Development") is a Delaware corporation that maintains offices at 2000 West Chester Avenue, White Plains, New York.    The corporation's registered agent is Prentice Hall, 2711 Centerville Road, Suite 400 Wilmington, Delaware.

16.    Gary Delgrego is an adult individual who resides at 13027 Fox Brush Lane, Houston, Texas and a post office box at P.O. Box 279, Delaware City, Delaware.    At all times relevant hereto Mr. Delgrego conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

## Background

17.    In May 2000, certain of the Defendants were engaged in the construction and operation of a "re-powering project" at the Plant (the "Project").    The Project included, among other things, the calibration of an oxygen-flow transmitter, which is utilized in the process of transferring 99.99% pure oxygen gas from a base load oxygen compressor ("BLOC") in a air separation unit ("ASU") through a series of control valves and pipes to a gassifier (The ASU and BLOC, together with all interconnected, vents, pipes, valves and gassifier are hereafter referred to collectively as the "Oxygen System" or "System").

18.    Upon information and belief, Parsons was retained to perform work for the Project and entered into an agreement with Praxair to supply, erect, and test the ASU.    The work included, amont other things, the installation of a valve intended to block and/or control the flow of oxygen to gassifiers.

4

19.     Upon information and belief, Praxair, Inc. purchased from Fisher and/or Northeast a BLOC control valve, tag number 83HVO629 (the "Valve"). The purpose of the Valve was to block and/or control the flow of oxygen the gassifier.

20.     Upon information and belief, valve specifications indicated that the Valve would be utilized for oxygen service. The specifications required, among other things, Fisher and/or Northeast to utilize certain disc material, seat material, guide material, and stem material.

21.     Fisher and/or Northeast knew or reasonably should have known, regardless of the purchase order's terms, that Praixair would utilize the Valve for high pressure oxygen service.

22.     Upon information and belief, Fisher and/or Northeast designed, manufactured, and sold the Valve to Praxair. The Valve was then shipped to the Plant for use in the Project. The Valve was installed in conjunction with the ASU.

23.     Upon information and belief, Texaco Development representatives, including Mr. Delgrego, assisted in plant operations and began and oversaw the initial opening of the Valve on May 20, 2000.

24.     A control room operator attempted to open the Valve, which did not respond. Mr. Olson responded to a call from the control room operator to check the Valve  While checking the Valve, an explosion occurred and Mr. Olson was engulfed in flames. As a result of the explosion, Mr. Olson sustained severe and permanent injuries, including but not limited to, severe burns, scarring, disfigurement, and pain and suffering. Mr. Olson has undergone several operations, has incurred and will continue to incur medical expenses, and has lost significant time from work resulting in a loss of wages and may continue to incur lost wages in the future..

25.     Upon information and belief, and at all times relevant hereto, Defendant Texaco participated in the development of operating procedures and design of the Oxygen System and

Plant. At all relevant times hereto, Texaco had a duty to ensure that the operating procedures and design of the System and Plant were properly designed and developed. Texaco also had a duty of reasonable care to ensure that the Oxygen System was properly maintained and cleaned and that the operating procedures were safe.

26.     Upon information and belief, and at all times relevant hereto, Defendant GG&P participated in the development of operating procedures and design of the Oxygen System and Plant. At all relevant times hereto, GG&P had a duty to ensure that the operating procedures and design of the System and Plant were properly designed and developed. GG&P also had a duty of reasonable care to ensure that the Oxygen System was properly maintained and cleaned and that the operating procedures were safe.

27.     Upon information and belief, and at all times relevant hereto, Defendant Motiva owned the Plant and also supplied specifications and requirements in connection with the Plant and/or System. At all times relevant hereto, Motiva had a duty to ensure that the System was safe and properly operated, maintained and cleaned.

