IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC., <br> 3 Enterprise Avenue <br> Clifton Park <br> New York, NY 12065 <br><br> ST. PAUL MERCURY <br> INSURANCE COMPANY <br> 385 Washington Street <br> St. Paul, MN 55102 <br><br>           Plaintiffs, <br><br> v. <br><br> FISHER CONTROLS INTERNATIONAL, LLC <br> 205 S. Center Street <br> Marshalltown, Iowa 50158 <br><br>           Defendant. | NO. 06-412 <br><br><br> **DEFENDANT'S MOTION TO** <br><br> **AMEND COUNTERCLAIM** |

## I.    INTRODUCTION AND RELIEF REQUESTED

In accordance with Fed. R. Civ. P. 15(a), defendant Fisher Controls International, LLC hereby moves this Court for an order allowing Fisher to amend its counterclaim against Northeast Controls.[1] Specifically, Fisher has previously asserted its significant losses only as an offset to plaintiffs' claimed damages. Fisher now seeks to recover those losses affirmatively—i.e., regardless whether plaintiffs are entitled to any recovery. This amendment does not alter the facts

---

[1] As set out below, counsel for Fisher made a reasonable effort to reach agreement with plaintiffs on the matter set forth in this motion.

underlying Fisher's counterclaim. Nor does it alter Fisher's legal theory. Instead, Fisher seeks

only to obtain a different form of relief, based on the same facts and the same legal theory.

Consequently, plaintiffs cannot be prejudiced by the requested amendment, and Fisher's Motion

should be granted.

In support of its Motion, Fisher alleges the following:

## II.    NATURE AND STAGE OF THE PROCEEDINGS

This Motion arises out of a case that had its genesis in actions dating back at least to May

1998. Those actions were the subject of four prior lawsuits that were in suit from April 2002

through summer 2005. The parties to those actions took dozens of depositions, exchanged

hundreds of thousands of pages of documents, and engaged in extensive motion practice. Fisher

provides this statement of facts to assist the Court in understanding the extensive factual and

procedural background to this current action.

### A.    The Ordering of the Valve

This lawsuit arises out of an explosion that occurred on May 20, 2000, at the Delaware

City Power Plant.[2] At the time of the incident, Motiva—owner of the Power Plant—was

involved in a large-scale construction project known as the Delaware City Power Plant

Repowering Project ("DCPPRP").[3] Part of the DCPPRP involved installation of an air separation

unit ("ASU"), an apparatus intended to supply oxygen and other industrial gasses.[4] The ASU was

---

[2] Affidavit of Daniel J. Gunter in Support of Fisher Controls International, LLC's Motion to Amend ("Gunter Aff."), Ex. 1. All materials submitted in support of this Motion are attached to the Gunter Affidavit and Bates-numbered consecutively throughout with a prefix "FCI/MOA." Further references to those exhibits will be to "FCI/MOA xxx."
[3] FCI/MOA 55.
[4] FCI/MOA 55.

designed and manufactured by Praxair, Inc.[5] It was used, among other things, to isolate and supply nearly pure oxygen to the DCPPRP's gasification equipment.[6]

The ASU included a number of components from various suppliers, including a valve ("the Valve") intended to control the flow of oxygen from the ASU's base load oxygen compressor ("BLOC") to the gasification unit.[7] The Valve was manufactured by Fisher. Northeast Controls acted as Fisher's outside sales representative.[8] A Northeast Controls employee, Albert Cappellini, obtained specifications from Praxair for the Valve; Northeast Controls then transmitted specifications for the Valve to Fisher.[9]

The explosion occurred when various parties involved in the commissioning of the DCPPRP opened the Valve to permit oxygen to flow from the BLOC to the gasification subunit. At the time of the explosion, the oxygen in the piping upstream of the Valve was about 99.6 percent pure and was pressurized to 1150 psi.[10] (Normal atmospheric pressure at sea level is 14.7 psi.) The oxygen was also approximately 270° F.[11] Under those conditions, many materials that will not typically ignite will auto-ignite—i.e., simply burst into flame even in the absence of an ignition source. Other materials—for example, carbon steel—may ignite if kindled, even by a small spark.[12]

---

[5] FCI/MOA 57.
[6] FCI/MOA 55.
[7] FCI/MOA 55.
[8] FCI/MOA 58.
[9] FCI/MOA 23, 228, 231–43.
[10] FCI/MOA 126.
[11] FCI/MOA 58.
[12] See, e.g., FCI/MOA 128, 133–34, 138–40.

The presence of nearly 100 percent pure oxygen creates a significant fire hazard.[13] The risk of fire increases as the temperature of the oxygen rises. Because of fire risks, systems for holding and transporting nearly pure oxygen must be meticulously designed, constructed, cleaned, and maintained in order to avoid oxygen explosions.

### B.    The Explosion and Initial Investigation

The Valve had been installed about six months before May 20, 2000, and had been tested for functionality, but the testing was conducted using only atmospheric air in the piping.[14] (Air typically consists of about 20 percent oxygen and 79 percent nitrogen, with a few additional elements in smaller concentrations.) The Valve had not previously been opened under the conditions present at the time of the incident on May 20, 2000.[15]

As noted above, the explosion occurred during commissioning of the Valve on oxygen— i.e., opening the Valve on nearly pure oxygen for the first time.[16] Initially, the persons involved in attempting to open the Valve sent signals to the Valve to instruct it to open.[17] Because of unusual specifications provided by Praxair for the equipment that would open the Valve, the Valve could open only when it received a "10 percent open" signal.[18] The persons attempting to open the Valve on May 20, 2000, were unaware of the effects of Praxair's design choices. Their first attempts to open the Valve were unsuccessful because they did not give the Valve a 10 percent open signal.

---

[13] FCI/MOA 56.
[14] FCI/MOA 273, 275–76.
[15] FCI/MOA 126.
[16] FCI/MOA 126.
[17] FCI/MOA 263.
[18] FCI/MOA 126–27, 154–55.

When the initial attempts to open the Valve were unsuccessful, Ronald Olson—an employee of the power plant operator—went to the Valve to investigate.[19] While he was checking the Valve, the persons attempting to open the Valve finally gave it a 10 percent open signal.[20] The Valve opened, and an explosion occurred almost immediately. The fire and explosion seriously injured Mr. Olson, consumed much of the Valve, and damaged nearby piping.

Within days of the incident, Praxair discovered that the written specifications for the Valve that it had provided to Northeast Controls did not match some of the specifications for the Valve as manufactured by Fisher.[21] Moreover, those specifications concerned critical parts of the Valve that would have been exposed to the flow of oxygen through the Valve. Further inquiry revealed that Northeast Controls had received one set of written specifications with the purchase order from Praxair, but the information that Northeast Controls sent to Fisher called for different materials for the construction of those critical components in the Valve.[22] (In addition, before the explosion Northeast Controls did not send to Fisher the specifications provided by Praxair to Mr. Cappellini.)

A comparison between (a) the specification sheet as accepted by Northeast Controls and (b) the order as processed by Northeast Controls shows the following variations:[23]

---

[19] FCI/MOA 223–24.
[20] FCI/MOA 224; FCI/MOA 262–65.
[21] FCI/MOA 21–22, 23, 203–205.
[22] FCI/MOA 21–23.
[23] FCI/MOA 21–23.

| Valve part | Praxair specifications | Northeast Controls order |
|---|---|---|
| Disk | Monel | Hastelloy |
| Stem | Monel | Inconel 718 |
| Bearings | Monel | TFE composite |
| Seal | Monel/PTFE | Tefzel |

Northeast Controls has never offered a satisfactory explanation for this discrepancy. Northeast Controls' employee Albert Cappellini, who worked with Praxair in preparing the specification sheet, later testified that he assumed that he had discussed the Valve's as-ordered materials of construction with Praxair's representative Bhim Bhakoo and that Mr. Bhakoo had approved those materials of construction.[24] But Mr. Bhakoo denied that he had agreed to anything other than the materials indicated on the specification sheet referenced in Praxair's purchase order.[25] Moreover, Mr. Cappellini could not explain why the order placed with Fisher differed from the specification sheet that Praxair had sent to Northeast Controls:

> Q:    . . . [I]n ordering the valve why wasn't a matrix[26] submitted
>         to Fisher that ordered a valve with the materials contained
>         on Exhibit 118 [i.e., the specification sheet initialed by
>         Praxair and Northeast Controls], the final, signed approved
>         ISA data sheet?

---

[24] FCI/MOA 257E–257F (Deposition of Albert Cappellini ["Cappellini Dep."] at 228:21–229:11, 232:22–233:22). See esp. Cappellini Dep. at 229:6–11 ("Q: There were conversations that the valves would be constructed identically the same? A: Correct. Q: With Mr. Bhakoo? A: Yes. I would have to assume that. I don't recall the exact conversations."); id. at 233:20 ("A: Again, I don't recall the exact conversation. So do I say yes, that conversation happened? I don't know if [it] exactly happened or when it happened . . . .").

[25] FCI/MOA 201–02 (Deposition of Bhim Bhakoo at 124:21s–125:4).

[26] The term "matrix" refers to a series of letters and numbers used in the Fisher order processing system to input information that leads to the order requisition. See FCI/MOA 192–96 (Deposition of Robert D. Barry at 58:15 – 62:15).

A:     I don't know. I don't know why the matrix is different than
        what's on [Exhibit] 118. I don't know that.
                I mean, you're asking me why wasn't it?

Q:     Yes.

A:     I don't know why it's on there like that, on [Exhibit] 118.[27]

And in testimony regarding one of the material deviations, Mr. Cappellini confirmed that

the specification sheet and the information conveyed by Northeast Controls to Fisher should have

matched:

Q:     Do you know why what was conveyed to Fisher for the
        bearing material was PTFE composite?

A:     I mean, that was the bearing material that we were going to
        use in that valve.

Q:     Okay. But that's not the bearing that's indicated on HV629
        [i.e., the specification sheet], correct?

A:     Correct.

Q:     So when was the decision made that that was the bearing
        that was going to be used in the valve?

A:     From the beginning.

Q:     Okay. **If that was the decision that was made, wouldn't
        you put that on the ISA data sheet?**

A      **Yes.**

Q:     Okay. **And that's not what's on the ISA data sheet,
        correct?**

A:     **Correct.**[28]

---

[27] FCI/MOA 257C–257D. Deposition exhibit 118 referenced in this testimony is attached as FCI/MOA
6–7.
[28] FCI/MOA 255 (Cappellini Dep. at 137:7–22) (emphasis added).

Motiva, Praxair, Fisher, Northeast Controls, and others cooperated in an initial investigation of the explosion. Motiva's operator at the plant—Conectiv, Inc.—retained an outside engineering firm, Wendell Hull and Associates ("WHA").[29] WHA had already had significant experience in investigating fires in oxygen systems; its lead investigator in the Delaware City incident had previously worked for NASA at its White Sands Testing Facility.[30] Before any litigation was filed, WHA provided an initial report that implicated the Valve's materials of construction.[31] In particular, WHA offered a tentative opinion that the fire was caused by the ignition of the Valve's thrust bearing.[32] As set out above, the thrust bearing was manufactured of TFE composite rather than the Monel as identified in Praxair's written specifications.[33]

Thus, before any lawsuit was filed, a well-respected expert in oxygen service had concluded that the fire was caused by an error on the part of Northeast Controls.

### C.    The Four State Court Lawsuits

In April 2002 Mr. Olson filed an action in Delaware state court to recover for his serious burns, injuries, and other damages sustained as a result of the explosion; Motiva, Praxair, and Great American Assurance (the insurer of the project's general contractor) filed three separate actions seeking to recover for damage to the DCPPRP and lost profits.[34] Fisher and Northeast Controls were defendants in all four of those actions. All four of the complaints referenced the

---

[29] FCI/MOA 25–28.
[30] FCI/MOA 29–30.
[31] FCI/MOA 25–28.
[32] FCI/MOA 25–28.
[33] FCI/MOA 21–23.
[34] FCI/MOA 31–52, 112–19,

distinction between (on the one hand) the Praxair specifications and (on the other) the actual materials of construction of the Valve.[35]

Fisher vigorously defended all four actions.[36] It took the lead in conducting document discovery and deposing witnesses. After completing initial discovery, Fisher moved for summary judgment on all claims in the three commercial cases—i.e., the <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u> actions.

Motiva responded to Fisher's motions for summary judgment by dismissing its action in its entirety without even filing a responsive brief.[37] Great American initially opposed Fisher's motions for summary judgment, but on the morning of oral argument on those motions it informed Fisher that it would stipulate to Fisher's dismissal. Fisher did not offer or provide anything to Motiva or Great American to settle the claims of those parties.

Praxair opposed Fisher's motions for summary judgment.[38] Judge Slights heard oral argument on Fisher's motions as to Praxair's claims and subsequently granted those motions, dismissing all of Praxair's claims against Fisher.[39]

In contrast with Fisher, Northeast Controls did not file its own motions for summary judgment—even though Fisher's counsel had shared its motions with Northeast Controls.[40] Instead, after Great American had agreed to dismiss its claims against Fisher, Northeast Controls

---

[35] <u>See, e.g.</u>, FCI 32 ¶ 10; 34 ¶ 20.a; 36 ¶ 30; 41 ¶ 7; 44 ¶¶ 21–22; 48 ¶ 12; 50 ¶ 26; 115 ¶ 20; 116 ¶ 39; 117 ¶ 45.
[36] Gunter Aff. ¶ 3.
[37] Gunter Aff. ¶ 4.
[38] Gunter Aff. ¶ 5.
[39] Gunter Aff. ¶ 5.
[40] Gunter Aff. ¶ 6.

negotiated with Great American to obtain dismissal of the Great American and Praxair actions

against Northeast Controls. Northeast Controls paid $501,000 to settle those actions.[41]

As part of that settlement, Northeast Controls effectively bought the silence of Great

American's expert consultants, Becht Engineering. Great American informed Northeast Controls

that Becht Engineering's expert(s) would offer the opinion that Northeast Controls was negligent

in the ordering of the valve and that its negligence caused the explosion and fire. Counsel for

Great American informed Thomas Wagner, counsel for Northeast Controls, of that opinion:

> The Becht people are confident that the actions of Northeast
> Controls, Inc., caused the explosion.[42]

Representatives for Northeast Controls subsequently met with Bruno Karcher of Becht

Engineering to determine what conclusions Becht Engineering had reached. The purpose for the

meeting was confirmed in an exchange of emails between counsel for Great American and

counsel for Northeast Controls:

> I understand your client is requesting the meeting [with Mr.
> Karcher] to confirm that Becht performed an independent
> investigation and reached certain conclusions about the valve that
> would have directly implicated Northeast. The Praxair test results
> simply confirmed what the Becht people believed, i.e., the material
> deviations caused the explosion.[43]

---

[41] FCI/MOA 91.

[42] FCI/MOA 82. The same attorney had previously informed counsel for Northeast Controls that he was considering dismissing Great American's claims against Fisher based solely on the testimony of a Northeast Controls representative (evidently Albert Cappellini): "Based on the testimony of the Northeast representative, I am very seriously considering voluntarily dismissing the claims against Fisher." FCI/MOA 75.

[43] FCI/MOA 88.

Counsel for Northeast Controls agreed: "Your understanding of the meeting is basically correct."[44]

The Praxair matter was subsequently dismissed.[45] Apparently, no order of dismissal has been entered in the Great American matter.

Throughout this period, Fisher continued to press ahead on discovery, developing significant evidence of numerous failures on the part of Praxair and Motiva regarding the design and commissioning of the ASU. In particular, Fisher developed evidence showing that the explosion was caused by a minute particle or particles impinging on a carbon steel flange immediately upstream of the Valve. In addition, Fisher developed evidence showing (a) that the piping system had not been maintained to the necessary standard of cleanliness and (b) that the parties in charge of the procedure at the time of the incident had failed to use appropriate procedures to ensure the integrity and safety of the system.

In light of that information, the expert retained by Mr. Olson—the plaintiff in the last case pending in the original set of actions—offered the opinion that the fire was caused by particle impingement on the carbon steel flange.[46] This opinion effectively exonerated both Fisher and Northeast Controls *from direct liability to Mr. Olson.*

In short, the expert for the sole remaining plaintiff had taken its sights off Fisher. Subsequently, though, an expert retained by Praxair—also a defendant in the *Olson* action—

---

[44] FCI/MOA 87.
[45] FCI/MOA 97–99.
[46] FCI/MOA 100–111.

offered an opinion that the fire was caused by "flow friction" resulting from the flow of oxygen across the Valve's seal, which was manufactured of a petroleum-based material.[47]

Fisher subsequently moved for summary judgment on all of the claims brought against it in the Olson action, including Northeast Controls' claims for contribution and indemnification in that action. Initially, Northeast Controls indicated that it would oppose Fisher's motion for summary judgment, but the parties then agreed to Fisher's dismissal, setting aside Northeast Controls' cross-claims for resolution at a later time. Praxair also agreed to Fisher's dismissal. The court granted Fisher's motions for summary judgment. Northeast Controls subsequently contributed $100,000 to the settlement of the Olson matter.[48]

This action followed. Northeast Controls and its insurer, St. Paul, have alleged that the Representative Agreement between the parties obligated Fisher to defend and indemnify Northeast Controls. Fisher has counterclaimed, alleging that Northeast Controls' Losses (a term defined under the Representative Agreement) were caused by its own negligence and that Fisher had no obligation to defend or indemnify it against those Losses. Further, Fisher claims that Northeast Controls breached its contractual obligations to Fisher, thus exposing Fisher to its legal fees and expenses in the underlying actions.

Initially, Fisher intended to assert that counterclaim only as an offset to plaintiffs' recovery (if any). Fisher now seeks to amend its counterclaim under Rule 15(a) so that it can recover those costs affirmatively, and not just as an offset.

---

[47] FCI/MOA 120–22. The evidence showed that, on Fisher's advice to Northeast Controls, the seal was made of Kel-F, not Tefzel as originally called out in the order placed by Northeast Controls. Under the theory of causation espoused by Praxair's expert, the fire would have occurred regardless whether the seal was manufactured of Kel-F or Tefzel.

[48] FCI/MOA 169 ¶ 9.

**D.**    <u>**Statement of Compliance with Local Rule 7.1.1**</u>

Counsel for Fisher has made a reasonable effort to reach agreement with plaintiffs on the matter set forth in this motion.[49] Fisher's counsel consulted with plaintiffs' counsel regarding the proposed amendment. In a telephonic discussion, plaintiffs' counsel initially expressed surprise at the request: he believed that Fisher's counterclaim sought precisely this relief. Nevertheless, plaintiffs declined to agree to the requested amendment.[50].

## III.    <u>ARGUMENT AND AUTHORITIES</u>

The grant or denial of a motion to amend is within the discretion of the Court. <u>Zenith Radio Corp. v. Hazeltine Research</u>, 401 U.S. 321 (1971). But the U.S. Supreme Court has instructed the district courts that leave should be freely granted unless there is an apparent reason for denying a request such as undue delay, bad faith, dilatory motive, undue prejudice, or futility of the claims. <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>Adams v. Gould, Inc.</u>, 739 F.2d 858 (3d Cir. 1984). In general, unless the motion to amend will result in prejudice to the non-moving party, the trial court should grant the motion. <u>Zenith Radio</u>, 401 U.S. at 330–31.

In this case, granting the motion to amend cannot prejudice the plaintiffs. The motion to amend seeks nothing more than to change the remedy requested by Fisher. None of the underlying facts will change, and the legal theory itself (i.e., breach of contract) will also stay the same. Fisher asks only that it be permitted to recover affirmatively—and not just as an offset— the costs that flowed from Northeast Controls' breach of its contract with Fisher.

---

[49] Gunter Aff. ¶ 7.
[50] FCI/MOA 187.

Plaintiffs cannot show any prejudice flowing from this amendment. It does not require proof of any additional facts. Indeed, Fisher does not even seek to assert a different legal theory. Instead, it seeks only a different remedy—i.e., the affirmative recovery of the expenses caused by Northeast Controls' negligence rather than the mere reduction of plaintiffs' recovery (if any).

Because plaintiffs will not be prejudiced by this amendment, Fisher respectfully requests that the Court grant its motion and permit Fisher to amend its counterclaim.

Attached to this Motion are (a) a "clean" copy of the proposed amended pleading and (b) a copy of the amended pleading showing deletions and additions.

RIDDELL WILLIAMS P.S.


By:  /s/ Daniel J. Gunter_____
    Patrick D. McVey
    *Pro hac vice*
    Daniel J. Gunter
    *Pro hac vice*
    Riddell Williams P.S.
    1001 Fourth Avenue Plaza, Suite 4500
    Seattle, WA 98154
    (206) 624-3600 (Tel.)
    (206) 389-1700 (Fax)
    pmcvey@riddellwilliams.com
    dgunter@riddellwilliams.com

Date: August 15, 2007

**MARON MARVEL BRADLEY**
**& ANDERSON, P.A.**

/s/ Paul A. Bradley
Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 425-5177 (phone)
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant

Date: August 15, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065<br><br>ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN  55102<br><br>                Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158<br><br><br>                Defendant. | NO. 06-412<br><br><br>**ANSWER TO AMENDED**<br><br>**COMPLAINT and AMENDED**<br><br>**COUNTERCLAIM** |

Defendant Fisher Controls International, LLC ("Fisher"), by and through its attorneys of record, answers plaintiffs' First Amended Complaint and asserts affirmative defenses as set forth below.  Each allegation not specifically admitted shall be deemed denied:

<u>**INTRODUCTION**</u>

1.	Responding to paragraph 1 of the Complaint, Fisher admits that this is a contractual indemnification action; admits that the actions identified were filed; and admits that the action filed by Great American Assurance Company was consolidated with actions filed by

Motiva Enterprises, LLC and Praxair, Inc.  Responding further, Fisher denies that it was obligated to defend and/or indemnify Northeast Controls for its own negligence in any of those actions.

## PARTIES

2.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 2 of the Complaint and therefore denies the same.

3.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 3 of the Complaint and therefore denies the same.

4.    Admitted.

5.    Admitted.

6.    Admitted.

7.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 7 of the Complaint and therefore denies the same.

## JURISDICTION AND VENUE

8.    Admitted.

9.    Admitted.

## BACKGROUND RELEVANT TO THE CLAIM

10.    Answering paragraph 10 of the Complaint, Fisher admits that Northeast Controls, Inc. ("Northeast Controls") and Fisher entered into a Representative Agreement on or about January 1, 1998, but denies that the document attached as  Exhibit "A" to the Complaint is the entire Representative Agreement.  Responding further, Fisher states that the Representative Agreement speaks for itself.

11.     Fisher admits that the Representative Agreement contains the passage set forth in paragraph 11 of the Complaint, but denies that the Representative Agreement contains the emphasis added by plaintiffs.  Responding further, Fisher states that plaintiffs have deleted language from the indemnity provision of the Representative Agreement and states that the Representative Agreement speaks for itself.

12.     Admitted.

13.     Admitted.

14.     Admitted.

15.     Responding to paragraph 15 of the Complaint, Fisher admits that Northeast Controls placed an order with Fisher for a control valve identified with the tag number "83HV0629." Fisher denies that Northeast Controls was acting "on behalf of Praxair." Responding further, Fisher states that Northeast Controls failed to place the order for that valve in accordance with specifications provided by Praxair to plaintiff. Northeast Controls' failure to do so breached its contract with Fisher and breached the duty of care owed by Northeast Controls to persons, including itself, who could foreseeably be injured by Northeast Controls' failure to place the order in accordance with the specifications provided by Praxair.  Further, Northeast Controls' negligent performance of its obligations under the Representative Agreement caused the losses suffered by plaintiffs in the underlying actions.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.    Admitted.

21.    Responding to paragraph 21 of the Complaint, Fisher admits that a fire occurred at the Delaware City Power Plant Repowering Project on or about May 20, 2000, but denies that the fire occurred "during re-powering of the ASU."

22.    Admitted.

23.    Responding to paragraph 23 of the Complaint, Fisher admits that, in the underlying actions, allegations were made that Praxair, Parsons Corporation ("Parsons"), and Motiva sustained property damage as a result of the May 20, 2000, fire.  Responding further, Fisher states that, on information and belief, neither Praxair nor Parsons suffered property damage as a result of the fire that occurred on May 20, 2000, at the Delaware City Power Plant Repowering Project.

24.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 24 of the Complaint and therefore denies the same.

25.    Admitted.

26.    Fisher admits that the Great American Complaint contains the passage set forth in paragraph 26 of the Complaint, but denies that the quoted passage constitutes the entirety of the Complaint.  Responding further, Fisher states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

27.    Denied.  Responding further, Fisher states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

28.    Fisher admits that the Great American Complaint "alleged that the defects, among other things, caused the fire and resulting damage," but states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

29.    Admitted.

30.    Fisher admits that paragraph 43 of the Olsons' Complaint alleges defects in the Fisher valve and further alleges that those defects caused injuries to Ronald and Carol Olson, but states that Northeast Controls' characterization of the Olsons' Complaint is partial and misleading and that the Olsons' Complaint speaks for itself.

31.    Denied.

32.    Admitted.

33.    Admitted.

34.    Admitted.

35.    Admitted.

36.    Admitted.

37.    Responding to paragraph 37 of the Complaint, Fisher states that the letter attached as Exhibit "J" speaks for itself and denies that the letter contains the emphasis added to the recitation of the letter in this paragraph.

38.    Responding to paragraph 38 of the Complaint, Fisher admits that it would have been responsible for defending and indemnifying Northeast Controls on claims of a product defect, but states that all claims of product defect made in any and all of the Underlying Actions

were based solely on Northeast Controls' negligent failure to ensure that the materials of

construction for the valve at issue met the written specifications provided by Praxair.

39.    Denied.  Responding further, Fisher states that it fully defended the valve in the

underlying actions; that it was not obligated to defend Northeast Controls for its negligence; and

that all of Northeast Controls' losses in the underlying actions were caused by Northeast

Controls' breach of its contract and its negligent conduct in failing to provide Fisher with the

specifications for the valve that Praxair had provided to Northeast Controls.

40.    Responding to paragraph 40 of the Complaint, Fisher states that it lacks

knowledge or information sufficient to form a belief as to whether "Rawle & Henderson LLP was

initially retained to defend Northeast in any lawsuit filed related to this fire" and therefore denies

the same.  Fisher admits that Northeast Controls is represented in this matter by Marshall,

Dennehey, Warner, Coleman & Goggin.

41.    Denied.  Responding further, Fisher states that the Representative Agreement

speaks for itself.

42.    Fisher admits that Great American and the Olsons both alleged the presence of

defects in the Fisher valve, but states that Northeast Controls' characterization of those

Complaints is partial and misleading and that those Complaints speak for themselves.  Responding

further, Fisher states that all allegations relating to the valve in the underlying actions focused

solely on Northeast Controls' failure to place an order with Fisher for the valve that conformed

with the specifications provided to Northeast Controls by Praxair, which failure constituted

negligence on the part of Northeast Controls. Further, Fisher states that Great American

voluntarily dismissed Fisher, but not Northeast Controls, from the <u>Great American</u> action.  Fisher

also states that the Olsons later agreed that there were no defects in the Fisher valve and therefore

agreed to entry of judgment on behalf of Fisher in the <u>Olson</u> action, but did not agree to the

dismissal of Northeast Controls from the <u>Olson</u> action.

43.    Fisher admits that Praxair and Motiva both filed suits alleging that the Fisher valve

was defective and that separate counsel appeared for Northeast Controls in the lawsuits filed by

those entities.  Responding further, Fisher states that Northeast Controls' characterization of the

<u>Praxair</u> and <u>Motiva</u> complaints is partial and misleading and that those Complaints speak for

themselves.  Fisher also states that the plaintiffs in the <u>Praxair</u> and <u>Motiva</u> actions alleged that

Northeast Controls was negligent and that the evidence developed during the pendency of those

actions confirmed that negligence.

44.    Admitted.

45.    Denied.

46.    Fisher admits that opinions of Dr. Robert. A. Mostello (Fisher's retained expert)

are attached as Exhibit G to the Complaint.  Those documents speak for themselves.  Responding

further, Fisher denies that Dr. Mostello's report "absolved Northeast from liability" and denies

each and every other allegation set forth in paragraph 46 of the Complaint.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Fisher lacks knowledge or information sufficient to form a belief as to the

allegations set forth in paragraph 50 of the Complaint and therefore denies the same.

51.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 51 of the Complaint and therefore denies the same.

52.    Denied.  Responding further, Fisher states that, based on documents obtained from plaintiffs, Northeast Controls entered into a settlement agreement with Great American because Great American had retained experts who had formed the conclusion that the fire at issue in the underlying actions was caused by Northeast Controls' negligence.

53.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 53 of the Complaint and therefore denies the same.

54.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 54 of the Complaint and therefore denies the same.

55.    Denied.

56.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 56 of the Complaint and therefore denies the same. Responding further, Fisher denies that it breached its contractual obligations.

57.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 57 of the Complaint and therefore denies the same.

58.    Denied.

## AFFIRMATIVE DEFENSES

1.    Plaintiffs' damages, if any, should be barred or reduced proportionally under the doctrines of contributory negligence and/or comparative fault.

2.    The various causes of action alleged in the Complaint are barred in whole or in part by the statute of limitations.

3.     The various causes of action alleged in the Complaint are barred in whole or in party by the principles of issue and/or claim preclusion.

4.     Northeast Controls failed to mitigate its damages, if any.

5.     Fisher is entitled to recoupment in the form of a reduction in the amount of Plaintiff's recovery in this lawsuit, if any, in the amount of attorneys fees and costs Fisher incurred in defending the underlying actions, which fees and costs were incurred by Fisher as a direct result of Northeast Controls' breach of contract and negligence in transmitting Praxair's specifications to Fisher.

6.     Fisher reserves the right to assert additional affirmative defenses disclosed through discovery or otherwise.

## COUNTERCLAIM

By way of counterclaim against plaintiff Northeast Controls, Inc., defendant Fisher Controls International, LLC ("Fisher"), by and through its counsel of record, Riddell Williams P.S., alleges as follows:

## JURISDICTION

1.     This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1332(a).

2.     This Court has jurisdiction over Fisher's counterclaim against plaintiff Northeast Controls under 28 U.S.C. § 1367(a) and Fed. R. Civ. P. 13(a).

## PARTIES

3.     Based on allegations in plaintiffs' Complaint, plaintiff Northeast Controls is a New York corporation with its principal place of business in Clifton Park, New York.

4.      Fisher is a Delaware limited liability company with a principal place of business in Marshalltown, Iowa.

## FACTUAL ALLEGATIONS

5.      At all times material to Fisher's counterclaims, Northeast Controls and Fisher were parties to a Representative Agreement.  A true and correct copy of the Representative Agreement is attached as Exhibit 1 to this Answer and Counterclaim.

6.      At all times material to Fisher's counterclaims, Fisher and Praxair, Inc. ("Praxair") were parties to a Worldwide Procurement Agreement.  A true and correct copy of the Worldwide Procurement Agreement is attached as Exhibit 2 to this Answer and Counterclaim.  The president of Northeast Controls signed the Worldwide Procurement Agreement on behalf of Northeast Controls.

7.      The Worldwide Procurement Agreement called for Fisher to manufacture its products supplied to Praxair in accordance with Praxair's specifications for those products.

8.      Under the terms of the Representative Agreement, and in accordance with the Worldwide Procurement Agreement, Northeast Controls placed orders with Fisher for control valves ordered by Praxair through Northeast Controls.

9.      Under the terms of the Representative Agreement, Northeast Controls was required to maintain documentation relating to the services that it provided in placing orders with Fisher for control valves ordered by Praxair through Northeast Controls.

10.      In 1996, Northeast Controls placed orders with Fisher for control valves for an air separation unit ("the ASU") that was being constructed by Praxair as part of the Delaware City Power Plant Repowering Project.

11.     The ordering and purchase of the control valves identified in paragraph 6 of this Counterclaim were governed by the Worldwide Purchasing Agreement between Fisher and Praxair.

12.     Northeast Controls' work in ordering the control valves identified in paragraph 10 of this Counterclaim was governed by the Representative Agreement between Fisher and Northeast Controls.

13.     On or about June 3, 1996, Praxair provided Northeast Controls with specifications for a 12" Type A11 valve that was to be identified or "tagged" as valve 83HV0629.  Valve 83HV0629 is referred to hereafter as "the Valve."

14.     As part of the order process for the Valve, Praxair provided specifications to Northeast Controls for the Valve.  A true and correct copy of Praxair's specifications for the Valve is attached as Exhibit 3 to this Answer and Counterclaim.

15.     Bert Cappellini was Northeast Controls' designated representative for purposes of Praxair's ordering of the Valve.  In his capacity as representative of Northeast Controls, Bert Cappellini initialed Praxair's specifications for the Valve as set forth in Exhibit 3.

16.     The document attached as Exhibit 3 to this Answer and Counterclaim was the only document relating to the purchase and sale of the Valve exchanged between Praxair and Northeast Controls that contained the initials of Bert Cappellini, as representative for Northeast Controls, and any representative for Praxair.

17.     The specifications provided by Praxair, and initialed by Bert Cappellini, called for the Valve to have, among others, the following specifications:  a disk manufactured of Monel; a shaft made of Monel; Monel bearings; and a seal manufactured of Monel/PTFE.

18.     Acting as Northeast Controls' representative, Bert Cappellini transmitted specifications to Fisher for the Valve.

19.     The specifications transmitted by Northeast Controls to Fisher for the Valve did not match the specifications provided to Northeast Controls in the only document signed by representatives for both Praxair and Northeast Controls.  Specifically, the  specifications that Northeast Controls transmitted to Fisher called for a disk manufactured of Hastelloy C; a shaft manufactured of Inconel 718; bearings manufactured of TFE composite; and a seal manufactured of Tefzel.

20.     Northeast Controls did not inform Praxair that Northeast Controls had provided Fisher with specifications for the Valve that differed from the specifications Praxair provided to Northeast Controls and Bert Cappellini accepted on behalf of Northeast Controls.

21.     Before the fire at issue in this matter, Northeast Controls never informed Fisher that Praxair had never agreed to purchase a Valve manufactured in accordance with the specifications provided by Northeast Controls to Fisher in relation to the Valve at issue.

22.     After Fisher received Northeast Controls' specifications for the Valve, a Fisher representative telephoned Bert Cappellini and recommended that the specification for the Valve seat be changed from Tefzel to Kel-F.

23.     Northeast Controls agreed that Fisher should change the material for the Valve seat from Tefzel to Kel-F.

24.     Northeast Controls did not obtain Praxair's approval for the change in the material for the Valve seat from Tefzel to Kel-F.  Nor did Bert Cappellini ever obtain Praxair's approval to use Kel-F in the Valve seat.

25.     Northeast Controls never informed Fisher that Praxair had requested that the Valve be manufactured using a Monel disk; a Monel shaft; Monel bearings; and a Monel/PTFE seat.

26.     Northeast Controls never informed Praxair that Fisher had manufactured the Valve using materials different from those specified by Praxair to Northeast Controls.

27.     Fisher manufactured the Valve in accordance with the specifications set forth in the communications between Northeast Controls and Fisher.

28.     On May 20, 2000, an incident ("the Incident") occurred at the Delaware City Power Plant Repowering Project.

29.     The Incident involved the Fisher Type A11 valve tagged "83HV0629."

30.     Following the Incident, four lawsuits ("the Underlying Actions") were filed against Fisher Controls International, Inc.

31.     In each of the Underlying Actions, the allegations against Fisher rested on the alleged failure of the Fisher Valve to comply with the specifications provided by Praxair to Northeast Controls.

32.     In the Underlying Actions, none of the parties ever adduced any evidence showing or tending to show that the Fisher Valve was defective in design or manufacture.

33.     In response to Northeast Controls' demand that Fisher defend and indemnify Northeast Controls in regard to the Underlying Actions, Fisher informed Northeast Controls that Fisher would defend Northeast Controls against any claim that the Valve was defective in design or manufacture.

34.    Fisher further informed Northeast Controls that it (Fisher) would not defend Northeast Controls against Northeast Controls' own negligence.

35.    In the Underlying Actions, Fisher defended the design and manufacturing of the Valve.

36.    Fisher filed motions for summary judgment in all four of the Underlying Actions.

37.    In the four Underlying Actions, Fisher's counsel drafted the motions for summary judgment identified in paragraph 36 of this Counterclaim.

38.    In the Underlying Actions, Fisher's counsel provided drafts of Fisher's motions for summary judgment to counsel for Northeast Controls before filing those motions.

39.    Northeast Controls did not file any motions for summary judgment in any of the Underlying Actions.

40.    After Fisher filed its motion for summary judgment as to all claims asserted by Motiva, Motiva voluntarily dismissed all of its claims.

41.    After Fisher filed its motion for summary judgment as to all claims asserted by Great American, Great American voluntarily dismissed all of its claims against Fisher.

42.    Great American did not voluntarily dismiss its claims against Northeast Controls.

43.    The state court granted Fisher's motion for summary judgment as to all claims asserted by Praxair against Fisher.

44.    After Fisher filed its motions for summary judgment in the Olson action, all of the parties to that action, including Northeast Controls, agreed to Fisher's dismissal from the Olson action.

## COUNTERCLAIM

## BREACH OF CONTRACT

45.    Fisher hereby incorporates the allegations set forth in paragraphs 1-44 of its Counterclaim as if fully set forth herein.

46.    The claims against both Northeast Controls an Fisher in the Underlying Actions were the direct result of Northeast Controls' failure to convey to Fisher the specifications provided for the Valve by Praxair to Northeast Controls.

47.    In failing to convey to Fisher the specifications provided for the Valve by Praxair, Northeast Controls breached the Representative Agreement.

48.    Northeast Controls' breach of the Representative Agreement caused Fisher damages, including but not limited to the costs incurred in defending the Olson, Praxair, Motiva, and Great American actions.

49.    In defending the Underlying Actions, Fisher incurred attorneys fees and costs in an amount to be proven at trial.

50.    In defending the Underlying Actions, Fisher incurred expert fees in an amount to be proven at trial.

51.    The attorneys fees and expert fees incurred by Fisher were reasonable.

52.    Fisher is entitled to recover the amount of the attorney fees, costs and expert fees incurred in defending the Underlying Actions.

WHEREFORE, Fisher demands judgment against Northeast Controls for the amount of the attorney fees, costs and expert fees incurred in defending the underlying action, together with

all costs and expenses for defending this action and any other such relief as the Court may deem equitable and just.

RIDDELL WILLIAMS P.S.


/s/ Daniel J. Gunter
By:     Patrick D. McVey
        *Pro hac vice*
        Daniel J. Gunter
        *Pro hac vice*
        Riddell Williams P.S.
        1001 Fourth Avenue Plaza, Suite 4500
        Seattle, WA  98154
        (206) 624-3600 (Tel.)
        (206) 389-1700 (Fax)
        pmcvey@riddellwilliams.com
        dgunter@riddellwilliams.com


Date:  August 15, 2007


MARON MARVEL BRADLEY & ANDERSON, P.A.


/s/ Paul A. Bradley
By:     Paul A. Bradley
        Maron & Marvel
        1201 N. Market St, Ste. 900
        Wilmington, DE 19801
        (302) 425-5177 (Tel.)
        (302) 425-0180 (Fax)
        pab@maronmarvel.com


Date:  August 15, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065<br><br>ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN  55102<br><br>               Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158<br><br><br>               Defendant. | NO. 06-412<br><br><br>**ANSWER TO AMENDED**<br><br>**COMPLAINT and AMENDED**<br><br>**COUNTERCLAIM** |

Defendant Fisher Controls International, LLC ("Fisher"), by and through its attorneys of record, answers plaintiffs' First Amended Complaint and asserts affirmative defenses as set forth below.  Each allegation not specifically admitted shall be deemed denied:

## INTRODUCTION

1.    Responding to paragraph 1 of the Complaint, Fisher admits that this is a contractual indemnification action; admits that the actions identified were filed; and admits that the action filed by Great American Assurance Company was consolidated with actions filed by

1

Motiva Enterprises, LLC and Praxair, Inc.  Responding further, Fisher denies that it was obligated to defend and/or indemnify Northeast Controls for its own negligence in any of those actions.

## PARTIES

2.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 2 of the Complaint and therefore denies the same.

3.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 3 of the Complaint and therefore denies the same.

4.    Admitted.

5.    Admitted.

6.    Admitted.

7.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 7 of the Complaint and therefore denies the same.

## JURISDICTION AND VENUE

8.    Admitted.

9.    Admitted.

## BACKGROUND RELEVANT TO THE CLAIM

10.    Answering paragraph 10 of the Complaint, Fisher admits that Northeast Controls, Inc. ("Northeast Controls") and Fisher entered into a Representative Agreement on or about January 1, 1998, but denies that the document attached as  Exhibit "A" to the Complaint is the entire Representative Agreement.  Responding further, Fisher states that the Representative Agreement speaks for itself.

11.     Fisher admits that the Representative Agreement contains the passage set forth in paragraph 11 of the Complaint, but denies that the Representative Agreement contains the emphasis added by plaintiffs.  Responding further, Fisher states that plaintiffs have deleted language from the indemnity provision of the Representative Agreement and states that the Representative Agreement speaks for itself.

12.     Admitted.

13.     Admitted.

14.     Admitted.

15.     Responding to paragraph 15 of the Complaint, Fisher admits that Northeast Controls placed an order with Fisher for a control valve identified with the tag number "83HV0629." Fisher denies that Northeast Controls was acting "on behalf of Praxair." Responding further, Fisher states that Northeast Controls failed to place the order for that valve in accordance with specifications provided by Praxair to plaintiff. Northeast Controls' failure to do so breached its contract with Fisher and breached the duty of care owed by Northeast Controls to persons, including itself, who could foreseeably be injured by Northeast Controls' failure to place the order in accordance with the specifications provided by Praxair.  Further, Northeast Controls' negligent performance of its obligations under the Representative Agreement caused the losses suffered by plaintiffs in the underlying actions.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.    Admitted.

20.    Admitted.

21.    Responding to paragraph 21 of the Complaint, Fisher admits that a fire occurred at the Delaware City Power Plant Repowering Project on or about May 20, 2000, but denies that the fire occurred "during re-powering of the ASU."

22.    Admitted.

23.    Responding to paragraph 23 of the Complaint, Fisher admits that, in the underlying actions, allegations were made that Praxair, Parsons Corporation ("Parsons"), and Motiva sustained property damage as a result of the May 20, 2000, fire. Responding further, Fisher states that, on information and belief, neither Praxair nor Parsons suffered property damage as a result of the fire that occurred on May 20, 2000, at the Delaware City Power Plant Repowering Project.

24.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 24 of the Complaint and therefore denies the same.

25.    Admitted.

26.    Fisher admits that the Great American Complaint contains the passage set forth in paragraph 26 of the Complaint, but denies that the quoted passage constitutes the entirety of the Complaint. Responding further, Fisher states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

27.    Denied.  Responding further, Fisher states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

28.    Fisher admits that the Great American Complaint "alleged that the defects, among other things, caused the fire and resulting damage," but states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

29.    Admitted.

30.    Fisher admits that paragraph 43 of the Olsons' Complaint alleges defects in the Fisher valve and further alleges that those defects caused injuries to Ronald and Carol Olson, but states that Northeast Controls' characterization of the Olsons' Complaint is partial and misleading and that the Olsons' Complaint speaks for itself.

31.    Denied.

32.    Admitted.

33.    Admitted.

34.    Admitted.

35.    Admitted.

36.    Admitted.

37.    Responding to paragraph 37 of the Complaint, Fisher states that the letter attached as Exhibit "J" speaks for itself and denies that the letter contains the emphasis added to the recitation of the letter in this paragraph.

38.    Responding to paragraph 38 of the Complaint, Fisher admits that it would have been responsible for defending and indemnifying Northeast Controls on claims of a product defect, but states that all claims of product defect made in any and all of the Underlying Actions were based solely on Northeast Controls' negligent failure to ensure that the materials of construction for the valve at issue met the written specifications provided by Praxair.

39.    Denied.  Responding further, Fisher states that it fully defended the valve in the underlying actions; that it was not obligated to defend Northeast Controls for its negligence; and that all of Northeast Controls' losses in the underlying actions were caused by Northeast Controls' breach of its contract and its negligent conduct in failing to provide Fisher with the specifications for the valve that Praxair had provided to Northeast Controls.

40.    Responding to paragraph 40 of the Complaint, Fisher states that it lacks knowledge or information sufficient to form a belief as to whether "Rawle & Henderson LLP was initially retained to defend Northeast in any lawsuit filed related to this fire" and therefore denies the same.  Fisher admits that Northeast Controls is represented in this matter by Marshall, Dennehey, Warner, Coleman & Goggin.

41.    Denied.  Responding further, Fisher states that the Representative Agreement speaks for itself.

42.    Fisher admits that Great American and the Olsons both alleged the presence of defects in the Fisher valve, but states that Northeast Controls' characterization of those Complaints is partial and misleading and that those Complaints speak for themselves.  Responding further, Fisher states that all allegations relating to the valve in the underlying actions focused

solely on Northeast Controls' failure to place an order with Fisher for the valve that conformed

with the specifications provided to Northeast Controls by Praxair, which failure constituted

negligence on the part of Northeast Controls. Further, Fisher states that Great American

voluntarily dismissed Fisher, but not Northeast Controls, from the <u>Great American</u> action. Fisher

also states that the Olsons later agreed that there were no defects in the Fisher valve and therefore

agreed to entry of judgment on behalf of Fisher in the <u>Olson</u> action, but did not agree to the

dismissal of Northeast Controls from the <u>Olson</u> action.

     43.     Fisher admits that Praxair and Motiva both filed suits alleging that the Fisher valve

was defective and that separate counsel appeared for Northeast Controls in the lawsuits filed by

those entities. Responding further, Fisher states that Northeast Controls' characterization of the

<u>Praxair</u> and <u>Motiva</u> complaints is partial and misleading and that those Complaints speak for

themselves. Fisher also states that the plaintiffs in the <u>Praxair</u> and <u>Motiva</u> actions alleged that

Northeast Controls was negligent and that the evidence developed during the pendency of those

actions confirmed that negligence.

     44.     Admitted.

     45.     Denied.

     46.     Fisher admits that opinions of Dr. Robert. A. Mostello (Fisher's retained expert)

are attached as Exhibit G to the Complaint. Those documents speak for themselves. Responding

further, Fisher denies that Dr. Mostello's report "absolved Northeast from liability" and denies

each and every other allegation set forth in paragraph 46 of the Complaint.

     47.     Denied.

48.    Denied.

49.    Denied.

50.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 50 of the Complaint and therefore denies the same.

51.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 51 of the Complaint and therefore denies the same.

52.    Denied.  Responding further, Fisher states that, based on documents obtained from plaintiffs, Northeast Controls entered into a settlement agreement with Great American because Great American had retained experts who had formed the conclusion that the fire at issue in the underlying actions was caused by Northeast Controls' negligence.

53.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 53 of the Complaint and therefore denies the same.

54.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 54 of the Complaint and therefore denies the same.

55.    Denied.

56.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 56 of the Complaint and therefore denies the same. Responding further, Fisher denies that it breached its contractual obligations.

57.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 57 of the Complaint and therefore denies the same.

58.    Denied.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs' damages, if any, should be barred or reduced proportionally under the doctrines of contributory negligence and/or comparative fault.

2.      The various causes of action alleged in the Complaint are barred in whole or in part by the statute of limitations.

3.      The various causes of action alleged in the Complaint are barred in whole or in party by the principles of issue and/or claim preclusion.

4.      Northeast Controls failed to mitigate its damages, if any.

5.      Fisher is entitled to recoupment in the form of a reduction in the amount of Plaintiff's recovery in this lawsuit, if any, in the amount of attorneys fees and costs Fisher incurred in defending the underlying actions, which fees and costs were incurred by Fisher as a direct result of Northeast Controls' breach of contract and negligence in transmitting Praxair's specifications to Fisher.

6.      Fisher reserves the right to assert additional affirmative defenses disclosed through discovery or otherwise.

## COUNTERCLAIM

By way of counterclaim against plaintiff Northeast Controls, Inc., defendant Fisher Controls International, LLC ("Fisher"), by and through its counsel of record, Riddell Williams P.S., alleges as follows:

## JURISDICTION

1.      This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1332(a).

2.      This Court has jurisdiction over Fisher's counterclaim against plaintiff Northeast

Controls under 28 U.S.C. § 1367(a) and Fed. R. Civ. P. 13(a).

## PARTIES

3.      Based on allegations in plaintiffs' Complaint, plaintiff Northeast Controls is a New

York corporation with its principal place of business in Clifton Park, New York.

4.      Fisher is a Delaware limited liability company with a principal place of business in

Marshalltown, Iowa.

## FACTUAL ALLEGATIONS

5.      At all times material to Fisher's counterclaims, Northeast Controls and Fisher were

parties to a Representative Agreement.  A true and correct copy of the Representative Agreement

is attached as Exhibit 1 to this Answer and Counterclaim.

6.      At all times material to Fisher's counterclaims, Fisher and Praxair, Inc. ("Praxair")

were parties to a Worldwide Procurement Agreement.  A true and correct copy of the Worldwide

Procurement Agreement is attached as Exhibit 2 to this Answer and Counterclaim.  The president

of Northeast Controls signed the Worldwide Procurement Agreement on behalf of Northeast

Controls.

7.      The Worldwide Procurement Agreement called for Fisher to manufacture its

products supplied to Praxair in accordance with Praxair's specifications for those products.

8.      Under the terms of the Representative Agreement, and in accordance with the

Worldwide Procurement Agreement, Northeast Controls placed orders with Fisher for control

valves ordered by Praxair through Northeast Controls.

9.    Under the terms of the Representative Agreement, Northeast Controls was required to maintain documentation relating to the services that it provided in placing orders with Fisher for control valves ordered by Praxair through Northeast Controls.

10.    In 1996, Northeast Controls placed orders with Fisher for control valves for an air separation unit ("the ASU") that was being constructed by Praxair as part of the Delaware City Power Plant Repowering Project.

11.    The ordering and purchase of the control valves identified in paragraph 6 of this Counterclaim were governed by the Worldwide Purchasing Agreement between Fisher and Praxair.

12.    Northeast Controls' work in ordering the control valves identified in paragraph 10 of this Counterclaim was governed by the Representative Agreement between Fisher and Northeast Controls.

13.    On or about June 3, 1996, Praxair provided Northeast Controls with specifications for a 12" Type A11 valve that was to be identified or "tagged" as valve 83HV0629.  Valve 83HV0629 is referred to hereafter as "the Valve."

14.    As part of the order process for the Valve, Praxair provided specifications to Northeast Controls for the Valve.  A true and correct copy of Praxair's specifications for the Valve is attached as Exhibit 3 to this Answer and Counterclaim.

15.    Bert Cappellini was Northeast Controls' designated representative for purposes of Praxair's ordering of the Valve.  In his capacity as representative of Northeast Controls, Bert Cappellini initialed Praxair's specifications for the Valve as set forth in Exhibit 3.

16.     The document attached as Exhibit 3 to this Answer and Counterclaim was the only document relating to the purchase and sale of the Valve exchanged between Praxair and Northeast Controls that contained the initials of Bert Cappellini, as representative for Northeast Controls, and any representative for Praxair.

17.     The specifications provided by Praxair, and initialed by Bert Cappellini, called for the Valve to have, among others, the following specifications:  a disk manufactured of Monel; a shaft made of Monel; Monel bearings; and a seal manufactured of Monel/PTFE.

18.     Acting as Northeast Controls' representative, Bert Cappellini transmitted specifications to Fisher for the Valve.

19.     The specifications transmitted by Northeast Controls to Fisher for the Valve did not match the specifications provided to Northeast Controls in the only document signed by representatives for both Praxair and Northeast Controls.  Specifically, the  specifications that Northeast Controls transmitted to Fisher called for a disk manufactured of Hastelloy C; a shaft manufactured of Inconel 718; bearings manufactured of TFE composite; and a seal manufactured of Tefzel.

20.     Northeast Controls did not inform Praxair that Northeast Controls had provided Fisher with specifications for the Valve that differed from the specifications Praxair provided to Northeast Controls and Bert Cappellini accepted on behalf of Northeast Controls.

21.     Before the fire at issue in this matter, Northeast Controls never informed Fisher that Praxair had never agreed to purchase a Valve manufactured in accordance with the specifications provided by Northeast Controls to Fisher in relation to the Valve at issue.

22.     After Fisher received Northeast Controls' specifications for the Valve, a Fisher representative telephoned Bert Cappellini and recommended that the specification for the Valve seat be changed from Tefzel to Kel-F.

23.     Northeast Controls agreed that Fisher should change the material for the Valve seat from Tefzel to Kel-F.

24.     Northeast Controls did not obtain Praxair's approval for the change in the material for the Valve seat from Tefzel to Kel-F.  Nor did Bert Cappellini ever obtain Praxair's approval to use Kel-F in the Valve seat.

25.     Northeast Controls never informed Fisher that Praxair had requested that the Valve be manufactured using a Monel disk; a Monel shaft; Monel bearings; and a Monel/PTFE seat.

26.     Northeast Controls never informed Praxair that Fisher had manufactured the Valve using materials different from those specified by Praxair to Northeast Controls.

27.     Fisher manufactured the Valve in accordance with the specifications set forth in the communications between Northeast Controls and Fisher.

28.     On May 20, 2000, an incident ("the Incident") occurred at the Delaware City Power Plant Repowering Project.

29.     The Incident involved the Fisher Type A11 valve tagged "83HV0629."

30.     Following the Incident, four lawsuits ("the Underlying Actions") were filed against Fisher Controls International, Inc.

31.    In each of the Underlying Actions, the allegations against Fisher rested on the alleged failure of the Fisher Valve to comply with the specifications provided by Praxair to Northeast Controls.

32.    In the Underlying Actions, none of the parties ever adduced any evidence showing or tending to show that the Fisher Valve was defective in design or manufacture.

33.    In response to Northeast Controls' demand that Fisher defend and indemnify Northeast Controls in regard to the Underlying Actions, Fisher informed Northeast Controls that Fisher would defend Northeast Controls against any claim that the Valve was defective in design or manufacture.

34.    Fisher further informed Northeast Controls that it (Fisher) would not defend Northeast Controls against Northeast Controls' own negligence.

35.    In the Underlying Actions, Fisher defended the design and manufacturing of the Valve.

36.    Fisher filed motions for summary judgment in all four of the Underlying Actions.

37.    In the four Underlying Actions, Fisher's counsel drafted the motions for summary judgment identified in paragraph 36 of this Counterclaim.

38.    In the Underlying Actions, Fisher's counsel provided drafts of Fisher's motions for summary judgment to counsel for Northeast Controls before filing those motions.

39.    Northeast Controls did not file any motions for summary judgment in any of the Underlying Actions.

40.     After Fisher filed its motion for summary judgment as to all claims asserted by Motiva, Motiva voluntarily dismissed all of its claims.

41.     After Fisher filed its motion for summary judgment as to all claims asserted by Great American, Great American voluntarily dismissed all of its claims against Fisher.

42.     Great American did not voluntarily dismiss its claims against Northeast Controls.

43.     The state court granted Fisher's motion for summary judgment as to all claims asserted by Praxair against Fisher.

44.     After Fisher filed its motions for summary judgment in the <u>Olson</u> action, all of the parties to that action, including Northeast Controls, agreed to Fisher's dismissal from the <u>Olson</u> action.

<div align="center">

**COUNTERCLAIM**

**BREACH OF CONTRACT**

</div>

45.     Fisher hereby incorporates the allegations set forth in paragraphs 1-44 of its Counterclaim as if fully set forth herein.

46.     The claims against both Northeast Controls an Fisher in the Underlying Actions were the direct result of Northeast Controls' failure to convey to Fisher the specifications provided for the Valve by Praxair to Northeast Controls.

47.     In failing to convey to Fisher the specifications provided for the Valve by Praxair, Northeast Controls breached the Representative Agreement.

48.    Northeast Controls' breach of the Representative Agreement caused Fisher damages, including but not limited to the costs incurred in defending the <u>Olson</u>, <u>Praxair</u>, <u>Motiva</u>, and <u>Great American</u> actions.

49.    In defending the Underlying Actions, Fisher incurred attorneys fees and costs in an amount to be proven at trial.

50.    In defending the Underlying Actions, Fisher incurred expert fees in an amount to be proven at trial.

51.    The attorneys fees and expert fees incurred by Fisher were reasonable.

52.    Fisher is entitled to ~~recoupment in the form of a reduction in the amount of Plaintiff's recovery in this lawsuit, if any, in~~<u>recover</u> the amount of the attorney fees, costs and expert fees incurred in defending the ~~underlying action~~<u>Underlying Actions</u>.

WHEREFORE, Fisher demands judgment ~~in its favor, reducing the amount of~~against

Northeast Controls~~' recovery, if any, in~~ for the amount of the attorney fees, costs and expert fees

incurred in defending the underlying action, together with all costs and expenses for defending this

action and any other such relief as the Court may deem equitable and just.

RIDDELL WILLIAMS P.S.


/s/ Daniel J. Gunter
By:     Patrick D. McVey
        *Pro hac vice*
        Daniel J. Gunter
        *Pro hac vice*
        Riddell Williams P.S.
        1001 Fourth Avenue Plaza, Suite
        4500
        Seattle, WA  98154
        (206) 624-3600 (Tel.)
        (206) 389-1700 (Fax)
        pmcvey@riddellwilliams.com
        dgunter@riddellwilliams.com


Date:   ~~April 16,~~August 15, 2007


MARON MARVEL BRADLEY & ANDERSON, P.A.


/s/ Paul A. Bradley
By:     Paul A. Bradley
        Maron & Marvel
        1201 N. Market St, Ste. 900
        Wilmington, DE 19801
        (302) 425-5177 (Tel.)
        (302) 425-0180 (Fax)
        pab@maronmarvel.com

Date:  ~~April 16,~~ August 15, 2007

Document comparison done by DeltaView on Tuesday, August 14, 2007 2:40:36 PM

| Input: | |
|---|---|
| Document 1 | PowerDocs://SEATTLE/571465/1 |
| Document 2 | PowerDocs://SEATTLE/587883/1 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 11 |
| Deletions | 8 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 19 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065<br><br>ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN 55102<br><br>     Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158<br><br><br>     Defendant. | NO. 06-412<br><br><br>**PROPOSED ORDER AS**<br><br>**TO DEFENDANT'S**<br><br>**MOTION TO AMEND**<br><br>**COUNTERCLAIM** |

The Defendant's Motion to Amend Counterclaim is hereby granted.

IT IS SO ORDERED THIS _____ DAY OF _____, 2007.


_____
J.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065<br><br>ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN 55102<br><br><div align="center">Plaintiffs,</div><br>v.<br><br>FISHER CONTROLS INTERNATIONAL,<br>LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158<br><br><div align="center">Defendant.</div> | NO. 06-412<br><br><br>**DEFENDANT'S NOTICE OF**<br><br>**WAIVER OF RIGHT TO**<br><br>**FILE OPENING BRIEF** |

Pursuant to Rule 7.1.2, Fisher Controls International LLC hereby gives notice that it waives its right to file an opening brief in relation to Defendant's Motion to Amend Counterclaim and relies on the contents of it is Motion.

<div align="center">

**MARON MARVEL BRADLEY**
**& ANDERSON, P.A.**

</div>

/s/ Paul A. Bradley
Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 425-5177 (phone)
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant

Date: August 15, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065<br><br>ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN 55102<br><br>               Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158<br><br><br>              Defendant. | NO. 06-412<br><br><br>**AFFIDAVIT OF DANIEL J.**<br><br>**GUNTER IN SUPPORT OF**<br><br>**DEFENDANT'S MOTION TO**<br><br>**AMEND COUNTERCLAIM** |

STATE OF WASHINGTON )
                      : ss.
County of King         )

    I, DANIEL J. GUNTER, being duly sworn, depose and state as follows:

    1.     I am one of the attorneys representing defendant Fisher Controls International,

LLC ("AmTech"), in the above matter. I am competent to attest as to the matters set forth herein,

and I make this affidavit based on my personal knowledge.

    2.     The incidents underlying the current action were also at issue in four prior actions:

Fisher was named as a defendant in four separate lawsuits filed against Fisher in the New Castle,

County, Delaware Superior Court: <u>Olson v. Motiva Enterprises LLC</u> (No. 02C-04-263); <u>Praxair, Inc., v. Fisher Controls International, Inc.</u> (No. 02C-05-190); <u>Motiva Enterprises, LLC v. Fisher Controls International, Inc.</u> (No. 02C-05-169); and <u>Great American Assurance Co. v. Fisher Controls International, Inc.</u> (No. 02C-05-168).

3.      Fisher vigorously defended all four of the underlying actions. It took the lead in conducting document discovery and deposing witnesses. After completing initial discovery, Fisher moved for summary judgment on all claims in the three commercial cases—i.e., the <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u> actions.

4.      Motiva responded to Fisher's motions for summary judgment by dismissing its action in its entirety without even filing an opposition brief. Great American initially opposed Fisher's motions for summary judgment, but on the morning of oral argument on those motions it informed Fisher that it would stipulate to Fisher's dismissal. Fisher did not offer or provide anything to Motiva or Great American to settle those claims.

5.      Praxair opposed Fisher's motions for summary judgment. Judge Slights heard oral argument on Fisher's motions as to Praxair's claims and subsequently granted those motions, dismissing all of Praxair's claims against Fisher.

6.      In contrast with Fisher, Northeast Controls did not file its own motions for summary judgment—even though Fisher's counsel had shared its motions with Northeast Controls.

7.      Counsel for Fisher has made a reasonable effort to reach agreement with plaintiffs on the matter set forth in this motion. On July 27, 2007, I consulted with plaintiffs' counsel Scott Shannon regarding the proposed amendment. In our telephonic conversation, Mr. Shannon initially expressed surprise at the request: he believed that Fisher's counterclaim sought precisely this relief. Nevertheless, in a later email, Mr. Shannon informed me that plaintiffs declined to agree to the requested amendment. A true and correct copy of that email is attached as Exhibit 31

to this Affidavit.

8.    Attached hereto as Exhibit 1 is a true and correct copy of selected pages of the Representative Agreement between Fisher and Northeast Controls at issue in this matter.

9.    Attached hereto as Exhibit 2 is a true and correct copy of a document marked as Exhibit 118 in the matter <u>Olson v. Motiva</u>, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS). Northeast Controls, Inc., has admitted that this is a true and correct copy of the only specification sheet (or "ISA") initialed by representatives for both Praxair, Inc., and Northeast Controls, Inc., for the 83HV0629 Valve ("the Valve").

10.    Attached hereto as Exhibit 3 is a true and correct copy of emails exchanged between and among a Northeast Controls, Inc. representative and employees of Fisher Controls International, Inc. The email dated June 18, 1998, provides a "matrix" number for the Valve.

11.    Attached hereto as Exhibit 4 is a true and correct copy of the relevant purchase order for the Valve. This document was sent by Praxair, Inc., to Northeast Controls, Inc.

12.    Attached hereto as Exhibit 5 is a true and correct copy of a specification sheet prepared by Northeast Controls, Inc., for the Valve on or about July 23, 1998.

13.    Attached hereto as Exhibit 6 is a true and correct copy of a facsimile message from Northeast Controls, Inc. to Praxair, Inc., detailing the actual materials of construction of the Valve.

14.    Attached hereto as Exhibit 7 is a true and correct copy of a document prepared by Northeast Controls, Inc.'s employee Albert Cappellini, titled "Order history regarding 12" Fisher A11 valve that was supplied to Praxair." Northeast Controls produced this document to counsel for Fisher.

15.    Attached hereto as Exhibit 8 is a true and correct copy of selected pages from the Wendell Hull & Associates Phase I Cause and Origin Analysis of the May 20, 2000 incident, along with a profile of the principal author, Barry Newton.

16.    Attached hereto as Exhibit 9 is a true and correct copy of Praxair, Inc.'s Complaint in the underlying case.

17.    Attached hereto as Exhibit 10 is a true and correct copy of Motiva Enterprises LLC's Amended Complaint in the underlying case.

18.    Attached hereto as Exhibit 11 is a true and correct copy of Great American Assurance Company's Complaint in the underlying case.

19.    Attached hereto as Exhibit 12 is a true and correct copy of the Bench Memorandum prepared for Judge Slights in the underlying case.

20.    Attached hereto as Exhibit 13 is a true and correct copy of Motiva Enterprises LLC's Stipulation of Dismissal of the parties in the underlying case.

21.    Attached hereto as Exhibit 14 is a true and correct copy of a January 19, 2004 E-mail from Christopher Konzelmann to Thomas Wagner.

22.    Attached hereto as Exhibit 15 is a true and correct copy of a February 19, 2004 letter from Thomas Wagner to Christopher Konzelmann.

23.    Exhibit 16 has been removed.

24.    Attached hereto as Exhibit 17 is a true and correct copy of a February 20, 2004 letter from Christopher Konzelmann to Thomas Wagner.

25.    Attached hereto as Exhibit 18 is a true and correct copy of a April 21, 2004 letter from Christopher Konzelmann to Thomas Wagner.

26.    Attached hereto as Exhibit 19 is a true and correct copy of a May 17, 2004 E-mail string between Thomas Wagner and Christopher Konzelmann.

27.    Attached hereto as Exhibit 20 is a true and correct copy of a May 25, 2004 letter from Christopher Konzelmann to Thomas Wagner attaching a signed release and settlement agreement and a signed non-disclosure affidavit.

28.    Attached hereto as Exhibit 21 is a true and correct copy of a Stipulation of

Dismissal of Praxair's Complaint against remaining defendants in the consolidated case.

29.ʳ     Attached hereto as Exhibit 22 is a true and correct copy of selected pages from the expert report of Engineering Design & Testing Corp.

30.     Attached hereto as Exhibit 23 is a true and correct copy of Ronald W. Olson's Second Amended Complaint. in the underlying case.

31.     Attached hereto as Exhibit 24 is a true and correct copy of selected pages from the December 21, 2004 expert report of Rimkus Consulting Group, Inc.

32.     Attached hereto as Exhibit 25 is a true and correct copy of selected pages from the December 27, 2004 expert report of Serry-Tech, Inc.

33.     Attached hereto as Exhibit 26 is a true and correct copy of the January 3, 2005 expert report of David P. Pope, Ph.D.

34.     Attached hereto as Exhibit 26A is a true and correct copy of selected pages from the January 3, 2005 expert report of AMCS Corp.

35.     Attached hereto as Exhibit 27 is a true and correct copy of the June 7, 2005 Order granting Fisher's Motion for Summary Judgment against all remaining claims in the underlying case.

36.     Attached hereto as Exhibit 28 is a true and correct copy of the September 1, 2005 Stipulation of Dismissal.

37.     Attached hereto as Exhibit 29 is a true and correct copy of the First Amended Complaint from Northeast Controls, Inc. and St. Paul Mercury Insurance Company.

38.     Attached hereto as Exhibit 30 is a true and correct copy of Fisher Controls International, LLC's Answer to Amended Complaint and Counterclaim.

39.     Attached hereto as Exhibit 32 is a true and correct copy of selected pages of the deposition testimony of Robert D. Barry, taken in the matter Olson v. Motiva, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on December 15, 2003.

40.     Attached hereto as Exhibit 33 is a true and correct copy of selected pages of the deposition testimony of Bhim Bhakoo, taken in the matter Olson v. Motiva, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on December 11, 2003.

41.     Attached hereto as Exhibit 34 is a true and correct copy of selected pages of the deposition testimony of Bhim Bhakoo, taken in the matter Olson v. Motiva, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on April 1, 2004.

42.     Attached hereto as Exhibit 35 is a true and correct copy of selected pages of the deposition testimony of Gregory Calloway, taken in the matter Olson v. Motiva, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on April 28, 2004.

43.     Attached hereto as Exhibit 36 is a true and correct copy of selected pages of the deposition testimony of Albert Cappellini, taken in the matter Olson v. Motiva, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on December 12, 2003.

44.     Attached hereto as Exhibit 36A is a true and correct copy of selected pages of the deposition testimony of Albert Cappellini, taken in the matter Olson v. Motiva, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on April 30, 2004.

45.     Attached hereto as Exhibit 37 is a true and correct copy of selected pages of the deposition testimony of Gary Del Grego, taken in the matter Olson v. Motiva, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on December 9, 2003, and October 4, 2004.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

46.    Attached hereto as Exhibit 38 is a true and correct copy of selected pages of the

deposition testimony of James Ponto, taken in the matter Olson v. Motiva, Del. Super. Ct., New

Castle County, No. C.A. 02C-04-263 (JRS) on January 25 and 26, 2005.

Daniel J. Gunter

Subscribed and sworn to before me this 14th day of August, 2007.

[Loren R. Dunn]
Notary Public, State of Washington
My commission expires:  11-88-07

# EXHIBIT 1

# REPRESENTATIVE AGREEMENT

THIS AGREEMENT, made this 1st day of January, 1998, by and between FISHER CONTROLS INTERNATIONAL, INC. having its principal offices at 8000 Maryland Avenue, Clayton, Missouri 63105 (hereinafter called "Fisher"), and NORTHEAST CONTROLS, INC., ~~Sitterly Road,~~ Clifton Park, NY 12065 (hereinafter called "Representative"). 3 Boolentschen Drive 

WHEREAS, Fisher desires to appoint on its own behalf and has been duly authorized by the other companies identified in Appendix A hereto (each such company, including Fisher, is hereinafter referred to individually as a "Fisher Company" and collectively as the "Fisher Companies") to appoint Representative as a sales, engineering and service representative for Products of the Fisher Companies upon the following terms and conditions; and

WHEREAS, Representative represents that it is qualified to act as such a representative for the Fisher Companies in the Territory defined in Section I below pursuant to such terms and conditions;

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

## I.   APPOINTMENT AND TERRITORY

Fisher hereby appoints Representative during the term of this Agreement, and Representative hereby accepts such appointment, as a sales, engineering and service representative for the Fisher Companies and for their designated products and related services as further described herein (said products and related services hereinafter referred to as "Products") in the territorial area specified in Appendix C hereto (hereinafter referred to as the "Territory").

It is understood that the Products included in this Agreement are those manufactured or supplied by the Fisher Companies specified in Appendix A unless otherwise excluded by such Appendix. The Fisher Companies shall also have the right, at any time, to amend or modify any Appendix to this Agreement upon written notice to Representative. This Agreement does not include representation for other subsidiaries or affiliated companies of the Fisher Companies or their products or services unless specifically listed in Appendix A.

1

FCI/MOA 0001

## II.    OBLIGATIONS OF REPRESENTATIVE

Representative shall:

A.    Use its best efforts to fully promote, and pursue all reasonable opportunities in the solicitation of orders for, the Products in the Territory at such prices, license fees, and upon such terms and conditions as may be from time to time specified by the Fisher Company for whom orders are solicited. All such orders shall be promptly transmitted to the Fisher Company on whose behalf the orders were solicited and shall be subject to the written approval and acceptance of such Fisher Company. In no event shall Representative accept any order or otherwise attempt to bind any Fisher Company in any transaction unless specifically authorized by the appropriate Fisher Company. All remittances by the customer to whom Products are sold or licensed shall be made directly by the customer to the relevant Fisher Company.

B.    Except to the extent limited by, and subject to the terms of, Section VII and Appendix D hereof, furnish engineering services, consistent with Fisher's standards and practices, to customers and potential customers, including without limitation, reviewing and evaluating the requirements for the Products and participating in the selection and designation of the proper Products and specifications therefor.

C.    Except to the extent limited by, and subject to the terms of, Section VII and Appendix D hereof, furnish proper technical services to all users of the Products located or installed in the Territory, including without limitation, assistance in connection with the start-up, check out and calibration of Products, the diagnosis of user inquiries concerning Products and the servicing of deficiencies in, and the performance of warranty obligations on, the Products in the manner specified from time to time by the Fisher Companies.

D.    Maintain in the Territory suitable premises, equipment and current technical and promotional literature for the Products, and employ sufficient and suitably qualified and trained technical, engineering and other competent personnel necessary to carry out the duties of Representative under this Agreement to the satisfaction of the Fisher Companies. Representative and its personnel shall maintain a working knowledge and familiarity with the Products, including associated services, and attend training sessions as appropriate to maintain such knowledge and familiarity.

E.    Keep the appropriate Fisher Companies fully informed of commercial and market conditions within the Territory and of the activities of customers and competitors, and regularly cover the trade and industry for the purposes of furthering sales of the Products.

F.    Provide the Fisher Companies periodically, as requested, with sales forecasts for the Products and customer evaluations.

G.    Assist, when requested, the Fisher Companies in obtaining relevant information relating to the financial standing and reputation of customers in order to evaluate credit risks.

H.    Maintain records in such form and in such detail as the Fisher Companies may reasonably request from time to time with respect to customers; outstanding quotations and orders; engineering and technical services and related activities, including plans,

FCI/MOA 0002

B. Representative agrees that it may only use those Product trademarks which identify the Products it is authorized to sell and then only to further the promotion and sale of the Products such trademarks identify. Representative may only use such trademarks in their standard form and style as they appear upon the Products or as instructed in writing by Fisher. No other letter(s), word(s), design(s), symbol(s), or other matter of any kind shall be superimposed upon, associated with or shown in such proximity to the trademarks so as to tend to alter or dilute them and Representative further agrees not to combine or associate any of such trademarks with any other trademark or trade name. The generic or common name of the Product must always follow the trademark except in those instances when Representative uses the name "FISHER" when referring to a Fisher Company, in which event no generic or common name is required.

C. In all advertisements, sales and promotional literature or other printed matter in which any of such trademarks appear, Representative must identify itself by its full name and address and state its relationship to the Fisher Company. Every such trademark used or displayed by Representative must be identified as a trademark owned by the relevant Fisher Company in the manner prescribed by Fisher.

D. On its letterheads, business cards, invoices, statements, etc., Representative or sales office may identify itself as the sales representative of the relevant Fisher Company or Companies.

E. Representative agrees that it will never use any trademark or trade name of Fisher or its subsidiaries or affiliates or any simulation of such marks or names as a part of Representative's corporate or other trading name or designation of any kind.

F. Upon expiration or termination of this Agreement, Representative shall promptly discontinue every use of such trademarks, trade names, corporate logos and identities, and any similar styles and any language stating or suggesting that Representative is a sales representative of any Fisher Company, as well as any word or term resembling such names, marks, logos, identities or styles which would be likely to cause confusion or deception.

## XI. INDEMNITY

Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI, Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Representative from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. The obligations set forth in the immediately preceding sentence shall not apply unless

10

Representative, upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses arising from the following:

A.    Any express warranty unauthorized by Fisher;

B.    Any distribution or sale of a Product for a purpose unauthorized by Fisher;

C.    Use of any instructions, labels, warnings or other product literature which have not been previously approved in writing by Fisher;

D.    Any failure by Representative to maintain any Product in merchantable condition;

E.    Demonstration, installation, servicing, modification or repair of any Product by Representative or any third party not in accordance with written warnings or instructions of Fisher, or

F.    Negligent acts or omissions by Representative.

## XII.  EXPENSES

All expenses incurred by Representative in carrying out this Agreement will be borne by Representative unless otherwise expressly provided herein.

## XIII.  GOVERNING LAW, ENTIRE AGREEMENT

The validity, interpretation and performance of this Agreement and any dispute connected herewith shall be governed and construed in accordance with the laws of the State of Missouri, U.S.A. This Agreement constitutes the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement. This Agreement cancels and supersedes all existing contracts and arrangements by and between Fisher, The Fisher Companies and the Representative for the representation of the Fisher Companies. Except as specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms and conditions of this Agreement shall be binding unless hereafter made in writing and signed by the party to be bound, and no modification shall be effected by the acknowledgment or acceptance of purchase order or shipping instruction forms containing terms and conditions at variance with or in addition to

11

those set forth herein. No waiver by either Fisher, a Fisher Company or Representative with respect to any breach or default or of any right or remedy and no course of dealing, shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver be expressed in writing signed by the party to be bound. If any term or condition of this Agreement or the application thereof is judicially or otherwise determined to be invalid or unenforceable, the remainder of this Agreement and the application thereof shall not be affected and shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written by their respective authorized officials.

NORTHEAST CONTROLS, INC.
(Representative)

By _____
Title _____President_____

FISHER CONTROLS INTERNATIONAL, INC.

By _____
Title _____Area Vice President, Northeast_____

FCI/MOA 0005

# EXHIBIT 2

Project:   STAR Delaware City P-8064
Unit:
P.O.:
Item:      46
Contract:
Serial:

SPECIFICATION FORM FOR PROCESS MEASUREMENT
Data Sheet   46 of
Spec:                    6/3/98
Tag:      83HV0629
DWG:      A-2272740
Service:BLOC discharge isolation

Crit. Pres. PC:737.620 psia

| | SERVICE CONDITIONS | Units | MAX | NRM | MIN | Shut-Off | OTH |
|---|---|---|---|---|---|---|---|
| 1 | Fluid:   OXYGEN | | | | | | |
| 2 | Q | scfh | 2572200.0 | 2184800.0 | | | |
| 3 | P1 | psia | 1167.000 | 1167.000 | | 1300 psid | |
| 4 | P2 | psia | 1165.000 | 1165.000 | | | |
| 5 | T | deg F | 250.000 | 250.000 | | | |
| 6 | SG | | 1.105 | 1.105 | | | |
| 7 | Fk | | 1.000 | 1.000 | | | |
| 8 | | | | | | | |
| 9 | Cv | | 1095.733 | 930.654 | | | |
| 10 | | | | | | | |
| 11 | Vlv LpA | dB(A) | <50.0 | <50.0 | | | |
| 12 | | | | | | | |

| | | | |
|---|---|---|---|
| | PIPE LINE | 53 | ACTUATOR Type:       PISTON,SPRING RTN |
| 13 | Size, Schedule In:12 in SCH STD | 54 | Mfg/Model:       FISHER/1031 |
| 14 | Size,Schedule Out:12 in SCH STD | 55 | Size: 33102-SR       Eff Area: N/A |
| 15 | Insulation: | 56 | On/Off:       Modulating: YES |
| 16 | VALVE BODY/BONNET   Type:BUTTERFLY | 57 | Spring Action:   CLOSE |
| 17 | Size:12"       ANSI 600 | 58 | Max Allow Press: 120 psig |
| 18 | Max Press:  1300  psig    Temp:300  F | 59 | Min Req'd Press:  80 psig |
| 19 | Mfg/Model:       FISHER/A11 | 60 | Available Air Supply Pressure |
| 20 | Body/Bonnet Matl: Hastelloy C | 61 | Max:120 psig    Min:90 psig |
| 21 | Liner Matl/ID:   NONE | 62 | Bench Range:   N/A |
| 22 | End Connection In:WAFER | 63 | Act Orientation: HORIZ. |
| 23 | End Connection Out:WAFER | 64 | Handwheel Type:  NONE |
| 24 | Flg Face Finish:  ANSI B16.5-81 | 65 | Air Fails Valve: CLOSE  Set at: |
| 25 | End Ext/Matl: | 66 | Stroke time < 1 sec to close |
| 26 | Flow Direction:   Shaft UP Stream | 67 | Input Signal:    4-20 mA dc |
| 27 | BONNET   Type:   EXTENDED | 68 | POSITIONER Type:   SINGLE ACTING |
| 28 | Lub-Iso Valve:       Lube: | 69 | Mfg/Model:       FISHER/3720 |
| 29 | Packing Material: SINGLE TFE | 70 | Incr Signal Output: INCREASES |
| 30 | Packing Type:    V-RING, JAM TYPE | 71 | Gauges: SUPP & OUT   By-Pass: NONE |
| 31 | | 72 | Cam Characteristic: LINEAR |
| 32 | TRIM Type:       STANDARD | 73 | |
| 33 | Size:Full       Travel: 90 Deg | | SWITCHES |
| 34 | Characteristic:   MOD EQUAL PERCENT | 74 | Type: POSITION TRANSMITTER   Qty: 1 |
| 35 | | 75 | Mfg/Model:       Stonel/PQ70E1C |
| 36 | Rated Cv:2831    Fl:.520    Xt:.350 | 76 | Contacts/Rating: |
| 37 | Disk Material:  Monel | 77 | Actuation Points:4-20 MA |
| 38 | Seat Material:  Monel/PTFE | 78 | |
| 39 | Guide Material:  Monel | | AIRSET |
| 40 | Stem Material:  Monel | 79 | Mfg/Model:       FISHER/67AFD FILTER |
| 41 | 2 Asco sol. Model: 8316G2 24vdc | 80 | Set Pressure:    n/a |
| 42 | piped per P&ID 3051 | 81 | Filter:YES      Gauges: No |
| | SPECIAL ACCESSORIES | 82 | |
| 43 | NEC:       Group:       Div: | 83 | TESTS Hydro Press: |
| 44 | STANDARD NOTES SUPPLIED PER DWG | 84 | ANSI/FCI Leak Class: VI |
| 45 | A-2234221 ALT D | 85 | Instrument overpressure protection |
| 46 | 1,2,4,11,13,15,16,17(2),18,23,24, | 86 | required  Yes( )  No (x) |
| 47 | 25,26,28,29,30,31,32,35,43 | | |

| | | Rev | Date | Revision | Orig | App |
|---|---|---|---|---|---|---|
| 48 | | | 6/3/98 | | BC | BSB |
| 49 | Torque Req.= 1264.9 FT-lbs | | | | | |
| 50 | Torque Gen.= 1350.0 Ft-lbs | | | | CHK'D | REV'D |
| 51 | FF Dim.= 5.50" | | | 1.42 HV0629-1 | RER | RER |
| 52 | | | | | | |

DEPOSITION
EXHIBIT
Olson 118
12-11-03 KE

FCI/MOA 0006

Northeast Controls, Inc.                     Page 1

P1.42 HV0629

Customer:    STAR Delaware City P-8064
Engineer:
Date:        6/3/98                Reference:
Item:        46                    Tag:      83HV0629
Quote:                             Order:    815F5206P
Fluid:       OXYGEN
Equipment:
Comments:

VALVE SIZING CALCULATION:   ISA/EN Gas

|  |  | NRM OXYGEN | MAX OXYGEN |
|---|---|---|---|
| SERVICE & SIZING | | | |
| Gas Name | | OXYGEN | OXYGEN |
| Inlet Pressure (psia) | | 1167.000 | 1167.000 |
| Pressure Drop (psid) | | 2.000 | 2.000 |
| dP/P1 Ratio | | 0.002 | 0.002 |
| Atm. Pressure (psia) | | 14.696 | 14.696 |
| Critical Temperature (deg F) | | -181.070 | -181.070 |
| Critical Pressure (psia) | | 737.620 | 737.620 |
| Specific Gravity (SG) | | 1.105 | 1.105 |
| Specific Heat Ratio Factor, Fk | | 1.000 | 1.000 |
| Temperature (deg F) | | 250.000 | 250.000 |
| Gas Flow Rate (scfh) | | 2184800.000 | 2572200.000 |
| Pressure Drop Ratio Factor, Xt | | 0.470 | 0.450 |
| Adj Pres. Drop Ratio Factor, Xtp | | 0.470 | 0.450 |
| Expansion Factor Y | | 0.999 | 0.999 |
| Gas Compressibility Factor, Z | | 0.995 | 0.995 |
| Valve diameter d (in) | | 12.000 | 12.000 |
| Inlet Pipe Diameter, D1 (in) | | 12.000 | 12.000 |
| Outlet Pipe Diameter, D2 (in) | | 12.000 | 12.000 |
| Piping Correction Factor, Fp | | 1.000 | 1.000 |
| Liquid Sizing Coefficient, Cv | | 930.654 | 1095.733 |
| dP Choked (psid) | | 548.490 | 525.150 |
| NOISE CALCULATION | | BUTTERFLY | BUTTERFLY |
| Fisher Valve/Trim Type | | 12.000 | 12.000 |
| Downstream Pipe Size (in) | | STD | STD |
| Downstream Pipe Schedule | | <50.0 | <50.0 |
| Valve LpA (SPL) (dB(A)) | | | |
| VELOCITY | | 113.000 | 113.000 |
| Upstream Area (in2) | | 113.000 | 113.000 |
| Downstream Area (in2) | | | |
| Sonic Velocity (ft/s) | | 1242.593 | 1242.593 |
| Inlet Mach | | 0.011 | 0.013 |
| Inlet Velocity (ft/s) | | 13.669 | 16.154 |
| Outlet Mach | | 0.011 | 0.013 |
| Outlet Velocity (ft/s) | | 13.669 | 16.154 |

# EXHIBIT 3

Author: Alan Richardson at USNSTPO1
Date:   6/24/98  09:56 AM
Priority: Normal
TO: Justin Trawny at USMTNMO2
CC: Alan Richardson
Subject: Re: Request for All pricing Quote 198-JET06221

    Justin,
        This is quite a request considering we have NO Service Conditions.
    Please see below for the PSC and Delivery.


                        Very truly yours,
                        Alan Richardson


_____ Reply Separator _____
Subject: Request for All pricing Quote 198-JET06221
Author: Justin Trawny at USMTNMO2
Date:   6/22/98  08:23 AM


        Alan,

        Need price and delivery for the inquiry below.  Please reference
        98-JET06221.

        Regards,
        Justin


_____ Forward Header _____
Subject: Request for All pricing
Author: Mark Paolucci at uscpkrp1
Date:   6/18/98  3:34 PM


        Justin,

        Please supply pricing and delivery on the following construction:
        All matrix: A11-12-151-CB743-J1-3-00.
                        Unit Budgetary PSC=$17,000
                        Delivery:16 Weeks ARO

        Any questions please call.

        Regards,
        Mark Paolucci



DEPOSITION
EXHIBIT
Olson 130
12-12-03 KH

CONFIDENTIAL

FCI/MOA 0008

Author: Justin Trawny at usmtnpol
Date:    6/24/98  12:10 PM
Priority: Normal
Receipt Requested
TO: Alan Richardson at USNSTPO1
Subject: Re[2]: Request for All pricing Quote #98-JET06221
-------------------------------- Message Contents ------------------
----------------

    Alan,
    Thanks for the quick response.  I apologize for not clarifyin
g this
    one better for you.  I had intended to but forgot.  This same
matrix,
    except for the size, is going into the same application with
the
    exception that there is now a lower Cv.  Appreciate and under
stand
    your comment, but it everything is fine on this one.

    Thanks again,

    Justin


_____ Reply Separator _____

    Subject: Re: Request for All pricing Quote #98-JET06221
    Author:  Alan Richardson at USNSTPO1
    Date:    6/24/98 9:56 AM


    Justin,
        This is quite a request considering we have NO Service Cond
itions.
        Please see below for the PSC and Delivery.


                        Very truly yours,
                        Alan Richardson


_____ Reply Separator _____

Subject: Request for All pricing Quote #98-JET06221
Author:  Justin Trawny at USMTNMO2
Date:    6/22/98 08:23 AM


                        Page 1

CONFIDENTIAL

FCI/MOA 0009

thor:  Mark Paolucci at uscpkrpl
       6/24/98  2:30 PM
 ty: Normal
 stin Trawny at usmtnpol
 t:  Re(2): Request for All pricing Quote #98-JET06221

Justin,
     Bert and I were able to secure an order from Praxair today for the
All matrix listed below for $ 24,552.00 net. ($ 752.00 Premium !!)
Any questions please call.
Regards,
Mark Paolucci

_____ Reply Separator _____
subject: Re: Request for All pricing Quote #98-JET06221
Author: Justin Trawny at usmtnpol
Date:  6/24/98 12:22 PM


    Mark,
    Please find pricing and delivery for the following construction below:
    All matrix: All-12-151-CB743-31-3-00.
    Net Price=$23,800 10% Commission
    Delivery: 16 Weeks ARO

    Regards,
    Justin

CONFIDENTIAL

# EXHIBIT 4



# PRAXAIR, INC.

PO BOX 44
TONAWANDA, N.Y. 14151-0044

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

22257

## PURCHASE ORDER: 815F5206P

**FAXED**

The above P.O. number, line item number, and release number if applicable must appear on all correspondence, invoices, shipping papers, and packages.

TELEPHONE: (716) 879-2000   DATE: 07/06/98

H064 8064                                    0793205



PROJECT 8064-DELAWARE CITY, DE
SHIPPING INSTRUCTIONS TO FOLLOW



FISHER CONTROLS INTERNATIONAL,
C/O NORTHEAST CONTROLS INC
6000 N BAILEY AVENUE SUITE 2B
AMHERST                NY 14228

| SHIP BY | REQUISITIONED BY | ROUTING CODE | COMMODITY CODE: 5404 | | |
|---|---|---|---|---|---|
| 07/31/98 | BHAKOO/SHELTON | | | | |
| PURCHASING AGENT | REFER QUESTIONS TO: | | CONFIRMING TO: | TAX STATUS | |
| A. PETERSON | J. SHIECH   879-2972(F) | | BERT 6/26/98 | TAX EXEMPT MD | |
| F.O.B. POINT | SHIP VIA | FREIGHT TERMS | PAYMENT TERMS | | |
| SHIPPING POINT | UPS-NO INSUR | 3RD PARTY | 2.00 PCT.  08 DAYS NET  30 | | |

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AMO |
|---|---|---|---|---|---|
| | | | ** ACKNOWLEDGEMENT REQUIRED ** | *Northeast* | |
| | | | * CONFIRMING-DO NOT DUPLICATE * | 1,464.49 | 1,464. |
| 001 | 1 | EA | 1-1/2" AUTOMATIC VALVE IN ACCORDANCE WITH BUYER'S DRAWING A-2272695, DATED 5/21/98 ATTACHED HERETO AND MADE A PART THEREOF. !TAG: 83KV0524 ACCT# PRO 080 8064 5400 | | |
| 002 | 1 | EA | 1-1/2" AUTOMATIC VALVE IN ACCORDANCE WITH BUYER'S DRAWING A-2272696, DATED 6/3/98 ATTACHED HERETO AND MADE A PART THEREOF. !TAG: 83KV0527 ACCT# PRO 080 8064 5400 | *Northeast* 1,464.49 | 1,464. |
| 003 | 1 | EA | 1" AUTOMATIC VALVE IN ACCORDANCE WITH BUYER'S DRAWING A-2272697, DATED 5/21/98 ATTACHED HERETO AND MADE A PART THEREOF. !TAG: 83KV0530 ACCT# PRO 080 8064 5400 | *Northeast* 1,279.24 | 1,279. |
| 004 | 1 | EA | 1" AUTOMATIC VALVE (CONTINUED NEXT PAGE) | *Northeast* 1,337.74 | 1,337. |

CONFIDENTIAL

JUL - 9 1998

DEPOSITION EXHIBIT 145
Olson
121503KF
PENGAD 800-631-6989

FCI/MOA 0011

| SPECIAL INSTRUCTIONS | ACKNOWLEDGED AND ACCEPTED |
|---|---|
| TEXAS DO NOT BILL TAXES.  TEXAS DIRECT PAY PERMIT NO. 3-01136-8104-0 TAXABLE MATERIAL | |

ACKNOWLEDGMENT

PAGE  2

# PRAXAIR, INC.

PO BOX 44
TONAWANDA, N.Y. 14151-0044

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

# PURCHASE ORDER

**FAXED**
81BF5206P

The above P.O. number, line item number, and release number if appli
must appear on all correspondence, invoices, shipping papers, and pack

TELEPHONE: (716) 879-2000   DATE:
H064  8064                                        0793205

**B U Y E R**

**S H I P T O**

**S E L L E R**

FISHER CONTROLS INTERNATIONAL

FCI/MOA 0012

CONFIDENTIAL

| SHIP BY | REQUISITIONED BY | | ROUTING CODE | | |
|---|---|---|---|---|---|
| PURCHASING AGENT | | REFER QUESTIONS TO: | | CONFIRMING TO: | TAX STATUS |
| F.O.B. POINT | | SHIP VIA | FREIGHT TERMS | PAYMENT TERMS | TEXAS SPECIAL INST |

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AM |
|---|---|---|---|---|---|
| | | | IN ACCORDANCE WITH BUYER'S DRAWING A-2272754, DATED 6/3/98 ATTACHED HERETO AND MADE A PART THEREOF. !TAG: 83XV0544 *83KV0539* ACCT# PRO 080 8064 5400 | *Not Present* 1,337.74 | 1,33 |
| 005 | 1 | EA | 1" AUTOMATIC VALVE IN ACCORDANCE WITH BUYER'S DRAWING A-2272705, DATED 6/3/98 ATTACHED HERETO AND MADE A PART THEREOF. !TAG: 83KV0544 ACCT# PRO 080 8064 5400 | *check* 23,779.32 | 23,77 |
| 006 | 1 | EA | 30" AUTOMATIC VALVE IN ACCORDANCE WITH BUYER'S DRAWING A-2272732, DATED 5/19/98 ATTACHED HERETO AND MADE A PART THEREOF. !TAG: 83XV0581 ACCT# PRO 080 8064 5400 | *check* 13,791.52 *# 21,860.34* | 13,79 *21,86* |
| 007 | 1 | EA | 24" AUTOMATIC VALVE IN ACCORDANCE WITH BUYER'S DRAWING A-2272733, DATED 6/3/98 ATTACHED HERETO AND MADE A PART THEREOF. | | |

*Change to 300;*
*A31*
*per Bus Covert*

(CONTINUED NEXT PAGE)

SPECIAL INSTRUCTIONS

ACKNOWLEDGED AND ACCEPTED

TEXAS
DO NOT BILL TAXES.  TEXAS DIRECT
PAY PERMIT NO. 3- 01136-8104-0 TAXABLE
MATERIAL

ACKNOWLEDGMENT



**PRAXAIR, INC.**
PO BOX 44
TONAWANDA, N.Y. 14151-0044

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

PAGE   3

**PURCHASE ORDER**     **FAXED**
815F5206P

The above P.O. number, line item number, and release number if appli
must appear on all correspondence, invoices, shipping papers, and pack

TELEPHONE: (716) 879-2000  DATE:
H064 8064                          0793205

**S H I P**      **S E L L E R**                    FISHER CONTROLS INTERNATIONAL

| SHIP BY | REQUISITIONED BY | | ROUTING CODE | | |
|---|---|---|---|---|---|
| PURCHASING AGENT | | REFER QUESTIONS TO: | | CONFIRMING TO: | TAX STATUS |
| F.O.B. POINT | | SHIP VIA | FREIGHT TERMS | PAYMENT TERMS | TEXAS SPECIAL INS |

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AMO |
|---|---|---|---|---|---|
| | | | !TAG: 83XV0582 | | |
| | | | ACCT# PRO 080 8064 5400 | *chk* | |
| 008 | 1 | EA | 12" AUTOMATIC VALVE | 5,585.84 | 5,585 |
| | | | IN ACCORDANCE WITH BUYER'S | | |
| | | | DRAWING A-2272734, DATED 6/3/98 | | |
| | | | ATTACHED HERETO AND MADE A PART | | |
| | | | THEREOF. | | |
| | | | !TAG: 830V0585 | | |
| | | | ACCT# PRO 080 8064 5400 | *chk* | |
| 009 | 1 | EA | 20" AUTOMATIC VALVE | 13,665.96 | 13,665 |
| | | | IN ACCORDANCE WITH BUYER'S | | |
| | | | DRAWING A-2272735, DATED 6/3/98 | | |
| | | | ATTACHED HERETO AND MADE A PART | | |
| | | | THEREOF. | | |
| | | | !TAG: 83FV0600 | | |
| | | | ACCT# PRO 080 8064 5400 | *chk* | |
| 010 | 1 | EA | 4" AUTOMATIC VALVE | 1,967.68 | 1,96 |
| | | | IN ACCORDANCE WITH BUYER'S | | |
| | | | DRAWING A-2272738, DATED 5/19/98 | | |
| | | | ATTACHED HERETO AND MADE A PART | | |
| | | | THEREOF. | | |
| | | | !TAG: 83HV0615 | | |
| | | | ACCT# PRO 080 8064 5400 | *chk* | |
| 011 | 1 | EA | 12" AUTOMATIC VALVE | 32,151.13 | 32,15 |
| | | | (CONTINUED NEXT PAGE) | | |

FCI/MOA 0013

CONFIDENTIAL

| SPECIAL INSTRUCTIONS | ACKNOWLEDGED AND ACCEPTED |
|---|---|

TEXAS
DO NOT BILL TAXES.   TEXAS DIRECT
PAY PERMIT NO. 3-01136-8104-0 TAXABLE
MATERIAL

**ACKNOWLEDGMENT**

PAGE 4



## PRAXAIR, INC.
PO BOX 44
TONAWANDA, N.Y. 14151-0044

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

## PURCHASE ORDER: 815F5206P    **FAXED**

The above P.O. number, line item number, and release number if applic
must appear on all correspondence, invoices, shipping papers, and pack:

TELEPHONE: (716) 879-2000  DATE:
H064 8064                              0793205

**B**
**U**
**Y**
**E**
**R**

**S**
**H**
**I**
**P**

**S**
**E**
**L**
**L**
**E**
**R**                      FISHER CONTROLS INTERNATIONAL

| | | | | | |
|---|---|---|---|---|---|
| SHIP BY | REQUISITIONED BY | | ROUTING CODE | | |
| PURCHASING AGENT | | REFER QUESTIONS TO: | | CONFIRMING TO: | TAX STATUS |
| F.O.B. POINT | | SHIP VIA | FREIGHT TERMS | PAYMENT TERMS | TEXAS<br>SPECIAL INSTR |

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AMO |
|---|---|---|---|---|---|
| | | | IN ACCORDANCE WITH BUYER'S<br>DRAWING A-2272740, DATED 6/3/98<br>ATTACHED HERETO AND MADE A PART<br>THEREOF.<br>!TAG: 83HV0629<br>ACCT# PRO 080 8064 5400 | 20,318.40 | 20,318. |
| 012 | 1 | EA | 30" AUTOMATIC VALVE<br>IN ACCORDANCE WITH BUYER'S<br>DRAWING A-2272741, DATED 6/3/98<br>ATTACHED HERETO AND MADE A PART<br>THEREOF.<br>!TAG: 83PV0700<br>ACCT# PRO 080 8064 5400 | 6,272.61 | 6,272 |
| 013 | 1 | EA | 12" AUTOMATIC VALVE<br>IN ACCORDANCE WITH BUYER'S<br>DRAWING A-2272742, DATED 6/9/98<br>ATTACHED HERETO AND MADE A PART<br>THEREOF.<br>!TAG: 83UV0710<br>ACCT# PRO 080 8064 5400 | 9,224.25 | 9,224 |
| 014 A | 1 | EA | 12" AUTOMATIC VALVE<br>IN ACCORDANCE WITH BUYER'S<br>DRAWING A-2272742, DATED 6/9/98<br>ATTACHED HERETO AND MADE A PART<br>THEREOF. | | |

FCI/MOA 0014

CONFIDENTIAL

(CONTINUED NEXT PAGE)

| SPECIAL INSTRUCTIONS | ACKNOWLEDGED AND ACCEPTED |
|---|---|
| TEXAS<br>DO NOT BILL TAXES. TEXAS DIRECT<br>PAY PERMIT NO. 3-01136-8104-0 TAXABLE<br>MATERIAL | |

ACKNOWLEDGMENT



PAGE 5

# PRAXAIR, I. 'C.

## PURCHASE ORDER: 815F5206P

**FAXED**

PO BOX 44
TONAWANDA, N.Y. 14151-0044

The above P.O. number, line item number, and release number if applicab must appear on all correspondence, invoices, shipping papers, and package

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

TELEPHONE: (716) 879-2000  DATE:
H064 8064                              0793205





FISHER CONTROLS INTERNATIONAL

| SHIP BY | REQUISITIONED BY | | ROUTING CODE | | | |
|---|---|---|---|---|---|---|
| PURCHASING AGENT | | REFER QUESTIONS TO: | | CONFIRMING TO: | | TAX STATUS |
| F.O.B. POINT | | SHIP VIA | FREIGHT TERMS | PAYMENT TERMS | | TEXAS FOR SPECIAL INSTRUCTI □ |

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AMOU |
|---|---|---|---|---|---|
| | | | !TAG: 83UV0710<br>ACCT# PRO 080 8064 5400 | 6,647.71 | 6,647.7 |
| 015 | 1 | EA | 8" AUTOMATIC VALVE<br>IN ACCORDANCE WITH BUYER'S<br>DRAWING A-2272731, DATED 6/3/98<br>ATTACHED HERETO AND MADE A PART<br>THEREOF.<br>!TAG: 83UV0741<br>ACCT# PRO 080 8064 5400 | | |
| 016 | 1 | EA | 1" AUTOMATIC VALVE<br>IN ACCORDANCE WITH BUYER'S<br>DRAWING A-2272749, DATED 6/3/98<br>ATTACHED HERETO AND MADE A PART<br>THEREOF.<br>!TAG: 83XV1516 | 1,705.12 | 1,705.1 |

OPERATING AND MAINTENANCE INSTRUCTION MANUALS
*********************************************
15 (*) SETS OF OPERATING AND MAINTENANCE INSTRUCTION
MANUALS INCLUDING PARTS LIST PER EACH COMPONENT/EQUIPMENT TYPE
AND DIMENSIONAL DRAWINGS AND CONNECTION INFORMATION, ALL IN
ACCORDANCE WITH BUYER'S SPECIFICATION GS-2. MANUALS SHALL BE
IDENTIFIED WITH BUYER'S PURCHASE ORDER NUMBER, PROJECT NUMBER,
PROJECT LOCATION AND TAG NUMBER.

ONE (1) MANUAL (SET) SHALL BE SHIPPED WITH THE COMPONENT.

FCI/MOA 0015

(CONTINUED NEXT PAGE)                                    CONFIDENTIAL

| SPECIAL INSTRUCTIONS | ACKNOWLEDGED AND ACCEPTED |
|---|---|
| TEXAS<br>DO NOT BILL TAXES. TEXAS DIRECT<br>PAY PERMIT NO. 3-01136-8104-0 TAXABLE<br>MATERIAL | |

ACKNOWLEDGMENT

**PRAXAIR, INC.**
PO BOX 44
TONAWANDA, N.Y. 14151-0044

**PURCHASE ORDER:** **FAXED** 815F5206P

The above P.O. number, line item number, and release number if applicable must appear on all correspondence, invoices, shipping papers, and package

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

TELEPHONE: (716) 879-2000   DATE:
H064 8064                                    0793205



FISHER CONTROLS INTERNATIONAL

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|

FOURTEEN (14)* MANUALS (SETS) TO BE SENT TO:

```
             PRAXAIR, INC.
             PO BOX 44
             175 EAST PARK DRIVE
             TONAWANDA, NY 14151-0044
             ATTN: TECHNICAL COMMUNICATIONS DEPT.

      (*)    UNLESS ANOTHER QUANTITY IS SPECIFIED

             ACCT# PRO 080 8064 5400
```

********* YEAR 2000 COMPLIANCE WARRANTY **********
SELLER HEREBY WARRANTS, CERTIFIES AND COVENANTS THAT IT HAS
OR WILL TAKE ALL NECESSARY MEASURES TO ENSURE THAT ITS
SUPPLY OF WORK, SERVICES, PRODUCTS, MATERIALS AND/OR EQUIPMENT
WILL NOT BE INTERRUPTED, DELAYED OR OTHERWISE ADVERSELY
AFFECTED BY "YEAR 2000 PROBLEM(S)" AND THAT ALL PRODUCTS,
MATERIALS AND/OR EQUIPMENT DELIVERED AND ALL WORK AND/OR
SERVICES PERFORMED HEREUNDER, TOGETHER WITH ANY INTEGRAL OR
INTERDEPENDENT ITEMS OR SYSTEMS WILL: (I) CORRECTLY AND FULLY
FUNCTION (INCLUDING, BUT NOT LIMITED TO, PROCESSING,
DISPLAYING AND MANIPULATING DATE FIELDS AND RELATED LOGIC)
WITHOUT REGARD TO YEAR 2000 PROBLEMS, (II) STORE AND DISPLAY
DATE INFORMATION IN WAYS THAT ARE UNAMBIGUOUS AS TO DETERMIN-
ATION OF THE CORRECT CENTURY, AND (III) FUNCTION WITHOUT

FCI/MOA 0016

CONFIDENTIAL

(CONTINUED NEXT PAGE)

SPECIAL INSTRUCTIONS                    ACKNOWLEDGED AND ACCEPTED

TEXAS
DO NOT BILL TAXES.  TEXAS DIRECT
PAY PERMIT NO. 3-01136-8104-0 TAXABLE
MATERIAL

ACKNOWLEDGMENT

PAGE   7

**PRAXAIR, INC.**

| B U Y E R | |
|---|---|

PO BOX 44
TONAWANDA, N.Y. 14151-0044

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

**PURCHASE ORDER:** 815F5206P

\*\*FAXED\*\*

The above P.O. number, line item number, and release number if applicable must appear on all correspondence, invoices, shipping papers, and packag

TELEPHONE: (718) 879-2000   DATE:
H064 8064                                   0793205

| S H I P | |
|---|---|

| S E L L E R | |
|---|---|

FISHER CONTROLS INTERNATIONAL



| SHIP QT | REQUISITIONED BY | | ROUTING CODE | | | |
|---|---|---|---|---|---|---|
| PURCHASING AGENT | | REFER QUESTIONS TO: | | CONFIRMING TO: | | TAX STATUS |
| F.O.B. POINT | | SHIP VIA | FREIGHT TERMS | PAYMENT TERMS | | |

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AMOU |
|---|---|---|---|---|---|

INTERRUPTION CAUSED BY THE DATE ON WHICH THE PROCESSES ARE
ACTUALLY PERFORMED OR THE DATE OF DATA INPUT. "YEAR 2000
PROBLEMS" GENERALLY INCLUDE FAILURES, ERRORS, DELAYS OR OTHER
EVENTS RESULTING DIRECTLY OR INDIRECTLY FROM THE INABILITY OF
FACILITIES, EQUIPMENT OR SOFTWARE TO ACCURATELY AND WITHOUT
INTERRUPTION, PROCESS OR HANDLE DATES BOTH BEFORE AND AFTER
JANUARY 1, 2000, AND TO PROCESS THE YEAR 2000 AS A LEAP YEAR.
SELLER HEREBY AGREES TO PROMPTLY NOTIFY BUYER IN WRITING
WITHOUT DELAY IF SELLER AT ANY TIME HAS ANY REASON TO BELIEVE
THAT ITS PERFORMANCE OF ITS OBLIGATIONS HEREUNDER WILL BE
AFFECTED BY "YEAR 2000 PROBLEM(S)", WHETHER AS A RESULT OF ITS
OWN OPERATIONS OR THOSE OF ITS SUPPLIERS.  SELLER SHALL DEFEND
INDEMNIFY AND HOLD HARMLESS BUYER FROM ANY AND ALL CLAIMS,
SUITS, CAUSES OF ACTION, COSTS, EXPENSES, LIENS, DAMAGES,
LOSSES, AND LIABILITY WHATSOEVER, IN LAW OR EQUITY OF ANY KIND
OR NATURE WHICH BUYER MAY INCUR WHICH MAY ARISE OUT OF, OR IS
IN ANY WAY CONNECTED WITH SELLER'S BREACH OF THE ABOVE
WARRANTY, CERTIFICATION AND COVENANT.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CARRIER ROUTING INSTRUCTIONS:
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IF "SHIP TO" ADDRESS IS NOT STATED, CALL PRAXAIR FOR
DETAILS.  SEE "REFER QUESTIONS TO BOX" ON PURCHASE ORDER.

IN THE ABSENCE OF WRITTEN CARRIER ROUTING INSTRUCTIONS, THE
FOLLOWING INSTRUCTIONS MUST BE USED:

UPS - USE UPS GROUND SERVICE ONLY (NOT AIR SERVICE) FOR

(CONTINUED NEXT PAGE)

FCI/MOA 0017   CONFIDENTIAL

| SPECIAL INSTRUCTIONS | ACKNOWLEDGED AND ACCEPTED |
|---|---|

TEXAS
DO  NOT  BILL TAXES.  TEXAS  DIRECT
PAY PERMIT NO. 3-01136-8104-0 TAXABLE
MATERIAL

OUTSIDE SHIPPING DATE              SHIPMENT WILL BE MADE FROM

DO NOT USE WORDS "PROMPTLY" OR "AT ONCE"

SIGNED FOR SELLER                                  DATE

**ACKNOWLEDGMENT**

PLEASE SIGN AND RETURN ATTACHED ACKNOWLEDGMENT PROMPTLY TO: THE PURCHASING DEPARTMENT AT THE ABOVE ADDRESS

—  PAGE  8        **FAXED**

## PRAXAIR, INC.

**PURCHASE ORDER** 815F5206P

PO BOX 44
TONAWANDA, N.Y. 14151-0044

The above P.O. number, line item number, and release number if applicable must appear on all correspondence, invoices, shipping papers, and packages

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

TELEPHONE: (716) 879-2000   DATE:
H064 8064                                0793205



FISHER CONTROLS INTERNATIONAL

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AMOU |
|---|---|---|---|---|---|
| | | | SHIPMENTS THAT ARE WITHIN UPS LIMITS. | | |
| | | | * USE "THIRD PARTY BILLING" TO PRAXAIR'S UPS ACCOUNT | | |
| | | | NO. 61W302. | | |
| | | | * DO NOT DECLARE A VALUE OR PURCHASE ADDITIONAL | | |
| | | | TRANSPORTATION INSURANCE. | | |

LTL - IF SHIPMENTS EXCEED THE LIMITS OF UPS, USE THE
FOLLOWING "LESS-THAN-TRUCKLOAD" CARRIERS
*** CONSOLIDATED FREIGHTWAYS ***
*** YELLOW FREIGHT SYSTEM ***

* IF TRAILER SPACE UTILIZED IS OVER 20 LINEAR FEET
OR 24,000 LBS., REFER TO "OTHER" BELOW.
* CALL CARRIERS LOCAL TERMINAL FOR PICK UP AND SHIP
"THIRD PARTY BILLING" PER NO. 2 BELOW.

OTHER - FOR ALL OTHER TRANSPORTATION REQUIREMENTS SUCH AS
AIR FREIGHT, FLATBED (LEGAL OR OVERSIZE DIMENSIONS),
TRUCKLOAD VAN, SPECIAL SERVICES, OR SAFETY RELATED
HANDLING ISSUES, FOLLOW INSTRUCTIONS BELOW.

* AT LEAST 7 DAYS PRIOR TO SHIP DATE FAX
PRAXAIR TRANSPORTATION DEPT. WITH
1) SHIPPING WEIGHT AND OVERALL DIMENSIONS
2) PRAXAIR PURCHASE ORDER NUMBER
3) READY DATE
**** FAX TO: (716) 879-2344 **** ATTN: PAUL LAUBER

FCI/MOA 0018

CONFIDENTIAL

(CONTINUED NEXT PAGE)

SPECIAL INSTRUCTIONS

ACKNOWLEDGED AND ACCEPTED

TEXAS
DO NOT BILL TAXES. TEXAS DIRECT
PAY PERMIT NO. 3-01136-8104-0 TAXABLE
MATERIAL

**ACKNOWLEDGMENT**

JUN 28 2000 11:13 FR FISHER ROSEMOUNT    514 745 3018 TO 912008091100    P.14/31



# PRAXAIR, ..JC.

PO BOX 44
TONAWANDA, N.Y. 14151-0044

MAIL INVOICE IN DUPLICATE TO:
Invoice Auditing Dept.
Praxair Inc.
PO Box 808, Tonawanda, N.Y. 14151-0808

PAGE  9

## PURCHASE ORDER:  **FAXED**
815F5206P

The above P.O. number, line item number, and release number if applic
must appear on all correspondence, invoices, shipping papers, and packi

TELEPHONE: (716) 879-2000   DATE:
H064  8064                        0793205



FISHER CONTROLS INTERNATIONAL

| ITEM NO. | QUANTITY | U/M | DESCRIPTION | UNIT PRICE | EXTENDED AMO |
|---|---|---|---|---|---|

THE FOLLOWING MUST BE INCLUDED ON THE BILL OF LADING PROVIDED
TO THE CARRIER:

    1.  REFERENCE TO PRAXAIR'S PURCHASE ORDER NUMBER

    2.  THIRD PARTY BILLING INVOICE ADDRESS:
        PRAXAIR INC
        PO BOX 808
        TONAWANDA NY   14151-0808

ANY ADDITIONAL FREIGHT OR SCHEDULE DELAY COSTS CAUSED BY LATE
NOTIFICATION OR FAILURE TO COMPLY WITH THESE INSTRUCTIONS
SHALL BE DEDUCTED FROM THE SELLER'S INVOICE.

***APPLIES AGAINST BUYER'S WORLDWIDE AGREEMENT #80171750T***

SHIPMENT DATE:
**************
SELLER'S SHIPPING PROMISE IS QUOTED AS THE "SHIP BY" DATE ON
PAGE ONE OF THIS ORDER.  SELLER SHALL IMMEDIATELY NOTIFY THE
INDIVIDUAL NAMED ON PAGE ONE UNDER "REFER QUESTIONS TO" OF ANY
OCCURRENCES WHICH IMPROVE OR DELAY SHIPMENT COMPARED TO THE
PROMISED DATE.

FCI/MOA 0019

CONFIDENTIAL

** ACKNOWLEDGEMENT REQUIRED **

* CONFIRMING-DO NOT DUPLICATE *

TOTAL AMOUNT          141,99

SPECIAL INSTRUCTIONS

ACKNOWLEDGED AND ACCEPTED

TEXAS
DO  NOT  BILL  TAXES.   TEXAS  DIRECT
PAY PERMIT NO. 3-01136-8104-0 TAXABLE
MATERIAL

ACKNOWLEDGMENT

# EXHIBIT 5

Project:    STAR Delaware City P-8064
Unit:
P.O.:       815F5206P
Item:       46
Contract:
Serial: 14989528

SPECIFICATION FORM FOR PROCESS MEASUREMENT
Data Sheet    46 of      6/3/98
Spec:
Tag:    83HV0629
DWG:    A-2272740
Service:BLOC discharge isolation

| | Fluid:    OXYGEN | | | Crit. Pres. PC:737.620 psia | | | |
|---|---|---|---|---|---|---|---|
| 1 | SERVICE CONDITIONS | Units | MAX | NRM | MIN | Shut-Off | OTH |
| 2 | Q | scfh | 2572200.0 | 2184800.0 | | | |
| 3 | P1 | psia | 1167.000 | 1167.000 | | 1300 psid | |
| 4 | P2 | psia | 1165.000 | 1165.000 | | | |
| 5 | T | deg F | 250.000 | 250.000 | | | |
| 6 | SG | | 1.105 | 1.105 | | | |
| 7 | Fk | | 1.000 | 1.000 | | | |
| 8 | | | | | | | |
| 9 | Cv | | 1095.733 | 930.654 | | | |
| 10 | | | | | | | |
| 11 | Vlv LpA | dB(A) | <50.0 | <50.0 | | | |
| 12 | | | | | | | |

| | | | | |
|---|---|---|---|---|
| | PIPE LINE | 53 | ACTUATOR Type:    PISTON,SPRING RTN | |
| 13 | Size, Schedule In:12 in SCH STD | 54 | Mfg/Model:    FISHER/1031 | |
| 14 | Size,Schedule Out:12 in SCH STD | 55 | Size: 33102-SR    Eff Area: N/A | |
| 15 | Insulation: | 56 | On/Off:    Modulating: YES | |
| 16 | VALVE BODY/BONNET    Type:BUTTERFLY | 57 | Spring Action:    CLOSE | |
| 17 | Size:12"    ANSI 600 | 58 | Max Allow Press: 120 psig | |
| 18 | Max Press:   1300 psig    Temp:300 F | 59 | Min Req'd Press: 80 psig | |
| 19 | Mfg/Model:    FISHER/A11 | 60 | Available Air Supply Pressure | |
| 20 | Body/Bonnet Matl: Hastelloy C | 61 | Max:120 psig    Min:90 psig | |
| 21 | Liner Matl/ID:    NONE | 62 | Bench Range:    N/A | |
| 22 | End Connection In:WAFER | 63 | Act Orientation: HORIZ. | |
| | End Connection Out:WAFER | 64 | Handwheel Type:  NONE | |
| | Flg Face Finish:  ANSI B16.5-81 | 65 | Air Fails Valve: CLOSE  Set at: | |
| 25 | End Ext/Matl: | 66 | Stroke time < 1 sec to close | |
| 26 | Flow Direction:    Shaft UP Stream | 67 | Input Signal:    4-20 mA dc | |
| 27 | BONNET    Type:    EXTENDED | 68 | POSITIONER Type:  SINGLE ACTING | |
| 28 | Lub-Iso Valve:    Lube: | 69 | Mfg/Model:    FISHER/3720 | |
| 29 | Packing Material: SINGLE TFE | 70 | Incr Signal Output: INCREASES | |
| 30 | Packing Type:    V-RING, JAM TYPE | 71 | Gauges: SUPP & OUT  By-Pass: NONE | |
| 31 | | 72 | Cam Characteristic: LINEAR | |
| 32 | TRIM Type:    STANDARD | 73 | | |
| 33 | Size:FUll    Travel: 90 Deg | | SWITCHES | |
| 34 | Characteristic:    MOD EQUAL PERCENT | 74 | Type: POSITION TRANSMITTER   Qty: 1 | |
| 35 | | 75 | Mfg/Model:    Stonel/FQ70E1C | |
| 36 | Rated Cv:2831    Fl:.520    Xt:.350 | 76 | Contacts/Rating: | |
| 37 | Disk Material:    Monel | 77 | Actuation Points:4-20 MA | |
| 38 | Seat Material:    Kel-F | 78 | | |
| 39 | Guide Material:    Monel | | AIRSET | |
| 40 | Stem Material:    Monel | 79 | Mfg/Model:    FISHER/67AFD FILTER | |
| 41 | 2 Asco sol. Model: 8316G2 24vdc | 80 | Set Pressure:    n/a | |
| 42 | piped per P&ID 3051 | 81 | Filter:YES    Gauges: No | |
| | SPECIAL ACCESSORIES | 82 | | |
| 43 | NEC:    Group:    Div: | 83 | TESTS Hydro Press: | |
| 44 | STANDARD NOTES SUPPLIED PER DWG | 84 | ANSI/FCI Leak Class: VI | |
| 45 | A-2234221 ALT D | 85 | Instrument overpressure protection | |
| 46 | 1,2,4,11,13,15,16,17(2),18,23,24, | 86 | required  Yes( )  No (x) | |
| 47 | 25,26,28,29,30,31,32,35,43 | | | |
| 48 | | | | |

Torque Req.= 1264.9 FT-lbs
Torque Gen.= 1350.0 Ft-lbs

| | | |
|---|---|---|
| Rev | Date | Revision | Orig BC | App |
| | 7/23/98 | Changed seat to Kel-f soft | |
| | | 1.42 HV0629 | |

| 51 | FF Dim.= 5.50" |
| 52 | |

DEPOSITION
EXHIBIT  119
Olson

# EXHIBIT 6

Fax # (302) 392-4140

**NORTHEAST CONTROLS, INC.**
6000 N. Bailey Avenue, Suite 2B
Amherst, NY 14226

# F A X   C O V E R   S H E E T

| | | | |
|---|---|---|---|
| **DATE:** | May 22, 2000 | **TIME:** | 2:00 PM |
| **TO:** | BHIM BHAKOO | **PHONES:** | 879-7044 |
| | PRAXAIR INC | **FAX:** | 879-4719 |
| **FROM:** | Bert Cappellini | **PHONE:** | 716-831-1960 |
| | | **FAX:** | 716-831-1966 |

Number of pages including cover sheet: 2

## Message

Bhim,

Here is the list of parts and there materials that make up the 12" Fisher A11 valve Tag HV0629 at Delaware City.

Any questions or comments please let me know.

Regards

Bert Cappellini

*7/98 Bert reviewed info with Px. doesn't know for sure*

FCI/MOA 0021

05/22/00   13:38   ☎716 831 1966        NC1 BUFFALO                              ⊠002

List of part numbers with descriptions and material description of each individual parts
that make up the 12" Hastelloy C Fisher A11 valve tag number HV0629 at Delaware City
Delaware.

| Description | Part # | Material |
|---|---|---|
| → Body | 16B1072X03 | Hastelloy C CW2M FMS 19C5 |
| → Retaining Ring | V111797X072 | Hastelloy C N10276 |
| → Retaining Ring Gasket | V110621X062 | Hastelloy C CW2M FMS 19C5 |
| Disc/Shaft Assembly | | |
| -Pin | V110597X062 | Inconel 718 N07718 HT |
| -Disc | V136264X162 | Hastelloy C CM-2M |
| -Shaft, Lower, FI | V156266X062 | Inconel 718 N07718 HT |
| -Shaft Lower | 16B1317X042 | Inconel 718 N07718 HT |
| Seal ring | V121732X012 | Kel-F |
| → Backup O-ring | V110436X012 | Viton FKM/FGS13H1 |
| Thrust Bearing | V131681X012 | TFE composite Fiberglass/PTFE |
| Bearing | V171721X012 | TFE Composite Fiberglass/PTFE |

FCI/MOA 0022

**EXHIBIT 7**

## Order history regarding 12" Fisher A11 valve that was supplied to Praxair.

Below you will find a complete summary of what I recall regarding how the 12" Fisher A11 valve was spec'd and supplied to Praxair. But first I will explain a little bit about the process that we go through with Praxair on how valves are spec'd and quoted. To generate a valve spec sheet it has to be done in the Fisher sizing program, which Praxair has at their facility. The way the process works is that Praxair will supply us with the service conditions and any other information related to a valve and the application. They go into the sizing program adding all the process conditions associated with the valve. Once they have done that they run the program and get a Cv, a valve coefficient, which determines what size valve to use. They then go into the ISA spec sheet section of the program and begin adding information on each line that is required so we can properly select a valve. Once Praxair has done that they either would fax or electronically send us a spec sheet or file for that valve. We then take that information they have sent us and begin to go through the sizing and spec sheets properly selecting the correct control valve. We then complete the ISA spec sheet and then either fax it or electronically send it back to Praxair for their review. If there were any changes that need to be done they then would send it back to us for our review and to make any necessary changes. Depending on the complexity of the application for the valve there could be many changes that might take place. Once this process is completed Praxair then signs off on the completed spec sheet and assigns a drawing number to it so it can be purchased.

Here is what I recall on how the 12" valve got spec'd and ordered. Back in May of 1998 Praxair had faxed to me an ISA spec sheet with process conditions on it and also a few lines filled in on the spec sheet. They had requested a 10" size valve and specified that it was going to be used for high-pressure oxygen. I had remembered that I had done a similar valve in 1997 for a Praxair project in Italy and it had virtually the same service conditions. I then proceeded to look at that valve construction for that project and duplicated it for this project. Knowing that I had talked to Fisher back then about the process conditions and that they had OK'd it before so I used the same construction for this new valve. From a spec sheet dated 5/14/98 it looks like I had given Praxair a spec sheet with the following construction. It was for a 10" Hastelloy C valve with Hastelloy C trim and a PTFE seat. On 5/27/98 a change was made to the spec sheet making the trim material Monel and with the body being Hastelloy C not sure why this change was made only thinking Praxair had requested it and a change was made to the spec sheet. On 6/3/98 Praxair had requested that the valve be changed to a 12" size valve. I than proceeded to change the spec sheet making it a 12" valve with the same construction as the previous 10" size.  On 6/18/00 I had requested from Fisher pricing for the following valve per Posi seal matrix number A11-12-151-CB743-31-3-00 which is a Hastelloy C body, Hastelloy C disk, Inconel 718 shaft, TFE composite bearings and Tefzel seal. This construction does not match what was on the spec sheet for the 12" valve dated 6/3/00. Not sure why the difference I can only think that I had requested a duplicate valve to what I had done on the previous project in Italy and also what was going to be supplied for a different application but same process conditions on this project. This valve was a

FCI/MOA 0023

4" valve and it was spec'd and constructed with a Hastelloy C body and trims. This valve construction was also signed off by Praxair and purchased.

After the 12" valve specification sheet was approved and signed off by Praxair an order then was placed on Northeast Controls, Inc. on June 24[th] 1998 for this valve. An order then was sent into Fisher Controls. The order went through Fisher Marshalltown order entry system and was detailed per what we had requested on the order and a serial card was generated. The order was then sent to Fisher North Stonington for manufacturing and was looked at by engineering there. That is when Fisher North Stonington had come back to me and had requested that the seat be changed from a Tefzel material to the Kel-F material. I don't recall if the process conditions were talked about with Fisher engineering or not. They said the reason for this change was that the Tefzel seat is not compatible to oxygen and the Kel-f would be better seat in this application. This was done per the request of Dave Whelan at Fisher North Stonington. The seat change was also done to the 4" valve that is currently at the Praxair site. I then procceded to change the seat material to Kel-F on my spec sheet that I had in my computer and not sure if this was relayed back to Praxair or not regarding the seat change. Because the last copy they had was with a Monel/PTFE seat and Monel trim.

HV0629 history.doc

# EXHIBIT 8

CONFIDENTIAL

Preliminary

Document No.    WHA 00H035-01
Date



Wendell Hull & Associates, Inc.

*Oxygen Systems Engineering and Test Group*

www.wendellhull.com

# Phase I Cause and Origin Analysis of the Delaware City Power Plant ASU Oxygen Fire Incident

## For



### conectiv

Conectiv Operating Services Company

DELAWARE CITY POWER PLANT
RIVER ROAD, ROUTE 9
DELAWARE CITY, DE 19706

Wendell Hull and Associates, Inc.
1020 S. Main St.
Las Cruces, NM 88005
(800) 338-4397 ph. (505) 523-5709 fax

FCI/MOA 0025

# Preliminary

## SUMMARY

Personnel from Wendell Hull & Associates Inc. (WHA) were requested by Conectiv Operating Services Company to perform a cause and origin analysis on an oxygen system fire that occurred at the Delaware City Power Plant (DCPP) as part of a new Repowering Project. The analysis was initially divided into two phases: Phase I comprised all nondestructive analysis including burn pattern documentation and radiography. Phase II comprised disassembly and destructive analysis. This report contains the preliminary cause and origin analysis after completing Phase I of the investigation.

The analysis performed by WHA focused specifically on determining the primary cause and origin of the fire. Through evaluation of the fire-damaged components including analysis of the melt/flow patterns, materials of construction, incident details, operational procedures, and history of use, WHA determined that the most probable origin of the fire was proximate to the ASU BLOC Isolation Valve, HV0629, specifically near the seat assembly/upstream flange interface. More specifically, the consumption patterns supported ignition starting in the third quadrant of this interface, from 180° to 270° measured clockwise from the top of the shaft, viewed from upstream. The materials specified for the valve, flange, and pipe around this location were largely considered flammable if ignited in the presence of near-pure oxygen at the operating conditions of the incident.

The melt/flow patterns and material mass loss were consistent with the fire starting near the seat assembly/upstream flange interface and propagating in a radial manner around the seat assembly and upstream flange. As the fire progressed in the valve, the evidence indicated a large amount of slag, fire, and burning debris swept into the flow stream and promoted (i.e., kindled) downstream components and piping until the fire compromised the pressure containment around the valve.

The propagation patterns were consistent with the most easily ignited materials, such as the plastic seat and backup seal, promoting the less flammable materials, such as the carbon steel flange/pipe and/or Inconel 718 shaft. The carbon steel, which comprised the upstream flange and piping, was the most easily ignited metal in the proximity of the origin. The evidence was consistent with the fire propagating from the carbon steel flange and/or valve seat in the third quadrant of the butterfly disc, though the Hastelloy butterfly disc would not be expected to readily support self-sustained combustion under the conditions of use. Hastelloy was considered the least flammable of the valve materials, especially in thick cross-sections. The Inconel 718 shaft was burned in two at the bottom and added significant energy to the fire after being kindled. The Inconel 718 shaft and/or the carbon steel flange would have been capable of kindling the stainless steel flange downstream, burning through the flange and melting the Monel pipe. Monel was considered nonflammable in this configuration and environment and would not be expected to support self-sustained combustion, but would be expected to melt from the intensity of the fire.

FCI/MOA 0026

# Preliminary

The preliminary evidence developed during the Phase I investigation supports three potential ignition mechanisms for initiation of the fire. Each of the following three mechanisms are consistent with the geometric preferences for combustion exhibited by the evidence and provide for the kindling chain necessary to result in the fire damage:

1) **Promoted ignition of the plastic seat/seal assembly resulting in kindling of the carbon steel flange and Inconel 718 shaft:** The evidence indicated substantial damage in the lower shaft region of the valve as well as substantial promoted combustion of the valve especially in the 3rd quadrant. The preliminary analysis of the lower shaft bushing has indicated a phenolic-based material, possibly used as a binder for the Fiberglass/PTFE shaft bushing. Phenolic materials typically exhibit autogenous ignition temperatures in the range of 311 °F, which is very close to the understood process condition of 270 °F. Once the valve began to rotate open, the additional frictional energy associated with the shaft rotation would be expected to provide enough additional thermal energy to cause auto-ignition of the phenolic and result in kindling of the plastic seat and seal ring near the lower shaft. Ignition of these materials would then be expected to initiate kindling of the carbon steel flange and sweep combustion products under the disc near the deep burn pattern centered at ~210°

2) **Flow friction ignition of the plastic seat resulting in kindling of the backup seal, carbon steel flange, and Inconel 718 shaft:** The plastic seat is understood to have been comprised of a PCTFE material, although the chemical analysis obtained to date has not confirmed the presence of PCTFE[1]. Recently, several investigators, including WHA, have documented an increased frequency of PCTFE-seated valve fires operating under either a slow leak or a throttling flow condition, which was the condition that probably existed for this fire. Experience indicates that flow-induced heating can occur when high-pressure, high-velocity, oxygen gas flows past a polymeric material causing localized deformation and heating of the polymeric fibers. In some cases, this heating can lead to ignition of the PCTFE and result in the kindling chain mechanisms indicated above. A further consideration pertaining to this mechanism is that the manufacturer of PCTFE materials supplied to the commercial market changed in the early to mid 1990's and the Kel-F PCTFE material that was historically utilized successfully by oxygen practitioners is no longer available. The PCTFE material presently available is marketed under the trade name Neoflon. The ASTM G-04 committee is presently investigating whether any manufacturing or molding changes could have contributed to the increase in fires that have been observed.

3) **Particle impact ignition of the carbon steel flange resulting in promoted combustion of the seat assembly and valve:** Evidence showed that the valve

---

[1] The materials specifications for this valve list ECTFE as a replacement seat. Although neither ECTFE nor PCTFE has been identified in the analysis completed to date, ECTFE materials are considered substantially less compatible with oxygen than PCTFE materials. The presence of ECTFE as the seat would be expected to increase the likelihood of ignition by flow-induced heating.

6

FCI/MOA 0027

# Preliminary

disc was open approximately 9-11 degrees, or 10-12% of full open. Under the designed start-up conditions and the HV0629 controls, the valve was limited to a maximum 10% open until the pressure drop across the valve was less than 10 psi. This control would have created a throttling condition across the seat and valve disc with sonic gas velocity for a substantial period of time after the valve was opened. Butterfly valves of this design inherently expose the upstream flange to the higher velocity flow streamlines as the side of the valve disc opens into the flow. Particulate residing in the sump (lowest point) of the upstream flange would be expected to be swept into the flow and potentially strike the upstream carbon steel flange. Direct metals ignition is easily achieved with these materials by particle impact. Ignition of the flange would lead to self-sustained combustion and promoted ignition of the remainder of the valve. While direct ignition of the carbon steel by particle impact is considered possible under the flow and pressure conditions, it is noteworthy that the highest velocities would be downstream of the controlling orifice (i.e., downstream of the butterfly disc – seat assembly) and that the highest mass flow rates would occur at the 9 o'clock position, above the segment of greatest damage on the disc. These considerations reduce the probability of direct ignition of the carbon steel by particle impact.

The Phase II investigation will attempt to further assess each of these ignition mechanisms, and others that might be indicated by the evidence, by destructive disassembly and testing of the materials and valve components.

7

Wendell Hull & Associates, Inc. - Company Profile Page



# Wendell Hull & Associates. Inc.
## forensic Engineering/Accident Reconstruction

1020 South Main St. • Las Cruces, NM • 88005
(505) 523-5623 • Fax: (505) 523-5709 • E-mail: wha@wendellhull.com

## Barry E. Newton





**VP Research and Development**
**Oxygen Systems Specialist**
*16 yrs. with WHA*

**BS, Mechanical Engineering**
*New Mexico State University*
*1983*
**Reg. Professional Engineer**
*New Mexico State Board of Registration*
*1994*

☒ SEND E-MAIL
▤ VIEW CV (PDF)
▤ VIEW PUBLICATIONS

Barry Newton, BSME, PE (WHA VP for Research & Development) has been involved in pneumatic system design and testing for the past 24 years while working for the National Aeronautics and Space Administration (NASA) White Sands Test Facility (WSTF) during 1981 to 1989 and for Wendell Hull & Associates, Inc. (WHA) from 1989 to the present. From 1983 to 1989 he managed the materials testing, pressure system qualification, and oxygen compatibility special projects performed at WSTF for the Shuttle Orbiter pneumatic systems and ground support equipment. From 1986 to 1989 he also acted as facility manager for the NASA-WSTF Materials Test Facility where the hazardous flammability and compatibility testing for the Johnson Space Center was performed. Since joining WHA in 1989, he has consulted with private industry and government evaluating pneumatic system/component failures, structural and component fires, breathing system design and evaluation for the US NAVY and Canadian NAVY, oxygen fire risk analysis on industrial and medical oxygen systems, and has managed the WHA Oxygen Fire Hazards Training courses. He was the primary engineer involved in the development of the WHA pressure system cycling capabilities, fuel gas (hydrogen, acetylene, and LP gas) combustion test systems, Nitrogen Trifluoride (NF3) materials test systems, and oxygen materials/components test

**Company Profiles**

**Engineering Associates**
Wendell Hull
Barry Newton
Greg Odom
Gwenael Chiffoleau
Cale Robertson
Nicholas Linley

**Administrative Staff**
Stanna Porter
Nola Franzoy
Andrea Gwynne
Emily Bair

**Engineering Consultants**
Jack Stradling
David Pippen
Elliot Forsyth

**Technical Services**
Peter Bennett
Sean Boswell
Jarad Hooser

capabilities including WHA's Component/Materials Adiabatic Compression, Autogenous Ignition Temperature (AIT), and Metals Promoted Combustion test systems. In addition to these failure analysis and test activities, he coordinates materials and components testing between commercial industry and NASA-WSTF and is an active member of ASTM's Committee G04 on Flammability and Sensitivity of Materials in Oxygen-Enriched Environments and the NFPA 99, "Health Care Facilities", Technical Committee for Hyperbaric and Hypobaric Facilities.

---

Main Page | Accident Reconstruction Services | Oxygen/Hydrogen Safety Engineering
Forensic Testing and Analysis | Expert Witness Services | Company Profile and Mission
Oxygen-Compatibility Material Database

---

Material and images on this site, unless otherwise noted are


Copyright Wendell Hull & Associates, Inc., 2004
1020 South Main Street, Las Cruces, NM 88005
Site Designed by Jeremy Gwin. Contact the Web Master

# EXHIBIT 9

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

PRAXAIR, INC.,

          Plaintiff,

    v.

FISHER CONTROLS INTERNATIONAL,
INC., NORTHEAST CONTROLS, INC.,
CONNECTIV OPERATING SERVICES
COMPANY, INC., TEXACO
DEVELOPMENT CORP., AND
GARY DELGREGO,

          Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. _02C-05-190 HLA_

NON-ARBITRATION CASE

TRIAL BY JURY OF
TWELVE DEMANDED

## COMPLAINT

1.    Plaintiff, Praxair, Inc. ("Praxair") is a publicly traded company engaged in the business of supplying atmospheric and specialty gases, high-performance coatings, and related technologies. Praxair's principal headquarters are located at 39 Old Ridgebury Road, Danbury, Connecticut 06810-5113.

2.    Defendant, Fisher Controls International, Inc. ("Fisher") is a Delaware Corporation that maintains its principal offices at 205 South Center Street, Marshalltown, Iowa 50158. Fisher manufactures control valves utilized in oxygen systems which it distributes internationally.

3.    Defendant, Northeast Controls ("Northeast") is a distributor of Fisher Valves. Northeast maintains its executive offices at 3 Enterprise Avenue, Clifton Park, New York and a branch office at 6000 North Bailey Avenue, Suite 2B, Amherst, New York.

4.      Defendant, Conectiv Operating Service Company, Inc.("Conectiv") is a Delaware corporation with its principal offices located at 800 King Street, Wilmington, Delaware. The corporation's registered agent is Conectiv Resource Partners, Inc., 800 King Street, Wilmington, Delaware.

5.      Defendant, Texaco Development Corp. is a Delaware corporation that maintains offices at 2000 West Chester Avenue, White Plains, New York. The corporation's registered agent is Prentice Hall, 2711 Centerville Road, Suite 400, Wilmington, Delaware.

6.      Defendant, Gary Delgrego is an adult individual who currently maintains a residence at 13027 Fox Brush Lane, Houston, Texas and a post office box at P.O. Box 279, Delaware City, Delaware.

7.      Parsons Energy and Chemicals Group, Inc. ("Parsons"), a non-party engaged in the business of designing, engineering, and managing the construction of institutional facilities, was retained to perform work for the repowering project at the Delaware City, Delaware refinery ("Project").

8.      Parsons entered into an agreement with Praxair ("Parsons Agreement") to supply, erect, and test a 2500 STPD air separation unit for the Project. The work included, among other things, the installation of a valve intended to block and/or control the flow of oxygen to gasifiers.

9.      In conjunction with its work under the Parsons Agreement, Praxair purchased from Fisher and/or Northeast a BLOC control valve, tag number 83HV0629. The purpose of the valve was to block and/or control the flow of oxygen to the gasifier.

10.     Valve specifications indicated that the 83HV0629 valve would be utilized for oxygen service. The specifications required, among other things, Fisher and/or Northeast to utilize Monel for the disc material, seat material, guide material, and stem material.

2

11.    Fisher and/or Northeast knew or reasonably should have known, that Praxair would utilize the valve for high pressure oxygen service.

12.    Fisher and/or Northeast designed, manufactured, and sold to Praxair the 83HV029 BLOC control valve and shipped the valve to the Project.

13.    The Fisher valve was installed by or on behalf of Praxair in conjunction with the air separation unit equipment.

14.    Conectiv operated, maintained, and managed the Delaware City plant.

15.    Texaco Development Corp representatives, including Gary Delgrego, assisted in plant operations.

16.    Conectiv and Texaco Development Corp. representatives, including Gary Delgrego, began and oversaw the initial opening of the BLOC control valve on or about May 20, 2000.

17.    A control room operator attempted to open the BLOC control valve which did not respond.

18.    Conectiv employee Ron Olson was sent to the valve to assist with the opening process. While at the valve, an explosion and fire occurred causing significant losses.

<u>COUNT I</u>

<u>PLAINTIFF v. FISHER AND NORTHEAST (Negligence)</u>

19.    Plaintiff incorporates the allegations contained in paragraphs one through eighteen hereof as if set forth herein at length.

20.    Fisher and Northeast were negligent. Their negligent acts include, but are not necessarily limited to, the following:

3

a.      Failing to design, manufacture, assemble, and distribute a BLOC control valve compatible with and appropriate for high pressure oxygen service;

b.      Failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment;

c.      Failing to investigate, for safety, the materials utilized during the design, assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment;

d.      Failing to provide a valve that complied with the specifications that required use of Monel;

e.      Failing to advise of any deficiencies in the valve that would make the product unsafe or unfit for use in a high pressure oxygen environment;

f.      Failing to use due care under the circumstances.

21.     Fisher's and Northeast's breach of duty was a direct and proximate cause of the failure, fire, and resulting damage which occurred as the result of the explosion on the Project on May 20, 2002.

WHEREFORE, Plaintiff, Praxair, Inc. demands judgment against Defendants for damages together with interest, attorneys' fees, and costs of suit.

## COUNT II

## PLAINTIFF v. FISHER AND NORTHEAST (Warranty)

22.     Plaintiff incorporates the allegations contained in paragraphs one through twenty-one hereof as if set forth herein at length.

4

FCI/MOA 0034

23.    Fisher and Northeast warranted that the BLOC control valve that they designed, manufactured, assembled, and distributed contained materials suitable for and safe in a high pressure oxygen environment.

24.    Fisher and Northeast warranted that the BLOC control valve would conform to the description and specifications and would be free from all defects in material and workmanship and all defects due to design.

25.    The parties relied on Fisher's and Northeast's skill, knowledge, and expertise in providing a BLOC control valve suitable for use in a high pressure oxygen environment.

26.    Fisher and Northeast breached the warranties issued in conjunction with the sale of the BLOC control valve.

27.    Fisher's and Northeast's breach of the warranties was a direct and proximate cause of the May 20, 2000 explosion and resulting failure, fire, and resulting damage.

WHEREFORE, Plaintiff demands judgment against Defendants for damages together with interest, attorneys' fees, and costs of suit.

## COUNT III

## PLAINTIFF v. FISHER AND NORTHEAST (Implied Warranty – 6 Del.C. § 2-314)

28.    Plaintiff incorporates the allegations contained in paragraphs one through twenty-seven hereof as if set forth herein at length.

29.    At all relevant times hereto, Defendants Fisher and Northeast were merchants within the meaning of 6 Del.C. § 2-104. Fisher and/or Northeast manufactured, distributed and sold the valve, which valve was defective at the time of distribution and sale.

5

FCI/MOA 0035

30.     Praxair entered into a valid, enforceable and unambiguous contract with Fisher and/or Northeast ("Praxair Contract") to purchase a valve made in accordance with certain written specifications and that would be suitable for use in a high pressure oxygen environment.

31.     This contract constituted a contract for the sale of goods and is governed by Delaware's uniform Commercial Code.

32.     The terms of the Praxair Contract included an implied warranty of merchantability as per 6 Del.C. § 2-314.

33.     That implied warranty was not effectively disclaimed and is cumulative of all other existing warranties as per 6 Del.C. § 2-316-17.

34.     Fisher and/or Northeast breached this warranty by delivering defective and non-conforming goods.

35.     Fisher's and Northeast's breach of this warranty was a direct and proximate cause of the May 20, 2000 explosion and resulting failure, fire, and resulting damage.

WHEREFORE, Plaintiff demands judgment against Defendants for damages together with interest, attorneys' fees, and costs of suit.

## COUNT IV

## PLAINTIFF v. FISHER AND NORTHEAST (Implied Warranty – 6 Del.C. § 2-315)

36.     Plaintiff incorporates the allegations contained in paragraphs one through thirty-five hereof as if set forth herein at length.

37.     Praxair entered into a valid, enforceable and unambiguous contract with Fisher and/or Northeast ("Praxair Contract") to purchase a valve made in accordance with certain written specifications and that would be suitable for use in a high pressure oxygen environment.

6

38. This contract constituted a contract for the sale of goods and is governed by Delaware's uniform Commercial Code.

39. The terms of the Praxair Contract included an implied warranty of fitness for a particular purpose as per 6 Del.C. § 2-315.

40. At all relevant times hereto, Fisher and/or Northeast had reason to know the purpose for which the valve required and that Praxair relied on Fisher and/or Northeast's skill and judgment to select or furnish a suitable valve.

41. The valve was not fit for the ordinary purpose for which it was intended.

42. Fisher's and Northeast's breach of this warranty was a direct and proximate cause of the May 20, 2000 explosion and resulting failure, fire, and resulting damage.

WHEREFORE, Plaintiff demands judgment against Defendants for damages together with interest, attorneys' fees, and costs of suit.

## COUNT V

## PLAINTIFF v. FISHER AND NORTHEAST (Contract)

43. Plaintiff incorporates the allegations contained in paragraphs one through forty-two hereof as if set forth herein at length.

44. Praxair entered into a contract with Northeast and/or Fisher ("Praxair Contract") to purchase a valve made in accordance with certain written specifications and that would be suitable for use in a high pressure oxygen environment.

45. Fisher and/or Northeast breached the Praxair Contract by supplying a valve that did not conform to the specifications and was not suitable for use in a high pressure oxygen environment.

7

FCI/MOA 0037

WHEREFORE, Plaintiff demands judgment against Defendants for damages together with interest, attorneys' fees, and costs of suit.

Respectfully submitted,

COZEN O'CONNOR

Gary W. Lipkin
Chase Manhattan Centre
1201 N. Market St., Suite 1400
Wilmington, Delaware 19801
(302) 295-2000

Attorney for Plaintiff, Praxair, Inc.

Of counsel:

F. Warren Jacoby
Joseph H. Riches
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

Dated:  May 20, 2002

9

FCI/MOA 0038

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

PRAXAIR, INC.,                          :
                        Plaintiff,      :
                                        :
            v.                          :       C.A. No. _____
                                        :
                                        :
FISHER CONTROLS INTERNATIONAL,  :       NON-ARBITRATION CASE
INC., NORTHEAST CONTROLS, INC.,  :
CONNECTIV OPERATING SERVICES    :       TRIAL BY JURY OF
COMPANY, INC., TEXACO            :       TWELVE DEMANDED
DEVELOPMENT CORP., AND           :
GARY DELGRECGO,                  :
                        Defendants.     :

## CERTIFICATE OF VALUE

I, Gary W. Lipkin, attorney for Plaintiff, hereby certify in good faith at this time,

in my opinion, that this is an action where the damages are in excess of One Hundred Thousand

Dollars ($100,000.00), exclusive of costs and interest, and that this action is therefore exempt

from compulsory arbitration pursuant to Superior Court Civil Rile 16.1(a).

                        COZEN O'CONNOR

                        *Gary W. Lipkin*
                        _____
                        Gary W. Lipkin
                        Chase Manhattan Centre
                        1201 N. Market St., Suite 1400
                        Wilmington, Delaware 19801
                        (302) 295-2000
                        Attorney for Plaintiff, Praxair, Inc.

Of counsel:
F. Warren Jacoby
Joseph H. Riches
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

FCI/MOA 0039

** TOTAL PAGE.14 **

# EXHIBIT 10

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MOTIVA ENTERPRISES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 02C-05-169 (HLA) |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, | ) | |
| INC., NORTHEAST CONTROLS, INC., | ) | **NON-ARBITRATION CASE** |
| PRAXAIR, INC. AND CONECTIV | ) | |
| OPERATING SERVICES COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

1.    Plaintiff ("Motiva") is a Delaware limited liability company with its principal place of business in Houston, Texas. Motiva owns and operates a refinery near Delaware City, Delaware ("the refinery").

2.    Defendant Fisher Controls International, Inc. ("Fisher") is a Delaware corporate entity with offices in Iowa. Fisher manufactures control valves for industrial applications.

3.    Defendant Northeast Controls, Inc. ("Northeast") is a corporate entity of unknown domestication, with offices in New Jersey. Northeast is a valve distributor for industrial applications.

4.    Defendant Praxair, Inc. ("Praxair") is a Delaware corporate entity, with offices in New York. Praxair is a manufacturer and distributor of industrial gases.

FCI/MOA 0040

5.    Conectiv Operating Services Company ("Conectiv") is a Delaware corporate entity with offices in Wilmington, Delaware. Conectiv delivers power plant operating services at the refinery pursuant to a contract with Motiva.

6.    In approximately 1997, Praxair entered into an agreement with Parsons Corporation ("Parsons") to design, fabricate, install, construct, test and deliver an Air Separation Unit ("ASU"), a sub-unit of a larger construction project, known as the "Re-powering" facility, being built for Motiva by Parsons at the refinery. Motiva's contract with Parsons called for the latter to design, fabricate, install, construct, test and deliver the Re-powering facility at an overall cost of approximately two hundred seventy-one million dollars ($271,000,000). Praxair designed the ASU such that it produced not only oxygen, but valuable quantities of other constituents of air, including nitrogen and argon, which Praxair could purchase from Motiva.

7.    Part of the ASU being constructed by Praxair included a high-pressure pipeline for the delivery of oxygen to the gasification sub-unit of the Re-powering facility. A portion of the pipeline's design included a control valve designed and manufactured by Fisher, and distributed by Northeast, Tag No. 83HV0629 ("the control valve"), which Praxair obtained from Fisher and Northeast for the purpose of controlling the flow of oxygen through the high-pressure pipeline. The specifications created by Praxair for the control valve included provisions for various materials to be used at strategic positions within the valve structure.

2

8.    Conectiv, as the operator of the refinery's power plant, had the responsibility of bringing the various sub-units of the re-powering facility "on-line". Conectiv employees participated in overseeing the commissioning of the high-pressure oxygen pipeline.

9.    It was anticipated that the Re-powering facility, including the capability of the ASU to produce and deliver oxygen to the gasification sub-unit, would be operational by the end of May 2000. On May 20, 2000, however, during the commissioning process for the high-pressure oxygen pipeline, a fire destroyed a portion of that pipeline, the control valve and appurtenant structures ("the fire").

10.    The destroyed control valve, pipeline segments and appurtenances had to be replaced and the pipeline re-built. Motiva paid for a portion of the cost of re-building. It took approximately sixty (60) days to accomplish that task. During that time no oxygen was delivered to the gasification sub-unit of the Re-powering facility. Likewise, there was no production of either nitrogen or argon. Motiva's resulting out-of-pocket costs and lost revenue total approximately $9.175 million dollars.

## First Cause of Action

11.    Plaintiff repeats the allegations of paragraphs 1 through 10 above as if specifically set forth herein.

12.    The fire was proximately caused by the negligence of Fisher. Fisher was negligent in that it:

3

(a)    knowingly provided a control valve to the ASU high-pressure oxygen pipeline which did not conform to the specifications for that valve;

(b)    failed to adequately inspect its control valve to confirm its conformance to specifications;

(c)    designed a control valve that had features conducive to combustion; and

(d)    failed to follow applicable industry standards for the design of a control valve destined for service in a high-pressure oxygen environment;

13.    Fisher's negligence resulted in both property damage and business loss to Motiva in an amount that exceeds $9,000,000.

14    The fire was proximately caused by the negligence of Northeast. Northeast was negligent in that it:

(a)    had a duty and an opportunity, before delivery and installation, to confirm that the Fisher control valve met the specifications provided by Praxair, but failed to do so;

(b)    failed to follow applicable industry standards for the design of a control valve destined for service in a high-pressure oxygen environment; and

(c)    failed to insure that the control valve ordered by Praxair was fit for service in a high-pressure oxygen environment.

15    Northeast's negligence resulted in both property damage and business loss to Motiva in an amount that exceeds $9,000,000.

19.   Conectiv's negligence resulted in both property damage and business loss to Motiva in an amount that exceeds $9,000,000.

<u>Second Cause of Action</u>

20.   Motiva reasserts the allegations of paragraphs 1 through 19 above as if specifically set forth herein.

21.   Fisher and Northeast sold and distributed the control valve to Praxair for specific and exclusive use in connection with the Motiva high-pressure oxygen pipeline which was to deliver oxygen from the ASU to the gasification sub-unit.  In doing so, they expressly warranted that the control valve was appropriate for a high-pressure oxygen environment.  In doing so, they impliedly warranted that the control valve was both fit for the particular purpose intended and was merchantable.

22.   Fisher breached its express and implied warranties associated with the control valve.  As a direct and proximate result of those breaches Motiva, the ultimate user of the control valve, sustained both property damage and business loss in an amount that exceeds $9,000,000.

23.   Northeast breached its express and implied warranties associated with the control valve.  As a direct and proximate result of those breaches Motiva, the ultimate user of the control valve, sustained both property damage and business loss in an amount that exceeds $9,000,000.

6

FCI/MOA 0044

WHEREFORE, Motiva demands judgment against the defendants, jointly and severally, for its property damage and business losses in excess of $9,000,000 resulting from the fire, interest thereon and the costs of this action.

PRICKETT, JONES & ELLIOTT, P.A.

BY: _____

PAUL M. LUKOFF
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
(302) 888-6520
Attorneys for Plaintiff,
Motiva Enterprises LLC

DATE:    May 28, 2002

7

FCI/MOA 0045

# EXHIBIT 11

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

GREAT AMERICAN ASSURANCE COMPANY           :     C.A. NO.
(formerly known as AGRICULTURAL            :
INSURANCE COMPANY)as subrogee of           :
PRAXAIR, INC., PARSONS CORPORATION         :
and MOTIVA ENTERPRISES, LLC                :
                                           :
                      Plaintiff,           :
                                           :
          v.                               :
                                           :
FISHER CONTROLS INTERNATIONAL, INC.,       :
NORTHEAST CONTROLS, INC., CONECTIV         :
OPERATING SERVICES COMPANY, INC.,          :
TEXACO DEVELOPMENT CORP., and              :
GARY DELGREGO                              :
                      Defendants.          :

## CIVIL ACTION COMPLAINT

1.   Great American Assurance Company ("Great American"), a
stock insurance company, is authorized to transact business in
Delaware and maintains offices at 580 Walnut Street, Cincinnati,
Ohio.   Great American Assurance Company was formally known as
Agricultural Insurance Company.

2.   Defendant Fisher Controls International, Inc. ("Fisher") is a Delaware Corporation
that maintains its principal offices at 205 South Center Street, Marshalltown, Iowa 50158. Fisher
manufactures control valves utilized in oxygen systems which it distributes internationally.

3.   Defendant Northeast Controls ("Northeast") is a distributor of Fisher Valves.
Northeast maintains its executive offices at 3 Enterprise Avenue, Clifton Park, New York and a

Doc# 1296094 v2

FCI/MOA 0046

branch office at 6000 North Bailey Avenue, Suite 2B, Amherst, New York.

4.    Defendant Conectiv Operating Service Company, Inc.("Conectiv") is a Delaware corporation with its principal offices located at 800 King Street, Wilmington, Delaware. The corporation's registered agent is Conectiv Resource Partners, Inc., 800 King Street, Wilmington, Delaware.

5.    Defendant Texaco Development Corp. is a Delaware corporation that maintains offices at 2000 West Chester Avenue, White Plains, New York. The corporation's registered agent is Prentice Hall, 2711 Centerville Road, Suite 400, Wilmington, Delaware.

6.    Defendant Gary Delgrego is an adult individual who currently maintains a residence at 13027 Fox Brush Lane, Houston, Texas and a post office box at P.O. Box 279, Delaware City, Delaware.

7.    Plaintiff Great American issued a builder's risk insurance policy to Parsons Corporation and related companies ("Parsons"). The policy provided certain protection to Parsons, and others, for defined losses during the Delaware City, Delaware repowering project.

8.    The Great American policy provided for subrogation rights. If the company paid a covered loss to an insured party that was caused by the actions of a third-party, the company would become subrogated to the insured's claims against that third-party to the extent of the claim payments.

9.    Parsons was retained to perform work for the repowering project at the Delaware City, Delaware refinery.

10.    Parsons entered into an agreement with Praxair, Inc. to supply, erect, and test a 2500 STPD air separation unit for the repowering project. The work included, among other things, the

FCI/MOA 0047

installation of a valve intended to block and/or control the flow of oxygen to gasifiers.

11.    Praxair, Inc. purchased from Fisher and/or Northeast a BLOC control valve, tag number 83HV0629. The purpose of the valve was to block and/or control the flow of oxygen to the gasifier.

12.    Valve specifications indicated that the 83HV0629 valve would be utilized for oxygen service. The specifications required, among other things, Fisher and/or Northeast to utilize Monel for the disc material, seat material, guide material, and stem material.

13.    Fisher and/or Northeast knew or reasonably should have known, regardless of the purchase order's terms, that Praxair, Inc. would utilize the valve for high pressure oxygen service.

14.    Fisher and/or Northeast designed, manufactured, and sold to Praxair the 83HV029 BLOC control valve. The company shipped the valve to the Delaware City project.

15.    The Fisher valve was installed in conjunction with the air separation unit equipment.

16.    Conectiv operated, maintained, and managed the Delaware City plant.

17.    Texaco Development Corp representatives, including Gary Delgrego, assisted in plant operations.

18.    Conective and Texaco Development Corp. representatives, including Gary Delgrego, began and oversaw the initial opening of the BLOC control valve on or about May 20, 2000.

19.    A control room operator attempted to open the BLOC control valve which did not respond.

20.    Conectiv employee Ron Olson was sent to the valve to assist with the opening

Doc#: 1296094 v2

FCI/MOA 0048

process. While at the valve, an explosion and fire occurred causing significant losses.

21.    Praxair, Inc., Parsons, and MOTIVA Enterprises LLP submitted claims to Great American. Great American made certain loss payments in response to those claims. The company may make additional payments in the future. Great American is subrogated to Praxair, Inc.'s, Parsons', and MOTIVA Enterprises LLP's rights and claims against the defendants to the extent of its payments.

## COUNT I

## PLAINTIFF V. FISHER AND NORTHEAST (Negligence)

22.    Plaintiff incorporates the allegations contained in paragraphs one through twenty-one as if set forth at length.

23.    Fisher and Northeast were negligent. The negligent acts include, but are not necessarily limited to, the following:

1.    Failing to design, manufacture, assemble, and distribute a BLOC control valve compatible with and appropriate for high pressure oxygen service;

2.    Failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment;

3.    Failing to investigate, for safety, the materials utilized during the design, assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment;

4.    Failing to provide a valve that complied with the specifications that required use of Monel;

5.    Failing to advise of any deficiencies in the valve that would make the product unsafe or unfit for use in a high pressure oxygen environment;

Doc#: 1296094 v2

FCI/MOA 0049

6.    Failing to use due care under the circumstances.

24.    Fisher's and Northeast's breach of duty was a direct and proximate cause of the failure, fire, and resulting damage.

**WHEREFORE**, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

## COUNT II

### PLAINTIFF V. FISHER AND NORTHEAST (Warranty)

25. Plaintiff incorporates the allegations contained in paragraphs one through twenty-four as if set forth at length.

26.    Fisher and Northeast expressly and/or impliedly warranted that the BLOC control valve that they designed, manufactured, assembled, and distributed contained materials suitable for and safe in a high pressure oxygen environment.

27.    Fisher and Northeast expressly and/or impliedly warranted that the BLOC control valve utilized Monel as required in the valve specifications.

28.    The parties relied on Fisher's and Northeast's skill, knowledge, and expertise in providing a BLOC control valve suitable for use in a high pressure oxygen environment.

29.    Fisher and Northeast breached the expressed and implied warranties issued in conjunction with the sale of the BLOC control valve.

30.    Fisher's and Northeast's breach of the expressed and/or implied warranties was a direct and proximate cause of the May 20, 2000 failure, fire, and resulting damage.

**WHEREFORE**, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

Doc# 1296094 v2

FCI/MOA 0050

## COUNT III

### PLAINTIFF v. NORTHEAST (Contract)

31.    Plaintiff incorporates the allegations contained in paragraphs one through thirty as if set forth at length.

32.    Praxair entered into a contract with Northeast to purchase a valve made in accordance with certain written specifications and that would be suitable for use in a high pressure oxygen environment.

33.    Northeast breached the contract entered into with Praxair by supplying a valve that did not conform to the specifications and was not suitable for use in a high pressure oxygen environment.

34.    Northeast's breach of the Praxair contract was a direct and proximate cause of the failure, fire, and resulting damage.

**WHEREFORE**, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

## COUNT IV

### PLAINTIFF v. CONECTIV, TEXACO DEVELOPMENT CORP., and GARY DELGREGO (Negligence)

35.    Plaintiff incorporates the allegations contained in paragraphs one through thirty-four as if set forth at length.

36.    Conectiv, Texaco Development Corp., and Gary Delgrego were negligent. The negligent acts committed by the corporate defendants' agents, servants, and/or employees, along with Gary Delgrego individually, include, but are not necessarily limited to, the following:

Doc#: 1296094 v2

FCI/MOA 0051

1. Failing to properly train operators on proper start-up and operation procedures;

2. Failing to make sure that proper and adequate start-up procedures were in place prior to opening the BLOC control valve;

3. Failing to immediately stop the start-up activity at the initial suggestion of a potential problem;

4. Failing to terminate valve opening procedures prior to sending Ron Olsen to the site to investigate;

5. Failing to use due care under the circumstances.

37.   Conectiv's, Texaco Development Corps.' and Gary Delgrego's negligence were a direct and proximate cause of the May 20, 2000 failure, fire, and resulting damage.

**WHEREFORE**, plaintiff demands judgment against defendants for damages together with interest, attorney's fees, and costs of suit.

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

BY: _____

JOHN BALAGUER, ESQ.
824 North Market Street
Suite 902
P.O. Box 902
Wilmington, DE 19899-0709
Attorney for Plaintiffs

Doc#: 1296094 v2

FCI/MOA 0052

**EXHIBIT 12**

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD W. OLSON and<br>CAROL OLSON, his wife | ) | **C.A. No. 02C-04-263 (JRS)** |
| | ) | |
| | ) | **Non-Arbitration Case** |
| Plaintiffs, | ) | |
| | ) | **Consolidated with:** |
| v. | ) | **C.A. No. 02C-05-168 (JRS)** |
| | ) | **C.A. No. 02C-05-169 (JRS)** |
| MOTIVA ENTERPRISES, L.L.C., et al. | ) | **C.A. No. 02C-05-190 (JRS)** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## BENCH MEMORANDUM

At the status conference of September 8, the Court requested that it be provided with a "bench memo" setting forth a brief overview of the factual background to this case. This memorandum—prepared with input from counsel for the Olsons, Great American Assurance Company, and Fisher Controls International, Inc.—is intended to provide such an overview. However, discovery in this case is still in its early stages, and none of the statements herein should be construed as an admission by any of the parties.

# TABLE OF CONTENTS                                  Page

I.     INTRODUCTION ................................................................................3

II.    THE PARTIES ...................................................................................5

III.   THE REPOWERING PROJECT ......................................................8

IV.    THE INCIDENT ...............................................................................10

V.     THEORIES OF CAUSATION ..........................................................11

VI.    EXHIBITS

       1. Overview of the parties
       2. Schematic overview of the Repowering Project
       3. Overview of the ASU at the Repowering Project
       4. Post-fire photograph showing damage to the Repowering Project
       5. Post-fire photograph of damaged Valve and flanges

# I. __INTRODUCTION__

This lawsuit arises from a fire that occurred at the Delaware City Power Plant on May 20, 2000. At the time of the incident, Motiva—owner of the Power Plant—was involved in a large-scale construction project known as the Delaware City Power Plant Repowering Project ("the Repowering Project"). The purpose of the Repowering Project was, literally, to "repower" the Power Plant using synthetic gas.

Part of the Repowering Project involved installation of an air separation unit ("ASU"), a facility intended to supply oxygen and other industrial gases required to run the Repowering Project. The ASU was used, among other things, to isolate and supply nearly pure oxygen to the Repowering Project's gasification equipment.

The ASU included a number of components from various suppliers, including a valve ("the Valve")[1] intended to isolate and control the flow of oxygen from the ASU's base load oxygen compressor ("BLOC") to the gasification equipment.

The fire occurred when various parties involved in the commissioning of the Repowering Project attempted to open the Valve to permit oxygen to flow from the BLOC to the gasification equipment. The signal from the control room to open the Valve was unsuccessful. After communication with the control room, Mr. Ronald Olson went to the Valve to investigate. While he was checking the Valve, a fire occurred, and Mr. Olson was seriously injured. He has undergone physical therapy and numerous operations. The fire also damaged the Valve and nearby piping.

---

[1] The Valve was assigned a specific tag number—83HV0629—and is sometimes referred to in the pleadings and documents by that number.

Mr. Olson filed this lawsuit to recover for his serious burns, injuries, and other damages that he sustained as a result of the fire. Praxair and Great American seek to recover for damage to the Repowering Project and lost profits.

The parties involved in this lawsuit have identified a number of potential causes of the fire. All of these theories of causation relate to the fact that the presence of nearly 100% pure oxygen creates a significant fire hazard. The risk of fire increases as the temperature of the oxygen rises. Because of fire risks, systems for holding and transporting nearly pure oxygen must be meticulously designed, constructed, cleaned, and maintained in order to avoid oxygen explosions. In light of the fact that the fire at issue occurred in a system that was transporting nearly 100% pure oxygen at a temperature of approximately 270° F and a pressure (on the upstream side of the Valve) of approximately 1100 psi, the following theories of causation have emerged: improper system design, improper operating conditions, inadequate operating procedures, improper pipe cleaning and maintenance procedures, improper welding procedures, and improper materials of construction in components, including the Valve.

## II. **THE PARTIES**

The following parties are involved in one or more of these four actions:

- **Ronald and Carol Olson:** Plaintiffs in the Olson action. Mr. Olson has been employed by Conectiv Operating Services Company for approximately 30 years. Mrs. Olson has sued the defendants for loss of consortium.

- **Motiva Enterprises LLC:** Corporate successor of Star Enterprises; formerly jointly owned by a Texaco entity, Shell, and Saudi Aramco. Owner of the Delaware City Power Plant and the Repowering Project. Plaintiff in the Motiva action (which will be dismissed); defendant in the Olson action; third-party defendant in the Great American and Praxair actions; alleged subrogor of Great American Assurance Company.

- **Parsons Energy and Chemicals Group, Inc.:** General contractor of the Repowering Project; defendant in the Olson action; third-party defendant in the Motiva, Praxair, and Great American actions; alleged subrogor of Great American.

- **Praxair, Inc.:** Designer and builder of the ASU; plaintiff in the Praxair action; defendant in the Olson and Motiva actions; third-party defendant in the Great American action; alleged subrogor of Great American.

- **Great American Assurance Company:** Issued builder's risk policy to Parsons; alleged subrogee of Motiva, Parsons, and Praxair; plaintiff in the Great American action.

- **Texaco, Inc.:** Allegedly the developer of operating procedures for the gasification equipment at the Repowering Project. Texaco, Inc. will be substituted as a defendant in the Olson action and is a third-party defendant in the Motiva, Praxair, and Great American actions.

FCI/MOA 0057

- **Texaco Development Corporation:** Allegedly the developer of operating procedures for the gasification equipment at the Repowering Project. Texaco Development Corporation is a defendant in all four actions.

- **Conectiv Operating Services Company:** Operator of the Power Plant and a participant in the commissioning of the Repowering Project; Mr. Olson's employer. Conectiv is a defendant in the <u>Motiva</u> and <u>Praxair</u> actions and a third-party defendant in the <u>Great American</u> action. Conectiv is not a party in the <u>Olson</u> action.

- **J.J. White, Inc.:** Subcontractor at the Repowering Project; allegedly performed welding and cleaning of piping associated with the ASU; defendant in the Olson action; third-party defendant in the <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u> actions.

- **Battaglia Mechanical, Inc.:** Subcontractor at the plant; allegedly performed cleaning and/or maintenance of piping associated with the ASU; defendant in the <u>Olson</u> action; third-party defendant in the <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u> actions.

- **HydroChem Industrial Co.:** Subcontractor at the plant; allegedly performed cleaning of pipe systems in the ASU; defendant in the <u>Olson</u> action; third-party defendant in the <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u> actions.

- **Fisher Controls International, Inc.:** Manufacturer of the "Valve," a 12" valve installed in the ASU; defendant in all four actions; third-party plaintiff in <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u>.

- **Northeast Controls, Inc.:** Sales representative for, and alleged distributor of, Fisher valves; defendant in all four actions; third-party plaintiff in <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u>.

FCI/MOA 0058

- **Daikin:** Manufacturer of raw material from which the valve seat in the Valve was manufactured. Daikin Industries, Ltd. is a defendant in the <u>Olson</u> action; Daikin Industries, Ltd. and Daikin America are third-party defendants in the <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u> actions.

- **Saint-Gobain Performance Plastics Corp.:** Corporate successor of processor of raw material used for the seat in the Valve; defendant in the <u>Olson</u> action; third-party defendant in the <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u> actions.

## III. THE REPOWERING PROJECT

Star Enterprises—Motiva's corporate predecessor—contracted with Parsons to construct the Delaware City Power Plant Repowering Project. In turn, Parsons subcontracted with a number of other entities—including Praxair—to construct subunits of the Repowering Project. Exhibit 1 sets out the relations between the principal parties to this action. Exhibit 2 is a conceptual overview of the Repowering Project. A predecessor of Great American Assurance Company issued a builder's risk policy to Parsons to cover the project, with coverage of approximately $261 million for property damage and $50 million for lost profits.

Parsons subcontracted with Praxair to construct the air separation unit as part of the Repowering Project. An air separation unit literally separates air into its elemental components—in this case, nitrogen, oxygen, and argon. Exhibit 3 is an overview of a portion of the ASU at the Repowering Project.

The ASU was intended to extract oxygen and other gases from the air and supply oxygen to the Repowering Project's gasification equipment. In addition, the parties planned to sell other industrial gases produced by the ASU on the commercial market. The gasification equipment was intended to generate and burn synthetic gas generated from refinery by-products to make steam and electricity.

The ASU included a base load oxygen compressor ("BLOC"), a device that boosts the circulating oxygen from approximately 70 psig to approximately 1150 psi before the oxygen is delivered to the gasification equipment. A Fisher Type A11 12" wafer-style (or "butterfly") valve (hereafter, "the Valve") was installed in the oxygen system between the BLOC and the gasifier. The Valve was to be opened and closed by an actuator, which was powered by air pressure. Exhibit 3 shows the location of the Valve. Various parties have alleged that the Valve was constructed using improper materials of construction.

To deliver the oxygen gas from the BLOC to the gasifier, the ASU was designed with a 12" piping system manufactured, cleaned and maintained for oxygen service. Exhibit 4 is a post-fire photograph of the ASU piping system.

A number of subcontractors were involved in the assembly, cleaning and maintenance of the ASU. J. J. White welded and tested the piping system both upstream and downstream of the Valve and was also involved in cleaning portions of the piping system, which it alleges it completed in January 2000. In addition, Praxair contracted with Battaglia to assist with various pre-startup punch list items for the ASU, including the removal, cleaning, maintenance, and reinstallation of the check valve located in the oxygen pipeline downstream of the Valve.

In the months before the Incident, workers at the Repowering Project discovered coke dust and other contamination in the oxygen pipeline. Coke dust contamination presents a significant hazard in an oxygen environment as it can ignite a fire. Thus, in March 2000 Motiva contracted with Hydrochem, which provided chemical cleaning of the oxygen piping.

By March 31, 2000, principal construction on the Repowering Project, including the ASU, had been completed. Remaining work at that time included calibration of systems, including calibration of the oxygen supply from the ASU to the gasification equipment.

FCI/MOA 0061

## IV. THE INCIDENT

On May 20, 2000, various parties involved in the commissioning of the Repowering Project decided to open the Valve as part of the process of performing an oxygen calibration on the gasifier. Before the parties attempted to open the Valve, the BLOC had been recirculating (in the piping on the oxygen side of the Valve) 99+% pure oxygen for a period of approximately two hours. The temperature of the oxygen was approximately 270° F, and the pressure was approximately 1150 psi. (Air pressure at sea level is normally 14.7 psi.) The pipe on the other side of the Valve was pressured with nitrogen to between 10 and 40 psi. Thus, the difference in pressure across the Valve was approximately 1110 to 1140 psi.

Employees of various parties stationed in a control room at the Repowering Project made a number of attempts to open the Valve. They did so by sending a signal from the control room to the Valve's actuator. The actuator uses pneumatic pressure to turn the disc of the Valve inside the Valve body. The control room did not receive any feedback as to whether the Valve had moved. The control room operator relayed to the Conectiv shift supervisor, Mr. Olson, that the control room was receiving no feedback on the Valve. Mr. Olson then arrived at the Valve to investigate the problem. While he was checking the Valve, a fire occurred, and Mr. Olson was seriously injured. Portions of the pipes on either side of the Valve were burned through. Exhibit 5 is a photograph of the fire-damaged Valve and flanges.

Mr. and Mrs. Olson seek damages for his personal injuries and loss of consortium. Praxair seeks to recover for costs to repair the Repowering Project and lost profits. Great American seeks to recover damages for payments made under the terms of the builder's risk policy. Motiva's Complaint—which Motiva's counsel has said will be voluntarily dismissed— sought to recover for damage to the Repowering Project and lost profits.

## V. THEORIES OF CAUSATION

The Court is likely already familiar with the concept of the fire triangle. The fire triangle illustrates the three basic elements needed to produce a fire: oxygen, heat, and fuel. In a nearly pure oxygen environment, less heat is required to ignite a fire. Further, in a nearly pure oxygen environment, materials that would not normally ignite or sustain combustion become flammable—that is, can become fuel. Consequently, it is critical that oxygen systems be designed, maintained, and cleaned to avoid the presence of potentially flammable materials, whether intentionally in the system or introduced into the system through contamination.

In this case, the system was intended to provide nearly 100 percent pure oxygen at temperatures up to 300° F and pressures up to 1300 psi. Given those conditions, a number of theories of causation have emerged.

### A.    Improper System Design

Some of the parties allege that the fire occurred because the overall design of the oxygen pipeline did not conform to industry standards for design, materials, and construction, particularly in that the recirculation loop was directly upstream of the Valve and in that carbon steel was used for the piping and flange upstream of the Valve.

### B.    Improper Operating Procedures

Some of the parties contend that the operating procedures and startup protocol for commissioning the pipeline and opening the Valve were not suitable for a nearly pure oxygen environment; that the 1110 psi pressure drop imposed on the Valve was improper; that the commissioning of the ASU was improperly supervised; that system operators were not properly trained on startup and operating procedures; that the commissioning should have been suspended at the first sign of problems; and that Mr. Olson should not have been sent to investigate the Valve under such conditions.

291/380300.08
081007 1348/41155.00193

C.    **Improper Cleaning/Maintenance Procedures**

Some of the parties allege that the fire resulted because component parts such as the

Valve and pipe components were not inspected for proper oxygen cleaning upon arrival at the

Repowering Project; that component parts were not maintained at the Repowering Project site in

an oxygen clean state, as evidenced by the presence of coke dust in the oxygen piping system;

that proper cleaning and maintenance protocols were neither established nor followed; and that

the cleaning procedures used left behind chemical residue in the oxygen system capable of

causing a spark and propagating to a fire.

D.    **Improper Welding Procedures**

Some parties allege that improper welding procedures may have contaminated the

oxygen lines and resulted in weak joints and rough surfaces capable of causing a spark.

E.    **Defective Components**

Some of the parties claim that the Valve and its component parts were defective; that the

Valve was not compatible with or appropriate for oxygen service; that the materials used in the

Valve were not safe for use in an oxygen environment; and that the Valve's materials of

construction did not conform to specifications.

Submitted this 27th day of October, 2003.

| ASHBY & GEDDES | WHITE & WILLIAMS LLP |
|---|---|
| Randall E. Robbins, Esq. | Christopher Konzelmann, Esq. |
| Joseph C. Handlon, Esq. | 1800 One Liberty Place |
| 222 Delaware Avenue | Philadelphia, PA 19103-7395 |
| P. O. Box 1150 | (215) 864-7000 |
| Wilmington, DE 19899 | Attorneys for Great American |
| (302) 654-1888 | Assurance Company (formerly known |
| Attorneys for Plaintiffs Ronald and | as Agricultural Insurance Company) |
| Carol Olson | |

FCI/MOA 0064

| McCarter & English, LLP | Riddell Williams P.S. |
|---|---|
| Paul A. Bradley, Esq.<br>919 North Market Street, Suite 1800<br>P.O. Box 111<br>Wilmington, DE 19899<br>(302) 984-6300<br>Attorneys for Defendant<br>Fisher Controls International, Inc. | Patrick D. McVey, Esq.<br>1001 Fourth Avenue Plaza, Suite 4500<br>Seattle, WA 98154-1065<br>(206) 624-3600<br>Attorneys for Defendant<br>Fisher Controls International, Inc. |

# Exhibit 1:  Overview of the Parties



291/380300
.08
081007
1348/41155
.00193

FCI/MOA 0066

# Exhibit 2: Delaware City Power Plant Repowering Project



FCI/MOA 0067



**Exhibit 3:  Repowering Project—Air Separation Unit**

12" Valve

## Exhibit 4: Fire Damage



FCI/MOA 0069

Exhibit 5:  Fire Damage—Valve and Flanges

FCI/MOA 0070

# EXHIBIT 13

/35

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MOTIVA ENTERPRISES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 02C-05-169 (JRS) |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, INC., NORTHEAST CONTROLS, INC., PRAXAIR, INC. AND CONECTIV OPERATING SERVICES COMPANY, | ) ) ) ) | __NON-ARBITRATION CASE__ |
| | ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, INC., | ) ) | |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BATTAGLIA MECHANICAL, INC., HYDROCHEM INDUSTRIAL SERVICES, INC., JJ WHITE, INC., PARSONS CORPORATION, PARSONS ENERGY AND CHEMICALS, INC., TEXACO AVIATION PRODUCTS LLC, TEXACO DEVELOPMENT CORP., TEXACO, INC., d/b/a TEXACO GLOBAL GAS AND POWER, DAIKIN AMERICA, INC., DAIKIN INDUSTRIES, LTD., and SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## STIPULATION OF DISMISSAL

COME NOW, the parties to this litigation, by and through counsel, who agree and stipulate that the above-captioned lawsuit is hereby dismissed, without prejudice, each party to bear its own costs.


PRICKETT, JONES & ELLIOTT, P.A.          McCARTER & ENGLISH, LLP


By: _____             By: _____
PAUL M. LUKOFF                               PAUL A. BRADLEY
1310 King Street                             919 North Market Street, Suite 1800
P. O. Box 1328                               P. O. Box 111
Wilmington, DE 19801                         Wilmington, DE 19899

*Attorneys for Motiva Enterprises LLC*       *Attorneys for Fisher Controls*
                                             *International, Inc.*

FCI/MOA 0072

17226.25\19030Gv1

RAWLE & HENDERSON LLP

By: _____
        DELIA A. CLARK
        300 Delaware Avenue
        Suite 1015
        Wilmington, DE 19802

*Attorneys for Northeast Controls, Inc.*

TIGHE, COTTRELL & LOGAN, P.A.


By: _____

MICHAEL K. TIGHE
First Federal Plaza
P.O. Box 1031
Wilmington, DE 19899

*Attorneys for Battaglia Mechanical, Inc.*


SO ORDERED this **17** day of _____, 2003.

_____
Judge

2003 NOV 24 AM 11:58
FILED PROTHONOTARY

FCI/MOA 0074

# EXHIBIT 14

------------------------------

Tom Wagner
Rawle & Henderson
twagner@rawle.com

-----Original Message-----
From: CHRISTOPHER KONZELMANN <KONZELMANNC@whiteandwilliams.com>
To: twagner@rawle.com <twagner@rawle.com>
CC: FJacoby@cozen.com <FJacoby@cozen.com>
Sent: Mon Jan 19 08:17:43 2004
Subject: Great American.

  <<CHRISTOPHER KONZELMANN.vcf>> Tom, the status conference along with oral
argument on various motions is scheduled for tomorrow.  We have not spoken
since our meeting but I understand you may have had some communications with
Peter.

I have spoken to Fred Jacoby.  He was attempting to make contact with his
client to address the issues we discussed, specifically, dismissal of the
Praxair affirmative claim, our experts, and the necessary paperwork that
would preserve cross claims in the Olson matter if you and I are able to
settle.  I hope to discuss these issues with Fred again today.

Based on the testimony of the Northeast representative, I am very seriously
considering voluntarily dismissing the claims against Fisher.  I will make
the final decision later this morning after speaking to my client.  He is in
California and I need to account to the time difference.  If that occurs,
and I am relatively certain it will, the Northeast claims will be the only
that remain.  Before actual dismissal, I did want to bring my intentions to
your attention because I do not know if you are attempting to obtain a

FCI/MOA 0075

contribution from Fisher. Also, if I do dismiss, I want to let Fisher's counsel know as soon as possible so he can avoid a long trip to Delaware for tomorrow.

Can you please give me a call as soon as possible so we can discuss. I am copying this email to Mr. Jacoby so he knows my intentions as well. I do ask that the email be considered confidential although it can be shared with clients. Thanks. Chris.

Christopher Konzelmann, Esq.
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
(215) 864-6334 phone
(215) 789-7636 direct fax
(609) 560-5153 cell
konzelmannc@whiteandwilliams.com

****CONFIDENTIALITY NOTICE****

This E-Mail message and any documents accompanying this E-Mail transmission contain information from the law firm of White and Williams LLP which is "Privileged and confidential attorney-client communication and/or work product of counsel." If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution and/or the taking of or refraining from taking of any action in reliance on the contents of this E-Mail information is strictly prohibited and may result in legal action being instituted against you. Please reply to the sender advising of the error in transmission and delete the message and any accompanying documents from your system immediately. Thank you.

****************************************************************
This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.
****************************************************************

CHRISTOPHER KONZELMANN.\

# EXHIBIT 15

# RAWLE & HENDERSON LLP



THE NATION'S OLDEST LAW OFFICES
ESTABLISHED 1783

www.rawle.com

THOMAS P. WAGNER
215-575-4307
twagner@rawle.com

THE WIDENER BUILDING
ONE SOUTH PENN SQUARE
PHILADELPHIA, PA 19107

TELEPHONE:(215) 575-4200
FACSIMILE:(215) 563-2583

February 19, 2004

Christopher Konzelman, Esquire
White and William LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

> Re:  *Great American Assurance Co. v. Northeast Controls, Inc. et al.*
> *Praxair, Inc. v. Fisher Controls International, Inc., et al.*
> *Our File No. 300,004*

Dear Mr. Konzelman:

On behalf of our client, Northeast Controls, Inc., we hereby offer to settle all claims in connection with the above-captioned matters for the total sum of $250,000.00 in exchange for a general release. The conditions of this settlement would require, at a minimum, the following:

- A general release extinguishing the liability of all defendants and all parties, known and unknown, for any and all claims advanced by plaintiffs, Great American Assurance Co. and Praxair, Inc. on their own behalf and/or as subrogee of other parties.

- An agreement of strict confidentiality by which Great American Assurance Co., Praxair, Inc., and their counsel would agree not to discuss any aspect of the settlement with anyone.

- Great American Assurance Co. would make its expert consultants available to us, our client, and our experts for unlimited consultation in the defense of any litigation arising from the re-powering project at the Delaware City Power Plant and/or the incident of May 20, 2000 described in the pleadings of various parties (hereafter referred to as "your experts."). This would include all technical or scientific experts, expert witnesses or consultants engaged by Great American or anyone acting on its behalf to investigate the causes of the incident from which this litigation arises or to support or refute the claim or defense of any party in any litigation arising from that incident (hereafter referred to as "the incident.").

FCI/MOA 0077

934450 v.1

FEB 23 2004

PHILADELPHIA, PA     MEDIA, PA     PITTSBURGH, PA     MARLTON, NJ     NEW YORK, NY     WILMINGTON, DE

RAWLE & HENDERSON LLP

Christopher Konzelman, Esquire
February 19, 2004
Page 2

- Our client would not be responsible for any payment to Great American or anyone else for the services of your experts up to the day this settlement is consummated by the signing of a settlement agreement, except for the payment stated above.

- Our client would be responsible for the payment of your experts' consultation fees going forward only to the extent that our client chooses to consult and work with these experts.

- All files of any kind or description maintained by your experts regarding the incident will be delivered to us. A complete copy of your firm's file would also be delivered to us, with a waiver of the attorney/client privilege by your client. All cost involved in the duplication and delivery of these materials would be included in the payment set forth above.

- No one else would be given access of any kind to your file, your experts, or your experts' files, and this would continue without limitation forever. Your experts would be required to acknowledge their agreement to this condition in writing.

- Your experts would be required to acknowledge in writing their willingness to work with and cooperate with us and our experts to the extent necessary in the defense of any litigation arising from the incident.

- Your experts and their materials would have to be identified with a confidential communication to us before the funds described above are actually paid.

I look forward to hearing from you.

Very truly yours,

RAWLE & HENDERSON LLP

By: Thomas P. Wagner

TPW/smm

cc:    Peter Parashes, Esquire

934450 v.1

FCI/MOA 0078

RAWLE & HENDERSON LLP

Christopher Konzelman, Esquire
February 19, 2004
Page 3

bcc:   Philip Jacobson, Esquire
       Marybeth Slevin, Esquire
       Jeffery Frock, Your File No. TE06401049-09T002

934450 v.1

# EXHIBIT 17

# White and Williams LLP

1800 One Liberty Place
Philadelphia, PA 19103-7395
Phone: 215.864.7000
Fax: 215.864.7123

Christopher Konzelmann
Direct Dial: 215.864.6334
Direct Fax: 215.789.7636
konzelmannc@whiteandwilliams.com

February 20, 2004

**By Facsimile**

Thomas Wagner, Esquire
RAWLE & HENDERSON, LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107

RE: **Great American v. Northeast Controls, Inc.**
**C.A. No. 02C-04-263 (JRS)**

Dear Mr. Wagner:

Thank you for your February 19, 2004 correspondence. Your client has offered to settle this matter for $250,000.00 subject to nine conditions. Some of those conditions are related. Let me respond.

Preliminarily, Great American has now resolved the MOTIVA claim. I have enclosed an updated statement of loss. The subrogation damages total $3,057,737.81. Great American will reduce its current $1,100,000.00 demand to $900,000.00 subject to agreement on the conditions/stipulations below.

First, Great American will provide a general release extinguishing the liability of all defendants and all parties, known and unknown, for subrogation claims arising from the explosion and fire. I do not represent any other parties and cannot speak on their behalf. Those parties will obviously want to keep their crossclaims in the Olson matter. I have spoken to Mr. Jacoby about the Praxair affirmative claims. I believe Praxair will agree to voluntarily dismiss its affirmative claim if we are able to resolve the subrogation litigation. Mr. Jacoby justifiably believes that he should obtain something in return for a voluntary dismissal. I will address that issue below.

Second, Great American has no objection to a strict confidentiality agreement with respect to any settlement. I do not represent Praxair and cannot speak for that company with respect to confidentiality.

Third, we retained Becht Engineering to perform the failure analysis. Given Great American's unique position in this matter, I would feel very uncomfortable giving you unfettered access to the Becht team. The Becht people are confident that the actions of Northeast Controls, Inc. caused the explosion. I cannot have the situation arise, however, where you attempt to utilize Becht to formulate liability theories against other Great American insureds. If that occurred, experts Great American hired through counsel would then be used to develop liability theories against entities to

*Allentown, PA • New York, NY • Paoli, PA • Paramus, NJ*
*Philadelphia, PA • Pittsburgh, PA • Westmont, NJ • Wilmington, DE*

DOCS_PH 154836lvl                                          FCI/MOA 0082

Thomas Wagner, Esquire
February 20, 2004
Page 2

whom the company owed contractual duties. Such a result could create significant ethical and moral problems.

Fourth, if we are able to reach a monetary settlement and agree on other non-monetary terms, I will not give anyone else access to my file materials, my experts, or my expert's files. The limitation, as it relates to this claim, would continue forever. I cannot agree to give you access to my personal file for obvious reasons.

Let me go back and address one additional issue with respect to experts. Mr. Jacoby believes he has viable affirmative claims against Northeast. He has no motivation to voluntarily dismiss those claims unless he receives something in return. The one thing that he should receive in return, for the reasons I explained above, is Great American's agreement to take its experts off the table completely so they cannot be used by anyone.

We previously discussed the benefits that Northeast Controls would receive by settling the Great American claims. Those benefits have a significant monetary value. Specifically, from a damage point of view, the value of the Olson case is high. Mr. Robbins, however, did not have any experts at the explosion site. I do not believe he has ever retained a liability expert. It would be extremely difficult and costly for him to do so at this late date. I assume he expects Great American's experts to establish liability against Northeast Controls for him. By settling with Great American, the Becht team members will be out of the case and not available to anyone. The value of the Olson claim, especially as it relates to Northeast Controls, then very significantly decreases. Mr. Robbins would be hard pressed to spend the money necessary to properly evaluate the claims against Northeast Controls at this late date on his own.

Let me make one final point. The subrogation damages exceed $3,000,000.00. The $1,100,000.00 demand made during mediation was extremely fair and reasonable. Great American has now reduced its demand an additional $200,000.00 recognizing that it cannot accept all of the conditions you have proposed. Settling the case at that amount, with the other non-monetary settlement terms described above, would be an excellent result for Northeast Controls.

Please let me know your client's response.

Very truly yours,

WHITE AND WILLIAMS LLP

By: Christopher Konzelmann

CK/eah
cc:   Mr. Vincent Eckles

DOCS_PH 154836lvl

# EXHIBIT 18

# White and Williams LLP

WW

*1800 One Liberty Place*
*Philadelphia, PA 19103-7395*
*Phone: 215.864.7000*
*Fax: 215.864.7123*

*Christopher Konzelmann*
*Direct Dial: 215.864.6334*
*Direct Fax: 215.789.7636*
*konzelmannc@whiteandwilliams.com*

April 21, 2004

<u>By Facsimile</u>

Thomas Wagner, Esquire
RAWLE & HENDERSON, LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107

> RE:  **Great American v. Northeast Controls, Inc.**
>      **C.A. No. 02C-04-263 (JRS)**

Dear Mr. Wagner:

My March 11, 2004 confirmed our settlement of this matter.  I clarified the settlement terms in my March 21, 2004 e-mail.  My April 1, 2004 e-mail requested the status of the settlement documents.  We later agreed on the terms of the release.  The Becht team members have started to return their files to me.  I should have the signed document from Becht concerning confidentiality shortly.

Mr. Jacoby has agreed to voluntarily dismiss the Praxair affirmative claims.  As my March 30, 2004 e-mail indicated, the sticking point appears to be the "with" or "without" prejudice language.  The statute of limitations has expired.  The distinction is therefore not relevant.  Once Mr. Jacoby signs the stipulation of dismissal "without prejudice", he will not be able to refile and the case will be gone forever.

Mr. Jacoby's client is not receiving any money.  Praxair is apparently agreeing to dismiss its affirmative claims so the parties can focus on the Olsen matter.  He is now somewhat dismayed that the defendants in that litigation appear to be pointing the finger at Praxair when, with the Becht Engineering people out of the picture, defense counsel should simply sit back and let Mr. Robbins try to establish the factual predicate for viable claims.

It is crucial that we finalize the settlement documents immediately.  Please forward the final copy of the release and stipulations of dismissal.  I will e-mail the release to my client and have the signed document returned to you the following day.  I will also sign and immediately return the stipulation of dismissal of the Great American litigation.  I will have somebody hand deliver the Praxair stipulation to Mr. Jacoby for his signature.  You will then have all documents, other than the signed Becht Engineering non-disclosure agreements, necessary to issue the settlement check.  I will have the signed non-disclosure documents from the Becht people any day.

*Allentown, PA • New York, NY • Paoli, PA • Paramus, NJ*
*Philadelphia, PA • Pittsburgh, PA • Westmont, NJ • Wilmington, DE*

DOCS_PH 1575959v1

FCI/MOA 0084

Thomas Wagner, Esquire
February 20, 2004
Page 2

We have exchanged several telephone messages and I truly appreciate your willingness to work with me in getting the final settlement paperwork completed.   I would like to get that paperwork finalized prior to the April 26, 2004 conference.  Thank you.

Very truly yours,

WHITE AND WILLIAMS LLP

By:      Christopher Konzelmann

CK/eah

FCI/MOA 0085

Thomas Wagner, Esquire
February 20, 2004
Page 3


bcc:  Mr. Vincent Eckles

FCI/MOA 0086

# EXHIBIT 19

-----Original Message-----
From: Tom Wagner
Sent: Monday, May 17, 2004 9:42 AM
To: 'Christopher Konzelmann'
Subject: RE: Great American.


Chris:

Your understanding of the meeting is basically correct.  We don't want
opinions.  I think it will be satisfactory for Mr. Karcher to address the
items you describe below.

My contact at St. Paul is in Ohio today. There is no way I can arrange to
have a check at that meeting tomorrow.  As stated previously, we need to
have the Becht meeting first.  Nevertheless, I agree that we need to get
this wrapped up as quickly as possible.  If we can do it before  the
Thursday conference, so much the better.

We will plan to meet you and Mr. Karcher in your office at 2:00 p.m.
tomorrow.  We will agree to compensate Mr.Karcher reasonably for his time.
Thanks.

Tom Wagner
Rawle & Henderson LLP
twagner@rawle.com
215 575-4307


     -----Original Message-----
From: Christopher Konzelmann [mailto:KONZELMANNC@whiteandwilliams.com]
Sent: Monday, May 17, 2004 9:12 AM
To: twagner@rawle.com
Cc: dclark@rawle.com
Subject: Great American.


Tom, I spoke to Guido Karcher.  He is available at 2:00 p.m. Tuesday for a
brief meeting in my office.  Please let me know if that time is still okay.
That would really be the best time for me.

This settlement must be finalized before the Thursday conference as Judge
Slights will be asking questions.  It will be very embarrassing to the firm
if, since I have been telling the court for a long time that the matter has
been resolved, I come in and tell him we are still working on the paperwork.

FCI/MOA 0087

There really are no issues remaining.  Because you have all of the signed closing documents, I would respectfully request that your client physically bring the settlement check and give it to me at the conclusion of the meeting.  I will hold the check until Fisher signs the Stipulation of Dismissal which can be done during the depositions.

You indicated that minor changes may be needed to the closing paperwork.  If so, please get those changes to me today.  I will have the new documents signed and provide you with fax signatures prior to the meeting.

One final point.  The scope of the Karcher meeting will necessarily have to be limited.  Karcher cannot provide opinions.  Doing so could violate the agreement with Fred Jacoby where he would dismiss if the Becht people were completely removed from the case.  I understand your client is requesting the meeting to confirm that Becht performed an independent investigation and reached certain conclusions about the valve that would have directly implicated Northeast.  The Praxair test results simply confirmed what the Becht people believed, i.e., the material deviations caused the explosion.  In addition to Karcher providing basic background information about the investigation, please let me know beforehand if the meeting addenda will be different.   While we have not specifically discussed the issue, I assume that Northeast will be compensating Karcher for his time in traveling to Philadelphia on Tuesday.  Please let me know if I am incorrect.   Note that I would ordinarily never agree to allow counsel for an adverse party to meet with my experts if the  matter was still pendng.  I continue to consider the matter settled.  Thanks.  Chris.

Christopher Konzelmann, Esq.
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
(215) 864-6334 phone
(215) 789-7636 direct fax
(609) 560-5153 cell
konzelmannc@whiteandwilliams.com

****CONFIDENTIALITY NOTICE****

This E-Mail message and any documents accompanying this E-Mail transmission contain information from the law firm of White and Williams LLP which is "Privileged and confidential attorney-client communication and/or work product of counsel." If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution and/or the taking of or refraining from taking of any action in reliance on the contents of this E-Mail information is strictly prohibited and may result in legal action being instituted against you. Please reply to the sender advising of the error in transmission and delete the message and any accompanying documents from your system immediately.  Thank you.

<font size=2>*******************************************************************************
***********************
This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges.  It constitutes non-public information intended to be conveyed only to the designated recipient(s).  If the reader or recipient of this communication is not the intended recipient, or you believe that you have received this

communication in error, please notify the sender immediately by return e-mail
and promptly delete this e-mail, including attachments without reading or
saving them in any manner.  The unauthorized use, dissemination, distribution,
or reproduction of this e-mail, is prohibited and may be unlawful.  Receipt by
anyone other than the intended recipient(s) is not a waiver of any
attorney/client or other privilege.
*****************************************************************************
***************</font>

# EXHIBIT 20

*1800 One Liberty Place*
*Philadelphia, PA 19103-7395*
*Phone: 215.864.7000*
*Fax: 215.864.7123*

*Christopher Konzelmann*
*Direct Dial: 215.864.6334*
*Direct Fax: 215.789.7636*
*konzelmannc@whiteandwilliams.com*

May 25, 2004

Thomas Wagner, Esquire
RAWLE & HENDERSON, LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107

　　　RE:  **Great American v. Northeast Controls, Inc.**
　　　　　　**C.A. No. 02C-04-263 (JRS)**

Dear Mr. Wagner:

　　　In follow-up to my May 25, 2004 correspondence, I have attached the original release and settlement agreement and non-disclosure affidavit.  These documents have original signatures.

　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　WHITE AND WILLIAMS LLP

　　　　　　　　By:

　　　　　　　　　　Christopher Konzelmann

CK/eah
Enclosure

*Allentown, PA • Cherry Hill, NJ • New York, NY • Paoli, PA*
*Paramus, NJ • Philadelphia, PA • Pittsburgh, PA • Wilmington, DE*

DOCS_PH 1590236v1

FCI/MOA 0090

## RELEASE AND SETTLEMENT AGREEMENT

KNOW ALL MEN BY THESE PRESENTS, that GREAT AMERICAN ASSURANCE COMPANY, formerly known as Agricultural Insurance Company, hereinafter "the Undersigned," in sole consideration of the sum of Five Hundred and One Thousand dollars ($501,000), by check made payable to its attorneys, WHITE AND WILLIAMS, LLP, the receipt of which is hereby acknowledged, does for itself and its successors, assigns, subsidiaries and inter-related companies, officers, employees, agents and representatives, and any other person, corporation, association or partnership hereby remise, release, and forever discharge all actions, claims and demands whatsoever, including, but not limited to, claims for property damage subrogation and any other damages, that now exist, ever existed, or may hereafter accrue, against NORTHEAST CONTROLS, INC. its successors, assigns, subsidiaries and inter-related companies, officers, employees, agents and representatives, and any other person, corporation, association or partnership or entity arising out of or in any way resulting from a fire/explosion incident at the Delaware City Power Plant more particularly in the Air Separation Unit at or around HV0629 which occurred on or about May 20, 2000 in Delaware City, New Castle County, Delaware (hereinafter, "the Fire") and which is the subject of a suit originally instituted by GREAT AMERICAN ASSURANCE COMPANY as subrogee for Praxair, Inc., Parsons Corporation, and Motiva Enterprises, LLC. against FISHER CONTROLS INTERNATIONAL, INC., NORTHEAST CONTROLS, INC. et al in the Superior Court of Delaware in and for New Castle County, 02C-05-168(JSS). The Undersigned acknowledges that it is compromising disputed claims for damages for which the parties herein released have denied any and all liability. The Undersigned also acknowledges that no promise or inducement has been offered except as set forth in this document; that this Release is executed without reliance upon any

statement or representation by the person or parties released herein, or their representatives, concerning the nature and extent of the injuries, damages or legal liability therefore; that the Undersigned representative is of legal age, legally competent and authorized to execute this Release and accepts full responsibility therefore.

In further consideration of payment of the aforementioned sum, it is agreed that the Undersigned will instruct Becht Engineering, Inc. and its team members to close their files and return any documentation received or generated during the course of the investigation to counsel for the Undersigned, Christopher Konzelmann, of White and Williams, LLP. Further, the Becht team members will be instructed not to discuss the litigation or investigation with others, or to participate through testimony or otherwise, in any litigation arising out of the fire. Additionally, a Becht authorized representative will execute an affidavit which states that the file has been closed and all documentation concerning Becht's involvement has been returned to counsel for the Undersigned. The affidavit will be incorporated into the terms of this agreement. Lastly, in the event that any party to the companion case entitled OLSON v. MOTIVA ENTERPRISES, et al 02CV-04-263 (JSS), seeks to obtain the Becht documents, opinions and investigation files, the Undersigned counsel, Christopher Konzelmann, will agree to file, argue, and pursue Motions to Quash or for a Protective Order which will drafted and prepared by counsel for Northeast Controls, Inc.

The Undersigned acknowledges that the damages to its insureds may be more severe or serious than now experienced or anticipated, and that a portion of the consideration paid by those released herein to the Undersigned shall operate as a final release and discharge of all such presently unknown and unanticipated injuries and damages resulting from the aforementioned events, as well as those now known.

-2-

FCI/MOA 0092

In further consideration of payment of the aforementioned sum, the Undersigned agrees that it will not, and will not permit its agents, attorneys, representatives or anyone else to disclose or cause to be disclosed the fact of or the terms of this settlement for any reason or purpose whatsoever to any person at any time other than his attorneys. The Undersigned understands and agrees that it must advise all such individuals of the confidentiality of this agreement and obtain consent thereto prior to discussing it with them. The Undersigned also agrees that any letters or other documentation exchanged in connection with this litigation or the settlement of this matter shall also remain confidential.

The Undersigned hereby agrees to direct his attorneys to dismiss with prejudice all claims in the action instituted by GREAT AMERICAN ASSURANCE COMPANY V. FISHER CONTROLS INTERNATIONAL, INC., NORTHEAST CONTROLS, INC. et al in the Superior Court of Delaware in and for New Castle County, Civil Action No. 02C-05-168 (JSS), upon execution of this Release.

The Undersigned certifies that he has made this compromise settlement after consultation with and advice from his attorney, CHRISTOPHER KONZELMANN, ESQUIRE, who has explained the nature and extent of the Undersigned's' legal rights and the effect of this Release.

IN WITNESS WHEREOF, we have hereunto set our hand and seal this 24TH day of _MAY_ , 2004.

_____
(Authorized Representative's Name)

_VICE - PRESIDENT Claims_
(Title)

-3-

Signed, Sealed and
Delivered in the Presence of:

STATE OF CALIFORNIA

COUNTY OF _L_o_s__A_n_g_e_l_e_s_                    :        SS.
                                                    :

On this _14th_ day of _May_                    , 2004, before me, the subscriber, a

Notary Public of the State of California, <u>Vincent Eckles</u>, the authorized representative for

GREAT AMERICAN ASSURANCE COMPANY personally appeared before me and stated that

he fully understood the meaning and effect of the Release; that all averments therein are true and

correct to the best of his knowledge, information, and belief; and that he voluntarily executed the

Release in my presence.

WITNESS my hand and notarial seal the day and year aforesaid.

Sworn to and Subscribed
by me this _24th_ day
of _May_          , 2004.

_____
Notary Public

ARLENE C. MC GEE
Commission # 1432658
Notary Public - California
Los Angeles County
My Comm. Expires Jul 28, 2007

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

GREAT AMERICAN ASSURANCE COMPANY   )
  )
vs.   )
  )    Civil Action No. 02C-05-168-JRS
NORTHEAST CONTROLS, INC., et al.   )
  )
         Plaintiff   )
  )

## AFFIDAVIT

Charles Becht, IV, being duly sworn, according to law, deposes and says as follows:

I am President of Becht Engineering, Inc., and I am authorized to take this affidavit on the company's behalf.

A team of Becht Engineering, Inc. personnel conducted an investigation (the investigation) into the possible causes of a fire (the fire) that occurred at the Delaware City Power Plant in the State of Delaware on May 20, 2000. Becht Engineering, Inc., and all of its employees, consultants, contractors, and any and all other persons acting on its behalf have delivered all documents and information of any kind or description in their possession regarding all work they performed in the course of the investigation to Christopher Konzelmann, Esquire of White and Williams, LLP in Philadelphia, Pennsylvania. Becht Engineering, Inc. has closed its file regarding the investigation. Neither Becht Engineering, Inc. nor any of its employees, consultants, contractors, nor any other persons acting on its behalf have retained any information or documents, or copies thereof, in any way relating to the investigation, or received in the course of or as a result of the investigation, or generated in the course of the investigation. No Becht Engineering representatives have communicated with any Praxair representatives, including consultants or attorneys, about the substantive results of its forensic failure

FCI/MOA 0095

investigation or any of the work performed in conjunction with that investigation. Becht Engineering, Inc. and all of its employees, consultants, contractors, and anyone else acting on its behalf will decline to discuss the investigation, or any aspect of the litigation arising from the fire, and will not disclose any information regarding the work of Becht Engineering, Inc. on the investigation to anyone. Neither Becht Engineering, Inc. nor anyone in its employ or acting on its behalf, nor any Becht Engineering, Inc. employee, consultant, or contractor who participated in the investigation will act as an expert witness on behalf of anyone in any litigation arising out of the fire, and they will further fully cooperate with Northeast Controls, Inc., and its attorneys, in resisting any effort to compel their testimony, whether opinion or fact.

SWORN TO AND SUBSCRIBED

BEFORE ME THIS 24 DAY

OF May_____, 2004.

NOTARY PUBLIC

PAMELA A. IZRUBINO
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires June 16, 2007

-2-DOCS_PH 1562118v1                              FCI/MOA 0096

# EXHIBIT 21

EFiled: Jun 11 2004 10:44 EDT
Filing ID 3716512



IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| RONALD W. OLSON and | ) C.A. No. 02C-04-263 (JRS) |
| CAROL OLSON, his wife, | ) |
| | ) Non-Arbitration Case |
| Plaintiffs, | ) |
| | ) Consolidated for discovery with: |
| MOTIVA ENTERPRISES, L.L.C.; | ) C.A. No. 02C-05-168 (JRS) |
| BATTAGLIA MECHANICAL, INC.; | ) C.A. No. 02C-05-169 (JRS) |
| FISHER CONTROLS INTERNATIONAL, | ) C.A. No. 02C-05-190 (JRS) |
| INC.; HYDROCHEM INDUSTRIAL | ) **JURY TRIAL DEMANDED** |
| SERVICES, INC.; JJWHITE, INC.; | ) |
| NORTHEAST CONTROLS, INC; PARSONS | ) |
| ENERGY AND CHEMICALS GROUP, INC.; | ) |
| PRAXAIR, INC.; DAIKIN INDUSTRIES, | ) |
| LTD.; SAINT-GOBAIN PERFORMANCE | ) |
| PLASTICS; RIX INDUSTRIES, INC.; | ) |
| TEXACO, INC., AND TEXACO | ) |
| DEVELOPMENT CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## STIPULATION OF DISMISSAL

PLEASE TAKE NOTICE that, pursuant to Rule 41(a)(1)(II) of the Superior Court Civil

Rules, the undersigned parties hereby stipulate to the dismissal of Praxair's Complaint against

Fisher Controls, Inc., Northeast Controls, Inc., Conectiv Operating Services, Inc. and Texaco

Development Corp., as asserted in C. A. No. 02C-05-190 (JRS) only, without prejudice as to

Northeast Controls, Inc., Conectiv Operating Services, Inc and Texaco Development Corp.,

Praxair's Complaint against Fisher Controls, Inc., only, having been previously dismissed with

prejudice. All Third-Party Complaints and cross-claims filed and asserted in C.A. No. 02C-05-

190 (JRS) are likewise dismissed, without prejudice. All cross-claims of Praxair as asserted in

C.A. No. 02C-04-263 (JRS), Ronald W. Olson et al. v. Motiva Enterprises. L.L.C., et al., and any

other active consolidated action, are preserved.

COZEN O'CONNOR

Dated: May 27, 2004

Sean J. Bellew (4072)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
(302) 295-2000
*Attorneys for Praxair, Inc.*

WIL.M1\254891\1 124029.000

1

FCI/MOA 0098

RAWLE & HENDERSON LLP

Dated: _____, 2004

_____
Delia A. Clark (3337)
300 Delaware Avenue, Suite 1015
Wilmington, DE  19801
(302) 654-0544

*Attorneys for Northeast Controls, Inc.*

WILM1\254791\1 124029.000                    9

FCI/MOA 0099

# EXHIBIT 22



# ENGINEERING DESIGN & TESTING Corp.
## ENGINEERS / CONSULTANTS / LABORATORIES

**ASHBY & GEDDES**
Wilmington, Delaware

Incident Involving a Fire and a Breach of Containment of an
Oxygen System Piping and Valving
Delaware City Power Plant Recovery Project
Delaware City, Delaware

ED&T File Number: COL11116-12908

July 29, 2004

POST OFFICE BOX 8027 / COLUMBIA, S.C. 29202 / TELEPHONE (803) 791-8800

FCI/MOA 0100

# ENGINEERING DESIGN & TESTING Corp.
### ENGINEERS / CONSULTANTS / LABORATORIES

CORPORATE OFFICES:
Post Office Box 8027
Columbia, South Carolina 29202

(803) 796-6975
Facsimile Transmission
(803) 796-

July 29, 2004

**REPORT TO:**   Mr. Randall E. Robbins and Mr. Joseph C. Handlon
Ashby & Geddes
Post Office Box 1150
Wilmington, Delaware 19899

**FROM:**   Tim A. Jur, Ph.D., P. E.

**REFERENCE:**   Incident Involving a Fire and a Breach of Containment of an Oxygen
System Piping and Valving
Delaware City Power Plant Recovery Project, Delaware City, Delaware
ED&T File Number: COL11116-12908

     The following is a report concerning a technical investigation of an incident that occurred on May 20, 2000 at the Delaware City Power Plant in Delaware City, Delaware. As part of a project to repower the plant, an air separation unit was constructed, a primary purpose of which was to supply oxygen to an adjacent pair of gasifiers. At the juncture of the air separation unit with the gasifiers, there existed a 12 inch diameter pipeline routing oxygen from an oxygen compressor to the gasifiers. The pipeline consisted also of valving and instrumentation, including a remote controlled butterfly valve installed as a means for controlling the volume flow rate of oxygen to the gasifiers. On the day of the incident, the connecting pipeline, valving and instrumentation were being pressurized with oxygen. The procedure involved opening of the control valve. Associated with the opening of the control valve there ensued a fire at the location of the control valve, resulting in a breach of containment of the pipeline. A workman in the area was injured.

DISTRICT OFFICES:   Columbia, South Carolina/Charlotte, North Carolina/Houston, Texas
Charleston, South Carolina/Birmingham, Alabama/Overland Park, Kansas/
Oakland, California/Greenville, South Carolina

**Incident Involving a Fire and a Breach of Containment of**
**an Oxygen System Piping and Valving**
**ED&T File Number:  COL11116-12908**

Page 2
July 29, 2004

    The object of this investigation has been to conduct a technical review of the incident, determine what caused the fire, and to determine the circumstances that led to the workman being in the vicinity when the incident took place.

    The conclusions and opinions stated herein are based on information available to the investigation as of this writing.   It is conceivable that additional information may be forthcoming which bears on these conclusions and opinions.  Therefore, the right is reserved to review and modify all conclusions and opinions at any future point in time should, in fact, additional information become available.

Incident Involving a Fire and a Breach of Containment of
an Oxygen System Piping and Valving
ED&T File Number: COL11116-12908

Page 21
July 29, 2004

pipeline hardware less its controls, as it was constructed and in place at the time of the incident.

4.  The valves and the pipe spool pieces used in the assembly of the pipeline were specified by Praxair. With respect to Control Valve HV0629, there developed a discrepancy between the valve materials of construction as specified by Praxair and the materials of construction of the valve as eventually sold to Praxair by Fisher (or by Northeast Controls as a sales representative of Fisher). Table 1 compares what was specified with what was delivered. In effect, Praxair ordered a valve to be manufactured with many of its metal internal component parts made out of Monel, a copper-nickel alloy favorable to oxygen service. What was delivered to Praxair was a valve with its metal internal component parts made of grades of Hastelloy and Inconel, materials less favorable to oxygen service. The terms that have been used are: exempt materials (Monel) and non-exempt materials (Hastelloy, Inconel, stainless steel and carbon steel). Non-exempt materials can be used for oxygen service but carry with them certain restrictions as to their use.

5.  Also with respect to Control Valve HV0629, the valve seal was specified by Praxair to be what Fisher referred to in their instruction manual as a "Phoenix III fire-safe seal," consisting of a Monel seal ring and a PTFE (Teflon) back-up ring. Reference in this regard is to a copy of the Instruction Manual for the Fisher Model A11 valve (the valve model as the basis for construction of Control Valve HV0629), attached to this report as Appendix XII. A description of the Phoenix III fire-safe seal is found on Page 15 of the Manual. What was actually delivered to Praxair by Fisher was a valve with a standard polymeric soft seal. Refer here once again to the Manual in

Incident Involving a Fire and a Breach of Containment of
an Oxygen System Piping and Valving
ED&T File Number: COL11116-12908

Page 22
July 29, 2004

Appendix XII, Page 15. This soft seal consisted of a seal ring made of Tefzel (a plastic material) and a PTFE back-up ring.

6.   With respect to the pipe spool pieces used in the pipeline, a number of these pieces were specified by Praxair to be constructed of carbon steel. Carbon steel is a common material of construction for pipelines but represents a lower end, non-exempt metal for oxygen service, carrying with it greater restrictions as to its use than Hastelloy, Inconel or stainless steel. In particular with respect to this incident, the pipe and pipe flange upstream of Control Valve HV0629 were made of carbon steel.

7.   Beginning as early as March 1999, Praxair had a concern as to the presence of coke dust in and around the air separation unit. It so happens that petroleum coke, as the intended feed stock source of hydrocarbon for the gasifier block, was stockpiled close enough to the air separation unit so as to have created a condition of coke dust blowing about and into the boundary of the air separation unit. Praxair was also aware at this time that hydrocarbon entry into an air separation unit was an opportunity for a hazardous condition. In particular, there was awareness at this time of recent explosions of cold boxes in air separation units constructed in Asia, where the culprit contaminant was suspected to be hydrocarbon solids.

8.   Although there was interaction with the facility owner, Motiva, as to the coke dust issue and the propensity for contamination of the air separation unit, there is no record that steps were taken to mitigate the prevalence of coke dust at the site. At the time of the site visit by this investigation three years after the incident, in 2004, there was visible coke dust collected at various locations around buildings and walkways where the coke pile was not far away.

Incident Involving a Fire and a Breach of Containment of                    Page 44
an Oxygen System Piping and Valving                                      July 29, 2004
ED&T File Number: COL11116-12908

region where the use of this material would be allowed. Further, the stems are not directly exposed to the flow stream. In this latter regard, see Appendix VIII, Figure VIII-4.

In summary, the conditions at the location of Control Valve HV0629 at what would have been the instant before the fire were such that the carbon steel pipe and flange were susceptible to involvement in the ignition of a fire. The metallic components of the valve were not.

(b)    Non-Metal Components

Control Valve HV0629 was produced with what is referred to in the Fisher literature (see Appendix XII) as a standard polymeric soft seal. The information available identifies the seal ring to have been made of Tefzel. The backup ring material is PTFE. Attention here is in regard to the seal ring, the part that was in contact with the oxygen flow stream.

Tefzel is a plastic material and goes by the generic name of "ethylenetetraflouroethylene" (a modified copolymer of tetraflourothylene and ethylene), or "ETFE" for short. This material has numerous industrial applications based on its chemical resistance properties, resistance to elevated temperature (manufacturer's literature suggests service temperatures up to 300F), stiffness and abrasion resistance. One such application is as the seal ring in Fisher Model A11 valves.

Incident Involving a Fire and a Breach of Containment of     Page 45
an Oxygen System Piping and Valving                          July 29, 2004
ED&T File Number: COL11116-12908

In assessing the acceptability of the use of Tefzel as a seal material in this application, reference was made to ASTM G-63-1998, "Standard Guide for Evaluating Non-Metallic Materials for Oxygen Service." Attention was focused on potential ignition mechanisms with respect to the seal ring as a candidate for initiation of the fire. In this regard, candidate ignition mechanisms are (a) particle impact and (b) heat generated by flow friction. Further, it is known from the damage patterns that the most likely location of the origin of the fire was on the south side at the Control Valve HV0629 location, also defined herein as from the 6 o'clock to the 12 o'clock positions. On this side of the control valve, the leading edge of the valve disc in its rotated position would have been projected toward the upstream side of the valve. That is, the seal ring location would have been downstream of the leading edge of the disc at the time of the ignition of the fire. In this regard, reference is made to the various frames in Appendix IX having to do with the oxygen flow stream at the 9 o-clock position, as estimated using CFD analysis.

Given the information available from the record and with the methodology presented in ASTM G-63 as a reference guide, the following observations are made:

(i)     Plastic materials, including Tefzel, are susceptible to igniting in a nearly pure oxygen environment. The Praxair "fire-safe seal" as specified by Praxair for Control Valve HV0629 involved a seal ring made of Monel. A seal ring made of this material would not have been susceptible to ignition.

(ii)    For particle impact to have occurred, a particle would have had to have struck the seal ring while moving at high velocity. Referencing Frame IX-6, the calculated flow velocity at the leading edge of the seal ring in

Incident Involving a Fire and a Breach of Containment of
an Oxygen System Piping and Valving
ED&T File Number: COL11116-12908

Page 46
July 29, 2004

the vicinity of the 9 o'clock position is calculated to be 1610 ft/sec and drops to 1490 ft/sec over the seal ring exposed surface. Given that the pressure drop through the valve is high, sonic flow conditions prevail.

(iii)    The location of the seal ring is such that the potential for particle impact would be minimized. There are three reasons. First, the opening for oxygen passage through the valve with the valve opened 9 degrees is small. Second, since even small particles have mass, the associated momentum of particles moving upstream of the valve opening allows only those particles having an incoming velocity directed toward the valve opening to pass through. In this regard, attention is directed to the velocity vector display shown in Frame IX-2. Particles approaching the valve opening at an angle would have a propensity to be caused by their momentum to impact with the disc, the retaining ring and the upstream pipe flange rather than pass through the opening. Third, the seal ring is positioned so as to be where the flow channel surface is sloping away from the direction of flow. Here again, particle momentum would be expected to carry what particles that made it thorough the valve opening to follow a projected path over and above the seal ring so as to be separated from and tend not to make contact with the seal ring surface.

(iv)    An important factor in ignition, in addition to velocity, is pressure. Referencing Frame IX-7, the pressure at the leading edge of the seal ring in the vicinity of the 9 o'clock position is calculated to be 217 psi and drops to 115 psi over the seal exposed surface. In effect, as the oxygen gas travels through the valve opening, the pressure would be expected to drop from 1150 psi to atmospheric pressure. As shown in

Incident Involving a Fire and a Breach of Containment of
an Oxygen System Piping and Valving
ED&T File Number:  COL11116-12908

Page 47
July 29, 2004

Frame IX-7, the pressure drop occurs in a short distance of travel of the oxygen gas past the valve opening, corresponding to a rapid rise in velocity over the same short distance.  The lowering of pressure at the seal ring reduces its propensity to ignite both due to particle impact and due to heating as a result of flow friction effects.

(v)    A factor of less importance than velocity and pressure is the prevailing temperature of the oxygen gas flowing over the seal ring.  The rapid drop in pressure of the oxygen gas corresponds to a rapid drop in temperature.  Referencing Frame IX-5, oxygen temperatures at the seal ring are as low as - 80F, as compared to a gas temperature upstream of the control valve of 200F as used in this analysis.  The lower oxygen gas temperature at the seal ring would have an expected minor effect in reducing the propensity of the seal ring to ignite as a result of particle impact.  The lower temperature would have a greater effect on reducing the propensity for ignition due to flow friction effects.

In summary, the conditions at the seal ring on Control Valve HV0629 at what would have been the instant before the fire were such that the seal ring was subject to being a location of ignition of a fire, but the likelihood of ignition was reduced by (a) its position, (b) the prevailing pressure of the oxygen gas and (c) the prevailing temperature of the oxygen gas.

2.    At Vent Line Control Valve PV0613 and Upstream Piping

The oxygen compressor discharge piping included a means of venting the piping system upstream of Control Valve HV0629, by way of a vent line.  Reference here is to

**Incident Involving a Fire and a Breach of Containment of**
**an Oxygen System Piping and Valving**
**ED&T File Number:  COL11116-12908**

Page 58
July 29, 2004

3.    Flow Friction at the Plastic Seal Ring

A means for igniting the fire due to a frictional effect as the oxygen flowed across the surface of the seal ring was also considered in Section G of this report.  Again, with respect to this mechanism, the flow velocity was high.  The parties involved would have or should have been aware of this condition.  However, corresponding to the increase in flow velocity was a drop in the prevailing pressure and temperature.  As reviewed previously regarding ignition by particle impact at the seal ring, there may have been ignition at this location due to a flow friction effect.  Such a condition cannot be ruled out, but is not considered by this investigation to be likely.  Here again, the low point of the fire was upstream at the carbon steel pipe and flange and upstream of the seal ring.  It is more reasonable to recognize that the location of the seal ring downstream of the carbon steel would better offer an opportunity for the seal ring to be ignited once the carbon steel began to burn.

Incident Involving a Fire and a Breach of Containment of
an Oxygen System Piping and Valving
ED&T File Number:  COL11116-12908

Page 69
July 29, 2004

L.     CONCLUSONS

1.     As to the Cause of the Fire

    (a)    The most likely cause of the fire was a condition of a high oxygen flow velocity in the presence of a carbon steel pipe and flange upstream of Control Valve HV0629, resulting in first ignition of the fire at this location by a mechanism of particle impact.

    (b)    The high oxygen flow velocity that resulted in a condition suitable for initiation of the fire by a mechanism of particle impact was the result of the consequences of opening Control Valve HV0629 under the prevailing conditions based on a defective procedure developed by Praxair and Texaco.

    (c)    A contributing cause of the fire was the presence of a dead leg upstream of Control Valve HV0629 that had not been blown down prior to the valve being opened on high differential pressure and high purity oxygen.

    (d)    The circumstances which led to Control Valve HV0629 being opened as it was with a dead leg upstream were a result of a failure by both Praxair and Texaco to address this condition in advance and in a manner that would have been consistent with industry custom and practice.

2.     As to the Presence of a Workman in the Vicinity of the Fire

    (a)    Mr. Ronald Olson was in the vicinity of the fire as part of an effort to determine why a signal from the position transmitter on Control Valve HV0629 was not being received at the station from which the valve was being controlled.

FCI/MOA 0110

**Incident Involving a Fire and a Breach of Containment of**
**an Oxygen System Piping and Valving**
**ED&T File Number: COL11116-12908**

Page 70
July 29, 2004

(b)  The positioner feedback signal from Control Valve HV0629 was not able to be received at the control station due to a physical disruption of the signal wiring, this disruption having taken place most likely during the handling of Control Valve HV0629 in March 2000.

(c)  The work that involved handling of Control Valve HV0629 was conducted under the authority of Motiva, where the party involved in the work of handling the valve was most likely Battaglia.

(d)  The control functions of Control Valve HV0629 were not re-verified following its being handled during the work involving the valve in March 2000, an action consistent with customary and expected practice that should have been undertaken as part of the job under the auspices of Motiva.

# EXHIBIT 23

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD W. OLSON, and<br>CAROL OLSON, his wife, | ) ) ) | C. A. No. 02C-04-263 JRS |
| Plaintiffs, | ) ) ) ) | Non-Arbitration Case<br><br>**JURY TRIAL DEMANDED** |
| MOTIVA ENTERPRISES L.L.C.; BATTAGLIA<br>MECHANICAL, INC.; FISHER CONTROLS<br>INTERNATIONAL, INC.; HYDROCHEM<br>INDUSTRIAL SERVICES, INC.; JJ WHITE,<br>INC.; NORTHEAST CONTROLS, INC.;<br>PARSONS ENERGY AND CHEMICALS<br>GROUP, INC.; PRAXAIR, INC.; TEXACO<br>AVIATION PRODUCTS LLC; DAIKIN<br>INDUSTRIES, LTD.; SAINT-GOBAIN<br>PERFORMANCE PLASTICS; RIX<br>INDUSTRIES, INC.; TEXACO GLOBAL<br>GAS AND POWER; TEXACO DEVELOPMENT<br>CORPORATION; GARY DELGREGO, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT[1]

Plaintiffs Ronald W. Olson and Carol Olson, by and through their undersigned attorneys,

for their SECOND Amended Complaint, hereby allege upon knowledge, information and belief:

### Parties

1.    Plaintiffs Ronald W. Olson and Carol Olson are residents of the State of

Delaware. At all times relevant hereto, Mr. Olson was an employee of Conectiv Operating

Services Co. ("Conectiv") and was married to Mrs. Olson.

---

[1] A blacklined copy of the Second Amended Complaint showing the amendments is attached
hereto as Exhibit A.

FCI/MOA 0112

2.     Defendant Motiva Enterprises, L.L.C. ("Motiva") is a Delaware Limited Liability Company and owns and/or operates a power plant located on River Road, Route 9, Delaware City, Delaware 19706 (the "Plant").

3.     Defendant Battaglia Mechanical, Inc ("Battaglia") is a Delaware corporation with its principal headquarters at 11 Industrial Boulevard, New Castle, Delaware 19720.

4.     Defendant Fisher Controls International, Inc. ("Fisher") is a Delaware corporation, and, upon information and belief, its principal headquarters is located at 205 South Center Street, Marshalltown, Iowa 50158. Among other things, Fisher engages in the business of manufacturing and distributing control valves used in oxygen systems.

5.     Upon information and belief, Defendant Hydrochem Industrial Services Inc. ("Hydro") is a Delaware corporation with offices located at 450 Preston Street, Houston, Texas 77002.

6.     Upon information and belief, Defendant JJ White, Inc. ("JJ White") is a Delaware corporation with its principal headquarters located at 5500 Bingham Street, Philadelphia, Pennsylvania 19120. JJ White is engaged in the business of, among other things, general construction, construction management and mechanical construction.

7.     Defendant Northeast Controls, Inc. ("Northeast") is a distributor of valves manufactured by Fisher. Northeast has offices located at 6000 N. Bailey Avenue, Suite 2B, Amherst, NY 14226. Upon information and belief, Northeast maintains its executive offices at 3 Enterprise Avenue, Clifton Park, New York.

8.     Defendant Parsons Energy and Chemicals Group, Inc. ("Parsons") is a Delaware Corporation, and, upon information and belief, its principal headquarters is located at 2675

2

FCI/MOA 0113

14.   Rix Industries, Inc. ("Rix") is headquarted out of Benecia, California and is engaged in the business of, among other things, manufacturing oil-free compressors for industrial use.

15.   Texaco Development Corp. ("Texaco Development") is a Delaware corporation that maintains offices at 2000 West Chester Avenue, White Plains, New York.   The corporation's registered agent is Prentice Hall, 2711 Centerville Road, Suite 400 Wilmington, Delaware.

16.   Gary Delgrego is an adult individual who resides at 13027 Fox Brush Lane, Houston, Texas and a post office box at P.O. Box 279, Delaware City, Delaware. At all times relevant hereto Mr. Delgrego conducted business within the State of Delaware and is otherwise subject to service of process pursuant to 10 Del. C. § 3104.

## Background

17.   In May 2000, certain of the Defendants were engaged in the construction and operation of a "re-powering project" at the Plant (the "Project"). The Project included, among other things, the calibration of an oxygen-flow transmitter, which is utilized in the process of transferring 99.99% pure oxygen gas from a base load oxygen compressor ("BLOC") in a air separation unit ("ASU") through a series of control valves and pipes to a gassifier (The ASU and BLOC, together with all interconnected, vents, pipes, valves and gassifier are hereafter referred to collectively as the "Oxygen System" or "System").

18.   Upon information and belief, Parsons was retained to perform work for the Project and entered into an agreement with Praxair to supply, erect, and test the ASU. The work included, amont other things, the installation of a valve intended to block and/or control the flow of oxygen to gassifiers.

4

19. Upon information and belief, Praxair, Inc. purchased from Fisher and/or Northeast a BLOC control valve, tag number 83HVO629 (the "Valve"). The purpose of the Valve was to block and/or control the flow of oxygen the gassifier.

20. Upon information and belief, valve specifications indicated that the Valve would be utilized for oxygen service. The specifications required, among other things, Fisher and/or Northeast to utilize certain disc material, seat material, guide material, and stem material.

21. Fisher and/or Northeast knew or reasonably should have known, regardless of the purchase order's terms, that Praixair would utilize the Valve for high pressure oxygen service.

22. Upon information and belief, Fisher and/or Northeast designed, manufactured, and sold the Valve to Praxair. The Valve was then shipped to the Plant for use in the Project. The Valve was installed in conjunction with the ASU.

23. Upon information and belief, Texaco Development representatives, including Mr. Delgrego, assisted in plant operations and began and oversaw the initial opening of the Valve on May 20, 2000.

24. A control room operator attempted to open the Valve, which did not respond. Mr. Olson responded to a call from the control room operator to check the Valve While checking the Valve, an explosion occurred and Mr. Olson was engulfed in flames. As a result of the explosion, Mr. Olson sustained severe and permanent injuries, including but not limited to, severe burns, scarring, disfigurement, and pain and suffering. Mr. Olson has undergone several operations, has incurred and will continue to incur medical expenses, and has lost significant time from work resulting in a loss of wages and may continue to incur lost wages in the future..

25. Upon information and belief, and at all times relevant hereto, Defendant Texaco participated in the development of operating procedures and design of the Oxygen System and

5

and/or cleaning the System, As a direct and proximate result of Defendant Praxair's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

## Count V
### Negligence – Fisher and Northeast

39.    At all times relevant hereto, Defendant Fisher and Northeast owed a duty of reasonable care to Mr. Olson, which duty defendants Fisher and Northeast, themselves, and through their agents, servants, and/or employees, breached by, among other things, negligently designing, manufacturing, and/or distributing the Valve.  Upon information and belief, Fisher and Northeast were also negligent in failing to design, manufacture, assemble and distribute a BLOC control valve compatible with and  appropriate for high pressure oxygen service; failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment; failing to investigate, for safety, the materials utilized during the design, assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment; failing to provide a valve that complied with the specifications that required use of certain material; and failing to advise of any deficiencies in the Valve that would make the product unsafe or unfit for use in a high pressure oxygen environment. As a direct and proximate result of defendants Fisher and Northeast's negligence, Mr. Olson suffered and continues to suffer great pain, both physically and mentally, and has suffered pecuniary loss, including, but not limited to, lost earnings, medical bills, and other damages permitted by law.

9

## Count IX
### Breach of Warranty – 6 Del. C. § 2-314 – Fisher and Northeast

43.    At all times relevant hereto, defendants Fisher and Northeast were merchants within the meaning of 6 Del. C. § 2-104. Defendants Fisher and Northeast sold the Valve, which Valve at the time of the sale, was defective. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher and Northeast's breach of the warranty of merchantability and the defective condition of the Valve. Defendant Northeast has notice of Mr. Olson's injuries and the damage caused by the defective Valve.

## Count X
### Breach of Warranty – 6 Del. C. § 2-315 – Fisher and Northeast

44.    Upon information and belief, at all times relevant hereto, defendants Fisher and Northeast had reason to know the purpose for which the Valve was required and that the buyer of the Valve was relying on Fisher and Northeast's skill or judgment to select or furnish a suitable valve. The Valve was not fit for the purpose for which it was intended. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher Northeast's breach of the implied warranty of fitness.

## Count XI
### Breach of Warranty – 6 Del. C. § 2-313 – Fisher and Northeast

45.    Upon information and belief, at all times relevant hereto, defendants Fisher and Northeast expressly warranted that the Valve that they designed, manufactured, assembled and/or distributed contained materials suitable for and safe in a high pressure oxygen environment, and utilized certain material as required in the valve specifications. Mr. Olson relied on the parties' skill, knowledge, and expertise in providing a BLOC control valve suitable for use in a high pressure oxygen environment. Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher and Northeast's breach of the express warranty.

11

## COUNT XXIV
## PUNITIVE DAMAGES - PRAXAIR

58.    In designing, building and commissioning the ASU, Praxair acted with a reckless indifference to the rights of others, including Mr. Olson.   Praxair designed the ASU with a conscious indifference to the foreseeable effects of its actions, or in-actions, which included, among other things:

       a.   failing to conduct velocity calculations for an initial start-up of the ASU and first delivery of pure oxygen to the Gassifier;

       b.   failing to address repeated concerns raised about the use of carbon steel in certain pipeline in the ASU and requests for any design limitations associated with that piping;

       c.   refusing to respond to such concerns because it would not be compensated for responding;

       d.   failing to provide qualified personnel on site to assist in commissioning of the oxygen pipeline in the period around May 2000, unless paid additional compensation and despite believing that other parties lacked the necessary qualification and experience to operate and maintain the ASU;

       e.   ignoring similar incidents involving violations of velocity limitations and improper use of carbon steel in an air separation unit;

       f.   using cheaper materials of construction not suitable for designed conditions;

       g.   violating industry and its own internal standards applicable to the design of the ASU and its operation; and

       h.   other outrageous conduct and decisions based on economic considerations that proximately caused the May 20, 2000 fire.

## CONCLUSION

WHEREFORE, plaintiffs demand (i) judgment against the defendants, jointly and severally, for all damages permitted by law, together with reasonable attorneys' fees, interest, and costs and (ii) judgment against Praxair for punitive damages.

16

ASHBY & GEDDES


*/s/ Joseph C. Handlon*
Randall E. Robbins (I.D. No. 2055)
Joseph C. Handlon (I.D. No. 3952)
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Ronald and Carol Olson*

Dated: November 3, 2004


17

FCI/MOA 0119

# EXHIBIT 24



Rimkus Consulting Group, Inc.
Eight Greenway Plaza, Suite 500
Houston, Texas 77046
(713) 621-3550 Telephone
(713) 623-4357 Facsimile

December 21, 2004

Sean J. Bellew, Esq.
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, Delaware 19801

Re:    Preliminary Report of Findings
       Ronald W. Olson, et al. v. Motiva Enterprises, L.L.C., et al.
       Rimkus File No. 105744

Dear Mr. Bellew:

On or May 20, 2000, a fire occurred at the Delaware City Power Plant in Delaware City, Delaware. The fire occurred in the area of a "butterfly" control valve in 12-inch (nominal) diameter piping that connected a recently completed air separation unit to a pair of gasifiers, all installed as part of a repowering project for the plant.

Rimkus Consulting Group, Inc. was retained on by Cozen O'Connor, attorneys for Praxair, Inc. ("Praxair"), to review the expert reports of Engineering Design & Testing Corp. ("ED&T") and Wendell Hull Associates ("Hull"), to comment on the bases and conclusions contained in those reports, and to offer any additional insight and opinions we might have as to the cause and origin of the fire.

## Conclusions

1. The most likely cause of the fire was friction and heating at the seal-disc interface[1], occasioned by gas flowing at sonic velocity, which led to failure of the seal assembly, a resultant enlarging of the effective orifice size beyond that which would be found with the valve only 10% (9 degrees) open, and higher than anticipated flow rates.

2. There is no evidence presented by either ED&T or Hull that any particulate or hydrocarbon products were present in the "dead" leg of pipe upstream of the control valve. If we assumed that particulate or hydrocarbon products, such as coke dust, were present in the piping, it would not affect our conclusion as to the most likely cause of the fire.

---

[1] On the left side of the valve as viewed from upstream – what we will refer to as the "leading edge."

Sean J. Bellew, Esq.                    - 2 -                    December 21, 2004

3.  Praxair specified that the seal ring be made of Monel®. If the seal ring had been made of Monel® instead of Tefzel®, the fire would not have occurred.

4.  The use of carbon steel piping and fittings upstream of the control valve location was not a cause of the fire and did not violate Praxair's own design standards.

## Discussion

As part of a repowering project, the Delaware City Power Plant ("Plant") was modified by the construction of an air separation unit and adjacent gasifiers, the purpose of which was to generate power using petroleum coke. The air separation unit was connected to a 12-inch pipeline carrying nearly pure (99+%) oxygen to the gasifiers. Part of the pipeline included a 12-inch "butterfly" control valve (the "valve"), designed to throttle the oxygen flow in the pipeline. A check valve was located nearby (and downstream of the butterfly valve) to prevent any backflow in the pipeline.

On May 20, 2000, operators attempted to open the control valve to pressurize the downstream portion of the pipeline. Upon the operators receiving no indication on the control panel that the valve was indeed opening, and in apparent response to a radio call, a nearby workman went to the control valve location in an attempt to observe whether the valve was in fact moving when the command was issued. As the valve was only being opened to the 10% position (nine degrees rotation of the valve disc), he was unable to tell whether it was opening or not. After several attempts to open the valve, a fire ensued which breached the valve assembly and pipeline, injuring the workman and causing physical damage to the facility.

### Rimkus Analysis of Flow Pattern

The reports by both ED&T and Hull recognize the phenomenon of sonic flow rates (i.e., gas flow at the speed of sound), induced by the passage of the gas under relatively high pressure through an orifice to a relatively low pressure (roughly a ratio of 2/1+ from high pressure to low pressure). As with any valve, the construction of the valve in question is such that partially opening the valve creates an effective orifice through which the high-pressure gas on the upstream side attempts to flow to reach the lower pressure on the downstream side.

According to reports, at the time of the incident the valve was open only 10%, or nine degrees[2]. The upstream pressure was 1,150 pounds per square inch gauge (psig),

---

[2] The valve is fully open when the disc has rotated 90 degrees from the fully closed position, presenting a cross-sectional flow area approximately equal to that of the pipe itself (less the thickness of the disc). Describing this as "10% open" can easily be misinterpreted to mean 10% of that total cross-sectional area open to flow when the valve is fully open. In fact, when the disc has rotated 9 degrees from fully closed, the orifice has less than two percent of the cross-sectional area open to flow when the valve is fully open.

Sean J. Bellew, Esq.                    - 8 -                    December 21, 2004

We appreciate the opportunity to provide this service. If you have any questions, please feel free to contact us.

Sincerely,
RIMKUS CONSULTING GROUP, INC.

J. Philip Whitman, P.E.
Division Manager

Michael W. Wiseman, M.S.
Division Manager

# EXHIBIT 25

# Serry - Tech, Inc.

20 ELLSWORTH AVENUE • MORRISTOWN, NJ 07960 • (973) 538-8231 • FAX (973) 538-5887

EVALUATION OF THE FACTORS AND CAUSES

UNDERLYING A FIRE IN AN OXYGEN LINE

LOCATED AT THE

DELAWARE CITY POWER PLANT

DELAWARE CITY, DELAWARE

Evaluation Performed For:

Thomas Wagner, Esq.
Delia A. Clark, Esq.
Rawle & Henderson, LLP
300 Delaware Avenue
Suite 1015
Wilmington, DE 19899

Evaluation Performed By:

Gerard Muller, P.E.
Serry -Tech, Inc.
20 Ellsworth Ave.
Morristown, NJ 07960

Date: December 27, 2004

FCI/MOA 0123

## PURPOSE OF REPORT

The purpose of this report is to provide the results of a technical evaluation of the circumstances contributing to a fire that occurred within an oxygen line in the area of Isolation Valve located at the battery limits of a Praxair Air Separation Unit (ASU) and a Gasifier, which was part of the Delaware City Power Plant (DCPP) Recovery Project.

## EXPERT QUALIFICATION

My name is Gerard Muller. Since 1986, I have been President, owner and sole employee of Serry-Tech, Inc., which provides consulting services in the area of process machinery reliability assessment, detail compression and power machinery evaluations and selection for new projects, and compressor and turbine technology training. I have a Master of Science Degree in Mechanical Engineering and 40 years of experience in the design, specification, standards, selection, commissioning, and troubleshooting of the equipment noted for application in refineries, chemical plants, offshore production platforms, power plants and tankers. I am also a Licensed Professional Engineer in the State of New Jersey. During this time I also headed up a machinery evaluation section responsible for evaluating refrigeration and product compressors for use in a Liquefied Natural Gas (LNG) plant in the Persian Gulf that utilizes much of the same technology and procedures used in the ASU plant in this case. Details of my complete background and experience are outlined in the resume attached as an Exhibit to this report.

In the 1970s and through the mid-1980s, I worked for Exxon Research & Engineering Company, where my responsibilities included evaluating and commissioning gas turbines, steam turbines, turbo-expanders, generators, axial and centrifugal compressors for new projects, as well as performing failure analyses for this family of equipment, worldwide. In the evaluation of the latter equipment for new projects I was also responsible for developing engineering guidelines for the use of non-lubricated compressors provided by the same compressor manufacturer as used in this ASU, Sulzer, for applications including oxygen compression.

2

FCI/MOA 0124

I have testified as an expert witness, at trial, within the preceding four years in the following cases: (i) Honeywell International v. Hamilton Sundstrand Corp. in Federal District Court in Wilmington, Delaware (99-309 GMS); (ii) TI Group Automotive Systems v. VDO North America in Federal District Court in Wilmington, Delaware (00-432 GMS); (iii) Spotless Enterprises v. A&E Products Group in U.S. District Court (Eastern District) in New York (CV-01-7815); (iv) John Rizzuto v. L. A. Wengner Contracting in Supreme Court of State of New York, County of Suffolk; (v) Tappan Wire & Cable v. County of Rockland in Supreme Court of State of New York, County of Rockland.

## DOCUMENTS REVIEWED

The documents reviewed are those associated with Olson vs. Motiva, et al., Civil Action No. 02C-04-263 (JRS) in the Superior Court of the State of Delaware in and for New Castle County:

1.      Olson Exhibits 1 through 289, inclusive.

2.      Depositions by: Amy R. Blanton; Glenn J. Robinson, Vols. 1 & 2; Dr. Tim A. Jur, Vols. 1, 2, 3, & 4; Ronald W. Olson; Roger F. Hawley, Vols. 1 & 2; Leonard A. Switliski, Vols. 1 & 2; Gary T. DelGrego; Bhim S. Bhakoo, Vols. 1 & 2; David N. Whelan; Robert D. Barry; Jayant H. Patel, Vols. 1 & 2; Andrew J. Engels; Roger D. Simon; Chris D. Affuso; Edward Nicholas Saccoccia, Jr.; Chris Carter; Gerald A. Paolino, Vols. 1, 2, & 3; David W. Good, Vols. 1 & 2; John M. Cimusz; Thomas W. Freuler;   Melvin E. Liechty, II; Mathew A. Rush; Gregory K. Calloway; Mark J. Paolucci; Bert M. Cappelini.

3.      *Phase 1 Cause and Origin Analysis of the Delaware City Power Plant ASU Oxygen Fire Incident* for Connectiv Operating Services Co., May 2001 and Final Report, July 24, 2001, Wendell Hull and Associates, Inc., Las Cruces, NM.

4.      *Incident Involving a Fire and a Breach of Containment of an Oxygen System Piping and Valving,* Delaware City Power Plant Recovery Project, Delaware City, Delaware, July 29, 2004. Engineering Design & Testing Corp., Columbia SC.

FCI/MOA 0125

5.      ASTM G94-92, *Standard Guide for Evaluating Metals for Oxygen Service.* ASTM G88-90, *Standard Guide for Designing Systems for Oxygen Service.* ASTM G145-96, *Standard Guide for Studying Fire Incidents in Oxygen Systems.*

6.      Photographs of fire damage and other documents obtained through discovery.

I also reserve the right to change, amend, modify or supplement the opinions I will provide based on additional facts that I may learn after the date of this report based on any other testimony, including other Expert's report, presented in this matter.

## DESCRIPTION OF FIRE INCIDENT

On May 20, 2000, the ASU at the DCPP attempted its first delivery of about 99.6% pure oxygen at its design condition of 1150 psig and 250° F to the gasifier located on the refinery side of the DCPP. The gasifier uses the oxygen in a process to generate syngas which is then used as the fuel in gas turbine driven electrical generators. Up until this point the ASU had been commissioned and operated with the Isolation Valve, 83HV0629 ("629") closed, thereby acting as a barrier to prevent any gas from being transmitted to the gasifier. There was also a check valve provided after the 629 that prevented any backflow of gas from the gasifier. The procedure to deliver 1150 psig oxygen involved the use of a Base Line Oxygen Compressor (BLOC) that pressurized the oxygen produced in the ASU to its design pressure which was then recirculated it until needed by the gasifier whereupon the 629 is opened. It was during this first attempt to deliver 1150 psig oxygen to the gasifier that the fire incident occurred.

With the oxygen pressurized and available for transmission to the gasifier, the operator initiated the prescribed procedure for opening the 629. Since the piping downstream of the 629 was initially at atmospheric conditions, the procedures called for opening the 629 sufficient to only allow about 10% of the design flow to pass through until the line downstream was within 10 psig of the pressure upstream of the 629, at which point the valve was to be fully opened. At first the operator called for a few percent of opening, but the 629 actuator controls did not acknowledge that the valve had opened. After a few

further attempts the operator called for Mr. Olson, an operating supervisor, to go look at the 629 and see if the instrument air line, which is used by the 629 actuator, was on. After a few minutes, Mr. Olson was at the 629 and communicated to the operator that the air line was on. The operator then opened the 629 to its full 10% opening, as Mr. Olson stood near the valve to see if the 629 actuator responded to the opening command. Mr. Olson thought he saw the actuator move; however, the operator still received no confirmation on his control panel. After a few minutes of observation Mr. Olsen stated that he sensed that something was wrong and started to leave the area. As he did so, the area around the 629 flange failed resulting in a violent discharge of flame. The flame front reached Mr. Olson before he could exit the area and consequently incurred injuries.

## TECHNICAL ANALYSIS

In my analysis of all the information that was provided describing the events leading up to the fire at the 629 there are at least five distinct areas that impacted on this incident: Piping Design, Contaminants, Pipe cleaning Procedures, Debris Forming Mechanism, and Isolation Valve Application. These are individually discussed below:

### Piping Material & Design

The two governing documents that define the maximum velocity allowable for various materials used in the transmission of pressurized oxygen are CGA G-4.4 standard (Olson Exhibit No. 83) and Praxair Standard EN-6 (Olson exhibit No. 222). The supply line upstream of the 629 was made of carbon steel (CS) as was the recirculation line, a few feet upstream of the 629; the 629 valve body was Hastelloy; and the downstream spool piece was Monel. The configuration is shown on a picture of the fire damaged 629 and the adjoining lines on photo NEC406.

The CGA G-4.4 standard only provides specific guidelines to operation at 1000 psig and 200° F. since operation above those levels are infrequent. Up to this 1000 psig level the CGA standard limits flow velocity in CS for straight pipes to 25 ft/sec, while in areas of piping where impingement is possible they restrict the velocity to 12.5 ft/sec (¶¶ 4.3.2 and 4.3.3). The CGA defines two of the "impingement" areas as side entrance tees (as

5

there is at the interface of the recirculating and straight sections of CS line upstream of the 629) and at pressure letdown valves (such as the 629 operating as a throttling valve) where they state *"high velocities and impingement always occur"*. Praxair's EN-6 provides further guidance on pressures greater than 1000 psig and temperatures greater than 200° F where it states in Figure 2 of EN-6 that at 1150 psig and 250° F, the maximum velocity allowable for CS is 23 ft/sec in straight sections and 11.5 ft/sec in impingement areas. The maximum velocity that Praxair allowed upstream of the 629 was 16.9 ft/sec which is within the standard for straight sections of CS line, but exceeds the CGA and Praxair standards by 35% and 47%, respectively, in the impingement areas consisting of the CS recirculation line immediately upstream of the 629 and the CS oxygen delivery line and flange contacting the 629.

In the selection of piping materials in high pressure oxygen, it is not only the velocity but the operating pressure that must be considered. ASTM G 94 provides guidance on the impact of high pressure in their Table 3, which shows that when metals burn in oxygen up to 1000 psig, the impact on the burning rate is only intermediate, but when the pressure exceeds 1000 psig, the burning rate becomes severe. This is further highlighted in Fig. X1.1 of the same standard for CS which shows that at 1150 psig if the per cent oxygen fraction were less than 50% then CS would be faced with partial combustion, while above that fraction, the combustion becomes complete.

Another consideration of the piping in the area of the 629 was the fact that the design allowed for a dead-ended piping segment upstream of the 629 when the 629 was closed and the BLOC was operating on recirculation, as shown on NEC406. Recirculation operation of the BLOC was used extensively during the commissioning. During normal operation recirculation is much less frequent but can still occur for extended periods. Dead-ended sections of a line basically serve as a debris trap for contaminants in the oxygen gas stream as ASTM G88 warns in Sect. 7.5.2 of the standard for designing systems for oxygen service: *"Avoid the presence of unnecessary sumps, dead-ends, and cavities likely to accumulate debris."*

6

FCI/MOA 0128

*Contaminants*

There are two major categories of contaminants within the piping of the ASU, those that occurred during the construction of the plant (weld slag, dirt, grinding particles, etc.) and airborne contaminants. I will deal with the contaminants incurred during construction in a later section dealing with pipe cleaning procedures.

The primary airborne contaminant usually encountered from adjoining refineries is hydrocarbon gas release. For the DCPP there was an additional contaminant to consider, namely, petroleum coke ("coke"). Coke is a byproduct of the crude oil refining process. It is a hydrocarbon-rich product that has an appearance and texture ranging from granules to a powder. In this plant it is used by the gasifier in the DCPP to form syngas. The coke is stored in a multiple story high pile at the DCPP close to the ASU. Consequently, the Base Line Air Compressors (BLAC) that draws in the air that is cryogenically distilled to obtain oxygen and other gases also draws in coke dust along with air. The prevalence of the coke was commented upon in Mr. Simon's (Motiva's piping inspector) testimony: *"Q: Can you describe that for us? Let's say you had a clean surface like a table or something that had been wiped off and you left for some period of time like a day or so, when you came back could you then sort of draw a line like somebody draws a line on a car that says wash me? A: You sure could. Q: And how long did it take to get enough coke dust to accumulate where you could sort of write wash me on something? A: It depended on how much wind was blowing, but you could find it inside your Igloo lunchbox. So it went just about anywhere it wanted to."* (Simon Deposition; page 114, lines 22-24; page 115, lines 1-10).

Praxair was concerned about the presence of coke dust in the air and ran an Accelerating Rate Calorimetry test and heat of combustion test to ascertain its combustion properties and determined that as little as 0.01 oz. of coke dust could self-ignite violently resulting in the bursting of the Hastelloy vessel used for the test. (Olson Exhibit 273). As a consequence, Praxair attempted to determine to what extent coke could enter the ASU through the air filtration provided to the BLAC inlet. The opportunity to determine the feasibility of coke dust infiltration through the installed air filters was presented during

7

the ASU plant commissioning. Mr. D.W. Good (Project Manager) discussed the coke issue in a March 9, 2000 letter titled "Coke Dust Concerns" (Olson Exhibit 19). He noted that there was evidence of coke dust in cryogenic liquid pools and speculated that the reason no coke dust was detected in the air filters was that *"fines are passing through and collecting in downstream units; sub processes"*. In spite of the realization that coke fines could be passing through the air filters, the only recommendation he made to deal with this situation was to attempt to mitigate coke dust and monitor air quality. This is also reflected in the in Mr. Paolino (Praxair Group Leader, Process Engineering) deposition testimony: *"Q: So the changes to reduce the concerns about coke dust have mainly been procedural changes? A: Yes."* (p. 257, lines 5 – 8).

However, in Mr. Good's March 9, 2000 letter it was also pointed out on page 4 that *"The inlet filter installation has a particle removal efficiency of less than 50% of 1 micron ........"* This meant that, regardless of the extent of monitoring of the air filter for coke dust, the effort would prove fruitless since as Mr. Paolino testified: *"Q: Okay. 'Analysis at PTC of samples [coke dust] sent in from the site' – PTC is Praxair Technology Center? A: That's correct. Q: (continuing) 'indicates particle size of 0.2 to 150 microns, indicates presence of fine dust coating on larger particles, confirms its non-compatibility with O$_2$.' Do you recall being advised what that non-compatibility meant? A: Well, it's a material that we would not want in any significant quantity in an oxygen system."* The fact that the coke dust could be five times smaller than the air filters capability to remove it assured that, during operation, coke dust particles would continuously enter the BLAC air filters, find their way throughout the process and deposit themselves in whatever dead-ended areas they found.

*Pipe Cleaning Procedures*

A review of the procedures used for the cleaning of the process piping of the ASU indicates that Praxair generally followed their own standard G-38, *Praxair Class 2 (Oxygen) Cleaning*. Based on this standard an audit was performed on October 28, 1999 (Olson Exhibit 174) by a Praxair engineer, Joe Million, of the process piping and valves prior to placing the ASU into service. At this inspection coke was found at two locations,

FCI/MOA 0130

piping to the LR oxygen tank (which was mentioned earlier in Mr. Good's letter) and within the 12 in. supply line to the gasifier among other external areas. In describing the care needed in the performance of the resultant blowdown/cleaning procedures, Mr. Million highlighted in bold script and underlining a warning regarding the special care required during blowdown procedures: *"It is stressed that extreme care be taken in insuring that the blowdown process be conducted in such a manner that there will be no areas conducive to particle entrapment. Any dead-end points, or zones where particulates could be trapped and accumulate is potentially very hazardous. Any potential particle entrapment zones need to be identified. The blowdown procedure has to be conducted such that potential entrapment zones are properly dealt with to insure particles are not going to be trapped and collect, ......"* (page 2). What Mr. Million was referring to was dead-end piping such as existed immediately upstream of the 629, as illustrated:

**FIGURE 1**



Piping Blowdown Procedures were issued on November 30, 1999 (PRA1598 & PRA 1599) by Praxair for BLOC Discharge Piping in which the discharge piping was to be blown down using pressurized nitrogen or air in which the 629 valve would be quickly opened to induce rapid flow out of the valve and thereby provide a means for debris in the dead-end portion of the piping upstream of the 629 to be purged. When Mr. Paolino was asked at deposition if this procedure had been done he responded that he did not

9

personally know. In Mr. Affuso's (who was responsible for field equipment commissioning) testimony commenting on if the blowdown procedures resulted in opening the 629 valve, stated: *"Q: Are you aware of any information from any source that would enable us to determine whether during this blowdown procedure that we see here conducted in November and December of '99 whether the 629 valve was ever opened? A: I think the only – I don't. I don't personally know of any occasion or have not seen a document that states that. But I would expect that there would be evidence of that as a result of documentation showing that blowdown of that piece of pipe had been conducted because, otherwise, it couldn't have, right ?"* (Affuso Deposition, Page 127, lines 9 – 20). And Mr. Affuso has a very a good point. If the 629 valve had been opened during the blowdown procedure there would be some confirmation of that, yet several years after the incident, following a comprehensive investigation of the incident by Praxair and other parties, neither Messrs. Paolini or Affuso, can confirm if the 629 was ever operated during the commissioning of the ASU other than the earlier time when instrumentation technicians conducted a functional check of the 629's operation prior to the run-in.

While blowdown procedures are an important part of pipe cleaning procedures, for oxygen service this alone is not sufficient. As the Praxair standard G-38 states, further internal checks are required to assure that there are no oil films or other contaminants that could auto-ignite in an oxygen pure environment. However, the limitations of access to long runs of piping made it impractical to fully comply with these requirements as was made evident in Mr. Simon's testimony. Mr. Simon testified that piping was only inspected for cleanliness at Praxair when an inspector happened to be in the area, but a more comprehensive procedure was practiced on the Parson's portion of the plant: *"Q: When you would inspect the cleaning, can you tell me how that would be done? Would that be done spool piece by spool piece as it's installed or did somebody install an entire line and then the only piece that you get to look at is the last five or ten feet of line? A: Every bolted-up connection. Q: So every time somebody bolts something up --. A: On Parson's side every bolted connection I witnessed. Q: What about on the Praxair side? A: It was more of a QA/QC position where I just checked as I went through the daily*

FCI/MOA 0132

routine. *If I was there when they got ready to bolt something up, I would go look at it. Q:*
*And if you weren't there, sections of pipe might be bolted up and you maybe never got a*
*chance to look at it? A: Yes."* (Simon Deposition, page 68, lines 4 -22). But even when
Mr. Simon could physically inspect the inside of the piping, the inspection was only
limited in scope: *"Q: And in your experience with a 12-inch section of pipe, even if there*
*weren't a 90, let's say there were a hundred foot run of 12-inch pipe, is there a limit you*
*can only see down five feet, ten feet? A: Yes. Q: What is that limit? A: It would be eight to*
*ten feet."* (Simon Deposition, page 78, lines 15 – 22).

In addition to blowing down piping to remove contaminants, there were also procedures
for recirculating gas through the use of the BLOC compressor in order to check for and
remove contaminants. The procedure for performing this is described in Olson Exhibit
174 (PRA1599). The means used to detect and remove contaminants involved fine
screened filters covered with cloth "socks" which were installed at the suction and
discharge of the BLOC compressor. While this procedure will detect and remove some
contaminants, it is limited by the fact that velocities within the piping are at a fraction of
the rated flow of the compressor as Mr. Affuso stated in his testimony when discussing
the recirculation rates during run-in: *"Q: And I would assume from that you're at*
*somewhere between 50 and 66 percent of design velocity? A: Yes."* (page 175, lines 15 -
19). Consequently, when the gas velocity achieves design rates it would be 50 to 100%
higher than when recirculation cleaning was performed. Therefore, whatever
contaminants were not removed during run-in would be picked up by the increased
velocity when design operation began. And that is because moving contaminants within
piping that runs horizontally and vertically is not only based on velocity, but the resultant
flow pressure generated. Since flow pressure is proportional to the square of the flow
velocity, the increase in flow pressure could range between two to four times higher;
thereby moving larger particles that the lower velocities experienced during the run-in
were unable to move.

The difficulty of assuring that the level of cleanliness that G-38 specifies must be
achieved for operation in a pure oxygen service is why there is such emphasis on using

FCI/MOA 0133

materials that will not cause or promote ignition. This is something that was understood by Texaco's engineer, Mr. DelGrego, when he stated in an email to Mr. Switliski, a Connectiv engineer: *"We typically refuse to use CS at all within the gasification unit battery limits, no matter what the pressure is. This is mostly because we can't guarantee the cleanliness of the system."* (Olson Exhibit 18). This view was further supported in an incident that was reported in a January 19, 2000 e-mail dealing with a failed filter in an oxygen delivery line from an ASU plant: *"Thought you might like see photos of the O2 pipeline filter at the API Energia gasification plant in Italy. The ASU is by Praxair. This filter was installed at the gasification unit battery limits in the main O2 line. The O2 pipeline between the ASU and gasifier is dedicated to the project and was already cleaned. The cleaning job was supervised by Praxair. The line is CS from the BLOC to the ASU battery limits, then SS [stainless steel] from the ASU to the gasifier, then Inconel after the filter ....... When they started flowing O2 to the gasifier, the filter filled up with sand, TSP residue, weld slag, etc. and collapsed."* Clearly, Praxair's pipe cleaning procedures could not assure the level of cleanliness required by G-38 in the Italian plant.

Prior to the May 20, 2000 fire there was one other opportunity to inspect the area immediately upstream of the 629. On March 22, 2000 the Monel spool piece immediately downstream of 629 was removed to inspect the check valve (Olson Exhibit 70, C3913). In order to remove the Monel spool piece the 629 valve needed to be separately supported and covered. It would then have been a simple matter to have removed the 629 valve at that time to allow inspection and cleaning of the area immediately upstream of the valve, but it was not done.

In summary, it appears that among the procedures employed by Praxair to clean the piping within the ASU, the area immediately upstream of the 629 (and downstream of the recirculation line at the tee) did not have its cleanliness assured to the governing G-38 standards prior to the first attempt at delivering 1150 psig oxygen to the gasifier.

FCI/MOA 0134

*Debris Forming Mechanism*

The significance of having a dead-ended area immediately in front of the 629 was not simply that it was an area where contaminants could gather, but by virtue of the re-circulation line immediately upstream, it served as a constant "contaminant trap" for the gas that recirculated. As illustrated in Fig. 2, as the gas flow executed a 90° turn, any contaminants would tend to be centrifuged out of the gas stream. By virtue of their momentum they were likely to accumulate mostly in the area in front of the 629 on the side of the recirculation line, as shown below:

**FIGURE 2**



*Isolation Valve Application*

The 629 was intended to serve as an isolation valve. An isolation valve, as the name implies, serves to isolate one portion of a process from another. Therefore, a premium is placed on the sealing capability of a valve of such a service. That is why this valve was specified as an ANSI/FCI Leak Class: VI. This class of sealing allows virtually no leakage. It operates either fully on or off and is not intended for any flow control (throttling) functions since that would eventually comprise its sealing capabilities. This is reflected in CGA G-4.4, Sect. 5.3.1: *"Isolation valves are valves either fully open or fully closed and are normally gate, ball or butterfly type. They are never operated in any intermediate throttling or regulating mode."*

FCI/MOA 0135

In spite of the stipulation by the CGA not to operate the 629 as throttling valve, Praxair's operating procedures specifically called for the 629 to be used in a throttling mode in which 1150 psi oxygen was throttled in order to fill the discharge line to the gasifier.

The control logic for opening the 629 when normally operating did not allow the valve to be opened until oxygen purity was at design conditions. At that point the operator was to slowly open the 629 until it reached a maximum opening of 10% and to leave it there until the pressure of the delivery line, initially at ambient conditions, was raised to within a 10 psi differential pressure, at which point the control logic would allow the 629 to be fully opened. As a consequence, each time the 629 was normally operated it would be acting for a period of time as a throttling valve until conditions allowed full opening. The common, alternative means of filling downstream piping from the high pressure upstream is to use an equalizing line across the isolation valve. In this way, the isolating valve is not abused and the downstream line fills in the same time as if the isolating valve had been used as a throttling valve. In this case, an equalizing line of about 4 in. diameter would have provided the same flow as opening the 629 to the 10% level.

The 629 valve was also provided with an asymmetrically mounted valve disc so that the area to the left (when facing the valve from the upstream, pressurized side) was slightly larger than the right side. This is done so that when the 629 is asked to rapidly close (within less than one second per the 629 specification) in order to perform its isolation function; the actuator would be aided by the high pressure producing a greater closing force on the left side. In addition, this asymmetry also helps in the sealing function of the valve.

## PROBABLE CAUSE OF FIRE INCIDENT

The fire that occurred on May 20, 2000 was the probable result of the following series of events as the 629 was opened for the first time under design conditions to provide oxygen to the gasifier:

Prior to the 629 being opened the ASU had been operating under recirculation for some time. To open the valve the operator, Mr. Callaway, initially called for a few percent of opening, but not receiving acknowledgement, called for the valve to open a few more percent. Still not obtaining an acknowledgment of his command, Mr. Callaway became concerned that an air instrument supply line might be closed and preventing the valve actuator from functioning. Consequently, he radioed for Mr. Olson to go to the 629 and see if the instrument air line supply valve was opened. Mr. Olson confirmed that the air supply was open. If Mr. Olson found the air supply open or if he opened it is a point of contention, but it is of little impact on the cause of the fire itself.

With assurance that the air supply line was opened, Mr. Callaway, called for 10% opening, as the Foxboro system later confirmed. Mr. Olson stood by the 629 to see if he could detect motion from the valve actuator. In the minutes that these events took, the following was occurring within the area upstream of the 629, as illustrated below:

<u>FIGURE 3</u>



The valve disc on the 629 valve opened as shown, but due to the asymmetric mount the valve disc portion moving upstream exposed an open area for flow before the portion of

15

the valve disc moving downstream. This resulted in the upstream portion of the valve disc allowing flow a few degrees of rotation sooner than the downstream portion of the valve disc because it remained in contact with the sealing material. Consequently, in the first few degrees of rotation all the flow though the valve was first directed to the left side of the upstream piping (facing the valve from the upstream side). As the flow approached the left side of the line, over a distance ranging from the left edge of the recirculating line to the left portion of the flange of the line, it made an abrupt turn downstream and accelerated rapidly towards down the discharge line to the gasifier. Even if the downstream side of the valve had opened sufficiently to allow some flow, the momentum of the turning gas flow, and the contaminants it carried from the debris area in front of the 629, would have still mostly gone through the left side of the 629 valve disc.

The flow approaching the side of the CS line had to accelerate from the low flow velocity of the gas stream to sonic velocity at the valve disc. The generation of sonic velocity at the valve disc arises from the thermodynamic principle that gas expanding across an orifice will do so at a maximum speed equal to its sonic velocity for pressure ratios across the orifice of greater than 2:1. That means that the oxygen flowing in the upstream line at about 17 ft/sec had to accelerate to 1243 ft/sec[1] in a few feet since the 1150 psig upstream pressure was in excess of 60 times higher than the downstream delivery line pressure. As it did so the high velocities within the disturbed flow in the area between the recirculation line and the 629 valve gathered up debris (abrasives, coke dust, weld slag, etc.) that had accumulated upstream of the 629 and hurled it at great velocity, magnitudes higher than the allowable velocity for CS, to the side of the CS line. As the oxygen gas stream turned downstream towards the valve disc, the particles it was carrying did not make the turn, owing to their inertia. They struck the CS line and created sparks which ignited the coke dust that was undoubtedly present and/or the CS line itself. With oxygen being continuously supplied the combustion of the CS line progressed furiously soon encompassing the CS line and flange at the 629, and the 629 Hastelloy valve body and

---

[1] Sonic velocity at the valve is determined by the relation: $c = [(k) (R) (T) (g)]^{\frac{1}{2}}$, where c is the sonic velocity, k is the specific heat ratio for oxygen (1.4), R is the Universal Gas Constant/ molecular weight of oxygen (1544/32), T is the gas temperature in deg. R (710°), and g is the gravitational constant. The relation then yields: $[(1.4) (48.3) (710) (32.2)]^{\frac{1}{2}} = 1243$ ft/sec.

FCI/MOA 0138

disc. The melting CS and Hastelloy were hurled downstream coating the Monel spool piece and check valve. This deflagration continued unabated until the ASU was shutdown by the control system

This portrayal of the events within the CS line is confirmed by the burn patterns and material loss on the CS line. Referring to photo NEC409, in the lower photo the left side of the CS line (facing the valve from the upstream side) is burned away while in the upper photo the right side of the line, which did not have high velocity gas/debris impingement, shows dramatically less damage to the CS line, its flange, and the body of the 629 valve.

## FINDINGS

Based on the foregoing analysis it is my opinion, within a reasonable degree of engineering certainty, that the fire incident that occurred on May 20, 2000 at the DCPP were the result of the following:

1. Praxair violated CGA's and their own standards that dictate the maximum velocities for the application of CS in lines where impingement areas exist, thereby creating an operating condition that was conducive to the generation of CS combustion.

2. In spite of knowing: a) the explosive hazard that coke dust constituted, b) that coke dust had been found within the ASU, and c) that particles of coke dust could be five times smaller than the capability of the air filtration system to the BLAC to remove, Praxair took no steps to prevent the intrusion of coke or to mitigate the possibility of resulting fires or explosions within the ASU by design and/or material changes resulting from the presence of coke.

3. Praxair's piping design allowed the formation of a dead-ended section upstream of the 629 valve. This dead-ended section provided a site for the collection of debris during recirculation of gas from the BLOC when the Isolation Valve, the 629, was closed. Collection of debris did not only occur during the run-in of the BLOC but also during various blowdown procedures for lines within the BLOC area. Also, there is no evidence to show that the 629 was ever opened to allow

17

FCI/MOA 0139

blowing down the portion of the line upstream of the 629 for the removal of debris, including coke dust. Nor is there evidence that anytime prior to the May 20, 2000 incident that the line just upstream of the 629 was ever "wiped down" per Praxair's own G-38 cleanliness standards.

4. When an opportunity in March 2000 occurred to inspect and clean the 629 valve and the line in front of the 629 valve (when the Monel spool piece immediately downstream of the 629 was removed) Praxair took no action to inspect or clean the 629 or the upstream line.

5. Praxair violated CGA standards by using the 629 Isolation Valve as a throttling valve. In doing so Praxair created a condition that dictated that the oxygen gas stream and any debris in the line upstream of the 629 would be propelled at great velocity directly towards the surface of the CS line thereby incurring an almost certain possibility of spark ignition. If the 629 had been operated as specified by the CGA, it would have been wide open when normal delivery flow began and the possibilities of high velocity and high angle impingement on the CS line would have been reduced along with the concurrent possibility of ignition.

In my opinion, findings 1, 2, 3, and 5 were sufficient in themselves to cause the fire incident, but taken together they created a condition that made the fire incident on May 20, 2000 almost inevitable.

_Gerard Muller, PE_

Gerard Muller, P.E.

FCI/MOA 0140

# EXHIBIT 26

Fire in the Oxygen Piping
in the Delaware City Power Plant,
Delaware City, Delaware on 5/20/00:
Investigation of Materials Compatibility
and Ignition Sources

David P. Pope, Ph.D.
1/3/05

Prepared for:
Thomas P. Wagner
Delia Clark
Rawle and Henderson
One South Penn Square
Philadelphia, PA 19107

FCI/MOA 0141

## INTRODUCTION

I was asked by Thomas P. Wagner of Rawle and Henderson to investigate the causes of an incident that occurred at the Delaware City Power Plant in Delaware City, DE on 5/20/00 during which a fire broke out in a pipeline carrying high-pressure oxygen, injuring Ronald Olson. The focus of my attention has been on reviewing the materials of construction and identifying the ignition source(s) of the fire. In the course of my investigation I reviewed a large body of documents supplied to me by Mr. Wagner. A list of these documents is contained at the end of this report, referred to in this report either by exhibit number or by the person deposed. In addition, I examined the fire-damaged portions of the piping system on two occasions at the Praxair Technology Center in Tonawanda, NY, the first time on 8/24/00, and the second time on 9/5/00. Photographs were taken on both occasions.

This report is based on the information presently available to me. I will supplement this report if additional information becomes available.

The upstream limit of the fire damage was just upstream of valve 629, the valve that was being opened at the time of the incident. The fire origin is in the near vicinity of this upstream limit of the damage, because the fire can only move downstream with the flowing oxygen, not upstream against the flow. Damaged components downstream from the origin are then considered to be victims of the fire.

## DAMAGE TO THE SYSTEM NEAR VALVE 629

The piping near valve HV0629 – referred to as valve 629 in the balance of this report – runs from east to west, upstream to downstream, with the damage concentrated on the south side of the upstream piping and flange. In the following description I will refer to the upstream and downstream sides of the valve, and also to the upper and lower, north and south portions of those items. Also when referring to the distribution of damage around the surface of the pipe and flanges, I will describe it as if looking at the face of a clock from the upstream side of the valve, with the 12:00 position pointing up.

Valve 629 was located approximately two feet downstream from a tee in the 12-inch carbon steel pipe. Before the valve was opened the oxygen was flowing straight west down the pipe towards valve 629, but then abruptly turned south as it entered the tee and flowed out to the atmosphere through valve 613. This was the condition of the gas flow before valve 629 was opened.

## DAMAGE TO VALVE 629 AND THE ADJACENT PIPING AND FLANGES

The greatest amount of damage and material loss are concentrated in the carbon steel pipe and carbon steel flange just upstream of valve 629 where about 3 inches of pipe is eroded away between about the 6:30 and 1:00 position, and the approximately 3-inch thick flange is entirely eroded away in that same area. Thus a total length of about 6 inches of carbon steel pipe and flange has been eroded away upstream of the upstream face of the

FCI/MOA 0142

valve. The vast majority of burned steel came from the flange as it has a much thicker wall than does the pipe.

Both the exterior and interior surfaces of the Hastelloy C valve body are severely eroded, and this damage is concentrated between about 7:00 and 11:00 on the upstream and downstream sides of the valve. In addition, there is a large gouge on the downstream side of the valve between about 9:30 and 1:30 at the mating surface with the stainless steel (SS) flange.

The downstream SS flange is heavily damaged between 3:00 and 12:00, but unlike the upstream carbon steel flange, nowhere is the SS flange totally eroded away. A skeletal framework remains between burned through areas on the downstream side of the flange. An additional area of damage is seen on the SS flange between about 3:00 and 5:00, see the discussion below of the monel pipe.

The wafer-type valve is held in place with 20 bolts, 4 are threaded from each of the upstream and downstream flanges into the body of the valve, two at the top and two at the bottom, and 12 go direct from flange to flange outside the perimeter of the valve wafer. All the mounting bolts on the south side of the valve are burned away, including one of the pair of bolts threaded into the valve body at the top and both pairs of bolts at the bottom of the valve. In fact, the damage to the down stream SS flange appears to correlate primarily with the burning of these bolts, i.e., the flange is damaged most where these bolts originally passed through the flange.

As a result of this uneven distribution of damage around the circumference of the pipes, flanges and valve, the assembly appears to be severely damaged only when viewed looking from the south side towards the north, but it shows remarkably little damage when viewed from the north looking towards the south. For example, all 6 of the flange-to-flange bolts are largely intact on the north side but are totally consumed on the south side, and both of the flanges, along with the valve body, appear to be largely intact when viewed from the south side.

The downstream monel pipe shows a different distribution of damage – it has been undercut at the SS flange between the 3:00 and 5:00 positions. Thus it appears that the damage to the monel pipe actually resulted from the flow of molten material from the interior to the exterior of the SS flange, and some of the monel was also melted and transported away by the molten SS at this time. The interior of the monel pipe downstream of valve 629 and upstream of the check valve is most heavily coated with slag between the 6:00 and 12:00.

Now consider the damage to the interior components of the valve itself. The Hastelloy C disk is eroded between 7:00 and 11:00 (the same as the heavily burned region on the valve body) while the thinner Hastelloy C retaining ring is burned between 1:00 and 11:00, i.e., over a large fraction of its circumference. The Inconel 718 shaft appears to be burned through at the bottom, allowing the lower edge of the disk to tilt towards the downstream direction.

FCI/MOA 0143

## RELATION BETWEEN FIRE DAMAGE OF THE COMPONENTS AND BURN RESISTANCE IN OXYGEN

The relative amounts of damage to the various metallic components are consistent with their resistance to burning in an oxygen environment. Neither monel nor Hastelloy C will support combustion in oxygen at this pressure, and therefore they suffered relatively lower amounts of damage. Inconel 718, SS and carbon steel will burn in oxygen (shown in order of increasing propensity towards burning) and therefore they showed more damage, with the carbon steel showing the most damage, by a large margin.

## IDENTIFICATION OF THE FIRE ORIGIN (IGNITION SITE)

The distribution of damage to these components suggests that the point of ignition was located somewhere upstream of the valve between 9:00 and 10:00, i.e., in the middle of the burned area of the upstream carbon steel components. The location of the origin between 9:00 and 10:00 can be understood from the following discussion: The valve opens by a counter clockwise rotation of the disk, as viewed from the top, and was 10% open at the time of the fire, as is discussed later in this report. This means that the south edge of the disk moves upstream and the north edge moves downstream as the disk rotates. Also, due to the geometry of the disk on its axis of rotation relative to the valve body, the crescent-shaped opening created between the disk and the seat is larger on the south side than on the north as the valve begins to open. As a result, the flow is greater on the south side, and therefore the region of greater damage to the upstream pipe and flange, as well as the valve body and the disk, correlates with the area of greater flow through the valve.

When such a valve is opened with an oxygen pressure of 1150 psig on the upstream side and ambient air at 0 psig on the downstream side, it is intuitively obvious that sonic flow velocities are likely to develop in the valve. Based on the results of computational fluid dynamics (CFD) calculations made after the incident, both by Praxair and by Engineering Design & Testing Corp., sonic velocities (around 1000 feet per second) are estimated to have developed in the valve during the first stage of opening and the highest velocities are found near the 9:00 position. The CFD calculations of Engineering Design & Testing Corp. estimate the gas velocity in the upstream carbon steel flange as being more than 100 feet per second, compared to the allowed value of about 23 feet per second, based on Praxair's standards as promulgated in EN-6, Exhibit 30, effective 6/25/98, in figure 2 on page 12 of 22 (1150 psig, 250 degrees Fahrenheit). CGA standard CGA G-4.4, Exhibit 83 also provides standards for allowable gas velocities but only up to oxygen pressures of 1000 psi. Thus, the gas velocities through valve 629 were extremely high during the initial opening of the valve. As a result, gas velocities far in excess of the values allowed by Praxair's own standards were created just upstream in the carbon steel flange and pipe around the 9:00 position in the flange and pipe.

It should be noted here that the above velocities are allowed in straight pipe. The allowed velocities are greatly reduced in so-called impingement areas – "areas where the flow is directed at an angle against a component surface" according to the CGA definition. The Praxair Standard requires a 50% reduction of velocity in these areas. The CGA standard

FCI/MOA 0144

gives as examples of impingement locations places where the flow changes direction abruptly, as in short radius elbows (the 90 degree turn just upstream from valve 629 was through just such an elbow) and pressure letdown valves (the pressure drop across valve -629 was initially 1150 psi). Therefore it can be argued that the standards actually allow velocities of no more than 50% of 23 feet per second, or 11.5 feet per second, in the carbon steel pipe just upstream of valve 629, as compared to the estimated value of more than 100 feet per second. Thus at the time of the incident the gas velocity upstream of valve 629 was approximately ten times higher than that allowed by the Praxair standard. (It also exceeded the CGS standard for 1000-psi gas by a similar amount.)

The gas velocity near flammable metals, like carbon steel, must be less than some maximum velocity so that foreign particles carried by the gas stream do not contain enough kinetic energy to cause ignition when they impact the surface of the flammable metal. When such a particle strikes the surface of the metal, the kinetic energy is converted to heat that raises the surface temperature of the metal, and if the particle's kinetic energy is sufficient (the velocity is high enough), the temperature of the metal rises to its ignition temperature, and a fire ensues. Since no system can be guaranteed to be totally free of foreign particles, one must assume that foreign particles are always present in the gas stream (even though great pains are normally taken to reduce their numbers). Therefore the only way to prevent ignition of a flammable metal in an oxygen environment is to limit the maximum gas velocity near the metal. This leads to a maximum gas velocity of 23 feet per second at 1150 psi in straight carbon steel pipe at 250 degrees Fahrenheit.

According to Praxair Standard EN-6 Inconel 718 can be used in pure oxygen at pressures less than 300 psig. Since the Inconel 718 shaft is downstream of the disk, and since the pressure downstream of the disk is much lower than above the disk, it is likely that the pressures surrounding the shaft at the time of the incident were not higher than this value. Thus the shaft is not a likely source of ignition.

The polymeric materials used in the sealing surfaces of the valves are even more susceptible than carbon steel to burning in a high-pressure oxygen environment. Therefore, the temperature and pressures surrounding these materials must also be carefully controlled. The seat material in the subject 629 valve was KEL-F, a chlorinated version of PTFE, made under the trade name of Daikin Neoflon Grade 400h. (This information is contained in a fax sent by Patrick D. McVey on 11/27/00 to a list of 15 recipients, including Northeast Controls.) According to Bhim S. Bhakoo, as stated on page 269 of his deposition, this material is approved by Praxair for applications such as the one in question, as is also confirmed in Exhibit 129 on page 567. This material can ignite in oxygen either by being heated to its ignition temperature by particle impact or by being heated by friction from the gas flow itself. Based on the results of the CFD calculations, the gas pressure as it flowed over the seal was in the range of 100 to 200 psi, and the temperature was around -80 degrees Fahrenheit, as compared to 200 degrees Fahrenheit upstream of the seal. Thus the gas pressure at the seal was sufficiently low that, barring particle impact, the seal would not have ignited. In addition, the flow around the seal is such that particles tend to be carried away from the seal, rather than towards it,

5

FCI/MOA 0145

so the risk of particle impact is greatly reduced. As a result of these considerations, it is highly unlikely that the seal itself ignited either due to gas flow or due to particle impact. It clearly did burn, but the above analysis suggests a different ignition source.

As stated earlier in this report, the gas flow upstream of valve 629 was initially directed west towards the valve, then to the south through a sharp 90 degree turn at a tee just upstream of the valve. As the gas made this 90-degree turn, any particulate material in the gas stream was preferentially deposited in the short length of pipe between the tee and valve 629, in the "dead leg", by virtue of the density of the particles relative to the density of the gas. As the valve was opened, the flow then changed from 100% of the flow through the tee to some of the flow through the valve and the balance through the tee, and the flow through the valve would also carry the locally deposited particles in the dead leg with it. These particles would follow the flow lines of the gas stream as it was directed towards the crescent shaped opening between the disk and the seal. Since the particles are denser than the gas they cannot follow the flow lines precisely and will tend to strike the south wall of the pipe/flange rather than turn to go through the valve opening. Since there was a high concentration of particles in the dead leg and since the gas velocity is very high in this region, the probability of a particle striking the carbon steel with sufficient energy to cause combustion was also very high. This, I believe, was the actual ignition source and ignition site. The steel was ignited just upstream of the valve by particle impingement against the carbon steel pipe and/or flange. The burning steel produced a high velocity stream of hot slag that first moved downstream through the interior of the valve and into the downstream piping, damaging both of them in the manner now visible. Then the fire cut through the south wall of the pipe and flange, releasing a stream of hot slag that then poured out of the upstream pipe towards the downstream direction. This stream of hot slag then ignited the bolts connecting the upstream and downstream flanges, burned the SS flange, and produced the damage now visible on the outside of valve 629.

The fact that two separate flows of slag occurred, first the flow contained in the interior of the piping, and second the flow around the exterior of the valve, explains why Mr. Olson sensed something was amiss just prior to the incident. He probably heard the sounds of the slag initially flowing inside the pipe before it broke through any of the piping walls.

Thus the sequence of the damage is:
1. The carbon steel flange/pipe upstream of valve 629 ignited by particle impact near the 9:00 position.
2. The fire propagated through the interior of the valve and piping.
3. The fire breached the wall of the carbon steel pipe and also propagated around the exterior of valve 629.
In summary, valve 629 was a victim of the fire, not the cause of the fire.

I return now to the possibility that the KEL-F seal did somehow ignite by particle impact or by some other cause, and then explore how this may have affected the carbon steel upstream. The distance between the seal and the carbon steel flange is approximately

6

FCI/MOA 0146

2.75 inches. So if the seal did ignite, then the heat from this flame must propagate 2.75 inches upstream against extremely high velocity gas flowing in the opposite direction in order to ignite the carbon steel flange. This is not possible, in my opinion. If only the seal ignited, then any other materials ignited by this burning seal would be located downstream of the seal, not 2.75 inches upstream of it. Consequently I conclude that even if the KEL-F seal did, somehow, ignite, that this would NOT have ignited the upstream carbon steel. Therefore the carbon steel ignited by some other process and I conclude that the ignition process was particle impact caused by accumulated particulate in the adjacent dead leg and excessive gas velocity through the valve and adjacent carbon steel as the valve opened. The same argument applies to the Inconel 718 shaft, except it was even further away from the carbon steel than was the KEL-F.

I now turn to the details of how the performance of valve 629 compared with that of nearby valve 613 constructed of identical materials, how and when the particulate accumulated in the dead leg and why it probably was not removed during the commissioning of the plant.

### VALVE 613

With valve 629 closed and the BLOC operating, the oxygen turns 90 degrees in the tee just upstream of valve 629 and passes through a recirculation loop, eventually flowing through valve 613 where is vented to the atmosphere. Valve 613 is a four-inch valve constructed of the same materials as valve 629, differing from 629 only in size. When the BLOC is not running, the valve opens and remains open to the atmosphere, providing access of atmospheric particulate (coke dust from the nearby storage areas) to the upstream piping. Like valve 629, valve 613 operates in a throttling mode, i.e., it is not necessarily fully opened or fully closed during operation, and therefore it, too, experiences sonic flow conditions, especially while opening and closing. The only significant difference between valve 629 and 613, other than their relative sizes, is the fact that there is no carbon steel adjacent to valve 613. The piping near valve 613 is all monel. Thus both valves and the nearby piping experience very high gas and particle velocities, both have an ample supply of particulate material on the upstream side, and both employ the same KEL-F seat and Inconel 718 shaft. However, even though valve 613 is known to have operated numerous times without any difficulties in high-pressure oxygen prior to this incident, the subject fire broke out near valve 629 during its first operation in high-pressure oxygen. The comparative performance of the two valves strongly suggests that the absence of carbon steel in the piping near valve 613 is the reason for the lack of problems near this valve

### POSSIBLE SOURCES OF THE PARTICULATE MATERIAL IN THE DEAD LEG

As discussed earlier in this report, particulate material contained in the gas stream is preferentially deposited in the dead leg as the gas is directed through the upstream tee into the recirculation loop. This is just a matter of the relative density of the gas and the particulate. However, this raises two questions:

1. Why wasn't the particulate material removed when valve 629 was 'blown down' prior to the incident, and

FCI/MOA 0147

2. Could there be any additional source of particulate in the dead leg?

I will discuss #2 first. Particulates can enter the dead leg through only two paths, by coming downstream with the gas flow, or by coming upstream through valve 629. Downstream flow already having been discussed, I turn to the possibility of upstream flow.

In March of 2000 the monel pipe downstream of valve 629 was discovered to require cleaning. The pipe was subsequently cleaned between the check valve and valve 629 and certain gasket repairs were also performed, but even though the downstream monel spool piece was loosened from valve 629 at this time, the carbon steel pipe upstream of valve 629 apparently was not checked, not even by simply opening the valve and peering upstream.

Later a high-pressure nitrogen test of the piping between the check valve downstream of valve 629 and a location further downstream inside the gasifier unit was attempted sometime shortly before the incident. However during the test it was discovered that not only was the check valve leaking nitrogen to the upstream side, valve 629 was also leaking, thereby pressurizing the BLOC with nitrogen, apparently leading to venting through valve 613, see exhibit # 95 with handwritten notes by Mr. DelGrego after item #7. In spite of the fact that valve 629 was leaking, there is no record of any investigation as to why it leaked, nor was there any investigation into the possibility of any particulate's having been carried to the upstream side of valve 629 during this test.

Thus is possible that whatever carried the particulate into the monel pipe downstream of valve 629 prior to 3/00 could have been carried there by reverse flow from the gasifier side of the plant. No attempt was apparently made to investigate this, nor was any attempt made to see if the carbon steel pipe upstream of valve 629 was also contaminated, even though it would have been a simple matter to check this.

I return now to the question of why the particulate was not removed during the 'blow down' of the valve as specified to be part of the commissioning procedure carried out in Nov. and Dec. of 1999. The dead leg upstream of valve 629 was to have been blown out by air or nitrogen gas by pressurizing the piping upstream of valve 629, then quickly opening valve 629 while monitoring the material caught in a downstream filter. This was to have been repeated until the discharge gas was found to be clean, see PRA1598 in exhibit 174. However, there is no record that this blow down was ever performed, e.g., see Paolino dep. Page 582, 3. (In fact, Mr. Paolino has no recollection of that valve's ever having been opened with a pressure drop across it prior to the day of the incident.) Similarly, Mr. Good said, pg. 260 of his dep.: "It is my understanding that that was done. I don't know definitely if it was done." Also, similar to Mr. Paolino, he said on pg. 260 that he knows of no other time prior to the incident that the valve had been operated.

Finally, during the incident, two series of increasingly larger signals were sent to valve 629 in an attempt to open it, see Exhibit 204. The first series of control signals to the valve were increased in steps from 0% open to 9% open, but the valve position indicator

8

always showed the valve to be closed. This is the time that Mr. Olson was asked to check the valve, at which time the signal was reset to 0% open. Then the valve-opening signal was sent again, again increasing in steps until the valve opened when the signal reached 10%. According to the operator, see Exhibit 204, "At 10% the safety triangle turned green on the screen and I don't remember if the valve position on the screen changed because....", followed by the incident. From this series of events it seems clear that a minimum signal of 10% was required to open the valve on 5/20/00. There is additional evidence of this requirement of a minimum signal in Exhibit 242, which contains the hand written notes of Gerald Paolino, probably written in Nov. or Dec. of 1999, see page 574 of his deposition. He said in the second note on page PRA 23147 of that Exhibit that valve 629 did not open until the signal was increased to about 11%. It should be noted here that the valve control system was programmed to limit it to being 10% open until the pressure drop across the valve is reduced to a preset value. Therefore, the valve was probably 10% open during the incident until the system shut down.

Thus, based on all the available evidence in the record, it appears that valve 629 was opened with a pressure drop across it for the first time on the day of the incident. Therefore it was never blown down prior to the incident and any particulate that ever accumulated in the dead leg upstream from it remained there until the incident.

## SUMMARY AND CONCLUSIONS

In summary, I conclude the following to a reasonable degree of engineering certainty:

1. The materials used in the construction of valve 629 were appropriate for the application and all had been previously approved for use by Praxair, with the possible exception of Inconel 718. But the Inconel 718 shaft was protected from the gas stream by its position in the valve.

2. The damage to the valve and nearby upstream components shows that ignition occurred upstream of valve 629 in the carbon steel flange and piping, i.e., *valve 629 was a victim of the fire, not its cause.*

3. Conclusion #2 is supported by the fact that valve 613 was made of the same materials as 629 and was operated many times without problem under similar conditions as 629. The only difference between the two is that carbon steel piping was located just upstream of 629, but there was only monel piping near 613.

4. The KEL-F seal, made of a Praxair-approved grade of KEL_F, was not an ignition source for this fire, nor was the Inconel shaft.

5. The gas velocity upstream of valve 629 in the carbon steel pipe and flange were excessive and dangerously high.

6. The ignition source was particulate matter contained in the dead leg upstream of valve 629 impinging on a nearby carbon steel pipe and flange at excessive velocities.

FCI/MOA 0149

7. The particulate matter in the dead leg was never removed from that section, even though procedures for blowing it out had been developed.

8. The particulate could have easily been seen in March of 2000 simply by opening the valve and looking upstream after the monel spool piece was removed.

9. Valve 629 was opened for the first time with a pressure drop across it on the day of the incident. It was not checked or operated under gas pressure (not air, nitrogen nor oxygen) prior to that time.

1/3/05
David P. Pope, Ph.D.

# EXHIBIT 26A

# REPORT ON THE DELAWARE CITY EXPLOSION AT THE DELAWARE CITY, DELAWARE FACILITY OF MOTIVA ENTERPRISES ON MAY 20, 2000

Prepared by:   Robert A. Mostello, PE, PhD
AMCS Corp.
981 Rt. 22 West, Suite 101
Bridgewater, NJ 08807

Tel: (908) 429-2100
Fax: (908) 429-3004



FCI/MOA 0151

Report on Delaware City Explosion
Of May 20, 2000

Report issued:  January 3, 2005

# REPORT ON THE DELAWARE CITY EXPLOSION AT THE DELAWARE CITY, DELAWARE FACILITY OF MOTIVA ENTERPRISES ON MAY 20, 2000

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 3 |
| PERSONAL BACKGROUND | 3 |
| ACCESS TO INFORMATION | 4 |
| PROJECT BACKGROUND | 6 |
| SITE CONDITIONS | 7 |
| DESIGN IMPLICATIONS | 8 |
| CONDITIONS AT STARTUP | 9 |
| OCCURRENCE OF THE ACCIDENT | 14 |
| DAMAGE SCENARIO | 16 |
| CONCLUSIONS | 17 |
| APPENDIX | 19 |



FCI/MOA 0152

Report on Delaware City Explosion          Report issued: January 3, 2005
Of May 20, 2000

## INTRODUCTION

A convergence of circumstances led to an unexpected and undesired event on
May 20, 2000 at the Delaware City plant of Motiva Enterprises. Admission of
high-pressure oxygen from the Air Separation Unit (ASU) to the Motiva pipeline
occurred when:

- Adequate particulate removal had not been accomplished upstream of
  83HV0629 isolation valve
- The procedure for opening the valve under high differential pressure was
  not in keeping with recognized standards
- The mechanism for actuation of the valve under startup conditions was not
  understood
- Poor training of personnel and inadequate precautions in place led to the
  presence of and injuries sustained by Mr. Ronald W. Olson.

## PERSONAL BACKGROUND

I am a chemical engineer with 40 years of experience in industry. My principal
specialty is process design, development, troubleshooting and safety of air
separation plants, in which I have been engaged for more than half that time. My
background includes environmental control and safety issues of petrochemical
plants, and process and process equipment design for chemical processing
plants. I have authored or co-authored several publications on the operation and
design of cryogenic systems, including a section on air separation in the
"Encyclopedia of Chemical Processing and Design" (ed. McKetta). I am the
author of about 15 US patents.

I have been a project engineer, a process engineer, and a startup engineer.
Recently, I specified a replacement piping system for supplying vaporized liquid
oxygen to supply a wastewater treatment plant, including conducting the HAZOP.
More recently, I was the proposal engineer and the process engineer for
supplying a nitrous oxide purification plant, including design of the process
equipment, setting the control strategy, conducting the HAZOP, commissioning,
and incorporating safety features necessary for processing nitrous oxide, which
is a strong oxidizer and which also can undergo explosive decomposition.

I was in a position of responsible charge for investigating multiple accidents in an
air separation plant, and keeping that dangerous plant safe while designing
remediation equipment and establishing means for interim operation. I have
reported on in-house accidents in air separation plants.

I investigated an oxygen valve fire (coincidentally in year 2000), with a findings
presentation to the Compressed Gas Association in 2001. Acknowledgment of



Page 3 of 31          by: Robert A. Mostello, PE, PhD

Report on Delaware City Explosion                Report issued: January 3, 2005
Of May 20, 2000

Preparation for admission of oxygen to the pipeline should have included:

- A hard blowdown of the piping through the 629 valve with successive blasts of high-pressure air.[8]  This air was readily available from the BLOC.
- The blowdown would have necessarily included stroking and proving the 629 valve operation.
- The area around the valve and around the BLOC system would be cordoned off and signed forbidding entry.

In the light of some of this neglect, the control system in-place exacerbated the situation.  In fact, Mr. Olson's observations that the 629 valve was not responding to the command from the control room (and the control room confirming that the valve did not appear to open) can be shown to be correct.[9]  The electronic signal from the control room to open the valve is eventually converted to a pneumatic signal fed to the valve positioner, effectively telling the positioner how far to open the valve.  A spool valve, part of the positioner system, which admits instrument air (which may be supplied in the 80-120 psig range) proportions its opening aperture to the error signal between the actual valve position and the commanded position.  This routes the instrument air to each of two internally-piloted, 3-way solenoid valves which are configured to back up each other in case of failure of either of them.  Instrument air then passes through one of the solenoid valves to the piston-type valve actuator to rotate the 629 valve stem and disc.

**Essential to note** is that these 3-way internally-piloted solenoid valves require a difference in pressure of 15 psi between the pressure port and the exhaust port in order to achieve full activation.  Until that pressure difference builds up and sets the solenoid valve to deliver full air to the actuator, the actuator does not receive any or enough air to move the 629 stem.  With an instrument air system initially at atmospheric pressure, and a command to change valve position from zero to 1% (or 2 or 3%), the instrument air supplied from the barely open spool valve cannot build up required pressure to overcome pre-activation venting from the solenoid valves exhaust and pilot exhaust ports.

I have had the opportunity to test an exemplar system, which was set up at Colorado Engineering Experiment Station, Inc. in Nunn, CO.[10]  This was a test with air at 1150 psig pressure, upstream of an exemplar 12" Fisher 629 valve equipped with a positioner, actuator, solenoid valves system, and instrument air supply essentially identical to the installation at the Motiva Delaware City plant on May 20, 2000.

---

[8]  Admittedly, provision for the blowndown gas exiting the pipeline would be necessary.
[9]  There seems to be some dispute in the record about whether the instrument air was valved in. It may be that the instrument air was already valved in before the first attempt.
[10] This testing took place on November 4, 2004. Others in attendance were: Mr. Ammar Kasabchy of AMCS, Mr. Nile Dielschneider and Mr. Tim McMahon of Fisher Controls, and Mr. Pat McVey of Riddell Williams.



Page 12 of 31        by: Robert A. Mostello, PE, PhD

Report on Delaware City Explosion          Report issued:  January 3, 2005
Of May 20, 2000

During testing, the control room signal scenario was repeated, **stepwise and timewise,** with the exemplar system, using 100 psig instrument air (Fig. 1).  (See also Fig. 4 for a repeat test.)  The first attempt failed  to open the valve after a 9% signal to open had been reached.  On the second attempt to open the 629 valve, the control room signal had to reach 10% open before the solenoid valves sealed permanently (in our case it was 11% in Fig. 1 and 10% in Fig. 4).  Venting of the instrument air supply ceased; and the 629 valve then moved to the 9% position in Fig. 1 and the 8.5% position in Fig. 4.  Before this point is approached, there is a considerable racket made by high-frequency chattering and venting from the system, as the solenoid valves cycle (compete) between their energized and de-energized positions as instrument air is introduced to and then partially exhausted from the actuator system through the newly de-energized solenoid valves.

That the solenoid valves become stable in their energized positions is due both to the rate of air supply finally providing makeup air to overcome air loss in the startup cycle, and the required pressurization of the actuator to an operating pressure.  **After this condition is established, there is no further anomalous behavior.**  (De-energizing the solenoid valves vents instrument air from the actuator, which is the action which the safety system employs to close the 629 valve rapidly.)

The first attempt on May 20, 2000 by the control room to open the valve with up to a 9% signal, and failing to get any reaction, clearly could have happened exactly as described, as was shown by the exemplar system. With a 9% signal, the rate of air supply was not high enough to energize the solenoid valves permanently.  Actual demarcation points will change with each solenoid valve, with instrument air supply pressure, and with the configuration of the instrument air supply system.  Indeed, with the same setup and an 81 psig instrument air supply, it required a command of 17% to achieve activation (Fig. 2).  This also was preceded by a period of chattering as the command signal was raised to 17%.  At 105 psig instrument air, solenoid valve sealing was achieved with a 7% command signal (Fig. 3).

When the 629 valve opened in the exemplar case, the valve moved to the commanded position which existed at that time—i.e. directly to its final position from full-closed.[11]

---

[11] In his notes on Exhibit 242, Mr. Paolino observed that an 11% signal was required before the 629 valve moved.  Whether this occurred before or after May 20, 2000 is uncertain. It still is a corroboration of the operation of the system. Mr. Paolino attributed this observed behavior to hysteresis; but, in fact, it was demonstrating its typical response under a startup condition.



Page 13 of 31      by:  Robert A. Mostello, PE, PhD

# EXHIBIT 27



```
┌──────────────────────────────────────────────┐
│                 SO ORDERED                     │
└──────────────────────────────────────────────┘
```

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| NALD W. OLSON and<br>ROL OLSON, his wife,           ) | C.A. No. 02C-04-263 JRS |
|                           ) | |
|            Plaintiffs,      ) | Non-Arbitration Case |
|                           ) | |
|        v.                       ) | |
|                           ) | |
| TIVA ENTERPRISES LLC, et al.,   ) | |
|                           ) | |
|            Defendants.     ) | |
| ----------------------------------- ) | |

**SO ORDERED** *(vertical left margin)*

## ORDER

This matter came before the Court on the following Motions (collectively, "Fisher's ions for Summary Judgment"):

1. Motion of Defendant Fisher Controls International, Inc. for Summary Judgment of [sic] Plaintiffs' Warranty Claims (efile #5600830);

2. Defendant Fisher Controls International, Inc.'s Motion for Partial Summary Judgment as to Plaintiffs' Negligence Claims (efile #5598740);

3. Motion of Defendant Fisher Controls International, Inc. for Summary Judgment as to All Cross-Claims for Contribution Asserted by All Defendants (efile #5599798); and

4. Motion of Defendant Fisher Controls International, Inc. for Summary Judgment on Praxair, Inc.'s Cross-Claim for Indemnification Against Fisher (efile #5599437).

Praxair, Inc., filed an Opposition to the Motion of Defendant Fisher Controls

International, Inc. for Summary Judgment as to All Cross-Claims for Contribution Asserted by All Defendants, but subsequently withdrew its opposition to that Motion. The cross-claims asserted by and between Fisher Controls International, Inc., and Northeast Controls, Inc., have previously been dismissed without prejudice. The Motions listed above now being unopposed,

IT IS HEREBY ORDERED that Fisher's Motions for Summary Judgment are GRANTED. All claims asserted by plaintiffs; Praxair, Inc.; Motiva Enterprises LLC; and Texaco, Inc.; Texaco Development, Inc. against Fisher are hereby DISMISSED WITH PREJUDICE and without costs to any party.

SO ORDERED this _____ day of _____, 2005.

_____
HONORABLE JOSEPH R. SLIGHTS, III

**Presented by:**

McCARTER & ENGLISH, LLP

_____
Paul A. Bradley
McCARTER & ENGLISH, LLP
919 Market Street, #950
Wilmington, DE 19801
Ph: (302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.

Court: DE Superior Court-New Castle County

Judge: Joseph R Slights III

LexisNexis File & Serve Reviewed Filing ID: 5883424

Date: 6/7/2005

Case Number: 02C-04-263 JRS

Case Name: Olsen, Ronald W et al vs Motiva Enterprises LLP et al

/s/ Judge Joseph R Slights III

FCI/MOA 0158

# EXHIBIT 28



EFiled: Oct 6 2005 11:08AM EDT
Transaction ID 6953034

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON and CAROL OLSON,   )
his wife,                             )   C.A. No. 02C-04-263 JRS
                                  )
       Plaintiffs,          )   Non-Arbitration Case
                                  )
       v.                     )
                                  )
MOTIVA ENTERPRISES L.L.C., et al.,   )
                                  )
       Defendants.         )

FILED PROTHONOTARY 2005 SEP -1 PM 12: 2

## STIPULATION OF DISMISSAL

COME NOW, the parties to this litigation, by and through their respective counsel, who

agree and stipulate that the above-captioned lawsuit, including all claims and remaining cross-

claims asserted by any party therein, is hereby dismissed, with prejudice, except that nothing in

this stipulation or in the dismissal shall be construed to limit or preclude the claim or cross-claim

of Northeast Controls, Inc. against Fisher Controls, Inc. for contractual indemnity.

ASHBY & GEDDES                COZEN & O'CONNOR

BY: _____       BY: _____
RANDALL E. ROBBINS (I.D. #2059)     SEAN J. BELLEW (ID#4072)
JOSEPH C. HANDLON (I.D. #3952)     Chase Manhattan Centre
222 Delaware Avenue             1201 N. Market St., Suite 1406
Wilmington, DE 19899           Wilmington, DE 19801
(302) 654-1888                (302) 295-2000
*Attorneys for Plaintiffs,*         *Attorneys for Defendant.*
*Ronald W. Olson & Carol Olson*    *Praxair, Inc.*

1185093 v.1

FCI/MOA 0159

PRICKETT, JONES & ELLIOT, P.A.

BY: _____
PAUL M. LUKOFF (I.D. #96)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6520
*Attorneys for defendant, Motiva
Enterprises, Inc.*

HEIMAN, ABER & GOLDLUST

BY: _____
GARY W. ABER (I.D. #754)
First Federal Plaza, #600
P.O. Box 1675
Wilmington, DE 19899
*Attorneys for Defendants,
Texaco, Inc. and Texaco
Development Corporation*

SO ORDERED this 31st day of

August_____, 2005

_____
Judge

RAWLE & HENDERSON LLP

BY: _____
DELIA A. CLARK (I.D. #3337)
300 Delaware Avenue
Suite 1015
Wilmington, DE 19801
(302) 778-1200
*Attorneys for Defendant,
Northeast Controls, Inc.*

1185093 v.1

FCI/MOA 0160

# EXHIBIT 29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, INC.                  :        CIVIL ACTION
3 Enterprise Avenue                       :
Clifton Park                              :
New York, NY 12065                        :        NO. 06-412
                                          :
ST. PAUL MERCURY                          :
INSURANCE COMPANY                         :
385 Washington Street                     :
St. Paul, MN 55102                        :
                     Plaintiffs,          :
            v.                            :
FISHER CONTROLS                           :
INTERNATIONAL, LLC,                       :
205 S. Center Street                      :
Marshalltown, Iowa 50158                  :
                     Defendant.           :

## FIRST AMENDED COMPLAINT

Northeast Controls, Inc., and St. Paul Mercury Insurance Company, by and through their

attorneys, Marshall, Dennehey, Warner, Coleman & Goggin, hereby make this Complaint in

Civil Action against defendant, Fisher Controls International, LLC, and in support thereof allege

the following:

### INTRODUCTION

1.    This action is a contractual indemnification claim for defense and indemnity

arising from the defense and settlement of the following actions: one brought by Great American

Assurance Company as subrogee of Praxair, Inc. ("Praxair"), Parsons Corporation and Motiva

Enterprises, LLC ("Motiva") at Civil Action No. 02C-05-168 ("Great American Complaint") and

the other brought by Ronald W. Olson and Carol Olson, Civil Action No. 02C-04-263 ("Olson

Complaint") in the Superior Court of the State of Delaware in and for New Castle County against

Northeast Controls, Inc. and others. The Great American Complaint was consolidated with two

other property damage suits filed separately by Motiva and Praxair.

1250288 v.1

FCI/MOA 0161

## PARTIES

2.    Plaintiff, Northeast Controls, Inc. ("Northeast"), is a New York corporation with a principal place of business at 3 Enterprise Avenue, Clifton Park, New York 12065.

3.    Plaintiff, St. Paul Mercury Insurance Company ("St. Paul"), is a Minnesota corporation with a principal place of business at 385 Washington Street, St. Paul, MN 55102.

4.    Defendant, Fisher Controls International, LLC ("Fisher") is a Delaware limited liability company with a principal place of business at 205 S. Center Street, Marshalltown, Iowa 50158 and a Registered Agent for service of process at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

5.    Fisher manufactures and sells valves for use in New Castle County and the state of Delaware.

6.    Northeast is a sales representative for Fisher.

7.    Northeast had a valid insurance policy with St. Paul at the time of the accident involved in the Great American and Olson litigations and, St. Paul, on behalf of its insured, expended attorneys' fees in defending these case and made contributions toward their resolutions.

## JURISDICTION AND VENUE

8.    This court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.    Venue is proper in this district in accordance with 28 U.S.C. §1391 (a)(1) and (2) since the defendant is incorporated in and a citizen of Delaware, the defendant resides in this district pursuant to 28 U.S.C. §1391 (c), the defendant may be served in this district and

2

FCI/MOA 0162

substantial parts of the transaction or occurrence for which the cause of action asserted herein

took place in this district.

## BACKGROUND RELEVANT TO THE CLAIM

10.    On or about January 1, 1998, Northeast and Fisher renewed and entered into a

Representative Agreement which outlined the sales representative relationship between

Northeast and Fisher. A true and correct copy of the Representative Agreement is attached hereto

as Exhibit "A" and incorporated herein as if set forth in full.

11.    The Representative Agreement contained an Indemnity Clause in Section XI,

which provides the following:

Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI,
Fisher agrees that it shall, at its own expense, **protect, defend, indemnify and hold harmless**
Representative (Northeast) from and against any and all claims, demands, actions, losses,
damages, liabilities, costs and expenses ... which may arise out of or be made in connection with
the death or injury of any person, or damage to property, by whomsoever suffered, **resulting or
claimed to result from any actual or alleged defect in any Product**. The obligations set forth
in the immediately preceding sentence shall not apply unless Representative, upon receiving
notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and
thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any
other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or
hold harmless Representative from and against any losses **arising from** the following:

    A.    Any express warranty unauthorized by Fisher;
    B.    Any distribution or sale of a Product for a purpose unauthorized by Fisher;
    C.    Use of any instructions, labels, warnings or other product literature which have
not been previously approved in writing by Fisher;
    D.    Any failure of Representative to maintain any Product in merchantable condition;
    E.    Demonstration, installation, servicing, modification or repair of any Product by
Representative or any third party not in accordance with written warnings or instructions
of Fisher, or
    F.    Negligent acts or omissions by Representative.

(emphasis added). *See* Exhibit "A."

12.    The January 1, 1998 Representative Agreement was in effect for a period of one

(1) year and was renewed thereafter.

1250288 v.1

FCI/MOA 0163

13.    Pursuant to a Worldwide Procurement Agreement dated January 1, 1995 between Praxair and Fisher, Northeast was identified as the sales representative for Praxair's purchases of control valves from Fisher.

14.    In accordance with the Worldwide Procurement Agreement, Praxair contacted Northeast regarding the purchase of control valves for a re-powering project at the Delaware City Power Plant in 1997.

15.    As part of the purchases for the project, on or about June 24, 1998, Northeast placed a purchase order for a control valve (hereinafter "valve") with Fisher on behalf of Praxair.

16.    Fisher sent an order acknowledgement form for the valve to Praxair on or about July 21, 1998, and thereafter, manufactured the valve (tag no. 83HVO629).

17.    Fisher invoiced Praxair for the valve on or about October 23, 1998 and the valve was shipped to and accepted by Praxair on or about December 3, 1998.

18.    Thus, the January 1, 1998 Representative Agreement was validly in place on the dates that the valve in question was ordered, manufactured, sold and shipped to Praxair.

19.    Thereafter, the valve was installed at the power plant located at River Road, Route 9, Delaware City, Delaware 19076 (hereinafter the "Plant") as part of a re-powering project.

20.    The valve was installed to control the flow of oxygen from a base load oxygen compressor ("BLOC") in an air separation unit ("ASU") to a gassifier.

21.    On or about May 20, 2000, there was a fire at the Plant during re-powering of the ASU.

22.    As a result of the fire, Ronald W. Olson allegedly sustained personal injuries.

23.    As a result of the fire, Praxair, Parsons Corporation ("Parsons") and Motiva allegedly sustained property damage.

4

24.     Great American Assurance Company ("Great American"), which insured Parsons and others, paid claims made by Praxair, Parsons and Motiva as a result of the fire.

25.     Thereafter, on or about May 2002, Great American filed suit as subrogee of Praxair, Parsons and Motiva against Northeast and others in the Superior Court of the State of Delaware in and for New Castle County. A true and correct copy of the Great American Complaint is attached hereto as Exhibit "B."

26.     The Great American Complaint alleged in part that Fisher and Northeast were negligent and that their negligence included:

> (a)     **failing to design, manufacture, assemble and distribute a BLOC control valve compatible with and appropriate for high pressure oxygen service;**
> (b)     **failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment;**
> ...
> (e)     **failing to advise of any deficiencies in the valve that would make the product unsafe or unfit for use in a high pressure oxygen environment;**
> ...

*See* ¶23 of Exhibit B. (Emphasis added).

27.     Great American's allegations in ¶ 23 of its Complaint were that Fisher's BLOC control valve was defective in its design, manufacture and assembly.

28.     Great American alleged that the defects, among other things, caused the fire and resulting damage. *See* ¶24 of Exhibit B.

29.     On or about April 2002, Ronald W. Olson and Carol Olson filed suit against Northeast and others in the Superior Court of the State of Delaware in and for New Castle County. A true and correct copy of the Olsons' First Amended Complaint dated May 20, 2002 is attached hereto as Exhibit "C."

FCI/MOA 0165

30.    The Olsons' First Amended Complaint alleged that the valve at issue was defective at the time of sale and that the injuries sustained by the plaintiff were caused by the defective valve. *See* Count IX, ¶43 in Exhibit C.

31.    Fisher had the duty under the Representative Agreement to both defend and indemnify Northeast on the Great American and Olson Complaints, both of which claimed damages due to alleged defects in the Fisher valve.

32.    By letter dated July 3, 2002, Northeast made a demand for defense and indemnification to Fisher based upon the Representative Agreement. A true and correct copy of the demand letter is attached hereto as Exhibit "D."

33.    Northeast made similar requests on two previous occasions. *See* attached letters dated September 25, 2000 and October 4, 2000 made a part hereof cumulatively as Exhibit "E."

34.    Northeast also demanded defense and indemnification from Fisher prior to the filing of the Great American and Olson Complaints.

35.    Fisher, through Matthew W. Geekie, responded to Northeast in a letter dated October 29, 2001. A true and correct copy of Mr. Geekie's letter is attached hereto as Exhibit J.

36.    Mr. Geekie was authorized to speak for Fisher.

37.    Fisher's response as set forth in Mr. Geekie's letter was as follows:

> I am in receipt of your letter dated March 30, 2001 to Mr. Robert Walker, Area Vice President for Fisher Controls International, Inc. Please consider this letter responsive to yours.
>
> Pursuant to the Representative Agreement between Northeast Controls, Inc. ("Northeast") and Fisher Controls International, Inc. ("Fisher"), made the first day of January, 2000 (the "Agreement"), Northeast acted as one of Fisher's sales representatives in May 2000. In accordance with the Agreement, Northeast provided certain services in support of the sale of Products (as defined in the Agreement) to Praxair, Inc., ("Praxair"). As you are aware, on or about May 20, 2000 an explosion and fire occurred at the Motiva facility in Delaware City, Delaware (the "Praxair Incident"). The

6

FCI/MOA 0166

Praxair Incident entailed damage to property as well as injury to an individual, (the "Losses").

Subsequent to the Praxair Incident several parties, including, but not limited to, Fisher, Northeast, Praxair, and Motiva, Inc., have, to varying degrees, participated in an investigation of the Praxair Incident (the "Third Party Investigation"). Fisher understands that this Third Party Investigation is focusing on the area of a Fisher butterfly valve as well as upstream and downstream of its location. The Third Party Investigation has yet to arrive at any conclusions, let alone allegations, as to the cause of the Praxair Incident. More particularly, this investigation has not resulted in any allegations or claims that the Losses arose out of any actual or alleged defect in the butterfly valve or for that matter, any Product.

In light of the fact that no conclusions have been reached and no allegations of Product defect have been made, we believe that your request that Fisher agree to defend, indemnify and hold harmless Northeast is premature. Accordingly, at this time Fisher declines to accept the tender of Northeast's defense. *If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement.* Pursuant to the Agreement, however, Fisher will not protect, indemnify, defend and hold harmless Northeast from its own negligent acts or omissions. The conclusions and the allegations that may be made will ultimately determine the extent, if at all, to which Fisher agrees to protect, defend, indemnify and hold harmless Northeast and the extent to which Fisher will need to reserve its rights while doing so should evidence develop suggesting that the losses resulted from negligent acts or omissions of Northeast.

If you have any questions about any of the issues set forth above, please do not hesitate to contact me.

Exhibit J (emphasis added).

1250288 v.1

FCI/MOA 0167

38.     By letter dated September 13, 2002, Fisher also admitted its responsibility for defending and indemnifying Northeast on claims of a product defect.  See Fisher's letter of September 13, 2002, a true and correct copy of which is attached hereto as Exhibit "F".

39.     Despite this acknowledgment of the obligation to Northeast, Fisher has failed to accept Northeast's demand for defense and indemnification of the Great American and Olson Complaints.

40.     The law firm of Rawle & Henderson LLP was initially retained to defend Northeast in any lawsuit filed related to this fire.  Presently, the undersigned counsel represents Northeast in these matters.

41.     According to the plain language of the Representative Agreement, Fisher's duty to defend and indemnify Northeast is immediately triggered upon **an allegation of a product defect**. *See* Exhibit A.

42.     Both Great American and the Olsons alleged in their respective Complaints that the Fisher valve was defective.

43.     Separate suits filed by Praxair and Motiva against Northeast and others similarly alleged that the Fisher valve was defective, and Northeast defended these suits as well.

44.     No Court has ever determined that the fire at the plant or the resulting alleged injuries and damages were caused by Northeast's negligence.

45.     Fisher did not claim nor adduce any evidence during any of the underlying cases that the fire at the plant or resulting alleged injuries or damages were caused by Northeast's negligence.

46.     On the contrary, Fisher produced evidence, including an expert opinion, which absolved Northeast from liability as the valve construction was not the cause of the fire. *See* the

8

FCI/MOA 0168

opinion of Dr. Robert A. Mostello in reports dated January 3, 2005 and January 28, 2005, attached hereto cumulatively as Exhibit "G."

47.     Despite repeated requests by Northeast for defense and indemnification, however, Fisher wrongfully refused to defend or indemnify Northeast during the time that all cases were pending and up until the present time.

48.     Accordingly, Fisher is in breach of its obligations under the Representative Agreement.

49.     As a result of Fisher's breach of the Representative Agreement, Northeast has incurred various damages, expenses and costs.

50.     On or about April 2004, Northeast entered into a Release and Settlement Agreement with Great American in order to limit its exposure in the Great American suit.

51.     According to the settlement, St. Paul, on behalf of its insured, Northeast, paid Great American $501,000.00 (Five Hundred One Thousand Dollars) in order to secure a general release. A true and correct copy of the Release signed by Great American is attached hereto as Exhibit "H."

52.     This settlement was fair and reasonably required to limit St. Paul's and Northeast's liability exposure to Great American caused by Fisher's wrongful denial of Northeast's request for defense and for indemnification.

53.     On or about July 28, 2005, St. Paul, on behalf of its insured, Northeast, contributed an amount of $100,000.00 to the Olson plaintiffs as part of a global settlement. A true and correct copy of the Release signed by the Olsons is attached hereto as Exhibit "I."

54.     This settlement contribution was fair and reasonably required to end St. Paul's and Northeast's litigation expenses.

9

FCI/MOA 0169

55.    As a result of Fisher's wrongful denial of its contractual obligation, St Paul, while defending Northeast, was forced to incur $466,621.80 in attorney's fees in defending the Great American, Olson, Praxair and Motiva Complaints.

56.    As a result of Fisher's wrongful denial of its contractual obligation, St Paul, while defending Northeast, was forced to incur $70,934.18 in costs in defending the Great American, Olson, Praxair and Motiva Complaints.

57.    Finally, St. Paul and Northeast will incur costs and expenses, including attorney's fees associated with the prosecution of this suit.

58.    The total costs and expenses incurred by Plaintiffs as a result of Fisher's refusal to defend and indemnify Northeast pursuant to the requirements of the Representative Agreement is in excess of $1,138,555.90.

WHEREFORE, Plaintiffs, St. Paul Mercury Insurance Company and Northeast Controls, Inc., demand judgment in their favor and against Defendant Fisher Controls International, LLC in the amount of $1,138,555.90 together with all costs and expenses for bringing this action and interest and any other such relief as the Court may deem equitable and just.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

_/s/ Lorenza A. Wolhar_____
BY:    LORENZA A. WOLHAR, ESQUIRE
DE ID #3971
1220 N. Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE  19899-8888
Attorneys for Plaintiffs

Date: _____

1250288 v.1

FCI/MOA 0170

# EXHIBIT 30

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065<br><br>ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN 55102<br><br>               Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158<br><br><br>            Defendant. | NO. 06-412<br><br><br>**ANSWER TO AMENDED**<br><br>**COMPLAINT and**<br><br>**COUNTERCLAIM** |

Defendant Fisher Controls International, LLC ("Fisher"), by and through its attorneys of record, answers plaintiffs' First Amended Complaint and asserts affirmative defenses as set forth below. Each allegation not specifically admitted shall be deemed denied:

## INTRODUCTION

1.    Responding to paragraph 1 of the Complaint, Fisher admits that this is a contractual indemnification action; admits that the actions identified were filed; and admits that the action filed by Great American Assurance Company was consolidated with actions filed by

Motiva Enterprises, LLC and Praxair, Inc.  Responding further, Fisher denies that it was obligated to defend and/or indemnify Northeast Controls for its own negligence in any of those actions.

<div align="center">

### PARTIES
</div>

2.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 2 of the Complaint and therefore denies the same.

3.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 3 of the Complaint and therefore denies the same.

4.     Admitted.

5.     Admitted.

6.     Admitted.

7.     Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 7 of the Complaint and therefore denies the same.

<div align="center">

### JURISDICTION AND VENUE
</div>

8.     Admitted.

9.     Admitted.

<div align="center">

### BACKGROUND RELEVANT TO THE CLAIM
</div>

10.     Answering paragraph 10 of the Complaint, Fisher admits that Northeast Controls, Inc. ("Northeast Controls") and Fisher entered into a Representative Agreement on or about January 1, 1998, but denies that the document attached as  Exhibit "A" to the Complaint is the entire Representative Agreement.  Responding further, Fisher states that the Representative Agreement speaks for itself.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-
Answer_to_Amended_Complaint_(412).DOC
041607 1349                                    2

FCI/MOA 0172

11.    Fisher admits that the Representative Agreement contains the passage set forth in paragraph 11 of the Complaint, but denies that the Representative Agreement contains the emphasis added by plaintiffs. Responding further, Fisher states that plaintiffs have deleted language from the indemnity provision of the Representative Agreement and states that the Representative Agreement speaks for itself.

12.    Admitted.

13.    Admitted.

14.    Admitted.

15.    Responding to paragraph 15 of the Complaint, Fisher admits that Northeast Controls placed an order with Fisher for a control valve identified with the tag number "83HV0629." Fisher denies that Northeast Controls was acting "on behalf of Praxair." Responding further, Fisher states that Northeast Controls failed to place the order for that valve in accordance with specifications provided by Praxair to plaintiff. Northeast Controls' failure to do so breached its contract with Fisher and breached the duty of care owed by Northeast Controls to persons, including itself, who could foreseeably be injured by Northeast Controls' failure to place the order in accordance with the specifications provided by Praxair. Further, Northeast Controls' negligent performance of its obligations under the Representative Agreement caused the losses suffered by plaintiffs in the underlying actions.

16.    Admitted.

17.    Admitted.

18.    Admitted.

19.    Admitted.

20.    Admitted.

21.    Responding to paragraph 21 of the Complaint, Fisher admits that a fire occurred at the Delaware City Power Plant Repowering Project on or about May 20, 2000, but denies that the fire occurred "during re-powering of the ASU."

22.    Admitted.

23.    Responding to paragraph 23 of the Complaint, Fisher admits that, in the underlying actions, allegations were made that Praxair, Parsons Corporation ("Parsons"), and Motiva sustained property damage as a result of the May 20, 2000, fire. Responding further, Fisher states that, on information and belief, neither Praxair nor Parsons suffered property damage as a result of the fire that occurred on May 20, 2000, at the Delaware City Power Plant Repowering Project.

24.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 24 of the Complaint and therefore denies the same.

25.    Admitted.

26.    Fisher admits that the Great American Complaint contains the passage set forth in paragraph 26 of the Complaint, but denies that the quoted passage constitutes the entirety of the Complaint. Responding further, Fisher states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

27.    Denied. Responding further, Fisher states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-
Answer_to_Amended_Complaint_(412).DOC
041607 1349                                                                      4

FCI/MOA 0174

28.     Fisher admits that the Great American Complaint "alleged that the defects, among other things, caused the fire and resulting damage," but states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

29.     Admitted.

30.     Fisher admits that paragraph 43 of the Olsons' Complaint alleges defects in the Fisher valve and further alleges that those defects caused injuries to Ronald and Carol Olson, but states that Northeast Controls' characterization of the Olsons' Complaint is partial and misleading and that the Olsons' Complaint speaks for itself.

31.     Denied.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.     Admitted.

37.     Responding to paragraph 37 of the Complaint, Fisher states that the letter attached as Exhibit "J" speaks for itself and denies that the letter contains the emphasis added to the recitation of the letter in this paragraph.

38.     Responding to paragraph 38 of the Complaint, Fisher admits that it would have been responsible for defending and indemnifying Northeast Controls on claims of a product defect, but states that all claims of product defect made in any and all of the Underlying Actions

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-Answer_to_Amended_Complaint_(412).DOC
041607 1349

5

FCI/MOA 0175

were based solely on Northeast Controls' negligent failure to ensure that the materials of

construction for the valve at issue met the written specifications provided by Praxair.

39.    Denied. Responding further, Fisher states that it fully defended the valve in the

underlying actions; that it was not obligated to defend Northeast Controls for its negligence; and

that all of Northeast Controls' losses in the underlying actions were caused by Northeast

Controls' breach of its contract and its negligent conduct in failing to provide Fisher with the

specifications for the valve that Praxair had provided to Northeast Controls.

40.    Responding to paragraph 40 of the Complaint, Fisher states that it lacks

knowledge or information sufficient to form a belief as to whether "Rawle & Henderson LLP

was initially retained to defend Northeast in any lawsuit filed related to this fire" and therefore

denies the same. Fisher admits that Northeast Controls is represented in this matter by Marshall,

Dennehey, Warner, Coleman & Goggin.

41.    Denied. Responding further, Fisher states that the Representative Agreement

speaks for itself.

42.    Fisher admits that Great American and the Olsons both alleged the presence of

defects in the Fisher valve, but states that Northeast Controls' characterization of those

Complaints is partial and misleading and that those Complaints speak for themselves.

Responding further, Fisher states that all allegations relating to the valve in the underlying

actions focused solely on Northeast Controls' failure to place an order with Fisher for the valve

that conformed with the specifications provided to Northeast Controls by Praxair, which failure

constituted negligence on the part of Northeast Controls. Further, Fisher states that Great

American voluntarily dismissed Fisher, but not Northeast Controls, from the <u>Great American</u>

C:\Documents and Settings\mmeinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-
Answer_to_Amended_Complaint_(412).DOC
041607 1349

6

FCI/MOA 0176

action. Fisher also states that the Olsons later agreed that there were no defects in the Fisher valve and therefore agreed to entry of judgment on behalf of Fisher in the Olson action, but did not agree to the dismissal of Northeast Controls from the Olson action.

43.    Fisher admits that Praxair and Motiva both filed suits alleging that the Fisher valve was defective and that separate counsel appeared for Northeast Controls in the lawsuits filed by those entities. Responding further, Fisher states that Northeast Controls' characterization of the Praxair and Motiva complaints is partial and misleading and that those Complaints speak for themselves. Fisher also states that the plaintiffs in the Praxair and Motiva actions alleged that Northeast Controls was negligent and that the evidence developed during the pendency of those actions confirmed that negligence.

44.    Admitted.

45.    Denied.

46.    Fisher admits that opinions of Dr. Robert. A. Mostello (Fisher's retained expert) are attached as Exhibit G to the Complaint. Those documents speak for themselves. Responding further, Fisher denies that Dr. Mostello's report "absolved Northeast from liability" and denies each and every other allegation set forth in paragraph 46 of the Complaint.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 50 of the Complaint and therefore denies the same.

51.   Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 51 of the Complaint and therefore denies the same.

52.   Denied.  Responding further, Fisher states that, based on documents obtained from plaintiffs, Northeast Controls entered into a settlement agreement with Great American because Great American had retained experts who had formed the conclusion that the fire at issue in the underlying actions was caused by Northeast Controls' negligence.

53.   Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 53 of the Complaint and therefore denies the same.

54.   Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 54 of the Complaint and therefore denies the same.

55.   Denied.

56.   Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 56 of the Complaint and therefore denies the same. Responding further, Fisher denies that it breached its contractual obligations.

57.   Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 57 of the Complaint and therefore denies the same.

58.   Denied.

## AFFIRMATIVE DEFENSES

1.   Plaintiffs' damages, if any, should be barred or reduced proportionally under the doctrines of contributory negligence and/or comparative fault.

2.   The various causes of action alleged in the Complaint are barred in whole or in part by the statute of limitations.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-Answer_to_Amended_Complaint_(412).DOC
041607 1349                                    8

FCI/MOA 0178

3.    The various causes of action alleged in the Complaint are barred in whole or in party by the principles of issue and/or claim preclusion.

4.    Northeast Controls failed to mitigate its damages, if any.

5.    Fisher is entitled to recoupment in the form of a reduction in the amount of Plaintiff's recovery in this lawsuit, if any, in the amount of attorneys fees and costs Fisher incurred in defending the underlying actions, which fees and costs were incurred by Fisher as a direct result of Northeast Controls' breach of contract and negligence in transmitting Praxair's specifications to Fisher.

6.    Fisher reserves the right to assert additional affirmative defenses disclosed through discovery or otherwise.

## COUNTERCLAIM

By way of counterclaim against plaintiff Northeast Controls, Inc., defendant Fisher Controls International, LLC ("Fisher"), by and through its counsel of record, Riddell Williams P.S., alleges as follows:

## JURISDICTION

1.    This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1332(a).

2.    This Court has jurisdiction over Fisher's counterclaim against plaintiff Northeast Controls under 28 U.S.C. § 1367(a) and Fed. R. Civ. P. 13(a).

## PARTIES

3.    Based on allegations in plaintiffs' Complaint, plaintiff Northeast Controls is a New York corporation with its principal place of business in Clifton Park, New York.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-Answer_to_Amended_Complaint_(412).DOC
041607 1349                                                    9

FCI/MOA 0179

4.      Fisher is a Delaware limited liability company with a principal place of business in Marshalltown, Iowa.

## FACTUAL ALLEGATIONS

5.      At all times material to Fisher's counterclaims, Northeast Controls and Fisher were parties to a Representative Agreement.  A true and correct copy of the Representative Agreement is attached as Exhibit 1 to this Answer and Counterclaim.

6.      At all times material to Fisher's counterclaims, Fisher and Praxair, Inc. ("Praxair") were parties to a Worldwide Procurement Agreement.  A true and correct copy of the Worldwide Procurement Agreement is attached as Exhibit 2 to this Answer and Counterclaim. The president of Northeast Controls signed the Worldwide Procurement Agreement on behalf of Northeast Controls.

7.      The Worldwide Procurement Agreement called for Fisher to manufacture its products supplied to Praxair in accordance with Praxair's specifications for those products.

8.      Under the terms of the Representative Agreement, and in accordance with the Worldwide Procurement Agreement, Northeast Controls placed orders with Fisher for control valves ordered by Praxair through Northeast Controls.

9.      Under the terms of the Representative Agreement, Northeast Controls was required to maintain documentation relating to the services that it provided in placing orders with Fisher for control valves ordered by Praxair through Northeast Controls.

10.      In 1996, Northeast Controls placed orders with Fisher for control valves for an air separation unit ("the ASU") that was being constructed by Praxair as part of the Delaware City Power Plant Repowering Project.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-
Answer_to_Amended_Complaint_(412).DOC
041607 1349

10

FCI/MOA 0180

11.     The ordering and purchase of the control valves identified in paragraph 6 of this Counterclaim were governed by the Worldwide Purchasing Agreement between Fisher and Praxair.

12.     Northeast Controls' work in ordering the control valves identified in paragraph 10 of this Counterclaim was governed by the Representative Agreement between Fisher and Northeast Controls.

13.     On or about June 3, 1996, Praxair provided Northeast Controls with specifications for a 12" Type A11 valve that was to be identified or "tagged" as valve 83HV0629. Valve 83HV0629 is referred to hereafter as "the Valve."

14.     As part of the order process for the Valve, Praxair provided specifications to Northeast Controls for the Valve. A true and correct copy of Praxair's specifications for the Valve is attached as Exhibit 3 to this Answer and Counterclaim.

15.     Bert Cappellini was Northeast Controls' designated representative for purposes of Praxair's ordering of the Valve. In his capacity as representative of Northeast Controls, Bert Cappellini initialed Praxair's specifications for the Valve as set forth in Exhibit 3.

16.     The document attached as Exhibit 3 to this Answer and Counterclaim was the only document relating to the purchase and sale of the Valve exchanged between Praxair and Northeast Controls that contained the initials of Bert Cappellini, as representative for Northeast Controls, and any representative for Praxair.

17.     The specifications provided by Praxair, and initialed by Bert Cappellini, called for the Valve to have, among others, the following specifications: a disk manufactured of Monel; a shaft made of Monel; Monel bearings; and a seal manufactured of Monel/PTFE.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-Answer_to_Amended_Complaint_(412).DOC
041607 1349                                              11

FCI/MOA 0181

18.     Acting as Northeast Controls' representative, Bert Cappellini transmitted specifications to Fisher for the Valve.

19.     The specifications transmitted by Northeast Controls to Fisher for the Valve did not match the specifications provided to Northeast Controls in the only document signed by representatives for both Praxair and Northeast Controls. Specifically, the specifications that Northeast Controls transmitted to Fisher called for a disk manufactured of Hastelloy C; a shaft manufactured of Inconel 718; bearings manufactured of TFE composite; and a seal manufactured of Tefzel.

20.     Northeast Controls did not inform Praxair that Northeast Controls had provided Fisher with specifications for the Valve that differed from the specifications Praxair provided to Northeast Controls and Bert Cappellini accepted on behalf of Northeast Controls.

21.     Before the fire at issue in this matter, Northeast Controls never informed Fisher that Praxair had never agreed to purchase a Valve manufactured in accordance with the specifications provided by Northeast Controls to Fisher in relation to the Valve at issue.

22.     After Fisher received Northeast Controls' specifications for the Valve, a Fisher representative telephoned Bert Cappellini and recommended that the specification for the Valve seat be changed from Tefzel to Kel-F.

23.     Northeast Controls agreed that Fisher should change the material for the Valve seat from Tefzel to Kel-F.

24.     Northeast Controls did not obtain Praxair's approval for the change in the material for the Valve seat from Tefzel to Kel-F. Nor did Bert Cappellini ever obtain Praxair's approval to use Kel-F in the Valve seat.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-Answer_to_Amended_Complaint_(412).DOC
041607 1349

12

FCI/MOA 0182

25.    Northeast Controls never informed Fisher that Praxair had requested that the Valve be manufactured using a Monel disk; a Monel shaft; Monel bearings; and a Monel/PTFE seat.

26.    Northeast Controls never informed Praxair that Fisher had manufactured the Valve using materials different from those specified by Praxair to Northeast Controls.

27.    Fisher manufactured the Valve in accordance with the specifications set forth in the communications between Northeast Controls and Fisher.

28.    On May 20, 2000, an incident ("the Incident") occurred at the Delaware City Power Plant Repowering Project.

29.    The Incident involved the Fisher Type A11 valve tagged "83HV0629."

30.    Following the Incident, four lawsuits ("the Underlying Actions") were filed against Fisher Controls International, Inc.

31.    In each of the Underlying Actions, the allegations against Fisher rested on the alleged failure of the Fisher Valve to comply with the specifications provided by Praxair to Northeast Controls.

32.    In the Underlying Actions, none of the parties ever adduced any evidence showing or tending to show that the Fisher Valve was defective in design or manufacture.

33.    In response to Northeast Controls' demand that Fisher defend and indemnify Northeast Controls in regard to the Underlying Actions, Fisher informed Northeast Controls that Fisher would defend Northeast Controls against any claim that the Valve was defective in design or manufacture.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-
Answer_to_Amended_Complaint_(412).DOC
041607 1349                                          13

FCI/MOA 0183

34.    Fisher further informed Northeast Controls that it (Fisher) would not defend Northeast Controls against Northeast Controls' own negligence.

35.    In the Underlying Actions, Fisher defended the design and manufacturing of the Valve.

36.    Fisher filed motions for summary judgment in all four of the Underlying Actions.

37.    In the four Underlying Actions, Fisher's counsel drafted the motions for summary judgment identified in paragraph 36 of this Counterclaim.

38.    In the Underlying Actions, Fisher's counsel provided drafts of Fisher's motions for summary judgment to counsel for Northeast Controls before filing those motions.

39.    Northeast Controls did not file any motions for summary judgment in any of the Underlying Actions.

40.    After Fisher filed its motion for summary judgment as to all claims asserted by Motiva, Motiva voluntarily dismissed all of its claims.

41.    After Fisher filed its motion for summary judgment as to all claims asserted by Great American, Great American voluntarily dismissed all of its claims against Fisher.

42.    Great American did not voluntarily dismiss its claims against Northeast Controls.

43.    The state court granted Fisher's motion for summary judgment as to all claims asserted by Praxair against Fisher.

44.    After Fisher filed its motions for summary judgment in the <u>Olson</u> action, all of the parties to that action, including Northeast Controls, agreed to Fisher's dismissal from the <u>Olson</u> action.

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-
Answer_to_Amended_Complaint_(412).DOC
041607 1349                                                                14

FCI/MOA 0184

## COUNTERCLAIM

## BREACH OF CONTRACT

45.     Fisher hereby incorporates the allegations set forth in paragraphs 1-44 of its

Counterclaim as if fully set forth herein.

46.     The claims against both Northeast Controls an Fisher in the Underlying Actions

were the direct result of Northeast Controls' failure to convey to Fisher the specifications

provided for the Valve by Praxair to Northeast Controls.

47.     In failing to convey to Fisher the specifications provided for the Valve by Praxair,

Northeast Controls breached the Representative Agreement.

48.     Northeast Controls' breach of the Representative Agreement caused Fisher

damages, including but not limited to the costs incurred in defending the <u>Olson</u>, <u>Praxair</u>, <u>Motiva</u>,

and <u>Great American</u> actions.

49.     In defending the Underlying Actions, Fisher incurred attorneys fees and costs in

an amount to be proven at trial.

50.     In defending the Underlying Actions, Fisher incurred expert fees in an amount to

be proven at trial.

51.     The attorneys fees and expert fees incurred by Fisher were reasonable.

52.     Fisher is entitled to recoupment in the form of a reduction in the amount of

Plaintiff's recovery in this lawsuit, if any, in the amount of the attorney fees, costs and expert

fees incurred in defending the underlying action.

WHEREFORE, Fisher demands judgment in its favor, reducing the amount of Northeast

Controls' recovery, if any, in the amount of the attorney fees, costs and expert fees incurred in

C:\Documents and Settings\mmcinnis\Local Settings\Temporary Internet Files\OLK12\SEATTLE-#571465-v1-
Answer_to_Amended_Complaint_(412).DOC
041607 1349                                                                          15

                                                                    FCI/MOA 0185

defending the underlying action, together with all costs and expenses for defending this action and any other such relief as the Court may deem equitable and just.

RIDDELL WILLIAMS P.S.


/s/ Daniel J. Gunter
By:    Patrick D. McVey
       *Pro hac vice*
       Daniel J. Gunter
       *Pro hac vice*
       Riddell Williams P.S.
       1001 Fourth Avenue Plaza, Suite 4500
       Seattle, WA  98154
       (206) 624-3600 (Tel.)
       (206) 389-1700 (Fax)
       pmcvey@riddellwilliams.com
       dgunter@riddellwilliams.com


Date:  April 16, 2007


MARON MARVEL BRADLEY & ANDERSON, P.A.


/s/ Paul A. Bradley
By:    Paul A. Bradley
       Maron & Marvel
       1201 N. Market St, Ste. 900
       Wilmington, DE 19801
       (302) 425-5177 (Tel.)
       (302) 425-0180 (Fax)
       pab@maronmarvel.com


Date:  April 16, 2007

# EXHIBIT 31

**Gunter, Dan**

| | |
|---|---|
| **From:** | Shannon, J. Scott [JSShannon@MDWCG.com] |
| **Sent:** | Tuesday, August 07, 2007 5:27 AM |
| **To:** | Gunter, Dan |
| **Cc:** | Wagner, Thomas P.; Mary Elizabeth Slevin; Jacobson,Philip C; pab@maronmarvel.com; McVey, Patrick |
| **Subject:** | RE: Follow-up on request |

Dan,
Apologies for the delay in getting back to you concerning your request that Northeast and St. Paul stipulate to Fisher seeking to amend its counterclaim to state an affirmative prayer for relief.

After review, we are unwilling to stipulate to an amendment to the pleadings.

s/Scott Shannon
MARSHALL DENNEHEY WARNER
        COLEMAN & GOGGIN
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899 – 8888
Direct dial: 302.552.4329
Office: 302.552.4300
Fax: 302.651.7905
e-mail: jsshannon@mdwcg.com

Confidentiality Notice:
This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to jsshannon@mdwcg.com, or by telephone at (302) 552 - 4329 and then delete the message and its attachments from your computer.
Thank you.
Jos. Scott Shannon
email: jsshannon@mdwcg.com
Firm Web Site: www.marshalldennehey.com

**From:** Gunter, Dan [mailto:dgunter@Riddellwilliams.com]
**Sent:** Friday, August 03, 2007 2:54 PM
**To:** Shannon, J. Scott
**Subject:** Follow-up on request

Scott--

Please let me know what the response is to our request to amend the counterclaim. If there's no response, we can simply inform the court of that fact.

--Dan

CONFIDENTIALITY AND CIRCULAR 230 NOTICE:   This communication is intended for the sole use of the individual and entity

8/14/2007                                                              FCI/MOA 0187

to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  You are hereby notified that any dissemination, distribution or duplication of this communication by someone other than the intended addressee or its designated agent is strictly prohibited.  As required by the Internal Revenue Service, anything contained in this communication pertaining to any U.S. federal tax matter is not to be used for the purpose of avoiding federal tax penalties under the Internal Revenue Code or for promoting, marketing or recommending to any third party the tax implications of any partnership or other entity, investment plan or arrangement discussed in this communication.  If you have received this communication in error, please notify this firm immediately by collect call (206)-624-3600, or by reply to this communication.

FCI/MOA 0188

# EXHIBIT 32

CONFIDENTIAL                                    1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON, and CAROL          ) CONFIDENTIAL
OLSON, his wife,                    )
                                    )
        Plaintiffs,                 )
                                    ) Civil Action No.
V.                                  ) 02C-04-263 (JRS)
                                    )
MOTIVA ENTERPRISES L.L.C.;          )
BATTAGLIA MECHANICAL, INC.;         )
FISHER CONTROLS INTERNATIONAL,      )
INC.; HYDROCHEM INDUSTRIAL          )
SERVICES, INC.; JJ WHITE, INC.;     )
NORTHEAST CONTROLS, INC.;           )
PARSONS ENERGY AND CHEMICALS        )
GROUP, INC.; PRAXAIR, INC.; TEXACO  )
AVIATION PRODUCTS LLC; DAIKIN       )
INDUSTRIES, LTD.; SAINT-GOBAIN      )
PERFORMANCE PLASTICS; RIX           )
INDUSTRIES, INC.; TEXACO GLOBAL     )
GAS AND POWER; TEXACO               )
DEVELOPMENT CORPORATION;            )
GARY DELGREGO,                      )
                                    )
                                    )
        Defendants,                 )
                                    )
NORTHEAST CONTROLS, INC.,           )
                                    )
        Third-Party Plaintiff,      )
                                    )
v.                                  )
                                    )
CONECTIV OPERATING SYSTEMS,         )
                                    )
        Third-Party Defendant.      )

DEPOSITION OF ROBERT D. BARRY

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters



FCI/MOA 0189

CONFIDENTIAL                    4

1    APPEARANCES: (Cont'd)

2         MARK CARLISLE LEVY, ESQ.
          JAMES A. KELLER, ESQ.
3         SAUL EWING
            Centre Square West
4           1500 Market Street - 38th Floor
            Philadelphia, Pennsylvania  19102
5           for the Defendants Texaco Development
            and Texaco Aviation

6
          CHASE T. BROCKSTEDT, ESQ.
7         MURPHY SPADARO & LANDON
            824 Market Street
8           Wilmington, Delaware  19899
            for the Defendant HydroChem
9           Industrial Services, Inc.

10        GREGORY A. INSKIP, ESQ.
          POTTER ANDERSON & CORROON
11          Hercules Plaza
            1313 North Market Street
12          Wilmington, Delaware  19801
            for the Third-Party Defendant
13          Conectiv Operating Systems

14                    -  -  -  -  -

15             MR. KELLER:  Let's go ahead and mark

16   these.

17             (Olson Deposition Exhibit Nos. 138 through

18   140, respectively, were marked for identification.)

19

20                  ROBERT D. BARRY,

21        the deponent herein, having first been

22        duly sworn on oath, was examined and

23        testified as follows:

24             MR. KELLER:  For the record, Greg Inskip

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

FCI/MOA 0190

| | |
|---|---|
| 1 | for Conectiv is not currently at the deposition. |
| 2 | Everyone else is and we're going to start and we will |
| 3 | put on the record when Mr. Inskip arrives. |
| 4 | EXAMINATION |
| 5 | BY MR. KELLER: |
| 6 | Q.   Sir, could you state your full name for the |
| 7 | record? |
| 8 | A.   Robert Dennis Barry. |
| 9 | Q.   Are you currently employed? |
| 10 | A.   Yes, I am. |
| 11 | Q.   Where are you currently employed? |
| 12 | A.   I'm currently employed by Fisher Controls |
| 13 | International, LLC Valve Division. |
| 14 | Q.   Where is your office? |
| 15 | A.   My office is in North Stonington, Connecticut. |
| 16 | Q.   How long have you worked for Fisher Controls? |
| 17 | A.   Since May of 1983. |
| 18 | Q.   Have you always worked in the North Stonington |
| 19 | office? |
| 20 | A.   Yes. |
| 21 | Q.   Has the North Stonington office always been |
| 22 | your primary office? |
| 23 | A.   Yes. |
| 24 | Q.   Have you ever been deposed before? |



1    Q.    Have you ever received any training on the use

2    of control valves in a high-pressure environment?

3    A.    No, I have not.

4    Q.    Have you ever reviewed any Praxair-specific

5    standards or requirements?

6    A.    At what time frame are you talking about?

7    Q.    Before May 1998, had you reviewed any

8    Praxair-specific standards or requirements?

9    A.    Not to my recollection.

10    Q.    Do you know if before May 1998 there was a

11    location at North Stonington where someone could go

12    and look at a book or a set of documents that were

13    Praxair-specific requirements?

14    A.    Not to my recollection.

15    Q.    Are you familiar with something called the OPS

16    system?

17    A.    Yes.

18    Q.    What's the OPS system?

19    A.    It's the order processing system.

20    Q.    And is that a Fisher system?

21    A.    Yes, it is.

22    Q.    And where is it maintained?

23    A.    It's maintained in Marshalltown, Iowa.

24    Q.    Is it also maintained in North Stonington?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    No, it's not.

2    Q.    If I were on a computer in North Stonington,

3    could I access the OPS system?

4    A.    Yes, you can.

5    Q.    And what would I do to do that?

6    A.    You would sign on for access to the system via

7    connections to Marshalltown.

8    Q.    Did you have any role in creating the OPS

9    system?

10   A.    No, I did not.

11   Q.    Do you directly input information into the OPS

12   system?

13   A.    No, I do not.

14   Q.    Who, and I mean what job title, not necessarily

15   specific name, but what would the job title of the

16   person be who would input information into the OPS

17   system at Fisher?

18   A.    At Fisher?

19   Q.    At Fisher.

20   A.    It would be a detailer in Marshalltown.

21   Q.    Now, you hesitated.  Is that because the

22   customer can also access the OPS system?

23   A.    I think you need to define who the customer is.

24   Q.    Can individuals outside of Fisher Controls



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    access the OPS system?

2       A.    Yes, they can.

3       Q.    And who would that include? .

4       A.    Those would be the sales representatives.

5       Q.    And that would include Northeast Controls?

6       A.    Yes.

7       Q.    And do you know how they would get access to

8    the OPS system?

9       A.    Through Web connections, electronic

10   connections.

11      Q.    And do you know what the OPS system screen

12   looks like?

13      A.    Actually, no, I haven't dealt with it.

14      Q.    Do you know if once an entry is made on the OPS

15   system is it saved somewhere?

16      A.    It's saved within the database.

17      Q.    Do you know if anyone in connection with this

18   litigation has searched the database for the OPS

19   screen or screens for the 629 valve?

20      A.    Yes, they have.

21      Q.    And is it your understanding that they have

22   been produced?

23      A.    That's my understanding.

24      Q.    If there are changes made to a product ordered



1    through the OPS system, if you know, do you have to

2    create an entire new document or can you go back in,

3    pull up the old OPS screen off the system and make

4    your changes right on the computer?

5        A.    I'm not certain as to how that is performed.

6        Q.    Who is the person at Fisher that would be most

7    knowledgeable about the OPS system?

8        A.    Probably the detailers.

9        Q.    Am I correct that the detailer I think you had

10   testified for the 629 valve was a gentleman named Gary

11   Boyle?

12       A.    That's correct.

13       Q.    Is Mr. Boyle still employed with Fisher?

14       A.    Yes, he is.

15       Q.    And is he still in Marshalltown?

16       A.    Yes, he is.

17       Q.    Let me see if I understand it.  Someone from

18   Fisher and/or someone from Northeast Controls input

19   information into the OPS system.  Is that correct?

20       A.    That's correct.

21       Q.    And then once the information is in the OPS

22   system, and we will say for the 629 valve, what

23   happens with it?  What's done with it on Fisher's end?

24       A.    Okay.  It depends on what information is



Robert D. Barry  -  CONFIDENTIAL          62

1    inputted into the system.  All right?

2      Q.   Okay.

3      A.   For the 629 valve the way the information was

4    inputted into the system a matrix number was used to

5    input information and as a result the system does a

6    verification of the information inputted.  And if

7    there isn't sufficient information or product

8    structure, this system kicks the information out or

9    sends out a request for further information to be

10   inputted before further processing that information.

11     Q.   Okay.  And if the point is reached where there

12   is sufficient information, what's the next step?

13     A.   When all of the information that's necessary to

14   be inputted into the system is provided, that creates

15   what's known as an order requisition.

16             MR. KELLER:  We will mark this as 142.

17             (Olson Deposition Exhibit No. 142 was

18   marked for identification.)

19   BY MR. KELLER:

20     Q.   Mr. Barry, I put before you a document that's

21   been marked as Exhibit 142.  Is this a requisition

22   form?

23     A.   Not exactly, no.

24     Q.   What is Exhibit 142?



Robert D. Barry   -   CONFIDENTIAL         63

1      A.    It appears to be a printout from the order

2    processing database that is requesting manual

3    validation for this particular detail request or this

4    particular order.

5      Q.    Is this different than the requisition form

6    that you were testifying about that would normally

7    follow after the OPS screen is complete?

8      A.    Yeah.  This is a data screen printout of

9    information that is used to generate the order

10   requisition.

11     Q.    So is this actually sort of an intermediate

12   step between the OPS screen and the requisition form?

13     A.    Yeah.  The...

14            Repeat the question.

15     Q.    Yes.  Sir, I'm really not trying to confuse you

16   here.  I'm just trying to figure out the sequence of

17   what happened.

18            So you have your OPS screen and then you

19   said once that's final, that would get you to a

20   requisition form.  So where does 142 fit in?  Is that

21   after the requisition form?

22     A.    This appears to be -- this is complete

23   information on a request that generated that was at

24   one point incomplete.  This -- let me try to explain



Robert D. Barry  -  CONFIDENTIAL          159

1   State of Delaware    )
                         )
2   New Castle County    )

3

4                    CERTIFICATE OF REPORTER

5

6        I, Kurt A. Fetzer, Registered Diplomate
    Reporter and Notary Public, do hereby certify that
    there came before me on the 15th day of December,
7   2003, the deponent herein, ROBERT D. BARRY, who was
    duly sworn by me and thereafter examined by counsel
8   for the respective parties; that the questions asked
    of said deponent and the answers given were taken down
9   by me in Stenotype notes and thereafter transcribed by
    use of computer-aided transcription and computer
10  printer under my direction.

11       I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.

13       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.

15

16                    

17            Kurt A. Fetzer, RDR, CRR
              Certification No. 100-RPR
18            (Expires January 31, 2005)

19  DATED:    12-22-03

20

21

22

23

24

# EXHIBIT 33

CONFIDENTIAL                    1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON, and CAROL          ) CONFIDENTIAL
OLSON, his wife,                    )
                                    )
        Plaintiffs,                 )
                                    ) Civil Action No.
V.                                  ) 02C-04-263 (JRS)
                                    )
MOTIVA ENTERPRISES L.L.C.;          )
BATTAGLIA MECHANICAL, INC.;         )
FISHER CONTROLS INTERNATIONAL,      )
INC.; HYDROCHEM INDUSTRIAL          )
SERVICES, INC.; JJ WHITE, INC.;     )
NORTHEAST CONTROLS, INC.;           )
PARSONS ENERGY AND CHEMICALS        )
GROUP, INC.; PRAXAIR, INC.; TEXACO  )
AVIATION PRODUCTS LLC; DAIKIN       )
INDUSTRIES, LTD.; SAINT-GOBAIN      )
PERFORMANCE PLASTICS; RIX           )
INDUSTRIES, INC.; TEXACO GLOBAL     )
GAS AND POWER; TEXACO               )
DEVELOPMENT CORPORATION;            )
GARY DELGREGO,                      )
                                    )
                                    )
        Defendants,                 )
                                    )
NORTHEAST CONTROLS, INC.,           )
                                    )
        Third-Party Plaintiff,      )
                                    )
v.                                  )
                                    )
CONECTIV OPERATING SYSTEMS,         )
                                    )
        Third-Party Defendant.      )

DEPOSITION OF BHIM S. BHAKOO

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

FCI/MOA 0199

CONFIDENTIAL                                    4

```
1    APPEARANCES:  (Cont'd)

2         MARK CARLISLE LEVY, ESQ.
          JAMES A. KELLER, ESQ.
3         SAUL EWING
             Centre Square West
4            1500 Market Street - 38th Floor
             Philadelphia, Pennsylvania  19102
5            for the Defendants Texaco Development
             and Texaco Aviation
6
          CHASE T. BROCKSTEDT, ESQ.
7         MURPHY SPADARO & LANDON
             824 Market Street
8            Wilmington, Delaware  19899
             for the Defendant HydroChem
9            Industrial Services, Inc.

10        GREGORY A. INSKIP, ESQ.
          POTTER ANDERSON & CORROON
11           Hercules Plaza
             1313 North Market Street
12           Wilmington, Delaware  19801
             for the Third-Party Defendant
13           Conectiv Operating Systems

14
15                    -  -  -  -  -

16                 BHIM S. BHAKOO,

17        the deponent herein, having first been

18        duly sworn on oath, was examined and

19        testified as follows:

20                     EXAMINATION

21   BY MS. CLARK:

22      Q.   Sir, would you state your name for the record,

23   please?

24    - A.   My name is Bhim, middle initial S, last name is
```

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Bhim S. Bhakoo  -  CONFIDENTIAL            124

1      A.   Which conversation?

2      Q.   The conversation about changing the line number

3   37 to Monel.  How does that stick out in your mind?

4   What was significant about that conversation?

5      A.   The significance about 629 is that it is a

6   battery limit valve.  That's the last valve in the

7   Praxair supply chain going to the customer and that's

8   the final valve and that's the reason it comes to my

9   mind that I requested him to change those materials to

10  Monel.

11           And the other thing, looking at this

12  document, nobody else in Praxair's organization or in

13  Northeast Controls' organization will ask Bert to

14  change the material other than me.  If there is

15  anyone, I would like to know.  There is no one.

16           That's the reason I am saying the

17  conversation took place, the changes to the

18  specifications took place.  And when it happened,

19  where it happened, how it happened, I cannot tell you

20  that.

21     Q.   After you signed this 118, did you have any

22  conversations with Mr. Cappellini about changing the

23  composition of that valve?

24           MR. JACOBY:  Objection.



WILCOX & FETZER LTD.
Registered Professional Reporters

1              You can answer.

2    A.   I did not.

3    Q.   You did not?

4    A.   No.

5              MS. CLARK:   119.

6              (Olson Deposition Exhibit No. 119 was

7    marked for identification.)

8    BY MS. CLARK:

9    Q.   Mr. Bhakoo, have you had a chance to look at

10   Exhibit 119?

11   A.   Yes.

12   Q.   This is also a specification form for 629.  Is

13   that correct?

14   A.   That's correct.

15   Q.   And this one has data sheet 46 and next to it

16   it has 6/3/98 and then at the bottom of it it says

17   date next to revision or R-e-v rather and says

18   7/23/98.

19              Have you ever seen this document before?

20   A.   No.

21   Q.   Do you ever remember having a conversation with

22   Mr. Cappellini about changing the seat material to

23   Kel-F?

24   A.   No.

Bhim S. Bhakoo  -  CONFIDENTIAL        135

1    discussed that with you?

2       A.    Correct.

3       Q.    Now, you stated earlier that you finished

4    ordering the valves you think sometime the end or

5    through '98.  Is that approximately correct?

6             MR. JACOBY:  Objection.  You mean the

7    valves for this project?

8             MS. CLARK:  For this project, right.

9       A.    For the most part we were done.

10      Q.    And you stated earlier I think that your next

11   involvement was after the May 20th, 2000 incident.  Is

12   that correct?

13      A.    With this particular valve, yes.

14      Q.    And how did you find out about the May 20th

15   incident?

16      A.    The incident happened on the weekend and I came

17   to the office on Monday and there was a message in my

18   voice mail.

19      Q.    From whom?

20      A.    The message was from Dave Good and giving a

21   description of the damage.

22      Q.    Do you remember what you were told about the

23   damage?

24      A.    I was told a verbal description of what they



WILCOX & FETZER LTD.
Registered Professional Reporters

1    could see; the parts of the valves are burned; the

2    piping is burned downstream, things like that.

3        Q.    And then what did you do, if anything?

4        A.    I was in shock and I heard there was one guy

5    who was injured, Ron Olson.  I was feeling for him and

6    hoping he would recover, that everything would be fine

7    with him and his family.

8        Q.    Other than that message, did you have any other

9    involvement in the Delaware City project?

10            MR. JACOBY:  Objection.  You're talking

11    about after the incident?

12            MS. CLARK:  After the incident, yes.

13       A.    After the incident my immediate response was

14    that I need to act fast and replace the valve.

15       Q.    So your immediate response was that you wanted

16    to act fast to replace the valve.  And what did you do

17    to do that?

18       A.    Okay.  Let me go back.  There were two things.

19    I'm getting emotional because I really feel for that

20    person who was working there that day.

21            The description of the damage which was

22    left on my voice mail message was not consistent with

23    the expectations from the valve the way it was

24    specified.  The valve which was specified as Monel I

Bhim S. Bhakoo  -  CONFIDENTIAL          137

1    would bet that valve as a Monel valve would not

2    experience the damage, the kind of damage that was

3    described.  So I was wondering what's going on?

4          One thing I did is call Bert Cappellini

5    that confirmed to me the materials which were supplied

6    on this valve.  He punched in the numbers in the

7    computer and I think the same day he gave me the

8    materials which was supplied in this valve.  And I'm

9    looking at what was supplied and what we specified and

10   what we ordered and I was shocked that the valve which

11   was supplied is totally different than what we

12   ordered.  That was the first time I came to know about

13   the materials.

14         And I was in deep shock not only for that

15   day but for weeks and months after that.  Then I said

16   the next thing I had to do was replace the valve.

17   That's my responsibility.  I don't need somebody

18   telling me.  I'm responsible enough.  I had to order

19   the valve.

20         And I asked Bert, I said, "Okay.  Whatever

21   happened happened.  We can talk about those things

22   later.  One thing we need to do is order another valve

23   with the materials as specified."  And he said okay;

24   he would work on that.



WILCOX & FETZER LTD.
Registered Professional Reporters

Bhim S. Bhakoo  -  CONFIDENTIAL                    188

1    State of Delaware    )
                          )
2    New Castle County    )

3

4              CERTIFICATE OF REPORTER

5

6        I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
     there came before me on the 11th day of December,
7    2003, the deponent herein, BHIM S. BHAKOO, who was
     duly sworn by me and thereafter examined by counsel
8    for the respective parties; that the questions asked
     of said deponent and the answers given were taken down
9    by me in Stenotype notes and thereafter transcribed by
     use of computer-aided transcription and computer
10   printer under my direction.

11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16

17   _____
     Kurt A. Fetzer, RDR, CRR
18   Certification No. 100-RPR
     (Expires January 31, 2005)

19   DATED:  _12-16-03_

20

21

22

23

24

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

ATTACH TO DEPOSITION OF: *Shim S Bhakov*

DATE TAKEN: *December 11, 2003*

IN THE MATTER OF: *Olson v Motiva Enterprise*

### ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 6 | 19 | Change "An estimate" to "Use of the words like about, approximate, around" [REF - Line 12, 13] |
| 7 | 23 | Change "companies" to "sessions" |
| 28 | 12 | Change "Curtis" to "Kurtis" at 2 places. |
| 53 | 4 | Change "meet" to "make" |
| 83 | 24 | Change "Yeah" to "Yeah they were automatic valves, some throttling type and some ON/OFF type. REASON - I MEANT TO SAY AUTO VALVES WHICH ARE ON/OFF & THROTTLING TYPES. |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: *1-16-04*            *Shim Jain Bhakor*
                      (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
            1330 King Street
            Wilmington, DE 19801

ATTACH TO DEPOSITION OF: _Blin S. Bhakov_

DATE TAKEN: _December 11, 2003_

IN THE MATTER OF: _Olson v Motiva Enterprise_

## ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. <u>Do not make any marks or notations on the transcript itself</u>. Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|----------------------------------|
| 15 | 12, 13 | Change "given unique to the project and" to "a unique number given". |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _1-16-04_          _Blin Sain Bhakov_
                              (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
                 1330 King Street
                 Wilmington, DE 19801

# EXHIBIT 34

VOLUME 2  -  CONFIDENTIAL                189

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON, and CAROL ) CONFIDENTIAL
OLSON, his wife,                    )
                                    )
          Plaintiffs,               )
                                    ) Civil Action No.
v.                                  ) 02C-04-263 (JRS)
                                    )
MOTIVA ENTERPRISES L.L.C.;          )
BATTAGLIA MECHANICAL, INC.;         )
FISHER CONTROLS INTERNATIONAL,      )
INC.; HYDROCHEM INDUSTRIAL          )
SERVICES, INC.; JJ WHITE, INC.;     )
NORTHEAST CONTROLS, INC.;           )
PARSONS ENERGY AND CHEMICALS        )
GROUP, INC.; PRAXAIR, INC.; TEXACO )
AVIATION PRODUCTS LLC; DAIKIN       )
INDUSTRIES, LTD.; SAINT-GOBAIN      )
PERFORMANCE PLASTICS; RIX           )
INDUSTRIES, INC.; TEXACO GLOBAL     )
GAS AND POWER; TEXACO               )
DEVELOPMENT CORPORATION;            )
GARY DELGREGO,                      )
                                    )
                                    )
          Defendants,               )
                                    )
NORTHEAST CONTROLS, INC.,           )
                                    )
          Third-Party Plaintiff,    )
                                    )
v.                                  )
                                    )
CONECTIV OPERATING SYSTEMS,         )
                                    )
          Third-Party Defendant.    )

DEPOSITION OF BHIM S. BHAKOO

WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters



FCI/MOA 0209

CONFIDENTIAL                              192

1    APPEARANCES:  (Cont'd)

2          PHILIP T. EDWARDS, ESQ.
           MURPHY SPADARO & LANDON
3             1011 Centre Road - Suite 210
              Wilmington, Delaware  19805
4             for the Defendant HydroChem
              Industrial Services, Inc.

5          R. STOKES NOLTE ESQ.
6          NOLTE BRODOWAY & SALTZ, P.A.
              Three Mill Road - Suite 304
7             Wilmington, Delaware  19806
              for the Third-Party Defendant
8             Conectiv Operating Systems

9    ALSO PRESENT:
           PHILIP C. JACOBSON, REGIONAL GROUP COUNSEL
10         THE ST. PAUL PROPERTY AND LIABILITY INSURANCE

11

12                MR. McVEY:  This will be the first

13   exhibit.

14                (Olson Deposition Exhibit No. 195 was

15   marked for identification.)

16

17                BHIM S. BHAKOO,

18        the deponent herein, having first been

19        duly sworn on oath, was examined and

20        testified as follows:

21           MR. RICHES:  We will read and sign.

22                EXAMINATION

23   BY MR. McVEY:

24      Q.   Good morning, Mr. Bhakoo.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    Good morning to you.

2    Q.    I think we met back on December 11, 2003, did

3    we not?

4    A.    I remember you very well.

5    Q.    Okay.  My name is Mr. McVey and I represent

6    Fisher Controls in this litigation.

7    A.    How can I forget you?

8    Q.    Okay.  It's good to be known as memorable, I

9    guess.

10            Mr. Bhakoo, subsequent to December 11th

11   did you have an opportunity to read or review the

12   transcript of your deposition, the first portion of

13   your deposition that was taken back on December 11th?

14   A.    Yes, I have.

15   Q.    And did you make a number of additional changes

16   or did you make some changes to the transcript of that

17   deposition which you then signed off on on January 16,

18   2004?

19   A.    That's correct.

20   Q.    Since January 16, 2004, have you had occasion

21   to review this deposition again?

22   A.    Since when?

23   Q.    Since January 16, 2004, when you signed off on

24   the signature page, have you taken the opportunity to



WILCOX & FETZER LTD.
Registered Professional Reporters

1   engineering data books and the engineering data books

2   were defined.  And when I say they were defined, it

3   means that the contents were defined and there was a

4   section for the instrumentation and control valves and

5   that's where this information goes.

6           And let me, let me make a correction on

7   that.  This C18161, this is a document that you were

8   questioning me about last time and you didn't show me

9   this document.  You were asking me questions on a

10  previous version of this document which was not

11  approved.  And you told me that I didn't approve it.

12  Here it is.  This document was approved and I told you

13  that I think it was approved and here it is approved.

14  Okay?

15      Q.   Okay.

16      A.   And the seat material in this is Hastelloy

17  C/PTFE.  And after my last deposition I have gone

18  through the other documents which were produced by

19  Fisher and it is shocking for me to find that this

20  Hastelloy C/PTFE was changed to Tefzel.  You know, I

21  don't know how.  And then Fisher changed the Tefzel to

22  Kel-f without my knowledge.

23          Fisher and Northeast Controls, they don't

24  claim to be the experts on the materials for the



1    valves, for the oxygen valves.  They raise their

2    hands:  We are not responsible.

3              However, they feel they have enough

4    knowledge to change the seat material and do not

5    communicate to Praxair, do not get my approval.  That

6    was shocking.  And once you do that, anything can

7    happen.  You know, replacing those seat materials is a

8    dangerous thing without getting proper Praxair

9    approval.

10   Q.    Your testimony as you sit here today is that

11   Mr. Cappellini never came back to you and told you we

12   recommend that the seat material be changed to Kel-f

13   for this valve?

14             MR. RICHES:  Objection to the form.

15             You can answer.

16   A.    Let me tell you this.  You know, in looking at

17   those documents the previous version -- looking at

18   those documents, the Fisher and Northeast Controls,

19   Fisher told Northeast Controls around July 21 to

20   change the seat material from Tefzel to Kel-f.  Why

21   Fisher did that, I don't know.

22             And this document is produced one week

23   later.  It's 7-30 dated and note the changes are

24   mentioned on this document one week later.  In the



1  revision note it says, "Added note 19 Moore Volume

2  Booster."

3              Now, he felt, you know, Fisher and

4  Northeast Controls felt that this is significant

5  enough to be documented on the drawing so that Praxair

6  will know.  However, changing the seat, which is

7  critical, which is inside the oxygen, they didn't feel

8  that it's significant enough that we document on this

9  and tell Praxair that we are changing this.

10             MR. McVEY:  Move to strike as

11  nonresponsive.

12    A.   That's for you, but it's a very valid point and

13  I'm upset because of all of what had happened.

14             MR. McVEY:  Move to strike as

15  nonresponsive.

16  BY MR. McVEY:

17    Q.   Mr. Bhakoo --

18    A.   You don't want to --

19    Q.   -- please listen to my question and just answer

20  the question.  Mr. Riches or other counsel will have

21  opportunities to ask you other questions at other

22  times.

23    A.   You have the right to ask questions.  I have

24  the right to answer the questions.

1    Q.    You also have the responsibility to answer the

2    question that is being asked of you.

3    A.    I think I did.

4    Q.    Okay.  Please listen to my question, sir.

5          Is it your testimony that in connection

6    with the ordering of the 629 valve Mr. Cappellini

7    never came back to you and said we recommend that the

8    seat material be changed to Kel-f?

9    A.    That is correct.

10   Q.    So if Mr. Cappellini were to say or were to

11   testify that he recommended to you that the seat

12   material be changed to Kel-f, it would be your

13   testimony that Mr. Cappellini would be false in making

14   that statement?

15         MR. RICHES:  I object to the form.  He

16   could just be mistaken.

17         MR. McVEY:  Okay.  He could be mistaken.

18   A.    That's correct.

19   Q.    And is it your testimony as you sit here today

20   that at no time did you ever see a specification sheet

21   prepared by Mr. Cappellini for either the 613 or the

22   629 valve that showed the seat material as Kel-f?

23   A.    That's the reason I showed you this sheet

24   (indicating) on 7-30, which is one week later, Fisher



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1   changed the materials on the seat and it's not

2   documented here and it's not approved by me.

3          MR. McVEY: .Move to strike as

4   nonresponsive.

5    A.   If you don't, if you don't like my answer --

6    Q.   No.  I want to ask you specific questions and

7   then you can give me answers to those specific

8   questions.

9          Mr. Bhakoo, prior to May 20, 2000, were

10   you ever given a specification sheet for either the

11   613 or the 629 valve by Mr. Cappellini that showed the

12   seat material as Kel-f?

13    A.   No.

14    Q.   Thank you, sir.

15    A.   Are we done with this one?  I can put it back?

16    Q.   We will be going back to this at some point in

17   time.

18          MR. RICHES:  Put it back in there so it

19   doesn't get lost.

20    Q.   Actually, why don't you pull it back out?  I'm

21   sorry.

22          I want to get a general understanding

23   first.  When the engineering data book that has the

24   information regarding the automatic valve like this

1    sheet that we looked at, Conectiv 18161 -- turn to

2    that.

3                When that binder is put together, do you

4    participate in physically putting the binder together

5    or is that done by somebody else?

6        A.    What do you mean by physically participate?

7        Q.    For example, you have a binder in front of you,

8    a three-ring binder that you've just taken apart, and

9    you have taken Exhibit 109 out of that binder and a

10   minute ago you put it back into that binder.

11       A.    Yes.

12       Q.    That's the activity that I talked about

13   physically putting the binder together.

14       A.    The binder responsibility belongs to our

15   technical documentation department.

16       Q.    And is there an individual in that department

17   who has primary responsibility for physically putting

18   the binder together?

19                MR. RICHES:  On all projects?

20       A.    Yes.

21       Q.    And who is that person, sir?  I'm just asking

22   on the Delaware City project.

23                MR. RICHES:  That's why I tried to clarify

24   that.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Bhim S. Bhakoo  -  CONFIDENTIAL                    384

```
1    State of Delaware    )
                          )
2    New Castle County    )

3

4              CERTIFICATE OF REPORTER

5
         I, Kurt A. Fetzer, Registered Diplomate
6    Reporter and Notary Public, do hereby certify that
     there came before me on the 1st day of April, 2004,
7    the deponent herein, BHIM S. BHAKOO, who was duly
     sworn by me and thereafter examined by counsel for the
8    respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.

11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16

17       _____
         Kurt A. Fetzer, RDR, CRR
18       Certification No. 100-RPR
         (Expires January 31, 2005)

19
     DATED:  ___4-6-04_____
20

21

22

23

24
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

FCI/MOA 0218

# EXHIBIT 35

# In The Matter Of:

*Olson    v.*
*Motiva, et al.*

---

*Gregory K. Callaway*
*April 28, 2004*

*CONFIDENTIAL*
*C.A. # 02C-04-263 (JRS)*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE  U.S.A.  19801*
*(302) 655-0477    FAX: (302) 655-0497*

*Original File 042804GC.KFC, 173 Pages*
*Min-U-Script® File ID: 1105590857*

# Word Index included with this Min-U-Script®

Gregory K. Callaway,
April 28, 2004

CONFIDENTIAL
C.A. # 02C-04-263 (JRS)

Olson v.
Motiva, et al.

---

Page 3

[1] APPEARANCES: (Cont'd)

[2]   PATRICK D. McVEY, ESQ.

   RIDDELL WILLIAMS P.S.

[3]      1001 Fourth Avenue Plaza - Suite 4500

   Seattle, Washington  98154

[4]   for the Defendant Fisher Controls

   International, Inc.

[5]

   DONALD M. DAVIS, ESQ.

[6]   MARGOLIS EDELSTEIN

      The Curtis Center

[7]   Independence Square West

      Philadelphia, Pennsylvania 19106

[8]   for the Defendant J. J. White, Inc.

[9]   MICHELE PORCELLI, ESQ.

   HOHN & SCHEUERLE

[10]      Eleven Penn Center - Suite 2901

      Philadelphia, Pennsylvania 19103

[11]   for the Defendant Parsons Energy

   and Chemicals, Inc.

[12]

   SEAN J. BELLEW, ESQ.

[13]   COZEN & O'CONNOR

      1900 Market Street

[14]   Philadelphia, Pennsylvania 19103

   for the Defendant Praxair, Inc.

[15]

   ALEXANDER EWING, JR., ESQ.

[16]   GOLLATZ GRIFFIN & EWING

      213 West Miner Street

[17]   West Chester, Pennsylvania 19381

   for the Defendant Saint-Gobain

[18]   Performance Plastics

[19]   MARK CARLISLE LEVY, ESQ.

   SAUL EWING

[20]   Centre Square West

   1500 Market Street - 38th Floor

[21]   Philadelphia, Pennsylvania 19102

   for the Defendants Texaco Development

[22]   and Texaco Aviation

[23]

[24]

---

Page 4

[1] APPEARANCES: (Cont'd)

[2]   CHASE T. BROCKSTEDT, ESQ.

   MURPHY SPADARO & LANDON

[3]      1011 Centre Road - Suite 210

   Wilmington, Delaware  19805

[4]   for the Defendant HydroChem

   Industrial Services, Inc.

[5]

   R. STOKES NOLTE ESQ.

[6]   NOLTE BRODOWAY & SALTZ, P.A.

      Three Mill Road - Suite 304

[7]   Wilmington, Delaware  19805

   for the Third-Party Defendant

[8]   Conectiv Operating Systems

[9]

[10]      GREGORY K. CALLAWAY,

[11]   the deponent herein, having first been

[12]   duly sworn on oath, was examined and

[13]   testified as follows:

[14]      EXAMINATION

[15] BY MR. HANDLON:

[16]   Q.  Mr. Callaway, my name is Joe Handlon.  I

[17] represent Ron Olson in this matter.

[18]      I'll just give you a couple of rules

[19] before we begin the deposition.  The rest of the

[20] people in the room are defense attorneys representing

[21] various defendants that have been named in this

[22] lawsuit.  I'll ask you a couple of questions and you

[23] can answer and then various defendants may have

[24] questions for you afterwards.

---

Page 5

[1] Do you understand that?

[2]   A:  Yes, sir.

[3]   Q:  It's important that you understand my questions

[4] so if you don't understand them at any time, just ask

[5] me to repeat or rephrase them and I will. Is that

[6] okay?

[7]   A:  That's fine.

[8]   Q:  Also, it's important that you let me finish

[9] asking questions before you answer them so the court

[10] reporter can take them down.

[11]   A:  (The witness nodded.)

[12]   Q:  I understand you have some back pain today. Is

[13] that right?

[14]   A:  Yes.

[15]   Q:  If at any time today you want to take a break,

[16] just let me know and we will take a break. If you

[17] want to stand up at any time during the deposition,

[18] that's fine.

[19]      Is that okay?

[20]   A:  Okay.

[21]   Q:  Are you on any medication today for that, sir?

[22]   A:  Just anti-inflammatories right at the moment.

[23]   Q:  Can you give me some information about your

[24] educational background starting with high school?

---

FCI/MOA 0220

Olson  v.
Motiva, et al.

**CONFIDENTIAL**
C.A. # 02C-04-263 (JRS)

Gregory K. Callaway
April 28, 2004

---

Page 22

[1] Q: Did you ever have any training on how to
[2] operate that valve?
[3]   A: No, sir.
[4]   Q: There's been testimony about a meeting with
[5] Praxair people in or around November of 1999. Do you
[6] recall, did you attend a meeting at the end of 1999?
[7]   A: I can't remember.
[8]   MR. BELLEW: Objection.
[9]   Q: Did you ever receive any training regarding
[10] procedures for commissioning the high-pressure oxygen
[11] line between the gasifier and the ASU?
[12]   A: Could you rephrase that question? It's like
[13] yes and no. I'm sorry. I really am. I understood —
[14] I understand how 629 was going to get oxygen up to the
[15] gasification unit.
[16]   Q: Where did you get that understanding?
[17]   A: Basically word of mouth from people that
[18] were — it was common knowledge we were going to
[19] eventually open this valve. This line had been
[20] cleaned, to my knowledge, had been purged with
[21] nitrogen. What things they used to clean that line I
[22] could not tell you. I mean because that's not my job.
[23] That's out in the field.
[24]   But knowing how that valve operates and

---

Page 23

[1] what it does and what it won't do, yes, I did know
[2] that. Now, specifically who told me that, I cannot
[3] tell you that, sir.
[4]   Q: I will get to May 20, 2000 in just a little
[5] bit. I just wanted to ask you prior to that date did
[6] you ever have any conversations with anyone from
[7] Praxair regarding opening that valve?
[8]   A: Prior to that day?
[9]   Q: Yes.
[10]   A: No, sir.
[11]   Q: Did you ever have any conversations with Gary
[12] DelGrego prior to May 20, 2000 about opening the
[13] valve?
[14]   A: I can't remember if specifically it was Gary.
[15]   Q: You recall there was word-of-mouth discussions
[16] about how to operate that valve? Is it fair to say
[17] that you just can't remember?
[18]   A: Yes, sir, I just can't remember the specific
[19] individual who said what.
[20]   Q: I asked you a question earlier about training,
[21] training regarding procedures for commissioning the
[2] line between the ASU and the gasifier, and you asked
[23] me to be a little bit more specific.
[24]   You're familiar with the high-pressure

---

Page 24

[1] oxygen line between the ASU and the 629 valve and then
[2] from the 629 valve to the gasifier? Are you familiar
[3] with that?
[4]   A: Yes, sir.
[5]   Q: Are you familiar with what commissioning of
[6] that line means?
[7]   A: My understanding of commissioning that line was
[8] for it to be cleaned and purged of any foreign
[9] material that could possibly cause an unwanted event.
[10]   Q: I'm going to take you to May 20, 2000. Do you
[11] remember when you arrived at work that day?
[12]   A: Excuse me?
[13]   Q: Do you remember when you arrived at work on May
[14] 20, 2000?
[15]   A: That would be 6:00 a.m. in the morning. I was
[16] on day shift.
[17]   Q: Can you describe just generally what you were
[18] doing that day prior to, say, later in the day at
[19] around 4:00 o'clock when the valve was opened? Can
[20] you describe for me what you were doing that day?
[21]   A: I was on the air plant. Prior to opening the
[22] 629 valve, it was just maintaining purities in the air
[23] plant. The BLOC was on. It was loaded up with
[24] oxygen. The base load oxygen compressor was on and it

---

Page 25

[1] was loaded with oxygen.
[2]   Q: Did you participate in that procedure?
[3]   A: No. It was already done when I — the BLOC was
[4] already under 1150 pounds of oxygen when I walked
[5] through the door. I did not put it on there.
[6]   Q: That was on prior to 6:00 in the morning?
[7]   A: Yes, sir. Well, yes.
[8]   Q: Did you ever have any meetings that day to
[9] discuss sending high-pressure gaseous oxygen from the
[10] ASU to the gasifier?
[11]   A: Meetings that day?
[12]   Q: That day.
[13]   A: No, not, not a formal meeting where I was
[14] pulled out of the control room or anything like that.
[15]   Q: I guess at some point during that day you
[16] learned that the high-pressure gaseous oxygen was
[17] going to be delivered to the gasifier. Is that fair?
[18]   A: Not necessarily. The high-pressure oxygen was
[19] not going to be delivered to the gasifier. It was
[20] going to be pressurized up to the eighth deck or the
[21] sixth deck that was the plan.
[22]   Q: When did you first learn that plan?
[23]   A: Well, we knew that it was coming and I found
[24] out I think I found out about it that morning. We

FCI/MOA 0221

---

Gregory K. Callaway
April 28, 2004

CONFIDENTIAL
C.A. # 02C-04-263 (JRS)

Olson v.
Motiva, et al.

---

Page 26

[1] were going to — the line has been cleared. All the
[2] preventive things that were supposed to have been done
[3] out in the field were done and it was okay, we're
[4] going to open this valve.
[5] And I do know prior to it that the valve
[6] would only open 10 percent until the pressure on both
[7] sides of the valve was within 10 pounds of itself, of
[8] each side. And you couldn't open the valve based on
[9] the safety logic built into the system, the valve
[10] couldn't open any more than 10 percent anyway until
[11] you were pretty much equal in pressure.
[12] Q: Was it your understanding that that was a
[13] Praxair procedure?
[14] MR. BELLEW: Objection.
[15] A: I don't know if that was a Praxair procedure or
[16] whose procedure it was.
[17] Q: You said you learned early in the morning that
[18] the valve was going to be opened. Is that correct?
[19] A: Yes, sir.
[20] Q: Do you recall who had those conversations with
[21] you?
[22] A: No, sir.
[23] Q: Did Roger Hawley at any time say,
[24] "Mr. Callaway, we're going to open this valve later

Page 27

[1] today"?
[2] A: Sir, I can't be — I can't remember exactly
[3] who.
[4] Q: Do you recall an oxygen line test and
[5] calibration procedure?
[6] A: I am aware that something, what you just
[7] described had taken place previous to this day. I
[8] Q: I'll actually show you the document later. I
[9] just want to know if you're familiar with that term.
[10] A: Okay. I just know the line had been cleaned
[11] and pressurized with nitrogen prior to this.
[12] Q: Do you recall who did that?
[13] A: Specifically, no, sir.
[14] Q: Do you know what company was in charge of that?
[15] A: Well, I assumed that — no, I don't know.
[16] Q: I don't want you to guess or assume.
[17] A: Excuse me?
[18] Q: I don't want you to guess or assume. If you
[19] know something, you can tell me.
[20] A: I don't know who did it. I am — other than
[21] the fact that it had been done. That was out in the
[22] field.
[23] Q: When you were operating the 629 valve on May
[24] 20, who was present in the control room?

Page 28

[1] A: Okay. There was the guy Paul DePaula, who was
[2] sitting either on my right or left. I believe in the
[3] control room with me was Mike Waters, Nick Gregorcyk.
[4] Q: Can you spell his last name?
[5] A: Gregorcyk?
[6] Q: Yes.
[7] A: It's G-o-r — wait a minute. G-r-e-g-o-
[8] r-y-c-k (sic), I believe. But these individuals
[9] weren't on — they were on different screens in the
[10] control room.
[11] Q: Is the control room — is there actually two
[12] control rooms?
[13] A: Yes, sir, there is.
[14] Q: What control room were you in?
[15] A: I'm predominantly number 2 control room.
[16] Q: Were you in number 2 control room that day?
[17] A: Yes, sir.
[18] Q: Was Mike Waters in number 1 control room?
[19] A: No. Mike Waters was in number 2 control room.
[20] See, number 2 control room — one position is for the
[21] operator to assist the person in number 1 control room
[22] control the existing plant, the steam headers and
[23] things like that, the boilers and whatnot. He has no
[24] direct relation to the repowering project. You know,

Page 29

[1] he doesn't monitor, take numbers and things like that.
[2] I believe the day in question we had an
[3] extra person in the control room, I think, and please
[4] don't hold me to that. But I do know that I was on C
[5] shift and that was Mr. Waters and Nick Gregorcyk were
[6] on that end. And besides Paul DePaula, I think that
[7] was it.
[8] Q: Was Gary DelGrego in the room at any point?
[9] A: No. I don't believe he was when the incident
[10] took place.
[11] Q: He testified that he came up to the control
[12] room at some point when you were operating the valve.
[13] Does that refresh your recollection as to
[14] whether he was there or not?
[15] MR. LEVY: Objection to form.
[16] A: No, sir. I can't remember if he was there. I
[17] don't think he was, but I can't remember if he was
[18] there during the time that we started working the
[19] valve.
[20] I'm sure he came up. He could have been
[21] up prior, after. I don't know.
[22] Q: You just don't recall if he was in the control
[23] room that day at all?
[24] A: Sir, he was at work that day. I do remember

---

FCI/MOA 0222

Olson v.
Motiva, et al.

CONFIDENTIAL
C.A. # 02C-04-263 (JRS)

Gregory K. Callaway
April 28, 2004

**Page 46**

[1] happened.

[2] Q: Do you know, would he be programed into program

[3] 4?

[4] A: Yes, sir. You can select what channel you want

[5] to be in. It's not a specific program for your job

[6] title or anything like that.

[7] Q: Do you remember any other Praxair people on the

[8] site on May 20 besides Mr. Freuler and Mr. DePaula?

[9] A: No, sir.

[10] Q: Mr. Whitacre?

[11] A: No, sir.

[12] MR. BELLEW: Objection.

[13] Q: Just tell us what happened after you called Ron

[14] Olson to check the valve.

[15] A: Okay. I called Ron Olson to check the valve,

[16] told him what I had done, where we were at. The valve

[17] basically was not responding. From what I could see,

[18] the valve had not been responding. Okay?

[19] So Ronny went out and here's a little gray

[20] area, but I think it's irrelevant. Ronny went out and

[21] checked it and called back and said, "The instrument

[22] air is valved in," meaning the instrument air was in

[23] service. I do not know if Ron Olson opened the

[24] instrument air line, which would have been the correct

**Page 47**

[1] thing to do, or the instrument air lines had been

[2] valved in.

[3] And the reason I am saying that is because

[4] even till this day when you make that call to an

[5] operator, is this instrument air valved into that,

[6] they will call you back and say yes, it's valved in

[7] and from your day-to-day job it doesn't make a

[8] difference if he valved in or not. You want it valved

[9] in. That means okay, that eliminates one reason

[10] something is not working or it — whatever.

[11] Q: Are you saying that you're not sure whether or

[12] not —

[13] A: I'm not sure if Ron Olson went and put the

[14] instrument air in service or the instrument air had

[15] already been in service and the valve was not

[16] responding the way it should have.

[17] Q: To the best of your recollection sitting here

[18] today, Ron said over the walkie-talkie the instrument

[19] air valve is in?

[20] A: The instrument air is valved in.

[21] Q: And then what happened after Mr. Olson said

[22] that?

[23] A: Then I told Ronny, I said, "Okay. I'm going to

[24] try it again. I'm going to put some load on the

**Page 48**

[1] valve," which means I'm going to send it a command to

[2] open up. And I did the same command in the same

[3] measure of control, which is 1 to 2 percent, on B to

[4] tell, to get something happening on A. Well, I wanted

[5] the valve to open. Okay? So I sent it a command of 2

[6] percent. Nothing happened. So okay. And do you know

[7] what? That's not unusual for any valve in the plant

[8] at 2 percent not to see something happen. Sometimes

[9] it might take 2 or 3 percent to get something to get

[10] going or 5 percent.

[11] Anyway, nothing happened. I put a little

[12] more load on it, 2 percent. Still I saw nothing

[13] happening, no feedback signalling A. And I called

[14] Ronny.

[15] Do you want me to shut up?

[16] Q: No, I don't want you to shut up. I just want

[17] to ask for the record when you're referring to A and B

[18] a couple of times there, you're referring to Exhibit

[19] 203?

[20] A: Right. I'm referring to on B I sent a

[21] command —

[22] MR. NOLTE: What he wants to know is he

[23] just wants to identify we're still looking at that

[24] Exhibit No. 203.

**Page 49**

[1] THE WITNESS: Yes, sir. We're still

[2] looking at this exhibit.

[3] BY MR. HANDLON:

[4] Q: Okay. Continue.

[5] A: So I get up to about 4 percent. I was at 4

[6] percent. And I had asked Ron, since he was out there,

[7] I said, "Ron, do you see any movement on the valve?"

[8] Ronny said, "Not from here. Let me go look."

[9] I said, "Okay." So I waited a few

[10] minutes. Ronny called me back and said, "The valve

[11] has not moved." I, in turn, told Ronny, I said,

[12] "Okay, Ronny. I'm going to put a little bit more load

[13] on the valve." And I took it up 2 percent, 1 percent,

[14] a very small, 1 to 2 percent.

[15] So at this point I'm up to I think I was

[16] up to 4, 5 percent. I told Ronny that I'm going to

[17] put some more load on it. I was up to 7 percent. And

[18] I asked Ron Olson "Do you see any movement on the

[19] valve?" Because I have not seen any feedback on A to

[20] indicate that the valve was moving.

[21] Ronny said, "No, I don't see anything."

[22] So I told Mr. Olson again — and keep in mind I had no

[23] idea — I knew Ronny was close enough to see the

[24] valve, but I didn't know exactly where he was at in

FCI/MOA 0223

Gregory K. Callaway                         CONFIDENTIAL
April 28, 2004                          C.A. # 02C-04-263 (JRS)                    Motiva, et al.

---

Page 50

[1] the field because I'm in the control room.

[2]    Q: Let me ask you a question there.

[3]    Why do you say you knew he was close

[4] enough to see the valve?

[5]    A: Because he was looking to see if the valve

[6] actuator was moving up or twisting or whatever it was

[7] going to do to indicate that the valve, that the

[8] physical positioner on the valve was going to open up

[9] regardless of what this electronic signal was telling

[10] me. Basically I was asking for physical verification

[11] if the valve was moving.

[12]    Q: To your knowledge, he could physically verify

[13] that the valve was moving?

[14]    A: To my knowledge, Mr. Olson could not — he had

[15] the ability to verify that the valve was moving, but

[16] his indication to me was that the valve was not

[17] moving.

[18]    Q: Okay.

[19]    A: And I told Ronny again, I said, "Okay, I'm

[20] going to go a little bit more on it." I was at 7

[21] percent. I took the valve — as soon as I went to 9

[22] percent on the valve, that's basically when all hell

[23] broke loose.

[24]    Q: You never went above 9 percent?

Page 51

[1]    A: No, sir. Now, the Galaxy, which is the

[2] recording mechanism or it records everything that the

[3] Foxboro does for everything throughout the refinery,

[4] says 10 percent, but I'm telling you on the Foxboro I

[5] didn't go any higher than 9 percent on the valve.

[6]    Q: When you say when all hell broke loose, what

[7] did you hear from Ronny, if anything?

[8]    A: What I had heard was right above — if everyone

[9] can look at where I have B and A, 629. Right below

[10] that is a control. There's a big S. Do you see what

[11] I am talking about?

[12]    Q: The S —

[13]    A: That S is a safety triangle.

[14]    Q: For the record, you're referring to the S below

[15] what you have marked as B on Exhibit 203?

[16]    A: Yes, sir. It's right on the — it's a little

[17] hat right on top of the valve. It's a triangle right

[18] on top of the valve indication itself.

[19]    MR. NOLTE: You're saying triangle. I'm

[20] seeing it as a diamond.

[21]    THE WITNESS: I'm sorry. Diamond.

[22] Diamond.

[23]    A: Safety diamond. That diamond changed colors.

[24] It went from red to green. And I had said to

Page 52

[1] Mr. DePaula, I said, "Well, something's happening."

[2] And I didn't know what and right about within a second

[3] Ronny called over the radio screaming "Shut the valve,

[4] shut the valve."

[5]    So that's when I went back to B and the

[6] control block was already opened on B and I rammed it

[7] closed. I mean, I took off the load after that valve

[8] as soon as I could based on what I was hearing

[9] Mr. Olson saying. I had enough experience that you

[10] know when somebody is in panic. I took the load off

[11] the valve.

[12]    So I called Ronny back and I asked him

[13] "Ronny, what's going on?" And he is still screaming.

[14] He calls back and he says, "Shut it down, shut it

[15] down."

[16]    And...

[17]    Q: Did you ever hear him say shut the compressor?

[18]    A: No.

[19]    Q: I'm sorry.

[20]    MR. NOLTE: Take a moment. Take your

[21] time.

[22]    Q: Do you want to take a break, sir?

[23]    A: So anyway I told him, I said, "Ronny, it is

[24] shut down." We're still thinking valve.

Page 53

[1]    So anyway within seconds after that Tom

[2] Freuler, and I recognized his voice on the radio, was

[3] very specific and he said, "Shut the air plant down.

[4] We got a man down. Shut the ASU down." There was no

[5] questioning that. There was no pronoun used. "Shut

[6] it down." And that's when Mr. DePaula went over to

[7] the wall and tripped the base load air compressor

[8] which caused the air separation unit to bottle up,

[9] bang, it was down.

[10]    And then Mr. DePaula went outside to

[11] assist. And that's when we in the control room

[12] between my people that I was working with, we called

[13] 911, we called the refinery emergency number, 777, and

[14] got everybody as much help, got Ronny as much help as

[15] we could.

[16]    Q: Let me just back up a second.

[17]    When Ron was at the valve and you were

[18] ramping it up, if you will, the second time, did you

[19] hear anyone over the radio say stop?

[20]    A: No, sir.

[21]    Q: Did Mr. DePaula at any time say stop?

[22]    A: No, sir.

[23]    Q: How far away was the mechanism that Mr. DePaula

[24] used to trip the BLOC from where you guys were at?

---

FCI/MOA 0224

# EXHIBIT 36

CONFIDENTIAL                    1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON, and CAROL          ) CONFIDENTIAL
OLSON, his wife,                    )
                                    )
        Plaintiffs,                 )
                                    ) Civil Action No.
V.                                  ) 02C-04-263 (JRS)
                                    )
MOTIVA ENTERPRISES L.L.C.;          )
BATTAGLIA MECHANICAL, INC.;         )
FISHER CONTROLS INTERNATIONAL,      )
INC.; HYDROCHEM INDUSTRIAL          )
SERVICES, INC.; JJ WHITE, INC.;     )
NORTHEAST CONTROLS, INC.;           )
PARSONS ENERGY AND CHEMICALS        )
GROUP, INC.; PRAXAIR, INC.; TEXACO  )
AVIATION PRODUCTS LLC; DAIKIN       )
INDUSTRIES, LTD.; SAINT-GOBAIN      )
PERFORMANCE PLASTICS; RIX           )
INDUSTRIES, INC.; TEXACO GLOBAL     )
GAS AND POWER; TEXACO               )
DEVELOPMENT CORPORATION;            )
GARY DELGREGO,                      )
                                    )
                                    )
        Defendants,                 )
                                    )
NORTHEAST CONTROLS, INC.,           )
                                    )
        Third-Party Plaintiff,      )
                                    )
v.                                  )
                                    )
CONECTIV OPERATING SYSTEMS,         )
                                    )
        Third-Party Defendant.      )


DEPOSITION OF BERT M. CAPPELLINI


WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



FCI/MOA 0225

CONFIDENTIAL                                    4

```
 1    APPEARANCES:  (Cont'd)

 2          MARK CARLISLE LEVY, ESQ.
            JAMES A. KELLER, ESQ.
 3          SAUL EWING
               Centre Square West
 4             1500 Market Street - 38th Floor
               Philadelphia, Pennsylvania  19102
 5             for the Defendants Texaco Development
               and Texaco Aviation
 6
            CHASE T. BROCKSTEDT, ESQ.
 7          MURPHY SPADARO & LANDON
               824 Market Street
 8             Wilmington, Delaware  19899
               for the Defendant HydroChem
 9             Industrial Services, Inc.

10          GREGORY A. INSKIP, ESQ.
            POTTER ANDERSON & CORROON
11             Hercules Plaza
               1313 North Market Street
12             Wilmington, Delaware  19801
               for the Third-Party Defendant
13             Conectiv Operating Systems

14                  -   -   -   -   -

15                BERT M. CAPPELLINI,

16    the deponent herein, having first been

17    duly sworn on oath, was examined and

18    testified as follows:

19                   EXAMINATION

20    BY MR. KELLER:

21      Q.    Sir, could you state your full name for the

22    record, please?

23      A.    Bert Cappellini.

24      Q.    Could you spell your last name?
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

FCI/MOA 0226

1    A.   C-a-p-p-e-l-l-i-n-i.

2         MR. WAGNER:  As to stipulations, just as

3    with Mr. Paolucci this morning, we will reserve the

4    right for Mr. Cappellini to read and sign.

5    BY MR. KELLER:

6    Q.   Mr. Cappellini, have you had your deposition

7    taken before?

8    A.   No.

9    Q.   Let me give you a few instructions regarding

10   the deposition.

11        MR. KELLER:  And I did promise to put on

12   the record, I'm sorry, that counsel for HydroChem is

13   not in the room and we are proceeding and we will put

14   on the record when he's back.

15   BY MR. KELLER:

16   Q.   I'm sorry, Mr. Cappellini.  I'm going to be

17   asking you a series of questions.  If at any point you

18   don't understand my question or you can't hear my

19   question, let me know and I will repeat it or rephrase

20   it for you.

21        Is that acceptable?

22   A.   Yeah.

23   Q.   If you do answer my question, sir, I'm going to

24   assume that you understood it and heard it.  Is that



Bert M. Cappellini  -  CONFIDENTIAL    64

1   A.   Well, based on an ANSI 600 pound valve

2   requested, there are ANSI temperature and pressure

3   charts for different materials that would fall under

4   that.

5   Q.   And would you be the person to go to those

6   charts and then recommend to the customer you're going

7   to need to use X, Y, Z type of flange with this or do

8   you leave that up to the customer?

9   A.   Well, we have in Fisher catalogs there are

10  those charts listed, pressure and temperatures, and

11  you go back to the customer and say this pressure and

12  temperature for this material will not fit into this

13  rating; you have to go to a different material or

14  something, a different rated flange.

15  Q.   Let's ask specifically now for the 629 valve.

16  Do you recall having that discussion with anybody?

17  A.   Yes.

18  Q.   Who did you have that discussion with?

19  A.   With Bhim Bhakoo.

20  Q.   And what did you guys discuss?

21  A.   What I recall was him requesting an ANSI 600

22  class valve and having 1300 pounds pressure at that

23  temperature and knowing it was oxygen and looking at a

24  Monel material will not fit the ANSI pressure chart at



1    Q.    And what does the 2831 signify?

2    A.    That's the maximum Cv published by Fisher

3    catalog for a 12-inch butterfly.

4    Q.    And how about F1?

5    A.    Those are flow coefficients that are published

6    by Fisher when doing calculations.

7    Q.    And that's something again that you're pulling

8    out of a catalog or out of a bulletin?

9    A.    Correct.  Both.

10   Q.    How about Xt?

11   A.    The same thing.

12   Q.    And what does Xt mean?

13   A.    I believe that's the pressure recovery factor.

14   Q.    The next four lines are for disk material, seat

15   material, guide material and stem material.  The

16   information on each of those entries, is that

17   something that you select?

18   A.    Yes.

19   Q.    And let's start with line 37 for disk material.

20   How do you determine what type of material you're

21   going to put in that line?

22   A.    That material is based on what valve is

23   selected, the body material that was selected, you

24   know, what the trim requirement is because of being



1    oxygen service.

2        Q.    Lines 38 through 40, the same thing?  You

3    select them based on the same factors?

4        A.    Correct.

5        Q.    Line 41 and 42, what do those lines tell us?

6        A.    Those lines are normally blank in the program.

7    Praxair had requested that note to be put on there

8    signifying they needed two ASCO solenoid valves in the

9    air lines on the valve.

10       Q.    What does that mean, ASCO solenoid valves?

11       A.    It's a little pneumatic electronic device

12   that's put in the air lines to operate the valve.

13       Q.    Okay.  And then on 42 it says piped per P&ID

14   3051.

15            Do you know what that means?

16       A.    I believe that was Praxair requested that to be

17   put on there and basically it's the piping and

18   instrument diagram that they have and they referenced

19   it I guess 3051.

20       Q.    Have you for this particular project ever

21   looked at P&ID 3051?

22       A.    Yes.

23       Q.    Did you look at that prior to completing this

24   ISA form?



1    A.   I wouldn't say always handed.  Again, he could

2  have faxed it.

3    Q.   That's a good clarification.

4        Did Mr. Bhakoo also provide you with a

5  copy of his marked-up changes?

6    A.   I would say yes.

7    Q.   Do you ever recall an occasion where Mr. Bhakoo

8  just provided you change information orally but didn't

9  actually hand you his marked-up comments?

10    A.   That's possible.  It could have happened.

11    Q.   Do you recall, do you have a specific

12  recollection of that happening?

13    A.   I don't know of a specific incident, but I've

14  had phone conversations with him requesting changes.

15    Q.   If Mr. Bhakoo did provide you with his

16  handwritten comments on an ISA spec sheet, would you

17  put a copy of what Mr. Bhakoo handed to you in the

18  project file?

19    A.   Yes.

20    Q.   Did you check in connection with this

21  litigation to see if you had any marked-up spec sheets

22  from Mr. Bhakoo relative to the Delaware City project?

23    A.   Yes.

24    Q.   Did you find any?



FCI/MOA 0231

1    A.    Only what's in what I have supplied already.  I

2    mean, he's given me -- there is some spec sheets

3    marked up with his handwriting on them.

4    Q.    So whatever you found we should probably have?

5    A.    Yeah.

6          MS. CLARK:  If requested.

7          MR. KELLER:  Okay.

8    BY MR. KELLER:

9    Q.    If requested, we should have it?

10    A.    Yeah.

11    Q.    But you gathered it and gave it to somebody,

12    right?

13    A.    Yeah.

14    Q.    Did you give that to Mike Peters?

15    A.    I believe he has a copy of it.

16    Q.    Okay.  Am I correct that sometimes the back-

17    and-forth, am I correct that sometimes there might be

18    a back-and-forth between you and Mr. Bhakoo where

19    there's more than one round of changes?

20    A.    Yes.  Yeah.

21    Q.    And then at some point I assume that the

22    decision is made that Mr. Bhakoo is happy with the

23    spec sheet as drafted.  Is that right?

24    A.    Yes.



1    A.    Meaning someone at Praxair -- I believe Praxair

2    had a review and approval process for any spec sheet

3    that was sent to them.  And someone probably -- they

4    usually had someone that would check over the spec

5    sheet and they put their initials.  Someone would

6    review it and they would put their initials and then

7    someone would approve it.

8    Q.    Did you understand by Mr. Bhakoo putting his

9    initials in those two columns that he was the person

10   who had checked and reviewed the spec sheet?

11   A.    Yes.

12   Q.    So you receive a document like Exhibit 118 and

13   Mr. Bhakoo has approved, checked and reviewed and the

14   next thing you will receive is an order confirming

15   that he's ordered the valve.  Is that correct?

16        MR. WAGNER:  We're now back on the

17   general?

18        MR. KELLER:  General.  Yes.  I'm just

19   using this right now as an example because it's

20   easier.  So I apologize for jumping back and forth.

21        MR. WAGNER:  That's okay.  I'm just trying

22   to keep it clear because some of your questions do

23   seem to be specific to this particular document and

24   yet I gather your line of questioning right now is

1    not.

2              MR. KELLER:  It is.  It's hard to --

3              MR. WAGNER:  You said it is.

4              MR. KELLER:  It is general.

5              MR. WAGNER:  It is general.

6              MR. KELLER:  It is general at this point,

7    yes.  That's as vague as it can be.

8    BY MR. KELLER:

9      Q.   Mr. Cappellini, when you received the order

10   form what do you do with it, if anything?

11     A.   Well, if the order had come in, being an

12   account manager at the time or being an account

13   manager or an applications engineer, I would not

14   process that order.  That would be processed by an

15   inside sales engineer.

16     Q.   Do you know who the inside engineer persons

17   were who would process orders in let's say the spring

18   of 1998?

19     A.   I believe that would be Mark Paolucci.

20     Q.   Do you know what Mr. Paolucci would do after he

21   would process a particular order, what he would do

22   with the order after that point?

23     A.   Well, he would detail it, I mean set up the

24   order entry sheet.  I believe there's one here.  So



1    the girls, the order entry sales associates could type

2    that into the Fisher system and electronically send it

3    to Fisher, the order.

4    Q.    You said you think there's one here, an order

5    entry form.  Which document do you think reflects

6    that?

7    A.    It would be this document here (indicating).

8    Q.    For the record the witness is referencing Olson

9    131.

10          Then it's your understanding that the

11    order clerks would take the information from

12    Mr. Paolucci's order form and do what with it?

13    A.    Type it into -- they would take this order

14    header sheet along with these price worksheets and

15    type it into the Fisher OPS system and electronically

16    send it to Fisher.

17    Q.    What is the Fisher OPS system?

18    A.    It's the -- I'm not sure of the exact name for

19    it, but it's where you electronically send in orders

20    to Fisher what you're ordering basically.  I believe

21    it says order processing system, if I'm not mistaken.

22    Q.    And is it something where you enter your order

23    on line and then you send it to Fisher electronically

24    or do you then have to print it out and send it

1    separately?

2      A.    No.  It's electronically sent.

3      Q.    Do you know what information the clerks are

4    filling out on the Fisher OPS system when they place

5    an order?

6      A.    I'm not sure what you mean by that.

7      Q.    Have you ever seen the Fisher OPS system?

8      A.    Yes, I have.

9      Q.    Are you aware of what the fields are in the

10   system?

11     A.    No, I'm not.  I've never done order entry so I

12   don't know.

13     Q.    Let's take a look at Exhibit 131 which you have

14   just referenced for a second.

15            Does Exhibit 131, if that's what the order

16   clerks are using to enter the order, does it contain

17   information about the fluid, the applicable fluid for

18   this valve, in other words, oxygen versus air versus

19   liquid?

20     A.    No.

21     Q.    Does 131 tell you about the particular

22   materials to be used in the valve?

23     A.    Well, the first sheet, no.  But if you went to

24   these sheets?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.   Sure.  You're referencing the second page of

2    Exhibit 131.

3    A.   I mean, a number on there could, you know, does

4    signify materials, but it doesn't tell you unless you

5    looked it up in another book.

6    Q.   Well, let's look specifically now at Exhibit

7    131 and specifically the second page of Exhibit 131.

8              What on that page, NEC 135, will tell me

9    what material is to be used for the disk in the valve?

10   A.   You would have to go down to the bottom where

11   it has that matrix number.

12   Q.   Okay.

13   A.   And then go through that matrix number and that

14   matrix chart and look up the disk number and see what

15   the material was.

16   Q.   Would that matrix number as you understand it

17   also tell me what the seat material, guide material

18   and stem material should be for the valve?

19   A.   Yes.

20   Q.   Do you have any -- and I'm speaking generally

21   now -- do you have any direct contact with Fisher

22   after the order clerk sends the document to Fisher by

23   way of the OPS system to discuss the specifications

24   for the valve?



Bert M. Cappellini  -  CONFIDENTIAL        93

1          MR. McVEY:  I object to the form.

2          MR. WAGNER:  You can answer.

3     A.   I'm not sure what you...

4     Q.   Okay.  As I understand it, you provide your

5     ISA, the approved ISA spec sheet leads to an order

6     form which a sales associate then types up which goes

7     to the order clerks which they then put into the OPS

8     system which then goes to Fisher.  Is that a fair

9     summary?

10    A.   Correct.

11    Q.   After the order is transmitted electronically

12    to Fisher, do you place a call to confirm that they

13    got the order?

14    A.   No.

15    Q.   Do you typically receive a call confirming that

16    they got the order?

17    A.   No.

18    Q.   Do you typically have discussions with Fisher

19    about the order?

20    A.   No.

21    Q.   In a typical situation will you not speak with

22    Fisher again before the valve is installed?

23    A.   Usually no, we would not speak with them.

24    Q.   Let's look on Exhibit 131 at that matrix number



WILCOX & FETZER LTD.
Registered Professional Reporters

Bert M. Cappellini  -  CONFIDENTIAL        94

1    that you had referenced.

2                Are you able to, looking at Olson Exhibit

3    133, find for me the information from that matrix

4    number?

5        A.    You know, if I could find the matrix which was

6    in --

7        Q.    I believe it's on the fourth page.

8        A.    The fourth page, yes.

9                MR. WAGNER:  The fourth page of Exhibit

10   133, just for the record.

11               MR. KELLER:  The fourth page of Exhibit

12   133, right.

13               Off the record for one second.

14               (Discussion off the record.)

15   BY MR. KELLER:

16       Q.    Mr. Cappellini, looking at Exhibit 131 and,

17   particularly, the matrix number that you've identified

18   for us, the first number is A11.  And I understand

19   that to be the type of valve, correct?

20       A.    Model number, sure.

21       Q.    The next entry is 12.  What does that refer to?

22       A.    12 is the size.

23       Q.    Okay.  So now if I'm looking at the matrix over

24   on Exhibit 133, the top left-hand column lists valve



1    sizes, correct?

2       A.    Correct.

3       Q.    So would I now go down to 12-inch?

4       A.    Yes.

5       Q.    What's the next thing I'll do when I have that

6    information?  What do I do next?

7       A.    You look at the next number, which is 1, which

8    is the product and it says standard soft seal.

9       Q.    Okay.  And then the next number is 5?

10      A.    5, which is the pressure class which is ANSI

11   600.

12      Q.    Okay.  Then the next number is 1?

13      A.    Right.

14      Q.    What does that reference?

15      A.    Body style, which is wafer.

16      Q.    Okay.  And there's a dash and then the next

17   entry is a C.  What does that reference?

18      A.    Body material which is Hastelloy C.

19      Q.    And then the next entry is a B.  What does that

20   reference?

21      A.    Disk material.

22      Q.    And for this particular entry what's disk

23   material B?

24      A.    It says Hastelloy B.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.   Then the next entry is it looks like a 7.  What

2  does that tell us?

3    .A.   Plating/overlay requirement on the body/disk.

4  7 means none/hard coat.

5    Q.   And what is that category referring to,

6  plating/overlay requirement?

7    A.   Meaning the none is that there's no hard

8  coating put onto the interior of the valve and then

9  the slash is for the disk, which the disk has hard

10  coating plated onto the disk.

11    Q.   The next entry is a 4.  What does that tell us?

12    A.   Stem.

13    Q.   And what is stem material category 4?

14    A.   Inconel 718.

15    Q.   And the next entry is a 3.  What does the 3

16  tell us?

17    A.   That's the bearing material which is PTFE

18  composite.

19    Q.   And then there's a dash and then the next entry

20  is a 3.  What does the 3 tell us?

21    A.   The seal ring.

22    Q.   And what's seal ring entry 3?

23    A.   Tef-Zel.

24    Q.   And the next entry is a 1.  What does that tell



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    us?

2        A.    Backup ring material.

3        Q.    And what's backup ring material category 1?

4        A.    Viton.

5        Q.    And there's a dash and then the next entry is a

6    3.  What does that tell us?

7        A.    Packing material.

8        Q.    And what's packing material category 3?

9        A.    PTFE/jam type.

10        Q.    What does packing material refer to?

11        A.    It's the Teflon rings that are put inside the

12    bonnet where the stem goes into the valve to keep it

13    from, anything from leaking into the atmosphere

14    basically.

15        Q.    Okay.  And then referring back to Exhibit 131,

16    there's the dash and then the next entry is a zero.

17    What does that tell us?

18        A.    That it was for cryo and high temperature

19    extension lengths which is zero for none.

20        Q.    And then finally there's another zero and what

21    does that tell us?

22        A.    Special requirements identifiers.

23        Q.    And what does the zero signify?

24        A.    No special requirements.



1    Q.    And am I correct under special requirements

2    identifier there's a category 3?

3    A.    Yes.

4    Q.    And what's category 3?

5    A.    Oxygen clean.

6    Q.    Back on Exhibit 131, Mr. Cappellini, is the

7    handwritten entry that we have been referring to to

8    work through this matrix, is that your handwriting?

9    A.    What the matrix number is?

10   Q.    Yes.  I'll read the whole entry:  "Supply the

11   following A11 valve per the matrix, A11L-12-151-

12   CB743-31-3-00."

13               Is that your handwriting?

14   A.    Yes.

15   Q.    Where did you get the information that led you

16   to conclude that those were the appropriate

17   designations for the matrix?

18               MR. WAGNER:  Again to clarify, we're now

19   talking this is now a very specific question?

20               MR. KELLER:  I'm now specifically asking

21   about this document, this entry and this matrix, yes.

22               MR. WAGNER:  I would only ask that you

23   make that real clear with the witness because up until

24   now I think we have agreed that these have been very

1    general questions.

2              Do you understand that?

3              MR. KELLER:  That's a fair question.

4    BY MR. KELLER:

5      Q.   Mr. Cappellini, your counsel is right.  So I'm

6    clear, I'm now specifically asking about this specific

7    entry on Exhibit 131 and the specific matrix exercise

8    we just went through.  Okay?

9      A.   (The witness nodded).

10     Q.   And Exhibit 131, so we're clear, what's the tag

11   number on the Bates labeled page NEC 135 that we're

12   referring to?

13     A.   83HV0629.

14     Q.   Okay.  So your matrix calculation that we have

15   just discussed was for tag number 83HV0629, correct?

16     A.   Yes.

17     Q.   Where did you get, how did you come to the

18   conclusion that those were the right entries for the

19   matrix?

20     A.   Working with Fisher and then Praxair.

21     Q.    Is there an ISA spec sheet that we could look

22   at that would tell us those values?

23     A.   That show those specific values?

24     Q.   That would tell me -- for example, is there an



WILCOX & FETZER LTD.
Registered Professional Reporters

FCI/MOA 0244

Bert M. Cappellini  -  CONFIDENTIAL      100

1    ISA spec sheet for tag number 83HV0629 that would tell

2    me that the stem material should be Inconel 718?

3      A.   I believe no.

4      Q.   Is there an ISA spec sheet that would tell me

5    that the bearing material for valve 629 is PTFE

6    composite?

7      A.   No.

8      Q.   Is there an ISA spec sheet that would tell me

9    the seal ring material for valve 629 is Tef-Zel?

10               THE WITNESS:  I have a question.

11               MR. WAGNER:  Okay.  Let's go off the

12    record for a minute.  The witness wants to consult

13    with me.

14    BY MR. KELLER:

15      Q.   Well, I'm just going to request that you answer

16    my question first.  If the answer is that "I need to

17    consult with my counsel" --

18               MR. WAGNER:  Well, if you want to consult

19    with me outside, you can just tell counsel that you

20    want to consult with me first.

21               MR. HANDLON:  I don't think you can

22    consult.

23               MR. KELLER:  That's what I am going to

24    find out.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    BY MR. KELLER:

2    Q.   Mr. Cappellini, is there something -- let me

3    rephrase my question and then see where we are.

4         Is there an ISA spec sheet that we could

5    all look at for valve 629 that would designate the

6    ring seal material as Tef-Zel?

7         MR. WAGNER:  Are you able to answer that?

8    A.   Well, I guess my question is, you know, a

9    signed-off spec sheet or one that was -- there's many

10   spec sheets that were done.

11   Q.   Well, I'll start with the broader question.

12        Are there any spec sheets, drafts or

13   otherwise, that would tell us or that would show to us

14   that the seal ring material for valve 629 is Tef-Zel?

15   A.   I don't know that.  I would have to look, I

16   guess.

17   Q.   Okay.

18        MR. WAGNER:  That's fine.  You have

19   answered the question.

20   Q.   That's fine.  Now that you have answered the

21   question, do you need a minute to speak with your

22   attorney or are you ready to proceed?

23   A.   No, I don't.

24   Q.   Okay.  Mr. Cappellini, let me show you a



1    document that we're going to mark as Exhibit 134.

2                (Olson Deposition Exhibit No. 134 was

3    marked for identification.)

4                MR. KELLER:  This will be 135.

5                (Olson Deposition Exhibit No. 135 was

6    marked for identification.)

7                MR. WAGNER:  I'm going to take my client

8    outside the room and make sure that there's nothing

9    that he wanted to discuss with me, but I understand

10   there's an objection to that.  Is that right?

11               MR. HANDLON:  Yes.  There's an objection

12   to that.

13               MR. RICHES:  Joined.

14               MR. INSKIP:  I'll join.

15               MR. WAGNER:  All right.  I'll honor the

16   objection and we will just proceed.

17   BY MR. KELLER:

18     Q.   Mr. Cappellini, two documents have been put

19   before you.  One has been marked as Exhibit 134 and

20   one has been marked Exhibit 135.  We will look at

21   Exhibit 134 first.

22               On Exhibit 134 are there initials in the

23   originator column in the bottom right-hand corner?

24     A.   Yes.



Bert M. Cappellini  -  CONFIDENTIAL    114

1    A.    Correct.

2    Q.    Do you recall why that changed?

3    A.    Again, that would be from going from 10-inch to

4    12-inch.

5    Q.    Okay.  Then on lines 85 and 86 for instrument

6    overpressure protection required, it still says no,

7    correct?

8    A.    Correct.

9    Q.    And in Exhibit 118 the approved version signed

10   by Mr. Bhakoo in line 56 it indicates that this valve

11   is a modulating valve, correct?

12   A.    Yes.

13   Q.    Do you understand that to be the same thing as

14   a throttling valve?

15   A.    Yes.

16   Q.    And did you understand the term throttling

17   valve to mean that the fluid, in this case oxygen,

18   would be throttling across the valve as it gradually

19   opened?

20   A.    No.

21   Q.    What did you understand that to mean?

22   A.    Meaning at these conditions the valve would be

23   at a certain position and these pressure drops would

24   be there and this flow would be there.



Bert M. Cappellini  -  CONFIDENTIAL     115

1    Q.   Okay.  Did you understand at the time

2    Mr. Bhakoo signed his approval of this ISA that this

3    valve was to be used in oxygen service?

4    A.   Can you repeat that again?

5    Q.   Okay.  Did you understand Mr. Bhakoo sends

6    back -- well, let me take a step back.

7         At the very top of the sheet,

8    Mr. Cappellini, it looks like there's a fax header and

9    it's --

10         MR. WAGNER:  Which exhibit are you on,

11   counselor?

12         MR. KELLER:  I'm on Exhibit 118.

13   BY MR. KELLER:

14    Q.   It's sort of hard to read, but it looks like

15   it's 6/15/98 and then there's a fax number which looks

16   to be 718-879-2344.

17         Do you know whose fax number that is, if

18   I'm reading that correctly?

19    A.   I believe that was Praxair purchasing.

20    Q.   And, in fact, next to that fax number it looks

21   like it says Praxair purchasing, right?

22    A.   Right.

23    Q.   Then there are three little arrows and then it

24   says NE Controls, right?



WILCOX & FETZER LTD.
Registered Professional Reporters

FCI/MOA 0249

1    A.   Yes.

2    Q.   Does that fax header mean anything to you?  Let

3    me ask a different question.

4         Can you derive anything from looking at

5    that fax header about the transmission of this sheet

6    from Praxair to Northeast?

7    A.   It was faxed to me and dated 6-15-98 on Monday

8    at 13:01 from fax number 716-879-2344 from the Praxair

9    purchasing department to Northeast Controls.

10   Q.   Do you know if you received a copy either

11   personally delivered by mail or as an e-mail

12   attachment from Mr. Bhakoo prior to June 15, 1998?

13   A.   No.

14   Q.   Do you recall if you had a face-to-face meeting

15   with Mr. Bhakoo where he handed you "Here you go,

16   Bert, here's my signed and approved sheet for the 629

17   valve"?

18   A.   I don't recall, no.

19   Q.   You don't recall one way or the other or that

20   did not happen?

21   A.   I believe that did not happen.

22   Q.   The document, the second page of Exhibit 118,

23   what is this document?

24   A.   This is the sizing calculation sheet that can



1    A.    Mm-hmm.

2            MS. CLARK:  I'm sorry.  The witness, for

3    the record, said, "Mm-hmm."  Was that a yes?

4            THE WITNESS:  Yes.

5    BY MR. KELLER:

6    Q.    Now, if we go back to the first page of Exhibit

7    118, what is the disk material that's identified in

8    line 37?

9    A.    Monel.

10   Q.    What is the seat or as I understand it seal

11   ring material identified in line 38?

12   A.    Monel/PTFE.

13   Q.    What is the guide material or bearing material

14   identified in line 39?

15   A.    Monel.

16   Q.    And what is the stem material identified in

17   line 40?

18   A.    Monel.

19           MR. KELLER:  Off the record for one

20   second.

21           (Discussion off the record.)

22           (A brief recess was taken.)

23           MR. KELLER:  Why don't we mark this as

24   136?

**W&F**

Bert M. Cappellini  -  CONFIDENTIAL    134

1   A.   That something was changed on the spec sheet

2   and a new one was generated.

3   Q.   Mr. Cappellini, where is the ISA spec sheet

4   that would show the disk material for the 629 valve as

5   Hastelloy B?

6   A.   I don't know if there is one.

7   Q.   Do you know then why that was the information

8   that you placed down in Exhibit 131?

9   A.   Repeat that question.

10   Q.   Yes.  We went through Exhibit 131 and

11   information that you drafted per the matrix which then

12   went to Fisher Controls, correct?

13   A.   Correct.

14   Q.   And we went through that process of matching

15   that up with the matrix and rather than go through it

16   now, I'm going to represent what I think you testified

17   to and if I'm wrong, your counsel will let me know.

18           I believe we established that as

19   transmitted you stated that the disk material for

20   valve 629 was Hastelloy B, correct?

21   A.   Correct.

22   Q.   Where is the ISA spec sheet that identifies the

23   disk material as Hastelloy B?

24   A.   I don't know.



WILCOX & FETZER LTD.
Registered Professional Reporters

FCI/MOA 0252

1    Q.    I believe we established or you testified that

2    the stem material for the 629 valve as indicated here

3    in 131 and conveyed to Fisher was Inconel 718.  Is

4    that correct?

5    A.    Correct.

6    Q.    Where is the ISA data sheet that indicates the

7    stem material for the 629 valve as Inconel 718?

8    A.    I don't know.

9    Q.    The seal ring or seat material that you put

10   down in Exhibit 131 and that was conveyed to Fisher

11   also known as the seat material you testified was

12   Tef-Zel, correct?

13   A.    Correct.

14   Q.    Where is the ISA data sheet that indicates that

15   the seat material or seal ring material for valve 629

16   is Tef-Zel?

17   A.    I don't know.

18   Q.    Now, the bearing material that you conveyed to

19   Fisher was PTFE composite, correct?

20   A.    Correct.

21   Q.    And is that what appears on the exhibit we just

22   took a look at which you crossed out, Exhibit 115?

23        MR. WAGNER:  Would you repeat that

24   question, Counselor?  You, frankly, lost me there.

1          MR. KELLER:  Yes.

2    BY MR. KELLER:

3      Q.   The bearing material or guide material that you

4    conveyed to Fisher for the order for valve 629 was

5    PTFE composite, correct?

6      A.   Correct.

7      Q.   Is that what's indicated on Exhibit 115?

8      A.   No.

9      Q.   What's TFE composite?

10     A.   It's Teflon.  PTFE is Teflon.  In industry

11   codes they mean the same thing.

12     Q.   At least as far as you are concerned, is TFE

13   composite and PTFE composite for the guide material,

14   is that the same thing?

15     A.   Yes.

16     Q.   Now if you will indulge me on one last thing.

17   Let me rephrase that.  If you will indulge me.

18          Exhibit 118, let's take a look at that

19   again very quickly.  Exhibit 118 is the signed-off

20   checked, reviewed and approved ISA data sheet for the

21   629 valve, correct?

22     A.   Correct.

23     Q.   And what's the bearing material or guide

24   material indicated in that document?

Bert M. Cappellini  -  CONFIDENTIAL    137

1    A.    Monel.

2    Q.    So do we know how what was conveyed to Fisher

3  for the bearing material was PTFE composite?

4         MR. WAGNER:  Do we know how it was?

5         MR. KELLER:  That's a fair question.

6  BY MR. KELLER:

7    Q.    Do you know why what was conveyed to Fisher for

8  the bearing material was PTFE composite?

9    A.    I mean, that was the bearing that we were going

10  to use in that valve.

11   Q.    Okay.  But that's not the bearing that's

12  indicated on HV629, correct?

13   A.    Correct.

14   Q.    So when was the decision made that that was the

15  bearing that was going to be used in the valve?

16   A.    From the beginning.

17   Q.    Okay.  If that was the decision that was made,

18  wouldn't you put that on the ISA data sheet?

19   A.    Yes.

20   Q.    Okay.  And that's not what's on the ISA data

21  sheet, correct?

22   A.    Correct.

23         MR. KELLER:  Are we up against the

24  deadline?  I want to honor his flight obligations.

Bert M. Cappellini   -   CONFIDENTIAL      141

1   State of Delaware    )
                         )
2   New Castle County    )

3

4              CERTIFICATE OF REPORTER

5          I, Kurt A. Fetzer, Registered Diplomate
6   Reporter and Notary Public, do hereby certify that
    there came before me on the 12th day of December,
7   2003, the deponent herein, BERT M. CAPPELLINI, who was
    duly sworn by me and thereafter examined by counsel
8   for the respective parties; that the questions asked
    of said deponent and the answers given were taken down
9   by me in Stenotype notes and thereafter transcribed by
    use of computer-aided transcription and computer
10  printer under my direction.

11         I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.

13         I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.

15

16

17              Kurt A. Fetzer, RDR, CRR
                Certification No. 100-RPR
18              (Expires January 31, 2005)

19  DATED:    12-18-03

20

21

22

23

24

FCI/MOA 0256

ATTACH TO DEPOSITION OF: _Bert M. Cappellini_

DATE TAKEN: _December 12, 2003_

IN THE MATTER OF: _Elson v Motiva Enterprises_

## ERRATA SHEET

<u>INSTRUCTIONS</u>: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |
|      |      |                                |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _1/5/04_    _Bert Cappellini_
(Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
1330 King Street
Wilmington, DE  19801

FCI/MOA 0257

# EXHIBIT 36A

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON, and CAROL ) CONFIDENTIAL
OLSON, his wife, )
 )
        Plaintiffs, )
 ) Civil Action No.
V. ) 02C-04-263 (JRS)
 )
MOTIVA ENTERPRISES L.L.C.; )
BATTAGLIA MECHANICAL, INC.; )
FISHER CONTROLS INTERNATIONAL, )
INC.; HYDROCHEM INDUSTRIAL )
SERVICES, INC.; JJ WHITE, INC.; )
NORTHEAST CONTROLS, INC.; )
PARSONS ENERGY AND CHEMICALS )
GROUP, INC.; PRAXAIR, INC.; TEXACO )
AVIATION PRODUCTS LLC; DAIKIN )
INDUSTRIES, LTD.; SAINT-GOBAIN )
PERFORMANCE PLASTICS; RIX )
INDUSTRIES, INC.; TEXACO GLOBAL )
GAS AND POWER; TEXACO )
DEVELOPMENT CORPORATION; )
GARY DELGREGO, )
 )
 )
        Defendants, )
 )
NORTHEAST CONTROLS, INC., )
 )
        Third-Party Plaintiff, )
 )
v. )
 )
CONECTIV OPERATING SYSTEMS, )
 )
        Third-Party Defendant. )

CONTINUED DEPOSITION OF BERT M. CAPPELLINI

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

FCI/MOA 0257A

CONFIDENTIAL                           145

1    APPEARANCES:   (Cont'd)

2              PHILIP T. EDWARDS, ESQ.
         MURPHY SPADARO & LANDON
3            1011 Centre Road - Suite 210
         Wilmington, Delaware  19805
4            for the Defendant HydroChem
         Industrial Services, Inc.

5

6                   -   -   -   -   -

7              BERT M. CAPPELLINI,

8    the deponent herein, having first been

9    duly sworn on oath, was examined and

10   testified as follows:

11                       EXAMINATION

12   BY MR. RICHES:

13   Q.   Good morning, Mr. Cappellini.  I was introduced

14   earlier.  I'm Joe Riches.  I represent Praxair in this

15   litigation.

16              As long as my voice holds out, I will ask

17   you some questions today and the same ground rules as

18   your last session, which is where I would like to pick

19   up.  I have made copies.  I think at the time you were

20   being questioned you sort of had Exhibit 118 and 131

21   laid out in front of you.  And with respect to 131, I

22   believe the emphasis was on the matrix on the second

23   page which is marked NEC135.

24              I am going to just pick up right from



WILCOX & FETZER LTD.
Registered Professional Reporters

FCI/MOA 0257B

1          MR. RICHES:  Then he can tell me he didn't

2     say that.

3          MR. WAGNER:  Well, that's not a fair way

4     to ask questions as far as I'm concerned.  You're

5     suggesting something to him that he didn't say and I

6     object to it.

7          MR. RICHES:  That's fine.  And my response

8     to that is that's what I thought he said.  If I'm

9     wrong, he can now correct me.

10    BY MR. RICHES:

11    Q.    Can you answer the question?

12    A.    I don't even know what the question was.

13    Q.    Let me try again.

14          You go through this whole process where

15    you get initial information and then there are

16    substantial changes made in the size and materials of

17    construction of the 629 valve from the point in time

18    when you first prepared the matrix for pricing

19    purposes until the final revised, the final, approved

20    ISA data sheet was prepared.

21          What I want to know is in ordering the

22    valve why wasn't a matrix submitted to Fisher that

23    ordered a valve with the materials contained on

24    Exhibit 118, the final, signed, approved ISA data



WILCOX & FETZER LTD.
Registered Professional Reporters

1     sheet?

2     A.    I don't know.  I don't know why the matrix is

3     different than what's on 118.  I don't know that.

4               I mean, you're asking me why wasn't it?

5     Q.    Yes.

6     A.    I don't know why it's on there like that, on

7     the 118.

8     Q.    You don't know why --

9     A.    I mean, the conversations and the thought

10    process and the things that went on for the 629 valve

11    was never the trim that's on that spec sheet.  It was

12    the original matrix number that I submitted to Fisher.

13    Q.    I understand that.

14    A.    But you're asking me why is it not the same?  I

15    don't know that.

16    Q.    Well, let me ask it this way:  Should it have

17    been?  Should the matrix that was listed on Exhibit

18    131, page 2, should it have been different than the

19    matrix that is on page 2 of Exhibit 131 considering

20    the information on Exhibit 118?

21    A.    I mean, it would have been different.  They are

22    different, if that's what you're asking me.  I mean,

23    the matrix would have been different as to what's on

24    the ISA data sheet.



WILCOX & FETZER LTD.
Registered Professional Reporters

1     from the factory it's in the closed position.  So when

2     this particular valve is with air on the actuator,

3     just opening the valve, they don't require a speed in

4     that direction, to open the valve.

5             So when a valve is fully open, now you

6     want to get the air out of the actuator.  And that's

7     not done by a volume booster.  You want to exhaust it

8     out of there quickly, which is done by what we call a

9     quick exhaust.  It's got a big port, a big Cv to take

10    that air out of there quickly.

11    Q.    Cv, is that what's in line 9 on Exhibit 118?

12    A.    That's a similar Cv, but that's a Cv for the

13    valve itself.  The device that could be on, that is on

14    this actuator, that was on this actuator is a small

15    device that has a Cv.

16    Q.    Is there something on this ISA data sheet that

17    would allow me to cross-reference and confirm that?

18    A.    Down at the bottom where the standard notes

19    are, if you looked at I believe note 18, 18 signifies

20    a quick exhaust.

21    Q.    Let me just check and then we will be able to

22    move on.

23            Okay.  Mr. Cappellini, was there a time

24    when you told Mr. Bhakoo or anyone else at Praxair



Bert M. Cappellini  -  CONFIDENTIAL      229

1    that you had decided you were going to use the same

2    exact materials of construction for the 613 valve and

3    the 629 valve?

4        A.    I mean, there were conversations that the

5    valves would be constructed the same.

6        Q.    There were conversations that the valves would

7    be constructed identically the same?

8        A.    Correct.

9        Q.    With Mr. Bhakoo?

10        A.    Yes.  I would have to assume that.  I don't

11    recall the exact conversations, but....

12        Q.    On your pricing sheet -- and I apologize for

13    jumping around.  This is what happens when you go

14    second.

15                Exhibit 131.  Am I correct that you

16    specified --

17                MR. WAGNER:  What exhibit are you on?

18                MR. KELLER:  Exhibit 131, the pricing

19    sheet, pricing matrix.

20    BY MR. KELLER:

21        Q.    Am I correct you specified a disk material of

22    Hastelloy B?

23        A.    I would have to look up this matrix.  I assume

24    that's what one of these numbers --



FCI/MOA 0257F

Bert M. Cappellini  -  CONFIDENTIAL      232

1  that this sheet -- I haven't seen this sheet since I

2  probably made it -- that they are the same and that

3  the matrix number is different.

4      Q.  Mr. Cappellini, since you and I last spoke have

5  you had a chance to look at the transcript from your

6  deposition from last time?

7      A.  Yes, I did.

8      Q.  Have you had a chance -- Tom, you can just tell

9  me if it's coming -- to go through that and make any

10  changes that you thought were necessary?

11     A.  I have been asked to do that, yes.

12     Q.  And you haven't finalized that process yet?

13     A.  No.  I don't think I feel like anything needs

14  to be changed.

15     Q.  Everything that was in there seemed accurate

16  and correct?

17     A.  Sure.

18     Q.  And truthful?

19     A.  Yes.

20             MR. KELLER:  I have no further questions.

21  BY MR. HANDLON:

22     Q.  Mr. Cappellini, my name is Joe Handlon.  I

23  represent Ron Olson in this matter.  I've got a couple

24  of quick follow-up questions.



FCI/MOA 0257G

Bert M. Cappellini  -  CONFIDENTIAL    233

1          You're not really sure whether or not you

2    had conversations with Bhim Bhakoo about the materials

3    for the 613 and 629 valve being identical.  Is that

4    fair?

5          MR. WAGNER:  Are we just going to repeat

6    all his testimony?

7          MR. HANDLON:  I'm not going to ask a lot

8    of questions.

9    BY MR. HANDLON:

10   Q.   Is that fair?

11   A.   I mean, I don't recall the exact conversation,

12   but the way that -- everything that I asked for from

13   Fisher had to revolve around a conversation that I did

14   have, that I must have had with Bhim Bhakoo.

15   Q.   The only reason I asked the question is because

16   you just said in response to Mr. Keller's question is

17   you would have to assume that conversation took place

18   and I wrote down your words.  You said that.  Is that

19   right?

20   A.   Again, I don't recall the exact conversation.

21   So do I say yes, that conversation happened?  I don't

22   know if exactly happened or when it happened or -- you

23   know.

24   Q.   If that conversation didn't happen, would you



Bert M. Cappellini  -  CONFIDENTIAL        241

1    State of Delaware    )
                          )
2    New Castle County    )

3

4                CERTIFICATE OF REPORTER

5

6        I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
     there came before me on the 30th day of April, 2004,
7    the deponent herein, BERT M. CAPPELLINI, who was duly
     sworn by me and thereafter examined by counsel for the
8    respective parties; that said questions asked of said
     deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.

11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16

17   _____
     Kurt A. Fetzer, RDR, CRR
18   Certification No. 100-RPR
     (Expires January 31, 2005)

19
     DATED:  ___5-4-04_____
20

21

22

23

24



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

FCI/MOA 02571

# EXHIBIT 37

CONFIDENTIAL

**In The Matter Of:**

*Olson    v.*
*Motiva, et al.*

---

*Gary T. DelGrego*
*December 9, 2003*

*C.A. # 02C-04-263 JRS*
*CONFIDENTIAL*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE  U.S.A.  19801*
*(302) 655-0477    FAX: (302) 655-0497*

*Original File 120903GD.KFC, 194 Pages*
*Min-U-Script® File ID: 2376785157*

**Word Index included with this Min-U-Script®**

FCI/MOA 0258

Gary T. DelGrego
December 9, 2003

C.A. # 02C-04-203 JRS
CONFIDENTIAL

Olson v.
Motiva, et al.

---

Page 3

[1] APPEARANCES: (Cont'd)

[2]    PATRICK D. McVEY, ESQ.

    RIDDELL WILLIAMS P.S.

[3]        1001 Fourth Avenue Plaza - Suite 4500

    Seattle, Washington  98154

[4]    for the Defendant Fisher Controls

    International, Inc.

[5]

    CHRISTOPHER KONZELMANN, ESQ.

[6]    WHITE AND WILLIAMS

        1800 One Liberty Place

[7]    Philadelphia, Pennsylvania  19103

    for the Defendant Great American

[8]    Assurance Company

[6]    DONALD M. DAVIS, ESQ.

    MARGOLIS EDELSTEIN

10]    The Curtis Center

    Independence Square West

11]    Philadelphia, Pennsylvania  19106

    for the Defendant JJ White, Inc.

12]

    JENNIFER A. KAPES, ESQ.

13]    ELZUFON AUSTIN REARDON TARLOV & MONDELL, P.A.

        300 Delaware Avenue - Suite 1700

14]    Wilmington, Delaware  19999

        for the Defendant Parsons Energy

15]    and Chemicals, Inc.

16]    JOSEPH H. RICHES, ESQ.

    COZEN & O'CONNOR

17]        1900 Market Street

        Philadelphia, Pennsylvania  19103

18]    for the Defendant Praxair, Inc.

19]    ALEXANDER EWING, JR., ESQ.

    GOLLATZ GRIFFIN & EWING

20]        213 West Miner Street

        West Chester, Pennsylvania  19381

21]    for the Defendant Saint-Gobain

    Performance Plastics

22]

23]

24]

---

Page 4

[1] APPEARANCES: (Cont'd)

[2]    MARK CARLISLE LEVY, ESQ.

    SAUL EWING

[3]        Centre Square West

        1500 Market Street - 38th Floor

[4]        Philadelphia, Pennsylvania  19102

        for the Defendants Texaco Development

[5]        and Texaco Aviation

[6]    CHASE T. BROCKSTEDT, ESQ.

    MURPHY SPADARO & LANDON

[7]        824 Market Street

        Wilmington, Delaware  19899

[8]        for the Defendant HydroChem

        Industrial Services, Inc.

[9]

    GREGORY A. INSKIP, ESQ.

[10]    POTTER ANDERSON & CORROON

    Hercules Plaza

[11]        1313 North Market Street

        Wilmington, Delaware  19801

[12]    for the Third-Party Defendant

        Conectiv Operating Systems

[13]

        (REPORTER'S NOTE:  Mr. Hiler was not

[14] present for the beginning of the deposition.)

[15]

[16]        GARY T. DELGREGO,

[17]    the deponent herein, having first been

[18]    duly sworn on oath, was examined and

[19]    testified as follows:

[20]        EXAMINATION

[21] BY MS. CLARK:

[22] Q.  Good morning, Mr. DelGrego.  Have you ever had

[23] your deposition taken before?

[24] A.  No.

---

Page 5

[1]    Q:  All right. I'm going to give you some

[2] instructions and periodically we may remind you of

[3] those instructions as the day goes on. Okay?

[4]        The first of which is the man seated to

[5] your right is a court reporter and he's taking down

[6] everything that's being said in this room today.

[7] That's important to note because of the fact that when

[8] I ask a question I'm going to ask that you wait until

[9] the question is completed before you respond. It's an

[10] automatic thing in normal everyday conversation to

[11] respond basically before the questioner or the

[12] question has been asked because you think that you

[13] know the answer, but that causes difficulty with the

[14] court reporter. All right? He can't take down what

[15] we're saying at the same time. Okay?

[16]    A: (The witness nodded.)

[17]    Q: The second reason I tell you about the court

[18] reporter is that your responses must be verbal. You

[19] just nodded your head and periodically you may hear an

[20] attorney say is that a yes or is that a no? The use

[21] of uh-uh does not translate, so I would ask you to say

[22] yes or no if that's the answer. All right?

[23]    A: Okay.

[24]    Q: If I ask you a question and you don't

---

**Min-U-Script®**    Wilcox & Fetzer, Ltd.  -  (302)655-0477

FCI/MOA 0259

Gary I. DelGrego                    C.A. # 02C-04-205 JRS          Olson    v.
December 9, 2003                    CONFIDENTIAL                   Motiva, et al.

Page 98

[1] Q: Now, on the first sheet in the next column it
[2] has a symbol with a slash through it. Is that a U
[3] with a slash through it?
[4] MR. LEVY: Sorry. You're on TDC38?
[5] MS. CLARK: The first page.
[6] A: No. No, that's not a U. It's an LA and I
[7] crossed out the L to indicate it was a control status.
[8] It's local auto versus auto.
[9] You can see in Jay's version, Jay makes
[10] the correction. He's got just A's.
[11] Q: Okay. If we go all the way over underneath
[12] blend.
[13] A: The next-to-last column?
[14] Q: Yes. It says — I can't read what's under
[15] there. Can you?
[16] A: Under which line? It says blend.
[17] Q: Blend.
[18] A: Oxygen blend and then there's some — that
[19] text?
[20] Q: Yes.
[21] A: It says blend, oxygen blend and then — this
[22] thing has been copied so many times. It looks like
[23] HS600B, but I can't be certain. Check Jay's version.
[24] Q: It doesn't have anything. At least I can't see

Page 99

[1] it?
[2] A: At the bottom. There it is. See where it says
[3] at the bottom of that column the first note press
[4] HS-600B. The second page.
[5] Q: Oh, okay. All right. What is HS-600B?
[6] A: It's a button on the DCS.
[7] Q: Okay. And then on oxygen run it's press
[8] HS-600C?
[9] A: Correct. A different mode.
[10] Q: All right. As we go down the chart, I would
[11] like you to look at your handwriting and in the second
[12] column, we're talking twelve lines up, just above
[13] discharge pressure.
[14] A: Okay.
[15] Q: The second column.
[16] A: Twelve lines up from the bottom, the second
[17] real column?
[18] Q: Yes. Underneath description.
[19] A: Underneath description. What do you mean
[20] description?
[21] Q: The column is entitled description.
[22] A: Oh, okay. I understand now. So the column
[23] that says description at the top?
[24] Q: Right.

Page 100

[1] A: And how many lines up from the bottom?
[2] Q: Twelve. Just above discharge pressure.
[3] A: Where I get to there's nothing on the 12th line
[4] up.
[5] Q: Maybe 11 lines up.
[6] MR. LEVY: Are you referring to the
[7] handwriting?
[8] MS. CLARK: Yes. Just on the line above.
[9] I counted 11 the second time.
[10] A: The line above the words discharge pressure?
[11] Q: Yes.
[12] A: What did you want to know?
[13] Q: What does it say? Is that HC?
[14] A: It says HC-629.
[15] Q: Okay. Then if you go across from that, man at
[16] zero percent, what does that mean?
[17] A: Manual at zero percent closed.
[18] Q: And then it says closed by and I can't read
[19] that.
[20] A: ESS.
[21] Q: ESS. Then you have an arrow. What does that
[22] arrow mean?
[23] A: It applies to all of the other columns until —
[24] it's the same thing in the next column, same thing in

Page 101

[1] the next column. It only changes in the very last
[2] column.
[3] Q: What's in the very last column?
[4] A: In the very last column that indicates how
[5] Praxair described it. The valve shut through all of
[6] the first five columns. On the fifth column when the
[7] oxygen run button is pushed, the ESS energizes, that's
[8] where it says valve energized. So the valves
[9] energized for control and ramp open. And then it says
[10] as delta P drops can go greater than 10 percent.
[11] So Praxair was telling us there's a limit
[12] on how far you could open the valve until the
[13] differential pressure across the valve had dropped to
[14] some preset value.
[15] Q: Okay. And if you look at the typewritten
[16] sheet, it says —
[17] MR. LEVY: Delia, you don't mean
[18] typewritten. You mean the next page?
[19] MS. CLARK: No. It's actually two pages
[20] back, page 2 of Jay Patel's chart.
[21] BY MS. CLARK:
[22] Q: There's an HC629 and an HV629. Do you know
[23] what the difference is?
[24] A: They're essentially the same. HC indicates the

FCI/MOA 0260

Motiva, et al.                    CONFIDENTIAL                    December 9, 2003

---

Page 102

[1] actual control element on the DCS. HV indicates the
[2] valve itself. That's just...
[3] Q: So HC is the control on the valve and HV is the
[4] valve itself. Is that correct?
[5] A: Right. If you want to be technical, yeah.
[6] Q: Now, in the last column, all the way over in
[7] the two lines of HV0629, is this M colon zero percent
[8] to M colon 100 percent in 10 percent increments?
[9] MR. LEVY: I want to make sure you're on
[10] TDC00040, the furthest column to the right?
[11] MS. CLARK: Correct. It's the last column
[12] on the right where the line says HC0629, if you go all
[13] the way over and follow it over.
[14] A: Okay. So what was the question about that
[15] line?
[16] Q: Is that the summarization of the valve that's
[17] energized and opens?
[18] A: Yes. Jay split it into two elements to
[19] indicate that the valve itself was locked out by the
[20] safety system, the Triconics, but there was a
[21] controller on the DCS. They're two independent items.
[22] So he indicates in his last column the valve itself is
[23] energized and then the operator can open it to 100
[24] percent.

---

Page 103

[1] Q: In 10 percent increments?
[2] A: In 10 percent increments. And my notes were
[3] you can't get past the first 10 percent until the
[4] delta P is low.
[5] Q: And delta P meaning change in pressure?
[6] A: Differential pressure across the valve.
[7] Q: Differential pressure, okay. All right.
[8] Other than create these notes, had you
[9] ever seen the typewritten chart before today?
[10] A: Which one?
[11] Q: The typewritten one. The fully typewritten,
[12] Jay's chart.
[13] A: Jay's chart?
[14] MR. LEVY: You're pointing.
[15] A: 39 and 40?
[16] Q: 39 and 40, correct.
[17] A: Yes. Those are what I provided to Keiderling.
[18] Q: Okay. All right.
[19] MR. McVEY: I'm sorry. Those were what
[20] you provided to who?
[21] MR. LEVY: He said Keiderling.
[22] THE WITNESS: Ron Keiderling.
[23] MR. McVEY: Oh, Keiderling.
[24] THE WITNESS: Right.

---

Page 104

[1] BY MS. CLARK:
[2] Q: Do you remember when you provided both of these
[3] charts, and I'm talking about your handwritten notes
[4] and then the chart that is 39 and 40, to
[5] Mr. Keiderling?
[6] A: After the incident.
[7] Q: After the incident. Do you know why you turned
[8] these over?
[9] A: Ron asked me for them.
[10] Q: Okay. Did he tell you why he was asking you
[11] for them?
[12] A: He said that they were looking into things and
[13] just wanted to get all of the information that they
[14] could.
[15] Q: After this meeting that you had in late '99,
[16] did you review your notes again prior to the incident
[17] in May of 2000?
[18] A: Not that I recall.
[19] Q: After this meeting with Praxair and Motiva and
[20] Parsons, did you discuss with a Conectiv employee or
[21] with Jay Patel or anybody the things you discussed in
[22] this meeting?
[23] MR. LEVY: I am going to object to form.
[24] A: I don't have any real recollection of

---

Page 105

[1] conversations about this.
[2] Q: Well, is there anything in this meeting that
[3] made you think that any follow-up needed to be done by
[4] Motiva or Conectiv in starting up the ASU or learning
[5] how to start up the ASU?
[6] A: No. This was the experts telling us how they
[7] were going to do it. There was no follow-up for me.
[8] Q: How long did the meeting last? Do you recall?
[9] A: No.
[10] Q: You have said on a couple of occasions "the
[11] experts told us." Who are you referring to as
[12] experts?
[13] A: In this particular meeting it was Jerry
[14] Paolino.
[15] Q: And why are you using the term expert?
[16] A: They dwarfed our knowledge about ASU's. Jay
[17] wanted to better understand it and asked Praxair to
[18] please explain it, so the meeting was set up for that
[19] purpose.
[20] Q: After the meeting did Jay ever express to you
[21] whether he was happy or that they satisfied his
[22] requests for information?
[23] MR. LEVY: Objection to form.
[24] Go ahead.

FCI/MOA 0261

---

Gary I. DelGrego                C.A. # 02C-04-265 JRS                Olson v.
December 9, 2003                CONFIDENTIAL                Motiva, et al.

Page 106

[1]    A: I don't know. Jay's not that type.

[2]    Q: Did he indicate that he had any other further

[3] follow-up or questions to you as regards to this

[4] meeting?

[5]    A: No, not that I recall.

[6]    MS. CLARK: Can you go to Exhibit 34,

[7] please?

[8]    MR. LEVY: Sure.

[9]    MS. CLARK: I am going to have you mark

[10] that one.

[11]    (Olson Deposition Exhibit No. 95 was

[12] marked for identification.)

[13]    MS. CLARK: We are going to start at 34.

[14]    MR. LEVY: Can we take a short break?

[15]    MS. CLARK: Sure.

[16]    (Discussion off the record.)

[17]    (A brief recess was taken.)

[18]          BY MS. CLARK:

[19]    Q: Before we broke, I gave you Exhibit 34. Have

[20] you had the opportunity to review that document?

[21]    A: Yes.

[22]    Q: The first page of the document is an e-mail

[23] from you dated May 4th of 2000. Is that correct?

[24]    A: Yes.

Page 107

[1]    Q: And there's a draft of the oxygen system

[2] calibration and test procedure. Was this the first

[3] draft that you had submitted or not?

[4]    A: It's the first draft that went out for

[5] distribution.

[6]    Q: And on or about May 4th, 2000 what was the

[7] anticipated date that the oxygen system calibration

[8] test was going to occur?

[9]    A: I don't remember.

[10]    Q: Now I'm going to draw your attention to the

[11] first full paragraph or the second full paragraph

[12] where it says, "Please note."

[13]    A: Okay. "Please note," yes.

[14]    Q: The second sentence, "The center & annular 02

[15] lines need to be blinded and the calibration spool

[16] line needs to be removed and blinded." What does that

[17] mean?

[18]    A: The first part, center and annular, those are

[19] the two lines that connect to the gasifier feed

[20] injector. For testing, the injector is not in

[21] place and you're not putting oxygen in the gasifier so

[22] we blind, put a solid metal blank at the end of those

[23] lines.

[24]    The calibration spool part, that's what I

Page 108

[1] spoke about earlier. The spool — actually, it looks

[2] like the spool was probably installed during

[3] construction. So the first step would be to take the

[4] spool out and blind it because the first step is

[5] pressure test and then we would put the spool back in

[6] midway through the procedure and then take the spool

[7] back out again at the end of the procedure.

[8]    Q: The second sentence or the third sentence in

[9] there, "In addition, an 02-clean local" — is that PI

[10] or PI?

[11]    A: PI

[12]    Q: PI. What is a PI?

[13]    A: Pressure indicator.

[14]    Q: "Needs to be installed on the bleed valve

[15] downstream of 82-XV-1168."

[16]    What does that mean?

[17]    A: That means the pressure gauge needs to be

[18] installed downstream of XV-1168.

[19]    Q: Is that a valve number, tag number?

[20]    A: 1168?

[21]    Q: Yes.

[22]    A: Yes.

[23]    Q: And that valve I take it is on the gasifier

[24] side?

Page 109

[1]    A: That is the gasifier oxygen vent valve.

[2]    Q: All right. And the other sentence I think is

[3] self-explanatory.

[4]    All right. Now, go back up to the list of

[5] items that you have.

[6]    A: The bullet list?

[7]    Q: Yes, the bullet list. And you start with "HP

[8] N2 test of entire 02 line (from BLOC to injector

[9] flange)."

[10]    What needed to be done in there? Explain

[11] that for me, if you will.

[12]    A: That was a nitrogen test from the battery

[13] limits down through to the injector, from the

[14] Praxair-Parsons battery limit all the way through to

[15] the gasifier reactors. It was a static pressure test

[16] of all of that piping.

[17]    Q: And what did that entail? I mean, how did you

[18] pressure test it?

[19]    A: Pressurize it with high-pressure nitrogen.

[20]    Q: And what was the pressure? What was the high I

[21] guess of the high pressure?

[22]    A: You would have to give me a few minutes to see

[23] what the procedure says. (Reviewing document).

[24]    1200 p.s.i.g.

FCI/MOA 0262

Gary T. DelGrego
December 9, 2003

C.A. # 02C-04-203 JRS
CONFIDENTIAL

Olson v.
Motiva, et al.

Page 130

[1] oxygen?

[2] Q: Correct.

[3] A: Between the last time it was run and when?

[4] Q: And May 20th.

[5] A: I don't really know. Whether they had

[6] practiced or anything? I don't know. You would have

[7] to check with Ron. He handled all of their training.

[8] Q: All right. So you came in and what did you do?

[9] A: We're back to the control room on May 20th.

[10] Q: Right, back to the control room on May 20th.

[11] A: I came in, stood kind of behind Calloway off to

[12] the side. The Praxair guy was kind of to my right.

[13] So Calloway was somewhat in the middle between myself

[14] and the Praxair guy.

[15] Q: Was that Mr. Freuler still?

[16] A: That was Mr. DePaula. Mr. Freuler was in the

[17] field. So there were two Praxair guys on site at the

[18] time. I don't really recall who else — there were

[19] others in the control room, but I don't remember

[20] names.

[21] Q: Okay.

[22] A: Okay. So we got to — okay. So that gets us

[23] to the point where I got up there. The next step was

[24] to bring oxygen over to the gasifier. So Calloway at

Page 131

[1] that point, I think he and I and DePaula had a

[2] conversation that "Okay, we're going to do this next"

[3] and it was Calloway then started the process to open

[4] the valve. That was the next thing in the sequential.

[5] So Calloway pressed the buttons to start,

[6] to move the valve and he moved it, I think he went a

[7] percent at a time or something, pausing in between

[8] steps, you know, like it was supposed to be done. And

[9] we didn't see any feedback from the position indicator

[10] on the valve and so Calloway kept moving it up to its

[11] maximum of 10 percent to see whether or not the

[12] positioner just might not be responding properly or

[13] what. Calloway was doing all of this.

[14] Then after he got to 10 percent and we

[15] weren't seeing anything process-wise —

[16] Q: What do you mean you weren't seeing anything

[17] process-wise?

[18] A: Well, we didn't see a valve indication that the

[19] valve had moved and we didn't see any change in the

[20] differential pressure across the valve.

[21] Q: What was the pressure of the oxygen at that

[22] point?

[23] A: On the upstream side?

[24] Q: Yes.

Page 132

[1] A: 1150 p.s.i.g.

[2] Q: And what was the pressure on the nitrogen side?

[3] A: On the downstream side we have no idea what the

[4] pressure was. Praxair provided no instrumentation on

[5] that side other than the differential pressure across

[6] the valve which was set very low. I recall something

[7] like 20 p.s.i. differential. So the pressure on the

[8] downstream side could have been anywhere from zero to

[9] 1130 and we would have had no indication.

[10] Q: Okay. Where did you see the pressure

[11] differential where you said it was set very low at 20

[12] p.s.i.?

[13] A: It was displayed on the graphic right next to

[14] the valve.

[15] Q: Okay. So you said when you got there you had a

[16] conversation with Calloway, DePaula and yourself?

[17] A: Yeah. Kind of like this is what — is

[18] everybody ready to do this kind of like, and no

[19] objections from everybody. Calloway was ready to

[20] start so we started.

[21] Q: Did Mr. Calloway have your procedures here to

[22] walk him through the process?

[23] A: I believe he had the Baker version.

[24] Q: Yeah. Obviously he didn't have the handwritten

Page 133

[1] one. But he had the Baker version?

[2] A: Yes.

[3] Q: All right. So were you at step 13 by the time

[4] you walked in? I mean, where were you when you walked

[5] in?

[6] A: Yes. That's my recollection.

[7] Q: So the next step after 13 would have been to

[8] follow onto 14 and then go sequentially down?

[9] A: Yes.

[10] Q: Do you remember when Mr. Calloway turned,

[11] pushed the button and put in the amount, the

[12] percentage that the valve was to open the first time

[13] and you didn't see a response, how long did you wait

[14] or did he wait?

[15] A: I don't think he waited very long. It was a

[16] few minutes. Once he realized it wasn't working, he

[17] called his supervisor to inform him of the situation.

[18] Q: I think you said that he tried in different

[19] increments to open the valve, is that correct, put in

[20] different percentages?

[21] A: Well, I remember him doing something like going

[22] from 1 to 2 and then 2 to 3, something of that nature.

[23] I don't know if it was always 1 percent.

[24] Q: Okay. Did he say to you anything like it

FCI/MOA 0263

Motiva, et al.                    CONFIDENTIAL                    December 9, 2003

---

Page 134

[1] doesn't appear to be responding?

[2] A: He may have been saying something like that,

[3] but not necessarily to me. To himself, to DePaula.

[4] Q: That was my next question.

[5] A: There were a few people there.

[6] Q: Did Mr. DePaula give him any input or

[7] instructions?

[8] A: Not specifically that I remember.

[9] Q: Mr. Calloway you said radioed to his

[10] supervisor?

[11] A: Correct.

[12] Q: Was the signal to the valve still on open or

[13] had he changed the signal?

[14] A: It was still requesting it to open when he

[15] called his supervisor.

[16] Q: And who did he call?

[17] A: He called Ron. At the time Ron was the man in

[18] charge of the air plant.

[19] Q: And what was the response? What was the

[20] instruction?

[21] A: What was?

[22] Q: Well, he called his supervisor.

[23] A: Oh, the conversation went something like "I'm

[24] trying this and the valve doesn't seem to be

---

Page 135

[1] responding."

[2] And Ron's reply was something like "I'll

[3] check it out" or "I'll go look at it," something.

[4] Q: When Mr. Olson responded that he would go check

[5] it out, did anybody in the control room make a

[6] suggestion that the valve, the signal be changed to

[7] close to make the valve close prior to his going back

[8] down there? And I'm talking him Mr. Olson.

[9] MR. LEVY: Objection to form.

[10] Go ahead.

[11] A: In the control room, no. Ron is the one who

[12] made that suggestion.

[13] Q: So Mr. Calloway did what? Did he just wait

[14] until Mr. Olson radioed back to him?

[15] A: That's what I remember.

[16] Q: And what was the radio transmission back?

[17] A: When Ron got there, the transmission was

[18] something like "The air's, the air's not on the valve"

[19] or "The air's off," something to that effect.

[20] Q: What does that mean?

[21] A: For a valve like that to operate, there's an

[22] instrument air line that feeds the actuator. So Ron's

[23] transmission indicated to us that he saw that the air

[24] had been turned off which would obviously not allow

---

Page 136

[1] the valve to move.

[2] Q: And what then do you recall?

[3] A: Then I recall Ron asking Greg to put the valve

[4] back to zero and then when Greg confirmed it was back

[5] to zero, Ron said he turned the air off.

[6] Q: How long did this take from Mr. Calloway's

[7] initial radio transmission to the time that he was

[8] instructed to put the valve to zero?

[9] A: It was pretty quick. Probably not more than

[10] five minutes or so.

[11] Q: Did Mr. Calloway tell Mr. Olson where the

[12] signal, you know, what amount or what percentage I

[13] guess the valve was being signalled to open at that

[14] initial radio call?

[15] A: The initial? I think he did. When he called

[16] Ron initially with the report of the problem, my

[17] recollection is that he told him basically what he had

[18] done, you know, something to the effect of "Ron, I've

[19] got 10 percent requested of this valve. I don't see

[20] any feedback that it's moved."

[21] And Ron understood what he meant by all of

[22] that.

[23] Q: Okay. Did Mr. Calloway have any papers in

[24] front of him as he was doing this process?

---

Page 137

[1] MR. LEVY: I am going to object to the

[2] extent that you asked him whether he had. At least in

[3] the beginning I think one of — I'm not sure which one

[4] you referred to. Probably Olson 34 at some point.

[5] A: He had Olson 34. There were other papers

[6] there, but I can't tell you what.

[7] Q: Was he referring to any document in order to

[8] open the 629 valve?

[9] A: No. No. I assumed he was referring to his

[10] training that he had gotten.

[11] Q: So when Mr. Olson radios back to put the valve

[12] to zero, did Mr. Calloway do that?

[13] A: Yes.

[14] Q: What did you see on the computer screen?

[15] A: There's just a little block where you put in

[16] the percentage and he put it back to zero.

[17] Q: So you saw it register zero on the computer

[18] screen?

[19] A: Yes.

[20] Q: Did anybody offer any suggestions at that point

[21] to Mr. Calloway?

[22] A: Once it went back to zero?

[23] Q: Yes.

[24] A: No. The next thing I remember is after Ron put

---

Wilcox & Fetzer, Ltd. · (302)655-0477    Min-U-Script®    (37) Page 134 - Page 137

FCI/MOA 0264

Gary T. DeGrego
December 9, 2003

C.A. # 02C-04-203 JRS
CONFIDENTIAL

Olson v.
Motiva, et al.

**Page 138**

[1] the air back on, Ron calling Greg to say, "Okay. Try
[2] it again."

[3]     Q: Do you know where Mr. Olson was when he told
[4] him to turn it back on?

[5]     A: I knew he was in the ASU, but I can't say
[6] where. It was very noisy where he was, so he must
[7] have been near the compressors. That's all I can say.
[8] The whole air plant is very noisy.

[9]     Q: All right. And what do you remember happening
[10] next?

[11]     A: Okay. Ron called and said, "Try it again."
[12] Greg went through the same procedure. I don't recall
[13] if it was the same number, the same increments, but he
[14] started at 1 and moved to the next 2 or 3. And he
[15] didn't see feedback again.

[16]     Greg again called out to Ron and said,
[17] "Ron, I'm not getting any feedback." And I think each
[18] time Greg was moving the valve he was communicating
[19] that to Ron. He was like "Okay, I've got 3 percent on
[20] it now," something to that nature.

[21]     And that's when Ron made that statement.
[22] It was something like — Greg asked him can you tell
[23] if it's moving, can Ron tell if it's moving? Because
[24] Greg is not getting any feedback that it's moving.

**Page 139**

[1] Ron made the comment something to the effect of "I
[2] can't see it from where I'm at" or "I can't tell from
[3] where I'm at." Hold on was kind of the gist of it.

[4]     Q: Okay. Again, do you remember how much time was
[5] in between the increments that Calloway was inputting
[6] into the computer?

[7]     A: I can't tell you. The whole day is kind of a
[8] blur. After Ron said, "I can't see from where it's
[9] at," or something like that," then I'm not exactly sure
[10] what the order was for what happened next. It got
[11] very hectic in the next couple of seconds.

[12]     Either Ron called in again saying, "I
[13] can't tell" or Greg asked him a question. Something
[14] went on and then Ron started yelling "Shut the valve"
[15] or "Shut the valve" or "Shut it." I don't remember
[16] which it was. So Ron radioed that in.

[17]     Greg responded something like "It is
[18] shut." I looked at the screen and that's when I saw
[19] that the little diamonds that tell you whether or not
[20] the compressor is running or not, that the diamonds
[21] had turned green, which meant that the machine wasn't
[22] running. DePaula, who was watching to my right, said,
[23] "Oh, the compressor's down," kind of like startled
[24] that the whole compressor was off.

**Page 140**

[1]     At the same time we heard Tom Freuler on
[2] the radio with a little more of a description. Tom
[3] said something like "Shut the compressor down, there's
[4] been a fire, there's been an explosion," something a
[5] little more descriptive as to what went on. And when
[6] we got that transmission is when myself and Greg or
[7] myself and Mike Waters, who was the other operator a
[8] little over to the right from me, went over to there's
[9] a big panel with a bunch of on-off switches and we
[10] started shutting down what we could. And then there
[11] was all the other radio traffic. We got informed that
[12] Ron was hurt; call an ambulance. One of the operators
[13] called an ambulance.

[14]     Do you want me to go further than that or
[15] is that enough?

[16]     Q: Well, let me back you up a little bit.
[17] You said that you got a radio transmission
[18] from Mr. Olson to either shut it or shut the valve.
[19]     A: Yeah. Ron called in something like "Shut it,
[20] shut the valve." Greg responded "It is shut." Ron
[21] may have said it again. I'm not sure. And then Greg
[22] may have said, "But it is shut, Ron."
[23]     Q: Was the data on the computer screen showing up
[24] zero?

**Page 141**

[1]     A: Yes.
[2]     Q: So Mr. Calloway had sometime in between —
[3]     A: Do you mean the feedback?
[4]     Q: No. The indicator. The one that he types in
[5] to tell him how much of a percent to open, was that
[6] showing zero?
[7]     A: The feedback red zero, but I don't know, I
[8] don't know if Greg actually ever typed in zero. When
[9] Ron made the first call in, everything started
[10] happening really fast and I don't really recall if
[11] Greg did type in zero.
[12]     Q: You said Mr. Freuler was in the field at the
[13] time that you guys started to open the valve. Where
[14] in the field? Do you know?
[15]     MR. LEVY: Objection to form.
[16]     A: Yeah. Afterwards he told me he was on the
[17] other side of the plant near what we called the truck
[18] fill.
[19]     Q: You recalled though that shortly after
[20] Mr. Olson's transmission to shut the valve, the next
[21] transmission you received was Freuler's?
[22]     A: Yes.
[23]     Q: Who said man down, turn off —
[24]     A: The man down came after the compressors —

FCI/MOA 0265

Gary T. DelGrego
December 9, 2003

C.A. # 02C-04-205 JRS
CONFIDENTIAL

Olson v.
Motiva, et al.

Page 192

[1] OLSON DEPOSITION EXHIBITS        MARKED
[2] 100 Document Bates stamped TDC00078-84   155
[3] 101 Document Bates stamped TDC00290   155
[4]
     ERRATA SHEET/DEPONENT'S SIGNATURE  PAGE 193
[5]
     CERTIFICATE OF REPORTER        PAGE 194
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 194

[1] State of Delaware              )
[2] New Castle County             )
[3]
[4]        CERTIFICATE OF REPORTER
[5]
        I, Kurt A. Fetzer, Registered Diplomate
[6] Reporter and Notary Public, do hereby certify that
     there came before me on the 9th day of December, 2003,
[7] the deponent herein, GARY T. DELGREGO, who was duly
     sworn by me and thereafter examined by counsel for the
[8] respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
[9] in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
[10] under my direction.
[11]   I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
[12] examination of said witness.
[13]     I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
[14] interested in the event of this suit.
[15]
[16]
[17]     Kurt A. Fetzer, RDR, CRR
        Certification No. 100-RPR
[18]     (Expires January 31, 2005)
[19]
DATED:
[20]
[21]
[22]
[23]
[24]

Page 193

[1]
[2]
[3] REPLACE THIS PAGE
[4] WITH THE ERRATA SHEET
[5] AFTER IT HAS BEEN
[6] COMPLETED AND SIGNED
[7] BY THE DEPONENT.
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

FCI/MOA 0266

*Pg 1 of 3*

ATTACH TO DEPOSITION OF: *Gary T. Delgregs*

DATE TAKEN: *December 9, 2003*

IN THE MATTER OF: *Nelson v Motiva Enterprises*

#### ERRATA SHEET

<u>INSTRUCTIONS</u>: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. <u>Do not make any marks or notations on the transcript itself.</u> Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 17 | 15 | "altogether" should be "all together" |
| 18 | 1 | Doesn't make sense. Should be "The only other one is Tom DeBusie, DeBusie is Joe's..." |
| 22 | 20 | The first class and visit was in Feb of 1999. |
| 32 | 9 | Delete "for" |
| 39 | 21 | Change "license or" to "licensor" |
| 55 | 10 | Change "impression" to "impressions" |
| 58 | 3 | This doesn't make sense. |
| 59 | 10 | Change "John" to "Jon" |
| 60 | 13 | Change "leave" to "lead" |
| 62 | 2 | Change "Triconics" to "Triconex" |
| 68 | 10 | Change "B-L-O-C" to "B-L-O-C-K" |
| 77 | 21 | should say "It was Conectiv who led the meeting and set the time." |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: *1/27/04*          *Gary Delgregs*
                    (Signature of Deponent)

RETURN TO: WILCOX AND FETZER, LTD.
              1330 King Street
              Wilmington, DE 19801

FCI/MOA 0267

ATTACH TO DEPOSITION OF: _____ Pg 2 of 3

DATE TAKEN: _____

IN THE MATTER OF: _____

## ERRATA SHEET

<u>INSTRUCTIONS</u>: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. <u>**Do not make any marks or notations on the transcript itself**</u>. Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 85 | 23 | Add a period after "start-up." |
| 88 | 18 | Looks like it contains part of the attorney's question. |
| 98 | 7 | Change "it was a" to "it's" |
| 101 | 5 | Change "valve" to "valve's" |
| 101 | 8 | Change "valves" to "valve's" |
| 102 | 20 | Change "Triconics" to "Triconex" |
| 126 | 11 | Change "received" to "receive" |
| 129 | 7 | Change "type" to "types" |
| 131 | 4 | Change "sequential" to "sequence." |
| 132 | 18 | I don't understand the transcription of this answer. |
| 136 | 5 | Change "off" to "on." |
| 139 | 9 | Delete quotation marks after "that," |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _1/29/07_          _____
                          (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
            1330 King Street
            Wilmington, DE  19801

FCI/MOA 0268

Pg 3 of 3

ATTACH TO DEPOSITION OF: _____

DATE TAKEN: _____

IN THE MATTER OF: _____

## ERRATA SHEET

INSTRUCTIONS:  After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet.  **Do not make any marks or notations on the transcript itself.**  Rule 30(e) governing this procedure is enclosed.  Please sign and date this errata sheet and return it to our office at the address indicated below.  Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 142 | 19 | Change "Triconics" to "Triconex" |
| 142 | 20 | Change "Triconics" to "Triconex" |
| 181 | 8 | I was at site prior, in Feb '99. |
| 24 | 7 | This class was actually in late '99. |
| 183 | 11 | Change "Russ" to "Rush" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _1/29/04_  _____
                    (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
            1330 King Street
            Wilmington, DE  19801

FCI/MOA 0269

# EXHIBIT 38



WILCOX & FETZER LTD.

# CONFIDENTIAL

In the Matter Of:

## Olson

v.

## Motiva Enterprises, L.L.C., et al.

C.A. # 02C-04-263 (JRS)

---

Transcript of:

# James C. Ponto

Volume # 1

January 25, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

FCI/MOA 0270

Olson
CONFIDENTIAL    James C. Ponto    C.A. # 02C-04-263 (JRS)

Motiva Enterprises, L.L.C., et al.
January 25, 2005

Page 2

1    Deposition of JAMES C. PONTO taken pursuant
to notice at the law offices of Cozen & O'Connor, 1900
2    Market Street, Philadelphia, Pennsylvania, beginning at
1:00 p.m. on Tuesday, January 25, 2005, before Eleanor J.
3    Schwandt, Registered Professional Reporter and Notary
Public.
4
5    APPEARANCES:
6    JOSEPH HANDLON, ESQ.
ASHBY & GEDDES
7    222 Delaware Avenue
Wilmington, Delaware 19801
8    for the Plaintiffs
9    THOMAS P. WAGNER, ESQ.
RAWLE & HENDERSON LLP
10    The Widener Building
One South Penn Square
11    Philadelphia, Pennsylvania 19107
for the Third-Party Plaintiff and
12    Defendant Northeast Controls, Inc.
13    PAUL M. LUKOFF, ESQ.
PRICKETT JONES & ELLIOTT, P.A.
14    1310 King Street
Wilmington, Delaware 19801
15    for the Defendant Motiva Enterprises LLC
16    MICHAEL K. TIGHE, ESQ.
TIGHE COTTRELL & LOGAN, P.A.
17    First Federal Plaza
Wilmington, Delaware 19801
18    for the Defendant Battaglia Mechanical, Inc.
19
JAMES F. X. HILER, ESQ.
20    WECHSLER & COHEN, LLP
116 John Street - 33rd Floor
21    New York, New York 10038
for the Defendants Daikin Industries
22    and Daikin America
23
24

Page 3

1    APPEARANCES (continued):
2    DANIEL J. GUNTER, ESQ.
RIDDELL WILLIAMS P.S.
3    1001 Fourth Avenue Plaza - Suite 4500
Seattle, Washington 98154
4    for the Defendant Fisher Controls
International, Inc.
5
DONALD M. DAVIS, ESQ.
6    MARGOLIS EDELSTEIN
The Curtis Center
7    Independence Square West
Philadelphia, Pennsylvania 19106
8    for the Defendant J. J. White, Inc.
9    RICHARD K. HOHN, ESQ.
HOHN & SCHEUERLE
10    Eleven Penn Center - Suite 2901
Philadelphia, Pennsylvania 19103
11    for the Defendant Parsons Energy
and Chemicals, Inc.
12
JOSEPH H. RICHES, ESQ.
13    COZEN & O'CONNOR
1900 Market Street
14    Philadelphia, Pennsylvania 19103
for the Defendant Praxair, Inc.
15
ALEXANDER EWING, JR., ESQ.
16    GOLLATZ GRIFFIN & EWING
213 West Miner Street
17    West Chester, Pennsylvania 19381
for the Defendant Saint-Gobain
18    Performance Plastics
19    MARK CARLISLE LEVY, ESQ.
SAUL EWING
20    Centre Square West
1500 Market Street - 38th Floor
21    Philadelphia, Pennsylvania 19102
for the Defendants Texaco Development
22    and Texaco Aviation
23
24

Page 4

1    APPEARANCES (continued):
2    PHILIP T. EDWARDS, ESQ.
MURPHY SPADARO & LANDON
3    1011 Centre Road - Suite 210
Wilmington, Delaware 19805
4    for the Defendant HydroChem
Industrial Services, Inc.
5
    - - - - -
6
7    (Deposition Exhibit 306 was marked for
8    identification.)
9    JAMES C. PONTO,
10    the witness herein, having first been
11    duly sworn on oath, was examined and
12    testified as follows:
13    EXAMINATION
14    BY MR. HANDLON:
15    Q. Good afternoon, Mr. Ponto.
16    A. Good afternoon.
17    Q. My name is Joe Handlon. My law firm represents
18    Ron Olson. Do you know who Ron Olson is, sir?
19    A. Yes.
20    Q. And you understand he was injured on May 20th,
21    2000, at the Motiva power plant in Delaware City,
22    Delaware?
23    A. Yes.
24    Q. Have you ever had your deposition taken before?

Page 5

1    A. Yes.
2    Q. Was it in the context of a lawsuit?
3    A. Yes.
4    Q. About how many times have you had your deposition
5    taken?
6    A. One other time.
7    MR. HOHN: I'm going to ask both you
8    gentlemen to keep your voices up. I can't hear you down
9    here, and I think the court reporter might be having a
10    hard time.
11    MR. HANDLON: She is right here.
12    MR. RICHES: Is that true?
13    BY MR. HANDLON:
14    Q. Did the one time that you had your deposition
15    taken involve a lawsuit involving an explosion at an air
16    separation unit?
17    A. No.
18    Q. Did it have anything to do with your employment
19    with Praxair?
20    MR. RICHES: Object to the form. You can
21    answer.
22    A. Yes.
23    Q. Did it involve an accident at an air separation
24    unit?

2 (Pages 2 to 5)

FCI/MOA 0271

Olson                                          v.                    Motiva Enterprises, L.L.C., et al.
CONFIDENTIAL    James C. Ponto    C.A. # 02C-04-263 (JRS)                  January 25, 2005

Page 54

1  didn't have any involvement with any pre-test procedures,
2  but have you in your work for Praxair reviewed the
3  pre-test procedures for piping tests?
4  A. Yes.
5  Q. And that's your understanding that, on page 107,
6  the flappers were probably removed?
7  A. Yes.
8  Q. If you go --
9  MR. DAVIS: I'm going to object to the form.
10  Because I'm not sure that is what this document
11  refers to when it says "check valve included in test."
12  "Check valves" is circled and then it says "gutted"
13  after, is not necessarily the same thing. So I don't
14  want anyone to assume --
15  THE WITNESS: When you look at the P&ID,
16  they wouldn't have removed the flappers on these.
17  MR. DAVIS: That's what I'm saying.
18  THE WITNESS: You have a vent valve
19  downstream. So you have got no way of trapping
20  pressurized air there.
21  MR. DAVIS: I agree with that.
22  THE WITNESS: It would just be the check
23  valve they have removed there.
24  MR. DAVIS: That's why I'm objecting to the

Page 56

1  A. No.
2  Q. Why not?
3  A. That's why you test, to make sure the system that
4  you are working on is put together right. Materials
5  sometimes are faulty, like a gasket. It could have been
6  pinched when they put it in. You know, the test here
7  proved, it blew, so you put a new one in and then you
8  took it up. Now it is good. Now you got a good gasket.
9  Q. Do you recall this actually happening, sir?
10  A. No, I don't.
11  Q. What could be done to remedy that from happening
12  again?
13  MR. RICHES: Object to the form.
14  A. Can't.
15  MR. HANDLON: We will take a quick break.
16  MR. RICHES: Sure.
17  (Recess taken.)
18  BY MR. HANDLON:
19  Q. Sir, when you arrived at Delaware City, do you
20  recall whether construction was complete or not?
21  MR. RICHES: Object to the form.
22  A. No.
23  Q. You don't recall?
24  A. It wasn't. It wasn't complete.

Page 55

1  suggestion by the question that it was gutted in this
2  case. It wasn't.
3  THE WITNESS: Okay. Yes.
4  BY MR. HANDLON:
5  Q. What does gutted mean, sir, to you?
6  A. That's taking the flapper out, if you have to.
7  Q. Okay. If you turn to the next to the last page.
8  Have you reviewed pneumatic test logs before?
9  A. Yes.
10  Q. Refer down to where it says "1169" in the
11  left-hand column. Do you see that?
12  A. Yes.
13  Q. Does it appear at that pressure that a grafoil
14  gasket blew out at the 629 valve?
15  MR. RICHES: Object to the form.
16  A. That's what it is telling me there.
17  Q. Would that raise any concerns in performing of
18  piping pressure test?
19  MR. RICHES: Object to the form.
20  A. I don't understand your question.
21  Q. Well, it appears that grafoil gasket blew out at
22  629 valve and it looks to say at 900 psi. And my
23  question to you is: If that occurred during a piping
24  pressure test, would that raise any concerns to you?

Page 57

1  Q. What wasn't complete about it? Was it just
2  punchlist items that had to be finished?
3  A. When I arrived there?
4  Q. Yes.
5  A. We were just starting to build the plant.
6  Q. Okay. I'm a little confused. I thought you
7  arrived at the Delaware City facility in 1999.
8  A. Yes.
9  Q. And at that point, nothing was constructed at
10  that point?
11  A. Oh, things were being built. But I was at the
12  site before that too for site visits.
13  Q. That's right. And you assisted in the
14  construction of the cold box, I believe?
15  A. Yes.
16  Q. After the plant was complete, construction of the
17  plant was complete, did your duties and responsibilities
18  change at some point?
19  MR. RICHES: Object to the form.
20  A. My duties and responsibilities changed quite
21  often on this job.
22  Q. Okay. At some point did you participate in
23  oxygen system pipe blow-down?
24  A. Yes, I did.

Page 58

1    Q. Was that with respect to the warm end piping, the
2    piping downstream of the base load oxygen compressor?
3    A. Yes. Right from the cold box, right through the
4    whole system.
5    Q. Pull out Exhibit 37. Sir, is this a oxygen
6    system blow-down procedure that you participated in
7    implementing in or around November 1999?
8    A. Yes, it looks familiar.
9    Q. Okay. And I believe you said you participated in
10   blow-downs of pipe at the Delaware City ASU from the cold
11   box all the way to the, through the base load oxygen
12   compressor to the battery limits?
13   A. Yes.
14   Q. Take a look at Phase 1. Does that refer to
15   piping upstream of the base load oxygen compressor?
16   A. From the PHX through the blow-out intake.
17   Q. Are those your initials --
18   A. Yes.
19   Q. -- in Phase 1?
20       MR. RICHES: You have to let him finish the
21   question.
22   Q. I'm sorry.
23       MR. RICHES: You get a tendency, you know
24   what he is going to say before he is done talking.

Page 59

1    Q. I apologize. Sometimes my questions kind of
2    linger. So my question is: There is three bullet points
3    under Phase 1, and it appears to have what I thought was
4    your initials next to at the end of each bullet point.
5    Are those, in fact, your initials?
6    A. Yes, they are.
7    Q. Is that you signing off that those procedures
8    were completed?
9    A. I don't recall if I signed it. It looks like it
10   could be that we completed that procedure.
11   Q. Is that your handwriting that says "work
12   completed around 11/30"?
13   A. No, that's not.
14   Q. Do you recognize that handwriting?
15   A. No, I don't.
16   Q. Does Phase 2 pertain to the discharge piping
17   downstream of the BLOC?
18   A. Yes.
19   Q. Is that your initials at the end of that
20   paragraph as well?
21   A. Yes, yes, it is.
22   Q. Do you recognize the handwriting that says, looks
23   like it says "OK" and looks to be "C.C."?
24   A. That looks like Chris Carter's.

Page 60

1    Q. Phase 2, after the first sentence says, "Place
2    discharge strainer sock in a clean bag, and leave it with
3    Chris Carter or Chris Affuso. Charge the discharge
4    piping between this blind, the closed re-circulation
5    valve, and the discharge valve 83HV0529 with 80 to 100
6    psi air on N2 from the IA header. Blow this pressure out
7    of the 12-inch flange at the battery limit (blind to
8    remove here) by quickly opening 83HV0529." Do you see
9    that?
10   A. Yes.
11   Q. There has been a lot of testimony from Praxair
12   employees, sir, that 83HV0529 should be really 83HV0629,
13   that that is a typo?
14   A. Yes.
15   Q. Is that your understanding?
16   A. Yes.
17   Q. Do you have any recollection of this procedure,
18   sir, and whether or not the 629 valve was opened during
19   this procedure?
20   A. Yes. I recall that, and it was opened.
21   Q. Is there anything significant about opening that
22   valve during this procedure that causes you to remember
23   it?
24       MR. RICHES: Object to the form.

Page 61

1    A. No.
2    Q. Do you have any understanding as to the design
3    control logic of the 629 valve?
4    A. No.
5    Q. You weren't aware that after the plant was
6    operational that the 629 valve could be opened only when
7    the pressure differential across the valve was less than
8    10 psi?
9        MR. RICHES: Object to the form.
10   A. No, I was not aware of that.
11   Q. That's nothing that you have any understanding
12   about?
13   A. No, I don't.
14   Q. Did you have any understanding as to that the 629
15   valve could be opened only on oxygen?
16   A. No.
17   Q. And sitting here, do you recall that this 629
18   valve was opened during this procedure?
19   A. Mm-hmm.
20       MR. RICHES: You have to say yes or no.
21   A. Yes.
22   Q. What is the purpose of blowing the pressure out
23   of the 12-inch flange at the battery limit by quickly
24   opening the 629 valve?



Olson
CONFIDENTIAL     James C. Ponto

v.

C.A. # 02C-04-263 (JRS)

Motiva Enterprises, L.L.C., et al.
January 25, 2005

Page 142

1      MR. RICHES:  9:30 it is going to be.
2      (Proceedings conclude at 4:55 p.m.)
3
4            I N D E X
5    DEPONENT:  JAMES C. PONTO              PAGE
6      Examination by Mr. Handlon              4
       Examination by Mr. Gunter             134
7
8            E X H I B I T S
9    OLSON DEPOSITION EXHIBITS          MARKED
10     306 - Ponto CV                         4
        8-F - Plan drawing                   104
11
12   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 143
13   CERTIFICATE OF REPORTER            PAGE 144
14
15
16
17
18
19
20
21
22
23
24

Page 144

1    State of Delaware  )
                        )
2    New Castle County  )
3
4         CERTIFICATE OF REPORTER
5
6      *  I, Eleanor J. Schwandt, Registered
     Professional Reporter and Notary Public, do hereby
     certify that there came before me on the 25th day of
7    January, 2005, the deponent herein, JAMES C. PONTO, who
     was duly sworn by me and thereafter examined by counsel
8    for the respective parties; that the questions asked of
     said deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use of
     computer-aided transcription and computer printer under
10   my direction.
11        I further certify that the foregoing is a
     true and correct transcript of the testimony given at
12   said examination of said witness.
13        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17         Eleanor J. Schwandt
18         Certification No. 125-RPR
19         (Expires January 31, 2008)
20
     DATED:
21
22
23
24

Page 143

1
2       WITH THE ERRATA SHEET
3       AFTER IT HAS BEEN
4       COMPLETED AND SIGNED
5       BY THE DEPONENT.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

FCI/MOA 0274

Praxair, Inc., Motiva Repowering Project
Delaware City, Delaware

Page 1 of 2
November 30ᵗʰ, 1999

# Oxygen System Piping Blow Down Procedure

*IFC*
*Release.*
*11/30*

**To;**
James Ponto    Dave Good    Ravi Pahade    Mike Melchioris
Stan Polonski   Chris Affuso   Tom Rabczak

**From;**
Chris Carter    Jerry Paolino

**Important Notes;**
See attached marked up P&I for additional detail on each phase of the blowdown.

James Ponto will manage the contractor and ensure that the phase 1 and 2 blow downs are continued until each area is clean.
Stan Polonski/Chris Affuso will manage phase 3.
Jerry Paolino/Stan Polonski/Chris Affuso will manage phase 4.
Jerry Paolino will manage phase 5.

All findings of contamination to be communicated to Dave Good, Jerry Paolino &/or Chris Carter prior to moving to the next phase of the blow down. Adjustments to the procedure will be made if necessitated by these findings.

## Phase 1 - BLOC Intake Piping (Complete prior to the second run-in of the BLOC on Air)

Charge the piping from the PHX (against closed valves on the LO2 process pump skid) through to the BLOC intake with 80 to 100 psi air or N2 from the IA header. Blow this pressure out of the following locations, one at a time.

- Blow through the 4" LP O2 to customer, by pulling check valve 83Y0671Q or removing blind at B/L on 4" LP O2, removing the orifice plate 83FE0671 and opening valve 83FV0671quickly.
- Blow through intake silencer by opening valve 83FV0670 quickly.
- Blow through BLOC intake, by pulling intake strainer and opening 83FV0600 quickly (make sure the piping on the compressor side of the adjacent piping is properly covered and sealed up. Place inlet strainer sock in a clean bag, and leave it with C. Carter or C. Affuso. Install a new sock on the strainer when it is replaced. *OK. J. J. 11/30*

*WORK COMPLETED AROUND .11/30*

## Phase 2 - BLOC Discharge Piping (Complete prior to the second run-in of the BLOC on Air)

Remove the BLOC discharge strainer and place a blind on the piping on the side away from the compressor (use a blind with an nipple for air addition if available). Place discharge strainer sock in a clean bag, and leave it with C. Carter or C. Affuso. Charge the discharge piping between this blind, the closed re-circulation valve, and the discharge valve 83HV0529 with 80 to 100 psi air or N2 from the IA header. Blow this pressure out of the 12" flange at the B/L (blind to remove here) by quickly opening 83HV0529. Continue this until the air at the discharge piping is clean. Replace the discharge strainer with a clean sock.

*OK J. J. 11/30*



FCI/MOA 0275

Praxair, Inc., Motiva Repowering Project
Delaware City, Delaware

### Phase 3 - BLOC Recirculation Piping (Already blown during initial run-in on air, but to be completed during second run-in).

Recirculate air through the re-circulation loop, with both intake and discharge socks in place. Pull socks and examine, replace strainers with no socks in place.

                  OK , CA , 12/2/99

### Phase 4 - BLOC System (To be completed during the blended run of the BLOC)

Run the BLOC with a blended mixture of O2 and N2 (to be finalized by Jerry Paolino - it has been suggested to use 50% of each). Discharge this air out of the discharge silencer, unless it can be coordinated with Parsons to blow out of their line during this exercise (Parsons not expected to be finished their cleaning process until 12/17, so it is not expected that this will be possible). Examine both the intake and discharge strainers for contamination. Ensure system is properly bottled up for cleanliness, and that ASU piping is separated from Gasifier piping until the entire system can be maintained clean.

                  OK , CA , 12/15/99

### Phase 5 - Liquid O2 System Outside of the Coldbox (To be completed during the cool down process)

Jerry Paolino to further define this blowdown, to be completed during the cooldown of the tank on nitrogen. It will involve the piping from the LR tank, through the truckfill pump skid, out through to the truckfill hose. Procedure to involve breaking flanges as necessary to blow through all piping except those lines blown down as part of the oxygen audit (see markups on P&I, attached). The charge pot will also be inspected for cleanliness during/after this process.

Attachments,        P&I pages 3037, 3034, 3025, 3050, 3051, 3070, 3075, 3077

FCI/MOA 0276



Chris Affuso
12/15/99 07:47 AM

To:       Dave Good@9-1-302-392-4140@notesfax1
cc:
Subject:  Del City BLOC Strainer Inspection

The BLOC inlet conical strainer (83STR0932Q) and discharge conical strainer (83STR0627Q)
was visually inspected on 12/15/99 and found to be free of any contaminants or rusts.
        This inspection immediately followed a blowdown of the system with O2 from the plant
at approximately 400,000 cfm @ 90 psig.
                        Chris D. Affuso

FCI/MOA 0277



Chris Affuso
06/05/2000 09:25 AM

To:      Dave Good@9-1-302-392-4140@notesfax1
cc:      Stan Polonski@PRAXAIR
Subject:    BLOC Strainer Inspect Fax Cover Sheet.

Dave,
       Attached (I'll be faxing to you from PTC) are BLOC documentation that contain
reference(s) to strainer/socks.  Below is a summary of sequence of events, through the first O2
run of the machine, as an aid to tie together the documentation.
       Let me know if there is anything else I can help you with......Chris.

| 11/1-11/10 | Installed inlet/discharge strainer socks |
| 11/11/99 | BLOC coupled "bump" and slow roll |
| 11/12/99 | 1st BLOC run-in, on air (experienced oil piping problems) |
| 11/16/99 | 2nd BLOC run-in, on air (w/temporary oil pump) |
| 11/18-11/22 | Remove, inspect, replace cartridge |
| 11/30/99 | Inspected both strainer socks (some rust dust, otherwise OK), replaced w/new socks |
| 12/2/99 | 3rd BLOC run-in, on air (prove out cartridge mechanical work) |
| 12/3/99 | Removed & inspected both socks (OK), replaced strainers w/o socks |
| 12/13/99 | 4th BLOC, on O2 |
| 12/15/99 | Inspected strainers through "clean-out" connection (very clean) |



Post-it® Fax Note    7671    Date 6/5/00  pages▶ 8
To  Dave Good        From  Chris Affuso
Co./Dept.  Praxair    Co.  Praxair
Phone #                Phone #  716-879-2686
Fax # 302-392-4140    Fax #  -7441

FCI/MOA 0278



11/3/99

BLOC Coupled Run-In Focus Plan

| Activity | | Comp Date | By |
|---|---|---|---|
| **\* Mechanical \*** | | | |
| 1) | Motor Shaft Alignment / Soft Foot | 11/5 | (COMP) AT, HA |
| 2) | Coupling & Guard Installation | 11/6 | (COMP) AT, HA |
| 3) | Main Oil Pump Re-alignment | 11/5 | (COMP) AT, HA |
| 4) | Re-install bomp. Holddown bolt washers | 11/4 | (COMP) AT |
| 5) | D.E. Compressor oil supply flush w/screen | 11/5 | (COMP) HA |
| 6) | Remove all remaining flush screens | 11/5 | (COMP) HA |
| 7) | | | |
| 8) | Verify socket on inlet/outlet strainers | 11/8 | (Eff) CA |
| 9) | Walkdown Aux/ss piping & coolers | 11/8 | (Eff) CA |
| 10) | Complete Mech. Installation & Air-Run-In Checklist | 11/8 | (COMP) HA, CA |
| | | | |
| **\* Controls / Instrumentation \*** | | | |
| 1) | Relocate oil pressure switches | 11/5 | defer NW |
| 2) | Axial probe adjust (clearance) | 11/11 | (COMP) NW |
| 3) | Complete loop checks (approx. 30) | 11/9 | (COMP) NW |
| 4) | DCS & Triconex checks on above loops | | (COMP) HH |
| 5) | logic review | | (COMP) SR, HH, Max |
| 6) | "Critical Controls" checks ? | | (COMP) NW, HH |
| 7) | Install solenoid (4") in turn line (XGV-2015) | | defer |
| | | | |
| | | | |
| **\* Electrical \*** | | | |
| 1) | Verify switchgear operation via DCS & local panel | 11/9 | (COMP) JTL, HH |
| 2) | Tape Motor main feeder cable terminations | 11/5 | (COMP) AT |

Page 1 of 2

FCI/MOA 0279



| Activity | | Comp'l Date | | By |
|---|---|---|---|---|
| ✗ Safety & Isolation ✗ | | | | |
| 1) Generate Isolation P&IDs | | 11/4 | (comp) | JP, CA |
| 2) Conduct LO/TO, walkdown system | | 11/8 | (comp) | BH, CA |
| 3) Pre Alm IN Safety Mtg | | 11/10 | (comp) | dm |
| | | | | |
| ✗ Outside Party Notification ✗ | | | | |
| 1) Parsons - Tom Lee | | 11/9 | (comp) | AG |
| 2) Matrix | | 11/4 | (comp) | SP |
| 3) Sulzer - Max Altorfer | | 11/3 | (comp) | CA |
| 4) Colmotiv - Marty Fogerty | | 11/4 | (comp) | CA |
| 5) Bently | | 11/4 | (comp) | SP |
| 6) GE | | 11/4 | (comp) | JL |
| | | | | |
| ✗ Piping/Construction Issues ✗ | | | | |
| 1) Design piping blowdown plan | | 11/8 | (comp) | SP |
| 2) Install cmpb avoid drains | | 11/9 | (comp) | JH |
| 3) Complete routing of bearing tell-tale drain | | 11/9 | (comp) | JH |
| 4) N₂ level in TM tank OK? | | 11/9 | | CA |
| | | | | |
| BLOC COUPLED RUN | | 11/10 | | |

Page ③ of ②

FCI/MOA 0280

 **PRAXAIR**

Post Office Box 44
Tonawanda, NY 14150-7991

*Global Supply Systems Commissioning Group*

*Commissioning Checklist CCL-205*

## MECHANICAL INSTALLATION CHECKLIST
### CENTRIFUGAL OXYGEN COMPRESSOR

| | | |
|---|---|---|
| Project Number | P B064 | Location | Motiva - Delaware City, DE |
| Machine Service | BLOC | Manufacturer | Sulzer |
| Model | RBZ 35 | Serial Number | G2 41105 |
| Checked By | M Dodds  Date 12/6/99 | Accepted By | Date |

**A. FOUNDATION**  Verified: MD  Date: 5/99
Yes  No  N/A
1. Bushed under load areas?
2. Anchor bolt holes clean, sealed and bolts wrapped?
3. Center line correct?
4. Elevation correct?
5. Leveling blocks under jack bolts?
6. Machinery leveled?
7. Grouting complete?
8. Leveling bolts removed / holes plugged?

**B. INLET PIPING**  Verified: CA  Date: 11/99
1. Cleaned and 02 inspected?
2. Inlet screen installed with sock?
3. Piping strains clear?
4. Test blinds removed?
5. Instrument taps correct?

**COMPRESSOR**  Verified: CA  Date: 11/99
1. Casing inspection complete?
2. Rotor inspection complete?
3. Seal clearances checked, correct?
4. Casing assembly complete?
5. Grouting brush installed, wired?
6. Casing to casing alignment complete?
7. Casing to gear alignment complete?
8. Piping to casing deflection checked?
9. Pedestal shimming complete?
10. Seal system complete?
11. Seal gas regulator set, tested?

**D. COMP. GEARBOX**  Verified: MD  Date: 10/99
1. Soft foot check?
2. Hold down bolts tight?
3. Piping strains checked, all connections?
4. Shipping locks out of gearing?
5. Correct Probs./Meters/Prox. installed?
6. Gear box cover torqued?
7. Pinion thrust clearances set (IR)?
8. Leveled in two axes?

**E. DRIVE MOTOR**  Verified: MD  Date: 10/99
1. 0.250" flat SS shim under each foot?
2. Feet and supports clean, deburred?
3. Soft foot check?
4. Bearing sumps clean?
5. Shaft end float correct?
6. Shaft runout checked?
7. Shaft rotation checked?
8. Lube supply and level checked?
9. Lube supply gas supply connected?
10. Bearing insulation checked?
11. Final alignment complete?
12. Shaft key shipped?

**F. COUPLING, MTR**  Verified: MD  Date: 10/99
1. All components inventoried?
2. Lube requirements?

Yes  No  N/A
3. Torque or bolt stretch?
4. Correct per drawing?
5. Spool piece spacing correct?
6. Coupling installed, torqued?
7. Guard per OSHA and installed?
8. All components match marked?

**G. LUBE SYSTEM**  Verified: MD  Date: 10/99
1. Reservoir inspected?
2. Plugged drain valve installed?
3. Correct lubricant installed?
4. Aux. oil pump rotation checked?
5. Oil heater meggered?
6. Vacuum blower tested?
7. Instrument set points correct?
8. Filter cartridges in chambers?
9. Flow direction through filter correct?
10. Valved drains and vents installed?
11. Main oil pump alignment checked?
12. Pump coupling thrust set?
13. Check valves in correctly?
14. Required flush jumpers installed?
15. Flush screens installed?
16. Pressure settings checked?
17. AMOT valve temperature correct?
18. Flow path through AMOT correct?
19. Flush screens and jumpers removed?
20. Seal gas piping installed?

**H. COOLERS**  Verified: MD  Date: 10/99
1. Inlet/outlet flow correct?
2. Valved low point drains installed?
3. Valved high point vents installed?
4. Throttle valves in outlets?
5. Flush jumpers required?
6. System flushed?
7. Temperature sensors in water outlets?
8. Coolers hydro tested?
9. Continuous top venting required?

**I. DISCH. PIPING**  Verified: CA  Date: 11/99
1. Flange loading checked?
2. Flange railings correct?
3. Flange type correct?
4. Check valves installed and correct?
5. Test blinds removed?
6. Instrument taps installed?
7. Valves stroked?
8. Valve type and pressure ratings correct?
9. Valve flow direction correct?
10. Safety valve pressure settings correct?
11. Piping supports installed?
12. Spring support set/stops out?
13. Expansion joint shipping support removed?
14. Expansion joint cover installed?
15. Discharge screen installed w/sock?

*USE THE BACK SIDE OF THIS SHEET WITH THE RELATED LINE NUMBER REFERENCED.*

*Page 1 of 1*

FCI/MOA 0281

 **PRAXAIR**

Praxair, Inc.
Post Office Box 44
Tonawanda, NY 14150-7891

*Global Supply Systems Commissioning Group*                  *Commissioning Checklist CCL-242*

## MECHANICAL INSTALLATION CHECKLIST
## EQUIPMENT LUBRICATION SYSTEM

Project Number P 8064          Location Motiva - Delaware Cty, DE
Machine Service B LOC          Manufacturer Sulzer
Model RBZ-35                    Serial Number GZ-61105
Main Pump Mfg. Allweiler       Model/Serial No.
Aux. Pump Mfg. Allweiler       Model/Serial No. 11SNH 440 EL4 U12.4 w/82
Vac. System Mfg. Dollinger     Model/Serial No. OE-153B-60
Filter Mfg. Hilco              Model/Serial No. 52720-524001041
Oil Install, Vendor TEX-MOBIL  ISOVG 46
Oil Lot                        Oil Quantity 1050 gal
Checked By M. Weeks  Date 12/6/99  Accepted By          Date

**A. RESERVOIR**  Accepted by: MD Date: 9/15/99
1. Shimmed level?
2. Grout or silicone sealed at foundation?
3. Inspection cover raised design?
4. Interior coated?
5. Interior clean?
6. Baffles installed?
7. Plugged drain valve installed?
8. Ground strap installed?
9. Oil installed?
10. Check valve operation?
11. Motor drains vented above oil level?
12. Operating oil level correct?
13. Pressure regulating valve set?

**B. FILTER SYSTEM**  Accepted by: MD Date: 9/15/99
1. Chambers clean?
2. Filters installed?
3. Transfer valve correct flow path?
4. Drains and continuous vents installed?
5. Spare elements on hand?

**C. OIL HEATERS**  Accepted by: MD Date: 9/15/99
1. Mounted in wells?
2. Watt density correct?
3. KW rating correct?
4. Electrical entry side or bottom?
5. Extra entries metal plugged?
6. Megger value acceptable?
7. Thermostat set?

**D. VACUUM SYS.**  Accepted by: MD Date: 9/15/99
1. Oil return drains installed?
2. Filter media installed?
3. Rotation correct?
4. Vacuum gauge installed?
5. Vacuum adjusted?
6. Electrical ground installed?
7. Vented above top of drive motor?
8. Vent stack supported?

**E. OIL PUMPS**  Accepted by: MD Date: 9/15/99
1. Aux. pump alignment correct?
2. Main pump alignment correct?
3. Couplings and guards installed?
4. Aux. pump rotation correct?
5. Pumps primed?
6. Guards installed?
7. Main pump bleed circuit installed?
8. Motor frame grounds installed?

**F. MISCELLANEOUS**  Accepted by: MD Date: 11/9/99
1. Flush jumpers installed?
2. Flush jumpers removed?
3. Flush screens installed?
4. Flush screens removed?
5. Motor bearing flow orifices installed?
6. Drain lines slopes correct?
7. Flange insulation kits installed?
8. Piping insulators installed to motor bearings?
9. Pressure switches set?
10. Temperature switches set?
11. All thread and piping leaks corrected?
12. Sight glasses installed?
13. AMOT flow pattern correct?
14. AMOT thermostats correct?

OIL FLUSH IS COMPLETE AND ACCEPTED.  Accepted by *Mark Webb*  Date 11/9/99

COMMENTS AND REPAIRS SHOULD BE NOTED ON THE REVERSE SIDE OF THIS SHEET WITH THE RELATED LINE NUMBER REFERENCED

FCI/MOA 0282