# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br><br>Defendant. | NO. 06-412 SLR |

## DEFENDANT FISHER CONTROLS INTERNATIONAL, LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**MARON MARVEL BRADLEY**
**& ANDERSON, P.A.**

Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 425-5177 (phone)
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant
Fisher Control International, LLC

RIDDELL WILLIAMS P.S.

Patrick D. McVey
*Pro hac vice*
Daniel J. Gunter
*Pro hac vice*
Riddell Williams P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA 98154
(206) 624-3600 (Tel.)
(206) 389-1700 (Fax)
pmcvey@riddellwilliams.com
dgunter@riddellwilliams.com

Dated:  November 5, 2007

## TABLE OF CONTENTS

I.     NATURE AND STAGE OF THE PROCEEDINGS ..................................................... 1

II.    SUMMARY OF ARGUMENT ................................................................................. 5

III.   STATEMENT OF FACTS ...................................................................................... 6

    A.     The Representative Agreement .......................................................................... 6

    B.     Northeast Controls Was Negligent in Ordering the Valve.................................... 7

    C.     The Delaware City Power Plant ......................................................................... 8

    D.     The Wendell Hull Report .................................................................................. 10

    E.     The Four Underlying Actions ............................................................................ 11

    F.     Further Evidence Developed in This Action Confirms That Northeast
           Controls' Ordering of the Valve Did Not Meet Applicable Standards................ 14

IV.    ARGUMENT AND AUTHORITIES ....................................................................... 21

    A.     Summary Judgment Standard ........................................................................... 21

    B.     Plaintiffs' Claim for Breach of Contract Against Fisher Is Barred by the
           Terms and Conditions of the Representative Agreement ................................... 22

          1.     Fisher Is Not Obligated to Defend and Indemnify Northeast
                Controls for Northeast Controls' Negligent Acts and Omissions........... 22

          2.     Northeast Controls Was Negligent ....................................................... 23

    C.     The "Losses" at Issue Arose from Northeast Controls' Negligence ................... 29

    D.     Under Delaware's Contribution Act, Northeast Could Have Been Held
           Liable Only for Its Own Negligence and Could Not Have Incurred
           Liability for Damages Attributable To Fisher; Thus, Northeast's Right to
           Defense and Indemnification Never Arose ........................................................ 31

    E.     Plaintiffs' Claims Are Barred by the Applicable Statute of Limitations ............. 34

    F.     Northeast Controls Breached the Representative Agreement by Failing to
           Process the Order for the Valve Properly ........................................................... 35

V.     CONCLUSION .................................................................................................... 38

## TABLE OF CITATIONS

American Energy Technologies, Inc., v. Colley & McCoy Co., 1999 WL 301648, at *2 (D. Del, April 15, 1999) ........................................................................ 34, 35

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ........................................... 21

B. Lewis Productions, Inc. v. Bean, No. 02-98-KAJ, 2005 WL 273298, *2 (D. Del. Jan. 28, 2005) ......................................................................................... 35

Forsythe v. Starnes, 554 S.W.2d 100, 111 (Mo. App. 1977) ......................................... 35

GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd., 270 F.Supp.2d 476 (D. Del. 2003) .................................................................................................. 21

Harris v. Niehaus, 857 S.W.2d 222, 225 (Mo. 1993) ................................................... 23

Hionis Int'l Enters., Inc. v. Tandy Corp., 867 F. Supp. 268, 271 (D. Del. 1994) ........... 23

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) ......................................... 23

Ikeda v. Molock, 603 A.2d 785, 787 (Del. 1991) ......................................................... 32

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) .................................................................................................... 21

New Zealand Kiwifruit Marketing Board v. City of Wilmington, 825 F. Supp. 1180, 1194 (D. Del. 1993) .................................................................... 33

Ohlendorf v. Beinstein, 697 S.W.2d 553, 556 (Mo. App. 1985) .................................... 36

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) ......................... 21

Fed. R. Evid. 802 ........................................................................................................ 26

10 Del.C. §6302(d) ..................................................................................................... 32

10 Del.C. § 8106 ......................................................................................................... 34

10 Del.C. §8121 ......................................................................................................... 34

Restatement (Second) of Torts § 282............................................................................ 23

## I.     NATURE AND STAGE OF THE PROCEEDINGS

> *"[W]hat's bothering me the most is there's a gap. There's something—*
> *something's missing here. You don't do—you don't do anything like this*
> *without informing somebody. It's just not done. Something's missing. I say*
> *that and yet I can't produce something for you."*
>
>                          —Deposition testimony of Steven Sabia,
>                          Northeast Controls account manager,
>                          regarding the ordering of the valve at issue
>                          in this litigation[1]

This lawsuit arises out of Northeast Controls' error in processing a purchase order. Acting as Fisher's independent sales representative, Northeast Controls received a written purchase order from Praxair, Inc.[2] Among other items, the purchase order covered the purchase of a 12" A11 valve and referred to a written specification sheet dated June 3, 1998. A Northeast Controls employee prepared that specification sheet and provided it to a Praxair employee, who accepted it on behalf of Praxair. The written specification sheet showed that important components of the valve were to be manufactured of certain specifically identified materials suitable for high pressure, high temperature oxygen service. But when Northeast Controls placed an order for the valve with Fisher, Northeast Controls identified significantly *different materials of construction* from the materials as specified in the Praxair purchase order. Those different materials were in critical parts of the valve—specifically, parts exposed to the oxygen flow. Because of Northeast Controls' error, the materials of construction for the valve as manufactured and supplied by

---

[1] All documents cited in support of Fisher's Motion for Summary Judgment are attached to the Declaration of Daniel J. Gunter in Support of Fisher's Motion for Summary Judgment ("Gunter Decl.") and numbered consecutively as FCI/MSJ 0001–xxx. The quotation above is from the deposition of Steven Sabia ("Sabia Dep.) at 62:6-11, FCI/MSJ 0520.

[2] The information set forth in this section of the Memorandum is supported by the evidence cited below.

Fisher did not match the materials of construction for the valve as specified by Praxair in the written purchase order that Praxair sent to Northeast Controls.

On Saturday, May 20, 2000, the valve was opened for the first time at the pressures, purity, and temperature of oxygen identified in the signed specification sheet prepared by Northeast Controls. A fire and explosion immediately occurred, centered almost squarely on the valve. The explosion seriously injured one man and caused property damage and economic losses later alleged to exceed $30 million dollars.

On May 22, 2000—the Monday immediately following the explosion—Bhim Bhakoo, the Praxair employee who placed the order for the valve, returned to his office to find a voice mail describing the damage to the valve. Based on this description, Mr. Bhakoo concluded that there was a problem with the materials of construction of the valve. Mr. Bhakoo immediately contacted Northeast Controls and asked that Northeast Controls advise Praxair of the materials of construction of the valve. Thus, within two days of the incident, Praxair was focusing on the improper materials of construction of the valve that resulted from Northeast Controls' mistake in processing the order.

Because Northeast Controls had mishandled the ordering of the valve, Fisher and Northeast Controls were named as defendants in four separate lawsuits. The plaintiffs in all four lawsuits initially focused on the error in processing the valve order. Fisher extricated itself from the lawsuits without paying a penny to any of the four plaintiffs. By contrast, Northeast Controls paid $601,000 to extricate itself from three of the lawsuits *after Fisher had been dismissed from those actions.*

Although the underlying actions against Northeast Controls and Fisher arose from Northeast Controls' mistake in processing the order for the valve, Northeast Controls and its insurer, St. Paul, filed this action alleging that Fisher breached the Representative Agreement by failing to defend and indemnify Northeast Controls in those actions. But the Representative Agreement specifically exempts Fisher from any obligation either to **defend or indemnify** Northeast Controls for "Losses" (including claims, demands, and actions) arising from Northeast Controls' negligence. All four of the lawsuits at issue were based on the unambiguous evidence of Northeast Controls' negligence in processing the order for the valve. Because Northeast Controls' "Losses" arose from its negligence, plaintiffs' claims are barred by the terms and conditions of the contract on which they rely.

