# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, INC.  :  CIVIL ACTION – LAW
   and        :
ST. PAUL MERCURY INSURANCE COMPANY :
            :
            :
    v.       :
            :
            :
FISHER CONTROLS INTERNATIONAL, LLC :  NO. 1:06-CV-00412 (SLR)

## PLAINTIFFS' CORRECTED OPENING BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

THOMAS P. WAGNER, ESQUIRE
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
1845 Walnut Street
Philadelphia, PA 19103
tel: 215-575-4562
e-mail: tpwagner@mdwcg.com
*Counsel for Plaintiffs*

JOSEPH SCOTT SHANNON, ESQUIRE
Delaware Bar I.D. No. 3434
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899 – 8888
tel.: 302.552.4329
e-mail: jsshannon@mdwcg.com
*Counsel for Plaintiffs*

Dated: November 5, 2007

## TABLE OF CONTENTS

PAGE

I.   STATEMENT OF NATURE AND STAGE OF PROCEEDING ................................... 1
II.  SUMMARY OF ARGUMENT ........................................................................ 1
III. STATEMENT OF FACTS ............................................................................ 2
IV.  ARGUMENT ........................................................................................... 10
     A.   STANDARD OF REVIEW ................................................................. 10
     B.   NORTHEAST AND FISHER HAD A VALID AND ENFORCEABLE
          CONTRACT WHEREIN FISHER AGREED TO DEFEND AND  INDEMNIFY
          NORTHEAST ................................................................................. 11
          1.   Missouri Law Requires Contracts To Be Enforced As Written ........... 11
          2.   The Indemnity Clause Is Enforceable Against Fisher ........................ 13
          3.   Fisher Agreed to Defend Northeast Against "Any and All Claims . . .
               From Any Actual or Alleged Defect in Any Product" ....................... 14
     C.   FISHER'S DUTY TO DEFEND AROSE UPON THE CLAIM OF AN
          "ALLEGED" DEFECT IN THE 629 VALVE ......................................... 14
     D.   THE "ESCAPE CLAUSE" REQUIRES PROOF OF ACTUAL  NEGLIGENCE
          CAUSING THE INCIDENT ............................................................... 17
          1.   There Is No Factual Basis For Fisher's Argument ............................ 17
          2.   There Is No Legal Basis For Fisher's Argument .............................. 19
     E.   DAMAGES .................................................................................... 23
     F.   FEES AND COSTS TO ENFORCE ARE RECOVERABLE ....................... 24
V.   CONCLUSION ......................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................. 10

*Celotex Corp. V. Catrett*, 477 U.S. 317 (1986).......................................................... 10

*Chehval v. St. John's Mercy Med. Ctr.*, 958 S.W.2d 36 (Mo. App. 1997) ................... 12

*Coast Automotive Group, Ltd. v. VW Credit, Inc.*, 2002 U.S. App

    LEXIS 1418 at **13 (3d Cir. 2002) ..................................................................... 21

*Coca-Cola v. Pepsi-Cola Co.*, 172 A. 260 (Del. 1934)............................................. 20

*Delle Donne & Associates, LLP v. Millar Elevator Svc. Co.*, 840 A.2d 1244 (Del. 2004).......... 24

*Fox v. Christina Square Assoc., L.P.*, 1994 Del.Super. LEXIS 141 at *6 n.3 (1994)................. 20

*General American Life Ins. Co. v. Barrett*, 847 S.W.2d 125 (Mo. Ct. App. 1993) .................... 13

*Great American v. Fisher et al.*, Civil Action No. 02C-05-168 ................................... 6

*Kansas City Power & Light Co. v. Federal Constr. Corp.*, 351 S.W.2d 741 (Mo. 1961) ........... 11

*Klein v. Stahl GMBH & Co. Maschinefabrik and Heidelberg USA*, 185 F.3d 98

    (3d Cir. 1999) .................................................................................................... 22

*Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431 (Mo. App. 1996)................................... 12

*LLP v. Millar Elevator Svc. Co.*, 840 A.2d 1244 (Del. 2004) ..................................... 24

*Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624 (Mo. 1997)................................. 11, 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................ 10

*Missouri Pacific Railroad Co. v. Rental Storage and Transit Co.*, 524 S.W. 2d 898

    (Mo. Ct. App. 1975) ........................................................................................... 24

*Montrose Med. Group Participating Sav. Plan v. Bulger*,

    243 F.3d 773 (3d Cir. 2001)............................................................................... 21

*Motiva v. Fisher*, Del. Super. Civ. A. No. 02C-05-169................................................. 6

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ................................................................ 21, 22

*Olson v. Motiva Enterprises, et al.*, Del. Super. Civ. A.

    No. 02C-04-263 JRS ........................................................... 3, 5, 6, 8, 9, 13, 18, 22

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996)................ 22

*Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510 (3d Cir. 1953) ..................................... 21

*Travelers Indemnity Co. v. S.M. Wilson & Co.*, 2005 U.S. Dist. LEXIS 29328

    (E.D. Mo. 2005) ......................................................................................... 12

*Utility Service & Maintenance, Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910 (Mo. 2005).. 12

**Statutes**

6 De. C. § 2-104 ........................................................................................................ 6

Fed. R. Civ. P. 56(c) ................................................................................................. 1

**Other Authorities**

Federal Practice and Procedure § 4477 (1981) ........................................................ 22

**Rules**

Fed. R. Civ. P. 56 ..................................................................................................... 1

Fed. R.Civ.P. 56(c) ................................................................................................ 10

Fed.R.Civ.P. 56(e) ................................................................................................. 10

Fed.R.Civ.P. 30(b)(6) .............................................................................................. 7

## I.     STATEMENT OF NATURE AND STAGE OF PROCEEDING

This is a breach of contract claim to enforce the clear and unambiguous indemnity clause of the Representative Agreement contract between Plaintiff Northeast Controls, Inc. ("Northeast") and Defendant Fisher Controls International, LLC ("Fisher").  As a result of Fisher's refusal to fulfill its contractual obligation to defend and indemnify Northeast against allegations of defects in a valve manufactured by Fisher, Plaintiffs Northeast and its liability insurance carrier St. Paul Mercury Insurance Company ("St. Paul") were forced to incur legal fees and costs totaling $1,207,833.50 in the defense and settlement of several lawsuits, collectively referred to as "the Underlying Litigation."  Through this action, Northeast and St. Paul seek to enforce the indemnity clause of the Representative Agreement, and obtain reimbursement from Fisher for the expenses they incurred in defending the Underlying Litigation.

