**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY<br><br>               Plaintiffs,<br><br> v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br><br>              Defendant. | NO. 06-412 SLR |

<u>**DEFENDANT FISHER CONTROLS INTERNATIONAL, LLC'S BRIEF IN RESPONSE
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

**RIDDELL WILLIAMS P.S.**

Patrick D. McVey
*Pro hac vice*
Daniel J. Gunter
*Pro hac vice*
Riddell Williams P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA 98154
(206) 624-3600 (Tel.)
(206) 389-1700 (Fax)
pmcvey@riddellwilliams.com
dgunter@riddellwilliams.com

**MARON MARVEL BRADLEY
& ANDERSON, P.A.**

Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 425-5177 (phone)
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant
Fisher Control International, LLC

Dated: November 20, 2007

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ...................................... 1

II.    SUMMARY OF ARGUMENT ................................................................. 2

III.   STATEMENT OF FACTS......................................................................... 5

    A.    Northeast Controls Placed an Order with Fisher That Did Not Match the Specifications Agreed to by Northeast Controls and the Customer ..................... 5

    B.    When the Valve Was Involved in a Catastrophic Explosion, the Parties Involved Immediately Seized on the Discrepancies in the Valve's Materials of Construction....................................................................... 7

    C.    The Underlying Actions .................................................................. 9

        1.    The Complaints in All Four Lawsuits Referred Specifically to the Improper Materials of Construction of the Valve That Resulted from Northeast Controls' Negligent Processing of the Order .................. 9

        2.    Northeast Controls' Tender of Defense ..................................... 9

        3.    Northeast Controls and Fisher Entered into Two Joint Defense Agreements in the Underlying Actions.................................... 10

    D.    Disposition of Claims in the Underlying Action ............................... 11

    E.    Fisher's Arguments and Motives in the Underlying Litigation............................ 12

IV.   ARGUMENT AND AUTHORITIES............................................................ 14

    A.    Plaintiffs' Claim for Breach of Contract Against Fisher Is Barred by the Terms and Conditions of the Representative Agreement.................................... 14

        1.    Fisher Had No Duty to Defend and Indemnify Northeast Controls for Northeast Controls' Negligent Acts and Omissions ......................... 14

        2.    Northeast Controls Was Negligent ....................................... 16

        3.    The "Losses" at Issue Arose from Northeast Controls' Negligence........ 18

        4.    Plaintiffs' Self-Contradictory Interpretations of the Representative Agreement Depend on Terms That Do Not Exist in the Agreement Itself....................................................................... 19

            a.    Plaintiffs' Original Interpretation of the Representative Agreement Contradicts the Plain Language of the Agreement ............................................................... 21

            b.    Plaintiffs' New Interpretation of the Representative Agreement Also Contradicts the Plain Language of the Agreement ............................................................... 23

# TABLE OF CONTENTS
(continued)

Page

B.    Northeast Controls Could Have Incurred "Losses" Only for Its Own Negligence in the Underlying Actions; Fisher Had No Duty to Defend or Indemnify Northeast Controls Against Those "Losses" ..................................... 25

C.    The Actual Cause of the Explosion Is Irrelevant to Plaintiffs' Claim in This Action; Nevertheless, Any Consideration of Causation Precludes Entry of Summary Judgment in Favor of Plaintiffs .......................................................... 28

D.    Plaintiffs' Estoppel Arguments Are Without Merit ........................................... 30

    1.    If Fisher's Claims Are Barred by the Doctrine of Claim Preclusion, Then Plaintiffs' Claims Are Equally Barred........................................... 31

    2.    Issue Preclusion Does Not Apply to the Facts of This Case .................. 32

    3.    Judicial Estoppel Is Inapplicable to the Facts of This Case .................... 34

V.    CONCLUSION............................................................................................................ 37

## TABLE OF CITATIONS

**Cases**

Beattie v. Beattie, 786 A.2d 549, 554 (Del. Super. 2001) ............................................. 28

Castaldo v. Pittsburgh-Des Moines Steel Co., 376 A.2d 88, 91 (Del. 1977) ............ 27, 28

Cline v. Prowler Indus. of Md., Inc., 418 A.2d 968, 980 (Del. 1980) ........................... 28

Digene Corp. v. Ventana Medical Systems, Inc., 484 F.Supp.2d 274, 282
    (D. Del. 2007) ..................................................................................................... 32

General American Life Ins. Co. v. Barrett, 847 S.W.2d 125, 133 (Mo. App. 1993)....... 15

Harris v. Niehaus, 857 S.W.2d 222, 225 (Mo. 1993) ................................................... 16

Ikeda v. Molock, 603 A.2d 785, 787 (Del. 1991) ........................................................ 26

J.S. Alberici Constr. Co. v. Mid-West Conveyor Co., 750 A.2d 518, 521
    (Del. 2000) ........................................................................................................... 16

Malan Realty Investors. Inc. v. Harris, 953 S.W.2d 624, 626–27 (Mo. 1997) .............. 14

Mohammed v. May Dept. Stores, Co., 273 F. Supp. 2d 531, 534 (D. Del. 2003).......... 31

Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 777–78
    (3d Cir. 2001)....................................................................................................... 34

New Zealand Kiwifruit Marketing Board v. City of Wilmington, 825 F. Supp.
    1180, 1194 (D. Del. 1993)..................................................................................... 26

Utility Serv. & Maintenance, Inc. v. Noranda Aluminum, Inc., 163 S.W.3d 910,
    914 (Mo. 2006) ..................................................................................................... 14

**Statutes**

10 Del.C. §6302(d) ...................................................................................................... 26

**Other Authorities**

Restatement (Second) of Torts § 282 .......................................................................... 16

I.    **NATURE AND STAGE OF THE PROCEEDINGS**

This lawsuit arises out of four underlying actions in which both Northeast Controls and Fisher were sued because of Northeast Controls' negligence in processing a purchase order for a valve intended for use in oxygen service. The contract between Fisher and Northeast Controls exempts Fisher from defending or indemnifying Northeast Controls against claims, demands, or actions arising from Northeast Controls' negligence. Northeast Controls was negligent in placing the order for the valve, and its negligence caused the "Losses" at issue in this matter. Further, in the underlying actions, Northeast Controls faced exposure only for its own negligence. Consequently, Fisher had no obligation to defend or indemnify Northeast Controls in those actions.

Despite the relevant contractual language and the factual background, in this lawsuit plaintiffs seek to recover Northeast Controls' defense and settlement costs. The parties have filed cross-motions for summary judgment. This is Fisher's response to plaintiffs' motion for summary judgment. For the reasons set out below, Fisher respectfully requests that the Court deny plaintiffs' motion for summary judgment.

## II.    SUMMARY OF ARGUMENT

1.      Under the terms of the Representative Agreement, Fisher had no duty defend or indemnify Northeast Controls from or against any claims, demands, or actions arising from Northeast Controls' negligence. A reasonable trier of fact could conclude that all of the claims, demands, or actions at issue arose from Northeast Controls' negligence in placing the valve order with Fisher and consequently that Fisher had no duty to defend or indemnify Northeast Controls against those claims.[1] For that reason alone, plaintiffs' motion for summary judgment should be denied.

2.      In the underlying actions Northeast Controls could have been held liable only for its own negligence. Fisher had no obligation to defend and indemnify Northeast Controls against claims arising out of Northeast Controls' own negligence. Plaintiffs' motion for summary judgment should therefore be denied.

3.      The actual cause of the damages at issue in the underlying actions is irrelevant to plaintiffs' claim in this matter. Even if the Court concludes that the damages at issue in the underlying actions are relevant, the undisputed evidence shows that Northeast Controls' negligence in placing the valve order caused a greater release of energy at the time of the fire and explosion. Further, a reasonable trier of fact could conclude that that greater release of energy caused additional physical damages to the plaintiffs in the underlying actions. The Court should therefore deny plaintiffs' motion for summary judgment.

4.      Plaintiffs' arguments with regard to claim preclusion, issue preclusion, and judicial estoppel are meritless and irrelevant as they apply to Fisher. Surprisingly, plaintiffs have failed to

---

[1] As set out in Fisher's Brief in Support of Its Motion for Summary Judgment, the underdisputed evidence—and, in particular, the testimony of Northeast Controls' own witnesses—confirms that Northeast Controls was negligent and that the claims, demands, and actions against it arose from its negligence.

advise the Court that Fisher and Northeast Controls were parties to two joint defense agreements, which required Fisher and Northeast Controls to cooperate in defending the underlying action. In addition, in the second joint defense agreement (executed in May 2005) Fisher and Northeast Controls reserved their rights against one another relating to the <u>Olson</u> action. Had Fisher affirmatively developed evidence against Northeast Controls in the underlying actions, Fisher would have breached those agreements.

5.    Plaintiffs' arguments regarding preclusion and estoppel are also meritless because Fisher has in fact taken consistent positions regarding Northeast Controls' negligence. In the underlying actions, Fisher successfully argued that Fisher's conduct in fulfilling the order for the valve were proper and that the valve's materials of construction did not cause the explosion.[2] In this action, Fisher contends that Northeast Controls' error in placing the valve order caused Northeast Controls' "Losses"—that is, the claims, demands, and actions at issue. Further, Fisher's motive in the underlying actions was significantly different from its motive in this case. Northeast Controls was Fisher's sales representative and consequently its agent for purposes of accepting the order from Praxair. Because Northeast Controls was Fisher's agent, Fisher could have been held liable for Northeast Controls' negligence in processing the valve order. Had Fisher affirmatively developed evidence against Northeast Controls in the underlying actions, or had Fisher argued affirmatively in the underlying actions that Northeast Controls was negligent, Fisher would have been developing evidence and arguments establishing its own liability. Fisher was not required to sabotage its own defense in order to preserve its arguments against Northeast Controls.

---

[2] Fisher was conspicuously *silent* as to whether Northeast Controls' acted negligently with regard to the valve order.

6.    If plaintiffs' claim preclusion arguments apply to Fisher, then those same arguments bar plaintiffs' claims. Plaintiffs assert that the principles of claim preclusion bar Fisher's defenses and counterclaim in all four actions. Northeast Controls paid the bulk of its settlement costs ($501,000) to settle the <u>Great American</u> and <u>Praxair</u> actions, both of which are now final. Further, the <u>Motiva</u> action is also final. Northeast Controls did not reserve its rights against Fisher in any of those three actions. Consequently, if plaintiffs' preclusions claims are valid, then plaintiffs are not entitled to recover any defense or indemnity costs arising out of those three actions.

In their May 2005 agreement, Fisher and Northeast Controls did reserve their rights against one another relating to claims or defenses at issue in <u>Olson</u>. Except for that agreement, Northeast Controls otherwise failed to reserve its rights against Fisher in agreeing to Fisher's dismissal from the <u>Olson</u> action. Consequently, if plaintiffs insist on ignoring the May 2005 agreement, then their claims for defense and indemnity arising from the <u>Olson</u> action are also barred.

III.    **STATEMENT OF FACTS**[3]

This lawsuit—and the claims, demands, and actions asserted against both Northeast Controls and Fisher in the underlying actions—arose from Northeast Controls' negligence in placing a purchase order. The evidence establishing Northeast Controls' negligence in placing that order and the lawsuits that followed is set out in Fisher's Brief in Support of Motion for Summary Judgment and the supporting affidavit.[4] As those facts demonstrate, Northeast Controls made an egregious error in placing the purchase order for the valve, and the valve was later at the center of a catastrophic explosion.

A.    **Northeast Controls Placed an Order with Fisher That Did Not Match the Specifications Agreed to by Northeast Controls and the Customer**

Acting as Fisher's agent, Northeast Controls accepted an order from Praxair for a 12-inch type A11 valve for use in an air separation unit ("ASU") that Praxair was constructing at the Delaware City Power Plant.[5] Praxair's purchase order called for specific materials of construction for critical parts of the valve that would be exposed to high pressure, high temperature oxygen.[6] Northeast Controls subsequently placed an order for the valve with Fisher using an electronic ordering system.[7]

The order that Northeast Controls placed with Fisher did not match the written

---

[3] Documents identified as FCI/MSJ 0001-0561 are attached to the Affidavit of Daniel J. Gunter ("Gunter Affi."), Dkt. #79 submitted with Fisher's Motion for Summary Judgment. Documents identified as FCI/MSJ 0562-0736 are attached to the Affidavit of Daniel J. Gunter in Support of Fisher's Response to Plaintiffs' Motion for Summary Judgment ("Gunter Response Aff."), submitted herewith.

[4] See Dkt. #78, Dkt. #79.

[5] FCI/MSJ 0004, 0060-61.

[6] Cappellini Dep. at 74:1-18, FCI/MSJ 0478A.

[7] FCI/MSJ 0004.

specifications that Northeast Controls had prepared and provided to Praxair. Specifically, the order that Northeast Controls placed with Fisher contained the following variations from the specifications agreed to in writing by Praxair and Northeast Controls:[8]

| Valve part | Specifications agreed to by Northeast Controls and Praxair | Order that Northeast Controls placed with Fisher |
|---|---|---|
| Disk | Monel | Hastelloy C |
| Stem ("shaft") | Monel | Inconel 718 |
| Bearings ("guide" | Monel | TFE composite |
| Seal ("seat") | Monel/PTFE | Tefzel |

The Northeast Controls sales representative who placed the inaccurate order with Fisher, Bert Cappellini, could not explain <u>why</u> the order placed with Fisher differed from the specification sheet that Northeast Controls had provided to Praxair.[9] Further, **Mr. Cappellini conceded that the specification sheet and the information conveyed by Northeast Controls to Fisher should have matched.**[10]

Michael Peters—Northeast Controls' president and sole shareholder—testified that the appropriate standard of care required Northeast Controls to confirm all customer specifications in writing and retain the confirming documents.[11]

> Q . . . There are oral discussions between the sales representative and a customer as to specifications for a product. It's also good general business practice to confirm those specifications in writing, isn't it?

---

[8] FCI/MSJ 0160-0162.
[9] FCI/MSJ 0463.
[10] Cappellini Dep. at 137:7–22 (emphasis added), FCI/MSJ 0447.
[11] Deposition of Michael Peters ("Peters Dep.") at 62:2-13, FCI/MSJ 0495.

> A It is.
>
> Q And if Praxair and Northeast Controls agreed on a set of
> specifications for a Fisher product, Northeast Controls would not
> have made a practice to substitute different specifications to Fisher
> without first obtaining Praxair's agreement, right?
>
> A Correct.[12]

Indeed, Mr. Peters testified that it would be "terrible" to submit an order that did not meet

the agreed specifications.[13]

> Q If, in fact, he [Bert Cappellini] or someone else at
> Northeast Controls simply . . . made up specifications, if that
> happened, that would be a serious error, wouldn't it?
>
> A Terrible. **It would be terrible.**[14]

Mr. Peters went on to confirm that the purchase order submitted by Northeast Controls in

this case failed to meet Praxair's specifications:

> Q So, you agree, though, **it [the order transmitted by Northeast
> Controls to Fisher] doesn't comply with the purchase order,
> correct?**
>
> A **Correct. I mean, it's right there.**[15]

Thus, by Northeast Controls' own admission, Northeast Controls failed to accurately

place Praxair's purchase order in breach of the appropriate standard of care.

**B.    When the Valve Was Involved in a Catastrophic Explosion, the Parties
Involved Immediately Seized on the Discrepancies in the Valve's Materials of
Construction**

On Saturday, May 20, 2000, the valve was opened for the first time at the pressures,

---

[12] Peters Dep. at 62:2-13, FCI/MSJ 0495.
[13] Peters Dep. at 102:7-104:9, FCI/MSJ 0499-0501 (emphasis added).
[14] Peters Dep. at 102:7-104:9, FCI/MSJ 0499-0501 (emphasis added).
[15] Peters Dep. at 100:18-20, FCI/MSJ 0498 (emphasis added).

purity, and temperature of oxygen identified in the signed specification sheet prepared by Northeast Controls.[16] A fire and explosion immediately occurred, centered almost squarely on the valve. The fire and explosion seriously injured Mr. Ronald Olson (an employee at the power plant), consumed portions of the valve, and damaged other components of the ASU.[17]

On May 22, 2000—the Monday immediately after the explosion—Bhim Bhakoo, the Praxair employee who placed the valve order, returned to his office to find a voice mail describing the damage to the piping around the valve.[18] Based on this description, Mr. Bhakoo immediately concluded that there was a problem with the materials of construction of the valve.[19] Mr. Bhakoo contacted Northeast Controls and asked Northeast Controls to advise Praxair of the materials of construction of the valve.[20] Thus, from the beginning Praxair focused on the materials of construction of the valve and the mistake that Northeast Controls made in processing the order for the valve.

After the explosion, Motiva, Praxair, Fisher, Northeast Controls, and other parties cooperated in an initial investigation. Motiva's operator at the plant—Conectiv, Inc.—retained a forensic engineering firm, Wendell Hull and Associates ("WHA"),[21] which issued a report implicating the valve's improper materials of construction.[22] Thus, before any lawsuit was filed, a well-respected expert in oxygen service had concluded that the fire was caused by an error on the part of Northeast Controls.

---

[16] FCI/MSJ 0004, 0058, 0406-0486
[17] FCI/MSJ 0004, 0058.
[18] FCI/MSJ 0308.
[19] FCI/MSJ 0308.
[20] FCI/MSJ 0308.
[21] FCI/MSJ 0171-0173.
[22] FCI/MSJ 0171-0173.

**C.    The Underlying Actions**

Plaintiffs' statement of the facts misrepresents the order of events in the underlying actions and mischaracterizes Fisher's arguments in that action.

**1.    The Complaints in All Four Lawsuits Referred Specifically to the Improper Materials of Construction of the Valve That Resulted from Northeast Controls' Negligent Processing of the Order**

In April 2002, Mr. Olson filed an action in Delaware state court to recover for his serious burns, injuries, and other damages sustained as a result of the explosion.[23] In addition, Motiva, Praxair, and Great American Assurance (the insurer of the project's general contractor) filed three separate actions seeking to recover for damage to the DCPPRP and lost profits.[24] Fisher and Northeast Controls were defendants in all four of those actions.[25] All four of the complaints referenced the distinction between (on the one hand) the written specifications and (on the other) the actual materials of construction of the valve.[26] In addition, all four complaints alleged negligence specifically on the part of Northeast Controls.[27]

**2.    Northeast Controls' Tender of Defense**

Northeast Controls tendered the defense of these actions to Fisher. In accordance with the Representative Agreement—and against the background of the evidence of Northeast Controls' negligence—Fisher informed Northeast Controls that it would defend and indemnify Northeast Controls in regard to any allegations as to the valve, but that it would not defend and indemnify

---

[23] FCI/MSJ 0005.
[24] FCI/MSJ 0001.
[25] FCI/MSJ 0001.
[26] FCI/MSJ 0029, 0038, 0044-46, 0052.
[27] FCI/MSJ 0038, 0052.

Northeast Controls against claims of Northeast Controls' own negligence.[28] All four complaints specifically alleged negligence on the part of Northeast Controls and referenced the distinction between (on the one hand) the Praxair specifications and (on the other) the actual materials of construction of the valve.[29]

### 3. Northeast Controls and Fisher Entered into Two Joint Defense Agreements in the Underlying Actions

Surprisingly, in their opening brief plaintiffs fail to advise the Court that Northeast Controls and Fisher entered into two joint defense agreements in the underlying actions. The parties entered into the first joint defense agreement in September 2002, four months after the first lawsuits were filed. In that agreement, the parties and their attorneys—including Thomas Wagner, plaintiffs' counsel in this action—agreed to cooperate in defending the pending actions.[30]

The parties entered into a second agreement in the Olson matter after the commercial actions had already been dismissed. In that agreement, entered into in May 2005, the parties agreed to dismiss their claims against each other in the Olson matter "without prejudice with the express understanding and agreement that each of them will preserve all of their rights to assert these claims against the other in a subsequent proceeding."[31] The second agreement applied only to the Olson matter. There was no equivalent reservation of rights in the Praxair, Motiva or Great American matters.[32]

---

[28] FCI/MSJ 0201-0202.
[29] FCI/MSJ 0029, 0038, 0044-46, 0052.
[30] FCI/MSJ 0562.
[31] FCI/MSJFCI/MSJ 0663.
[32] Gunter Response Aff. ¶ 25.

**D.**    **Disposition of Claims in the Underlying Action**

In reciting the events in the underlying actions, plaintiffs apparently hope to convince the Court that Northeast Controls settled its own liability while claims against Fisher were still pending. That characterization is false. Instead, Northeast Controls settled its liability *after Fisher had been dismissed.* In short, Northeast Controls settled its own liability—not Fisher's.

The history of those lawsuits shows the following timeline:

| | | |
|---|---|---|
| September 22, 2003 | | Motiva informs court that it will voluntarily dismiss its complaint[33] |
| January 20, 2004 | | Great American informs the court that it is voluntarily dismissing its claims against Fisher[34] |
| April 26, 2004 | | Court enters summary judgment for Fisher on all claims asserted against it by Praxair[35] |
| | **May 24, 2004** | **Northeast Controls agrees to pay $501,000 to resolve its liability in the <u>Praxair</u> and <u>Great American</u> actions[36]** |
| June 7, 2005 | | Court grants Fisher's motion for summary judgment on all remaining claims against it in the <u>Olson</u> action[37] |
| | **July 28, 2005** | **Northeast Controls agrees to pay $100,000 to settle its liability in the <u>Olson</u> action[38]** |

In summary, by April 26, 2004, Fisher had been dismissed from all of the commercial actions. On May 25, 2004, Northeast Controls' settled the <u>Great American</u> and <u>Praxair</u> actions.

---

[33] FCI/MSJ 0582.
[34] Affidavit of Patrick D. McVey ("McVey Aff.") ¶ 2.
[35] Plaintiffs' Appendix #20, AO301.
[36] Plaintiffs' Appendix #24, AO465.
[37] FCI/MSJ 0669.
[38] Plaintiffs' Appendix #23, AO459.

Similarly, on June 7, 2005, Fisher was dismissed from the <u>Olson</u> action. On July 28, 2005, Northeast Controls settled the <u>Olson</u> action. This timeline demonstrates that, in the underlying actions, Northeast Controls settled its own potential liability for its own negligence and did so <u>after</u> the claims against Fisher had already been dismissed.

### E.     Fisher's Arguments and Motives in the Underlying Litigation

Contrary to plaintiffs' misrepresentations to the Court, in the underlying actions Fisher <u>never</u> argued that Northeast Controls was <u>not</u> negligent. Instead, for strategic reasons <u>and because Fisher had signed a joint defense agreement with Northeast Controls</u>, Fisher declined to develop further the already glaring evidence of Northeast Controls' negligence. Instead, Fisher focused its efforts on showing that Fisher itself did not act negligently and that—despite Northeast Controls' negligence—the valve did not cause the fire.[39]

Fisher had only one choice with regard to its strategy as to Northeast Controls in the underlying actions. Northeast Controls was acting as Fisher's agent when it negligently placed the order for the valve. Had Fisher developed further evidence of Northeast Controls' negligence, or had Fisher argued in the underlying actions that Northeast Controls was negligent, then Fisher would have been developing evidence and arguments that would have damaged Fisher's own interests.[40] In addition, had Fisher affirmatively developed evidence of Northeast Controls' negligence in the underlying actions, Fisher would have breached the first joint defense agreement, which obligated the parties to cooperate in the defense of the underlying actions.[41]

Faced with indisputable evidence of Northeast Controls' negligence, Fisher elected to

---

[39] Gunter Response Aff. ¶ 23.
[40] Gunter Response Aff. ¶ 23.
[41] Gunter Response Aff. ¶ 23.

defend the underlying actions by focusing on its own conduct and the issue of causation.[42] To that end, Fisher developed substantial evidence showing that neither *Fisher's* conduct nor the valve were in fact the initial cause of the explosion. The extensive evidence that Fisher developed—at significant effort and cost—included the testimony of Fisher's expert, Dr. Robert Mostello, who offered the opinion that the materials of construction of the valve did not *initiate* the fire.[43] But in the underlying actions, Dr. Mostello offered no opinion one way or the other as to whether Northeast Controls was negligent, and he did not offer an opinion as to whether the deviations in material specifications caused *additional* injuries to the plaintiffs in those action.[44]

In short, in the underlying actions Fisher was forced to defend four multi-million dollar lawsuits in the face of undisputed evidence (1) that its sales representative had made an egregious error in placing the order for the valve; (2) that, because of Northeast Controls' negligence, Fisher breached the express warranty that it provided to its customer, Praxair;[45] and (3) that the valve was located at the center of a catastrophic explosion. By exonerating its own conduct and the valve, Fisher successfully reduced claims initially alleged to be in excess of $35 million to <u>zero</u>.[46]

---

[42] Gunter Response Aff. ¶ 23.
[43] Plaintiffs' Appendix # 22 at A0437.
[44] Plaintiffs' Appendix # 22 at AO380-458.
[45] Fisher defended the breach of warranty claims by showing that the warranty period had expired before the incident. FCI/MSJ at 0583.
[46] McVey Aff. ¶ 3.

IV.    **ARGUMENT AND AUTHORITIES**

    A.    **Plaintiffs' Claim for Breach of Contract Against Fisher Is Barred by the Terms and Conditions of the Representative Agreement**

Northeast Controls was negligent, and its negligence caused both Fisher and Northeast Controls to be named as defendants in four lawsuits. Given that Northeast Controls was named as a defendant *because of Northeast Controls' negligence*, Fisher had no obligation to defend or indemnify Northeast Controls in those four lawsuits. Plaintiffs' claim should therefore be dismissed.

    1.    **Fisher Had No Duty to Defend and Indemnify Northeast Controls for Northeast Controls' Negligent Acts and Omissions**

As plaintiffs concede, Missouri law applies to the interpretation of the Representative Agreement. Plaintiffs also concede that the Representative Agreement includes a clear and unambiguous indemnification provision, which should be enforced as written. "If the contract terms are unequivocal, plain, and clear, the court is bound to enforce the contract as written. . . . It is a well-established principle of contract construction that, when a contract is clear, the court is bound to enforce the terms as written." Malan Realty Investors. Inc. v. Harris, 953 S.W.2d 624, 626–27 (Mo. 1997). Indemnity agreements between sophisticated businesses should be strictly construed and enforced as written. Utility Serv. & Maintenance, Inc. v. Noranda Aluminum, Inc., 163 S.W.3d 910, 914 (Mo. 2006).

The Representative Agreement specifically exempts Fisher from defending or indemnifying Northeast Controls for "Losses" arising from Northeast Controls' negligence:

> Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Representative from and against any and all claims, demands, actions, losses, damages, liabilities, costs

and expenses (collectively, "Losses") which may arise out of or be
made in connection with the death or injury of any person, or
damage to property, by whomever suffered, resulting or claimed to
result from any actual or alleged defect in any Product. . . ..

Notwithstanding the provisions of the immediately preceding
paragraph of this section XI or any other provision of this
Agreement, **Fisher shall not be obligated to protect, defend,
indemnify or hold harmless Representative from and against
any Losses arising from . . .**

### F. Negligent acts or omissions by Representative.[47]

As plaintiffs acknowledge in their opening brief, "specific terms and provisions of a
contract are given preference over general ones." General American Life Ins. Co. v. Barrett, 847
S.W.2d 125, 133 (Mo. App. 1993).[48] The parties to the Representative Agreement specifically
identified circumstances in which Fisher had no duty to defend or indemnify Northeast Controls.
Those specific circumstances include instances in which the "Losses" arise from Northeast
Controls' negligent acts or omissions. Plaintiffs' expert James W. Semple has confirmed that the
term "Losses" means "claims, demands, actions, losses, damages, liabilities, costs and
expenses."[49]

The meaning of this provision is not subject to debate. Fisher had no duty to defend or
indemnify Northeast Controls against any claims, demands, or actions arising from Northeast
Controls' negligence. If—as here—a lawsuit against Northeast Controls arose from Northeast
Controls' negligence, then Fisher was not obligated either to defend or indemnify Northeast
Controls against that lawsuit. Indeed, Delaware courts refuse to enforce a contract provision

---

[47] FCI/MSJ 0115 (emphasis added).
[48] Plaintiffs' Brief in Support of Motion for Summary Judgment, Dkt. # 76 at 13.
[49] Deposition of James W. Semple ("Semple Dep.") at 75:5-16, FCI/MSJ 0526.

calling for indemnification for a parties' own negligence. J.S. Alberici Constr. Co. v. Mid-West Conveyor Co., 750 A.2d 518, 521 (Del. 2000). Plaintiffs are complaining that Fisher failed to defend and indemnify Northeast Controls for its own negligence. Fisher had no duty to do so.

**2.    Northeast Controls Was Negligent**

A reasonable trier of fact must conclude that Northeast Controls was negligent. Under Missouri law,[50] "negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm." See Restatement (Second) of Torts § 282. "'[T]he standard of conduct to which [a person] must conform to avoid being negligent is that of a reasonable [person] under like circumstances.'" Harris v. Niehaus, 857 S.W.2d 222, 225 (Mo. 1993) (quoting Restatement (Second) of Torts § 283).

When Northeast Controls placed the order for the valve, it knew that the valve was going to be used in oxygen service, exposed to almost 100 percent pure oxygen at high pressures (in excess of 1150 psi) and high temperatures (above 250° F).[51] Mr. Peters, Northeast Controls' president, testified that Northeast Controls knew that there were hazards associated with oxygen service.[52] In fact, Northeast Controls had in its file a Fisher publication specifically warning of risks associated with oxygen service.[53] Further, **that Fisher publication warned that only specific materials should be used in valves used in oxygen service**.[54] In fact, the Fisher

---

[50] Because Missouri law applies to the Representative Agreement, the term "negligence" should be interpreted by reference to Missouri law. Nevertheless, under either Missouri or Delaware law, Northeast Controls was negligent.
[51] FCI/MSJ 0531.
[52] Peters Dep. at 63: 1-4, FCI/MSJ 0501.
[53] FCI/MSJ 0546-0549.
[54] FCI/MSJ 0547-0548.

publication specifically recommend using Monel or similar materials in the oxygen flowstream.[55]

Northeast Controls also knew (or should have known) that failure to process an order correctly could lead to litigation. Northeast Controls' president and sole shareholder, Mr. Peters, had signed an agreement between Praxair and Fisher that incorporated an express warranty by Fisher that the products that it supplied would meet Praxair's specifications.[56] Northeast Controls knew (or should have known) that if it failed to place an order in accordance with Praxair's specifications for a product, then that failure could expose Fisher to litigation.[57] At deposition Mr. Peters agreed that an error in processing an order like the one for the valve at issue would expose a party to litigation.[58]

Under those circumstances, a reasonable sales representative would have placed the order for the valve accurately. It would not have substituted other materials for those identified in the purchase order for the valve.

But Northeast Controls' conduct did not conform to the standard of conduct that a reasonable sales representative would have observed in placing the order for the valve—a standard of conduct spelled out in the testimony of its own employees. Instead, the evidence shows that the order that Northeast Controls placed with Fisher does <u>not</u> match the purchase order that Praxair sent to Northeast Controls.

Northeast Controls has no explanation for this mismatch. It has conceded that the specification sheet and the information conveyed by Northeast Controls to Fisher should have

---

[55] FCI/MSJ 0548.
[56] FCI/MSJ 0080, 0098.
[57] FCI/MSJ 00501
[58] Peters Dep. at 104:10–105:6, FCI/MSJ 0501.

matched. Its sole shareholder and its employees have testified that Northeast Controls violated both good practice and Northeast Controls' written procedures.[59] A reasonable trier of fact can conclude only that Northeast Controls was negligent in processing the order for the valve.

### 3. The "Losses" at Issue Arose from Northeast Controls' Negligence

Just as a reasonable trier of fact must conclude that Northeast Controls was negligent, so too must a reasonable trier of fact conclude that Northeast Controls' "Losses" arose from its negligence in placing the valve order.

This conclusion can and must be drawn from the history of the investigation of the May 2000 incident and the complaints as filed. The incident occurred on May 20, 2000. On May 22, 2000, Praxair learned from Northeast Controls that the specification sheet in Praxair's file did not match the materials of construction for the valve as actually supplied.[60] Further, before the first lawsuit was filed, an investigation had taken place, and a prominent forensic engineering firm— Wendell Hull and Associates—had issued a preliminary report offering three possible causes for the fire.[61] Of those three possible causes, two could be traced directly to the deviation in material specifications introduced by Northeast Controls: (1) the use of Kel-F rather than Monel for the valve's seal and (2) the use of TFE composite bearings rather than Monel bearings.[62]

---

[59] Cappellini Dep. at 137:7–22 (FCI/MSJ 0447), 127: 7-19 (FCI/MSJ 0479), 127: 7-19 (FCI/MSJ 0479); Peters Dep. at 62:2-13 (FCI/MSJ 0495), 100:18-20 (FCI/MSJ 0498), 102:7-104:9 (FCI/MSJ 0499-0501); Sabia Dep. at 54:3-16, (FCI/MSJ 0518).

[60] FCI/MSJ 0158-0159.

[61] FCI/MSJ 0171-0173.

[62] FCI/MSJ 0172. It is irrelevant that Fisher later developed evidence supporting Wendell Hull's third scenario—i.e., particle impact on piping immediately upstream of the valve. What is relevant is that the plaintiffs (and codefendants) in the underlying actions were relying on the theories put forward by Wendell Hull. Further, the hearsay rule does not bar Fisher's reference to the Wendell Hull report. Fisher is not offering that report for the truth of the matters asserted in that report. Instead, Fisher is offering the report only to show that those matters were asserted, regardless of the truth of those assertions.

Given the written record of these material deviations and the presence of the Wendell Hull report, the plaintiffs in the underlying actions naturally focused on the fact that the valve did not meet Praxair's written specifications. All four plaintiffs in the underlying actions specifically alleged that the valve failed to meet specifications because it used the wrong materials.[63] Although those complaints generically alleged "defects" in the valve, no party in the underlying actions raised any issues about the design or manufacture of the valve other than the material deviations. In short, **in the underlying actions the plaintiffs focused exclusively on the material deviations that resulted from Northeast Controls' negligence.**

In light of that history, a reasonable trier of fact can draw only one conclusion: Northeast Controls' "Losses" (i.e., the claims demands, actions, losses, damages, liabilities, costs and expenses) were the direct result of Northeast Controls' negligence in processing the order for the valve. Under the terms of the Representative Agreement, Fisher was not obligated to defend or indemnify Northeast Controls for those Losses.

### 4.    Plaintiffs' Self-Contradictory Interpretations of the Representative Agreement Depend on Terms That Do Not Exist in the Agreement Itself

The undisputed evidence shows that Northeast Controls was negligent and that its negligence drew both Northeast Controls and Fisher into four lawsuits. Despite that evidence, plaintiffs argue that Fisher should bear the costs resulting from Northeast Controls' negligence. To make that argument, plaintiffs have offered to the Court two conflicting interpretations of the Representative Agreement:

---

[63] Motiva, Praxair, Great American, Olson Complaints, FCI/MSJ 0038, 0029, 0044-0046, 0052.

- On November 5, 2007,[64] plaintiffs argued that Fisher was obligated to defend and indemnify Northeast Controls unless and until a court had adjudicated Northeast Controls liable in negligence for a plaintiffs' damages.

- On November 16, 2007—11 days after offering their initial interpretation of the Representative Agreement—plaintiffs jettisoned that interpretation when they filed an untimely "corrected" brief in support of their motion for summary judgment.[65] In their "corrected" brief, plaintiffs now argue that Fisher was obligated to defend and indemnify Northeast Controls unless and until Fisher proves that Northeast Controls' negligence was the cause in fact of the personal injury and property damages suffered by the plaintiffs in the underlying actions.[66]

By filing a "corrected" brief, plaintiffs abandoned their initial interpretation of the Representative Agreement. The Court should therefore reject that original interpretation.

Further, plaintiffs' abandonment of their original interpretation of the Representative Agreement also vitiates their new interpretation. Plaintiffs cannot claim that their new interpretation derives from the plain language of the Representative Agreement. They had almost eight years to come up with an interpretation of the contract—and, after all that time, they offered an interpretation, only to reject it 11 days later. **Had plaintiffs' new interpretation of the contract represented the contract's plain language, they could have offered that**

---

[64] See Dkt. # 76 at 17.

[65] See Plaintiff's Corrected Brief in Support of Motion for Summary Judgment, Dkt. # 82. Plaintiffs fail to inform the Court what "corrections" they made. In particular, they fail to advise the Court that they did not merely correct some typographical or other non-substantive error but also changed their arguments. In fact, plaintiffs did not bother to seek the Court's leave to file their "corrected" brief. The "corrected" brief should be stricken.

[66] See Dkt. # 82 at 17.

interpretation on November 5, 2007, rather than waiting another 11 days—an 11 days in which they had the opportunity to review Fisher's motion for summary judgment—to offer their "plain language" interpretation.

In short, plaintiffs' rejection of their original interpretation of the Representative Agreement shows that this new interpretation is just as artificial, and just as false, as the original interpretation that they rejected.

Regardless which interpretation plaintiffs offer, the Court should reject that interpretation on the merits. Neither of plaintiffs' interpretations is supported by the language of the Representative Agreement. Instead, plaintiffs are asking the Court to ignore the plain language of the agreement and incorporate into it new terms that contradict the terms to which the parties agreed.[67]

a.    **Plaintiffs' Original Interpretation of the Representative Agreement Contradicts the Plain Language of the Agreement**

The indemnification provision at issue specifically provides that Fisher has no obligation either to defend or indemnify Northeast Controls against "Losses," a term that includes <u>claims</u>, <u>demands</u>, and <u>actions</u> arising from Northeast Controls' negligence. If the claims, demands, or actions against Northeast Controls arose from Northeast Controls' negligence, then Fisher was not obligated to provide a defense or indemnification. Had the parties intended the exemption to apply only after entry of judgment against Northeast Controls for its negligence, then these two sophisticated business entities could have drafted the contract accordingly. They did not do so.

Further, plaintiffs' original, timely interpretation of the Representative Agreement either

---

[67] <u>See</u> Dkt. #76 at 16

eliminates the term "defense" from the contract or results in an absurd interpretation. Under plaintiffs' original interpretation, Fisher was required to defend and indemnify Northeast Controls against any action, even if that action alleged only Northeast Controls' negligence. Further, Fisher would have been released from its obligation only if it were *unsuccessful* in defending Northeast Controls. Had Fisher settled any such claim, demand, or action, it would have eliminated the possibility of demonstrating Northeast Controls' negligence. Even if Northeast Controls were palpably negligent (as it was in this case), and even if that negligence were obviously the cause of the plaintiff's or claimant's harm, then Fisher would be obligated to defend or indemnify Northeast Controls through trial.

That interpretation of the Representative Agreement requires that the agreement be rewritten to mandate that Fisher defend and indemnify Northeast Controls unless and until a court enters judgment against Northeast Controls based on its negligence. The Representative Agreement does not contain any language supporting that interpretation. Instead, the contract specifically provides that the Fisher has no obligation to defend or indemnify Northeast Controls against claims, demands, or actions arising from Northeast Controls' own negligence:

> **Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses arising from the following: . . .**
>
> **F. Negligent acts or omissions by Representative.**[68]

Plaintiffs' own legal expert admits that Losses means "claims, demands, actions, losses, damages, liabilities, costs and expenses."[69] In this case, the claims, demands, or actions asserted against

---

[68] FCI/MSJ 0115 (emphasis added)
[69] Semple Dep. at 75:5-16, FCI/MSJ 0526.

22

Northeast Controls arose from Northeast Controls' negligence, Fisher had no duty to defend or indemnify Northeast Controls against those Losses. Plaintiffs cannot now rewrite the contract to provide a duty that never existed.

        **b.**     **Plaintiffs' New Interpretation of the Representative Agreement Also Contradicts the Plain Language of the Agreement**

In their "corrected" brief, plaintiffs jettisoned their original interpretation of the Representative Agreement. Now, plaintiffs seek to argue that Fisher was required to defend and/or indemnity Northeast Controls unless and until it is established that the claimed damages were actually caused by Northeast Controls' negligence.[70] That argument was made

- Almost ten years after the agreement was executed;
- Almost ten years after Northeast Controls made the mistake that led to these lawsuits;
- Almost eight years after the first lawsuit was filed;
- More than a year after plaintiffs filed suit in this action;
- Eleven days after plaintiffs filed their original motion for summary judgment; and
- Eleven days after Fisher filed its motion for summary judgment, setting forth its interpretation of the Representative Agreement.

As this history shows, long after the eleventh hour plaintiffs have offered a brand-new interpretation of the Representative Agreement. Plaintiffs' new interpretation of the agreement demonstrates that their original, timely interpretation is without merit. Further, plaintiffs' former interpretation of the agreement vitiates their new interpretation of that agreement: plaintiffs cannot honestly claim to the Court that their new interpretation of the agreement reflects the clear, unambiguous meaning of the agreement. **If that were the case, plaintiffs would have offered their new and improved meaning the first time around.** Indeed, plaintiffs' shifting

---

[70] See Dkt. # 82 at 17.

interpretations of the Representative Agreement vitiate all of their interpretations.

Further, plaintiffs' newly minted and untimely interpretation of the agreement is also without merit because it contradicts the plain language of the agreement. Under plaintiffs' new interpretation, "Losses" means "damages actually suffered by persons asserting claims, demands, or actions against Northeast Controls." But that is <u>not</u> the language of the Representative Agreement. Further, the actual language of that agreement shows that Northeast Controls and Fisher alike understood how to distinguish "Losses"—i.e., claims, demands, and actions—from the damages at issue in the underlying action. Again, the relevant section of the agreement provides as follows:

> Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Representative from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomever suffered, resulting or claimed to result from any actual or alleged defect in any Product.

In this section of the Representative Agreement, the term "Losses" appears <u>before</u> the phrases "death or injury of any person, or damage to property." Had the parties intended the term "Losses" to apply to "death or injury of any person, or damage to property," they would have inserted the phrase "collectively, 'Losses'" <u>after</u> the phrase "death or injury of any person, or damage to property." But they did not do so.

Plaintiffs' expert, James Semple, agrees with Fisher that "Losses" means "any and all claims, demands, actions, losses, damages, liabilities, costs and expenses."[71] Plaintiffs now (for the very first time) assert that "Losses" really means "death or injury of any person, or damage to

---

[71] Semple Dep. at 75:5-16, FCI/MSJ 0526.

property." In short, they would rewrite the Representative Agreement as follows:

> Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses [i.e., *death or injury of any person, or damage to property*] arising from the following: . . .
>
> F. Negligent acts or omissions by Representative.

But that is not what the Representative Agreement provides. Instead, it provides as follows:

> Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses [i.e., *claims, demands, actions, losses, damages, liabilities, costs and expenses*] arising from the following: . . .
>
> F. Negligent acts or omissions by Representative.

The Court should reject plaintiffs' new and untimely interpretation of the Representative Agreement. Instead, the Court should conclude that, under the unambiguous terms and conditions of the Representative Agreement, Fisher had no duty either to defend or indemnify Northeast Controls against "claim, demands, [or] actions" arising from Northeast Controls' negligence. The underlying actions involved "claims" of Northeast Controls' negligence. Because Fisher had no obligation to defend or indemnify Northeast Controls against "claims" arising from its negligence, Fisher had no obligation to defend or indemnify Northeast Controls against the "claims" at issue in the underlying actions. Plaintiffs' motion for summary judgment should therefore be denied.

**B.    Northeast Controls Could Have Incurred "Losses" Only for Its Own Negligence in the Underlying Actions; Fisher Had No Duty to Defend or Indemnify Northeast Controls Against Those "Losses"**

In the alternative, plaintiffs' motion for summary judgment should be denied because Northeast Controls' only exposure in the underlying actions was for claims of Northeast Controls' own negligence, for which Fisher owed no duty of defense or indemnification.

The plaintiffs in the underlying actions brought their claims in Delaware state court, subject to Delaware's procedural and substantive rules. Under Delaware's Contribution Act, each joint tortfeasor is held responsible only for its own degree of fault. 10 Del. C. §6302(d); Ikeda v. Molock, 603 A.2d 785, 787 (Del. 1991). Consequently, Northeast Controls could have been held liable in the underlying actions only for its own negligence; it could not have incurred any losses attributable to Fisher.

Because Fisher would have been held directly liable for its own share of fault, and because Northeast could never have been held liable for Fisher's fault, there were never and never would have been any circumstances that would trigger any obligation by Fisher to defend or indemnify Northeast.[72] See New Zealand Kiwifruit Marketing Board v. City of Wilmington, 825 F. Supp. 1180, 1194 (D. Del. 1993) (noting that the effect of the Contribution Act is to require a factual determination of degrees of fault, which prevents the parties from incurring liability for another party's actions and therefore prevents the right to indemnification from ever being triggered).[73]

Moreover, even if the Delaware Contribution Act did not exist, Northeast Controls still did not have any exposure for a product defect claim. The underlying plaintiffs' generic reference to a valve "defect" did nothing more than restate their allegations that the valve failed to conform to the material specifications set forth in the written specifications prepared by Northeast Controls and accepted by Praxair. No party in the underlying actions raised any issues about the design or

---

[72] By contrast, because Northeast Controls was acting as Fisher's agent when it placed the order for the Valve, Fisher could have been held vicariously liable for Northeast Controls' negligence even though Northeast Controls could never have been held liable for Fisher's acts.

[73] Although it was not possible for Northeast Controls to be held liable for fault attributable to Fisher, Fisher did agree to defend and indemnify Northeast Controls in regard to any allegations as to the valve. As plaintiffs agree, Fisher mounted an aggressive and successful defense against all such claims.

manufacture of the valve other than those material deviations. In fact that was the <u>only</u> issue on which either Fisher or Northeast faced exposure. Under the component supplier doctrine, as adopted in Delaware, a supplier of a component, such as the valve at issue in this case, can be held liable <u>only</u> if (a) the component fails to meet specifications or (b) the specifications are so obviously dangerous that no reasonable person would follow them. <u>Castaldo v. Pittsburgh-Des Moines Steel Co.</u>, 376 A.2d 88, 91 (Del. 1977). Had Northeast Controls accurately communicated the written specifications to which Northeast Controls and Praxair had agreed, the component supplier doctrine would have barred any claims against Fisher or Northeast Controls. Instead, Northeast Controls' negligence meant that the component <u>failed to meet specifications</u> and made it impossible for Fisher or Northeast Controls to take advantage of the component supplier doctrine.

Had a separate and distinct "product defect" claim been asserted, **Northeast Controls had no exposure for those claims under Delaware law for the simple reason that it did not sell the valve.**[74] Instead, Northeast Controls provided only its services as an independent sales representative for Fisher. As the Delaware Supreme Court has made clear, a person who provides only services may be held liable only for negligence in providing his or her services:

> No case . . . has been brought to our attention wherein strict tort liability has been imposed against a defendant who has provided only professional services. Indeed, the "service-product" distinction has been determinative, the general rule being that **those who sell "services" are not liable in the absence of negligence.**

<u>Castaldo v. Pittsburgh-Des Moines Steel Co.</u>, 376 A.2d 88, 91 (Del. 1977).

---

[74] This analysis should come as no surprise to plaintiffs. In the underlying actions, plaintiffs' attorneys provided this same analysis to Fisher's counsel. Gunter Response Aff. ¶ 24.

Further, under Delaware law Northeast Controls faced no exposure for strict liability:[75]

> [T]he predicate for strict liability remains the same: strict liability
> will apply when a consumer or bystander is injured by a defective
> product when such consumer or bystander is exposed to the
> defective product by the actions of "*one engaged in the business of
> selling or otherwise distributing products*" and the injured party is
> not eligible for recourse in statutory remedies.

Beattie v. Beattie, 786 A.2d 549, 554 (Del. Super. 2001) (per Slights, J.) (emphasis added).[76]

In short, **because Northeast Controls did not sell or manufacture the valve, its sole
exposure and the only "Losses" it did or could have incurred in the underlying actions
arose from its own negligence as a sales representative.** Fisher had no duty to defend or
indemnify Northeast Controls against those Losses. For this alternate reason, plaintiffs' motion for
summary judgment should be denied.

### C.    The Actual Cause of the Explosion Is Irrelevant to Plaintiffs' Claim in This Action; Nevertheless, Any Consideration of Causation Precludes Entry of Summary Judgment in Favor of Plaintiffs

The central question in this case is, "What caused Northeast Controls' 'Losses'"? The
answer to that question is "Northeast Controls' negligence caused its Losses—i.e., the claims,
demands, and actions asserted against Northeast Controls."

The cause of the *explosion* at issue in the underlying actions is fundamentally irrelevant to
this central question. It does not matter whether the material deviations actually caused the

---

[75] In general, Delaware law does not recognize a strict product liability cause of action. See Cline v.
Prowler Indus. of Md., Inc., 418 A.2d 968, 980 (Del. 1980) ("[I]t is not within the power of this Court to
adopt the doctrine of strict tort liability in sales cases due to the preeminence of the Uniform Commercial
Code in the sales field of the law."). A cause of action for strict product liability is available for certain
non-sales transactions, such as the one at issue in Beattie v. Beattie, 786 A.2d 549 (Del. Super. 2001)
(injury arising out of use of "demonstrator" car).

[76] The underlying actions were assigned to Judge Slights.

explosion. What matters is whether the plaintiffs in the underlying actions *sued* Fisher and Northeast Controls *because of those material deviations.* The answer to that is an unequivocal "Yes." Even though Fisher developed evidence showing that the plaintiffs in those actions were mistaken, it is abundantly clear that Northeast Controls and Fisher were both sued because of Northeast Controls' negligence in processing the valve order.

Plaintiffs, though, have ignored the reading of "Losses" adopted by their own expert. Plaintiffs assert that "Losses" actually means "damages"—even though that is not the meaning to which the parties agreed in the Representative Agreement. As set forth above, the Court should reject that misinterpretation of the contract language. But even if the Court concludes that the damages at issue in the underlying actions are relevant, the undisputed evidence shows that Northeast Controls' negligence in placing the valve order exacerbated the effects of the explosion.

Plaintiffs' expert David Pope and Fisher's expert Robert Mostello agree: Northeast Controls' substitution of unspecified materials of construction caused a greater release of energy and greater heat of combustion at the time of the fire and explosion. Fisher's expert Dr. Robert Mostello offered the opinion that "the materials of construction, as supplied, caused a significantly greater release of energy than would the materials on Exhibit 118, the specification sheet initialed by Praxair and Northeast Controls."[77]

Plaintiffs' expert Dr. David Pope agreed that the total heat of combustion in this incident was greater because of the deviation in the valve's materials of construction:

> Q.    . . . [H]ad there been a Monel disk and a Monel shaft, had
> either of those combusted, the heat of combustion that they would
> have contributed would have been less than was contributed by the

---

[77] Affidavit of Robert A. Mostello ("Mostello Aff. at ¶ 4)

> similar portions of the Hastelloy C disk and the Inconel 718 shaft, correct?
>
> A.    That's correct.
>
> Q.    So that at the end of the day had the valve had a Monel disk and a Monel shaft, the total heat of combustion in this incident would have been less than what we had in the incident as it actually happened?
>
> A.    That's correct.
>
> Q.    And that is, in fact, Dr. Mostello's opinion in this matter, correct, a portion?
>
> A.    That's my understanding of it, yes.[78]

Based on this evidence, a reasonable trier of fact could conclude that the greater heat of combustion was a cause of additional damages to the plaintiffs in the underlying actions. Thus, even if the Court concludes that the cause of plaintiffs' damages in the actions below are relevant, it should deny plaintiffs' motion for summary judgment.

### D.    Plaintiffs' Estoppel Arguments Are Without Merit

Plaintiffs' arguments with regard to claim preclusion, issue preclusion, and judicial estoppel are confused, misplaced, and based on misrepresentations about the underlying actions. First, plaintiffs have confused the issues addressed in each case. The issue to be decided in the underlying actions was the cause in fact of the explosion and the resulting personal injury and property damage. The issue to be decided in the current action is whether or not Fisher had a contractual duty to defend and indemnify Northeast Controls against the lawsuits that followed the explosion. Causation for the explosion is not (or should not be) at issue in the current action. Second, Northeast Controls has confused the arguments asserted (or not asserted) by Fisher in

---

[78] Deposition of David P. Pope ("Pope Dep.") at 41:7-21, FCI/MSJ 0676.

each case. In the underlying action, Fisher successfully argued that its conduct and the valve's materials of construction *did not cause the explosion*. By contrast, in the current action, Fisher contends that Northeast Controls' error in processing the order for the valve *caused Northeast Controls and Fisher to be sued*. There is nothing inconsistent about Fisher's arguments in both cases.

1.    **If Fisher's Claims Are Barred by the Doctrine of Claim Preclusion, Then Plaintiffs' Claims Are Equally Barred**

Under Delaware law, a party is precluded from bringing a claim in a subsequent lawsuit only where there has been (1) a final judgment on the merits in a prior suit involving (2) the same claim and (3) the same parties or their privies." <u>Mohammed v. May Dept. Stores, Co.</u>, 273 F. Supp. 2d 531, 534 (D. Del. 2003) (citations omitted). Plaintiffs have not identified any final judgment on the merits in the underlying actions that resolved any of Fisher's claims against Northeast Controls. The claim preclusion doctrine is wholly inappropriate and inapplicable to the facts of this case.

If plaintiffs wish to pursue a claim preclusion argument against Fisher, then plaintiffs' must concede that their claims, too, are barred by this very same doctrine. Northeast Controls asserted the very same claims for indemnification against Fisher in the <u>Olson</u>, <u>Praxair</u>, <u>Motiva</u>, and <u>Great American</u> matters. Northeast Controls stipulated to the dismissal of all claims against Fisher in the <u>Praxair</u>, <u>Motiva</u>, and <u>Great American</u> actions without reserving the right reassert its claim for indemnification against Fisher in future litigation.[79]

By contrast, when Northeast Controls later agreed to the dismissal of the <u>Olson</u> action,

---

[79] FCI/MSJ 0607, 0618, Gunter Affid. ¶ 25.

Fisher and Northeast Controls entered into a joint defense agreement that specifically reserved the right of both parties to assert their claims against one another in a subsequent proceeding.[80] If plaintiffs' claim preclusion argument is accepted *as to Fisher*, then that argument applies equally to plaintiffs' claims.

## 2.  Issue Preclusion Does Not Apply to the Facts of This Case

Fisher should not be precluded from presenting arguments that it had no contractual duty to indemnify Northeast Controls' in the underlying actions. Issue preclusion, or collateral estoppel bars a potential claim if four requirements are met: (1) the issue decided in the prior adjudication is identical with the one presented in the later action, (2) there was a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party or in privity with the party to the prior adjudication, and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in question in the prior adjudication. Digene Corp. v. Ventana Medical Systems, Inc., 484 F.Supp.2d 274, 282 (D. Del. 2007).

Northeast Controls voluntarily dismissed all of its claims for defense and indemnification against Fisher in the underlying actions. The parties did not fully litigate the issue that is the subject of the current litigation—that is, whether Fisher had a contractual duty to defend and indemnify Northeast Controls. Likewise, there was never a determination or final judgment on that issue. Further, Northeast Controls settled the negligence claims against it *after* Fisher had been dismissed from the relevant lawsuits. Thus, there was never a determination or final judgment as to Northeast Controls' negligence in placing the valve order in any litigation involving Fisher or any of the other parties.

---

[80] FCI/MSJ 0663.

Moreover, by the very nature of its relationship with Northeast Controls, Fisher was significantly impeded in its ability to develop evidence of Northeast Controls' negligence in the underlying actions. Fisher was forced to defend against a multi-million dollar lawsuit in the face of undisputed evidence that its sales representative had made an egregious error in placing the order for a valve that was located at the center of a catastrophic explosion.[81] Had Fisher developed further evidence of Northeast Controls' already glaring negligence, it would have been developing evidence against itself.[82] Plaintiffs acknowledge this tension in their opening brief: "Even while other parties tried to blame Northeast, **Fisher refrained from doing so**. Obviously this would have been inconsistent with its defense that the valve was merely 'a victim of the fire.'"[83] Thus, it should come as no surprise that Fisher would refrain from blaming Northeast Controls in the midst of the other parties' accusations that Northeast Controls' error caused damages exceeding $35 million.

Also, had Fisher affirmatively developed evidence of Northeast Controls' negligence in the underlying actions, Fisher would have been in breach of the joint defense agreement, which obligated the parties to cooperate in the defense of the underlying actions.[84] And, of course, in the <u>Olson</u> action both parties specifically reserved their rights against one another.

Plaintiffs contend that Fisher now should be precluded from presenting the issue of Northeast Controls' negligence because Fisher's arguments in the underlying actions and in the present action are inconsistent. Plaintiffs' assertion is false. Although Fisher's motives and legal

---

[81] Gunter Response Aff. ¶ 23.
[82] Gunter Response Aff. ¶ 23.
[83] Dkt. #76 at 19 (emphasis added).
[84] Gunter Response Aff. ¶ 23.

risks in the underlying actions were entirely different from those in the present action, Fisher's factual allegations and its legal arguments are wholly consistent. Again, in the underlying actions Fisher successfully argued that *its* conduct and the valve's materials of construction did not cause the explosion. In the current action, Fisher contends that Northeast Controls' error in processing the order for the valve caused Northeast Controls and Fisher to be sued. Not only are Fisher's arguments entirely consistent, they do not even address the same issue. Fisher should not be precluded from presenting these arguments.

### 3.    Judicial Estoppel Is Inapplicable to the Facts of This Case

Application of judicial estoppel is equally inappropriate to the facts of this case. Judicial estoppel may be imposed only if (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or he position in bad faith (i.e., in a culpable manner threatening to the court's authority or integrity); and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity. Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 777–78 (3d Cir. 2001). Inconsistencies are not sanctionable unless a litigant has acted "in bad faith—i.e., with intent to play fast and loose with the court." Id. at 780–81.

> A finding of bad faith must be based on more than the existence of an inconsistency . . . ; indeed, a litigant has not acted in bad faith for judicial estoppel purposes unless two requirements are met. First, he or she must have behaved in a manner that is somehow culpable. Second, a litigant may not be estopped unless he or she has engaged in culpable behavior vis-a-vis the court. . . . Accordingly, judicial estoppel may not be employed unless a litigant's culpable conduct has assaulted the dignity or authority of the court.

Id. (citations and internal quotation marks omitted).

Once again, Fisher's arguments in the underlying actions and in this action are entirely consistent. In the underlying action, Fisher argued that neither its conduct nor the valve *caused the explosion*. In the current action, Fisher contends that Northeast Controls' error in processing the order for the valve *caused it to be sued*. These arguments are easily reconcilable.

Further, in the underlying actions Fisher and Northeast Controls were operating under a joint defense agreement that called for the parties to cooperate in the defense of those actions. Fisher could not have cooperated with Northeast Controls on the one hand while, on the other, developing evidence and offering arguments of Northeast Controls' negligence.

And even if the Court focuses not on the issue of Northeast Controls' negligence but on the issue of property damage and personal injury, Fisher has still adopted consistent positions. In the underlying actions, Fisher *never* argued that Northeast Controls was not negligent, and it never argued that the valve's materials of construction did *not* contribute to the heat of combustion and consequently cause greater damages. In fact, Fisher stayed resolutely away from that question *precisely because it knew that, if the issue surfaced, Fisher could face exposure based on an agency theory.* Instead, Fisher focused on what *initiated* the fire and explosion—not what may have exacerbated the effects of the fire.[85]

That approach is perfectly consistent with its approach here. In this case, Fisher must defend itself against the attempt of its sale representative (and the sales representative's insurer) to impose on Fisher costs that resulted from the sales representative's negligence. Northeast Controls is saying, "Ignore my negligence in getting us both involved in the underlying actions.

---

[85] In fact, Fisher was extraordinarily fortunate in the underlying actions that no other party raised this issue. Had that occurred, Fisher would have faced far greater difficulties in extricating itself from those lawsuits.

Because you successfully extricated yourself from those actions—despite the overwhelming evidence of my negligence—you must now pay me for the consequences of my mistake." Faced with that claim, Fisher is arguing only against those affirmative claims. If plaintiffs are entitled to assert their arguments against Fisher, then Fisher should be entitled to assert its arguments against plaintiffs.

The Court should reject that request and deny plaintiffs' motion for summary judgment.

## V.    __CONCLUSION__

In both its original and "corrected" motions for summary judgment, plaintiffs have claimed that Fisher acted "cynically" in refusing to defend and indemnify Northeast Controls.[86] But the true cynicism in this case rests with plaintiffs. Despite the overwhelming evidence that Northeast Controls was negligent, and despite the overwhelming evidence that Northeast Controls' negligence brought both Northeast Controls and Fisher into the underlying actions, plaintiffs insist that Fisher was obligated to bear the costs deriving from Northeast Controls' negligence. The Court should reject plaintiffs' arguments, which would impose on Fisher the costs of Northeast Controls' negligence. The parties never agreed that Fisher would defend and indemnify Northeast Controls for its negligence. Consequently, the Court should deny plaintiffs' motion for summary judgment. The reasons may be summarized as follows:

1. Under the terms of the Representative Agreement, Fisher had no duty to defend or indemnify Northeast Controls for any claims, demands, or actions arising from its negligence. The undisputed evidence shows that the plaintiffs in the underlying actions sued Northeast Controls because of its negligence. Consequently, Fisher had no duty to defend or indemnify Northeast Controls against those claims, demands, or action.

2. Fisher had no duty to defend and indemnify Northeast Controls in the underlying actions because the undisputed evidence shows that Northeast Controls' only exposure in the underlying actions was for its own negligence.

3. The actual cause of the fire and explosion at issue in the underlying litigation is irrelevant. But if the Court determines that the cause of the underlying plaintiffs' damages is

---

[86] See Dkt. # 76 at 16, Dkt. # 82 at 17.

relevant, there is at least a genuine issue of material fact as to whether Northeast Controls' negligence caused additional damages to the underlying plaintiffs.

4. Plaintiffs' arguments regarding claim preclusion, issue preclusion, and judicial estoppel are without merit. In the underlying actions, there was no decision on the merits of any of the claims or defenses asserted by Fisher in this action. If claim preclusion is applicable, then plaintiffs' claims should be dismissed under that same doctrine. Further, Fisher's arguments in the underlying case and in the present action are entirely consistent. Fisher never argued that Northeast Controls was not negligent; it simply declined to develop additional evidence of that negligence. Finally, Fisher had significantly different motives in the underlying actions than in the current action. Northeast Controls was acting as Fisher's agent when it inaccurately processed Praxair's order for the valve. Northeast Controls' negligence in doing so could have been imputed to Fisher. Fisher was not required to sabotage its own defense by developing additional evidence of Northeast Controls' negligence in the underlying actions. Likewise, Fisher was not obligated to breach its joint defense agreement with Northeast Controls in order to preserve its arguments against Northeast Controls.

For these reasons, Fisher respectfully requests that the Court deny Northeast Controls' motion for summary judgment.

RESPECTFULLY SUBMITTED,

MARON MARVEL BRADLEY & ANDERSON, P.A.

By:    /s/ Paul A. Bradley_____
        Paul A. Bradley (DE Bar ID #2156)
        Maron Marvel Bradley & Anderson, P.A.
        1201 N. Market St, Ste. 900
        Wilmington, DE 19801
        (302) 425-5177 (Tel.)
        (302) 425-0180 (Fax)
        pab@maronmarvel.com

Date: November 20, 2007

RIDDELL WILLIAMS P.S.

By: /s/ Daniel J. Gunter_____
    Patrick D. McVey
    *Pro hac vice*
    Daniel J. Gunter
    *Pro hac vice*
    Riddell Williams P.S.
    1001 Fourth Avenue Plaza, Suite 4500
    Seattle, WA 98154
    (206) 624-3600 (Tel.)
    (206) 389-1700 (Fax)
    pmcvey@riddellwilliams.com
    dgunter@riddellwilliams.com

Date: November 20, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br><br>Defendant. | NO. 06-412<br><br>**AFFIDAVIT OF DANIEL J. GUNTER IN SUPPORT OF DEFENDANT FISHER'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

STATE OF WASHINGTON )
: ss.
County of King )

I, DANIEL J. GUNTER, being duly sworn, depose and state as follows:

1.      I am one of the attorneys representing defendant Fisher Controls International, LLC ("Fisher"), in the above matter. I was also one of the attorneys representing Fisher in the four underlying actions. I am competent to attest as to the matters set forth herein, and I make this affidavit based on my personal knowledge.

2.      Attached hereto as Exhibit 41 is a true and correct copy of the September 2002 Joint Defense Agreement between Northeast Controls, Inc. and Fisher.

3.      Attached hereto as Exhibit 42 is a true and correct copy of the Motion of Defendant Fisher Controls International, Inc. for Partial Summary Judgment on Praxair, Inc.'s Negligence Claim, filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on August 8, 2003.

4.      Attached hereto as Exhibit 43 is a true and correct copy of the Motion of

1

Defendant Fisher Controls International, Inc. for Summary Judgment on All Claims of Plaintiff Motiva Enterprises LLC, filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on August 8, 2003.

5.       Attached hereto as Exhibit 44 is a true and correct copy of the September 22, 2003 letter from Motiva's Counsel, Paul M. Lukoff, to Judge Slights.

6.       Attached hereto as Exhibit 45 is a true and correct copy of the Motion of Defendant Fisher Controls International, Inc., For Partial Summary Judgment On Warranty and Contract Claims Asserted By Plaintiff Praxair, Inc. (The Praxair Warranty Motion) filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on October 20, 2003.

7.       Attached hereto as Exhibit 46 is a true and correct copy of the Motion of Defendant Fisher Controls International, Inc., for Partial Summary Judgment on Negligence Claim Asserted by Plaintiff Great American Assurance Company filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on October 20, 2003.

8.       Attached hereto as Exhibit 47 is a true and correct copy of the Motion of Defendant Fisher Controls International, Inc., for Partial Summary Judgment on Warranty Claims Asserted by Great American Assurance Company, filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on October 20, 2003.

9.       Attached hereto as Exhibit 48 is a true and correct copy of the Motion of Defendant Fisher Controls International, Inc., for Summary Judgment on All Claims Asserted by Plaintiff Great American Assurance Company (the Additional Insured Motion) filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on October 20, 2003.

10.      Attached hereto as Exhibit 49 is a true and correct copy of the Stipulation of

Dismissal, filed on November 7, 2003.

11.    Attached hereto as Exhibit 50 is a true and correct copy of the Stipulation of Dismissal filed on June 11, 2004.

12.    Attached hereto as Exhibit 51 is a true and correct copy of Defendant Fisher Controls International, Inc.'s Motion for Partial Summary Judgment as to Plaintiffs' Negligence Claims, filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on April 12, 2005.

13.    Attached hereto as Exhibit 52 is a true and correct copy of the Motion of Defendant Fisher Controls International, Inc. for Partial Summary Judgment [as to] Plaintiffs' Warranty Claims, filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on April 12, 2005.

14.    Attached hereto as Exhibit 53 is a true and correct copy of the Defendant Fisher Controls International, Inc.'s Motion for Partial Summary Judgment as to All Cross-claims for Contribution Asserted by All Defendants, filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on April 12, 2005.

15.    Attached hereto as Exhibit 54 is a true and correct copy of the Motion of Defendant Fisher Controls International, Inc., for Summary Judgment on Praxair, Inc.'s Cross-Claim for Indemnification Against Fisher, filed with the Superior Court for the State of Delaware, New Castle County, in C.A. No. 02C-050168 JRS on April 12, 2005.

16.    Attached hereto as Exhibit 55 is a true and correct copy of the May 2005 Joint Defense Privilege Agreement between Northeast Controls and Fisher.

17.    Attached hereto as Exhibit 56 is a true and correct copy of the June 7, 2005 Order by Judge Slights dismissing all claims against Fisher in the Olson action.

18.    Attached hereto as Exhibit 57 is a true and correct copy of the Stipulation of Dismissal, entered on October 6, 2005.

19.    Attached hereto as Exhibit 58 is a true and correct copy of selected pages of the deposition testimony of David P. Pope taken in this action.

20.    Attached hereto as Exhibit 59 is a true and correct copy of selected pages of the deposition testimony of Gregory Calloway. taken in the matter Olson v. Motiva. Del. Super. Ct.. New Castle County, No. C.A. 02C-04-263 (JRS) on April 28, 2004.

21.    Attached hereto as Exhibit 60 is a true and correct copy of selected pages of the deposition testimony of Gary Del Grego, taken in the matter Olson v. Motiva, Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on December 9, 2003, and October 4, 2004.

22.    Attached hereto as Exhibit 61 is a true and correct copy of selected pages of the deposition testimony of James Ponto. taken in the matter Olson v. Motiva. Del. Super. Ct., New Castle County, No. C.A. 02C-04-263 (JRS) on January 25 and 26, 2005.

23.    In the underlying action, Fisher declined to develop affirmative evidence of Northeast Controls' negligence for several strategic reasons. Fisher believed that Northeast Controls was acting as Fisher's agent when it placed the order for the valve. Consequently, Fisher was concerned that it would be held vicariously liable for Northeast Controls' actions. Had Fisher developed further evidence of Northeast Controls' negligence. or had Fisher argued in the underlying actions that Northeast Controls was negligent, then Fisher would have been developing evidence and arguments that would have damaged Fisher's own interests. In addition, Fisher was a party to two joint defense agreements, which obligated Fisher and Northeast Controls to cooperate in the defense of the underlying actions. Had Fisher affirmatively developed evidence of Northeast Controls' negligence in the underlying actions, Fisher would have breached the joint defense agreements. Instead, Fisher focused its efforts on showing that Fisher itself did not act negligently and that—despite Northeast Controls' negligence—the valve did not cause the fire. That strategy was successful and ultimately led to Fisher's dismissal from all four lawsuits without paying anything to any of the plaintiffs in those

4

lawsuits.

24.    During the course of the underlying action, I specifically discussed with Northeast Controls' counsel, Delia Clark, the fact that Northeast Controls did not face exposure for any product defect claims because Northeast Controls was not a product manufacturer or seller.

25.    Northeast Controls stipulated to the dismissal of all claims against Fisher in the Praxair, Motiva, and Great American actions without reserving the right reassert its claim for indemnification against Fisher in future litigation.

_Daniel J. Gunter_

Daniel J. Gunter

Subscribed and sworn to before me this 20th day of November, 2007.

_Molly J McInnis_

Printed Name: Molly J McInnis
Notary Public, State of Washington
Residing at Enumclaw
My commission expires:  9/8/11

MOLLY J. MCINNIS
COMMISSION EXPIRES
NOTARY
PUBLIC
09-08-11
STATE OF WASHINGTON

EXHIBIT 41

## JOINT DEFENSE AGREEMENT

WHEREAS, Fisher Controls International, Inc. and Northeast Controls, Inc. (the "parties") are defendants in the cases of <u>Olson v. Motiva Enterprises, L.L.C. et al.</u>, C.A. No. 02C-04-263 HLA; <u>Praxair, Inc. v. Fisher Controls International, Inc., et al.</u>, C.A. No. 02C-05-190 HLA; <u>Great American Assurance Company v. Fisher Controls International, Inc., et al.</u>, CA No. 02C-05-168; and <u>Motiva Enterprises, L.L.C. v. Fisher Controls International, Inc., et al.</u>, CA No. 01C-05-169 (HLA) (the "Delaware City Power Plant Litigation"), all now pending in the Superior Court of the State of Delaware, in and for New Castle County; and

WHEREAS, the parties recognize the need to defend themselves from allegations made against them in the Delaware City Power Plant Litigation, but intend that this Agreement not constitute an admission or serve as evidence regarding any of the allegations in the Delaware City Power Plant Litigation or any other litigation; and

WHEREAS, the parties have individually undertaken factual and legal research and are of the opinion that, although from time to time they may hold differing views with respect to various specific issues connected with the Delaware City Power Plant Litigation, they share some common interests in regard to the Delaware City Power Plant Litigation; and

WHEREAS, Fisher Controls International, Inc. ("Fisher"), and Northeast Controls, Inc. ("Northeast Controls"), are parties to a contract that provides (1) that "[Fisher] agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless [Northeast Controls] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, 'Losses') which may arise out of or be made in connection with the death or injury of any person, or damage to property,

by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. The obligations set forth in the immediately preceding sentence shall not apply unless [Northeast Controls], upon receiving notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof"; and (2) that "Fisher shall not be obligated to protect, defend, indemnify or hold harmless [Northeast Controls] from and against any Losses arising from . . . [n]egligent acts or omissions by [Northeast Controls]"; and

WHEREAS, the parties desire to reduce the costs of defense by cooperating fully and allocating tasks on matters in which they share a common interest; and

WHEREAS, the parties also need to ensure the protection of the mental impressions, conclusions, opinions, legal theories and other work product of counsel, as well as client confidences and other privileged information (collectively, "Confidential Materials"), and at the same time need to be able to exchange certain information and to cooperate in certain joint defense efforts, in order that each may obtain accurate appraisal of the facts underlying the Delaware City Power Plant Litigation, and present the most appropriate defense thereto;

NOW, THEREFORE, in order to accomplish the goals set forth above, the parties, by and through their counsel of record, Patrick D. McVey and Daniel J. Gunter of Riddell Williams P.S., Paul A. Bradley of McCarter & English LLP, and Thomas P. Wagner and Delia Clark of Rawle & Henderson, LLP, hereby agree as follows:

1.    The parties hereby acknowledge that each possesses materials and information that each is entitled, under applicable law, to keep confidential and privileged. Such Confidential Materials include, but are not necessarily limited to,

statements of potential witnesses, notes or memoranda of counsel, and statements, documents or information regarding trial preparation, trial strategy and tactics discussed or exchanged during communications and/or conferences among counsel and/or with employees and/or agents of the parties.

2.      The parties intend by this Agreement to protect the privileged and confidential nature of any Confidential Materials.

3.      When a party determines that it wishes to share written Confidential Materials with one or more of the other parties, it shall mark the copy of the writing that is to be shown to the other party or parties with a conspicuous legend substantially in the form: CONFIDENTIAL - JOINT DEFENSE PRIVILEGE. Any failure to place the legends on the documents shall not, by itself, constitute a waiver of any privilege.

4.      Except as stated above, each party agrees that all oral and/or written Confidential Materials received from one of the other parties shall be held in strictest confidence and shall not be given, shown, made available, communicated or otherwise disclosed in any way to anyone without the express consent of the party from whom the Confidential Materials were received. It shall be the duty of counsel for the respective parties to inform all persons, to whom disclosures are made pursuant to this Agreement, that all such disclosures are to be kept confidential.

5.      The parties agree that Confidential Materials exchanged by one or more of the parties and/or their attorneys may be used only for the purposes of jointly defending against the Delaware City Power Plant Litigation. If either party settles or is otherwise no longer a party to the Delaware City Power Plant Litigation, it shall immediately return all Confidential Materials and copies thereof to the other party, and it agrees not to voluntarily assist the plaintiff in pursuing their claims against the other party.

6.    At the conclusion of the Delaware City Power Plant Litigation, whether by settlement or otherwise, each party will return all Confidential Materials to the other.

7.    Except as is necessary for the purpose of seeking enforcement of this Agreement, this Agreement shall be confidential to the parties, and nothing contained herein shall be disclosed to any other person, other than counsel for the parties to this Agreement and their insurers, without either a court order compelling disclosure or prior written consent of the other party.

8.    The parties understand that any breach of this Agreement could cause irrevocable harm to one or more of the other parties, and that under some circumstances there may be no adequate remedy at law in the event of breach. Therefore, the parties agree that the provisions of this Agreement may be enforced in a civil action seeking equitable remedies, damages, or both; provided, however, that no breach of this Agreement shall give rise to a cause of action for damages unless such breach is intentional and material. Notwithstanding the foregoing, the parties understand that Confidential Material exchanged pursuant to this Agreement may be the subject of a discovery request or requests. The parties acknowledge that one or both of them may be compelled to produce Confidential Material exchanged pursuant to this Agreement in the course of discovery. Any production of such Confidential Material pursuant to Court Order shall not constitute a breach of this Agreement.

9.    The parties agree that should either party be released or otherwise dismissed from any of the lawsuits identified above, the party who is not released or dismissed has the right to use the services of any jointly retained expert in defense of the Lawsuit, including, but not limited to, calling the jointly retained expert at trial.

10.    The attorneys signing this Agreement on behalf of the parties represent that prior to signing this Agreement on behalf of their clients they have provided a copy of this Agreement to their clients, discussed its implications with their clients and have been authorized and instructed to sign this Agreement on behalf of their respective clients.  The attorneys signing this Agreement on behalf of the parties further represent that once it is fully executed they will provide a copy of the executed Agreement to their clients.

RIDDELL WILLIAMS P.S.

DATE 9/12/2002

By _____
    Patrick D. McVey
    Daniel J. Gunter
Attorneys for Fisher Controls International, Inc.

RAWLE & HENDERSON, LLP

DATE 9/20/02

By _____
    Thomas P. Wagner
    Delia Clark
Attorneys for Northeast Controls, Inc.

# EXHIBIT 42

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

|  |  |
|---|---|
| RONALD W. OLSON, and CAROL OLSON, his wife, | ) C.A. No. 02C-05-263 (JRS) |
| | ) |
| | ) Non-Arbitration Case |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) **CONSOLIDATED** |
| MOTIVA ENTERPRISES L.L.C., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## MOTION OF DEFENDANT FISHER CONTROLS INTERNATIONAL, INC. FOR PARTIAL SUMMARY JUDGMENT ON PRAXAIR, INC.'S NEGLIGENCE CLAIM

Defendant/third-party plaintiff Fisher Controls International, Inc. ("Fisher") hereby moves the Court for entry of an order granting summary judgment, pursuant to Superior Court Civil Rule 56, on the negligence claim asserted by plaintiff Praxair, Inc. against Fisher in Praxair, Inc. v. Fisher Controls International, Inc., et al. C.A. No. 02C-04-190 (JRS). The evidence demonstrates conclusively that Praxair did not own any property damaged in the incident that occurred on May 20, 2000, and that forms the basis of Praxair's action. Because Praxair did not own any property damaged in that incident, the economic loss rule precludes it from recovering in tort against Fisher.

FCI/MSJ 0567

I.    **THE ECONOMIC LOSS RULE PRECLUDES RECOVERY IN TORT IN THE ABSENCE OF INJURY TO THE PERSON OF THE PLAINTIFF OR PROPERTY OWNED BY THE PLAINTIFF**

1.    The Supreme Court of Delaware[1] has adopted the economic loss rule, "[a] doctrine that prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to other property) and the only losses suffered are economic in nature." Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1195 (Del. 1992). As that court has explained: "[T]he economic loss doctrine is a complete bar to the recovery of economic loss caused by qualitatively defective products, notwithstanding the presence of privity of contract." Id.

2.    Danforth relied on Crowell Corp. v. Topkis Construction Co., 280 A.2d 730 (Del. Super. Ct. 1971), which addressed the narrow question "whether the economic loss doctrine applies under Delaware law based on the presence or absence of privity." Danforth, 608 A.2d at 1198. In Crowell a building owner sued the architect, general contractor, and subcontractors in tort for damages arising from alleged construction defects in the building. The Supreme Court of Delaware affirmed a grant of summary judgment in favor of the subcontractors, who were not in privity of contract with the owner, because the "great weight of authority does not yet permit tort recovery under the circumstances here present [mere pecuniary loss] in the absence of physical injury to a person [or other property damage caused] by dramatic incident such as accident, collapse or explosion." Danforth, 608 A.2d at 1198 (quoting Crowell, 280 A.2d at 732).

3.    In Danforth the plaintiff tried unsuccessfully to argue that Crowell allows

---

[1] In this Motion, Fisher assumes that Delaware law applies to Praxair's negligence claim against Fisher. The contract between Fisher and Praxair under which the Valve was sold to Praxair calls for application of Missouri law to issues of interpretation or enforcement of that contract. Consequently, Praxair's contract claims (including its claims for breach of warranty) are governed by Missouri law. By contrast, under Delaware's choice-of-law principles Praxair's negligence claim must be decided under Delaware law: both Fisher and Praxair are Delaware corporations, and the incident at issue occurred in Delaware. See The Travelers Indemnity Co. v. Lake, 594 A.2d 38, 39 (Del. 1991) (setting out factors under "most significant relationship" test). But even if this issue were decided under Missouri law, the result would be the same: Missouri, like Delaware, "prohibits a cause of action in tort where the losses are purely economic." Rockport Pharmacy, Inc. v. Digital Simplistics, Inc., 53 F.3d 195 (8th Cir. 1995) (applying Missouri law).

FCI/MSJ 0568

-4-

recovery for non-economic losses when the plaintiff and defendant are in privity.  Id.  The Danforth court rejected that argument and held that economic loss is not recoverable in the absence of personal injury or damage to other property.  Id.

4.    Consequently, to recover in tort under Delaware law for damages allegedly caused by a defective product, a plaintiff must allege and prove personal injury or damage to other property owned by the plaintiff.  Danforth, 608 A.2d at 1198.  Delaware thus follows the reasoning of the federal courts, which have barred recovery in tort for solely economic losses.  See, e.g., East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986); Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 309 (1927) ("[A]s a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong."); Petition of Kinsman Transit Co., 388 F.2d 821 (2d Cir. 1968) (prohibiting recovery of solely economic loss).

## II.    BECAUSE PRAXAIR DID NOT OWN ANY PROPERTY DAMAGED IN THE INCIDENT, IT CANNOT RECOVER IN TORT AGAINST FISHER

5.    As set out above, the economic loss doctrine bars recovery in tort where a plaintiff has not suffered injury to his or her own person or to property owned by that plaintiff.  The evidence demonstrates conclusively that Praxair did not own any property damaged in the incident at issue in this matter.  Consequently, its tort claim against Fisher should be dismissed.

6.    First, Praxair's contract with Parsons Energy and Chemicals Group, Inc. ("Parsons"), the general contractor on the Delaware City Power Plant Repowering Project ("the DCPPRP" or "the Repowering Project"), demonstrates that Praxair did not own any property damaged in the incident at issue.  In this regard, Praxair alleges that it contracted with Parsons "to supply, erect, and test a 2500 STPD air separation unit ['ASU']" for the Repowering Project.  (Praxair Complaint ¶ 8, Exhibit 1).  Further, Praxair alleges that it purchased from Fisher a valve bearing tag number 83HV0629 ("the Valve") for installation in the ASU.  (Id. ¶ 9.)

FCI/MSJ 0569

7.      Parsons' agreement with Praxair is set out in various documents, including a document entitled "Section GC Parsons Subcontract General Conditions: Star Enterprise – Delaware City Repowering Project: Air Separation Unit." ("General Conditions") (Exhibit 2). The General Conditions include a provision governing passage of title:

> SUBCONTRACTOR [Praxair] warrants good and legal title, free and clear of any liens, claims, security interests or other encumbrances, to all equipment, systems, materials and supplies furnished by SUBCONTRACTOR or SUBCONTRACTOR's vendors, suppliers and Lower Tier-Subcontractors that become part of or are incorporated into the WORK or are purchased for CONTRACTOR [Parsons] or COMPANY [Star Enterprises, allegedly the corporate predecessor of Motiva] for the operation, maintenance or repair thereof. **Title to any such goods, whether incorporated in the WORK or in storage, either on or off the site, shall pass to CONTRACTOR or COMPANY, as applicable, upon the earlier of the date of incorporation into the WORK or the date payment therefor is received by SUBCONTRACTOR.**

(General Conditions ¶ 18.1) (emphasis added).

8.      Title to the ASU had passed to Motiva before May 20, 2000.  A document authored by Parsons and dated May 10, 2000, states specifically that the ASU—as well as all other components of the Delaware City Power Plant Repowering Project—had been turned over to Motiva by March 31, 2000.  (Exhibit 3).  Further, that document confirms that the ASU had been "incorporat[ed] into the WORK" and thus that title had passed to Motiva.  Consequently, the documentary evidence demonstrates that Motiva, not Praxair, owned the Valve, the ASU, and all other components of the DCPPRP on the date of the incident.

9.      Further, in discovery responses Praxair has explicitly stated that it never owned the Valve, the ASU, or the DCPPRP: "Praxair has never had any ownership or title in the valve, the ASU and/or the DCPPRP." (Exhibit 4 at 14).

10.     In summary, under Praxair's contract with Parsons, title in both the Valve and all other materials supplied as part of the ASU had passed to Parsons or Motiva before the incident. (See General Conditions ¶ 18.1.)  That conclusion is confirmed by the Parsons document

FCI/MSJ 0570

showing that Motiva had taken control of the ASU on or before March 31, 2000, and by Praxair's discovery response, in which it specifically disclaims owning any of the property at issue in this matter. Consequently, Praxair did not sustain any damage to its own property.

11.    Because Praxair did not suffer any damage to its own property, its tort claim against Fisher is barred by the economic loss rule. See Danforth, 608 A.2d at 1198.

WHEREFORE Defendant Fisher Controls International, Inc., respectfully requests that the Court enter an order of summary judgment dismissing Count I of Praxair's Complaint.

Dated: August 8, 2003            McCARTER & ENGLISH, LLP


                                 Paul A. Bradley, DE Bar ID #2156
                                 McCarter & English, LLP
                                 919 North Market Street, Suite 1800
                                 P.O. Box 111
                                 Wilmington, DE 19899
                                 (302) 984-6300
                                 Attorneys for Defendant
                                 Fisher Controls International, Inc.


Dated: August 8, 2003            RIDDELL WILLIAMS P.S.


                                 Patrick D. McVey
                                 RIDDELL WILLIAMS P.S.
                                 1001 Fourth Avenue Plaza, Suite 4500
                                 Seattle, WA 98154-1065
                                 (206) 624-3600
                                 Attorneys for Defendant
                                 Fisher Controls International, Inc.


                                                    FCI/MSJ 0571

# EXHIBIT 43

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD W. OLSON, and CAROL OLSON, his wife, | ) | C.A. No. 02C-04-263 (JRS) |
| | ) | |
| | ) | Non-Arbitration Case |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **CONSOLIDATED** |
| MOTIVA ENTERPRISES L.L.C., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## MOTION OF DEFENDANT FISHER CONTROLS INTERNATIONAL, INC. FOR SUMMARY JUDGMENT ON ALL CLAIMS OF PLAINTIFF MOTIVA ENTERPRISES LLC

Defendant/third-party plaintiff Fisher Controls International, Inc. ("Fisher") hereby moves the Court for entry of an order dismissing all claims asserted by plaintiff Motiva Enterprises LLC ("Motiva") against Fisher.

1.    Motiva has asserted claims against Fisher for negligence and breach of warranty. Fisher is entitled to summary judgment on both claims pursuant to Superior Court Civil Rule 56.

2.    To recover under a breach of warranty claim, a plaintiff other than a natural person is required to establish that it was in privity with the defendant. Motiva is, of course, not a natural person, and it was not in privity with Fisher. Consequently, Motiva's claim for breach of warranty against Fisher should be dismissed.

3.    Delaware's economic loss rule precludes recovery for damages caused when a product fails and damages only itself. A "product" is determined by the object of the plaintiff's

bargain. In this case, Motiva bargained for one product: the Delaware City Power Plant Repowering Project. That product failed and damaged only itself. Consequently, the economic loss rule bars Motiva from recovering in tort for the damages to that product.

4.    Fisher therefore requests that the Court enter an order dismissing all of Motiva's claims against Fisher

## I.    BECAUSE MOTIVA WAS NOT IN PRIVITY WITH FISHER, ITS WARRANTY CLAIMS AGAINST FISHER SHOULD BE DISMISSED

5.    In it Complaint, Motiva alleges that Fisher sold to co-defendant Praxair, Inc., a valve bearing tag number 83HV0629 ("the Valve"), which was subsequently installed as a component in the Delaware City Power Plant as part of the repowering project for that plant. (Motiva Complaint ¶¶ 6–7, attached as Exhibit 1.) As its Second Cause of Action against Fisher, Motiva alleges that the Valve did not meet specifications and contends that Fisher thereby breached express and implied warranties. (Id. ¶¶ 21 – 22.)

6.    Motiva was not a party to a contract with Fisher. (See Motiva Complaint ¶¶ 7, 21.) Both Motiva and Fisher are Delaware corporations, and the incident at issue took place in Delaware. (Id. ¶¶ 1, 2, 9.) Consequently, the rights and liabilities of the parties will be decided under Delaware law. See The Travelers Indem. Co. v. Lake, 594 A.2d 38, 40 (Del. 1991) (setting out factors under "most significant relationship" test).

7.    Before Delaware adopted the Uniform Commercial Code ("UCC"), an injured party was required to establish privity with the defendant to recover under a breach of warranty claim. S&R Assocs., L.P. v. Shell Oil Co., 725 A.2d 431, 437 (Del. Super. Ct. 1998) (citing Ciociola v. Delaware Coca-Cola Bottling Co., 172 A.2d 252 (1961)). The Delaware legislature adopted a version of UCC § 2-318 that abolished the privity requirement and granted standing to certain natural persons injured by defective products:

> **A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the**

FCI/MSJ 0573

> warranty. A seller may not exclude or limit the operation of this
> section.

6 Del. C. § 2-318 (2001) (emphasis added).

8.      Section 2-318 does not extend warranty protection to corporations that are not in

privity with the original seller. S&R Assocs., 725 A.2d at 438 (citing Dover Downs, Inc. v.

Koppers Co., No. 80C-0C02 (Del. Super. Ct. Feb. 8, 1984)).  Section 2-318 similarly fails to

protect limited partnerships and other entities. Id.

9.      In S&R Associates, the owner of an apartment complex damaged by allegedly

defective polybutylene pipes in its plumbing system lacked privity with the supplier of resin used

to manufacture the pipes; it therefore sought standing as a third-party beneficiary to bring breach

of warranty claims against the supplier.  But because the apartment owner was a limited

partnership and not a "natural person," the court held that the owner lacked standing to bring

breach of warranty claims. Id.

10.     Like the owner of the apartment complex in S&R Associates, Motiva was not in

privity with Fisher. See S&R Assocs., 725 A.2d at 437 n.7; Motiva Complaint ¶¶ 7, 21.

Consequently, it cannot claim the protection of § 2-318. See S&R Assocs., 725 A.2d at 438.

11.     Because Motiva was not in privity with Fisher, it cannot assert a breach of

warranty claim against Fisher. See id.  Motiva's Second Cause of Action against Fisher should

therefore be dismissed.

## II.    BECAUSE THE PRODUCT AT ISSUE DAMAGED ONLY ITSELF, MOTIVA'S NEGLIGENCE CLAIM AGAINST FISHER SHOULD BE DISMISSED

12.     As its First Cause of Action, Motiva alleges that Fisher was negligent and that

Fisher's alleged negligence proximately caused damage to Motiva.  This cause of action against

Fisher is barred by the economic loss rule and should therefore be dismissed.

13.     The economic loss rule is "[a] doctrine that prohibits recovery in tort where a

product has damaged only itself (i.e., has not caused personal injury or damage to other property)

and the only losses suffered are economic in nature." Danforth v. Acorn Structures, Inc., 608

A.2d 1194, 1195 (Del. 1992).

14.    "[T]he economic loss doctrine is a complete bar to the recovery of economic loss caused by qualitatively defective products . . . ." Id. The economic loss rule is based on the distinction between the functions of tort law and contract law. Id. Whereas tort law protects individuals and their property from risk of physical harm posed by dangerous products, contract law protects the bargained-for expectations of the contracting parties and other foreseeable users who suffer loss when a product fails to meet qualitative expectations. Id. (citing East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 872 (1986)).

15.    In Danforth, the Delaware Supreme Court was persuaded by the reasoning of the U.S. Supreme Court in East River, which recognized that tort concerns for safety are reduced and the policy reasons for imposing a tort duty of care are weak when a product injures only itself. Id. at 1197-1198 (citing East River, 476 U.S. at 871). As the U.S. Supreme Court explained in East River:

> Products liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty. . . . It is clear, however, that if this development were allowed to progress too far, contract law would drown in a sea of tort. . . . We must determine whether a commercial product injuring only itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation.
>     . . . .
>     . . . When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.
>     The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet. . . . In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or . . . experiences increased costs in performing a service. Losses like these can be insured. . . . Society need not presume that a customer needs special protection. The increased cost to the public that

FCI/MSJ 0575

> would result from holding a manufacturer liable in tort for injury to
> the product itself is not justified.
>
> Damage to a product itself is most naturally understood as a
> warranty claim. Such damage means simply that the product has
> not met the customer's expectations, or, in other words, that the
> customer has received "insufficient product value." . . . The
> maintenance of product value and quality is precisely the purpose
> of express and implied warranties. . . . Therefore, a claim of a
> nonworking product can be brought as a breach-of-warranty
> action. Or, if the customer prefers, it can reject the product or
> revoke its acceptance and sue for breach of contract. . . .

East River, 476 U.S. at 866, 871-72 (citations omitted) (emphasis added).

16.     In keeping with the policy principles set out in East River and adopted by the

Delaware Supreme Court in Danforth, in Delaware a plaintiff cannot recover in tort where a

product fails and injures only itself. See Danforth, 608 A.2d at 1197-98.

17.     Further, a plaintiff cannot avoid the economic loss rule by identifying a

component of an integrated product as the "product itself," with the remainder of the integrated

product identified as "other property" as to that component: "[s]ince all but the very simplest of

machines have component parts, [a contrary] finding would require a finding of 'property

damage' in virtually every case where a product damages itself." East River, 476 U.S. at 867

(quoting Northern Power & Eng'g Corp. v. Caterpillar Tractor Co., 623 P.2d 324, 330 (Alaska

1981)).

18.     In predicting Pennsylvania law, the Third Circuit adopted similar reasoning in

holding that plaintiffs cannot avoid the economic loss rule by proceeding against a component

supplier: "We perceive no principled basis for affording the purchaser of a defective product

greater relief against the manufacturer of a component part that has rendered a product defective

than against the manufacturer of the assembled defective product." King v. Hilton-Davis, 855

F.2d 1047, 1051 (3d Cir. 1988). Similarly, the Fifth Circuit has held that there is "no rational

reason to give the buyer greater rights to recover economic losses for a defect in the product

because the component is designed, constructed, or furnished by someone other than the final

manufacturer." Shipco 2295, Inc. v. Avondale Shipyards, Inc., 825 F.2d 925, 929 (5th Cir.

FCI/MSJ 0576

1987).

19.      As these authorities demonstrate, under Delaware law a party cannot recover in tort where a product has failed and damaged only itself. Moreover, a party cannot recover in tort against a party that supplied a component to a product where the product has damaged only itself.

20.      To determine what constitutes "the product," a court must ask, "what is the object of the contract or bargain that governs the rights of the parties?" Shipco 2295, 825 F.2d at 928. See also Rodman Indus., Inc. v. G&S Mill, Inc., 145 F.3d 940, 944 (7th Cir. 1998) (company hired to retrofit a boiler owned by plaintiff was a "manufacturer" of a new product for purposes of the economic loss rule, thus barring recovery in tort for the failure of the boiler to perform properly); Fireman's Fund Ins. Co. v. Childs, 52 F. Supp. 2d 139, 143 (D. Me. 1999) ("The so-called 'integrated products rule' is premised on the view that one must look to the product purchased or bargained for by the plaintiff rather than to the particular product sold by the defendant. . . . The masonry facade and weep holes are components that are integrated into the finished hotel purchased by Berkeley. Hence, because Plaintiff alleges that the faulty facade and weep holes caused damages to the hotel, the damages caused by any defects in these components constituted damages only to the product itself and not damages to 'other property.'") (citations omitted); Sebago, Inc. v. Beazer East, Inc., 18 F. Supp. 2d 70, 92-93 (D. Mass. 1998) (holding that each plaintiff had purchased a complete building and that the entire building—and not an allegedly defective insulation product, PFRI, used in the building—was the "product itself": "[T]he PFRI was purchased to be installed and to become integrated with the building. It is a component of the building, and has no use to the plaintiffs otherwise.").

21.      Application of these principles to the facts of this case requires dismissal of Motiva's negligence claim against Fisher.

22.      Motiva has alleged that the object of its bargain was the Delaware City Power Plant Repowering Project. Specifically, Motiva has alleged that it entered into a contract with Parsons under which Parsons was "to design, fabricate, install, construct, test and deliver" a

FCI/MSJ 0577

"construction project, known as the 'Re-powering' facility" at a cost of $271 million. (Motiva Complaint ¶ 6.) Thus, as demonstrated by the allegations in Motiva's Complaint, Motiva entered into a contract for one product—the "'Re-powering facility."

23.     Motiva has alleged further that the Valve was only a component in the ASU, which was itself a component of the Repowering Project. (Motiva Complaint ¶¶ 6–7.) Specifically, Motiva alleges that Parsons subcontracted with Praxair "to design, fabricate, install, construct, test and deliver an Air Separation Unit ('ASU'), **a sub-unit of [the] larger construction project.**" (Id. [emphasis added].)   Motiva also alleges that "[p]art of the ASU being constructed by Praxair included a high-pressure pipeline for the delivery of oxygen to the **gasification sub-unit of the Repowering facility.**" (Motiva Complaint ¶ 7 [emphasis added].) Motiva further alleges that "[a] portion of the pipeline's design included a control valve designed and manufactured by Fisher . . . [bearing] Tag No. 83HV0629"—i.e., the Valve. (Id.)

24.     In short, the allegations in Motiva's Complaint demonstrate (1) that the ASU was a component of the Repowering facility and (2) that the Valve was a component of the ASU. Consequently, the only conclusion that can be drawn is that Motiva bargained for and received one product and that the Valve was only a component of that product.

25.     Documents obtained through discovery confirm that Motiva bargained for and received one product—the Repowering Project. For example, the contract between Parsons and Star Enterprises (Motiva's predecessor) was for the construction of a single project. (See Exhibit 2, Sched. B ¶ 1.1.1 [defining "Project Business Objectives" as "Gasification facilities to use all coke generated at {the Delaware City Plant}"]; id., Sched. B-12 ["COMPANY {i.e., Motiva} will contract with CONTRACTOR {Parsons} to provide the Onsite facilities as **a turn-key lump sum project.**"] [emphasis added].)  The Star-Parsons contract identified the ASU as a part of that overall project. (See id., Sched. B ¶ 1.2.7 .)  Further, Parsons was to be paid one price for the work of constructing the Repowering Project. (Id., Sched. C ¶ 1.1 ["As full and complete compensation for CONTRACTOR's performance of the WORK and all of CONTRACTOR's obligations hereunder in accordance with the terms and conditions of this Contract, COMPANY

FCI/MSJ 0578

shall pay CONTRACTOR a lump sum Contract Price of Two Hundred Sixty One Million, Two Hundred Ninety Three Thousand Dollars ($261,293,000) . . . ."].)

26.    Further, the Builder's Risk policy issued by Agricultural Insurance Company insured the Repowering Project as a single item, not as a collection of stand-alone products. (See Exhibit3 [describing project as "[c]onstruction of a petroleum coke gasification and cogeneration facility."])  Similarly, a Parsons document dated May 10, 2000, confirms that Parsons and Motiva considered the Repowering Project to constitute a single project comprising various components, all of which had been turned over to Motiva's care, custody, and control before the incident of May 20, 2000. (See Exhibit 4.)

27.    In light of Motiva's allegations and the documentary evidence, there can be no dispute that Motiva suffered damage only to the "product" that was the object of its bargain with Parsons—the Repowering Project.

28.    Because Motiva suffered damage only to the one product that was the object of its bargain, the economic loss rule precludes Motiva from recovering in tort for damage to that property. See East River, 476 U.S. at 867; Rodman Indus., 145 F.3d at 944; Fireman's Fund, 52 F. Supp. 2d at 143; Sebago, 18 F. Supp. 2d at 92-93. Motiva's negligence claim against Fisher should therefore be dismissed.

29.    Dismissal of Motiva's negligence claim against Fisher promotes the policy principles behind the economic loss rule.  The damage that Motiva suffered was damage to the product that was the object of its contract with Parsons. Star (Motiva's predecessor) and Parsons, as sophisticated business entities, had and took the opportunity to allocate responsibility for the precisely the sort of damages at issue in this matter.  Those parties negotiated a lengthy contract for the construction of the Repowering Project that contains extensive provisions regarding the warranties that Parsons was providing to Motiva and Motiva's remedies, and Parsons' liability, arising in any manner from Parsons' performance of the contract. (See Exhibit 2, Sched. B § 11 ["Warranties and Remedy of Defects"]; Sched. C § 4 ["Liquidated Damages and Performance Guarantees"].)

FCI/MSJ 0579

30.    The Star-Parsons contract contract also required Parsons to maintain various policies of insurance—including a builder's risk policy. (Exhibit 2, Sched. B § 17 ["Insurance"].) Motiva specifically required that coverage under the builder's risk policy "should extend to physical damage resulting from faulty workmanship, materials or errors in design." (Id., Sched. B ¶ 17.1.6.) And, of course, Parsons did obtain such a policy—the builder's risk policy issued by Agricultural Insurance Company, under which Great American Assurance has now brought suit against Fisher and others.

31.    In short, Motiva and Parsons entered into a detailed, fully negotiated contract that allocated responsibility for the entire range of risks associated with the construction of the Repowering Project—including the risk that the Repowering Project would fail and damage itself. In accordance with that contract, Parsons obtained a policy of insurance that would protect the parties in the event that the parties suffered precisely the sort of damage that is now at issue in this lawsuit. Given these indisputable facts, the policy principles underlying the economic loss rule—as enunciated by the Delaware Supreme Court in Danforth, 608 A.2d at 1197-98—prohibit Motiva from seeking to recover in tort from Parsons. Further, those policy principles prohibit Motiva from seeking to recover in tort from Fisher, which was merely a component supplier. Motiva had the opportunity to allocate responsibility through contract for the risk that the Valve would fail. It cannot now seek to go around the contract that it negotiated and assert a tort claim against a component supplier. Motiva's First Cause of Action against Fisher should therefore be dismissed.

WHEREFORE Defendant Fisher Controls International, Inc. respectfully requests that the Court enter an order granting summary judgment on all claims asserted by Motiva against Fisher.

FCI/MSJ 0580

Dated: August 8, 2003

MCCARTER & ENGLISH, LLP

_Paul A Bradley_

Paul A. Bradley, DE Bar ID #2156
McCarter & English, LLP
919 North Market Street, Suite 1800
P.O. Box 111
Wilmington, DE  19899
(302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.

Dated: August 8, 2003

RIDDELL WILLIAMS P.S.

_Patrick D. McVey rtn_

Patrick D. McVey
RIDDELL WILLIAMS P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA  98154-1065
(206) 624-3600
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0581

# EXHIBIT 44

**PRICKETT, JONES & ELLIOTT**
A PROFESSIONAL ASSOCIATION
**1310 KING STREET, BOX 1328**
**WILMINGTON, DELAWARE 19899**
TEL: (302) 888-6500
FAX: (302) 658-8111
http://www.prickett.com

WAYNE N. ELLIOTT
MASON E. TURNER, JR.
JAMES L. HOLZMAN
JOHN H. SMALL
MICHAEL HANRAHAN
DAVID E. BRAND
WAYNE J. CAREY
PAUL M. LUKOFF
ELIZABETH M. MCGEEVER
WILLIAM J. MARTIN*
GARY F. TRAYNOR
JOHN W. PARADEE
RONALD A. BROWN, JR.
BRUCE E. JAMESON*
THOMAS A. MULLEN
F. PETER CONATY, JR.
PAUL A. FIORAVANTI, JR.**

WILLIAM S. PRICKETT
(1888-1926)

DOVER OFFICE
11 NORTH STATE STREET
DOVER, DE 17901
TEL: (302) 674-3841
FAX: (302) 674-5864

WILLIAM PRICKETT
(1919-1964)

PENNSYLVANIA OFFICE
217 WEST STATE STREET
KENNETT SQUARE, PA 19348
TEL: (610) 444-1573
FAX: (610) 444-9273

OF COUNSEL
WILLIAM PRICKETT
RICHARD I.G. JONES

COUNSEL
APRIL CASO ISHAK

WILLIAM H. LUNGER*
CARLA I. BROWN*
J. CLAYTON ATHEY***
D. BENJAMIN SNYDER***
TANYA E. PINO

* ALSO ADMITTED IN PA
** ALSO ADMITTED IN MD
*** ADMITTED IN PA

September 22, 2003

Writer's Direct Dial: (302) 888-6520
Writer's Telecopy Number: (302) 888-6331
Writer's E-Mail Address: PMLukoff@prickett.com

## VIA FACSIMILE

The Honorable Joseph R. Slights
Superior Court of Delaware
500 N. King Street
Wilmington, De 19801

> RE:  Motiva Enterprises LLC v. Fisher Controls, et al.
>      **C. A. No. 02C-05-169 (JRS)**

Dear Judge Slights:

I've been instructed by my client to unilaterally dismiss this lawsuit. Consequently, Motiva will not be filing an Opposition to Fisher Controls' Motion for Summary Judgment, which is scheduled to be heard on September 26, 2003. I will circulate a Stipulation of Dismissal shortly.

Very truly yours,

PAUL M. LUKOFF

PML/mhl
cc:  Prothonotary's Office (By Facsimile)
     All Counsel of Record (By Facsimile)

FCI/MSJ 0582

17226.25\190502v1

# EXHIBIT 45

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD W. OLSON and CAROL OLSON, his wife, | ) ) | C.A. No. 02C-04-263 JRS |
| | ) | **Non-Arbitration Case** |
| Plaintiffs, | ) ) | |
| | ) | **Consolidated for discovery purposes** |
| v. | ) | **with:** |
| | ) | |
| MOTIVA ENTERPRISES, L.L.C., et al., | ) | **C.A. No. 02C-05-168 JRS** |
| | ) | **C.A. No. 02C-05-169 JRS** |
| Defendants. | ) | **C.A. No. 02C-05-190 JRS** |
| ------------------------------------------------------- | ) | |

## MOTION OF DEFENDANT FISHER CONTROLS INTERNATIONAL, INC., FOR PARTIAL SUMMARY JUDGMENT ON WARRANTY AND CONTRACT CLAIMS ASSERTED BY PLAINTIFF PRAXAIR, INC.
### (THE "PRAXAIR WARRANTY" MOTION)

Defendant/third-party plaintiff Fisher Controls International, Inc. hereby moves the Court for entry of an order dismissing the claims for breach of warranty and breach of contract asserted by plaintiff Praxair, Inc., against Fisher.

1.    The contract between Fisher and Praxair governing the sale of the valve at issue provided for a single express warranty for a period of 18 months following the date of shipment by Fisher. That contract disclaimed all other warranties, express or implied. The 18-month warranty period had expired on April 23, 2000, almost one month before the May 20, 2000, incident. Because the claim asserted by Praxair arose after the expiration of the warranty period, Praxair does not have a warranty or contract claim in this matter. Consequently, under Superior Court Rule 56, Fisher is entitled to entry of an order of summary judgment on Praxair's warranty and contract claims.

## I.    PRAXAIR AND FISHER AGREED THAT THE VALVE WOULD BE SOLD SUBJECT ONLY TO A SINGLE EXPRESS WARRANTY

2.    In its Complaint, Praxair contends that Fisher breached express and implied

warranties and breached its contract with Praxair because (according to Praxair) the Fisher valve, bearing tag number 83HV0629 and sold by Fisher to Praxair ("the Valve"), did not meet Praxair's specifications. (See Praxair Complaint, Exhibit 2, FCI/SJ 13–17, ¶¶ 22 – 46.)[1]

3.    The purchase order for the Valve explicitly states that the order "applies against Buyer's Worldwide Agreement # 80171750T." (Exhibit 17, FCI/SJ 157.) That agreement was negotiated between Praxair and Fisher—two multinational corporations—in 1995. (See Exhibit 11, FCI/SJ 105–111.) In that agreement, Praxair agreed that Fisher would provide only a limited express warranty for a period of 18 months:

> **WARRANTY:** Seller hereby warrants that the Equipment and the operation thereof shall conform to the mutually agreed to conditions and specifications contained or referred to in this Order, except to the extent any such non-conformance in operation is due to the design specified by the Buyer; and Seller further warrants that the Equipment and all parts thereof shall be free from (i) defects in material and workmanship; and (ii) defects due to design (other than any design specified by Buyer). If the Equipment, or any part hereof fails to meet any or all of the foregoing warranties at any time prior to the Expiration Date hereinafter described, then, upon Buyer's request for remedial work, Seller shall, at its sole expense, promptly either replace or repair free of charge . . . . As used herein "Expiration Date" shall mean twelve (12) months after the date [that] the Equipment is either used or placed in operation, provided, however, that such Expiration Date shall in no event exceed a period of eighteen (18) months from the date of shipment by Seller.
>
> **IN CONSIDERATION OF THE HEREIN STATED PURCHASE PRICE OF THE GOODS, SELLER GRANTS ONLY THE ABOVE STATED EXPRESS WARRANTY. NO OTHER WARRANTIES ARE GRANTED INCLUDING, BUT NOT LIMITED TO EXPRESS AND IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

(See Exhibit E to Worldwide Procurement Agreement ¶ 8, FCI/SJ 109 [bold emphasis in

---

[1] All exhibits referenced in this motion are attached to a separate pleading, "Exhibits Referenced in Motions for Summary Judgment Filed by Fisher Controls International, Inc., on October 20, 2003," which is being filed concurrently with this motion. Those exhibits are numbered sequentially throughout using the prefix "FCI/SJ."

original].)

4.      The Worldwide Procurement Agreement provides for application of Missouri law. (Ex. E to Worldwide Procurement Agreement ¶ 24, FCI/SJ 110.)  Delaware courts honor contractual choice-of-law provisions.  J.S. Alberici Constr. Co. v. Mid-West Conveyor Co., 750 A.2d 518, 520 (Del. 2000).  But regardless whether Missouri or Delaware law is applied, all of Praxair's claims for breach of warranty or breach of contract should be dismissed.

5.      Under the Uniform Commercial Code ("UCC"), which has been adopted by both Missouri and Delaware, parties may waive, exclude, or modify implied warranties and limit express warranties.  Mo. Rev. Stat. § 400.2-314 (2001); id. § 400.2-316; Karr-Bick Kitchens & Bath, Inc., v. Gemini Coatings, Inc., 932 S.W.2d 877, 879 (Mo. App. 1996); Delmarva Power & Light Co. v. ABB Power T & D Co., No. Civ.A. 00C-02-1750WCC, 2002 WL 840564, at *4 (Del. Super. Ct. Apr. 30, 2002).

6.      Further, unless there is unfairness in the contracting process,[2] the courts will enforce limitations of warranty periods.  See Central Maine Power Co. v. Foster Wheeler Corp., 684 F. Supp. 724 (D. Maine 1988); Hart Eng'g Co. v. FMC Corp., 593 F. Supp. 1471, 1480 (D.R.I. 1984).  Indeed, disregarding warranty limitations contravenes the intent of the UCC: "Since the Code does not oblige the seller to make any express warranties, limitations on such warranties should stand in the absence of inconsistency under [U.C.C] 2-316(1)."  Hart Eng'g, 593 F. Supp. at 1479 (citing White and Summers, Uniform Commercial Code at 431 n.19 (2d ed. 1982)).

7.      Application of those principles requires dismissal of Praxair's claims for breach of the implied warranties of merchantability and fitness for a particular purpose.  As set out

---

[2] Praxair cannot claim any unfairness in the contracting process.  In 1999, Praxair claimed that it "[was] the largest industrial gases company in North and South America and third largest worldwide, with $4.7 billion in sales." (Ex. 23, FCI/SJ 345)  It had 25,000 employees, more than 1 million customers, and operations in more than 40 countries.  (Id.)  In 1997, Praxair purchased approximately $28.4 million in valves and valve accessories.  (Id., FCI/SJ 350.)  Fisher supplied $2 million of those valves.  (Id., FCI/SJ 352.)  In light of those facts, there can be no dispute that Praxair negotiated the Worldwide Procurement Agreement as a powerful and sophisticated business entity.

above, Fisher expressly disclaimed the implied warranties of merchantability and fitness for a particular purpose. Consequently, Praxair's claims for breach of those implied warranties (specifically, Counts III and IV of Praxair's Complaint) should be dismissed. See Karr-Bick Kitchens, 932 S.W.2d at 879; Delmarva Power & Light, 2002 WL 840564, at *4.

## II.    BECAUSE THE WARRANTY PERIOD HAD EXPIRED, PRAXAIR'S CAUSE OF ACTION FOR BREACH OF EXPRESS WARRANTY SHOULD BE DISMISSED

8.    Count V of Praxair's Complaint should be dismissed because the warranty period had expired. The Worldwide Procurement Agreement expressly limits the sole warranty negotiated by the parties to a period of 18 months from the date of shipment:

> **[S]uch Expiration Date shall in no event exceed a period of eighteen (18) months from the date of shipment by Seller.**

(Exhibit E to Worldwide Procurement Agreement ¶ 8, FCI/SJ 109 [emphasis added].)

9.    The Valve was shipped from Fisher on October 23, 1998. (Exhibit 19, FCI/SJ 335; Exhibit 20, FCI/SJ 338.) Fisher invoiced Praxair for the Valve on the same date. (Exhibit 21, FCI/SJ 339-40.) Praxair paid Fisher for the Valve on November 3, 1998. (Exhibit 22, FCI/SJ 341.) The incident at issue occurred on May 20, 2000, more than 18 months after the date of shipment and more than 18 months after Praxair paid for the Valve. Consequently, **the sole warranty negotiated by the parties had expired before the incident.**

10.    The following timeline sets out the relevant dates:

| | |
|---|---|
| **October 23, 1998** | **Fisher ships Valve and invoices Praxair** |
| **November 3, 1998** | **Praxair pays Fisher for Valve** |
| **April 23, 2000** | **Warranty expires** |
| **May 20, 2000** | **Incident** |

11.    Because the specific warranty period agreed to by the parties had expired before the incident, Fisher cannot be held liable for breach of that warranty. See Hart Eng'g, 593 F. Supp. at 1480 (enforcing one-year limitation of warranty period); Central Maine Power, 684 F. Supp. at 734 (enforcing limitation of warranty on sale of product, even though warranty expired

before product was put into use). Praxair's claim for breach of express warranty (Count II of Praxair's Complaint) should therefore be dismissed.

12.    Fisher anticipates that, in response, Praxair will contend that the Valve was shipped to Delaware City on January 27, 1999, and consequently that the warranty period had not expired. But that argument—if made—lacks merit. On October 23, 1998, Fisher shipped the Valve to Praxair care of Chick Packaging. (See Exhibit 20, FCI/SJ 338.) Fisher understands that, pursuant to an arrangement between Praxair and Northeast Controls, the Valve—which had already been bought and paid for by Praxair—was stored at Chick Packaging until it was shipped to Delaware City on January 27, 1999.

13.    The fact that Praxair arranged with Northeast Controls to warehouse the Valve at Chick Packaging does not change the date of shipment by the seller. Because Fisher was the "Seller," under the plain terms of the Worldwide Purchase Agreement, October 23, 1998, was "the date of shipment by Seller." The fact that Praxair chose to warehouse the Valve for a period of months after the date of shipment by the seller does not alter the date of that shipment. Consequently, October 23, 1998, was "the date of shipment by Seller." More than 18 months passed between the date of shipment by seller and the incident on May 20, 2000. Because the claim at issue did not arise within the warranty period, Praxair's claim for breach of express warranty should be dismissed.

## III.    PRAXAIR'S BREACH OF CONTRACT CLAIM SHOULD ALSO BE DISMISSED

14.    Under the terms of the Purchase Order, the sale of the Valve was governed by the Worldwide Purchase Agreement. As explained above, Fisher did not breach that agreement: the claim asserted by Praxair did not arise within the period of the sole warranty negotiated by the parties. Because Fisher did not breach the warranty provided for in the contract governing the sale of the Valve, Praxair's claim for breach of contract (Count V of Praxair's Complaint) should also be dismissed.

FCI/MSJ 0587

## IV.    CONCLUSION

15.    As set out above, Praxair and Fisher negotiated an agreement that provided for a limited warranty of only 18 months' duration, measured from the date that the valve was shipped from Fisher. Parties negotiate such limitations to provide mutual benefits. In this case, the limitation on the warranty period benefited Fisher, which could be clear as to the period for which it had to warrant its valves. But that limitation also benefited Praxair, which presumably obtained the valves that it purchased from Fisher at a lower price because of the limitation on the warranty period. Praxair benefited from the Worldwide Procurement Agreement in all of its purchases from Fisher—not just the purchase of the Valve. Having negotiated and benefited from the Agreement, it should not be permitted to nullify it now. Instead, the Court should hold Praxair to the terms of its agreement with Fisher, hold that Praxair's sole warranty had expired before the date of the incident that gave rise to this lawsuit, and dismiss all of Praxair's warranty and contract claims.

WHEREFORE Defendant Fisher Controls International, Inc., respectfully requests that the Court enter an order dismissing Counts II through V of Praxair's Complaint.

Dated: October 20th, 2003

McCARTER & ENGLISH, LLP

Paul A. Bradley
McCarter & English, LLP
919 N. Market Street, Ste. 1800
Wilmington, DE  19899
(302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0588

Dated: October 2003

RIDDELL WILLIAMS P.S.

Patrick D. McVey
Riddell Williams P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA 98154-1065
(206) 624-3600
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0589

# EXHIBIT 46

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD W. OLSON and CAROL OLSON,<br>his wife, | ) | C.A. No. 02C-04-263 JRS |
| | ) | |
| Plaintiffs, | ) | **Non-Arbitration Case** |
| | ) | |
| v. | ) | **Consolidated with:** |
| | ) | |
| MOTIVA ENTERPRISES L.L.C., et al., | ) | **C.A. No. 02C-05-168 JRS** |
| | ) | **C.A. No. 02C-05-169 JRS** |
| Defendants. | ) | **C.A. No. 02C-05-190 JRS** |
| ------------------------------------------------------- | ) | |

**MOTION OF DEFENDANT FISHER CONTROLS INTERNATIONAL, INC., FOR**

**PARTIAL SUMMARY JUDGMENT ON NEGLIGENCE CLAIM ASSERTED BY**

**PLAINTIFF GREAT AMERICAN ASSURANCE COMPANY**

**(THE "GREAT AMERICAN NEGLIGENCE" MOTION)**

Defendant/third-party plaintiff Fisher Controls International, Inc. ("Fisher"), hereby

moves the Court for entry of an order dismissing the negligence claim asserted by plaintiff Great

American Assurance Company against Fisher.[1]

1.      Great American contends that Fisher was negligent in regard to the design or

manufacturing of a valve sold by Fisher to Praxair ("the Valve"). (See Great American

Complaint, Exhibit 1, ¶¶ 23–24, FCI/SJ 5–6.)[2] Great American contends further that Fisher's

alleged negligence caused a fire at the Delaware City Power Plant Repowering Project ("the

Repowering Project") on May 20, 2000. (Id. ¶¶ 18-21, 24.) Under Superior Court Civil Rule 56,

Fisher is entitled to summary judgment on Great American's negligence claim against Fisher.

---

[1] Fisher is filing this motion concurrently with its Motion for Summary Judgment on All Claims Asserted by Plaintiff Great American Assurance Company. If the Court grants that motion, it need not reach the merits of this motion.

[2] All exhibits referenced in this motion are attached to a separate pleading, "Exhibits Referenced in Motions for Summary Judgment Filed by Fisher Controls International, Inc., on October 20, 2003," which is being filed concurrently with this motion. Those exhibits are numbered sequentially throughout using the prefix "FCI/SJ."

I.    **GREAT AMERICAN'S RIGHTS ARE NO GREATER THAN THE RIGHTS OF ITS SUBROGORS**

2.    Great American alleges that it made payments under a policy of insurance to Praxair, Inc., Parsons Corporation, and Motiva Enterprises LLC. (Great American Complaint, FCI/SJ 4–5, ¶ 21.) Great American thus alleges that it is subrogated to the rights of those entities. (Id.)

3.    An insurer, as subrogee of its insureds, cannot acquire rights superior to those of its subrogors: "When proceeding by subrogation, the subrogee 'stands in the place of one whose claim he has paid.' . . . The subrogee, who has all the rights of the subrogor, usually 'cannot acquire by subrogation what another whose rights he claims did not have.'" United States v. California, 507 U.S. 746, 756 (1993) (citation omitted). See also Sinex v. Wallis, 565 A.2d 1384, 1386 (Del. Super. Ct. 1988) ("[Subrogation is] a substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to a debt or claim, and its rights or remedies.") (citing Black's Law Dictionary at 1279 (5th ed. 1979)). Consequently, Great American's rights against Fisher are no greater than the rights of its insureds against Fisher.

4.    As set in Fisher's Motion for Partial Summary Judgment on Praxair, Inc.'s Negligence Claim and its Motion for Summary Judgment on All Claims Asserted by Motiva Enterprises LLC, Fisher is not liable to either Praxair or Motiva for negligence. To reduce the amount of briefing before the Court, Fisher's opening and reply briefs in support of those motions are herewith incorporated by reference. The following sections briefly set out arguments as to the negligence claims of Great American's alleged subrogors.

II.   **BECAUSE PRAXAIR DID NOT OWN ANY PROPERTY DAMAGED IN THE INCIDENT, THE ECONOMIC LOSS RULE BARS ITS TORT CLAIM AGAINST FISHER**

5.    Great American has not alleged that Praxair incurred any damages to other property as a result of the incident that occurred at the Delaware City Power Plant on May 20,

2000. (See Great American Complaint.)[3]  In discovery responses, Praxair alleged that it did not

and in fact never owned any of the property damaged in the fire. (See Praxair Discovery

Responses, Exhibit 4, FCI/SJ 28 [response to Request for Production No. 3].) Further, in

response to Fisher's Motion for Summary Judgment on Praxair's negligence claim, Praxair failed

to identify any damage to other property owned by Praxair.  Likewise, in its response to the same

motion, Great American failed to identify any damage to other property owned by Praxair.

Because Praxair did not own any property damaged in the incident, the economic loss rule bars

any negligence claim by Praxair.  Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1198 (Del.

1992).

      6.     Because Great American can claim no greater rights against Fisher than its

subrogor could claim, Great American's claim for negligence must be dismissed to the extent

that it derives from Praxair's claim against Fisher. See Sinex, 565 A.2d at 1386.

### III.    BECAUSE MOTIVA SUFFERED DAMAGE ONLY TO THE PROPERTY FOR WHICH IT BARGAINED, THE ECONOMIC LOSS RULE BARS ITS TORT CLAIM AGAINST FISHER

      7.     In its Motion for Summary Judgment on All Claims Asserted by Motiva

Enterprises LLC, Fisher explained that Motiva's own allegations establish that Motiva bargained

for only one item—the Delaware City Power Plant Repowering Project.  That bargained-for item

failed and damaged only itself.  Consequently, the economic loss rule bars Motiva's negligence

claim against Fisher.  See East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 867

(1986) (a plaintiff cannot bypass the economic loss rule by identifying a component of an

integrated product as the "product itself"); Sebago, Inc. v. Beazer East, Inc., 18 F. Supp. 2d 70

(D. Mass. 1998) (in determining what constitutes the "product itself," the courts look to the

object of the plaintiff's bargain); Danforth, 608 A.2d at 1198 (the economic loss rule bars

recovery in tort where a product fails and damages only itself).

---

[3] Similarly, Praxair's Complaint also fails to identify any damage to any property owned by Praxair. (See generally Exhibit 2, FCI/SJ 10 – 18.)

8.    Fisher's motion as to Motiva was set for hearing on September 26. Motiva did not file any opposition to Fisher's motion. Instead, on September 22, 2003, Motiva's counsel sent a letter to the Court stating that Motiva intended to dismiss all of its claims. Nevertheless, on September 25, 2003, Great American filed a brief opposing Fisher's motion as to Motiva's claims. In that brief, Great American argued that the ASU might have been "other property" as to the Repowering Project and vice versa. However, Great American failed to set forth any evidence that would support such an inference.

9.    The undisputed evidence demonstrates that Motiva bargained for one product (i.e., the Repowering Project), that the ASU was a component of that product, and that the Valve was a component of the ASU. First, the allegations of all of the commercial plaintiffs themselves mandate that conclusion:

- **Motiva bargained for one item, the Repowering Project:** Motiva alleged that Parsons contracted "to design, fabricate, install, construct, test and deliver" a "construction project, known as the 'Re-powering' facility." (Motiva Complaint, Exhibit 3, FCI/SJ 20, ¶ 6.) Likewise, in its Complaint Great American alleges that its builder's risk policy "provided certain protection to Parsons, and others, for defined losses during the Delaware City, Delaware repowering project." (Great American Complaint, FCI/SJ 3, ¶ 7.)

- **The ASU was a component of the Repowering Project:** Motiva alleged that Parsons subcontracted with Praxair "to design, fabricate, install, construct, test and deliver an Air Separation Unit ('ASU'), **a sub-unit of [the] larger construction project.**" (Motiva Complaint, FCI/SJ 20, ¶ 6 [emphasis added].) Likewise, Great American has alleged that "Parsons entered into an agreement with Praxair, Inc. to supply, erect, and test a 2500 STPD air separation unit **for the repowering project.**" (Great American Complaint, FCI/SJ 3, ¶ 10.) Praxair made precisely the same allegation. (See Praxair Complaint, Exhibit 2, FCI/SJ 11, ¶ 8.)

- **The Fisher valve was a component of the ASU:** Motiva alleged that "[a] portion of the pipeline's design included a control valve designed and manufactured by Fisher . . . ." (Motiva Complaint, FCI/SJ 20, ¶ 7.) Great American alleged that "[t]he work [performed by Praxair] included, among other things, the installation of a valve intended to block and/or control the flow of oxygen to gasifiers." (Great American Complaint, FCI/SJ 3, ¶ 10.) Again, Praxair made precisely the same allegation. (Praxair Complaint, FCI/SJ 11, ¶ 8.)

10.    In addition, all of the documentary evidence confirms that Motiva contracted for and received one product—the Repowering Project—and that the ASU and the Valve were components of that product:

- The contract between Star (Motiva's predecessor) and Parsons confirms that the contract was for the purchase of a single, integrated product. (See Exhibit 5, FCI/SJ 30 – 58, esp. FCI/SJ 36, 38 – 39, 40.)

- The contract between Parsons and Praxair confirms that the ASU was a portion of the Repowering Project. (See Exhibit 6, FCI/SJ 59, 72; Exhibit 7, FCI/SJ 79.)

- The builder's risk policy issued by Great American's predecessor demonstrates that only one item was insured—"a petroleum coke gasification and cogeneration facility." (Exhibit 10, FCI/SJ 102, ¶ 3.)

- A Texaco document, captioned "Texaco Gasification Power System, Delaware City Gasification Project, Block Flow Diagram," shows the ASU as part of the project. (Exhibit 8, FCI/SJ 83.)

- Each of the ASU drawings carries a caption stating "Delaware City Repowering Project." (See, e.g., Exhibit 8, FCI/SJ 84–98.)

- The cover page for the Operating Manual for the ASU is emblazoned with the caption "Delaware City Refinery Repowering Project." (Exhibit 9, FCI/SJ

99.)

- The Report authored by Roger F. Hawley, Motiva's Repowering Operations Manager (and previously submitted to the Court by Great American), confirms that the Repowering Project was an integrated product and that the ASU was a component of that product. (Exhibit 12, FCI/SJ 112–122.)[4]

- A May 10, 2000, document authored by Parsons confirms that the ASU was one of the "operating systems" making up the Repowering Project. (Exhibit 16, FCI/SJ 124, ¶ 2.)

- Documents in Great American's possession since the inception of the project confirm that the ASU was a component of the Repowering Project. (See, e.g., Exhibit 14, FCI/SJ 130, ¶¶ 1, 11 [identifying the ASU as one of the "major components" of the "lump sump EPC project for gasification of petroleum coke and combustion of the gasified coke . . ."].)

11.    In short, the allegations of the commercial parties and all of the documentary evidence confirm that Motiva bargained for and received only one product—the Repowering Project—which failed and damaged only itself. In those circumstances, the economic loss rule bars recovery in tort against a component supplier of the bargained-for item. See East River, 476 U.S. at 867 (1986); Sebago, 18 F. Supp. 2d 70; Danforth, 608 A.2d at 1198. Because Great American can claim no greater rights against Fisher than its subrogor could claim, Great American's claim for negligence must be dismissed to the extent that it derives from Motiva's claim against Fisher. See Sinex, 565 A.2d at 1386.

## IV.    GREAT AMERICAN'S NEGLIGENCE CLAIM AGAINST FISHER MUST BE DISMISSED TO THE EXTENT THAT GREAT AMERICAN IS ASSERTING RIGHTS AS PARSONS' SUBROGEE

12.    The economic loss rule also bars Great American from recovering against Fisher

---

[4] Various e-mails authored by Mr. Hawley relating to the progress of the Repowering Project (see Exhibit 15, FCI/SJ 140 – 145) also confirm that the ASU was one of the components of that project.

under a negligence theory for any payments made to Parsons.

13.    Parsons has not itself asserted any claims against Fisher.  Further, Parsons, like Praxair, did not suffer any damage to any property that it owned, for title in the damaged property had all passed to Motiva before the fire at issue.  (See Exhibit 16, FCI/SJ 124 [May 10, 2000, document showing that care, custody, and control of all major components of the Repowering Project had passed to Motiva on or before May 9, 2000.)

14.    Because Parsons did not own any property damaged in the fire, its damages are solely pecuniary and consequently barred by the economic loss rule.  See Danforth, 608 A.2d at 1198.

WHEREFORE Defendant Fisher Controls International, Inc., respectfully requests that the Court enter an order of summary judgment dismissing Count II of Great American's Complaint.

Dated:  October ___, 2003                MCCARTER & ENGLISH, LLP


_____
Paul A. Bradley
McCarter & English, LLP
919 N. Market Street, Ste. 1800
Wilmington, DE  19899
(302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0596

291/330728.02
102003/1309/41155.00193

Dated: October 20th, 2003

RIDDELL WILLIAMS P.S.

Patrick D. McVey  for
Riddell Williams P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA 98154-1065
(206) 624-3600
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0597

# EXHIBIT 47

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD W. OLSON and CAROL OLSON, his wife, | ) ) ) | C.A. No. 02C-04-263 JRS |
| Plaintiffs, | ) ) ) | Non-Arbitration Case |
| v. | ) ) | Consolidated with: |
| MOTIVA ENTERPRISES L.L.C., et al., | ) ) | C.A. No. 02C-05-168 JRS |
| | ) | C.A. No. 02C-05-169 JRS |
| Defendants. | ) | C.A. No. 02C-05-190 JRS |
| ------------------------------------------------------ | ) | |

MOTION OF DEFENDANT FISHER CONTROLS INTERNATIONAL, INC., FOR
PARTIAL SUMMARY JUDGMENT ON WARRANTY CLAIMS ASSERTED BY
GREAT AMERICAN ASSURANCE COMPANY
(THE "GREAT AMERICAN WARRANTY" MOTION)

Defendant/third-party plaintiff Fisher Controls International, Inc. hereby moves the Court

for entry of an order dismissing the warranty claims asserted by plaintiff Great American

Assurance Company against Fisher.[1]

I.    **GREAT AMERICAN'S RIGHTS AGAINST FISHER ARE NO GREATER THAN**
      **THE RIGHTS OF ITS SUBROGORS**

1.    In its complaint, Great American contends that Fisher breached express and

implied warranties because (according to Great American) the Fisher valve, bearing tag number

83HV0629 ("the Valve") and sold by Fisher to Praxair, Inc., did not meet specifications.  (Great

American Complaint, Exhibit 1, FCI/SJ 6, ¶¶ 26 – 36.)[2]  Under Superior Court Rule 56, Fisher is

---

[1] Fisher is filing this motion concurrently with its Motion for Summary Judgment on All Claims Asserted by Plaintiff Great American Assurance Company.  If the Court grants that motion, it need not reach the merits of this motion.

[2] All exhibits referenced in this motion are attached to a separate pleading, "Exhibits Referenced in Motions for Summary Judgment Filed by Fisher Controls International, Inc., on October 20, 2003," which is being filed concurrently with this motion.  Those exhibits are numbered sequentially throughout using the prefix "FCI/SJ."

entitled to summary judgment on Great American's warranty claim.

2.      Great American alleges that, as a consequence of Fisher's alleged breach of warranties, it made payments under a policy of insurance to Praxair, Parsons Corporation, and Motiva Enterprises LLC. (Great American Complaint, FCI/SJ 4–5, ¶ 21.) Consequently, Great American alleges that it is subrogated to the rights of those entities against Fisher. (Id.)

3.      An insurer, as subrogee of its insureds, cannot acquire rights superior to those of its subrogors: "When proceeding by subrogation, the subrogee 'stands in the place of one whose claim he has paid.' . . . The subrogee, who has all the rights of the subrogor, usually 'cannot acquire by subrogation what another whose rights he claims did not have.'" United States v. California, 507 U.S. 746, 756 (1993) (citation omitted); Sinex v. Wallis, 565 A.2d 1384, 1386 (Del. Super. Ct. 1988) ("[Subrogation is] a substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to a debt or claim, and its rights or remedies.") (citing Black's Law Dictionary at 1279 (5th ed. 1979)). Consequently, Great American's rights against Fisher are no greater than the rights of its insureds against Fisher.

4.      As set out in Fisher's Motion for Partial Summary Judgment on Praxair, Inc.'s Contract and Warranty Claims and its Motion for Summary Judgment on All Claims Asserted by Motiva Enterprises LLC, Fisher is not liable to either Praxair or Motiva for breach of any warranty or contract. To reduce the amount of briefing before the Court, those motions are herewith incorporated by reference.[3]

5.      Further, as set out below, Fisher is also not liable to Parsons for breach of any warranty or contract. Because neither Praxair, Parsons, nor Motiva has any right to recover against Fisher for such claims, Great American also lacks any right to recover against Fisher for

---

[3] On August 8, 2003, Fisher filed its Motion for Summary Judgment on All Claims Asserted by Motiva Enterprises LLC. That motion was set for hearing on September 26. Motiva did not file any opposition to Fisher's motion. Instead, on September 22, 2003, Motiva's counsel sent a letter to the Court stating that Motiva intended to dismiss all of its claims. Nevertheless, on September 25, 2003, Great American filed a brief opposing Fisher's motion. In that brief, Great American did not dispute that Motiva's warranty claim should be dismissed.

such claims. Consequently, Great American's warranty claims against Fisher should be dismissed.

## II.    GREAT AMERICAN'S WARRANTY CLAIM AGAINST FISHER MUST BE DISMISSED TO THE EXTENT THAT IT IS ASSERTING RIGHTS AS PARSONS' SUBROGEE

6.      Before Delaware adopted the UCC, an injured party was required to establish privity with the defendant to recover under a breach of warranty claim. S&R Assocs., L.P. v. Shell Oil Co., 725 A.2d 431, 437 (Del. Super. Ct. 1998).[4] The Delaware legislature adopted a version of UCC § 2-318 that abolished the privity requirement and granted standing to certain natural persons injured by defective products:

> **A seller's warranty whether express or implied extends to any natural person** who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section.

6 Del. C. § 2-318 (2001) (emphasis added).

7.      Section 2-318 does not extend warranty protection to corporations that are not in privity with the original seller. S&R Assocs., 725 A.2d at 438. Section 2-318 similarly fails to protect limited partnerships and other entities. Id.

8.      There was no contract between Fisher on the one hand and Parsons on the other. Consequently, Parsons cannot assert that it is entitled to enforce any warranties against Fisher. Further, because Parsons is a corporation, not a natural person, it cannot claim the protection of § 2-318. See S&R Assocs., 725 A.2d at 438. Thus, Parsons cannot assert a claim for breach of warranty against Fisher. See id. As a corollary, to the extent that Count II of Great American's Complaint is based on rights derived from Parsons, that portion of the Complaint should be

---

[4] Because Parsons was not a party to the Worldwide Procurement Agreement, the choice-of-law clause in that agreement does not apply to Great American's claims brought as subrogee of Parsons. Instead, Delaware's choice-of-law rules call for application of Delaware law to Parsons' right to assert warranty claims. See The Travelers Indemnity Co. v. Lake, 594 A.2d 38, 39 (Del. 1991) (setting out factors under "most significant relationship" test).

dismissed.

### III.    CONCLUSION

9.      As set out above, none of Great American's alleged subrogors has a right to
recover from Fisher for breach of warranty. Great American's claim for breach of warranty
should therefore be dismissed.

WHEREFORE Defendant Fisher Controls International, Inc., respectfully requests that
the Court enter an order of summary judgment dismissing Count II of Great American's
Complaint.

Dated: October 20th, 2003                    McCARTER & ENGLISH, LLP


                                             _____
                                             Paul A. Bradley
                                             McCarter & English, LLP
                                             919 N. Market Street, Ste. 1800
                                             Wilmington, DE  19899
                                             (302) 984-6300
                                             Attorneys for Defendant
                                             Fisher Controls International, Inc.


Dated: October 20th, 2003                    RIDDELL WILLIAMS P.S.


                                             _____
                                             Patrick D. McVey
                                             Riddell Williams P.S.
                                             1001 Fourth Avenue Plaza, Suite 4500
                                             Seattle, WA  98154-1065
                                             (206) 624-3600
                                             Attorneys for Defendant
                                             Fisher Controls International, Inc.


                                                                    FCI/MSJ 0601

WL1: 83514.01

# EXHIBIT 48

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD OLSON and CAROL OLSON, his wife, | ) ) ) | **C.A. No. 02C-04-263 JRS** |
| Plaintiffs, | ) ) ) | **Non-Arbitration Case** |
| v. | ) ) ) | **Consolidated with** |
| MOTIVA ENTERPRISES L.L.C., et al., | ) ) ) | **C.A. No. 02C-05-168 JRS** **C.A. No. 02C-05-169 JRS** |
| Defendants. | ) ) ) | **C.A. No. 02C-05-190 JRS** |
| ------------------------------------------------------- | ) | |

## MOTION OF DEFENDANT FISHER CONTROLS INTERNATIONAL, INC., FOR SUMMARY JUDGMENT ON ALL CLAIMS ASSERTED BY PLAINTIFF GREAT AMERICAN ASSURANCE COMPANY
### (THE "ADDITIONAL INSURED" MOTION)

Defendant/third-party plaintiff Fisher Controls International, Inc. ("Fisher"), hereby

moves the Court for entry of an order dismissing plaintiff Great American Assurance Company's

claims against Fisher. An insurer may not maintain a subrogation action against one of its

insureds. As set out below, Fisher is an additional insured under the terms of the policy through

which Great American allegedly acquired its right to bring this action.[1] Thus, under Superior

Court Rule 56, Fisher is entitled to dismissal of Great American's claims against it.

1.      As the Court is aware, Great American has alleged that it acquired the rights of

Motiva Enterprises LLC, Parsons Corporation, and Praxair, Inc., by paying claims asserted by

those entities under the terms of a builder's risk policy initially issued by Agricultural Insurance

Company to Parsons. (See Exhibit 10, FCI/SJ 100–104.)[2] That policy provided coverage of

---

[1] Fisher is filing this motion concurrently with its Motion for Partial Summary Judgment on Negligence Claim Asserted by Plaintiff Great American Assurance Company and its Motion for Partial Summary Judgment on Warranty Claims Asserted by Plaintiff Great American Assurance Company. If the Court grants both of those motions, it need not reach the merits of this motion.

[2] All exhibits referenced in this motion are attached to a separate pleading, "Exhibits Referenced in Motions for Summary Judgment Filed by Fisher Controls International, Inc., on October 20, 2003," which

$261,293,000 for physical damage and $50,000,000 for delay in completion. (Id., FCI/SJ 101, 102.) The policy was intended "to insure, in respect of occurrences happening during the period of the policy, against all risks of direct physical loss or damage to the property insured hereunder from a peril insured against by this policy." (Id., FCI/SJ 104.)

2.    Under Delaware law an insurer cannot maintain a subrogation action against one of its insureds. See, e.g., Lexington Ins. Co. v. Raboin, 712 A.2d 1011, 1015 (Del. Super. Ct. 1998). The builder's risk policy at issue identifies as insureds "Parsons Corporation, Parsons Process Group, Inc., Star Enterprises and **all contractors, subcontractors and sub-subcontractors of every tier** as their interests may appear." (Exhibit 10, FCI/SJ 102, ¶ 1; emphasis added.)   Fisher was a sub-subcontractor on the Repowering Project. Consequently, it was an insured under the builder's risk policy. Because Fisher was an insured under the builder's risk policy, Great American cannot maintain a subrogation action against Fisher.

3.    The contractual documents establish that Fisher was a sub-subcontractor:

- The Parsons-Praxair contract defines "lower tier-subcontractor or SUB-SUBCONTRACTOR" as "[a]ny entity under contract with SUBCONTRACTOR [i.e., Praxair] to perform a portion of the WORK in accordance with this Subcontract." (Exhibit 6, FCI/SJ 61, ¶ 1.6.)

- Further, that contract defines "Work" as "[t]he work to be performed by [Praxair] in accordance with the Subcontract." (Id., FCI/SJ 61, ¶ 1.7.)

- The "work to be performed" by Praxair was the provision of an ASU as part of the Repowering Project. (Id., FCI/SJ 72; Great American Complaint, Exhibit 1, FCI/SJ 3, ¶ 10.)

- Praxair was required to provide a large number of valves, including the valve at issue, as part of the ASU. (See, e.g., Exhibits 8 [diagrams showing some of the valves required for the ASU], 17 – 18 [Praxair purchase orders for

---

is being filed concurrently with this motion. Those exhibits are numbered sequentially throughout using the prefix "FCI/SJ."

-2-        FCI/MSJ 0603        WLI: 83516.01

valves].)

- Praxair contracted with Fisher to build valves intended for installation at the ASU. (See Exhibits 17 – 18.)
- Fisher manufactured at least 69 valves for the ASU and supplied associated actuators and other equipment, at a contract price of at least $507,425.65. (See Exhibits 17–18.)
- In building those valves, Fisher "perform[ed] a portion of the work" that Praxair was contractually obligated to perform. (See Exhibit 6, FCI/SJ 61, ¶ 1.7.)

In light of this evidence, the only reasonable conclusion that can be drawn is that Fisher is a "sub-subcontractor" under the terms of the Parsons-Praxair contract. And because Fisher was a sub-subcontractor under the terms of that contract, it was a sub-subcontractor under the terms of the builder's risk policy.

4.      Other evidence confirms that Fisher is an additional insured under the builder's risk policy. The contract between Star (Motiva) and Parsons identified Fisher as an "approved supplier" for valves for the Delaware City Power Plant Repowering Project. (Exhibit 5, Sched. B-6, FCI/SJ 53.) That contract is, of course, the principal contract on the risk insured by Great American. Given that Fisher was identified as an approved supplier in that contract—a supplier that provided more than half a million dollars' worth of valves to the Project—the conclusion must be that all parties, including Great American, were or should have been aware that Fisher would be involved in the Project. Further, in light of Fisher's status as an approved supplier, the broad phrase "subcontractors and sub-subcontractors of every tier" should be construed to extend to Fisher. See, e.g., Crow-Williams, I v. Federal Pac. Elec. Co., 683 S.W.2d 523, 525 (Tex. App—Dallas 1984) (recognizing a supplier as subcontractor).

5.      Because Fisher was a sub-subcontractor for the Project, it is also an additional insured under the builder's risk policy, which insured "subcontractors and sub-subcontractors of every tier as their interests may appear." Great American cannot maintain a subrogation action

against one of its insureds. See Lexington Ins., 712 A.2d at 1015. Accordingly, Great American's claims against Fisher should be dismissed.

WHEREFORE Defendant Fisher Controls International, Inc., respectfully requests that the Court enter an order of summary judgment on Great American's claims against Fisher.

Dated: October 20th, 2003                McCARTER & ENGLISH, LLP

Paul A. Bradley  fcm
McCarter & English, LLP
919 N. Market Street, Ste. 1800
Wilmington, DE 19899
(302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.

Dated: October 20th, 2003                RIDDELL WILLIAMS P.S.

Patrick D. McVey  for
Riddell Williams P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA 98154-1065
(206) 624-3600
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0605

-4-

WLI: 83516.01

# EXHIBIT 49

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MOTIVA ENTERPRISES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 02C-05-169 (JRS) |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, | ) | |
| INC., NORTHEAST CONTROLS, INC., | ) | **NON-ARBITRATION CASE** |
| PRAXAIR, INC. AND CONECTIV | ) | |
| OPERATING SERVICES COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, | ) | |
| INC., | ) | |
| | ) | |
| Defendant/Third-Party | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BATTAGLIA MECHANICAL, INC., | ) | |
| HYDROCHEM INDUSTRIAL SERVICES, | ) | |
| INC., JJ WHITE, INC., PARSONS | ) | |
| CORPORATION, PARSONS ENERGY | ) | |
| AND CHEMICALS, INC., TEXACO | ) | |
| AVIATION PRODUCTS LLC, TEXACO | ) | |
| DEVELOPMENT CORP., TEXACO, INC., | ) | |
| d/b/a TEXACO GLOBAL GAS AND | ) | |
| POWER, DAIKIN AMERICA, INC., | ) | |
| DAIKIN INDUSTRIES, LTD., and | ) | |
| SAINT-GOBAIN PERFORMANCE | ) | |
| PLASTICS CORPORATION, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## STIPULATION OF DISMISSAL

COME NOW, the parties to this litigation, by and through counsel, who agree and stipulate that the above-captioned lawsuit is hereby dismissed, without prejudice, each party to bear its own costs.

PRICKETT, JONES & ELLIOTT, P.A.        McCARTER & ENGLISH, LLP


By: _____        By: _____
    PAUL M. LUKOFF                              PAUL A. BRADLEY
    1310 King Street                            919 North Market Street, Suite 1800
    P. O. Box 1328                              P. O. Box 111
    Wilmington, DE 19801                        Wilmington, DE 19899

*Attorneys for Motiva Enterprises LLC*        *Attorneys for Fisher Controls*
                                              *International, Inc.*

FCI/MSJ 0607

17226.25\190306v1

MARGULIS EDELSTEIN

~~ADELMAN LAVINE GOLD &~~
~~LEVIN, P.C.~~

By: _____
    ~~BRADFORD J. SANDLER~~  DONALD M. DAVIS
    The Wilmington, Trust Building
    1100 N. Market Street, Suite 1100
    Wilmington, DE 19801

*Attorneys for J.J. White, Inc.*
*Services, Inc.*

FCI/MSJ 0608

COZEN O'CONNOR

By: _____
SEAN J. BELLEW
1201 N. Market Street
Suite 1406
Wilmington, DE 19801

*Attorneys for Praxair, Inc.*

FCI/MSJ 0609

17226.25\190306v1

GOLLATZ, GRIFFIN & EWING, P.C.

By: _____
    JOANNA REIVER
    1700 W. Fourteenth Street
    Wilmington, DE 19806-4058

*Attorneys for Saint-Gobain Performance
Plastics*

FCI/MSJ 0610

RAWLE & HENDERSON LLP

By: _____

DELIA A. CLARK
300 Delaware Avenue
Suite 1015
Wilmington, DE 19802

*Attorneys for Northeast Controls, Inc.*

POTTER ANDERSON & CORROON LLP

By: _____
　　　GREGORY A. INSKIP
　　　Hercules Plaza, 6th Floor
　　　1313 North Market Street
　　　P.O. Box 951
　　　Wilmington, DE  19899-0951

*Attorneys for Conectiv Operating Services
Company*

FCI/MSJ 0612

TYBOUT, REDFEARN & PELL

By: _____
        DAVID G. CULLEY
        300 Delaware Avenue, 11th Floor
        P. O. Box 2092
        Wilmington, DE 19899

*Attorneys for Daikin Industries Ltd. &*
*Daikin America, Inc.*

FCI/MSJ 0613

MURPHY, SPADARO & LANDON, P.A.

By: _____

        ROGER D. LANDON
        824 North Market Street
        P.O. Box 8989
        Wilmington, DE 19899

*Attorneys for HydroChem Industrial*
*Services, Inc.*

FCI/MSJ 0614

17226.25\190306v1

SAUL EWING LLP

By: _____
         CHAD J. TOMS
         222 Delaware Avenue
         Suite 1200
         Wilmington, DE 19801

*Attorneys for Texaco Development Corp. &
Texaco Aviation Products, Inc.*

FCI/MSJ 0615

17226.25\190306v1

ELZUFON, AUSTIN, REARDON,
TARLOV & MODELL, P.A.

By: _____
      JOSEPH F. GULA, III
      1201 N Market Street
      Suite 2100
      Wilmington, DE 19899

*Attorneys for Parsons Energy &
Chemicals, Inc.*

FCI/MSJ 0616

17226.25\190306v1

TIGHE, COTTRELL & LOGAN, P.A.

By: _____

MICHAEL K. TIGHE
First Federal Plaza
P.O. Box 1031
Wilmington, DE 19899

*Attorneys for Battaglia Mechanical, Inc.*

SO ORDERED this __17__ day of __November__, 2003.

_____
Judge

FILED
PROTHONOTARY
2003 NOV 24  AM 11: 58

FCI/MSJ 0617

17226.25\190306v1

# EXHIBIT 50

EFiled: Jun 11 2004 10:44▓▓ EDT
Filing ID 3716512

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| RONALD W. OLSON and<br>CAROL OLSON, his wife,<br><br>Plaintiffs,<br><br>MOTIVA ENTERPRISES, L.L.C.;<br>BATTAGLIA MECHANICAL, INC.;<br>FISHER CONTROLS INTERNATIONAL,<br>INC.; HYDROCHEM INDUSTRIAL<br>SERVICES, INC.; JJWHITE, INC.;<br>NORTHEAST CONTROLS, INC; PARSONS<br>ENERGY AND CHEMICALS GROUP, INC.;<br>PRAXAIR, INC.; DAIKIN INDUSTRIES,<br>LTD.; SAINT-GOBAIN PERFORMANCE<br>PLASTICS; RIX INDUSTRIES, INC.;<br>TEXACO, INC., AND TEXACO<br>DEVELOPMENT CORPORATION,<br><br>Defendants. | C.A. No. 02C-04-263 (JRS)<br><br>Non-Arbitration Case<br><br>Consolidated for discovery with:<br>C.A. No. 02C-05-168 (JRS)<br>C.A. No. 02C-05-169 (JRS)<br>C.A. No. 02C-05-190 (JRS)<br>**JURY TRIAL DEMANDED** |

## STIPULATION OF DISMISSAL

PLEASE TAKE NOTICE that, pursuant to Rule 41(a)(1)(II) of the Superior Court Civil

Rules, the undersigned parties hereby stipulate to the dismissal of Praxair's Complaint against

Fisher Controls, Inc., Northeast Controls, Inc., Conectiv Operating Services, Inc. and Texaco

Development Corp., as asserted in C. A. No. 02C-05-190 (JRS) only, without prejudice as to

Northeast Controls, Inc., Conectiv Operating Services, Inc and Texaco Development Corp.,

Praxair's Complaint against Fisher Controls, Inc., only, having been previously dismissed with

prejudice. All Third-Party Complaints and cross-claims filed and asserted in C.A. No. 02C-05-

190 (JRS) are likewise dismissed, without prejudice. All cross-claims of Praxair as asserted in

C.A. No. 02C-04-263 (JRS), Ronald W. Olson et al. v. Motiva Enterprises. L.L.C., et al., and any

other active consolidated action, are preserved.

Dated: May 27 , 2004

COZEN O'CONNOR

Sean J. Bellew (4072)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
(302) 295-2000
*Attorneys for Praxair, Inc.*

WILM1\254891 124029.000                    1

FCI/MSJ 0619

NOLTE & ASSOCIATES

R. Stokes Nolte, Esquire
Three Mill Road
Suite 304
Wilmington, DE 19806
(302) 777-1700

*Attorney for Conective Operating Systems*

Date: 6-1-0 4

PRICKETT JONES & ELLIOTT

Dated: _May 27_____, 2004

_Paul M. Lukoff_

Paul M. Lukoff (96)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500

_Attorneys for Motiva Enterprises, L.L.C._

WILM1\2548\1 124023.000

4

FCI/MSJ 0621

TIGHE COTTRELL & LOGAN, P.A.


_____

Michael K. Tighe, Esquire
First Federal Plaza, Suite 500
P.O. Box 1031
Wilmington, DE 19899
(302) 658-6400

*Attorneys for Battaglia Mechanical, Inc.*

Dated: _____, 2004

FCI/MSJ 0622

Dated: _____, 2004

McCARTER & ENGLISH

By: Paul A. Bradley (2156)
919 North Market Street
P.O. Box 111
Wilmington, DE  19899
(302) 654-8010

*Attorneys for Fisher Controls International, Inc.*

WILM1\2548911 124029.000

6

FCI/MSJ 0623

Dated: 6|1____, 2004

MURPHY SPADARO & LANDON

_Clirk T. Bodstell_ for
Roger Landon (2460)
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100

*Attorneys for HydroChem Industrial
Services, Inc.*

WILM1U542901 124079 000

7

FCI/MSJ 0624

ADELMAN LEVINE GOLD & LEVIN

Dated: _June 10_, 2004

Bradford J. Sandler (4142)
1100 North Market Street, Suite 1100
Wilmington, DE 19801
(302) 654-8200

*Attorneys for J.J. White, Inc.*

WILM1\254891 124029.000

8

FCI/MSJ 0625

RAWLE & HENDERSON LLP

Dated: _____, 2004

Delia A. Clark (3337)
300 Delaware Avenue, Suite 1015
Wilmington, DE 19801
(302) 654-0544

*Attorneys for Northeast Controls, Inc.*

FCI/MSJ 0626

ELZUFON AUSTIN REARDON TARLOV
& MONDELL, P.A.

Dated: _6/10_____, 2004

_____
Joseph F. Guía, III (4197)
300 Delaware Avenue
P.O. Box 1630
Wilmington, DE 19899

*Attorneys for Parsons Energy and
Chemicals Group, Inc.*

WILM1\254851\1 124029.000                    10

FCI/MSJ 0627

TYBOUT REDFEARN & PELL

Dated: _____, 2004

_____
David G. Culley (2141)
300 Delaware Avenue, Suite 1100
P.O. Box 2092
Wilmington, DE  19899
(302) 658-6901

*Attorneys for Daikin Industries, LTD.*

WILM1\25489\1 124029.000                    11

FCI/MSJ 0628

GOLLATZ GRIFFIN & EWING, P.C.

Dated: _5/27/04_, 2004

for Sheriden Black (
1700 West 14th Street
Wilmington, DE 19806-4056

*Attorneys for Saint-Gobain Performance Plastics*

FCI/MSJ 0629

SAUL EWING, LLP

Dated: May 28, 2004

Kimberly L. Gattuso (No. 3733)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899-1266

*Attorneys for Texaco Development
Corporation*

13

FCI/MSJ 0630

# EXHIBIT 51

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD W. OLSON and<br>CAROL OLSON, his wife | )<br>) | **C.A. No. 02C-04-263 JRS** |
| | ) | |
| Plaintiffs, | ) | **Non-Arbitration Case** |
| | ) | |
| MOTIVA ENTERPRISES, L.L.C.;<br>, *et al.* | )<br>) | |
| | ) | |
| Defendants. | ) | |

------------------------------------------------------------

## DEFENDANT FISHER CONTROLS INTERNATIONAL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS' NEGLIGENCE CLAIMS

Defendant Fisher Controls International, Inc. ("Fisher"), hereby moves the Court for entry of an order granting summary judgment to Fisher on the negligence claims asserted by plaintiffs Ronald W. and Carol Olson against Fisher.

## I.    INTRODUCTION

1.    The Olsons contend that Fisher was negligent in the design, manufacture, assembly, and distribution of a valve sold by Fisher to Praxair ("the Valve") and incorporated by Praxair into the Air Separation Unit ("ASU") that Praxair was hired to construct for the Delaware City Power Plant Repowering Project ("DCPPRP"). See Count V of Plaintiffs' Second Amended Complaint ("Complaint"), Ex. A at 9. The Olsons contend further that Fisher's alleged negligence caused or contributed to injuries suffered by Mr. Olson on May 20, 2000 at the Delaware City Power Plant. Id.

2.    To establish that Fisher was negligent, the Olsons must show that Fisher owed a duty to Mr. Olson, that Fisher breached its duty to Mr. Olson, and that Fisher's breach of that duty was the cause Mr. Olson's injuries. In light of the complex nature of the explosion that occurred at the Delaware City Power Plant on May 20, 2000 (the "Incident"), plaintiffs must

- 1 -

offer an admissible expert opinion demonstrating the element of causation. But plaintiffs' expert as to causation has concluded that the Incident was caused by factors unrelated to the Fisher Valve.

3.    Consequently, even if there were evidence of some breach of a duty owed by Fisher to plaintiffs, plaintiffs' own expert's testimony forecloses any argument that Fisher's alleged breach of duty caused Mr. Olson's injuries. Because plaintiffs cannot establish the necessary element of causation, Fisher requests, pursuant to Del. R. Civ. P. 56(c), that the Court grant summary judgment in favor of Fisher as to plaintiffs' claims against Fisher.

## II.    PLAINTIFFS CANNOT DEMONSTRATE THAT FISHER CAUSED OR CONTRIBUTED TO PLAINTIFFS' INJURIES

4.    To establish their negligence claim against Fisher, plaintiffs must show that Fisher owed a duty to plaintiffs; that Fisher breached that duty; and that Fisher's breach of that duty was the proximate cause of plaintiffs' injuries. Hall v. Dorsey, No. 96C-06-045, 1998 WL 960774 at *2 (Del. Super. Nov. 5, 1998) (setting forth elements of tort of negligence) (citing Prosser & Keeton, The Law of Torts § 30 at 164-65 (5th ed. 1984)).

5.    Although the issue of causation is ordinarily a question of fact to be submitted to the jury, when the issue of causation is presented in a context that is not a matter of common knowledge, the causal connection between a defendant's negligence and the plaintiff's injury can be proven only by the testimony of a competent expert witness. Money v. Manville Corp. Asbestos Disease Compensation Trust Fund, 596 A.2d 1372, 1377 (Del. 1991).

6.    The parties do not dispute that the cause of the fire that took place at the Delaware City Power Plant is a complex engineering issue that can only be proven by the testimony of competent expert witnesses. As a result, the parties have submitted no fewer than 23 expert reports relating to the fire.

7.    Plaintiffs retained Dr. Tim A. Jur of Engineering Design & Testing Corporation for the specific purpose of rendering an opinion as to the cause of the explosion. Dr. Jur

FCI/MSJ 0632

submitted two written report and was also deposed over a period of several days.  In his initial

report, Dr. Jur offered the following conclusions as to the cause of the fire:

> (a) The most likely cause of the fire was a condition of a high
> oxygen flow velocity in the presence of a carbon steel pipe
> and flange upstream of Control Valve HV0629, resulting in
> first ignition of the fire at this location by a mechanism of
> particle impact.
>
> (b) The high oxygen flow velocity that resulted in a condition
> suitable for initiation of the fire by a mechanism of particle
> impact was the result of the consequences of opening Control
> Valve HV0629 under the prevailing conditions based on a
> defective procedure developed by Praxair and Texaco.
>
> (c) A contributing cause of the fire was the presence of a dead
> leg upstream of Control Valve HV0629 that had not been
> blown down prior to the valve being opened on high
> differential pressure and high purity oxygen.
>
> (d) The circumstances which led to Control Valve HV0629 being
> opened as it was with a dead leg upstream were a result of a
> failure by both Praxair and Texaco to address this condition in
> advance and in a manner that would have been consistent with
> industry custom and practice.

See July 29, 2004 Engineering Design & Testing Corporation Report by Dr. Tim A. Jur, Ex. B at

69.

8.    None of Dr. Jur's conclusions attribute fault to Fisher or to the materials of

construction of the Valve.  Instead, Dr. Jur has concluded that the fire was the result of defective

procedures developed by Praxair and Texaco with respect to the velocity limitations of carbon

steel pipe and the failure of Praxair and Texaco to design or maintain the system in accordance

with industry custom and practice.

9.    Consistent with his report, at deposition Dr. Jur explained that, in his opinion, the

fire was caused by particle impact with the carbon steel pipe and flange upstream of the Fisher

Valve:

> Q: Are you able to explain to me as you sit here today the
> dynamics of this particular fire and how it occurred, from the point

FCI/MSJ 0633

291/463904.01

when the valve opened what happened, what was going on up to that point? I'm talking about the second opening when the fire occurred. From the point the valve lifted from the seat and up until the point there was ignition?

**A:** I think it's expressed in my report why my understanding of that happens to be. There was a velocity condition set up in the valve which was in excess of what would be generally accepted, in fact, it was well in excess of what would be generally accepted as velocity limitations for the valve, for the material for which the upstream carbon steel pipe and flange were able to withstand.

The indication from there is that particulate which cannot be 100 percent guaranteed to be outside of the gaseous stream and particularly with respect to there being a dead leg upstream of the 629 valve was another likely condition.

The high velocities resulted in particulate matter making contact, forcible contact with the inside wall of the carbon steel piping, resulting in the carbon steel piping igniting, which then proceeded to create a fire, igniting other materials and eventually burning its way through the wall of the carbon steel pipe.

<u>See</u> Transcript of Deposition of Dr. Jur ("Jur Dep"), Ex. C at 154:1-155:7.

**Q:** It's your opinion in this matter that the accident that resulted in the injuries to Mr. Olson occurred as a result of particle impact on carbon steel?

**A:** Yes.

. . .

**Q:** And, in fact, in this very instance it's your opinion, is it not, that the place where the particulate impact occurred was on the wall of the pipe somewhere between 7:00 and 11:00 o'clock, that's the wall of the pipe between the dead leg and the 629 valve?

**A:** Yes.

<u>Id.</u> at 395:12-16, 444:18-445:3.

10.     Dr. Jur submitted a supplemental expert report on January 31, 2005, after having the opportunity to conduct further investigation, review additional discovery, and analyze the reports submitted by the other parties' experts. In his supplemental report, Dr. Jur makes a specific point of directly refuting the opinion of Praxair's expert, J. Philip Whitman of the

- 4 -

Rimkus Consulting Group, that the incident was caused by flow friction heating at the Valve seal material. Specifically, Dr. Jur concluded that there was "no heat transfer analysis contained in the [Rimkus] report or otherwise suggested to substantiate [Whitman's] conclusion" and that "[Whitman's] conclusion is without basis and is, therefore, speculation." See January 31, 2005 Engineering Design and & Testing Corporation Report by Dr. Tim A. Jur, Ex. D at 20.  In response to the Rimkus report, Dr. Jur conducted his own heat transfer analysis investigation and specifically concluded that "ignition of the fire as a result of flow friction at the seal surface would not be expected." Id.

11.    In short, plaintiffs have submitted no expert opinion that the Valve was the cause of the Incident. Moreover, in response to the only expert report that does attempt to attribute fault to the Valve, plaintiffs' expert made a specific point of conducting additional analysis to refute that opinion.

12.    In short, plaintiffs cannot establish the essential element of causation as to their claims against Fisher. Consequently, plaintiffs' claims against Fisher should be dismissed.

## III.    CONCLUSION

For the reasons set forth above, Fisher hereby requests that this Court enter an order granting summary judgment to Fisher on plaintiffs' negligence claims against Fisher.

FCI/MSJ 0635

Dated: April 12, 2005

McCARTER & ENGLISH, LLP

_____

Paul A. Bradley
Delaware Bar No. 2156
McCARTER & ENGLISH, LLP
919 Market Street, Suite 1800
Wilmington, DE 19899
(302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.


Dated: April 12, 2005

RIDDELL WILLIAMS P.S.

_____

Patrick D. McVey
Daniel J. Gunter
RIDDELL WILLIAMS P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA 98154-1065
(206) 624-3600
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0636

# EXHIBIT 52

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| RONALD W. OLSON and CAROL OLSON, his wife, | ) **C.A. No. 02C-04-263 JRS** |
| | ) |
| Plaintiffs, | ) **Non-Arbitration Case** |
| | ) |
| v. | ) |
| | ) |
| MOTIVA ENTERPRISES L.L.C., et al., | ) |
| | ) |
| Defendants. | ) |

## MOTION OF DEFENDANT FISHER CONTROLS INTERNATIONAL, INC., FOR PARTIAL SUMMARY JUDGMENT OF PLAINTIFFS' WARRANTY CLAIMS

Defendant Fisher Controls International, Inc. ("Fisher"), hereby moves the Court for entry of an order dismissing the warranty claims asserted by plaintiffs Ronald W. and Carol Olson against Fisher.

1.    The Olsons contend that Fisher breached express and implied warranties because (according to the Olsons) the Fisher valve, bearing tag number 83HV0629 and sold by Fisher to Praxair ("the Valve"), did not meet specifications. See Olson Amended Complaint ¶¶ 19, 44-46. Specifically, the Olsons contend that Fisher breached express and implied warranties, as set forth under 6 Del. C. § 2-313 through 2-315.

2.    Before Delaware adopted the Uniform Commercial Code ("UCC"), an injured party was required to establish privity with the defendant to recover under a breach of warranty claim. S&R Assocs., L.P. v. Shell Oil Co., 725 A.2d 431, 437 (Del. Super. 1998) (citing Ciociola v. Delaware Coca-Cola Bottling Co., 172 A.2d 252 (1961)). UCC § 2-318 abolished the privity requirement and granted standing to certain persons injured by defective products. Id. The Delaware legislature adopted the following version of that section:

> A seller's warranty whether express or implied extends to any
> natural person who may reasonably be expected to use, consume or

FCI/MSJ 0637

291/330718.03

> be affected by the goods and who is injured by breach of the
> warranty. A seller may not exclude or limit the operation of this
> section.

6 Del. C. § 2-318 (2001).

3.    Mr. Olson is a natural person and thus can claim that Fisher's warranty extends to

him.[1]  However, under Delaware law a secondary purchaser who claims the protection of a

warranty is subject to the same disclaimers, modifications, or limitations set forth in the

underlying sales agreement between the original purchaser and seller.  Lecates v. Hertrich

Pontiac Buick Co., 515 A.2d 163, 166 (Del. Super. 1986) (secondary purchaser of vehicle

subject to durational limit of manufacturer's warranty); Townsend v. Ed Fine Oldsmobile, 1987

WL 14870 (Del. Super. July 23, 1987) (natural person claiming breach of warranty had no better

rights than did person in privity with seller; because the seller had disclaimed its warranties to

the purchaser, the purchaser's passenger could not assert a warranty claim against the seller).  As

the court in Townsend explained:

> Because the liability asserted by the non-privity plaintiff is
> derivative, being derived from the buyer to whom the warranty
> sued upon was expressly or impliedly made, it follows that the
> plaintiff claiming the right to sue under UCC § 2-318 is in no
> better position than the original buyer.
>
> From this it follows that if in fact there were no warranties in the
> original transaction, a plaintiff cannot assert warranty liability
> merely because he is a person entitled to sue under UCC § 2-318
> when there is in fact a warranty on which to bring suit.
> Consequently, when warranties are validly excluded with respect
> to the buyer, a plaintiff within the scope of UCC § 2-318 is subject
> to such exclusion.

Id. (quoting 3 Anderson, Uniform Commercial Code § 2-318-9 (3d ed. 1983)).

4.    Thus, when warranties are validly excluded with respect to the original buyer, a

third party who falls within the scope of § 2-318 is nevertheless subject to the same warranty

---

[1] By its terms, this section does not extend warranties to Mrs. Olson, as she is not a person who could
"reasonably be expected to use, consume or be affected by the goods." But even if she has standing under
this section, judgment should be entered against her on her warranty claims, for the reasons set forth
below.

- 2 -

exclusions or limitations effective against the original buyer. <u>Townsend</u>, 1987 WL 14870; <u>see</u> <u>also</u> In re Asbestos Litig., 542 A.2d 1205, 1213 (Del. Super. 1986) (if no warranties were extended to buyer, no subsequent user under § 2-318 can claim their breach).

5.      In this case, the original buyer of the Valve was Praxair, Inc. In its Order of April 26, 2004 ("Order"), this Court granted Fisher's motion for summary judgment on Praxair's warranty claims, holding that all implied warranties were effectively disclaimed by contract and that the single express warranty had expired.[2] Because the Olsons cannot have any warranty claims superior to those of Praxair, and because Praxair cannot assert any warranty claims against Fisher, the Olsons' warranty claims should be dismissed.

6.      As set forth in Fisher's motion for summary judgment on Praxair's warranty claims, the purchase order for the Valve stated that the purchase order "applies against Buyer's [Praxair's] Worldwide Agreement # 80171750T." <u>See</u> Ex. L ("Purchase Order"). The Worldwide Procurement Agreement provides a limited 18-month express warranty and disclaims all other warranties:

> 8.      **WARRANTY:** Seller hereby warrants that the Equipment and the operation thereof shall conform to the mutually agreed to conditions and specifications contained or referred to in this Order, except to the extent any such non-conformance in operation is due to the design specified by the Buyer; and Seller further warrants that the Equipment and all parts thereof shall be free from (i) defects in material and workmanship; and (ii) defects due to design (other than any design specified by Buyer). If the Equipment, or any part hereof fails to meet any or all of the foregoing warranties at any time prior to the Expiration Date hereinafter described, then, upon Buyer's request for remedial work, Seller shall, at its sole expense, promptly either replace or repair free of charge . . . . As used herein "Expiration Date" shall mean twelve (12) months after the date [that] the Equipment is either used or placed in

---

[2] Plaintiffs filed an opposition brief to Fisher's motion for summary judgment on Praxair's warranty claims. <u>See</u> Olson's Response to the Motion for Partial Summary Judgment on Warranty and Contract Claims Asserted by Plaintiff Praxair, Inc. In reaching its decision, the Court considered and rejected each of the Olson's arguments on this issue. <u>See</u> Order at 24, 25-28. Consequently, plaintiffs cannot argue that their interests were not represented when the Court made its decision on Praxair's warranty claims.

FCI/MSJ 0639

operation, provided, however, that such Expiration Date shall in no event exceed a period of eighteen (18) months from the date of shipment by Seller.

**IN CONSIDERATION OF THE HEREIN STATED PURCHASE PRICE OF THE GOODS, SELLER GRANTS ONLY THE ABOVE STATED EXPRESS WARRANTY. NO OTHER WARRANTIES ARE GRANTED INCLUDING, BUT NOT LIMITED TO EXPRESS AND IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

Exhibit E to Worldwide Procurement Agreement, Ex. E, ¶ 8 at 2 (bold emphasis in original).

7.    In granting Fisher's motion for summary judgment as to Praxair's implied warranty claims, the Court held that, consistent with the terms of U.C.C. 2-316, Fisher had effectively disclaimed <u>all</u> implied warranties "with clear, unambiguous and sufficiently prominent language."[3] <u>See</u> Order at 5. Because Fisher effectively disclaimed all implied warranties, and because those disclaimers are effective against the Olsons, their claims for breach of implied warranties (Counts IX–X of the Amended Complaint) should be dismissed. <u>See</u> <u>Lecates</u>, 515 A.2d at 166; <u>In re Asbestos Litig.</u>, 542 A.2d at 1213; <u>Townsend</u>, 1987 WL 14870, * 3.

8.    Further, in granting Fisher's motion for summary judgment as to Praxair's express warranty claims, the Court ruled that "Praxair's breach of express warranty claim fails because it was not brought within eighteen months of the date on which the Valve was shipped by Fisher." <u>See</u> Order at 33. As set out in Fisher's motion for summary judgment on Praxair's warranty claims, the sole express warranty that Fisher granted was limited to a period of 18 months from the date of shipment by Fisher. Exhibit E to Worldwide Procurement Agreement ¶ 8 at 2. The

---

[3] The Worldwide Procurement Agreement between Fisher and Praxair called for the application of Missouri law. As the Court noted in its Order, Delaware courts typically honor a contractual choice of law provision. Because Delaware and Missouri have both adopted nearly identical versions of the relevant provisions of the Uniform Commercial Code, the analysis regarding the Agreement's warranty provisions would be the same under either state's law. In keeping with Delaware's policy of honoring parties' intentions as expressed in a clear and unambiguous contract, the Court followed Missouri law in holding that Praxair's warranty claims should be dismissed. <u>See</u> Order at 14-15. No party has objected to the application of Missouri law to the terms of the Worldwide Procurement Agreement.

FCI/MSJ 0640

Valve was shipped by Fisher on October 28, 1998.  See Exs. M, N.  The incident at issue

occurred on May 20, 2000, more than 18 months after the date of shipment.  See Olson Amended

Complaint ¶¶ 23–24.  Consequently, the sole warranty provided by Fisher had expired before the

time of the incident.  Because the warranty period had expired, Fisher cannot be held liable to the

Olsons for breach of the warranty.  See In re Asbestos Litig., 542 A.2d at 1213; Lecates, 515

A.2d at 166; Townsend, 1987 WL 14870, * 3.  The Olsons' claim for breach of express warranty

(Count XI of the Amended Complaint) should therefore be dismissed.

WHEREFORE Defendant Fisher Controls International, Inc., respectfully requests that

the Court enter an order of summary judgment dismissing Counts IX–XI of the Olsons'

Amended Complaint.

Dated:  April 12, 2005                          McCARTER & ENGLISH, LLP


                                                Paul A. Bradley
                                                Delaware Bar # 2156
                                                McCarter & English, LLP
                                                919 Market Street, Suite 1800
                                                Wilmington, DE  19899
                                                (302) 984-6300
                                                Attorneys for Defendant
                                                Fisher Controls International, Inc.


Dated:  April 12, 2005                          RIDDELL WILLIAMS P.S.


                                                Patrick D. McVey
                                                Daniel J. Gunter
                                                RIDDELL WILLIAMS P.S.
                                                1001 Fourth Avenue Plaza, Suite 4500
                                                Seattle, WA  98154-1065
                                                (206) 624-3600
                                                Attorneys for Defendant
                                                Fisher Controls International, Inc.


                                                            FCI/MSJ 0641

# EXHIBIT 53

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| RONALD W. OLSON and<br>CAROL OLSON, his wife | )<br>) **C.A. No. 02C-04-263 JRS**<br>) |
| Plaintiffs, | ) **Non-Arbitration Case**<br>) |
| MOTIVA ENTERPRISES, L.L.C., *et al.,* | )<br>) |
| Defendants. | )<br>) |

DEFENDANT FISHER CONTROLS INTERNATIONAL, INC.'S MOTION FOR
SUMMARY JUDGMENT AS TO ALL CROSS-CLAIMS FOR CONTRIBUTION
ASSERTED BY ALL DEFENDANTS

  Defendant Fisher Controls International, Inc. ("Fisher") hereby moves the Court for entry

of summary judgment as to all cross-claims for contribution asserted by all parties against Fisher.

I.  **INTRODUCTION**

  1.  The cross-claims for contribution asserted by the other defendants against Fisher

are premised on the assertion that Fisher is liable, in whole or in part, to plaintiffs for the injuries

that they suffered as a result of the May 20, 2000, incident at the Delaware City Power Plant

("the Incident").

  2.  To establish that Fisher is liable to plaintiffs, the defendants must prove that

Fisher is a joint tortfeasor. A fundamental element of that claim is proof that Fisher's conduct

was a proximate cause of the Incident. The question as to the cause of the Incident is sufficiently

complex that it requires the submission of expert testimony. But no competent expert testimony

in this case supports a claim that Fisher or the Fisher Valve was the cause of the Incident. Thus,

the required element of causation cannot be established against Fisher, and no reasonable trier of

FCI/MSJ 0642

- 1 -

fact could conclude that Fisher is a joint tortfeasor. The parties' cross-claims for contribution against Fisher should therefore be dismissed.

3.    Further, the parties' cross-claims for contribution should be dismissed because they are barred by the component supplier doctrine. The component supplier doctrine applies specifically to manufacturers who supply a component part that becomes integrated by its purchaser into a larger product. Under this doctrine, a component manufacturer who does not substantially participate in the integration of its component into a larger product has two duties: (1) to provide a component product that does not in itself contain a harm-causing defect, and (2) to provide a component product that meets specifications. A component manufacturer who fulfills these duties cannot be held liable for injuries arising from a dangerous condition created by a third party's integration of the component into a larger product.

4.    Fisher supplied a component valve, which Praxair then integrated into an Air Separation Unit that Praxair was hired to build for the DCPPRP. Fisher played no role in the design, construction, or operation of the ASU, Praxair's integration of the Valve into the ASU, or the development of the operating procedures or operating conditions for the ASU. Further, Fisher manufactured the Valve to the specifications it received,[1] and Praxair accepted the Valve knowing the materials of construction. None of the parties has suggested that the Valve contained a defect that caused the Incident independent of the Valve's integration into the ASU.

5.    In short, Fisher fulfilled its obligations as a component supplier and therefore breached no duty to any of the parties. Fisher is therefore entitled to summary judgment on all cross-claims for contribution asserted by all parties.

---

[1] As explained in further detail below, Fisher provided the valve specified in the purchase order, but with an upgrade from a Tefzel seal to a Kel-F seal. Because of the date when Fisher's confirmation documents were generated, those documents do not show the upgrade from Tefzel to Kel-F.

291/463905.03

FCI/MSJ 0643

## II.    THE EVIDENCE DOES NOT ESTABLISH THAT FISHER CAUSED OR CONTRIBUTED TO THE INCIDENT

6.    Under the facts of this case – involving a complex explosion that occurred during the construction, testing, and operation of a large-scale power plant project – expert testimony is required to prove the cause of the explosion.  Although the issue of causation is ordinarily a question of fact to be submitted to the jury, when that issue is presented in a context that is not a matter of common knowledge, the causal connection between a defendant's negligence and the plaintiff's injury can be proven only by the testimony of a competent expert witness.  Money v. Manville Corp. Asbestos Disease Compensation Trust Fund, 596 A.2d 1372, 1377 (Del. 1991).  In the absence of such expert testimony, the jury would be forced to engage in impermissible speculation as to the cause of the incident:  "While the plaintiff is entitled to the benefit of reasonable inferences from established facts, the jury cannot supply any omission by speculation or conjecture."  Gannett Co., Inc. v. Kanaga, 750 A.2d 1174, 1188 (Del. 2000).

7.    The parties do not dispute that the question of the cause of the explosion that took place at the Delaware City Power Plant represents a complex engineering question.  Thus, the cause of that explosion can be proven only by the testimony of competent expert witnesses.  In fact, the parties have submitted 23 expert reports on this very issue.

8.    With the exception of the report submitted by Praxair's experts, the Rimkus Consulting Group ("Rimkus"), none of these experts has opined that the Fisher Valve caused or contributed to the Incident.  Instead, of those experts who have offered an admissible opinion as to the cause of the fire, all agree that the fire was caused by particle impingement on the carbon

FCI/MSJ 0644

- 3 -

steel piping upstream of the Fisher Valve, i.e. the Valve was a victim of the fire and not the cause.[2]

9.     The Rimkus Report does opine that the fire was caused by melting of the Valve's seal. But, as explained in Fishers' Daubert Motion to Exclude the Testimony of Praxair, Inc.'s Causation Expert J. Philip Whitman,[3] the Rimkus Report fails to meet the standard for admissibility under Rule 702 and should be excluded. The argument set forth in that Motion is incorporated herein.

10.     Because there is no competent expert testimony identifying the Fisher Valve as the cause of the Incident, the required element of causation cannot be established and the parties' cross-claims for contribution against Fisher must fail.

## III.     THE PARTIES' CROSS-CLAIMS FOR CONTRIBUTION FROM FISHER ARE BARRED BY THE COMPONENT SUPPLIER DOCTRINE

11.     Fisher manufactured a valve that Praxair purchased and installed as a component part of the ASU that Praxair contracted to build for the DCPPRP. Therefore, in order to pursue a claim for contribution against Fisher, a codefendant must establish that Fisher breached the duties owed by a component manufacturer.

12.     The duties of a component manufacturer are established by the component supplier doctrine as set out in the Restatement (Third) of Torts: Products Liability § 5 (1998):

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> > (a)   the component is defective in itself . . . , and the defect causes the harm; or

---

[2] Certain experts retained by various parties have not offered an opinion as to the cause of the Incident, but have instead offered opinions only as to whether certain parties met the applicable standard of care.
[3] Filed concurrently with this Motion.

FCI/MSJ 0645

(b)  (1) the seller or distributor of the component
     substantially participates in the integration of the
     component into the design of the product; and

     (2) the integration of the component causes the
     product to be defective . . . ; and

     (3) the defect in the product causes the harm.

13.    The purpose of the component supplier doctrine is to prevent the unjust

imposition of liability on a component supplier whose otherwise safe product is unsafely

incorporated by its purchaser into a larger product that causes injury. As stated in the Comments

to the Restatement, "[I]f the component itself is not defective . . . , it would be unjust and

inefficient to impose liability solely on the ground that the manufacturer of the product utilizes

the component in a manner that renders the integrated product defective." Instead, it is the

product manufacturer who owes the primary duty to ensure that the integrated product functions

safely. See, e.g., Buonanno v. Colmar Belting Co., 733 A.2d 712, 716 (R.I. 1999) ("[T]he

primary duty is owed by the designer of the machine, not the supplier of the component parts")

(citing Crossfield v. Quality Control Equip. Co., 1 F.3d 701, 704 (8th Cir. 1993)).

14.    Delaware courts have adopted the component supplier doctrine. "It is the law in

Delaware that a manufacturer who merely supplies a component part that is subsequently

assembled by another in a manner creating a dangerous condition is not liable for an individual's

injuries." Steffen v. Colt Indus. Operating Corp., 1987 WL 8689 *2 (Del. Super. 1987) (citing

Castaldo v. Pittsburgh Des Moines Steel Co., 376 A.2d 88 (Del. 1977)).

15.    In Castaldo, the plaintiff sought to recover from the manufacturer of a tank built

to specifications provided by the employer of plaintiff's decedent. 376 A.2d at 89. The

employer, acting on its own, then installed a temperature-monitoring device. Id. Plaintiff's

decedent was killed while attempting to replace a broken thermometer that was part of the

FCI/MSJ 0646

temperature-monitoring device. Id. Plaintiff brought suit against the tank manufacturer,

claiming that the tank should have been manufactured differently or that warnings should have

been affixed to the tank. Id. at 89-90.

16.     Approving the component supplier doctrine, the Delaware Supreme Court

affirmed the entry of summary judgment in favor of the tank manufacturer, holding that the

manufacturer could not be held liable for building a tank to specifications provided by the

employer of plaintiff's decedent:

> It is uncontroverted that, under its contract with [decedent's
> employer], PDM [the tank manufacturer] was hired to construct a
> storage tank of standard size built in accordance with industry
> specifications. The case, therefore falls within the generally
> accepted rule that the manufacture of a product, built in accordance
> with plans and specifications of an employer, will not be held
> liable for damage occasioned by a defect in those specifications
> unless the plans are so obviously dangerous that no reasonable
> person would follow them.

Id. at 90 (citations omitted).

17.     The court went on to note that the plaintiff had failed to establish the evidence of

any "defect" in the tank at the time of its manufacture, thereby precluding any finding that the

manufacturer was negligent. Id. In reaching that conclusion, the court cited approvingly to

component supplier cases:

> If there was any negligence, the evidence established by it was due
> either to the unsuitability to the particular type of heat-measuring
> device selected or its improper installation. Neither of those
> decisions was made by [the tank supplier]. Analogous, therefore,
> is the line of cases which relieves from liability a manufacturer
> who merely supplies a component part subsequently assembled by
> another in a manner creating a dangerous condition. . . . **We
> approve that rule.**

Id. (citations omitted; emphasis added).

FCI/MSJ 0647

A.    **Fisher Fulfilled Its Obligations as a Component Supplier**

18.    Fisher fulfilled the obligations imposed by the component supplier doctrine. Fisher supplied a valve which was non-defective, which met the specifications that Fisher received, and which Praxair accepted knowing the materials of construction.  Further, Fisher did not participate in any way in the design or construction of the ASU, or the integration of the Valve into the ASU.  Consequently, Fisher cannot be held liable for a dangerous condition created by Praxair's integration of the Valve into the ASU.

1.    If the Valve Was Involved In the Incident At All, It Was Involved Solely as a Result of Integration into the ASU

19.    The Incident at issue did not occur until control room operators for the Delaware City Power Plant Repowering Project attempted to open the Valve and allow high-pressure, nearly 100 percent pure oxygen to travel from the ASU's base load oxygen compressor to the power plant gasifier.  Deposition of Gregory Calloway ("Calloway Dep."), Ex. F at 34:18-37:10.

20.    The circumstances under which the Incident occurred conclusively show that if the Valve was involved in the Incident at all, it was involved solely because of its integration into the ASU and the fact that it was subjected to the operating conditions of that larger product.  This is exactly the scenario contemplated by the component supplier doctrine, and exactly the reason that a component supplier is not held liable for injuries caused by a dangerous condition created by the integration of a component part into a larger product.

2.    Fisher Manufactured the Valve According to the Specifications It Received, and Praxair Accepted the Valve Knowing the Materials of Construction

21.    Fisher manufactured the Valve to the specification that it received from Northeast Controls, with an upgrade of the seal material.  In June of 1998, Fisher received an order for a 12" type A11 valve with a Hastelloy body, Hastelloy disc, and a Tefzel seal, to be shipped to

FCI/MSJ 0648

- 7 -

Praxair at the Delaware City Power Plant.[4]  <u>See</u> Second Affidavit of Meredith Miller at ¶6.

Fisher shipped the 12" butterfly style valve with a Hastelloy body, Hastelloy disc, and an

upgrade to a Kel-F seal.  <u>See</u> Affidavit of Meredith Miller at ¶2.  Thus, with one upgrade, Fisher

provided exactly the valve specified in the purchase order that Fisher received.

22.     Because of the date when the order acknowledgement form and spare parts

packing list were generated, those documents do not show the upgrade from Tefzel to Kel-F.

Thus, Fisher recognizes that there is an issue of fact as to whether the Valve seal was

manufactured of Tefzel or Kel-F.  But no party has argued that the fire was caused by the use of

Kel-F as opposed to a Tefzel seal material, and there is no evidence in support of such a claim.

Instead, Praxair's expert, the Rimkus Consulting Group ("Rimkus") – and Rimkus alone – has

argued that the fire was caused by the use of a plastic seal (both Kel-F and Tefzel are plastic

materials) and that, in his opinion, the fire would have occurred whether the seal was Tefzel or

Kel-F.[5]  Even if the opinions in the Rimkus report are admissible, Fisher still is not liable under

the component suppler doctrine because Tefzel is precisely the material identified in the

specifications provided to Fisher and in the documents provided to Praxair by Fisher.  <u>See</u>

Second Affidavit of Meredith Miller at ¶6; Affidavit of Meredith Miller at ¶2.

23.     Assuming solely for purposes of this motion that the Valve seal was manufactured

of Tefzel, that was the material specification which Fisher received.  Thus the undisputed

---

[4] The order for the 12-inch Fisher A11 Valve (83HV0629) identifies the materials of construction of the
Valve by the following matrix number:  A11-12-151-CB743-31-3-00.  The first section of the matrix
refers to the style of the Valve – A11.  The second section of the matrix number refers to the size of the Valve –
12 inches.  The letters C and B in the fourth section of the matrix number refer to a Hastelloy body and
Hastelloy disc, respectively.  The number three in the fifth section of the matrix number refers to a Tefzel
seal.  <u>See</u> Second Affidavit of Meredith Miller at ¶ 6.
[5] As explained in Fishers' Daubert Motion to Exclude the Testimony of Praxair, Inc.'s Causation Expert,
J. Philip Whitman, the Rimkus Report fails to meet the standard for admissibility under Rule 702 and
should be excluded.

evidence is that Fisher shipped a valve to Praxair which was as good as, if not better than, the specifications it received.    Further, the evidence shows that Praxair knew the materials of construction of the Valve when it accepted shipment of the Valve. After delivery, the Valve was inspected and signed for by Praxair employee, Gail Deuro on December 3, 1998. See Ex. G. Both before and at the time of the receipt of the Valve, Praxair received documentation and other information showing the Valve's materials of construction, including:  (1) an order acknowledgment form first sent by Fisher to Praxair on July 21, 1998; (2) a spare parts packing list sent to Praxair on that same date and later attached to the packing case for the Valve; and (3) a casting mark located on the Valve itself identifying the materials of construction of the Valve's disk. See Affidavit of Meredith Miller at ¶¶ 2-4.

24.    The evidence shows not only that Praxair received this information, but that it accepted the Valve based on that information.  Praxair's own engineering data books contain a copy of the "unit spare parts list" for the Valve, which identifies the seal as having been manufactured of Tefzel.. See Ex. H at C000001871.

25.    In addition, Praxair had specific procedures in place to document the receipt of incoming components and ensure that those components met specifications.  Specifically, Praxair's form "Field Receiving & Inspection Checklist" required that the person receiving a component review all shipping documents that accompany the incoming component. See Ex. I.

26.    Praxair has never produced the Field Receiving & Inspection Checklist for the Valve. David Good, Praxair's project manager for the Delaware City project, testified that twelve banker's boxes of documents are missing from Praxair's field files and that those documents disappeared after the commencement of this litigation. See Deposition of David Good, Ex. J at 210-219. But the evidence is that it was Praxair's practice to complete a Field

FCI/MSJ 0650

Receiving and Inspection Checklist. Thus, the only conclusion that can reasonably be drawn is that Praxair reviewed the shipping documents as required by the Checklist, and accepted the Fisher Valve knowing the materials of construction.

27.  The fact that Praxair had a procedure in place to verify the materials of construction of incoming components is consistent with Praxair's duties as the manufacturer of the ASU. Under the component supplier doctrine, it is the "product manufacturer who owes the primary duty to ensure that the integrated product functions safely." See, e.g., Buonanno v. Colmar Belting Co., 733 A.2d 712 (R.I. 1999) ("[T]he primary duty is owed by the designer of the machine, not the supplier of the component parts") (citations omitted). This outcome is appropriate because it is the manufacturer of the integrated product who has the ability to ensure that it is incorporating the product's components in a rational and safe manner. In this case, Praxair, not Fisher, owed the primary duty to ensure that the integrated product (the ASU) functions safely.

28.  Not only did Praxair have a general duty to ensure that the Valve was safely integrated into the ASU, but in this case it also had a contractual obligation to do so. The contract between Parsons and Praxair for the construction of the ASU specifically requires that Praxair establish and follow a Quality Assurance Program for the control of equipment, materials, and services furnished under the contract. See Attachment SCB to Parsons/Praxair Special Conditions, Ex. K at 1-2. This provision specifically addresses Praxair's responsibility for the control of purchased materials, equipment, and services and requires that Praxair develop a program to inspect all incoming components for conformance with specifications and that Praxair maintain documented evidence of each inspection:

FCI/MSJ 0651

- 10 -

### 6.0 CONTROL OF PURCHASED MATERIALS, EQUIPMENT AND SERVICES

6.1 The SUBCONTRACTOR shall have a documented program which assures that purchased materials conform to the Subcontract specifications and its procurement documents. The procurement system shall provide for evaluation and selection of suppliers. The SUBCONTRACTOR shall assure himself that materials and equipment purchased are of required quality, and shall inspect materials upon receipt. The SUBCONTRACTOR shall maintain documented evidence of received materials conformance to purchase requirements. The SUBCONTRACTOR's system shall provide for information feedbacks to the LOWER TIER SUBCONTRACTOR responsible for a quality program.

Id. at §6.1.

29.    In short, the undisputed evidence shows that Fisher delivered either a valve that it was asked to build or a valve with an upgrade. Further, the undisputed evidence shows that Praxair knew that the Valve was to be used in a high-pressure, high-temperature, high-purity oxygen environment. Praxair was informed of the Valve's materials of construction, Praxair inspected the Valve, and Praxair accepted the Valve. Fisher fulfilled the duties imposed by the component supplier doctrine and, unless an exception applies – which it does not – Fisher is relieved of all liability resulting from a Praxair's integration of the Valve into a larger product.

3.    Fisher Did Not Participate in the Integration of the Valve into the ASU

30.    Fisher receive a purchase order for a 12" butterfly valve. Fisher manufactured the product it was asked to build and Fisher's relationship with that product ended when Fisher shipped the Valve off to its intended recipient. It is undisputed that Fisher did not assist Praxair in integrating the Valve into the ASU. It is further undisputed that Fisher did not participate in any way in the design or operation of ASU or in the development or drafting of the ASU operating procedures or operating conditions. Fisher simply played no role whatsoever in Praxair's integration of the Valve or any other component part into Praxair's ASU.

FCI/MSJ 0652

Consequently, under the component supplier doctrine, Fisher cannot be held liable for any dangerous condition which may or may not have developed as the result of Praxair's integration of the Valve into Praxair's product.

**B.    Fisher Had No Other Duties to Plaintiffs**

31.    As a component supplier, Fisher had no duties other than those imposed by the component supplier doctrine. Having fulfilled its duties as a component supplier, Fisher cannot be held liable for any injuries incurred by plaintiffs. Further, because Fisher is not liable to plaintiffs as a matter of law, it is not a "joint tortfeasor" and thus has no liability to any of the codefendants for contribution. See 10 Del.C. 6302(d).

32.    This result is both appropriate and fair. A component supplier who does not participate in the overall design of the larger finished product, or in integrating its component into the larger product, is simply not in a position to ensure the safety of the integrated product. "[I]f the component itself is not defective . . ., it would be unjust and inefficient to impose liability solely on the ground that the manufacturer of the product utilizes the component in a manner that renders the integrated product defective." Comment to Restatement (Third) of Torts: Products Liability § 5 (1998).

33.    In accordance with the component supplier doctrine, liability appropriately rests with the party that unsafely integrated the component into a larger product. In this case, the party that integrated the Valve into the ASU – Praxair – is present in the action, and any fault that may flow from the use of the Valve in that application may be allocated to Praxair as the product integrator.

FCI/MSJ 0653

291/463905.03

IV.    **CONCLUSION**

For the reasons set forth above, Fisher respectfully requests that the Court enter an order dismissing all cross-claims for contribution by all parties against Fisher with prejudice.

Dated:  April 12, 2005

McCarter & English, LLP

*Paul A Bra...* (signature)

Paul A. Bradley
Delaware Bar # 2156
McCarter & English, LLP
919 Market Street, Suite 1800
Wilmington, DE  19899
(302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.

Dated:  April 12, 2005

Riddell Williams P.S.

*Patrick D McVey* (signature)

Patrick D. McVey
Daniel J. Gunter
*Admitted pro hac vice*
Riddell Williams P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA  98154-1065
(206) 624-3600
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0654

- 13 -

291/463905.03

# EXHIBIT 54

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD W. OLSON and<br>CAROL OLSON, his wife | ) | **C.A. No. 02C-04-263 JRS** |
| | ) | |
| Plaintiffs, | ) | **Non-Arbitration Case** |
| | ) | |
| MOTIVA ENTERPRISES, L.L.C.,<br>*et al.* | ) | |
| | ) | |
| Defendants. | ) | |

---

## MOTION OF DEFENDANT FISHER CONTROLS INTERNATIONAL, INC., FOR SUMMARY JUDGMENT ON PRAXAIR, INC.'S CROSS-CLAIM FOR <u>INDEMNIFICATION AGAINST FISHER</u>

Defendant Fisher Controls International, Inc. ("Fisher") hereby moves the Court for entry of summary judgment on the claims for indemnification asserted by Praxair, Inc., against Fisher.

1.    The contract between Fisher and Praxair governing the sale of the valve at issue in this matter (the "Valve") provides for indemnification by Fisher for losses sustained by Praxair that are <u>attributable</u> to Fisher. The contract specifically <u>excludes</u> indemnification for losses caused by Praxair's own negligence. In addition, Delaware law expressly prohibits indemnification for an indemnitee's own negligence. Consequently, there are no circumstances under which Fisher could be contractually obligated to indemnify Praxair for losses arising from *Praxair's* own negligence.

2.    Further, the indemnification provision contained in the contract between Fisher and Praxair is triggered only if Praxair provides Fisher with adequate notice, information, and assistance to enable Fisher to defend itself adequately. Praxair has failed to tender its defense to Fisher; thus, an indemnification duty has not arisen. Further, Praxair affirmatively filed suit against Fisher and has continuously resisted Fisher's attempts to obtain information. Rather than

FCI/MSJ 0655

assist Fisher in defending this matter, Praxair has actively thwarted Fisher's ability to defend itself.

3.    In addition, under Delaware's Uniform Contribution Among Tortfeasors Act ("Contribution Act"), defendants are entitled to request that the trier of fact apportion liability to other parties based on the parties' relative degrees of fault. Because fault, if any, will be allocated to Fisher for any claims arising from Fisher's acts, Praxair can not, and will not, incur liability for Fisher's fault. Consequently, Praxair's right to contractual indemnification will never arise.

4.    Finally, no competent expert testimony in this case supports a claim that Fisher's alleged negligence was the cause of the Incident. Thus, as discussed in Fisher's Motion for Summary Judgment on Plaintiff's Negligence Claims, the required element of causation cannot be established as to Fisher. Accordingly, no right to indemnification could arise under any circumstances.

5.    Under Superior Court Rule 56, Fisher is entitled to entry of an order of summary judgment on Praxair's indemnification claims.[1]

## I.    PRAXAIR AND FISHER AGREED THAT FISHER WOULD <u>NOT</u> INDEMNIFY PRAXAIR FOR NEGLIGENT ACTS BY PRAXAIR

6.    The purchase order for the Valve contains an express indemnification provision that specifically excludes indemnification by Fisher for acts of Praxair's own negligence:[2]

> Seller [Fisher] shall defend, protect and indemnify Buyer [Praxair]
> . . . for and against any and all losses, expenses, liens, claims,
> demands, and causes of action of [Praxair] and all third parties for
> death, personal injury, property damage or any other liability

---

[1] In its Order of April 26, 2004, this Court granted Fisher's motion for summary judgment on Praxair's warranty claims, holding that all implied warranties were effectively disclaimed by contract and that the single express warranty had expired. Consequently, to the extent that Praxair is asserting a cross-claim for indemnification against Fisher based on a theory of breach of warranty, those claims are barred by the doctrine of collateral estoppel.

[2] Because the contract between Fisher and Praxair contains an express indemnification provision, no implied right to indemnification can arise. <u>See</u> <u>New Zealand Kiwifruit Marketing Board v. City of Wilmington</u>, 825 F. Supp. 1180, 1195 (D. Del. 1993) (indemnification may not be implied by the court where contract contains an express indemnification provision). Consequently, to the extent that Praxair asserts an implied right to indemnification, that claim should be dismissed.

FCI/MSJ 0656

damages, fines or penalties . . . arising out of any act performed by [Fisher] or its employees in the course of work under this Contract, **except to the extent such loss, expense, claim, damage, etc. is contributed to by (a) the negligence in any form of [Praxair]**, its agents, employees, and/or independent sellers or any other third party directly responsible to it, or (b) defects in, or condition of the premises on which the work is to be performed or equipment thereon or materials furnished by [Praxair]. The foregoing shall apply provided that [Praxair] has provided to [Fisher] adequate notice, information and assistance (at [Fisher's] expense) to enable [Fisher] to adequately defend itself. . . .

(Ex. E. to Worldwide Procurement Agreement ("WPA"), Ex. E at ¶ 12.) (bold emphasis added).

7.     The Worldwide Procurement Agreement provides for application of Missouri law. (Ex. E. to Worldwide Procurement Agreement ¶ 24. ) Delaware courts honor contractual choice-of-law provisions unless the law to be applied is repugnant to the public policy of Delaware. J.S. Alberici Constr. Co. v. Mid-West Conveyor Co., 750 A.2d 518, 520 (Del. 2000).

8.     Under Missouri law, indemnification provisions are presumed to exclude indemnification for the indemnitee's negligent acts. Nusbaum v. City of Kansas City, 100 S.W.3d 101, 105 (Mo. 2003). The Missouri courts will enforce a provision purporting to indemnify a party for its own negligence only if the intention is expressed in clear and unequivocal terms. Id. In the absence of such a clear expression, Missouri courts will not construe a contract to indemnify an indemnitee against his or her own negligence. Id. Because the contract between Fisher and Praxair specifically excludes indemnification for Praxair's negligence, Missouri law prohibits the contract from being construed otherwise.

9.     Further, Delaware law expressly prohibits indemnification for a party's own negligence and will not enforce contracts purporting to require such indemnification: "[A] contractual provision requiring one party to indemnify another party for the second party's own negligence, whether sole or partial, is against public policy and is void and unenforceable." Alberici, 750 A.2d at 521. The Delaware courts will not enforce such a provision even if, under the law chosen by the parties, that provision would be enforceable. Id. (holding as void and unenforceable a contractual provision purporting to indemnify a party for its own negligence, which provision would have been enforceable under Kansas law).

FCI/MSJ 0657

- 3 -

10.     Because the Worldwide Procurement Agreement expressly excludes indemnification by Fisher for Praxair's negligence and because Delaware law prohibits indemnification for a party's own negligence, Fisher is not obligated to indemnify Praxair for claims arising from Praxair's negligence.

11.     Under the specific facts of this case, it is clear that Praxair is being sued only for its own negligence. As set out in Fisher's Motion for Summary Judgment on Plaintiffs' Negligence Claims, plaintiffs' causation expert in this matter, Dr. Timothy Jur, has offered the opinion that the fire began in the carbon steel piping underlined upstream of the Valve. See Ex. B at 69. He attributes no fault or causal role to the design or construction of the Valve. Id. Thus, Praxair is not defending itself against any claim that arises from the design or manufacture of the Valve. Instead, Praxair is defending itself solely against a claim that it was negligent in the design and operation of the ASU wholly separate from the Valve. Because the indemnification provision in the Worldwide Procurement Agreement specifically excludes indemnification in such instances, Fisher is not obligated to indemnify Praxair in this matter. Praxair's indemnification claim against Fisher should therefore be dismissed.

## II.    PRAXAIR DID NOT TAKE THE STEPS NECESSARY TO TRIGGER THE INDEMNIFICATION OBLIGATION

12.     Praxair's indemnification claim should also be dismissed because of Praxair's failure to comply with the terms of the indemnification provision. As noted above, the Worldwide Procurement Agreement specifically provides that the indemnification provision "shall apply provided that [Praxair] has provided to [Fisher] adequate notice, information and assistance (at [Fisher's] expense) to enable [Fisher] to adequately defend itself . . .." (Ex. E at ¶ 12).

13.     Praxair has never tendered its defense in this matter to Fisher. Second Affidavit of Meredith Miller at ¶ 2. To the contrary, Praxair filed a separate lawsuit in which it affirmatively sought damages from Fisher for alleged breaches of warranty and negligence. (All

FCI/MSJ 0658

claims against Fisher in that case were dismissed in accordance with this Court's order of April 26, 2004.)

14.    Moreover, throughout this litigation Praxair has resisted providing adequate information or assistance to Fisher. As the Court is well aware, Praxair's resistance to the discovery process forced Fisher to file five (5) separate motions to compel as to Praxair.

15.    Praxair's actions are fundamentally inconsistent with its contractual obligation to provide adequate notice, information, and assistance to enable Fisher to defend itself should it seek indemnification from Fisher. Praxair's failure to fulfill any of its contractual requirements necessary to trigger the indemnification provision is a separate and distinct reason why its claims for indemnification should be dismissed.

## III.    UNDER DELAWARE'S CONTRIBUTION ACT, PRAXAIR WILL NEVER INCUR LIABILITY FOR DAMAGES ATTRIBUTABLE TO FISHER; THUS, PRAXAIR'S RIGHT TO INDEMNIFICATION WILL NEVER ARISE

16.    As a practical matter, even if Fisher did act negligently (and it did not), and even if Praxair had taken the steps necessary to preserve its right to indemnification (and it did not), Praxair still is not entitled to an indemnification claim because, under the circumstances of this case, Praxair will never incur any losses attributable to Fisher.

17.    Delaware's Contribution Act requires the trier of fact to apportion liability among joint tortfeasors based on the parties' relative degrees of fault. Ikeda v. Molock, 603 A.2d 785, 787 (Del. 1991); 10 Del.C. §6302(d).[3] Under the Contribution Act, each joint tortfeasor is held responsible only for its own degree of fault.

18.    In this case, if any fault is attributable to Fisher, the jury will apportion that fault to Fisher, not to Praxair. Praxair will not be held liable for any damages caused by Fisher.

---

[3] In order for the jury to prorate liability based upon proportionate fault, the parties to the litigation must first file cross-claims against one another. Id. This requirement has been met: all of the defendants in this matter have filed cross-claims against one another. As set forth in further detail in Fisher's Motion for Summary Judgment as to All Cross-Claims for Contribution Asserted by All Defendants, Fisher is moving for summary judgment on the cross-claims of all defendants on the ground that there is no proof that the Fisher Valve caused or contributed to the fire.

FCI/MSJ 0659

Because Fisher will be held directly liable for its own share of fault (if any) and Praxair will never be held liable for Fisher's fault (if any), there can never be any circumstances that would trigger Fisher's obligation to indemnify Praxair. See New Zealand Kiwifruit Marketing Board v. City of Wilmington, 825 F. Supp. 1180, 1194 (D. Del. 1993) (noting that the effect of the Contribution Act is to require a factual determination of degrees of fault, which prevents the parties from incurring liability for another party's actions and therefore prevents the right to indemnification from ever being triggered). Because there are no circumstances under which Praxair's contractual right to indemnification will be triggered, Praxair's indemnification claim should be dismissed.

## IV.    THE EVIDENCE IS INSUFFICIENT TO ESTABLISH THAT NEGLIGENT ACTS BY FISHER CAUSED OR CONTRIBUTED TO THE INCIDENT

19.    As set out in greater detail in Fisher's Motion for Summary Judgment as to Plaintiffs' Negligence Claims,[4] the undisputed facts in this case show that the Fisher Valve did not cause or contribute to the fire at issue in this matter. The only allegation that the Valve did cause or contribute to the fire has been set forth in the reports authored by the Rimkus Consulting Group ("Rimkus").

20.    As explained in Fishers' Daubert Motion to Exclude the Testimony of Praxair, Inc.'s Causation Expert, J. Philip Whitman, the Rimkus Report fails to meet the standard for admissibility under Rule 702 and should be excluded. Consequently, there is no competent expert testimony identifying the Fisher Valve as the cause of the Incident, the required element of causation cannot be established and Fisher cannot be held liable to plaintiffs. Because there is no competent evidence that the Fisher Valve caused the Incident, Praxair's contractual right to indemnification can never arise and Praxair's claims for indemnification should be dismissed.

---

[4] Fisher hereby incorporates into this Motion the analysis set forth in its Motion for Summary Judgment as to Plaintiffs' Negligence Claims and its Daubert Motion to Exclude the Testimony of Praxair, Inc.'s Causation Expert, J. Philip Whitman. Those motions are being filed concurrently with this one.

## V.   CONCLUSION

For the reasons set forth above, Fisher hereby requests that this Court enter an order dismissing Praxair's claims for indemnification against Fisher with prejudice.

Dated: April 12, 2005

McCARTER & ENGLISH, LLP

Paul A. Bradley
Delaware Bar No. 2156
McCARTER & ENGLISH, LLP
919 Market Street, Suite 1800
Wilmington, DE  19899
(302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.

Dated: April 12, 2005

RIDDELL WILLIAMS P.S.

Patrick D. McVey
Daniel J. Gunter
RIDDELL WILLIAMS P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA  98154-1065
(206) 624-3600
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0661

- 7 -

291/456733.02

EXHIBIT 55

## CONFIDENTIAL – JOINT DEFENSE PRIVILEGE
## AGREEMENT

This Agreement is entered into by and between Fisher Controls International, Inc., on behalf of its predecessors, successors and assigns (collectively "Fisher"), and Northeast Controls, Inc., on behalf of its predecessors, successors and assigns (collectively "Northeast"), effective as of the __th day of May, 2005 (the "Effective Date").

WHEREAS, Fisher and Northeast were named as defendants in the consolidated case entitled *Ronald W. Olson et ux. v. Motiva Enterprises LLC, et al*, Superior Court State of Delaware in and for New Castle County, Case No. 02C-04-263 JRS (hereinafter the "Litigation");

WHEREAS, the parties are prepared to dismiss their claims against each other in the Litigation without prejudice with the express understanding and agreement that each of them will preserve all of their rights to assert these claims against the other in a subsequent proceeding.

NOW, THEREFORE, the Parties agree as follows:

1.    The recitals set forth above are hereby incorporated as if fully set forth herein.

2.    The Parties hereby acknowledge that the execution of this Agreement by one another is full and adequate consideration for its execution.

3.    The Subject Matter of this Agreement (the "Subject Matter") includes all causes of actions, claims, rights, counterclaims, third-party claims, cross-claims, or cross-complaints that either Party has, might have, might assert or otherwise would be entitled to present against the other in the Litigation.  The Subject Matter shall also include any defenses, affirmative or otherwise, that either Party has, might have, might assert or otherwise would be entitled to present against any causes of actions, claims,

291/465292.03
051305/0832/41155.00193

1

FCI/MSJ 0662

rights, counterclaims, third-party claims, cross-claims, or cross-complaints of the other Party in the Litigation.

     4.     Nothing in this Agreement shall affect any claim or defense available to either Party applicable to any dispute between the Parties as to any claims they may have against the other. Nothing in this Agreement shall be deemed to create or preserve any rights or claims held or asserted by any person or entity not a party to this Agreement.

     5.     Upon execution of this Agreement, the parties will dismiss their cross claims against each other in the Litigation without prejudice pursuant to a Stipulation and Order of Dismissal Without Prejudice in the form attached as Exhibit A. The Parties expressly reserve all rights that either Party has against the other (or any other person or entity) in any pending or future litigation.

     6.     Fisher agrees that so long as Northeast remains a party to the Litigation, Fisher will fully cooperate with Northeast in the defense of the Litigation including, but not limited to, making its employees available to Northeast for consultation, or to testify at trial or any other proceeding in the Litigation. Fisher also agrees to make Dr. Robert Mostello of AMCS and Mr. Wayne Niemeyer of McCrone Associates, Inc., available to Northeast as testifying experts. Any further work done by either of them in preparing their testimony or testifying at trial will be at the sole expense of Northeast. It is further understood that Fisher shall retain the sole right to use Dr. Mostello and/or Mr. Niemeyer in any subsequent proceeding between the parties with respect to any of the issues that are the subject of this Agreement. Northeast expressly waives any right to contend that Dr. Mostello or Mr. Niemeyer is precluded from testifying on behalf of Fisher in any subsequent proceeding between the parties because of Fisher's agreement to allow Northeast to use either person's services in the Litigation.

FCI/MSJ 0663

7.    This Agreement may not be used or relied upon for any purpose other than the enforcement of its terms and shall not be used or referred to in any proceeding except for the purpose of establishing and/or enforcing its terms.

8.    The Parties agree that this Agreement and the terms hereof are confidential to the Parties and to their legal counsel and insurers, and shall not be disclosed to any other person unless (i) it becomes necessary to do so to enforce this Agreement, or (ii) a Party is compelled to do so by requirement of law or legal process (including, but not limited to, a subpoena).  If a Party intends to disclose this Agreement or the terms hereof to any other person for any reason, then such Party shall provide the other Party with at least seven (7) days prior notice in the manner set forth in Paragraph 10 of this Agreement before disclosing this Agreement or the terms hereof.

9.    The Parties shall each preserve and maintain (and shall cause their officers, directors, employees, agents, shareholders, members, partners, limited partners, professional corporations, subsidiaries, parents, affiliates, predecessors, successors and assigns, and insurers, whether foreign or domestic, to preserve and maintain) all documents or other tangible evidence in their possession, custody or control, or in the possession, custody or control of their attorneys, which relates to the Subject Matter, including, without limitation, all files, correspondence, memoranda, e-mails, manuals, calendars, notes, studies, test results, plans, contracts, agreements, purchase orders, invoices, product or design specifications, and all other records, whether in hard copy or electronic format, to the extent such documents or other tangible evidence would have to be preserved, under applicable law or rules, if litigation, arbitration or some other form of commercial dispute resolution were pending or imminent.  The Parties acknowledge that the purpose of this Paragraph 9 is to preserve the status quo with respect to such documents and tangible evidence, and not to enlarge, increase or otherwise affect the scope of a Party's obligation with respect to the maintenance or preservation of such documents and tangible evidence.

3

10.    Each person executing this Agreement hereby acknowledges, declares, represents and warrants that such person is duly authorized to execute this Agreement on behalf of the entity for whom such person is executing this Agreement.

11.    All notices required under this Agreement shall be in writing and hand-delivered, or sent by facsimile and Federal Express or another similar overnight delivery service with signature of receipt required.  The date of personal delivery, the date the facsimile is sent, or one day after the notice is sent by overnight mail, as the case may be, shall be the date of such notice.  All notices shall be addressed as set forth below or to such other address as each Party may specify in writing:

> If to Fisher:
>
> Michael J. Mason
> Executive Vice President
> Fisher Controls International Inc.
> 205 South Center Street
> P.O. Box 190
> Marshaltown, Iowa  50158-0190
>
> With a copy to:
>
> Patrick D. McVey
> Riddell Williams P.S.
> 1001 Fourth Avenue Plaza, Suite 4500
> Seattle, Washington 98154-1065
> Fax:  206/389-1708
>
> If to Northeast:
>
> Michael J. Peters
> President
> Northeast Controls, Inc.
> 3 Enterprise Avenue
> Clifton Park, New York  12065

FCI/MSJ 0665

With a copy to:

Thomas P. Wagner, Esquire
Rawle & Henderson LLP
300 Delaware Avenue, Suite 1015
Wilmington, DE  19801
(302) 654-0544

Any Party may change the address at which it should be given notice by giving written notice of the change of address to the other Party and its counsel at the above address, by registered mail, return receipt requested.

12.    The Parties agree that any discovery conducted in the Litigation may be used by either Party in any subsequent litigation involving the Subject Matter of this Agreement in the same manner as if it were taken in the subsequent litigation.

13.    No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provision hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

14.    The Parties acknowledge that this Agreement was negotiated in good faith.  The Parties represent that they have consulted with independent counsel of their selection concerning the meaning and effect of this Agreement and have received such advice and consultation from such independent counsel of their selection as they deem necessary and appropriate under the circumstances.  In the event of ambiguities in the construction of this Agreement, no inferences shall be drawn against either Party.

15.    This Agreement shall be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

FCI/MSJ 0666

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

FISHER CONTROLS INTERNATIONAL LLC

John Spezino, Assistant Secretary

DATED: _____5- 5-0 S_____

NORTHEAST CONTROLS INC.

_____

DATED: _____

FCI/MSJ 0667

291/465292.03
050505/1345/41155.00193

6

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

FISHER CONTROLS INTERNATIONAL

_____

DATED: _____

NORTHEAST CONTROLS INC.

*Michael J Peters, President*

DATED: *May 13, 2005*

FCI/MSJ 0668

EXHIBIT 56



| SO ORDERED |
| --- |

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

**SO ORDERED**

NALD W. OLSON and  )    C.A. No. 02C-04-263 JRS
ROL OLSON, his wife, )
                    )    **Non-Arbitration Case**
       Plaintiffs, )
                    )
     v. )
                    )
TIVA ENTERPRISES LLC, et al., )
                    )
       Defendants. )
                    )
-------------------------------------------- )

### ORDER

This matter came before the Court on the following Motions (collectively, "Fisher's tions for Summary Judgment"):

1.    Motion of Defendant Fisher Controls International, Inc. for Summary Judgment of [sic] Plaintiffs' Warranty Claims (efile #5600830);

2.    Defendant Fisher Controls International, Inc.'s Motion for Partial Summary Judgment as to Plaintiffs' Negligence Claims (efile #5598740);

3.    Motion of Defendant Fisher Controls International, Inc. for Summary Judgment as to All Cross-Claims for Contribution Asserted by All Defendants (efile #5599798); and

4.    Motion of Defendant Fisher Controls International, Inc. for Summary Judgment on Praxair, Inc.'s Cross-Claim for Indemnification Against Fisher (efile #5599437).

Praxair, Inc., filed an Opposition to the Motion of Defendant Fisher Controls

FCI/MSJ 0669

WL1:106844.01

International, Inc. for Summary Judgment as to All Cross-Claims for Contribution Asserted by All Defendants, but subsequently withdrew its opposition to that Motion. The cross-claims asserted by and between Fisher Controls International, Inc., and Northeast Controls, Inc., have previously been dismissed without prejudice. The Motions listed above now being unopposed,

IT IS HEREBY ORDERED that Fisher's Motions for Summary Judgment are GRANTED. All claims asserted by plaintiffs; Praxair, Inc.; Motiva Enterprises LLC; and Texaco, Inc.; Texaco Development, Inc. against Fisher are hereby DISMISSED WITH PREJUDICE and without costs to any party.

SO ORDERED this _____ day of _____, 2005.

_____
HONORABLE JOSEPH R. SLIGHTS, III

**Presented by:**

McCARTER & ENGLISH, LLP

_____
Paul A. Bradley
McCARTER & ENGLISH, LLP
919 Market Street, #950
Wilmington, DE 19801
Ph: (302) 984-6300
Attorneys for Defendant
Fisher Controls International, Inc.

FCI/MSJ 0670

WL1: 106844.01

Court: DE Superior Court-New Castle County

Judge: Joseph R Slights III

LexisNexis File & Serve Reviewed Filing ID: 5883424

Date: 6/7/2005

Case Number: 02C-04-263 JRS

Case Name: Olsen, Ronald W et al vs Motiva Enterprises LLP et al


/s/ Judge Joseph R Slights III

FCI/MSJ 0671

# EXHIBIT 57



EFiled: Oct 6 2005 11:08AM EDT
Transaction ID 6953034

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
### IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| RONALD W. OLSON and CAROL OLSON, his wife, | ) ) C.A. No. 02C-04-263 JRS |
| Plaintiffs, | ) ) Non-Arbitration Case |
| v. | ) ) |
| MOTIVA ENTERPRISES L.L.C., et al., | ) ) |
| Defendants. | ) |

### STIPULATION OF DISMISSAL

COME NOW, the parties to this litigation, by and through their respective counsel, who agree and stipulate that the above-captioned lawsuit, including all claims and remaining cross-claims asserted by any party therein, is hereby dismissed, with prejudice, except that nothing in this stipulation or in the dismissal shall be construed to limit or preclude the claim or cross-claim of Northeast Controls, Inc. against Fisher Controls, Inc. for contractual indemnity.

ASHBY & GEDDES

BY: _____
RANDALL E. ROBBINS (I.D. #2059)
JOSEPH C. HANDLON (I.D. #3952)
222 Delaware Avenue
Wilmington, DE 19899
(302) 654-1888
*Attorneys for Plaintiffs,*
*Ronald W. Olson & Carol Olson*

COZEN & O'CONNOR

BY: _____
SEAN J. BELLEW (ID #4072)
Chase Manhattan Centre
1201 N. Market St., Suite 1406
Wilmington, DE 19801
(302) 295-2000
*Attorneys for Defendant,*
*Praxair, Inc.*

FCI/MSJ 0672

1185093 v.1

PRICKETT, JONES & ELLIOT, P.A.

BY: _____
PAUL M. LUKOFF (I.D. #96)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6520
*Attorneys for defendant, Motiva*
*Enterprises, Inc.*

HEIMAN, ABER & GOLDLUST

BY: _____
GARY W. ABER (I.D. #754)
First Federal Plaza, #600
P.O. Box 1675
Wilmington, DE 19899
*Attorneys for Defendants,*
*Texaco, Inc. and Texaco*
*Development Corporation*

SO ORDERED this __31st__ day of

__August_____, 2005

_____
Judge

RAWLE & HENDERSON LLP

BY: _____
DELIA A. CLARK (I.D. #3337)
300 Delaware Avenue
Suite 1015
Wilmington, DE 19801
(302) 778-1200
*Attorneys for Defendant,*
*Northeast Controls, Inc.*

FCI/MSJ 0673

1185093 v.1

# EXHIBIT 58

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


NORTHEAST CONTROLS, INC.,            )
ST. PAUL MERCURY                     )
INSURANCE COMPANY,                   )
                                     )
          Plaintiffs,                )
                                     ) Civil Action
v.                                   ) No. 06-412
                                     )
FISHER CONTROLS                      )
INTERNATIONAL, LLC,                  )
                                     )
          Defendant.                 )



          Deposition of DAVID P. POPE, Ph.D. taken
pursuant to notice at the law offices of Maron,
Marvel, Bradley & Anderson, P.A., 1700 Market Street,
Suite 1500, Philadelphia, Pennsylvania, beginning at
9:45 a.m., on Wednesday, October 17, 2007, before Kurt
A. Fetzer, Registered Diplomate Reporter and Notary
Public.

APPEARANCES:

          THOMAS P. WAGNER, ESQ.
          MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
            1845 Walnut Street
            Philadelphia, Pennsylvania  19103
            For the Plaintiffs

          DANIEL J. GUNTER, ESQ.
          RIDDELL WILLAIMS P.S.
            1001 Fourth Avenue Plaza - Suite 4500
            Seattle, Washington  98154-1065
            For the Defendant

                WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                   (302) 655-0477
                 www.wilfet.com          FCI/MSJ 0674



**WILCOX & FETZER LTD.**
Registered Professional Reporters



1          (NEC Deposition Exhibit Nos. 23 through

2     through 28, respectively, were marked for

3     identification.)

4

5                     -    -    -    -    -

6

7                     DAVID P. POPE, Ph.D.,

8          the deponent herein, having first been

9          duly sworn on oath, was examined and

10         testified as follows:

11              MR. WAGNER:  Before we begin, it is my

12    understanding -- correct me if I'm wrong -- that we

13    are producing Dr. Pope today with the understanding

14    that the defendant will be responsible for his fees in

15    giving the deposition.

16              MR. GUNTER:  Certainly.

17              MR. WAGNER:  Thank you.

18                     EXAMINATION

19    BY MR. GUNTER:

20     Q.   Dr. Pope, could you state your full name and

21    spell your last name for the record?

22     A.   Yes.  It's David P. Pope, P-o-p-e.

23     Q.   And could you give us your business address,

24    please?                                    FCI/MSJ 0675

41

1   because if it melts, it's not contributing any heat of

2   combustion to the fire, correct?

3    A.    Yes.

4    Q.    In fact, it is absorbing some of the heat of

5   combustion of the rest of the fire, correct?

6    A.    Yes.

7    Q.    And even if it did, some portion had there been

8   a Monel disk and a Monel shaft, had either of those

9   combusted, the heat of combustion that they would have

10   contributed would have been less than was contributed

11   by the similar portions of the Hastelloy C disk and

12   the Inconel 718 shaft, correct?

13    A.    That's correct.

14    Q.    So that at the end of the day had the valve had

15   a Monel disk and a Monel shaft, the total heat of

16   combustion in this incident would have been less than

17   what we had in the incident as it actually happened?

18    A.    That's correct.

19    Q.    And that is, in fact, Dr. Mostello's opinion in

20   this matter, correct, a portion?

21    A.    That's my understanding of it, yes.

22    Q.    I would like to ask you about the first

23   sentence there: "He," being Dr. Mostello, "implies

24   that a Hastelloy C disk and an Inconel 718 shaft are

78

```
 1   State of Delaware    )
                          )
 2   New Castle County    )

 3

 4                 CERTIFICATE OF REPORTER

 5

 6        I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
     there came before me on Wednesday, October 17, 2007,
 7   the deponent herein, DAVID P. POPE, Ph.D., who was
     duly sworn by me and thereafter examined by counsel
 8   for the respective parties; that the questions asked
     of said deponent and the answers given were taken down
 9   by me in Stenotype notes and thereafter transcribed by
     use of computer-aided transcription and computer
10   printer under my direction.

11        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16

17                 Kurt A. Fetzer, RDR, CRR
                   Certification No. 100-RPR
18                 (Expires January 31, 2008)

19
     DATED:
20

21

22

23                                    FCI/MSJ 0677

24
```



**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters



# EXHIBIT 59

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON, and CAROL ) CONFIDENTIAL
OLSON, his wife,                      )
                                                   )
          Plaintiffs,                      )
                                                   ) Civil Action No.
V.                                             ) 02C-04-263 (JRS)
                                                   )
MOTIVA ENTERPRISES L.L.C.;             )
BATTAGLIA MECHANICAL, INC.;            )
FISHER CONTROLS INTERNATIONAL,     )
INC.; HYDROCHEM INDUSTRIAL            )
SERVICES, INC.; JJ WHITE, INC.;         )
NORTHEAST CONTROLS, INC.;              )
PARSONS ENERGY AND CHEMICALS        )
GROUP, INC.; PRAXAIR, INC.; TEXACO )
AVIATION PRODUCTS LLC; DAIKIN         )
INDUSTRIES, LTD.; SAINT-GOBAIN        )
PERFORMANCE PLASTICS; RIX              )
INDUSTRIES, INC.; TEXACO GLOBAL       )
GAS AND POWER; TEXACO                   )
DEVELOPMENT CORPORATION;              )
GARY DELGREGO,                            )
                                                   )
                                                   )
          Defendants,                      )
                                                   )
NORTHEAST CONTROLS, INC.,              )
                                                   )
          Third-Party Plaintiff,         )
                                                   )
v.                                             )
                                                   )
CONECTIV OPERATING SYSTEMS,            )
                                                   )
          Third-Party Defendant.         )

DEPOSITION OF GREGORY K. CALLAWAY

WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
(302) 655-0477

FCI/MSJ 0678



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

```
 1    APPEARANCES:   (Cont'd)

 2            CHASE T. BROCKSTEDT, ESQ.
              MURPHY SPADARO & LANDON
 3               1011 Centre Road - Suite 210
                 Wilmington, Delaware  19805
 4               for the Defendant HydroChem
                 Industrial Services, Inc.
 5
              R. STOKES NOLTE ESQ.
 6            NOLTE BRODOWAY & SALTZ, P.A.
                 Three Mill Road - Suite 304
 7               Wilmington, Delaware  19806
                 for the Third-Party Defendant
 8               Conectiv Operating Systems

 9                    -   -   -   -   -

10                    GREGORY K. CALLAWAY,

11        the deponent herein, having first been

12        duly sworn on oath, was examined and

13        testified as follows:

14                       EXAMINATION

15    BY MR. HANDLON:

16      Q.   Mr. Callaway, my name is Joe Handlon.   I

17    represent Ron Olson in this matter.

18             I'll just give you a couple of rules

19    before we begin the deposition.   The rest of the

20    people in the room are defense attorneys representing

21    various defendants that have been named in this

22    lawsuit.   I'll ask you a couple of questions and you

23    can answer and then various defendants may have

24    questions for you afterwards.
```

FCI/MSJ 0679

1    Q.    Did you ever have any training on how to

2    operate that valve?

3    A.    No, sir.

4    Q.    There's been testimony about a meeting with

5    Praxair people in or around November of 1999.  Do you

6    recall, did you attend a meeting at the end of 1999?

7    A.    I can't remember.

8            MR. BELLEW:  Objection.

9    Q.    Did you ever receive any training regarding

10   procedures for commissioning the high-pressure oxygen

11   line between the gasifier and the ASU?

12   A.    Could you rephrase that question?  It's like

13   yes and no.  I'm sorry.  I really am.  I understood --

14   I understand how 629 was going to get oxygen up to the

15   gasification unit.

16   Q.    Where did you get that understanding?

17   A.    Basically word of mouth from people that

18   were -- it was common knowledge we were going to

19   eventually open this valve.  This line had been

20   cleaned, to my knowledge, had been purged with

21   nitrogen.  What things they used to clean that line I

22   could not tell you.  I mean because that's not my job.

23   That's out in the field.

24            But knowing how that valve operates and

FCI/MSJ 0680

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    oxygen line between the ASU and the 629 valve and then

2    from the 629 valve to the gasifier?  Are you familiar

3    with that?

4    A.    Yes, sir.

5    Q.    Are you familiar with what commissioning of

6    that line means?

7    A.    My understanding of commissioning that line was

8    for it to be cleaned and purged of any foreign

9    material that could possibly cause an unwanted event.

10    Q.    I'm going to take you to May 20, 2000.  Do you

11    remember when you arrived at work that day?

12    A.    Excuse me?

13    Q.    Do you remember when you arrived at work on May

14    20, 2000?

15    A.    That would be 6:00 a.m. in the morning.  I was

16    on day shift.

17    Q.    Can you describe just generally what you were

18    doing that day prior to, say, later in the day at

19    around 4:00 o'clock when the valve was opened?  Can

20    you describe for me what you were doing that day?

21    A.    I was on the air plant.  Prior to opening the

22    629 valve, it was just maintaining purities in the air

23    plant.  The BLOC was on.  It was loaded up with

24    oxygen.  The base load oxygen compressor was on and it

FCI/MSJ 0682

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    was loaded with oxygen.

2        Q.    Did you participate in that procedure?

3        A.    No.   It was already done when I -- the BLOC was

4    already under 1150 pounds of oxygen when I walked

5    through the door.   I did not put it on there.

6        Q.    That was on prior to 6:00 in the morning?

7        A.    Yes, sir.   Well, yes.

8        Q.    Did you ever have any meetings that day to

9    discuss sending high-pressure gaseous oxygen from the

10   ASU to the gasifier?

11       A.    Meetings that day?

12       Q.    That day.

13       A.    No, not, not a formal meeting where I was

14   pulled out of the control room or anything like that.

15       Q.    I guess at some point during that day you

16   learned that the high-pressure gaseous oxygen was

17   going to be delivered to the gasifier.   Is that fair?

18       A.    Not necessarily.   The high-pressure oxygen was

19   not going to be delivered to the gasifier.   It was

20   going to be pressurized up to the eighth deck or the

21   sixth deck.   That was the plan.

22       Q.    When did you first learn that plan?

23       A.    Well, we knew that it was coming and I found

24   out, I think I found out about it that morning.   We

FCI/MSJ 0683

1    were going to -- the line has been cleared.  All the

2    preventive things that were supposed to have been done

3    out in the field were done and it was okay, we're

4    going to open this valve.

5              And I do know prior to it that the valve

6    would only open 10 percent until the pressure on both

7    sides of the valve was within 10 pounds of itself, of

8    each side.  And you couldn't open the valve based on

9    the safety logic built into the system, the valve

10   couldn't open any more than 10 percent anyway until

11   you were pretty much equal in pressure.

12   Q.   Was it your understanding that that was a

13   Praxair procedure?

14              MR. BELLEW:  Objection.

15   A.   I don't know if that was a Praxair procedure or

16   whose procedure it was.

17   Q.   You said you learned early in the morning that

18   the valve was going to be opened.  Is that correct?

19   A.   Yes, sir.

20   Q.   Do you recall who had those conversations with

21   you?

22   A.   No, sir.

23   Q.   Did Roger Hawley at any time say,

24   "Mr. Callaway, we're going to open this valve later

FCI/MSJ 0684



WILCOX & FETZER LTD.
Registered Professional Reporters

1    today"?

2        A.    Sir, I can't be -- I can't remember exactly

3    who.

4        Q.    Do you recall an oxygen line test and

5    calibration procedure?

6        A.    I am aware that something, what you just

7    described had taken place previous to this day.

8        Q.    I'll actually show you the document later.  I

9    just want to know if you're familiar with that term.

10       A.    Okay.  I just know the line had been cleaned

11   and pressurized with nitrogen prior to this.

12       Q.    Do you recall who did that?

13       A.    Specifically, no, sir.

14       Q.    Do you know what company was in charge of that?

15       A.    Well, I assumed that -- no, I don't know.

16       Q.    I don't want you to guess or assume.

17       A.    Excuse me?

18       Q.    I don't want you to guess or assume.  If you

19   know something, you can tell me.

20       A.    I don't know who did it.  I am -- other than

21   the fact that it had been done.  That was out in the

22   field.

23       Q.    When you were operating the 629 valve on May

24   20, who was present in the control room?



Gregory K. Callaway  -  CONFIDENTIAL          28

1     A.    Okay.   There was the guy Paul DePaula, who was

2     sitting either on my right or left.   I believe in the

3     control room with me was Mike Waters, Nick Gregorcyk.

4     Q.    Can you spell his last name?

5     A.    Gregorcyk?

6     Q.    Yes.

7     A.    It's G-o-r -- wait a minute.   G-r-e-g-o-

8     r-y-c-k (sic), I believe.   But these individuals

9     weren't on -- they were on different screens in the

10    control room.

11    Q.    Is the control room -- is there actually two

12    control rooms?

13    A.    Yes, sir, there is.

14    Q.    What control room were you in?

15    A.    I'm predominantly number 2 control room.

16    Q.    Were you in number 2 control room that day?

17    A.    Yes, sir.

18    Q.    Was Mike Waters in number 1 control room?

19    A.    No.   Mike Waters was in number 2 control room.

20    See, number 2 control room -- one position is for the

21    operator to assist the person in number 1 control room

22    control the existing plant, the steam headers and

23    things like that, the boilers and whatnot.   He has no

24    direct relation to the repowering project.   You know,

FCI/MSJ 0686



1    he doesn't monitor, take numbers and things like that.

2             I believe the day in question we had an

3    extra person in the control room, I think, and please

4    don't hold me to that.  But I do know that I was on C

5    shift and that was Mr. Waters and Nick Gregorcyk were

6    on that end.  And besides Paul DePaula, I think that

7    was it.

8    Q.    Was Gary DelGrego in the room at any point?

9    A.    No.  I don't believe he was when the incident

10   took place.

11   Q.    He testified that he came up to the control

12   room at some point when you were operating the valve.

13            Does that refresh your recollection as to

14   whether he was there or not?

15            MR. LEVY:  Objection to form.

16   A.    No, sir.  I can't remember if he was there.  I

17   don't think he was, but I can't remember if he was

18   there during the time that we started working the

19   valve.

20            I'm sure he came up.  He could have been

21   up prior, after.  I don't know.

22   Q.    You just don't recall if he was in the control

23   room that day at all?

24   A.    Sir, he was at work that day.  I do remember

FCI/MSJ 0687



1    happened.

2       Q.   Do you know, would he be programed into program

3    4?

4       A.   Yes, sir.  You can select what channel you want

5    to be in.  It's not a specific program for your job

6    title or anything like that.

7       Q.   Do you remember any other Praxair people on the

8    site on May 20 besides Mr. Freuler and Mr. DePaula?

9       A.   No, sir.

10      Q.   Mr. Whitacre?

11      A.   No, sir.

12           MR. BELLEW:  Objection.

13      Q.   Just tell us what happened after you called Ron

14   Olson to check the valve.

15      A.   Okay.  I called Ron Olson to check the valve,

16   told him what I had done, where we were at.  The valve

17   basically was not responding.  From what I could see,

18   the valve had not been responding.  Okay?

19           So Ronny went out and here's a little gray

20   area, but I think it's irrelevant.  Ronny went out and

21   checked it and called back and said, "The instrument

22   air is valved in," meaning the instrument air was in

23   service.  I do not know if Ron Olson opened the

24   instrument air line, which would have been the correct

FCI/MSJ 0688



WILCOX & FETZER LTD.
Registered Professional Reporters

1    thing to do, or the instrument air lines had been

2    valved in.

3           And the reason I am saying that is because

4    even till this day when you make that call to an

5    operator, is this instrument air valved into that,

6    they will call you back in and say yes, it's valved in

7    and from your day-to-day job it doesn't make a

8    difference if he valved in or not.  You want it valved

9    in.  That means okay, that eliminates one reason

10   something is not working or it -- whatever.

11      Q.   Are you saying that you're not sure whether or

12   not --

13      A.   I'm not sure if Ron Olson went and put the

14   instrument air in service or the instrument air had

15   already been in service and the valve was not

16   responding the way it should have.

17      Q.   To the best of your recollection sitting here

18   today, Ron said over the walkie-talkie the instrument

19   air valve is in?

20      A.   The instrument air is valved in.

21      Q.   And then what happened after Mr. Olson said

22   that?

23      A.   Then I told Ronny, I said, "Okay.  I'm going to

24   try it again.  I'm going to put some load on the

FCI/MSJ 0689

1    valve," which means I'm going to send it a command to

2    open up.  And I did the same command in the same

3    measure of control, which is 1 to 2 percent, on B to

4    tell, to get something happening on A.  Well, I wanted

5    the valve to open.  Okay?  So I sent it a command of 2

6    percent.  Nothing happened.  So okay.  And do you know

7    what?  That's not unusual for any valve in the plant

8    at 2 percent not to see something happen.  Sometimes

9    it might take 2 or 3 percent to get something to get

10   going or 5 percent.

11              Anyway, nothing happened.  I put a little

12   more load on it, 2 percent.  Still I saw nothing

13   happening, no feedback signalling A.  And I called

14   Ronny.

15              Do you want me to shut up?

16   Q.    No, I don't want you to shut up.  I just want

17   to ask for the record when you're referring to A and B

18   a couple of times there, you're referring to Exhibit

19   203?

20   A.    Right.  I'm referring to on B I sent a

21   command --

22              MR. NOLTE:  What he wants to know is he

23   just wants to identify we're still looking at that

24   Exhibit No. 203.

FCI/MSJ 0690



1          THE WITNESS:  Yes, sir.  We're still

2     looking at this exhibit.

3     BY MR. HANDLON:

4       Q.   Okay.  Continue.

5       A.   So I get up to about 4 percent.  I was at 4

6     percent.  And I had asked Ron, since he was out there,

7     I said, "Ron, do you see any movement on the valve?"

8     Ronny said, "Not from here.  Let me go look."

9               I said, "Okay."  So I waited a few

10    minutes.  Ronny called me back and said, "The valve

11    has not moved."  I, in turn, told Ronny, I said,

12    "Okay, Ronny.  I'm going to put a little bit more load

13    on the valve."  And I took it up 2 percent, 1 percent,

14    a very small, 1 to 2 percent.

15              So at this point I'm up to, I think I was

16    up to 4, 5 percent.  I told Ronny that I'm going to

17    put some more load on it.  I was up to 7 percent.  And

18    I asked Ron Olson "Do you see any movement on the

19    valve?"  Because I have not seen any feedback on A to

20    indicate that the valve was moving.

21              Ronny said, "No, I don't see anything."

22    So I told Mr. Olson again -- and keep in mind I had no

23    idea -- I knew Ronny was close enough to see the

24    valve, but I didn't know exactly where he was at in

 1    the field because I'm in the control room.

 2        Q.    Let me ask you a question there.

 3              Why do you say you knew he was close

 4    enough to see the valve?

 5        A.    Because he was looking to see if the valve

 6    actuator was moving up or twisting or whatever it was

 7    going to do to indicate that the valve, that the

 8    physical positioner on the valve was going to open up

 9    regardless of what this electronic signal was telling

10    me.  Basically I was asking for physical verification

11    if the valve was moving.

12        Q.    To your knowledge, he could physically verify

13    that the valve was moving?

14        A.    To my knowledge, Mr. Olson could not -- he had

15    the ability to verify that the valve was moving, but

16    his indication to me was that the valve was not

17    moving.

18        Q.    Okay.

19        A.    And I told Ronny again, I said, "Okay, I'm

20    going to go a little bit more on it."  I was at 7

21    percent.  I took the valve -- as soon as I went to 9

22    percent on the valve, that's basically when all hell

23    broke loose.

24        Q.    You never went above 9 percent?

FCI/MSJ 0692



WILCOX & FETZER LTD.
Registered Professional Reporters

Gregory K. Callaway  -  CONFIDENTIAL      51

1    A.    No, sir.  Now, the Galaxy, which is the

2    recording mechanism or it records everything that the

3    Foxboro does for everything throughout the refinery,

4    says 10 percent, but I'm telling you on the Foxboro I

5    didn't go any higher than 9 percent on the valve.

6    Q.    When you say when all hell broke loose, what

7    did you hear from Ronny, if anything?

8    A.    What I had heard was right above -- if everyone

9    can look at where I have B and A, 629.  Right below

10   that is a control.  There's a big S.  Do you see what

11   I am talking about?

12   Q.    The S --

13   A.    That S is a safety triangle.

14   Q.    For the record, you're referring to the S below

15   what you have marked as B on Exhibit 203?

16   A.    Yes, sir.  It's right on the -- it's a little

17   hat right on top of the valve.  It's a triangle right

18   on top of the valve indication itself.

19            MR. NOLTE:  You're saying triangle.  I'm

20   seeing it as a diamond.

21            THE WITNESS:  I'm sorry.  Diamond.

22   Diamond.

23   A.    Safety diamond.  That diamond changed colors.

24   It went from red to green.  And I had said to

FCI/MSJ 0693

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1    Mr. DePaula, I said, "Well, something's happening."

2    And I didn't know what and right about within a second

3    Ronny called over the radio screaming "Shut the valve,

4    shut the valve."

5              So that's when I went back to B and the

6    control block was already opened on B and I rammed it

7    closed.  I mean, I took off the load after that valve

8    as soon as I could based on what I was hearing

9    Mr. Olson saying.  I had enough experience that you

10   know when somebody is in panic.  I took the load off

11   the valve.

12             So I called Ronny back and I asked him

13   "Ronny, what's going on?"  And he is still screaming.

14   He calls back and he says, "Shut it down, shut it

15   down."

16             And...

17   Q.    Did you ever hear him say shut the compressor?

18   A.    No.

19   Q.    I'm sorry.

20             MR. NOLTE:  Take a moment.  Take your

21   time.

22   Q.    Do you want to take a break, sir?

23   A.    So anyway I told him, I said, "Ronny, it is

24   shut down."  We're still thinking valve.

FCI/MSJ 0694



1        So anyway within seconds after that Tom

2   Freuler, and I recognized his voice on the radio, was

3   very specific and he said, "Shut the air plant down.

4   We got a man down.  Shut the ASU down."  There was no

5   questioning that.  There was no pronoun used.  "Shut

6   it down."  And that's when Mr. DePaula went over to

7   the wall and tripped the base load air compressor

8   which caused the air separation unit to bottle up,

9   bang, it was down.

10        And then Mr. DePaula went outside to

11   assist.  And that's when we in the control room

12   between my people that I was working with, we called

13   911, we called the refinery emergency number, 777, and

14   got everybody as much help, got Ronny as much help as

15   we could.

16   Q.    Let me just back up a second.

17        When Ron was at the valve and you were

18   ramping it up, if you will, the second time, did you

19   hear anyone over the radio say stop?

20   A.    No, sir.

21   Q.    Did Mr. DePaula at any time say stop?

22   A.    No, sir.

23   Q.    How far away was the mechanism that Mr. DePaula

24   used to trip the BLOC from where you guys were at?

FCI/MSJ 0695



1      Q.    178 you were shown.  Before today did you ever

2    see this document?  This has highlights.  I'm trying

3    to save time.

4      A.    Ask me again.

5      Q.    You were asked questions about this document.

6    I have the stuff you talked about with highlighting.

7              Do you know whether or not you saw this

8    before today?

9      A.    I saw information -- again, this particular

10   document, I can't tell you if I saw it, that

11   particular document.  But I have seen descriptions and

12   in training manuals, books and things about the oxygen

13   and the compressors and the seals and how the seals, a

14   blanket of air, a blanket of nitrogen around the shaft

15   of the BLOC to keep the lubricant away from your 02 so

16   you keep that separate because you don't want an

17   explosion.  I have read all that.  I have seen that.

18              This particular document there, sir, I

19   can't tell you if I specifically saw that or not

20   because there's been so many documents floating around

21   this place.

22              MR. HANDLON:  Thank you.

23              MR. NOLTE:  Going, going, gone.  We will

24   read.



1    State of Delaware   )
                         )
2    New Castle County   )

3

4                    CERTIFICATE OF REPORTER

5

6         I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
     there came before me on the 28th day of April, 2004,
7    the deponent herein, GREGORY K. CALLAWAY, who was duly
     sworn by me and thereafter examined by counsel for the
8    respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.

11        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16                    
                      _____
17                    Kurt A. Fetzer, RDR, CRR
                      Certification No. 100-RPR
18                    (Expires January 31, 2005)

19   DATED:   _5-4-04_____

20

21

22

23

24

                                        FCI/MSJ 0697

                      W&F
                 WILCOX & FETZER LTD.
               Registered Professional Reporters

EXHIBIT 60

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

|  |  |
|---|---|
| RONALD W. OLSON, and CAROL OLSON, his wife, | ) CONFIDENTIAL<br>)<br>) |
| Plaintiffs, | )<br>) Civil Action No. |
| V. | ) 02C-04-263 (JRS)<br>) |
| MOTIVA ENTERPRISES L.L.C.;<br>BATTAGLIA MECHANICAL, INC.;<br>FISHER CONTROLS INTERNATIONAL,<br>INC.; HYDROCHEM INDUSTRIAL<br>SERVICES, INC.; JJ WHITE, INC.;<br>NORTHEAST CONTROLS, INC.;<br>PARSONS ENERGY AND CHEMICALS<br>GROUP, INC.; PRAXAIR, INC.; TEXACO<br>AVIATION PRODUCTS LLC; DAIKIN<br>INDUSTRIES, LTD.; SAINT-GOBAIN<br>PERFORMANCE PLASTICS; RIX<br>INDUSTRIES, INC.; TEXACO GLOBAL<br>GAS AND POWER; TEXACO<br>DEVELOPMENT CORPORATION;<br>GARY DELGREGO, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
|  | )<br>) |
| Defendants, | )<br>) |
| NORTHEAST CONTROLS, INC., | )<br>) |
| Third-Party Plaintiff, | )<br>) |
| v. | )<br>) |
| CONECTIV OPERATING SYSTEMS, | )<br>) |
| Third-Party Defendant. | ) |

DEPOSITION OF GARY T. DELGREGO

FCI/MSJ 0698

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



CONFIDENTIAL

4

1    APPEARANCES:   (Cont'd)

2        MARK CARLISLE LEVY, ESQ.
         SAUL EWING
3            Centre Square West
             1500 Market Street - 38th Floor
4              Philadelphia, Pennsylvania  19102
             for the Defendants Texaco Development
5           and Texaco Aviation

6        CHASE T. BROCKSTEDT, ESQ.
         MURPHY SPADARO & LANDON
7            824 Market Street
             Wilmington, Delaware  19899
8           for the Defendant HydroChem
             Industrial Services, Inc.

9
         GREGORY A. INSKIP, ESQ.
10       POTTER ANDERSON & CORROON
             Hercules Plaza
11             1313 North Market Street
             Wilmington, Delaware  19801
12          for the Third-Party Defendant
             Conectiv Operating Systems

13
             (REPORTER'S NOTE:  Mr. Hiler was not
14   present for the beginning of the deposition.)

15               -   -   -   -   -

16               GARY T. DELGREGO,

17     the deponent herein, having first been

18     duly sworn on oath, was examined and

19     testified as follows:

20               EXAMINATION

21   BY MS. CLARK:

22     Q.   Good morning, Mr. DelGrego.  Have you ever had

23   your deposition taken before?

24     A.   No.

FCI/MSJ 0699

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.   All right.  I'm going to give you some

2   instructions and periodically we may remind you of

3   those instructions as the day goes on.  Okay?

4          The first of which is the man seated to

5   your right is a court reporter and he's taking down

6   everything that's being said in this room today.

7   That's important to note because of the fact that when

8   I ask a question I'm going to ask that you wait until

9   the question is completed before you respond.  It's an

10  automatic thing in normal everyday conversation to

11  respond basically before the questioner or the

12  question has been asked because you think that you

13  know the answer, but that causes difficulty with the

14  court reporter.  All right?  He can't take down what

15  we're saying at the same time.  Okay?

16   A.   (The witness nodded.)

17   Q.   The second reason I tell you about the court

18  reporter is that your responses must be verbal.  You

19  just nodded your head and periodically you may hear an

20  attorney say is that a yes or is that a no?  The use

21  of uh-uh does not translate, so I would ask you to say

22  yes or no if that's the answer.  All right?

23   A.   Okay.                        FCI/MSJ 0700

24   Q.   If I ask you a question and you don't

Gary T. DelGrego  -  CONFIDENTIAL

98

1    Q.    Now, on the first sheet in the next column it

2   has a symbol with a slash through it.  Is that a U

3   with a slash through it?

4            MR. LEVY:  Sorry.  You're on TDC38?

5            MS. CLARK:  The first page.

6    A.    No.  No, that's not a U.  It's an LA and I

7   crossed out the L to indicate it was a control status.

8   It's local auto versus auto.

9            You can see in Jay's version, Jay makes

10   the correction.  He's got just A's.

11   Q.    Okay.  If we go all the way over underneath

12   blend.

13   A.    The next-to-last column?

14   Q.    Yes.  It says -- I can't read what's under

15   there.  Can you?

16   A.    Under which line?  It says blend.

17   Q.    Blend.

18   A.    Oxygen blend and then there's some -- that

19   text?

20   Q.    Yes.

21   A.    It says blend, oxygen blend and then -- this

22   thing has been copied so many times.  It looks like

23   HS600B, but I can't be certain.  Check Jay's version.

24   Q.    It doesn't have anything.  At least I can't see

Gary T. DelGrego  -  CONFIDENTIAL

99

1    it?

2     A.   At the bottom.  There it is.  See where it says

3    at the bottom of that column the first note press

4    HS-600B.  The second page.

5     Q.   Oh, okay.  All right.  What is HS-600B?

6     A.   It's a button on the DCS.

7     Q.   Okay.  And then on oxygen run it's press

8    HS-600C?

9     A.   Correct.  A different mode.

10     Q.   All right.  As we go down the chart, I would

11    like you to look at your handwriting and in the second

12    column, we're talking twelve lines up, just above

13    discharge pressure.

14     A.   Okay.

15     Q.   The second column.

16     A.   Twelve lines up from the bottom, the second

17    real column?

18     Q.   Yes.  Underneath description.

19     A.   Underneath description.  What do you mean

20    description?

21     Q.   The column is entitled description.

22     A.   Oh, okay.  I understand now.  So the column

23    that says description at the top?

FCI/MSJ 0702

24     Q.   Right.



WILCOX & FETZER LTD.
Registered Professional Reporters

Gary T. DelGrego  —  CONFIDENTIAL

100

1    A.    And how many lines up from the bottom?

2    Q.    Twelve.  Just above discharge pressure.

3    A.    Where I get to there's nothing on the 12th line

4    up.

5    Q.    Maybe 11 lines up.

6              MR. LEVY:  Are you referring to the

7    handwriting?

8              MS. CLARK:  Yes.  Just on the line above.

9    I counted 11 the second time.

10   A.    The line above the words discharge pressure?

11   Q.    Yes.

12   A.    What did you want to know?

13   Q.    What does it say?  Is that HC?

14   A.    It says HC-629.

15   Q.    Okay.  Then if you go across from that, man at

16   zero percent, what does that mean?

17   A.    Manual at zero percent closed.

18   Q.    And then it says closed by and I can't read

19   that.

20   A.    ESS.

21   Q.    ESS.  Then you have an arrow.  What does that

22   arrow mean?

23   A.    It applies to all of the other columns until --

24   it's the same thing in the next column, same thing in

1  the next column.  It only changes in the very last

2  column.

3  Q.   What's in the very last column?

4  A.   In the very last column that indicates how

5  Praxair described it.  The valve shut through all of

6  the first five columns.  On the fifth column when the

7  oxygen run button is pushed, the ESS energizes, that's

8  where it says valve energized.  So the valves

9  energized for control and ramp open.  And then it says

10  as delta P drops can go greater than 10 percent.

11         So Praxair was telling us there's a limit

12  on how far you could open the valve until the

13  differential pressure across the valve had dropped to

14  some preset value.

15  Q.   Okay.  And if you look at the typewritten

16  sheet, it says --

17         MR. LEVY:  Delia, you don't mean

18  typewritten.  You mean the next page?

19         MS. CLARK:  No.  It's actually two pages

20  back, page 2 of Jay Patel's chart.

21  BY MS. CLARK:

22  Q.   There's an HC629 and an HV629.  Do you know

23  what the difference is?

24  A.   They're essentially the same.  HC indicates the

Gary T. DelGrego  -  CONFIDENTIAL

102

1   actual control element on the DCS.  HV indicates the

2   valve itself.  That's just...

3     Q.   So HC is the control on the valve and HV is the

4   valve itself.  Is that correct?

5     A.   Right.  If you want to be technical, yeah.

6     Q.   Now, in the last column, all the way over in

7   the two lines of HV0629, is this M colon zero percent

8   to M colon 100 percent in 10 percent increments?

9             MR. LEVY:  I want to make sure you're on

10  TDC00040,  the furthest column to the right?

11            MS. CLARK:  Correct.  It's the last column

12  on the right where the line says HC0629, if you go all

13  the way over and follow it over.

14    A.   Okay.  So what was the question about that

15  line?

16    Q.   Is that the summarization of the valve that's

17  energized and opens?

18    A.   Yes.  Jay split it into two elements to

19  indicate that the valve itself was locked out by the

20  safety system, the Triconics, but there was a

21  controller on the DCS.  They're two independent items.

22  So he indicates in his last column the valve itself is

23  energized and then the operator can open it to 100

24  percent.

FCI/MSJ 0705

Gary T. DelGrego  –  CONFIDENTIAL

103

1    Q.   In 10 percent increments?

2    A.   In 10 percent increments.  And my notes were

3  you can't get past the first 10 percent until the

4  delta P is low.

5    Q.   And delta P meaning change in pressure?

6    A.   Differential pressure across the valve.

7    Q.   Differential pressure, okay.  All right.

8          Other than create these notes, had you

9  ever seen the typewritten chart before today?

10    A.   Which one?

11    Q.   The typewritten one.  The fully typewritten,

12  Jay's chart.

13    A.   Jay's chart?

14          MR. LEVY:  You're pointing.

15    A.   39 and 40?

16    Q.   39 and 40, correct.

17    A.   Yes.  Those are what I provided to Keiderling.

18    Q.   Okay.  All right.

19          MR. McVEY:  I'm sorry.  Those were what

20  you provided to who?

21          MR. LEVY:  He said Keiderling.

22          THE WITNESS:  Ron Keiderling.

23          MR. McVEY:  Oh, Keiderling.

24          THE WITNESS:  Right.

FCI/MSJ 0706

Gary T. DelGrego  -  CONFIDENTIAL

104

1  BY MS. CLARK:

2  Q.   Do you remember when you provided both of these

3  charts, and I'm talking about your handwritten notes

4  and then the chart that is 39 and 40, to

5  Mr. Keiderling?

6  A.   After the incident.

7  Q.   After the incident.  Do you know why you turned

8  these over?

9  A.   Ron asked me for them.

10  Q.   Okay.  Did he tell you why he was asking you

11  for them?

12  A.   He said that they were looking into things and

13  just wanted to get all of the information that they

14  could.

15  Q.   After this meeting that you had in late '99,

16  did you review your notes again prior to the incident

17  in May of 2000?

18  A.   Not that I recall.

19  Q.   After this meeting with Praxair and Motiva and

20  Parsons, did you discuss with a Conectiv employee or

21  with Jay Patel or anybody the things you discussed in

22  this meeting?

23       MR. LEVY:  I am going to object to form.

24  A.   I don't have any real recollection of

Gary T. DelGrego  -  CONFIDENTIAL

105

1    conversations about this.

2      Q.    Well, is there anything in this meeting that

3    made you think that any follow-up needed to be done by

4    Motiva or Conectiv in starting up the ASU or learning

5    how to start up the ASU?

6      A.    No.  This was the experts telling us how they

7    were going to do it.  There was no follow-up for me.

8      Q.    How long did the meeting last?  Do you recall?

9      A.    No.

10     Q.    You have said on a couple of occasions "the

11   experts told us."  Who are you referring to as

12   experts?

13     A.    In this particular meeting it was Jerry

14   Paolino.

15     Q.    And why are you using the term expert?

16     A.    They dwarfed our knowledge about ASU's.  Jay

17   wanted to better understand it and asked Praxair to

18   please explain it, so the meeting was set up for that

19   purpose.

20     Q.    After the meeting did Jay ever express to you

21   whether he was happy or that they satisfied his

22   requests for information?

23             MR. LEVY:  Objection to form.

24             Go ahead.                      FCI/MSJ 0708

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

Gary T. DelGrego   -   CONFIDENTIAL

106

1    A.    I don't know.  Jay's not that type.

2    Q.    Did he indicate that he had any other further

3    follow-up or questions to you as regards to this

4    meeting?

5    A.    No, not that I recall.

6                MS. CLARK:  Can you go to Exhibit 34,

7    please?

8                MR. LEVY:  Sure.

9                MS. CLARK:  I am going to have you mark

10   that one.

11               (Olson Deposition Exhibit No. 95 was

12   marked for identification.)

13               MS. CLARK:  We are going to start at 34.

14               MR. LEVY:  Can we take a short break?

15               MS. CLARK:  Sure.

16               (Discussion off the record.)

17               (A brief recess was taken.)

18   BY MS. CLARK:

19   Q.    Before we broke, I gave you Exhibit 34.  Have

20   you had the opportunity to review that document?

21   A.    Yes.

22   Q.    The first page of the document is an e-mail

23   from you dated May 4th of 2000.  Is that correct?

24   A.    Yes.

FCI/MSJ 0709

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Gary T. DelGrego  -  CONFIDENTIAL

107

1    Q.    And there's a draft of the oxygen system

2    calibration and test procedure.  Was this the first

3    draft that you had submitted or not?

4    A.    It's the first draft that went out for

5    distribution.

6    Q.    And on or about May 4th, 2000 what was the

7    anticipated date that the oxygen system calibration

8    test was going to occur?

9    A.    I don't remember.

10   Q.    Now I'm going to draw your attention to the

11   first full paragraph or the second full paragraph

12   where it says, "Please note."

13   A.    Okay.  "Please note," yes.

14   Q.    The second sentence, "The center & annular 02

15   lines need to be blinded and the calibration spool

16   line needs to be removed and blinded."  What does that

17   mean?

18   A.    The first part, center and annular, those are

19   the two lines that connect to the gasifier feed

20   injector.  For the testing, the injector is not in

21   place and you're not putting oxygen in the gasifier so

22   we blind, put a solid metal blank at the end of those

23   lines.

24               The calibration spool part, that's what I

Gary T. DelGrego  -  CONFIDENTIAL

108

1    spoke about earlier.  The spool -- actually, it looks

2    like the spool was probably installed during

3    construction.  So the first step would be to take the

4    spool out and blind it because the first step is

5    pressure test and then we would put the spool back in

6    midway through the procedure and then take the spool

7    back out again at the end of the procedure.

8        Q.    The second sentence or the third sentence in

9    there, "In addition, an 02-clean local" -- is that Pl

10   or PI?

11       A.    PI

12       Q.    PI.  What is a PI?

13       A.    Pressure indicator.

14       Q.    "Needs to be installed on the bleed valve

15   downstream of 82-XV-1168."

16             What does that mean?

17       A.    That means the pressure gauge needs to be

18   installed downstream of XV-1168.

19       Q.    Is that a valve number, tag number?

20       A.    1168?

21       Q.    Yes.

22       A.    Yes.

23       Q.    And that valve I take it is on the gasifier

24   side?

FCI/MSJ 0711

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Gary T. DelGrego  -  CONFIDENTIAL

109

1    A.    That is the gasifier oxygen vent valve.

2    Q.    All right.  And the other sentence I think is

3    self-explanatory.

4          All right.  Now, go back up to the list of

5    items that you have.

6    A.    The bullet list?

7    Q.    Yes, the bullet list.  And you start with "HP

8    N2 test of entire 02 line (from BLOC to injector

9    flange)."

10         What needed to be done in there?  Explain

11   that for me, if you will.

12   A.    That was a nitrogen test from the battery

13   limits down through to the injector, from the

14   Praxair-Parsons battery limit all the way through to

15   the gasifier reactors.  It was a static pressure test

16   of all of that piping.

17   Q.    And what did that entail?  I mean, how did you

18   pressure test it?

19   A.    Pressurize it with high-pressure nitrogen.

20   Q.    And what was the pressure?  What was the high I

21   guess of the high pressure?

22   A.    You would have to give me a few minutes to see

23   what the procedure says.  (Reviewing document).

24         1200 p.s.i.g..

FCI/MSJ 0712

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Gary T. DelGrego  -  CONFIDENTIAL

130

1   oxygen?

2     Q.    Correct.

3     A.    Between the last time it was run and when?

4     Q.    And May 20th.

5     A.    I don't really know.  Whether they had

6   practiced or anything?  I don't know.  You would have

7   to check with Ron.  He handled all of their training.

8     Q.    All right.  So you came in and what did you do?

9     A.    We're back to the control room?

10    Q.    Right, back to the control room on May 20th.

11    A.    I came in, stood kind of behind Calloway off to

12  the side.  The Praxair guy was kind of to my right.

13  So Calloway was somewhat in the middle between myself

14  and the Praxair guy.

15    Q.    Was that Mr. Freuler still?

16    A.    That was Mr. DePaula.  Mr. Freuler was in the

17  field.  So there were two Praxair guys on site at the

18  time.  I don't really recall who else -- there were

19  others in the control room, but I don't remember

20  names.

21    Q.    Okay.

22    A.    Okay.  So we got to -- okay.  So that gets us

23  to the point where I got up there.  The next step was

24  to bring oxygen over to the gasifier.  So Calloway at

Gary T. DelGrego  -  CONFIDENTIAL

131

1   that point, I think he and I and DePaula had a

2   conversation that "Okay, we're going to do this next"

3   and it was Calloway then started the process to open

4   the valve.  That was the next thing in the sequential.

5        So Calloway pressed the buttons to start,

6   to move the valve and he moved it, I think he went a

7   percent at a time or something, pausing in between

8   steps, you know, like it was supposed to be done.  And

9   we didn't see any feedback from the position indicator

10  on the valve and so Calloway kept moving it up to its

11  maximum of 10 percent to see whether or not the

12  positioner just might not be responding properly or

13  what.  Calloway was doing all of this.

14       Then after he got to 10 percent and we

15  weren't seeing anything process-wise --

16  Q.   What do you mean you weren't seeing anything

17  process-wise?

18  A.   Well, we didn't see a valve indication that the

19  valve had moved and we didn't see any change in the

20  differential pressure across the valve.

21  Q.   What was the pressure of the oxygen at that

22  point?

23  A.   On the upstream side?

24  Q.   Yes.

FCI/MSJ 0714



WILCOX & FETZER LTD.
Registered Professional Reporters

Gary T. DelGrego  -  CONFIDENTIAL

132

1    A.    1150 p.s.i.g.

2    Q.    And what was the pressure on the nitrogen side?

3    A.    On the downstream side we have no idea what the

4    pressure was.  Praxair provided no instrumentation on

5    that side other than the differential pressure across

6    the valve which was set very low.  I recall something

7    like 20 p.s.i. differential.  So the pressure on the

8    downstream side could have been anywhere from zero to

9    1130 and we would have had no indication.

10   Q.    Okay.  Where did you see the pressure

11   differential where you said it was set very low at 20

12   p.s.i.?

13   A.    It was displayed on the graphic right next to

14   the valve.

15   Q.    Okay.  So you said when you got there you had a

16   conversation with Calloway, DePaula and yourself?

17   A.    Yeah.  Kind of like this is what -- is

18   everybody ready to do this kind of like, and no

19   objections from everybody.  Calloway was ready to

20   start so we started.

21   Q.    Did Mr. Calloway have your procedures here to

22   walk him through the process?

23   A.    I believe he had the Baker version.

24   Q.    Yeah.  Obviously he didn't have the handwritten

133

1   one.   But he had the Baker version?

2   A.   Yes.

3   Q.   All right.   So were you at step 13 by the time

4   you walked in?   I mean, where were you when you walked

5   in?

6   A.   Yes.   That's my recollection.

7   Q.   So the next step after 13 would have been to

8   follow onto 14 and then go sequentially down?

9   A.   Yes.

10   Q.   Do you remember when Mr. Calloway turned,

11   pushed the button and put in the amount, the

12   percentage that the valve was to open the first time

13   and you didn't see a response, how long did you wait

14   or did he wait?

15   A.   I don't think he waited very long.   It was a

16   few minutes.   Once he realized it wasn't working, he

17   called his supervisor to inform him of the situation.

18   Q.   I think you said that he tried in different

19   increments to open the valve, is that correct, put in

20   different percentages?

21   A.   Well, I remember him doing something like going

22   from 1 to 2 and then 2 to 3, something of that nature.

23   I don't know if it was always 1 percent.

24   Q.   Okay.   Did he say to you anything like it

Gary T. DelGrego  -  CONFIDENTIAL

134

1   doesn't appear to be responding?

2      A.    He may have been saying something like that,

3   but not necessarily to me.  To himself, to DePaula.

4      Q.    That was my next question.

5      A.    There were a few people there.

6      Q.    Did Mr. DePaula give him any input or

7   instructions?

8      A.    Not specifically that I remember.

9      Q.    Mr. Calloway you said radioed to his

10  supervisor?

11     A.    Correct.

12     Q.    Was the signal to the valve still on open or

13  had he changed the signal?

14     A.    It was still requesting it to open when he

15  called his supervisor.

16     Q.    And who did he call?

17     A.    He called Ron.  At the time Ron was the man in

18  charge of the air plant.

19     Q.    And what was the response?  What was the

20  instruction?

21     A.    What was?

22     Q.    Well, he called his supervisor.

23     A.    Oh, the conversation went something like "I'm

24  trying this and the valve doesn't seem to be

Gary T. DelGrego  –  CONFIDENTIAL

135

1    responding."

2              And Ron's reply was something like "I'll

3    check it out" or "I'll go look at it," something.

4    Q.    When Mr. Olson responded that he would go check

5    it out, did anybody in the control room make a

6    suggestion that the valve, the signal be changed to

7    close to make the valve close prior to his going back

8    down there?  And I'm talking him Mr. Olson.

9              MR. LEVY:  Objection to form.

10             Go ahead.

11   A.    In the control room, no.  Ron is the one who

12   made that suggestion.

13   Q.    So Mr. Calloway did what?  Did he just wait

14   until Mr. Olson radioed back to him?

15   A.    That's what I remember.

16   Q.    And what was the radio transmission back?

17   A.    When Ron got there, the transmission was

18   something like "The air's, the air's not on the valve"

19   or "The air's off," something to that effect.

20   Q.    What does that mean?

21   A.    For a valve like that to operate, there's an

22   instrument air line that feeds the actuator.  So Ron's

23   transmission indicated to us that he saw that the air

24   had been turned off which would obviously not allow

Gary T. DelGrego  -  CONFIDENTIAL

136

1    the valve to move.

2       Q.   And what then do you recall?

3       A.   Then I recall Ron asking Greg to put the valve

4    back to zero and then when Greg confirmed it was back

5    to zero, Ron said he turned the air off.

6       Q.   How long did this take from Mr. Calloway's

7    initial radio transmission to the time that he was

8    instructed to put the valve to zero?

9       A.   It was pretty quick.  Probably not more than

10   five minutes or so.

11      Q.   Did Mr. Calloway tell Mr. Olson where the

12   signal, you know, what amount or what percentage I

13   guess the valve was being signalled to open at that

14   initial radio call?

15      A.   The initial?  I think he did.  When he called

16   Ron initially with the report of the problem, my

17   recollection is that he told him basically what he had

18   done, you know, something to the effect of "Ron, I've

19   got 10 percent requested of this valve.  I don't see

20   any feedback that it's moved."

21              And Ron understood what he meant by all of

22   that.

23      Q.   Okay.  Did Mr. Calloway have any papers in

24   front of him as he was doing this process?

Gary T. DelGrego  -  CONFIDENTIAL

137

1          MR. LEVY:  I am going to object to the

2    extent that you asked him whether he had.  At least in

3    the beginning I think one of -- I'm not sure which one

4    you referred to.  Probably Olson 34 at some point.

5    A.    He had Olson 34.  There were other papers

6    there, but I can't tell you what.

7    Q.    Was he referring to any document in order to

8    open the 629 valve?

9    A.    No.  No.  I assumed he was referring to his

10   training that he had gotten.

11   Q.    So when Mr. Olson radios back to put the valve

12   to zero, did Mr. Calloway do that?

13   A.    Yes.

14   Q.    What did you see on the computer screen?

15   A.    There's just a little block where you put in

16   the percentage and he put it back to zero.

17   Q.    So you saw it register zero on the computer

18   screen?

19   A.    Yes.

20   Q.    Did anybody offer any suggestions at that point

21   to Mr. Calloway?

22   A.    Once it went back to zero?

23   Q.    Yes.

24   A.    No.  The next thing I remember is after Ron put

Gary T. DelGrego   -   CONFIDENTIAL

138

1    the air back on, Ron calling Greg to say, "Okay.  Try

2    it again."

3      Q.   Do you know where Mr. Olson was when he told

4    him to turn it back on?

5      A.   I knew he was in the ASU, but I can't say

6    where.  It was very noisy where he was, so he must

7    have been near the compressors.  That's all I can say.

8    The whole air plant is very noisy.

9      Q.   All right.  And what do you remember happening

10   next?

11     A.   Okay.  Ron called and said, "Try it again."

12   Greg went through the same procedure.  I don't recall

13   if it was the same number, the same increments, but he

14   started at 1 and moved to the next 2 or 3.  And he

15   didn't see feedback again.

16           Greg again called out to Ron and said,

17   "Ron, I'm not getting any feedback."  And I think each

18   time Greg was moving the valve he was communicating

19   that to Ron.  He was like "Okay, I've got 3 percent on

20   it now," something to that nature.

21           And that's when Ron made that statement.

22   It was something like -- Greg asked him can you tell

23   if it's moving, can Ron tell if it's moving?  Because

24   Greg is not getting any feedback that it's moving.

Gary T. DelGrego  —  CONFIDENTIAL

139

1   Ron made the comment something to the effect of "I

2   can't see it from where I'm at" or "I can't tell from

3   where I'm at."  Hold on was kind of the gist of it.

4     Q.    Okay.  Again, do you remember how much time was

5   in between the increments that Calloway was inputting

6   into the computer?

7     A.    I can't tell you.  The whole day is kind of a

8   blur.  After Ron said, "I can't see from where it's

9   at" or something like that," then I'm not exactly sure

10  what the order was for what happened next.  It got

11  very hectic in the next couple of seconds.

12          Either Ron called in again saying, "I

13  can't tell" or Greg asked him a question.  Something

14  went on and then Ron started yelling "Shut the valve"

15  or "Shut the valve" or "Shut it."  I don't remember

16  which it was.  So Ron radioed that in.

17          Greg responded something like "It is

18  shut."  I looked at the screen and that's when I saw

19  that the little diamonds that tell you whether or not

20  the compressor is running or not, that the diamonds

21  had turned green, which meant that the machine wasn't

22  running.  DePaula, who was watching to my right, said,

23  "Oh, the compressor's down," kind of like startled

24  that the whole compressor was off.

Gary T. DelGrego  -  CONFIDENTIAL

140

1       At the same time we heard Tom Freuler on

2    the radio with a little more of a description.  Tom

3    said something like "Shut the compressor down, there's

4    been a fire, there's been an explosion," something a

5    little more descriptive as to what went on.  And when

6    we got that transmission is when myself and Greg or

7    myself and Mike Waters, who was the other operator a

8    little over to the right from me, went over to there's

9    a big panel with a bunch of on-off switches and we

10   started shutting down what we could.  And then there

11   was all the other radio traffic.  We got informed that

12   Ron was hurt; call an ambulance.  One of the operators

13   called an ambulance.

14       Do you want me to go further than that or

15   is that enough?

16   Q.   Well, let me back you up a little bit.

17       You said that you got a radio transmission

18   from Mr. Olson to either shut it or shut the valve.

19   A.   Yeah.  Ron called in something like "Shut it,

20   shut the valve."  Greg responded "It is shut."  Ron

21   may have said it again.  I'm not sure.  And then Greg

22   may have said, "But it is shut, Ron."

23   Q.   Was the data on the computer screen showing up

24   zero?

**W&F**

Gary T. DelGrego  -  CONFIDENTIAL

141

1   A.   Yes.

2   Q.   So Mr. Calloway had sometime in between --

3   A.   Do you mean the feedback?

4   Q.   No.  The indicator.  The one that he types in

5   to tell him how much of a percent to open, was that

6   showing zero?

7   A.   The feedback red zero, but I don't know, I

8   don't know if Greg actually ever typed in zero.  When

9   Ron made the first call in, everything started

10  happening really fast and I don't really recall if

11  Greg did type in zero.

12  Q.   You said Mr. Freuler was in the field at the

13  time that you guys started to open the valve.  Where

14  in the field?  Do you know?

15      MR. LEVY:  Objection to form.

16  A.   Yeah.  Afterwards he told me he was on the

17  other side of the plant near what we called the truck

18  fill.

19  Q.   You recalled though that shortly after

20  Mr. Olson's transmission to shut the valve, the next

21  transmission you received was Freuler's?

22  A.   Yes.

23  Q.   Who said man down, turn off --

24  A.   The man down came after the compressors --

**W&F**

194

1    State of Delaware    )
                          )
2    New Castle County    )

3

4                    CERTIFICATE OF REPORTER

5

6        I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
     there came before me on the 9th day of December, 2003,
7    the deponent herein, GARY T. DELGREGO, who was duly
     sworn by me and thereafter examined by counsel for the
8    respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.

11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16       _Kurt A. Fetzer_ KF

17   Kurt A. Fetzer, RDR, CRR
     Certification No. 100-RPR
18   (Expires January 31, 2005)

19

     DATED:
20

21

22

23                                      FCI/MSJ 0725

24




EXHIBIT 61

CONFIDENTIAL

1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON, and CAROL
OLSON, his wife,

        Plaintiffs,

V.

MOTIVA ENTERPRISES L.L.C.;
BATTAGLIA MECHANICAL, INC.;
FISHER CONTROLS INTERNATIONAL,
INC.; HYDROCHEM INDUSTRIAL
SERVICES, INC.; JJ WHITE, INC.;
NORTHEAST CONTROLS, INC.;
PARSONS ENERGY AND CHEMICALS
GROUP, INC.; PRAXAIR, INC.; TEXACO
AVIATION PRODUCTS LLC; DAIKIN
INDUSTRIES, LTD.; SAINT-GOBAIN
PERFORMANCE PLASTICS; RIX
INDUSTRIES, INC.; TEXACO GLOBAL
GAS AND POWER; TEXACO
DEVELOPMENT CORPORATION;
GARY DELGREGO,

        Defendants,

NORTHEAST CONTROLS, INC.,

        Third-Party Plaintiff,

v.

CONECTIV OPERATING SYSTEMS,

        Third-Party Defendant.

) CONFIDENTIAL
)
)
)
)
) Civil Action No.
) 02C-04-263 (JRS)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DEPOSITION OF JAMES C. PONTO

FCI/MSJ 0726

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters
COPY

1    APPEARANCES (continued):

2              PHILIP T. EDWARDS, ESQ.
         MURPHY SPADARO & LANDON
3              1011 Centre Road - Suite 210
               Wilmington, Delaware  19805
4              for the Defendant HydroChem
               Industrial Services, Inc.
5
                    -   -   -   -   -
6

7              (Deposition Exhibit 306 was marked for

8    identification.)

9                        JAMES C. PONTO,

10         the witness herein, having first been

11         duly sworn on oath, was examined and

12         testified as follows:

13                        EXAMINATION

14   BY MR. HANDLON:

15      Q.   Good afternoon, Mr. Ponto.

16      A.   Good afternoon.

17      Q.   My name is Joe Handlon.  My law firm represents

18   Ron Olson.  Do you know who Ron Olson is, sir?

19      A.   Yes.

20      Q.   And you understand he was injured on May 20th,

21   2000, at the Motiva power plant in Delaware City,

22   Delaware?

23      A.   Yes.

24      Q.   Have you ever had your deposition taken before?

CONFIDENTIAL - James C. Ponto

1    didn't have any involvement with any pre-test procedures,

2    but have you in your work for Praxair reviewed the

3    pre-test procedures for piping tests?

4        A.    Yes.

5        Q.    And that's your understanding that, on page 107,

6    the flappers were probably removed?

7        A.    Yes.

8        Q.    If you go --

9              MR. DAVIS:  I'm going to object to the form.

10   Because I'm not sure that that is what this document

11   refers to when it says "check valve included in test."

12   "Check valves" is circled and then it says "gutted"

13   after, is not necessarily the same thing.  So I don't

14   want anyone to assume --

15             THE WITNESS:  When you look at the P&ID,

16   they wouldn't have removed the flappers on these.

17             MR. DAVIS:  That's what I'm saying.

18             THE WITNESS:  You have a vent valve

19   downstream.  So you have got no way of trapping

20   pressurized air there.

21             MR. DAVIS:  I agree with that.

22             THE WITNESS:  It would just be the check

23   valve they have removed there.

24             MR. DAVIS:  That's why I'm objecting to the

1  suggestion by the question that it was gutted in this

2  case.  It wasn't.

3           THE WITNESS:  Okay.  Yes.

4  BY MR. HANDLON:

5     Q.   What does gutted mean, sir, to you?

6     A.   That's taking the flapper out, if you have to.

7     Q.   Okay.  If you turn to the next to the last page.

8  Have you reviewed pneumatic test logs before?

9     A.   Yes.

10    Q.   Refer down to where it says "1169" in the

11 left-hand column.  Do you see that?

12    A.   Yes.

13    Q.   Does it appear at that pressure that a grafoil

14 gasket blew out at the 629 valve?

15           MR. RICHES:  Object to the form.

16    A.   That's what it is telling me there.

17    Q.   Would that raise any concerns in performing of

18 piping pressure test?

19           MR. RICHES:  Object to the form.

20    A.   I don't understand your question.

21    Q.   Well, it appears that grafoil gasket blew out at

22 629 valve and it looks to say at 900 psi.  And my

23 question to you is:  If that occurred during a piping

24 pressure test, would that raise any concerns to you?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    No.

2    Q.    Why not?

3    A.    That's why you test, to make sure the system that

4  you are working on is put together right.  Materials

5  sometimes are faulty, like a gasket.  It could have been

6  pinched when they put it in.  You know, the test here

7  proved, it blew, so you put a new one in and then you

8  took it up.  Now it is good.  Now you got a good gasket.

9    Q.    Do you recall this actually happening, sir?

10   A.    No, I don't.

11   Q.    What could be done to remedy that from happening

12 again?

13        MR. RICHES:  Object to the form.

14   A.    Can't.

15        MR. HANDLON:  We will take a quick break.

16        MR. RICHES:  Sure.

17        (Recess taken.)

18 BY MR. HANDLON:

19   Q.    Sir, when you arrived at Delaware City, do you

20 recall whether construction was complete or not?

21        MR. RICHES:  Object to the form.

22   A.    No.

23   Q.    You don't recall?

FCI/MSJ 0730

24   A.    It wasn't.  It wasn't complete.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

CONFIDENTIAL - James C. Ponto

1    Q.    What wasn't complete about it?  Was it just

2    punchlist items that had to be finished?

3    A.    When I arrived there?

4    Q.    Yes.

5    A.    We were just starting to build the plant.

6    Q.    Okay.  I'm a little confused.  I thought you

7    arrived at the Delaware City facility in 1999.

8    A.    Yes.

9    Q.    And at that point, nothing was constructed at

10   that point?

11   A.    Oh, things were being built.  But I was at the

12   site before that too for site visits.

13   Q.    That's right.  And you assisted in the

14   construction of the cold box, I believe?

15   A.    Yes.

16   Q.    After the plant was complete, construction of the

17   plant was complete, did your duties and responsibilities

18   change at some point?

19        MR. RICHES:  Object to the form.

20   A.    My duties and responsibilities changed quite

21   often on this job.

22   Q.    Okay.  At some point did you participate in

23   oxygen system pipe blow-down?

24   A.    Yes, I did.

FCI/MSJ 0731



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    Was that with respect to the warm end piping, the

2    piping downstream of the base load oxygen compressor?

3    A.    Yes.  Right from the cold box, right through the

4    whole system.

5    Q.    Pull out Exhibit 37.  Sir, is this a oxygen

6    system blow-down procedure that you participated in

7    implementing in or around November 1999?

8    A.    Yes, it looks familiar.

9    Q.    Okay.  And I believe you said you participated in

10   blow-downs of pipe at the Delaware City ASU from the cold

11   box all the way to the, through the base load oxygen

12   compressor to the battery limits?

13   A.    Yes.

14   Q.    Take a look at Phase 1.  Does that refer to

15   piping upstream of the base load oxygen compressor?

16   A.    From the PHX through the blow-out intake.

17   Q.    Are those your initials --

18   A.    Yes.

19   Q.    -- in Phase 1?

20        MR. RICHES:  You have to let him finish the

21   question.

22   Q.    I'm sorry.

23        MR. RICHES:  You get a tendency, you know

24   what he is going to say before he is done talking.

1    Q.   I apologize.  Sometimes my questions kind of

2    linger.  So my question is:  There is three bullet points

3    under Phase 1, and it appears to have what I thought was

4    your initials next to at the end of each bullet point.

5    Are those, in fact, your initials?

6    A.   Yes, they are.

7    Q.   Is that you signing off that those procedures

8    were completed?

9    A.   I don't recall if I signed it.  It looks like it

10    could be that we completed that procedure.

11    Q.   Is that your handwriting that says "work

12    completed around 11/30"?

13    A.   No, that's not.

14    Q.   Do you recognize that handwriting?

15    A.   No, I don't.

16    Q.   Does Phase 2 pertain to the discharge piping

17    downstream of the BLOC?

18    A.   Yes.

19    Q.   Is that your initials at the end of that

20    paragraph as well?

21    A.   Yes, yes, it is.

22    Q.   Do you recognize the handwriting that says, looks

23    like it says "OK" and looks to be "C.C."?

24    A.   That looks like Chris Carter's.   FCI/MSJ 0733

1    Q.    Phase 2, after the first sentence says, "Place

2    discharge strainer sock in a clean bag, and leave it with

3    Chris Carter or Chris Affuso.  Charge the discharge

4    piping between this blind, the closed re-circulation

5    valve, and the discharge valve 83HV0529 with 80 to 100

6    psi air on N2 from the IA header.  Blow this pressure out

7    of the 12-inch flange at the battery limit (blind to

8    remove here) by quickly opening 83HV0529."  Do you see

9    that?

10    A.    Yes.

11    Q.    There has been a lot of testimony from Praxair

12    employees, sir, that 83HV0529 should be really 83HV0629,

13    that that is a typo?

14    A.    Yes.

15    Q.    Is that your understanding?

16    A.    Yes.

17    Q.    Do you have any recollection of this procedure,

18    sir, and whether or not the 629 valve was opened during

19    this procedure?

20    A.    Yes.  I recall that, and it was opened.

21    Q.    Is there anything significant about opening that

22    valve during this procedure that causes you to remember

23    it?

24              MR. RICHES:  Object to the form.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

FCI/MSJ 0734

CONFIDENTIAL — James E. Ponto

1    A.    No.

2    Q.    Do you have any understanding as to the design

3    control logic of the 629 valve?

4    A.    No.

5    Q.    You weren't aware that after the plant was

6    operational that the 629 valve could be opened only when

7    the pressure differential across the valve was less than

8    10 psi?

9              MR. RICHES:   Object to the form.

10   A.    No, I was not aware of that.

11   Q.    That's nothing that you have any understanding

12   about?

13   A.    No, I don't.

14   Q.    Did you have any understanding as to that the 629

15   valve could be opened only on oxygen?

16   A.    No.

17   Q.    And sitting here, do you recall that this 629

18   valve was opened during this procedure?

19   A.    Mm-hmm.

20             MR. RICHES:   You have to say yes or no.

21   A.    Yes.

22   Q.    What is the purpose of blowing the pressure out

23   of the 12-inch flange at the battery limit by quickly

24   opening the 629 valve?                    FCI/MSJ 0735

1  State of Delaware )
                    )
2  New Castle County )

3

4              CERTIFICATE OF REPORTER

5

6          I, Eleanor J. Schwandt, Registered
   Professional Reporter and Notary Public, do hereby
   certify that there came before me on the 25th day of
7  January, 2005, the deponent herein, JAMES C. PONTO, who
   was duly sworn by me and thereafter examined by counsel
8  for the respective parties; that the questions asked of
   said deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use of
   computer-aided transcription and computer printer under
10 my direction.

11         I further certify that the foregoing is a
   true and correct transcript of the testimony given at
12 said examination of said witness.

13         I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.

15

16

17 _____
   Eleanor J. Schwandt

18         Certification No. 125-RPR

19         (Expires January 31, 2008)

20
   DATED:  ____1/28/05____
21

22

23

24                                    FCI/MSJ 0736



**WILCOX & FETZER LTD.**
Registered Professional Reporters

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br><br>Defendant. | NO. 06-412<br><br><br>**AFFIDAVIT OF ROBERT A MOSTELLO IN SUPPORT OF DEFENDANT FISHER'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

I, **Robert A Mostello**, being first duly sworn upon oath, depose and state as follows:

1.      I have been retained in this matter by Fisher Controls International, Inc. A true and correct copy of my résumé is attached as Exhibit A to this Affidavit.

2.      Attached hereto as Exhibit B, and hereby incorporated by reference as if fully set forth herein, is a true and correct copy of my report of September 4, 2007, setting forth my opinions in this matter.

3.      Attached hereto as Exhibit C, and hereby incorporated by reference as if fully set forth herein, is a true and correct copy of my rebuttal report of October 5, 2007, setting forth my opinions in this matter.

4      As set forth in my reports in this matter, it is my opinion, to a reasonable degree of engineering certainty, that the substitution of materials in the Fisher Type A11 Valve, bearing the tag number 83HV0629, resulting from Northeast Controls, Inc.'s conduct in processing the order for that valve resulted in a significantly greater heat release than would have been the case had the

1

valve been constructed of the materials identified in the specification sheet for the valve dated

June 3, 1998.

SIGNED this 20 day of November, 2007, at *Somerville*, New Jersey.

*Robert A. Mostello*

Robert A. Mostello

SIGNED AND SWORN TO before me on this 20th day of November, 2007.

(Seal or stamp)

_____

Notary Signature

HYZA GONZALES

Print/Type Name

Notary Public in and for the State of NJ,

residing at 10 W HIGH SOMERVILLE, NJ, BANK OF AMERICA

My appointment expires _____

HYZA GONZALES
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/11/2012

2

# EXHIBIT A

ROBERT A. MOSTELLO

AMCS Corporation
981 Route 22 West
Bridgewater, NJ 08807

Telephone: 908-429-2100 Ext. 223
Fax:  908-429-3004
Email:  bob.mostello@amcscorp.com

## SUMMARY

Process engineering professional providing expert leadership in the development of innovative processes and troubleshooting plant performance and safety problems.  Consultant for unusual or complex technical and operating problems.  Key representative of the process engineering function in the organization.  Lecturer at corporate technical conferences.  Inventor, author, and active in industry associations.

## ACTIVITIES AND ACCOMPLISHMENTS

- Took leadership over a period of about 1-1/2 years in the organizational response to potentially devastating circumstances occasioned by repeated failures of an oxygen plant due to energy releases, involving almost daily decisions on procedures, designs, safety and risk.  Obtained client's confidence.  Initiated terms for agreement on indemnity issues.  At stake were multimillion-dollar claims in forfeitures, contract supply, etc. To date, more than ten years of safe operation.
- Accident investigations and facilities safety audits for new facilities (HAZOPs), processing problems, hazards, and third-party requirements.
- Evaluated extensive history of plant design, construction, and commissioning stages to establish most probable causes of factors leading to oxygen fire and resulting personnel injury to the plaintiff.  This included testing and system component examination; evaluating depositions and exhibits, and issuing written reports and affidavits. Client was the only major defendant to be released from all claims, totalling $6 million.
- Participated in Layer of Protection Analysis argument employed by the defense team for its client in $58 million suit over damage to chemical plant, demonstably releasing client from liability.
- Wrote definitive report on $1 million pipeline oxygen fire after investigation and analysis of effects and remains of the accident.  Reconstructed the events leading to the fire and the rapid sequence of events occurring after ignition.  Findings noted in international industry publication.
- Conducted an analysis of automatic ice cream production equipment and made recommendations for safe and effective operation.
- Proposal leader, process, process control, and process equipment designer, and safety reviewer (HAZOP) for a nitrous oxide purification plant.
- Proposal leader, process, process control, and process equipment designer, and safety reviewer (HAZOP) for an ammonia purification plant for electronic components production
- Served as a sounding board, an informed source of technical courage and reasonableness, and a teacher of and promoter for the pursuit of technical excellence in an organization which was ripe for it, actually resulting in the development of numerous personnel and their accomplishments beyond the commonplace.
- Safety and on-site Code Compliance Audits of large liquid hydrogen storage facility.  Developed a comprehensive training program for emergency personnel.
- Participated in planning, field-execution, analysis and evaluation of results of process and equipment aspects for FDA validation of industrial gas plants.
- Overcame widespread opposition to commercialize an innovative process for highly efficient production of ultrapure nitrogen.  With over 30 plants in operation, this patented design continues to serve as the industry benchmark.  It was BOC's entry card to hundreds of millions of dollars of subsequent business in the electronics industry.
- Codified and put in order performance of a then most important product line for proposal accuracy, machine matching, and comparison with other products to establish hurdles for development of new product lines, which subsequently occurred.  This was the first step in a successful 5-year effort to develop a world-class packaged plants portfolio.
- Provided timely input in innumerable instances where speed and accuracy of response were absolutely critical:

Identified and corrected subtle hydraulic problems in a "dead-in-the-water" plant recovering argon from ammonia purge gas. Implication of hundreds of thousands of dollars in unfulfilled contractual obligations, plus the multimillion dollar cost of an unusable plant.

- Sorted temperature and flow data to show that 10% of liquid product was being lost due to air purification unit dusting. About $1M/year impact. Deduced the location of damage for efficient repair in air purification adsorber responsible for frequent downtimes of major merchant plant ($100,000/yr).
- Resolved numerous baffling hydraulic issues, e.g. liquid level, two-phase flow, gravity. Identified damaged equipment as causes of poor performance in various plants to set the stage for targetted shutdown and repairs.
- Refined simple on-line test for prediction of long-term reversing heat exchanger performance, saving weeks or months of data-taking and experimental effort.
- Developed a simplified method which confirmed that estimates of heat leak in cold boxes were unrealistically high.
- Put liquefaction power and distillation in air separation plants with nitrogen liquefiers on a sound technical footing for establishing the equivalence of plant test results.
- Regarded as an authority by regional managements and site operators for providing direct one-on-one real-time assistance on processing problems and hazards.
- Internal quality auditor, ISO 9001, 1994

## INVENTIONS

The author or co-author of 15 patents, with patents pending.

| U.S Patent No. | Year | Significance |
|---|---|---|
| 4,966,002 | 1990 | Served as the industry benchmark for nitrogen generators for the last 12 years and cornerstone of BOC's penetration of the electronics marketplace. Approximately 30 built and in operation at a value of several hundred million dollars. |
| 5,152,149 | 1992 | Variable-demand pattern gaseous oxygen plant. |
| 5,379,598 | 1995 | Energy-saving in a high pressure liquid-pumped oxygen gas plant utilizing a cold compressor. |
| 5,507,148 | 1996 | High efficiency, low pressure nitrogen generator. Several operating units with promise of more to come. |
| 6,330,812 | 2001 | Two-column nitrogen plant with lowest energy requirements, to-date. |

Other patents or pending patents cover distillation, purification, refrigeration, operation.

## PUBLICATIONS /PRESENTATIONS

- Nitrogen, Oxygen, and Argon Production from Air, "Encyclopedia of Chemical Processing and Design", 31, 205-235,John J. McKetta, editor (1990) and "Inorganic Chemicals Handbook", 2, 1215-1245 (1993).
- Troubleshooting Hydraulic Flow Problems in Cryogenic Systems, "Proceedings of The 8th Annual Energy Week Conference & Exhibition, Book VI: Intersociety Cryogenics, 99-107 (Jan. 1997).
- Quoted extensively in "Cold Facts" Spring 1997, Newsletter of Cryogenic Society of America, Inc., Survey: Air Separation.
- "Oxygen Plants for Coal Gasification: Experience at the Cool Water GCC Power Plant", Electric Power Research Institute AP-5432, Project 2221-14, Final Report, September 1987.
- Thermodynamic Comparison of Large-Scale Liquefaction of Air, Hydrogen, and Helium, AIChE J, 10, 3, 407-415 (1964).
- Featured speaker---Advanced Process Cycle Development, "1999 Modern Air Separation Plant Technology Conference", Chengdu, Sichuan, China.
- Presentation of paper at Compressed Gas Association, Safety and Reliability of Industrial Gases, Equipment, and Facilities Seminar, Oct. 15-17, 2001: "An Aspect of Gate Valves in High-Pressure Oxygen Service".

## AWARDS

3 BOC Annual Innovation Team Awards over 10-year life of program, and the captain of each of these teams:

- Development of a new nitrogen generator--a high recovery, single column, utilizing a cryogenic compressor
- Safe conversion of an accident-prone reversing heat exchanger oxygen plant to multimedia air pre-purification
- Development of new nitrogen generator--a high efficiency single column for low pressure product delivery

## EMPLOYMENT

- AMCS Corporation, Bridgewater, NJ 1999-   Applied technology for industrial gas plants and specialty gas plants, including nitrous oxide and ammonia purification.  Industrial gas accident investigations.  FDA validation for oxygen, USP and nitrogen, NF facilities.  Process development, plant and equipment design and troubleshooting.  Patents pending.
- The BOC Group, Murray Hill, NJ 1983-1999.  Industrial gases.
- Jacobs Engineering Group, Mountainside, NJ 1982.  Assistant to the VP of Operations.
- Exxon Chemical Company (now ExxonMobil), Florham Park, NJ; Baytown, TX 1976-1982.  Large petrochemical plant safety designs.  Environmental control for EPA compliance covering air, water and solid waste issues.
- Allied Chemical Corporation (later Allied-Signal, now Honeywell), Morris Township, NJ; Hopewell, VA; Detroit, MI 1973-1976.  Sulfuric acid, coke and tar, uranium hexafluoride, ammonia plants; design methods.  Environmental control for EPA compliance covering air and water discharges.
- Procedyne Corporation, New Brunswick, NJ 1969-1973.  Fluidized bed drying, pyrolysis, and incineration.
- Air Reduction Company (became BOC and now Linde), Jersey City and Plainfield, NJ 1960-1962, 1964-1965.
- American Cryogenics Inc. (later Exxon Enterprises, now L'Air Liquide) O'Fallon, IL 1962-1964.
- Socony Mobil Oil Company (now ExxonMobil), Paulsboro, NJ, Summer 1957.  Viscosity stability of residual fuel oil blends.

## ACADEMIC

- Newark College of Engineering (now NJIT), B.S. in chemical engineering 1958; Tau Beta Pi, Omega Chi Epsilon
- Pennsylvania State University, no degree, 1958-1959
- Stevens Institute of Technology, M.E. (Chemical) 1967.  Thesis:  Polymerization in a tubular reactor.
- Stevens Institute of Technology, Ph.D. in Chemical Engineering 1971; NASA Traineeship.  Thesis:  Design and Operation of the Multipurpose Plant.

## PROFESSIONAL

- Registered Professional Engineer, State of New Jersey; Member, American Institute of Chemical Engineers; American Chemical Society; Listed in Who's Who in Science and Engineering 1996-1997 (Marquis), p. 695; Member, Compressed Gas Association; Member, Cryogenic Society of America; *pro bono* consultant to Federal Trade Commission; Certificate of Completion--current Good Manufacturing Practice Training, 21 CFR 211;  Certificate of Completion—Hazard and Operability (HAZOP) Studies for Process Safety and Risk Management, American Institute of Chemical Engineers; member of ASTM Committee G04 on Compatibility and Sensitivity of Materials in Oxygen Enriched Atmospheres; certified in GMP and HACCP procedures; Certificate of Completion of ASME Layer of Protection Analysis course.

09/03/07

FCI/MSJ 0739

# EXHIBIT B

# REPORT ON
## ORDERING OF VALVE 83HV0629
## IN REGARD TO ACCIDENT AT
## DELAWARE CITY, DE
## ON
## MAY 20, 2000

Prepared by:   Robert A. Mostello, PE (ret), PhD
AMCS Corp.
981 Rt. 22 West
Bridgewater, NJ 08807

Tel: (908) 429-2100
Fax: (908) 429-3004

Signature of preparer: *Robert A Mostello*
Date: *Sept 4, 2007*



FCI/MSJ 0740

REPORT ON
ORDERING OF VALVE 83HV0629
IN REGARD TO ACCIDENT AT
DELAWARE CITY, DE
ON
MAY 20, 2000

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 3
PERSONAL BACKGROUND ............................................................. 3
MATERIALS HISTORY ....................................................................... 4
STANDARD OF CARE IN THE INDUSTRIAL GAS INDUSTRY .......... 5
EFFECTS OF DIFFERENCE IN MATERIALS ..................................... 7
SUMMARY .......................................................................................... 8
ACCESS TO INFORMATION ............................................................... 8
COMPENSATION AND PRIOR TESTIMONY ....................................... 9
APPENDIX ........................................................................................... 10

Report on Ordering of Valve . . . .                    September 4, 2007

## INTRODUCTION

An oxygen fire occurred at a facility operated by Motiva Enterprises at Delaware City, DE during startup operations on May 20, 2000. The fire was located in and around a high-pressure oxygen isolation valve, which was part of the oxygen plant built by Praxair, Inc. The valve, 83HV0629, was a butterfly valve built by Fisher Controls International, Inc., and which Praxair ordered through Northeast Controls, Inc.

I have described elsewhere the sequence of events leading to the fire and conclusions. My prior opinions are appended to and incorporated into this report. My current investigation and opinions have centered on the differences between the original specification of the valve approved in writing by Praxair and the actual materials of construction of the valve supplied.

## PERSONAL BACKGROUND

I am a chemical engineer with more than 40 years of experience in industry. My principal specialty is process design, development, troubleshooting and safety of air separation plants, in which I have been engaged for about 28 years. My background includes environmental control and safety issues of petrochemical plants, and process and process equipment design for chemical processing plants. I have authored or co-authored several publications on the operation and design of cryogenic systems, including a section on air separation in the "Encyclopedia of Chemical Processing and Design" (ed. McKetta). I am the author of about 15 US patents.

Among my current activities are the design and specification of cryogenic air separation plants, including specification of equipment used in oxygen systems, which involves:
1. review of vendor-proposed components for oxygen systems
2. assurance of compliance to oxygen safety standards and state-of-the-art practice in oxygen systems
3. potential for contamination of oxygen systems and the safety implications thereof

I have been a project engineer, a process engineer, and a startup engineer. In 2002, I specified a replacement piping system for supplying vaporized liquid oxygen to supply a wastewater treatment plant, including conducting the HAZOP. In 2003, I was the proposal engineer and the process engineer for supplying a nitrous oxide purification plant, including design of the process equipment, setting the control strategy, conducting the HAZOP, commissioning, and incorporating safety features necessary for processing nitrous oxide, which is a strong oxidizer and which also can undergo explosive decomposition. In 2005-2006, I was the principal engineer for process design and control strategy for an ammonia

AMCS Corporation
Robert A. Mostello                    Page 3 of 10

FCI/MSJ 0742

purification plant, producing ultra-high purity ammonia for use in electronic components production.

I was in a position of responsible charge for investigating multiple accidents in an air separation plant, and keeping that plant safe while designing remediation equipment and establishing means for interim operation. That plant now has 16 years of safe operating history. I have reported on in-house accidents in air separation plants. I planned and executed an operation for blowdown of particulate contaminants at an air separation plant to correct for poor plant performance.

In 2004-2005, I investigated the accident which occurred at the Delaware City, Delaware facility of Motiva Enterprises, which occurred on May 20, 2000; I authored several reports and affidavits regarding relevant phenomena and responsibilities of the parties involved. These reports and affidavits are appended.

I investigated an oxygen valve fire at a steel mill (occurring in year 2000), with a findings presentation to the Compressed Gas Association in 2001. Acknowledgment of the significance of my findings was made in Document 13/02E of the European Industrial Gases Association (EIGA) "Oxygen Pipeline Systems" 2002.

**MATERIALS HISTORY**

As part of its air separation plant for supplying gases to Motiva, Inc. for a petroleum coke gasification project, Praxair, Inc. ordered a number of valves through Northeast Controls, Inc. from Fisher Controls International. Among these valves was 83HV0629, a valve intended as an isolation valve in high-pressure oxygen service. A specification sheet for '629 was initialed by Praxair and Northeast Controls. This specification sheet was dated 6/3/98 and was identified as Drawing Number A-2272740. Praxair placed a purchase order for valve '629, referencing Drawing Number A-2272740, i.e. the specification sheet which had been initialed by Praxair. Subsequently, Northeast Controls processed the order with Fisher as per a Matrix (valve identification) number, which called for construction materials listed in column 3 of the table below. Column 2 of the table below lists the construction materials in the initialed specification sheet.

During order processing, a discussion between Fisher and Northeast Controls resulted in a change in seal ring material from Tefzel to KEL-F. Consequently, valve '629 was shipped as per the elements of construction listed in the fifth column.

Report on Ordering of Valve . . . .                     September 4, 2007

There are differences between the materials in column 2 and those in column 5; and the fact that there are differences constitutes the basis for the balance of this report on the appropriate standard of care required in the industrial gas industry.

| Valve 83HV0629 | Specification sheet initialed by Northeast Controls and Praxair (Exh. 118) | As submitted by Northeast Controls (Exh. 131,NEC 135) | As agreed by Northeast Controls and Fisher (Whelan deposition, p.31) | As supplied by Fisher |
|---|---|---|---|---|
| Body | Hastelloy C | Hastelloy C | Hastelloy C | Hastelloy C |
| Disk | Monel | Hastelloy C | Hastelloy C | Hastelloy C |
| Shaft (Stem) | Monel | Inconel 718 | Inconel 718 | Inconel 718 |
| Seal ring (Seat) | Monel/PTFE | Tefzel | Kel-F | Kel-F |
| Journal & Thrust Bearings (Guide) | Monel | TFE composite | TFE composite | TFE composite |

## STANDARD OF CARE IN THE INDUSTRIAL GAS INDUSTRY

In the industrial gas industry, the appropriate standard of care is that when a customer agrees with a supplier or a supplier's representative[1] on what a product of sale is to consist of, the supplier will not change any item in the agreed product without the customer's consent. In all but the most trivial agreements, that agreement and all agreed modifications should be made in writing for the protection of both customer and supplier. Persons working with the equipment need to rely on documentation in order to maintain or replace or use such equipment in conjunction with a system of other components.

Equipment for any industrial plant cannot be considered trivial. Further, anyone in the educated technical community is expected to respect the gravity associated with the words "high pressure" and "oxygen".

Nearly everything that high-pressure oxygen contacts in a plant environment must be considered a potential fuel for combustion. Oxygen fires can ruthlessly cause equipment damage and injury/death. Examination of the results of oxygen fires, their re-construction from the disappearance of metal, which has been consumed or melted away, and the effects of a hot blast on surrounding

---

[1] Reference to supplier includes supplier's representative.

AMCS Corporation
Robert A. Mostello                     Page 5 of 10

FCI/MSJ 0744

structures, as well as the propulsion of objects over thousands of feet, can be disconcerting even to a technically-trained person.

Preparation of the document which specified construction materials for valve '629 and the ordering of the valve with different materials specifications constituted a serious departure from the appropriate standard of care. High-pressure oxygen is a particularly dangerous gas because it can sustain fires in materials routinely considered to be non-combustible.

Departure from the appropriate standard of care was magnified, due to the occurrence of an unfortunate accident involving the '629 valve. But there are other implications of an equally serious nature:

1. A valve, such as the '629 valve, may be in service for more than 20 years. Over that time, its conditions of service may be intentionally changed. Only one document (e.g., the ISA specification sheet, Exhibit 118) may be available to a party in charge of changing conditions. That party may decide that a further field check is not required. New conditions may be appropriate for the documented specifications, but not for the actual materials used in the valve as constructed.
2. The plant may be sold to a new owner; or new personnel come into positions of responsibility. The valve construction may be known; but the basis of decisions for its construction cannot be traced; or are assumed to be sound, based on the reputation of the former owner.

Commitment to an appropriate standard of care provides assurance that the negative effects that could be caused by oversight will be prevented. In this case Northeast Controls failed to ensure that the materials specified in writing matched the materials actually used in the valve. That failure was a significant deviation from the standard of care observed in the industrial gas industry.

My opinion stands regardless of the choice of materials. In other words, the specification sheet should match the actual materials of construction. I have identified the following items to support my opinion that Northeast Controls failed to adhere to the appropriate standard of care:

1. The ISA specification sheet, Exh. 118 (initialed by Bert Cappellini of Northeast Controls and Bhim Bhakoo of Praxair), was not treated by Northeast Controls to be an agreed document for materials, as well as for valve sizing.
2. Northeast Controls processed the order in a manner that resulted in the specification sheet not matching materials of construction of the valve, despite the categorical and publicly-recognized hazards associated with oxygen service. (Deposition of Bert M. Cappellini, Vol. 2, April 30, 2004, pp.222-223, 228-229)

3. Northeast Controls failed to advise Praxair of the materials of construction of the valve as supplied by Fisher.

## EFFECTS OF DIFFERENCE IN MATERIALS

Implications of these differences in the light of the accident at valve 83HV0629 on May 20, 2000 follow. However, my judgment on the appropriate standard of care is independent of the unfortunate accident and the resulting consequences.

The primary material of construction for valve 83HV0629 internals, signed off on an ISA specification sheet on 6/3/98 by Mr. Bhim Bhakoo of Praxair and Mr. Bert Cappellini of Northeast Controls, was Monel, and the body was specified as Hastelloy C. The valve was supplied with a Hastelloy C body, a Hastelloy C disk, an Inconel 718 shaft, a Kel-F seal ring, and TFE/composite bearings.

Monel, with rare exceptions, has been considered the preferred material for low risk construction of valves and piping elements in oxygen service. Choice of alternative materials can result from considerations of cost, availability, and mechanical/strength issues, but never at the sacrifice of safety. Among the advantageous characteristics of Monel are its low heat of combustion and the very high pressure of oxygen necessary for its combustion to be self-sustaining. **In nearly all oxygen fires, Monel simply does not burn.** A material can burn under "promoted" conditions (and release its heat of combustion) even at an oxygen pressure lower than that which will independently sustain combustion, if heat and high temperature are supplied from another source, such as another material present which is undergoing combustion. The process by which one ignited material subsequently ignites and sustains combustion of another material is termed a "kindling chain". Note that the specified seal ring had a PTFE component, and if it had ignited and burned, it would have contributed little to the overall fuel load and ignition chain, due to the refractory nature of the specified Monel internals in its vicinity.

This is a central issue when the designer of an oxygen system uses materials of construction with heats of combustion higher than Monel[2]. An oxygen threshold pressure is the minimum oxygen pressure at which a material will independently sustain combustion[3]. Materials such as Hastelloy C and Inconel 718 have substantially lower oxygen threshold pressures than Monel. In this instance, the oxygen threshold pressure for Hastelloy C is greater than the actual prevailing oxygen pressure; nevertheless, it underwent combustion, and its heat of

---

[2] Promoted Ignition Behavior of Engineering Alloys in High-Pressure Oxygen, McIlroy, et al, "Flammability and Sensitivity of Materials in Oxygen-Enriched Atmospheres: Third Volume", ASTM STP 986, p. 91 (1988).

[3] NFPA 53 "Recommended Practice on Materials, Equipment, and Systems Used in Oxygen-Enriched Atmospheres" 2004 Edition, Table F.3.4.2(a) Threshold Pressures in Oxygen of 3.2-mm (0.13-in.) Diameter Rods Ignited at the Bottom.

AMCS Corporation
Robert A. Mostello                    Page 7 of 10

Report on Ordering of Valve . . . .                    September 4, 2007

combustion, which is approximately 60% higher than that of Monel, further fueled the overall destruction in this incident. In the case of Inconel 718, the oxygen threshold pressure is lower than the prevailing oxygen pressure, and its heat of combustion is approximately 80% greater than Monel. These just about guaranteed its combustion and contribution to the kindling chain in this incident (as confirmed by post-incident photographs). The Kel-F seal ring and the Fiberglass/PTFE bearings were consumed in the fire. These are more prone to ignition than the components specified on the ISA Specification sheet, Exh. 118, agreed to by Northeast Controls and Praxair. **Unfortunately, the kindling chain existed and had its initiation from carbon (coke) deposits and an inlet carbon steel pipe and flange.**

## SUMMARY

In conclusion, I hold the following opinions to a reasonable degree of certainty:

1. Northeast Controls failed to observe the appropriate standard of care in processing the order for the 83HV0629 valve.
2. The materials of construction, as supplied, caused a significantly greater release of energy than would the materials identified in Exhibit 118, the specification sheet initialed by Praxair and Northeast Controls.
3. I continue to hold the opinions set forth in my reports and affidavits prepared in Olson v. Motiva.

## ACCESS TO INFORMATION

As preparation for the reports and affidavits appended, I had access to Deposition Transcripts and Deposition Exhibits for the Delaware City Explosion of May 20, 2000 in which an employee of Conectiv, Mr. Ronald W. Olson, was injured. Much of the especially relevant material was in my office for immediate access over several months. I had unlimited access to the complete collection of discovery documents (Olson v. Motiva, et al.) made available during two visits of 3-day and 2-day duration to the offices of Riddell Williams P.S. in Seattle, WA. I had also received documents on request from Riddell Williams. I utilized these references by prioritizing what appeared to me to be the most significant issues and circumstances surrounding the accident, including the construction and operation of the pipeline delivery system from the air separation plant, which was installed for supplying oxygen for gasification of petroleum coke at Motiva in Delaware City, DE.

Subsequently, I have requested and have made available to me documents, which were no longer in my possession, which are relevant to the current issues.

Report on Ordering of Valve . . . .                          September 4, 2007

## COMPENSATION AND PRIOR TESTIMONY

I will be compensated at a rate of $225 per hour for review of materials, writing this report, and testimony.  For door-to-door travel I will be compensated at a rate of $112.50 per hour.

I have not previously testified as an expert.

Report on Ordering of Valve . . . .                    September 4, 2007

## APPENDIX

1. "Report on the Delaware City Explosion at the Delaware City, Delaware Facility of Motiva Enterprises of Motiva Enterprises on May 20, 2000", prepared by Robert A. Mostello, PE, PhD, AMCS Corp., January 3, 2005; and page 15 Erratum letter, dated January 4, 2005.
2. Rebuttal report of January 28, 2005 by Robert A. Mostello to "Preliminary Report of Findings, December 21, 2004", by Whitman and Wiseman of the Rimkus Consulting Group.
3. Affidavit of Robert A. Mostello of April 15, 2005, in the Superior Court of the State of Delaware in and for New Castle County. Ronald W. Olson and Carol Olson, his wife, Plaintiffs, v. Motiva Enterprises, L.L.C., et al., Defendants. C.A. No. 02C-04-263 JRS.
4. Reply Affidavit of Robert A. Mostello of May 24, 2005, in the Superior Court of the State of Delaware in and for New Castle County. Ronald W. Olson and Carol Olson, his wife, Plaintiffs, v. Motiva Enterprises, L.L.C., et al., Defendants. C.A. No. 02C-04-263 JRS.
5. Current resume of Robert A. Mostello
6. "Industrial Practices for Gaseous Oxygen Transmission and Distribution Piping Systems", Compressed Gas Association, Inc. CGA G-4.4—1993.
7. "Oxygen Pipeline Systems", IGC Doc 13/02/E, European Industrial Gases Association, 2002.
8. Deposition Exhibit 109
9. Deposition Exhibit 118
10. Deposition Exhibit 119
11. Deposition Exhibit 131
12. Deposition Exhibit 136
13. Deposition Exhibit 141
14. Deposition Exhibit 145
15. Deposition Exhibit 146
16. Deposition Exhibit 148
17. Deposition Exhibit 153
18. Deposition Exhibit 212
19. Deposition of Bert M. Cappellini
20. Deposition of Bert M. Cappellini
21. Deposition of Mark J. Paolucci
22. Deposition of Robert D. Barry
23. Deposition of David N. Whelan
24. Deposition of Bhim S. Bhakoo

AMCS Corporation
Robert A. Mostello                    Page 10 of 10

FCI/MSJ 0749

# EXHIBIT C



October 4, 2007

Mr. Patrick D. McVey
Riddell Williams P.S.
1001 Fourth Avenue Plaza
Suite 4500
Seattle, WA 98154-1065

Dear Mr. McVey:

This rebuttal report addresses elements in the report of Dr. David P. Pope, dated 8/30/07, and that of Mr. Gerard Muller, dated 8/23/07, regarding Northeast Controls, Inc. & St. Paul Mercury Ins. Co. v. Fisher Controls, Int'l.[1]

Mr. Muller has concentrated his argument exclusively on the impact and importance of the valve seal used in the '629 valve and has relegated all the other valve internals to an inconsequential status. This is a serious error on Mr. Muller's part. It will be shown below that the valve seal, although truly of an inferior construction to that specified by Praxair, was of lesser importance than other valve internals.

Dr. Pope has summarily considered only the valve seal as "non-exempt", from both technical and literal standpoints, and from any causality in the extent and severity of damage to the valve and the surrounding environment. This is surprising in the light of Dr. Pope's report of 1/3/05, in which Dr. Pope states that Inconel 718, the material of the valve shaft, will burn in oxygen; and stated that indeed, the Inconel 718 shaft did undergo combustion. Photographs of the damaged valve show that combustion of part of the shaft did take place. It will be shown below that Dr. Pope has not exercised sufficient oversight in applying the term "non-exempt", which means that Dr. Pope has exempted all other valve internals from causality in the extent and severity of damage to the valve and the surrounding environment.

AMCS Corp.
981 Rt. 22 West
Bridgewater, NJ 08807
Tel: (908) 429-2100
Fax: (908) 429-3004
Email.
bob.mostello@amcscorp.com

In fact, analysis of the valve, post-accident, showed that the Inconel 718 shaft, the Hastelloy C disk, the Hastelloy C valve body, the TFE guide bearings, and the Kel-F seal, all elements of the '629 valve, underwent combustion.

Dr. Pope and Mr. Muller have missed the importance of the term, "promoted combustion"[2]. A substance **can burn** in oxygen and release its considerable heat of combustion, even though the material cannot by itself sustain burning at the prevailing

---

[1] I incorporate my report of September 4, 2007 in this paper.
[2] This can be considered "continuously promoted ignition", whereby an external energy source is employed to ignite a material. Ignited materials which continue to burn are classified by a "threshold pressure", the minimum oxygen pressure which will support combustion *unassisted*. Engel, et al., "Promoted Metals Combustion at Ambient and Elevated Temperatures", J ASTM

oxygen pressure, as long as energy from another source is provided. The sustaining energy originated from the burning upstream carbon steel pipe and flange. Consumption of parts of the Inconel 718 valve shaft, the Hastelloy C valve disk, the Hastelloy C valve body, and all of the Kel-F seal and composite TFE guide bearings occurred, **as shown in the photographs and descriptions of the damage.** These all released their heats of combustion over an extremely short interval. The contribution of the valve seal alone was a small part of the overall combustion heats from the rest of the valve internals. This combination of combusting internal components each sustained the other. So there was a synergy of the effects of the combustions of valve shaft and valve disk and valve body, truly aggravating the hazardous situation which had unfolded upstream. One cannot consider Inconel 718 and Hastelloy C "exempt" under these circumstances, since components made of these materials actually underwent combustion.

The materials of construction originally specified by Praxair were: Hastelloy C body, Monel disk, Monel shaft, Monel guide bearings, Monel-PTFE seal ring. With these materials and the same incidence of fire from the carbon steel inlet flange and pipe, the oxygen pressure would have been far below that required to promote ignition of the disk and valve shaft. Monel pipe is consistently used as a "fire-break" in oxygen pipeline systems, because it does not burn in such systems.[3] Moreover, these Monel valve components would serve as massive heat sinks, absorbing heat even to their melting points. As the hot blast from upstream progressed, there would be no synergy between the Monel valve disk, Monel shaft, and the Hastelloy body, casting doubt on whether any of the Hastelloy C body would have burned. At the point of contact where the hot gas from upstream contacted the valve opening, the PTFE part of the composite Monel-PTFE seal would have burned; but the companion Monel would have melted at the small disk-to-seal aperture. The Monel part of the seal is at least 1/8" thick and more in other sections, too thick for combustion of Monel[4], especially with respect to its close proximity to the heat sink of the massive Monel disk. The mass of the PTFE seal in the combination Monel-PTFE seal is even less than that of the substituted Kel-F seal, which Mr. Muller already has said was "inconsequential".

---

International, **3**, 6, Paper ID JAI13539, has shown that there is a very wide "transition zone" between the threshold pressure and a lower pressure at which even an igniter cannot produce continuous burning of the material. In the transition zone, many factors come into play, including the effect of the temperature of the sample. This is demonstrated in Fig. 12 (*"Inconel 718 pressure-temperature burn characteristics"*) of the Engel paper. Another factor would be when an external torch serves as a continuous igniter, as from a burning carbon steel pipe and flange upstream. This behavior has been identified as the two-shelf phenomenon between which there is a Promoted Ignition-Combustion Transition by Zawierucha et al., "Promoted Ignition-Combustion Behavior of Cast and Wrought Engineering Alloys in Oxygen-Enriched Atmospheres", <u>Flammability and Sensitivity of Materials in Oxygen-Enriched Atmospheres</u>: **10**, STP 1454, ASTM International, 164-176 (2003).
[3] In effect, even the transition zone for Monel is at a pressure level very much higher than the pipeline pressure which existed during the '629 valve accident.
[4] The Compressed Gas Association (CGA) and the European Industrial Gases Association (EIGA) recognize 1/8" thickness as a reasonable representative thickness for testing to assess the applicability of specific materials for pipeline and other equipment uses in oxygen service. That is, 1/8" is considered thick. As an example of what would be considered thin are screens with wire diameters of 1/100".

Thus, while the upstream instigation of the accident would have been unchanged, the valve itself may either have snuffed out the incident fire or transmitted it in a weaker condition downstream. A preponderance of information on materials in oxygen service strongly indicates that the valve itself would not have been a contributor to the accident damage, if it were fabricated using the originally-specified materials. The materials which were used in fabrication of the '629 valve were significant contributors to the damage which the valve experienced and augmented.

This concludes my analysis of the reports of Dr. David P. Pope and Mr. Gerard Muller.

Respectfully submitted,

Robert A. Mostello, PE (ret.), PhD

FCI/MSJ 0752

3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY | NO. 06-412 |
| Plaintiffs, | |
| v. | **AFFIDAVIT OF PATRICK D. MCVEY IN SUPPORT OF DEFENDANT FISHER'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| FISHER CONTROLS INTERNATIONAL, LLC | |
| Defendant. | |

STATE OF WASHINGTON )
               : ss.
County of King        )

    I, PATRICK D. MCVEY, being duly sworn, depose and state as follows:

    1.     I am one of the attorneys representing defendant Fisher Controls International, LLC, in the above matter and in the underlying actions. I am competent to attest as to the matters set forth herein, and I make this affidavit based on my personal knowledge.

    2.     On January 20, 2004, I attended a hearing before Judge Slights in the underlying actions. The hearing was scheduled to include oral argument on Fisher's motions for summary judgment on all claims asserted by Great American. Great American's counsel, Christopher Konzelmann, offered no argument in opposition to Fisher's motions. Instead, Mr. Konzelmann informed the court that Great American had decided to voluntarily dismiss all claims against Fisher.

    3.     In the early stages of the underlying actions, I was informed by counsel for plaintiffs in those actions that total damages, including claims for lost profits, could exceed $35

million.

Patrick D. McVey

Subscribed and sworn to before me this 20th day of November, 2007.

Molly J McInnis

Printed Name: Molly J McInnis
Notary Public, State of Washington
Residing at _Enumclaw_
My commission expires: _9/8/11_

## CERTIFICATE OF SERVICE

I, Paul A. Bradley, Esquire, hereby certify that, on November 20, 2007, I caused a true and correct copy of the following documents to be served upon counsel of record via electronic filing and hand delivery:

1.  Defendant Fisher Controls International, LLC's Brief in Response to Plaintiffs' Motion for Summary Judgment;

2.  Affidavit of Daniel J. Gunter in Support of Defendant Fisher Controls International, LLC's Response to Plaintiffs' Motion for Summary Judgment;

3.  Affidavit of Robert A. Mostello in Support of Defendant Fisher Controls International, LLC's Response to Plaintiffs' Motion for Summary Judgment; and

4.  Affidavit of Patrick D. McVey in Support of Defendant Fisher Controls International, LLC's Response to Plaintiffs' Motion for Summary Judgment.

MARON MARVEL BRADLEY
& ANDERSON, P.A.

/s/ Paul A. Bradley
Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 425-5177 (phone)
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant
Fisher Controls International, LLC

**_OF COUNSEL_**

**RIDDELL WILLIAMS P.S.**
Patrick D. McVey, Esquire
Daniel J. Gunter, Esquire
1001 Fourth Avenue Plaza
Suite 4500
Seattle, WA 98154

Date: November 20, 2007