IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHEAST CONTROLS, INC.; and | ) | |
| ST. PAUL MERCURY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Plaintiffs | ) | No. 1:06-CV-00412 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant | ) | |

## PLAINTIFFS, NORTHEAST CONTROLS, INC., AND ST. PAUL MERCURY INSURANCE COMPANY'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT FISHER CONTROLS INTERNATIONAL, LLC'S MOTION FOR SUMMARY JUDGMENT

THOMAS P. WAGNER, ESQUIRE
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
1845 Walnut Street
Philadelphia, PA 19103
tel: 215-575-4562
e-mail: tpwagner@mdwcg.com
*Counsel for Plaintiffs*

JOSEPH SCOTT SHANNON, ESQUIRE
Delaware Bar I.D. No. 3434
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899-8888
tel.: 302.552.4329
e-mail: jsshannon@mdwcg.com
*Counsel for Plaintiffs*

Dated: November 21, 2007

01/4203013.v1

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS ............................................................ 1

SUMMARY OF ARGUMENT ........................................................................................ 2

ARGUMENT ............................................................................................................... 3

    A.    This Is Not A Negligence Case ..................................................... 4

    B.    The Contract Language ................................................................. 7

        1.    Why Were Northeast And Fisher Sued: .............................. 8

        2.    What Are The "Losses"? ................................................. 12

    C.    Delaware Contribution Act .......................................................... 18

    D.    Statute of Limitations ................................................................. 21

    E.    Fisher's Counterclaim for Breach of Contract ............................. 24

CONCLUSION ........................................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*B.Lewis Productions, Inc. v. Bean,* 2005 U.S. Dist. LEXIS 1579 (D. Del. 2005) .....................22

*Burns & McDonnell Engineering Company, Inc. v. Torson Construction Company, Inc.*, 834 S.W.2d 755 (Mo.App.1992) ..................................................................................................15

*Cannon v. Fidelity & Cas. Co. of New York*, 484 F.Supp. 1375 (D.Del. 1980)...........................23

*Cf. Tichnell v. United States*, 681 F.2d 165 (3d Cir. 1982)..........................................................4

*Chesapeake Utilities Corp. v. Chesapeake & Potomac Telephone Co. of Maryland*, 401 A.2d 101 (Del. Super. 1979)...................................................................................................................23

*Forsythe v. Starnes*, 554 S.W. 2d 100 (Mo.App. 1977) ...........................................................27

*Missouri Pacific Railroad Company v. Rental Storage and Transit Company*, 524 S.W 2d 898 (Mo. Ct. App. 1975).............................................................................................................21

*Sorensen v. Overland Corp.*, 142 F.Supp. 354 (D. Del. 1956) ..................................................23

*Travelers Indemnity Company v. S.M. Wilson & Company, et al.*, 2005 U.S. Dist. LEXIS 29328 (E.D.Mo. 2005), at 3. .....................................................................................................13, 20

## Statutes

10 Del. C. §8106..........................................................................................................................23

10 Del. C. §8121..........................................................................................................................22

10 Del.C. §6302...........................................................................................................................18

10 Del.C. §8106...........................................................................................................................22

Mo. Rev. Stat. §516.120 (1986) .................................................................................................23

## Other Authorities

*Merriam-Webster's Collegiate Dictionary, 11th Edition* (2005) ....................................................3

## Rules

Fed.R.Civ.P. 30(b)(6)..........................................................................................................3, 6, 11

Fed.R.Evid. 801 ..........................................................................................................................18

## <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

Discovery is completed and Cross-Motions for Summary Judgment have been filed by plaintiffs and defendant.  This brief is in response to the Motion of Defendant Fisher for Summary Judgment.

## SUMMARY OF ARGUMENT

1.     This is not a negligence case.  Defendant Fisher had the full opportunity in the Underlying Litigation to litigate any negligence claims against plaintiff Northeast Controls, Inc. The current action is for breach of contract only.

2.     The issue in this case is whether the language of the indemnity clause required defendant Fisher to defend and indemnify plaintiff Northeast.  Fisher argues in its Motion for Summary Judgment that the term "Losses" in the contract refers only to the lawsuits brought against Northeast and Fisher, and Fisher argues further that the alleged negligence of Northeast caused these lawsuits.  Fisher reasons, therefore, that Northeast's negligence caused the "Losses" and it does not have to indemnify Northeast.

3.     Fisher's position is incorrect.  Under the language of the contract, and under Missouri law, the "Losses" are all the liabilities and damages arising from or connected with the personal injury and property damage resulting from the explosion and fire at the power plant. Fisher is obligated to defend and indemnify plaintiff Northeast for these "Losses" unless they were caused by Northeast's negligence.  Fisher's own evidence in the Underlying Litigation proved that no negligence of Northeast caused the explosion and fire.  Therefore, the personal injury and property damage "Losses" were not caused by Northeast's negligence, and the indemnity obligation is intact.

4.     Neither the Delaware Contribution Act nor the statute of limitations bars plaintiffs' action.

5.     Defendant's counterclaim is without merit.

## <u>ARGUMENT</u>

Merriam-Webster's Dictionary defines the term "Red Herring" as "**something that distracts attention from the real issue.**"[1]  That definition could also apply to the brief that defendant Fisher has filed in support of its Motion for Summary Judgment.

In its long Statement of Facts and in the 18-page Argument that follows it, Fisher has devoted most of its brief to establishing that plaintiff Northeast Controls was negligent in processing the order for the 629 valve.  Like Webster's Red Herring, Fisher's argument is nothing but an effort to distract the Court's attention from the real issue in this case.  This is not a tort action; it is not about negligence.  If Fisher wanted to pursue a negligence claim against its sales representative, Northeast, it had the full and fair opportunity to do so in the Underlying Litigation.  For clear strategic reasons, Fisher chose not to do so, and it reaped the benefits of that successful strategy.

Now, the tort claim is over.  Now, the negligence issues are in the past.

This is an action for breach of contract.  Fisher promised that if its sales representative Northeast was sued by anyone claiming damages resulting from an alleged defect in a Fisher product, Fisher would protect, defend and indemnify Northeast.  That was the bargain it made in return for Northeast's services.  It is undisputed that four lawsuits were indeed brought against Northeast claiming damages resulting from an alleged defect in a Fisher product.

The contract, which Fisher wrote,[2] provided only one escape from the indemnity obligation.  Under the terms of the escape clause, Fisher was not obligated to defend and

---

[1]      *Merriam-Webster's Collegiate Dictionary, 11th Edition* (2005).  According to the dictionary, the term is derived from the practice of drawing a Red Herring across a trail to confuse hunting dogs.

[2]      See deposition of James Montgomery as corporate designee of defendant Fisher Controls, LLC pursuant to Fed.R.Civ.P. 30(b)(6), at pages 21-22, attached as App. B, Ex. 1, p. B0001.

indemnify Northeast for losses that resulted from Northeast's negligent acts or omissions. The language in the indemnity clause triggers the obligation to defend and indemnify upon the mere allegation of a product defect. The language of the escape clause, by contrast, is more narrow. That language requires that the losses sued upon must actually result from Northeast's negligence. The mere allegation of such causal negligence is not enough.

### A.    This Is Not A Negligence Case

Most of Fisher's brief in support of its Motion for Summary Judgment is devoted to an excruciating dissection of Northeast employee Bert Cappellini and his actions in processing the order for the 629 valve. Fisher traces Mr. Cappellini's steps; quotes long passages of testimony from his supervisors; examines the requirements of his company's procedure manuals; and refers at length to the statements of the man who ordered the valve from him at Praxair.

After laboring through its long effort to chronicle the alleged misdeeds of Mr. Cappellini, Fisher finally reaches a conclusion on the 29th page of its brief: **"Northeast Controls was negligent in processing the order for the valve."**

Plaintiffs certainly do not concede negligence by Mr. Cappellini or anyone else. To be sure, we would have all preferred to see better documentation of the order for the valve and its components in accordance with Northeast's procedures. This does not necessarily mean that Mr. Cappellini was negligent. *Cf. Tichnell v. United States*, 681 F.2d 165, 173 (3d Cir. 1982). But whether there was negligence in processing the order for the valve is not the issue in the current litigation.

The tort lawsuits arising from the explosion and fire at the Delaware City Power Plant were thoroughly litigated in the Superior Court. That litigation is over. As set forth in the

plaintiffs' opening brief, defendant Fisher had every opportunity there to defend itself by

pursuing a negligence claim against co-defendant Northeast Controls, Inc.  Fisher could have

attempted to prove in the Underlying Litigation that the Losses arising from the explosion and

fire were caused by the negligence of Northeast, but it chose not to do so.  This was a strategic

decision by Fisher, and its strategy succeeded.  Fisher argued aggressively in the underlying case

that there was nothing wrong with the valve and that the explosion and fire were caused by other

parties and other factors.  Fisher developed and produced in that litigation an expert report which

called the valve "a victim of the fire."  The report's author, Dr. Mostello, stated unequivocally

that the fire was initiated upstream, before the oxygen reached the valve.  He blamed this on the

phenomenon known as "particle impingement," and he said it happened because of the way that

the oxygen line was designed, cleaned, and operated.[3]    His opinion laid no blame at the feet of

Northeast.[4]

---

[3]    Dr. Mostello gave a deposition in this action on November 2, 2007, the transcript of which is not yet available.  There, he confirmed that he continues to hold the opinions set forth above.  He is the only scientific expert identified by Fisher in this litigation.

[4]    Fisher's effort now to condemn the conduct of Northeast is exaggerated to the point of being disingenuous.  For example, Fisher states in its brief that the engineering firm of Wendell Hull and Associates was engaged shortly after the incident to investigate the causes.  Fisher says that Wendell Hull "already had significant experience in investigating fires in oxygen systems," and that "its lead investigator . . . had previously worked for NASA at its White Sands testing facility."  Fisher goes on to point out that Wendell Hull provided "an initial report that implicated the valve's materials of construction."  "Thus,", says Fisher in its brief, "before any lawsuit was filed, a well-respected expert in oxygen service had concluded that the fire was caused by an error on the part of Northeast Controls."  See Fisher opening brief at pages 10-11.  Later, Fisher comes back to Wendell Hull on page 30 of its brief, describing the company as a "prominent forensic engineering firm" and pointing out that its conclusions implicated the actions of Northeast.

What Fisher does not point out in its brief is that the Wendell Hull report was subsequently repudiated by its *own authors*.  This fact is well known to Fisher, since Fisher itself filed a Motion in the Underlying Litigation to exclude the testimony of Praxair's expert Phillip Whitman because it was based on the "unreliable" Wendell Hull report.  Fisher stated as follows: "[Whitman's] belief that the fire was caused by friction flow ignition rests on an opinion by the authors of the preliminary Wendell Hull report – but that opinion was later withdrawn by those authors in a peer-reviewed publication that was not supplied to Whitman by counsel for Praxair."  Fisher went on to say that "when the Wendell Hull report was drafted, the authors of that report had access to virtually none of these [documents produced in discovery].  Consequently, they did not have an adequate basis for their opinion."  Fisher also said: "The unreliability of the Wendell Hull report is further demonstrated by the fact that the authors of that report later withdrew the 'flow friction' theory."  Fisher's Motion is attached as App. B, Ex. 2.

Having chosen not to pursue a claim of negligence against Northeast in the Underlying

Litigation, Fisher cannot be heard to revive that claim now.  Plaintiffs incorporate by reference

the arguments set forth at pages 19 to 23 of our Corrected Opening Brief in Support of our

---

Similarly, Fisher's brief suggests to the Court that Northeast cavalierly changed the materials of construction for this important valve to be used in a sophisticated system involving highly pressurized oxygen. Fisher's description would make the reader believe that Northeast placed everyone at grave risk of harm.

In doing so, Fisher neglects to mention some facts that it proved during the Underlying Litigation. Notably, the materials of construction for every piece of the valve were well-known to the buyer at Praxair more than a year before the explosion and fire. Fisher offered in the underlying litigation the Affidavit of Mr. Meredith Miller. Mr. Miller's Affidavit explained that when Fisher shipped the 629 valve to Praxair, it was accompanied by both an order acknowledgment form and a spare parts packing list. These documents spelled out the valve's materials of construction, with the exception of one error made by Fisher itself. The Affidavit goes on to state that the valve disc bore a casting mark identifying its material, and that the casting mark would have been "visible to anyone inspecting the Valve." The Affidavit concluded by stating: "The Valve's disc and stem are both manufactured of materials capable of being identified through the used (sic) of a portable materials analyzer." The Miller Affidavit and its accompanying Exhibits are attached. See App. A to Plaintiffs' Opening Brief in Support of Motion for Summary Judgment, Ex. 18.

Fisher's brief also neglects to point out that on receiving the valve more than a year before the incident, Praxair signed an Inspection Release form expressly stating that the valve complied with the buyer's purchase order. This form, too, was produced in the Underlying Litigation. The Inspection Release form is attached as App. B, Ex. 3.

Also missing from Fisher's description of Northeast's "appalling" conduct is the matter of the 613 valve. Although no one could find a final specification sheet approved by Praxair with the actual materials used to make the 629 valve, there was another valve near it in the same system made of exactly the same materials, and Praxair approved those specifications. The other valve was identified in the underlying litigation as the 613 valve. Although smaller in size, it was the same model valve as the 629 valve, and it was designed to perform the same functions. As he had to admit in his deposition, Praxair's engineer Bhim Bakhoo authorized the same materials of construction for the 613 valve that were actually used in the 629 valve. The specification sheet for the 613 valve, approved by Bhim Bakhoo, is attached as App. B, Ex. 4. Mr. Bakhoo admitted that he approved this specification sheet in his deposition testimony on December 11, 2003 at p. 131, a copy of which is attached as App. B, Ex. 5.

Finally, while it condemns the "negligence" of Northeast, Fisher makes no mention of its own conduct. Fisher was the manufacturer of this valve. Fisher knew that the valve would be used in oxygen service. This was established in deposition testimony during the Underlying Litigation, and it was admitted by Fisher during the company's deposition in this case under Fed.R.Civ.P. 30(b)(6). See App. B, Ex. 6. In fact, a Fisher employee actually contacted Mr. Cappellini at Northeast on receiving the order for the 629 valve, and recommended a change in one of the materials of construction, precisely because the valve was to be used with oxygen. If the other materials in the valve were inappropriate for use with oxygen, or were dangerous for any reason, Fisher most certainly should have known it. Indeed, this very charge was made against Fisher in all four of the Complaints in the Underlying Litigation. If Fisher allowed an industrial valve intended for oxygen service to leave its possession, knowing that it contained materials which could be dangerous in certain oxygen service conditions, whose negligence would then be viewed as "appalling"? Nevertheless, the fact is that Fisher did manufacture the valve and ship it to Praxair, containing the very materials found in the valve transmitted by Northeast, and knowing that the valve would be used with oxygen. This was not dangerous at all, and Fisher knows why. The materials were perfectly appropriate for use with oxygen. In fact, although they varied from those in the specifications, the materials used to make the valve were all approved by Praxair itself in its published standards for materials deemed acceptable for use with oxygen.

Motion for Summary Judgment.  As set forth in those pages, Fisher cannot be permitted to have it both ways.  For reasons dictated by its strategy in defending its own interests, the defendant chose not to pursue a negligence claim against Northeast which was fully available to it.  In fact, the same claim was pursued by other parties in the same litigation, but without success.  Fisher took a different path, and cannot be permitted to change its course now.

**B.        The Contract Language**

The real issue in this case is whether the language of the Representative Agreement requires Fisher to indemnify Northeast and reimburse the plaintiffs for the amounts they spent to defend and resolve the Underlying Litigation.

Fisher wants this court to conclude that it does not matter whether Northeast's "negligence" had any role in causing the explosion and fire which gave rise to these lawsuits. Fisher argues that although the theories against Northeast were completely wrong, and although Northeast's alleged "negligence" really had no role in causing the underlying incident, Fisher can seize upon that unadjudicated claim of negligence to escape its indemnity obligation.

A fundamental premise of Fisher's position is stated very early in its brief.  "Because Northeast Controls had mishandled the ordering of the valve, Fisher and Northeast Controls were named as defendants in four separate lawsuits."  Defendant's Opening Brief in support of its Motion for Summary Judgment, p. 2.  The next 27 pages of the defendant's brief are devoted to chronicling the alleged negligence of Northeast, before Fisher finally returns to its argument at page 29-31.  There, in two short pages, Fisher sets forth the main thrust of its argument:

1.        It was Northeast's "negligence" that caused Fisher and Northeast to be sued in the Underlying Litigation.

2.      The "Losses" against which Fisher must protect Northeast are not the personal injury and property damages that resulted from the explosion and fire.

These arguments have no merit, and they should be rejected.

### 1.      Why Were Northeast And Fisher Sued?

As an essential pillar of its argument, Fisher contends that Northeast and Fisher were both sued because Northeast allegedly mishandled the purchase order for the valve. This is pure speculation.  Not surprisingly, Fisher cites no evidence from the record to support its conclusion. Fisher offers no Affidavit, or deposition, or admission, or document of any kind to confirm its guesswork as to why the underlying plaintiffs sued Northeast, or Fisher, or anyone else.

Instead, Fisher points to the Wendell Hull report discussed above and in footnote 4. Fisher argues that no matter how wrong the Wendell Hull report may have been, since the report was in existence, the material deviations which it discussed must have been the reason that Fisher and Northeast were sued.  This is nothing but a leap of faith.  As stated above, it has no evidentiary support in the record.

A good place to begin looking for the reasons why Fisher and Northeast were sued would be the allegations in the Underlying Complaints.  The Olson personal injury Complaint alleged, as Fisher says, that "[t]he valve specifications required . . . Fisher and/or Northeast to utilize certain . . . material."  ¶20.  Immediately thereafter, however, the Complaint went on to allege that "Fisher and/or Northeast knew or reasonably should have known, *regardless of the purchase order's terms* (emphasis added), that Praxair would utilize the valve for high pressure oxygen service."  ¶21.[5]

---

[5]      The Olson personal injury Complaint is attached as Exhibit 6 to Fisher's Motion for Summary Judgment, beginning at page FCI-MSJ 0048.

Thus, while the allegations of the Olson Complaint included the change in the specifications for the materials, they also went beyond that subject. The Complaint clearly charged that Fisher itself knew or should have known the valve would be used with oxygen, and "regardless" of what was specified or requested by the purchaser, both Fisher and Northeast had a duty to supply a valve product that was suitable for its intended purpose.[6]

The Complaints in the three property damage cases were substantially similar. The Great American Complaint expressly alleged, like the Olsons, that "regardless of the purchase order's terms," (and thus regardless of any difference between what was specified and what was supplied), both Fisher and Northeast "knew or should have known" that they had to supply an oxygen-appropriate valve.[7]

These Complaints provide no basis for concluding that Fisher and Northeast were sued only because of Northeast's alleged failure to follow the original specifications from the buyer of the valve. On the contrary, all of the Complaints made allegations that Fisher knew how the valve was going to be used and that both Fisher and Northeast had a duty to supply a valve that was appropriate for this use. Two of the Complaints, Olson and Great American, expressly alleged that Fisher and Northeast had this duty "regardless" of what was specified by the buyer.

