IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHEAST CONTROLS, INC.; and ST. PAUL MERCURY INSURANCE COMPANY, | ) ) ) ) | |
| Plaintiffs | ) ) | No. 1:06-CV-00412 (SLR) |
| v. | ) ) | |
| FISHER CONTROLS INTERNATIONAL, LLC, | ) ) | |
| Defendant | ) | |

**REPLY BRIEF OF PLAINTIFFS, NORTHEAST CONTROLS, INC., AND ST. PAUL MERCURY INSURANCE COMPANY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

THOMAS P. WAGNER, ESQUIRE
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
1845 Walnut Street
Philadelphia, PA 19103
tel: 215-575-4562
e-mail: tpwagner@mdwcg.com
*Counsel for Plaintiffs*

JOSEPH SCOTT SHANNON, ESQUIRE
Delaware Bar I.D. No. 3434
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899-8888
tel.: 302.552.4329
e-mail: jsshannon@mdwcg.com
*Counsel for Plaintiffs*

Dated: November 28, 2007

01/4214266.v1

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................ 1

    A.    Fisher's Change in Position ............................................................................ 1

    B.    Did The Negligence Of Northeast Make The Fire Worse? ............................ 5

    C.    Fisher's Strategy ............................................................................................. 8

    D.    Why Were Fisher And Northeast Sued? ........................................................ 9

    E.    Preclusion And Judicial Estoppel ................................................................... 9

    F.    Delaware Contribution Act ........................................................................... 11

    G.    Fisher Did Not Defend Or Indemnify Northeast ......................................... 12

CONCLUSION ......................................................................................................... 13

# TABLE OF AUTHORITIES

**Statutes**

10 Del.C. §6302..................................................................................................................11

Mo.Rev.Stat. §537.067 .......................................................................................................11

## ARGUMENT

A. **Fisher's Change In Position**

In their brief opposing plaintiffs' Motion for Summary Judgment, defendant Fisher's counsel claims that plaintiffs have somehow changed their position. Plaintiffs have made no such change. On the contrary, our position has been the same all along. Unlike Fisher, we think this is a breach of contract case, not a tort claim. The indemnity provision of the Representative Agreement required Fisher to defend and indemnify its Sales Representative Northeast against any claims of injury to person or property which were *alleged* to be the result of a defect in any Fisher product. Northeast was sued in four cases claiming personal injury and property damages allegedly resulting from a defect in a Fisher valve. It is admitted in this litigation that the Complaints in those cases included allegations of product defect and that the valve in question was a "product" within the meaning of the Representative Agreement.

It has further been our consistent position that Fisher could escape from this obligation to defend and indemnify only if the personal injury and property damage "Losses" claimed in those lawsuits were caused by the negligence of Northeast. Fisher's own evidence has shown that no negligence of Northeast had anything to do with causing those personal injury and property damages.

We find it ironic that Fisher and its counsel would attempt to criticize the plaintiffs for allegedly changing positions. The record in this case shows that the only change of position has been by Fisher itself. The incident from which this litigation arises occurred on May 20, 2000. Within the first year after that date, plaintiffs made written demands on Fisher for defense and indemnity under the contract. Fisher responded to those demands by a letter from its authorized

1

representative, Matthew W. Geekie, Esquire,[1] who said that the request was premature because the lawsuits had not yet been filed and the allegations had not yet been made.

In this letter, Mr. Geekie provided Northeast with a clear statement regarding Fisher's interpretation of the contract's terms. After identifying the May 20, 2000 explosion and fire as the "Praxair Incident", he defined the term "Losses" as it is used in the contract:

> "The Praxair Incident entailed damage to property as well as injury to an individual, (the **"Losses"**).

There is no question about what Mr. Geekie was saying here. In response to the Request from its Sales Representative for defense and indemnity under the contract, Fisher's authorized representative said that the term "Losses" in this contract meant the personal injury and property damage that occurred in the explosion and fire at the Delaware City Power Plant.

