IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHEAST CONTROLS, INC.<br>  and<br>ST. PAUL MERCURY INSURANCE COMPANY | : <br> : <br> : <br> : <br> : | CIVIL ACTION – LAW |
| v. | : <br> : <br> : | |
| FISHER CONTROLS INTERNATIONAL, LLC | : | NO. 1:06-CV-00412 (SLR) |

APPENDIX C
TO
REPLY BRIEF OF PLAINTIFFS NORTHEAST CONTROLS, INC. AND ST. PAUL MERCURY INSURANCE COMPANY IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>

THOMAS P. WAGNER, ESQUIRE
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
1845 Walnut Street
Philadelphia, PA  19103
tel: 215-575-4562
*Counsel for Plaintiffs*

JOSEPH SCOTT SHANNON, ESQUIRE
Delaware Bar I.D. No. 3434
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899 – 8888
tel.: 302.552.4329
e-mail: jsshannon@mdwcg.com
*Counsel for Plaintiffs*

Dated: November 28, 2007

## TABLE OF CONTENTS

| Document | Exhibit |
|---|---|
| Selected Pages of Deposition Transcript of David. P. Pope, Ph.D. [C0001-0003] | 1 |
| Selected Pages of Deposition Transcript of Robert A. Mostello, P.E. [C0004-0006] | 2 |
| Selected Pages of Deposition Transcript of Robert A. Mostello, P.E. [C0007-0012] | 3 |

# EXHIBIT 1



**WILCOX & FETZER LTD.**

In the Matter Of:

# Northeast Controls Inc. and St. Paul Mercury Insurance

v.

# Fisher Controls International, LLC

C.A. # 06-412

Transcript of:

David P. Pope, Ph.D.

October 17, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Northeast Controls Inc. and St. Paul Mercury Insurance v. Fisher Controls International, LLC
David P. Pope, Ph.D.

### Page 54

1  Did you read Mr. Bhakoo's deposition
2  transcripts in the underlying litigation?
3  A. Yes.
4  Q. Do you recall that in those transcripts he
5  stated that he was asked to examine and he stated that
6  Inconel 718 would not have been an approved material
7  for this application?
8  Do you recall reading that?
9  A. That's probably what I'm referring to there. I
10 just don't recall.
11 Q. Let's look at Exhibit 27 briefly and I would
12 like to turn your attention to page 5 of that which is
13 Exhibit A.
14 MR. WAGNER: What's 27?
15 MR. GUNTER: Exhibit 27 is the notice of
16 deposition.
17 MR. WAGNER: Oh, okay. Thank you.
18 BY MR. GUNTER:
19 Q. Let's go down through here.
20 We have with us by virtue of your 8-30-07
21 report your curriculum vitae in this matter, correct?
22 A. Yes.
23 Q. And your working file in this particular matter
24 is Exhibit 28, correct?

### Page 55

1  A. Yes.
2  Q. And does that include your billing statements
3  reflecting all work done by you in this, in preparing
4  your expert report and formulating your opinion in
5  this case?
6  A. Yes.
7  Q. I take it this doesn't include billing
8  statements from the underlying action?
9  A. Well, it's all in one file, so I was too lazy
10 to separate them out.
11 Q. Very good.
12 Point 4, quote, "Each and every document
13 reviewed by you or utilized by you in preparing your
14 expert report or in formulating your opinion in this
15 case," close quote. I take it this does not include
16 all of those documents, correct?
17 A. Well, it includes all of the documents that I
18 have that I referred to.
19 Q. And, in addition, to the extent they formed the
20 background, the materials at your office from the
21 underlying litigation you didn't refer to
22 specifically?
23 A. That's correct. Anything that I specifically
24 referred to in writing these Exhibits 26 and 25 are

