## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br><br>Defendant. | NO. 06-412 SLR |

### DEFENDANT FISHER CONTROLS INTERNATIONAL, LLC'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**RIDDELL WILLIAMS P.S.**

Patrick D. McVey
*Pro hac vice*
Daniel J. Gunter
*Pro hac vice*
Riddell Williams P.S.
1001 Fourth Avenue Plaza, Suite 4500
Seattle, WA 98154
(206) 624-3600 (Tel.)
(206) 389-1700 (Fax)
pmcvey@riddellwilliams.com
dgunter@riddellwilliams.com

**MARON MARVEL BRADLEY
& ANDERSON, P.A.**

Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 425-5177 (phone)
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant
Fisher Control International, LLC

Dated: November 29, 2007

## TABLE OF CONTENTS

I.     FISHER HAD NO DUTY TO DEFEND OR INDEMNIFY NORTHEAST
       CONTROLS IN THE UNDERLYING ACTIONS ........................................................ 1

       A.     Northeast Controls' Negligence Is the Key to This Contract Dispute .................. 1

       B.     It Is Undisputed That Northeast Controls Was Negligent ..................................... 1

              1.     The Wendell Hull Report ........................................................................... 2

              2.     Northeast Controls Was Negligent in Substituting Materials of
                     Construction ................................................................................................. 3

       C.     Northeast Controls' Negligence Caused the Losses at Issue in this Matter ........... 6

II.    THERE IS NO SUPPORT FOR PLAINTIFFS' INTERPRETATION OF
       "LOSSES" ....................................................................................................................... 8

III.   THE ONLY CLAIMS NORTHEAST CONTROLS HAD TO DEFEND
       AGAINST—AND THE ONLY CLAIMS NORTHEAST CONTROLS
       SETTLED—WERE CLAIMS OF NORTHEAST CONTROLS' OWN
       NEGLIGENCE ............................................................................................................. 11

IV.    HAD NORTHEAST CONTROLS PROCESSED THE VALVE ORDER
       CORRECTLY, NEITHER NORTHEAST CONTROLS NOR FISHER WOULD
       HAVE INCURRED THE LOSSES AT ISSUE IN THIS MATTER ............................. 13

V.     PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACTUAL DUTY TO
       DEFEND ARE BARRED BY DELAWARE'S STATUTE OF LIMITATIONS .......... 14

VI.    FISHER IS ENTITLED TO SUMMARY JUDGMENT ON ITS
       COUNTERCLAIM ....................................................................................................... 16

       A.     Northeast Controls' Breach Caused Fisher's Losses ........................................... 16

       B.     The Fees Incurred by Fisher in Defending the Underlying Actions Were
              Reasonable ......................................................................................................... 17

       C.     If Plaintiffs' Claim Was Timely, Then Fisher's Counterclaim Was Timely ....... 18

       D.     Plaintiffs' Preclusion and Estoppel Arguments Are Without Merit .................... 18

VII.   PLAINTIFFS' RESPONSE WAS UNTIMELY; THUS, THE COURT SHOULD
       DEEM FISHER'S MOTION FOR SUMMARY JUDGMENT UNOPPOSED ............. 19

VIII.  CONCLUSION ............................................................................................................. 20

## TABLE OF CITATIONS

**Cases**

American Energy Technologies, Inc. v. Colley & McCoy Co., 1999 WL 301648
(D. Del. 1999) ................................................................................ 14

Cannon v. Fidelity & Cas. Co. of New York, 484 F.Supp. 1375, 1388-90
(D. Del. 1980) ................................................................................ 14

Castaldo v. Pittsburgh-Des Moines Steel Co., 376 A.2d 88, 91 (Del. 1977)....... 12, 13, 16

Forsythe v. Starnes, 554 S.W.2d 100, 111 (Mo. App. 1977)........................... 16

Ikeda v. Molock, 603 A.2d 785, 787 (Del. 1991) ......................................... 11

PNC Bank, Delaware v. Turner, 659 A.2d 222, 225 (Del. Super. 1995)........................ 18

New Zealand Kiwifruit Marketing Board v. City of Wilmington, 825 F. Supp.
1180, 1194 (D. Del. 1993) ............................................................... 11

Sorenson v. The Overland Corp., 142 F. Supp. 354, 364 (D. Del. 1956)...................... 15

Worrel v. Farmers Bank of State of Del., 430 A.2d 469, 472 (Del. 1981) ..................... 14

**Statutes**

10 Del. C. § 6302(d) ......................................................................... 11

10 Del. C. § 8106 ............................................................................. 14

10 Del. C. § 8121 ............................................................................. 14

D. Del. LR 7.1.2 .............................................................................. 19

Fed. R. Civ. P. 6(a), (e) ..................................................................... 19

