IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. No. 06-412-SLR ) |
| FISHER CONTROLS INTERNATIONAL, LLC, | ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

At Wilmington this 18th day of January, 2008, having reviewed the various pending motions for summary judgment and the papers filed in connection therewith;

IT IS ORDERED that plaintiffs' motion for summary judgment (D.I. 75) is granted and defendant's motion for summary judgment (D.I. 77) is denied, for the reasons that follow.

1. **Standard of review.** A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence

exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"'[D]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment.'" GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd., 270 F. Supp. 2d 476, 481 (D. Del. 2003) (citing Tamarind Resort Assocs. v. Government of Virgin Islands, 138 F.3d 107, 110 (3d Cir. 1998)).

2. **Facts.** The facts of record are essentially undisputed. On January 1, 1998, plaintiff Northeast Controls, Inc. ("Northeast") and defendant Fisher Controls International, LLC ("Fisher") entered into a Representative Agreement contract ("the

2

Agreement") stating their mutual obligations and defining the basis for their business relationship. Fisher manufactures control valves utilized in oxygen systems; Northeast is a distributor of Fisher valves. The Agreement contains the following language obligating Fisher to defend and indemnify Northeast:

> Fisher agrees that it shall, at its own expense, protect, defend, indemnify and hold harmless representative [Northeast] from and against any and all claims, demands, actions, losses, damages, liabilities, costs and expenses (collectively "Losses") which may arise out of or be made in connection with the death or injury of any person, or damage to property, by whomsoever suffered, resulting or claimed to result from any actual or alleged defect in any Product. The obligations set forth in the immediately preceding sentence shall not apply unless [Northeast], upon receiving notice thereof, promptly notifies Fisher in writing of such claim, demand or action, and thereafter reasonably cooperates with Fisher in the resolution thereof.
>
> Notwithstanding the provisions of the immediately preceding paragraph of this Section XI or any other provision of this Agreement, Fisher shall not be obligated to protect, defend, indemnify or hold harmless [Northeast] from and against any Losses arising from the following . . .
>
> F.  Negligent acts or omissions by [Northeast].

(D.I. 81, ex. 1) Article XIII of the Agreement provides that "[t]he validity, interpretation and performance of this Agreement and any dispute connected herewith shall be governed and construed in accordance with the laws of the State of Missouri, U.S.A." (Id.)

3. Acting as Fisher's agent under the terms of the Agreement, Northeast accepted an order from Praxair, Inc.[1] in 1998 for a 12-inch BLOC control valve ("the

---

[1] Praxair is engaged in the business of supplying atmospheric and specialty gases, high-performance coatings, and related technologies. (D.I. 79, ex. 3)

Valve") for use in an air separation unit that Praxair was constructing at a power plant in Delaware City, Delaware ("the Plant"). Northeast does not dispute that the order it placed with Fisher did not match the specifications approved by Praxair. (D.I. 82 at 4 n.2) In May 2000, Praxair and others were engaged in the construction and operation of a "re-powering project" ("the Project") at the Plant. The Project included, among other things, the calibration of an oxygen-flow transmitter, which is utilized in the process of transferring 99.99% pure oxygen gas from a base load oxygen compressor in an air separation unit through a series of control valves and pipes to a gassifier. (D.I. 79, ex. 6) The purpose of the Valve purchased through Northeast from Fisher by Praxair was to block and/or control the flow of oxygen to the gassifier. On May 20, 2000, various parties involved in the Project opened the Valve for the first time under the process conditions. When the Valve opened, an explosion occurred almost immediately, causing extensive personal injuries and property damage.

 4. In October 2000, Northeast tendered written demands for defense and indemnification. (D.I. 81, ex. 2) In October 2001, Fisher denied the demands as premature, explaining that

> [i]f, at some point in the future there is an assertion that there was an actual or alleged defect in the butterfly valve that gave rise to the losses, then Fisher will honor its obligations under the Agreement and will protect, defend, indemnify and hold harmless Northeast in accordance with the Agreement. Pursuant to the Agreement, however, Fisher will not protect, indemnify, defend and hold harmless Northeast from its own negligent acts or omissions.

