IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC. and ST. PAUL MERCURY INSURANCE COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br><br>Defendant. | NO. 06-412<br><br>**AFFIDAVIT OF DANIEL J. GUNTER IN SUPPORT OF DEFENDANT FISHER'S SUR-REPLY TO PLAINTIFFS' MOTION FOR ENTRY OF MONEY JUDGMENT AND MOTION TO AMEND OR ALTER JUDGMENT** |

STATE OF WASHINGTON )
                  : ss.
County of King        )

      I, DANIEL J. GUNTER, being duly sworn, depose and state as follows:

I am one of the attorneys representing defendant Fisher Controls International, LLC, in the above matter.  I am competent to attest as to the matters set forth herein, and I make this affidavit based on my personal knowledge.

      1.      Attached hereto as Exhibit 1 is a true and correct copy of the "Order history regarding 12" Fisher A11 valve that was supplied to Praxair".

      2.      Attached hereto as Exhibit 2 is a true and correct copy of the first page of the Northeast Controls Purchase Order Review Guidelines.

      3.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the deposition of Albert Cappellini taken on December 12, 2003.

      4.      Attached hereto as Exhibit 4 is a true and correct copy of a letter from Christopher Konzelmann, dated April 21, 2004, to Thomas Wagner.

5.    Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the deposition of Albert Cappellini taken on April 30, 2004.

6.    Attached hereto as Exhibit 6 is a true and correct copy of the first page of the Northeast Controls, Inc. Quality Manual.

7.    Attached hereto is as Exhibit 7 is a true and correct copy of the Answers of Plaintiffs, Northeast Controls, Inc. and St. Paul Mercury Insurance Company To Defendant Fisher Controls International, LLC's First Discovery Requests.

8.    Attached hereto as Exhibit 8 is a true and correct copy of a letter from Daniel J. Gunter, dated January 29, 2007, to Thomas Wagner enclosing Defendant Fisher Controls International, Inc.'s Responses to "Answers Of Plaintiffs, Northeast Controls, Inc. And St. Paul Mercury Insurance Company To Defendant Fisher Controls International, LLC's First Discovery Requests".

9.    Attached hereto as Exhibit 9 is a true and correct copy of Northeast Controls, Inc.'s Responses And Objections To Defendant's First Discovery Requests.

10.    Attached hereto as Exhibit 10 is a true and correct copy of an E-mail from Daniel Gunter, dated June 6, 2007, to J. Scott Shannon forwarding a page from the Northeast Controls website.

11.    Attached hereto as Exhibit 11 is a true and correct copy of Northeast Controls, Inc.'s Answers And Responses To Defendant's First Requests For Admissions Directed To Northeast Controls.

12.    Attached hereto as Exhibit 12 is a true and correct copy of the August 23, 2007 report of Gerard Muller.

13.    Attached hereto as Exhibit 13 is a true and correct copy of Defendant's Motion To Compel Depositions Of Michael Peters and Albert Cappellini.

14.    Attached hereto as Exhibit 14 is a true and correct copy of the August 30, 2007

report of David P. Pope.

15.    Attached hereto as Exhibit 15 is a true and correct copy of excerpts from the deposition of Michael J. Peters taken on October 22, 2007.

16.    Attached hereto as Exhibit 16 is a true and correct copy of excerpts from the deposition of Albert Cappellini taken on October 24, 2007.

17.    Counsel for Fisher took the lead in defending the underlying action until Fisher was dismissed. Counsel for Fisher noted the bulk of the depositions, took the lead in questioning at the depositions, conducted the vast majority of the document discovery (including many days spent reviewing documents in Houston and Philadelphia), drafted multiple motions to compel, and drafted the motions that led to the dismissals of Fisher in all four actions. Counsel for Fisher also drafted briefing for filing by Northeast Controls' attorneys in the underlying action, worked to set up testing of an exemplar valve by one of its retained experts, and worked with another expert to test the valve artifacts to determine the materials of construction of the valve's seat.

18.    During the course of the underlying action, St. Paul's attorneys admitted to counsel for Fisher that St. Paul had instructed its attorney to let Fisher take the lead.

19.    St. Paul's counsel initially agreed to produce Northeast Controls' employees Bert Cappellini and Michael Peters for deposition without raising any objection. Having agreed to the depositions, St. Paul's attorney later refused to produce the witness on the basis that the witnesses could not be produced during the pendency of Fisher's motion to amend its counterclaim. Fisher was forced to file a motion to compel the production of those witnesses.

20.    Attached hereto as Exhibit 17 is a true and correct copy of an excerpt from Northeast Controls' claims file, with notation by Jeffrey W. Frock dated September 15, 2006.

/ / /

/ / /

/ / /

Daniel J. Gunter

Subscribed and sworn to before me this 29th day of February, 2008.

Printed Name: _Alissa B. Panzer_

Notary Public, State of Washington

Residing at _Kent_

My commission expires: _3-8-11_

4

# EXHIBIT 1

## Order history regarding 12" Fisher A11 valve that was supplied to Praxair.

Below you will find a complete summary of what I recall regarding how the 12" Fisher A11 valve was spec'd and supplied to Praxair. But first I will explain a little bit about the process that we go through with Praxair on how valves are spec'd and quoted. To generate a valve spec sheet it has to be done in the Fisher sizing program, which Praxair has at their facility. The way the process works is that Praxair will supply us with the service conditions and any other information related to a valve and the application. They go into the sizing program adding all the process conditions associated with the valve. Once they have done that they run the program and get a Cv, a valve coefficient, which determines what size valve to use. They then go into the ISA spec sheet section of the program and begin adding information on each line that is required so we can properly select a valve. Once Praxair has done that they either would fax or electronically send us a spec sheet or file for that valve. We then take that information they have sent us and begin to go through the sizing and spec sheets properly selecting the correct control valve. We then complete the ISA spec sheet and then either fax it or electronically send it back to Praxair for their review. If there were any changes that need to be done they then would send it back to us for our review and to make any necessary changes. Depending on the complexity of the application for the valve there could be many changes that might take place. Once this process is completed Praxair then signs off on the completed spec sheet and assigns a drawing number to it so it can be purchased.

Here is what I recall on how the 12" valve got spec'd and ordered. Back in May of 1998 Praxair had faxed to me an ISA spec sheet with process conditions on it and also a few lines filled in on the spec sheet. They had requested a 10" size valve and specified that it was going to be used for high-pressure oxygen. I had remembered that I had done a similar valve in 1997 for a Praxair project in Italy and it had virtually the same service conditions. I then proceeded to look at that valve construction for that project and duplicated it for this project. Knowing that I had talked to Fisher back then about the process conditions and that they had OK'd it before so I used the same construction for this new valve. From a spec sheet dated 5/14/98 it looks like I had given Praxair a spec sheet with the following construction. It was for a 10" Hastelloy C valve with Hastelloy C trim and a PTFE seat. On 5/27/98 a change was made to the spec sheet making the trim material Monel and with the body being Hastelloy C not sure why this change was made only thinking Praxair had requested it and a change was made to the spec sheet. On 6/3/98 Praxair had requested that the valve be changed to a 12" size valve. I than proceeded to change the spec sheet making it a 12" valve with the same construction as the previous 10" size. On 6/18/00 I had requested from Fisher pricing for the following valve per Posi seal matrix number A11-12-151-CB743-31-3-00 which is a Hastelloy C body, Hastelloy C disk, Inconel 718 shaft, TFE composite bearings and Tefzel seal. This construction does not match what was on the spec sheet for the 12" valve dated 6/3/00. Not sure why the difference I can only think that I had requested a duplicate valve to what I had done on the previous project in Italy and also what was going to be supplied for a different application but same process conditions on this project. This valve was a



4" valve and it was spec'd and constructed with a Hastelloy C body and trims. This valve construction was also signed off by Praxair and purchased.

After the 12" valve specification sheet was approved and signed off by Praxair an order then was placed on Northeast Controls, Inc. on June 24[th] 1998 for this valve. An order then was sent into Fisher Controls. The order went through Fisher Marshalltown order entry system and was detailed per what we had requested on the order and a serial card was generated. The order was then sent to Fisher North Stonington for manufacturing and was looked at by engineering there. That is when Fisher North Stonington had come back to me and had requested that the seat be changed from a Tefzel material to the Kel-F material. I don't recall if the process conditions were talked about with Fisher engineering or not. They said the reason for this change was that the Tefzel seat is not compatible to oxygen and the Kel-f would be better seat in this application. This was done per the request of Dave Whelan at Fisher North Stonington. The seat change was also done to the 4" valve that is currently at the Praxair site. I then proceeded to change the seat material to Kel-F on my spec sheet that I had in my computer and not sure if this was relayed back to Praxair or not regarding the seat change. Because the last copy they had was with a Monel/PTFE seat and Monel trim.

HV0629 history.doc

# EXHIBIT 2

## NORTHEAST CONTROLS GUIDELINES

| | |
|---|---|
| Subject: | PURCHASE ORDER REVIEW |
| Document #: | G0007 |
| Revision 6: | August 7, 2002 |
| | PAGE 1 OF 2 |
| FILE: | \U:\GUIDELNS\G0007.DOC |

## PURCHASE ORDER REVIEW GUIDELINE

▶ All customer Purchase Orders, whether mailed, faxed, verbal, or EDI, must be reviewed by an Inside Person or Sales Associate.

▶ All Purchase Orders should be reviewed against the quotation and for the following, as appropriate:

  ▶ Purchase Order Number
  ▶ Vendor (e.g. Northeast Controls, Inc., Fisher Controls International, Inc. c/o Northeast Controls)
  ▶ Bill To and Ship To Addresses, shipment method, requested date, F.O.B. point
  ▶ Type or part numbers, quantities, and prices
  ▶ Payment terms and tax status
  ▶ Special requirements (tagging, mark packages, etc.)

▶ If the customer requests an acknowledgment by any method (signed copy, fax back, telephone call, acknowledge by exception only), provide it.

▶ If a verbal Purchase Order is given, request a confirming Purchase Order.

▶ If a confirming Purchase Order is received after an order is entered, it must still be reviewed. If the customer requests acknowledgment of the confirming Purchase Order, it must be acknowledged.

▶ Any discrepancies found during Purchase Order review must be resolved with the customer.

## NORTHEAST CONTROLS GUIDELINES

| | |
|---|---|
| Subject: | PURCHASE ORDER REVIEW |
| Document #: | G0007 |
| Revision 5: | SEPTEMBER 13, 1994 |

FSUR 0003

NECF 0513

# EXHIBIT 3

CONFIDENTIAL                                                    1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RONALD W. OLSON, and CAROL        )  CONFIDENTIAL
OLSON, his wife,                  )
                                  )
        Plaintiffs,               )
                                  )  Civil Action No.
V.                                )  02C-04-263 (JRS)
                                  )
MOTIVA ENTERPRISES L.L.C.;        )
BATTAGLIA MECHANICAL, INC.;       )
FISHER CONTROLS INTERNATIONAL,    )
INC.; HYDROCHEM INDUSTRIAL        )
SERVICES, INC.; JJ WHITE, INC.;   )
NORTHEAST CONTROLS, INC.;         )
PARSONS ENERGY AND CHEMICALS      )
GROUP, INC.; PRAXAIR, INC.; TEXACO )
AVIATION PRODUCTS LLC; DAIKIN     )
INDUSTRIES, LTD.; SAINT-GOBAIN    )
PERFORMANCE PLASTICS; RIX         )
INDUSTRIES, INC.; TEXACO GLOBAL   )
GAS AND POWER; TEXACO             )
DEVELOPMENT CORPORATION;          )
GARY DELGREGO,                    )
                                  )
                                  )
        Defendants,               )
                                  )
NORTHEAST CONTROLS, INC.,         )
                                  )
        Third-Party Plaintiff,    )
                                  )
v.                                )
                                  )
CONECTIV OPERATING SYSTEMS,       )
                                  )
        Third-Party Defendant.    )


DEPOSITION OF BERT M. CAPPELLINI


WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

FSUR 0004



1    APPEARANCES:   (Cont'd)

2          MARK CARLISLE LEVY, ESQ.
          JAMES A. KELLER, ESQ.
3          SAUL EWING
            Centre Square West
4            1500 Market Street - 38th Floor
            Philadelphia, Pennsylvania  19102
5            for the Defendants Texaco Development
            and Texaco Aviation
6
          CHASE T. BROCKSTEDT, ESQ.
7          MURPHY SPADARO & LANDON
            824 Market Street
8            Wilmington, Delaware  19899
            for the Defendant HydroChem
9            Industrial Services, Inc.

10          GREGORY A. INSKIP, ESQ.
          POTTER ANDERSON & CORROON
11            Hercules Plaza
            1313 North Market Street
12            Wilmington, Delaware  19801
            for the Third-Party Defendant
13            Conectiv Operating Systems

14                   -   -   -   -   -

15                   BERT M. CAPPELLINI,

16        the deponent herein, having first been

17        duly sworn on oath, was examined and

18        testified as follows:

19                      EXAMINATION

20     BY MR. KELLER:

21      Q.   Sir, could you state your full name for the

22     record, please?

23      A.   Bert Cappellini.

24      Q.   Could you spell your last name?

1    A.    Well, based on an ANSI 600 pound valve

2    requested, there are ANSI temperature and pressure

3    charts for different materials that would fall under

4    that.

5    Q.    And would you be the person to go to those

6    charts and then recommend to the customer you're going

7    to need to use X, Y, Z type of flange with this or do

8    you leave that up to the customer?

9    A.    Well, we have in Fisher catalogs there are

10   those charts listed, pressure and temperatures, and

11   you go back to the customer and say this pressure and

12   temperature for this material will not fit into this

13   rating; you have to go to a different material or

14   something, a different rated flange.

15   Q.    Let's ask specifically now for the 629 valve.

16   Do you recall having that discussion with anybody?

17   A.    Yes.

18   Q.    Who did you have that discussion with?

19   A.    With Bhim Bhakoo.

20   Q.    And what did you guys discuss?

21   A.    What I recall was him requesting an ANSI 600

22   class valve and having 1300 pounds pressure at that

23   temperature and knowing it was oxygen and looking at a

24   Monel material will not fit the ANSI pressure chart at

Bert M. Cappellini - CONFIDENTIAL                    65

1    600.

2       Q.   Okay.  And what did Mr. Bhakoo say in response

3    to that?

4                MR. McVEY:  I object to the form.

5                I'm just objecting.

6                MR. KELLER:  That's a fair objection.

7    BY MR. KELLER:

8       Q.   What did you discuss next?

9       A.   Logical discussion would be that if you need an

10   ANSI 600 class valve, you don't want to go any higher,

11   then you have got to go to a different material of

12   construction to meet those pressures and temperatures.

13      Q.   And what resolution, if any, did you and

14   Mr. Bhakoo reach at the end of your discussion on this

15   point?

16      A.   That a Hastelloy C material for the body would

17   be used.

18      Q.   Did you speak with Mr. Bhakoo at all about the

19   types of material that might be used in the flange?

20      A.   No.

21      Q.   Do you typically talk about that with your

22   customers?

23      A.   No.

24      Q.   Have you ever talked about that with your

1    customers?

2       A.    No.

3       Q.    Line 24, Flg, which I'm going to assume is

4    flange, face finish and it says ANSI B16.5-81.  Is

5    that information that you put into the program?

6       A.    Yes.

7       Q.    How do you make the determination of what that

8    value is going to be?

9       A.    That's based on a flange finish that meets an

10   ANSI rating.

11      Q.    How does your determination of that finish tie

12   into the other pieces of information on this sheet, if

13   it does at all?

14      A.    It doesn't really.

15      Q.    Does the flange finish, do you know if whether

16   or not a flange is going to be used in oxygen service

17   has any impact on the appropriate types of finish on

18   the flange?

19      A.    No.

20      Q.    You don't know or you know it does not?

21      A.    I believe it doesn't.

22      Q.    Line 26, flow direction, it says shaft

23   upstream.  What does that mean?

24      A.    What that means is it's when the valve is

1    positioned in the pipeline that if you look at a valve

2    and how it's mated to a disk, the shaft would be more

3    protruding upstream of the valve than it would be

4    downstream.

5        Q.    And who makes the determination of -- I assume

6    the other option is downstream.   Is that right?

7        A.    Yeah.  Well, you could have downstream,

8    depending on what type of valve it was.  Now, that's

9    from Fisher catalogs that that information is taken

10   from.

11       Q.    That's what I was trying to figure out.  That

12   comes from the catalog?

13       A.    Correct.

14       Q.    Based on the type of valve that you select?

15       A.    Right.

16       Q.    Okay.  27, it says bonnet type and in this

17   particular document it says extended.  What does that

18   mean?

19       A.    If it says extended, that means it would have

20   an extension bonnet on it.

21       Q.    What does an extension bonnet do?

22       A.    It would do -- if the valve was used in, say,

23   cold service, you would have to get the packing away

24   from the process that goes through the valve.

1    Q.    Okay.  Would you use an extension bonnet in

2    warm service?

3    A.    If the temperature was high, real high.

4    Q.    Is 300 degrees real high in your experience

5    working on these specs?

6    A.    No.  No.

7    Q.    Line 29, packing material, it says single TFE.

8    Where do you get that information from?

9    A.    That comes right from the product, you know,

10    Fisher product bulletin catalog.

11    Q.    Okay.  So it's something again where once you

12    select the type of valve, it's going to tell you the

13    packing material?

14    A.    Correct.

15    Q.    Is that the same for the entry packing type?

16    A.    Yes.

17    Q.    Let's skip down a little bit.  Line 36 says

18    rated and there are entries for Cv, Fl and Xt.

19    Do you know what those different

20    categories mean?

21    A.    Yes.

22    Q.    What does Cv mean?  Is that the same as Cv in

23    line 9?  Not the same number but the same meaning?

24    A.    Yes.

Bert M. Cappellini  -  CONFIDENTIAL          69

1      Q.    And what does the 2831 signify?

2      A.    That's the maximum Cv published by Fisher

3   catalog for a 12-inch butterfly.

4      Q.    And how about F1?

5      A.    Those are flow coefficients that are published

6   by Fisher when doing calculations.

7      Q.    And that's something again that you're pulling

8   out of a catalog or out of a bulletin?

9      A.    Correct.  Both.

10     Q.    How about Xt?

11     A.    The same thing.

12     Q.    And what does Xt mean?

13     A.    I believe that's the pressure recovery factor.

14     Q.    The next four lines are for disk material, seat

15   material, guide material and stem material.  The

16   information on each of those entries, is that

17   something that you select?

18     A.    Yes.

19     Q.    And let's start with line 37 for disk material.

20   How do you determine what type of material you're

21   going to put in that line?

22     A.    That material is based on what valve is

23   selected, the body material that was selected, you

24   know, what the trim requirement is because of being

1    take a break?

2                    MR. KELLER:  That's fine.

3                    (A brief recess was taken.)

4                    MR. WAGNER:  Before we proceed, the

5    witness during the break asked me to clarify on the

6    record that his understanding of the questions that he

7    was being asked following the lines in Exhibit 118

8    were about his general practice, not necessarily about

9    what occurred with this specific valve in this case.

10                    MR. KELLER:  That was my intent at this

11   stage.

12                    MR. WAGNER:  Thank you.

13   BY MR. KELLER:

14       Q.    Mr. Cappellini, after you would complete an ISA

15   like what's in Exhibit 118, what would you do with it?

16       A.    We would send it off to a customer.

17       Q.    Would you send a copy off to Fisher?

18       A.    No.

19       Q.    Would you print out a copy for yourself?

20       A.    Yes.

21       Q.    And where would you put that copy?

22       A.    It would be kept with the quote that might have

23   been sent with the valve.

24       Q.    Do you generally keep for each valve that you

1    work on the quote and any ISA sheets you have relating

2    to that valve all in one folder?

3      A.    Yes.

4      Q.    The procedures, general procedures and

5    information that you provide as an inside sales rep,

6    would your completion of the document or who you may

7    talk to about things differ any when you became an

8    account manager in terms of filling out the ISA sheet?

9      A.    I'm not sure what you mean.

10      Q.    I'll ask a better question.

11            As an account manager you traveled and you

12    went on site, correct?

13      A.    Correct.

14      Q.    What other than that is different between being

15    an outside sales manager or an outside account manager

16    and an inside sales rep?

17      A.    Well, being an outside account manager you

18    didn't get into this tedious doing spec sheets and

19    things like that as much as the inside salesperson

20    would, doing quotes.

21      Q.    Would you ever complete spec sheets as an

22    outside sales rep?

23      A.    Yes.

24      Q.    Do you recall if you prepared spec sheets in

Bert M. Cappellini - CONFIDENTIAL          78

1    connection with the Delaware City project?

2       A.    Yes, I did.

3       Q.    And when you completed those sheets or you

4    completed a first draft of one of those sheets, would

5    you send it to someone at Praxair?

6       A.    Yes.

7       Q.    And who would you send it to?

8                  MR. WAGNER:    Just to clarify, who would he

9    or who did he in fact?

10      Q.    The reason I didn't say did is I'm not speaking

11   about a specific valve now, but let's just talk about

12   valves that you were working on for the Delaware City

13   project when you completed an ISA sheet for a

14   particular valve.

15                 MR. WAGNER:    You understand we're now

16   talking about that specific project?

17      Q.    That specific project but not a specific valve

18   within the project just yet.

19                 MR. WAGNER:    Okay.

20      Q.    So when you were working on that project and

21   you completed a draft of an ISA sheet, who at Praxair

22   would you send the sheet to?

23      A.    Bhim Bhakoo.

24      Q.    And how would you convey that information to

Bert M. Cappellini  -  CONFIDENTIAL          79

1    Mr. Bhakoo?

2       A.    Working with Bhim, it could have been faxed or

3    a lot of times I believe they were just hand

4    delivered.

5       Q.    And how would you hand deliver an ISA sheet to

6    Mr. Bhakoo?

7       A.    I would set up an appointment to go over and

8    see him and we would sit down, we would go through and

9    I would give him the spec sheets, completed ones that

10   I had completed.

11      Q.    When you faxed an ISA sheet to Mr. Bhakoo, did

12   you normally include a fax cover sheet?

13      A.    Normally, yes.

14      Q.    Do you know if Northeast Controls has a fax

15   logbook or some type of document that would let us

16   know what faxes have been sent from Northeast Controls

17   on a given day?

18      A.    No.

19      Q.    Do you keep all of your fax cover sheets in a

20   certain location?

21      A.    It would be kept possibly with a quote that was

22   done and then if that quote turned into an order it

23   could eventually be the order file.

24      Q.    If you sent an ISA spec sheet by way of fax and



1    used a fax cover sheet, would you generally keep the

2    cover sheet on the front of the spec sheet in your

3    file?

4        A.    No.  Not -- no.

5        Q.    What would you do with the fax cover sheet?

6        A.    It could be just within the rest of the papers

7    that could be with that quote possibly.

8        Q.    Are there times when you would throw out the

9    cover sheet after you sent the fax?

10       A.    No.

11       Q.    When you would hand deliver spec sheets to

12   Mr. Bhakoo, did you obtain any type of receipt or

13   other written acknowledgment from Mr. Bhakoo to

14   confirm that he had, in fact, received the document

15   you were delivering?

16       A.    No.

17       Q.    Did you generally take notes during your

18   meetings with Mr. Bhakoo?

19       A.    Yes.

20       Q.    When you would meet with Mr. Bhakoo to discuss

21   an ISA spec sheet, if you took notes of that meeting

22   what would you do with those notes?

23       A.    They could be kept with the file.  They could

24   be on scrap paper and thrown out.

1    Q.    Have you checked in connection with this

2    litigation to see if you had any of those types of

3    meeting notes relating to your conversations with

4    Mr. Bhakoo for the Delaware City project?

5    A.    Yes.

6    Q.    Did you find anything?

7    A.    No.

8    Q.    What happens next?  You either fax or you meet

9    with Mr. Bhakoo and by way of fax or by way of meeting

10   you've let him know what you have in your ISA spec

11   sheet.  What happens next?

12   A.    Those spec sheets are left with him.  He could

13   come back with questions marked up, you know, make

14   some changes, things like that.

15   Q.    And if Mr. Bhakoo or on the occasions when

16   Mr. Bhakoo marked up the spec sheets, would he hand

17   you or fax you his markup?

18   A.    He could do that, yeah, he could fax it to me.

19   Q.    What other ways could he convey his comments to

20   you?

21   A.    If I went back and saw him a couple of days

22   later, he had the sheet marked up and handed it to me.

23   Q.    Did Mr. Bhakoo always hand you a hard copy of

24   his marked-up changes?



Bert M. Cappellini   -   CONFIDENTIAL          82

1    A.   I wouldn't say always handed.  Again, he could

2    have faxed it.

3    Q.   That's a good clarification.

4         Did Mr. Bhakoo also provide you with a

5    copy of his marked-up changes?