28.     Upon information and belief, and at all times relevant hereto, Defendant Parsons was engaged to, among other things, engineer, design, build and/or procure some or all of the System. At all times relevant hereto, Parsons had a duty to ensure that the System was properly designed and built and also that the System was safe and properly operated, maintained and cleaned.

29.     Upon information and belief, and at all times relevant hereto, Defendant Praxair was engaged to, among other things, engineer, design, build and/or procure some or all of the System, including the Valve. At all times relevant hereto, Praxair was engaged to support operations regarding the System. At all times relevant hereto, Praxair had a duty to ensure that

the System was safe and properly operated, maintained and cleaned.30.    Upon information and belief, and at all times relevant hereto, Defendant Battaglia was engaged to perform services on the System so that the System could be properly maintained and cleaned.

30.    Upon information and belief, and at all times relevant hereto, Defendant JJ White was engaged to perform services on the System.

31.    Upon information and belief, and at all times relevant hereto, Defendant Hydro was engaged to perform cleaning and maintenance services on the System.

32.    Upon information and belief, and at all times relevant hereto, Defendant Daikin manufactured and distributed polymer to SGPP, which, in turn, SGPP implemented into a valve seat or a part thereof (the "Valve Seat"). The Valve Seat was then implemented into the System.

33.    Upon information and belief, and at all times relevant hereto, Defendant SGPP manufactured and distributed the Valve Seat.

34.    Upon information and belief, and at all times relevant hereto, Defendant Rix distributed the Valve.

### Count I
### Negligence – Texaco

35.    At all times relevant hereto, Defendant Texaco owed a duty of reasonable care to Mr. Olson, which duty Defendant Texaco, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently developing and designing the operating procedures, the Oxygen System and/or the Plant, and negligently maintaining and/or cleaning the System. As a direct and proximate result of Defendant Texaco's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count II
### Negligence – Motiva

36.    At all times relevant hereto, Defendant Motiva owed a duty of reasonable care to Mr. Olson, which duty Defendant Motiva, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently supplying specifications and requirements in connection with the Plant and/or System and negligently maintaining and/or cleaning the System.  As a direct and proximate result of Defendant Motiva's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count III
### Negligence – Parsons

37.    At all times relevant hereto, Defendant Parsons owed a duty of reasonable care to Mr. Olson, which duty Defendant Parsons, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently engineering, designing, building and/or procuring some or all of the System and negligently maintaining and/or cleaning the System.  As a direct and proximate result of Defendant Parsons' negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count IV
### Negligence – Praxair

38.    At all times relevant hereto, Defendant Praxair owed a duty of reasonable care to Mr. Olson, which duty Defendant Praxair, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently engineering, designing, building and/or procuring some or all of the System, including the Valve, and negligently maintaining operating

and/or cleaning the System, As a direct and proximate result of Defendant Praxair's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

### Count V
### Negligence – Fisher and Northeast

39.     At all times relevant hereto, Defendant Fisher and Northeast owed a duty of reasonable care to Mr. Olson, which duty defendants Fisher and Northeast, themselves, and through their agents, servants, and/or employees, breached by, among other things, negligently designing, manufacturing, and/or distributing the Valve. Upon information and belief, Fisher and Northeast were also negligent in failing to design, manufacture, assemble and distribute a BLOC control valve compatible with and appropriate for high pressure oxygen service; failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment; failing to investigate, for safety, the materials utilized during the design, assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment; failing to provide a valve that complied with the specifications that required use of certain material; and failing to advise of any deficiencies in the Valve that would make the product unsafe or unfit for use in a high pressure oxygen environment. As a direct and proximate result of defendants Fisher and Northeast's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count VI
### Negligence – Battaglia

40.    At all times relevant hereto, Defendant Battaglia owed a duty of reasonable care to Mr. Olson, which duty Defendant Northeast, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently maintaining and cleaning the System. As a direct and proximate result of Defendant Battaglia's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count VII
### Negligence – JJ White