Further, plaintiffs' claim must fail because, under the applicable law, Northeast Controls could have been held liable *only for its own negligence.* In the underlying actions, all of the plaintiffs' claims against Northeast Controls were governed by Delaware law. Delaware's Contribution Act provides for several liability only. Consequently, in the underlying actions Northeast Controls could have been held responsible <u>only</u> for its own degree of fault, and it could not have been held liable for any of Fisher's fault. Because Northeast Controls could not have been held liable for, and did not have to defend against, any claims other than claims directed specifically at Northeast Controls, there was no circumstance under which Fisher could have been obligated to defend or indemnify Northeast Controls.

Further, plaintiffs' claims against Fisher are also barred by Delaware's three-year statute of limitations for breach of contract claims. Fisher therefore moves this Court for an order dismissing plaintiffs' claims against Fisher in their entirety.

Finally, Northeast Controls' failure to process the order for the valve properly was a breach of Northeast Controls' obligations under the Representative Agreement. The consequential damages flowing from that breach include the significant fees and costs that Fisher expended in defending itself in the underlying actions. Fisher therefore moves this Court for an order granting summary judgment as to Fisher's counterclaim for breach of contract against Northeast Controls.

Pursuant to Federal Rule of Civil Procedure 56(c), Fisher Controls International, LLC. hereby moves this Court for an order dismissing plaintiffs' breach of contract claim against Fisher and granting summary judgment as to Fisher's counterclaim for breach of contract.

## II.    SUMMARY OF ARGUMENT

This is an action for breach of contract. Plaintiffs have alleged that the Representative Agreement between the parties obligated Fisher to defend and indemnify Northeast Controls in the underlying actions. Fisher alleges that Northeast Controls' Losses were caused by its own negligence and thus that Fisher had no obligation to defend or indemnify Northeast Controls for those Losses. Fisher also alleges that plaintiffs' claims are barred by the applicable statute of limitations.

Finally, Fisher asserts that Northeast Controls breached its contractual obligations to Fisher, thus exposing Fisher to its legal fees and expenses in the underlying actions.

### III.     STATEMENT OF FACTS

#### A.     The Representative Agreement

This lawsuit arises out of the sale of a Fisher valve for use at an air separation unit in Delaware City, Delaware.[3] The valve was ordered by Praxair, Inc., in 1998 through Northeast Controls, Inc., an independent sales representative for Fisher.[4] As a Fisher sales representative, Northeast Controls sought and processed orders for various Fisher products, including Fisher control valves.[5] The contractual relationship between Fisher and Northeast Controls was governed by the "Representative Agreement" between those parties.[6] The Representative Agreement requires Northeast Controls to provide engineering services to Fisher customers and to maintain appropriate documentation.[7]

The relevant version of the Representative Agreement generally obligates Fisher to defend and indemnify Northeast Controls in product liability cases:

> . . . Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless [Northeast Controls] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product.[8]

But the Representative Agreement specifically provides that Fisher has no obligation to defend or indemnify Northeast Controls against "Losses"—i.e., "claims, demands, actions,

---

[3] FCI/MSJ 0004.
[4] FCI/MSJ 0004.
[5] FCI/MSJ 0104-0116.
[6] FCI/MSJ 0104-0116.
[7] FCI/MSJ 0104-0107.
[8] FCI/MSJ 0114.

losses, damages, liabilities, costs and expenses"—arising from Northeast Controls' own negligence:

> . . . Fisher shall not be obligated to protect, defend, indemnify or hold harmless [Northeast Controls] from and against any Losses arising from the following:
>
> . . .
>
> Negligent acts or omissions by [Northeast Controls].[9]

In short, under the Representative Agreement, Fisher has no obligation to defend or indemnify Northeast Controls from or against any "claims, demands, actions, losses, damages, liabilities, costs [or] expenses" arising from Northeast Controls' negligent acts or omissions.

### B.  Northeast Controls Was Negligent in Ordering the Valve

Acting as Fisher's agent under the terms of the Representative Agreement, Northeast Controls accepted an order from Praxair for a 12-inch type A11 valve for use in an air separation unit ("ASU") that Praxair was constructing at the Delaware City Power Plant.[10] In particular, one of Northeast Controls' employees, Albert Cappellini, worked with Bhim Bhakoo, a Praxair employee, to prepare specifications for the valve.[11] On June 3, 1998, Mr. Bhakoo initialed a specification sheet prepared by Mr. Cappellini.[12] Later, on July 6, 1998, Praxair sent to Northeast Controls a purchase order that specifically reference the June 3, 1998, specification sheet.[13]

---

[9] FCI/MSJ 0115.
[10] FCI/MSJ 0004, 0060-0061.
[11] FCI/MSJ 0428-0429, 0432-0433
[12] FCI/MSJ 0129.
[13] FCI/MSJ 0144-0154.

Northeast Controls subsequently placed an order for the valve with Fisher by using an electronic ordering system.[14] After the May 20, 2000, incident, Fisher learned that the order that Northeast Controls placed with Fisher did not match the June 3, 1998, specification sheet referenced in the purchase order for the valve. Discovery has confirmed the following variations between the agreed specification sheet and the order that Northeast Controls placed with Fisher:[15]

| Valve part | Praxair specifications | Order that Northeast Controls placed with Fisher |
|---|---|---|
| Disk | Monel | Hastelloy C |
| Stem ("shaft") | Monel | Inconel 718 |
| Bearings ("guide" | Monel | TFE composite |
| Seal ("seat") | Monel/PTFE | Tefzel |

After Northeast Controls initially placed the order with Fisher, Northeast Controls and Fisher discussed the materials of construction for the valve seat; in accordance with those communications, the valve as manufactured included a Hastelloy C disk, an Inconel 718 stem, TFE composite bearings, and a Kel-F seal.[16]

## C.    The Delaware City Power Plant

After Fisher manufactured the valve, it shipped it to Praxair, which installed the valve at an air separation unit that formed part of a larger project, the Delaware City Power Plant Repowering Project ("DCPPRP").[17] On May 20, 2000, various parties involved in commissioning the DCPPRP opened the valve for the first time under the process conditions

---

[14] FCI/MSJ 0004.
[15] FCI/MSJ 0160-0162.
[16] FCI/MSJ 0158-0159
[17] FCI/MSJ 0004, 0058

identified in the specification sheet prepared by Northeast Controls.[18] At that time, the oxygen in the piping upstream of the valve was approximately 99.7 percent pure and was pressurized to 1150 psi. (Normal atmospheric pressure at sea level is 14.7 psi.)[19] The oxygen's temperature was approximately 250° F.[20] When the valve opened, an explosion occurred almost immediately. The fire and explosion seriously injured Mr. Ronald Olson (an employee at the power plant), consumed portions of the valve, and damaged other components of the ASU.[21]

On May 22, 2000—the Monday immediately following the explosion—Bhim Bhakoo, the Praxair employee who placed the order for the valve, returned to his office to find a voice mail describing the damage to the piping around the valve.[22] Based on this description, Mr. Bhakoo immediately concluded that there was a problem with the materials of construction of the valve.[23] Mr. Bhakoo contacted Northeast Controls and asked Northeast Controls to advise Praxair of the materials of construction of the valve.[24] Thus, from the very first moment that Praxair employees involved in the purchase of the valve learned of the incident, Praxair focused on the materials of construction of the valve and the mistake that Northeast Controls made in processing the order for the valve.