## II.     SUMMARY OF ARGUMENT

1.     There being no genuine issues of material fact, summary judgment in Northeast's favor and against Fisher as to the interpretation, application and enforcement of the indemnity clause of the parties' Representative Agreement is appropriate and warranted as a matter of law pursuant to Fed. R. Civ. P. 56.

2.     The Representative Agreement is a valid and enforceable contract with a clear and unambiguous indemnification clause to be interpreted according to Missouri law.  Under Missouri law, indemnity provisions are interpreted according to their plain meaning and when agreed to between sophisticated businesses, as here, they are to be enforced as written.  The duty Fisher owes to Northeast under the Representative Agreement is to "protect, defend, indemnify and hold harmless Representative [Northeast] from and against any and all claims, demands,

1

actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property. . . resulting or claimed to result from any actual or alleged defect in any Product."  Accordingly, Fisher has a contractual obligation to defend and indemnify Northeast for all losses "resulting or claimed to result from any actual or alleged defect in any Product."

3.      The Underlying Litigation arose from an explosion and fire.  Fisher admits that each of the Underlying Complaints included allegations of product defect.  Those allegations triggered Fisher's obligation to defend and indemnify Northeast under the Representative Agreement.   As a result of Fisher's refusal to fulfill its contractual indemnification duty, Northeast incurred a total of $1,207,833.50 in defending and settling the claims asserted against it in the Underlying Litigation.

4.      Fisher cannot avoid its duty to defend and indemnify Northeast by relying on an "escape clause" in the Representative Agreement.  The escape clause would require proof that negligence by Northeast caused the personal injury and property damage losses at stake in the Underlying Litigation.  Fisher itself argued to the contrary, and it cannot be heard to change its position now.

## III.      **STATEMENT OF FACTS**

On January 1, 1998, Northeast and Fisher entered into a Representative Agreement contract stating their mutual obligations and defining the basis for their business relationship.  (A copy of the Representative Agreement is Appendix A, Exhibit 1 at A0001-12 hereto).[1]  The

---

[1]        The testimony of Fisher's corporate representative, taken under Fed.R.Civ.P. 30(b)(6), established that Fisher uses the same Agreement with all its sales representatives throughout the United States and Canada. Currently, there are about 25 companies, including Northeast, operating as Fisher's sales force under the Representative Agreement.  Through these companies, Fisher does approximately $1.2 billion in annual sales.

Representative Agreement contains a specific indemnity clause, Section XI, obligating Fisher to defend and indemnify Northeast, and stating in pertinent part:

> Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless representative [Northeast] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. The obligations set forth in the immediately preceding sentence shall not apply unless Representative, upon receiving notice thereof, promptly notifies Fisher in writing of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.
>
> Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses arising from the following: . . .
>
> F. Negligent acts or omissions by Representative.

(Appendix A010-11).

The Representative Agreement also contains a choice of law provision, Article XIII, providing that "The validity, interpretation and performance of this Agreement and any dispute connected herewith shall be governed and construed in accordance with the laws of the State of Missouri, U.S.A." (Appendix A011).

On May 20, 2000, there was an explosion and fire at the Delaware City Power Plant ("the Plant"). The incident caused extensive property damage, as well as serious personal injuries to Mr. Ronald Olson. The equipment involved in this incident included a valve manufactured by Fisher and ordered through Northeast by Praxair, Inc., in 1998, while the Representative Agreement was in effect. That valve, identified by Tag No. 83HV0629, and known as "the 629

Valve", was initially (and erroneously) identified as the cause of the explosion and fire.[2]  This

prompted Northeast to put Fisher on notice of the incident.  Northeast tendered its defense to

Fisher and requested indemnification.  (App. A, Exhibit 2 at A0013-15).

Fisher responded to Northeast's written demands for defense and indemnification by

letter dated October 29, 2001, from Matthew Geekie, Esquire, the assistant General Counsel of

Fisher's parent, Emerson Electric Company.  (App. A, Exh. 3 at A0016-17).  Mr. Geekie

explained Fisher's refusal to undertake Northeast's defense as of October 29, 2001, by claiming

that the investigation into the causes of the explosion and fire was still underway, and no

conclusions had yet been reached.  Mr. Geekie characterized Northeast's indemnification demand

as "premature" in light of the fact that the investigation was still continuing and that specific

allegations had not yet been made.  Speaking for Fisher,[3] he went on to state:

> If, at some point in the future there is an assertion that there was an actual or
> alleged defect in the butterfly valve that gave rise to the losses, then Fisher will
> honor its obligations under the agreement and will protect, defend, indemnify and
> hold harmless Northeast in accordance with the Agreement.  Pursuant to the
> Agreement, however, Fisher will not protect, indemnify, defend and hold
> harmless Northeast from its own negligent acts or omissions.

(Appendix A0017).

Beginning in April, 2002, four lawsuits were filed in the Superior Court of the State of

Delaware by various parties seeking to recover for personal injuries and property damage arising

---

[2]     The valve drew the early attention of investigators because the materials from which it was made did not completely match the specifications approved by Praxair, the buyer.  This discrepancy was prematurely identified as a likely cause of the explosion and fire.  That theory, however, was later rejected by most experts in the case, including Fisher's expert.  (*See*, Appendix A, Exhibit 14, A0178-189, being a *Bench Memorandum* submitted to the Delaware Superior Court in the Underlying Litigation outlining the various theories of how the May 20, 2000, explosion and fire occurred, and various theories of liability then being investigated).