The one deposition taken in this case that bears directly on the reasons for suing Fisher and Northeast was that of Mr. Guido Karcher. Oddly, Fisher makes no reference to this

---

[6]    As noted elsewhere, Fisher has admitted in this litigation that it knew the valve would be used in oxygen service at the time that the valve was manufactured and sold. See App. B, Ex. 6, B0022-B0024.

[7]    See Great American Complaint at ¶13, attached to Fisher's Motion for Summary Judgment as Exhibit 5. See also the Complaint of Praxair at ¶11, which contains substantially the same allegations, except that it omits the phrase "regardless of the purchase order's terms." The Praxair Complaint is attached to Fisher's Motion for Summary Judgment as Exhibit 3. The Motiva Complaint contains far more vague allegations regarding the materials and the general design of the valve, claiming that both Fisher and Northeast were negligent in failing to supply a valve that was suitable for oxygen service, despite knowledge that the valve would be used with oxygen. The Motiva Complaint is attached to Fisher's Motion for Summary Judgment as Exhibit 4.

deposition when it asks the Court to draw unsupported conclusions about why the underlying lawsuits were filed.

Mr. Karcher was the lead engineer on a team of investigators working for Great American Assurance Company.  Great American paid large property damage claims resulting from the explosion and fire, and it conducted an early investigation with Mr. Karcher's assistance.  Subsequently, Great American filed its Complaint as a subrogation plaintiff.  That Complaint is attached to Fisher's Motion for Summary Judgment as Exhibit 5.

Mr. Karcher's deposition was taken by Fisher's counsel on October 26, 2007.  In the course of this deposition, the witness was asked about the conclusions that he reached:

> Q.    You used those observations and results to conclude that the change in materials of construction of the valve from what Praxair specified to what it eventually received was a cause of the explosion?
>
> A.    I think I'd like to add to that the fact that Fisher designs valves that are specifically for oxygen service.  There's cleanliness requirements, there are nonmetallic requirements and other things, and this valve did not satisfy that.

Karcher Deposition, p. 34.

Clearly disappointed with this answer, Fisher's counsel tried again.  It got worse:

> Q.    What you were stating was that had the valve been as specified by Praxair, it would not have been a cause of the fire and explosion?
>
> A.    If the valve had been as specified and built to the oxygen standard requirements that even Fisher has in their own literature, then my answer to that question is yes.

Karcher Deposition, p. 36.[8]

---

[8]    The pertinent pages from the Karcher deposition are attached as App. B, Ex. 7, B0025-B0026.

Thus, Mr. Karcher said in his deposition that the reasons to make a claim against Fisher and Northeast included the valve materials of construction, but they also included other things. As he made clear, Fisher designs valves that are specifically intended for oxygen service, and it has its own published standards. In his opinion, this valve did not meet those standards for various reasons, including such factors as "cleanliness requirements, . . . nonmetallic requirements and other things." He concluded that "this valve did not satisfy that." As set forth above, this man was leading the investigation for Great American and the property damage plaintiffs.

Indeed, it is hard to imagine that Fisher and Northeast would not have been drawn into this litigation as defendants, with or without the alleged deviations in the valve's materials from what was specified in the purchase order. As alleged in the various underlying Complaints, this incident was set in motion when the control room at the power plant sent the valve an electronic instruction to open, and the valve failed to respond. There has never been any allegation that this failure had anything to do with the materials from which the valve was made. The control room then called Mr. Olson and asked him to check the valve. The explosion occurred in the immediate vicinity of the valve shortly after Mr. Olson arrived. Fisher manufactured the valve, knowing it was to be used in oxygen service.[9] Northeast was directly involved with the buyer to determine, not only the materials for the valve, but also its size, and the very type of valve to be used for the application.[10]

---

[9]    See Fisher corporate designee deposition under Fed.R.Civ.P. 30(b)(6), App. B, Ex. 6, B0022-B0024.

[10]    This was done in accordance with Northeast's obligations under the Representative Agreement. See App. A to Plaintiffs' Motion for Summary Judgment, Ex. 1, at p. A0002, ¶B.

Fisher is asking this Court to speculate about why the defendants were sued in the Underlying Litigation. There is no evidence to support this speculation, and no conclusion can be drawn from it.[11]

### 2.       What Are The "Losses"?

Hopefully, even Fisher would agree that the indemnity provision in the Representative Agreement is intended to protect Northeast against *something*. In the terminology of this contract, that "something" is called "Losses."

At pages 29 to 31 of its brief, Fisher strains to convince the Court that the "Losses" have nothing to do with the damages sustained in the underlying incident. Instead, Fisher wants the Court to believe that the "Losses" are the underlying lawsuits themselves, and not the damages which they sought to recover. To make this argument, Fisher quotes half the operative language from the contract while ignoring the other half (*see* p. 30); cites *no authority* for its interpretations; and openly tells the Court that "truth" does not matter in this analysis. *See* Fisher's Opening Brief, at p. 30, n. 86.

The best place to begin is with the language of the indemnity provision. The pertinent language reads as follows:

> **Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless Representative from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or may be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any product.**

---

[11]      This is not a reason to deny summary judgment to the plaintiffs. The question of why Fisher and Northeast were sued is irrelevant to the plaintiffs' claim for indemnification based on the contract. Thus, it is not a "material" issue of fact.

> **Notwithstanding the provisions of the immediately preceding paragraph . . . , Fisher shall not be obligated to protect, defend, indemnify or hold harmless Representative from and against any Losses arising from the following:**
>
> **. . .**
>
> **F.    Negligent acts or omissions by Representative.**

Representative Agreement, §XI.  INDEMNITY.  See App. A, Ex. 1, p. A0010 and A0011.

Fisher tries to twist and strain this language to reach the absurd result that the "Losses" Northeast is protected against have nothing to do with the damages sustained in the incident that gives rise to the litigation.  This is simply not what the language says, and common sense dictates that it could not be what the language means.

By the terms of the Representative Agreement, Missouri law governs the substantive issues now before the Court.

> "Under Missouri law, if its terms are clear and unambiguous, Courts enforce a contract according to the plain meaning of its words.  *Contract Freighters, Inc. v. J.B. Hunt Transportation, 245 F.3d 660, 663 (8th Cir. 2001)*.  The plain unequivocal language of a contract must be enforced as written, and the intent of the parties to an unambiguous contract is found by giving the contract language its natural, ordinary and common sense meaning.  *Cheval v. St. Johns Mercy Medical Center, 958 S.W. 2d 36, 39 (Mo.Ct.App. 1997)*."

*Travelers Indemnity Company v. S.M. Wilson & Company, et al.*, 2005 U.S. Dist. LEXIS 29328 (E.D.Mo. 2005), at 3.

Giving them their "natural, ordinary and common sense meaning," the words quoted above clearly say that the Representative (Northeast) is protected by Fisher from the consequences of any personal injury or property damage that is caused or allegedly caused by a defect in a Fisher product.  Specifically, the contract protects Northeast against "any and all"

such consequences, whether they be claims, or demands, or actions, or losses (this word is used twice), or damages, or liabilities, or costs and expenses.

Twice on page 30 of its brief, Fisher tries to tell the Court that the Losses against which Northeast is protected are only "claims, demands, [and] actions."[12]  But the real language in the contract is much broader.  It captures virtually any consequence at all, including any "damages," any "costs and expenses," any "losses," any "liabilities"  that are in any way connected with personal injuries and property damages allegedly caused by a product defect.

Fisher's entire argument is based on the narrow premise that Northeast's "negligence" in handling the order for the valve is what caused the "claims, demands [and] actions."  Plaintiffs make no such concession; on the contrary, the "claims, demands [and] actions" were caused by the explosion and fire, and the resulting personal injuries and property damage.  But more importantly, Fisher has not even tried to argue that any alleged negligence of Northeast caused the "damages" or "costs and expenses" or "liabilities" that arose from or were connected with the personal injuries and property damage.  Yet, these are just as much a part of the "Losses" against which Northeast is protected under the indemnity clause.  Fisher has no answer to this argument, and does not even address it.

As noted earlier, Fisher cites no authority whatsoever to support its argument.  The fact is that Fisher's narrow reading of its indemnity obligation under this contract, which it wrote, is contradicted by Missouri law.  The indemnity provision protects the representative, Northeast, from "any and all . . . Losses."  The word "Losses" is a collective term which expressly includes

---

[12] Inexplicably, Fisher claims on Page 30 of its Brief, that ". . . the relevant question is whether the 'claims, demands, [and] actions' at issue arose from Northeast Controls 'negligence'."  Thus, Fisher quoted only three words from a list of eight which are collectively referred to as "Losses."

such words as "claims" and "liabilities."  These are not narrow terms in Missouri's law of

indemnity.  On the contrary, they are broad and all-encompassing:

> The use of the word "claims," while not expressly so designating,
> indemnifies [the indemnitee] from any liability which it might
> incur.
>
> The word "liability" is a broad legal term and includes "almost
> every character of hazard or responsibility, absolute, contingent or
> likely"; and the "condition of being actually or potentially subject
> to an obligation." . . .  The term also applies to "unliquidated
> claims."  As used in indemnity contracts, the term "claim" has been
> interpreted as referring to indemnity against liability.

*Burns & McDonnell Engineering Company, Inc. v. Torson Construction Company, Inc.*, 834

S.W.2d 755, 759 (Mo.App.1992) (citations omitted).

Clearly, the broad indemnity clause found in this contract should operate to protect

Northeast "from any liability which it might incur" to the personal injury and property damage

plaintiffs who sued Northeast on the claim that their damages resulted from a defect in a Fisher

valve.

The only escape from this obligation for Fisher would be if the negligent acts or

omissions of Northeast were proven to have caused the Losses, i.e., caused the personal injury

and property damages, and the "claims," the "losses," the "damages," the "liabilities," the "costs

and expenses," etc., arising from or connected with them.  This would include such items as Mr.

Olson's medical bills and the costs of repairing the damage at the plant.  Fisher's own expert

proved that no act of Northeast caused these things.

Plaintiffs contend that this is the only way to read the clear and unambiguous language of

the contract, as quoted above.  Fisher's interpretation, by contrast, would have the Court

conclude that Northeast could be sued for a catastrophic incident which allegedly was caused by

a defect in its manufacturer's valve, and end up with no protection at all, despite the
acknowledged fact that it did nothing to cause the incident from which all the damages arose.
This result is anomalous and unreasonable.  It is also totally inconsistent with the plain language
of the contract as quoted above.

Plaintiffs maintain that the language of the contract is clear and unambiguous.  The
"Losses" here are the personal injury and property damages that resulted from the explosion and
fire and for which both Northeast and Fisher were sued.  If Northeast's negligence caused those
personal injury and property damages, then it is fair that Northeast should not be protected under
the contract.  Otherwise, the indemnity obligation is clear.

If the Court finds, however, that the language is not clear, and is somehow ambiguous,
then the Court should look to extrinsic evidence as to what the language means.  The extensive
discovery record in this case contains only one item of such extrinsic evidence.

Here, plaintiffs invite the Court's attention to the "Geekie letter."  This evidence provides
powerful support to Northeast's position, and directly contradicts the twisted interpretation in
Fisher's brief.

Counsel for plaintiffs Northeast and St. Paul sent written demands to Fisher for
indemnification and defense under the contract in 2000 and 2001, following the Delaware City
Power Plant incident.  Fisher responded to these written demands by a letter dated October 29,
2001 from Matthew W. Geekie, Esquire, Assistant General Counsel of Fisher's corporate parent,
Emerson Process Management Company.  See App. A, Ex. 3, p. A0016 and A0017.  It is
admitted in this litigation that Mr. Geekie was authorized to speak for Fisher.[13]

---

[13]    See Plaintiffs' Amended Complaint, D.I. #26, ¶36 and Defendant Fisher's Answer thereto, D.I. #27, ¶36,
attached as App. B, Ex. 8, B0027-B0053.

Mr. Geekie's letter acknowledged the demand for indemnification.  He stated Fisher's position that the demand for indemnification was premature, and he declined to accept it for that reason.

We note that Mr. Geekie was employed by Fisher's parent, and his letter came on Fisher's behalf.  This letter stated Fisher's official position in response to the written demands for indemnification.  Yet, when discussing the meaning of the contract in their brief, Fisher's counsel never mentioned this letter at all.  The letter directly contradicts their argument.

In this letter, Mr. Geekie offered certain interpretations of the Representative Agreement between the parties.  This included a clear and unequivocal definition of the term "Losses" as it is used in the contract.  After identifying the parties as "Northeast" and "Fisher"; after identifying the Representative Agreement as the "Agreement"; and after identifying the explosion and fire as the "Praxair Incident," Mr. Geekie said the following:

> **"The Praxair Incident entailed damage to property as well as injury to an individual, (the "Losses").**

*See* Geekie letter, p. 1, second paragraph, attached as App. A, Ex. 3, p. A0016.  In stating this interpretation, Mr. Geekie was not simply making a gratuitous remark.  Rather, he was making a specific response to the plaintiffs' demand for indemnification and defense, and he was authorized to speak for Fisher on this subject.  These facts are not in dispute.  His statements, therefore, should be accepted into evidence and treated as an admission by Fisher regarding the meaning of the Representative Agreement.  *Fed.R.Evid.* 801(d)(2)(C) and (D).

Without question, Fisher's authorized representative defined the "Losses" as the personal injury and the property damage that resulted from the explosion and fire.  Yet, Fisher's counsel

have now attempted to give the same term a completely different meaning in their brief. This is one more reversal of position by Fisher, and it should be rejected by the Court.

Accordingly, the "Losses" are the personal injury and property damages caused by the explosion and fire, and the "damages," the "costs and expenses," the "liabilities," etc., arising directly from them, such as the medical bills and the costs to rebuild the plant. No negligence of Northeast caused these Losses. Fisher itself proved that in the Underlying Litigation. The indemnity obligation, therefore, is clearly intact.

C.        **Delaware Contribution Act.**

On Pages 31 through 34 of its brief, in Section "D," Fisher sets forth an argument under the Delaware Contribution Act, 10 Del.C. §6302.   Fisher argues that, pursuant to this statute, the jury in the Underlying Litigation would have been required to apportion fault among the various joint tortfeasors. Northeast, says Fisher, could have been held liable only for its own negligence, as determined by the jury in that apportionment. Fisher says that Northeast's "sole exposure" was for its own negligence, and the escape clause in the Representative Agreement says that Fisher does not have to defend or indemnify Northeast for "Losses" arising from its own negligence. "Consequently, Fisher had no obligation under the Representative Agreement." (Fisher's Brief, p. 32).

If plaintiffs understand this argument, Fisher is actually contending that it never has any obligation whatsoever to its Sales Representatives under the law of Delaware or any other state where liability is apportioned by the fact finder. Fisher reasons here that Northeast could not have been held liable for anyone's actions other than its own. This, in the defendant's view, relieved Fisher of any obligation to its sales representative from the beginning, regardless of how wrong the claims of the various plaintiffs may have been.

Fisher's argument would make the duty to indemnify meaningless; it ignores the duty to defend; and it completely overlooks the possibility that a trial might result in a defense verdict.

What if the Underlying Litigation went to trial against all defendants, and the jury found that neither Fisher nor Northeast had any liability at all?  Is Fisher seriously contending that it would not have owed a defense and indemnity obligation to Northeast under that circumstance? Clearly, the Complaints all alleged that the injuries and damages were caused by a defect in a Fisher product.  (As already noted elsewhere, this is admitted by Fisher.)  If Fisher refused to provide a defense, Northeast would have had to defend the case through trial by itself.  If the case resulted in a verdict for Northeast, as against the Olsons and the property damage plaintiffs, Northeast would have "won," but it would still have incurred the tremendous expense of defending a complex products liability suit all the way through trial.  Fisher is apparently arguing that, even under these circumstances, it would not owe Northeast a defense because Northeast could never have been held liable for anything other than its own negligence.  If this is correct, then the indemnity clause has no practical effect and would be of no use to Northeast at all.

This is not a correct interpretation of the law.  Under the Representative Agreement, Northeast was entitled to both a defense and indemnification.  "It is well-settled that, though they may be contained in a single contractual provision, a duty to defend is independent of a duty to indemnify." *Travelers Indemnity Company v. S.M. Wilson and Company*, 2005 U.S. Dist. LEXIS 29328, p. 3 (E.D.Mo. 2005).  Construing Missouri law, the Court quoted 42 C.J.S. Indemnity §4 as saying: "Indemnitor's duty to defend a lawsuit against its indemnitee is totally independent from its obligation to indemnify in the event that a judgment is rendered."  The court went on to say that "Missouri Courts will enforce a contractual obligation to defend when

the allegations in the Complaint fall within the scope of the contractual language." *Travelers Indemnity Company v. S.M. Wilson and Company*, *supra*, citing numerous Missouri cases.

Under the terms of the indemnity clause in the Representative Agreement, Fisher's duty to defend arose as soon as there was an allegation that the damages sustained by the underlying plaintiffs were the result of a defect in a Fisher product. This duty would have been nullified by the escape clause only if the Losses being sought by the Olsons and the property damage plaintiffs were found to have been caused by the negligence of Northeast.

Here, of course, the Underlying Litigation did not go to trial. Instead, Fisher succeeded in obtaining summary judgment for itself in one case, and bargained for its dismissal by Stipulation from the others. Northeast was left to fend for itself. Rather than take the risk and incur the additional expense of going to trial, Northeast negotiated settlements with the plaintiffs and the remaining co-defendants. These negotiations resulted in payments by Northeast of $601,000, contributing to total settlements exceeding $4 million.

It is well-established under Missouri law that Northeast had every right to enter into these settlement agreements, instead of trying the case. Fisher cannot question those decisions now. In *Missouri Pacific Railroad Company v. Rental Storage and Transit Company*, 524 S.W 2d 898 (Mo. Ct. App. 1975), the Court stated as follows:

> Ordinarily, to sustain a claim upon an indemnity contract, such as we have here, it is necessary for the indemnitee to prove legal liability to the injured party . . . However, . . . where the indemnitor denies liability under the indemnity contract and refuses to assume the defense of the claim, then the indemnitee . . . may make a good faith settlement without assuming the risk of being able to prove absolute liability or the actual amount of the damage . . . . A contrary rule would make the right to settlement meaningless, in cases where the indemnitor has denied liability.

524 S.W.2d at 909.

Fisher's argument is completely without merit.  Essentially, Fisher is saying that it would never have any indemnity or defense obligation because the Representative could only be held liable at the conclusion of the litigation for its own negligent acts.  If this theory was correct, it would render the entire indemnity clause meaningless.  The sales representative would have no real protection at all.  Contrary to this specious argument, Fisher has a clear duty to defend when its representative is sued for damages alleged to be caused by a product defect.  Obviously, this obligation continues if Fisher tries the case for its representative and secures a verdict of no liability.  It also continues if Fisher defends the case and chooses to settle it.  The indemnity obligation is nullified only if the Losses sought by the underlying plaintiffs are found to have resulted from the negligence of the representative.