This was not the end of Mr. Geekie's letter. He went on to assure Northeast that "[i]f . . . in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the Losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement." He said further that Fisher would not protect and indemnify Northeast from its own negligent acts, and he provided a clear explanation of exactly what this meant under the Agreement:

> The conclusions and the allegations that may be made will ultimately determine the extent, if at all, to which Fisher agrees to protect, defend, indemnify and hold harmless Northeast and the extent to which Fisher will need to reserve its rights while doing so should evidence develop suggesting that the Losses resulted from negligent acts or omissions of Northeast.

*See* letter of Matthew W. Geekie, Esquire, App. A, Ex. 3, p. A0017.

The meaning of this language cannot be seriously debated. This was Fisher's authorized representative responding in writing to the request from Northeast for protection and indemnity

---

[1] Mr. Geekie's letter is found in Appendix A to Plaintiffs' Opening Brief in Support of their Motion for Summary Judgment. *See* App. A, Ex. 3, pp. A0016 and A0017.

2

under their Representative Agreement.  It is worth remembering here that Fisher wrote the agreement.[2]  After having clearly defined the term "Losses" as the personal injury and property damages resulting from the explosion and fire, Mr. Geekie went on to state how and under what circumstances Fisher would defend and indemnify its Sales Representative.  He told Northeast in this letter that the company would not be protected, defended, indemnified and held harmless if evidence developed in the future "suggesting that the Losses resulted from negligent acts or omissions of Northeast."

By this letter, Fisher was plainly telling Northeast that the word "Losses" meant the personal injury and property damages that occurred in the incident at Delaware City.  Fisher was further saying that Northeast would be protected and indemnified unless the evidence showed that Northeast had caused those personal injury and property damages.  Plaintiffs ask the Court to agree that there is no other fair way to read this letter.

Mr. Geekie's letter represented the official position of Fisher as a company when it responded to Northeast's plea for protection.  Now, Fisher's position has changed completely.  In its Brief in Response to Plaintiffs' Motion for Summary Judgment, Fisher sets forth an argument that is totally at odds with the statements and promises Fisher made through Mr. Geekie six years ago.

On page 24 of their Brief, Fisher's counsel says that the term "Losses" does not mean injury to person or damage to property.  They arrive at this conclusion by purporting to dissect the relative positioning of the phrases in the contract, a contract which Fisher wrote.  Then, on page 28, Fisher states that "[t]he cause of the *explosion* (emphasis in original) at issue in the underlying actions is fundamentally irrelevant . . . .  It does not matter whether the material

---

[2] *See* Deposition of Defendant Fisher's Corporate Designee taken under Fed.R.Civ.P. 30(b)(6), at p. 21.  App. B, Ex. 1, p. B0002.

3

deviations [the difference between the purchase order and the metals used in the valve] actually caused the explosion."

The contrast between Mr. Geekie's letter and Fisher's current brief is stark.  In October of 2001, Fisher's authorized spokesman told Northeast that the term "Losses" meant "damage to property as well as injury to an individual."  Now, in November of 2007, Fisher's counsel has told this Court that if "the parties intended the term "Losses" to apply to "death or injury of any person or damage to property" they would have written the contract differently.  "But they did not do so."  *See* Fisher's Responsive Brief at p. 24.  In October of 2001, Mr. Geekie assured Northeast that it would be protected, defended and indemnified unless evidence was developed suggesting that these "Losses" (the personal injury and property damages) "resulted from negligent acts or omissions of Northeast."  *See* letter of Matthew W. Geekie, App. A, Ex. 3, p. A0017.  Now, in November of 2007, Fisher's counsel says that the cause of the explosion resulting in these personal injury and property damages is "fundamentally irrelevant."  *See* Fisher's Responsive Brief at p. 28.  It would be difficult to imagine a more "fundamental" reversal of position.

Plaintiff Northeast had every right to rely upon its contract with Fisher, as that contract was interpreted by Fisher's authorized spokesman.  Plaintiff Northeast also had every right to rely upon the promises and assurances made in the letter from Fisher when Northeast asked for the company's protection under the contract.  Now, in a desperate effort to escape that obligation, the company's litigation attorneys have twisted, strained and distorted the language of the contract.  Despite those efforts, plaintiffs suggest that the meaning of this contract is clear.  As plaintiffs have consistently argued from the beginning, the "Losses" are the personal injury and property damages that occurred in the explosion and fire at the Delaware City Power Plant on May 20, 2000. Plaintiff Northeast was sued in four lawsuits by parties claiming that these

4

"Losses" resulted from a defect in a Fisher product. Fisher's own evidence showed that no negligence of Northeast had anything to do with causing the explosion and fire. Despite all this, Fisher failed and refused to defend Northeast or indemnify it against the settlements it paid to end the Underlying Litigation. Accordingly, plaintiffs are entitled to Summary Judgment.