### Page 56

1  included there (indicating).
2  Q. This time let's look at point 8 on that: "Any
3  exhibits or demonstrative aids you plan to rely on at
4  the trial in this matter."
5  Have you prepared any such exhibits or
6  demonstrative aids?
7  A. No.
8  Q. Have you identified any for use?
9  A. No.
10 MR. WAGNER: I would add only, Counsel, as
11 I mentioned before, we certainly do plan to use
12 Dr. Pope's photographs which are here. We haven't had
13 any of them enlarged yet. It's not anywhere close
14 enough to trial to do that. We do anticipate doing
15 that, however and you have got all the photographs
16 here to my knowledge.
17 MR. GUNTER: Okay. What I would like to
18 do now is go through the file a little bit more and
19 make copies of a few things and then ask Dr. Pope a
20 few questions. I appreciate his direct and
21 straightforward answers to my questions this morning
22 and because of that, I think we might be able to
23 release you to the general population pretty quickly
24 here.

### Page 57

1  We can go off the record.
2  (A brief recess was taken.)
3  BY MR. GUNTER:
4  Q. Dr. Pope, you have identified in your report
5  some of the areas in which you disagree at least with
6  Dr. Mostello's original report and he then provided a
7  rebuttal report.
8  Have you formed any opinions regarding
9  Dr. Mostello's rebuttal report and are you prepared to
10 offer any opinions about his rebuttal report?
11 A. Yes.
12 Q. Can you identify for me -- and if you need to
13 look at it, you can -- what portions of Dr. Mostello's
14 rebuttal report that you disagree with?
15 A. Dr. Mostello clarified in that rebuttal report
16 what he meant by the role of the Inconel 718 and the
17 Hastelloy C in the spread of the fire and specifically
18 he talked about the heat of combustion that those two
19 materials added to the fire that wouldn't have been
20 there if the Monel alloy had been used instead of
21 those two alloys.
22 He correctly points out that there is some
23 heat of combustion applied, that came into the fire as
24 a result of the inclusion of those two materials. My

15 (Pages 54 to 57)

Case 1:06-cv-00412-SLR   Document 86   Filed 11/28/2007   Page 6 of 17

Northeast Controls Inc. and St. Paul Mercury Insurance v. Fisher Controls International, LLC
David P. Pope, Ph.D.

Page 58

1  disagreement is with the overall implication of what
2  he's saying. It is true that there's additional heat
3  of combustion supplied by that mechanism, but that
4  additional heat is so small as to be inconsequential
5  and even unmeasurable.
6    Q.  What's the basis for your opinion that the
7  additional heat of combustion contributed by the
8  Hastelloy C disk and the Inconel 718 shaft would be
9  inconsequential and even unmeasurable?
10   A.  The reason is that the steel pipe and flange
11 upstream from the valve was consumed to such an extent
12 that I estimate something in excess of a hundred
13 pounds of iron was consumed in the fire. The iron has
14 a very high heat of combustion compared to either of
15 the other two alloys, plus the fact that those, the
16 quantities of material in those other two components
17 is very small so the additional heat of combustion
18 supplied is far less than 1 percent of the total heat
19 of combustion supplied by the burning of the iron.
20   Q.  Had the disk been manufactured of Monel and the
21 stem been manufactured from Monel, that in your
22 opinion would have either melted or burned, correct?
23   A.  Yes.
24   Q.  Had those items melted, they would not have

Page 59

1  contributed anything to the heat of combustion,
2  correct?
3    A.  That's correct.
4    Q.  And, in fact, as we discussed earlier, they
5  would have subtracted some quantity from the heat of
6  combustion, correct?
7    A.  Yes.
8    Q.  Recognizing that it would be -- well, the
9  thrust bearing was specified in the specification
10 sheet initialed by Mr. Bhakoo and Mr. Cappellini as
11 being a Monel thrust bearing, correct?
12   A.  Yes.
13   Q.  Had it simply melted, been present and melted,
14 that would have subtracted from the heat of combustion
15 as well, correct?
16   A.  Yes.
17   Q.  And, similarly, although recognizing that the
18 Kel-f seal was small, had there been a Monel/PTFE seal
19 in place you would have had a smaller quantity of PTFE
20 than Kel-f, correct?
21   A.  Yes.
22   Q.  It's just a thin ring of PTFE in the Monel/PTFE
23 Phoenix III Fire Safe seat?
24   A.  Yes.