Fed. R. Civ. P. 56(e) ......................................................................... 1

I.     **FISHER HAD NO DUTY TO DEFEND OR INDEMNIFY NORTHEAST CONTROLS IN THE UNDERLYING ACTIONS**

    A.     **Northeast Controls' Negligence Is the Key to This Contract Dispute**

**Northeast Controls' negligence is central to the contract issue to be resolved in this case.** In signing the Representative Agreement, Northeast Controls agreed that Fisher had no duty to defend and indemnify Northeast Controls for "Losses"—i.e., "any and all claims, demands, actions, losses, damages, liabilities, costs and expenses"—arising from Northeast Controls' own negligence. Fisher contends that Northeast Controls' "Losses" arose from its negligence. If Northeast Controls' "Losses" arose from its negligence, then Fisher had no duty to defend or indemnify Northeast Controls from or against those Losses.

    B.     **It Is Undisputed That Northeast Controls Was Negligent**

In its opening brief, Fisher set forth evidence showing that Northeast Controls breached the applicable standard of care in ordering the valve. In response, plaintiffs assert that they do not "concede" that Northeast Controls was negligent and that Mr. Cappellini was "not necessarily" negligent in failing to properly transmit Praxair's specifications.[1] Such hair-splitting arguments do not suffice to avoid entry of summary judgment, plaintiffs must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Plaintiffs have failed to set forth specific facts showing that Northeast Controls' did not act negligently in placing the valve order.

Plaintiffs do offer a long, largely citation-free footnote that may be intended to create a genuine issue of material fact. As set out below, no evidence supports plaintiffs' arguments in

---

[1] See Plaintiff's Opposition to Fisher's Motion for Summary Judgment, Dkt. # 78 at 4.

that footnote.

### 1.     The Wendell Hull Report

Before any complaints were filed in the underlying actions, Wendell Hull—a prominent forensic engineering firm with extensive experience in investigating oxygen service incidents—issued a report identifying three potential causes of the fire.[2] Two of those potential causes implicated Northeast Controls' negligence in processing the valve order: (a) the use of a "soft" seat rather than the specified Monel seat and (b) the use of TFE/composite bearings rather than Monel bearings.[3] The authors of the Wendell Hull Report later published in a peer-reviewed ASTM journal an article that dropped one of the three theories of ignition (i.e., the theory focusing on the use of the soft seat).[4] The published article continued to focus on the materials of construction, contending that the most likely cause of the fire was the use of TFE/composite bearings.[5] The valve was manufactured using those bearings because of Northeast Controls' negligence in passing on the agreed specifications for the valve.

In defending the underlying actions, Fisher developed evidence that contradicted Wendell Hull's theory that the fire resulted from Northeast Controls' substitution of materials for the bearings. But that history is irrelevant, just as the ultimate "truth" of the Wendell Hull Report is irrelevant. What is relevant is that *the plaintiffs in the underlying actions were familiar with the Wendell Hull Report before they filed suit, and they knew that it pointed to the valve's materials*

---

[2] FCI/MSJ 0171–0173. All documents numbered FCI/MSJ 0001–0752 were previously submitted to the Court.

[3] FCI/MSJ 0172.

[4] FCI/MSJ 0753–763. Documents numbered FCI/MSJ 0753–0849 are attached to the Affidavit of Daniel J. Gunter in Support of Fisher's Reply in Support of Motion for Summary Judgment ("Gunter Reply Aff.") filed concurrently with this brief.

[5] FCI/MSJ 0763.

*of construction as the cause of the fire.* The report confirms that the plaintiffs in the underlying

actions brought suit against both Northeast Controls and Fisher because of Northeast Controls'

negligence. Thus, **the Wendell Hull Report confirms that Northeast Controls' Losses arose**

**from its negligence.**

      2.    **Northeast Controls Was Negligent in Substituting Materials of**
             **Construction**

      In footnote 4 of its response, Northeast Controls suggests that it was not negligent

because—despite the fact that it changed the valve's materials of construction—"the materials

[actually] used to make the valve were all approved by Praxair itself in its published standards

for materials deemed acceptable for use with oxygen."[6] Fisher agrees that the valve's actual

materials of construction were suitable *generally* for oxygen service. That explains why Fisher

was not negligent: Fisher had no reason to conclude that the valve's materials of construction

were improper for use in certain oxygen service environments.

      But that fact does not excuse Northeast Controls from having substituted materials of

construction. Northeast Controls did not have the expertise to select materials for use in specific

oxygen service environments. In fact, its witnesses agree that it should not have chosen the

materials of construction for the valve components exposed to oxygen flow.