(Id., ex. 3)

 5. Beginning in April 2002, four lawsuits were filed in the Superior Court of the State of Delaware by various parties seeking to recover for those personal injuries and

property damage arising from the May 2000 explosion and fire ("the Underlying Litigation"). (Id., exs. 4 - 7)  Plaintiffs in all four of the lawsuits asserted claims against Fisher and Northeast based on, inter alia, the alleged negligent design, manufacture, inspection and operation of the Valve.  During the course of the Underlying Litigation, Fisher and Northeast entered into a joint defense agreement[2] and Fisher thereafter "focused its efforts on showing that Fisher itself did not act negligently and that - despite Northeast Controls' negligence - the valve did not cause the fire.  That strategy was successful and ultimately led to Fisher's dismissal from all four lawsuits without paying anything to any of the plaintiffs in those lawsuits." (D.I. 83, affidavit of Daniel J. Gunter at 4)[3]

6. Despite Fisher's successful defense (Id., ex. 56), Northeast and it insurer, co-plaintiff St. Paul Mercury Insurance Company, incurred legal fees and costs totaling $606,833.50, as well as $601,000 to settle the remainder of the claims asserted by the other parties against Northeast in exchange for dismissal with prejudice and no finding

---

[2](D.I. 83, ex. 41)

[3]According to the record, the cause of the explosion and fire was determined to be the result of defective procedures developed by, among others, Praxair with respect to the velocity limitations of carbon steel pipe and the failure of Praxair and others to design or maintain the system in accordance with industry custom and practice. (See D. I. 83, ex. 51 at 3)  Consistent with the above, Fisher's expert opined that the

> discrepancies between the valve materials discussed between representatives of Praxair and Northeast Controls and those supplied by Fisher Controls . . . were not implicated in the initiation of the fire.  Rather, the valve was a victim of the fire, which was initiated by particle impingement and was strongly fueled by the carbon steel flange upstream, as evidenced by the burn patterns.

(D.I. 81, ex. 22 at 15 n.14)

5

of any liability. (D.I. 82 at 9-10) Plaintiffs seek indemnification of such expenses through the instant lawsuit.

7. **Analysis.** Under Missouri law, "[i]f the contract terms are unequivocal, plain, and clear, the court is bound to enforce the contract as written. It is a well-established principle of contract construction that, when a contract is clear, the court is bound to enforce the terms as written. . . ." Malan Realty Investors, Inc. v. Harris, 953 S.W. 2d 624, 626-27 (Mo. 1997) (citation omitted). Moreover, courts in Missouri "'enforce the objective terms of contracts between sophisticated businesses, without regard to the parties' subjective intent. The character and quality of negotiations do not vary the terms of a written contract between sophisticated businesses.'" Utility Service & Maintenance, Inc. v. Noranda Aluminum, Inc., 163 S.W. 3d 910, 914 (Mo. 2005) (citing Purcell Tire & Rubber Co., Inc. v. Executive Beechcraft, Inc., 59 S.W. 3d 505, 509 (Mo. 2001) (en banc)). Therefore, the indemnity provision at issue must be construed according to its plain meaning.

8. The dispute between the parties can be summarized as follows. Plaintiffs argue that, because the negligence of Northeast was not causally related to the personal injuries and property damage claimed in the Underlying Litigation, the indemnity provision should be enforced against Fisher. Fisher argues to the contrary, that Northeast's negligent processing of the order for the Valve caused its "losses," as plaintiffs in the Underlying Litigation "focused exclusively on the material deviations that resulted from Northeast Controls' negligence," as opposed to the design or manufacture of the Valve. (D.I. 78 at 31)