6    A.   I would say yes.

7    Q.   Do you ever recall an occasion where Mr. Bhakoo

8    just provided you change information orally but didn't

9    actually hand you his marked-up comments?

10   A.   That's possible.  It could have happened.

11   Q.   Do you recall, do you have a specific

12   recollection of that happening?

13   A.   I don't know of a specific incident, but I've

14   had phone conversations with him requesting changes.

15   Q.   If Mr. Bhakoo did provide you with his

16   handwritten comments on an ISA spec sheet, would you

17   put a copy of what Mr. Bhakoo handed to you in the

18   project file?

19   A.   Yes.

20   Q.   Did you check in connection with this

21   litigation to see if you had any marked-up spec sheets

22   from Mr. Bhakoo relative to the Delaware City project?

23   A.   Yes.

24   Q.   Did you find any?

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters.                FSUR 0018

1    A.    Only what's in what I have supplied already.  I

2  mean, he's given me -- there is some spec sheets

3  marked up with his handwriting on them.

4    Q.    So whatever you found we should probably have?

5    A.    Yeah.

6            MS. CLARK:  If requested.

7            MR. KELLER:  Okay.

8  BY MR. KELLER:

9    Q.    If requested, we should have it?

10    A.    Yeah.

11    Q.    But you gathered it and gave it to somebody,

12  right?

13    A.    Yeah.

14    Q.    Did you give that to Mike Peters?

15    A.    I believe he has a copy of it.

16    Q.    Okay.  Am I correct that sometimes the back-

17  and-forth, am I correct that sometimes there might be

18  a back-and-forth between you and Mr. Bhakoo where

19  there's more than one round of changes?

20    A.    Yes.  Yeah.

21    Q.    And then at some point I assume that the

22  decision is made that Mr. Bhakoo is happy with the

23  spec sheet as drafted.  Is that right?

24    A.    Yes.

1   Q.   And how does he convey that to you?

2   A.   Well, he would on a spec sheet check off that

3   he's checked it or approved it or whatever and then if

4   he sent that in with an order, but he wouldn't come

5   back and just say this valve is okay and then do

6   nothing with it, not order it or nothing.  It usually

7   comes with an order.

8   Q.   Let me try to break that down.

9        Between the time you first speak with

10  Mr. Bhakoo about a particular valve and the time that

11  he approves it, are you having conversations with

12  Fisher about the valve while it's in process?

13  A.   Not normally.

14  Q.   After Mr. Bhakoo approves of a spec sheet, do

15  you send that approved spec sheet to Fisher?

16  A.   No.

17  Q.   Do you ever send spec sheets to Fisher?

18  A.   Yes.

19  Q.   When?

20  A.   When it goes through a particular group in

21  Fisher called the specials group.  If they're building

22  a special valve, they request a completed spec sheet.

23  Q.   Who's in the specials group at Fisher?

24  A.   A gentleman called John McKeever.  There's many

Bert M. Cappellini  -  CONFIDENTIAL                    85

1    other people in it.  I just can't recall their names.

2        Q.    Do you know a gentleman at Fisher named David

3    Whelan?

4        A.    Yes.

5        Q.    Do you know if Mr. Whelan is in the specials

6    group?

7        A.    No.

8        Q.    He is not in the specials group?

9        A.    He's not in the specials group.

10       Q.    Do you know a gentleman at Fisher named Gary

11   Boyle?

12       A.    Yes.

13       Q.    Is Mr. Boyle in the specials group?

14       A.    No.

15       Q.    Do you know what group Mr. Whelan is in?

16       A.    Dave Whelan was in --

17       Q.    Whelan.  I apologize.  I'm sorry.  I was

18   mispronouncing his name.

19              Mr. Whelan was in what group?

20       A.    He was at the North Stonington facility where

21   he was in the engineering group there.  The specials

22   group is located in Marshalltown, Iowa.

23       Q.    Do you know what group Mr. Boyle was working

24   with?

1              MR. McVEY:  I object to the form.

2              MR. WAGNER:  You can answer.

3      A.    I'm not sure what you...

4      Q.    Okay.  As I understand it, you provide your

5  ISA, the approved ISA spec sheet leads to an order

6  form which a sales associate then types up which goes

7  to the order clerks which they then put into the OPS

8  system which then goes to Fisher.  Is that a fair

9  summary?

10     A.    Correct.

11     Q.    After the order is transmitted electronically

12  to Fisher, do you place a call to confirm that they

13  got the order?

14     A.    No.

15     Q.    Do you typically receive a call confirming that

16  they got the order?

17     A.    No.

18     Q.    Do you typically have discussions with Fisher

19  about the order?

20     A.    No.

21     Q.    In a typical situation will you not speak with

22  Fisher again before the valve is installed?

23     A.    Usually no, we would not speak with them.

24     Q.    Let's look on Exhibit 131 at that matrix number

1       State of Delaware    )
                             )
2       New Castle County    )

3

4                    CERTIFICATE OF REPORTER

5

6            I, Kurt A. Fetzer, Registered Diplomate
        Reporter and Notary Public, do hereby certify that
        there came before me on the 12th day of December,
7       2003, the deponent herein, BERT M. CAPPELLINI, who was
        duly sworn by me and thereafter examined by counsel
8       for the respective parties; that the questions asked
        of said deponent and the answers given were taken down
9       by me in Stenotype notes and thereafter transcribed by
        use of computer-aided transcription and computer
10      printer under my direction.

11           I further certify that the foregoing is a true
        and correct transcript of the testimony given at said
12      examination of said witness.

13           I further certify that I am not counsel,
        attorney, or relative of either party, or otherwise
14      interested in the event of this suit.

15

16

17                      Kurt A. Fetzer, RDR, CRR
                        Certification No. 100-RPR
18                      (Expires January 31, 2005)

19      DATED:  12-18-03

20

21

22

23

24

# EXHIBIT 4

# White and Williams LLP

*1800 One Liberty Place*
*Philadelphia, PA 19103-7395*
*Phone: 215.864.7000*
*Fax: 215.864.7123*

Christopher Konzelmann
*Direct Dial: 215.864.6334*
*Direct Fax: 215.789.7636*
*konzelmannc@whiteandwilliams.com*

April 21, 2004

**By Facsimile**

Thomas Wagner, Esquire
RAWLE & HENDERSON, LLP
The Widener Building
One South Penn Square
Philadelphia, PA  19107

RE:  **Great American v. Northeast Controls, Inc.**
     **C.A. No. 02C-04-263 (JRS)**

Dear Mr. Wagner:

My March 11, 2004 confirmed our settlement of this matter. I clarified the settlement terms in my March 21, 2004 e-mail. My April 1, 2004 e-mail requested the status of the settlement documents. We later agreed on the terms of the release. The Becht team members have started to return their files to me. I should have the signed document from Becht concerning confidentiality shortly.

Mr. Jacoby has agreed to voluntarily dismiss the Praxair affirmative claims. As my March 30, 2004 e-mail indicated, the sticking point appears to be the "with" or "without" prejudice language. The statute of limitations has expired. The distinction is therefore not relevant. Once Mr. Jacoby signs the stipulation of dismissal "without prejudice", he will not be able to refile and the case will be gone forever.

Mr. Jacoby's client is not receiving any money. Praxair is apparently agreeing to dismiss its affirmative claims so the parties can focus on the Olsen matter. He is now somewhat dismayed that the defendants in that litigation appear to be pointing the finger at Praxair when, with the Becht Engineering people out of the picture, defense counsel should simply sit back and let Mr. Robbins try to establish the factual predicate for viable claims.

It is crucial that we finalize the settlement documents immediately. Please forward the final copy of the release and stipulations of dismissal. I will e-mail the release to my client and have the signed document returned to you the following day. I will also sign and immediately return the stipulation of dismissal of the Great American litigation. I will have somebody hand deliver the Praxair stipulation to Mr. Jacoby for his signature. You will then have all documents, other than the signed Becht Engineering non-disclosure agreements, necessary to issue the settlement check. I will have the signed non-disclosure documents from the Becht people any day.

*Allentown, PA • New York, NY • Paoli, PA • Paramus, NJ*
*Philadelphia, PA • Pittsburgh, PA • Westmont, NJ • Wilmington, DE*

DOCS_PH 1575959v1

FSUR 0024

Thomas Wagner, Esquire
February 20, 2004
Page 2


We have exchanged several telephone messages and I truly appreciate your willingness to work with me in getting the final settlement paperwork completed. I would like to get that paperwork finalized prior to the April 26, 2004 conference. Thank you.

Very truly yours,

WHITE AND WILLIAMS LLP

By: _____
Christopher Konzelmann

CK/eah

DOCS_PH 1575959v1

FSUR 0025

# EXHIBIT 5

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| RONALD W. OLSON, and CAROL OLSON, his wife, | ) CONFIDENTIAL |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. |
| V. | ) 02C-04-263 (JRS) |
| | ) |
| MOTIVA ENTERPRISES L.L.C.; BATTAGLIA MECHANICAL, INC.; FISHER CONTROLS INTERNATIONAL, INC.; HYDROCHEM INDUSTRIAL SERVICES, INC.; JJ WHITE, INC.; NORTHEAST CONTROLS, INC.; PARSONS ENERGY AND CHEMICALS GROUP, INC.; PRAXAIR, INC.; TEXACO AVIATION PRODUCTS LLC; DAIKIN INDUSTRIES, LTD.; SAINT-GOBAIN PERFORMANCE PLASTICS; RIX INDUSTRIES, INC.; TEXACO GLOBAL GAS AND POWER; TEXACO DEVELOPMENT CORPORATION; GARY DELGREGO, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| | ) |
| Defendants, | ) |
| | ) |
| NORTHEAST CONTROLS, INC., | ) |
| | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CONECTIV OPERATING SYSTEMS, | ) |
| | ) |
| Third-Party Defendant. | ) |

CONTINUED DEPOSITION OF BERT M. CAPPELLINI


WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

FSUR 0026

```
 1    APPEARANCES:   (Cont'd)

 2               PHILIP T. EDWARDS, ESQ.
               MURPHY SPADARO & LANDON
 3                 1011 Centre Road - Suite 210
                 Wilmington, Delaware  19805
 4                 for the Defendant HydroChem
                 Industrial Services, Inc.
 5

 6                      -  -  -  -  -

 7                    BERT M. CAPPELLINI,

 8         the deponent herein, having first been

 9         duly sworn on oath, was examined and

10         testified as follows:

11                       EXAMINATION

12    BY MR. RICHES:

13       Q.   Good morning, Mr. Cappellini.  I was introduced

14    earlier.  I'm Joe Riches.  I represent Praxair in this

15    litigation.

16               As long as my voice holds out, I will ask

17    you some questions today and the same ground rules as

18    your last session, which is where I would like to pick

19    up.  I have made copies.  I think at the time you were

20    being questioned you sort of had Exhibit 118 and 131

21    laid out in front of you.  And with respect to 131, I

22    believe the emphasis was on the matrix on the second

23    page which is marked NEC135.

24               I am going to just pick up right from
```

1    sheet for the 629 valve with Bhim Bhakoo's initials

2    approving it, did you go back and compare it to the

3    pricing matrix you prepared to see that they were

4    consistent?

5    A.    No.

6    Q.    Why not?

7    A.    When this 118 was sent in, it usually comes in

8    with the order that Praxair sends in.  Okay?  I don't

9    prepare the order for Fisher.  Someone else does that.

10          So if the document wasn't completely gone

11    through, then it wouldn't have been checked.

12    Q.    You don't prepare the order and the order being

13    submitted to Fisher for the valve would be Exhibit

14    131?  That would be the order form?

15    A.    Correct.

16    Q.    And someone other than you prepared this?

17    A.    Correct.

18    Q.    And not to go over something that I'm sure you

19    were asked about earlier and I don't recall your

20    testimony, but is there any writing on Exhibit 131

21    that's attributable to you?

22    A.    Yes.

23    Q.    That would be the matrix number?

24    A.    Correct.

Bert M. Cappellini  -  CONFIDENTIAL    163

1    Praxair's perspective they ordered a valve and

2    specifically the 629 valve and were expecting to

3    receive the 629 valve which, among other things,

4    included a Monel disk, a Monel/PTFE seat, a Monel

5    guide and a Monel stem?

6                    MR. WAGNER:   Objection.   This witness

7    can't testify what Praxair is expecting or anything

8    from Praxair's perspective, which is what you asked

9    him.

10                   MR. RICHES:   All right.   I will rephrase

11   the question.

12   BY MR. RICHES:

13     Q.    The valve as ordered and delivered was

14   constructed with PTFE as the guide material.   How was

15   that information relayed by Northeast to Praxair?

16     A.    It would be by the spec sheet.

17     Q.    The ISA data sheet?

18     A.    Correct.

19     Q.    Now, what I need you to show me is the ISA data

20   sheet approved by Bhim Bhakoo that indicates that the

21   guide material that was used in the construction of

22   the 629 valve was PTFE and not Monel.

23                   Do you have that?

24     A.    No.

Bert M. Cappellini  -  CONFIDENTIAL        202

1    BY MR. RICHES:

2        Q.   So if that's the case with respect to a 12-inch

3    valve, then somewhere in Northeast's records there

4    should be a document that reflects a similar order for

5    a 10-inch valve.  Is that fair?

6                MR. McVEY:  Objection to the form.

7        A.   An order?

8        Q.   Yes.

9        A.   No.  There was no order for a 10-inch valve.

10       Q.   Because that changed?

11       A.   In the quoting process from 10 to 12.

12       Q.   And because of that the valve that was ordered

13   was a 12-inch valve, not a 10-inch valve?

14       A.   Well, that's what Praxair ordered, a 12-inch

15   valve.

16       Q.   Praxair also ordered a valve with Monel disk,

17   Monel seat, Monel guide and Monel stem and that's not

18   what was requested from Fisher?

19       A.   Correct.

20       Q.   I am going to go to 119.

21                Exhibit 119 is an ISA data sheet relative

22   to the 629 valve and it indicates a revision of July

23   23, 1998.  Is that correct?

24       A.   Correct.

Bert M. Cappellini  -  CONFIDENTIAL                187

1          MR. RICHES:  Then he can tell me he didn't

2     say that.

3          MR. WAGNER:  Well, that's not a fair way

4     to ask questions as far as I'm concerned.  You're

5     suggesting something to him that he didn't say and I

6     object to it.

7          MR. RICHES:  That's fine.  And my response

8     to that is that's what I thought he said.  If I'm

9     wrong, he can now correct me.

10    BY MR. RICHES:

11       Q.   Can you answer the question?

12       A.   I don't even know what the question was.

13       Q.   Let me try again.

14            You go through this whole process where

15    you get initial information and then there are

16    substantial changes made in the size and materials of

17    construction of the 629 valve from the point in time

18    when you first prepared the matrix for pricing

19    purposes until the final revised, the final, approved

20    ISA data sheet was prepared.

21            What I want to know is in ordering the

22    valve why wasn't a matrix submitted to Fisher that

23    ordered a valve with the materials contained on

24    Exhibit 118, the final, signed, approved ISA data

1    sheet?

2       A.    I don't know.  I don't know why the matrix is

3    different than what's on 118.  I don't know that.

4                    I mean, you're asking me why wasn't it?

5       Q.    Yes.

6       A.    I don't know why it's on there like that, on

7    the 118.

8       Q.    You don't know why --

9       A.    I mean, the conversations and the thought

10   process and the things that went on for the 629 valve

11   was never the trim that's on that spec sheet.  It was

12   the original matrix number that I submitted to Fisher.

13      Q.    I understand that.

14      A.    But you're asking me why is it not the same?  I

15   don't know that.

16      Q.    Well, let me ask it this way:  Should it have

17   been?  Should the matrix that was listed on Exhibit

18   131, page 2, should it have been different than the

19   matrix that is on page 2 of Exhibit 131 considering

20   the information on Exhibit 118?

21      A.    I mean, it would have been different.  They are

22   different, if that's what you're asking me.  I mean,

23   the matrix would have been different as to what's on

24   the ISA data sheet.



Bert M. Cappellini  -  CONFIDENTIAL    227

1    A.    Correct.

2    Q.    And the intent of the Moore volume booster at

3    least in part was to help meet that goal of closing in

4    less than one second, right?

5    A.    Right.   Because when they get the valve, it's

6    fully opened because it sits with nothing on it so you

7    give it air to close the disk on the seat.

8    Q.    And that should help the valve reach its target

9    of less than one second to close?

10    A.    Correct.

11    Q.    If you will flip back to Exhibit 118.   118, as

12    you know, well know is the ISA data sheet for the 629

13    valve, correct?

14    A.    Correct.

15    Q.    Am I correct that valve also had a stroke time

16    of less than one second?

17    A.    Correct.

18    Q.    Did you ever add a Moore volume booster to the

19    629 valve?

20    A.    No.

21    Q.    Why not?

22    A.    Well, these two particular valves if you looked

23    at, say, line 57 and 65, they are in the closed

24    position, so this particular valve when it arrived

1    A.    Correct.

2    Q.    And can you show me the ISA data sheet with

3    respect to the 629 valve that reflects Praxair's

4    approval of this change?  Because I have not been able

5    to find it.

6    A.    I don't have it.  I don't think there is one.

7    Q.    Pardon me?

8    A.    I haven't seen one, so I don't....

9    Q.    Until you received an ISA data form for the 629

10    valve that approved this revision, would it be fair to

11    say that the valve material should not have been

12    changed?

13    A.    No.  Because there could have been a verbal

14    from Praxair to make the change, it was okay and

15    submit a new ISA data sheet for the record.

16    Q.    Well, is it the practice, sir, that when these

17    kinds of changes are made even if there's a verbal

18    approval that allows for the process, the

19    manufacturing process to continue, that at some point

20    approval of that change is going to be documented by

21    Praxair?

22    A.    I don't know that.

23    Q.    Well, in your dealings with Praxair in the

24    situation where a valve has been ordered and there's

Bert M. Cappellini  -  CONFIDENTIAL          215

1      Q.    And then if you follow through the progression

2    of e-mails going through reverse order, it looks like

3    that request makes its way to Mr. Richardson at Fisher

4    at some point that same day, June 24, 1998?

5      A.    Yes.

6      Q.    So would you agree with me, sir, that before

7    that matrix or that valve gets sent to Fisher, you

8    have the PO we looked at that was Exhibit 128?

9      A.    Yes.

10     Q.    Okay.  And you had the ISA spec sheet for the

11   629 valve that was in that purchase order, correct?

12     A.    Correct.

13     Q.    But it's your testimony that you didn't go back

14   and cross-reference the purchase order against what

15   was being transmitted to Fisher on June 24, 1998?

16     A.    Yes.  I would have to say that, yes.

17     Q.    And then about a month later, give or take, you

18   made the change to the 629 valve which you've told us

19   is on Exhibit 119, correct?

20     A.    Yes.

21     Q.    And that's where you made the change with the

22   Kel-f soft seat, correct?

23     A.    Correct.

24     Q.    That was on July 23, 1988?

1    from the factory it's in the closed position.  So when

2    this particular valve is with air on the actuator,

3    just opening the valve, they don't require a speed in

4    that direction, to open the valve.

5              So when a valve is fully open, now you

6    want to get the air out of the actuator.  And that's

7    not done by a volume booster.  You want to exhaust it

8    out of there quickly, which is done by what we call a

9    quick exhaust.  It's got a big port, a big Cv to take

10    that air out of there quickly.

11    Q.    Cv, is that what's in line 9 on Exhibit 118?

12    A.    That's a similar Cv, but that's a Cv for the

13    valve itself.  The device that could be on, that is on

14    this actuator, that was on this actuator is a small

15    device that has a Cv.

16    Q.    Is there something on this ISA data sheet that

17    would allow me to cross-reference and confirm that?

18    A.    Down at the bottom where the standard notes

19    are, if you looked at I believe note 18, 18 signifies

20    a quick exhaust.

21    Q.    Let me just check and then we will be able to

22    move on.

23              Okay.  Mr. Cappellini, was there a time

24    when you told Mr. Bhakoo or anyone else at Praxair

Bert M. Cappellini  -  CONFIDENTIAL          229

1    that you had decided you were going to use the same

2    exact materials of construction for the 613 valve and

3    the 629 valve?

4        A.    I mean, there were conversations that the

5    valves would be constructed the same.

6        Q.    There were conversations that the valves would

7    be constructed identically the same?

8        A.    Correct.

9        Q.    With Mr. Bhakoo?

10       A.    Yes.  I would have to assume that.  I don't

11   recall the exact conversations, but....

12       Q.    On your pricing sheet -- and I apologize for

13   jumping around.  This is what happens when you go

14   second.

15                Exhibit 131.  Am I correct that you

16   specified --

17                MR. WAGNER:  What exhibit are you on?

18                MR. KELLER:  Exhibit 131, the pricing

19   sheet, pricing matrix.

20   BY MR. KELLER:

21       Q.    Am I correct you specified a disk material of

22   Hastelloy B?

23       A.    I would have to look up this matrix.  I assume

24   that's what one of these numbers --

1    Q.    We did it last time.  If you want to do it

2    again, we can cross-reference the matrix if you want

3    to be sure.

4    A.    I mean, if that's what one of those numbers

5    signify, yes.

6    Q.    So rather than make you go through the process,

7    let's assume I'm correct that what you told us last

8    time is the C is the body and the B is the disk

9    material.

10              Does that sound right?

11    A.    Yeah, that sound correct.

12    Q.    B would be Hastelloy B?

13    A.    Correct.

14    Q.    Am I correct what ultimately was constructed

15    was Hastelloy C in the disk?

16    A.    That I -- looking at those other sheets, I

17    believe that's what that says.

18    Q.    Do you recall having a discussion with Fisher

19    about changing the disk material from Hastelloy B to

20    Hastelloy C?

21    A.    No.

22    Q.    Do you recall sending documents to or from

23    either Fisher or Praxair about changing the disk

24    material from Hastelloy B to Hastelloy C?



1    A.    No.

2    Q.    If you would like to cross-reference again to

3    Exhibit 212, which is the document when you went back

4    and checked to see what was in the valves.  If you

5    look on the second page, am I correct that the body

6    and the disk for the 629 valve were constructed of the

7    same material?

8    A.    On this sheet it appears that they are the

9    same.

10    Q.    When you noticed that, did you do any

11    investigation or try to figure out how it was that the

12    disk turned out to be Hastelloy C instead of Hastelloy

13    B?

14    A.    Again, I might have taken this information just

15    from the serial card and didn't cross-reference it to

16    a matrix number.

17    Q.    No.  I understand that.  I guess my question

18    is:  After you did that and you created this document,

19    did you ever look and say wait a minute; that disk is

20    Hastelloy C; I thought I said Hastelloy B and go and

21    try to figure out how it was that that change had

22    occurred?

23    A.    No, I didn't.  Because I may not have actually

24    realized it until your actually pointing it out now

1    that this sheet -- I haven't seen this sheet since I

2    probably made it -- that they are the same and that

3    the matrix number is different.

4        Q.   Mr. Cappellini, since you and I last spoke have

5    you had a chance to look at the transcript from your

6    deposition from last time?

7        A.   Yes, I did.

8        Q.   Have you had a chance -- Tom, you can just tell

9    me if it's coming -- to go through that and make any

10   changes that you thought were necessary?

11       A.   I have been asked to do that, yes.

12       Q.   And you haven't finalized that process yet?

13       A.   No.   I don't think I feel like anything needs

14   to be changed.

15       Q.   Everything that was in there seemed accurate

16   and correct?

17       A.   Sure.

18       Q.   And truthful?

19       A.   Yes.

20            MR. KELLER:  I have no further questions.

21   BY MR. HANDLON:

22       Q.   Mr. Cappellini, my name is Joe Handlon.   I

23   represent Ron Olson in this matter.   I've got a couple

24   of quick follow-up questions.

Bert M. Cappellini  -  CONFIDENTIAL       241

1    State of Delaware    )
                          )
2    New Castle County    )

3

4                  CERTIFICATE OF REPORTER

5

6        I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
     there came before me on the 30th day of April, 2004,
7    the deponent herein, BERT M. CAPPELLINI, who was duly
     sworn by me and thereafter examined by counsel for the
8    respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.

11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16

17   _____
     Kurt A. Fetzer, RDR,  CRR
18   Certification No. 100-RPR
     (Expires January 31, 2005)

19
     DATED:  _____5-4-04_____
20

21

22

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

FSUR 0041

# EXHIBIT 6

| NORTHEAST | Document Name: Quality Manual | Original Issue Date: 6/3/03 | |
|---|---|---|---|
| NORTHEAST CONTROLS INC. | IFS Document #: 1055319 | Rev: A8 | Rev. Date 3/30/06 |
| | Owner: Services Manager | Page 1 of 25 | |

# Northeast Controls Inc.

# Quality Manual

This Quality Manual sets forth the quality system policies and defines compliance with the ISO 9001-2000 requirements.