41.    At all times relevant hereto, Defendant JJ White owed a duty of reasonable care to Mr. Olson, which duty Defendant Northeast, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently maintaining and cleaning the System. As a direct and proximate result of Defendant JJ White's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count VIII
### Negligence – Hydro

42.    At all times relevant hereto, Defendant Hydro owed a duty of reasonable care to Mr. Olson, which duty Defendant Hyrdo, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently maintaining and cleaning the System. As a direct and proximate result of Defendant Hydro's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count IX
### Breach of Warranty – 6 Del. C. § 2-314 – Fisher and Northeast

43.     At all times relevant hereto, defendants Fisher and Northeast were merchants within the meaning of 6 Del. C. § 2-104. Defendants Fisher and Northeast sold the Valve, which Valve at the time of the sale, was defective. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher and Northeast's breach of the warranty of merchantability and the defective condition of the Valve. Defendant Northeast has notice of Mr. Olson's injuries and the damage caused by the defective Valve.

## Count X
### Breach of Warranty – 6 Del. C. § 2-315 – Fisher and Northeast

44.     Upon information and belief, at all times relevant hereto, defendants Fisher and Northeast had reason to know the purpose for which the Valve was required and that the buyer of the Valve was relying on Fisher and Northeast's skill or judgment to select or furnish a suitable valve. The Valve was not fit for the purpose for which it was intended. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher Northeast's breach of the implied warranty of fitness.

## Count XI
### Breach of Warranty – 6 Del. C. § 2-313 – Fisher and Northeast

45.     Upon information and belief, at all times relevant hereto, defendants Fisher and Northeast expressly warranted that the Valve that they designed, manufactured, assembled and/or distributed contained materials suitable for and safe in a high pressure oxygen environment, and utilized certain material as required in the valve specifications. Mr. Olson relied on the parties' skill, knowledge, and expertise in providing a BLOC control valve suitable for use in a high pressure oxygen environment. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher and Northeast's breach of the express warranty.

## Count XII
## Negligence – GG&P

46.     At all times relevant hereto, Defendant GG&P owed a duty of reasonable care to Mr. Olson, which duty Defendant GG&P, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently developing and designing the operating procedures, the Oxygen System and/or the Plant, and negligently maintaining and/or cleaning the System. As a direct and proximate result of Defendant GG&P's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count XIII
## Negligence – Daikin

47.     At all times relevant hereto, Defendant Daikin owed a duty of reasonable care to Mr. Olson, which duty Defendant Daikin, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently designing, manufacturing, and/or distributing the polymer that was used in the Valve Seat. As a direct and proximate result of Defendant Daikin's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count XIV
## Breach of Warranty – 6 Del. C. § 2-314 – Daikin

48.     At all times relevant hereto, Defendant Daikin was a merchant within the meaning of 6 Del. C. § 2-104. Defendant Daikin manufactured and distributed the polymer used in the Valve Seat. The polymer was defective when it was distributed. Mr. Olson sustained significant injuries, which injuries were caused by Defendant Daikin's breach of the warranty of

merchantability and the defective condition of the polymer. Defendant Daikin has notice of Mr.

Olson's injuries and the damage caused by the defective polymer.

## Count XV
### Breach of Warranty – 6 Del. C. § 2-315 – Daikin

49.     Upon information and belief, at all times relevant hereto, Defendant Daikin had

reason to know the purpose for which the polymer was required and that the buyer of the

polymer was relying on Daikin's skill or judgment to select or furnish suitable polymer. The

polymer was not fit for the purpose for which it was intended. Mr. Olson sustained significant

injuries, which injuries were caused by Defendant Daikin's breach of the implied warranty of

fitness.

## Count XVI
### Negligence – SGPP

50.     At all times relevant hereto, Defendant SGPP owed a duty of reasonable care to

Mr. Olson, which duty Defendant SGPP, itself, and through its agents, servants, and/or

employees, breached by, among other things, negligently designing, manufacturing, and/or

distributing the Valve Seat. As a direct and proximate result of Defendant SGPP's negligence,

Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has

suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other

damages permitted by law.