After being contacted by Praxair, Northeast Controls sent Praxair a fax that confirmed that the valve's actual materials of construction did not match written specifications for the valve

---

[18] Bench Memo, FCI/MSJ 0058.
[19] FCI/MSJ 0406-0486
[20] FCI/MSJ 0531
[21] FCI/MSJ 0004, 0058.
[22] FCI/MSJ 0308.
[23] FCI/MSJ 0308.
[24] FCI/MSJ 0308.

identified in the purchase order for the valve.[25] Moreover, those specifications concerned critical parts of the valve that would have been exposed to the flow of oxygen through the valve.[26] Further inquiry revealed the information set out above, showing that Northeast Controls had received one set of written specifications with the purchase order from Praxair, but had placed an order with Fisher that called for different materials for the construction of those critical components in the valve.[27]

### D.    The Wendell Hull Report

After the explosion, Motiva, Praxair, Fisher, Northeast Controls, and other parties cooperated in an initial investigation. Motiva's operator at the plant—Conectiv, Inc.—retained an outside engineering firm, Wendell Hull and Associates ("WHA").[28] WHA had already had significant experience in investigating fires in oxygen systems; its lead investigator in the Delaware City incident had previously worked for NASA at its White Sands Testing Facility.[29] Before any litigation was filed, WHA provided an initial report that implicated the valve's materials of construction.[30] In particular, WHA offered a tentative opinion that the fire was caused by the ignition of the valve's thrust bearing.[31] As set out above, the thrust bearing was manufactured of TFE composite rather than Monel, the material identified in the written specifications prepared by Northeast Controls and accepted by Praxair.[32]

---

[25] FCI/MSJ 0158-0159, 0160, 0308.
[26] Cappellini Dep. at 74:1-18, FCI/MSJ 0478A.
[27] FCI/MSJ 0160-0162.
[28] FCI/MSJ 0171-0173.
[29] FCI/MSJ 0522-0523.
[30] FCI/MSJ 0171-0173.
[31] FCI/MSJ 0172-0173.
[32] FCI/MSJ 0159.

Thus, before any lawsuit was filed, a well-respected expert in oxygen service had concluded that the fire was caused by an error on the part of Northeast Controls.

### E.     The Four Underlying Actions

In April 2002, Mr. Olson filed an action in Delaware state court to recover for his serious burns, injuries, and other damages sustained as a result of the explosion.[33] In addition, Motiva, Praxair, and Great American Assurance (the insurer of the project's general contractor) filed three separate actions seeking to recover for damage to the DCPPRP and lost profits.[34] Fisher and Northeast Controls were defendants in all four of those actions.[35] All four of the complaints referenced the distinction between (on the one hand) the Praxair specifications and (on the other) the actual materials of construction of the valve.[36] In addition, all four complaints alleged negligence specifically on the part of Northeast Controls.[37]

Northeast Controls tendered the defense of these actions to Fisher. In accordance with the Representative Agreement—and against background of the evidence of Northeast Controls' negligence available at that time to both parties—Fisher informed Northeast Controls that it would defend and indemnify Northeast Controls in regard to any allegations as to the valve, but that it would not defend and indemnify Northeast Controls against claims of Northeast Controls' own negligence.[38]

---

[33] FCI/MSJ 0005.
[34] FCI/MSJ 0001.
[35] FCI/MSJ 0001.
[36] FCI/MSJ 0029, 0038, 0044-46, 0052.
[37] FCI/MSJ 0038, 0052.
[38] FCI/MSJ 0201-0202.

Despite the evidence that Northeast Controls had not properly processed the valve order, Fisher mounted an aggressive and ultimately successful defense in the underlying actions. Fisher's attorneys took the lead in conducting discovery, conducting the bulk of the depositions of the plaintiffs and other witnesses.[39] Fisher's attorneys conducted extensive written discovery, including reviewing hundreds of boxes of documents in Philadelphia and Houston.[40] Those attorneys also drafted and filed numerous motions and other briefs.[41] For example, when one party (Conectiv, Inc.) sought to dismiss Northeast Controls' third-party complaint against Conectiv in the <u>Great American</u> action, Fisher's attorneys drafted an opposition brief for Northeast Controls and sent it to Northeast Controls' attorneys, who filed an almost verbatim version of the same brief—a brief that was ultimately successful.[42] Despite the unambiguous evidence that the valve failed to conform to specifications, Fisher's attorneys developed evidence of an alternate cause of the fire and, through discussions with counsel for Mr. Olson, convinced those attorneys to pursue the other defendants, not Fisher—and consequently not Northeast Controls.[43] Fisher also identified and retained an expert in oxygen service, Dr. Robert Mostello. In fact, Dr. Mostello was the <u>only</u> expert in oxygen service retained by any of the parties to the underlying litigation.[44] Fisher's counsel also developed evidence in support of motions for

---

[39] Gunter Aff. ¶ 39.

[40] Gunter Aff. ¶ 39.

[41] Gunter Aff. ¶ 40.

[42] Gunter Aff. ¶ 40; <u>See also</u> See Great American Assurance Co. v. Fisher Controls Int'l, Inc., No. Civ.A. 02C-05-168, 2003 WL 21901094 (Del. Super. Aug. 4, 2003).

[43] Gunter Aff. ¶ 41.

[44] None of the other experts disclosed in that litigation had any expertise in oxygen service. That includes Northeast Controls' two testifying experts, David Pope and Gerard Muller. Gunter Aff. ¶ 41

summary judgment that led to the dismissal of all three of the claims brought by the commercial parties in the underlying actions (i.e., the <u>Motiva</u>, <u>Praxair</u>, and <u>Great American</u> actions).[45]

As a result of its aggressive litigation strategy, Fisher did not pay a penny to any of the plaintiffs in any of the four lawsuits. By contrast, Northeast Controls settled the claims against it *after Fisher had been dismissed from the relevant lawsuits.*

The history of those lawsuits shows the following timeline:

- August 8, 2003:        Fisher moves for summary judgment on all claims asserted by plaintiff Motiva and on Praxair's negligence claims

- September 22, 2003:    Motiva informs court that it will voluntarily discontinue its action

- October 20, 2003       Fisher moves for summary judgment on warranty and contract claims asserted by plaintiff Praxair

- October 20, 2003       Fisher moves for partial summary judgment on all claims asserted by plaintiff Great American

- January 20, 2004       Great American informs the court that it is voluntarily dismissing its claims against Fisher

- April 26, 2004         Court enters summary judgment for Fisher on all claims asserted against it by Praxair

- May 24, 2004           Northeast Controls agrees to pay $501,000 to resolve its liability in the <u>Praxair</u> and <u>Great American</u> actions

- June 7, 2005           Court grants Fisher's motion for summary judgment on all remaining claims against it in the <u>Olson</u> action

- July 28, 2005          Northeast Controls agrees to pay $100,000 to settle its liability in the <u>Olson</u> action

This timeline demonstrates that, in the underlying actions, Northeast Controls settled its own potential liability for its own negligence.

---

[45] Gunter Aff. ¶ 43

**F.    Further Evidence Developed in This Action Confirms That Northeast Controls' Ordering of the Valve Did Not Meet Applicable Standards**

As set out above, the evidence in the underlying action showed that Northeast Controls was negligent in processing the order for the valve. In addition, the wording of the complaints showed that the plaintiffs—and, later, the codefendants—in those lawsuits focused sharply on that negligence.

Despite that evidence, plaintiffs brought the instant action to recover the costs of defending and settling the underlying actions. The evidence developed in this action has served only to underscore the negligence of Northeast Controls.