[3]     Fisher has admitted that Mr. Geekie was authorized to speak for the company.  See Amended Complaint ¶36 and defendant's answer thereto.

from the May 20, 2000, explosion and fire.  Those lawsuits, being Del. Super. Civ. A. Nos. 02C-

04-263 ("*Olson*") (App. A, Exhibit 4 at A0018-34); 02C-05-168 ("*Great American*") (Appendix

A, Exhibit 5 at A0035-43), 02C-05-169 ("*Motiva*") (Appendix A, Exhibit 6 at A0044-51), and

02C-05-190 ("*Praxair*") (App. A, Exh. 7 at A0052-60), named various defendants including

Northeast and Fisher, as well as Praxair, the Plant owner, its operator, and contractors engaged in

the construction project during which the 629 Valve was installed at the Plant.  (App. A, Exhs. 4-

7, *passim*).  These actions are hereinafter referred to collectively as the "Underlying Litigation."

As Fisher has already admitted, each of the Underlying Complaints included allegations

of defects in the 629 Valve.  (*I.e.*, *Olson* Count V, ¶39, App. at A0026; *Olson* Counts IX-XI,

¶¶43-45, App. at A0028; *Great American*, Counts I-II, ¶¶22-30, App. at A0039-40; *Motiva* at

¶14, App. at A0047; *Praxair* at Counts I-V, ¶¶19-46, App. at A0054-59).  The Underlying

Complaint in the personal injury action *Olson v. Motiva et. al.*, Del. Super., Civ. A.No. 02C-04-

236, alleged in relevant part as follows:

> 39.     At all times relevant hereto, Defendant Fisher and Northeast owed a duty
> of reasonable care to Mr. Olson, which duty defendants Fisher and Northeast,
> themselves, and through their agents, servants, and/or employees, breached by,
> among other things, negligently designing, manufacturing, and/or distributing the
> Valve.  Upon information and belief, Fisher and Northeast were also negligent in
> failing to design, manufacture, assemble and distribute a BLOC control valve
> compatible with and appropriate for high pressure oxygen service; failing to
> utilize materials in the design and assembly process that were safe for use in a
> high pressure oxygen environment; failing to provide a valve that complied with
> the specifications that required use of certain material; and failing to advise of any
> deficiencies in the Valve that would make the product unsafe or unfit for use in a
> high pressure oxygen environment.  As a direct and proximate result of
> defendants Fisher and Northeast's negligence, Mr. Olson suffered and continues
> to suffer great pain, both physically and mentally, and has suffered pecuniary loss,
> including, but not limited to, lost warnings, medical bills, and other damages
> permitted by law.
> [ . . . ]

43.    At all times relevant hereto, defendants Fisher and Northeast were merchants within the meaning of 6 De. C. § 2-104.  Defendants Fisher and Northeast sold the Valve, which Valve at the time of the sale, was defective.  Mr. Olson sustained significant injuries, which injuries were caused by defendants Fisher and Northeast's breach of the warranty of merchantability and the defective condition of the Valve.  Defendant Northeast has notice of Mr. Olson's injuries and the damage caused by the defective Valve.

(Appendix at A0026, A0028).

The *Praxair* Complaint, Civil Action No. 02C-05-190, alleged:

20.    Fisher and Northeast were negligent.  Their negligent acts include, but are not necessarily limited to, the following:
a.    Failing to design, manufacture, assemble, and distribute a BLOC control valve compatible with and appropriate for high pressure oxygen service;
b.    Failing to utilize materials in the design and assembly process that were safe for use in a high pressure oxygen environment;
c.    Failing to investigate, for safety, the materials utilized during the design, assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment;
d.    Failing to provide a valve that complied with the specifications that required use of Monel;
e.    Failing to advise of any deficiencies in the valve that would make the product unsafe or unfit for use in a high pressure oxygen environment.
f.    Failing to use due care under the circumstances.

(Appendix at A0054-55).

One Underlying Complaint, *Motiva v. Fisher*, made an independent claim of negligence against Northeast in the context of alleging defects in the Valve.  (App. at A0047).

The Underlying Complaint in *Great American v. Fisher et al.*, Civil Action No. 02C-05-168, also alleged defects in the Valve:

23.    Fisher and Northeast were negligent.  The negligent acts include, but are not necessarily limited to, the following:
a.    Failing to design, manufacture, assemble, and distribute a BLOC control valve compatible with and appropriate for high pressure oxygen service;
b.    Failing to utilize materials in the design and  assembly process that were safe for use in a high pressure oxygen environment;

  c.  Failing to investigate, for safety, the materials utilized during the design assembly, and manufacturing process to make sure they were appropriate for a high pressure oxygen environment;

  d.  Failing to provide a valve that complied with the specifications that require use of Monel;

  e.  Failing to advise of any deficiencies in the valve that would make the product unsafe or unfit for use in a high pressure oxygen environment;

  f.  Failing to use due care under the circumstances.

(Appendix at A0039).

As noted above, defendant Fisher has admitted in this case that the Complaints in the Underlying Litigation included allegations of defect in the valve. (*See* Plaintiffs' Amended Complaint, D.I. # 26 *herein* at ¶¶ 42-43; *and* Defendant's Answer to Amended Complaint, D.I. # 27). It is also admitted that the valve was a "product" within the meaning of the Representative Agreement. (*See* the deposition of defendant Fisher taken under Fed.R.Civ.P. 30(b)(6), the transcript of which is not yet available.)