### D.        <u>Statute of Limitations</u>

Fisher's argument that Northeast Control's claims against it are time-barred lacks logical or legal force. Fisher devotes the majority of its statute of limitations argument to explaining why the Delaware statute applies instead of the Missouri statute.  Under Delaware's choice of law principles, as must be applied by a federal court in Delaware sitting in diversity, when a cause of action arises outside of Delaware, the applicable statute of limitations will be the shorter of either Delaware's statute or the statute of the state where the cause of action arose.  *See* 10 Del. C. §8121.  Delaware's statute of limitations provides that the limitations period shall begin to run upon "the accruing of the cause of action."  10 Del.C. §8106.  Thus, any meaningful argument regarding the statute of limitations for Northeast's claims would not merely turn on which state's

statute of limitations applies, but also on when the claim accrued.  This issue is conspicuously

absent from Fisher's analysis. [14]

Delaware's statute of limitations for contractual claims is three years.[15]  *See* 10 Del. C.

§8106.  Under Delaware's statute of limitations, a claim for breach of contract must be

commenced within three years of the "accruing of the cause of action."  *Id.*  This Court has

recognized that in the case of a contract for indemnity, [16] the cause of action accrues and "the

statute of limitations begins to run when the indemnitor-liability becomes fixed and ascertained

or as soon as the debt becomes due." *See Cannon v. Fidelity & Cas. Co. of New York*, 484

F.Supp. 1375, 1388-89 (D.Del. 1980) (citing *Sorensen v. Overland Corp.*, 142 F.Supp. 354, 361

(D. Del. 1956)).[17]  "The claim accrues and the statute begins to run only when the cause of action

for indemnity arises, or the indemnitee's liability is fixed and discharged.  The determining factor

---

[14]      In an about face (set forth in the section of its brief immediately following its statute of limitations argument against Northeast),  Fisher maintains that its own counterclaim  for breach of contract against Northeast is not subject to Delaware's borrowing statute and statute of limitations.  Contrary to Fisher's assertion, *B.Lewis Productions, Inc. v. Bean*,  2005 U.S. Dist. LEXIS 1579 (D. Del. 2005), does not save its breach of contract claim against Northeast.  Under the express terms of the borrowing statute, Fisher, a Delaware limited liability company and resident of Delaware, would be subject to the Delaware statute of limitations.

Assuming for the sake of argument, however, that Fisher's counterclaim is governed by Missouri's five year statute of limitations for contract claims, it is still time-barred.  Fisher's entire counterclaim against Northeast is based on the allegation that Northeast's alleged negligence was a breach of contract.  As set forth repeatedly in its brief, Fisher claims that this alleged breach of contract occurred at the time Northeast placed the order for the valve with Fisher.  Accordingly, Fisher's breach of contract claim accrued and the statute of limitations began to run from the date Northeast placed the order for the valve with Fisher.  The valve order was placed in 1998, seven years before Fisher filed its counterclaim, the only time in  seven years of litigation that Fisher ever made such a claim against Northeast.  To argue that it was "forced" to file a counterclaim in this action, is disingenuous at best.  The time for Fisher to assert a breach of contract claim against Northeast had long expired before this litigation commenced.

[15]      Missouri's statute of limitations for contract claims is five years.  Mo. Rev. Stat. §516.120 (1986).

[16] Fisher fails to take into account the fact that this is a claim under a contract for defense and indemnity.  The obligation to defend and indemnify is continuing as is any breach of an obligation to defend and indemnify.  *See Cannon v. Fidelity & Cas. Co. of New York*, 484 F.Supp. 1375, 1388-90 (D.Del. 1980).

[17]      Similarly, under Missouri law, a contractual indemnity claim shall not be deemed to accrue until the damage resulting therefrom is sustained and capable of ascertainment.  Mo. Rev. Stat. §516.100.  If more than one item of damage exists, then the last item must be ascertainable for the claim to accrue.  *Id. See also Burns & McDonnell Engineering Co., Inc. v. Torson Construction Co., Inc.*, 834 S.W.2d 755 (Mo. 1992).

is the point at which the indemnitee suffers a loss or damage through payment of a claim after judgment or settlement." *Chesapeake Utilities Corp. v. Chesapeake & Potomac Telephone Co. of Maryland*, 401 A.2d 101 (Del. Super. 1979).[18] Similarly, a cause of action for breach of a duty to defend accrues only when the full damages can be determined and recovered. *Id.* at 1389-90. This occurs only upon the completion of the litigation. *Id.*

Fisher argues that the statute of limitations began to run on October 29, 2001, the date Fisher declined Northeast's pre-suit demands for defense and indemnity. This argument is completely wrong. In his letter on behalf of Fisher, Mr. Geekie turned down the demand for defense and indemnity because it was "premature." Mr. Geekie said that the allegations of the personal injury and property damage plaintiffs were not yet known, and he said that if allegations were made in the future based upon product defect, Fisher would in fact defend and indemnify Northeast. Yet, Fisher now argues that upon receipt of this letter, Northeast should have known *then* that despite its promise, Fisher would never fulfill its obligation to indemnify.

Fisher's position is indefensible. The complaints in the Underlying Litigations had not yet even been filed. How could Northeast possibly know that Fisher would not do what it said it would do? As established by the authorities cited above, Fisher's pre-suit letter could not start the limitations period running. On the contrary, the period began to run with the accrual of a cause of action, and this did not happen until the settlement payments were made and until the last of the defense costs was incurred.[19] Fisher's position completely ignores the well-established

---

[18]     Interestingly, Fisher's own expert, Somers S. Price, Jr. Esquire, litigated that case.

[19]     While Fisher's calculation lacks any basis in law or fact, it should be noted that Northeast actually asserted crossclaims against Fisher for contractual indemnification in the underlying litigation as early as 2002. These claims were preserved by a Confidential-Joint Defense Privilege Agreement entered into by Fisher and Northeast in May 2005. By the terms of that agreement, all rights that either party had against the other in any pending or future litigation were expressly reserved.

law of both Delaware and Missouri concerning the accrual of a cause of action for breach of a contractual obligation to defend and indemnify.

Here, Fisher's liability became fixed and ascertainable when the Underlying Litigation was concluded and Northeast paid its portion of the settlement. Having been left to fend for itself after Fisher refused to fulfill its ongoing contractual obligation of defense and indemnity, Northeast settled the property damage claims and paid $501,000.00 in settlement thereof on May 24, 2004. Accordingly, Northeast's cause of action against Fisher for defense and indemnity in the property damage litigation accrued on May 24, 2004. Similarly, the personal injury litigation was concluded and the last item of damage was first capable of ascertainment no earlier than July 28, 2005 when the Olsons executed the release in exchange for a $100,000.00 payment by Northeast. Accordingly, Northeast's cause of action for defense and indemnity as to the personal injury claim accrued on July 28, 2005.

Northeast's Complaint against Fisher was filed on June 29, 2006, just eleven months from the settlement and conclusion of the personal injury action and two years from the settlement and conclusion of the property damage action. Northeast's claims against Fisher are timely, having been filed well within three years of the time they accrued. There is simply no basis, in law or fact, for Fisher's argument that Northeast's claims are barred by the statute of limitations.

E.      **Fisher's Counterclaim for Breach of Contract**

In the last few pages of its brief, Fisher sets forth an argument in support of a counterclaim for breach of contract. By this claim, Fisher purports to seek recovery of its attorneys' fees incurred in defending the Underlying Litigation. This claim is without merit for multiple reasons.

First, Fisher attempted to amend its counterclaim so as to seek affirmative relief by a Motion that it filed in August of 2007. The Court denied that Motion.

Second, any claim by Fisher based on a breach of contract theory now is barred by virtue of Fisher's failure to raise or assert any such claim in the underlying litigation. Fisher made no crossclaim or third party claim for breach of contract against Northeast Controls in any of the underlying cases, though it had every opportunity to do so. Again, as discussed in plaintiff's opening brief, Fisher's entire strategy in the Underlying Litigation was to avoid any criticism of Northeast or any claim against it. That strategy succeeded for Fisher, and it escaped from all four underlying cases without paying anything to anyone. At pages 19 through 23 of Plaintiffs' Opening Brief in Support of Motion for Summary Judgment, we discuss the concepts of claim preclusion and collateral estoppel, which have been adopted as the law in Delaware. Those pages and the discussion contained within them is incorporated herein by reference. Having failed to make any breach of contract claim in the underlying litigation, Fisher cannot advance such a claim now.

Third, Fisher's claim for breach of contract is barred by the statute of limitations. See footnote 14, *supra*. Fisher's claim is that Northeast breached the Representative Agreement by its actions in processing the order for the valve. Those actions occurred in 1998. Any claim for breach of contract based on those actions was time-barred long ago, under either Delaware or Missouri law.

Fourth, the claim advanced by Fisher has no merit in substance. The defendant is seeking recovery of counsel fees through a breach of contract theory based upon the Representative Agreement. The agreement has already been discussed at length in this and previous briefs. A copy of the Agreement is attached as App. A, Ex. 1. The Agreement provides the

Representative, Northeast, with the right to a defense against any litigation. No corresponding right to recover counsel fees, however, is provided in any way to Fisher.

Fisher relies on exactly two cases to support its claim. These cases do not help Fisher's position in any way. They stand for the proposition that attorney fees can be awarded under limited circumstances in contract litigation when one party's breach causes another to become involved in "collateral litigation." The very cases Fisher cites, however, make it clear that the requirements for the collateral litigation rule are not satisfied here: "To be awarded attorney's fees incurred as a result of collateral litigation, the wronged party [Fisher], must show that the litigation was the natural and proximate result of the wrong or breach of duty by the other party [Northeast] . . . ." *Forsythe v. Starnes*, 554 S.W. 2d 100 (Mo.App. 1977). As discussed at length in section B.1., *supra*, there is no satisfactory evidence in the record of this case to prove that Fisher and/or Northeast were sued because of the alleged negligence by Northeast in processing the order for the valve. On the contrary, the evidence of record, including the allegations in the underlying Complaints, and the testimony of the only witness who has been deposed on the subject, shows that the reasons for suing both Fisher and Northeast went well beyond the alleged material deviations between the specifications for the valve and what was eventually supplied. Fisher, therefore, cannot show at all that the litigation "was the natural and proximate result of the [alleged] wrong or breach of duty by [Northeast]."

The cases cited by Fisher also demonstrate that to recover any such fees, Fisher must demonstrate that they were reasonable. No evidence exists in this record to establish the reasonableness of these fees. Their reasonableness is not admitted.

## CONCLUSION

For the all the reasons set forth above, the Motion of defendant Fisher for Summary

Judgment should be denied.

**MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**

By:___/s/ *Thomas P. Wagner*_____
        Thomas P. Wagner, Esquire
        1845 Walnut Street
        Philadelphia, PA  19103
        tel: 215-575-4562
        Counsel for Plaintiffs

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

By:___/s/ *Joseph Scott Shannon*_____
        Joseph Scott Shannon, Esquire (I.D. 3434)
        1220 North Market Street, 5th Floor
        P.O. Box 8888
        Wilmington, DE 19899 – 8888
        tel.: 302.552.4329
        e-mail: jsshannon@mdwcg.com
        Counsel for Plaintiffs
        *Counsel for Plaintiffs*

15/555573.v1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NORTHEAST CONTROLS, Inc.; and | ) | |
| ST. PAUL MERCURY INSURANCE Co., | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. A. No. 06-412-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

TO:   RIDDELL WILLIAMS                    MARON MARVEL BRADLEY
      Patrick McVey, Esquire                    & ANDERSON, P.A.
      Daniel J. Gunter, Esquire             Paul A. Bradley, Esquire
      1001 Fourth Avenue Plaza, Ste. 4500   1201 North Market Street, Ste. 900
      Seattle, WA 98154                     Wilmington, DE 19801

PLEASE TAKE NOTICE:    On November 21, 2007, Northeast Controls, Inc. served the

attached *Plaintiffs, Northeast Controls, Inc. and St. Paul Mercury Insurance Company's*

*Answering Brief in Opposition to Defendant Fisher Controls International, LLC's Motion for*

*Summary Judgment* upon Defendant Fisher Controls, Inc. via e-filing and First Class U.S. Mail,

postage prepaid, to the above-named persons.

**MARSHALL DENNEHEY WARNER**              **MARSHALL DENNEHEY WARNER**
**COLEMAN & GOGGIN**                       **COLEMAN & GOGGIN**


  */s/Thomas P. Wagner*                        */s/Joseph Scott Shannon*
Thomas P. Wagner, Esquire (*pro hac vice*)   Joseph Scott Shannon, Esquire (I.D. 3434)
1845 Walnut Street, 21st Floor             1220 North Market Street, 5th Floor
Philadelphia, PA 19103                     P.O. Box 8888
tel.: 215.575.4562                         Wilmington, DE 19899 – 8888
e-mail: tpwagner@mdwcg.com                 tel.: 302.552.4329
*Of Counsel for Plaintiffs*                 e-mail: jsshannon@mdwcg.com
                                           *Counsel for Plaintiffs*

Dated: November 21, 2007

15/555569.v1

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHEAST CONTROLS, INC. | : | CIVIL ACTION – LAW |
| and | : | |
| ST. PAUL MERCURY INSURANCE COMPANY | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FISHER CONTROLS INTERNATIONAL, LLC | : | NO. 1:06-CV-00412 (SLR) |

### APPENDIX B
### TO
### PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THOMAS P. WAGNER, ESQUIRE
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
1845 Walnut Street
Philadelphia, PA  19103
tel: 215-575-4562
*Counsel for Plaintiffs*

JOSEPH SCOTT SHANNON, ESQUIRE
Delaware Bar I.D. No. 3434
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899 – 8888
tel.: 302.552.4329
e-mail: jsshannon@mdwcg.com
*Counsel for Plaintiffs*

Dated: November 21, 2007

## TABLE OF CONTENTS

**Document**                                                                                    **Exhibit**

Selected Pages of Deposition Transcript of James Montgomery as corporate designee of
defendant Fisher Controls, LLC pursuant to Fed.R.Civ.P. 30(b)(6)
       [B0001-0002]...........................................................................................................1

Fisher Controls International, Inc.'s Daubert Motion to Exclude Praxair, Inc.'s Causation Expert
J. Philip Whitman
       [B0003-0017]...........................................................................................................2

Inspection Release Form
       [B0018] ...................................................................................................................3

Specification Sheet for 613 Valve
       [B0019] ...................................................................................................................4

Selected Pages of Deposition Transcript of Bhim Bhakoo
       [B0020-0021]...........................................................................................................5

Selected Pages of Deposition Transcript of James Montgomery as corporate designee of
defendant Fisher Controls, LLC pursuant to Fed.R.Civ.P. 30(b)(6)
       [B0022-0024]...........................................................................................................6

Selected Pages of Deposition Transcript of Guido George Karcher, P.E.
       [B0025-0026]...........................................................................................................7

Plaintiffs' First Amended Complaint and Defendant's Answer to Amended Complaint and
Counterclaim
       [B0027-0053]...........................................................................................................8

# EXHIBIT 1

James Montgomery

COPY (Pages 1 to 4)

---

Page 1

```
1     IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF DELAWARE
2           NO.: 1:06-CV-00412 (SLR)
3
   NORTHEAST CONTROLS, INC. and
4  ST. PAUL MERCURY INSURANCE COMPANY,
              Plaintiffs
5           vs.
6  FISHER CONTROLS INTERNATIONAL, LLC,
              Defendant
7
8       - - - - - - - - - - - - -
9           OCTOBER 31, 2007
10      - - - - - - - - - - - - -
11
12       Telephonic deposition of JAMES MONTGOMERY,
13
14  taken at the offices of Zanaras Reporting & Video,
15
16  1616 Walnut Street, Suite 300, Philadelphia,
17
    Pennsylvania on the above-mentioned date, commencing
18
    at or about 1:15 p.m., before Teresa L. DeMonte,
19
    Certified Shorthand Reporter-Notary Public.
20
21       ZANARAS REPORTING & VIDEO
22
23  1616 Walnut St., Suite 300    2112 Bay Avenue
24
    Philadelphia, Pa. 19103    Ocean City, NJ 08226

    (215) 790-7857        1-877-GO-DEPOS
```

---

Page 2

```
1
2   APPEARANCES:
3
4        OFFICES OF MARSHALL, DENNEHEY, WAGNER,
5        COLEMAN & GOGGIN
6        BY:  THOMAS P. WAGNER, ESQUIRE
7        1845 WALNUT STREET, 18TH FLOOR
8        PHILADELPHIA, PENNSYLVANIA 19103
9        ATTORNEYS FOR THE PLAINTIFFS
10
11       OFFICES OF RIDDELL WILLIAMS, P.S.
12       BY:  CHARLES McVEY, ESQUIRE
13       1001 FOURTH AVENUE PLAZA
14       SUITE 4500
15       SEATTLE, WASHINGTON 98154-1065
16       ATTORNEYS FOR THE DEFENDANT
17
18
19
20
21
22
23
24
```

---

Page 3

```
1
             I N D E X
2
3
4   WITNESS
5
    JAMES MONTGOMERY
6
7   EXAMINATION BY                PAGE
8   MR. WAGNER                     5
9
10
11            - - -
12
13        E X H I B I T S
14
15  NUMBER       DESCRIPTION       PAGE
    Montgomery-1   NOTICE          10
16  Montgomery-2   1998 AGREEMENT  17
    Montgomery-3   FIRST AGREEMENT 34
17  Montgomery-4   1993 AGREEMENT  39
    Montgomery-5   1994 AGREEMENT  39
18  Montgomery-6   1995 AGREEMENT  45
    Montgomery-7   1996 AGREEMENT  48
19  Montgomery-8   1997 AGREEMENT  48
    Montgomery-9   1999 AGREEMENT  50
20  Montgomery-10  2000 AGREEMENT  51
    Montgomery-11  2001 AGREEMENT  51
21  Montgomery-12  2004 AGREEMENT  62
    Montgomery-13  2006 AGREEMENT  65
22  Montgomery-14  2007 AGREEMENT  66
23
24
```

---

Page 4

```
1
            LITIGATION SUPPORT INDEX
2
3   Direction To Witness Not To Answer
4
    Page    Line    Page    Line
5
    None
6
7
8   Request For Production of Documents
9   Page    Line    Page    Line
10
    None
11
12
13
    Stipulations
14
    Page    Line    Page    Line
15
    8       1
16
17
18
19  Questions Marked
20  Page    Line    Page    Line
21
    None
22
23
24
```

| Page 21 |
|---|

1     **Q.**   I'd like you to read to yourself the five lines
2 of that language, and tell me when you're done,
3 please.
4     **A.**   I'm done.
5     **Q.**   Is the valve identified as Tag No. 83HV0629 a
6 product within the meaning of the term product and the
7 term products in that language that you just read?
8     **A.**   Yes, it would be.
9     **Q.**   Going to the agreement itself now, which
10 Mr. McVey has told you is already identified as
11 Exhibit-33 and which we've called Montgomery-1 --
12     **MR. McVEY: Actually you called it**
13 **Montgomery-2.**
14     **MR. WAGNER: Thank you for the**
15 **correction. The notice of deposition was one. I'm**
16 **very glad I have you here, Pat, to keep me straight on**
17 **that stuff. My apologies.**
18 **BY MR. WAGNER:**
19     **Q.**   Anyway, we called it Montgomery-2. Is the
20 agreement still in front of you?
21     **A.**   Yes, it is.
22     **Q.**   Who wrote this agreement?
23     **A.**   The agreement was written by our legal
24 department.