B.  **Did The Negligence Of Northeast Make The Fire Worse?**

Plaintiffs and defendant Fisher agree on one important point: no negligence of Northeast caused the fire and explosion. This point is made unequivocally in the report of Fisher's expert, Dr. Robert Mostello. As discussed elsewhere, Dr. Mostello says that the explosion and resulting fire were ignited "upstream" of the valve (i.e., before the oxygen reached the valve), and it was caused by the manner in which the oxygen piping system was designed, cleaned and operated. Fisher itself developed this evidence. *See* page 13 of Defendant Fisher's Brief in Response to Plaintiff's Motion for Summary Judgment.

Now, in this litigation, Fisher argues that the cause of the explosion and fire is irrelevant because the damages sustained in that incident (called the Praxair Incident by Fisher's representative Mr. Geekie) are not the "Losses" against which Fisher is obligated to protect, defend and indemnify its Sales Representative Northeast. Perhaps, however, even Fisher secretly realizes that this argument is implausible. So, Fisher offers an alternative argument. At p. 29 of its Brief in Response to Plaintiffs' Motion for Summary Judgment, Fisher says the following: "But even if the Court concludes that the damages at issue in the underlying actions are relevant, the *undisputed evidence* (emphasis added) shows that Northeast Controls' negligence in placing the valve order exacerbated the effects of the explosion."

To support this extraordinary statement, Fisher quotes the opinion of its own expert, Dr. Robert Mostello that "the materials of construction, as supplied, caused a significantly greater release of energy then would the materials [originally specified]." *See* Fisher's Brief, at p. 29.

5

Fisher then quotes an isolated portion of deposition testimony from plaintiffs' expert, Dr. David Pope. Dr. Pope did indeed agree that the "heat of combustion" contributed to the fire by the valve parts made of Hastelloy C and Inconel was greater than it would have been if the same parts had been made of Monel. Fisher, however, did not point out to the Court in its Brief the further testimony of Dr. Pope in the same deposition that this additional or greater "heat of combustion" would be "so small as to be inconsequential."

The relevant testimony of Dr. Pope came in response to questions by Fisher's counsel on October 17, 2007:

> Q. Can you identify for me - - and if you need to look at it, you can - - what portions of Dr. Mostello's rebuttal report that you disagree with?
>
> A. Dr. Mostello clarified in that rebuttal report what he meant by the role of the Inconel 718 and the Hastelloy C in the spread of the fire and specifically he talked about the heat of combustion that those two materials added to the fire that wouldn't have been there if the Monel alloy had been used instead of those two alloys.
>
> He correctly points out that there is some heat of combustion applied, that came into the fire as a result of the inclusion of those two materials. My disagreement is with the overall implication of what he's saying. It is true that there's additional heat of combustion supplied by that mechanism, but that additional heat is so small as to be inconsequential and even unmeasurable.
>
> Q. What's the basis for your opinion that the additional heat of combustion contributed by the Hastelloy C disk and the Inconel 718 shaft would be inconsequential and even unmearsurable?
>
> A. The reason is that the steel pipe and flange upstream from the valve was consumed to such an extent that I estimate something in excess of a hundred pounds of iron was consumed in the fire. The iron has a very high heat of combustion compared to either of the other two alloys, plus the fact that those, the quantities of material in those other two components is very small so the additional heat of

6

        combustion supplied is far less than 1 percent of the total
heat of combustion supplied by the burning of the iron.[3]

Thus, the evidence is hardly "undisputed."