Page 60

1       MR. GUNTER: Off the record.
2       (Discussion off the record.)
3  BY MR. GUNTER:
4    Q.  You identified, Dr. Pope, one area in which you
5  disagreed with Dr. Mostello. Are there additional
6  areas in Dr. Mostello's rebuttal report, additional
7  points in Dr. Mostello's report with which you
8  disagree?
9       This (indicating) is Dr. Mostello's
10 rebuttal report if you need to --
11   A.  Yes. I have that.
12   Q.  I think that's it.
13   A.  I believe that those are the major points with
14 which I disagreed or that is the major point with
15 which I disagreed.
16   Q.  Have we covered today the points with which you
17 disagreed with Dr. Mostello at this time or are there
18 additional points with which you disagree with
19 Dr. Mostello that we have not yet covered?
20   A.  Perhaps I could take a quick look at his most
21 recent report to make sure that I haven't missed
22 something.
23   Q.  Certainly.
24       MR. WAGNER: And I'm glad for Dr. Pope to

Page 61

1  answer your question as best as he can verbally.
2  That, however, is not to exclude anything that is
3  already disclosed in his reports.
4       MR. GUNTER: Certainly.
5    A.  Oh, yes. There was one other thing.
6       He talks about the use of Monel as a fire
7  break, implying somehow that if the Monel, if the disk
8  had been made out of Monel, that somehow that might
9  have prevented the fire from spreading downstream. I
10 strongly disagree with that.
11   Q.  And what's the basis for your disagreement with
12 Dr. Mostello on that point?
13   A.  Again, the main point is that if around 100
14 pounds of iron is burning upstream in pure oxygen,
15 that is the granddaddy of all oxygen torches and a
16 small amount of Monel that is opened, that is to say
17 that that disk was partially opened, will make no
18 difference in the downstream events.
19   Q.  Do you know the weight, what the weight of the
20 disk would have been had it been manufactured in
21 Monel?
22   A.  No, I don't. But I know that it is relatively
23 small compared to the weight of the steel that was
24 burned.

16 (Pages 58 to 61)

# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY | : CIVIL ACTION - LAW : : : : : |
| V. | : : |
| FISHER CONTROLS INTERNATIONAL, LLC | : NO. 1:06-CV-00412 :     (SLR) : |

- - -

November 2, 2007

- - -

Oral deposition of ROBERT A. MOSTELLO, P.E., held in the offices of Marshall, Dennehey, Warner, Coleman & Goggin, 1220 North Market Street, Suite 500, Wilmington, Delaware 19801, commencing at 9:58 a.m., on the above date, before Yvonne A. Santiago, a Professional Reporter and a Notary Public of the State of Delaware.

- - -

BSR -- BASYE SANTIAGO REPORTING
One Commerce Center, Suite 903
1201 North Orange Street
Wilmington, Delaware 19801
(302) 573-2300

C0004

Case 1:06-cv-00412-SLR   Document 86   Filed 11/28/2007   Page 9 of 17
Robert A. Mostello, P.E.

Page 86

1  the actual case did burn.
2        Q.    When you say they may not
3  have, on the other hand, it still could have
4  ignited as well, correct?
5        A.    It's possible.  But,
6  overwhelming, my feeling is that it would
7  not have burned.  The Hastelloy body would
8  not have burned had the Monel internals been
9  in present.
10       Q.    Would Mr. Olson's injuries
11 have been any different?
12       A.    I don't really know.  I know
13 the damage would be less.  The basic damage
14 of the valve would be less.  Whether -- how
15 that would affect Mr. Olson's position, one
16 would think, if you had to make a decision,
17 worse or better, I would say probably his
18 position would have been better.  But
19 strictly based on the fact that there would
20 have been less damage in the first place had
21 the internals been made of Monel.
22       Q.    So scientifically or from an
23 engineering standpoint, your first answer
24 was the correct one, you really don't know?