      The decision as to which materials to use in oxygen service must be left to experts in the

field of oxygen service. The Praxair standards to which plaintiffs allude in their footnote 4

demonstrate that some materials are acceptable in some oxygen service environments, but not in

---

[6] Dkt. # 84 at 6 n.4.

other environments.[7] A similar conclusion must be drawn from a review of the standard published by the ASTM Committee G-4 on Compatibility and Sensitivity of Materials in Oxygen Enriched Atmospheres.[8]

It is undisputed that the valve's materials of construction were not appropriate for the specific process conditions present at the Delaware City Power Plant Repowering Project. Praxair designed the air separation unit and ordered a valve using materials that it deemed appropriate for the temperatures and pressures present in that specific application. The Praxair employee who placed the order for the valve with Northeast Controls testified that he <u>did not</u> approve the changes that Northeast Controls made to the valve's materials of construction and that it <u>would not have</u> been acceptable for Northeast Controls to make such changes without his approval.[9]

Northeast Controls' employees testified that Northeast Controls was not an expert in oxygen service and would not have made independent decisions about materials for oxygen service:

> Q    [I]f Praxair and Northeast Controls agreed on a set of specifications for a Fisher product, Northeast Controls would not have made a practice to substitute different specifications to Fisher without first obtaining Praxair's agreement, right?
>
> A    Correct.
>
> Q    In 1998, Northeast Controls understood that Praxair was in the industrial gases industry, right?
>
> A    Absolutely.

---

[7] FCI/MSJ 0764–0793.
[8] FCI/MSJ 0794–0818.
[9] Bhakoo Dep. at 422:18-426:24, FCI/MSJ 0844–0848.

Q        You understood that part of Praxair's work was specifically in the oxygen service industry, correct?

A        Yes.

Q        And Northeast Controls did not hold itself out as being an expert in oxygen service, correct?

A        Correct.

Q        Northeast Controls did know, though that there are hazards associated with oxygen service, correct?

A        Yes.[10]

. . .

Q        . . . You wouldn't have . . . independently decided what materials to use in the oxygen flow stream for a valve in oxygen service, right?

A        Independently, no.

Q        . . . You would have relied on the customer to provide you that information, correct?

A        Correct.[11]

Northeast Controls was not in the business of choosing materials for oxygen service. And the undisputed evidence shows that Northeast Controls breached the standard of care by substituting materials for a valve intended for use in oxygen service.

That conduct was negligent. Northeast Controls' own employees testified that they should not change material specifications for a product such as a valve. Mr. Peters—the sole shareholder of Northeast Controls—himself described such conduct as "terrible":

Q        If, in fact, [Bert Cappellini] or someone else at Northeast Controls simply, the term you used, tell me if it's fair,

---

[10] Peters Dep. at 62:8–63:4, FCI/MSJ 0825–0826.
[11] Cappellini Dep. at 105:9–17, FCI/MSJ 0821.

made up specifications, if that happened, that would be a serious error, wouldn't it?

    A    Terrible. **It would be terrible.**[12]

And that is precisely what happened here. Northeast Controls made up the specifications for the valve's materials of construction. And, as Mr. Peters tells us, that was a terrible thing to do.

An analogy may be instructive. Penicillin and cephalosporin are both approved for use in fighting infection. But they are not identical. If a physician prescribes a cephalosporin, a pharmacist filling the prescription should not substitute a penicillin for the cephalosporin. The pharmacist, after all, is not licensed as a physician.

In this instance, the physician (Praxair) "prescribed" a valve with Monel trim. As the pharmacist, Northeast Controls' duty was to fill Praxair's "prescription." Northeast Controls failed to do so. Instead, Northeast Controls acted beyond its expertise, "prescribing" materials different from those prescribed by the expert in the field. A pharmacist should not be excused for filling a prescription incorrectly. Northeast Controls should not be excused from its negligence in filling the order for the valve.

    **C.**    **Northeast Controls' Negligence Caused the Losses at Issue in this Matter**

The Representative Agreement defines the term "Losses" in the following section:

> Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless [Northeast Controls] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively, "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product.

---

[12] Peters Dep. at 102:7–104:9, FCI/MSJ 0499–0501 (emphasis added).

The Representative Agreement uses the term "Losses" again in defining when Fisher has no obligation either to defend or indemnify Northeast Controls:

> . . . Fisher shall not be obligated to protect, defend, indemnify or hold harmless [Northeast Controls] from and against any Losses arising from the following:
>
> . . .
>
> Negligent acts or omissions by [Northeast Controls].[13]

The term "Losses"—with a capital "L"—is used in both the general indemnification provision and in the specific "carve-out." Because the same term is used in both parts of the contract, it must be read the same way. Consequently, the "carve-out" provision must be read as follows:

> . . . Fisher shall not be obligated to protect, defend, indemnify or hold harmless [Northeast Controls] from and against any Losses [i.e., claims, demands, actions, losses, damages, liabilities, costs and expenses] arising from the following:
>
> . . .
>
> Negligent acts or omissions by [Northeast Controls].