9. Fisher overstates its case. The record indicates that the Valve was the

immediate site of the May 2000 explosion and fire and, therefore, was a universal focus of all plaintiffs in the Underlying Litigation. Consequently, said plaintiffs sued Fisher for, inter alia, a failure in design, manufacture, and inspection of the Valve. In one of its many submissions to the Superior Court of the State of Delaware, Fisher wrote: "The parties do not dispute that the cause of the fire that took place at the Delaware City Power Plant is a complex engineering issue that can only be proven by the testimony of competent expert witnesses." (D.I. 83, ex. 51 at 2) To argue that, but for the discrepancy between Praxair's specification and Northeast's order, Fisher would have been immediately absolved of liability or never sued at all, is an unrealistic and unproven scenario.[4]

10. Although I am cognizant of the fact that Northeast did not perform its role of sales representative without error, nevertheless, there is no reasoned way to determine in the case at bar whether any (or what portion) of the "Losses" incurred in the complex Underlying Litigation arose from such a poor performance, as required by the language of the Agreement. To put the point differently, given the circumstances surrounding the

---

[4] Consistent with the above reasoning, the court rejects Fisher's claim under Missouri law for its costs in defending the Underlying Litigation, characterized by Fisher in this argument as being no more than "collateral litigation." (See D.I. 78 at 36-37) The court also rejects Fisher's arguments made pursuant to Delaware law. More specifically, Fisher argues that, under Delaware's Contribution Act, 10 Del. C. § 6302(d), each joint tortfeasor is held responsible only for its own degree of fault. According to Fisher's reasoning, Northeast could have been held liable only for its own negligence and Fisher, therefore, had no obligation to defend or indemnify Northeast against such negligence claims in the Underlying Litigation. Aside from the fact that the instant litigation is a contract case and not a tort case, Fisher cites no authority that supports its apparent proposition that indemnity agreements are not operable in the face of this statute, particularly where, as here, there has been no finding or admission of fault. (See D.I. 79, exs. 38, 39)

May 2000 explosion and fire, there is no reasonable basis to find that Fisher would not have been sued, regardless of Northeast's conduct; therefore, there is no reliable evidence that the costs of litigation (one of the "Losses" described in the Agreement) would have been avoided but for Northeast's conduct. With respect to the settlement sums, because the releases specifically provide that there has been no finding of fault, again, there is no evidence that these expenses "arose from" Northeast's negligence, as required by the language of the Agreement.

11. **Conclusion.** In sum, the language of the Agreement requires that Fisher demonstrate a causal connection between the claimed "Losses" and Northeast's alleged negligence. Fisher has not carried its burden of proof in this regard and, instead, relies on little more than speculation to support its defense. Moreover, Fisher cannot be heard to complain that it is being denied the opportunity to demonstrate Northeast's negligence and the causal connection between the negligence and the "Losses," when Fisher had a full and fair opportunity to resolve every tort issue presented in the complex Underlying Litigation. It surely makes no sense for these issues to be tried in the context of a contract action, when the parties to the Underlying Litigation went to great lengths to avoid such a trial.[5] For these reasons, I conclude that

---

[5] With respect to Fisher's argument that the instant lawsuit is barred by the three-year statute of limitations, 10 Del. C. § 8106, I agree with Northeast's statement of the law that, in the case of a contract for indemnity, the cause of action accrues and "the statute of limitations begins to run when the indemnitor-liability becomes fixed and ascertained or as soon the debt becomes due." See Oliver B. Cannon & Son, Inc. v. Fidelity & Cas. Co. of New York, 484 F. Supp. 1375, 1388-89 (D. Del. 1980) (citations omitted). Consequently, in this case, the limitations period did not begin to run until all of the costs subject to recovery under the Agreement had been ascertained through the resolution of the Underlying Litigation, in July 2005. (D.I. 79, exs. 38, 39) The case at bar was filed in June 2006 and, therefore, is not barred by the applicable statute of

Fisher shall be responsible for honoring its obligations to Northeast under the Agreement.

IT IS FURTHER ORDERED, therefore, that the Clerk of Court enter judgment in favor of plaintiffs and against defendant.

_____
United States District Judge

---

limitations.