Printed copies of this document are uncontrolled.

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, INC.          :          CIVIL ACTION
3 Enterprise Avenue                :
Clifton Park                       :
New York, NY 12065                 :          NO. 1:06-CV-00412 (SLR)
                                   :
                                   :
ST. PAUL MERCURY                   :
INSURANCE COMPANY                  :
385 Washington Street              :
St. Paul, MN 55102                 :
                Plaintiffs,        :
         v.                        :
FISHER CONTROLS                    :
INTERNATIONAL, LLC,                :
205 S. Center Street               :
Marshalltown, Iowa 50158           :
                Defendant.         :


ANSWERS OF PLAINTIFFS, NORTHEAST CONTROLS,
INC. AND ST. PAUL MERCURY INSURANCE COMPANY TO DEFENDANT
FISHER CONTROLS INTERNATIONAL, LLC'S FIRST DISCOVERY
REQUESTS

Plaintiffs, Northeast Controls, Inc. and St. Paul Mercury Insurance Company, by

and through their attorneys, Rawle & Henderson, LLP, hereby answer the discovery

requests of Fisher Controls International, LLC as follows:

FSUR 0043

1.    Identify all persons who answered or assisted in answering these Interrogatories and Requests for Production.

ANSWER:    Jeff Frock, adjuster for St. Paul Companies.

FSUR 0044

2.      Identify all of your employees assigned to work on any file relating to any policy of insurance issued to Northeast Controls, including each such employee's job title and duties.

**ANSWER:**    Objection.  **Plaintiffs object to the use of the term "file" as it is vague and undefined in the Definitions and Instructions.  Furthermore, to the extent this interrogatory seeks information regarding policies of insurance that do not relate to the incident or underlying litigations, it is objected to because it is unreasonably cumulative and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and the burden and expense of the proposed discovery outweighs the likely benefit.**

FSUR 0045

3.    Identify all of your employees assigned to work on any file relating to the

Underlying Actions, including each such employee's job title and duties.

ANSWER:    Objection.  Plaintiffs object to the use of the term "file" as it is
vague and undefined in the Definitions and Instructions.  Plaintiffs further
object to the extent this interrogatory seeks information which is not relevant,
and not reasonably calculated to lead to the discovery of admissible evidence.

FSUR 0046

4.    Identify all files in your possession, custody, or control relating to your

policy or policies of insurance issued to Northeast Controls.

ANSWER:    Objection.  Plaintiffs object to the use of the term "files" as it is vague
and undefined in the Definitions and Instructions.  To the extent this interrogatory
seeks information regarding policies of insurance that do not relate to the incident
or underlying litigations, it is objected to because it is irrelevant and not reasonably
calculated to lead to the discovery of admissible evidence.  Plaintiffs further object
because it is unreasonably cumulative, and the burden and expense of the proposed
discovery outweighs the likely benefit.  Plaintiffs further object to the extent this
interrogatory seeks documents subject to the attorney-client privilege and work
product doctrines.

FSUR 0047

5.     Identify all files in your possession, custody or control relating to the Incident

and/or the Underlying Action.

ANSWER:    Objection.  Plaintiffs object to the use of the term "files" as it is vague
and undefined in the Definitions and Instructions.  Plaintiffs object to this
interrogatory to the extent it seeks information in these files which is subject to the
attorney-client privilege or work product doctrine.  Subject to this objection, see all
documents which were produced in the Underlying Actions, including, but not
limited to, the Representative Agreement between Fisher Control International, Inc.
and Northeast Controls, Inc., dated January 1, 2000, the confidential Joint Defense
Privilege Agreement dated May 2005, and the expert report of Dr. Robert A.
Mostello titled "Report on the Delaware City Explosion at the Delaware City,
Delaware Facility of Motiva Enterprises on May 20, 2000" dated January 3, 2005.

FSUR 0048

6.     Identify all persons who provided policies of reinsurance relating to your policy or policies of insurance issued to Northeast Controls.

ANSWER:    Objection.  To the extent this interrogatory seeks information regarding policies of reinsurance that do not relate to the incident or underlying litigations, it is objected to because it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs further object because it is unreasonably cumulative, and the burden and expense of the proposed discovery outweighs the likely benefit.

FSUR 0049

## REQUESTS FOR PRODUCTION

1.    Produce all documents identified in your Initial Disclosures.

**ANSWER:**    All documents identified in Plaintiffs' Initial Disclosures are documents which have been produced in the Underlying Action. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

2.    Produce all documents constituting your claims file for the Incident.

**ANSWER:**    Objection. Plaintiffs object to this Request for Production as to the use of the term "file" as it is vague and undefined in the Definitions and Instructions. Plaintiffs further object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

3.    Produce all documents constituting your underwriting file relating to Northeast Controls and/or the Incident.

**ANSWER:**    Objection. Plaintiffs object to this Request for Production as to the use of the term "file" as it is vague and undefined in the Definitions and Instructions. Plaintiffs further object to this Request to the extent it seeks information relating generally to Northeast Controls but not directly related to this Incident on the basis that it is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

4.    Produce all documents relating to any adjustment of claims relating to the Incident.

**ANSWER:**    Objection. Plaintiffs object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

5.    Produce all documents relating to any settlement or attempted settlement of any or all of the Underlying Actions or any other claim arising out of the Incident.

FSUR 0050

ANSWER:    Objection. Plaintiffs object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

6.    Produce all documents relating to any policy or policies of insurance that you issued to or for the benefit of Northeast Controls for the period 1993 through 2006.

ANSWER:    Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

7.    Produce all documents relating to any policies of re-insurance relating to any policy of insurance issued by you to Northeast Controls for the period 1993 through 2006.

ANSWER:    Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

8.    Produce all documents exchanged between you and any other party, including but not limited to Northeast Controls or any re-insurer, relating to any reservation of rights relating to coverage for the Incident.

ANSWER:    Objection. Plaintiffs object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

9.    Produce all documents relating to any analysis or assessment of Northeast Controls' or your exposure for damages or claimed damages arising out of the Incident.

ANSWER:    Objection. Plaintiffs object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's

FSUR 0051

Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

10.    Produce all documents relating to any analysis or assessment of Northeast Controls' business practices at any time between January 1, 1993, and the present.

**ANSWER:    Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

11.    Produce all documents relating to the involvement of Becht Engineering, Inc., in the Underlying Actions or in relation to the Incident.

**ANSWER:    Objection. Plaintiffs object to this Request for Production to the term "Becht Engineering, Inc." as it is undefined in the Definitions and Instructions. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

12.    Produce any mediation letters or memoranda relating to the Incident, including but not limited to any mediation letters or memoranda provided to Vincent A. Bifferato by any party to the Underlying Action.

**ANSWER:    Objection. Plaintiffs object to this Request for Production to the term "Vincent A. Bifferato" as it is undefined in the Definitions and Instructions. Plaintiffs further object to this Request to the extent it seeks information which is confidential and protected by the work-product doctrine. Plaintiffs further object to this Request for Production to the extent it seeks information which may have been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

13.    Produce any and all correspondence or other documents relating to the Valve, the ASU, the DCPP, the DCPPRP, the Incident, or the Underlying Actions exchanged between you and any person or entity, including but not limited to the following:

    i.    Battaglia;
    ii.    Becht Engineering, Inc.;
    iii.    Vincent A. Bifferato;

FSUR 0052

iv. Conectiv;
v. Cozen O'Connor;
vi. Donald Davis;
vii. Fisher;
viii. Great American;
ix. Hydrochem;
x. J.J. White;
xi. Joseph Handlon;
xii. Richard Hohn;
xiii. Hohn & Scheuerle;
xiv. F. Warren Jacoby;
xv. James Keller;
xvi. Christopher Konzelmann;
xvii. Mark Levy;
xviii. Paul Lukoff;
xix. Margolis Edelstein;
xx. Motiva;
xxi. The Olsons;
xxii. Parsons;
xxiii. Praxair;
xxiv. Joseph Riches;
xxv. Prickett, Jones & Elliott;
xxvi. Randall Robbins;
xxvii. Saul Levy LLP;
xxviii. Texaco;
xxix. Michael K. Tighe;
xxx. Tighe, Cottrell & Logan, P.A.;
xxxi. White & Williams LLP.

**ANSWER:** Objection. Plaintiffs object to this Request for Production to the use of the terms "Becht Engineering, Inc.; Vincent A. Bifferato; Cozen O'Connor; Donald Davis; Joseph Handlon; Richard Hohn; Hohn & Scheuerle; F. Warren Jacoby; James Keller; Christopher Konzelmann;
Mark Levy; Paul Lukoff; Margolis Edelstein; Joseph Riches; Prickett, Jones & Elliott; Randall Robbins; Saul Levy LLP; Michael Tighe; Tighe, Cottrell & Logan, P.A.; and White & Williams, LLP" to the extent these terms are vague and undefined in the Definitions and Instructions. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

14.    Produce any and all documents relating to any other claims made on any policy of insurance issued by you to Northeast Controls during the period 1993 to the present.

FSUR 0053

ANSWER     Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

15.     Produce any and all correspondence and other documents exchanged by you and any other insurer or insurers, or any re-insurer or re-insurers, relating to the Incident or any claim or lawsuit relating to the Incident.

ANSWER:     Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

16.     Produce any and all documents relating to your document retention policy in effect for the period 1993 to the present.

ANSWER:     Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

17.     Produce all reports in your possession or control prepared by any and all experts who will testify at the time of trial.

ANSWER:     Objection. Plaintiffs object to this Request for Production to the extent that Plaintiffs have not yet retained any experts in this matter. Plaintiffs reserve their right to supplement this response as discovery continues. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

18.     Produce the complete files relating to the opinions or testimony of any and all experts who will testify at the time of trial.

FSUR 0054

ANSWER:     Objection. Plaintiffs object to this Request for Production to the extent that Plaintiffs have not yet retained any experts in this matter. Plaintiffs reserve their right to supplement this response as discovery continues. Plaintiffs further object to the extent this request seeks information which is beyond the requirements of the applicable federal rules for expert information disclosure. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

19.     Produce the curriculum vitae of any and all experts who will testify at the time of trial.

ANSWER:     Objection. Plaintiffs object to this Request for Production to the extent that Plaintiffs have not yet retained any experts in this matter. Plaintiffs reserve their right to supplement this response as discovery continues. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

FSUR 0055

## CERTIFICATION

I hereby certify that the foregoing answers to interrogatories are true.  I am aware

that if any of the foregoing statements made by me are willfully false, I am subject to

punishment.

Date: __1/5/07__

Name: __Jeffrey W. Froeh__
Representative of St. Paul Companies

FSUR 0056

# EXHIBIT 8





# RIDDELL WILLIAMS P.S.

1001 FOURTH AVENUE, SUITE 4500 I SEATTLE, WASHINGTON 98154-1192
206.624.3600 TELEPHONE I 206.389.1708 FACSIMILE
WWW.RIDDELLWILLIAMS.COM

DANIEL J. GUNTER
206.389.1570
DGUNTER@RIDDELLWILLIAMS.COM

January 29, 2007

**VIA EMAIL, FAX, AND FEDERAL EXPRESS**

Mr. Thomas Wagner
Rawle & Henderson LLP
1339 Chestnut St.
One South Penn Square
The Widener Building, 16th Floor
Philadelphia PA 19107

Re:   **Northeast Controls, Inc. and St. Paul Mercury Ins. Co. v. Fisher Controls International, LLC**
      **U.S. Dist. Ct., D. Del., NO. 1:06-CV-00412 (SLR)**

Dear Mr. Wagner:

I am writing to follow up on our telephone conversation of January 23 relating to St. Paul's responses to Fisher's first discovery requests.

As I indicated during that conversation, we were deeply surprised by and disapprove of those responses. You will recall that, during our telephonic conference with Judge Robinson, you informed her that you had a good working relationship with our firm during the pendency of the underlying actions. During those cases, we coordinated our work and drafted many—if not all—of the briefs that your office filed on behalf of Northeast Controls before Fisher's final dismissal from the Olson action.

I think that it is also important to consider the background of this matter. From the very beginning of the investigation of the explosion at the Delaware City Power Plant, the parties focused their attention on the glaring distinction between the specifications set forth on the purchase order provided by Praxair, Inc., for the 83HV0269 Valve ("the Valve") and the specifications for the Valve as provided by Northeast Controls's employee, Bert Cappellini. Within days of that incident, it had become clear that Praxair's purchase order specifications did not match the specifications provided by Mr. Cappellini to Fisher. From the beginning, the other interested parties—later, the plaintiffs and other co-defendants in the Underlying Actions—focused their attention on that discrepancy. From the beginning, Mr. Cappellini was unable to explain why the

Mr. Thomas Wagner
January 29, 2007
Page 2

order that he placed with Fisher failed to conform with Praxair's purchase order. And from the beginning of the Underlying Actions it was clear that Fisher and Northeast Controls were defendants in those actions precisely because of Mr. Cappellini's failure to ensure agreement between Praxair's purchase order specifications and the specifications that he—acting as agent for Northeast Controls—supplied to Fisher.

Given that background, and given your acknowledgment to the Court that we had previously enjoyed a good working relationship, the discovery responses were a shock and disappointment. The responses provide precisely one piece of information—i.e., that Jeff Frock, a claims adjuster for the St. Paul Companies, answered or assisted in answering the Interrogatories. Other than that single piece of information, the answers to our interrogatories and requests for production fail to provide a single substantive piece of information.

The lack of responsiveness is astonishing. For example, St. Paul failed to produce even the policy of insurance that allegedly provided coverage to Northeast Controls in this matter. St. Paul failed to produce copies of any checks made in settlement of the Great American or Olson matters. In fact, St. Paul failed to produce any evidence that it had actually paid anything to anyone at any time in relation to the Underlying Actions.

St. Paul also interposed objections that lack any merit. For example, St. Paul claims to be unable to understand the term "file," as in this request and partial answer:

>        2.       Produce all documents constituting your claims file for
> the Incident.
>
> **ANSWER:** Objection. Plaintiffs object to this Request for
> Production as to the use of the term "file" as it is vague and
> undefined in the Definitions and Instructions.

Similarly, St. Paul pretends to be unable to understand terms such as "Becht Engineering, Inc.," "White & Williams LLP," and "Christopher Konzelmann," even though those entities and people—like all of the persons and entities referred to in our discovery requests—are well known to you. In fact, the Complaint in this matter refers to Becht Engineering and White & Williams. St. Paul could not have been confused about entities identified in its own allegations.

In short, the discovery responses were entirely inadequate. The inadequacy was even more remarkable in that St. Paul took an additional 30 days to respond to this discovery. When Ms. Monte Carlo requested an additional 30 days to respond to our requests, I did not anticipate that we would receive such a response. I assumed that the request was being made in good faith, and not in an attempt to gain additional time to serve a set of boilerplate objections and nonresponsive answers.

Mr. Thomas Wagner
January 29, 2007
Page 3

You and I have scheduled a telephone conference for Tuesday, February 6, at 11:30 a.m. to conduct a Rule 37 conference in regard to these responses. In preparation for that conference, I am enclosing with this letter a detailed explanation of the inadequacies of St. Paul's responses. During our conference, I anticipate hearing from you that St. Paul will provide full and complete responses to our discovery requests no later than Friday, February 23.

Please note that we will expect substantive responses, not duplications of St. Paul's prior objections or the assertion of any new objections. In this regard, note that it is our position that St. Paul has waived all objections not made in its first set of responses and that additional objections—including objections alleging the existence of a privilege—cannot now be raised.

If we cannot reach agreement during that conversation, please be advised that we will request the Court's assistance in obtaining responses to our requests. Further, we will ask the Court to award costs and, if necessary, impose other sanctions.

I look forward to speaking with you on February 6. In the meantime, please do not hesitate to call me if you have any questions or wish to speed up the time to St. Paul's service of its responses.

Sincerely,

Daniel J. Gunter
of
RIDDELL WILLIAMS P.S.

Our File: 41155.00412

cc:    Patrick D. McVey (w/ encl.)
       Paul A. Bradley (w/ encl.)
       Nancy Monte Carlo (w/ encl.)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065 | CIVIL ACTION<br><br>NO. 1:06-CV-00412 (SLR) |
| ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN 55102 | |
| Plaintiffs, | |
| v. | |
| FISHER CONTROLS<br>INTERNATIONAL, LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158 | |
| Defendant. | |

**DEFENDANT FISHER CONTROLS INTERNATIONAL, INC.'S
RESPONSES TO**

**"ANSWERS OF PLAINTIFFS, NORTHEAST CONTROLS, INC. AND ST. PAUL
MERCURY INSURANCE COMPANY TO DEFENDANT FISHER CONTROLS
INTERNATIONAL, LLC'S FIRST DISCOVERY REQUESTS"**

Counsel for Defendant Fisher Controls International, Inc. ("Fisher") provides this

document to counsel for plaintiff St. Paul Mercury Insurance Company ("St. Paul") to provide a

guide for the Rule 37 conference scheduled between those counsel for February 6, 2007. This

FSUR 0060

document includes the original requests made to St. Paul, St. Paul's answers to those requests,

and Fisher's responses to those answers.

## PLAINTIFFS' INITIAL STATEMENT

Plaintiffs, Northeast Controls, Inc. and St. Paul Mercury Insurance Company, by and

through their attorneys, Rawle & Henderson, LLP, hereby answer the discovery requests of

Fisher Controls International, LLC as follows:

**FISHER'S RESPONSE:** Defendant Fisher Controls International, LLC ("Fisher"), notes

that these discovery requests were directed only to plaintiff St. Paul Mercury Insurance Company

("St. Paul"), not plaintiff Northeast Controls, Inc. ("Northeast Controls").

1.      Identify all persons who answered or assisted in answering these Interrogatories

and Requests for Production.

**ANSWER: Jeff Frock, adjuster for St. Paul Companies.**

**FISHER'S RESPONSE:**     Fisher reserves its response to this Answer.

2.      Identify all of your employees assigned to work on any file relating to any policy

of insurance issued to Northeast Controls, including each such employee's job title and duties.

**ANSWER: Objection. Plaintiffs object to the use of the term "file" as it is vague and**

**undefined in the Definitions and Instructions. Furthermore, to the extent this interrogatory**

**seeks information regarding policies of insurance that do not relate to the incident or**

underlying litigations, it is objected to because it is unreasonably cumulative and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and the burden and expense of the proposed discovery outweighs the likely benefit.

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. St. Paul's assertion that it does not understand the term "file" is not credible. St. Paul clearly understands that term. See, e.g., St. Paul Fire and Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd., No. 91-0748, 1996 WL 19028, *3 (S.D.N.Y. Jan. 17, 1996) (noting that "[t]hrough discovery, St. Paul obtained . . . Heath's internal **files** and the **claims and underwriting files** for the risks ceded to Farex and reinsured by St. Paul") (emphasis added).

St. Paul has failed to identify any employees who worked on files relating to the policy of insurance referenced by plaintiffs in paragraph 7 of the Complaint in this matter. Further, St. Paul's blanket assertions that the Interrogatory seeks information that is "unreasonably cumulative and irrelevant" do not constitute a proper basis for refusing to answer this Interrogatory. Nor has St. Paul identified any particular burden or expense involved in answering this Interrogatory. The information sought may be relevant to, or may lead to evidence relevant to, determining whether Northeast Controls's alleged damages were caused by its own negligence.

3.    Identify all of your employees assigned to work on any file relating to the Underlying Actions, including each such employee's job title and duties.

**ANSWER: Objection. Plaintiffs object to the use of the term "file" as it is vague and undefined in the Definitions and Instructions. Plaintiffs further object to the extent this interrogatory seeks information which is not relevant, and not reasonably calculated to lead to the discovery of admissible evidence.**

**FISHER'S RESPONSE:** St. Paul's Answer is inadequate. St. Paul's assertion that it does not understand the term "file" is not credible. Further, St. Paul's blanket assertion that the Interrogatory seeks information that is "irrelevant" does not constitute a proper basis for refusing to answer this Interrogatory. Nor has St. Paul identified any particular burden or expense involved in answering this Interrogatory. The information sought may be relevant to, or may lead to evidence relevant to, determining whether Northeast Controls's alleged damages were caused by its own negligence.

4.    Identify all files in your possession, custody, or control relating to your policy or policies of insurance issued to Northeast Controls.

**ANSWER: Objection. Plaintiffs object to the use of the term "files" as it is vague and undefined in the Definitions and Instructions. To the extent this interrogatory seeks information regarding policies of insurance that do not relate to the incident or underlying litigations, it is objected to because it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object because it is unreasonably cumulative, and the burden and expense of the proposed discovery outweighs the likely**

FSUR 0063

benefit. **Plaintiffs further object to the extent this interrogatory seeks documents subject to the attorney-client privilege and work product doctrines.**

**FISHER'S RESPONSE:**     St. Paul's Answer is inadequate. St. Paul's assertion that it does not understand the term "files" is meritless. St. Paul has failed to identify even a single employee who worked on files relating to the policy of insurance referenced by plaintiffs in paragraph 7 of the Complaint in this matter. Further, St. Paul's blanket assertion that the Interrogatory seeks information that is "unreasonably cumulative and irrelevant" does not constitute a proper basis for refusing to answer this Interrogatory. Nor has St. Paul identified any particular burden or expense involved in answering this Interrogatory. Finally, this Interrogatory does not seek "documents"; thus, St. Paul's objection that the "interrogatory seek[s] documents subject to the attorney-client privilege and work product doctrines" is without merit. The mere existence of any such files or documents is not privileged and is discoverable. The information sought may be relevant to, or may lead to evidence relevant to, determining whether Northeast Controls's alleged damages were caused by its own negligence.

5.     Identify all files in your possession, custody or control relating to the Incident and/or the Underlying Action.

**ANSWER: Objection. Plaintiffs object to the use of the term "files" as it is vague and undefined in the Definitions and Instructions. Plaintiffs object to this interrogatory to the extent it seeks information in these files which is subject to the attorney-client privilege or work product doctrine. Subject to this objection, see all documents which were**

produced in the Underlying Actions, including, but not limited to, the Representative

Agreement between Fisher Control International, Inc. and Northeast Controls, Inc., dated

January 1, 2000, the confidential Joint Defense Privilege Agreement dated May 2005, and

the expert report of Dr. Robert A. Mostello titled "Report on the Delaware City Explosion

at the Delaware City, Delaware Facility of Motiva Enterprises on May 20, 2000" dated

January 3, 2005.

     **FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. St. Paul's assertion that it

does not understand the term "files" is not credible. Further, St. Paul's objection to the

Interrogatory "to the extent that it seeks information in these files which is subject to the

attorney-client privilege or work product doctrine" is without merit. This Interrogatory asks only

that St. Paul identify relevant files, not disclose the information in those files. The mere existence

of any such files or documents is not privileged, and the existence of those files is discoverable.


     6.    Identify all persons who provided policies of reinsurance relating to your policy or

policies of insurance issued to Northeast Controls.

     **ANSWER: Objection. To the extent this interrogatory seeks information regarding**

**policies of reinsurance that do not relate to the incident or underlying litigations, it is**

**objected to because it is irrelevant and not reasonably calculated to lead to the discovery of**

**admissible evidence. Plaintiffs further object because it is unreasonably cumulative, and**

**the burden and expense of the proposed discovery outweighs the likely benefit.**

FSUR 0065

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. St. Paul has failed to identify any reinsurers, including reinsurers who provided policies of reinsurance that relate to the Incident or Underlying Actions. Further, St. Paul's blanket assertion that the Interrogatory seeks information that is "irrelevant" does not constitute a proper basis for refusing to answer this Interrogatory. Nor has St. Paul identified any particular burden or expense involved in answering this Interrogatory. The information sought may be relevant to, or may lead to evidence relevant to, determining whether Northeast Controls's alleged damages were caused by its own negligence.

## REQUESTS FOR PRODUCTION

1.    Produce all documents identified in your Initial Disclosures.

**ANSWER: All documents identified in Plaintiffs' Initial Disclosures are documents which have been produced in the Underlying Action. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**    Fisher reserves its response to this Answer. Fisher notes, though, that Plaintiffs' Initial Disclosures fail to identify any documents showing proof of payment of any alleged damages.