## Count XVII
### Breach of Warranty – 6 Del. C. § 2-314 – SGPP

51.     At all times relevant hereto, Defendant SGPP was a merchant within the meaning

of 6 Del. C. § 2-104. Defendant SGPP manufactured and distributed the Valve Seat. The Valve

Seat was defective when it was distributed. Mr. Olson sustained significant injuries, which

injuries were caused by Defendant SGPP's breach of the warranty of merchantability and the

13

defective condition of the Valve Seat. Defendant SGPP has notice of Mr. Olson's injuries and the damage caused by the defective Valve Seat.

## Count XVIII
### Breach of Warranty – 6 Del. C. § 2-315 – SGPP

52.     Upon information and belief, at all times relevant hereto, Defendant SGPP had reason to know the purpose for which the Valve Seat was required and that the buyer of the Valve Seat was relying on SGPP's skill or judgment to select or furnish a suitable Valve Seat. The Valve Seat was not fit for the purpose for which it was intended. Mr. Olson sustained significant injuries, which injuries were caused by Defendant SGPP's breach of the implied warranty of fitness.

## Count XIX
### Negligence – Rix

53.     At all times relevant hereto, Defendant Rix owed a duty of reasonable care to Mr. Olson, which duty Defendant Rix, itself, and through its agents, servants, and/or employees, breached by, among other things, negligently distributing the Valve. As a direct and proximate result of Defendant Rix's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count XX
### Breach of Warranty – 6 Del. C. § 2-314 – Rix

54.     At all times relevant hereto, Defendant Rix was a merchant within the meaning of 6 Del. C. § 2-104. Defendant Rix distributed the Valve. The Valve was defective when it was distributed. Mr. Olson sustained significant injuries, which injuries were caused by Defendant Rix's breach of the warranty of merchantability and the defective condition of the Valve. Defendant Rix has notice of Mr. Olson's injuries and the damage caused by the defective Valve.

14

## Count XXI
### Breach of Warranty – 6 Del. C. § 2-315 – Rix

55.    Upon information and belief, at all times relevant hereto, Defendant Rix had reason to know the purpose for which the Valve was required and that the buyer of the Valve was relying on Rix's skill or judgment to select or furnish a suitable valve. The Valve was not fit for the purpose for which it was intended.  Mr. Olson sustained significant injuries, which injuries were caused by Defendant Rix's breach of the implied warranty of fitness.

## Count XXII
### Negligence – Texaco Development

56.    At all times relevant hereto, Defendant Texaco Development owed a duty of reasonable care to Mr. Olson, which duty Defendant Texaco Development, itself, and through its agents, servants, and/or employees, breached by, among other things, failing to properly train operators on proper start-up and operation procedures; failing to make sure that proper and adequate start-up procedures were in place prior to opening the BLOC control valve; failing to immediately stop the start-up activity at the initial suggestion of a potential problem; and failing to terminate valve opening procedures prior to sending Mr. Olsen to the site to investigate.  As a direct and proximate result of Defendant Texaco Development's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count XXIII
### Loss of Consortium

57.    As a direct and proximate result of the aforementioned injuries sustained by her husband, Ms. Olson was and may in the future continue to be deprived of the consortium, care, comfort and society of her husband in various degrees as a result of Mr. Olson's injuries.

## CONCLUSION

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally,

for all damages permitted by law, together with reasonable attorneys' fees, interest, and costs.