The undisputed evidence shows that the specifications incorporated into the purchase order for the valve do not match the specifications for the valve that Northeast Controls provided to Fisher.[46] In the face of that glaring discrepancy, Northeast Controls may assert that there was some oral agreement between Northeast Controls and Praxair as to the valve's materials of construction.[47] For example, Mr. Cappellini testified that he "believed" that Praxair's representative Bhim Bhakoo had orally approved the valve's materials of construction as set out in the order placed with Fisher.[48] But there is no documentation of such an agreement, and Mr. Bhakoo vehemently denied any such agreement.[49] Moreover, Mr. Cappellini testified that he had no specific recollection of any such agreement: he merely believed that it had occurred.[50] At

---

[46] FCI/MSJ 0473.
[47] As explained below, the hearsay rule will prevent Northeast Controls from offering evidence of such an agreement. See Fed. R. Evid. 802. Northeast Controls cannot offer testimony by one of its employees that purports to convey a statement made by a Praxair representative.
[48] FCI/MSJ 0473-0474.
[49] FCI/MSJ 0305.
[50] FCI/MSJ 0473-0474.

deposition in the underlying actions, Mr. Cappellini testified that he "assume[d]" that he had discussed the Valve's as-ordered materials of construction with Praxair's representative Bhim Bhakoo and that Mr. Bhakoo had approved those materials of construction.[51]

The absence of any such oral agreement—and Northeast Controls' negligence in transmitting the order—is confirmed by a document prepared by Mr. Cappellini titled "Order history regarding 12" Fisher A11 valve that was supplied to Praxair."[52] In the "Order History," Mr. Cappellini confirms that "[the as-ordered] construction does not match what was on the spec sheet for the 12" valve dated 6/3/[98]. **Not sure why the difference . . . .**"[53] Moreover, Mr. Cappellini could not explain <u>why</u> the order placed with Fisher differed from the specification sheet that Praxair had sent to Northeast Controls.[54] And **Mr. Cappellini confirmed that the specification sheet and the information conveyed by Northeast Controls to Fisher should have matched.**[55]

Regardless whether there was or was not an oral agreement between Northeast Controls and Praxair regarding the valve's materials of construction, the undisputed evidence shows that Northeast Controls violated the standard of care that applies to the processing of orders by a sales representative.

**First,** Northeast Controls violated the standard of care set forth in its Purchase Order Review Guidelines ("NEC Guidelines"). The NEC Guidelines require Northeast Controls' sales associates to review all purchase orders against the quotation and to resolve all discrepancies

---

[51] Cappellini Dep. at 228:21-229:11, FCI/MSJ 0473-0474.
[52] FCI/MSJ 0160-0162.
[53] FCI/MSJ 0160.
[54] FCI/MSJ 0463
[55] Cappellini Dep. at 137:7–22 (emphasis added), FCI/MSJ 0447.

with the customer.[56] The NEC Guidelines also provide strict instructions with regard to verbal purchase orders:

> If a verbal Purchase Order is given, request a confirming purchase Order.
>
> If a confirming Purchase Order is received after an order is entered, it must still be reviewed. If the customer requests acknowledgment of the confirming Purchase Order, it must be acknowledged.[57]

Despite Northeast Controls' own standards, the Praxair specifications do not match the order that Northeast Controls transmitted to Fisher, and not a single document shows or even hints that Northeast Controls sought to resolve the discrepancy between the valve's materials of construction as specified in the purchase order and the materials of construction as transmitted to Fisher. Nor does a single document show that Praxair approved different materials of construction from those identified in the purchase order for the valve.

**Second,** Northeast Controls violated the standard of care set forth in Northeast Controls' Quality Standards, which emphasize in several places the importance of confirming and documenting all purchase orders—including verbal purchase orders—and resolving all discrepancies with the customer:

> Customer requirements, Emerson or other Supplier product/service specific requirements and contract scope are adequately defined and documented including verbal specifications. Verbal specifications are confirmed with documentation.[58]

---

[56] Northeast Controls' Purchase Order Review Guidelines, FCI/MSJ 0203.

[57] Id.

[58] Northeast Controls Quality Manual, Section 7.2.1, "Determination of Requirements Related to the Product/Service. FCI/MSJ 0217-0218.

> Any contract or accepted order requirements differing from those in the quotation tender are resolved, documented, and acknowledged by the customer.[59]
>
> A Process Map and NCI procedures are established and maintained to ensure that purchasing documents clearly and completely identify ordered materials or other required resources. Purchasing documents are completed to clearly define the material requirements and may include reference to applicable drawings, inspection instructions, and other relevant technical data . . . . All purchase order data is reviewed for adequacy, completeness and released to suppliers."[60]
>
> Customer purchase order, write up, and/or quote match[.][61]

Again, the material specifications *originated by Northeast Controls* and incorporated into the purchase order for the valve do not match the materials identified in the order that was transmitted by Northeast Controls to Fisher. Further, not a single document indicates that Northeast Controls sought to resolve the discrepancy between the valve's materials of construction as specified and the materials of construction as transmitted to Fisher. And no document shows that Praxair approved different materials of construction from those identified in the purchase order for the valve.

In addition to the documentary evidence of Northeast Controls' negligence, the deposition testimony of Northeast Controls' witnesses confirms that Northeast Controls failed to adhere to the appropriate standard of care in processing the order for the valve. Michael Peters—Northeast Controls' president and owner of 100 percent of its shares—confirmed that the appropriate standard of care required Northeast Controls to confirm all customer specifications in writing and

---

[59] Id.
[60] NEC Quality Manual, Section 7.4.1, Purchasing Process, FCI/MSJ 0219.
[61] NEC Quality Manual, "Order Entry & Delivery Management Process Map,", FCI/MSJ 0258-0259.

retain the confirming documents. Indeed, Mr. Peters testified that it would be "terrible" to submit

an order that did not meet the agreed specifications:

> Q . . . There are oral discussions between the sales representative and a customer as to specifications for a product. It's also good general business practice to confirm those specifications in writing, isn't it?
>
> A  It is.
>
> Q  And if Praxair and Northeast Controls agreed on a set of specifications for a Fisher product, Northeast Controls would not have made a practice to substitute different specifications to Fisher without first obtaining Praxair's agreement, right?
>
> A  Correct.[62]
>
> . . .
>
> Q: If there were discussions that were other information transmitted by Praxair to Northeast Controls regarding materials of construction for the valve, good business practice would have been to document those discussions in writing, confirm them with the customer, correct?
>
> A  Yes.
>
> Q  And good business practice would have called to maintain those documents so that they could be found in the event of a dispute with the customer for any reason down the road, correct?
>
> A  Yes.
>
> Q  And whatever we have at the end of the day, **we do not have maintained documentation that connects up the documents initialed by Bhim Bhakoo on behalf of Praxair and the order information as transmitted to Fisher by Northeast Controls for this 12-inch valve, correct?**
>
> A  We—you know, there are things we don't have and there are things that we do have. **What we don't have, what you suggested, that's just as clear as a bell.** And then—and then with

---

[62] Deposition of Michael Peters ("Peters Dep.") at 62:2-13, FCI/MSJ 0495.

that said, as I've indicated before, Bert, and his legendary detailed diligence, does not invent specifications. It was there—it had to be there, in all probability, for a reason. And then the fact that the 12-inch valve was ordered per Praxair specifications for that pressure and temperature of oxygen service tells me that there was something that was transacted someplace along the way.

Q  Again, though, that something that was transacted along the way was not any—**documentation was not retained, correct**?

A  Well, **we can't find it, if it is.** And, you know, you tell me. Was Bhim Bhakoo supposed to—was Bert's agreement with Bhim Bhakoo that Bhim Bhakoo would send Bert a note and he failed to do that? Was Bert supposed to confirm that back? Don't know. Can we find phone notes? No. But what we do—I don't know that. What we do know is Bert's practices as an employee as an inside engineer is such that he is very, very diligent and doesn't commit errors to that degree.