In reliance upon Fisher's promise to undertake Northeast's defense and representations as stated in the October 29, 2001, letter from its Assistant General Counsel that "If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast from its own negligent acts or omissions", (App. A0017), Northeast notified Fisher of the pending lawsuits which contained allegations of defects in the Valve. (App. A, Exhibit 8, at A0061-63). Fisher responded by quoting the language of the Indemnification Clause to Northeast without accepting Northeast's indemnification demand and defense tender. (App. A, Exhibit 9 at A0064).

Left with no other choice, Northeast undertook its own representation and defense in the Underlying Litigation. Northeast's answers in the underlying cases included cross-claims for

indemnification against Fisher based upon the indemnification clause of the Representative Agreement. (Appendix A at Exhibits 10 [A0065-90, being Northeast's Answer and Cross-Claim in *Olson*]; Exhibit 11 [A0091-121, being Northeast's Answer and Cross-Claim in *Great American*]; Exhibit 12 [A0122-145, being Northeast's Answer and Cross-Claim in *Motiva*]; and Exhibit 13 [A0146-177, being Northeast's Answer and Cross-Claim in *Praxair*]). Fisher asserted no cross-claims against Northeast. (*See* Appendix, Exhibit 25 at A04698-658, being the Superior Court Docket, *passim*). Fisher denied that it owed any duty of indemnification to Northeast, ultimately filing a *Motion of Defendant Fisher Controls International, Inc. for Summary Judgment on Indemnification Claims Asserted by Northeast Controls*, (App. A, Exhibit 21 at A0335-379), stating its position therein that the terms of the Representative Agreement control.

Defending itself in the Underlying Litigation, Fisher produced and served upon all the parties the expert report of Robert A. Mostello, Ph.D. (Appendix A, Exhibit 22 at A0380-458), who concluded that the explosion and fire were caused entirely by acts of parties other than Fisher or Northeast. His report offered no criticism of any act by Northeast, and it supported no connection between Northeast's actions and the explosion or fire. (Dr. Mostello's Report, submitted as part of his *Affidavit* in the Underlying Litigation, is Exhibit F therein, at Appendix A0421-453). Dr. Mostello unequivocally stated: "...[T]he discrepancies between the valve materials discussed between representatives of Praxair and Northeast Controls and those supplied by Fisher Controls ... were not implicated in the initiation of the fire. Rather, the valve was a victim of the fire, which was initiated by [other causes]." (Appendix at A0437 at in footnote 14, on page 15 of his report dated 1/3/05). Despite this evidence from its own expert, however, Fisher steadfastly persisted in its refusal to defend and indemnify Northeast.

The Delaware Superior Court accepted Fisher's arguments and granted Fisher's motion for summary judgment with respect to the Praxair and Great American claims. (Appendix A, Exhibit 20 at A0301-334, being *Olson v. Motiva Enterprises, et al.*, Del. Super. Civ. A. Nos. 02C-04-263 JRS (consolidated), *Memorandum Opinion Upon Consideration of Defendant Fisher Controls International's Motions for Partial Summary Judgment*, Slights, J. (April 26, 2004)). (The docket of the Underlying Litigation in the Delaware Superior Court is appended hereto as Appendix A, Exhibit 25, for the purpose of establishing, *inter alia*, that the Underlying Litigation is concluded, with no findings of liability having been made). Fisher negotiated its dismissal by stipulation from the *personal* injury case, and the one remaining property damage claim was withdrawn.

Left by Fisher to defend itself, Northeast negotiated settlements of the claims against it and obtained stipulations of dismissal from all parties, which stipulations included Fisher's agreement that Northeast's cross-claims for indemnification against Fisher would be preserved. (Appendix A, Exhibit 23 [A0459-464, *Olson Release*]; and Exhibit 24 [A0465-467, *Great American Release and Settlement Agreement*]). Each of the Underlying Litigation matters were eventually resolved as to all the parties through a combination of motion practice and settlement agreements. (Appendix A, Exhibit 25, Superior Court Docket, at A0468, Stipulation of Dismissal filed 10/06/2005 being the last pleading filed with Superior Court and notation of "Closed" within "Court Name" field therein). None of the cases went to trial and no findings of liability were made against any of the defendants (*id.*).

In defending the Underlying Litigation, Northeast and St. Paul Mercury, its insurer to whom Northeast turned for its defense, incurred legal fees and costs totaling $606,833.50. On behalf of Northeast, St. Paul Mercury also paid a total of $601,000.00 to settle the remainder of

the claims asserted by other parties against Northeast in the Underlying Litigation, in exchange

for dismissal with prejudice and no finding of any liability.  (A printout summary of the fees and

costs incurred by Northeast and paid by St. Paul Mercury is attached hereto as Appendix A,

Exhibit 26, at A0659-665, and totals $1,207,833.50).

## IV.    ARGUMENT

### A.    STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, a court shall grant a motion for summary

judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). S*ee also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion.  The requirement is that there is no genuine issue of

material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Material facts are those that "might affect the outcome of the suit under the governing

law." *Id.*  A genuine issue of material fact is one such that "a reasonable jury could return a

verdict for the nonmoving party." *Id.*  If the moving party demonstrates an absence of any

genuine issue of material fact, then the nonmoving party "must come forward with 'specific facts

showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)).

Because the resolution of this claim involves the interpretation of a contract, the terms of which are not in dispute, and there are no genuine issues of material fact, summary judgment as a matter of law is appropriate and warranted at this stage of the litigation.

**B.    NORTHEAST AND FISHER HAD A VALID AND ENFORCEABLE CONTRACT WHEREIN FISHER AGREED TO DEFEND AND INDEMNIFY NORTHEAST**

In clear and unambiguous language, the Representative Agreement indemnification clause states:

> Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Representative from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product.

(Appendix  at A0010) .

**1.    Missouri Law Requires Contracts To Be Enforced As Written**

Under Missouri law, which is designated as the governing law by the Representative Agreement, "If the contract terms are unequivocal, plain, and clear, the court is bound to enforce the contract as written. . . .  It is a well-established principle of contract construction that, when a contract is clear, the court is bound to enforce the terms as written."  *Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624, 626-27 (Mo. 1997).