| Page 22 |
|---|

1     **Q.**   Do you know specifically who there actually
2 drafted it?
3     **A.**   I know the administer who was working with the
4 legal department in drafting it was a man named David
5 Oaks.
6     **Q.**   Does he still work for Fisher?
7     **A.**   No, he doesn't.
8     **Q.**   Is he still alive, do you know?
9     **A.**   He is still alive, yes.
10     **Q.**   Are you in touch with him? Have you been in
11 touch with him recently?
12     **A.**   I saw him -- I saw him Monday night.
13     **Q.**   Under what circumstances, why did you see him?
14     **A.**   It was a social outing.
15     **Q.**   Just in general, where does he work now?
16     **A.**   He's retired.
17     **Q.**   What was his position at the time that he wrote
18 the agreement?
19     **A.**   He was -- he was the head of business
20 administration for the sales organization, so he
21 worked on things like these contracts.
22     **Q.**   Is he or was he at the time an attorney?
23     **A.**   No.
24     **Q.**   You said that, quote, our legal department,

| Page 23 |
|---|

1 unquote, wrote it. Was Mr. Oaks at that time a member
2 of the legal department?
3     **A.**   No, he wasn't. He worked with the legal
4 department to work on the contracts.
5     **Q.**   I see. And maybe you already said it, I don't
6 know if you did, what was his title at the time?
7     **A.**   He was the head of business administration for
8 the sales organization.
9     **Q.**   What was his educational background?
10     **A.**   It was, to my knowledge, it was an engineering
11 background with an MBA. And I'm not certain of the
12 MBA.
13     **Q.**   Do you know who in the legal department Mr. Oaks
14 worked with in drafting this document?
15     **A.**   I don't know who that was.
16     **Q.**   Was it approved by the company's legal
17 department?
18     **A.**   Yes.
19     **Q.**   And, by the way, when I say the company, I'm
20 referring there to Fisher. Are you referring to any
21 other company besides Fisher?
22     **A.**   The company I'm referring to is Fisher Controls
23 International, Incorporated.
24     **Q.**   All right. At the time this document was

| Page 24 |
|---|

1 written was Fisher Controls, as you've just identified
2 it, a part of the Emerson Electric Company corporate
3 structure?
4     **A.**   Yes, it was.
5     **Q.**   When was this document written?
6     **A.**   The 1998 version of this document, the core
7 elements of the document, have been in place for some
8 time. There might have been minor modifications to
9 the '98 contract, I'm not aware of what those
10 modifications are; but the document has been in place
11 substantively as you see it for a period of four
12 years.
13     **Q.**   Did anything precede it or was that its origin,
14 the four years before 1998?
15     **A.**   There's always been a representative contract in
16 place. And I think we provided the Northwest Controls
17 -- Northeast Controls contracts back to 1992.
18     **Q.**   So you have, and we're going to get to that.
19     The document that became the 1998 agreement
20 between Northeast Controls and Fisher, was it
21 essentially based on a document whose core elements
22 preceded 1994?
23     **A.**   The core elements, yes.
24     **Q.**   How far back would they go until you reach a

# EXHIBIT 2

EFiled: Apr 12 2005 5:22 [...]
Filing ID 5599794

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| RONALD W. OLSON and CAROL OLSON,<br>his wife,<br><br>Plaintiffs,<br><br>v.<br><br>MOTIVA ENTERPRISES L.L.C., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 02C-04-263 JRS

**Non-Arbitration Case**

## FISHER CONTROLS INTERNATIONAL, INC.'S DAUBERT MOTION TO EXCLUDE PRAXAIR, INC.'S CAUSATION EXPERT J. PHILIP WHITMAN

### INTRODUCTION

This matter arose out of an incident on May 20, 2000, at the Delaware City Power Plant. A fire occurred when parties involved in commissioning an oxygen pipeline in the plant's air separation unit ("ASU") opened a valve ("the Valve"). Plaintiff Ronald Olson brought this litigation to recover for injuries suffered in the fire.

Defendant Praxair, Inc., the builder of the ASU, intends to offer at trial the opinions of J. Philip Whitman of the Rimkus Consulting Group. Amazingly, even though Praxair is itself a leader in the air separation industry, it chose to retain at the very last minute a forensic expert who has no prior experience with oxygen service, no experience investigating oxygen service fires, and no experience with the relevant standards.

A mere two weeks after his retention—in a case that had been pending more than two years and that had already generated hundreds of thousands of pages of documents, dozens of depositions, and hundreds of exhibits—Whitman produced his December 21, 2004, report setting forth the four opinions that Praxair intends to have him offer.

Since then, Whitman has produced two more reports and revised a number of his calculations to address errors pointed out by other experts. But despite the numerous

1

errors in his reports, Whitman remains committed to his four initial opinions.

Not surprisingly, given the haste with which Whitman worked, his opinions fail to meet the standard for admissibility established by Delaware Rule of Evidence 702 and the Delaware Supreme Court's opinion in M.G. Bancorporation, Inc. v. LeBeau, 737 A.2d 513 (Del. 1999). Whitman lacks the necessary expertise, and he has not undertaken to gain such expertise since his retention. Further, Whitman's opinions do not rest on a reliable foundation. They assume facts that are contrary to the evidence. They are contrary to all applicable standards, and they are not based on a scientific methodology. Indeed, Whitman relies on a methodology that no one else has ever used.

In light of these inadequacies, Fisher respectfully requests that the Court exclude Whitman as an expert. Fisher also joins in the Daubert motions brought by plaintiffs and by defendant Northeast Controls, Inc. This brief addresses the first of Whitman's four opinions (i.e., that the fire was caused by flow friction ignition of the Valve's seal).

## BACKGROUND

In the months following the May 20, 2000, incident ("the Incident"), Praxair assembled a team of its employees to collect and review information relating to the Incident and perform a root cause analysis. Exhibit ("Ex.") 12, Saccoccia Dep. at 5:4 – 8:2, 57:13 – 63:22, 66:16 – 18, 71:7 – 72:7, 167:2 – 169:7; Ex. 11, Paolino Dep. at 632:9 – 633:19.[1] In that analysis, Praxair concluded that the fire was caused by particle impingement. Exs. 5, 6.

Praxair retained J. Philip Whitman as its causation expert. Before that retention Whitman had absolutely no experience with oxygen service or with the investigation of fires in oxygen service. Ex. 4, Whitman Dep. at 8:5 – 12:10, 21:16 – 22:11, 69:14 – 22. Despite his lack of prior experience, and despite being provided with only two

---

[1] For the Court's convenience, Fisher, Northeast Controls, and plaintiffs are filing a joint appendix of all exhibits referenced in their three Daubert motions seeking exclusion of Mr. Whitman's opinions. All exhibit references herein are to that joint appendix.

B0004

documents, in a mere two weeks—from December 7 until December 21—Whitman

produced a report setting forth his four opinions. Ex. 1. Later, having reviewed reports

by experts retained by other parties, Whitman significantly revised some of his

calculations. See Exs. 2, 3. But, despite having altered the supporting calculations, he

still intends to offer the following four opinions:

> 1.    The most likely cause of the fire was friction and heating at the seal-disc interface, occasioned by gas flowing at sonic velocity, which led to failure of the seal assembly . . . .
> 2.    There is no evidence . . . that any particulate or hydrocarbon products were present in the "dead" leg of the pipe upstream of the control valve. . . .
> 3.    Praxair specified that the seal ring be made of Monel®. If the seal ring had been made of Monel® instead of Tefzel®, the fire would not have occurred.
> 4.    The use of carbon steel piping and fittings upstream of the control valve location was not a cause of the fire and did not violate Praxair's own design standards.

Ex. 1 at 1-2; Ex. 4, Whitman Dep. at 564:12 – 19.

Whitman's opinions fail to meet the relevant standard of admissibility and should

therefore be excluded.

**ARGUMENT**

I.    **INTRODUCTION**

Rule 702 governs the admissibility of expert witness testimony. The Delaware

Supreme Court has adopted the U.S. Supreme Court's holdings in Daubert v. Merrell

Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co., Ltd. v.

Carmichael, 562 U.S. 137 (1999), as the correct interpretation of Rule 702. M.G.

Bancorporation, Inc. v. LeBeau, 737 A.2d 513, 522 (Del. 1999). Under Rule 702, the

proponent of the proffered expert testimony bears "the burden of establishing relevance,

reliability, and admissibility by a preponderance of the evidence." Minner v. American

Mort. & Guar. Co., 791 A.2d 826, 843 (Del. Ch. 2000). In its "gatekeeper" role, the

Court must determine the reliability of the proffered testimony by reviewing both the

3

expert's qualifications and methodology. <u>Bell Sports, Inc. v. Yarusso</u>, 759 A.2d 582, 588-89 (Del. 2000).

As set out at greater length below, Whitman's opinions are inadmissible:

- His opinions are not supported by any testing of anything (Ex. 4 at 48:1 – 5, 62:8 – 63:4, 169:7 – 22);

- He has never seen the A11 Valve at issue nor an exemplar A11 valve (<u>id.</u> at 65:4 – 5);

- He has never seen a valve seal of the type at issue (<u>id.</u> at 169:12 – 15);

- He has never seen any of the fire artifacts (<u>id.</u> at 49:9 – 50:7);

- He reviewed no depositions or deposition exhibits before issuing his December 21 report (<u>id.</u> at 40:11 – 15);

- He has never had any conversation or contact with any Praxair employees— including the employees who formed opinions directly contrary to his (<u>id.</u> at 23:3 – 14, 74:2 – 5);

- He conducted no interviews (<u>id.</u> at 189:11 – 13);

- He assumes—wrongly—that the Valve used an infinitely thin disc (<u>id.</u> at 576:20 – 577:4; Affidavit of Robert A. Mostello ["Mostello Aff."] ¶ 22);

- He assumes—wrongly—that the Valve opens symmetrically, when in fact the Valve has an offset design (<u>see</u> Ex. 1, App. A thereto at 1; Mostello Aff., Ex. F at 31);

- He assumes—wrongly—that Praxair ordered a valve with an all-metal seal (Ex. 4 at 84:19 – 89:13; Ex. 11, Paolino Dep. at 224:7 – 17);

- His initial calculation done to support his opinions was "off by more than an order of magnitude" (Ex. 4 at 94:2 – 5);

- His belief that the fire was caused by friction flow ignition rests on an opinion by the authors of the preliminary Wendell Hull Report—but that opinion was later withdrawn by those authors in a peer-reviewed publication that was not

4

supplied to Whitman by counsel for Praxair (Ex. 4 at 60:24 – 61:21; compare Ex. 13 with Ex. 19);

- The only other support for his opinion regarding flow friction ignition rests on an Internet article that consists of nothing more than a bald assertion that flow friction ignition can occur (Ex. 4 at 58:2 – 60:10; Ex. 20);

- He mixes and matches equations, combining different equations in a way that is not supported by any scientific literature (Mostello Aff. ¶¶ 7, 18);

- He uses "frictionless" equations based on behaviors of "ideal" gases, then uses the numbers derived from those "frictionless" equations to calculate friction in an oxygen environment, despite the fact that oxygen is not an ideal gas (Ex. 4 at 387:14 – 412:12);

- The principal equation on which he relies is an approximation, but he relies on that approximation to conclude that there was friction (Ex. 4 at 342:13 –21; Mostello Aff. ¶ 14);

- In calculating that the surface of the Valve's seal would have ignited, he makes no allowance for heat transferring from the surface of the seal into the body of the seal or into the massive body of the Valve (id. at 356:2 – 4);

- He was not advised of key evidence showing that the piping upstream of the Fisher Valve was contaminated (id. at 217:4 – 218:23);

- He was never shown Praxair's own Root Cause Analysis, which concluded that the fire was caused by particle impact (id. at 659:20 – 660:21; Exs. 5, 6);

- None of the applicable Praxair, ASTM, and NASA standards and publications regarding ignition hazards in oxygen environments supports his opinion (Exs. 14, 17; Mostello Aff., Ex. F).

In short, Whitman lacks the necessary experience, and his opinions do not rest on a reliable foundation. His testimony should therefore be excluded.

5

## II.    WHITMAN'S "FLOW FRICTION" THEORY RESTS ON SERIOUS MISTAKES OF FACT REGARDING THE DESIGN OF THE VALVE

Under Rule 702, expert testimony is admissible only if it is "based upon sufficient facts or data." If an expert's opinion is not based on the facts of the case, it should be excluded. See, e.g., Elcock v. K Mart Corp., 233 F.3d 734, 754–56 (3d Cir. 2000). Whitman's opinions are contrary to a host of facts in the case and thus are inadmissible.

Among other factual and theoretical errors, Whitman's opinion rests on various false assumptions regarding the design of the Valve. His mistakes in this regard are hardly surprising: he has never seen the Valve or an exemplar A11 Valve. Ex. 4 at 65:4 – 5. This failure is surprising, especially in light of the fact that his client, Praxair, has possession of the Valve.

**First,** Whitman's calculations and opinion rest on the false assumption that the Valve used an infinitely thin disc. Ex. 4 at 45:5 – 10, 576:20 – 577:4. It did not. Instead, the Valve disc was 13/16" thick. See Mostello Aff. ¶ 22. The thickness of the disc means that Whitman's calculations regarding the flow stream around the disc are incorrect. Id. Given the thickness of the disc, the oxygen flow stream was compressed— and thus accelerated—upstream of the body of the Valve, between the leading edge of the disc and the carbon steel flange upstream of the Valve body. Id.

**Second,** Whitman's opinion rests on the false assumption that the Valve uses a symmetrical design, with the valve disc rotating squarely on the valve stem. See Ex. 1, App. A thereto at 1. In fact, the Valve uses an offset, asymmetric design, with the disc mounted on one side of the stem. See Mostello Aff., Ex. F at 31. The asymmetry in the Valve design, coupled with the thickness of the Valve disc, would have resulted in significantly more flow on the left side of the disc (viewed from upstream of the Valve— i.e., toward the ASU [see Ex. 21]) than on the right side of the disc as the Valve opened. Further, the leading edge of the disc would cross the line of the Valve/flange interface as the disc approached 10 percent open. See id. As it did so, the flow stream would have

6

accelerated at an angle toward the carbon steel flange upstream of the Valve body. <u>See</u> Mostello Aff. ¶ 22.

**Third,** Whitman's opinion rests on the false assumption that the Valve's seal was thrust up into the flow stream. Ex. 4. at 64:23 – 65:18. In fact, the shape of the Valve body meant that the Valve seal was effectively <u>recessed</u> from the high-velocity oxygen flow stream. <u>See</u> Mostello Aff., Ex. F at 31.

Finally, the fact that the Valve seal was recessed means that the seal would not be directly exposed to the high-velocity oxygen flow stream and that the body of the Valve would have served as a heat sink for any of the hypothetical heat generated by "flow friction." <u>See</u> Ex. 4 at 356:5 - 18. But Whitman does not take these factors into account. <u>See id.</u> at 356:2 – 4.

**III.    <u>WHITMAN'S THEORY OF "FRICTION FLOW" IS NOT SUPPORTED IN THE SCIENTIFIC LITERATURE AND THUS IS NOT ADMISSIBLE</u>**

Although published works need not form the basis of the expert's opinion, the absence of such a foundation "is one factor in determining whether an expert's opinion is based on good grounds." <u>Minner</u>, 791 A.2d at 850 n.29 (citation omitted). In this case, there is <u>no</u> support in the literature for Whitman's theory that flow friction can ignite seals in this situation. Because the theory is unsupported, it should be excluded.

**A.    <u>The Applicable Standards Do Not Recognize the Possibility of Flow Friction Ignition</u>**

Praxair, the ASTM, and NASA have researched factors that may cause fires in oxygen systems. None of those entities has recognized the possibility of flow friction ignition under the conditions present at the time of the incident.

**1.    <u>The Leading Industry Committee on Oxygen Service Does Not Recognize "Flow Friction" as a Possible Cause of Ignition</u>**

The ASTM Committee G-4 on Compatibility and Sensitivity of Materials in Oxygen Enriched Atmospheres ("the G-4 Committee") is the leading industry committee

7

on oxygen service. Mostello Aff. ¶ 25. In its "Standard Guide for Designing Systems for Oxygen Service" (the "G 88 standard"), the G-4 Committee lists "Factors Recognized as Causing Fires," including temperature, pressure, concentration, contamination, particle impact, heat of compression, friction—"the rubbing together of two surfaces"—resonance, static electric discharge, and electrical arc. Ex. 14 at 520–21. **Nowhere does the G 88 standard identify flow friction as a potential source of ignition.** See generally Ex. 14.

> 2.    NASA Has Concluded That Ignition by Flow Friction Can Occur (If at All) Only at Pressures More Than Twice as High as That Present in This Incident

One of the leading entities in the field of oxygen service is the National Aeronautical and Space Agency ("NASA"). In 2001 NASA issued a report titled "Spacecraft Fire Safety—A Human Space Flight Program Perspective," which states:

> "In recent years, several oxygen system fires have been attributed to a phenomenon christened (possibly erroneously) as 'flow friction.'
> • Occurs only at high pressures (over 2,500 psia). . . ."

Mostello Aff., Ex. F.

As this report shows, the phenomenon of "flow friction" is not well understood. Id. Further, the phenomenon has been observed only at pressures above 2,500 psi—far above the 1150 psi involved in this incident. See id. Consequently, even if there is such a phenomenon, the "flow friction" theory cannot be applied to the facts of this case.

> 3.    Praxair Itself Rejected "Flow Friction" as a Possible Cause

Praxair itself—one of the leading companies in the air separation industry—has significant experience in investigating fires in oxygen systems. It has employees who are members of the G-4 Committee and contribute peer-reviewed articles to G-4 publications. See, e.g., Ex. 13 (including articles authored by Praxair employees).

With this expertise, Praxair has promulgated its own internal standard, EN-6,

8

addressing possible causes of ignition in oxygen systems. See Ex. 17. That standard nowhere identifies "flow friction" as a possible source of ignition. Ex. 4 at 711:15 – 20. Praxair's most recent version of that standard does not recognize "flow friction" as a possible cause of ignition, despite the fact that the preliminary Wendell Hull Report identified that as a potential cause of this fire in 2001, well before Praxair's revision of the EN-6 standard. See Ex. 17 at 1 (showing revision date).

Further, in the months following the incident Praxair employees—including its Operational Safety Manager, Ed Saccoccia—investigated the incident and drafted a Root Cause Analysis, which was reviewed and commented on by other Praxair employees, including Dave Good (project manager for the ASU at Delaware City) and Gerald Paolino (lead process engineer for that project). Ex. 12 at 5:4 – 8:2, 57:13 – 63:22, 66:16 – 18, 71:7 – 72:7, 167:2 – 169:7. Praxair never identified "flow friction" as a possible cause of the incident. Instead, Praxair concluded that "the major energy release most likely occurred because there were particles in the gas stream traveling through valve HVO629 and impinging on valve surfaces at high velocities." See Exs. 5, 6.