It might appear that this dispute presents a material issue of fact which could preclude Summary Judgment. Plaintiffs, however, think that no such issue exists. Although Fisher's expert, Dr. Mostello, offered the opinion that the change in materials increased the "heat of combustion" in this fire, he candidly admitted that he really does not know what difference, if any, this made to the resulting damage. He testified as follows:

        Q.      Would Mr. Olson's injuries have been any different?

        A.      I don't really know. I know the damage would be less. The basic damage of the valve would be less. Whether – how that would affect Mr. Olson's position, one would think, if you had to make a decision, worse or better, I would say probably his position would have been better. But strictly based on the fact that there would have been less damage in the first place had the internals been made of Monel.

        Q.      So scientifically or from an engineering standpoint, your first answer was the correct one, you really don't know?

        A.      Really don't know.[4]

As to the damage to the valve itself and the surrounding piping, Dr. Mostello was more equivocal. The fair import of his testimony, however, is that even if the trim parts had been made of Monel, he really does not know the quantitative difference in the damage that the piping system would have sustained. He said that the calculation of this estimate would be very difficult to do, and that he has not attempted to do it. He did testify clearly that the valve itself would still no longer be usable as a valve.[5]

---

[3]    *See* Deposition of David P. Pope, Ph.D., at 57:13 to 58:19, App. C, Ex. 1, p. C0002-C0003 .
[4]    *See* Deposition of Robert A. Mostello, P.E., 86:10 to 87:1, App. C., Ex. 2, p. C0005-C0006 .

[5]    *See* Deposition of Robert A. Mostello, P.E., 119:8 to 123:22, App. C., Ex. 3, pp. C0008-C0012.

In light of this testimony, there is no triable issue of material fact about whether any negligence of Northeast in changing the materials of the valve made the fire worse. Plaintiffs' expert says that the difference would have been so small as to be insignificant and even unmeasurable. The defendant's expert thinks that the difference in the heat of combustion would have been significant, but he admits that he has no knowledge as to what difference, if any, this would have made to the damage sustained.

In plaintiffs' view, therefore, this "issue" is just one more Red Herring drawn across the trail by Fisher.

**C.     Fisher's Strategy**

At several points in its brief in response to Plaintiffs' Motion for Summary Judgment, Fisher tries to explain its "strategy" in the Underlying Litigation. Fisher says that it could not criticize Northeast or draw attention to Northeast's "negligence" because of the concern that Fisher would have been vicariously liable, since Northeast was its agent. Furthermore, Fisher says that it had a duty to cooperate with Northeast because it had entered into a Joint Defense Agreement.

This argument has no merit whatsoever. Northeast's status as an agent of Fisher did not dictate Fisher's strategic planning in the defense of the Underlying Litigation. Even if Fisher was held vicariously liable for the actions of Northeast, it still had every right and opportunity to pursue a third-party claim against Northeast for contribution under common law, just as it did against the other defendants. Fisher decided, however, that the best way to defend its own interests was to establish that neither Fisher itself, nor Northeast, nor the valve, had anything to do with causing the damages claimed in the underlying lawsuits. Fisher succeeded in this strategy.

8

Likewise, Fisher was not compelled by anyone to enter into the Joint Defense Agreement. Rather, this was part of its voluntary strategic plan to defend itself by defending the valve and by proving that the change in the materials of the valve's construction had nothing to do with causing the subject incident.

Fisher's argument, therefore, is without merit.

**D.     Why Were Fisher And Northeast Sued?**

In their brief opposing Plaintiffs' Motion for Summary Judgment, Fisher's counsel continue to make the argument that Fisher and Northeast were sued because Northeast mishandled the order for the valve. As noted earlier, this is an essential pillar of Fisher's entire position in this litigation. According to Fisher's counsel, this conclusion as to why both defendants were sued in the Underlying Litigation is "abundantly clear." *See* Defendant Fisher's Brief in Response to Plaintiff's Motion for Summary Judgment, at p. 29.

Perhaps Fisher thinks that if they say it often enough, the Court will believe it. Just as in their previous brief, however, Fisher's counsel has cited no evidence to support this conclusion that they say is "abundantly clear." In fact, the only thing this conclusion has in abundance is speculation.

This issue is discussed thoroughly in Plaintiffs' Brief in Opposition to Defendant Fisher's Motion for Summary Judgment, at pages 8-12. That discussion is incorporated herein by reference, and it is not necessary to repeat it in this brief.