1    A.    Really don't know.
2    Q.    Doctor, tell me this, have you
3 ever met Mr. Olson?
4    A.    No. I have not.
5    Q.    Have you read his deposition?
6    A.    Yes, way back in 2004.
7    Q.    That's when you read it?
8    A.    Yes.
9    Q.    Have you read it more
10 recently?
11   A.    No. I have not.
12   Q.    Is there any reason why you
13 chose not to read it in connection with your
14 work in the current litigation?
15   A.    I felt it was irrelevant.
16   Q.    Why?
17   A.    I was only asked to assess, A,
18 whether the order was processed properly by
19 Northeast Controls and, secondarily, would
20 the damage have been different had the valve
21 materials been as specified by Praxair.
22   Q.    Dr. Mostello, if I understood
23 your reports correctly, it was your opinion
24 that the fire in this case was ignited when

# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY | : CIVIL ACTION - LAW : : : : |
| V. | : : |
| FISHER CONTROLS INTERNATIONAL, LLC | : NO. 1:06-CV-00412 :     (SLR) : |

- - -

November 2, 2007

- - -

Oral deposition of ROBERT A. MOSTELLO, P.E., held in the offices of Marshall, Dennehey, Warner, Coleman & Goggin, 1220 North Market Street, Suite 500, Wilmington, Delaware 19801, commencing at 9:58 a.m., on the above date, before Yvonne A. Santiago, a Professional Reporter and a Notary Public of the State of Delaware.

- - -

BSR -- BASYE SANTIAGO REPORTING
One Commerce Center, Suite 903
1201 North Orange Street
Wilmington, Delaware 19801
(302) 573-2300

C0007

```
 1            MR. WAGNER:  Let's go off the
 2    record one second.
 3                    -  -  -
 4            (An off-the-record discussion
 5    was held.)
 6                    -  -  -
 7  BY MR. WAGNER:
 8       Q.      Dr. Mostello, we're back on
 9  the record.
10            You testified earlier that if
11  the trim parts we were talking about had
12  been made of Monel, you believe the valve
13  itself may not have burned in the way that
14  it did, although you testified that it would
15  have been deformed; am I correct, is that
16  the word you used?
17       A.      Well, I think my words were,
18  the valve body itself may not have burned if
19  the internals were made of Monel.  I believe
20  the internals would have been deformed.  I'm
21  not sure about the body.
22       Q.      Even if they were made of
23  Monel, you're saying they would have been
24  deformed?
```

1    A.    Oh, yeah.  They would have.
2 It's a soft material.
3    Q.    Would they have been deformed
4 to the extent that the valve would no longer
5 have been usable as a valve?
6    A.    Most likely.
7    Q.    And what about the adjoining
8 Monel pipe, would that still have melted to
9 a greater or lesser degree?
10   A.    I don't know because the Monel
11 components in the valve would have absorbed
12 some of the heat coming down from upstream.
13 Whether that gas would have been cooler when
14 it reached the Monel pipe, if it were
15 cooler, it would possibly not have melted
16 then.  The pipe would not have melted having
17 had upstream some absorption of heat and
18 nothing added to the heat by any combustion.
19   Q.    The answer is, you don't know?
20   A.    Directionally -- I don't know
21 precisely. Directionally, I would say, as I
22 have said in my report, that it would be
23 absorption of heat by Monel internals and no
24 contribution from those internals to the

1 heat.
2 Q. And what I'm trying to
3 understand is, do you have an opinion about
4 the extent of difference that we would see,
5 if any, in the damage to the adjoining Monel
6 pipe or don't you know?
7 A. Well, I would go back then to
8 my estimate of the heat added by the
9 components in the actual fire as being
10 anywhere from 10 to 50 percent of the heat
11 which came from the carbon steel flange.
12 So, therefore, there would be a significant
13 difference in heat going downstream from
14 that valve.
15 Q. Would some part the Monel pipe
16 still have melted or don't you know?
17 A. I would suspect it would not
18 have melted because less heat would be
19 reaching it.
20 Q. Well, have you done something
21 to calculate whether or not it would have
22 melted?
23 A. No.
24 Q. Would there be a way to do

Robert A. Mostello, P.E.