Thus, if the "claims, demands, actions, losses, damages, liabilities, costs and expenses" at issue in this matter arose from Northeast Controls' negligent acts or omissions, then Fisher had no duty to defend or indemnify Northeast Controls from and against such claims.

The undisputed evidence shows that *all* of Northeast Controls' Losses arose from its negligence. As set out in Fisher's opening brief, within two days of the incident the parties had learned that the specification sheet for the valve—a specification sheet *created by Northeast Controls*—did not match the valve as it was actually constructed.[14] In addition, before any of the

---

[13] FCI/MSJ 0115.
[14] FCI/MSJ 0004, 0308.

underlying lawsuits were filed, Wendell Hull had conducted a preliminary investigation into the cause of the explosion and issued a report implicating the valve's improper materials of construction. When the underlying lawsuits were filed, the plaintiffs knew that the valve was located at the center of the explosion; they knew that the valve was not manufactured to specifications; and they knew that at least one expert had concluded that the valve's materials of construction were a likely cause of the explosion. Against that background of information, each complaint specifically alleged that the valve specifications did not match the materials of the valve as actually supplied.

The prefiling history, coupled with the allegations made in the complaints, provides undisputed evidence from which a reasonable trier of fact may draw only one conclusion: **the claims made against Northeast Controls in the underlying actions, and consequently all of Northeast Controls' "Losses," arose from Northeast Controls' negligence in processing the order for the valve.**

**II.    THERE IS NO SUPPORT FOR PLAINTIFFS' INTERPRETATION OF "LOSSES"**

Plaintiffs' entire case rests on the assertion that Fisher owed a contractual duty to defend and indemnify Northeast Controls in the underlying actions despite the fact that Northeast Controls' negligence caused both parties to be drawn into those actions. To establish its argument, plaintiffs must show that Northeast Controls' "Losses" did <u>not</u> arise from Northeast Controls' own negligence. As set out above, the undisputed evidence establishes that Northeast Controls was negligent and that its negligence caused its Losses.

In the face of this evidence, plaintiffs have asked the Court to ignore the definition of "Losses" to which the parties agreed when they signed the Representative Agreement. Instead,

plaintiffs assert a brand-new definition. Plaintiffs' new definition of the term appears in the following portion of their brief:

> The only escape from this [indemnification] obligation for Fisher would be if the negligent acts or omissions of Northeast were proven to have caused the Losses, i.e., caused the personal injury and property damages, and the "claims," the "losses," the "damages," the "liabilities," the "costs and expenses," etc., arising from or connected with them. This would include such items as Mr. Olson's medical bills and the costs of repairing the damage at the plant.[15]

In other words, plaintiffs have asked the Court to define the term "Losses" as follows:

> Losses, i.e. . . . the <u>personal injury and property damages</u>, <u>and</u> the "claims," the "losses," the "damages," the "liabilities," the "costs and expenses," etc., <u>arising from or connected with them</u>. This would include such items as Mr. Olson's medical bills and the costs of repairing the damage at the plant.

This is not the language of the Representative Agreement. Had the parties intended the term Losses to mean "personal injury and property damage and the claims, losses, damages, liabilities arising from or connected with them," the parties could have and would have drafted the contract to say just that. In fact, the parties could have easily drafted the contract in that way by moving the term "Losses" from where it appears to further down in the indemnification provision, so that the agreement would have looked like this:

> Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless [Northeast Controls] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses ~~(collectively, "Losses")~~ which may arise out of or be made in connection with the death or injury of any person, or damage to property **(collectively, "Losses")**, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product.

---

[15] Dkt # 78 at 15.

In this redlined version, the term "Losses" has been deleted from its actual location and moved down in the paragraph to follow "death or injury of any person, or damage to property." But the Representative Agreement in fact defines "Losses" as "any and all claims, demands, actions, losses, damages, liabilities, costs and expenses."

Both Northeast Controls and Fisher are sophisticated business entities and are perfectly capable of drafting contract language that accurately reflects the parties' intentions. The actual language of the agreement shows that Northeast Controls and Fisher knew exactly how to distinguish "Losses" (i.e., claims, demands, actions, losses, damages, liabilities, costs and expenses) from the personal injury and property damage at issue in the underlying litigation. The Court should apply the definition agreed to by the parties.