2.    Produce all documents constituting your claims file for the Incident.

**ANSWER: Objection. Plaintiffs object to this Request for Production as to the use of the term "file" as it is vague and undefined in the Definitions and Instructions. Plaintiffs further object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. St. Paul's assertion that it does not understand the term "file" is not credible. Further, it is not credible that Northeast Controls produced all documents relating to the Incident that were contained in St. Paul's claims file(s). For example, in the Underlying Actions Northeast Controls did not produce any documents showing any communications between it and St. Paul; it did not produce any of St. Paul's internal documents relating to the claim; it did not produce any communications with counsel for the other parties to the Underlying Actions relating to the settlement of those actions; it did not produce prior drafts of the alleged settlement agreements attached as Exhibits H and I to the Complaint in this matter; it did not produce any communications with its own counsel and/or counsel for St. Paul that would have been copied to St. Paul; and it did not produce a copy of even a single canceled check showing that either Northeast Controls or St. Paul actually paid any monies to anyone. All such documents are responsive to this Request. All such documents are, or may be, relevant to determining the cause of plaintiffs' alleged damages.

If St. Paul insists on maintaining this objection, Fisher will move for summary judgment on the ground that there is no evidence that the plaintiffs actually incurred any losses.

FSUR 0067

3.    Produce all documents constituting your underwriting file relating to Northeast Controls and/or the Incident.

**ANSWER: Objection. Plaintiffs object to this Request for Production as to the use of the term "file" as it is vague and undefined in the Definitions and Instructions. Plaintiffs further object to this Request to the extent it seeks information relating generally to Northeast Controls but not directly related to this Incident on the basis that it is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. St. Paul's assertion that it does not understand the term "file" is not credible. Further, it is not credible that, in the Underlying Actions, Northeast Controls produced all documents responsive to this Request. For example, in the Underlying Actions Northeast Controls did not produce a single document that was printed on St. Paul's letterhead or that was otherwise identified as being a St. Paul document. Nor did Northeast Controls produce any documents showing that St. Paul communicated at all with Northeast Controls or any other person or entity. Nor did it produce any of St. Paul's internal documents showing that St. Paul had ever calculated any risk related to Northeast Controls or, for that matter, even issued a policy of insurance to Northeast Controls or collected a premium.

FSUR 0068

St. Paul's objection that the Request "is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence," "to the extent it seeks information relating generally to Northeast Controls" is without merit. St. Paul's underwriting file or files potentially contain documents analyzing Northeast Controls's business practices. Such documents may be relevant to, or may lead to evidence relevant to, determining whether Northeast Controls's alleged damages were caused by its own negligence.

4.      Produce all documents relating to any adjustment of claims relating to the Incident.

**ANSWER: Objection. Plaintiffs object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**      St. Paul's Answer is inadequate. It is not credible that, in the Underlying Actions, Northeast Controls produced all documents responsive to this Request. For example, in the Underlying Actions Northeast Controls did not produce any documents showing any communications between it and St. Paul; it did not produce any of St. Paul's internal documents relating to the claim; it did not produce any communications with counsel for the other parties to the Underlying Actions relating to the settlement of those actions; it did not produce prior drafts of the alleged settlement agreements attached as Exhibits H and I to the Complaint in this matter; it did not produce any communications with its own counsel and/or

counsel for St. Paul; and it did not produce a copy of even a single canceled check showing that

either Northeast Controls or St. Paul actually paid any monies to anyone. All such documents are

responsive to this Request. All such documents are, or may be, relevant to determining the cause

of plaintiffs' alleged damages.

If St. Paul insists on maintaining this objection, Fisher will move for summary judgment

on the ground that there is no evidence that plaintiffs actually incurred any losses.

5.      Produce all documents relating to any settlement or attempted settlement of any or

all of the Underlying Actions or any other claim arising out of the Incident.

**ANSWER: Objection. Plaintiffs object to the extent this Request for Production**

**seeks information which has already been produced in the Underlying Action and is**

**already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the**

**production of such documents is not being sought, Plaintiffs do not possess any documents**

**responsive to this Request.**

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. It is not credible that, in

the Underlying Actions, Northeast Controls produced all documents responsive to this Request.

For example, in the Underlying Actions Northeast Controls did not produce a copy of even a

single canceled check showing that Northeast Controls or St. Paul actually paid any monies to

anyone. Further, Northeast Controls did not produce a copy of any communications with counsel

for Great American Assurance Company or counsel for the Olsons relating to the settlement

agreements attached as Exhibits H and I to the Complaint in this matter. Likewise, Northeast

Controls did not produce any prior drafts of those alleged settlement agreements; nor did it produce any written documents relating to any such prior drafts. Nor did Northeast Controls produce any internal communications, or communications with counsel for Northeast Controls and/or St. Paul, relating to these alleged settlements. All such documents are responsive to this Request. All such documents are, or may be, relevant to determining the cause of plaintiffs' alleged damages. All such documents should be produced.

If St. Paul insists on maintaining this objection, Fisher will move for summary judgment of dismissal as to any claims relating to the alleged settlements.

6.      Produce all documents relating to any policy or policies of insurance that you issued to or for the benefit of Northeast Controls for the period 1993 through 2006.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to the extent this Request for Production seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**     St. Paul's Answer is inadequate. It is not credible that, in the Underlying Actions, Northeast Controls produced all documents responsive to this Request. For example, in the Underlying Actions Northeast Controls did not produce even the insurance

policy that St. Paul allegedly issued to Northeast Controls. St. Paul's insurance policies are

relevant to plaintiffs' allegations in paragraph 7 of the Complaint. Further, those policies may

lead to additional evidence relating to St. Paul's analysis of risks associated with Northeast

Controls and thus may be relevant to, or lead to evidence relevant to, determining the cause of

plaintiffs' claimed damages.

If St. Paul insists on maintaining this objection, Fisher will move for summary judgment

on St. Paul's claim in this action on the ground that St. Paul was not obligated to defend and/or

indemnify Northeast Controls.


7.    Produce all documents relating to any policies of re-insurance relating to any

policy of insurance issued by you to Northeast Controls for the period 1993 through 2006.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the extent it**

**seeks information which is not relevant, nor reasonably calculated to lead to the discovery**

**of admissible evidence. Plaintiffs further object to the extent this Request for Production**

**seeks information which has already been produced in the Underlying Action and is**

**already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the**

**production of such documents is not being sought, Plaintiffs do not possess any documents**

**responsive to this Request.**

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. It is not credible that, in

the Underlying Actions, Northeast Controls produced all documents responsive to this Request.

For example, in the Underlying Actions Northeast Controls did not produce even the insurance

policy that St. Paul allegedly issued to Northeast Controls, much less any policies of reinsurance.

Documents related to policies of reinsurance may lead to additional evidence relating to St. Paul's or other insurers' analysis of risks associated with Northeast Controls, including analysis of Northeast Controls's business practices. Such documents may be relevant to, or may lead to evidence relevant to, determining whether Northeast Controls's alleged damages were caused by its own negligence.

8.    Produce all documents exchanged between you and any other party, including but not limited to Northeast Controls or any re-insurer, relating to any reservation of rights relating to coverage for the Incident.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. In the Underlying Actions Northeast Controls did not produce any documents prepared by St. Paul (or any of its employees or agents) or by any re-insurer (or any of its employees or agents). Such documents may be relevant to, or may lead to evidence relevant to, determining whether Northeast Controls's alleged damages were caused by its own negligence.

FSUR 0073

9.      Produce all documents relating to any analysis or assessment of Northeast Controls' or your exposure for damages or claimed damages arising out of the Incident.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**     St. Paul's Answer is inadequate. It is not credible that, in the Underlying Actions, Northeast Controls produced all documents responsive to this Request. For example, in the Underlying Actions Northeast Controls did not produce any documents showing that either Northeast Controls or St. Paul had conducted any analysis or assessment of any exposure arising out of the Incident. It is not credible that St. Paul, at least, did not conduct any such analysis or assessment. Without any such analysis, St. Paul would not have been able to conclude that it should enter into the settlement agreements set forth in Exhibits H and I to the Complaint in this matter. All such documents—including but not limited to internal communications related to such an analysis and communications among or with counsel for St. Paul and/or Northeast Controls—relating to this issue are responsive to this Request and should be produced.

10.     Produce all documents relating to any analysis or assessment of Northeast Controls' business practices at any time between January 1, 1993, and the present.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:** St. Paul's Answer is inadequate. It is not credible that, in the Underlying Actions, Northeast Controls produced all documents responsive to this Request. For example, in the Underlying Actions Northeast Controls did not produce any documents showing that either Northeast Controls or St. Paul had conducted any analysis or assessment of Northeast Controls's business practices.

Further, St. Paul's assertion that this Request "seeks information which is not relevant" is not a valid ground for objecting to production of responsive documents. Similarly, St. Paul's assertion that this Request is not "reasonably calculated to lead to the discovery of admissible evidence" is without merit. The documents sought may be relevant to, or may lead to evidence relevant to, determining whether Northeast Controls's alleged damages were caused by its own negligence. All such documents should be produced.

11.    Produce all documents relating to the involvement of Becht Engineering, Inc., in the Underlying Actions or in relation to the Incident.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the term "Becht Engineering, Inc." as it is undefined in the Definitions and Instructions. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. St. Paul's objection that "the term Becht Engineering, Inc.' . . . is undefined in the Definitions and Instructions" is not a valid objection, especially in light of the fact that St. Paul referred to "Becht Engineering, Inc." in its Complaint in this matter. See Complaint ¶ 47 & Ex. H at 2. St. Paul's assertion that it does not understand that term is without merit.

This Response is also inadequate because Northeast Controls did not produce in the Underlying Actions any documents relating to Becht Engineering, Inc. ("Becht"). Nor is it credible that St. Paul has only one document relating to Becht (i.e., the settlement agreement attached as Exhibit H to the Complaint). All documents relating to Becht—including but not limited to all communications within St. Paul, within Northeast ControlS, or between counsel for either of those parties and the parties themselves—are responsive to this Request and should be produced.

12.    Produce any mediation letters or memoranda relating to the Incident, including but not limited to any mediation letters or memoranda provided to Vincent A. Bifferato by any party to the Underlying Action.

ANSWER: Objection. Plaintiffs object to this Request for Production to the term "Vincent A. Bifferato" as it is undefined in the Definitions and Instructions. Plaintiffs further object to this Request to the extent it seeks information which is confidential and protected by the work-product doctrine. Plaintiffs further object to this Request for Production to the extent it seeks information which may have been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

**FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. St. Paul's objection that "the term Vincent A. Bifferato' . . . is undefined in the Definitions and Instructions" is not a valid objection. Counsel for plaintiffs was involved in at least one mediation before Vincent A. Bifferato. St. Paul's assertion that it does not understand that term is without merit.

St. Paul's objection "to this Request to the extent it seeks information which is confidential and protected by the work-product doctrine" is also without merit. The fact that a document is or may be "confidential" does not shield it from production. Further, any responsive documents provided to third parties are not confidential and must be produced.

This Response is also inadequate because Northeast Controls did not produce any responsive documents in the Underlying Actions. Northeast Controls presumably provided at least one mediation letter or memorandum to Mr. Bifferato in relation to that mediation. That document at least should be produced. In addition, if St. Paul has withheld any documents responsive to this Request on the basis of the work-product privilege, those documents should be identified on a privilege log.

13.    Produce any and all correspondence or other documents relating to the Valve, the

ASU, the DCPP, the DCPPRP, the Incident, or the Underlying Actions exchanged between you

and any person or entity, including but not limited to the following:

i.      Battaglia;

ii.     Becht Engineering, Inc.;

iii.    Vincent A. Bifferato;

iv.     Conectiv;

v.      Cozen O'Connor;

vi.     Donald Davis;

vii.    Fisher;

viii.   Great American;

ix.     Hydrochem;

x.      J.J. White;

xi.     Joseph Handlon;

xii.    Richard Hohn;

xiii.   Hohn & Scheuerle;

xiv.    F. Warren Jacoby;

xv.     James Keller;

xvi.    Christopher Konzelmann;

xvii.   Mark Levy;

FSUR 0078

    xviii.   Paul Lukoff;

    xix.   Margolis Edelstein;

    xx.   Motiva;

    xxi.   The Olsons;

    xxii.   Parsons;

    xxiii.   Praxair;

    xxiv.   Joseph Riches;

    xxv.   Prickett, Jones & Elliott;

    xxvi.   Randall Robbins;

    xxvii.   Saul Levy LLP;

    xxviii.  Texaco;

    xxix.   Michael K. Tighe;

    xxx.   Tighe, Cottrell & Logan, P.A.;

    xxxi.   White & Williams LLP.

ANSWER: Objection. Plaintiffs object to this Request for Production to the use of the terms "Becht Engineering, Inc.; Vincent A. Bifferato; Cozen O'Connor; Donald Davis; Joseph Handlon; Richard Hohn; Hohn & Scheuerle; F. Warren Jacoby; James Keller; Christopher Konzelmann; Mark Levy; Paul Lukoff; Margolis Edelstein; Joseph Riches; Prickett, Jones & Elliott; Randall Robbins; Saul Levy LLP; Michael Tighe; Tighe, Cottrell & Logan, P.A.; and White & Williams, LLP" to the extent these terms are vague and undefined in the Definitions and Instructions. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the

**Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

    **FISHER'S RESPONSE:**    St. Paul's Answer is inadequate. St. Paul's objection that the various terms are "vague and undefined" is without merit. All of these people or entities are well known to St. Paul through the Underlying Actions. Further, St. Paul incorporated the terms "Becht Engineering, Inc.," "Christopher Konzelmann," and "White and Williams, LLP" into the Complaint in this matter. See Complaint ¶ 47 & Ex. H at 2.

    Further, it is not credible that Northeast Controls produced in the Underlying Actions all documents responsive to this Request. Counsel for Northeast Controls presumably engaged in negotiations with Christopher Konzelmann and/or White and Williams LLP, attorneys for Great American Assurance Company, in reaching the settlement agreement attached as Exhibit H to the Complaint. Further, counsel for Northeast Controls presumably engaged in negotiations with Randall Robbins and/or Joseph Handlon in reaching the settlement agreement attached as Exhibit I to the Complaint. Further, it is likely that, at the very least, there were cover letters to those agreements and drafts of those agreements. Further, there were, presumably, checks sent to counsel for Great American and counsel for the Olsons to effectuate those settlements. None of those documents were produced by Northeast Controls in the Underlying Actions.

    If St. Paul continues to refuse to produce responsive documents, Fisher will move for summary judgment on the ground that there is no evidence of damages.

14.    Produce any and all documents relating to any other claims made on any policy of insurance issued by you to Northeast Controls during the period 1993 to the present.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**    St. Paul's objection that this Request seeks "information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence" is without merit. Responsive documents may be relevant to, or may lead to evidence relevant to, determining the cause of Northeast Controls's alleged losses, including its business practices.

Further, it is not credible that Northeast Controls produced in the Underlying Actions all documents responsive to this Request. Northeast Controls did not produce any documents relating to other claims against it.

15.    Produce any and all correspondence and other documents exchanged by you and any other insurer or insurers, or any re-insurer or re-insurers, relating to the Incident or any claim or lawsuit relating to the Incident.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

**FISHER'S RESPONSE:**    St. Paul's objection that this Request seeks " information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence" is without merit. Responsive documents may be relevant to, or may lead to evidence relevant to, determining the cause of Northeast Controls's alleged losses.

Further, it is not credible that Northeast Controls produced in the Underlying Actions all documents responsive to this Request. Northeast Controls did not produce any documents exchanged between St. Paul and other insurers. It is highly likely that such documents exist. For example, St. Paul presumably exchanged documents at least with Great American Assurance Company, as evidenced by the settlement agreement attached as Exhibit H to the Complaint in this matter. Such documents likely included prior drafts of Exhibit H along with correspondence related to those drafts. All such documents are responsive to this Request and should be produced.

16.    Produce any and all documents relating to your document retention policy in effect for the period 1993 to the present.

ANSWER: Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

FISHER'S RESPONSE:    St. Paul's objection that this Request seeks " information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence" is without merit. Responsive documents may assist in determining whether St. Paul has in fact produced all documents responsive to these discovery requests.

Further, it is not credible that Northeast Controls produced in the Underlying Actions all documents responsive to this Request. Northeast Controls did not produce any documents relating to St. Paul's document retention policy. It is probable that St. Paul has a document retention policy. Thus, there should be documents relating to that policy, and those documents should be produced.

17.    Produce all reports in your possession or control prepared by any and all experts who will testify at the time of trial.

ANSWER: Objection. Plaintiffs object to this Request for Production to the extent that Plaintiffs have not yet retained any experts in this matter. Plaintiffs reserve their right to supplement this response as discovery continues. Plaintiffs further object to this Request

for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

> **FISHER'S RESPONSE:**    Fisher reserves its response to this Answer.

18.    Produce the complete files relating to the opinions or testimony of any and all experts who will testify at the time of trial.

**ANSWER: Objection. Plaintiffs object to this Request for Production to the extent that Plaintiffs have not yet retained any experts in this matter. Plaintiffs reserve their right to supplement this response as discovery continues. Plaintiffs further object to the extent this request seeks information which is beyond the requirements of the applicable federal rules for expert information disclosure. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.**

> **FISHER'S RESPONSE:**    Fisher reserves its response to this Answer.

19.    Produce the curriculum vitae of any and all experts who will testify at the time of trial.

ANSWER: Objection. Plaintiffs object to this Request for Production to the extent that Plaintiffs have not yet retained any experts in this matter. Plaintiffs reserve their right to supplement this response as discovery continues. Plaintiffs further object to this Request for Production to the extent it seeks information which has already been produced in the Underlying Action and is already in the possession of Defendant's counsel. Pursuant to Fisher's Note that the production of such documents is not being sought, Plaintiffs do not possess any documents responsive to this Request.

FISHER'S RESPONSE:    Fisher reserves its response to this Answer.

RIDDELL WILLIAMS P.S.

By:    Patrick D. McVey
       *Pro hac vice*
       Daniel J. Gunter
       *Pro hac vice*
       Riddell Williams P.S.
       1001 Fourth Avenue Plaza, Suite 4500
       Seattle, WA 98154
       (206) 624-3600 (Tel.)
       (206) 389-1700 (Fax)
       pmcvey@riddellwilliams.com
       dgunter@riddellwilliams.com

Date: January 29, 2007

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHEAST CONTROLS, Inc.; and | ) | |
| ST. PAUL MERCURY INSURANCE Co., | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. A. No. 06-412-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| FISHER CONTROLS INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### NORTHEAST CONTROLS, Inc.'s RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST DISCOVERY REQUESTS

COMES NOW Plaintiff Northeast Controls, Inc., by and through Counsel, and hereby

responds to Defendant's First Discovery Requests to Plaintiff Northeast Controls, Inc., as

follows, to wit:

### General Answers and Objections

Plaintiffs hereby incorporate by specific reference the "General Answers and Objections"

stated within Fisher's *Answers to Interrogatories of Plaintiffs, Northeast Controls, inc. and ASt.*

*Paul Mercury Insurance Company Directed to Defendant, Fisher Controls International, LLC –*

*Set II,* (D.I. # __), a Notice of Service of which appears not to have been docketed, but which

were dated May 24, 2007, by Fisher and received by Northeast via e-mail the same date and via

regular mail the next business day, as if fully restated herein.  All answers and responses stated

herein are subject to all applicable objections and/or privileges, which are preserved, whether

fully restated within each answer or response or not.

Further, Northeast Controls, Inc., (*hereinafter* "Northeast"), reserves the right to

supplement its Responses herein as provided by the Federal Rules of Civil Procedure.

## Answer to Interrogatories

**Interrogatory No. 1**: Identify all persons who answered or assisted in answering these Interrogatories and Requests for Production.

**Response to Interrogatory No. 1**:    Scott Shannon, Esquire, and Thomas Wagner, Esquire, of the law firm of Marshall Dennehey Warner Coleman & Goggin; Mary Elizabeth Slevin, Esquire, of the law firm of Stockli Greene & Slevin, LLP, 90 State Street, Albany, New York; Steven M. Sabia, Manager, Inside Sales & Account Manager, Northeast Controls, Inc.

**Interrogatory No. 2**: Identify all documents relating to your quality management system processes, as referenced on your website.

**Response to Interrogatory No. 2**:    The phrase "quality management system processes" was not found upon a search of Northeast's website, at http://www.northeastcontrols.com/ . The closest reference discovered thereon is specific to Emerson/Fisher products and is a reference to the "process management systems" through Emerson/Fisher for its products. The specific language referenced apparently is only found at http://www.northeastcontrols.com/ , the website homepage, and reads [copied and pasted verbatim from the website as it existed on May 30, 2007, with text converted to Times New Roman 12 point type for consistency with this document]: "Northeast Controls, the local Manufacturer's Representative for Fisher Controls and Fisher-Rosemount Systems in NY state, Western Massachusetts, and Southern Vermont for over 30 years, is dedicated to serving customer needs with process management solutions, integration of automated control valves, regulators, transmitters, analyzers, control systems, and process management systems."

Corollary text from the Emerson Process Management webpage,

http://www.emersonprocess.com/systems/reach/na.htm , contains the following description

[copied and pasted verbatim from the website as it existed on May 30, 2007, with text converted

to Times New Roman 12 point type for consistency with this document]: "Emerson Process

Management, Process Systems provides sales and services in North America through a network

of independent representatives. Select your location using the territory map below or North

American representatives can be found alphabetically in the drop-down menu." That webpage

includes a list of its "independent representatives", and a map of their territories, and including

[copied and pasted verbatim as the image exists on the website]:

| Northeast Controls, Inc. | 3 Enterprise Avenue<br>Clifton Park, NY 12065 | (518) 664-6600 | (518) 664-9280 |
|---|---|---|---|
| | 6000 N. Bailey Ave., Suite 2B<br>Amherst, NY 14226 | (716) 831-1960 | (716) 831-1966 |
| | 75 Goodway Drive, Suite 1<br>Rochester, NY 14623 | (585) 427-7870 | (585) 427-2341 |

Consequently, any such documents "relating to" Northeast's "quality management system

processes" to the extent that is a valid identifier, would be documents authored by, originating

from, and provided to Northeast by Emerson Processes and would be with respect to Emerson

Processes' "quality management system processes" and not Northeast's.

**Interrogatory No. 3**: Identify all documents relating to your ISO 9001:2000

certification, as referenced on your website.

**Response to Interrogatory No. 3**:    Northeast is willing to provide copies of the Quality

Manual and Process Maps relative to the ISO 9001 certification, to the extent they may be either

relevant or reasonably calculated to lead to the discovery of relevant and/or admissible evidence

and production would not be unduly burdensome, however the Company did not commence the

process of seeking ISO 9001 certification until late 2002 and was not ISO 9001 certified until

November, 2003. At the time of the ordering of the Valve at issue and the subsequent Incident,

Northeast was not ISO 9001 certified and Northeast therefore objects as the requested

information is not interposed for any proper purpose under the Federal Rules of Civil Procedure.


### Requests for Production

**Request No. 1**:        Produce all documents identified in your responses to Fisher's

Interrogatories.

**Response to Request No. 1**: Please see responses to Interrogatory Nos. 2 and 3.


**Request No. 2**:        Produce all documents relating to any policy of insurance issued to

you by St. Paul.

**Response to Request No. 2**: The policy of insurance covering the Incident is

TE06401049, effective January 1, 2000. That policy was produced under cover of

correspondence to Fisher by Gunter dated March 5, 2007 (a copy of the letter of transmittal is

attached hereto and Bates Numbered "NECF 0001"). Northeast objects to production of any

other policies of insurance as the request is not being interposed for any proper purpose under the

Federal Rules of Civil Procedure.


**Request No. 3**:        Produce all documents relating to any claim that you made to St.

Paul relating to the Incident or the Underlying Actions.

**Response to Request No. 3**: The St. Paul claims file was previously provided to Fisher

by St. Paul within its responses to Fisher's *Discovery Requests*. In addition, as to documents

within Northeast's possession, attached hereto please find correspondence dated July 27, 2000, from Crane, Greene & Parente by Slevin to St. Paul Fire and Marine Insurance by Frock; providing in response to Frock's request certain documents related to the Incident; and correspondence of the same date by Crane, Greene & Parente by Slevin to Rawle & Henderson by Wagner, confirming Wagner's assignment as litigation counsel for Northeast. (Bates Numbers NECF 0006 through NECF 0008 hereto).

Northeast Controls does not possess a copy of any written claim to St. Paul relating to the Incident. All subsequent correspondence is between Northeast's corporate counsel, (primarily by Slevin), to Northeast's litigation counsel (primarily by Wagner), and would be subject to the attorney/client and/or attorney work-product privileges.

**Request No. 4**:        Produce all documents relating to any claim that you made to any other insurance company, insurance agent, claims adjuster, claims investigator, or other person relating to the Incident or the Underlying Actions.

**Response to Request No. 4**: There were no other claims to any other insurance company or person, except as reflected in the pleadings to the Underlying Actions in which Northeast was a party and in which counterclaims, and/or cross-claims, and or third-party claims for contribution and/or indemnification were asserted within the context of those actions.