ASHBY & GEDDES


Randall E. Robbins
Joseph C. Handlon
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

*Attorneys for Ronald and Carol Olson*


Dated:  May 20, 2002
110354.1

16

# EXHIBIT "D"



# RAWLE & HENDERSON, LLP



THE NATION'S OLDEST LAW OFFICES
ESTABLISHED 1783

www.rawle.com

THOMAS P. WAGNER
215-575-4307
twagner@rawle.com

The Widener Building
One South Penn Square
Philadelphia, PA 19107

Telephone: (215) 575-4200
Facsimile: (215) 563-2583

July 3, 2002

Warren Voter, Esquire
Sweeney & Sheehan, P.C.
1515 Market Street
19th Floor
Philadelphia, PA 19102

Re:    **Incident at Praxair Installation**
       **Our File No. 300,004**

Dear Warren:

I understand that you represent Fisher Controls International, Inc. in the above-captioned case. As you probably know, suit has now been filed by Great American Assurance Company as subrogee of Praxair, Inc., Parsons Corporation and Motiva Enterprises, LLC, Ron Olson and Praxair, Inc. The defendants include your client Fisher Controls International, Inc., and our client Northeast Controls, Inc., in addition to several others. Enclosed please find copies of the complaints.

On behalf of our client, we have made two written demands on Fisher Controls International, Inc. for defense and indemnification, as well as for reimbursement of all costs incurred so far in this matter. We first tendered the defense and indemnification of our client to Fisher on October 4, 2000. Having received no response, we did a follow-up letter on March 30, 2001. We then received a response signed by Matthew Geekie, Esquire and dated October 29, 2001. Mr. Geekie's letter declined to accept our client's defense and indemnification at that time, saying that he felt the tender was premature. Mr. Geekie pointed out that no conclusions had been reached in the investigation of this matter, and that no allegations of defect in the Fisher valve had yet been made.

The letter stated, however, that the defense and indemnification of Northeast would be accepted by Fisher in the event of a future allegation that a defect in the valve gave rise to the losses sued upon. Mr. Geekie's letter was very specific on this point. He stated as follows:

0669901.01

PHILADELPHIA, PA          MEDIA, PA          PITTSBURGH, PA          MARLTON, NJ          NEW YORK, NY

R A W L E & H E N D E R S O N LLP

Warren Voter, Esquire
July 3, 2002
Page 2

        If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement.

    Mr. Geekie's letter limited this commitment to indemnify Northeast only with respect to our client's own negligent acts or omissions, if any. He went on to say that the extent of Fisher's ultimate indemnification would depend upon the conclusions and allegations that may be made.

    Now suit has been filed, and we are in a position to know the allegations that have been made. The complaints make specific allegations of negligence against Fisher and Northeast simultaneously. All the allegations of negligent conduct arise specifically from the design and manufacture of the butterfly valve. The complaint alleges that Fisher and Northeast simultaneously were negligent in failing to design and manufacture a valve that was safe for use in a high pressure oxygen environment, failing to provide a valve that complied with specifications, and failing to warn of defects in the valve. There are no allegations of separate or independent acts of negligence by Northeast. Instead, all the allegations of negligence are simultaneous and coincidental.

    Under the circumstances of this case, the conduct of our client Northeast would be completely secondary to that of your client Fisher. All the design and manufacturing was done by Fisher. The only separate allegations at all against our client Northeast are based in contact, and any liability here would also pass through directly to Fisher.

    With this matter now in suit, our client will begin incurring substantially greater costs than it has already incurred. We request that you and your client agree immediately to take over the complete defense and indemnification of Northeast Controls, Inc., as well as reimburse our client and its insurer for all defense costs incurred to date.

0669901.01

RAWLE & HENDERSON LLP

Warren Voter, Esquire
July 3, 2002
Page 3


       I request that you get back to me within one week so that we can avoid the need for any more duplicative costs of suit. In addition, please confirm whether there is vendor coverage available. I look forward to hearing from you.