Q  If, in fact, he or someone else at Northeast Controls simply, the term you used, tell me if it's fair, made up specifications, if that happened, that would be a serious error, wouldn't it?

A  Terrible. **It would be terrible.**[63]

. . .

Q  So, you agree, though, **it [the order transmitted by Northeast Controls to Fisher] doesn't comply with the purchase order, correct?**

A  **Correct. I mean, it's right there.**[64]

Mr. Cappellini's supervisor at the time of the incident, Steven Sabia, also confirmed that good business practice required Northeast Controls to confirm—and retain—Praxair's valve specifications in writing:

---

[63] Peters Dep. at 102:7-104:9, FCI/MSJ 0499-0501 (emphasis added).
[64] Peters Dep. at 100:18-20, FCI/MSJ 0498 (emphasis added).

Q  If there had been discussions between Praxair and Northeast Controls regarding this valve that would have called for different materials of construction, it would have been your practice to document those discussions, correct?

A  Absolutely.

Q  And it would have been your practice to retain the documentation of those discussions, correct?

A  Correct.

Q  And it would, also, not have been your practice to substitute or to call for a different material of construction for any of those four items [i.e., disk, stem, guide, seat] without confirming that with Praxair, correct?

A  Absolutely not.[65]

In short, the testimony of Northeast Controls' own witnesses confirms that Northeast Controls failed to adhere to the appropriate standard of care. That negligence led not only to the "gap" in the documents, but also to the four actions that were brought against Northeast Controls and Fisher. As set out below, Fisher had no obligation to defend and indemnify Northeast Controls against those lawsuits.

---

[65] Sabia Dep. at 54:3-16, FCI/MSJ 0518.

## IV.    ARGUMENT AND AUTHORITIES

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. In determining whether there is a triable issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, Rule 56(c) requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). Instead, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587 (citation omitted). Accordingly, a mere scintilla of evidence in support of the nonmoving party is insufficient for a court to deny summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

"[D]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment." GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd., 270 F.Supp.2d 476 (D. Del. 2003) (citing Tamarind Resort Assocs. v. Government of Virgin Islands, 138 F.3d 107, 110 (3d Cir. 1998)).

**B.** **Plaintiffs' Claim for Breach of Contract Against Fisher Is Barred by the Terms and Conditions of the Representative Agreement**

    **1.** **Fisher Is Not Obligated to Defend and Indemnify Northeast Controls for Northeast Controls' Negligent Acts and Omissions**

The Representative Agreement at issue in this matter specifically provides that Fisher has no obligation to defend or indemnify Northeast Controls for "Losses" arising from Northeast Controls' own negligence:

> . . . Fisher shall not be obligated to protect, defend, indemnify or hold harmless [Northeast Controls] from and against any Losses arising from the following:
>
> . . .
>
> Negligent acts or omissions by [Northeast Controls] .[66]

The term "Losses" includes "any and all claims, demands, actions, losses, damages, liabilities, costs and expenses."[67] This definition has been confirmed by plaintiffs' expert James W. Semple, who offered the opinion that the term "Losses" is "shorthand" for "claims, demands, actions, losses, damages, liabilities, costs and expenses."[68]

Consequently, under the Representative Agreement Fisher had no obligation to defend or indemnify Northeast Controls against any "claims, demands, actions, losses, damages, liabilities, costs and expenses" arising out of Northeast Controls' own "[n]egligent acts or omissions." As set out below, the undisputed evidence shows that Northeast Controls was negligent: its own witnesses confirmed that Northeast Controls' conduct failed to conform to the appropriate standard of care. Further, the undisputed evidence shows that the "claims, demands, actions,

---

[66] FCI/MSJ 0115.
[67] FCI/MSJ 0114-0115.
[68] Deposition of James W. Semple ("Semple Dep. at 75:5-16), FCI/MSJ 0526.

losses, damages, liabilities, costs and expenses" at issue arose out of Northeast Controls'
negligence. Thus, Fisher had no obligation to defend Northeast Controls in litigation arising out
of Northeast Controls' negligence.

### 2. Northeast Controls Was Negligent

The first question is whether Northeast Controls was negligent in processing the order for
the valve. Under Missouri law,[69] "negligence is conduct which falls below the standard
established by law for the protection of others against unreasonable risk of harm." See
Restatement (Second) of Torts § 282. "'[T]he standard of conduct to which [a person] must
conform to avoid being negligent is that of a reasonable [person] under like circumstances.'"
Harris v. Niehaus, 857 S.W.2d 222, 225 (Mo. 1993) (quoting Restatement (Second) of Torts §
283).

In processing the order for the valve, Northeast Controls knew that it was going to be
used in oxygen service, with almost 100 percent pure oxygen at high pressures (in excess of 1150
psi) and high temperatures (above 250° F).[70] Mr. Peters, Northeast Controls' president, testified
that Northeast Controls knew that there were hazards associated with oxygen service.[71] In fact,

---

[69] The interpretation of the Representative Agreement is governed by Missouri law. FCI/MSJ ---. A
federal court in a diversity case must apply the conflict of laws rules of the state in which it is sitting. See
Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). Delaware choice of law rules rely on
Restatement (Second) of Conflicts of Law § 187 for the proposition that "the parties' choice of law, as
expressed in their agreement, will be upheld unless the state whose law would control in the absence of a
choice has a materially greater interest in the subject matter." Hionis Int'l Enters., Inc. v. Tandy Corp.,
867 F. Supp. 268, 271 (D. Del. 1994) (citing Rosenmiller v. Bordes, 607 A.2d 465, 468 (Del. Ch. 1991)).
Under Delaware law, express choice of law provisions are generally given effect. Id. (citing A.I.C. Ltd. v.
Mapco Petroleum Inc., 711 F.Supp. 1230, 1237 (D. Del. 1989)). The Court should therefore apply
Missouri law to the issue of Northeast Controls' negligence. Nevertheless, under either Missouri or
Delaware law, Northeast Controls was negligent.
[70] FCI/MSJ 0531.
[71] Peters Dep. at 63: 1-4, FCI/MSJ 0501.

Northeast Controls had in its file a Fisher publication specifically warning of risks associated with oxygen service.[72] Further, that Fisher document warned that only specific materials should be used in valves used in oxygen service.[73]

Northeast Controls also knew (or should have known) that failure to process an order correctly could lead to litigation. In fact, Northeast Controls' president, Mr. Peters, had signed an agreement between Praxair and Fisher that incorporated an express warranty by Fisher that the products that it supplied would meet Praxair's specifications.[74] Northeast Controls knew (or should have known) that if it failed to transmit accurately Praxair's specifications for a product to Fisher, it could expose Fisher to litigation.[75] In fact, at deposition Mr. Peters agreed that an error in processing an order like the one for the valve at issue would expose a party to litigation.[76]

Under those circumstances, a reasonable sales representative would have transmitted the order for the valve accurately. It would not have substituted other materials from those identified in the purchase order for the valve. If the purchase order did not reflect an oral agreement between the sales representative and the customer, a reasonable sales representative would have resolved the discrepancy and would have confirmed the oral agreement in writing.

But Northeast Controls' conduct did not conform to the standard of conduct that a reasonable sales representative would have observed in processing the order for the valve. The evidence shows that the order that Northeast Controls placed with Fisher does not match the purchase order that Praxair sent to Northeast Controls. Only two scenarios explain this mismatch.

---

[72] FCI/MSJ 0546-0549.
[73] FCI/MSJ 0547-0548.
[74] FCI/MSJ 0080, 0098.
[75] FCI/MSJ 00501
[76] Peters Dep. at 104:10–105:6, FCI/MSJ 0501.