Contracts of indemnity are usually intended to provide against loss or liability of one party, through the operations of the other. *See Kansas City Power & Light Co. v. Federal Constr. Corp.*, 351 S.W.2d 741, 749 (Mo. 1961).  In this case, the manufacture of industrial valves was Fisher's operation, for which Northeast was a sales representative.

The economic reality is that contracts between sophisticated businesses frequently include indemnity provisions. Missouri courts recognize that a contract between sophisticated businesses which does not include indemnification would presumably carry a different price than a contract that does include such a provision. *See Utility Service & Maintenance, Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910, 914 (Mo. 2005). Accordingly, under Missouri law, indemnity agreements between sophisticated businesses should be strictly construed and enforced as written. *Id.*

"Parties are generally free to contract as they wish and courts will enforce contracts, including indemnity provisions, according to their plain meaning, unless induced by fraud, duress, or undue influence." *Id.* at 913 (citing *Malan Realty Investors, Inc. v. Harris*, S.W.2d 624, 626-627 (Mo. 1997)). When ascertaining the plain meaning of a contract, the court must give the language used its natural, ordinary and common sense meaning, considering the entire contract, along with its object, nature and purpose. *See Chehval v. St. John's Mercy Med. Ctr.*, 958 S.W.2d 36, 37 (Mo. App. 1997) (citing *Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431, 436 (Mo. App. 1996)).

In *Travelers Indemnity Co. v. S.M. Wilson & Co.*, 2005 U.S. Dist. LEXIS 29328 (E.D. Mo. 2005), the language of the indemnity provision was found "unambiguous" where it provided that the defendant therein

> agreed 'to indemnify and defend [Wilson] against and save him harmless from any and all claims, suits, or liability for injuries to property . . . on account of any act or omission of [defendant], or any of his officers, agents, employees or servants.' This provision contains both a promise by [defendant] that it will indemnify and a promise by [defendant] that it will provide a defense for Wilson under certain circumstances. According to its plain language, the Subcontract obligates [defendant] to defend Wilson against any claim or suit alleging injuries to property on account of any act or omission of [defendant].

12

2005 U.S. Dist. LEXIS 29328 at *11.

The same analysis applies to the indemnification clause of the Representative Agreement between Northeast and Fisher under consideration here.

### 2.    The Indemnity Clause Is Enforceable Against Fisher

Applying Missouri law, the Representative Agreement between Northeast and Fisher, two sophisticated business entities, is a valid and enforceable contract wherein Fisher agreed to defend and indemnify Northeast "against any and all . . . 'Losses' . . . resulting or claimed to result from any actual or alleged defect in any Product."

"A pertinent rule of construction is that specific terms and provisions of a contract are given preference over general ones." *General American Life Ins. Co. v. Barrett*, 847 S.W.2d 125, 133 (Mo. Ct. App. 1993).

The indemnification clause is specific.  Fisher promised to "at its own expense, protect, defend, indemnify and hold harmless" Northeast "against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product."

The Underlying Litigation arose out of injury to Mr. Olson and damage to property, all of which was claimed to result from an alleged defect in the 629 Valve.  As to these facts, there is no dispute.

3.    **Fisher Agreed to Defend Northeast Against "Any and All Claims . . . From Any Actual or Alleged Defect in Any Product"**

Recognizing that an "alleged defect in any Product" would give rise to its duty to defend and indemnify Northeast, Fisher responded to Northeast's pre-suit request for indemnification by saying:

> If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement.

(Appendix A, Exhibit 3 at A0017).

Subsequently, the Complaints in the Underlying Litigation were filed. Fisher admits that each of those complaints contained allegations of defects in the valve. Under the plain language of the contract, this triggered the obligation to defend and indemnify Northeast. Nevertheless, Fisher refused to undertake Northeast's defense, causing Northeast to incur fees and costs of $1,207,833.50 in resolving the claims against it.

C.    **FISHER'S DUTY TO DEFEND AROSE UPON THE CLAIM OF AN "ALLEGED" DEFECT IN THE 629 VALVE**

Fisher's duty to defend and indemnify Northeast arose as soon as the Complaints were filed in the Underlying Litigation alleging the presence of a defect in the valve.[4] The Representative Agreement does not require proof that a defect in the valve actually caused the explosion and fire. On the contrary, the agreement clearly states that the duty to defend and indemnify arose as soon as a Complaint was filed against Northeast which contained the *allegation* of a defect in the valve. As stated earlier, Fisher has already admitted that the

---

[4]    Fisher's corporate representative has admitted that the 629 valve was a "product" within the meaning of the Representative Agreement.

Complaints in the Underlying Litigation all contain such allegations.  See Defendant Fisher's
Answer to the Amended Complaint in this action, D.I. # 27 at paragraphs 42-43 therein.

Fisher, however, attempts to justify its refusal to defend and indemnify Northeast by
pointing to the "escape clause" in the Representative Agreement.  That clause excuses Fisher
from the obligation to defend and indemnify if it is determined that the losses sued upon arose
from "negligent acts or omissions" by Northeast.

As Plaintiffs understand it, Fisher will argue that a Northeast employee named Albert
Cappellini negligently transmitted incorrect specifications for the 629 valve.  Fisher will point
out that the buyer of the valve, Praxair, requested the use of certain specific materials in making
the valve's internal parts.  Fisher alleges that Mr. Cappellini "negligently" changed the
specifications, with the result that the valve's materials were different in certain respects from
what Praxair had ordered.  Relying on this alleged act of "negligence" by Northeast's employee,
Fisher argues that it had no duty to defend or indemnify its representative, Northeast.