Praxair in fact confirmed that "[o]ther than adiabatic compression, which is not likely in this case, **particle impingement is the only plausible trigger of a major energy release in this service."** Ex. 5. Praxair reached this conclusion after "brainstorm[ing] all the potential mechanisms":

> **If you were to brainstorm all the potential mechanisms that could have triggered this event, they all seem to begin with particle impingement.**
> The only other scenario would have been adiabatic compression, which we didn't feel was a valid scenario in this case.

Ex. 12. at 172:15 – 173:2 (emphasis added).

Praxair has never retreated from the conclusions set out in its Root Cause Analysis. As late as March 18, 2005, Mr. Saccoccia testified that he had no reason to disagree with the conclusions made in the Root Cause Analysis:

B0011

> Q. As you sit here now, you have no reason to believe that any of the issues and statements that you have written in Exhibit 343 and 349 are not accurate?
>
> MR. RICHES: Objection. You can answer.
>
> **A. I, I have no reason to believe that there are inaccurate statements on this report.**

Ex. 12 at 181:22 – 182:3 (emphasis added).

In short, the relevant industry standards, Praxair's own standards, and Praxair's own internal investigation demonstrate that "flow friction" is not a recognized cause of fires in these conditions. Further, Praxair's own investigation of this incident confirms that "particle impingement [was] the only plausible trigger." Ex. 5. In light of the relevant scientific literature and Praxair's own conclusions, the Court should conclude that Whitman's contrary opinion is not reliable.

### B.    Whitman Attempts to Rely on Unreliable Sources

At deposition, Whitman could point to only two sources that supporting his "flow friction" theory: the preliminary Wendell Hull Report and an Internet article from the Free University of Amsterdam. Ex. 4 at 61:22 – 62:9 Neither of those documents supports his assertion.

### 1.    The Preliminary Wendell Hull Report Does Not Support Whitman's "Flow Friction" Theory

As the first source for his "flow friction" theory, Whitman relies on the preliminary Wendell Hull Report. Ex. 4 at 60:24 – 61:21. The preliminary Wendell Hull report is not itself a reliable source. That report was issued July 24, 2001. See Ex. 19. This case has been pending since May 2002. During the three years of this litigation, the parties have conducted extensive discovery. They have exchanged hundreds of thousands of pages of documents. Thirty-five witnesses have been deposed, with several of the depositions consuming multiple days. The total number of deposition transcript pages exceeds 8,700 pages. In recent months, the parties have exchanged 23 separate expert reports. When the Wendell Hull Report was drafted, the authors of that report had

10

B0012

access to virtually none of these documents. Consequently, they did not have an adequate basis for their opinion..

Further, the report's comments regarding flow friction are conclusory assertions based at most on anecdotal evidence. See generally Ex. 19. The report does not set forth any of the circumstances under which "flow friction" allegedly occurred. See id. It does not identify the pressures or temperatures involved in those incidents; it does not identify the types of valves involved; it does not identify how long the slow leaks were leaking or what degrees of throttling were involved. See id. **In short, there is simply no information showing that the assertions regarding flow friction ignition were themselves reliable or that they have anything to do with the facts of this case.**

Anecdotal evidence of this nature does not provide the reliability required by Rule 702. See, e.g., McClain v. Metabolife Int'l, Inc., --- F.3d ---, 2005 WL 477861 (11th Cir. Mar. 2, 2005) (attached as Exhibit "A" to this brief). Consequently, the Wendell Hull Report does not provide an adequate basis for Whitman's "flow friction" opinion.

**The unreliability of the Wendell Hull Report is further demonstrated by the fact that the authors of that report later withdrew the "flow friction" theory.** In 2003 Newton and Forsyth published an article about the Delaware City incident, "Cause and Origin Analyses of Two Large Industrial Oxygen Valve Fires," which appeared in the ASTM publication Flammability and Sensitivity of Materials in Oxygen-Enriched Atmospheres. Ex. 13. **Notably absent from this article is any mention of "flow friction."** See id. Newton and Forsyth's rejection of that theory undercuts Whitman's attempt to rely on it. Consequently, to the extent that Whitman's opinions rest on the Wendell Hull Report, those opinions are inadmissible.

## C.     An Internet Site Does Not Provide an Adequate Basis for Whitman's Flow Friction Opinion

As the second support for his "flow friction" opinion, Whitman relies on an article from an Internet site. See Ex. 4 at 58:2 – 60:10; Ex. 20. That article—which he found

11

after forming his opinions (Ex. 4 at 655:2 – 9)—also fails to provide an adequate basis for Whitman's opinion.

The Internet article asserts as follows:

> Compressed oxygen, when in contact with grease, can ignite spontaneously and even put metal on fire.
> In an oxygen-rich environment, all kind of materials (clothing) are increasingly flammable. Sometimes even friction heat of the out coming gas flow is enough to start a flame.

Ex. 20.

That's it. The article says nothing more about the potential for flow friction ignition. It does not identify any cases in which "friction heat of the out coming gas flow" has actually caused ignition. It fails to identify the circumstances under which flow friction can occur—i.e., the pressures, temperatures, or velocities involved.

Worse, the unnamed author of the article apparently does not understand the role of oxygen in fires. The article states: "Compressed oxygen, when in contact with grease, can ignite spontaneously . . . ." Wrong. In the presence of (enough) oxygen and (enough) heat, certain objects (for example, grease) can ignite—but oxygen itself does not ignite. The fact that this article can misstate this fundamental point so radically makes all of its assertions dubious at best.

An unsigned, content-free article from the Internet does not provide a sufficient basis for an expert opinion. If it does, then the Daubert test may as well be jettisoned.

## IV.    WHITMAN'S CALCULATIONS REGARDING FLOW FRICTION ARE RIDDLED WITH MISTAKES

Whitman's opinion that the Valve seal saw its ignition temperature is based on calculations he performed only after he formed his "friction flow" opinion. Whitman Dep. at 90:18 – 91:16. Those equations are just so much smoke.

Initially, it should be noted that at deposition Whitman could not name anyone who had used his calculations to form an opinion that flow friction could cause ignition

12

of a plastic material in oxygen service:

> Q:      Do you know of anyone else as you sit here today who has used
> the calculations that you used to reach an opinion that friction flow of
> oxygen over a plastic material in an oxygen service pipeline can generate
> sufficient heat to cause that plastic material to ignite?
> A:      The answer is I don't know of anybody on the planet that's done
> that specific calculation, you know, that calculation for that specific
> situation.

Ex. 4 at 239:19 – 240:3; see also id. at 422:7 – 11.

Despite the fact that no one else has adopted his methodology, Whitman

continues to insist that his approach is valid. It is not.

### A.      Whitman Mixes and Matches Equations, Then Concludes That the Resulting Error Reveals Frictional Heating of the Valve Seal

Whitman's errors are set out in the Affidavit of Robert A. Mostello, filed in

conjunction with this Motion. Dr. Mostello's Affidavit is necessarily technical in nature.

But it is this Court's task to review such technical materials and determine as a

preliminary matter whether Whitman's "flow friction" opinion is reliable: "The Trial

Judge must determine whether the reasoning and methodology is valid by the

professional standards of the scientific, professional, or business field of the expert."

Minner, 791 A.2d at 846.

Whitman's mistake involves mixing and matching equations. The flow of oxygen

through the partially opened Valve involved first a constriction of the gas and then an

expansion of it. Mostello Aff. ¶ 6. As the gas is constricted on entering the Valve

opening, it gains kinetic energy. Id. In determining the gain of kinetic energy in such

situations, the typical equation assumes an ideal gas. Id.

Whitman proceeds first by calculating the gain of kinetic energy according to the

ideal gas formula. Mostello Aff. ¶ 6. But he then changes the density of the accelerated

ideal gas in order to take into account the fact that oxygen is not an ideal gas. Id. By

**changing the gas from ideal to non-ideal midway through his calculations, Whitman**

13

arbitrarily slows the gas down. Id. ¶ 7. Slowing down the gas results in an apparent (but not real) loss of kinetic energy. Id. Because the "new" kinetic energy (applied by falsely correcting to a "real" gas) no longer fully re-captures the energy of the ideal gas expansion, there is an apparent loss in energy, which Whitman then assumes is transferred to the Valve seal. Id. **This approach is not supported by any of the scientific literature.** Id. At deposition, Whitman could not identify anyone who had previously used his "mix and match" methodology. Ex. 4 at 397:12 – 398:11.

Whitman's misuse of equations from various textbooks is fundamentally false and misleading. Whitman begins with an ideal gas equation, but switches horses midstream. Had Whitman begun and ended by calculating for an ideal gas, or had he begun and ended by calculating for oxygen as a real gas, he would have ended up with the proper answer—i.e., that frictional heating of the seal would be minimal. Mostello Aff. ¶ 8.

It is beyond dispute that the temperature of the oxygen upstream of the Valve was no more than 270° F. Mostello Aff. ¶ 9. The lower melting temperature of Tefzel is 491° F. Ex. 3 at 23. The seal would have had to be heated up more than 200° F to reach its melting temperature. But the oxygen would have been cooled on expansion, and the frictional heating of the Tefzel would have been minute. Mostello Aff. ¶ 9. Thus, the seal would never have seen anything like its melting temperature. Id.

Further, Whitman fails to understand the principal equation on which he relies. That equation in fact provides an <u>approximation</u>, as is clear from the text of the source. See Ex. 7 at 250. But Whitman believes erroneously that it provides an exact figure. Ex. 4 at 342:13 – 343:8. If the approximation is well done, the energy loss that Whitman finds—and that he ascribes to friction—does not arise. Mostello Aff. ¶ 14.

### B. Whitman Fails to Allow for the Conduction of Heat Away from the Surface of the Seal

Further, Whitman makes the unwarranted assumption that <u>all</u> of the frictional heat that he hypothesizes would have been confined to the "surface of the seal" and that <u>none</u>

14

of that energy would have been transferred to the massive body of the Valve. Whitman Dep. at 357:1 – 11. **Although he agreed that some of the frictional heat would be transferred to the Valve body, he performed no heat loss calculation as part of his work.** Id. at 356:2 - 4. This approach renders his opinion inadmissible.

An analogy is instructive. Wood is a poor conductor of heat. Nevertheless, it is almost impossible to light a log with a match because the body of the log serves as a heat sink: the heat from the flame of the match is conducted into the body of the log, and thus the wood does not reach its ignition temperature. Whitman Dep. at 357:12 – 358:19. Likewise, in this case, even if there were any frictional heating of the valve seal, that heat would have been dissipated through the rest of the seal and conducted to the body of the Valve, which would have remained far below the temperature necessary to ignite Tefzel.

CONCLUSION

For the reasons set forth above, Fisher respectfully requests that the Court enter an order excluding Mr. Whitman from testifying at trial.

RIDDELL WILLIAMS P.S.                         MCCARTER & ENGLISH, LLP


/s/ Patrick D. McVey                          /s/ Paul A. Bradley
Patrick D. McVey                              Paul A. Bradley
Daniel J. Gunter                              Delaware Bar # 2156
Admitted pro hac vice                         MCCARTER & ENGLISH, LLP
RIDDELL WILLIAMS P.S.                         919 Market Street, Suite 1800
1001 Fourth Avenue Plaza, Suite 4500          Wilmington, DE 19899
Seattle, WA 98154-1065                        (302) 984-6300
(206) 624-3600

Dated: April 12, 2005                         Attorneys for Defendant
                                              Fisher Controls International, Inc.

15

# EXHIBIT 3

12/03/98  THU 17:14 FAX 716 879 2929        PRAXAIR PROJ EXEC

(check)

# ■PRAXAIR

Fax # 716-879-2929

## INSPECTION RELEASE

Date  12/03/98

Fax to: Gail Deuro

| | Inspector Supplier QA |
|---|---|

| Purchase Order No. 815F5206P Shop Order | Equipment Name  Valves |

Supplier Name/ Location Fisher Controls

Contact Name/Phone No. Bert Cappellini  716-831-1690

If shipping more than 10 items attach detailed packing list

| P.O. Item | Quantity | Description & Tag Nos. | P.O. Item | Quantity | Description & Tag Nos. |
|---|---|---|---|---|---|
| | | See packing slip detail | | | |
| 11 | 1 | 12" Automatic Valve Drawing A-2272746 Tag# 83HV0629 | | | |

THIS ORDER IS  X COMPLETE  [ ]  INCOMPLETE

If incomplete, state reason for incomplete shipment. Provide a status of missing or shipped loose items.

Manuals, Quality Dossier, and other deliverables as defined in the Purchase Order.  The Quality Dossier is to include completed Inspection and Test Plans, Test Reports, Material Test Reports, Transfer, Final Inspection Report, and Core Data (if applicable) for the supplier and the major sub-suppliers.  In cases where specific Inspection and Test Plans were not developed, the supplier's normal QA Documentation will be deemed acceptable.

Praxair ISO certified/ technically qualified supplier

THIS DOES NOT RELEASE SUPPLIER FROM ANY RESPONSIBILITY FOR FULL COMPLIANCE WITH CONTRACT REQUIREMENTS

THIS EQUIPMENT COMPLIES WITH ALL REQUIREMENTS OF, AND BUILT IN ACCORDANCE WITH, PRAXAIR PURCHASE ORDER.  815F5206P

RELEASE FOR SHIPMENT AUTHORIZED BY: *Gail Deuro*

DATE: 12/03/98

B0018

cc: Tom Rabczak

o:\%shelton\star\8064form

*Ex 199*

NEC317

# EXHIBIT 4

SPECIFICATION FORM FOR PROCESS MEASUREMENT

| Project: | STAR Delaware City P-8064 | Data Sheet | 45 of | | 6/26/98 |
|---|---|---|---|---|---|

Spec:
Tag: 83PV0613
DWG: A-2272739
Item: 45
Contract:
Mfg Serial:
Service: BLOC discharge vent

Crit. Pres. PC=737.620 psia

| | 1 Fluid: OXYGEN | Units | MAX | NRM | MIN | Shut-Off | OTH |
|---|---|---|---|---|---|---|---|
| | SERVICE CONDITIONS | | | | | | |
| 2 | Q | scfh | 2572200.0 | 2184800.0 | 218000.00 | | |
| 3 | P1 | psia | 1167.000 | 1167.000 | 1167.000 | 1300 psid | |
| 4 | P1 Diff | psia | 900.000 | 764.391 | 76.275 | | |
| 5 | T | deg P | 100.000 | 100.000 | 100.000 | | |
| 6 | SG | | 1.105 | 1.105 | 1.105 | | |
| 7 | | | | | | | |
| 8 | | | 2565.371 | 2071.405 | 203.719 | | |
| 9 | Vlv Cg | | 102.615 | 82.856 | 8.149 | | |
| 10 | Vlv Cv | dB(A) | 102.4 | 107.1 | 109.4 | | |
| 11 | Vlv IpA | w/insul. | < 85 dBa | < 85 dBa | < 85 dBa | | |
| 12 | Vlv LpA | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | PIPE LINE | | 53 | ACTUATOR Type: | PISTON, SPRING RTN |
| 13 | Size, Schedule In:10 in SCH 40 | | 54 | Mfg/Model: | Fisher/1032 |
| 14 | Size,Schedule Out:4 IN SCH 40 | | 55 | Size: 680A-SR | Eff Area: N/A |
| 15 | Insulation: 3"Red.24-27dBa | | 56 | On/Off: No | Modulating: Yes |
| 16 | VALVE BODY/BONNET Type:BUTTERFLY | | 57 | Spring Action: | OPEN |
| 17 | Size:4" ANSI 600 | | 58 | Max Allow Press: 120 psig | |
| 18 | Max Press: 1300 psig Temp:270 F | | 59 | Min Req'd Press: 80 psig | |
| 19 | Mfg/Model: Fisher/A11 | | 60 | Available Air Supply Pressure | |
| | Body/Bonnet Matl: Hastelloy C | | 61 | Max:120 psig Min:90 psig | |
| | Liner Matl/ID: NONE | | 62 | Bench Range: N/A | |
| 22 | End Connection In:Wafer | | 63 | Act Orientation: HORIZ. | |
| 23 | End Connection Out:Wafer | | 64 | Handwheel Type: NONE | |
| 24 | Flg Face Finish: ANSI B16.5-81 | | 65 | Air Fails Valve: OPEN Set at: | |
| 25 | End Ext/Matl: | | 66 | Stroke Time < 10 sec | |
| 26 | Flow Direction: Shaft up stream | | 67 | Input Signal: 4-20 mA dc | |
| 27 | BONNET Type: STANDARD | | 68 | POSITIONER Type: SINGLE ACTING | |
| 28 | Lub-Iso Valve: Lube: | | 69 | Mfg/Model: Fisher/3720 | |
| 29 | Packing Material: SINGLE TFE | | 70 | Incr Signal Output: INCREASES | |
| 30 | Packing Type: V-RING, JAM TYPE | | 71 | Gauges: SUPP & OUT By-Pass: NONE | |
| 31 | | | 72 | Cam Characteristic: LINEAR | |
| 32 | TRIM Type: STANDARD | | 73 | | |
| 33 | Size:Full Travel: 90 Deg | | | SWITCHES | |
| 34 | Characteristic: EQUAL PERCENT | | 74 | Type: POSITION TRANSMITTER Qty: 1 | |
| 35 | | | 75 | Mfg/Model: Stone1/PQ70E1C | |
| 36 | Rated Cv:252 Fl:.520 Xt:.230 | | 76 | Contacts/Rating: | |
| 37 | Disk Material: Hastelloy C | | 77 | Actuation Points:4-20 MADC | |
| 38 | Seat Material: Haselloy C/PTFE | | 78 | | |
| 39 | Guide Material: TFE Composite | | | AIRSET | |
| 40 | Stem Material: Inconel 718 | | 79 | Mfg/Model: FISHER/67AFD FILTER | |
| 41 | 2 Asco 3-way sol. model:8316G2 | | 80 | Set Pressure: N/A | |
| 42 | 24vdc piped per P&ID 3051 | | 81 | Filter:YES Gauges: No | |
| | SPECIAL ACCESSORIES | | 82 | | |
| 43 | NEC: Group: Div: | | 83 | TESTS Hydro Press: | |
| 44 | STANDARD NOTES SUPPLIED PER DWG | | 84 | ANSI/PCI Leak Class: VI | |
| 45 | A-2234221 ALT D | | 85 | Instrument overpressure protection | |
| 5 | 1,2,4,11,13,15,16,17(2),23,24,25, | | 86 | required Yes( ) No(x) | |
| 7 | 26,28,29,30,31,32,33,43 | | | | |

| 48 | | Rev | Date | Revision | Orig BC | App BBB |
|---|---|---|---|---|---|---|
| 49 | Torque Req.= 79.3 Ft-lbs | | 6/26/98 | | | |
| 50 | Torque Gen.= 171.4 Ft-lbs | | | | CHK'D BBB | REV'D BBB |
| 51 | FF Dim.= 2.38" | | | 1.42 PV-0613 | | |
| 52 | Sized w/Diffuser Cg: 3117.000 | | | | | 24 |

# EXHIBIT 5

# In The Matter Of:

## *Olson   v.*
## *Motiva, et al.*

---

### *Bhim S. Bhakoo*
### *December 11, 2003*

### *C.A. # 02C-04-263 JRS*
### *CONFIDENTIAL*

---

## *Wilcox & Fetzer, Ltd.*
## *1330 King Street*
## *Wilmington, DE  U.S.A.  19801*
## *(302) 655-0477    FAX: (302) 655-0497*

*Original File 121103BB.KFC, 188 Pages*
*Min-U-Script® File ID: 2012762189*

# Word Index included with this Min-U-Script®

Page 130

[1]   MS. CLARK: This will be 126.