**E.     Preclusion And Judicial Estoppel**

Fisher attempts in its brief to answer plaintiffs' arguments regarding issue preclusion, claim preclusion and judicial estoppel. Fisher first attempts to argue that these concepts do not apply. Plaintiffs submit that our discussion of these concepts in our brief in support of our

9

Motion for Summary Judgment remain completely valid and are unaffected by Fisher's thin arguments. Accordingly, plaintiffs incorporate herein by reference the discussion at pages 19-23 of our Brief in Support of our Motion for Summary Judgment. It is not necessary to repeat that discussion here.

Fisher goes on to argue in its opposition brief that if the concepts of issue preclusion and claim preclusion are applicable to Fisher, then some of plaintiffs' claims are also barred by the same doctrines. Specifically, Fisher argues that plaintiffs did not preserve their indemnity claims when Fisher was dismissed from the property damage actions. Fisher argues, therefore, that the indemnity claim for reimbursement of the $501,000.00 paid by plaintiffs to settle the Great American property damage case is barred.

This argument is incorrect. According to Fisher's own time line on page 11 of its responsive brief, Fisher was dismissed from the Great American action because plaintiff Great American informed the Court that it was voluntarily dismissing its claims against Fisher. This did not involve any action by Northeast. At that time, Northeast's indemnity claim had not yet even accrued. The payment of $501,000.00 was neither agreed to nor made until at least four months later. Thus, this claim was not in existence at the time of Fisher's dismissal and it could not have been waived or otherwise compromised.

Furthermore, the payment of the $501,000.00 to eliminate the property damage claims of Great American was done by plaintiffs Northeast and St. Paul for the purpose of defending the Olson case and improving their position in that personal injury matter, which had a much larger damage exposure.

Defendant's position is completely without merit.

10

**F.**     **Delaware Contribution Act**

Just as it did in its brief supporting its own Motion for Summary Judgment, defendant Fisher has again argued in response to the Plaintiffs' Motion for Summary Judgment that the indemnity clause in the Representative Agreement provided plaintiff Northeast with no protection because, under the Delaware Contribution Act, 10 Del.C. §6302, Northeast could have been held liable only for its own negligent acts. This argument is addressed thoroughly in Plaintiffs' Answering Brief in Opposition to Defendant Fisher's Motion for Summary Judgment, at pages 18-21. That discussion is incorporated herein by reference, and it is not necessary to repeat it in this brief.

Plaintiffs wish to add, however, that the Delaware Contribution Act is similar to legislation governing the apportionment of liability among tortfeasors in a great many states. In fact, the State of Missouri requires the trier of fact to apportion liability among tortfeasors, just as it is required in Delaware. Mo.Rev.Stat. §537.067. In its current brief responding to Plaintiffs' Motion for Summary Judgment, Fisher makes the bold statement that under the statute like the one in Delaware, "there were never and never would have been any circumstances that would trigger any obligation by Fisher to defend and indemnify Northeast." *See* Defendant Fisher's Brief in Response to Plaintiffs' Motion for Summary Judgment, at page 26. It is well to remember that Fisher wrote this contract for signature by each of its Sales Representatives. The contract provided that it would be enforced according to Missouri law. If Fisher's argument is correct, therefore, the contract was deliberately written in such a way that the indemnity provision would never have any effect at all.

Plaintiffs submit that this result is unreasonable, and could not possibly have been intended by the parties. For the reasons set forth above, and for the reasons set forth in Plaintiffs'

Answering Brief in Opposition to Defendant Fisher's Motion for Summary Judgment at pages 18-21, Fisher's arguments are incorrect and should be rejected.

### G. Fisher Did Not Defend Or Indemnify Northeast

More than once in its briefs, Fisher has made the bizarre suggestion that it actually did defend and indemnify Northeast, at least to the extent that it was defending the valve. For example, on page 26 of its Brief in Response to Plaintiffs' Motion for Summary Judgment, at footnote 73, Fisher states as follows: "Fisher did agree to defend and indemnify Northeast Controls in regard to any allegations as to the valve. As plaintiffs agree, Fisher mounted an aggressive and successful defense against all such claims." This is nonsense.