Page 123

1   internals and to the body of the valve from
2   the hot gas and then what the residual heat
3   would be leaving the valve.
4       Q.   How would you go about making
5   that estimate if you wanted to do so?
6       A.   In just that way.  I would --
7   what the difficult part is, is that the
8   effect of any openings or breaches upstream
9   of the valve allowing hot gas to escape
10  upstream of the valve is a big unknown how
11  to quantify that as well as radiation of
12  heat from the carbon steel pipe and from the
13  outside of the Hastelloy body, which gets
14  hot.  So there are a lot of -- there's an
15  awful big range of -- in trying to do a
16  calculation like that.
17      Q.   And there would have been such
18  openings upstream of the valve regardless of
19  what the internals of the valve were made
20  of?
21      A.   Yes, as we saw from the carbon
22  steel flange.
23      Q.   All right.  I'd like you to go
24  now please to your report of September 4 of

BSR -- BASYE SANTIAGO REPORTING

C0011

Robert A. Mostello, P.E.

Page 122

1  that?
2     A.    There might be.
3     Q.    Do you know if there is?
4     A.    There are ways of estimating.
5  This is very difficult to model this
6  situation quantitatively, but there are ways
7  of estimating that.
8     Q.    In any event, you have not
9  done that as we sit here now, correct?
10    A.    As we sit here now I have not
11 done that.
12    Q.    Doctor, do you know what the
13 cost of that Monel piping that we're talking
14 about here was, the part that was damaged?
15    A.    I don't.  I would estimate of
16 the order of $10,000.
17    Q.    By the way, you said there
18 would be ways of estimating that difference
19 that we just spoke of.  What ways would they
20 be?
21    A.    One would have to estimate how
22 much of the hot gas actually left due to
23 burning the carbon steel flange before the
24 valve, the likely heat transfer to the Monel

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, Inc.; and <br> ST. PAUL MERCURY INSURANCE Co., <br><br> Plaintiffs, <br><br> v. <br><br> FISHER CONTROLS INTERNATIONAL, LLC, <br><br> Defendant. | ) <br> ) <br> ) <br> ) Civ. A. No. 06-412-SLR <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## CERTIFICATE OF SERVICE

TO:  RIDDELL WILLIAMS                        MARON MARVEL BRADLEY
     Patrick McVey, Esquire                      & ANDERSON, P.A.
     Daniel J. Gunter, Esquire                Paul A. Bradley, Esquire
     1001 Fourth Avenue Plaza, Ste. 4500      1201 North Market Street, Ste. 900
     Seattle, WA 98154                        Wilmington, DE 19801

PLEASE TAKE NOTICE:   On November 28, 2007, Northeast Controls, Inc. served the attached *Appendix C to Reply Brief of Plaintiffs Northeast Controls, Inc. and St. Paul Mercury Insurance Company in Support of Motion for Summary Judgment* upon defendant Fisher Controls, Inc. via e-filing and First Class U.S. Mail, postage prepaid, to the above-named persons.

| **MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN** | **MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN** |
|---|---|
| /s/Thomas P. Wagner | /s/Joseph Scott Shannon |
| Thomas P. Wagner, Esquire (*pro hac vice*) | Joseph Scott Shannon, Esquire (I.D. 3434) |
| 1845 Walnut Street, 21st Floor | 1220 North Market Street, 5th Floor |
| Philadelphia, PA 19103 | P.O. Box 8888 |
| tel.: 215.575.4562 | Wilmington, DE 19899 – 8888 |
| e-mail: tpwagner@mdwcg.com | tel.: 302.552.4329 |
| *Of Counsel for Plaintiffs* | e-mail: jsshannon@mdwcg.com |
| | *Counsel for Plaintiffs* |

Dated: November 28, 2007

15/556989.v1