In short, the parties agreed that the "Losses" at issue are *Northeast Controls' losses*—not other parties' losses. Because the parties agreed to define "Losses" as *Northeast Controls' losses,* the parties also agreed that Fisher would <u>not</u> be required to prove that the actual personal injury and property damages at issue in the underlying actions arose from Northeast Controls' negligence. Instead, the Representative Agreement requires only that Fisher establish that the "claims, demands, actions, losses, damages, liabilities, costs and expenses" at issue arose from Northeast Controls' negligence.[16]

---

[16] Plaintiffs contend that Matthew Geekie's October 29, 2001 letter to Northeast Controls supports their revised definition of "Losses." That contention has no merit. The Representative Agreement was signed by Northeast Controls and Fisher in 1998. The terms and conditions of the Representative Agreement are defined within the four corners of the contract. Fisher's letter—sent three years after the Representative Agreement was signed—is not a contract and does not change the meaning of the contract that was signed by the parties. Further, plaintiffs have made no showing that they relied any assertions in Mr. Geekie's letter to their detriment. The Geekie letter does not purport to redefine "Losses." At most, it is a piece of imprecise drafting in a "placeholder" document.

Fisher has provided undisputed evidence from which a reasonable trier of fact <u>must</u> conclude that the "claims, demands, actions, losses, damages, liabilities, costs and expenses" at issue arose from Northeast Controls' negligence. The Court should conclude that Fisher has sustained its burden of proof and therefore dismiss plaintiffs' claim.

**III.  <u>THE ONLY CLAIMS NORTHEAST CONTROLS HAD TO DEFEND AGAINST—AND THE ONLY CLAIMS NORTHEAST CONTROLS SETTLED— WERE CLAIMS OF NORTHEAST CONTROLS' OWN NEGLIGENCE</u>**

The plaintiffs in the underlying actions brought their claims in Delaware state court, subject to Delaware's procedural and substantive rules. Because of the plaintiffs' choice of forum in the underlying actions, Northeast Controls faced exposure—*as a matter of law*—only for claims of its own negligence. Fisher had no duty to defend or indemnify Northeast Controls against claims of its own negligence; consequently, no right to defense or indemnification arose.

Delaware has adopted two significant legal doctrines that affected the parties' rights and obligations in the underlying actions.

<u>First</u>, under Delaware's Contribution Act, Northeast Controls never faced any exposure for fault attributable to Fisher. The Delaware Contribution Act provides that each joint tortfeasor is held responsible only for its own degree of fault. 10 Del. C. §6302(d); <u>Ikeda v. Molock</u>, 603 A.2d 785, 787 (Del. 1991). Because the incident occurred in Delaware and the plaintiffs in the underlying actions filed suit in Delaware, Northeast Controls could have incurred liability only for its own negligence. It could never have incurred liability attributable to Fisher. Thus, from the

---

On October 13, 2002—after the lawsuits were filed—Fisher sent another letter to Northeast Controls, accepting the tender in part and denying it in part. <u>See</u> Dkt. # 76-3, A0064. That letter uses the same definition of "Losses" as set out in the Representative Agreement. Further, the October 2002 letter is the operative letter in regard to Fisher's response to Northeast Controls' tender.

very beginning the only claims Northeast Controls ever defended against—and the only claims that Northeast Controls ever paid money to settle—were claims of its own negligence. There were never any circumstances that triggered any obligation by Fisher to defend or indemnify Northeast. See New Zealand Kiwifruit Marketing Board v. City of Wilmington, 825 F.Supp. 1180, 1194 (D. Del. 1993) (Contribution Act prevents parties from incurring liability for another party's actions and therefore prevents the right to indemnification from ever being triggered).

Second, because in this instance Northeast Controls provided only services as an independent sales representative for Fisher and did not sell or manufacture the valve, Northeast Controls never faced any exposure for claims of product defect. Under Delaware law, service providers—in contrast to product manufacturers and sellers—are liable only for their own negligence. Castaldo v. Pittsburgh-Des Moines Steel Co., 376 A.2d 88, 91 (Del. 1977). Because Northeast Controls did not sell or manufacture the valve, the only claims Northeast Controls ever defended against—and the only claims that Northeast Controls ever paid money to settle—were claims of its own negligence. Northeast Controls' sole exposure and the only "Losses" it did or could have incurred in the underlying action arose from its own negligence as a sales representative. Fisher had no duty to defend or indemnify Northeast Controls against those Losses.

Plaintiffs contend that the result proposed by Fisher—and the result supported by the language of the Representative Agreement—renders the indemnification provision meaningless and unfair. But the indemnification provision is neither meaningless nor unfair; it was simply never triggered under the facts and circumstances of the underlying actions.