**Request No. 5**:        Produce all documents relating to the ordering of the Valve.

**Response to Request No. 5**: All documents relating to the ordering of the valve have been previously provided to Fisher by Northeast on multiple occasions, most recently during Fisher's by Daniel J. Gunter, Esquire's, document review on March 5th – 6th, 2007, at the law

offices of Marshall Dennehey Warner Coleman & Goggin, located at 1845 Walnut Street, 21st

floor, Philadelphia, Pennsylvania, during which full access was provided to Mr. Gunter to

Northeast litigation counsel's 51 document boxes of all pleadings, correspondence and materials

concerning the Underlying Litigation and within which 51 boxes were contained any and all

documents in Northeast's possession and control responsive to this Request.

Previously, the documents sought within this request were provided to all parties in the

Underlying Litigation, including Fisher, through Northeast's responses to discovery requests

therein; and subsequently to those Underlying Litigation parties who were signatories to the Joint

Defense Agreement through the auspices of Fisher by Patrick D. McVey, Esquire, in the form of

a binder in which were compiled not only the requested documents, but additionally order

documents for unrelated valves which Fisher by McVey deemed similar and informative for the

purposes of the party-defendants' defenses to the claims within the Underlying Litigation.

The document attached hereto and Bates Numbered NECF 0096 through NECF 0331

consistent of all documents Northeast understands to "relate to" the ordering of the Valve. (**N.B.:**

There may be some duplication of documents and the inclusion of documents relating to the

ordering of valves other than the Valve, which duplication or inclusion of otherwise non-

responsive documents was unintentional, to the extent such occurred).


**Request No. 6**:       Produce all documents that provide any sort of guide, instruction,

advice, or standard for you or your employees in regard to the process by which sales and

ordering of products are to be conducted.

**Response to Request No. 6**: No documents responsive to this Request for any period of

time prior to 2001 are in Northeast's possession or remain in existence, unless or to the extent

any responsive documents were produced by Northeast in the Underlying Actions, and were made available to Fisher by Gunter during the March 5th – 6th, 2007, document review conducted by Gunter, as explained more fully in Response to Request No. 5, *supra*. *See also*, Response to Request No. 15, *infra*, for Northeast's document retention policy.

**Request No. 7**:     Produce all documents relating to your quality management system processes, as referenced on your website.

**Response to Request No. 7**: See Response to Interrogatory No. 2, *supra*.

**Request No. 8**:     Produce all documents relating to your ISO 9001:2000 certification, as referenced on your website.

**Response to Request No. 8**: See Response to Interrogatory No. 3, *supra*.

**Request No. 9**:     Produce all documents relating to any ISO certification, or request for certification, that you have ever received or made.

**Response to Request No. 9**: See Response to Interrogatory No. 3, *supra*.

**Request No. 10**:     Produce all documents relating to training, instruction, advice, or standards applicable to the work performed by your employee Albert Cappellini in ordering the Valve.

**Response to Request No. 10**:     All documented training of Albert Cappellini was provided by Fisher and would be in the possession of Fisher.  In addition, see Response to

Request No. 5, *supra*, concerning the March 5th – 6th, 2007, document review conducted by Fisher.

**Request No. 11**:    Produce all documents relating to the hiring, training, promotion, demotion or duties of your employee Albert Cappellini.

**Response to Request No. 11**:    Responsive documents are attached hereto and Bates Numbered NECF 0009 through NECF 0089, and consisting of Cappellini's performance evaluations and reviews.  As to training, other than as reflected within the attached documents, please see Response to Request No. 10, *supra*.

**Request No. 12**:    Produce all documents relating to Becht Engineering, Inc., as referenced in Exhibit H to your Complaint in this matter.

**Response to Request No. 12**:    Northeast has no documents responsive to this request.  For a further response, *see* Response to Request No. 21, *infra*, addressing the requests for the files of Bruno Karcher and Becht Engineering, Inc., at the third paragraph therein.

**Request for Production No. 13**:    Produce all documents relating to the Valve, the ASU, the DCPP, the DCPPRT, the Incident and/or the Underlying Actions.

**Response to Request No. 13**:    See Response to Request No. 5, *supra*.  By way of further response, Northeast's litigation counsel, by Wagner, has in its possession a total of 51 boxes of documents generated during the Underlying Action which are, in whole or in part, responsive to this Request and which, pursuant to the agreement reached by the Parties during the Rule 37 teleconference held on February 9, 2007, as memorialized by correspondence from

Northeast by Wagner to Fisher by Gunter on February 14, 2007, (attached hereto and Bates

Numbered NECF 0002 through NECF 0005), were produced for Fisher by Gunter's review and

inspection on March 5th – 6th, 2007, at the law offices of Marshall Dennehey Warner Coleman &

Goggin, located at 1845 Walnut Street, 21st floor, Philadelphia, Pennsylvania, during which

review full access to Northeast litigation counsel's 51 document boxes were provided to Mr.

Gunter, and during which certain documents identified by Mr. Gunter were copied and provided

to him.

This Request, at this time, in this form, is objected to as unduly burdensome given both

the volume of documents arguably responsive to the Request, all or most of the 51 document

boxes referenced *supra*, and in light of the document review and access provided to Fisher on

March 5th – 6th, 2007, which was intended to avoid the burden associated with such production.


**Request for Production No. 14**:     Produce any and all correspondence or other

documents relating to the Valve, the ASU, the DCPP, the DCPPRP, the Incident, or the

Underlying Actions exchanged between you and any person or entity, including but not limited

to the following:

|      |                         |
|------|-------------------------|
| i.   | Battaglia;              |
| ii.  | Becht Engineering, Inc.; |
| iii. | Conectiv;               |
| iv.  | Cozen O'Connor;         |
| v.   | Donald Davis;           |
| vi.  | Fisher;                 |
| vii. | Great American;         |
| viii.| Hydrochem;              |
| ix.  | JJ White;               |
| x.   | Joseph Handlon;         |
| xi.  | Richard Hohn;           |
| xii. | F. Warren Jacoby;       |
| xiii.| James Keller;           |
| xv.  | Christopher Konzelman;  |

xvi.   Mark Levy;
xvii.  Paul Lukoff;
xviii. Margolis Edelstein;
xix.   Motiva;
xx.    The Olsons;
xxi.   Parsons;
xxii.  Praxair;
xxiii. Joseph Riches;
xxiv.  Pricket Jones & Elliott;
xxv.   Randall Robbins;
xxvi.  Saul Levy LLP;
xxvii. Texaco;
xxviii. Michael K. Tighe;
xxix.  Tighe Cottrell & Logan, P.A.;
xxx.   White and Williams LLP;

**Response to Request No. 14**:      *See* Response to Request No. 13, *supra*.


**Request No. 15**:      Produce any and all documents relating to your document retention

policy in effect for the period 1995 to the present.

**Response to Request No. 15**:      Attached hereto and Bates Numbered NECF 0090

through NECF0095. After reasonable investigation, Northeast was unable to locate any prior

versions of its document retention policy.


**Request No. 16**:      Produce any and all correspondence and other documents

exchanged between you and any insurer or insurer relating to the Incident or any claim or lawsuit

relating to the Incident.

**Response to Request No. 16**:      The St. Paul claims file was previously produced.

*See also* Response to Request No. 3, *supra*.

**Request No. 17**:    · Produce any and all correspondence or other documents exchanged between you and any other person or entity relating to any claim or lawsuit relating to the Incident. ·

**Response to Request No. 17**:    *See* Response to Request No. 13, *supra*.

**Request No. 18**:    Produce all reports in your possession or control prepared by any and all experts who will testify at the time of trial.

**Response to Request No. 18**:    The deadline for submission of Northeast's experts' reports in this matter is July 20, 2007.  This Response will be supplemented as responsive documents are obtained by Northeast.

**Request No. 19**:    Produce the complete files relating to the opinions or testimony of any and all experts who will testify at the time of trial.

**Response to Request No. 19**:    *See* Response to Request No. 18, *supra*.

**Request No. 20**:    Produce the curriculum vitae of any and all experts who will testify at the time of trial.

**Response to Request No. 20**:    *See* Response to Request No. 18, *supra*.

**Request No. 21**:    Produce the complete files of the following persons relating to any inspection, investigation or analysis of the Incident:

      i.     Gerard Muller;
      ii.    Irving Glassman;
     iii.   David Pope;
     iv.   Bruno Karcher;

v.    Becht Engineering, Inc.

**Response to Request No. 21**:    The files of Messrs. Muller and Pope are being

reproduced and will be provided to supplement these *Responses* upon their receipt by Northeast's

litigation counsel.

Dr. Glassman was contacted by Northeast litigation counsel Scott Shannon, Esquire, and

in response to Shannon's request for his files, Dr. Glassman related to Shannon that within the

last year he disposed of his closed files, including all of the documents and records he compiled

for his work in this matter. Northeast has no documents in its possession responsive to this

Request, and Dr. Glassman did not provide any conclusions, opinions or reports to Northeast

during his retention as a consulting expert.

Northeast has neither possession nor control of any files of Mr. Karcher or his employer

Becht Engineering, Inc., which documents are the subject of Fisher's subpoena request to

Christopher Konzelman, Esquire, for same, which subpoena Northeast will not oppose pursuant

to the stipulations regarding discovery as agreed upon by the Parties during the February 9, 2007,

Rule 37 teleconference as memorialized in the correspondence from Northeast by Wagner to

Fisher by Gunter dated Febrary 14, 2007, (NECF 0002 through NECF 0005), and as stated

within the three bullet points within the bottom half of page 2 therein, (NECF 0003).

[this space intentionally left blank]

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
_/s/Thomas P. Wagner_____
Thomas P. Wagner, Esquire (*pro hac vice*)
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
tel.: 215.575.4562
e-mail: tpwagner@mdwcg.com
*Of Counsel for Plaintiffs*


Dated: June 1, 2007

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
_/s/Joseph Scott Shannon_____
Joseph Scott Shannon, Esquire (I.D. 3434)
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899 – 8888
tel.: 302.552.4329
e-mail: jsshannon@mdwcg.com
*Counsel for Plaintiffs*

FSUR 0098

EXHIBIT 10

**Gunter, Dan**

| | |
|---|---|
| **From:** | Gunter, Dan |
| **Sent:** | Wednesday, June 06, 2007 11:03 AM |
| **To:** | 'Shannon, J. Scott' |
| **Cc:** | McVey, Patrick; 'Paul A. Bradley' |
| **Subject:** | Northeast Controls |
| **Attachments:** | QualityPolicy.pdf |

Scott--

Thanks for your discussion today. I'm forwarding the page from the NEC website that references its quality management system processes.

I look forward to speaking with you on Friday at 10:30 a.m. PDT/1:30 p.m. EDT.

Best regards,

Dan

FSUR 0099

2/27/2008

NORT

## Quality Policy



Northeast Controls will be known as a recognize
bringing technology and engineering together t
innovative solutions to satisfy customer's requir
process control and industrial automatio



We will succeed in building lasting relationships t
consistently superior products and services tha
quantifiable business results and by continually
our quality management system processe

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

NORTHEAST CONTROLS, Inc.; and )
ST. PAUL MERCURY INSURANCE COMPANY,)
                             )
          Plaintiffs,     )     No. 06-412 SLR
                             )
    v.               )
                             )
FISHER CONTROLS INTERNATIONAL, LLC, )
                             )
          Defendant.    )

**NORTHEAST CONTROLS, Inc.'s
ANSWERS AND RESPONSES TO DEFENDANT'S
FIRST REQUESTS FOR ADMISSIONS DIRECTED TO NORTHEAST CONTROLS**

COMES NOW Plaintiff Northeast Controls, Inc., by and through Counsel, and pursuant

to Fed. R. Civ. P. 36, hereby answers and responds to Defendant Fisher Controls International,

LLC's ("Fisher") *First Requests for Admissions* as follows, to wit:

**General Answers and Objections**

Plaintiffs hereby incorporate by specific reference the "General Answers and Objections"

stated within Fisher's *Answers to Interrogatories of Plaintiffs, Northeast Controls, Inc. and St.

Paul Mercury Insurance Company Directed to Defendant, Fisher Controls International, LLC –

Set II*, dated May 24, 2007, by Fisher and received by Northeast via e-mail the same date and via

regular mail the next business day, as if fully restated herein. All answers and responses stated

herein are subject to all applicable objections and/or privileges, which are preserved, whether

fully restated within each answer or response or not.

Further, Northeast Controls, Inc., (*hereinafter* "Northeast"), reserves the right to

supplement its Responses herein as provided by the Federal Rules of Civil Procedure.

<u>Responses to Requests for Admissions</u>

<u>Request for Admission No. 1</u>:        Admit that Praxair's representative Bhim Bhakoo

signed or initialed a document setting forth specifications for the materials of construction for the

"629 Valve", which document is attached as Exhibit 1 to the *Requests for Admission*.

<u>Response No. 1</u>:        Admitted.


<u>Request for Admission No. 2</u>:        Admit that the document attached as Exhibit 1 to

these Requests for Admission is a true and correct copy of the only document exchanged

between Northeast Controls and Praxair showing the materials of construction for the 629 Valve

that was signed or initialed by any person acting on behalf of Praxair.

<u>Response No. 2</u>:        Admitted.


<u>Request for Admission No. 3</u>:        Admit that the document attached as Exhibit 2 to

these Requests for Admissions is a true and correct copy of a purchase order that Praxair sent to

Northeast Controls.

<u>Response No. 3</u>:        With the exception of the handwritten notations shown on the

document, which Northeast denies as having been present when the purchase order was

submitted, it is admitted that Exhibit 2 is a true and correct copy of the purchase order sent by

Praxair to Fisher Controls.


<u>Request for Admission No. 4</u>:        Admit that the document attached as Exhibit 2 to

these Requests for Admission is a true and correct copy of the only purchase order that Praxair

sent to Northeast Controls that relates to the 629 Valve.

Response No. 4:    It is admitted that the document attached as Exhibit 2 to these *Requests for Admissions*, as qualified by Response No. 3, *supra*, is the only purchase order that Praxair sent to Fisher controls that relates to the 629 Valve.

Request for Admission No. 5:    Admit that the document attached as Exhibit 2 to these Requests for Admission references the specification sheet dated June 3, 1998, a true and correct copy of which specification sheet is attached hereto as Exhibit 1.

Response No. 5:    It is admitted that the document attached as Exhibit 2 to these *Requests for Admissions*, as qualified by Response No. 3, *supra*, states "In accordance with Buyer's Drawing A-2272740 Dated 6/3/98."

Request for Admission No. 6:    Admit that, after receiving the document attached as Exhibit 2 to these Requests for Admission, Northeast Controls placed an order with Fisher for the 629 Valve.

Response No. 6:    Denied.  Praxair placed its order with Fisher through submission to Northeast Controls of the document attached as Exhibit 2 to these *Requests for Admissions*, as qualifed by Response No. 3, *supra*.

Request for Admission No. 7:    Admit that Northeast Controls placed an order with Fisher for the 629 Valve.

Response No. 7:    Denied.  See Response No. 6, *supra*.

FSUR 0103

Request for Admission No. 8:    Admit that the materials of construction for the 629

Valve's disk, stem, seal ring, and thrust bearing, as identified in the order that Northeast Controls

placed with Fisher, did no match the materials of construction set forth on the document attached

as Exhibit 1 to these Requests for Admission.

Response No. 8:    Denied in part, and Northeast Controls is unable to either admit or

deny in part. It is denied that Northeast Controls placed an order with Fisher; the Purchase Order

attached as Exhibit 2 to the *Requests for Admissions*, as qualified by Response No. 3, *supra*, was

Praxair's order to Fisher. *See* Response No. 6, *supra*. After reasonable investigation, the

information that is known or readily available to Northeast Controls is insufficient to enable

Northeast Controls to either admit or deny this Request. By way of further answer, under the

Fisher order processing system ("OPS") then in place during the relevant time period and utilized

by Northeast Controls to transmit orders generally, and the Praxair order specifically, to Fisher

Controls, the specifications for the 629 Valve were inputted by a Northeast Controls employee

into a Fisher Controls proprietary computer program (OPS) and electronically transmitted by

Northeast Controls to Fisher Controls, per Fisher Controls' specifications for use of the OPS

system. No hard copy printout of the input data for the 629 Valve was retained by Northeast

Controls and the computer program contained no means for Northeast Controls to save the data

inputted into the OPS system nor to convert it to a printed document.

Request for Admission No. 9:    Admit that the order that Northeast controls placed

with Fisher calls for the disk of the 629 Valve to be manufactured of Hastelloy C.

Response No. 9:    *See* Response No. 8, *supra*.

Request for Admission No. 10:    Admit that the written specification document signed or initialed by Praxair's representative Bhim Bhakoo and dated June 3, 1998, calls for the disk of the 629 Valve to be manufactured of Monel.

Response No. 10:    Admitted.

Request for Admission No. 11:    Admit that the order that Northeast Controls placed with Fisher calls for the stem of the 629 Valve to be manufactured of Inconel.

Response No. 11:    *See* Response No. 8, *supra.*

Request for Admission No. 12:    Admit that the written specification document signed or initialed by Praxair's representative Bhim Bhakoo and dated June 3, 1998, calls for the stem of the 629 Valve to be manufactured of Monel.

Response No. 12:    Admitted.

Request for Admission No. 13:    Admit that the order that Northeast Controls initially placed with Fisher calls for the seal of the 629 Valve to be manufactured of Tefzel.

Response No. 13:    *See* Response No. 8, *supra.*

Request for Admission No. 14:    Admit that the written specification document signed or initialed by Praxair's representative Bhim Bhakoo and dated June 3, 1998, calls for the seal of the 629 Valve to be manufactured of Monel/PTFE.

Response No. 14:    Admitted.

Request for Admission No. 15:    Admit that the order that Northeast Controls placed with Fisher calls for the guide material of the 629 Valve to be manufactured of PTFE composite.

Response No. 15:    *See* Response No. 8, *supra*.

Request for Admission No. 16:    Admit that the written specification document signed or initialed by Praxair's representative Bhim Bhakoo and dated June 3, 1998, calls for the guide material of the 629 Valve to be manufactured of Monel.

Response No. 16:    Admitted.

Request for Admission No. 17:    Admit that, prior to May 20, 2000, Northeast Controls did not inform Fisher that the written specification document signed or initialed by Praxair's representative Bhim Bhakoo and dated June 3, 1998, calls for the disk of the 629 Valve to be manufactured of Monel.

Response No. 17:    *See* Response No. 8, *supra*.

Request for Admission No. 18:    Admit that, prior to May 20, 2000, Northeast Controls did not inform Fisher that the written specification document signed or initialed by Praxair's representative Bhim Bhakoo and dated June 3, 1998, calls for the stem of the 629 Valve to be manufactured of Monel.

Response No. 18:    *See* Response No. 8, *supra*.

Request for Admission No. 19:    Admit that, prior to May 20, 2000, Northeast Controls did not inform Fisher that the written specification document signed or initialed by

FSUR 0106

Praxair's representative Bhim Bhakoo and dated June 3, 1998, calls for the seal of the 629 Valve

to be manufactured of Monel/PTFE.

<u>Response No. 19</u>:      *See* Response No. 8, *supra*.


<u>Request for Admission No. 20</u>:      Admit that, prior to May 20, 2000, Northeast

Controls did not inform Fisher that the written specification document signed or initialed by

Praxair's representative Bhim Bhakoo and dated June 3, 1998, calls for the guide material of the

629 Valve to be manufactured of Monel.

<u>Response No. 20</u>:      *See* Response No. 8, *supra*.


<u>Request for Admission No. 21</u>:      Admit that, when Northeast Controls placed the

order for the 629 Valve with Fisher, the specifications provided by Praxair to Northeast showed

that the 629 Valve would be used in oxygen service.

<u>Response No. 21</u>:      Denied in part, admitted in part.  See Response No. 8, *supra*.  By

way of further response, it is admitted that at the time Northeast Controls received from Praxair

the order Praxair placed with Fisher Controls, the specifications showed that Valve 629 would be

used in oxygen service.


<u>Request for Admission No. 22</u>:      Admit that, when Northeast Controls initially

placed the order for the 629 Valve with Fisher, the information provided at that time by

Northeast Controls to Fisher did not show that the 629 Valve would be used in oxygen service.

<u>Response No. 22</u>:      Denied as stated.  Praxair placed the order with Fisher Controls.

*See* Response No. 8, *supra*.  By way of further response, the order confirmation returned to

Northeast Controls from Fisher Controls for Valve 629 states in part "Type A11 Control Valve Assembly Size 12, Type Degreasing, . . . ." The designation of "Type Degreasing", per Fisher's specifications, shows that Valve 629 would be used in oxygen service.

Request for Admission No. 23:    Admit that, when Northeast Controls placed the order for the 629 Valve with Fisher, the written specifications provided by Praxair to Northeast Controls showed that the 629 Valve would be used in oxygen service with oxygen up to a pressure of 1165 psia.

Response No. 23:    Denied as stated.  Praxair placed its order with Fisher.  By way of further response, at the time Praxair placed its order with Fisher, several different specifications concerning the oxygen service had been provided to Northeast Controls by Praxair, including a reference to 1165.000 psia "MAX" and "NRM" for Service Condition P2; 1167.000 psia "MAX" and "NRM" for Service Condition P1 (NECF0116, 0319, 0320, 0321); 1150 psig operating pressure with a max pressure of 1300 psig; max operating pressure would be 1060 psid (see NECF0131); 1164.000 psia "MAX" for Service Condition P2 (NECF 0316); "Inlet Pressure (psia)" of 1167.000 "NRM" and "MAX" (NECF0317, 0322); and there may be other specifications provided to Northeast Controls by Praxair concerning the 629 Valve.

Request for Admission No. 24:    Admit that, when Northeast Controls placed the order for the 629 Valve with Fisher, the written specifications provided by Praxair to Northeast Controls showed that the 629 Valve would be used in oxygen service with oxygen at temperatures up to 250° Fahrenheit.

<u>Response No. 24</u>:    Denied as stated. Praxair placed its order with Fisher. By way of further response, at the time Praxair placed its order with Fisher, Northeast had received specifications from Praxair showing the "Service Conditions" and/or operating temperature to be, variously, in degrees Fahrenheit, 242.000° (NECF0109, 0111); 250° (NECF0110, 0115, 0116, 0117); "Critical Temperature (deg F)" -181.070° "NRM" and "MAX" (NECF0117); and there may be other specifications provided to Northeast Controls by Praxair concerning the 629 Valve.

<u>Request for Admission No. 25</u>:    Admit that, in placing orders with Fisher for any Fisher valve or other product, it is Northeast Control's practice to ensure that the materials of construction as ordered through Fisher match the materials of construction as requested by the customer.

<u>Response No. 25</u>:    Pursuant to the procedures for the processing of orders implemented by Fisher, Northeast was constrained to relay customer specifications with reference to Fisher-designated stock numbers for the component parts requested. For customer specifications which match Fisher parts numbers in all respects including materials of construction, that is a matter of determining the appropriate Fisher part number(s). For customer orders for materials of construction which are not co-determinate with Fisher parts numbers, the materials of construction were specified by Northeast within the notes section of the Fisher OPS, which notes, once inputted by Northeast personnel into the Fisher OPS, were electronically transmitted to Fisher with no means for Northeast to reduce the OPS-inputted notes to writing, and which notes to the OPS were not returned back to Northeast by Fisher in the order acknowledgment, which only reflects the Fisher parts numbers. It is admitted that it is

Northeast's practice to ensure that the materials of construction specified by the customer are relayed to Fisher.

Request for Admission No. 26:    Admit that, in placed an order for a product with a manufacturer, an independent sales representative, such as you, has a duty to ensure that the materials of construction specified in writing by the customer are passed on to the manufacturer.

Response No. 26:    Objection.  This Request does not seek the "truth of a matter" as required by Rules 36 and 37(c) and asks instead for a conclusion of law to which no response is required.

Objection.  As phrased, this request is overly broad, unduly vague and incapable of any meaningful response.  By way of further response and for purposes of illustration only, assuming the materials specified by "the customer" were either unavailable through the manufacturer or designated by the manufacturer as inappropriate or unsafe for the conditions, it is denied that such an unfailing duty would attach.

Request for Admission No. 27:    Admit that, in placing the order for the 629 Valve with Fisher, you did not ensure that the materials of construction specified in writing by Praxair were passed on to Fisher.

Response No. 27:    Denied.  By way of further response, see Response No. 8, supra.

Request for Admission No. 28:    Admit that you were negligent in placing the order for the 629 Valve with Fisher.

Response No. 28:    Denied.

FSUR 0110

Request for Admission No. 30:    Admit that your negligence in placing the order for the 629 Valve with Fisher was a proximate cause of your being named as a defendant in each of the Underlying Actions.

Response No. 30:    Denied.  Counts V and IX-XI of the *Second Amended Complaint* in the Underlying Action captioned *Olson v. Motiva Enterprises, et al.*, states the alleged bases for Northeast being named as a defendant.