                      Very truly yours,

                      RAWLE & HENDERSON LLP

                      By: _____

                          Thomas P. Wagner

TPW/sdk

# EXHIBIT "E"

# RAWLE & HENDERSON LLP



THOMAS P. WAGNER
215-575-4307
twagner@rawle.com

LAW OFFICES
THE WIDENER BUILDING
ONE SOUTH PENN SQUARE
PHILADELPHIA, PA 19107
215-575-4200

CABLE RAWLE PHILADELPHIA
FACSIMILE 215-563-2583

NEW JERSEY OFFICE
TEN LAKE CENTER EXECUTIVE PARK
MARLTON, NEW JERSEY

NEW YORK OFFICE
140 BROADWAY
NEW YORK, NY

September 25, 2000

**VIA CERTIFIED MAIL**

Mr. Robert Walker, Area Vice President
Fisher Controls International, Inc.
205 South Center Street
Marshalltown, IA 50158

     **Re:   Incident at Praxair Installation**
     **Date of Loss: 05/20/00**
     **Our File No. 435,197**

Dear Mr. Walker:

     It is our understanding that you represent Fisher Controls International, Inc. in connection with the above-captioned matter. Please accept this correspondence as the demand of Northeast Controls, Inc. that Fisher Controls International, Inc. take over the defense of Northeast Controls, Inc. in connection with the above-captioned matter pursuant to the terms of the Representative Agreement between Fisher Controls International, Inc. and Northeast Controls, Inc.

     As you are aware, the above matter concerns an alleged incident which took place during the final stages of ASU startup at the Connectiv facility in Delaware City, Delaware. According to the information supplied by Wendell Hull Associates, the incident at issue appears to involve a BLOC Isolation Valve which failed while Connectiv was preparing to deliver high pressure oxygen to the gasifiers. The valve at issue was designed, manufactured and/or supplied by Fisher Controls International, Inc. pursuant to specifications provided by Praxair. In accordance with the terms of the Representative Agreement, Fisher Controls, Inc. designated Northeast Controls, Inc. as its sales, engineering and service representative for its designated products and related services.

     Article XI of the Representative Agreement states the following:

     XI. INDEMNITY
          Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at is own expense, protect, defend, indemnify and hold harmless

# RAWLE & HENDERSON LLP

Robert Walker
September 25, 2000
Page 2

Representative [Northeast Controls, Inc.] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whosoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. The obligations set forth in the immediately preceding sentence shall not apply unless Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provision of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any losses arising from the following:
A. Any express warranty unauthorized by Fisher;
B. Any distribution or sale of a Product for a purpose unauthorized by Fisher;
C. Use of any instruction labels, warnings or other product literature which have not been previously approved in writing by Fisher;
D. Any failure by Representative to maintain any Product in merchantable condition;
E. Demonstration, installation, servicing, modification or repair of any Product by Representative or any third party not in accordance with written warnings or instructions of Fisher, or
F. Negligent acts or omissions by Representative.

In light of the provisions of the Representative Agreement, Northeast Controls, Inc. requests that Fisher Controls International, Inc. take over the defense of Northeast Controls, Inc. in this case, and agree to reimburse Northeast Controls, Inc. for all its costs of defense in this matter.

If you have any questions or comments regarding the foregoing, please contact this office. Thank you.

# R A W L E & H E N D E R S O N LLP

Robert Walker
September 25, 2000
Page 3

Very truly yours,

RAWLE & HENDERSON LLP

By:

Thomas P. Wagner
Jason Banonis

TPW/jb

cc:     Matthew Geekie
        Warren Voter

# RAWLE & HENDERSON LLP



THOMAS P. WAGNER
215-575-4307
twagner@rawle.com

LAW OFFICES
THE WIDENER BUILDING
ONE SOUTH PENN SQUARE
PHILADELPHIA, PA 19107
215-575-4200

CABLE RAWLE PHILADELPHIA
FACSIMILE 215-563-2583

NEW JERSEY OFFICE
TEN LAKE CENTER EXECUTIVE PARK
MARLTON, NEW JERSEY

NEW YORK OFFICE
140 BROADWAY
NEW YORK, NY

October 4, 2000

**VIA CERTIFIED MAIL**

Mr. Robert Walker, Area Vice President
Fisher Controls International, Inc.
205 South Center Street
Marshalltown, IA 50158