And under either scenario, Northeast Controls failed to conform to the appropriate standard of conduct:

1.  *All of the communications between Praxair and Northeast Controls are set forth in the purchase documents.* If so, those documents demonstrate that Northeast Controls submitted the wrong materials of construction for the valve to Fisher.

2.  *Praxair and Northeast Controls had some oral agreement regarding the materials of construction of the valve.* If so, then Northeast Controls failed to confirm that oral agreement in writing. Indeed, Northeast Controls not only failed to confirm that oral agreement in writing, it instead confirmed in writing a *different agreement.*

**If the first scenario applies,** then the evidence confirms that Northeast Controls was negligent. The witnesses for Northeast Controls confirmed at deposition that the written specifications *should* conform with the order transmitted to Fisher. Indeed, Mr. Peters testified that it would "terrible" to receive one set of specifications and then submit an order calling for different specifications.[77] But the written specifications do *not* conform with the order that Northeast Controls placed with Fisher. A reasonable trier of fact can draw only one conclusion: Northeast Controls made a terrible mistake.

**There is no admissible evidence of the second scenario.** Not a single *admissible* document shows the existence of an oral agreement between Northeast Controls and Praxair. And there can be no other *admissible* evidence of such an agreement. To prove the existence of

---

[77] FCI/MSJ 0501.

an oral agreement, Northeast Controls would have to offer the testimony of one of its witnesses that Praxair consented orally to that agreement. Any such Northeast Controls testimony would necessarily rely on an out-of-court statement (i.e., the alleged statement of the Praxair representative) to prove the truth of the matter asserted in that statement—that is, that Praxair had entered into such an oral agreement with Northeast Controls. The hearsay rule prevents Northeast Controls from offering testimony by one of its employees that a Praxair employee made such a statement. See Fed. R. Evid. 802. Praxair's relevant employee, Bhim Bhakoo, has denied the existence of any such oral agreement.[78]

In short, there is no admissible evidence of any oral agreement. Thus, based on the *admissible* evidence, only one conclusion can be drawn: Northeast Controls failed to transmit to Fisher the specifications set out in the written agreement with Praxair. That failure violated the standard of care established by Northeast Controls' own employees. Because Northeast Controls' conduct failed to conform to the applicable duty of care—i.e., because it acted in a way that a reasonable person would *not* have acted—it was negligent.

**But even if there were admissible evidence supporting the existence of an oral agreement, then the evidence would still confirm that Northeast Controls was negligent.** Northeast Controls' own quality procedures required Northeast Controls' sales representative to carefully review all purchase orders for accuracy, to obtain written confirmation for any verbal purchase order, and to resolve any discrepancies before releasing the purchase order data to Fisher.[79] Further, the testimony of all of the Northeast Controls witnesses confirms that the

---

[78] FCI/MSJ 0305.
[79] FCI/MSJ 0217-0219, 0258-0259.

appropriate standard of care calls for a sales representative to confirm verbal agreements in writing and to maintain documentation of those agreements. But there is not a shred of evidence that Northeast Controls ever documented any alleged verbal agreement. More than seven years after the May 2000 incident at the Delaware City Power Plant, more than five years after the first action was filed, and more than a year after bringing this suit, plaintiffs have never produced such a document. The failure to produce any such document leads to the inevitable conclusion that there never was any oral agreement between Northeast Controls and Praxair. In any event, the undisputed evidence shows that Northeast Controls did not document that agreement.

Northeast Controls' failure to document the alleged oral agreement also fell below the applicable standard of care. As noted above, Albert Cappellini was the Northeast Controls employee responsible for working with Praxair in preparing the order for the valve. At deposition, Mr. Cappellini confirmed that Northeast Controls failed to adhere to the appropriate standard of care in processing the Praxair order:

> Q  (By Mr. Gunter) You agree **good practice would have called to retain those documents regarding the construction of this valve in Northeast Controls' file**, correct?
>
> A  Yeah. **Good practice would have been, sure.**
>
> Q  And so, **if there are missing documents, then that good practice was not followed in regard to this valve, correct?**
>
> A  **If there are missing documents. Yeah.**
>
> Q  **And if the verbal discussions were not confirmed in writing, then that would not have conformed with good practice, correct?**
>
> A  **Correct.**[80]

---

[80] Cappellini Dep. at 127: 7-19, FCI/MSJ 0479.

Northeast Controls' CEO Michael Peters and Mr. Cappellini's supervisor at the time of the incident, Steven Sabia, also conceded that Mr. Cappellini failed to document any alleged oral agreement and thus failed to adhere to the appropriate standard of care.[81]

Northeast Controls' failure to follow good practice is so astounding that Mr. Peters and Mr. Sabia both testified that it was simply not possible that Mr. Cappellini had committed such an error. They resorted to speculating that something must exist to explain the "terrible" "gap" between the specification sheet and the order that Northeast Controls transmitted to Fisher:

> A . . . [R]eferring to the differences between the Praxair specifications and the order that was sent to Fisher and why—I mean, and the fact that they were different. And it's important to point out that—for me to point out, that something probably happened here. . . . [O]ur people, don't just take a customer specification sheet like that, ignore it and write the order any way they choose.
>
> Q  That would not be your expectation, that that would occur, right?
>
> A  Correct. They just don't write it any way they choose. . . .
>
> . . . [t]here's a reason why the Monel trim wasn't in there.
>
> Q  Your expectation would be, though, that the reason for that difference would be documented, wouldn't it?
>
> A  You know, I would. And I kind of feel like we're all at a loss as to whose responsibility it was to do the documenting and why we can't lay our hands on it. . . .
>
> . . . I don't know who lost it, I don't know where it is, but it's clear to me that something's missing here. Something is missing. . . .
>
> Q  But **you don't know of a document that tells us what that reason is?**

---

[81] Peters Dep. at 100:18-20, 102:7-104:9, FCI/MSJ 0498-0501; Sabia Dep. at 54:3-16, FCI/MSJ 0518.

A  **No, I don't.** And, you know, **we just can't find telephone notes; we can't find, you know, other documents and whatnot.** But what we do know is that the order for this 12-inch valve just didn't—just wasn't invented out of thin air. You know, **it was changed.** There are differences for a reason. And more than likely, the cause for that is the fact that—would be borne out by the fact that it does comply with the Praxair specifications, not the purchase order, but the specifications which Bert was used to using. So—

Q  **So, you agree, though, it doesn't comply with the purchase order, correct?**

A  **Correct. I mean, it's right there.**[82]

Q  . . . [W]ould you agree that something fell through the cracks here?

A  **Something's missing. There's a gap here somewhere.** . . . **[W]hat's bothering me the most is there's a gap. There's something—something's missing here.** You don't do—**you don't do anything like this without informing somebody.** It's just not done. **Something's missing. I say that and yet I can't produce something for you.**[83]

There is nothing to fill the gap. A reasonable trier of fact cannot speculate that something existed when there is no evidence of its existence. Only one conclusion can be drawn: **Northeast Controls was negligent in processing the order for the valve.**

C.  **The "Losses" at Issue Arose from Northeast Controls' Negligence**

Throughout the current litigation, plaintiffs have apparently taken the position that Northeast Controls' appalling negligence was really irrelevant. After all, plaintiffs claim, Northeast Controls' negligence did not cause the fire at the Delaware City Power Plant.

---

[82] Peters Dep. at 98:4-100:20, FCI/MSJ 0496-0498.
[83] Sabia Dep. at 61:18-62:11, FCI/MSJ 0519-0520.

29

Plaintiffs' argument misses the mark. The Representative Agreement provides that Fisher has no obligation to defend or indemnify Northeast Controls against "claims, demands, [and] actions" arising from Northeast Controls' negligence. Consequently, the relevant question is whether the "claims, demands, [and] actions" at issue arose from Northeast Controls' negligence. And, again, a reasonable trier of fact could reach only one conclusion: regardless whether Northeast Controls' negligence caused the fire and explosion, the "claims, demands, [and] actions" at issue in this matter arose from Northeast Controls' negligent processing of the order for the valve.