In the Underlying Litigation, however, Fisher's position was dramatically different.
There, to defend itself and prove that its valve was not defective, Fisher argued exhaustively that
the alleged change in materials had nothing to do with the explosion and fire.  In fact, Fisher
offered the expert report of Dr. Robert A. Mostello which contained an extensive scientific
analysis exonerating Fisher, the Valve, and Northeast of any causal negligence or any role in
causing the incident.

Dr. Mostello's conclusions, aggressively advanced by Fisher in the Underlying Litigation,
are in no doubt.  Specifically, Fisher's expert stated that ". . . the discrepancies between the valve
materials discussed between representatives of Praxair and Northeast Controls and those

supplied by Fisher Controls . . . were not implicated in the initiation of the fire. Rather, the valve was a victim of the fire, which was initiated by [other causes]."[5] (App. A, Exh. 22 at A0437)

Relying on this scientific evidence, and its complete vindication of both Northeast and the Valve, Fisher obtained summary judgment for itself in one of the Underlying Cases and successfully bargained for its dismissal by stipulation from the others. Northeast was left to fend for itself.

Meanwhile, the principal target of the personal injury plaintiffs and the other defendants in the Underlying Litigation was Praxair, the purchaser of the Valve. Praxair was heavily criticized by Dr. Mostello and other experts for the manner in which the oxygen line upstream of the Valve (i.e., *before* the pressurized oxygen reached the Valve) was designed, cleaned, and operated. In a desperate effort to defend itself, Praxair produced an expert report of its own, criticizing Northeast and the change in the Valve materials, and claiming that this was the true cause of the explosion.

Subsequently, all the Underlying Litigations settled. Left by Fisher to defend itself as best it could, Northeast negotiated settlements with both the property damage and the personal injury plaintiffs, paying $601,000.00 out of a total settlement to all plaintiffs of more than $4,000,000.00. The bulk of that settlement was paid by Praxair, with substantial contributions from two other defendants.

Now, Fisher seeks to reverse its field. <u>Having argued below that no negligence in changing the construction of the valve had anything to do with causing this tragic incident, Fisher now wants to claim that this same accusation of negligence by Northeast relieves it of the</u>

---

[5]      Dr. Mostello testified on November 2, 2007 that this is still his opinion.

duty to defend and indemnify.  This position is a cynical about-face.  It provides Fisher with no

escape from its clear indemnity obligation.

> **D.    THE "ESCAPE CLAUSE" REQUIRES PROOF OF ACTUAL**
> **NEGLIGENCE CAUSING THE INCIDENT**

As set forth above, Fisher's obligation to defend and indemnify was triggered when

Northeast was served with litigation complaints claiming damages that resulted from an alleged

defect in the 629 Valve.  To avoid that obligation, Fisher seeks to rely on an escape clause which

reads in relevant part as follows:

> "Notwithstanding the provisions of the immediately preceding
> paragraph . . . Fisher shall not be obligated to protect, defend,
> indemnify or hold harmless [Northeast] from and against any
> Losses arising from . . . "[n]egligent acts or omissions by
> [Northeast].

Plainly, the language of this escape clause is not the same as the contract language

requiring Fisher to defend and indemnify.  The indemnity obligation arises on the mere

*allegation* of a product defect.  The escape clause, by contrast, only permits Fisher to avoid its

indemnity obligation for damages that underline actually arise from the negligence of Northeast.  Thus,

unless Fisher is in a position, factually and legally, to prove that Northeast's negligence caused

the personal injury and property damage "losses" at the Delaware City Power Plant, the

indemnity obligation is clear.  Fisher is in no such position.

> **1.    There Is No Factual Basis For Fisher's Argument**

Factually, defendant Fisher would be hard pressed indeed to argue now that there was

any causal connection between the conduct of its representative Northeast and the explosion or

fire at the power plant.  Fisher devoted itself in the litigation below to proving just the opposite.

Its own expert, Dr. Robert Mostello, issued an extensive report calling the Valve ordered by

Praxair through Northeast and manufactured by Fisher a "victim" of the fire.  He concluded that

the fire was ignited upstream of the Valve (i.e., before the pressurized oxygen reached the Valve)

and he offered a detailed scientific analysis to back it up.  Not surprisingly, Northeast's own

experts agreed.  All the same experts have been identified by the parties now in this case.

Perhaps more surprisingly, the same conclusion was even reached by Dr. Timothy Jur, the expert

offered by the *Olson* plaintiffs.  When the Underlying Litigation reached its climax, the *Olson*

plaintiffs joined with Fisher and Northeast to produce an overwhelming tide of expert opinion

which carried the day.  Praxair and its co-defendants negotiated a settlement, with Praxair itself

paying the lion's share.

The only act of negligence ever alleged – but never established – by anyone on the part of

Northeast was the alleged change in the Valve materials of construction.  As stated above,

Fisher's own expert dismissed this factor in the Underlying Litigation and said it had nothing to

do with causing the explosion and fire.  Fisher has named only one liability expert in this case,

and it is the same man, Dr. Robert Mostello.  At his deposition on November 2, 2007, Dr.

Mostello was shown his report from the Underlying Litigation, where he stated as follows:

"[T]he discrepancies between valve materials discussed between representatives of Praxair and

Northeast Controls and those supplied by Fisher . . . were not implicated in the initiation of the

fire.  Rather, the valve was a victim of the fire, which was initiated by [other causes]."  Dr.

Mostello has acknowledged that this is still his opinion.[6]

---

[6]    See Dr. Mostello's deposition of November 2, 2007, the transcript of which is not yet available.  As
Northeast understands it, Dr. Mostello is expected to testify in this case that while the change in materials did not
cause the explosion and fire, it somehow made the fire worse.  At his deposition on November 2, 2007, however, the
doctor admitted that he cannot quantify what difference, if any, this would have made either to Mr. Olson's injuries
or to the property damage sustained at the plant.