[2]   (Olson Deposition Exhibit No. 126 was

[3]   marked for identification.)

[4]   BY MS. CLARK:

[5]   Q: Are you ready?

[6]   A: Yes.

[7]   Q: Before you I would like to direct your

[8]   attention to Exhibit 123. Do you see that?

[9]   A: Yes.

[10]   Q: That's a data sheet again for tag number

[11]   83PV0613. Is that correct?

[12]   A: Correct.

[13]   Q: And this is for, if we look at line 17, it's

[14]   for a 4-inch ANSI class 600 butterfly valve, correct?

[15]   And I have combined line 17 and 16.

[16]   A: Correct.

[17]   Q: And this sheet is dated June 11, 1998. Do you

[18]   see that?

[19]   A: Yes.

[20]   Q: Do you remember around June of '98 discussing

[21]   with Mr. Cappellini the stem material of Inconel 718?

[22]   A: Specifically?

[23]   Q: Yes.

[24]   A: No.

Page 131

[1]   Q: Do you remember if you and he ever had a

[2]   discussion about changing the stem material in the 629

[3]   in around this time? I'm talking around the middle of

[4]   June, June 11, 1998.

[5]   A: No.

[6]   Q: I'm going to refer you to Exhibit 124. This

[7]   sheet is the same as the previous one except it's got

[8]   a different date of June 26, 1998. It's for the 613

[9]   valve. Is that correct?

[10]   A: That's correct.

[11]   Q: And this one says checked and then reviewed and

[12]   has your initials?

[13]   A: That's correct.

[14]   Q: Is there a difference between checked and

[15]   reviewed?

[16]   A: There is a slight difference between checked

[17]   and reviewed.

[18]   Q: Tell me the slight difference, if you will.

[19]   A: Checked means you have gone through the valve

[20]   in detail and you have — checked means you have

[21]   looked at it in detail. Reviewed means you have

[22]   looked at it too and not in that detail that's high

[23]   level, and approved is, you know, another high level.

[24]   Q: Approved is another higher level?

Page 132

[1]   A: Yeah.

[2]   Q: Then I want to refer you to 125 and 126

[3]   simultaneously, if you will.

[4]   A: Okay.

[5]   Q: Do you remember having any discussions with

[6]   Mr. Cappellini about changing the seat of this valve,

[7]   and "this valve" being the 613 valve, to Kel-F?

[8]   A: Honestly, I don't recall.

[9]   Q: Now, the difference between 125 and 126 appears

[10]   to be there's a handwritten note in the revision

[11]   section. Do you see that? And in 126 it's typed. Do

[12]   you see that?

[13]   A: Correct.

[14]   Q: And there's a date of July 30th, 1998. Do you

[15]   see that?

[16]   A: Correct.

[17]   Q: And next to it it says, "Added note 19 Moore

[18]   Vol," I would assume that's volume, "Booster." Is

[19]   that correct?

[20]   A: Correct.

[21]   Q: Do you remember discussing with Mr. Cappellini

[22]   adding note No. 19, the Moore Volume Booster?

[23]   A: I don't recall talking to Cappellini about

[24]   adding this. I think this happened when I was out of

Page 133

[1]   town and the direction was given by somebody else on

[2]   the team and I was made aware of that and I accepted

[3]   that.

[4]   Q: Do you remember who on the team made that

[5]   change?

[6]   A: I don't.

[7]   Q: Do you remember why that change was made?

[8]   A: If you look at line 66, it's clear.

[9]   Q: Stroke time?

[10]   A: Correct.

[11]   Q: Somebody changed the stroke time?

[12]   A: Correct. That's what volume booster does.

[13]   Q: Were you away in the last week of July of 1998?

[14]   A: Somewhere around there, yes, I was away, I

[15]   think. Sometime in July, yeah, I was away.

[16]   MR. McVEY: We're approaching 3:30, I

[17]   think. Would this be a good time for our afternoon

[18]   break?

[19]   MS. CLARK: Yes. Thanks. I'm almost

[20]   done. I have one more area and then I'll be done.

[21]   (Discussion off the record.)

[22]   (A brief recess was taken.)

[23]   THE WITNESS: Can I say something? I want

[24]   to make a correction to the last item we were talking

# EXHIBIT 6

COPY (Pages 1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
NO.: 1:06-CV-00412 (SLR)

NORTHEAST CONTROLS, INC. and
ST. PAUL MERCURY INSURANCE COMPANY,
        Plaintiffs
        vs.
FISHER CONTROLS INTERNATIONAL, LLC,
        Defendant

- - - - - - - - - - - - -
        OCTOBER 31, 2007
- - - - - - - - - - - - -

        Telephonic deposition of JAMES MONTGOMERY,

taken at the offices of Zanaras Reporting & Video,

1616 Walnut Street, Suite 300, Philadelphia,

Pennsylvania on the above-mentioned date, commencing

at or about 1:15 p.m., before Teresa L. DeMonte,

Certified Shorthand Reporter-Notary Public.

        ZANARAS REPORTING & VIDEO

1616 Walnut St., Suite 300    2112 Bay Avenue

Philadelphia, Pa. 19103        Ocean City, NJ 08226

(215) 790-7857            1-877-GO-DEPOS

---

**Page 2**

```
 1
 2  APPEARANCES:
 3
 4      OFFICES OF MARSHALL, DENNEHEY, WAGNER,
 4
 5      COLEMAN & GOGGIN
 5
 6      BY:  THOMAS P. WAGNER, ESQUIRE
 6
 7      1845 WALNUT STREET, 18TH FLOOR
 7
 8      PHILADELPHIA, PENNSYLVANIA 19103
 8
 9      ATTORNEYS FOR THE PLAINTIFFS
 9
10
11      OFFICES OF RIDDELL WILLIAMS, P.S.
12      BY:  CHARLES McVEY, ESQUIRE
13      1001 FOURTH AVENUE PLAZA
14      SUITE 4500
15      SEATTLE, WASHINGTON 98154-1065
16      ATTORNEYS FOR THE DEFENDANT
17
18
19
20
21
22
23
24
```

---

**Page 3**

```
 1
                    I N D E X
 2
 3
 4  WITNESS
 5
    JAMES MONTGOMERY
 6
 7  EXAMINATION BY                 PAGE
 8  MR. WAGNER                      5
 9
10
                     - - -
11
12              E X H I B I T S
13
14  NUMBER         DESCRIPTION         PAGE
15  Montgomery-1   NOTICE              10
    Montgomery-2   1998 AGREEMENT      17
16  Montgomery-3   FIRST AGREEMENT     34
    Montgomery-4   1993 AGREEMENT      39
17  Montgomery-5   1994 AGREEMENT      39
    Montgomery-6   1995 AGREEMENT      45
18  Montgomery-7   1996 AGREEMENT      48
    Montgomery-8   1997 AGREEMENT      48
19  Montgomery-9   1999 AGREEMENT      50
    Montgomery-10  2000 AGREEMENT      51
20  Montgomery-11  2001 AGREEMENT      51
    Montgomery-12  2004 AGREEMENT      62
21  Montgomery-13  2006 AGREEMENT      65
    Montgomery-14  2007 AGREEMENT      66
22
23
24
```

---

**Page 4**

```
 1
            LITIGATION SUPPORT INDEX
 2
 3
    Direction To Witness Not To Answer
 4
    Page    Line    Page    Line
 5
    None
 6
 7
 8
    Request For Production of Documents
 9
    Page    Line    Page    Line
10
    None
11
12
13
    Stipulations
14
    Page    Line    Page    Line
15
    8       1
16
17
18
    Questions Marked
19
    Page    Line    Page    Line
20
    None
21
22
23
24
```

Page 9

1  question, but let me get it out on the record before
2  you start to answer.  If you begin to answer in the
3  middle of a question, we'll end up with a record with
4  half a question and then an answer and it won't make
5  any sense.
6      I will attempt to do the same for you, sir, I
7  will not deliberately interrupt you until it appears
8  to me that you have finished answering the last
9  question that I asked you.  If I do interrupt you and
10  if I start to ask you another question before you were
11  finished answering the one that went before it, please
12  just tell me that and I will stop and you can go ahead
13  and answer the question to whatever extent you want.
14  Is that understandable to you, sir?
15  A.  Yes, I understand.
16  Q.  All right.  We are looking for factual testimony
17  here which is under oath.  We definitely do not want
18  you to guess at the answers to my questions.  So, if
19  you don't know an answer or you don't remember the
20  answer, please just tell me that and I will attempt to
21  rephrase it.  If you go ahead and answer a question,
22  we'll assume that you did hear it and you understood
23  it.  Is that understandable do you, sir?
24  A.  Yes, it is.

Page 10

1  Q.  If any point in time comes when you need to take
2  a break, please just tell us that and we'll be glad to
3  accommodate you.
4  A.  Okay.
5  Q.  Bear with me for just one second, please.
6      Mr. Montgomery, have you been shown a Notice of
7  Deposition for a corporate representative of the
8  Defendant in this case, Fisher Controls?
9  A.  Yes, I have.
10  Q.  So you have seen that notice?
11  A.  Yes.
12  Q.  All right.  I'm going to be handing to the court
13  reporter a copy of that to mark as exhibit
14  Montgomery-1.
15      (Whereupon, Exhibit Montgomery-1 was
16  marked for identification.)
17      MR. McVEY:  I want to make clear what
18  it is you handed him.  What we have here on the table
19  is a revised Notice of Deposition and Fisher's
20  objections thereto, which is a nine-page document
21  which I think came back to you.  Are you marking some
22  other document than that?
23      MR. WAGNER:  I'm not markings Fisher's
24  objections but it is the revised Notice of Deposition,

Page 11

1  that's correct.  And it has in it a total of 10
2  paragraphs, Pat.  Is that what you've got?
3      MR. McVEY:  Yes.  I got 10 paragraphs
4  and he has in front of him a document which has those
5  10 paragraphs in it plus the objections.
6      MR. WAGNER:  All right, that's fine.
7  To the extent we need to, we can deal with the
8  objections as we go along.
9      MR. McVEY:  Okay.
10  BY MR. WAGNER:
11  Q.  Mr. Montgomery, have you in fact read this
12  Notice of Deposition?
13  A.  Yes.
14  Q.  It's my understanding that you have been
15  designated by Fisher to speak for it and testify for
16  it in this deposition as to at least some parts of
17  this Notice of Deposition; is that correct, sir?
18  A.  Yes.  That's right.
19  Q.  And have you in fact consented to so testify for
20  Fisher?
21  A.  Yes, I have.
22      MR. WAGNER:  All right.  Can you tell
23  me, please, either you or Mr. McVey, which paragraphs
24  of the notice Mr. Montgomery is offering testimony

Page 12

1  regarding?
2      MR. McVEY:  Let me give this a shot and
3  then Jim will correct me if I'm wrong.
4      MR. WAGNER:  All right.
5      MR. McVEY:  But certainly Paragraph 1,
6  certainly paragraph 2, a portion of Paragraph 3
7  although Mr. Shannon probably knows more about 3 than
8  Mr. Montgomery.  Mr. Shannon really will speak to
9  Paragraph 4, although Mr. Montgomery may have some
10  limited knowledge.  Mr. Shannon will speak to
11  Paragraph 5.  Mr. Montgomery will speak to Paragraph
12  6.  Mr. Montgomery will speak to Paragraph 7.
13  Mr. Montgomery will speak to paragraph 8.  And then we
14  have objected to, nor do we have Mr. Miller here as
15  you discussed with Mr. Gunter, we have no one here
16  today to speak as to Paragraph 9 and 10.
17      MR. WAGNER:  You're correct, Mr. Gunter
18  and I did talk about that and it was my understanding
19  that you would simply be able to represent on the
20  record or have the 30(b)6 deponent represent on the
21  record that the Defendant Fisher was aware that the
22  valve involved in this case was going to be used in
23  oxygen service at the time that the valve was
24  manufactured and sold.  Is that correct, or is there

Page 13

1  something not correct about that?
2          MR. McVEY: Well, that's the first I
3  heard of that comment. What I understood, we stand by
4  in all respects the first and second affidavits of
5  Mr. Miller.
6          MR. WAGNER: Right.
7          MR. McVEY: We stand by those.
8          MR. WAGNER: And I understand that. I
9  did have a subsequent telephone conversation with
10 Mr. Gunter about that subject. I told him what I just
11 represented to you. He, I believe, said to me, okay,
12 that's fine. He was going to convey that to you.
13 Maybe there's been a disconnect there. Perhaps you
14 and he have not discussed it.
15         What I simply would like to know on
16 this record and either one of the witnesses can
17 address it, unless you tell me that neither of them is
18 able to address it, is whether or not Fisher was aware
19 that the valve, the 629 Valve, would be used in oxygen
20 service at the time the valve was manufactured and
21 sold.
22         MR. McVEY: Okay. Let me speak to that
23 briefly, maybe we can address this in another forum.
24         MR. WAGNER: Okay.

Page 14

1          MR. McVEY: I'm aware of and I think
2  you are from the prior deposition that there was a
3  conversation between Mr. Cappellini and Mr. Whelan,
4  wherein Dave Whelan asked Mr. Cappellini about whether
5  the valve was to be oxygen clean and whether the valve
6  was for oxygen service. I believe Mr. Cappellini
7  answered in the affirmative in that phone call, that
8  the valve was to be used in oxygen service and that
9  information was communicated in that phone call to
10 Mr. Whelan. And we do not -- and that testimony is
11 the testimony of Mr. Whelan and the testimony of
12 Fisher and we stand by that testimony.
13         MR. WAGNER: All right. I appreciate
14 that, and that is essentially my understanding of that
15 testimony too. For evidentiary purposes what I wanted
16 was a representation from a 30(b)6 deponent on the
17 record that Fisher was aware that the valve would be
18 used in oxygen service. It's really not sounding to
19 me like that's an issue. It also, for what it's
20 worth, did not sound to me like that was an issue in
21 my two conversations with Dan Gunter about it either.
22         MR. McVEY: It's not an issue.
23         MR. WAGNER: All right. That's fine.
24         MR. McVEY: Not an issue in this case.

Page 15

1          MR. WAGNER: That's fine. I'm going to
2  just accept that on this record and we can move on.
3          MR. McVEY: Just so we're absolutely
4  clear here, what we're also adamant about is that in
5  that conversation that no information was communicated
6  regarding temperature conditions, pressure conditions,
7  operation or functions of the valve nor the other
8  information contained on ISA spec sheet. Just as long
9  you understand we will acknowledge that Mr. Whelan was
10 told it would be for oxygen service but that is the
11 extent of our acknowledgement.
12         MR. WAGNER: I understand that to be
13 the extent of your acknowledgement.
14         MR. McVEY: Thank you. Please proceed
15 BY MR. WAGNER:
16 Q.    Okay. Mr. Montgomery, do you know why you were
17 selected as one of the two people to testify about the
18 items set forth in this notice of deposition?
19 A.    Yes, I do.
20 Q.    Why?
21 A.    I've been administering these representative
22 contracts and managing the representatives in various
23 functions since 1984. And since 2002 I've had overall
24 responsibility for managing the reps and completing

Page 16

1  their contracts as well.
2  Q.    How about in 1998, what was your responsibility
3  for managing the representatives and completing their
4  contracts then?
5  A.    I was an area vice-president of five
6  representatives at that time and completing the
7  contracts for them.
8  Q.    We may have missed a part of that by the fact
9  that we were making some noise with papers here, and I
10 again apologize for that. You started to say, I was
11 an area vice-president.
12 A.    Right.
13 Q.    And then I think we missed a phrase. Could you
14 repeat that?
15 A.    I was responsible for administering the
16 contracts for the five representatives that I had
17 responsibility for at the time.
18 Q.    And what part of the country did that cover?
19 A.    It was in the midwest.
20 Q.    All right. I'm going to try to move this along
21 rather quickly, in part because of the telephone
22 circumstances here. I'd like you to get out in front
23 of you, if you could, please, a copy of the
24 representative agreement that was in effect at the

EXHIBIT 7



**WILCOX & FETZER LTD.**

In the Matter Of:

# Northeast Controls Inc. and St. Paul Mercury Insurance Company
## v.
# Fisher  Controls International, LLC

C.A. # 06-412

---

Transcript of:

Guido George Karcher, P.E.

October 26, 2007

---

Wilcox and Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  depos@wilfet.com
Internet:  www.wilfet.com

B0025

Northeast Controls Inc. and St. Paul Mercury Insurance Company v. Fisher Controls International, LLC
Guido George Karcher, P.E.

34

1  A.  I think it would be more correct to say I
2  observed them. I did not receive them, yes.
3  Q.  You used those observations and results to
4  conclude that the change in materials of construction
5  of the valve from what Praxair specified to what it
6  eventually received was a cause of the explosion?
7  A.  I think I'd like to add to the fact that
8  Fisher designs valves that are specifically for oxygen
9  service. There's cleanliness requirements, there are
10  nonmetallic requirements and other things, and this
11  valve did not satisfy that.
12  Q.  Does Mr. Konzulmann reference that in his
13  e-mail there?
14  A.  Not that I can see that he does, no.
15  Q.  You mentioned Monel. Let's go back to this.
16       Praxair specified what it wanted in the
17  valve; is that correct?
18  A.  That's my memory, yes. There was a spec sheet
19  with valve chemistry on it, material requirements,
20  yes.
21  Q.  To your knowledge, the valve that was produced
22  and given to Praxair did not match those
23  specifications; is that correct?
24  A.  That is correct, yes.

35

1  Q.  There were materials in Becht Engineering's
2  opinions, there were materials that were used in the
3  valve that weren't specified that led to the fire or
4  caused the fire?
5  A.  That is correct.
6  Q.  Did you express those statements to Mr. Wagner
7  at that meeting that we've talked about on May 18th,
8  2004?
9  A.  I expressed that opinion to the group that was
10  there, yes.
11  Q.  Do you know if anyone has a list of the people
12  who were present at this meeting?
13  A.  I do not know.
14  Q.  I assume that you don't have any information as
15  to how the materials of construction of the valve were
16  changed from what was specified by Praxair to what was
17  eventually manufactured?
18  A.  I was never apprised of that, just the fact
19  that when we got into the investigation, we found out
20  the valve was specified this way and the actual valve
21  in place was of a different chemistry and design.
22  Q.  Had it been manufactured as specified by
23  Praxair, you would not have had that opinion; is that
24  correct? Let me change that.