In the Geekie letter of October 29, 2001,[6] Fisher expressly declined to accept the defense and indemnification of Northeast on the ground that it was premature. Fisher said it would defend and indemnify Northeast in the future, depending upon the allegations, but it never did so. When the lawsuits were filed, Fisher entered an appearance only for itself. It never assigned counsel or entered an appearance for Northeast. Fisher moved for Summary Judgment on behalf of itself alone in one of the lawsuits, and it bargained for and obtained its Dismissal by Stipulation from the others. It did not obtain any similar dismissals for Northeast. Fisher was offered the opportunity to participate in the cost of the settlement with the Great American plaintiffs, but it declined to do so.

Accordingly, this suggestion by Fisher that it somehow fulfilled its defense and indemnity obligation to Northeast is absurd, and it should be completely rejected by the Court. Fisher did nothing to defend Northeast. On the contrary, Fisher left its Sales Representative to fend entirely for itself.

---

[6] *See* App. A, Ex. 3, p. A0016-A0017.

**CONCLUSION**

For all the reasons set forth above, as well as in our brief supporting our Motion for Summary Judgment and in our Responsive Brief opposing defendant's Motion for Summary Judgment, plaintiffs respectfully request that the Court grant their Motion for Summary Judgment and deny the Cross-Motion for Summary Judgment of Defendant Fisher.

>  MARSHALL, DENNEHEY, WARNER,
>    COLEMAN & GOGGIN
>
> By: /s/ *Thomas P. Wagner*
>     Thomas P. Wagner, Esquire
>     1845 Walnut Street
>     Philadelphia, PA 19103
>     tel: 215-575-4562
>     email: tpwagner@mdwcg.com
>     *Counsel for Plaintiffs*
>
> MARSHALL DENNEHEY WARNER
>    COLEMAN & GOGGIN
>
> By: */s/Joseph Scott Shannon*
>     Joseph Scott Shannon, Esquire (I.D. 3434)
>     1220 North Market Street, 5th Floor
>     P.O. Box 8888
>     Wilmington, DE 19899 – 8888
>     tel.: 302.552.4329
>     e-mail: jsshannon@mdwcg.com
>     *Counsel for Plaintiffs*

15/556857.v1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, Inc.; and<br>ST. PAUL MERCURY INSURANCE Co.,<br><br>              Plaintiffs,<br><br>    v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC,<br><br>              Defendant. | )<br>)<br>)<br>)   Civ. A. No. 06-412-SLR<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CERTIFICATE OF SERVICE**

TO:    RIDDELL WILLIAMS                  MARON MARVEL BRADLEY
          Patrick McVey, Esquire                    & ANDERSON, P.A.
          Daniel J. Gunter, Esquire                Paul A. Bradley, Esquire
          1001 Fourth Avenue Plaza, Ste. 4500      1201 North Market Street, Ste. 900
          Seattle, WA 98154                                Wilmington, DE 19801

        PLEASE TAKE NOTICE:    On November 28, 2007, Northeast Controls, Inc. served the

attached *Reply Brief of Plaintiffs, Northeast Controls, Inc. and St. Paul Mercury Insurance*

*Company in Support of Motion for Summary Judgment* upon Defendant Fisher Controls, Inc. via

e-filing and First Class U.S. Mail, postage prepaid, to the above-named persons.

**MARSHALL DENNEHEY WARNER**            **MARSHALL DENNEHEY WARNER**
        **COLEMAN & GOGGIN**                             **COLEMAN & GOGGIN**

   */s/Thomas P. Wagner*                              */s/Joseph Scott Shannon*
Thomas P. Wagner, Esquire (*pro hac vice*)        Joseph Scott Shannon, Esquire (I.D. 3434)
1845 Walnut Street, 21st Floor                     1220 North Market Street, 5th Floor
Philadelphia, PA 19103                               P.O. Box 8888
tel.: 215.575.4562                                   Wilmington, DE 19899 – 8888
e-mail: tpwagner@mdwcg.com                   tel.: 302.552.4329
*Of Counsel for Plaintiffs*                              e-mail: jsshannon@mdwcg.com
                                                                *Counsel for Plaintiffs*

Dated: November 28, 2007

15/555569.v1