Because the incident occurred in Delaware and the underlying actions were filed in

Delaware, Northeast Controls received the protection of Delaware law. Under that law, Northeast Controls escaped any exposure for fault attributable to other parties and escaped any exposure for claims of product defect. Thus, <u>from the very beginning</u>, the only clams that Northeast Controls ever had to defend against—and the only claims that Northeast controls settled—were claims of its own negligence. Fisher was not obligated to defend or indemnify Northeast Controls against those claims.

The indemnification provision can be triggered in many instances. For example, if an accident occurred in a jurisdiction that imposes joint and several liability, then the provision could potentially be triggered. Likewise, had Northeast Controls been in the chain of distribution of this valve, it could have faced liability for breach of warranty under Delaware law. Fisher would have been obligated to defend against those claims. But that was not the case here. Because the incident occurred in Delaware and the plaintiffs in the underlying actions filed suit in Delaware, Northeast Controls was shielded from liability from all claims except those arising out of its own negligence. Fisher had no duty to defend or indemnify Northeast Controls against claims arising out of Northeast Controls' own negligence. Consequently, Fisher had no obligation to defend or indemnify Northeast Controls in the underlying actions.

## IV.    HAD NORTHEAST CONTROLS PROCESSED THE VALVE ORDER CORRECTLY, NEITHER NORTHEAST CONTROLS NOR FISHER WOULD HAVE INCURRED THE LOSSES AT ISSUE IN THIS MATTER

Both Fisher and Northeast Controls faced liability in the underlying actions only because of Northeast Controls' negligence in placing the order for the valve.

Under Delaware's component supplier doctrine, a supplier of a component can be held liable <u>only</u> if (a) the component fails to meet specifications or (b) the specifications are so

obviously dangerous that no reasonable person would follow them. Castaldo v. Pittsburgh-Des Moines Steel Co., 376 A.2d 88, 91 (Del. 1977). Had Northeast Controls accurately communicated to Fisher the written specifications for the valve, the component supplier doctrine would have barred any claims against Fisher and Northeast Controls.

Instead, Northeast Controls' negligence meant that the component failed to meet specifications. Fisher and Northeast Controls were thus exposed to liability because of Northeast Controls' negligence. As a consequence, all of Northeast Controls' Losses—i.e., its expenses incurred in defending and settling the actions—arose from its negligence. Fisher had no duty to defend or indemnify Northeast Controls against those Losses.

## V.    PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACTUAL DUTY TO DEFEND ARE BARRED BY DELAWARE'S STATUTE OF LIMITATIONS

Under Delaware law,[17] a complaint for breach of contract must be filed within **three years** of the breach. 10 Del. C. §8106. Further, "'a right of action accrues and the statute begins to run at the time the contract is broken, not at the time when actual damage results or is ascertained . . . .'" Worrel v. Farmers Bank of State of Del., 430 A.2d 469, 472 (Del. 1981) (citations omitted). Thus, plaintiffs claims for Fisher's alleged breach of contractual duty to defend accrued on Fisher's refusal to defend Northeast Controls in the underlying litigation, not when Northeast Controls' final damages were ascertained.

Plaintiffs cite Cannon v. Fidelity & Cas. Co. of New York, 484 F.Supp. 1375, 1388-90 (D. Del. 1980) for the proposition that the statute of limitations on claim for breach of contract to

---

[17] Contractual choice-of-law provisions do not apply to statute-of-limitations issue unless the provision specifically references that issue. American Energy Technologies, Inc. v. Colley & McCoy Co., 1999 WL 301648 (D. Del. 1999). Under Delaware's borrowing statute, Delaware's three-year statute of limitations for breach of contract applies to plaintiffs' claims against Fisher. 10 Del. C. §§ 8106, 8121.

defend does not accrue until full damages can be determined.[18] The <u>Cannon</u> opinion is not binding authority. The <u>Cannon</u> case was not decided by any Delaware court; instead, <u>Cannon</u> merely predicts Delaware law—and predicts it incorrectly. <u>Cannon</u> involved a contract for insurance, which involves an entire body of law that is not applicable here. Further, the <u>Cannon</u> opinion relies on a 1956 case involving a contract for *indemnification*, not a contract for defense. <u>Sorenson v. The Overland Corp.</u>, 142 F. Supp. 354, 364 (D. Del. 1956). The <u>Sorenson</u> case— again, not a Delaware case—involved a contract for *indemnification*, which included indemnification for expenses incurred as the result of actions arising from the indemnitee's position as a corporate officer. <u>Id</u>. <u>Sorenson</u> did not involve an affirmative duty to defend and does not alter the Delaware rule that a right of action in contract accrues and the statute begins to run at the time the contract is breached.