Request for Admission No. 31:    Admit that your negligence in placing the order for the 629 Valve with Fisher was a proximate cause of Fisher being named as a defendant in each of the Underlying Actions.

Response No. 31:    Denied.  Counts V and IX-XI of the *Second Amended Complaint* in the Underlying Action captioned *Olson v. Motiva Enterprises, et al.*, states the alleged bases for Fisher being named as a defendant.

Request for Admission No. 32:    Admit that the 629 Valve was not defective in its design, except to the extent that the materials of construction deviated from the materials specified by Praxair.

Response No. 32:    It is admitted that the 629 Valve was not defective in its design; and denied that any deviation by Fisher from the materials specified by Praxair made the Valve "defective" in any manner.

FSUR 0111

Request for Admission No. 33:    Admit that the 629 Valve was not defective in terms of its manufacture, except to the extent that the materials of construction deviated from the materials specified by Praxair.

Response No. 33:    After reasonable investigation, and based upon information known or readily available, Northeast Controls is unable to either admit or deny whether the 629 Valve was "defective in terms of its manufacture" as much of the 629 Valve was destroyed in the fire and explosion and prohibited, as Northeast Controls understands, any meaningful determination as to whether its manufacture was defective.

Request for Admission No. 34:    Admit that the presence of nearly 100 percent pure oxygen creates a significant fire hazard.

Response No. 34:    It is denied that the presence of nearly 100 percent pure oxygen, in and of itself, "creates a significant fire hazard".

Request for Admission No. 35:    Admit that, because of fire risks, systems for holding and transporting nearly pure oxygen must be meticulously designed, constructed, cleaned and maintained in order to avoid oxygen explosions.

Response No. 35:    Objection. This Request as phrased is overly broad, unduly vague, and incapable of any meaningful response. By way of further response, Fisher possesses the expertise necessary to evaluate, design and construct systems for holding and transporting nearly pure oxygen and committed itself to "meeting the intent of Praxair's specifications" in responding to Praxair's July 28, 1999, RFP (NECF0253-79).

FSUR 0112

Request for Admission No. 36:    Admit that your attorney Thomas Wagner met with Bruno Karcher of Becht Engineering prior to your settlement of the action brought against you by Great American, which action is at issue in this litigation.

Response No. 36:    It is admitted that Thomas Wagner, Esquire, met with Bruno Karcher of Becht Engineering prior to Northeast's settlement of the Underlying Litigation which is at issue in this litigation.

Request for Admission No. 37:    Admit that, prior to your settlement of the action brought against you by Great American, which action is at issue in this litigation, you believed the Becht Engineering had formed the opinion that you were negligent in regard to the ordering of the 629 Valve.

Response No. 37:    See Response No. 40, *infra*.

Request for Admission No. 38:    Admit that, prior to your settlement of the action brought against you by Great American, you believed that Becht Engineering had formed the opinion that your negligence in ordering the 629 Valve caused or contributed to the fire that occurred on may 20, 2000, at the Delaware City Power Plant.

Response No. 38:    See Response No. 40, *infra*.

Request for Admission No. 39:    Admit that you settled the action brought against you by Great American because you believed that the testimony of Becht Engineering would be devastating to your defense of the action brought against you by Ronald and Carol Olson.

Response No. 39:    See Response No. 40, *infra*.

<u>Request for Admission No. 40</u>:    Admit that you settled the action brought against

you by Great American because you believed that the testimony of Becht Engineering would

have an adverse effect on your defense of the action brought against you by Ronald and Carol

Olson.

<u>Response No. 40</u>:    Denied as stated. It is admitted only that the decision to settle the

Great American action was made in part because of concerns that the opinions Becht

Engineering proposed to offer could have had an adverse affect on Northeast Controls' defense of

the Olson action.


<u>Request for Admission No. 41</u>:    Admit that you settled the action brought against

you by Great American because you believed that you had separate and independent exposure

for your own negligence in the action brought against you by Great American.

<u>Response No. 41</u>:    Denied. By way of further response, what Northeast lacked was

the defense of the economic loss doctrine and warranty limitations which provided the bases for

Fisher's summary judgment dismissal from the Underlying Litigation, by *Memorandum Opinion*

and accompanying *Order* dated April 26, 2004. Northeast's continued participation in the

Underlying Litigation potentially exposed it to any liability which might have otherwise been

found against Fisher without regard to any "separate or independent" exposure for which

Northeast might potentially have been liable.

FSUR 0114

<u>Request for Admission No. 42</u>:     Admit that you settled the action brought against you by Great American because you believed that you had separate and independent exposure for your own negligence in the action brought against you by Great American.

<u>Response No. 42</u>:     Denied. *See* Response No. 41, *supra*.

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN

<u>/s/Joseph Scott Shannon</u>
Joseph Scott Shannon, Esq. (I.D. 3434)
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899 – 8888
tel.: 302.552.4329
e-mail: jsshannon@mdwcg.com
*Counsel for Plaintiffs*

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
Thomas Wagner, Esquire
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
*Of Counsel for Plaintiffs*

Dated: August 10, 2007

# EXHIBIT 12

# Serry - Tech, Inc.

20 ELLSWORTH AVENUE • MORRISTOWN, NJ 07960 • (973) 538-8231 • FAX (973) 538-5887

August 23, 2007

Thomas P. Wagner, Esq.

Marshall, Dennehey, Warner, Coleman & Goggin

1845 Walnut Street

Philadelphia, PA 19103-4797

Re: Northeast Controls, Inc. & St. Paul Mercury Ins. Co. v. Fishers Controls, Int'l.
    U.S.D.C., District of Delaware, Civil Action No: 1:06-CV-00412 (SLR)

Dear Mr. Wagner:

As you requested, I have considered what impact the seals of the Isolation Valve, 83HV0629 ("629"), would have had on the propagation of the oxygen line fire that occurred on May 20, 2000 at the battery limits of the Praxair Air Separation Unit (ASU) and a Gasifier, which was part of the Delaware City Power Plant (DCPP) Recovery Project located in Delaware City, Delaware. In performing this analysis I have referred to three previous reports that I issued that provide my qualifications, analysis and conclusions regarding the cause of the oxygen line fire and which I am incorporating by reference.[1]

In order to place this analysis in context with the May 20, 2000 oxygen line fire I have restated the description of the fire incident that I provided in my December 27, 2004 report, as follows:

> "On May 20, 2000, the ASU at the DCPP attempted its first delivery of about 99.6% pure oxygen at its design condition of 1150 psig and 250° F to the gasifier located on the refinery side of the DCPP. The gasifier uses the oxygen in a process

---

[1] The reports refer to those dated December 27, 2004, January 19, 2005, and February 22, 2005 that were provided to Delia Clark, Esq., Rawle & Henderson LLP, One South Penn Square, Philadelphia, PA 19107.

to generate syngas which is then used as the fuel in gas turbine driven electrical generators. Up until this point the ASU had been commissioned and operated with the Isolation Valve, 83HV0629 ("629") closed, thereby acting as a barrier to prevent any gas from being transmitted to the gasifier. There was also a check valve provided after the 629 that prevented any backflow of gas from the gasifier. The procedure to deliver 1150 psig oxygen involved the use of a Base Line Oxygen Compressor (BLOC) that pressurized the oxygen produced in the ASU to its design pressure which was then recirculated it until needed by the gasifier whereupon the 629 is opened. It was during this first attempt to deliver 1150 psig oxygen to the gasifier that the fire incident occurred.

With the oxygen pressurized and available for transmission to the gasifier, the operator initiated the prescribed procedure for opening the 629. Since the piping downstream of the 629 was initially at atmospheric conditions, the procedures called for opening the 629 sufficient to only allow about 10% of the design flow to pass through until the line downstream was within 10 psig of the pressure upstream of the 629, at which point the valve was to be fully opened. At first the operator called for a few percent of opening, but the 629 actuator controls did not acknowledge that the valve had opened. After a few further attempts the operator called for Mr. Olson, an operating supervisor, to go look at the 629 and see if the instrument air line, which is used by the 629 actuator, was on. After a few minutes, Mr. Olson was at the 629 and communicated to the operator that the air line was on. The operator then opened the 629 to its full 10% opening, as Mr. Olson stood near the valve to see if the 629 actuator responded to the opening command. Mr. Olson thought he saw the actuator move; however, the operator still received no confirmation on his control panel. After a few minutes of observation Mr. Olsen stated that he sensed that something was wrong and started to leave the area. As he did so, the area around the 629 flange failed resulting in a violent discharge of flame. The flame front reached Mr. Olson before he could exit the area and consequently incurred injuries"

2

As to the cause of the fire, I summarized in my February 22, 2005 report the position I had held in my previous reports, namely, that "it is clear that the fire incident that originated in the upstream CS line was a result of excessive oxygen velocity in combination with debris (acting as an ignition source) and coke dust (acting as a fire promoter) that were present in the upstream CS line during the filling of the downstream line to the gasifier by the fractional opening of the 629 valve." Moreover, I also reiterated the conclusion that "... the 629 valve seal material played no role in this fire incident." These were my conclusions then and they are so now. I should also note that Dr. Robert A. Mostello, Fisher's expert at the time, in his report issued on January 3, 2005, independently arrived[2] at the same conclusions, as to the cause of the fire, as I did and also concluded, as I did, that the valve seals "were not implicated in the initiation of the fire."

Combustion of CS Pipe Melted 629 Body Containing Seal

To assist in visualizing the sequential process of the fire I have provided the following figure from my December 27, 2004 report:



---

[2] I was first aware of Dr. Mostello's findings weeks after I issued my report. I issued a February 22, 2005 sur-rebuttal report after reviewing his report, among others, in which I commented on their findings.

FSUR 0118

The piping upstream of the 629 valve consisted of a carbon steel (CS) pipe and flange. The 629 valve body, flange and valve disc were made of Hastelloy C (a nickel based, non-sparking alloy) which, in turn, was attached to a discharge pipe made of Monel (also a nickel based, non-sparking, alloy).

The fire originated in the CS pipe upstream of the CS pipe flange, as shown in the figure, when the valve was opened slightly thereby directing the oxygen flow towards the inside surface of the CS pipe. The debris and coke laden flow struck the CS pipe and ignited. The ensuing fire expanded very rapidly since the flowing oxygen continually removed the combustion products and provided fresh oxygen to promote combustion of the CS piping. The CS piping burned radially outwardly as well as axially down the CS pipe. The temperature of the combustion gases flowing down the CS pipe were approximately 3100°F, based on various sources involving the injection of pure oxygen into molten steel.

The first outward evidence of the fire occurred when the radially outwardly burning fire penetrated the CS pipe whereupon the oxygen, at 1150 psig, depressured through the breach at supersonic speed which further accelerated the burning process. During and before the latter event the action of the flowing oxygen was to, in effect, create a "blowtorch" at the entry of the 629 valve. Two of the many consequences of this aggressive combustion were to melt the periphery of the heavy sectioned 629 valve disc (Hastelloy C melts at about 2500°F) and adjoining areas on the 629 valve body (also made of Hastelloy C) which contained the seal.

The four ounce seal contained within the 629 valve body would have combusted within seconds of the CS piping igniting since the seal, if it were made of either Kel-F or Tefzel[3], would have ignited at either about 760°F, if it had been Kel-F or 450°F, if it had

---

[3] There was some controversy as to which seal, Kel-F or Tefzel, was used in the 629 valve, so I've analyzed the hypothetical impact of both.

4

been Tefzel. In either case, the almost instantaneous contact with the 3100°F flame from the combustion of the CS piping and flange would have incinerated these seals before they would have had any significant impact on the relatively large masses of either the 629 valve body or disc. The extensive material loss of the valve body and valve disc was effectively due to the sustained combustion of the CS piping and flange upstream of the 629 valve.

If, instead of Kel-F or Tefzel, a seal made of Monel had been used, which was one of the possible seals available for the 629 valve, the situation would not have been significantly different. With Monel, the ignition temperature is about 2160°F which means that it would have taken a few seconds longer to reach its potential ignition temperature in the face of the approximately 3100°F flame than either Kel-F or Tefzel, but it too would have been consumed quickly since in order for the Monel to function as a seal it must readily deform which means that the seal is made of very thin sections of Monel which would have allowed rapid heating to its ignition temperature.

### The Impact of the Seal as an Accelerant Was Inconsequential

As I have just discussed, the impact of the approximately 3100°F flame acting alone on the 629 valve internals and body was sufficient to rapidly incinerate the seal, regardless of the seal material used. However, for the purpose of this hypothetical analysis, I also considered the possible damage to the 629 valve, and components downstream, by the combustion of either Kel-F, Tefzel, or Monel seals for the few seconds they would have survived in the approximately 3100°F flame.

One way of considering the possible impact of the seal combustion is to compare the heat contributed by the combustion of the seal as compared to the heat contributed by the combustion of the CS piping and flange. Based on a study of the various photographs of the damaged 629 valve and the associated piping, I estimated that the amount of CS combusted amounted to about 100 lbs., or possibly more.

5

The potential heat contributed by combustion of various components can be estimated by multiplying the Heat of Combustion of the material times the weight of the material combusted. In this case, the heat generated from the combustion of the CS was about 100 lbs. times the Heat of Combustion for CS (about 1800 BTU/lb) or 180,000 BTUs. For a Kel-F or Tefzel seal, the amount of heat contribution would have been about 0.25 lbs times their Heats of Combustion (which cover the range from 1800 to about 3900 BTU/lb) to yield a potential heat contribution of about 450 BTU to about 975 BTU. This represents about 0.25% to 0.54% of the heat generated by the combustion of the CS alone. Clearly, if either Kel-F or Tefzel had been used as a seal material, neither of these seals would have had any significant impact on fire damage observed on the 629 valve and its adjoining piping.

If Monel (with a PTFE backup ring) had been used as the seal material then the amount of heat it would have contributed would have been about 0.5 lbs. times their combined Heats of Combustion of about 1100 BTU/lb to yield a heat contribution of about 550 BTU or about 0.3% of the heat generated by the combustion of the CS alone. Again, as in the case of Kel-F and Tefzel, the impact on the damage observed on the 629 valve and its adjoining piping would have been insignificant.

<u>Conclusions</u>

Based on the foregoing analysis it is my opinion, within a reasonable degree of engineering certainty, that:

1. The heat generated by the combustion of the CS piping and flange upstream of the 629 valve was alone sufficient to explain all of the extensive damaged exhibited by the 629 valve and the piping downstream of the 629 valve.
2. Regardless of the seals that might have been used in the 629 valve (Kel-F, Tefzel or Monel), the potential heat contribution they could have made are fractions of a percent of the heat energy provided through the combustion of the CS piping alone. And even this small amount of heat contribution would have only occurred for a few seconds after which the seal materials would have been consumed.

6

3.  Consequently, this analysis has shown that regardless of the seals available to the 629 valve, none would have played a significant or measurable role in the damage that was observed either upstream or downstream of the 629 valve.

Sincerely,

Gerard Muller, PE

**GERARD MULLER, PE**  
**20 Ellsworth Avenue**  
**Morristown, NJ 07960**

**Tel: 973- 538- 8231**  
**Fax: 973- 538- 5887**  
**gm-stitech@att.net**

### PROFILE

Broad based background resulting from varied technical responsibilities entailing design through commissioning and operation of mechanical systems for refining, chemical, and production plants and power generation services. Extensive experience in the application of engineering technology to legal issues.

### CAREER HISTORY

SERRY-TECH, INC.                                              1986 - Present

A consulting organization that provides services in the areas of plant reliability assessment, technology services for attorneys and machinery technology training. Major assignments and accomplishments have included:

- **Expert technical consultant in litigation** dealing with machinery system damage/losses, environmental hazards, patent challenges, machinery contractual issues and personal injury resulting from machinery maloperation or process system failure. Testimony specifically cited by several Federal Appeals Courts in arriving at decisions upholding and overturning lower court decisions in patent cases.
- Established and directed industrial development of **advanced process analysis system** for Exxon Research.
- Performed **Machinery Reliability Audits** for eight major plants consisting of refineries, chemical plants, and power plants located in the US and abroad.
- **Directed multi-national Technical & Economic Evaluation Team** for $200 million of compression equipment including industry's most powerful steam turbines and centrifugal compressors for LNG service in a Persian Gulf refining complex.
- Performed **Technical Audit of process machinery** and other project support services for a 1.5 billion dollar FCC project for a Korean refining complex.
- **Directed multi-national Technical & Economic Evaluation Team** for $100 million gas turbine driven gas reinjection centrifugal compressors operating at industry's highest pressures for a Persian Gulf production complex.
- Developed and presented **training courses** dealing with process machinery analysis and operation for refining and chemical plants.

EXXON RESEARCH & ENGINEERING COMPANY                  1969 - 1986

Major project and technical responsibilities for the application of process compression and power generation equipment:

- Team leader in the application of process compression and power generation systems; responsible for **design evaluations, project management and field commissioning**.
- Conceived, developed, and project managed **computerized machinery analysis systems** for eight refining and production facilities worldwide.
- Conceived and developed award winning, **hand-held computer based monitoring and analysis system** for machinery and process data collection.

FSUR 0123

Responsible for development and application of advanced machinery diagnostic procedures and project engineering associated with major plant expansions, which included:

- Developing **design evaluation criteria for thrust and journal bearings and turbine blading** used throughout Exxon for equipment evaluation.
- **Evaluation and selection of machinery** (turbines, motors, diesel engines, centrifugal & reciprocating compressors, gears, and pumps) for major European refinery expansions.
- Commissioning of all **process and power generation machinery** for a French refinery expansion.

Led multi-disciplined technical services group in supporting plant operations at an Australian petrochemical plant:

- Responsible for performance analysis and development of **Safe Operation Procedures** for compression and pumping services.
- Developed **performance measurement technology** for centrifugal & reciprocating compressors and turbines credited with major operational and maintenance cost savings.
- As **consultant to Australian gas production** facility, successfully resolved compression system failures threatening gas supply to City of Melbourne.

PRATT & WHITNEY AIRCRAFT COMPANY                 1963 - 1969

Performed mechanical design and analysis for advanced flight and industrial applications of gas turbines. Granted US patent for turbine design developments.

## EDUCATION

M.S. in Mechanical Engineering, University of Connecticut
B.S. in Mechanical Engineering, Polytechnic University of New York

## AFFILIATIONS & AWARDS

- Licensed Professional Engineer, State of New Jersey
- Member, American Society of Mechanical Engineers
- Awarded "Best Paper" dealing with machinery vibration analysis, Instrument Society of America
- Recipient of R.N. Pond Award (highest national honor in Chemical/Petroleum division) for development of a machinery monitoring hand-held computer system, Instrument Society of America
- Conference Chairman, Engineering Foundation 5th Mechanical Signature Analysis Conference

Expert Trial Witness History of Gerard Muller, P.E.

| Case Title | Hartford Steam Boiler Insurance Co. v. Cummins Power Co. |
|---|---|
| Court | Superior Court, Hartford Connecticut |
| Docket/I.D. No. | |
| Law Firm/Atty. | Howard, Kohn, Sprague, Hartford, CT / Todd W. Whitford |
| Representing | Defendant as an Expert Trial Witness |
| Case Summary | CPC accused by HSB/CIGNA of performing inadequate maintenance resulting in failure of two standby diesel generators |

| Case Title | Honeywell v. Hamilton Sundstrand |
|---|---|
| Court | Federal District Court, Wilmington, DE |
| Docket/I.D. No. | 99-309 (GMS) |
| Law Firm/Atty. | Kirkland & Ellis, New York, NY / Jonathan Putnam |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | HS accused of infringing on APU Compressor Surge Control patent. HS countersued claiming patents not viable and non-infringing alternatives available. |

| Case Title | TI Group Automotive Systems v. VDO North America |
|---|---|
| Court | Federal District Court, Wilmington, DE |
| Docket/I.D. No. | 00-432 (GMS) |
| Law Firm/Atty. | Clifford Chance, New york, NY / Drew Wintringham III |
| Representing | Defendant as an Expert Trial Witness |
| Case Summary | VDO accused of infringing on a Fuel Pump patent |

Expert Trial Witness History of Gerard Muller, P.E., (cont.)

| Case Title | Spotless Enterprises v. A&E Products Group |
|---|---|
| Court | U.S. District Court, Eastern District of New York |
| Docket/I.D. No. | Civil Action No. CV-01-7815 |
| Law Firm/Atty. | Scully, Scott, Murphy & Presser/ Peter I. Bernstein |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | Defendant accused of patent infringement of various plastic garment hangers. |

| Case Title | John Rizzuto v. L. A. Wengner Contracting |
|---|---|
| Court | Supreme Court of the State of NY, County of Suffol;k |
| Docket/I.D. No. | Index No. 93-10399 |
| Law Firm/Atty. | Grey & Grey, LLP / Robert E. Grey |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | Defendant accused of negligence during pressure testing resulting in a personell injury |

| Case Title | Tappan Wire & Cable v. County of Rockland |
|---|---|
| Court | Supreme Court of the State of NY, County of Rockland |
| Docket/I.D. No. | Index No. 3273/00 (WKN) |
| Law Firm/Atty. | Granick Silverman & Hecker |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | Defendant accused of negligence operating a diesel generator resulting in failure of allowing a release of 25M gallons of raw sewage |

FSUR 0126

Expert Trial Witness History of Gerard Muller, P.E., (cont.)

| Case Title | Wheeler v. ICON Heallth & Fitness and Sears & Roebuck |
|---|---|
| Court | Supreme Court of the State of New York, County of Richmond |
| Docket/I.D. No. | Index No: 113199 |
| Law Firm/Atty. | Sullivan Papain Block McGrath & Cannavo/ Paul N. Schlemmer |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | Defendant accused of defective design of an exercise treadmill resulting in an injury to a child |

| Case Title | Center Capital Corp. v. Optima Machine & Design |
|---|---|
| Court | Bergen County Court House, New Jersey |
| Docket/I.D. No. | BER-L-010429-04 |
| Law Firm/Atty. | Abe Rappaport/ William Fishkin |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | Defendant accused of profiding a CNC lathe incapable of achieveing claimed repeatability tolerance |

| Case Title | Honeywell v. Hamilton Sundstrand |
|---|---|
| Court | Federal District Court, Wilmington, DE |
| Docket/I.D. No. | 03-1153-GMS |
| Law Firm/Atty. | Kirkland & Ellis, New York, NY / Jonathan Putnam |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | HS accused of infringing on APU Compressor Surge Control patent. |

FSUR 0127

Expert Trial Witness History of Gerard Muller, P.E., (cont.)

| Case Title | Estate of Brandon Jones v. TEPPCO, et al |
|---|---|
| Court | Court of Common Pleas, Butler County, Ohio |
| Docket/I.D. No. | 2003-08-2077 |
| Law Firm/Atty. | Katz, Greenberger & Norton/Richard Norton |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | Defendant accused of actions resulting in death of a contractor's employee |

| Case Title | Honeywell v. Hamilton Sundstrand |
|---|---|
| Court | Federal District Court, Wilmington, DE |
| Docket/I.D. No. | 99-309 (GMS) |
| Law Firm/Atty. | Kirkland & Ellis, New York, NY / Jonathan Putnam |
| Representing | Plaintiff as an Expert Trial Witness |
| Case Summary | Remand Proceeding to establish foreseeability of technology |

FSUR 0128

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORTHEAST CONTROLS, INC.,<br>3 Enterprise Avenue<br>Clifton Park<br>New York, NY 12065<br><br>ST. PAUL MERCURY<br>INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN 55102<br><br>            Plaintiffs,<br><br>v.<br><br>FISHER CONTROLS INTERNATIONAL, LLC<br>205 S. Center Street<br>Marshalltown, Iowa 50158<br><br>            Defendant. | C.A. No.: 06-412 SLR<br><br>**DEFENDANT'S MOTION TO<br>COMPEL DEPOSITIONS OF<br>MICHAEL PETERS AND<br>ALBERT CAPPELLINI** |

In accordance with Fed. R. Civ. P. 37(a), defendant Fisher Controls International, LLC hereby moves this Court for an order (1) compelling plaintiffs to produce for deposition Albert Cappellini and Michael Peters and (2) ordering plaintiffs and/or plaintiffs' counsel to pay Fisher its costs in bringing this Motion, including reasonable attorneys' fees.

In support of this Motion, Fisher alleges as follows:

1.      Fisher duly noted the depositions of Northeast Controls employees Michael Peters and Albert Cappellini and worked with plaintiff's counsel to schedule those depositions at a time and place convenient to the witnesses.

2.    In a letter dated August 16, 2007, plaintiffs' counsel suddenly changed course and informed Fisher that plaintiffs would not produce those witnesses for depositions.