  Re:   **Incident at Praxair Installation**
  **Date of Loss: 05/20/00**
  **Our File No. 435,197**

Dear Mr. Walker:

   It is our understanding that you represent Fisher Controls International, Inc. in connection with the above-captioned matter. Please accept this correspondence as the demand of Northeast Controls, Inc. that Fisher Controls International, Inc. take over the defense of Northeast Controls, Inc. in connection with the above-captioned matter pursuant to the terms of the Representative Agreement between Fisher Controls International, Inc. and Northeast Controls, Inc.

   As you are aware, the above matter concerns an alleged incident which took place during the final stages of ASU startup at the Connectiv facility in Delaware City, Delaware. According to the information supplied by Wendell Hull Associates, the incident at issue appears to involve a BLOC Isolation Valve which failed while Connectiv was preparing to deliver high pressure oxygen to the gasifiers. The valve at issue was designed, manufactured and/or supplied by Fisher Controls International, Inc. pursuant to specifications provided by Praxair. In accordance with the terms of the Representative Agreement, Fisher Controls, Inc. designated Northeast Controls, Inc. as its sales, engineering and service representative for its designated products and related services.

   Article XI of the Representative Agreement states the following:

  XI. INDEMNITY
    Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at is own expense, protect, defend, indemnify and hold harmless

RAWLE & HENDERSON LLP

Robert Walker
October 4, 2000
Page 2

Representative [Northeast Controls, Inc.] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whosoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. The obligations set forth in the immediately preceding sentence shall not apply unless Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provision of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any losses arising from the following:
A. Any express warranty unauthorized by Fisher;
B. Any distribution or sale of a Product for a purpose unauthorized by Fisher;
C. Use of any instruction labels, warnings or other product literature which have not been previously approved in writing by Fisher;
D. Any failure by Representative to maintain any Product in merchantable condition;
E. Demonstration, installation, servicing, modification or repair of any Product by Representative or any third party not in accordance with written warnings or instructions of Fisher, or
F. Negligent acts or omissions by Representative.

In light of the provisions of the Representative Agreement, Northeast Controls, Inc. requests that Fisher Controls International, Inc. take over the defense of Northeast Controls, Inc. in this case, and agree to reimburse Northeast Controls, Inc. for all its costs of defense in this matter.

If you have any questions or comments regarding the foregoing, please contact this office. Thank you.

RAWLE & HENDERSON LLP

Robert Walker
October 4, 2000
Page 3

Very truly yours,

RAWLE & HENDERSON LLP

By:

Thomas P. Wagner
Jason Banonis

TPW/jb

cc:    Matthew Geekie
       Warren Voter

# EXHIBIT "F"



**EMERSON.**
Process Management

Fisher Controls International, Inc.
205 South Center Street
P.O. Box 190
Marshalltown, Iowa 50158-0190
USA

T (641) 754-3011
F (641) 754-2830

September 13, 2002

Mr. Michael J. Peters
President
Northeast Controls, Inc.
3 Enterprise Avenue
Clifton Park, NY 12065

Re:   Motiva Enterpirses v. Fisher Controls, et al.

Dear Mr. Peters:

Fisher agrees that, with respect to the accident which occurred at the Delaware City Power Plant, which is the subject of litigation including but not limited to: <u>Olsen v. Motiva Enterprises, L.L.C. et al.</u> C.A. No. 02C-04-263, <u>Praxair, Inc. v. Fisher Conrols International, et al.</u>, C.A. No. 02C-05-190; <u>Great American Assurance Company v. Fisher Controls International, Inc. et al.</u>, C.A. No. 02C-05-168; and <u>Motiva Enterprises, L.L.C. v. Fisher Controls International, Inc. et. al.</u>, C.A. No. 02-05-169; it shall, at its own expense, protect, defend, indemnify and hold harmless Northeast Controls, Inc. from and against all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively "Losses") which may arise out of or be made in connection with the death or injury of any person, or the damage of property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. Notwithstanding the provisions of the immediately preceding sentence, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Northeast Controls, Inc. from and against any Losses arising from any negligent acts or omissions of Northeast Controls, Inc. or any other independent basis for liability as set forth in Paragraphs XI A-E of the Representative Agreement entered into between the parties effective January 1, 1998.