This conclusion can and must be drawn from the history of the investigation of the May 2000 incident and the complaints as filed. The incident occurred on May 20, 2000. On May 22, 2000, Praxair learned from Northeast Controls that the specification sheet that it had did not match the materials of construction for the valve as actually supplied.[84] Before the first lawsuit was filed, an investigation had taken place, and a prominent forensic engineering firm—Wendell Hull and Associates—had issued a preliminary report offering three possible causes for the fire.[85] Of those three possible causes, two could be traced directly to the deviation in material specifications introduced by Northeast Controls: (1) the use of Kel-F rather than Monel for the valve's seal and (2) the use of TFE composite bearings rather than Monel bearings.[86]

---

[84] FCI/MSJ 0158-0159.
[85] FCI/MSJ 0171-0173.
[86] FCI/MSJ 0172. It is irrelevant that Fisher later developed evidence supporting Wendell Hull's third scenario—particle impact on piping immediately upstream of the valve. The point is that the various parties were relying on the theories put forward by Wendell Hull. Further, the hearsay rule does not bar Fisher's reference to the Wendell Hull report. Fisher is not offering that report for the truth of the matters asserted in that report. Instead, Fisher is offering the report only to show that those matters were asserted, regardless of the truth of those assertions.

Given the written record of these material deviations and the presence of the Wendell Hull report, the plaintiffs in the underlying actions naturally focused on the fact that the valve did not meet Praxair's written specifications. All four plaintiffs in the underlying actions specifically alleged that the valve failed to meet specifications because it used the wrong materials.[87] Although those complaints generically alleged "defects" in the valve, no party in the underlying actions raised any issues about the design or manufacture of the valve other than those material deviations. In short, **in the underlying actions the plaintiffs focused exclusively on the material deviations that resulted from Northeast Controls' negligence.**

In light of that history, a reasonable trier of fact can draw only one conclusion: Northeast Controls' "Losses" (i.e., claims demands, actions, losses, damages, liabilities, costs and expenses) were the direct result of Northeast Controls' negligence in processing the order for the valve. Under the terms of the Representative Agreement, Fisher was not obligated to defend or indemnify Northeast Controls for those Losses.

Plaintiffs' claims for breach of contract against Fisher are specifically excluded by the terms and conditions of the contract on which they rely. Consequently, plaintiffs' claims should be dismissed in their entirety.

### D. Under Delaware's Contribution Act, Northeast Could Have Been Held Liable Only for Its Own Negligence and Could Not Have Incurred Liability for Damages Attributable To Fisher; Thus, Northeast's Right to Defense and Indemnification Never Arose

Northeast Controls' Losses indisputably arose from Northeast Controls' negligence. But it is not necessary to conclude that Northeast Controls was negligent as a matter of law in order

---

[87] <u>Motiva</u>, <u>Praxair</u>, <u>Great American</u>, <u>Olson</u> Complaints, FCI/MSJ 0038, 0029, 0044-0046, 0052.

to dismiss plaintiffs' claims against Fisher. Under Delaware law, Northeast Controls could have been held liable in the underlying actions only for its own negligence. It could not have incurred any losses attributable to Fisher. Thus, Northeast Control' sole exposure in the underlying actions was exposure arising from Northeast Controls' negligence. As a corollary, any "Losses" that Northeast Controls did or could have incurred in the underlying actions arose (or would have arisen) solely from its own potential liability. The Representative Agreement specifically provides that Fisher has no obligation either to defend or indemnify Northeast Controls for Losses arising from its own negligent acts or omissions. Consequently, Fisher had no obligation under the Representative Agreement.

Delaware's Contribution Act requires the trier of fact to apportion liability among joint tortfeasors based on the parties' relative degrees of fault. Ikeda v. Molock, 603 A.2d 785, 787 (Del. 1991); 10 Del.C. §6302(d).[88] Under the Contribution Act, each joint tortfeasor is held responsible only for its own degree of fault.

In the underlying actions, had any fault been attributable to Fisher, the jury would have apportioned that fault to Fisher, not to Northeast Controls. Northeast Controls could not have been held liable for any fault apportioned to Fisher. Instead, Northeast Controls could have been held liable only for its own fault. Because Northeast Controls could have been held liable only for its own fault, it could have been held liable only for "Losses . . . arising from . . . [its] [n]egligent acts or omissions."

_____

[88] In order for the jury to prorate liability based upon proportionate fault, the parties to the litigation must first file cross-claims against one another. Id. This requirement was met: all of the defendants in the underlying matter filed cross-claims against one another.

Because Fisher would have been held directly liable for its own share of fault, and because Northeast could never have been held liable for Fisher's fault, there were never and never would have been any circumstances that would trigger any obligation by Fisher to indemnify Northeast. See New Zealand Kiwifruit Marketing Board v. City of Wilmington, 825 F. Supp. 1180, 1194 (D. Del. 1993) (noting that the effect of the Contribution Act is to require a factual determination of degrees of fault, which prevents the parties from incurring liability for another party's actions and therefore prevents the right to indemnification from ever being triggered).[89]

Further, in accordance with the substantive law applicable to plaintiffs' claims in the underlying actions, Northeast Controls could have been held liable only for its own negligence. Northeast Controls did not sell or distribute the valve. Consequently, it could not have been held liable as a product seller. Further, even though Northeast Controls' conduct resulted in Fisher breaching its express warranty to Praxair, Northeast Controls itself made no warranty to anyone and thus could not have been held liable for a breach of warranty.[90] Similarly, Northeast Controls was not party to a contract with any of the plaintiffs in the underlying actions. Consequently, it could not have been held liable for breach of contract.

In short, in the underlying actions Northeast Controls could have been held liable only for its own negligence. Fisher had no obligation to defend or indemnify Northeast Controls against

---

[89] Although it was not possible for Northeast Controls to be held liable for fault attributable to Fisher, Fisher did agree to defend and indemnify Northeast Controls in regard to any allegations as to the valve. As described in further detail above, Fisher mounted an aggressive and ultimately successful defense against all such claims.

[90] Fisher's express warranty had expired before the incident at issue. Because of that lapse in time, Fisher was able to defeat Praxair's claim for breach of warranty.

claims, demands, or actions arising from Northeast Controls' own negligence. Consequently, Fisher had no obligation to defend or indemnify Northeast Controls against such claims in the underlying actions. Plaintiffs' claims for defense and indemnification should therefore be dismissed.

### E.     Plaintiffs' Claims Are Barred by the Applicable Statute of Limitations

Even if Fisher had a contractual duty to defend or indemnify Northeast Controls for acts of Northeast Controls' negligence —which it did not—plaintiffs' claims against Fisher are barred by Delaware's three-year statute of limitations.

Plaintiffs have invoked diversity jurisdiction to assert a breach of contract claim against Fisher in the United States District Court for the District of Delaware. Having chosen to bring their cause of action in Delaware, plaintiffs have subjected themselves to Delaware's procedural rules. In determining the applicable limitations period, a court sitting in diversity must apply the statutes of limitation of the forum state. American Energy Technologies, Inc., v. Colley & McCoy Co., 1999 WL 301648, at *2 (D. Del, April 15, 1999). When the cause of action arises outside of Delaware, a federal court sitting in diversity is required to apply Delaware's borrowing statute. Id. Under Delaware's borrowing statue, where a cause of action arises outside of Delaware, an action cannot be brought in Delaware to enforce such a cause of action after the expiration of whichever is shorter: the time limited by the law of Delaware, or the time limited by the law of the state or country where the cause of action arose. Id., 10 Del.C. §8121 (emphasis added).