Thus, there is no material issue of fact to be decided here.  Fisher has no evidence from which it could be concluded, or even argued, that any negligent act or omission of Northeast caused the personal injury and property damage losses from which the Underlying Litigation arose.  Under the command of the numerous Missouri cases cited above, therefore, the clear language of the indemnity agreement should be enforced, and Summary Judgment should be granted to the plaintiffs.

## 2.    There Is No Legal Basis For Fisher's Argument

Legally, Fisher should not be permitted now to argue that any negligence alleged against Northeast caused the personal injury and property damage losses, even if Fisher had evidence to support such a claim.

The issue of Northeast's alleged negligence was before the Superior Court of Delaware in the Underlying Litigation.  Fisher had every opportunity to litigate that issue fully in that forum, but chose not to do so for its own strategic reasons.  Instead, Fisher made the decision that the best way to defend itself was to "defend the Valve".  Accordingly, Fisher mounted an aggressive defense, successfully arguing that there was nothing wrong with the Valve and that the personal injury and property damage losses were caused by other factors.  This strategy worked for Fisher and it escaped from the Underlying Litigation without paying anyone a dime.

For the same strategic reasons, Fisher chose to assert no third party claim against Northeast in the Underlying Litigation.  In fact, Fisher asserted and pursued negligence claims against numerous other defendants, including Praxair, Texaco, Motiva, and others.  Pointedly, however, Fisher pursued no such claim or theory against Northeast.  Even while other parties

tried to blame Northeast, Fisher refrained from doing so.  Obviously, this would have been inconsistent with its defense that the Valve was merely "a victim of the fire."

After pursing this strategy, however, Fisher cannot be allowed to have it both ways.  If Fisher wanted to defend its interests by proving that Northeast negligently caused the personal injury and property damage losses, it had the full and fair opportunity to do so when that issue was before the court in the Underlying Litigation.  Having chosen not to do so then, Fisher waived any chance to do it now.

In *Fox v. Christina Square Assoc., L.P.*, 1994 Del. Super. LEXIS 141 at *6n. 3 (1994), the Superior Court stated as follows:

> Delaware has adopted the term "claim preclusion" to signify the preclusive effects of a prior judgment to foreclose litigation on matters or claims that should have been raised in an earlier suit. The Court has likewise adopted the term "issue preclusion" to signify the preclusive effects of a suit involving the same parties based on the same cause of action that was actually litigated.

The Court went on to state that "the public policy surrounding the doctrine of collateral estoppel [also known as issue preclusion] is to require a definitive end to litigation when each of the parties has had a full, free and untrammeled opportunity to present all of the facts pertinent to the controversy." *Id.* at *11 (citing *Coca-Cola v. Pepsi-Cola Co.*, 172 A. 260 (Del. 1934)).[7]

---

[7]    Plaintiffs cite Delaware law on preclusion based upon Delaware choice of law rules.  A federal court sitting in diversity must apply the choice of law rules of the state in which it sits.  *See Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1083 (D. Del. 1990).  Delaware courts follow the *Restatement (Second) of Conflicts of Law § 95, comment g*, which provides: "What issues are determined by a valid judgment is determined . . . by the local law of the State where the judgment was rendered."  *See Albanese v. Emerson Electric Co.*, 552 F.Supp. 694, 699 (D. Del. 1982).  Accordingly, Delaware law on preclusion applies to the Underlying Litigation. Missouri and federal law for determining preclusion are substantially the same as Delaware law.  *See King Gen. Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints*, 821 S.W. 2d 495, 500 (Mo. 1991); *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 1991).

Fisher had an untrammeled opportunity to raise and prove causal negligence by Northeast in the underlying litigation if it chose to do so. Indeed, several other parties tried to make that very claim. Fisher, however, deliberately chose a different direction. It cannot be allowed to double-back now and pursue the claim that it never made before.

For similar reasons, plaintiffs also invite the Court's attention to the concept of "judicial estoppel."

"'Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.' . . . . This rule, known as judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

> Under Third Circuit case law:
>
> Judicial estoppel may be imposed only if: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, *i.e.*, in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity.

*Coast Automotive Group, Ltd. v. VW Credit, Inc.*, 2002 U.S. App. LEXIS 1418 at **13 (3d Cir. 2002) (citing *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001)).

As explained by the Court of Appeals, judicial estoppel, or "the doctrine against the assertion of inconsistent positions" "is not intended to eliminate all inconsistencies, however

slight or inadvertent; rather, it is designed to prevent litigants from 'playing fast and loose with the courts.' *Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953). 'The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.' 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (1981), p. 782." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996).

The Court will look to whether the party asserted "either or both of the inconsistent positions . . . 'with intent to play fast and loose' with the court" in making its bad faith determination. *Klein v. Stahl GMBH & Co. Maschinefabrik and Heidelberg USA*, 185 F.3d 98, 111 (3d Cir. 1999).

As stated by the Supreme Court, judicial estoppel "prohibits parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001). When it suited Fisher's self-interest to deny any defect in the Valve and to oppose the claims of negligence related to its specifications and construction, it did so vigorously and successfully. Now, however, the exigencies require that it prove Northeast's negligence in order to avoid its contractual duty of indemnification.

In this matter, all three of the conditions precedent for application of judicial estoppel are met: (1) Fisher asserted to the Delaware Superior Court in the Underlying Litigation that there was no causal negligence with respect to the materials of construction, and is taking an irreconcilable position here; (2) Fisher's change of position is in bad faith as its position below was for the purpose of avoiding liability to Mr. Olson and the property damage plaintiffs, while

22

its attempt here is to avoid liability to Northeast; and (3) the Court may exercise its discretion to estop Fisher from attempting now to revive a negligence case that it so effectively disclaimed in the Underlying Litigation.

For the reasons set forth above, therefore, Plaintiffs respectfully maintain that defendant Fisher's obligation to defend and indemnify was triggered when plaintiff Northeast was served with Complaints alleging a defect in the 629 valve. Plaintiffs further maintain that, under the clear language of the contract, the "escape" clause does not excuse Fisher from that obligation. Accordingly, Summary Judgment should be granted to the plaintiffs and Defendant Fisher should be obligated to reimburse all the defense and indemnity costs that Northeast and St. Paul incurred in the Underlying Litigation.