36

1       What you were stating was that had the
2  valve been as specified by Praxair, it would not have
3  been a cause of the fire and explosion?
4  A.  If the valve had been as specified and built to
5  the oxygen standard requirements that even Fisher has
6  in their own literature, then my answer to that
7  question is yes.
8  Q.  You're aware that certain materials of the
9  valve were changed; right? Do you recall which
10  materials were changed?
11  A.  As I recall, just about everything. I don't
12  think there was any Monel in the valve at all. There
13  was an Inconel or an Inconalloy -- Inconel -- Inconel
14  and Hastelloy in place of the Monel, and I cannot
15  remember which components -- I'd have to look at my
16  file to confirm that.
17       However, the real challenging part were the
18  nonmetallics that were in there. There was evidence
19  from the tests up in Tonawanda at Praxair that there
20  were some phenolics in there in the bearing area, that
21  there was Teflon in the seating area that were
22  probably a bigger issue than the metal components
23  because we had what we call a kindling chain here.
24       It's like when you start a fire, you start

37

1  it with shavings of wood to get the big wood started.
2  And that's what happens in an oxygen fire. You have
3  some nonmetallic or something like that that could
4  initiate it, and then the other metals will
5  deteriorate very rapidly because of the very high
6  oxygen atmosphere that you have in there, over
7  99 percent oxygen in the line.
8  Q.  The bearing part of the valve was specified as
9  Monel; is that correct?
10  A.  It was not specified. That would be what would
11  be expected from the Fisher valve for oxygen service.
12  Q.  You don't know if Praxair specified Monel for
13  the bearing part of the valve?
14  A.  They specified Monel for the body, the disk,
15  and the seats.
16  Q.  How about the bearing?
17  A.  That is not something that a -- a user or a
18  designer of a valve normally specifies.
19  Q.  Let's go back to my question.
20       Do you know if Praxair specified the
21  material to be used in the bearing part of the valve?
22  A.  They did not that I recall.
23  Q.  Can you point me to any record that shows they
24  did not make that specification?

B0026

10  (Pages 34 to 37)

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NORTHEAST CONTROLS, INC. | : | CIVIL ACTION |
| 3 Enterprise Avenue | : | |
| Clifton Park | : | |
| New York, NY 12065 | : | NO. 06-412 |
| | : | |
| ST. PAUL MERCURY | : | |
| INSURANCE COMPANY | : | |
| 385 Washington Street | : | |
| St. Paul, MN 55102 | : | |
| Plaintiffs, | : | |
| v. | : | |
| FISHER CONTROLS | : | |
| INTERNATIONAL, LLC, | : | |
| 205 S. Center Street | : | |
| Marshalltown, Iowa 50158 | : | |
| Defendant. | : | |

### FIRST AMENDED COMPLAINT

Northeast Controls, Inc., and St. Paul Mercury Insurance Company, by and through their attorneys, Marshall, Dennehey, Warner, Coleman & Goggin, hereby make this Complaint in Civil Action against defendant, Fisher Controls International, LLC, and in support thereof allege the following:

### INTRODUCTION

1.      This action is a contractual indemnification claim for defense and indemnity arising from the defense and settlement of the following actions: one brought by Great American Assurance Company as subrogee of Praxair, Inc. ("Praxair"), Parsons Corporation and Motiva Enterprises, LLC ("Motiva") at Civil Action No. 02C-05-168 ("Great American Complaint") and the other brought by Ronald W. Olson and Carol Olson, Civil Action No. 02C-04-263 ("Olson Complaint") in the Superior Court of the State of Delaware in and for New Castle County against Northeast Controls, Inc. and others. The Great American Complaint was consolidated with two other property damage suits filed separately by Motiva and Praxair.

B0027

## PARTIES

2.      Plaintiff, Northeast Controls, Inc. ("Northeast"), is a New York corporation with a principal place of business at 3 Enterprise Avenue, Clifton Park, New York 12065.

3.      Plaintiff, St. Paul Mercury Insurance Company ("St. Paul"), is a Minnesota corporation with a principal place of business at 385 Washington Street, St. Paul, MN 55102.

4.      Defendant, Fisher Controls International, LLC ("Fisher") is a Delaware limited liability company with a principal place of business at 205 S. Center Street, Marshalltown, Iowa 50158 and a Registered Agent for service of process at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

5.      Fisher manufactures and sells valves for use in New Castle County and the state of Delaware.

6.      Northeast is a sales representative for Fisher.

7.      Northeast had a valid insurance policy with St. Paul at the time of the accident involved in the Great American and Olson litigations and, St. Paul, on behalf of its insured, expended attorneys' fees in defending these case and made contributions toward their resolutions.

## JURISDICTION AND VENUE

8.      This court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.      Venue is proper in this district in accordance with 28 U.S.C. §1391 (a)(1) and (2) since the defendant is incorporated in and a citizen of Delaware, the defendant resides in this district pursuant to 28 U.S.C. §1391 (c), the defendant may be served in this district and

2

B0028

substantial parts of the transaction or occurrence for which the cause of action asserted herein

took place in this district.

## BACKGROUND RELEVANT TO THE CLAIM

10.    On or about January 1, 1998, Northeast and Fisher renewed and entered into a

Representative Agreement which outlined the sales representative relationship between

Northeast and Fisher. A true and correct copy of the Representative Agreement is attached hereto

as Exhibit "A" and incorporated herein as if set forth in full.

11.    The Representative Agreement contained an Indemnity Clause in Section XI,

which provides the following:

Subject to the limitations set forth in the immediately succeeding paragraph of this Section XI,
Fisher agrees that it shall, at its own expense, **protect, defend, indemnify and hold harmless**
Representative (Northeast) from and against any and all claims, demands, actions, losses,
damages, liabilities, costs and expenses ... which may arise out of or be made in connection with
the death or injury of any person, or damage to property, by whomsoever suffered, **resulting or
claimed to result from any actual or alleged defect in any Product**. The obligations set forth
in the immediately preceding sentence shall not apply unless Representative, upon receiving
notice thereof, promptly notifies Fisher in writing thereof of such claim, demand or action, and
thereafter reasonably cooperates with Fisher in the resolution thereof.

Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any
other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or
hold harmless Representative from and against any losses **arising from** the following:

> A.    Any express warranty unauthorized by Fisher;
> B.    Any distribution or sale of a Product for a purpose unauthorized by Fisher;
> C.    Use of any instructions, labels, warnings or other product literature which have
> not been previously approved in writing by Fisher;
> D.    Any failure of Representative to maintain any Product in merchantable condition;
> E.    Demonstration, installation, servicing, modification or repair of any Product by
> Representative or any third party not in accordance with written warnings or instructions
> of Fisher, or
> F.    Negligent acts or omissions by Representative.

(emphasis added). *See* Exhibit "A."

12.    The January 1, 1998 Representative Agreement was in effect for a period of one

(1) year and was renewed thereafter.

1250288 v.1                                                                          B0029

13.    Pursuant to a Worldwide Procurement Agreement dated January 1, 1995 between Praxair and Fisher, Northeast was identified as the sales representative for Praxair's purchases of control valves from Fisher.

14.    In accordance with the Worldwide Procurement Agreement, Praxair contacted Northeast regarding the purchase of control valves for a re-powering project at the Delaware City Power Plant in 1997.

15.    As part of the purchases for the project, on or about June 24, 1998, Northeast placed a purchase order for a control valve (hereinafter "valve") with Fisher on behalf of Praxair.

16.    Fisher sent an order acknowledgement form for the valve to Praxair on or about July 21, 1998, and thereafter, manufactured the valve (tag no. 83HVO629).

17.    Fisher invoiced Praxair for the valve on or about October 23, 1998 and the valve was shipped to and accepted by Praxair on or about December 3, 1998.

18.    Thus, the January 1, 1998 Representative Agreement was validly in place on the dates that the valve in question was ordered, manufactured, sold and shipped to Praxair.

19.    Thereafter, the valve was installed at the power plant located at River Road, Route 9, Delaware City, Delaware 19076 (hereinafter the "Plant") as part of a re-powering project.

20.    The valve was installed to control the flow of oxygen from a base load oxygen compressor ("BLOC") in an air separation unit ("ASU") to a gassifier.

21.    On or about May 20, 2000, there was a fire at the Plant during re-powering of the ASU.

22.    As a result of the fire, Ronald W. Olson allegedly sustained personal injuries.

23.    As a result of the fire, Praxair, Parsons Corporation ("Parsons") and Motiva allegedly sustained property damage.

4

24.     Great American Assurance Company ("Great American"), which insured Parsons

and others, paid claims made by Praxair, Parsons and Motiva as a result of the fire.

25.     Thereafter, on or about May 2002, Great American filed suit as subrogee of

Praxair, Parsons and Motiva against Northeast and others in the Superior Court of the State of

Delaware in and for New Castle County. A true and correct copy of the Great American

Complaint is attached hereto as Exhibit "B."

26.     The Great American Complaint alleged in part that Fisher and Northeast were

negligent and that their negligence included:

> **(a)     failing to design, manufacture, assemble and distribute a BLOC control
> valve compatible with and appropriate for high pressure oxygen service;**
> **(b)     failing to utilize materials in the design and assembly process that were safe
> for use in a high pressure oxygen environment;**
> ...
> **(e)     failing to advise of any deficiencies in the valve that would make the product
> unsafe or unfit for use in a high pressure oxygen environment;**
> ...

*See* ¶23 of Exhibit B. (Emphasis added).

27.     Great American's allegations in ¶ 23 of its Complaint were that Fisher's BLOC

control valve was defective in its design, manufacture and assembly.

28.     Great American alleged that the defects, among other things, caused the fire and

resulting damage. *See* ¶24 of Exhibit B.

29.     On or about April 2002, Ronald W. Olson and Carol Olson filed suit against

Northeast and others in the Superior Court of the State of Delaware in and for New Castle

County. A true and correct copy of the Olsons' First Amended Complaint dated May 20, 2002 is

attached hereto as Exhibit "C."

30.    The Olsons' First Amended Complaint alleged that the valve at issue was defective at the time of sale and that the injuries sustained by the plaintiff were caused by the defective valve. *See* Count IX, ¶43 in Exhibit C.

31.    Fisher had the duty under the Representative Agreement to both defend and indemnify Northeast on the Great American and Olson Complaints, both of which claimed damages due to alleged defects in the Fisher valve.

32.    By letter dated July 3, 2002, Northeast made a demand for defense and indemnification to Fisher based upon the Representative Agreement. A true and correct copy of the demand letter is attached hereto as Exhibit "D."

33.    Northeast made similar requests on two previous occasions. *See* attached letters dated September 25, 2000 and October 4, 2000 made a part hereof cumulatively as Exhibit "E."

34.    Northeast also demanded defense and indemnification from Fisher prior to the filing of the Great American and Olson Complaints.

35.    Fisher, through Matthew W. Geekie, responded to Northeast in a letter dated October 29, 2001. A true and correct copy of Mr. Geekie's letter is attached hereto as Exhibit J.

36.    Mr. Geekie was authorized to speak for Fisher.

37.    Fisher's response as set forth in Mr. Geekie's letter was as follows:

> I am in receipt of your letter dated March 30, 2001 to Mr. Robert Walker, Area Vice President for Fisher Controls International, Inc. Please consider this letter responsive to yours.
>
> Pursuant to the Representative Agreement between Northeast Controls, Inc. ("Northeast") and Fisher Controls International, Inc. ("Fisher"), made the first day of January, 2000 (the "Agreement"), Northeast acted as one of Fisher's sales representatives in May 2000. In accordance with the Agreement, Northeast provided certain services in support of the sale of Products (as defined in the Agreement) to Praxair, Inc., ("Praxair"). As you are aware, on or about May 20, 2000 an explosion and fire occurred at the Motiva facility in Delaware City, Delaware (the "Praxair Incident"). The

Praxair Incident entailed damage to property as well as injury to an individual, (the "Losses").

Subsequent to the Praxair Incident several parties, including, but not limited to, Fisher, Northeast, Praxair, and Motiva, Inc., have, to varying degrees, participated in an investigation of the Praxair Incident (the "Third Party Investigation").  Fisher understands that this Third Party Investigation is focusing on the area of a Fisher butterfly valve as well as upstream and downstream of its location. The Third Party Investigation has yet to arrive at any conclusions, let alone allegations, as to the cause of the Praxair Incident.  More particularly, this investigation has not resulted in any allegations or claims that the Losses arose out of any actual or alleged defect in the butterfly valve or for that matter, any Product.

In light of the fact that no conclusions have been reached and no allegations of Product defect have been made, we believe that your request that Fisher agree to defend, indemnify and hold harmless Northeast is premature.  Accordingly, at this time Fisher declines to accept the tender of Northeast's defense. *If, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement.*  Pursuant to the Agreement, however, Fisher will not protect, indemnify, defend and hold harmless Northeast from its own negligent acts or omissions.  The conclusions and the allegations that may be made will ultimately determine the extent, if at all, to which Fisher agrees to protect, defend, indemnify and hold harmless Northeast and the extent to which Fisher will need to reserve its rights while doing so should evidence develop suggesting that the losses resulted from negligent acts or omissions of Northeast.

If you have any questions about any of the issues set forth above, please do not hesitate to contact me.

Exhibit J (emphasis added).

7

B0033

38.    <u>By letter dated September 13, 2002, Fisher also admitted its responsibility for defending and indemnifying Northeast on claims of a product defect.  See Fisher's letter of September 13, 2002, a true and correct copy of which is attached hereto as Exhibit "F".</u>

39.    Despite this acknowledgment of the obligation to Northeast, Fisher has failed to accept Northeast's demand for defense and indemnification of the Great American and Olson Complaints.

40.    The law firm of Rawle & Henderson LLP was initially retained to defend Northeast in any lawsuit filed related to this fire.  Presently, the undersigned counsel represents Northeast in these matters.

41.    According to the plain language of the Representative Agreement, Fisher's duty to defend and indemnify Northeast is immediately triggered upon **an allegation of a product defect**. *See* Exhibit A.

42.    Both Great American and the Olsons alleged in their respective Complaints that the Fisher valve was defective.

43.    Separate suits filed by Praxair and Motiva against Northeast and others similarly alleged that the Fisher valve was defective, and Northeast defended these suits as well.

44.    No Court has ever determined that the fire at the plant or the resulting alleged injuries and damages were caused by Northeast's negligence.

45.    Fisher did not claim nor adduce any evidence during any of the underlying cases that the fire at the plant or resulting alleged injuries or damages were caused by Northeast's negligence.

46.    On the contrary, Fisher produced evidence, including an expert opinion, which absolved Northeast from liability as the valve construction was not the cause of the fire.  *See* the

8

opinion of Dr. Robert A. Mostello in reports dated January 3, 2005 and January 28, 2005, attached hereto cumulatively as Exhibit "G."

47.     Despite repeated requests by Northeast for defense and indemnification, however, Fisher wrongfully refused to defend or indemnify Northeast during the time that all cases were pending and up until the present time.

48.     Accordingly, Fisher is in breach of its obligations under the Representative Agreement.

49.     As a result of Fisher's breach of the Representative Agreement, Northeast has incurred various damages, expenses and costs.

50.     On or about April 2004, Northeast entered into a Release and Settlement Agreement with Great American in order to limit its exposure in the Great American suit.

51.     According to the settlement, St. Paul, on behalf of its insured, Northeast, paid Great American $501,000.00 (Five Hundred One Thousand Dollars) in order to secure a general release. A true and correct copy of the Release signed by Great American is attached hereto as Exhibit "H."

52.     This settlement was fair and reasonably required to limit St. Paul's and Northeast's liability exposure to Great American caused by Fisher's wrongful denial of Northeast's request for defense and for indemnification.

53.     On or about July 28, 2005, St. Paul, on behalf of its insured, Northeast, contributed an amount of $100,000.00 to the Olson plaintiffs as part of a global settlement. A true and correct copy of the Release signed by the Olsons is attached hereto as Exhibit "I."

54.     This settlement contribution was fair and reasonably required to end St. Paul's and Northeast's litigation expenses.

55.    As a result of Fisher's wrongful denial of its contractual obligation, St Paul, while defending Northeast, was forced to incur $466,621.80 in attorney's fees in defending the Great American, Olson, Praxair and Motiva Complaints.

56.    As a result of Fisher's wrongful denial of its contractual obligation, St Paul, while defending Northeast, was forced to incur $70,934.18 in costs in defending the Great American, Olson, Praxair and Motiva Complaints.

57.    Finally, St. Paul and Northeast will incur costs and expenses, including attorney's fees associated with the prosecution of this suit.

58.    The total costs and expenses incurred by Plaintiffs as a result of Fisher's refusal to defend and indemnify Northeast pursuant to the requirements of the Representative Agreement is in excess of $1,138,555.90.

**WHEREFORE**, Plaintiffs, St. Paul Mercury Insurance Company and Northeast Controls, Inc., demand judgment in their favor and against Defendant Fisher Controls International, LLC in the amount of $1,138,555.90 together with all costs and expenses for bringing this action and interest and any other such relief as the Court may deem equitable and just.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

___*/s/ Lorenza A. Wolhar*_____
BY:    LORENZA A. WOLHAR, ESQUIRE
          DE ID #3971
          1220 N. Market Street, 5th Floor
          P.O. Box 8888
          Wilmington, DE  19899-8888
          Attorneys for Plaintiffs

Date: _ _____

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065<br><br>ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN 55102<br><br>            Plaintiffs,<br><br>          v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158<br><br><br>          Defendant. | NO. 06-412<br><br><br>**ANSWER TO AMENDED**<br><br>**COMPLAINT and**<br><br>**COUNTERCLAIM**<br><br><br><br>**JURY TRIAL DEMANDED** |

Defendant Fisher Controls International, LLC ("Fisher"), by and through its attorneys of record, answers plaintiffs' First Amended Complaint and asserts affirmative defenses as set forth below. Each allegation not specifically admitted shall be deemed denied:

## INTRODUCTION

1.    Responding to paragraph 1 of the Complaint, Fisher admits that this is a contractual indemnification action; admits that the actions identified were filed; and admits that the action filed by Great American Assurance Company was consolidated with actions filed by Motiva Enterprises, LLC and Praxair, Inc.    Responding further, Fisher denies that it was

B0037

obligated to defend and/or indemnify Northeast Controls for its own negligence in any of those actions.

## PARTIES

2.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 2 of the Complaint and therefore denies the same.

3.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 3 of the Complaint and therefore denies the same.

4.    Admitted.

5.    Admitted.

6.    Admitted.

7.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 7 of the Complaint and therefore denies the same.

## JURISDICTION AND VENUE

8.    Admitted.

9.    Admitted.

## BACKGROUND RELEVANT TO THE CLAIM

10.    Answering paragraph 10 of the Complaint, Fisher admits that Northeast Controls, Inc. ("Northeast Controls") and Fisher entered into a Representative Agreement on or about January 1, 1998, but denies that the document attached as Exhibit "A" to the Complaint is the entire Representative Agreement.    Responding further, Fisher states that the Representative Agreement speaks for itself.