In this case, Northeast Controls knew no later than September 13, 2002,[19] that Fisher would not defend Northeast Controls against claims of its own negligence. By that time, Northeast Controls was aware—or should have been aware—that it would not have to defend against any product defect claims and would only have to defend against allegations of its own negligence. Further, by September 16, 2002, Northeast Controls knew that Fisher would not defend it for its own negligence. Plaintiffs filed this lawsuit on June 29, 2006, more than three years after it knew that Fisher would not defend Northeast Controls the underlying actions.

---

[18] <u>See</u> Dkt. # 84 at 23.

[19] In its opening brief, Fisher argued incorrectly that the statute of limitations began to run on October 29, 2001. In fact, no claim had been made against Northeast Controls at that time, and the October 2001 letter specifically stated that Northeast Controls' tender was premature. The statute began to run only on September 16, 2002 (i.e., three days after the September 13 letter). The September 2002 letter appears at Dkt. # 76-3, A0064.

Consequently, plaintiffs' claim for breach of the duty to defend is untimely.

Plaintiffs' attempt to resurrect their defense claims by referring to the joint defense agreement between Fisher and Northeast Controls in the <u>Olson</u> action has no merit. That agreement merely reserves the right of both parties to assert claims against one another in future litigation. **The agreement does not toll the statute of limitation on any such claims.** Moreover, the <u>Olson</u> agreement applies only to claims in that action. Even if that agreement did toll the statute of limitations on Northeast Controls' claims against Fisher in the <u>Olson</u> matter— which it does not—that agreement does not apply to any of the claims in the commercial action.

## VI.    FISHER IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM

### A.    Northeast Controls' Breach Caused Fisher's Losses

Under Missouri law, a party is entitled to recover attorneys' fees incurred in defending against collateral litigation that was the natural and proximate result of the other party's breach. <u>Forsythe v. Starnes</u>, 554 S.W.2d 100, 111 (Mo. App. 1977). As set forth in detail in Fisher's motion for summary judgment, the undisputed evidence shows that Fisher was sued in four lawsuits because Northeast Controls breached its contractual duties to Fisher. Fisher is entitled to recover from Northeast Controls the costs and expenses it incurred because of that breach.

The undisputed evidence shows that plaintiffs sued Fisher because of the mismatch in specifications that resulted from Northeast Controls' negligence. Not a shred of evidence shows that plaintiffs knew of any problem with the valve other than the mismatch with the specifications. To find for plaintiffs, a trier of fact would have to speculate that plaintiffs in the underlying action had something else in mind other than the mismatch in material. But there is no evidence that plaintiffs had a basis for suing Fisher other than the problem with specifications

that resulted from Northeast Controls' negligence.

Even if the Court speculates that Fisher was sued for reasons other than the valve's failure to meet specifications, Fisher faced liability in the underlying lawsuits solely because of Northeast Controls' mistake, which caused Fisher to manufacture a valve that did not meet specifications. Had the valve met the written specifications created by Northeast Controls and accepted by Praxair, the component supplier doctrine would have barred any claims against Fisher. Castaldo v. Pittsburgh-Des Moines Steel Co., 376 A.2d 88, 91 (Del. 1977). But because of Northeast Controls' negligence in submitting improper material of construction to Fisher, the component failed to meet specifications and Fisher could not take advantage of the component supplier doctrine. Consequently, the attorneys fees that Fisher incurred in defending the underlying actions were the direct result of Northeast Controls' breach of the Representative Agreement, which required Northeast Controls to accurately submit a purchaser's specifications to Fisher. Fisher is entitled to recover those costs.

**B.** **The Fees Incurred by Fisher in Defending the Underlying Actions Were Reasonable**

Fisher incurred $1,951,340.05 in fees and costs in defending the underlying action. Those fees and costs include $1,503,412.88 in attorneys' fees, $264,109.33 in other legal expenses, and $183,817.84 in expert fees and expenses. Plaintiffs contend that Northeast Controls' expenditure of $606,833.50 in fees and costs was reasonable. Plaintiffs concede, and their own expert agrees, that Fisher mounted an aggressive and successful defense in the underlying actions. Plaintiffs do not dispute that Fisher took the lead in all of the depositions in the underlying action, conducted aggressive discovery, and prepared several motions that ultimately led to Fisher's dismissal from

all four cases without paying anything to any of the plaintiffs.

In light of Fisher's substantial efforts in driving the underlying actions to a favorable conclusion, a trier of fact would be compelled to conclude that Fisher's defense costs were reasonable. In the alternative, the Court may ask the trier of fact to conclude whether Fisher's fees and expenses were reasonable.