3.    Plaintiffs have not provided an adequate reason for their position. Plaintiffs apparently refuse to produce these witnesses because Fisher has filed a motion to amend its counterclaim. The pendency of that motion is irrelevant to the question whether the witnesses should be deposed. Plaintiffs' own claims rest on the testimony of Mr. Peters (president of Northeast Controls). Further, this case arose out of an order processed by Northeast Controls. Mr. Cappellini, an employee of Northeast Controls, was deeply involved in Northeast Controls' handling of that order. Regardless whether the Court grants Fisher's motion to amend its counterclaim, the testimony of Peters and Cappellini is central to the claims and defenses in this action. Given the importance of their testimony, plaintiffs should be compelled to produce them for deposition.

4.    Counsel for Fisher made a good-faith attempt to resolve this issue before bringing this Motion to Compel. Counsel for plaintiffs has refused to provide a timely response to Fisher's requests that this issue be resolved and the witnesses produced.

5.    Fisher therefore respectfully requests that the Court enter an order (1) compelling plaintiffs to produce Messrs. Peters and Cappellini for deposition at a time and place of Fisher's choosing (within reason) and (2) ordering plaintiffs and/or plaintiffs' counsel to pay Fisher's costs incurred in bringing this Motion, including reasonable attorneys' fees.

6.    In support of this Motion, Fisher offers the Memorandum of Law, the Affidavit of Daniel J. Gunter filed in support of Defendant's Motion to Amend Counterclaim, and the Affidavit of Daniel J. Gunter filed concurrently with this Motion.

MARON MARVEL BRADLEY
& ANDERSON, P.A.

/s/ Paul A. Bradley
Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant
Fisher Controls International, LLC

*OF COUNSEL*

**RIDDELL WILLIAMS P.S.**
Patrick D. McVey, Esquire
Daniel J. Gunter, Esquire
1001 Fourth Avenue Plaza,
Suite 4500
Seattle, WA 98154

Date:  August 24, 2007

## CERTIFICATE OF SERVICE

I, Paul A. Bradley, Esquire, hereby certify that, on August 24, 2007, I caused a true and

correct copy of the Defendant's Motion to Compel Depositions of Michael Peters and Albert

Cappellini to be served upon counsel of record via electronic filing.

MARON MARVEL BRADLEY
& ANDERSON, P.A.

/s/ Paul A. Bradley
Paul A. Bradley (DE Bar ID #2156)
1201 N. Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19899
(302) 428-0180 (fax)
pab@maronmarvel.com
Attorney for Defendant
Fisher Controls International, LLC

*OF COUNSEL*

**RIDDELL WILLIAMS** P.S.
Patrick D. McVey, Esquire
Daniel J. Gunter, Esquire
1001 Fourth Avenue Plaza,
Suite 4500
Seattle, WA 98154


Date: August 24, 2007

# EXHIBIT 14

DAVID P. POPE, PH.D.
624 ST. ANDREW ROAD
PHILADELPHIA, PA 19118

PHONE: 215-247-7234
FAX: 215-247-7554

8/30/07

Thomas P. Wagner
Marshall, Dennehey, Warner, Coleman & Goggin
1845 Walnut St.
Philadelphia, PA 19103

RE: NEC v. Fisher

Dear Mr. Wagner,

I am writing to supplement my previous two reports in this matter dated 1/3/05 and 2/22/05.

In my two previous reports I discussed the role of the various materials used in the construction of the valve, the role of the gas velocity through the valve at the time of the incident, the effects of debris in the dead leg of the piping, and the geometric relationship of the various components to the origin of the fire and direction of its propagation. Rather than repeat those discussions here, I incorporate them into the current report by reference.

Since I wrote those reports it has been suggested that even if the non-exempt material used in the construction of the subject valve was not the origin of the fire, the presence of that material aided the spread of the fire, making the fire worse than it otherwise would have been. I do not agree with this conclusion, for the following reasons:

As stated in my 1/3/05 report, I concluded that the origin of the fire was in the carbon steel piping upstream of valve 629 in the 9:00 to 10:00 o'clock position. The bases for this conclusion are stated in that report and will not be repeated here. Given that the fire initiated in the carbon steel pipe, and that the volume and weight of this pipe are very large compared to that of the non-exempt material in the valve, the presence of such a small amount of non-exempt material had no discernible effect on the spread of the fire. Once the fire initiated upstream of valve 629 in the carbon steel, the amount of combustion products flowing through the valve was huge compared to the total amount of non-exempt material in the valve.

FSUR 0133

1

In summary, I conclude to a reasonable degree of engineering certainty that the non-exempt material in the valve had no discernible effect on this fire, neither on the initiation nor on the spread of the fire. The final result would have been the same, with or without the non-exempt material in the valve.

Sincerely,

David P. Pope, Ph.D.

| DAVID P. POPE, DEPOSITIONS | | | |
|---|---|---|---|
| | | 8/02-8/07 | |
| **CAPTION** | **DATE** | **VENUE/COURT** | **INDEX NO.** |
| High Concrete Structures, Inc. v. New enterprise Stone and Lime Co., et al | 12/18/2002 | US District Court for the Eastern District of PA | 02-CV-86 |
| Arlene & Gina Rockey, Inc. v. Cordis Corp. | 7/11/2003 | US District Court Southern District of Florida | 02-22555-CIV |
| Raul Merced & Vilma Merced v. JLG Ind., Inc. et al | 10/28/2003 | US District Court Massachusetts, Central District Section | 4:00 CV 40146 |
| Merritt vs. Anderson Windows, Inc., et al | 2/27/2004 | Superior Crt. of NJ, Ocean County. | OCN-L-1449-01 |
| Arlene & Gina Rockey, Inc. v. Cordis Corp. | 3/17/2004 | US District Court Southern District of Florida | 02-22555-CIV |
| Perlman vs. Virtua Health, et al | 10/29/2004 | US District Court, New Jersey | 01-00651(SMO) |
| Ball v. Bayard Pump and Tank Co. et al | 1/5,6/05 | Court of Comm. Pleas, Montgom. Cnty, PA | 99-06438 |
| Eby v. Thompson, et al | 2/26/2005 | Superior Crt. of Del. Sussex Cnty. | 03C-10-010 |
| Coleman v. Galaxy Tire and Wheel, et al | 7/1/2005 | Superior Crt. Of New Jersey, Middlesex Cnty | MID-L-5669-03 |
| Lotz v. Signature Farms, et al | 8/11/2005 | Circuit Crt. of MI, Van Buren Cnty. | 04-52-204-NO |
| Royal Insurance Co. of America v. Coast Foundry and Manuf. Co. | 11/23/2005 | Circuit Crt. of MD, Montgomery Cnty | Civ. Action # 257789-V |
| Jimmy Santiago v. Clark Equip. Co. & Terex Co. | 12/13/2005 | US District Court, Eastern District of PA | Civil Action # 04-CV-722 & -3775 |
| Neil Langanbach v. Aluma-Pole Corp. | 8/8/2006 | Superior Crt. Of NJ, Essex Cnty. | ESX-L-0744-04 |
| Kristina M. Leonard v. Cooper Industries, LTD., et al | 11/1&15/06 | US District Crt., Western District of PA | No. 05-254J |
| Nationwide Mut. Ins. Co. vs. National RV Holdings, et al | 1/22/2007 | US District Crt., Middle District of PA | |
| Hagerty v. Galaxy Tire, et al | 2/12/2007 | District Crt. Wyandotte Cnty, Kansas Civil Crt. District | No. 05 CV 1165 |
| Karen Pappas v. Larrison Coal and Fuel, Inc. | 8/9/2007 | Superior Crt. Of NJ Law Div., Monmouth Cnty | MON-L-4910-05 |
| | | | |

FSUR 0135

### DAVID P. POPE, COURT TESTIMONY
#### 8/02-8/07

| CAPTION | DATE | VENUE/COURT | INDEX NO. |
|---|---|---|---|
| Charles Reinhardt vs. Keeper Corp. et al | 9/24/2003 | Crt. of Common Pleas Phil. County, PA | May term 2001 No. 2198 |
| Phillip Sardone vs. John Tilley Ladders Co. | 5/12/2004 | Supreme Crt. of New York, Kings Cnty | 79107/97 |
| Ocean Spray Cranberries, Inc. v. Refrigerated Food Distirbutors, Inc., et al | 11/22/2004 | Crt. of Comm. Pleas Phila. County, PA | 162 |
| Stephen Smith v. FKI Industries, et al | 12/8/2004 | Crt. Common Pleas, Schuylkill Cnty, PA | 2020-96 |
| Lotz v. Signature Farms, et al | 2/1/2006 | Circuit Crt. of MI, Van Buren Cnty. | 04-52-204-NO |
| National Mutual Ins. Co. vs. Nat. RV Holdings, et al | 4/4/2007 | US District Crt., Middle District of PA | |
| John Schramm vs. SEPTA | 4/12/2007 | Crt. of Comm. Pleas Phila. County, PA | |
| Ottaviano vs. Genex, et al | 4/24/2007 | NY Supreme Crt. Erie Cnty | 1999-10365-TP3 |
| | | | |
| | | | |
| DEP.&_CRT.TEST.5.yrs.8.30.07.xls | | | |

FSUR 0136

*CURRICULUM VITAE*
**David Peter Pope**

| | |
|---|---|
| **Education** | 1961 - B.Sc., Engineering Science, University of Wisconsin, Madison, Wis., USA<br>1962 - M.S., Materials Science, California Institute of Technology, Pasadena, Calif., USA<br>1967 - Ph.D., Materials Science, California Institute of Technology, Pasadena, Calif., USA |
| **Positions Held**<br>January 1967 to<br>July 1968 | Post-doctoral Fellow - California Institute of Technology |
| August 1968 | Assistant Professor, School of Metallurgy and Materials Science<br>University of Pennsylvania |
| July 1973 | Associate Professor, Department of Materials Science and Engineering<br>University of Pennsylvania |
| July 1982 | Professor, Department of Materials Science and Engineering<br>University of Pennsylvania |
| July 1984 to<br>Nov. 1988 | Associate Dean, Undergraduate Education<br>School of Engineering and Applied Science<br>University of Pennsylvania |
| Nov. 1988 to<br>June 1992 | Chairman, Department of Mechanical Engineering<br>University of Pennsylvania |
| June 1992 to<br>August 1994 | Chairman, Department of Materials Science and Engineering<br>University of Pennsylvania |
| August 1994 to<br>July 1997 | Associate Dean, Undergraduate Education<br>School of Engineering and Applied Science<br>University of Pennsylvania |
| July 2003 to<br>July 2006 | Ombudsman<br>University of Pennsylvania |
| July 1997 to<br>Present | Professor, Department of Materials Science and Engineering<br>University of Pennsylvania |

-1-

FSUR 0137

**Honors/Distinctions**

    National Science Foundation "Creativity Award"
    Sigma Xi
    Tau Beta Pi
    Fellow, ASM International
    S. Reid Warren Teaching Award, Univ. of PA

**Professional Activities** (since 1989)

    Member, Advisory Committee, Metals & Ceramics Division, Oak Ridge National Laboratory, 1988-90; Chair, 1990.
    Co-organizer, International Symposium on High Temperature Aluminides and Intermetallics, Indianapolis, IN, 10/1-5/89, ASM/AIME
    Member, International Committee, International Conference on the Strength of Metals and Alloys, Israel, July 1991.
    Member, Board of Directors, Friends of the Wissahickon, 1989-.
    Member, Visiting Committee for the Division of Humanities, University of Virginia, School of Engineering and Applied Science, 1989.
    Co-organizer, Symposium on Alloy Phase Stability and Design, Materials Research Society, April, 1990.
    Co-organizer, Symposium on High Temperature Ordered Intermetallic Alloys, Materials Research Society, November, 1990.
    Co-organizer, International Conference on Intermetallic Compounds and Composites, TMS, Fall, 1991.
    President, Friends of the Wisshickon, 1992-1998
    Chair, Peer Review Committee, Intermetallics Research Program, NASA Lewis 1992.
    Editorial Board, Journal of Intermetallics, 1992 - 1997.
    Co-orginizer, Int'l Conf. on High Temperature Intermetallics, ASM, May 1994
    Co-organizer, Int'l Conf. on High Temperature Intermetallics, ASM, May 1997
    Organizer, 4th International conference on Ultra-High Purity Metallic-Base Materials, Sept., 1997.

**Research Interests**

    Deformation and fracture of intermetallic compounds, crystal growth, high temperature fracture, strength of metal-ceramic interfaces, ductile to brittle transition.

**Publications (Recent, from approximately 200 publications)**

    "The Effects of Boron on the High Temperature Ductility of Iron and Steel", Scripta Met., 20, 1785-90 (1986), with P.L. Li and E.P. George.

    "Creep Ductility of CrMoV Steels: Impurity and Microstructural Effects", Scripta Met., 20, 1775-80 (1986), with E.P. George and S.-H. Chen.

    "Creep Cavitation in Iron I: Sulfides and Carbides as Nucleation Sites", Acta Met., 35, 2471-86 (1987), with E.P. George and P.L. Li.

-2-

FSUR 0138

"Creep Cavitation in Iron II: Oxides as Nucleation Sites", Acta Met., 35 (1987), 2487-95 with E.P. George and P.L. Li.

"Creep Damage Nucleation Sites in Ferrous Alloys", Mat. Sci. Eng., A103, 97-102 (1988), with J.E. Benci and E.P. George.

"The Tensile Ductility of Fe-3.5 Si at Elevated Temperatures: Impurity Effects", Scripta Met., 23, 109-112 (1989), with C.P Warner and J.E. Benci.

"Environmental Embrittlement: The Major Cause of Room-Temperature Brittleness in Ni$_3$Al", Scripta Met. et Mat. 27, 365-70 (1992), with E. P. George and C. T. Liu.

"An Atomistic Study of the Dislocation Core Structures and Mechanical Behavior of a Model DO$_{19}$ Alloy", Mat. Sci. Eng., A152 (1992), pp. 95-102, with J. Cserti, M. Khantha, and V. Vitek.

"An Atomistic Study of Dislocations and their Mobility in a Model DO$_{22}$ Alloy", Mat.Sci. Eng., A152 (1992) pp. 89-94, with M. Khantha and V. Vitek.

"The Influence of Grain Boundary Geometry on Intergranular Crack Propagation in Ni$_3$Al", Acta Met. 41, 553-62 (1993), with H. Lin.

"Stability and Thermal Properties of the Cubic Laves Phase Hf$_{30}$V$_{55}$Nb$_{15}$", Scr. Met. et Mat. 28, 331-36 (1993), with F. Chu.

"Intrinsic Ductility and Environmental Embrittlement of Binary Ni$_3$Al", Scripta Met. et Mat., 28, 857-62 (1993), with E. P. George and C. T. Liu.

"Deformation Twinning in Intermetallic Compounds - the Dilemma of Shears vs. Shuffles", Mat. Sci. Eng., A170, 39-47 (1993), with F. Chu.

"Twinning in Intermetallic Compounds - Are Long Sear Vectors and/or Shuffles Really Necessary?", J. Mater. Sci. Technol., 9, #5, (1993), pp 313-321, with F. Chu.

"A Combined Experimental and Analytical Investigation of Creep Damage Development in Copper", Acta Met. et Mat. 42, 225-238 (1993), J. E. Benci and J. L. Bassini.

"Atomic Force Micrcroscopy Observations of Iron-Sapphire Fracture Surfaces", Mat. Sci & Eng., A176, 405-409 (1994), with M.A. Smith, and J. Y. Josefowicz.

"Grain Boundary Faceting and Twinning in Complex Intermetallic Compounds, Phil. Mag. A, Phil. Mag. A, 69, 409-20 (1994), with F. M. Chu.

"Dynamic and Static Strain Aging Effects in Fe-Modified L1$_2$Al$_3$Ti", Acta Met. et Mat., 42, 3577-3580 (1994), with Z.L. Wu and V. Vitek

-3-

FSUR 0139

"Plastic Deformation of Cr-Modified L1$_2$Al$_3$Ti: (I) Flow Behavior", Phil.Mag. A, 70, 159-169 (1994), with Z.L. Wu and V. Vitek.

"Plastic Deformation of Cr-Modified L1$_2$Al$_3$Ti: (II) Weak Beam TEM Study of Dislocation Structures", Phil. Mag. A, 70, 171-183 (1994), with Z.L. Wu and V. Vitek.

"Effect of Vacuum on Room Temperature Ductility of Ni$_3$Al", with E.P. George and C.T. Liu, Scr. Met. et Mat., 30, 37-42 (1993).

"Atomistic Modelling of Planar Faults, Dislocations and Twins in a Non-Cubic Intermetallic Compound", Modelling Simul. Mater. Sci. and Eng., 2, 587-596, (1994), with M. Khantha and V. Vitek

"Texture and Grain Boundary Character Distribution in Recrystallized Ni$_3$Al Sheets", Scripta Met. et Mat., 30, 1409-1412 (1994), with Hui Lin.

"The Brittle-to-Ductile Transition - I: A Cooperative Dislocation Generation Instability", Scr. Met. et Mat., 31, 1349-1354 (1994), with M. Khantha and V.Vitek.

"Dislocation Generation Instability and the Brittle-To-Ductile Transition", Mat. Sci. and Eng., A192/193, 435-442 (1995), with M. Khantha and V.Vitek.

"Environmental Embrittlement and Other Causes of Brittle Grain Boundary Fracture in Ni$_3$Al", E. P. George, C.T. Liu, H. Lin, and D. P. Pope, Mat. Sci. and Eng., A192/193, 277-288 (1995).

"Mechanical Behavior of Ni$_3$Al: Effects of Environment, Strain Rate, Temperature and Boron Doping", E. P. George, C. T. Liu, and D. P. Pope, Acta Met. et Mat., 44, 1757-1763 (1996).

"High Temperature Applications of Intermetallic Compounds", D. P. Pope and Ram Darolia, MRS Bulletin, 21, #7, 30-36 (1996).

"Impurities, Toughness and Intermetallic Compounds: An Overview", Phys. Stat. Sol.(A), 160, 481-486, (1997).

"Review of Trace element Effects on High-temperature Fracture of Fe- and Ni-Base Alloys", Phys Stat. Sol., 167, 313-333, (1998), with E. P. George and R. L. Kennedy.

"Deformation of Hf-V-Nb Laves Phase Alloys", Y. Kimura, D. Pope, and D. Luzzi, Trans. Nonferrous Met. Soc. China, 9, 169-79, (1999).

"Deformation of a Hf-V-Nb Laves Phase Alloy", Y, Kimura, D. E. Luzzi, and D. P. Pope, in Proceedings of the 3rd International Workshop on Ordered Intermetallic Alloys and

-4-

Composites, Trans. Nonferrous Met. Soc. China, 9, Suppl. 1, Dong-Liang Lin, Editor, Beijing, PRC, (1999) pp 169-79.

"Temperature-Dependent Onset of Yielding in Dislocation-Free Silicon: Evidence of a Brittle-to-Ductile Transition", R. H. Folk II, M. Khantha, D. P. Pope, and V. Vitek, in Fracture and Ductile vs. Brittle Behavior - Theory, Modelling, and Experiment, G. Beltz, Robin L. Blumberg Selinger, Kyung-Suk Kim and M. Marder, Editors, Materials Research Society, Warrendale, PA, USA, (1999) pp 161-167.

"Deformation of polysynthetically twinned TiAl single crystals with near-hard orientations", Min-Chul Kim, M. Nomura, V. Vitek and D. P. Pope, in High-Temperature-Ordered Intermetallic Alloys VIII, E. George, M. Mills and M. Yamaguchi, Editors, MRS Symposium Proceedings, (1999) p. KK3.1.1.

"Deformation of Two-Phase Alloys Based on C15 Laves Phase $HfV_2 + Nb$", Y. Kimura, D. E. Luzzi, and D. P. Pope, in High-Temperature-Ordered Intermetallic Alloys VIII, E. George, M. Mills and M. Yamaguchi, Editors, MRS Symposium Proceedings, (1999).

"Deformation of Polysynthetically Twinned TiAl single crystals with near-hard orientations: experiments and atomistic simulations", M. Nomura, Min-Chul Kim, V. Vitek and D. P. Pope, in Gamma Titanium Aluminides 1999, Y. W. Kim, D. M. Dimiduk, and M. H. Loretto, Editors, TMS, Warrendale, PA, (1999) pp 67-73.

## Books/Chapters in Books

"Embrittlement of Ferrous Alloys Under Creep Conditions", in: Embrittlement of Engineering Alloys, C.L. Briant and S.K. Banerji, Editors, Treatise on Materials Science and Technology, Vol. 25, Academic Press, 1983, NY, pp. 125-155.

"Strength and Ductility of Intermetallic Compounds", in: Superalloys, Supercomposites and Superceramics, J.K. Tien and T. Caulfield, Editors, Academic Press, 1989, San Diego, CA, pp. 583-624, with C.T. Liu.

High Temperature Aluminides and Intermetallics, S.H. Whang, C.T. Liu, D.P. Pope and J.O. Stiegler, Editors, TMS, Warrendale, PA (1990).

High Temperature Aluminides and Intermetallics, Proceedings of the Second International Conference, S.H. Whang, D.P. Pope, and C.T. Liu, Editors, Elsevier Science, England (1992).

High Temperature Ordered Intermetallic Alloys, IV, J.O. Stiegler, D.P. Pope, and L. Johnson, Editors, MRS, Pittsburgh, PA (1991).

Alloy Phase Stability and Design, G. Malcolm Stocks, D. P. Pope and A. F. Giamei, Editors, MRS, Pittsburgh, PA (1991).

High Temperature Intermetallics, Proceedings of the Third International Conference, D.P. Pope, S.H. Whang and C.T. Liu, Editors, Elsevier Sequoia S.A., Lausanne, Switzerland (1995).

"Ni$_3$Al and Its Alloys", C.T. Liu and D.P. Pope, in: Intermetallic Compounds, vol. 2: Practice, J.H. Westbrook and R.L. Fleischer, Editors, John Wiley & Sons, West Sussex, England (1995), pp 17-51.

"Anomalous Yield Behavior of Compounds with the Ll$_2$ Structure", V. Vitek, D.P. Pope and J.L. Bassani, in: Dislocations in Solids, Volume 10: L1$_2$ Alloys, F.R.N. Nabarro and M.S. Duesberry, Editors, Elsevier, the Netherlands, (1996) pp.135-185.

"The Mechanical Properties of Intermetallic Compounds", in: Physical Metallurgy, 4th edition, R. W. Cahn and P. Haasen, Editors, Elsevier Science BV, the Netherlands (1996), pp 2076-2104.

High Temperature Intermetallics, Proceedings of the Fourth International Conference, D.P. Pope, S.H. Whang and C.T. Liu, Editors, Elsevier Sequoia S.A., Lausanne, Switzerland (1997).

Proceedings of the Fourth International Conference on Ultra-High Purity Metallic-Base Alloys, D. P. Pope, T. Egami, and C. J. McMahon, Editors, Phys. Stat. Sol.(a), Wiley -VCH, Weinheim, Germany, (1998).

"Temperature-Dependent Onset of Yielding in Dislocation-Free Silicon: Evidence of a Brittle-to-Ductile Transition", R. H. Folk II, M. Khantha, D. P. Pope, and V. Vitek, in Fracture and Ductile vs. Brittle Behavior - Theory, Modelling, and Experiment, G. Beltz, Robin L. Blumberg Selinger, Kyung-Suk Kim and M. Marder, Editors, Materials Research Society, Warrendale, PA, USA, (1999) pp 161-167.

"Ni$_3$Al and Its Alloys", C.T. Liu and D.P. Pope, in: Intermetallic Compounds, vol. 2: Practice, J.H. Westbrook and R.L. Fleischer, Editors, John Wiley & Sons, West Sussex, England, 2003.

FSUR 0142

# EXHIBIT 15

⌐ORIGINAL⌐

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NORTHEAST CONTROLS, INC. and )
ST. PAUL MERCURY INSURANCE )
COMPANY, )
        Plaintiffs, )
                    )CA# CV-06-412
- against- )
                   )
FISHER CONTROLS )
INTERNATIONAL, LLC, )
        Defendant. )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

          DEPOSITION OF NORTHEAST CONTROLS, INC., a
Plaintiff, by and through their representative,
MICHAEL J. PETERS, conducted pursuant to Notice at
the law offices of THORN, GERSHON,   TYMANN & BONANNI,
5 Wembley Court, Albany, New York, on October 22, 2007,
commencing at approximately 9:30 a.m. before Lynne
Billington, a Shorthand Reporter and Notary Public in
and for the State of New York.

          A P P E A R A N C E S:

FOR THE PLAINTIFFS:
      MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
      1845 Walnut Street
      Philadelphia, PA 19103
      By: Thomas P. Wagner, Esq.