Sincerely,

FISHER CONTROLS INTERNATIONAL, INC.

Michael J. Mason
Executive Vice President

**FISHER**

EXHIBIT
F

# EXHIBIT "G"

OCT 31 2001 14:08 FR EMERSON PROCESS MGMNT314 553 1816 TO 912155632583    P.02/03



## EMERSON.
### Process Management

Matthew W. Geekie
Assistant General Counsel

Emerson Process Management
8100 West Florissant Avenue
P.O. Box 36911
St. Louis, MO 63136
USA

T  (314) 553 1814
F  (314) 553 1816
Matt.Geekie@EmersonProcess.com

October 29, 2001

Thomas P. Wagner, Esq.
Rawle & Henderson LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107

Re: Incident at Praxair Installation

Dear Mr. Wagner:

I am in receipt of your letter dated March 30, 2001 to Mr. Robert Walker, Area Vice President for Fisher Controls International, Inc. Please consider this letter responsive to yours.

Pursuant to the Representative Agreement between Northeast Controls, Inc. ("**Northeast**") and Fisher Controls International, Inc. ("**Fisher**"), made the first day of January, 2000 (the "**Agreement**"), Northeast acted as one of Fisher's sales representatives in May 2000. In accordance with the Agreement, Northeast provided certain services in support of the sale of Products (as defined in the Agreement) to Praxair, Inc., ("**Praxair**"). As you are aware, on or about May 20, 2000 an explosion and fire occurred at the Motiva facility in Delaware City, Delaware (the "**Praxair Incident**"). The Praxair Incident entailed damage to property as well as injury to an individual, (the "**Losses**").

Subsequent to the Praxair Incident several parties, including, but not limited to, Fisher, Northeast, Praxair, and Motiva, Inc., have, to varying degrees, participated in an investigation of the Praxair Incident (the "**Third Party Investigation**"). Fisher understands that this Third Party Investigation is focusing on the area of a Fisher butterfly valve as well as upstream and downstream of its location. The Third Party Investigation has yet to arrive at any conclusions, let alone allegations, as to the cause of the Praxair Incident. More particularly, this investigation has not resulted in any allegations or claims that the Losses arose out of any actual or alleged defect in the butterfly valve or for that matter, any Product.

Thomas P. Wagner, Esq.
October 29, 2001
Page 2


    In light of the fact that no conclusions have been reached and no allegations of Product defect have been made, we believe that your request that Fisher agree to defend, indemnify and hold harmless Northeast is premature.  Accordingly, at this time Fisher declines to accept the tender of Northeast's defense.  If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement.  Pursuant to the Agreement, however, Fisher will not protect, indemnify, defend and hold harmless Northeast from its own negligent acts or omissions.  The conclusions and the allegations that may be made will ultimately determine the extent, if at all, to which Fisher agrees to protect, defend, indemnify and hold harmless Northeast and the extent to which Fisher will need to reserve its rights while doing so should evidence develop suggesting that the Losses resulted from negligent acts or omissions of Northeast.

    If you have any questions about any of the issues set forth above, please do not hesitate to contact me.

                                Sincerely,

                                Matthew W. Geekie

                                Matthew W. Geekie


MWG/slh
cc:  Terry Buzbee
     Walter Stark
     Michael Keating
     Steve Frauen
     Meredith Miller
     Warren Voter
     Patrick McVey