Under Delaware law, the statute of limitations for a breach of contract action is three years from the date that the breach occurs. 10 Del.C. § 8106. Thus, no matter where plaintiffs

claim that the alleged breach occurred, plaintiffs were required to file their claim, at most, within a period of three years of learning that Fisher did not intend to defend or indemnify Northeast Controls in the underlying actions. American Energy Technologies, Inc. v. Colley & McCoy Co, 1999 WL 301648, at *3.

Plaintiffs were aware by October 29, 2001, that Fisher would not defend Northeast Controls against its own negligence.[91] Plaintiffs filed their original Complaint in this matter on June 29, 2006, more than six years after learning of Fisher's denial of its request for defense and indemnification. Consequently, plaintiffs' claims against Fisher are time-barred and should be dismissed.

### F.    Northeast Controls Breached the Representative Agreement by Failing to Process the Order for the Valve Properly

Under Missouri law, an injured party to a contract may recover attorney's fees incurred in defending collateral litigation.[92] Forsythe v. Starnes, 554 S.W.2d 100, 111 (Mo. App. 1977). Collateral litigation occurs when a breach of contract by one party results in a lawsuit by a third party against the other party to the contract. Ohlendorf v. Beinstein, 697 S.W.2d 553, 556 (Mo. App. 1985). The injured party to the contract may recover attorneys' fees incurred in defending collateral litigation if the litigation was the natural and proximate result of the wrong or breach

---

[91] See Exhibit J to Plaintiff's First Amended Complaint; FCI/MSJ 0201-0202
[92] By contrast, Missouri law applies to Fisher's counterclaim. The Representative Agreement calls for application of Missouri law. Representative Agreement, FCI/MSJ 0115. Fisher could have brought its breach-of-contract claim against Northeast Controls in Missouri or New York, but was forced instead to file its action as a counterclaim against plaintiff's Delaware action. Under the circumstances of this case, where the parties chose Missouri law and the breach occurred in New York (Northeast Controls' location and the location of the place of business of Praxair, Inc., the purchaser of the valve), Delaware's borrowing statute does not apply to Fisher's counterclaim. See, e.g., B. Lewis Productions, Inc. v. Bean, No. 02-98-KAJ, 2005 WL 273298, *2 (D. Del. Jan. 28, 2005) (citing Saudi Basic Indus.Corp. v. Mobil Yanbu Petrochemical Co., 2005 WL120789 (Del. Jan. 14, 2005)) (per Jurdan, J.). Thus, Missouri substantive and procedural law applies to Fisher's action for breach of contract.

by the other party, the fees were necessarily and in good faith incurred to protect the wronged party from injury, and the amount of fees is reasonable. Forsythe, 554 S.W.2d at 111.

The Representative Agreement obligated Northeast Controls (among other things) to "furnish engineering services, consistent with Fisher's standards and practices."[93] The Representative Agreement also obligated Northeast Controls to process orders from customers and to perform that work correctly—i.e., it was obligated to ensure that a purchase order from a customer matched the order that it placed through Fisher's order processing system.

As explained above, Northeast Controls' own purchase order guidelines require that its sales associates review every purchase order for accuracy, make sure that all verbal purchase orders match a confirming written purchase order, and resolve any discrepancies with the customer. Northeast Controls did not review the purchase order for accuracy, did not obtain a confirming purchase order for the verbal materials change to which Praxair allegedly agreed; and did not resolve the discrepancy between the materials of construction as ordered by Praxair and the materials of construction as ordered

Simply put, the order that Northeast Controls received did not match the order that it placed with Fisher through Fisher's order processing system. That mismatch constituted a breach of Northeast Controls' own standard of care in processing orders and a breach of the agreement between Fisher and Northeast Controls: Northeast Controls cannot fulfill its contractual obligations to Fisher by making egregious errors in processing orders. Northeast Controls' witnesses confirmed that it is supposed to transmit orders correctly—not receive one purchase order and then transmit an order for a different product.

---

[93] Representative Agreement, FCI/MSJ 0106.

As a direct result of Northeast Controls' breach of its contractual obligations, Fisher was sued by third parties Praxair, Motiva, Great American Assurance Company, and Ronald Olson in the underlying actions. Fisher incurred significant costs in defending those actions and in defending against counterclaims asserted by the co-defendants in those actions—including defendant Northeast Controls. The fees incurred by Fisher in defending the underlying actions were reasonable and incurred in good faith. Fisher is entitled to recover those fees.

**V.    CONCLUSION**

Within two days of the incident at the bottom of all of these years of litigation, it had become apparent that Northeast Controls was negligent. Northeast Controls received one set of specifications from Praxair, but then placed an order with Fisher that did not conform to those specifications.

As a result of Northeast Controls' negligence, both Fisher and Northeast Controls were drawn into the underlying actions. In those actions, Fisher vigorously and successfully defended any and all claims that focused on the valve or Fisher's conduct. Fisher thus fully satisfied its obligations under the Representative Agreement. It had no obligation to defend and indemnify Northeast Controls against claims arising from Northeast Controls' own negligence. As a matter of fact and as a matter of law, in the underlying actions Northeast Controls could have been held liable only for its own negligence. Because Fisher had no obligation to defend or indemnify Northeast Controls against those claims, Fisher did not breach the Representative Agreement.

By contrast, Northeast Controls breached the Representative Agreement. It failed to provide appropriate engineering services to Fisher's customer, and it failed to maintain appropriate documentation. Because of those failures, Fisher was forced to defend itself in four lawsuits—four lawsuits in which Fisher had to struggle with the unambiguous evidence that it did not supply the valve specified in its customer's purchase order. Fisher is entitled to recover from Northeast Controls the considerable costs that it expended in defending the actions that flowed from Northeast Controls' breach.

Fisher therefore respectfully requests that the Court enter an order granting Fisher's Motion for Summary Judgment.

RESPECTFULLY SUBMITTED,

MARON MARVEL BRADLEY & ANDERSON, P.A.

By:    /s/ Paul A. Bradley_____
       Paul A. Bradley (DE Bar ID # 2156)
       Maron Marvel Bradley & Anderson,
       P.A.
       1201 N. Market St, Ste. 900
       Wilmington, DE 19801
       (302) 425-5177 (Tel.)
       (302) 425-0180 (Fax)
       pab@maronmarvel.com

Date: November 5, 2007

RIDDELL WILLIAMS P.S.

By: /s/ Daniel J. Gunter_____
    Patrick D. McVey
    *Pro hac vice*
    Daniel J. Gunter
    *Pro hac vice*
    Riddell Williams P.S.
    1001 Fourth Avenue Plaza, Suite 4500
    Seattle, WA 98154
    (206) 624-3600 (Tel.)
    (206) 389-1700 (Fax)
    pmcvey@riddellwilliams.com
    dgunter@riddellwilliams.com

Date: November 5, 2007

## CERTIFICATE OF SERVICE

I, Paul A. Bradley, Esquire, hereby certify that, on November 5, 2007, I caused a true and correct copy of the Defendant Fisher Controls International, LLC's Motion for Summary Judgment, Opening Brief in Support thereof, and Affidavit of Daniel J. Gunter to be served upon counsel of record via electronic filing and hand delivery.

**MARON MARVEL BRADLEY**
**& ANDERSON, P.A.**

/s/ Paul A. Bradley
Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 425-5177 (phone)
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant
Fisher Controls International, LLC

*OF COUNSEL*

**RIDDELL WILLIAMS P.S.**
Patrick D. McVey, Esquire
Daniel J. Gunter, Esquire
1001 Fourth Avenue Plaza
Suite 4500
Seattle, WA 98154

Date:  November 5, 2007