### E.    DAMAGES

Attached to this Motion is a computer print-out listing every check issued by St. Paul Mercury Insurance Company on behalf of its insured, Northeast Controls, Inc., to defend and resolve the Underlying Litigation. The total of these checks comes to $1,207,833.50. This amount includes $601,000.00 paid to the various plaintiffs as part of the settlements in the underlying cases. The balance consists of attorneys' fees and other litigation costs, primarily including experts and court reporters. Detailed invoices for all the attorneys' fees, experts and other costs were produced in discovery to the defendant more than six months before the filing of this Motion.

Under Missouri law, defendant Fisher cannot be heard now to argue that the actions of Northeast and St. Paul in defending and settling the underlying cases were somehow

23

unreasonable.[8]  The law in Missouri makes it clear that where an indemnitor has refused to

assume the defense, it cannot thereafter second-guess the actions of its indemnitee in doing its

best to resolve the litigation.  In *Missouri Pacific Railroad Co. v. Rental Storage and Transit

Co.*, 524 S.W. 2d 898 (Mo. Ct. App. 1975), the Court stated as follows:

> Ordinarily, to sustain a claim upon an indemnity contract such as
> we have here, it is necessary for the indemnitee to prove legal
> liability to the injured party . . . However . . . where the indemnitor
> denies liability under the indemnity contract and refuses to assume
> the defense of the claim, then the indemnitee . . . may make a good
> faith settlement without assuming the risk of being able to prove
> absolute legal liability or the actual amount of the damage . . . .  A
> contrary rule would make the right to settle meaningless in cases
> where the indemnitor has denied liability.

524 S.W.2d at 909.

### F.    FEES AND COSTS TO ENFORCE ARE RECOVERABLE

Although the Representative Agreement is interpreted according to Missouri law,

Northeast's action to enforce its terms is governed by Delaware law, and under Delaware law,

"where, as here, a party . . . is contractually entitled to be held harmless, that party is entitled to

its costs and attorneys' fees incurred to enforce the contractual indemnity provision.  Any other

outcome would not result in [the indemnitee] being held harmless."  *Delle Donne & Associates,

LLP v. Millar Elevator Svc. Co.*, 840 A.2d 1244, 1256 (Del. 2004).  For these reasons, Northeast

requests an order awarding its attorneys' fees and costs incurred in prosecuting this action, in an

amount to be established by subsequent application to the Court upon final resolution of the

claims.

---

[8]        If this matter proceeds to trial, Plaintiffs are prepared to offer an expert opinion, if necessary, to establish
the reasonableness of the actions taken to defend and resolve the Underlying Litigations.

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, it is respectfully requested that this Honorable Court grant Summary Judgment in favor of Plaintiffs Northeast Controls and St. Paul Mercury Insurance in the amount of $1,207,833.50 and dismiss Defendant's counterclaim against them with prejudice; and award Plaintiffs interest and costs to be determined.

**MARSHALL, DENNEHEY, WARNER,**
**COLEMAN & GOGGIN**

By:    /s/ Thomas P. Wagner
        Thomas P. Wagner, Esquire
        1845 Walnut Street
        Philadelphia, PA  19103
        tel: 215-575-4562
        Counsel for Plaintiffs

**MARSHALL DENNEHEY WARNER**
**COLEMAN & GOGGIN**

By:    /s/Joseph Scott Shannon
        Joseph Scott Shannon, Esquire (I.D. 3434)
        1220 North Market Street, 5th Floor
        P.O. Box 8888
        Wilmington, DE 19899 – 8888
        tel.: 302.552.4329
        e-mail: jsshannon@mdwcg.com
        Counsel for Plaintiffs

01/4198746.v1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, Inc.; and    )
ST. PAUL MERCURY INSURANCE Co.,    )
    )
        Plaintiffs,    )    Civ. A. No. 06-412-SLR
    )
    v.    )
    )
FISHER CONTROLS INTERNATIONAL, LLC,    )
    )
        Defendant.    )

## CERTIFICATE OF SERVICE

TO:    RIDDELL WILLIAMS        MARON MARVEL BRADLEY
           Patrick McVey, Esquire         && ANDERSON, P.A.
           Daniel J. Gunter, Esquire       Paul A. Bradley, Esquire
           1001 Fourth Avenue Plaza, Ste. 4500    1201 North Market Street, Ste. 900
           Seattle, WA 98154           Wilmington, DE 19801

        PLEASE TAKE NOTICE:    On November 16, 2007, Northeast Controls, Inc. served the

attached *Plaintiff Northeast Controls, Inc.'s Corrected Opening Brief in Support of Motion for*

*Summary Judgment Pursuant to Fed. R. Civ. P. 56* upon Defendant Fisher Controls, Inc. via e-

filing and First Class U.S. Mail, postage prepaid, to the above-named persons.

**MARSHALL DENNEHEY WARNER**        **MARSHALL DENNEHEY WARNER**
**COLEMAN & GOGGIN**              **COLEMAN & GOGGIN**

   */s/Thomas P. Wagner*             */s/Joseph Scott Shannon*
Thomas P. Wagner, Esquire (*pro hac vice*)    Joseph Scott Shannon, Esquire (I.D. 3434)
1845 Walnut Street, 21st Floor         1220 North Market Street, 5th Floor
Philadelphia, PA 19103             P.O. Box 8888
tel.: 215.575.4562                Wilmington, DE 19899 – 8888
e-mail: tpwagner@mdwcg.com        tel.: 302.552.4329
*Of Counsel for Plaintiffs*            e-mail: jsshannon@mdwcg.com
                             *Counsel for Plaintiffs*

Dated: November 16, 2007