11.    Fisher admits that the Representative Agreement contains the passage set forth in paragraph 11 of the Complaint, but denies that the Representative Agreement contains the

B0038

emphasis added by plaintiffs. Responding further, Fisher states that plaintiffs have deleted language from the indemnity provision of the Representative Agreement and states that the Representative Agreement speaks for itself.

    12.    Admitted.

    13.    Admitted.

    14.    Admitted.

    15.    Responding to paragraph 15 of the Complaint, Fisher admits that Northeast Controls placed an order with Fisher for a control valve identified with the tag number "83HV0629." Fisher denies that Northeast Controls was acting "on behalf of Praxair." Responding further, Fisher states that Northeast Controls failed to place the order for that valve in accordance with specifications provided by Praxair to plaintiff. Northeast Controls' failure to do so breached its contract with Fisher and breached the duty of care owed by Northeast Controls to persons, including itself, who could foreseeably be injured by Northeast Controls' failure to place the order in accordance with the specifications provided by Praxair. Further, Northeast Controls' negligent performance of its obligations under the Representative Agreement caused the losses suffered by plaintiffs in the underlying actions.

    16.    Admitted.

    17.    Admitted.

    18.    Admitted.

    19.    Admitted.

    20.    Admitted.

21.    Responding to paragraph 21 of the Complaint, Fisher admits that a fire occurred at the Delaware City Power Plant Repowering Project on or about May 20, 2000, but denies that the fire occurred "during re-powering of the ASU."

22.    Admitted.

23.    Responding to paragraph 23 of the Complaint, Fisher admits that, in the underlying actions, allegations were made that Praxair, Parsons Corporation ("Parsons"), and Motiva sustained property damage as a result of the May 20, 2000, fire. Responding further, Fisher states that, on information and belief, neither Praxair nor Parsons suffered property damage as a result of the fire that occurred on May 20, 2000, at the Delaware City Power Plant Repowering Project.

24.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 24 of the Complaint and therefore denies the same.

25.    Admitted.

26.    Fisher admits that the Great American Complaint contains the passage set forth in paragraph 26 of the Complaint, but denies that the quoted passage constitutes the entirety of the Complaint. Responding further, Fisher states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

27.    Denied.    Responding further, Fisher states that Northeast Controls' characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

28.    Fisher admits that the Great American Complaint "alleged that the defects, among other things, caused the fire and resulting damage," but states that Northeast Controls'

characterization of the Great American Complaint is partial and misleading and that the Great American Complaint speaks for itself.

    29.    Admitted.

    30.    Fisher admits that paragraph 43 of the Olsons' Complaint alleges defects in the Fisher valve and further alleges that those defects caused injuries to Ronald and Carol Olson, but states that Northeast Controls' characterization of the Olsons' Complaint is partial and misleading and that the Olsons' Complaint speaks for itself.

    31.    Denied.

    32.    Admitted.

    33.    Admitted.

    34.    Admitted.

    35.    Admitted.

    36.    Admitted.

    37.    Responding to paragraph 37 of the Complaint, Fisher states that the letter attached as Exhibit "J" speaks for itself and denies that the letter contains the emphasis added to the recitation of the letter in this paragraph.

    38.    Responding to paragraph 38 of the Complaint, Fisher admits that it would have been responsible for defending and indemnifying Northeast Controls on claims of a product defect, but states that all claims of product defect made in any and all of the Underlying Actions were based solely on Northeast Controls' negligent failure to ensure that the materials of construction for the valve at issue met the written specifications provided by Praxair.

    39.    Denied.  Responding further, Fisher states that it fully defended the valve in the underlying actions; that it was not obligated to defend Northeast Controls for its negligence; and

B0041

that all of Northeast Controls' losses in the underlying actions were caused by Northeast Controls' breach of its contract and its negligent conduct in failing to provide Fisher with the specifications for the valve that Praxair had provided to Northeast Controls.

40.     Responding to paragraph 40 of the Complaint, Fisher states that it lacks knowledge or information sufficient to form a belief as to whether "Rawle & Henderson LLP was initially retained to defend Northeast in any lawsuit filed related to this fire" and therefore denies the same. Fisher admits that Northeast Controls is represented in this matter by Marshall, Dennehey, Warner, Coleman & Goggin.

41.     Denied.  Responding further, Fisher states that the Representative Agreement speaks for itself.

42.     Fisher admits that Great American and the Olsons both alleged the presence of defects in the Fisher valve, but states that Northeast Controls' characterization of those Complaints is partial and misleading and that those Complaints speak for themselves. Responding further, Fisher states that all allegations relating to the valve in the underlying actions focused solely on Northeast Controls' failure to place an order with Fisher for the valve that conformed with the specifications provided to Northeast Controls by Praxair, which failure constituted negligence on the part of Northeast Controls. Further, Fisher states that Great American voluntarily dismissed Fisher, but not Northeast Controls, from the <u>Great American</u> action. Fisher also states that the Olsons later agreed that there were no defects in the Fisher valve and therefore agreed to entry of judgment on behalf of Fisher in the <u>Olson</u> action, but did not agree to the dismissal of Northeast Controls from the <u>Olson</u> action.

43.     Fisher admits that Praxair and Motiva both filed suits alleging that the Fisher valve was defective and that separate counsel appeared for Northeast Controls in the lawsuits

B0042

filed by those entities. Responding further, Fisher states that Northeast Controls' characterization of the <u>Praxair</u> and <u>Motiva</u> complaints is partial and misleading and that those Complaints speak for themselves. Fisher also states that the plaintiffs in the <u>Praxair</u> and <u>Motiva</u> actions alleged that Northeast Controls was negligent and that the evidence developed during the pendency of those actions confirmed that negligence.

     44. Admitted.

     45. Denied.

     46. Fisher admits that opinions of Dr. Robert. A. Mostello (Fisher's retained expert) are attached as Exhibit G to the Complaint. Those documents speak for themselves. Responding further, Fisher denies that Dr. Mostello's report "absolved Northeast from liability" and denies each and every other allegation set forth in paragraph 46 of the Complaint.

     47. Denied.

     48. Denied.

     49. Denied.

     50. Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 50 of the Complaint and therefore denies the same.

     51. Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 51 of the Complaint and therefore denies the same.

     52. Denied. Responding further, Fisher states that, based on documents obtained from plaintiffs, Northeast Controls entered into a settlement agreement with Great American because Great American had retained experts who had formed the conclusion that the fire at issue in the underlying actions was caused by Northeast Controls' negligence.

B0043

53.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 53 of the Complaint and therefore denies the same.

54.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 54 of the Complaint and therefore denies the same.

55.    Denied.

56.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 56 of the Complaint and therefore denies the same. Responding further, Fisher denies that it breached its contractual obligations.

57.    Fisher lacks knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 57 of the Complaint and therefore denies the same.

58.    Denied.

## AFFIRMATIVE DEFENSES

1.    Plaintiffs' damages, if any, should be barred or reduced proportionally under the doctrines of contributory negligence and/or comparative fault.

2.    The various causes of action alleged in the Complaint are barred in whole or in part by the statute of limitations.

3.    The various causes of action alleged in the Complaint are barred in whole or in party by the principles of issue and/or claim preclusion.

4.    Northeast Controls failed to mitigate its damages, if any.

5.    Fisher is entitled to recoupment in the form of a reduction in the amount of Plaintiff's recovery in this lawsuit, if any, in the amount of attorneys fees and costs Fisher incurred in defending the underlying actions, which fees and costs were incurred by Fisher as a

direct result of Northeast Controls' breach of contract and negligence in transmitting Praxair's specifications to Fisher.

6.    Fisher reserves the right to assert additional affirmative defenses disclosed through discovery or otherwise.

## COUNTERCLAIM

By way of counterclaim against plaintiff Northeast Controls, Inc., defendant Fisher Controls International, LLC ("Fisher"), by and through its counsel of record, Riddell Williams P.S., alleges as follows:

### JURISDICTION

1.    This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1332(a).

2.    This Court has jurisdiction over Fisher's counterclaim against plaintiff Northeast Controls under 28 U.S.C. § 1367(a) and Fed. R. Civ. P. 13(a).

### PARTIES

3.    Based on allegations in plaintiffs' Complaint, plaintiff Northeast Controls is a New York corporation with its principal place of business in Clifton Park, New York.

4.    Fisher is a Delaware limited liability company with a principal place of business in Marshalltown, Iowa.

### FACTUAL ALLEGATIONS

5.    At all times material to Fisher's counterclaims, Northeast Controls and Fisher were parties to a Representative Agreement. A true and correct copy of the Representative Agreement is attached as Exhibit 1 to this Answer and Counterclaim.

6.    At all times material to Fisher's counterclaims, Fisher and Praxair, Inc. ("Praxair") were parties to a Worldwide Procurement Agreement. A true and correct copy of the

B0045

Worldwide Procurement Agreement is attached as Exhibit 2 to this Answer and Counterclaim.

The president of Northeast Controls signed the Worldwide Procurement Agreement on behalf of

Northeast Controls.

7.    The Worldwide Procurement Agreement called for Fisher to manufacture its

products supplied to Praxair in accordance with Praxair's specifications for those products.

8.    Under the terms of the Representative Agreement, and in accordance with the

Worldwide Procurement Agreement, Northeast Controls placed orders with Fisher for control

valves ordered by Praxair through Northeast Controls.

9.    Under the terms of the Representative Agreement, Northeast Controls was

required to maintain documentation relating to the services that it provided in placing orders with

Fisher for control valves ordered by Praxair through Northeast Controls.

10.    In 1996, Northeast Controls placed orders with Fisher for control valves for an air

separation unit ("the ASU") that was being constructed by Praxair as part of the Delaware City

Power Plant Repowering Project.

11.    The ordering and purchase of the control valves identified in paragraph 6 of this

Counterclaim were governed by the Worldwide Purchasing Agreement between Fisher and

Praxair.

12.    Northeast Controls' work in ordering the control valves identified in paragraph 10

of this Counterclaim was governed by the Representative Agreement between Fisher and

Northeast Controls.

13.    On or about June 3, 1996, Praxair provided Northeast Controls with specifications

for a 12" Type A11 valve that was to be identified or "tagged" as valve 83HV0629.  Valve

83HV0629 is referred to hereafter as "the Valve."

B0046

14.    As part of the order process for the Valve, Praxair provided specifications to Northeast Controls for the Valve. A true and correct copy of Praxair's specifications for the Valve is attached as Exhibit 3 to this Answer and Counterclaim.

15.    Bert Cappellini was Northeast Controls' designated representative for purposes of Praxair's ordering of the Valve. In his capacity as representative of Northeast Controls, Bert Cappellini initialed Praxair's specifications for the Valve as set forth in Exhibit 3.

16.    The document attached as Exhibit 3 to this Answer and Counterclaim was the only document relating to the purchase and sale of the Valve exchanged between Praxair and Northeast Controls that contained the initials of Bert Cappellini, as representative for Northeast Controls, and any representative for Praxair.

17.    The specifications provided by Praxair, and initialed by Bert Cappellini, called for the Valve to have, among others, the following specifications: a disk manufactured of Monel; a shaft made of Monel; Monel bearings; and a seal manufactured of Monel/PTFE.

18.    Acting as Northeast Controls' representative, Bert Cappellini transmitted specifications to Fisher for the Valve.

19.    The specifications transmitted by Northeast Controls to Fisher for the Valve did not match the specifications provided to Northeast Controls in the only document signed by representatives for both Praxair and Northeast Controls. Specifically, the specifications that Northeast Controls transmitted to Fisher called for a disk manufactured of Hastelloy C; a shaft manufactured of Inconel 718; bearings manufactured of TFE composite; and a seal manufactured of Tefzel.

B0047

20.    Northeast Controls did not inform Praxair that Northeast Controls had provided Fisher with specifications for the Valve that differed from the specifications Praxair provided to Northeast Controls and Bert Cappellini accepted on behalf of Northeast Controls.

21.    Before the fire at issue in this matter, Northeast Controls never informed Fisher that Praxair had never agreed to purchase a Valve manufactured in accordance with the specifications provided by Northeast Controls to Fisher in relation to the Valve at issue.

22.    After Fisher received Northeast Controls' specifications for the Valve, a Fisher representative telephoned Bert Cappellini and recommended that the specification for the Valve seat be changed from Tefzel to Kel-F.

23.    Northeast Controls agreed that Fisher should change the material for the Valve seat from Tefzel to Kel-F.

24.    Northeast Controls did not obtain Praxair's approval for the change in the material for the Valve seat from Tefzel to Kel-F. Nor did Bert Cappellini ever obtain Praxair's approval to use Kel-F in the Valve seat.

25.    Northeast Controls never informed Fisher that Praxair had requested that the Valve be manufactured using a Monel disk; a Monel shaft; Monel bearings; and a Monel/PTFE seat.

26.    Northeast Controls never informed Praxair that Fisher had manufactured the Valve using materials different from those specified by Praxair to Northeast Controls.

27.    Fisher manufactured the Valve in accordance with the specifications set forth in the communications between Northeast Controls and Fisher.

28.    On May 20, 2000, an incident ("the Incident") occurred at the Delaware City Power Plant Repowering Project.

B0048

29.    The Incident involved the Fisher Type A11 valve tagged "83HV0629."

30.    Following the Incident, four lawsuits ("the Underlying Actions") were filed against Fisher Controls International, Inc.

31.    In each of the Underlying Actions, the allegations against Fisher rested on the alleged failure of the Fisher Valve to comply with the specifications provided by Praxair to Northeast Controls.

32.    In the Underlying Actions, none of the parties ever adduced any evidence showing or tending to show that the Fisher Valve was defective in design or manufacture.

33.    In response to Northeast Controls' demand that Fisher defend and indemnify Northeast Controls in regard to the Underlying Actions, Fisher informed Northeast Controls that Fisher would defend Northeast Controls against any claim that the Valve was defective in design or manufacture.

34.    Fisher further informed Northeast Controls that it (Fisher) would not defend Northeast Controls against Northeast Controls' own negligence.

35.    In the Underlying Actions, Fisher defended the design and manufacturing of the Valve.

36.    Fisher filed motions for summary judgment in all four of the Underlying Actions.

37.    In the four Underlying Actions, Fisher's counsel drafted the motions for summary judgment identified in paragraph 36 of this Counterclaim.

38.    In the Underlying Actions, Fisher's counsel provided drafts of Fisher's motions for summary judgment to counsel for Northeast Controls before filing those motions.

39.    Northeast Controls did not file any motions for summary judgment in any of the Underlying Actions.

B0049

40.    After Fisher filed its motion for summary judgment as to all claims asserted by Motiva, Motiva voluntarily dismissed all of its claims.

41.    After Fisher filed its motion for summary judgment as to all claims asserted by Great American, Great American voluntarily dismissed all of its claims against Fisher.

42.    Great American did not voluntarily dismiss its claims against Northeast Controls.

43.    The state court granted Fisher's motion for summary judgment as to all claims asserted by Praxair against Fisher.

44.    After Fisher filed its motions for summary judgment in the <u>Olson</u> action, all of the parties to that action, including Northeast Controls, agreed to Fisher's dismissal from the <u>Olson</u> action.

**COUNTERCLAIM**

**BREACH OF CONTRACT**

45.    Fisher hereby incorporates the allegations set forth in paragraphs 1-44 of its Counterclaim as if fully set forth herein.

46.    The claims against both Northeast Controls an Fisher in the Underlying Actions were the direct result of Northeast Controls' failure to convey to Fisher the specifications provided for the Valve by Praxair to Northeast Controls.

47.    In failing to convey to Fisher the specifications provided for the Valve by Praxair, Northeast Controls breached the Representative Agreement.

48.    Northeast Controls' breach of the Representative Agreement caused Fisher damages, including but not limited to the costs incurred in defending the <u>Olson</u>, <u>Praxair</u>, <u>Motiva</u>, and <u>Great American</u> actions.

B0050

49.    In defending the Underlying Actions, Fisher incurred attorneys fees and costs in an amount to be proven at trial.

50.    In defending the Underlying Actions, Fisher incurred expert fees in an amount to be proven at trial.

51.    The attorneys fees and expert fees incurred by Fisher were reasonable.

52.    Fisher is entitled to recoupment in the form of a reduction in the amount of Plaintiff's recovery in this lawsuit, if any, in the amount of the attorney fees, costs and expert fees incurred in defending the underlying action.

WHEREFORE, Fisher demands judgment in its favor, reducing the amount of Northeast Controls' recovery, if any, in the amount of the attorney fees, costs and expert fees incurred in defending the underlying action, together with all costs and expenses for defending this action and any other such relief as the Court may deem equitable and just.

RIDDELL WILLIAMS P.S.

/s/ Daniel J. Gunter
Patrick D. McVey
*Pro hac vice*
Daniel J. Gunter
*Pro hac vice*
Riddell Williams P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA 98154
(206) 624-3600 (Tel.)
(206) 389-1700 (Fax)
pmcvey@riddellwilliams.com
dgunter@riddellwilliams.com

Date: April 16, 2007

B0051

MARON, MARVEL, BRADLEY
& ANDERSON P.A.

/s/ Paul A. Bradley
Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 425-5177 (phone)
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorneys for Defendant
Fisher Control International LLC

Date: April 16, 2007

## CERTIFICATE OF SERVICE

I, Paul A. Bradley, do hereby certify that on this 16th day of April 2007, a copy of the

foregoing Answer to Amended Complaint and Counterclaim was electronically served, via

CM/ECF, upon all counsel of record.


/s/ Paul A. Bradley
Paul A. Bradley (DE Bar ID #2156)

B0053

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHEAST CONTROLS, Inc.; and | ) | |
| ST. PAUL MERCURY INSURANCE Co., | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. A. No. 06-412-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

TO:    RIDDELL WILLIAMS          MARON MARVEL BRADLEY
       Patrick McVey, Esquire        & ANDERSON, P.A.
       Daniel J. Gunter, Esquire     Paul A. Bradley, Esquire
       1001 Fourth Avenue Plaza, Ste. 4500    1201 North Market Street, Ste. 900
       Seattle, WA 98154             Wilmington, DE 19801

PLEASE TAKE NOTICE:    On November 21, 2007, Northeast Controls, Inc. served the

attached  *Appendix B to Plaintiffs' Answering Brief in Opposition to Defendant's Motion for*

*Summary Judgment*  upon Defendant Fisher Controls, Inc. via e-filing and First Class U.S. Mail,

postage prepaid, to the above-named persons.

**MARSHALL DENNEHEY WARNER**          **MARSHALL DENNEHEY WARNER**
**COLEMAN & GOGGIN**                   **COLEMAN & GOGGIN**


  /s/Thomas P. Wagner                    /s/Joseph Scott Shannon
Thomas P. Wagner, Esquire (*pro hac vice*)    Joseph Scott Shannon, Esquire (I.D. 3434)
1845 Walnut Street, 21st Floor          1220 North Market Street, 5th Floor
Philadelphia, PA 19103                  P.O. Box 8888
tel.: 215.575.4562                      Wilmington, DE 19899 – 8888
e-mail: tpwagner@mdwcg.com              tel.: 302.552.4329
*Of Counsel for Plaintiffs*             e-mail: jsshannon@mdwcg.com
                                        *Counsel for Plaintiffs*


Dated: November 21, 2007

15/555588.v1