### C.    If Plaintiffs' Claim Was Timely, Then Fisher's Counterclaim Was Timely

Fisher's counterclaim does not seek affirmative relief. Rather, Fisher has asserted a counterclaim in the form of recoupment. Recoupment is an equitable doctrine that permits a defendant to assert a defensive claim to reduce the damages recoverable from the plaintiff. A recoupment claim is not barred by the statute of limitations so long as the main action is timely. PNC Bank, Delaware v. Turner, 659 A.2d 222, 225 (Del. Super. 1995). If plaintiffs contend that their claims were timely filed, they must concede that Fisher's counterclaim was timely. Consequently, plaintiff's argument as to Fisher's counterclaim should be rejected.

### D.    Plaintiffs' Preclusion and Estoppel Arguments Are Without Merit

As discussed at length in Fisher's response to plaintiff's motion for summary judgment, plaintiffs' preclusion and estoppel arguments do not apply to the facts of this case. The question whether Fisher had a contractual duty to defend and indemnify Northeast Controls in the underlying litigation was never determined. Likewise, there was never a determination as to Northeast Controls' negligence in placing the valve order.

Moreover, if plaintiffs insist on arguing claim preclusion as to Fisher, then plaintiffs' must concede that their claims are equally barred. Northeast Controls asserted claims for indemnification against Fisher in all four of the underlying actions. Northeast Controls stipulated

to the dismissal of all claims against Fisher in the commercial actions without reserving the right to reassert its claim for indemnification against Fisher in future litigation.[20] In the <u>Olson</u> action, Fisher and Northeast Controls entered into a joint defense agreement that specifically reserved the right of the parties to assert their claims against one another in a subsequent proceeding.[21]

If plaintiffs contend that Fisher's claims against Northeast Controls are barred in the commercial actions, then their claims against Fisher are also barred because Northeast Controls reserved no rights in any of those matters. Likewise, if plaintiffs contend that Fisher's claims against Northeast Controls are barred in the <u>Olson</u> action, then their claims against Fisher are equally barred because the parties reserved identical rights in that action.

## VII.   PLAINTIFFS' RESPONSE WAS UNTIMELY; THUS, THE COURT SHOULD DEEM FISHER'S MOTION FOR SUMMARY JUDGMENT UNOPPOSED

The Court's Scheduling Order required the parties to serve and file all summary judgment motions on or before November 5, 2007, and to submit all briefing in accordance with Local Rule 7.1.2. The parties filed cross-motions for summary judgment on November 5, 2007. Accordingly, plaintiffs' opposition to Fisher's motion for summary judgment was due no later than November 20, 2007. D. Del. LR 7.1.2; Fed. R. Civ. P. 6(a), (e).

Plaintiffs filed their opposition to Fisher's motion for summary judgment on November 21, 2007. Plaintiffs offered no explanation for their untimely filing, nor did they seek leave from the Court or an extension from Fisher to submit a late-filed brief. The Court should deem Fisher's motion unopposed and enter summary judgment in favor of Fisher.

---

[20] FCI/MSJ 0607; Gunter Aff. ¶ 25.
[21] FCI/MSJ 0663.

**VIII.  CONCLUSION**

The undisputed evidence in this matter is clear: Northeast Controls was negligent. Its negligence led to both Fisher and Northeast Controls being named as defendants in the four underlying actions. Now plaintiffs ask the Court to conclude that Fisher had a duty to defend and indemnify Northeast Controls against its own negligence. Fisher had no obligation to do so. Plaintiffs' claim should be dismissed, and judgment should be entered in favor of Fisher.

RESPECTFULLY SUBMITTED,

RIDDELL WILLIAMS P.S.

By: /s/ Daniel J. Gunter _____
    Patrick D. McVey
    *Pro hac vice*
    Daniel J. Gunter
    *Pro hac vice*
    Riddell Williams P.S.
    1001 Fourth Avenue Plaza, Suite 4500
    Seattle, WA 98154
    (206) 624-3600 (Tel.)
    (206) 389-1700 (Fax)
    pmcvey@riddellwilliams.com
    dgunter@riddellwilliams.com

Date: November 29, 2007

MARON MARVEL BRADLEY & ANDERSON, P.A.

By: /s/ Paul A. Bradley _____
    Paul A. Bradley (DE Bar ID #2156)
    Maron Marvel Bradley & Anderson, P.A.
    1201 N. Market St, Ste. 900
    Wilmington, DE 19801
    (302) 425-5177 (Tel.)
    (302) 425-0180 (Fax)
    pab@maronmarvel.com

Date: November 29, 2007