FOR THE DEFENDANT:
      RIDDELL WILLIAMS
      1001 Fourth Avenue Plaza, Suite 4500
      Seattle, WA  98154
      By: Daniel J. Gunter, Esq.

ALSO PRESENT:
      Mary Elizabeth Slevin, Esq.        FSUR 0143
      Meredith Miller (via phone)

P.O. Box 222
Glenmont. N.Y. 12077

Dianne E. Wilson
Professional Reporting Service

(518) 767-9102

62

1    A    It is.  It is.

2    Q    Okay.

3         There are oral discussions between the sales

4    representative and a customer as to specifications for

5    a product.  It's also good general business practice to

6    confirm those specifications in writing, isn't it?

7    A    It is.

8    Q    And if Praxair and Northeast Controls agreed

9    on a set of specifications for a Fisher product,

10   Northeast Controls would not have made a practice to

11   substitute different specifications to Fisher without

12   first obtaining Praxair's agreement, right?

13   A    Correct.

14   Q    In 1998, Northeast Controls understood that

15   Praxair was in the industrial gases industry, correct?

16   A    Absolutely.

17   Q    You understood that part of Praxair's work

18   was specifically in the oxygen service industry,

19   correct?

20   A    Yes.

21   Q    And Northeast Controls did not hold itself

22   out as being an expert in oxygen service, correct?

23   A    Correct.

FSUR 0144

63

1    Q    Northeast Controls did know, though, that

2  there are hazards associated with oxygen service,

3  correct?

4    A    Yes.

5              MR. GUNTER:   This is Deposition

6  Exhibit 35.

7

8              (NEC Exhibit Number 35 was marked for

9  identification.)

10

11   Q    (By Mr. Gunter) Mr. Peters, handing you

12  what's been marked as Deposition Exhibit 35, I'd ask

13  you to review that briefly.

14   A    (Witness complies.)

15        Finished.

16   Q    Okay.

17        Having reviewed Deposition Exhibit 35,

18  Mr. Peters, have you previously seen that document?

19   A    I believe I have, yeah.

20   Q    Okay.

21        And this document is headed Material

22  Guidelines for Gaseous Oxygen Service, correct?

23   A    Yes.

FSUR 0145

98

1    A    Well, you know, I think that, you know,

2 referring back to some of the questions you had asked

3 about -- I may not get them exactly right, but did

4 the -- referring to the differences between the Praxair

5 specifications and the order that was sent to Fisher

6 and why -- I mean, and the fact that they were

7 different.  And it's important to point out that -- for

8 me to point out, that something probably happened here.

9 We just don't -- we just don't take our people, don't

10 just take a customer specification sheet like that,

11 ignore it and write the order any way they choose.

12    Q    That would not be your expectation, that that

13 would occur, right?

14    A    Correct.  They just don't write it any way

15 they choose.  There is a reason -- there is probably a

16 reason why this order -- this -- referring to the

17 12-inch valve spec sheet --

18    Q    You're identifying --

19    A    Exhibit 36.

20    Q    -- Exhibit 36, yeah.

21    A    That there's a reason why the Monel trim

22 wasn't in there.

23    Q    Your expectation would be, though, that the

FSUR 0146

99

 1  reason for that difference would be documented,

 2  wouldn't it?

 3      A    You know, I would.  And I kind of feel like

 4  we're all at a loss as to whose responsibility it was

 5  to do the documenting and why we can't lay our hands on

 6  it.  I'm a little frustrated with that.

 7          But, you know, I think the -- taking a couple

 8  of sections here, if you look back at Exhibit 38, this

 9  history regarding the 12-inch valve, although it

10  doesn't point it out, Bert says in a couple places,

11  geez, you know, I'm not sure why the difference is.

12          I think you might be aware that the control

13  valve, as ordered, did comply with Praxair's

14  specifications, their basic specifications for valves

15  for the pressure, pressure drop and temperature of

16  oxygen.  And that, you know, more than likely, is

17  probably the cause for the difference.  And, you know,

18  Bhim Bhakoo -- I mean, there's a lot of business

19  conducted on the phone.  Bhim very rarely, I

20  understand, cared to use the electronic facilities like

21  fax and e-mail at the time.  And it was a big project

22  for him.

23          I mean, I don't know who lost it, I don't

FSUR 0147

P.O. Box 222
Glenmont, N.Y. 12077

Dianne E. Wilson
Professional Reporting Service

(518)767-3102

100

1    know where it is, but it's clear to me that something's

2    missing here.  Something is missing.  And that the

3    valve that was actually ordered was probably identical

4    to the one for a reason.

5        Q    But you don't know of a document that tells

6    us what that reason is?

7        A    No, I don't.

8             And, you know, we just can't find telephone

9    notes; we can't find, you know, other documents and

10   whatnot.  But what we do know is that the order for

11   this 12-inch valve just didn't -- just wasn't invented

12   out of thin air.  You know, it was changed.  There are

13   differences for a reason.  And more than likely, the

14   cause for that is the fact that -- would be borne out

15   by the fact that it does comply with the Praxair

16   specifications, not the purchase order, but the

17   specifications which Bert was used to using.  So --

18       Q    So, you agree, though, it doesn't comply with

19   the purchase order, correct?

20       A    Correct.  I mean, it's right there.

21       Q    And you agree that Fisher manufactured the

22   valve in accordance with its discussions and

23   information from Northeast Controls, correct?

FSUR 0148

102

1  leaders in oxygen service, correct?

2     A   Sure.

3     Q   All right.

4        Mr. Peters, good business practice would have

5  been to have and maintain a document -- let's drop

6  back.

7        If there were discussions that were other

8  information transmitted by Praxair to Northeast

9  Controls regarding materials of construction for the

10  valve, good business practice would have been to

11  document those discussions in writing, confirm them

12  with the customer, correct?

13     A   Yes.

14     Q   And good business practice would have called

15  to maintain those documents so that they could be found

16  in the event of a dispute with the customer for any

17  reason down the road, correct?

18     A   Yes.

19     Q   And whatever we have at the end of the day,

20  we do not have maintained documentation that connects

21  up the documents initialed by Bhim Bhakoo on behalf of

22  Praxair and the order information as transmitted to

23  Fisher by Northeast Controls for this 12-inch valve,

FSUR 0149

103

1    correct?

2        A    We -- you know, there are things we don't

3    have and there are things that we do have.  What we

4    don't have, what you suggested, that's just as clear as

5    a bell.  And then -- and then with that said, as I've

6    indicated before, Bert, and his legendary detailed

7    diligence, does not invent specifications.  It was

8    there -- it had to be there, in all probability, for a

9    reason.

10          And then the fact that the 12-inch valve was

11   ordered per Praxair specifications for that pressure

12   and temperature of oxygen service tells me that there

13   was something that was transacted someplace along the

14   way.

15       Q    Again, though, that something that was

16   transacted along the way was not any -- documentation

17   was not retained, correct?

18       A    Well, we can't find it, if it is.

19          And, you know, you tell me.  Was Bhim Bhakoo

20   supposed to -- was Bert's agreement with Bhim Bhakoo

21   that Bhim Bhakoo would send Bert a note and he failed

22   to do that?  Was Bert supposed to confirm that back?

23   Don't know.  Can we find phone notes?  No.  But what we

FSUR 0150

104

1   do -- I don't know that.  What we do know is Bert's

2   practices as an employee as an inside engineer is such

3   that he is very, very diligent and doesn't commit

4   errors to that degree.

5        Q    If, in fact, he or someone else at Northeast

6   Controls simply, the term you used, tell me if it's

7   fair, made up specifications, if that happened, that

8   would be a serious error, wouldn't it?

9        A    Terrible.  It would be terrible.

10       Q    An error like that would -- I ask you as a

11  business person.  You understand that an error like

12  that, first would expose a company to potential

13  litigation simply for a breach of warranty or contract,

14  correct?

15       A    Yeah.

16       Q    If an incident like the one on May 20th, 2000

17  at the Delaware City Power Plant repowering project, if

18  that occurs, you can anticipate that -- if there is an

19  error like that -- that is, simply making up the

20  specifications, that that's likely to result in

21  litigation over that incident and the role of the

22  customer's involvement of the company supplying the

23  product?

FSUR 0151

132

C E R T I F I C A T E

1

2

3        I, Lynne Billington, a Shorthand Reporter and

4    Notary Public in and for the State of New York, do

5    hereby certify that the foregoing is a true, correct

6    and complete transcript of the testimony of MICHEAL J.

7    PETERS taken on October 23, 2007 in the proceedings as

8    mentioned in the heading hereof, to the best of my

9    knowledge, and belief

10        IN WITNESS THEREOF I hereby set my hand

11    this 30th day of October, 2007.

12

13

14    *Lynne Billington*
      LYNNE BILLINGTON, Notary Public

15

16    My commission expires:
      December 14, 2010

17

18

19

20

21

22                                          FSUR 0152

23

# EXHIBIT 16



UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NORTHEAST CONTROLS, INC. and       )
ST. PAUL MERCURY INSURANCE         )
COMPANY,                           )
          Plaintiffs,              )
                                   )
– against–                         )CA# CV-06-412
                                   )
FISHER CONTROLS                    )
INTERNATIONAL, LLC,                )
          Defendant.               )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

          DEPOSITION OF NORTHEAST CONTROLS, INC., a
Plaintiff, by and through their representative,
ALBERT CAPPELLINI, conducted pursuant to Notice at the
law offices of THORN, GERSHON, TYMANN & BONANNI,
5 Wembley Court, Albany, New York, on October 24, 2007,
commencing at approximately 9:30 a.m. before Lynne
Billington, a Shorthand Reporter and Notary Public in
and for the State of New York.


          A P P E A R A N C E S:

FOR THE PLAINTIFFS:
          MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
          1845 Walnut Street
          Philadelphia, PA  19103
          By: Thomas P. Wagner, Esq.

FOR THE DEFENDANT:
          RIDDELL WILLIAMS
          1001 Fourth Avenue Plaza, Suite 4500
          Seattle, WA  98154
          By: Daniel J. Gunter, Esq.

ALSO PRESENT:
          Meredith Miller (via phone)                FSUR 0153

3

1                       ALBERT CAPPELLINI,

2    was called as a witness by the Defendant and, having

3    been first duly sworn, testified as follows:

4

5                          EXAMINATION

6

7    BY MR. GUNTER:

8

9        Q    Mr. Cappellini, could you state your full

10   name and spell your last name for the record, please?

11       A    Albert Cappellini, C-a-p-p-e-l-l-i-n-i.

12       Q    And what is your residence address,

13   Mr. Cappellini?

14       A    868 Edgewater Drive, Amherst, New York 14228.

15       Q    Are you currently employed?

16       A    Yes.

17       Q    And by whom are you employed?

18       A    Northeast Controls.

19            MR. WAGNER:  I'm sorry, Counsel, to

20   interrupt.

21            Stipulations?

22            MR. GUNTER:  Same as we had yesterday.

23            MR. WAGNER:  Same as we had in the other

FSUR 0154

43

1    litigation?

2        A    Right.  Yes.

3        Q    But this document purports to have been sent

4    to Bert at Northeast Controls, correct?

5        A    Correct.

6        Q    And it would have been your practice in June

7    of 1998 to receive a document such as this from

8    Praxair, correct?

9        A    Correct.  Yeah.

10       Q    And do you have any reason to think that you

11   did not receive this document from Praxair?

12       A    Yes.  I mean, I -- could have been that I did

13   not receive this document directly, since it was a

14   purchase order; so, it would be handled by someone else

15   in the office.

16       Q    It would have gone to Northeast Controls,

17   correct?

18       A    Yeah.

19       Q    Would this document have been transmitted by

20   Northeast Controls to Fisher?

21       A    No.

22       Q    Let's turn to -- and here, if you look down

23   at the bottom, there are Bates stamps on these, and if

FSUR 0155

47

```
 1      A    Yeah.  That's my handwriting down at the

 2  bottom.

 3      Q    That "change to 300 pounds A31A per bus

 4  covert"?

 5      A    Yes.  Correct.

 6      Q    Okay.

 7           Does that help you recognize the other

 8  handwriting on this?

 9      A    I just don't know if that's my handwriting or

10  not.

11      Q    Would you have transmitted this purchase

12  order in this form to Fisher?

13      A    No.

14      Q    Okay.

15           An order would have been transmitted to

16  Fisher, correct?

17      A    Correct.

18      Q    And that order would have been transmitted

19  electronically to Fisher, correct?

20      A    Yes.

21      Q    And information would have been entered into

22  the Fisher OPS and then transmitted electronically to

23  Fisher, correct?
```

FSUR 0156

1      A    Yes.

2      Q    Who would have been responsible for entering

3  the information into the Fisher OPS for this particular

4  order, if you remember?

5      A    I don't remember exactly who did that.

6      Q    It would have been somebody at Northeast

7  Controls?

8      A    Somebody at Northeast Controls, yes.

9      Q    Okay.  Let's look at NECF 158.  You see that?

10          If we look down at the bottom of the page, we

11  see Item Number 11 there.  Do you see that?

12     A    Yes.

13     Q    And we see identified as a 12-inch automatic

14  valve with a unit price of $32,151.13, correct?

15     A    Correct.

16     Q    If we turn the page to NECF 159, see that?

17     A    Yes.

18     Q    And this states, "In accordance with buyer's

19  Drawing A-2272740 dated 6/3/98 attached hereto and made

20  a part thereof."  You see that?

21     A    Yes.

22     Q    And identified Tag 83HV0629, correct?

23     A    Yes.

FSUR 0157

P.O. Box 222
Glenmont, N.Y. 12077

Dianne E. Wilson
Professional Reporting Service

(518) 767-3102

1     Q    We have a drawing number, A-2272740, and

2  that's dated 6/3/98, correct?

3     A    Yes.

4     Q    And if we look back to Exhibit 47 -- see

5  that?

6     A    Uh-huh.

7     Q    And if we look at that, we see -- at NECF

8  116, right, we see Drawing Number A-2272740, correct?

9     A    Correct.

10     Q    And that's the same drawing number that's

11  identified in Exhibit 37 at NECF 159, correct?

12     A    Correct.

13     Q    Okay.

14     And the drawing is dated 6/3/98, correct?  It

15  is at NECF 116.

16     A    Yes.

17     Q    And that is the date identified in the

18  purchase order at 6/3/98, correct?

19     A    Yes.

20     Q    It would have been Northeast Controls'

21  practice in June 1998 to review the purchase order and

22  to enter the order on the Fisher OPS in accordance with

23  the customer's purchase order, correct?

FSUR 0158

50

1     A    Correct.

2     Q    And that practice would have called for

3  entering the order on the Fisher OPS in accordance with

4  the document that is identified as Drawing A-2272740

5  dated 6/3/98, correct?

6     A    Yes.

7     Q    And we have one document that's identified as

8  Drawing A-2272740 and dated 6/3/98, correct?

9     A    Correct.

10     Q    And we've identified a number of times what

11  the disk, seat, guide and stem material are on that

12  document, correct?

13     A    Yes.

14     Q    And those are Monel and Monel/PTFE for the

15  seat material, correct?

16     A    Yes, they are.

17     Q    You had a subsequent communication regarding

18  the 83HV0629 valve with Fisher, correct?  Before

19  5/20/2000, you spoke with Mr. --

20          You're looking blank there.  Let me try

21  again.

22     A    Yeah.

23     Q    You spoke with Mr. Dave Whalen regarding the

FSUR 0159

1   document identified here as Praxprod 42 in Exhibit 36

2   and the materials of construction of the valve on

3   Exhibit 44, correct?

4       A    Correct.

5       Q    And we see that the -- well, we don't need to

6   go through them again.  We've gone through them many

7   times.

8           You were able, on May 22, 2000, to determine

9   the materials of construction for the HV0629 valve,

10  correct?

11      A    On May 22nd?

12      Q    May 22nd, 2000, you were able to identify

13  those materials of construction?

14      A    Yes.

15      Q    And you informed Praxair of those materials

16  of construction?

17      A    Yes, I did.

18      Q    A couple more minutes with Exhibit 36 and

19  Praxprod 42 in there.

20          Looking at Exhibit 36 at Praxprod 42, we look

21  up at the top, we see that -- under Line 3 we see P1,

22  psia 1167 maximum and normal level 1167.  You see that?

23      A    Yes.

FSUR 0160

P.O. Box 222
Glenmont, N.Y. 12077

Dianne E. Wilson
Professional Reporting Service

(518) 767-3102

1    A    Yes.

2    Q    And you, at that time, tried to capture the

3    information that you had in your memory as to the

4    product history for the valve, 12-inch valve that we've

5    been discussing today --

6    A    Correct.

7    Q    -- correct?  Okay.

8    And we start off with a -- with -- in the

9    first paragraph you, quote, explain a little bit about

10   the process that we go through with Praxair on how

11   valves are speced and quoted, correct?

12   A    Correct.

13   Q    And that talks generally about the process

14   for purchasing -- excuse me, for the placement of an

15   order by Praxair for a Fisher valve through Northeast

16   Controls, right?

17   A    Yes.  Yeah.

18   Q    Now, then we continue down into the body of

19   the second paragraph, and we've covered this some today

20   with the documents, but if we look down about a third,

21   maybe not quite halfway in and see -- if I can direct

22   you there, directing your attention into the middle of

23   the second paragraph, there's a sentence that starts

FSUR 0161

1  6/24/98, you get the confirming purchase order in

2  writing on 6/26/98, right?

3      A    Correct.

4      Q    And that would have been the practice when

5  you got an order from Praxair, if it was made verbally

6  or orally, that order would then be followed up with a

7  written purchase order, right?

8      A    Right.

9      Q    If there was an oral -- or some people call

10 it verbal purchase order, verbal instruction for a

11 purchase order, and there wasn't a written confirmation

12 of the purchase order following, a written purchase

13 order following, you'd follow up -- somebody at

14 Northeast Controls would follow up with Praxair and ask

15 where the written purchase order was, right?

16     A    Correct.

17     Q    Okay.  Let's return to Exhibit 38 and that

18 second paragraph -- or last paragraph on Page 2, quote,

19 an order then was sent in to Fisher Controls, period.

20 The order went through Fisher Marshalltown order entry

21 system and was detailed per what we had requested on

22 the order and a serial card was generated, right?  See

23 that?

FSUR 0162

1  4-inch valve was speced and constructed ...

2       A    Correct.  Correct.

3       Q    So, this indicates that the change was to

4  the -- that what you're referring to here was to the

5  12-inch valve, right?

6       A    If that's -- I don't know.  I can't -- if

7  that's the way I was writing this, I just don't --

8       Q    You don't recall right now, right?  You don't

9  recall right -- one way or another right now whether it

10  was a 4-inch or the 12-inch?

11      A    Right.  I don't remember what I was writing

12  here and what I was thinking at the point.

13      Q    In June and July 1998, it was the practice of

14  Northeast Controls to transmit to Fisher the

15  specifications for product that was being ordered by a

16  customer that would match the specifications agreed to

17  by Northeast Controls and the customer, right?

18      A    The practice?  Yes.  Yeah.

19      Q    That was your practice.  Yeah.

20           You wouldn't transmit to Fisher

21  specifications for a product that differed from the

22  specifications agreed to by Northeast Controls and its

23  customer, right?

FSUR 0163

```
 1      A    No.

 2      Q    No?  What would those be?

 3      A    You mean the part numbers for the valve?

 4      Q    Yeah.

 5      A    In Northeast terms, or Fisher terms, it would

 6  be the model number of all the components.

 7      Q    Okay.  Would have called for you -- good

 8  practice would have called for you to review this

 9  purchase order, which is Exhibit 37, against buyer's

10  drawing A-2272740 dated 6/3/98, correct?

11      A    Correct.

12      Q    And if you had reviewed buyer's drawing

13  A-2272740 dated 6/3/98, the document which we've looked

14  at -- if you want to look at it again, we can pull it

15  out of Exhibit 36, Praxprod 42 -- that would have

16  called for an order on Fisher for valve HV0629 to have

17  Monel disk, seat material of Monel/PTFE, guide material

18  of Monel and stem material of Monel, correct?

19      A    This spec sheet would have indicated that?

20      Q    And this purchase order.  This purchase order

21  combined with the spec sheet would have indicated that,

22  correct?

23      A    If you're comparing the drawing numbers and
```

1  the tag number, yes.

2      Q    Okay.

3           And the drawing number and tag number are

4  identified in the purchase order, correct?

5      A    Correct.

6      Q    And it doesn't identify a different drawing

7  number or different tag number, correct?

8      A    Correct.

9      Q    And there's only one drawing number, 2272740,

10  right?

11      A    Yes.

12      Q    And one document that's dated 6/3/98 for that

13  drawing number, correct?

14      A    Yes.

15      Q    And the order that was transmitted to Fisher

16  for the HV0629 valve did not match Drawing Number

17  A-2272740, right?

18      A    Correct.

19           MR. GUNTER:  If I could have a moment

20  to --

21           MR. WAGNER:  Sure.

22           MR. GUNTER:  -- talk with my client, we

23  may be able to send Mr. Cappellini down the road.

FSUR 0165

130

```
 1              C E R T I F I C A T E

 2

 3          I, Lynne Billington, a Shorthand Reporter and

 4   Notary Public in and for the State of New York, do

 5   hereby certify that the foregoing is a true, correct

 6   and complete transcript of the testimony of ALBERT

 7   CAPPELLINI taken on October 24, 2007 in the proceedings

 8   as mentioned in the heading hereof, to the best of my

 9   knowledge, and belief

10          IN WITNESS THEREOF I hereby set my hand

11   this 30th day of October, 2007.

12

13

14          _____
                LYNNE BILLINGTON, Notary Public
15

16   My commission expires:
     December 14, 2010
17

18

19

20

21

22

23
```

FSUR 0166

P.O. Box 222
Glenmont, N.Y. 12077

Dianne E. Wilson
Professional Reporting Service

(518) 767-3102

EXHIBIT 17

AFO: 007 LD: ER CLM: VKS9909 H CMT: A-000-File Level INS: NORTHEAST CONTROLS INC
DOL: 05/20/2000 ST: DE Status: Active CH/SUPV: JWF /HAP TYPE:

| Date | Author | Topic | Subject | Free Form Subject | Clmt (Level) |
|---|---|---|---|---|---|
| 09/26/2006 11:18:05 | JEFFREY W FROCK - 007 | Litigation/Legal | Completed Attorney Retention | | 003 INJ - RONALD OLSEN |
| Panel counsel was retained to initiate a contractual indemnity action against Fisher Controls. | | | | | |
| 09/15/2006 15:59:15 | JEFFREY W FROCK - 007 | Investigation | Evidence | | 002 INJ - RONALD OLSEN |
| We have received Fisher's Answer. Their Answer included a Counterclaim against us. Our defense attorney, Tom Wagner, is now in the process of drafting his Reply to Fisher's Counterclaim. Oddly, the Counterclaim is not seeking money damages. They are simply seeking a credit towards any reimbursement they have to pay to us. <br><br> Once our Reply is filed, we will then proceed with preparing an filing a Motion and/or brief with the Court to enforce the terms of the contract between our insured and Fisher and seek indemnification from Fisher of our approx. $1.1 million in indemnity & expense payments. | | | | | |
| 08/07/2006 13:04:43 | JEFFREY W FROCK - 007 | Resolution Plan | Resolution Strategy | | 003 INJ - RONALD OLSEN |
| I received a return call from our Subrogation Department. They informed me that they do not handle liability claims pursuing recovery. Thus, I will continue to handle and monitor our efforts of recovery. | | | | | |
| 08/07/2006 13:03:46 | JANE WOODS - 295 | Management Review | File Management | | 000 FILE LEVEL |
| In Ron's absence, I called Jeff and advised that because this is a liability claim, the file will stay with the field office for pursuit of recovery. | | | | | |
| 08/07/2006 11:13:10 | JEFFREY W FROCK - 007 | Resolution Plan | Resolution Strategy | | 003 INJ - RONALD OLSEN |
| I placed a call into Ron Hoeck in our Subro Dept to see if this is a case his unit should be handling now that all claims by plaintiffs have been resolved. Ron was not in. I left message to call me back. | | | | | |
| 08/07/2006 11:11:55 | JEFFREY W FROCK - 007 | Litigation/Legal | Contacted Defense Counsel | | 003 INJ - RONALD OLSEN |
| File is being reviewed on diary. Our defense counsel, Bill Cattie $ Tom Wagner have initiated our contractual indemnification suit for defense and indemnity against Fisher Controls. We are waiting for Fisher to file their Answer to the Complaint. <br><br> I assume we will attempt to file a Motion to get the Court to rule upon the enforceability of the Representative Agreement between our insured and Fisher. <br><br> If the court does not grant our Motion, we will attempt to negotiate a compromise and consider mediation. | | | | FSUR 0167 | |
| 07/24/2006 10:10:04 | JAMES A | MCU | Review MCU | | 000 FILE |